IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ART SHY, et al. | |
| Plaintiffs, | |
| v. | Case No. 3:92-cv-00333 |
| | Judge Walter H. Rice |
| NAVISTAR INTERNATIONAL CORPORATIONAL, et al. | |
| Defendants. | |
| SUPPLEMENTAL BENEFIT COMMITTEE OF THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP. RETIREE SUPPLEMENTAL BENEFIT PROGRAM, | |
| Intervenor-Plaintiff, | |
| v. | |
| NAVISTAR INTERNATIONAL CORPORATION, | **ELECTRONICALLY FILED** |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF THE MOTION OF THE SUPPLEMENTAL BENEFIT COMMITTEE OF THE NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION RETIREE SUPPLEMENTAL BENEFIT PROGRAM TO INTERVENE**

This Motion to Intervene arises with respect to the execution of the settlement agreement between Plaintiffs Art Shy, the International Union, United Automobile Aerospace and Agricultural Implement Workers of America ("UAW") and other named plaintiffs, and the Navistar International Corporation ("Navistar" or the "Company") and other named defendants concerning certain life and health benefits made available to

retirees of the Company through various benefit arrangements.  In general, the Settlement Agreement creates a health and life insurance plan for retirees, as well as a Supplemental Benefit Program and Trust ("Supplemental Program"), which is intended to defray the cost of premiums, co-pays, and deductibles that retirees are required to pay to obtain benefits from the main plan.  The Settlement Agreement created the Supplemental Benefits Committee to serve as the Named Fiduciary and Administrator of the Supplemental Program.  The Committee is comprised of two members designated by the UAW, and three members representing various sub-classes of other Plaintiffs.

The initial funding of the Supplemental Program consisted of stock contributed by the Company.  The Company also agreed to make additional contributions based on its profitability, and the Settlement Agreement created the Supplemental Benefit Trust Profit Sharing Plan ("PSP") to receive, invest and make decisions with respect to those additional contributions.  The Committee is also the Named Fiduciary and Administrator of the PSP.

By this motion, the Committee seeks to intervene in this matter to represent the interests of the Supplemental Program, the PSP, and their participants and beneficiaries.  Since the Committee did not exist until the Settlement Agreement was approved, it was not a party to the original action, but it is now has the authority to represent the Supplemental Program and the PSP.  Assuming the Court grants the motion, the Committee is simultaneously filing a motion which seeks the aid of this Court in enforcing the terms of the Settlement Agreement so that the Committee may fulfill its fiduciary duty to protect the interests of the PSP participants and beneficiaries.  Despite multiple efforts, the Committee has not received the financial and other information it

needs to ascertain whether Navistar has appropriately fulfilled its obligations with respect to the Settlement Agreement or made all of the PSP contributions that it agreed to make in the Settlement Agreement.

## FACTUAL BACKGROUND

### 1. The Structure of the Supplemental Program

In 1992, the UAW, along with other named parties, commenced this class action seeking declaratory and injunctive relief against Defendant related to the provision of retiree medical benefits (the "Shy Litigation").  After extensive negotiations, on March 30, 1993, the parties to the Shy Litigation entered into a Settlement Agreement, which was approved by this Court on May 26, 1993.[1]  On June 30, 1993, the parties asked the Court to approve a few changes to the settlement, and it is this agreement that we have referred to as the "Settlement Agreement," and attached hereto as Exhibit A.

The plaintiffs agreed to allow Navistar to make significant changes to its retiree plans, but also insisted that the Company ameliorate the negative effect on the participants and beneficiaries by establishing the Supplemental Program to make up for the reductions in benefits and to defray the cost increases on the participants.  The funding of the Supplement Program consisted of two elements:  (1) Navistar was required to issue new common stock to the Supplemental Benefit Trust, in an amount to make the Supplemental Benefit Trust the owner of 50% of Navistar's then-outstanding common shares, and (2) Navistar was required to make ongoing contributions pursuant to a profit-sharing formula included in the Settlement Agreement, and as prescribed under the PSP.

---

[1] On June 8, 1993, the Court supplemented its opinion and again entered judgment approving the Settlement Agreement.

3

*See* Ex. A, p. 3.  The Settlement Agreement also created the Intervenor Committee herein to administer the Supplemental Program, including the PSP.  *Id.*

### 2. The Profit Sharing Payments

The parties drafted the plan document for the PSP, which in large part sets out the formulae for calculating the Company's contribution obligation using such metrics as "Qualifying Profits" from "Covered Operations" attributable to "Qualifying Hours."[2]  In order to allow the Committee to ascertain whether the Company's contributions have been calculated correctly, the PSP established several annual reporting and disclosures requirements to which the Company must comply.  The PSP further requires that the data that the Company provides on profits, hours worked, Qualifying Profits, and Qualifying Hours "shall be reviewed by a certified public accounting firm [. . .] and the report [. . .] shall be delivered to the UAW and the Supplemental Benefit Committee."  A letter report setting forth the procedures performed and conclusions reached must be prepared by such firm and delivered to the Company, the UAW and the Supplemental Benefit Committee." *Id*. at § 8.2.  Such reports must be delivered to the UAW and the Committee "on or before the date that the contribution obligation, if any, is required to be paid [. . .] [or if] no contribution obligation is required to be paid, the Company will deliver [the] information [. . .] to the UAW and the Supplemental Benefit Committee within 90 calendar days following the end of the plan year for which no contribution is required."  *Id*. at § 8.3.

Finally, the PSP requires Navistar to respond as soon as practicable to any reasonable requests from the Committee for information supporting any computation

---

[2]  The PSP is part of the Settlement Agreement approved by the Court, but we have set it out separately in Exhibit B for the convenience of the Court.

4

made to calculate the Contribution obligation, and provide such information as requested. *Id*. at § 8.6.

### 3. The Contribution History

Between the years 1995-2001, Navistar made significant contributions to the Profit Sharing Plan per its terms ranging from $126,070 in plan year 1997 to $71,568,920 in 2001, for an average of over $30 million per year. *See* Chart of Profit Sharing Payments, attached as Exhibit C. Between the years 2002 and 2010, however, Navistar has only made one contribution to the PSP, in the amount of $1.4 million, which it now claims was made in error and seeks to offset from any subsequent contribution it may make.

In or around 2005, Navistar was the subject of an investigation into its accounting practices by the Securities and Exchange Commission, and it informed the Committee that it was unable to provide accurate information pursuant to its PSP obligations. The Committee agreed to wait for the information. Navistar eventually released restated financial statements for the fiscal years 2004 and 2005 on December 7, 2007.

### 4. The Committee's Information Requests

Navistar has been consistently late in providing the required reports and schedules; indeed, most of the reports were just provided, two to three years after the applicable deadline, and the Committee still does not have several schedules and reports to which it is entitled.

On May 4, 2010, to address Navistar's non-compliance with the express terms of the PSP, the Committee sent the Company a letter expressing general and specific concerns relating to the schedules of Qualifying Profits that Navistar had provided, or

5

neglected to provide, to the Committee.  *See* May 4, 2010 Letter to Navistar, attached as Exhibit D.  On April 6, 2011, in response to the Committee's May 4, 2010 letter, the Company provided the Committee with a schedule that purported to show that there were no Qualifying Profits for plan year 2010.  *See* Ex. E.  The Company declined to respond to any of the other questions or concerns set forth in the Committee's May 4, 2010 letter.

Concerned about the lack of disclosure and the glaring discrepancy between the substantial contributions made in the early years versus the lack of contributions post-2002, the Committee retained an expert to evaluate the public information released by the Company to see whether the lack of contributions was based on actual financial performance, or whether the Company had made internal accounting and management decisions in order to shield profits in a manner that is inconsistent with the intent of the parties, as expressed in the Settlement Agreement.  Based on that review, the Committee sent a detailed request for information to Navistar on November 15, 2011.  *See* Nov. 15, 2011 Letter to Navistar, attached as Exhibit F.  The letter gave the Company sixty days to respond, but the Committee later agreed to extend the time to respond to ninety days.

On February 15, 2012, Navistar finally responded to the Committee's 2011 requests and promised a response to the Committee's 2010 request "in the near future."  However, the response consisted of a series of "General Objections" and summaries claiming to establish that the Company, despite its overall profitability, owed no profit-sharing contributions.  The Company flatly refused to respond to *any* of the Committee's questions about the components of the profit-sharing calculation that are set forth in the Settlement Agreement, claiming generally that it did not have to explain itself to the Committee.

6

.

## ARGUMENT

Rule 24 of the Federal Rules of Civil Procedure governs intervention both as a matter of right, and by the permissive authority of the court. In relevant part, it provides that:

> On timely motion, a court must permit anyone to intervene who: [. . .] (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of that action may as a practical matter impair or impeded the movant's ability to protect its interest, unless existing parties adequately represent that interest [. . .]; or the court may permit anyone to intervene who: has a claim or defense that shares with the main action a common question of law or fact. [. . .] In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Fed. R. Civ. P. 24 (2000); *see Purnell v. City of Akron*, 925 F,2d 941, 950-51 (6th Cir. 1991).

Regarding intervention as a matter of right, the Sixth Circuit has established four elements which must be satisfied before intervention will be granted: "(1) timeliness of the application to intervene, (2) the applicant's substantial legal interest in the case, (3) impairment of the applicant's ability to protect that interest in the absence of intervention, and (4) inadequate representation of the interests by parties already before the court." *Stupak-Thrall v. Glickman*, 226 F.3d 467, 471 (6th Cir. 2000) (citations omitted). All of these elements must be met for the motion to be granted. *Id.*

Regarding permissive intervention, Rule 24 should be "broadly construed in favor of potential intervenors." *Purnell*, 925 F.2d at 950. "So long as the motion for intervention is timely and there is at least one common question of law or fact, the balancing of undue delay, prejudice to the original parties, and any other relevant factors

7

is reviewed for an abuse of discretion." *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1240 (6th Cir. 1997).

I. **AS A MATTER OF RIGHT, THE COMMITTEE SHOULD BE ALLOWED TO INTERVENE TO PROTECT THE INTERESTS OF THE PARTICIPANTS AND TO FULFILL THEIR FIDUCIARY DUTIES UNDER THE SETTLEMENT AGREEMENT.**

A. **The Motion is Timely.**

The Sixth Circuit test for timeliness is evaluated in the context of all relevant circumstances, including:

> (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors know or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances mitigating against or in favor of intervention."

*Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990).

Though judgment in the Shy Litigation was entered in 1993, the responsibilities of the parties under the Settlement Agreement are ongoing. Indeed, this Court retained "exclusive jurisdiction to resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation" of the Agreement. *See* Ex. A, § 15.4. In pursuing this intervention, the Committee – an entity created to represent the interests of the participants and beneficiaries of the Supplemental Program and the PSP, both established by the Settlement Agreement – seeks to enforce the express terms of that very agreement.

The Company in its response complains about the Committee's requests for information relating to prior years. But that was necessitated in large part by Navistar's

8

request that the Committee hold off on any requests while it restated its financial statements. Thereafter, the Committee reached out several times to Navistar, but its response has been either extremely delayed, or in many cases, non-existent. Finally, the Committee concluded that Navistar was simply never going to respond in good faith and decided it had no choice other than to file these Motions.

It is self-evident that the intervention of the Committee for the sole purpose of enforcing the Settlement Agreement on behalf of the participants and beneficiaries of the Supplemental Program will not prejudice the parties to the original litigation. Put simply, there is no pending litigation to prejudice.

### B. The Committee's Substantial and Exclusive Interest in Acting in the Best Interests of the Participants Will Be Impaired Without Intervention.

"As the Program Administrator and Named Fiduciary of under the Supplemental Benefit Program, the Supplemental Benefit Committee is responsible for the administration of the Supplemental Benefit Program." *Id.* As the Named Fiduciary of the Supplemental Program and the PSP, the Committee has a substantial interest in ensuring that the Settlement Agreement is complied with by all parties, especially Navistar. Indeed, the parties explicitly granted the Committee the exclusive authority to administer the Plan, including "review[ing] and enforc[ing] [. . .] the Company's compliance with their obligations under the Supplemental Benefit Program." *See id.* at § 6.2(d). Thus, intervention under the circumstances here is not only consistent with the Settlement Agreement, but also necessary to effectuate its terms. Unless this Motion is granted, no one will be able to enforce the terms of the Settlement Agreement and the plaintiffs to the original action will be severely prejudiced.

9

## II. IN THE ALTERNATIVE, THE COMMITTEE SHOULD BE PERMITTED TO INTERVENE BECAUSE OF COMMON ISSUES OF FACT.

Alternatively, the Committee should be permitted to intervene in the Shy Litigation under Fed. R. Civ. P. 24(b)(2), which grants the district court discretionary power to permit intervention (1) if the motion is timely, *Michigan Ass'n for Retarded Citizens,* 657 F.2d 102, 105 (6th Cir. 1981); and (2) if the "applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b)(2). Rule 24(b)(2) also provides that "[i]n exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.*

It is self-evident that the Committee's instant motions present issues of fact and law that were present in the existing litigation. The Committee was created in order to deal with the issues in the lawsuit going forward, and its motions and claims arise directly out of that lawsuit. Moreover, responsibilities of the parties to the Settlement Agreement, as well as the Committee, are ongoing. *See* Ex. A, pps. 4-5; *id.* at Ex. B, pps. 6-7. Consequently, the requested intervention will neither prejudice the rights of the original parties, nor will it result in undue delay, because the original parties contemplated that the Committee might have to participate in the case going forward in order to enforce the Settlement Agreement.

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests this Court grant it leave to intervene in the underlying matter, award attorney costs and fees related to the filing of this motion, and grants such other and further relief in favor of the Committee as deemed just and necessary.

10

Respectfully Submitted:

/s/ Kevin L. Murphy

Kevin L. Murphy (#0021810)
Graydon Head & Ritchey LLP
2400 Chamber Center Drive
Suite 300
Ft. Mitchell, KY  41014
859-578-3060 (p)
859-525-0214 (f)
kmurphy@graydon.com

Edward A. Scallet (*pro hac vice* admission to be submitted)
Will E. Wilder (*pro hac vice* admission to be submitted)
Groom Law Group, Chartered
1701 Pennsylvania Avenue, NW
Washington, DC  20006
202-857-0620 (p)
202-659-4503 (f)
eas@groom.com
wwilder@groom.com

## **CERTIFICATE OF SERVICE**

   I hereby certify that on this 23rd day of March, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorneys of record:

               /s/ Kevin L. Murphy
               Kevin L. Murphy