IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ART SHY, et al. | |
| Plaintiffs, | |
| v. | Case No. 3:92-cv-00333 |
| | Judge Walter H. Rice |
| NAVISTAR INTERNATIONAL CORPORATIONAL, et al. | |
| Defendants. | |
| SUPPLEMENTAL BENEFIT COMMITTEE OF THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP. RETIREE SUPPLEMENTAL BENEFIT PROGRAM, | |
| Intervenor-Plaintiff, | |
| | **ELECTRONICALLY FILED** |
| v. | |
| NAVISTAR INTERNATIONAL CORPORATION, | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF THE MOTION OF THE
SUPPLEMENTAL BENEFIT COMMITTEE OF THE NAVISTAR INTERNATIONAL
TRANSPORTATION CORPORATION RETIREE SUPPLEMENTAL BENEFIT
PROGRAM TO ENFORCE THE SETTLEMENT AGREEMENT**

The Supplemental Benefit Committee of the Navistar International Transportation Corporation Retiree Supplemental Benefit Program ("Committee"), by and through its undersigned counsel, hereby files this motion to seek enforcement of a Settlement Agreement entered into by the parties in the above-captioned case, and subsequently approved by this

1

Court.[1]  As the Court is aware, plaintiffs Art Shy, the International Union, United Automobile Aerospace and Agricultural Implement Workers of America ("UAW") and other named plaintiffs, brought suit against Navistar International Corporation ("Navistar" or the "Company") and other named defendants concerning certain life and health benefits made available to retirees of the Company through various benefit arrangements.  In general, the Settlement Agreement creates a new basic health and life insurance plan for retirees, as well as a Supplemental Benefit Program and Trust ("Supplemental Program"), which is intended to defray the cost of premiums, co-pays, and deductibles that retirees are required to pay to obtain benefits from the main plan.  The Settlement Agreement created the Committee to serve as the Named Fiduciary and Administrator of the Supplemental Program.  The Committee is comprised of two members designated by the UAW, and three members representing various sub-classes of other plaintiffs.

The initial funding of the Supplemental Program consisted of stock contributed by the Company.  The Company also agreed to contribute other amounts based on its profitability, and the Settlement Agreement created the Supplemental Benefit Trust Profit Sharing Plan ("PSP") to receive, invest and make decisions with respect to those additional contributions.  The Committee is also the Named Fiduciary and Administrator of the PSP.

By this motion, the Committee seeks the aid of this Court in enforcing the terms of the Settlement Agreement so that the Committee may fulfill its fiduciary duty to protect the interests of the PSP participants and beneficiaries.  The express terms of the Supplemental Program, and in particular, the PSP, establish the Committee's responsibility to zealously protect and represent the interests of the participants and beneficiaries, while also imposing duties on Navistar,

---

[1] The Committee has filed a Motion to Intervene in the case for the purpose of filing this Motion. Although the Committee was created by the Settlement Agreement here and was charged with the primary responsibility of executing important terms of that agreement, it was not a party to the case, thus necessitating the separate Motion to Intervene.

including the obligation to provide information to the Committee. Navistar has failed to meet that obligation under the PSP despite multiple efforts and requests by the Committee. Thus, the Committee requests that this Court enforce the terms of Settlement Agreement, and order Navistar to comply in full with the Committee's requests for information.

## FACTUAL BACKGROUND

### 1. The Structure of the Supplemental Program

In 1992, the UAW, along with other named parties, commenced this class action seeking declaratory and injunctive relief against Defendants relating to the provision of retiree medical benefits (the "Shy Litigation"). After extensive negotiations, on March 30, 1993, the parties to the Shy Litigation entered into a Settlement Agreement, which was approved by this Court on May 26, 1993.[2] On June 30, 1993, the parties asked the Court to approve a few changes to the settlement, and it is this agreement that we have referred to as the "Settlement Agreement," and attached hereto as Exhibit A.

The plaintiffs agreed to allow Navistar to make significant changes to its retiree plans, but also insisted that the Company ameliorate the negative effect on the participants and beneficiaries by establishing the Supplemental Program to make up for the reductions in benefits and to defray the cost increases on the participants. The funding of the Supplemental Program consisted of two elements: (1) Navistar was required to issue new common stock to the Supplemental Benefit Trust to make the Supplemental Benefit Trust the owner of 50% of Navistar's then-outstanding common shares, and (2) Navistar was required to make ongoing contributions pursuant to a profit-sharing formula included in the Settlement Agreement, and as

---

[2] On June 8, 1993, the Court supplemented its opinion and again entered judgment approving the Settlement Agreement.

3

prescribed under the PSP.  *See* Ex. A, p. 3.  The Settlement Agreement also created the Intervenor Committee herein to administer the Supplemental Program, including the PSP.  *Id*.

### 2. The Profit Sharing Payments

The parties drafted the plan document for the PSP, which sets out the formulae for calculating the Company's contribution obligation using such metrics as "Qualifying Profits" from "Covered Operations" attributable to "Qualifying Hours."[3]  In order to allow the Committee to ascertain whether the Company's contributions have been calculated correctly, the PSP established several annual reporting and disclosure requirements to which the Company must comply.  As relevant here, the PSP requires that the Company provide both the UAW and the Committee with a worksheet detailing the calculations of that year's contribution, including the Qualifying Hours and the Qualifying Profits.  *See id*. at § 8.1.  These worksheets must include a listing by category of employees included and excluded in the calculation of Qualifying Hours and all information reasonably necessary to review the calculation of Qualifying Profits.  *Id*.

The PSP further requires that the data that the Company provides on profits, hours worked, Qualifying Profits, and Qualifying Hours "shall be reviewed by a certified public accounting firm [. . .] and the report [. . .] shall be delivered to the UAW and the Supplemental Benefit Committee."  A letter report setting forth the procedures performed and conclusions reached must be prepared by such firm and delivered to the Company, the UAW and the Supplemental Benefit Committee."  *Id*. at § 8.2.  Such reports must be delivered to the UAW and the Committee "on or before the date that the contribution obligation, if any, is required to be paid [. . .] [or if] no contribution obligation is required to be paid, the Company will deliver [the]

---

[3]  The PSP is part of the Settlement Agreement approved by the Court, but we have set it out separately in Exhibit B for the convenience of the Court.

4

information [. . .] to the UAW and the Supplemental Benefit Committee within 90 calendar days following the end of the plan year for which no contribution is required." *Id*. at § 8.3.

Finally, the PSP requires Navistar to respond as soon as practicable to any reasonable requests from the Committee for information supporting any computation made to calculate the Contribution obligation, and provide such information as requested. *Id*. at § 8.6.

### 3. The Contribution History

Between the years 1995-2001, Navistar made significant contributions to the Profit Sharing Plan per its terms ranging from $126,070 in plan year 1997 to $71,568,920 in 2001, for an average of over $30 million per year. *See* Chart of Profit Sharing Payments, attached as Exhibit C. Between the years 2002 and 2010, however, Navistar has only made one contribution to the PSP, in the amount of $1.4 million, which it now claims was made in error and seeks to offset from any subsequent contribution it may make.

Beginning in January 2006, Navistar undertook a comprehensive review of its previous financial statements. In April 2006 the audit committee of Navistar's board of directors concluded the Company's previously prepared and audited financial statements could not be relied upon and should be restated. The effects of this review and related restatements included a $2.4 billion reduction to the Company's previously reported stockholders' equity, the de-listing of the Company's common stock by the New York Stock Exchange, and a formal investigation by the U.S. Securities and Exchange Commission that resulted in actions against former senior Company officers who had direct responsibility for Navistar's financial and management reporting. Navistar also informed the Committee that it was unable to provide accurate information pursuant to its PSP obligations. The Committee agreed to wait for the information.

5

Navistar eventually released restated financial statements for the fiscal years 2004 and 2005 on December 7, 2007.

### 4. The Committee's Information Requests

Navistar has been consistently late in providing the required reports and schedules; indeed, most of the reports were just provided, two to three years after the applicable deadline, and the Committee still does not have several schedules and reports to which it is entitled.

On May 4, 2010, to address Navistar's non-compliance with the express terms of the PSP, the Committee sent the Company a letter expressing general and specific concerns relating to the schedules of Qualifying Profits that Navistar had provided, or neglected to provide, to the Committee. *See* May 4, 2010 Letter to Navistar, attached as Exhibit D. Specifically, the Committee: 1) noted that Navistar had not been timely meeting all of its reporting obligations under the Plan; 2) disputed the Company's calculation of Qualifying Profits for each of the years 2007, 2008, and 2009; 3) noted that the Schedules did not provide sufficient information to verify the accuracy and reasonableness of the Company's calculations; and 4) pointed out the schedules lacked information relating to "Qualifying Hours," as required under Sections 8.1, 8.2, and 8.3 of the Plan. *Id.*

On April 6, 2011, in response to the Committee's May 4, 2010 letter, the Company provided the Committee with a schedule that purported to show that there were no Qualifying Profits for plan year 2010. *See* Ex. E. The Company declined to respond to any of the other questions or concerns set forth in the Committee's May 4, 2010 letter.

Concerned about the lack of disclosure and the glaring discrepancy between the substantial contributions made in the early years versus the lack of contributions post-2002, the Committee retained an expert to evaluate the public information released by the Company to see

6

whether the lack of contributions was based on actual financial performance, or whether the Company had made internal accounting and management decisions in order to shield profits in a manner that is inconsistent with the intent of the parties, as expressed in the Settlement Agreement. Based on that review, the Committee sent a detailed request for information to Navistar on November 15, 2011. *See* Nov. 15, 2011 Letter to Navistar, attached as Exhibit F. The letter gave the Company sixty days to respond, but the Committee later agreed to extend the time to respond to ninety days.

On February 15, 2012, Navistar finally responded to the Committee's 2011 requests and promised a response to the Committee's 2010 request "in the near future." However, the response consisted of a series of "General Objections" and summaries claiming to establish that the Company, despite its overall profitability, owed no profit-sharing contributions. The Company flatly refused to respond to *any* of the Committee's questions about the components of the profit-sharing calculation that are set forth in the Settlement Agreement, claiming generally that it did not have to explain itself to the Committee.

## ARGUMENT

"A settlement agreement is considered a contract, and construction and enforcement of settlement agreements are governed by principles of contract law." *Haisma v. Edgar*, 578 N.E.2d 163, 168 (Ill. 1991).[4] Where there is no ambiguity in the language of the settlement agreement, the intent of the parties is governed by its express terms. *Payne v. Coates-Miller, Inc*., 434 N.E. 2d 306 (Ill. 1982).

As noted, the Supplemental Program and PSP were established pursuant to the terms of the Settlement Agreement. *See* Ex. A. p. 3; PSP, p. 1. Under the express and unambiguous

---

[4] Section 10.9 of the Supplement Benefit Program provides that the program shall be construed "in accordance with applicable federal laws and, to the extent not inconsistent therewith or preempted thereby, with the laws of the State of Illinois."

7

terms of the PSP, Navistar is required to provide the Committee with certain reports and data with respect to contribution obligations.  *See* Ex. B at §§ 8.1 and 8.2.

As set forth above, Navistar has failed to comply with numerous provisions of the Settlement Agreement, particularly with respect to its reporting and disclosure obligations under the PSP.  Thus, the Committee seeks an order from this Court requiring Navistar to promptly provide each and every report that it has failed to provide.

But the Committee's needs go further than simply ascertaining whether the numbers on the schedules and reports produce the results Navistar claims.  The Company has chosen to have its certified public accounting firm audit the annual data in accordance with auditing standards generally accepted in the United States of America ("GAAS").  But the information subject to audit is prepared and presented based on Navistar's interpretation of the Settlement Agreement.  GAAS does not impose any obligation or responsibility for the certified public accounting firm to consider whether that interpretation is correct or proper, and that would be inappropriate since certified public accountants are not licensed attorneys.

Accordingly, the Committee needs to look beneath the numbers on the schedules.  It is clear that the parties to the Settlement Agreement intended that the Committee would be entitled to information other than the reports and schedules.  While Sections 8.1 through 8.4 refer to the reports and schedules, Section 8.6 imposes a much broader disclosure obligation on the Company, providing (emphasis supplied):

> *In addition to the above* [schedules and reports], the Company *will* respond as soon as practicable to *any* reasonable requests from the UAW or the Supplemental Benefit Committee for information *supporting any computation* made by the Company to compute the Contribution obligation, and *will provide* the information so requested.

Thus, the parties understood that the Committee would likely need to have information to assess not only the adequacy and accuracy of the various reports, but also Navistar's interpretation and implementation of the Settlement Agreement.  And the only limitation on the Committee's right to request and obtain such information is that the request be "reasonable."

Based on the limited information it has been provided, the Committee has reason to believe that Navistar has allocated revenues, costs and profits within the consolidated group for the explicit purpose of robbing the Supplemental Program of the profit-sharing payments to which it is entitled.  For example, it appears that Navistar has attempted to present the construction of new factories and related capital expenditures as  "acquisitions" in their profit sharing calculations solely to avoid fully and appropriately including these highly profitable operations in the profit-sharing calculation since "acquisitions"  are only partially included.  At the same time, the Company has refused to explain or provide any information about how its decisions, policies, procedures, methods, etc. regarding its internal allocation of various revenues and costs (including, among other things, interest expense, research and development costs, corporate management costs, the costs associated with various shared services, etc.) among and between its various business units affects the profit-sharing calculation.  The Committee believes that these internal management decisions have the effect of shifting profits in certain business units to other business units in ways that materially affect the profit-sharing calculations.  In short, the Committee suspects that Navistar has and is intentionally manipulating the placement of revenues and costs in its various business units in a manner that, if true, is wholly inconsistent with the intent of the Settlement Agreement to look at Navistar as one entity for purposes of the profit-sharing calculation.

As the Court can see in Exhibit F, many of the requests from the Committee seek information on Navistar's supposed acquisitions and its methodology for allocating revenues, costs and profits between the various business units that comprise the corporate group. The fact that Navistar flatly refuses to address any of these questions suggests that the Committee is on the right track in its theory for how Navistar made its profit-sharing obligations under the Settlement Agreement disappear.

Section 15.4 of the Settlement Agreement provides that this Court retains exclusive jurisdiction to remedy a breach of the Agreement. *See* Ex. A, § 15.4. That is consistent with the law in this Circuit and the state law underlying the Agreement. *See Hehl v. City of Avon Lake*, 90 F. App'x 797, 801 (6th Cir. 2004) ("[A] district court retains jurisdiction to enforce a settlement agreement if it either [. . .] (2) incorporates the terms of the settlement agreement into the dismissal order); *Haisma*, 578 N.E. 2d at 167 ("Where breach goes to an essential element of the compromise agreement and in effect amounts to refusal to perform or an abandonment, [parties] may sue on the agreement for the breach.")(citations omitted). The Committee submits that, under the circumstances here, Navistar has failed to honor its disclosure obligations under the Agreement, and the Committee is entitled to prompt and complete responses to its requests for information and the various schedules that Navistar has failed to provide.

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that this Court: 1) find that Navistar is not in compliance with the terms of the Settlement Agreement; 2) enter an Order requiring Navistar to timely provide worksheets, schedules and reports as prescribed in Section 8.1 of the Settlement Agreement; 3) enter an Order requiring Navistar to respond promptly and fully and completely to the requests of the Committee set forth in Exhibits D and F and any

10

related follow-up requests; 4) enter any other such orders as are necessary to compel compliance with the letter and spirit of the Settlement Agreement; 5) award the Committee its attorneys' fees and costs related to the filing of this motion; and 6) grant such other and further relief in favor of the Committee as may be deemed just and necessary.

Respectfully Submitted:

/s/ Kevin L. Murphy

Kevin L. Murphy (#0021810)
Graydon Head & Ritchey LLP
2400 Chamber Center Drive
Suite 300
Ft. Mitchell, KY  41014
859-578-3060 (p)
859-525-0214 (f)
kmurphy@graydon.com

Edward A. Scallet (*pro hac vice* admission to be submitted)
Will E. Wilder (*pro hac vice* admission to be submitted)
Groom Law Group, Chartered
1701 Pennsylvania Avenue, NW
Washington, DC  20006
202-857-0620 (p)
202-659-4503 (f)
eas@groom.com
wwilder@groom.com

## **CERTIFICATE OF SERVICE**

  I hereby certify that on this 26rd day of March, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorneys of record:

            /s/ Kevin L. Murphy
            Kevin L. Murphy