# NAVISTAR INTERNATIONAL CORPORATION
## FINAL VERSIONS OF KEY
## SETTLEMENT AGREEMENT DOCUMENTS

| Document | Page Number |
|---|---|
| Amended and Restated Settlement Agreement | 1 |
| Exhibit A - Base Plan | 32 |
| Appendix A-3 - Health Benefit Trust Agreement | 67 |
| Appendix A-5 - Initial Actuarial Valuation | 78 |
| Appendix A-6 - Actuarial Definitions Supplement | 100 |
| Exhibit B - Supplemental Plan | 109 |
| Appendix B-2 - Supplemental Benefit Trust Agreement | 130 |
| Appendix B-3 - Restated Certificate of Incorporation | 143 |
| Appendix B-4 - Registration Rights | 207 |
| Appendix B-6 - Supplemental Benefit Profit Sharing Plan | 221 |
| Exhibit D - Definition Supplement | 230 |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ART SHY, FRED BURRIS, CLARENCE
NUSS, JOHN HERRING, CARL POTTS,
HAROLD RETHERFORD, HENRY G. BETLEY,
RICHARD A. SPITLER, JACK O'NEAL, and
DONALD McPHEARSON on behalf of
themselves and other persons
similarly situated, and
INTERNATIONAL UNION, UNITED
AUTOMOBILE AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA AND ITS LOCAL UNIONS 6,
66, 98, 119, 226, 305, 402, 472, 658,
2274, and 2293, INTERNATIONAL UNION,
UNITED PLANT GUARD WORKERS OF AMERICA
("UPGWA") AND ITS LOCAL UNIONS 122,
4 AND 134 AND INTERNATIONAL
MACHINISTS DISTRICT LODGE 28 AND ITS
LOCAL LODGES 1471, 2819, AND 2821,
SOCIETY OF ENGINEERING EMPLOYEES, INC.
("SEE"), INTERNATIONAL UNION, UNITED
STEELWORKERS OF AMERICA ("USWA")
AND ITS LOCAL UNION 4320 on behalf of
themselves and other similarly
situated unions,

                    Plaintiffs,

vs.

NAVISTAR INTERNATIONAL CORPORATION,
NAVISTAR INTERNATIONAL TRANSPORTATION
CORP., NAVISTAR FINANCIAL CORPORATION,
HARCO NATIONAL INSURANCE COMPANY, the
NAVISTAR INTERNATIONAL TRANSPORTATION
CORP. HEALTH PLAN and the INDIANAPOLIS
CASTING CORPORATION,

                    Defendants.

Case No. C-3-92-333
Judge Walter H. Rice

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Summary of Settlement Agreement . . . . . . . . . . | | 2 |
| 1. | Discovery . . . . . . . . . . . . . . . | 2 |
| 2. | Benefits Of Settlement . . . . . . . . . | 4 |
| 3. | No Admissions . . . . . . . . . . . . . | 4 |
| 4. | Class Action Notice Order . . . . . . . | 6 |
| 5. | Judgment to be Entered Approving the Settlement | 7 |
| 6. | Releases and Related Matters . . . . . . | 7 |
| 7. | Initial Eligibility and Enrollment in the Plan | 9 |
| 8. | Corporate Approvals . . . . . . . . . . | 13 |
| 9. | Contribution of Parent Securities . . . . | 13 |
| 10. | Board of Directors . . . . . . . . . . . | 13 |
| 11. | Costs, Attorneys Fees and Indemnification . | 14 |
| 12. | Conditions and Effective Date of Settlement | 15 |
| 13. | Effect of Disapproval or Modification . . | 16 |
| 14. | Representations and Warranties . . . . . | 20 |
| 15. | Miscellaneous Provisions . . . . . . . . | 22 |

- i -

<u>Exhibits</u>

Exhibit A — The Navistar International Transportation Corp.
Retiree Health Benefit and Life Insurance Plan

Exhibit B — The Navistar International Corp. Retiree
Supplemental Benefit Program

Exhibit C — List of Class Members

Exhibit D — Definition Supplement

Exhibit E — Notice Order

Exhibit F — Cover Letter

Exhibit G — Judgment

Exhibit H — Health Benefit Program Letter

Exhibit I — Premium Bill

Exhibit J — Fees and Expenses

Exhibit K — Legal Opinions

Amended and Restated
Settlement Agreement

This Settlement Agreement, dated as of March 30, 1993, and amended and restated as of June 30, 1993 (which, together with the Exhibits hereto, is referred to as the "Settlement Agreement"), is between Navistar, by and through its attorneys, and the Class Representatives, on behalf of the Class, by and through Class Counsel, in the class action of Shy et al. v. Navistar, Civil Action No. C-3-92-333 (S.D. Ohio) (the "Shy Case"). This Settlement Agreement shall apply to:

(i)      Present Retirees, Present Surviving Spouses and Eligible Dependents of Class Members;

(ii)     Present Eligible Former Employees and Present Non-Represented Employees who will be eligible for Health and Life Insurance Benefits after the Effective Date; and

(iii)    all labor organizations which presently are or were in the past parties to collective bargaining agreements ("CBAs") pursuant to which Navistar maintains an Existing Plan.

Each such natural person constitutes a "Class Member" and all of such natural persons and entities constitute the "Class".

In the event of an inconsistency between this Settlement Agreement and any Exhibit hereto, this Settlement Agreement shall control; provided, that any reference to or description of the Health Benefit Program or the Life Insurance Program is qualified entirely by reference to Exhibit A, and any reference to or description of the Supplemental Benefit Program is qualified entirely by reference to Exhibit B. In the event of any inconsistency between the Health Benefit Program SPD or the Life Insurance Program SPD and Exhibit A, Exhibit A shall control. In the event of any inconsistency between the Supplemental Benefit Program SPD and Exhibit B, Exhibit B shall control.

Capitalized terms used and not otherwise defined in this Settlement Agreement have the meanings given them in the Definition Supplement attached as Exhibit D.

This Settlement Agreement affects only the duration and level of, and not eligibility for, Health and Life Insurance Benefits. All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan in the absence of this Settlement Agreement (other than Excluded Retirees) shall be eligible for benefits under the Plan. No person not otherwise eligible for benefits under an Existing Plan shall be eligible for any benefit by virtue of this Settlement Agreement.

4

**Summary of**
**Settlement Agreement**

This Settlement Agreement finally resolves and settles all claims of the Class Members in the *Shy Case*, subject to Court approval and the other terms and conditions set out below.

On the Effective Date, the Company will establish the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), ERISA Plan number 584, EIN 36-1264810, which will be comprised of:

(i)      the Navistar International Transportation Corp. Retiree Health Benefit Program (the "Health Benefit Program"), described in Exhibit A;

(ii)     the Navistar International Transportation Corp. Retiree Life Insurance Program (the "Life Insurance Program"), described in Exhibit A, which consists of the Basic Life Insurance Program and the Optional Life Insurance Program; and

(iii)    the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (the "Supplemental Benefit Program"), described in Exhibit B.

Subject to the contribution requirements described in Exhibit A, the Company agrees that the benefits provided by the Health Benefit Program will be made available for the lifetime of:

(i)      Present Retirees and Class Members who are or will become Surviving Spouses;

(ii)     Present Eligible Former Employees at such time as they would have been entitled to receive Health and Life Insurance Benefits under the Existing Plans in the absence of this Settlement Agreement; and

(iii)    Present Non-Represented Employees at such time as they become eligible to commence the receipt of Pension Benefits or as described below.

The Company has further agreed that (i) the benefits provided by the Health Benefit Program will be made available to Eligible Dependents of Class Members for as long as they remain such; (ii) the benefits provided by the Basic Life Insurance Program will be made available to Present Retirees for the duration of their lives, and (iii) the benefits provided by the Optional Life Insurance Program will be made available to Class Member Retirees who satisfy the eligibility requirements set out in the Life Insurance SPD.

Pursuant to the New CBAs and not through this Settlement Agreement, the Company has also agreed that the benefits provided by the Health Benefit Program and the Basic Life Insurance Program will be made available to Present Represented Employees and their Surviving Spouses at such time as they would have been entitled to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the New CBAs for the duration of their lives and to their Eligible Dependents for so long as they remain such, subject, in the case of the Health Benefit Program to the contribution requirements described in Exhibit A.

The Company's share of the initial estimated accumulated post-retirement benefit obligation in connection with the Plan is $1 billion ($946 million for the Health Benefit Program and $54 million for the Basic Life Insurance Program). The Company will fund the Health Benefit Program and the Basic Life Insurance Program by making contributions to the Health Benefit Trust, including contributions of the Annual Service Cost and pre-funding contributions up to $500 million on or before the Event Date from the proceeds of sales of securities or from other sources. The Health Benefit Program will be administered by the Company in its capacity as Plan Administrator, subject to the review authority of the Health Benefit Program Committee. The Health Benefit Program Committee shall consist of seven members, including three Company appointees, two UAW appointees and two other appointees, one of whom shall preside as chairperson. The initial members of such committee shall be approved by the Court.

The Supplemental Benefit Program will be established for the purposes of reducing or reimbursing premiums, co-payments and deductibles that would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program and of providing Additional Permissible Benefits. The Supplemental Benefit Program will be funded on the Effective Date by the issuance of the Supplemental Benefit Trust of new shares of Parent Class B Common equal to 50 percent of the total amount of the Parent Common Equity outstanding immediately after such contribution on a Fully Diluted Basis (estimated to be approximately 255 million shares of Parent Class B Common). Upon the occurrence of an Event Date or a permitted sale of shares of Parent Class B Common to a third party, all of such shares (in the case of an Event Date) or the shares to be transferred (in the case of a permitted sale) will convert automatically into shares of Parent Common. In addition, the Company will make profit-sharing contributions to the Supplemental Benefit Trust under the Profit Sharing Plan, which provides for payments up to a maximum of 16 percent of eligible profits above a specified threshold.

The Supplemental Benefit Program will be administered by the Supplemental Benefit Committee, which shall consist of five members, including two UAW appointees and three other appointees, one of whom shall preside as chairperson. The initial members of such committee shall be approved by the Court. On the Effective

- 3 -

6

Date, Parent will transfer one share of Parent Series A Preference to the Supplemental Benefit Trust, which will entitle the Supplemental Benefit Committee to elect two members of the Board during such time as the Supplemental Benefit Trust holds 20 percent or more of the shares of Parent Common Equity then outstanding and one member of the Board during such time as the Supplemental Benefit Trust holds between 10 percent and 20 percent of the shares of Parent Common Equity then outstanding. In addition, on the Effective Date Parent will transfer one share of Parent Series B Preference to the UAW, which will entitle it to elect one member of the Board until such time as the Health Benefit Program and the Life Insurance Program are Fully Funded, subject to certain reinstatement rights.

The Plan can only be amended under certain limited conditions specified herein and in Exhibits A and B, including in the event of the adoption of a State or National Health Insurance Program.

In exchange, the coverage of Class Members for Health and Life Insurance Benefits under the Existing Plans will be terminated at the end of the day before the Effective Date, except that claims incurred prior to the Effective Date will be paid in accordance with the Existing Plans. At that time, all of the claims of the Class in the Shy Case will be released, and the Shy Case will be dismissed with prejudice.

1. *Discovery.*

The Class Representatives conducted substantial discovery both prior to and after the commencement of the Litigation. This discovery included, among other things, the review of documents produced by Navistar and third parties, interviews of witnesses and the analysis of Navistar's relevant retiree health care documents. The Class Representatives have thoroughly investigated the law applicable to the Class Members' claims. The Class Representatives and their retained experts and consultants have also conducted an extensive review of Navistar's current and projected future financial condition. Similarly, counsel for Navistar has thoroughly reviewed the various defenses available to Navistar.

2. *Benefits of Settlement.*

2.1 *To The Class.* The Class Representatives and Class Counsel have conducted a thorough and detailed analysis of Navistar's financial situation and have determined that unless the costs incurred by the Employers to provide Health and Life Insurance Benefits under the Existing Plans are immediately and permanently reduced, Navistar is likely to file for bankruptcy and may be liquidated. In the event of Navistar's bankruptcy and liquidation, there is a high likelihood that benefits for the Class Members would be dramatically reduced or eliminated. Even in the event of a successful reorganization of Navistar, it is likely that continued retiree benefits would be reduced by more than is

– 4 –

7

required in this Settlement Agreement. Thus, the Class Representatives and Class Counsel have concluded that further proceedings to continue the *Shy Case* against Navistar would not be in the best interests of the Class. In reaching this conclusion, the Class Representatives and Class Counsel further recognize the length and cost of further proceedings necessary to continue the *Shy Case* against Navistar through trial and appeals. The Class Representatives and Class Counsel have also taken into account the uncertainty and delay that such proceedings would entail and the risk of an adverse outcome. The Class Representatives and Class Counsel are also mindful of problems of proof and the various defenses available to Navistar.

In exchange for the reduction in benefits received by the Class Members to the levels described herein, the Class Members will have the opportunity to benefit from Navistar's future growth. As a result of Parent's contributions of Parent Class B Common to the Supplemental Benefit Trust, the Supplemental Benefit Trust will be Parent's largest single stockholder. Thus, the Class Members, through the holdings of the Supplemental Benefit Trust, may receive increased benefits based on the increase in value of such holdings in the event Navistar returns to financial stability.

As described in Exhibit A, the Company also expects to fund the Health Benefit Program through the sale of Parent Common. To facilitate this course of action and to stabilize the market for Parent Common, the Parent Class B Common held by the Supplemental Benefit Trust will not be sold for a period up to five years except under limited circumstances. If any or all of this stock could be sold freely in the market in the short term, the willingness of the market to invest in the planned offerings of Parent Common would be diminished. It is in the interests of the Class Members, however, that Parent be able to make such offerings on commercially attractive terms to enable the Company to make prefunding contributions to the Health Benefit Trust. Thus, the five-year restriction period works to the advantage of the Class Members and fosters the goals of ERISA -- to promote soundness and stability in employer-sponsored retiree benefit arrangements.

Given these considerations, but without admitting that their contentions in the *Shy Case* lack merit or any liability of any kind to Navistar, the Class Representatives and the Class Counsel have determined that it is desirable, beneficial and in the best interests of the Class that the claims of the Class be settled in the manner and on the terms set forth herein, and that these terms are fair and reasonable.

2.2    *To Navistar.* Navistar has concluded that the further conduct of the *Shy Case* would be protracted and expensive for all parties. This Settlement Agreement will allow Navistar to avoid the expense of litigating multiple lawsuits concerning its Health Benefit and Life Insurance obligations. Navistar previously sought to reduce its retiree health benefits pursuant to a declaratory

- 5 -

8

judgment action filed in the Northern District of Illinois (the "Foster Case"), which was dismissed by the agreement of the parties as a condition of the commencement of settlement discussions in the Shy Case.

Substantial amounts of time, energy and resources have been spent on and, absent this Settlement Agreement, would continue to be spent on the defense of the Class. Although Navistar's current financial position permits it to pay its debts as they become due, Navistar's net assets are dwarfed by its potential long-term liability for Health and Life Insurance Benefits. Unless definite and swift action is taken permanently to reduce the costs of such benefits, Navistar will be threatened with insolvency. Without admitting liability of any kind to the Class, or that its defense in the Shy Case lacks merit, Navistar has therefore determined that it is desirable, beneficial and in the best interest of Navistar, that the claims of all Class Members be settled in the manner and on the terms set forth herein, and that these terms are fair and reasonable.

3.   No Admissions.

3.1   Navistar continues to deny any wrongdoing or legal liability arising out of any of the claims and contentions alleged against it in the Shy Case. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement is, may be construed as, or may be used as, an admission by or against Navistar of any fault, wrongdoing or liability whatsoever.

3.2   The Class Representatives have claimed and continue to claim that the contentions made by or on behalf of the Class in the Shy Case have merit. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement is, may be construed as, or may be used as, an admission by or against the Class or the Class Representatives, or any of them, that any of their contentions lacked merit.

3.3   There has been no determination by any court as to the factual or legal allegations made by or against Navistar in the Shy Case. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement is, may be construed as, or may be used as, a waiver of any applicable statute of limitations, and neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement shall be offered or received in evidence in any action or proceeding by or against Navistar, the Class or the Class Representatives, or any of them, in any court, administrative agency or other tribunal for any purpose whatsoever other than to enforce the provisions of this Settlement Agreement or to obtain or seek approval of this Settlement Agreement in accordance with Rule 23 of the Federal Rules of Civil Procedure.

4. *Class Action Notice Order.*

4.1    The parties shall submit this Settlement Agreement to the Court and shall seek from the Court an order (the "Notice Order"), substantially in the form of Exhibit E hereto, providing that the *Shy Case* will continue to be stayed and that notice of the hearing on the proposed settlement (the "Fairness Hearing") shall be given to the Class. Following entry of the Notice Order, the Company shall (i) mail a copy of the notice contemplated in the Notice Order to the Class, together with the documents referred to in Section 4.2, (ii) cause the notice contemplated by the Notice Order to be published in the daily newspaper of largest circulation in Springfield, Ohio, Chicago, Illinois, Indianapolis, Indiana, Fort Wayne, Indiana, Moline, Illinois, and Milwaukee, Wisconsin, and (iii) submit a proof of the Judgment, copies of this Settlement Court. Until entry of the Judgment, copies of this Settlement Agreement shall also be made available for inspection by Class Members at the Court, at the UAW offices in Springfield, Ohio, Indianapolis, Indiana, Chicago, Illinois, Moline, Illinois, Dallas, Texas, Memphis, Tennessee, and Louisville, Kentucky, and at the offices of each of the other labor organization Class Representatives and Class Counsel. In addition, prior to entry of the Judgment, Class Counsel shall conduct such meetings or make such other communications as Class Counsel deem appropriate to inform the Class Members of the proposed terms of this Settlement Agreement, which meetings and communications will be ineffective to vary the terms hereof.

4.2    The notice sent to the Class Members shall include a cover letter substantially in the form of Exhibit F, and copies of this Settlement Agreement, definitions of certain terms used in this Settlement Agreement, the Health Benefit Program SPD (Appendix A-1), the Life Insurance Program SPD (Appendix A-2) and the Supplemental Benefit Program SPD (Appendix B-1). The Company shall send additional copies of any of such materials and/or copies of any other Exhibit or Appendix to any Class Member upon request.

5.    *Judgment to be Entered Approving the Settlement.*

After notice to the Class Members and upon approval by the Court of this Settlement Agreement, the parties will request the Court to enter the Judgment substantially in the form of Exhibit G hereto.

6.    *Releases and Related Matters.*

6.1    In consideration of Navistar's entry into this Settlement Agreement, the establishment of the Plan and the other obligations of Navistar contained herein, the Class Representatives and the Class Counsel hereby consent to the entry of the Judgment, which will be binding upon the Class pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.

- 7 -

6.1.1 As of the Effective Date, the Class, the Class Representatives and anyone claiming on behalf of, through or under them by way of subrogation or otherwise shall be released and discharged, and shall be forever barred and enjoined from instituting or prosecuting, either directly or indirectly, against the Navistar Released Parties or the Employers, any and all rights, claims or causes of action, whether known or unknown, suspected or unsuspected, concealed or hidden, which they had, may have or hereafter may have, arising out of or based upon or otherwise related to any of the claims that were or could have been asserted in the *Shy* Case with respect to Health and Life Insurance Benefits, including all rights to continuation of such benefits under expired collective bargaining agreements, as well as any claims that this Settlement Agreement, any document referred to herein or any action taken to carry out this Settlement Agreement is not in compliance with applicable laws and regulations; provided, that nothing contained in this Settlement Agreement shall preclude the Class or the Class Representatives, or any of them, from asserting any right or claim or bringing any action to enforce the terms of this Settlement Agreement or the Judgment.

6.1.2 Each of the Navistar Released Parties, the Employers, the Class Representatives and the Class Counsel shall refrain from taking any action to challenge the compliance of this Settlement Agreement, any document referred to herein or any action taken to carry out this Settlement Agreement with applicable laws and regulations or from encouraging any other person or entity to do so.

6.1.3 As of the Effective Date, the Navistar Released Parties and the Employers shall be forever released and discharged with respect to any and all rights, claims or causes of action that the Class or anyone claiming on behalf of, through or under the Class by way of subrogation or otherwise, has, had or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to any of the claims that were or could have been asserted in the *Shy* Case with respect to Health and Life Insurance Benefits, including all rights to continuation of such benefits under expired collective bargaining agreements, as well as any claims that this Settlement Agreement, any document referred to herein or any action taken to carry out this Settlement Agreement is not in compliance with applicable laws and regulations.

6.2 Neither the entry into of this Settlement Agreement nor the consent to the Judgment is, may be construed as, or may be used as, an admission by or against the Navistar Released Parties, the Employers, the Class, the Class Representatives, or any of them, of any fault, wrongdoing or liability whatsoever.

6.3 Neither the entry into of this Settlement Agreement nor the consent to the Judgment waives or releases any right, claim or cause of action, whether known or unknown, suspected or

- 8 -

unsuspected, concealed or hidden, which the Class or the Class Representatives, or any of them, has, had or hereafter may have with respect to (i) any matter not related to Health and Life Insurance Benefits, including, but not limited to, rights, claims or causes of action relating to workers' compensation, pension benefits, sickness or accident programs, salary continuation or disability or pension programs maintained by the Employers or any of them or (ii) the implementation and enforcement of this Settlement Agreement or the Implementation of the Judgment.

7. **Initial Eligibility and Enrollment in the Plan.**

7.1 **Termination of Existing Plans.** The Company will, and will cause the other Employers to, terminate the coverage of the Class Members (other than Deferred Retiree Participants) for Health and Life Insurance Benefits under the Existing Plans as of the end of the day before the Effective Date, whereupon the Plan will be established as described below and in Exhibits A and B. The Company will, and will cause the other Employers to, terminate the coverage of Deferred Retiree Participants under the Existing Plans for Health and Life Insurance Benefits under the Existing Plans as of the end of the first day permitted by the applicable settlement agreements, whereupon they will be entitled to receive benefits under the Health Benefit Program and the Supplemental Benefit Program. Claims incurred prior to the Effective Date or such day will be paid under the Existing Plans as provided in Exhibit A.

7.2 **Initial Eligibility.** Present Retirees (other than the Deferred Retiree Participants), Present Surviving Spouses and Present Eligible Dependents will be entitled to receive benefits under the Health Benefit Program on the Effective Date, subject to the applicable enrollment requirements set forth below. Present Retirees will receive benefits under the Basic Life Insurance Program without contribution or enrollment. Present Retirees will receive benefits under the Optional Life Insurance Program if they make required premium contributions and if they meet the eligibility requirements set forth in the Life Insurance Program SPD. Deferred Retiree Participants will be entitled to receive benefits under the Health Benefit Program at such time as may be permitted under the applicable Settlement Agreement. Present Eligible Former Employees and Present Non-Represented Employees shall be eligible for benefits under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of this Settlement Agreement. Class Members will receive benefits under the Health Benefit Program and the Supplemental Benefit Program subject to the payment of any required premium contributions, except that supplemental life insurance benefits may be provided to all Retirees, including those who are not Enrolled Participants.

7.2.1 **Enrollment.** Not less than two weeks before the Effective Date, Present Retirees (other than the Deferred Retiree Participants) and Present Surviving Spouses will be sent a

- 9 -

letter, substantially in the form of Exhibit H (the "Health Benefit Program Letter"), a premium bill, substantially in the form of Exhibit I, and a stamped, preaddressed envelope.

7.2.2 **Health Benefit Program Letter and Bill.** The Health Benefit Program Letter sent to each Present Retiree (other than Deferred Retiree Participants) and Present Surviving Spouse will state that the Health Benefit Program will be effective on the beginning of the Effective Date and that payment of the enclosed bill will automatically enroll the Participants for whom coverage is elected in the Health Benefit Program and the Supplemental Benefit Program. The letter will also list the names of any Present Eligible Dependents of such Present Retiree or Present Surviving Spouse in the Company's records, whether or not such Present Retiree, Present Surviving Spouse and such Eligible Dependents are eligible for Medicare, and the premium due. The letter will provide instructions for declining coverage and correcting the information with respect to Eligible Dependents and Medicare eligibility contained in the letter.

The letter will further explain that failure to pay will lead to termination of health benefit coverage under the Health Benefit Program and the Supplemental Benefit Program. The letter will summarize the right to re-enroll for health benefits under the Health Benefit Program and the Supplemental Benefit Program and will refer to specific pages of the Health Benefit Program SPD for further detail. The bill will provide that Present Retirees or Present Surviving Spouses who do not wish to enroll in the Health Benefit Program and the Supplemental Benefit Program may decline coverage by checking a box on the back of the bill. The back of the bill will also provide spaces for electing or declining coverage for Spouses. The letter will include a toll-free number which the Present Retirees or Present Surviving Spouses may call for assistance.

7.2.3 **Payments.** The letter and bill will both specify that payment may be made by personal check, bank check or money order. Pension deduction will be made available at the first feasible opportunity and forms for such election will be sent at that time. Until such option is made available, Present Retirees and Present Surviving Spouses who enroll in the Health Benefit Program and the Supplemental Benefit Program will receive bills, reminder notices and termination notices in accordance with Exhibit A, and the due dates and grace periods for payment of bills set out in Exhibit A shall apply.

7.2.4 **Due Dates.** Payment of the applicable initial premium contribution will be due on the Effective Date. Payments received within 31 days of the due date will be considered as received as of such date. A reminder notice will be sent 14 days after the due date. A termination notice will be sent 31 days after the due date, stating that coverage is terminated, but that

coverage will be reinstated without penalty as of the Effective Date if payment is received within 90 days of the Effective Date.

7.2.5    Enrollment in the Optional Life Insurance Program.    Each Present Retiree who meets the eligibility requirements for the Optional Life Insurance Program set forth in the Life Insurance Program SPD will receive an enrollment letter (the "Optional Life Insurance Program Letter") prior to the Effective Date. The Optional Life Insurance Program Letter sent to each such Present Retiree will state the amount of Company-paid life insurance benefits provided to such Present Retiree under the Existing Plans as of the day before the Effective Date and the amount of Company-paid life insurance that will be discontinued as of the Effective Date. The Optional Life Insurance Program Letter will further state that such Present Retiree will have the right, as a one-time option, to purchase optional life insurance directly from Aetna Life Insurance company in $1,000 increments up to the discontinued amount, rounding upwards if necessary. To receive such optional life insurance, such Present Retiree must enroll within 31 days of the date of the Optional Life Insurance Program letter. An enrollment form will be included with the Optional Life Insurance Program Letter, together with a rate schedule with examples of premium cost, and a space to designate beneficiaries. Subsequent bills will be sent quarterly. Upon payment of the applicable premium for the first month, individual certificates of coverage will be sent to Present Retirees electing optional life insurance.

7.2.6    Enrollment for Class Members Not Yet Eligible for Retirement.    Present Eligible Former Employees and Present Non-Represented Employees may apply to enroll in the Health Benefit Program, the Supplemental Benefit Program and (if they meet the eligibility requirements set out in the Life Insurance Program SPD) the Optional Life Insurance Program as of the date on which they apply to receive Pension Benefits. If such Present Eligible Former Employees and Present Non-Represented Employees are eligible to enroll in the Health Benefit Program and the Supplemental Program at such time, they will receive a notice containing substantially the information set out in Section 7.2.2 and a bill for the applicable initial premium contribution, payable in accordance with Exhibit A, and they shall be enrolled in the Basic Life Insurance Program automatically at such time.  Upon payment of such premium contribution, such Present Eligible Former Employees and Present Non-Represented Employees shall also be enrolled in the Health Benefit Program and the Supplemental Benefit Program. If any such person is eligible to enroll in the Optional Life Insurance Program at such time, he will receive substantially the information set out in Section 7.2.5. In the event of a change in the eligibility requirements under any of the Applicable Retirement Plans, if a Present Eligible Former Employee or a Present Non-Represented Employee applies for Pension Benefits prior to the time such person is eligible to receive benefits under the Plan, the Company shall

- 11 -

14

inform such person of the date on which such person shall be so eligible.

**7.2.7    Enrollment for Deferred Retiree Participants.**
Not less than two weeks before the date on which Deferred Retiree Participants become eligible to receive benefits under the Health Benefit Program, they will be sent a letter containing substantially the information set out in Section 7.2.2 and a bill for the applicable initial premium contribution, payable in accordance with Exhibit A. Upon payment of such premium contribution, such Deferred Retiree Participants shall be enrolled in the Health Benefit Program and the Supplemental Benefit Program.

**7.3    List of Eligible Class Members.** Exhibit C sets out the names of Present Retirees, Present Surviving Spouses, Present Eligible Former Employees and Present Non-Represented Employees, all as reflected in the records of the Company. At any time prior to the Effective Date, if the Company, the Class Members or the Class Representatives, or any of them, believes that an individual has been erroneously included in or excluded from Exhibit C, the inclusion or exclusion will be brought to the attention of the other parties. If the Company, the Class Members or the Class Representatives, or any of them, does not agree to the inclusion or exclusion of any such individual in or from Exhibit C, the disagreement shall be resolved through the claims dispute procedure set forth in the Health Benefit Program SPD. After the Effective Date, an individual who believes that he or she has been erroneously excluded from Exhibit C should contact the Plan Administrator, and any dispute shall be determined pursuant to the claims dispute procedures set forth in Exhibit A. No person erroneously included in Exhibit C shall be entitled to any benefits under this Settlement Agreement or the Exhibits. No person who would otherwise be entitled to Health and Life Insurance Benefits under any existing Plan shall lose his or her eligibility for benefits under this Settlement Agreement because he or she was erroneously excluded from Exhibit C.

**7.4    Erroneous Exclusion Remedy.** In the event that an individual who has been erroneously excluded from Exhibit C is later determined to be a Class Member, such individual's participation shall be recognized as of the Effective Date or such later date as such individual first became eligible to enroll in the Health Benefit Program and the Supplemental Benefit Program or, at the option of such Class Member, the date on which he or she receives the Health Benefit Program Letter and other material described in Section 7.2.2. The Company shall send the Health Benefit Program Letter and such other material to each individual erroneously excluded from Exhibit C as promptly as practicable upon learning that such individual was so excluded, explaining such person's enrollment options and offering to permit such individual to pay premium arrearages in installments as may be agreed between the Company and such individual.

- 12 -

1

8.    *Corporate Approvals.*

Navistar shall take all actions required in connection with the execution and delivery of this Settlement Agreement and the performance of its obligations hereunder. Without limiting the generality of the foregoing, Parent shall use its best efforts to obtain any necessary stockholder approval to ensure that the Certificate of Incorporation of Parent as of the Effective Date shall be in the form of the amended and restated certificate of incorporation attached as Appendix B-3 (the "<u>Charter Amendments</u>").

9.    *Contribution of Parent Securities.*

9.1   On the Effective Date, the Company shall contribute such number of shares of Parent Class B Common to the Supplemental Benefit Trust as shall ensure that the number of shares of Parent Common Equity held by the Supplemental Benefit Trust immediately following such contribution will represent 50 percent of the total shares of Parent Common Equity on a Fully Diluted Basis.

9.2   On the Effective Date, the Company shall contribute one share of Parent Series A Preference to the Supplemental Benefit Trust as described in Exhibit B.

9.3   On the Effective Date, the Company shall contribute one share of Parent Series B Preference to the UAW. This share may not be transferred, since the sole purpose of its issuance is to permit the UAW to elect the UAW Designee in accordance with Section 10.1. The following legend shall be placed on the certificate representing the Parent Series B Preference issued to the UAW:

"The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be sold or transferred except in compliance with such Act or an exemption from the registration requirements under such Act. In addition, the securities represented by this certificate are subject to voting agreements, transfer restrictions and other provisions contained in the Navistar International Corporation certificate of incorporation, and the Settlement Agreement, dated as of March 30, 1993 in the class action of *Shy et al. v. Navistar Civil Action No. C-3-92-33 (S.D. Ohio)*, a copy of which is on file at the office of the Secretary of Navistar International Corporation."

Stop transfer orders will be entered with the transfer agent (or agents) and the registrar (or registrars) of such securities

- 13 -

16

against the transfer of legended securities held by the UAW. Other than as provided herein, the UAW shall not give any proxies or powers of attorney or make any assignments with respect to the voting of, or enter into any voting trusts, voting agreements or similar arrangements with respect to the Parent Series B Preference.

10. Board of Directors.

10.1 Until the Fully Funded Date, the UAW shall be entitled to elect the UAW Designee. After the Fully Funded Date, the UAW shall be entitled, pursuant to the terms of its share of the Parent Series B Preference, to elect the UAW Designee at any time when the funding level of the Health Benefit Trust falls below 85 percent of the Fully Funded Amount. The UAW Designee shall not be entitled to any compensation from Parent for the performance of his services as such; provided, that the Company shall, at the option of the UAW (i) pay such director the value of any compensation paid to a non-employee director of Parent, (ii) contribute such amount to the Supplemental Benefit Trust or (iii) pay and contribute such amount to the UAW Designee and the Supplemental Benefit Trust in such proportions as the UAW shall direct in each case in a lump sum in cash within 30 days following the end of the year for which such payment or contribution is paid; and provided, further, that this Section 10.1 shall not affect the UAW Designee's right to any amount paid as or in lieu of reimbursement for expense.

10.2 The Supplemental Benefit Trust shall be entitled, pursuant to the terms of the Parent Series A Preference, to elect two Supplemental Benefit Trust Designees during such time as the Supplemental Benefit Trust holds 20 percent or more of the shares of Parent Common Equity then outstanding and one Supplemental Trust Designee during such time as the Supplemental Benefit Trust holds between 10 percent and 20 percent of the shares of Parent Common Equity then outstanding.

10.3 Parent shall indemnify each present or former UAW Designee and Supplemental Trust Designee for, and hold each such person harmless from and against, any and all losses, costs, liabilities, damages and expenses (including fees and disbursements of legal advisors), as incurred, which any such person may incur as a result of his or her actions or omissions as a director of Parent to the greatest extent that Parent then indemnifies or holds harmless any other director of Parent, whether pursuant to the Delaware General Corporation Law, Parent's Certificate of Incorporation, contract or otherwise. From and after the Effective Date and until the sixth anniversary of such time as no UAW Designee or Supplemental Trust Designee is entitled to serve on the Board, Parent shall cause to be maintained in effect its current policies of directors' and officers' liability insurance for the benefit of such Designees and, if such current policies cannot be maintained, Parent shall use its reasonable best efforts to obtain appropriate substitute policies of directors' and officers,

- 14 -

liability insurance; provided, that the terms and conditions of any such policies with respect to such Designees, or any of them, shall not be less favorable to such Designees than the terms and conditions of any directors' and officers' liability insurance then maintained by Parent for any of its other directors.

10.4 The Board shall cause the number of directors constituting the Board to be increased or decreased from time to time in order to include the UAW Designee and the Supplemental Trust Designees.

10.5 The UAW Designee and the Supplemental Trust Designees will be assigned to the committees of the Board in the same manner as the current members of the Board.

11. *Costs, Attorneys Fees and Indemnification.*

11.1 Navistar has agreed to support the award of the fees and expenses of actuarial, financial and legal advisors retained by the non-Navistar parties to the Foster Case and by the Class Representatives through the date of the Fairness Hearing up to an estimated aggregate amount not to exceed $3 million. This amount includes such fees and expenses already paid or payable pursuant to the Stay Orders. The amount of the fees and expenses of each of such advisors through the date of this Settlement Agreement shall be set out in Exhibit J. Exhibit J shall also set out the reasonably projected additional fees and expenses of actuarial, financial and legal advisors retained by the Class Representatives. All attorneys' fees included in such amounts shall be determined on a strict hourly fee basis with no claims for premium billing. Navistar agrees to support the award of the fees and expenses described above, including such estimated projected fees and expenses. As promptly as practicable after the date hereof, Navistar and the Class Representatives shall prepare a petition jointly requesting the award of such fees and expenses, which shall be submitted to the Court for approval prior to the date of the Fairness Hearing.

11.2 Navistar further agrees to support the award of reasonable fees and expenses of actuarial, financial and legal advisors retained by the Class Representatives from the date of the Fairness Hearing until the Judgment has become Final; provided, that the amount of such fees and expenses will be determined in accordance with the principles set forth in Section 11.1. Each party to this Settlement Agreement agrees not to seek any other future fees or expenses from any other party in connection with the Shy Case, except that the Class Representatives or any other party prevailing in any action to enforce the terms of this Settlement Agreement may seek any such fees and costs as may be allowed by law or as provided herein.

11.3 Parent and the Company shall indemnify the Class Representatives for, and hold them harmless from and against, any

– 15 –

18

and all losses, costs, liabilities, damages and expenses (including, without limitation, fines, penalties, taxes and the fees and disbursements of actuarial, financial and legal advisors) as incurred, which they may incur (a) in connection with or arising out of the Litigation, including, without limitation, the execution, delivery, performance and enforcement of this Settlement Agreement, (b) as a result of the failure of Navistar to comply with its obligations hereunder or the failure of any representation or warranty made by Navistar to be true and complete on and as of the date on which it was made or (c) as a result of any limitation on the legality, validity, binding nature or enforceability of this Settlement Agreement as a result of Navistar's obligation to indemnify the any Employer, except that Navistar's obligation to indemnify the non-Navistar parties to the Foster Case and the Class Representatives for the fees and expenses of actuarial, financial and legal advisors retained by them through the date on which the Judgment becomes Final shall be limited to the fees and expenses specified in Sections 11.1 and 11.2. Any claim for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

12. *Conditions and Effective Date of Settlement.*

12.1 This Settlement Agreement shall become effective on the date on which each of the following conditions has been satisfied or waived in accordance with Section 12.2 or 12.3 (the "Effective Date").

12.1.1 The Court entering the Notice Order and such order not being materially modified after being entered.

12.1.2 The Court entering the Judgment and the Judgment becoming Final without being materially modified.

12.1.3 The parties receiving the DOL Exemptions.

12.1.4 Receipt of (a) a private ruling or rulings from the IRS or (b) a favorable reasoned opinion of Covington & Burling addressed and in form and substance satisfactory to Navistar and the Class Representatives to the effect that the Health Benefit Trust and the Supplemental Benefit Trust will be organizations described in Section 501(c)(9) of the IRC, assuming that such trusts (i) are operated in accordance with Appendices A-3 and B-2 to Exhibits A and B, respectively, and (ii) satisfy the notification requirement imposed by Section 505(c) of the IRC.

12.1.5 The receipt of (i) (a) a private letter ruling or rulings from the IRS or (b) a favorable reasoned opinion of Covington & Burling addressed and in form and substance satisfactory to Navistar and the Class Representatives to the effect that (i) the Health Benefit Trust and the Supplemental Benefit Trust will be eligible for the exclusion from the application of the account limits under Section 419A of the IRC by

– 16 –

19

reason of Section 419A(f)(5)(A) of the IRC, and (ii) the income of the Health Benefit Trust and the Supplemental Benefit Trust (other than any gross income derived from any unrelated trade or business regularly carried on by the Health Benefit Trust or the Supplemental Benefit Trust) that is set aside to provide for post-retirement benefits will be exempt function income within the meaning of Section 512(a)(3)(B) of the IRC, assuming that such trusts are operated in accordance with Appendices A-3 and B-2 to Exhibits A and B, respectively, and (II) a favorable reasoned opinion of Covington & Burling addressed and in form and substance satisfactory to Navistar and the Class Representatives to the effect that the Health Benefit Trust and the Supplemental Benefit Trust will not be subject to income tax under the IRC or to the excise tax imposed by Section 4976 of the IRC, assuming that (a) such trusts are operated in accordance with Appendices A-3 and B-2 to Exhibits A and B, respectively, (b) all of the income of each of such trusts is set aside to provide for the payment of life, sick, accident, or other benefits within the meaning of section 512(a)(3)(B)(ii) of the IRC, (c) such trusts derive no gross income from any unrelated trade or business regularly carried on by such trusts computed as if the trusts were subject to Section 512(a)(1), and (d) such trusts satisfy the notification requirement imposed by Section 505(c) of the IRC.

12.1.6   Ratification of CBAs between Navistar and the Collective Bargaining Representatives such that all Present Employees who are represented by Collective Bargaining Representatives shall, upon such Present Employees becoming Retirees, be eligible to receive benefits under the Plan (the "New CBAs").

12.1.7   All necessary actions required in connection with Navistar's execution and delivery of this Settlement Agreement and the performance of its obligations hereunder (including approval of the Charter Amendments) having been taken.

12.1.8   The Health Benefit Trust and the Supplemental Benefit Trust having been established in the form set forth in Appendices A-3 and B-2 to Exhibits A and B, respectively, or in such amended form as may be approved by the Company and the Class Representatives; provided, that no such amendment shall adversely impact the level of benefits to any Class Member.

12.1.9   The contribution of Parent Class B Common and the Parent Series A Preference to the Supplemental Benefit Trust and the Parent Series B Preference to the UAW, in each case in accordance with Section 9.

12.1.10   The size of the Board of Directors of Parent having been increased to the extent necessary to permit the election to the Board of the Supplemental Trust Designees and the UAW Designee, and the holders of the Parent Series A Preference and Parent Series B Preference having the ability forthwith to elect

- 17 -

20

the Supplemental Trust Designees and the UAW Designee, respectively, to the Board.

12.1.11 The delivery of legal opinions substantially in the form of Exhibit K attached hereto.

12.1.12 The NFC Revolving Credit Agreement dated as of November 9, 1990 and the NFC Retail Note Purchase Facility dated as of August 23, 1989 having been amended on terms and conditions consistent in all material respects with the term sheet dated December 17, 1992 including with respect to the extension of the maturity of such agreements to November 15, 1995 and authorization of the payment of a special dividend by NFC to the Company in the amount of $20 million in excess of the amount of any dividends of NFC permitted under such agreements immediately prior to the effectiveness of such amendments.

12.1.13 The delivery of a notice from the office of the Secretary of State of Delaware, dated the Effective Date, of the filing of amendments to the Certificate of Incorporation of Parent or articles of merger with respect to the merger of Parent into a wholly-owned subsidiary of Parent.

12.1.14 The delivery of a certificate executed by the secretary of Parent as to the adoption and effectiveness of the certificate of incorporation of Parent.

12.1.15 The delivery of certificates of the secretaries of state of the respective states of incorporation of each of the Employers that each such party is a corporation duly organized, validly existing and in good standing in such state as of the Effective Date.

12.1.16 The delivery of a certificate executed by the secretary of each of the Employers as to the adoption and effectiveness of resolutions of the board of directors of each of such parties authorizing the appropriate officers to execute and deliver each document referred to herein required to be executed by such party and to take any and all such further actions as may be necessary or appropriate in connection with the performance of its obligations hereunder.

12.1.17 The delivery of a certificate executed by the secretary of each of the Employers as to the incumbency of each officer of such party executing any document referred to herein or taking any and all such further actions as may be necessary or appropriate in connection with the performance of its obligations hereunder.

12.1.18 The delivery of a certificate of an authorized officer of Parent to the effect that the shares of Parent Class B Common contributed to the Supplemental Benefit Trust represent 50%

– 18 –

2

of the Parent Common Equity issued and outstanding on a Fully Diluted Basis immediately after giving effect to such contribution.

officer of each of the Navistar Parties to the effect that (a) the representations of such party in Section 14.2 are true and correct on and as of the Effective Date and (b) such party has performed and complied with all terms of this Settlement Agreement to be performed or complied with by it on or before the Effective Date.

12.1.19  The delivery of a certificate of an authorized

12.1.20  The delivery of a waiver executed by a duly authorized officer of each Employer of its rights to seek any amendment or modification of the Plan pursuant to Section 1114 of the Bankruptcy Code or of any New CBA pursuant to Section 1113 of the Bankruptcy Code substantially in the form of Sections 15.1.1 and 15.1.2 hereto.

12.1.21  The delivery of such further information and documents as Class Counsel or the Class Representatives, or any of them, may reasonably request (a) to evidence the compliance of Navistar with its obligations under this Settlement Agreement, (b) to substantiate the representations of Navistar contained in Section 14.2 and (c) to consummate the transactions contemplated by this Settlement Agreement.

12.1.22  The establishment of the Plan, which shall occur on the first day of a calendar month.

12.2  Navistar and the Class Representatives may jointly waive any of the conditions set out in Sections 12.1.2 to 12.1.21 by means of a written instrument executed by each of such parties; provided, that Navistar and the UAW may jointly waive the condition set out in Section 12.1.6 by means of a written instrument executed by both of such parties.  If any such condition is waived as provided in this Section 12.2, then such waiver shall include a waiver of any representation or warranty made in Section 14.2 which would otherwise be untrue as a result of such condition being unsatisfied.

12.3  In the event that an appeal period remains pending at the conclusion of the appeal period following the entry of the Judgment, Navistar and the Class Representatives will jointly make every effort to expedite resolution of such appeal because it is their intent to implement this Settlement Agreement as expeditiously as possible.  If such efforts are unsuccessful then, notwithstanding Section 12.1.2, if each of the conditions set out in Section 12.1.1 and Sections 12.1.3 through 12.1.21 have been satisfied or waived in accordance with Section 12.2, Navistar may proceed with the implementation of the Plan unless implementation of a material aspect of this Settlement Agreement is enjoined or unless counsel for either the UAW or the Company delivers an opinion that it is probable that such appeal will be successful.

- 19 -

22

13. *Effect of Disapproval or Modification.*

In the event that the Judgment is materially modified as the result of any ruling by the Court or by the Court of Appeals, either of Navistar or the Class Representatives may terminate this Settlement Agreement by notice to the others within 90 days of such modification after negotiating in good faith to agree on such amendments to this Settlement Agreement as will effectuate the purposes hereof while complying with the terms of such modification; provided, that the obligations of Navistar in Sections 10.3 and 11 shall survive such termination. In the event of such termination, the positions of Navistar, the Class, the Class Representatives, or any of them, shall be deemed to have reverted to the positions of such parties as of the date and time immediately prior to the execution of this Settlement Agreement as provided under the executed stipulations and Orders for Stay of litigation and Certain Other Matters ("stay Orders"), including reinstatement of the Existing Plans. As promptly as practicable following such termination, the UAW Designee and the Supplemental Trust Designees shall resign from the Board. In the event of a termination under this Section, the Company shall apply assets held in the Health Benefit Trust or the Supplemental Benefit Trust to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the IRC). Monies disbursed (i) by Navistar pursuant to the Stay Orders or Section 11 or (ii) which have been used to provide benefits to Participants shall not be reimbursed and, except as otherwise expressly provided herein, the parties shall thereafter proceed in all respects as if this Settlement Agreement had not been executed, without prejudice to the right of any party to assert any claims or to be reimbursed for costs and expenses incurred by it pursuant to the Stay Orders, this Settlement Agreement or any other agreement. In the event of such termination, the parties specifically agree that in the event any subsequent proceedings in the Shy Case are necessary, each of the parties will bear its own costs and expenses (including the fees and expenses of actuarial, financial and legal advisors), without prejudice to its right to seek reimbursement of such costs and expenses as permitted by law or pursuant to any future stay order or agreement among the parties.

14. *Representations and Warranties.*

14.1 Class Counsel represent and warrant to Navistar that they have full power and authority to execute and deliver this Settlement Agreement on behalf of the Class Representatives and to perform their obligations hereunder.

14.2 Navistar represents and warrants to Class Counsel and the Class Representatives as of the Effective Date as follows:

- 20 -

2

Employers are all corporations duly incorporated, validly existing, and in good standing in the jurisdictions of their incorporation;

(a) The Navistar Parties and the other Employers have all necessary power and authority to execute and deliver this Settlement Agreement and each document referred to herein to be executed and delivered by them and to take any action required or appropriate to be taken by them in connection with the performance of their obligations hereunder;

(b) Navistar and the other Employers have all necessary power and authority to execute and deliver this Settlement Agreement and each document referred to herein to be executed and delivered by them and to take any action required or appropriate to be taken by them in connection with the performance of their obligations hereunder;

(c) The execution and delivery of this Settlement Agreement and any document referred to herein to be executed and delivered by Navistar or any other Employer and any action required or appropriate to be taken by any of them in connection with the performance of its obligations hereunder have been duly authorized by all necessary action on the part of such party;

(d) This Settlement Agreement and each document required to be executed and delivered by Navistar or any other Employer are the legal, valid and binding obligations of Navistar or such other Employer enforceable against them in accordance with their terms except to the extent such enforceability is limited by bankruptcy;

(e) The Class Members include all of the individuals entitled to receive Health and Life Insurance Benefits under Existing Plans, except for the Excluded Retirees. All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan (except for the Excluded Retirees) in the absence of this Settlement Agreement shall be eligible for benefits under the Plan. No person not otherwise eligible for Health and Life Insurance Benefits under an Existing Plan shall be eligible for any benefit by virtue of this Settlement Agreement.

(f) The execution and delivery of this Settlement Agreement and any document referred to herein and the performance of the obligations of Navistar and the other Employers hereunder will not (i) violate or conflict with the certificate of incorporation, by-laws or other constituent documents of Navistar or any other Employer, (ii) require the consent of any person, or violate or conflict with or accelerate the performance required, under any agreement to which Navistar or any other Employer is a party or by which it is bound, (iii) violate or conflict with any statute, rule or regulation applicable to Navistar or any other Employer or by which any of such parties is bound, (iv) violate the authorization or approval of, any other action by, or any notice to or filing with, any governmental authority in connection with Navistar's execution and delivery of this Settlement Agreement or the performance of the obligations of Navistar or any other Employer hereunder, other than the authorizations, approvals,

- 21 -

notices and filings referred to in Section 12.1, (v) violate or conflict with any order, ruling, decree, judgment or award of any court, arbitrator or government agency applicable to Navistar or any other Employer or (vi) result in the creation of any lien, claim, security interest, encumbrance, charge, restriction or right of any kind whatsoever of any third party upon any of the properties or assets of Navistar or any other Employer;

(g) Upon their issuance in accordance with the terms of this Settlement Agreement, the shares of Parent Class B Common, Parent Series A Preference and Parent Series B Preference to be issued by Parent will be duly and validly authorized, issued and outstanding, fully paid and non-assessable;

(h) Immediately following their issuance in accordance with the terms of this Settlement Agreement, the shares of Parent Class B Common to be issued by Parent will represent 50 percent of the shares of Parent Common Equity issued and outstanding on a Fully Diluted Basis;

(i) Upon the issuance of the shares of Parent Class B Common, Parent Series A Preference and Parent Series B Preference to be issued by the Parent in accordance with the terms of this Settlement Agreement, the Supplemental Benefit Trust and the UAW will acquire valid title to, and full rights of ownership of, the shares issued to them, free and clear of any and all liens, claims, security interests, encumbrances, charges, restrictions or rights of third parties of any kind (other than restrictions set out in Exhibit B or under the Securities Act); and

(j) Except as specifically set forth herein, the execution, delivery and performance of this Settlement Agreement shall not result in the creation of any rights in, or in any payments to, any employee, officer or director of any of the Navistar Parties and shall not constitute a change in control or similar event under any plan, program, arrangement or agreement with, or benefitting, any such employee, officer or director.

14.3   Counsel to Navistar represent and warrant to the Class Representatives that they have full power and authority to execute and deliver this Settlement Agreement on behalf of Navistar.

15.   *Miscellaneous Provisions.*

15.1   Waiver of Sections 1113 and 1114.

15.1.1   In consideration of the agreements of the Class Representatives in this Settlement Agreement, Navistar hereby waives, and shall cause each of the other Employers to waive, its rights to seek any amendment or modification of the Plan pursuant to Section 1114 of the Bankruptcy Code. In the event that the waiver set forth in the preceding sentence is held to be unenforceable and any court of competent jurisdiction should

approve any such amendment or modification, then Navistar will be obligated to take, and shall cause such other Employers to take, such remedial actions as the Class Representatives may deem appropriate in order to place the Participants in substantially the same position as they would have been in had the waiver been held valid.

15.1.2 In consideration of the agreements of the Class Representatives in this Settlement Agreement, Navistar hereby waives, and shall cause each of the other Employers to waive, its rights to seek amendment or modification of the New CBAs pursuant to Section 1113 of the Bankruptcy Code. In the event that the waiver set forth in the preceding sentence is found to be unenforceable and a court of competent jurisdiction should approve any such amendment or modification, then Navistar will be obligated to take such remedial actions as the Class Representatives may deem appropriate in order to place the Employees covered by the New CBAs in substantially the same position as they would have been in had the waiver been held valid.

15.2 The Exhibits hereto are incorporated in this Settlement Agreement as though fully set forth herein. References in this Settlement Agreement to "Sections" and "Exhibits" refer to the Sections and Exhibits of this Settlement Agreement unless otherwise specified.

15.3 The waiver by one party of (a) any breach by the other party of, or (b) any other right to enforce or claim or benefit under, this Settlement Agreement shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, this Settlement Agreement.

15.4 This Court will retain exclusive jurisdiction to resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of this Settlement Agreement, except for disputes relating solely to eligibility or entitlement to benefits hereunder. Each of the parties hereto expressly and irrevocably submits to the jurisdiction of the Court in connection with any proceedings in connection with the enforcement, interpretation or implementation of this Settlement Agreement, except for disputes relating solely to eligibility or entitlement to benefits hereunder, and expressly waives any argument it may have with respect to venue or <u>forum non conveniens</u>.

15.5 This Settlement Agreement constitutes the entire agreement between the parties, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than the representations, warranties and covenants contained and memorialized in this Settlement Agreement. This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, which are related to the subject matter hereof.

15.6    The captions used in this Settlement Agreement are for convenience of reference only and do not constitute a part of this Settlement Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Settlement Agreement, and all provisions of this Settlement Agreement will be enforced and construed as if no captions had been used in this Settlement Agreement.

15.7    The Class Representatives expressly authorize Class Counsel to take all appropriate action required or permitted to be taken by the Class Representatives pursuant to this Settlement Agreement to effectuate its terms and also expressly authorize Class Counsel to enter into any non-material modifications or amendments to this Settlement Agreement on behalf of them that Class Counsel deems appropriate from the date this Settlement Agreement is signed until the Effective Date; provided, that the effectiveness of any amendment which adversely impacts the level of Plan benefits to any Class Member as well as any material amendment shall be subject to the approval of the Court after appropriate notice to the Class Members.

15.8    This Settlement Agreement may be executed in two or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument, provided that counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

15.9    No party to this Settlement Agreement may assign any of its rights hereunder without the prior written consent of the other parties, and any purported assignment in violation of this sentence shall be void. Any party to this Settlement Agreement may delegate any of its obligations under this Settlement Agreement; provided, that no such delegation shall relieve such party of such obligation; and provided, further, that the delegation of any of the obligations of Navistar under this Settlement Agreement to the transferee of all or any part of the assets of any Employer shall be subject to the express written assumption of such obligations by such transferee.

15.10    By executing and supporting this Settlement Agreement, and by agreeing to its provisions regarding the role of the Class Representatives in corporate governance, administration of the Plan, claims dispute resolution, and other matters, the Class Representatives are not undertaking any legal duty or standard of care with respect to such future activities except as otherwise may be required by law. In all instances where individual Class Members have the right to initiate claims review or arbitration proceedings, no failure of the Class Representatives to participate in such proceedings shall bar or prejudice any such Class Members.

15.11   Each of Navistar, the Class Representatives and the Class Counsel shall do any and all acts and things, and shall

– 24 –

27

execute and deliver any and all documents, as may be necessary or appropriate to effect the purposes of this Settlement Agreement.

15.12 This Settlement Agreement shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or preempted thereby, with the laws of the State of Illinois.

15.13 Any notice, request, information or other document to be given under this Settlement Agreement to any of the parties by any other party shall be in writing or delivered personally, or sent by Federal Express or other carrier which guarantees next-day delivery, transmitted by facsimile, or sent by registered or certified mail, postage prepaid, as follows:

If to the Class Representatives or Class Counsel, addressed to Class Counsel at the addresses indicated on the signature pages of this Settlement Agreement

If to Navistar, addressed to:

Navistar International Transportation Corp.
Benefits Department
455 North Cityfront Plaza Drive
Chicago, Illinois 60611

in each case with copies to:

General Counsel
Navistar International Transportation Corp.
455 North Cityfront Plaza Drive
Chicago, Illinois 60611

and

Emily Nicklin, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601

IN WITNESS WHEREOF, the parties hereto have caused this Settlement Agreement to be executed by themselves or their duly authorized attorneys.

– 25 –

28

/s/ David S. Cupps
David S. Cupps       (0017002)
Anne C. Griffin      (0017571)
VORYS, SATER, SEYMOUR & PEASE
52 East Gay Street
P.O. Box 1008
Columbus, Ohio  43216-1008
(614) 464-6319

Trial Attorney

/s/ Emily Nicklin
Emily Nicklin
Ruben Castillo
KIRKLAND & ELLIS
200 E. Randolph Drive
Chicago, Illinois  60601
(312) 861-2000

Attorneys for Defendants Navistar International
Corporation, Navistar International
Transportation Corp., Navistar Financial
Corporation, Harco National Insurance Company,
the Navistar International Transportation Corp.
Health Plan and the Indianapolis Casting
Corporation

/s/ Daniel W. Sherrick
Daniel W. Sherrick
Associate General Counsel
International Union, United Automobile, Aerospace
and Agricultural Implement Workers of America, UAW
8000 East Jefferson
Detroit, Michigan  48214
(313) 926-5216

Counsel for Plaintiffs International Union,
United Automobile, Aerospace, and Agricultural
Implement Workers of America, and its Local
Unions 6, 66, 98, 119, 226, 305, 402, 472,
658, 2274 and 2293

/s/ Betty Grdina
Betty Grdina                         , Trial Attorney
BOBULSKY, GRDINA & ALTIER        (0014602)
2036 East Prospect Road
Ashtabula, Ohio  44004
(216) 998-4214

Counsel for Plaintiffs Art Shy,
Fred Burris, Clarence Nuss, John Herring,
Henry G. Betley and Richard A. Spitler

- 26 -

/s/ Gerald B. Lackey
Gerald B. Lackey                                , Trial Attorney
LACKEY, NUSBAUM, HARRIS, RENY & TORZEWSKI    (0017244)
Two Maritime Plaza, 3rd Floor
Toledo, Ohio 46304
(419) 243-1105

Counsel for Plaintiffs Carl Potts and
Harold Retherford

/s/ Barry Macey
Barry Macey
MACEY, MACEY & SWANSON
445 North Pennsylvania Street
Suite 401
Indianapolis, Indiana 46204
(317) 637-2345

Counsel for Plaintiffs Jack O'Neal &
Donald McPhearson

/s/ Gordon A. Gregory
Gordon A. Gregory
GREGORY, MOORE, JAEKLE, HEINEN
ELLISON & BROOKS
3727 Cadillac Tower
Detroit, Michigan 48226
(313) 964-5600

Counsel for Plaintiffs International Union,
United Plant Guard Workers of America, and its Local
Unions 122, 4 and 134

/s/ Mark Schneider
Mark Schneider
Associate General Counsel
International Association of Machinists
900 Machinists Place
Upper Marlboro, Maryland 20772
(301) 967-4500

Counsel for International Association
of Machinists, its District Lodge 28,
and its Local Lodges 1471, 2819, and 2821

/s/ Bruce O. Boxberger
Bruce O. Boxberger
Arthur E. Mandelbaum

- 27 -

30

MILLER, CARSON & BOXBERGER
1400 One Summit Square
Fort Wayne, Indiana 46802
(219) 423-9411

Counsel for Society of Engineering
Employees, Inc.


/s/ David Gore
David Gore
KLEIMAN, WHITNEY, WOLFE & GORE
One East Wacker Drive
Suite 1910
Chicago, Illinois 60601
(312) 467-4380

Counsel for International Union,
United Steelworkers of America, and its Local 4320
and USWA, Local 4320


/s/ Frederick G. Cloppert, Jr., Trial Attorney
Frederick G. Cloppert, Jr.          (0010371)
Michael J. Hunter                   (0018756)
CLOPPERT, PORTMAN, SAUTER, LATANICK & FOLEY
225 East Broad Street
Columbus, Ohio 43215
(614) 461-4455

Local Counsel for all Unions and
Individual Plaintiffs listed above


/s/ Ian D. Lanoff
Ian D. Lanoff
Julia Penny Clark
BREDHOFF & KAISER
1000 Connecticut Ave., N.W.
Suite 1300
Washington, D.C. 20036
(202) 833-9340

Additional Counsel for all Unions and
Individuals listed above

THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.
RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN

EXHIBIT A

# TABLE OF CONTENTS

ARTICLE I        Introduction . . . . . . . . . .        1

1.1   Definitions . . . . . . . . . . . . .        1
1.2   Purpose of the Plan . . . . . . . . .        1
1.3   Health Benefit Program, Life Insurance
      Program, Supplemental Benefit Program .        1
1.4   Trust Funds . . . . . . . . . . . . .        2
1.5   Administration, Plan Year . . . . . .        2
1.6   Amendments . . . . . . . . . . . . .         3
1.7   Termination of Existing Health and Life
      Insurance Benefits . . . . . . . . .         3

ARTICLE II       Plan Participants . . . . . . . .        3

2.1   Eligibility . . . . . . . . . . . . .        3
2.2   Enrollment . . . . . . . . . . . . .         4
2.3   Termination of Coverage Under the Health
      Benefit Program . . . . . . . . . .          5
2.4   Re-Enrollment . . . . . . . . . . . .        6

ARTICLE III      Contributions to the Health
                 Benefit Program . . . . . . . .          6

3.1   Determinations by the Actuary . . . .        6
3.2   Contributing Participants' Annual
      Contributions . . . . . . . . . . .          7
3.3   Employers' Annual Contribution . . .         10
3.4   Transfers of Funds between Sub-accounts .     10
3.5   Transfers from the Supplemental Benefit Trust
      to the Health Benefit Trust . . . .           11
3.6   Employers' Prefunding Contributions . .       11
3.7   Payment of Benefits . . . . . . . . .         12
3.9   Guarantee of Health Benefit Program .         15

ARTICLE IV       Contributions to Life Insurance
                 Program . . . . . . . . . . . .         16

4.1   Employer Contributions . . . . . . .         16
4.2   Optional Life Insurance . . . . . . .        16
4.3   Guarantee of Life Insurance Program .         17

ARTICLE V        Administration of the Health Benefit
                 Program and the Life Insurance
                 Program . . . . . . . . . . . .         18

ARTICLE VI       Health Benefit Program Committee .       19

6.1   Health Benefit Program Committee . .         19
6.2   Committee Powers . . . . . . . . . .         19

- i -

6.3    Program Design . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
6.4    Action by Health Benefit Program Committee . . . . . 21
6.5    Health Benefit Program Committee Minutes . . . . . . 22
6.6    HBPC Other Member . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
6.7    Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
6.8    Dispute Resolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARTICLE VII     General Provisions . . . . . . . . . . . . . . . . . . . . . 24

7.1    Required Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
7.2    Non-Alienation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
7.3    Action by Employers . . . . . . . . . . . . . . . . . . . . . . . . . . 24
7.4    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
7.5    Limitation of Liability; Indemnification . . . . . . 24
7.6    Limitation on Liens as Security for Employers'
       Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
7.7    Limitations on Sale and Lease-Back
       Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
7.8    Subrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
7.9    Assignment and Delegations . . . . . . . . . . . . . . . . . . . 28
7.10   Captions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE VIII    Amendment and Termination . . . . . . . . . . . . . 29

8.1    Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
8.2    Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE IX     Exclusive Benefit and Prohibited Inurement  30

9.1    Exclusive Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
9.2    Prohibited Inurement . . . . . . . . . . . . . . . . . . . . . . . . . 30

ARTICLE X      Events of Default . . . . . . . . . . . . . . . . . . . . . . 30

APPENDICES

Appendix A-1    Health Benefit Program SPD
Appendix A-2    Life Insurance Program SPD
Appendix A-3    Health Benefit Trust Agreement
Appendix A-4    Present Represented Employees
Appendix A-5    Initial Actuarial Report
Appendix A-6    Actuarial Definitions Supplement
Appendix A-7    HBPC Committee Members

- ii -

34

# NAVISTAR INTERNATIONAL TRANSPORTATION CORP. RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN

## ARTICLE I

### Introduction

1.1 <u>Definitions</u>. Capitalized terms used and not defined herein have the meanings assigned to them in Exhibit D to the Settlement Agreement.

1.2 <u>Purpose of the Plan</u>. The Plan shall be established by the Employers effective as of the Effective Date. The purpose of the Plan is (i) to provide Enrolled Participants with the health insurance benefits described herein; (ii) to provide all Retirees, whether or not they are Enrolled Participants, with the life insurance benefits described here, and (iii) to provide Enrolled Participants and all Retirees with the additional benefits described in Exhibit B to the Settlement Agreement. Enrolled Participants who are (i) Retirees and Surviving Spouses will be eligible to receive such health insurance and additional benefits for the duration of their lives and (ii) Eligible Dependents will be eligible to receive such health insurance and additional benefits for so long as they remain Eligible Dependents. Basic life insurance benefits shall be provided to Retirees for the duration of their lives.

1.3 <u>Health Benefit Program, Life Insurance Program, Supplemental Benefit Program</u>. The Plan ("Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan") consists of the Health Benefit Program ("Navistar International Transportation Corp. Retiree Health Benefit Program"), the Life Insurance Program ("Navistar International Transportation Corp. Retiree Life Insurance Program") and the Supplemental Benefit Program ("Navistar International Transportation Corp. Retiree Supplemental Benefit Program").

(a) The Health Benefit Program provides for the health benefits described in the SPD attached as Appendix A-1 hereto. Such SPD also describes the preferred provider organization and coordinated care features of the Health Benefit Program and the HMO alternatives to the Health Benefit Program. The Plan Administrator will make arrangements for Contributing Participants to be afforded the option to subscribe to HMO alternatives as required by law or as determined by the UAW/Navistar Joint Health Benefit Program described in Appendix A-1. Contributing Participants who are Retirees or Surviving Spouses will be given the opportunity not less than once

3

each year to elect to change their enrollment (and that of their Eligible Dependents) from the Health Benefit Program to such HMO alternatives or from such HMO alternatives to the Health Benefit Program. If such a Retiree or Surviving Spouse elects an HMO alternative, the Actuary shall determine the per capita cost of benefits under the Health Benefit Program for such Contributing Participant, and the excess of the premium contribution payable to the HMO for such Contributing Participant over such amount shall be added to the required contributions of such Contributing Participant under the Health Benefit Program. Promptly after receiving notice from a Contributing Participant who has elected to enroll in an HMO alternative that he or she has moved out of an area where such HMO alternative is offered, the Plan Administrator shall notify such Contributing Participant of the premium contribution required to be made to the Health Benefit Trust to receive coverage under the Health Benefit Program. Such Contributing Participant will be transferred to coverage under the Health Benefit Program as of the first day of the calendar month following the month for which premium payments are last made to the HMO on behalf of the Contributing Participant.

(b) The Life Insurance Program provides Retirees with the life insurance benefits described in the SPD attached as Appendix A-2 hereto.

(c) The Supplemental Benefit Program provides for the reduction or reimbursement of premiums, co-payments, deductibles and other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program or to participate in Medicare or any part thereof, or any successor or comparable program thereto, and for the provision of Additional Permissible Benefits to Enrolled Participants and Retirees whether or not they are Enrolled Participants, as set forth in Exhibit B to the Settlement Agreement.

1.4  **Trust Funds.**  The Health Benefit Program and the Life Insurance Program shall be implemented by the Health Benefit Trust. The Supplemental Benefit Program shall be implemented by the Supplemental Benefit Trust. The Health Benefit Trust and the Supplemental Benefit Trust are intended to meet the requirements of tax exempt organizations under Section 501(c)(9) of the IRC, or under any comparable section or sections of any future legislation that amends, supplements or supersedes said section.

1.5  **Administration Plan Year.**  The Plan is administered for plan reporting purposes on the basis of the Plan Year, although the determinations to be made by the Actuary hereunder are made on

- 2 -

36

the basis of the calendar year or the Measurement Year. The Health Benefit Program and the Life Insurance Program are administered by the Company as the Plan Administrator and Named Fiduciary in accordance with Article V, subject to the review authority of the Health Benefit Program Committee provided in Article VI.

1.6 **Amendments.** The benefits provided under the Plan may be amended only to the limited extent provided in Section 8.1.

1.7 **Termination of Existing Health and Life Insurance Benefits.** The Company will, and will cause the other Employers to, terminate coverage for Health and Life Insurance Benefits under Existing Plans (other than for Excluded Retirees and Deferred Retiree Participants) as of the end of the day immediately before the Effective Date. The Company will, and will cause the other Employers to, terminate the coverage of Deferred Retiree Participants for Health and Life Insurance Benefits under the Existing Plans as of the end of the first day permitted by the applicable settlement agreements, whereupon they will be eligible to receive benefits under the Health Benefit Program and the Supplemental Benefit Program. Claims incurred prior to the Effective Date or such day will be paid under the Existing Plans in accordance with the terms thereof. Claims for hospital stays which commenced and pregnancies which occurred prior to the Effective Date will be paid as described in the Health Benefit Program SPD.

## ARTICLE II

## Plan Participants

2.1 **Eligibility.** The following shall apply with respect to eligibility:

(a) Each Present Employee, Present Eligible Former Employee, Present Retiree, Present Eligible Dependent and Present Surviving Spouse shall be a Participant in the Plan as of the Effective Date;

(b) Present Retirees (other than Deferred Retiree Participants), Present Surviving Spouses and Present Eligible Dependents will be entitled to receive benefits under the Health Benefit Program on the Effective Date, subject to the applicable enrollment requirements set forth below. Present Retirees will receive benefits under the Basic Life Insurance Program without contribution or enrollment. Present Retirees if they make required contribution under the Optional Life Insurance Program if they meet the eligibility requirements set forth in the Life Insurance Program SPD. Deferred Retiree Participants will be entitled to receive benefits under the Health Benefit Program at such time as may be permitted under the applicable settlement agreement. Present Eligible Employees and Present Non-Represented Employees shall be eligible for benefits

- 3 -

under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement;

(c) Present Represented Employees shall be eligible for benefits under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement;

(d) Exhibit C is intended to list all President Non-Represented Employees, Present Eligible Former Employees, Present Retirees and Present Surviving Spouses, as reflected in the records of the Company. Appendix A-4 is intended to list all Present Represented Employees, as reflected in the records of the Company. The Company shall correct each error in Exhibit C and Appendix A-4 (including each omission therefrom) as it becomes known. All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan in the absence of the Settlement Agreement (other than Excluded Retirees) shall be eligible for benefits under the Plan. No person erroneously listed on Exhibit C or Appendix A-4 shall be entitled to any benefits hereunder. Any disputes concerning eligibility to participate in the Plan shall be resolved through the claims dispute procedure set forth in Appendix A-1.

2.2 Enrollment. Participants may enroll in the Health Benefit Program and the Supplemental Benefit Program as follows:

(a) Each Present Retiree, Present Surviving Spouse, Present Eligible Former Employee and Present Non-Represented Employee may enroll in the Health Benefit Program and the Supplemental Benefit Program for themselves and for their Eligible Dependents as provided in the Settlement Agreement;

(b) Each Present Represented Employee may apply to enroll in the Health Benefit Program, the Supplemental Benefit Program and (if they meet the eligibility requirements set out in the Life Insurance Program SPD) the Optional Life Insurance Program as of the date on which they apply to receive Pension Benefits. If such Present Represented Employees are eligible to enroll in the Health Benefit program and the Supplemental Program at such time, they will receive a notice and a bill for the applicable initial premium contribution, in accordance with the reasonable enrollment procedures adopted by the Plan Administrator from time to time, and they shall be enrolled in the Basic Life Insurance Program automatically at such time. Upon payment of such premium contribution, such Present Represented Employee shall also be enrolled in the Health Benefit Program and the Supplemental Benefit Program. If any such person is eligible to enroll in the Optional Life Insurance Program

- 4 -

at such time, he will receive information in accordance with the reasonable enrollment procedures adopted by the Plan Administrator from time to time. In the event of a change in the eligibility requirements under any of the Applicable Retirement Plans, if a Present Represented Employee applies for Pension Benefits prior to the time such person is eligible to receive benefits under the Plan, the Plan Administrator shall inform such person of the date on which such person shall be so eligible; and

(c)     Each Future Surviving Spouse not otherwise enrolled at the death of his or her wife or husband shall become eligible to enroll in the Health Benefit Program and the Supplemental Benefit Program for himself or herself and any other Eligible Dependents at that time.

The Plan Administrator shall notify each person described in subparagraphs (b) and (c) of their eligibility to enroll in the Plan without any pre-existing condition limitation or health screening requirement. Notices of the monthly contributions required to be made to the Health Benefit Program by or on behalf of Enrolled Participants shall be sent each month to all Contributing Participants and to all Participants who become eligible to become Contributing Participants as provided in Appendix A-1. Such contributions shall be due on the first day of that month. The Plan Administrator shall establish reasonable procedures for enrollment and payment of required contributions, including procedures for the payment of such contributions by voluntary deductions from pension payments under pension plans of the Employers. Present Employees shall be enrolled in the Basic Life Insurance Program for the duration of their lives automatically as of the dates they would have become eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement, irrespective of whether they become or continue as Enrolled Participants in the Health Benefit Program and the Supplemental Benefit Program.

    2.3    Termination of Coverage Under the Health Benefit Program.    An Enrolled Participant shall continue as an Enrolled Participant in the Health Benefit Program and the Supplemental Benefit Program only during the periods for which required contributions have been made to the Health Benefit Program by or on behalf of that Enrolled Participant in accordance with Article III. Following the enrollment of each Contributing Participant as described above, a bill will be sent to such Contributing Participant approximately three weeks prior to the first day of each month. A reminder notice shall be sent approximately two weeks after the first day of each month to each Contributing Participant for whom the required contribution for that month had not yet been received. If such contribution still has not been received, a termination notice will be sent at the end of the month to each Contributing Participant for whom the required contribution for that month has not yet been received, stating that coverage

- 5 -

3

will be reinstated without penalty if such contribution is received within 45 days of the original due date. If a contribution required to be made by or on behalf of an Enrolled Participant to enroll or to continue as an Enrolled Participant for any month is not received within 45 days of the first day of such month, such Enrolled Participant's participation in the Health Benefit Program and the Supplemental Benefit Program shall cease as of the first day of the calendar month for which the contribution was not made, except that Retirees who are not Enrolled Participants may continue to receive life insurance benefits under the Life Insurance Program. Except for required contributions so received during the 45 days following the due date therefor, premium contributions may not be paid retroactively. Notwithstanding any other provisions hereof, the participation of an Eligible Dependent in the Health Benefit Program and the Supplemental Benefit Program shall cease when such person ceases to be an Eligible Dependent. If the participation of an Enrolled Participant in the Health Benefit Program and the Supplemental Benefit Program ceases for any reason, benefits will be paid for claims incurred prior to the date on which his or her participation ceases.

2.4  Re-Enrollment.  Re-Enrollments (including enrollments for those who decline to participate when first eligible) in the Health Benefit Program and the Supplemental Benefit Program are permitted as provided in Appendix A-1, subject to certain pre-existing condition and other limitations. Except as provided in Appendix A-1, no Retiree, Eligible Dependent or Surviving Spouse who is not enrolled when eligible or who ceases enrollment shall be eligible to re-enroll in the Health Benefit Program.

## ARTICLE III

## Contributions to the Health Benefit Program

3.1  Determinations by the Actuary.  The Actuary shall make the determinations required to be made by it pursuant to the Health Benefit Program on behalf of the Plan Administrator in the Plan Administrator's capacity as a fiduciary hereunder. Such determinations include determining annually the Retiree Cost Sharing Ratio, the Contributing Participants' Annual Contributions, the Total Estimated Annual Cost of the Health Benefit Program and such other liability and expense calculations as may be required under the Health Benefit Program or by the Health Benefit Program Committee in the exercise of its powers, rights and duties hereunder.  The Actuary will furnish these determinations and such additional information as may be necessary or appropriate, including but not limited to workpapers and computer readable spreadsheets, to verify the accuracy thereof to the Company, the Health Benefit Program Committee and the Supplemental Benefit Committee as promptly as practicable, but not later than September 1 of each year for the following calendar year. The Actuary will

be available to answer reasonable questions from the Health Benefit Program Committee and the Supplemental Benefit Committee and their designees at no cost to the Health Benefit Trust or the Supplement Benefit Trust. The Health Benefit Program Committee may choose to review or reproduce such determinations and information itself or hire another actuary to review or reproduce all or part of such determinations and information. The initial determinations of the Actuary are detailed in the initial actuarial report attached hereto as Appendix A-5. All determinations by the Actuary hereunder are subject to the dispute resolution provisions of Section 6.8.

3.2    Contributing Participants' Annual Contributions.

The Employers and the Contributing Participants shall share the total cost of the Health Benefit Program. All definitions and mathematical formulas relating to the calculation of Contributing Participants' Annual Contributions for a given calendar year are set out in Appendix A-6. The Actuary will determine the Contributing Participants' Annual Contribution for each year. The Contributing Participants' Annual Contribution for a given calendar year ("calendar year (x)") shall be the Scheduled Contributions for calendar year (x) adjusted for the following:

(a)    Adjustment 1 (T1) - The Contributing Participants' Annual Contribution for calendar year (x) shall be increased by (T1) if the Total Actual Medical Cost for Measurement Year (x-1) exceeds the Total Expected Medical Dollars for Measurement Year (x-1). T1 will equal the lesser of Total Maximum Corridor Medical Dollars for Measurement Year (x-1) or Total Actual Medical Dollars for Measurement Year (x-1), reduced by Total Expected Medical Dollars for Measurement Year (x-1).

(b)    Adjustment 2 (T2). The Contributing Participants' Annual Contribution for calendar year (x) shall be adjusted by (T2) if the Total Actual Medical Cost for Measurement Year (x-1) is less than Total Expected Medical Dollars for Measurement Year (x-1) or if the Total Actual Medical Cost for Measurement Year (x-1) is greater than the Total Maximum Corridor Medical Dollars for Measurement Year (x-1). T2 equals (i) the Retiree Adjustment Ratio for Measurement Year (x-1), multiplied by (ii) the Total Actual Medical Cost for Measurement Year (x-1) reduced by the sum of the Total Expected Medical Dollars for Measurement Year (x-1) and T1. T2 can be positive or negative, resulting in an increase or decrease in the Contributing Participants' Annual Contribution.

(c)    Adjustment 3 (T3) - The Contributing Participants' Annual Contribution for calendar year (x) shall be adjusted by (T3) if the Total Actual Drug Cost for Measurement Year (x-1) is greater or less than Total Expected Drug Dollars for Measurement Year (x-1). T3 equals (i) the Total

- 7 -

Actual Drug Cost for Measurement Year (x-1) reduced by Total Expected Drug Dollars for Measurement Year (x-1), multiplied by (ii) the Retiree Adjustment Ratio for Measurement Year (x-1). T3 can be positive or negative resulting in an increase or decrease in contributions.

(d) Adjustment 4 (DRP) - The Contributing Participants' Annual Contribution for calendar year (x) shall be decreased by (DRP) to account for savings due to the failure of Participants who are or became eligible to enroll in the Health Benefit Program to do so. For calendar year 1994, DRP will equal the Expected Company Costs Per Capita for Measurement Year 1994 times the number of Immediate Drop Outs During the First 45 Days.

For calendar year 1995, DRP will equal the sum of (i) Expected Company Costs Per Capita for Measurement Year 1994 multiplied by the number of Immediate Drop Outs During the Second 45 Days, (ii) the number of Cumulative Drop Outs at the beginning of Measurement Year 1995 reduced by the number of Immediate Drop Outs, multiplied by 50 percent of Expected Company Costs Per Capita for Measurement Year 1994, and (iii) the number of Cumulative Drop Outs at the beginning of Measurement Year 1995 multiplied by the Expected Company Costs Per Capita for Measurement Year 1995.

For calendar years after 1995, DRP will equal the Expected Company Costs Per Capita for Measurement Year (x) multiplied by the number of Cumulative Drop Outs at the beginning of that Measurement Year.

In all years, DRP will be calculated for each of the eight age groupings shown in Tables I and II of Appendix A-6 and the eight calculations will be totaled.

(e) Adjustment 5 (DEF) - The Contributing Participants' Annual Contribution for calendar year (x) shall be decreased by (DEF) to account for savings due to potential Retirees who elect to defer their retirements beyond the dates assumed in the initial retirement rate assumptions. DEF equals (i) the Expected Number of Retirees and Spouses at the beginning of Measurement Year (x) reduced by the Actual Number of Retirees and Spouses at the beginning of Measurement Year (x), multiplied by (ii) the Expected Company Costs Per Capita for Measurement Year (x). The DEF calculation will be performed for each of the eight age groupings shown in Table IV of Appendix A-6 and multiplied by the Retiree Adjustment Ratio for such calendar year for any age group in which the Actual Number of Retirees and Spouses for Measurement Year (x) is greater than the Expected Number of Retirees and Spouses for Measurement Year (x). DEF

will equal the sum of the above calculation for each of the eight age groupings.

(f) Adjustment 6 (I) - The Contributing Participants' Annual Contributions for calendar year (x) shall be adjusted by (i) for any interest accrued on (i) late payments from the Supplemental Benefit Trust to reduce or reimburse the Employers' permissible Benefits, deductibles and costs or to provide Additional Permissible Benefits, (ii) advances from the Employers' Sub-account to the Contributing Participants' Sub-account during Measurement Year (x-1), (iii) general interest accrued in the Contributing Participants' Sub-account during Measurement Year (x-1), and (iv) interest accrued on adjustments to the Contributing Participants' Annual Contributions for T1, T2, T3, DRP and DEF.

The interest adjustment will include the net result of any interest accrued on the Employers' funding any Contributing Participants' contribution shortfalls as described in section 3.7. Interest accrued for advances from the Employer Sub-account to the Contributing Participants' Sub-account will be calculated monthly and be the average daily advance times the number of days advanced divided by 365 times the Navistar Rate at the end of the prior Measurement Year.

Interest accrued due to late payments from the Supplemental Benefit Program will be calculated monthly and will be the average daily late payment during such month times the number of days late divided by 365 times the Navistar Adjustment Rate at the end of the prior Measurement Year.

Interest will be credited on excess Contributing Participants' contributions as described in Section 3.7. Interest will be calculated monthly and be the greater of (i) the actual earnings on the Contributing Participants' Sub-account, and (ii) the average daily balance for such month of the Contributing Participants' Sub-account multiplied by the average for each month of the 90-day LIBOR rates during such month.

Interest will be adjusted for delays in the recognition of T1, T2, T3, DRP and DEF. The adjustment to the recognition of the Contributing Participants' Annual Contributions for calendar year 1994 will be calculated as the negative of the DRP adjustment times the Navistar Rate at the beginning of Measurement Year 1994 times seven divided by 12. The calendar year 1995 adjustment to the Contributing Participants' Annual Contributions will be calculated as (i) the Navistar Rate at the beginning of Measurement Year 1995, multiplied by (ii) the sum of T1,

- 9 -

43

T2 and T3, times 19, divided by 12, reduced by the sum of (A) DEF times eight, divided by 12, (B) DRP component (i) times 19 divided by 12, and (D) DRP component (ii) times 16.5 divided by 12, and (D) DRP component (iii) times eight divided by 12. The adjustment to the Contributing Participants' Annual Contributions for all years after 1995 will be calculated as (i) the Navistar Rate at the beginning of the Measurement Year, multiplied by (ii) the result of (A) the sum of T1, T2 and T3, times 20, divided by 12, reduced by (B) the sum of DEF and DRP times eight, divided by 12.

The net amount of the aggregate increases or decreases required by Adjustments 1 through 6 above shall be determined and shall be used to determine the uniform percentage adjustment to the Monthly Base Contributions for the year. Each year the Contributing Participants' Annual Contribution shall be multiplied by a fraction the numerator of which will be [Scheduled Contributions plus (T1) plus (T2) plus (T3) minus (DEF) minus (DRP) plus (i)] and the denominator of which will be Scheduled Contributions.

3.3 <u>Employers' Annual Contribution</u>. The Employers' annual contribution shall equal the Total Estimated Annual Cost less the Contributing Participants' share of the Total Estimated Annual Cost. The Contributing Participants' share of the Total Estimated Annual Cost shall equal the sum of the Plan 1 and Plan 2 Estimated Annual Cost shall equal the sum of the Plan 1 and Plan 2 Contributing Participants' Annual Contributions (detailed in section 3.2) times the respective number of Plan 1 and Plan 2 Contributing Participants.

3.4 <u>Transfers of Funds between Sub-accounts</u>. The Actuary will determine the amount of transfers from the Employers' Sub-account to the Contributing Participants' Sub-account and vice versa for each calendar year required by the Section 3.2 adjustments. Transfers will be made on the first of each month and will be equal to one twelfth of the annual transfer amount. The annual amount of transfers for calendar year x will equal:

(a) T1 times (1-Retiree Adjustment Ratio for Measurement Year x-1), minus

(b) DRP, minus

(c) DEF, plus

(d) I accrued on T1, multiplied by (1-Retiree Adjustment Ratio for Measurement Year (x-1)), minus

(e) I accrued on DRP minus

(f) I accrued on DEF.

If the amount of transfers is greater than zero, the transfer will be made from the Contributing Participants' Sub-account to the Employers' Sub-account. If the amount of transfers is less than zero, the transfer will be made to the Contributing Participants' Sub-account from the Employers' Sub-account.

3.5 _Transfers from the Supplemental Benefit Trust to the Health Benefit Trust_. At the discretion of the Supplemental Benefit Committee, contributions may be made from the Supplemental Benefit Trust to the Health Benefit Trust. If contributions are to be made by the Supplemental Benefit Trust in lieu of Participant Contributions in calendar year (x), Supplemental Benefit Trust contributions will be made on the first of each month and be credited to the Contributing Participants' Sub-account. If the Supplemental Benefit Trust makes contributions are to reduce or reimburse premiums, co-payments, deductibles and other amounts that would otherwise be required to be paid by or on behalf of Enrolled Participants or to provide Additional Permissible Benefits, the value of the enhanced benefits will be determined by the claims administrator and billed monthly by the Plan Administrator to the Supplemental Benefit Committee. Payment of such amounts is due within 15 days of notification and will be allocated to the Contributing Participants' and Employers' Sub-accounts. The amount allocated to the Contributing Participants' Sub-account will be the payment amount times the Retiree Cost Sharing Ratio. The balance of the payment will be allocated to the Employers' sub-account according to Section 3.7(b).

3.6 _Employers' Prefunding Contributions_. The following shall apply with respect to prefunding contributions:

(a) The Employers will make a prefunding contribution of $2 million as of the Effective Date to pay all then accrued administrative costs of establishing the Plan and initial claims.

(b) As of the end of each calendar quarter, the Employers will make a prefunding contribution equal to one-quarter of the Employers' share of the estimated Annual Service Cost as determined by the Actuary.

(c) Prior to six months after the Effective Date, Parent shall make a pre-funding contribution or contributions to the Health Benefit Trust totalling $100 million. Prior to the Event Date and as quickly as is prudent, the Parent shall use its best efforts to sell $500 million of Parent Common. From the Effective Date until the Event Date, Parent shall make pre-funding contributions to the Health Benefit Trust of any and all net cash proceeds from the sale of Parent Common; provided, that Parent may use whatever portion of the proceeds from the sale of Parent Common as the Board reasonably determines is appropriate for working capital; and provided, further, that by the Event Date, the amount of pre-funding contributions made to the Health Benefit Trust shall equal the lesser of $500 million or the total amount of the cash

proceeds of all sales of Parent Common between the Effective Date and the Event Date. Nothing herein shall prevent Parent from making pre-funding contributions to the Health Benefit Trust from sources other than the sale of the Parent Common. Parent may defer the initial $100 million contribution, or any portion thereof, required by the first sentence of this Section 3.6(c) only if, and only for so long as, the Board reasonably and in good faith determines that failure to defer such contribution, or such portion, will cause Parent to defer such contribution, or such portion, will cause Parent to defer such contribution, or such its obligations arising in the ordinary course of its business when due. Any deferral described in the preceding sentence shall be permitted only upon notice to the HBPC Committee, by an authorized officer of Parent, that the Board has made the determination described in the preceding sentence.

3.7  **Payment of Benefits.**  For purposes of accounting for contributions and the payment of benefits, the following shall apply.

(a)   The Contributing Participants' share of actual benefit payments and administrative costs will be charged to the accumulated Contributing Participants' accumulated contributions according to the Retiree Cost Sharing Ratio. Any excess contributions shall be accumulated and used to offset any actual benefit payments and administrative costs incurred in subsequent months in excess of contributions collected. Should the balance in the Contributing Participants' Sub-account be insufficient to pay the Contributing Participants' share of actual benefit payments and administrative costs, the Employers' Sub-account (prefunding contribution balance) will advance sufficient funds to the Contributing Participants' Sub-account to cover such shortfalls. Such amounts advanced to the Contributing Participants' Sub-account will be repaid to the Employers' Sub-account immediately upon the availability of funds in the Contributing Participants' Sub-account.

(b)   The Employers' share of actual benefit payments and administrative costs will be one minus the Retiree Cost Sharing Ratio and will be allocated to the Employers' monthly contribution or to Employers' prefunding contributions. The amount of the actual benefit payments and administrative costs to be paid from Employers' prefunding contributions shall be the amount equal to the aggregate of such amounts to be paid by the Employers multiplied by the ratio of the prior year end outstanding balance of Employers' prefunding contributions (plus the balance of any advances to the Contributing Participants' Sub-account) divided by the Employers' share of the Health APBO as of the prior year end. Should the Employers make prefunding contributions at times other than the beginning of the year (other than prefunding

- 12 -

46

contributions for estimated Annual Service Cost), the ratio used to allocate amounts to be paid by the Employers after such additional contribution shall be adjusted as if such additional contribution were made at the beginning of the calendar year less an earnings adjustment equal to the amount of additional contribution times the discount rate used to calculate the Health APBO for the prior year and multiplied by the ratio of the number of months elapsed from the beginning of the year to the date of additional contribution divided by 12.

(c) Should the amount of Employers' contributions not be sufficient to pay the portion of the Employers' share of actual benefit payments and administrative costs not allocated to Employers' prefunding contributions, the Employers shall make additional contributions to cover the deficiency. Should the amount of Employers' contributions exceed such share, such excess contributions shall be used to offset subsequent months' actual benefit payments and administrative costs described above.

(d) The balance of any Employers' and Contributing Participants' contributions not required to pay actual benefit payments and administrative costs shall be invested by the trustee of the Health Benefit Trust and the actual earnings on such invested balance will be credited to the respective account balances and used in determining contributions described in sections 3.2.

3.8 State or National Health Insurance Programs. Notwithstanding the foregoing, in the event of the adoption of, or any legislative change in, a State or National Health Insurance Program as a result of which, following such adoption or change, Participants receive post-retirement health care benefits greater or lesser than those provided under such programs on the Effective Date, the following shall apply:

(a) The Actuary (i) shall determine the actuarial present value of any new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or change attributable to the provision of such post-retirement benefits to such Participants, and (ii) shall redetermine the Health APBO immediately following the implementation of such adoption or change by subtracting such actuarial present value determined in (i) above from the Health APBO immediately prior to the implementation of such adoption or change; provided that the resulting Health APBO immediately following the implementation of such adoption or change, plus the actuarial present value of the new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or change attributable to

- 13 -

the provision of such post-retirement benefits to such Participants, shall not exceed the Health APBO immediately prior to the implementation of such adoption or change.

In addition, if any new taxes, premiums or other amounts are required to be paid by the Employers as a result of such adoption or change based on the number of Participants or on the value of benefits provided to Participants under the Health Benefit Program or contributions made by the Employers under the Health Benefit Program for the benefit of Participants, after the Actuary has made the calculations described in the preceding paragraph, the Actuary shall determine the actuarial present value of such new taxes, premiums or other amounts, and the excess thereof over the actuarial present value determined in (i) above will be allocated between the Employers and the Participants by the Health Benefit Program Committee in a fair and equitable manner to further reduce the Health APBO immediately following the implementation of such adoption or change; provided that the Health APBO immediately following the implementation of such adoption or change, the actuarial present value of the new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or change attributable to the provision of such post-retirement benefits to such Participants, plus the actuarial present value of the allocated additional taxes, premiums or other amounts used to further reduce the Health APBO, shall not exceed the Health APBO immediately prior to the implementation of such adoption or change. If the Health Benefit Program Committee cannot reach a consensus in 30 days as to how such allocation shall be made, the Health Benefit Program Committee shall select a qualified individual or firm to make such determination, and the determination of such individual or firm shall be final and binding. If the Health Benefit Program Committee is unable to agree upon an individual or firm to resolve such dispute, the Health Benefit Program Committee shall petition the Court to select an individual or firm to assist the parties by resolving the dispute. In such event, the Health Benefit Program Committee shall suggest to the court at least five individuals or firms with appropriate background to be so appointed. One-half of the fees and expenses of the individual or firm appointed by the court shall be a Plan Expense, and the other half shall be paid by the Company.

(b) Following such determinations as are required in Section 3.8(a) above, the Health Benefit Program Committee may

– 14 –

48

redesign the Health Benefit Program, including, in its sole discretion, by modifying the benefits thereunder and the amount of contributions required to be made by or on behalf of Enrolled Participants; provided that any changes in required contributions must be reasonably related to changes in the redesigned benefits provided under the Health Benefit Program. Further, the duration of the Employers' liability under the Health Benefit Program following such redesign shall be consistent with such duration immediately prior to such redesign. This redesign opportunity shall be a one-time opportunity available to the Health Benefit Program Committee with respect to each such adoption or change.

If the Employers are required as a result of such adoption or change to provide benefits which are not available under the Health Benefit Program, the Health Benefit Program Committee will redesign the Health Benefit Program to provide such mandated benefits while maintaining the Health APBO in effect prior to such mandate.

(c)    Following any such redetermination of the Health APBO, the Actuary shall continue to make the determinations required to be made by it hereunder in accordance with the other provisions of this Exhibit A on the basis of the Health APBO as so redetermined.

The Actuary's determinations under this Section 3.8 shall be made based upon actuarial data, methods, factors, procedures and assumptions consistent with those used in the determination of the Health APBO and Retiree Cost-Sharing Ratio as of the Effective Date.

3.9    Guarantee of Health Benefit Program.  The Parent and the Company hereby jointly and severally, unconditionally and irrevocably guarantee the provision of benefits under and in accordance with the terms of the Health Benefit Program as primary obligors and not merely as sureties.  The Parent's and the Company's obligations under this guarantee shall not be impaired by (i) any breach or violation of any provision of the Health Benefit Program, whether by the Company, any other Employer or otherwise, (ii) any modification or amendment of or to, or any waiver of any obligation of any party under, the Health Benefit Program, provided that as of the effectiveness of any such modification, amendment or waiver this guarantee shall thereafter be deemed to apply to the Health Benefit Program as so modified, amended or waived, (iii) any merger, re-organization or bankruptcy of the Company or any other Employer or (iv) any other event which may cause the Company or any other Employer to lose its separate legal identity or to cease to exist.  This guarantee shall not be affected in any way by the

- 15 -

absence of any action to obtain payment of any amount under the Health Benefit Program. The Parent and the Company hereby waive all requirements as to promptness, diligence, presentment, demand for payment, protest and notice of any kind with respect to this guarantee. This guarantee shall remain in full force and effect until the termination of the Health Benefit Program and shall remain in full force and effect or be reinstated, as the case may be, if at any time any amount paid by the Parent, the Company or any other Employer under the Health Benefit Program or this guarantee, in whole or in part, is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Parent, the Company or such other Employer or otherwise, all as though such payment had not been made. This guarantee is a guarantee of payment and not of collection. Each of Parent and the Company irrevocably waives any and all rights or claims to indemnity, subrogation, reassessment, exoneration or contribution which it had, has, or hereafter may have in respect of any payment under this guarantee to the extent that under applicable law such rights of Parent or the Company would render a payment by the Company or any other Employer (other than Parent) avoidable if made prior to 90 days before a bankruptcy or similar proceeding of the Company or such Employer. To the extent that Parent makes a payment of a type described in the immediately preceding sentence under this guarantee on behalf of any other Employer, and to the extent that the Company makes a payment of such a type on behalf of any other Employer (other than Parent), such payment shall be deemed to be a capital contribution to such Employer.

## ARTICLE IV

## Contributions to Life Insurance Program

4.1 Employer Contributions. The Employers shall make monthly contributions to the Health Benefit Trust sufficient to permit such trust to pay all premiums necessary to obtain the life insurance benefits (other than the optional additional life insurance benefits referred to in Section 4.2) for Retirees under the Basic Life Insurance Program. Such contributions shall be segregated from the contributions to the Health Benefit Program and invested in a separate sub-account under the Health Benefit Trust prior to applying such amounts to pay such premiums.

4.2 Optional Life Insurance. In addition to the coverage referred to in Section 4.1, Retirees who meet the eligibility requirements set out in the Life Insurance Program SPD shall have the right to purchase, at group rates but entirely at their own cost, optional additional life insurance coverage up to the maximum of the coverage that would have been available to such Retirees under the Existing Plans. As more fully described in Appendix A-2, this opportunity is a one-time election available to

- 16 -

50

each such Retiree as of the later of the Effective Date or such Retiree's date of retirement which shall be exercised in accordance with the procedures set forth in Appendix A-2. The Plan Administrator shall arrange for such coverage to be provided directly to Retirees electing to purchase such coverage by a designated insurance company, which as of the Effective Date shall be Aetna Life Insurance Company. Retirees shall be given reasonable notice of this optional coverage and of any changes in the insurance company designated to provide such coverage, or in the terms and conditions of the coverage made available to Retirees from time to time pursuant to this Section 4.2 are competitive. The Plan Administrator shall use its best efforts to ensure that the terms and conditions of the coverage made available to Retirees from time to time pursuant to this Section 4.2 are competitive. The Optional Life Insurance Program is provided directly to Retirees by the designated life insurance company under a group insurance arrangement, not under the Life Insurance Program. Although the eligibility and benefit amount provisions of this program are included in the Life Insurance Program SPD attached as Appendix A-2, it is intended that the Optional Life Insurance Program shall not be considered a plan as such term is defined in ERISA.

4.3 _Guarantee of Life Insurance Program_. Parent and the Company hereby jointly and severally, unconditionally and irrevocably guarantee the provision of benefits under and in accordance with the terms of the Basic Life Insurance Program, as primary obligors and not merely as sureties. Parent's and the Company's obligations under this guarantee shall not be impaired by (i) any breach or violation of any provision of the Basic Life Insurance Program, whether by Parent, the Company, any other Employer or otherwise, (ii) any modification or amendment of or to, or any waiver of any obligation of any party under, the Basic Life Insurance Program, provided that as of the effectiveness of any such modification, amendment or waiver this guarantee shall thereafter be deemed to apply to the Basic Life Insurance Program as so modified, amended or waived, (iii) any merger, re-organization or bankruptcy of Parent, the Company or any other Employer or (iv) any other event which may cause Parent, the Company or any other Employer to lose its separate legal identity or to cease to exist. This guarantee shall not be affected in any way by the absence of any action to obtain payment of any amount under the Basic Life Insurance Program. Parent and the Company hereby waive all requirements as to promptness, diligence, presentment, demand for payment, protest and notice of any kind with respect to this guarantee. This guarantee shall remain in full force and effect until the termination of the Basic Life Insurance Program and shall remain in full force and effect or be reinstated, as the case may be, if at any time any amount paid by Parent, the Company or any other Employer under the Basic Life Insurance Program or this guarantee, in whole or in part, is rescinded or must otherwise be returned upon the insolvency,

- 17 -

bankruptcy or reorganization of Parent, the Company or such other Employer or otherwise, all as though such payment had not been made. This guarantee is a guarantee of payment and not of collection. Each of Parent and the Company irrevocably waives any and all rights or claims to indemnity, subrogation, reassessment, exoneration or contribution which it had, has, or hereafter may have in respect of any payment under this guarantee to the extent that under applicable law such rights of Parent or the Company would render a payment by the Company or any other Employer (other than Parent) avoidable if made prior to 90 days before a bankruptcy or similar proceeding of the Company or such Employer. To the extent that Parent makes a payment of a type described in the immediately preceding sentence under this guarantee on behalf of any other Employer, and to the extent that the Company makes a payment of such a type on behalf of any other Employer (other than Parent), such payment shall be deemed to be a capital contribution to such Employer.

## ARTICLE V

### Administration of the Health Benefit Program and the Life Insurance Program

As the Plan Administrator and Named Fiduciary, the Company is responsible for the administration of the Health Benefit Program and the Life Insurance Program, subject to review by the Health Benefit Program Committee as provided in Article VI. Subject to such review, the Plan Administrator shall have the following powers, rights and duties, which it shall perform in its capacity as a fiduciary under ERISA:

(a) to adopt such rules of procedure consistent with the Health Benefit Program and the Life Insurance Program as it may deem appropriate for the efficient administration of such programs or in connection with the exercise or discharge of its powers, rights and duties;

(b) to construe and interpret the Health Benefit Program and the Life Insurance Program and to decide all questions of eligibility under such programs;

(c) to appoint claims administrators, medical review agencies and other service providers;

(d) to enroll Participants in the Health Benefit Program, and the Life Insurance Program, to distribute and receive plan administration forms and to comply with all applicable governmental reporting and disclosure requirements; and

- 18 -

52

(e)  to respond to requests for information by the Health Benefit Program Committee relating to the Plan.

The Plan Administrator shall perform its duties with respect to plan administration on a reasonable and non-discriminatory basis and shall apply uniform rules to all persons similarly situated.

## ARTICLE VI

## Health Benefit Program Committee

6.1  Health Benefit Program Committee.  The Health Benefit Program Committee shall consist of seven members, including two members appointed by the UAW (the "HBPC UAW Members"), who may be replaced at any time by the UAW, three members appointed by the Company (the "HBPC Company Members"), who may be replaced at any time by the Company, one member appointed as representative of the non-UAW Retirees in accordance with Section 6.6 (the "HBPC Other Member") and a seventh member appointed by a majority of the other six members, who shall be the chairperson of the Health Benefit Program Committee (the "HBPC Chair"; the HBPC Chair, the HBPC UAW Members, the HBPC Other Member and the HBPC Company Members, collectively, the "HBPC Committee Members"); provided that such seventh member may be recalled at any time by a vote of a majority of the HBPC UAW Members and the HBPC Other Member, on the one hand, or a majority of the HBPC Company Members, on the other hand, whereupon a new member shall be appointed by a majority of the other six members. The persons who shall initially serve in such capacities are identified in Appendix A-7 hereto. The Health Benefit Program Committee shall have a Secretary, who shall be elected by the HBPC Committee Members.

6.2  Committee Powers.  The Health Benefit Program Committee shall be a fiduciary under ERISA with respect to its responsibilities hereunder. The Health Benefit Program Committee shall have the powers, rights and duties set forth herein and the following additional powers, rights and duties consistent with its rights and obligations under this Exhibit A:

(a)  to adopt such rules of procedure consistent with the Health Benefit Program and the Life Insurance Program as it may deem appropriate in its sole discretion in connection with the exercise or discharge of its powers, rights and duties hereunder;

(b)  to resolve disputes with respect to determinations of the Plan Administrator regarding benefits and eligibility in its sole discretion in accordance with the dispute resolution procedure set forth in the relevant SPD; provided, that the Health Benefit Program Committee shall

apply the terms of the Existing Plans in a manner consistent with the prior interpretations of such Existing Plans by the Company; and provided, further, that the Health Benefit Program Committee may not provide for the payment of any benefits not provided under the Health Benefit Program;

(c) to review any and all determinations made by the Actuary under the Health Benefit Program, as well as the calculations and experience trends and other assumptions used by the Actuary in making such determinations and to initiate the dispute resolution procedure referred to in Section 6.8, such decision to review or initiate being in its sole discretion;

(d) to bring to the attention of the Plan Administrator and to discuss with the Plan Administrator such administrative problems under the Health Benefit Program of which it has knowledge as it may deem appropriate in its sole discretion;

(e) to require the Plan Administrator to provide it with such information regarding the administration of the Plan as it may deem appropriate in its sole discretion;

(f) to make such recommendations to the Plan Administrator and Named Fiduciary in connection with the administration of the Health Benefit Program and the Life Insurance Program as it may deem appropriate in its sole discretion;

(g) to engage such consultants and other professionals to assist it in the exercise or discharge of its powers, rights and duties hereunder as it may deem appropriate in its sole discretion;

(h) to review and enforce Parent's, the Company's and the other Employers' compliance with their obligations under the Health Benefit Program and the Life Insurance Program, such decision to review or enforce being in its sole discretion; and

(i) to undertake such other actions as are necessary or appropriate in connection with the exercise or discharge of, such powers, rights and duties.

provided, that the Health Benefit Program Committee shall have no authority to modify benefits except as expressly provided herein or to waive any contribution obligation of the Employers under the Health Benefit Program or the Life Insurance Program; and provided, further, that the Health

- 20 -

54

Benefit Program Committee shall be bound by the instructions of the Supplemental Benefit Program Committee with respect to the use of any assets transferred to the Health Benefit Trust from the Supplemental Benefit Trust.

6.3 **Program Design.** The Health Benefit Program Committee, as a matter of appropriate program design and not as a fiduciary, shall have the following powers, rights and duties:

(a) reasonably to redesign benefits under the Health Benefit Program as provided in Section 3.8 as it may deem appropriate in its sole discretion;

(b) reasonably to redesign benefits under the Health Benefit Program as necessary to implement such coordinated care systems as may be recommended by the UAW/Navistar Joint Committee or, if such committee ceases to exist, reasonably to redesign benefits under the Health Benefit Program as it deems necessary or appropriate to implement coordinated care systems in its sole discretion and otherwise to give effect to the powers granted to such committee in Appendix A-1; provided, that no such redesign shall increase the Employers' share of the Health APBO;

(c) to make such adjustments in the Contributing Participants' Annual Contribution by a unanimous vote of the HBPC Committee Members as may be required to prevent the Contributing Participant's Sub-account from maintaining an unnecessary and inappropriate surplus or deficit for an extended period of time.

6.4 **Action by Health Benefit Program Committee.** Any action by the Health Benefit Program Committee will be subject to the following provisions:

(a) The HBPC Chair or any two members may call a meeting of the Health Benefit Program Committee on not less than two days' advance written notice to all members (including telephone conference, video conference and other technology-assisted meetings of persons at separate locations);

(b) At all meetings of the Health Benefit Program Committee the HBPC Company Members shall have a total of three votes and the HBPC UAW Members and the HBPC Other Member together shall have a total of three votes, the vote of any absent HBPC Company Members being divided equally between the HBPC Company Members present and the vote of any absent HBPC UAW Member or the absent HBPC Other Member

- 21 -

being divided equally between the HBPC UAW Members
and HBPC Other Member present;

(c) A meeting of the Health Benefit Committee shall be
validly constituted if both HBPC UAW Members or one
UAW Member and the HBPC Other Member, on the one
hand, and two HBPC Company Members, on the other
hand, participate in such meeting;

(d) Except as otherwise specifically provided herein,
the Health Benefit Program Committee shall act by
the majority vote of all of its members at a duly
called and validly constituted meeting, which
action shall be as effective as if such action had
been taken by all members of the Health Benefit
Program Committee, or by written instrument signed
by all of the HBPC Committee Members, which
instrument may be executed in counterparts;
provided, that one or more HBPC Committee Members
or other persons may be so authorized to act with
respect to particular matters on behalf of all HBPC
Committee Members; and provided, further, that no
HBPC Committee Member shall be liable or
responsible for any act or omission of other HBPC
Committee Members' in which the former has not
concurred; and

(e) The HBPC Chair shall vote only in case of a failure
of the other HBPC Committee Members to adopt a
decision as to any matter which is properly before
the Health Benefit Committee and within its
authority to determine; and

(f) The certificate of the Secretary of the Health
Benefit Program Committee or of a majority of the
HBPC Committee Members that the Health Benefit
Program Committee has taken or authorized any
action shall be conclusive in favor of any person
relying on such certificate.

6.5    Health Benefit Program Committee Minutes.  As soon
as is reasonably practicable after each meeting of the Health
Benefit Program Committee, its Secretary shall prepare draft
minutes of such meeting, which shall be delivered to each HBPC
Committee Member and approved or modified at the following meeting.

6.6    HBPC Other Member.  The initial HBPC Other Member is
the person specified as such in Appendix A-7.  In the event of the
death, incapacity or resignation of the HBPC Other Member, his
successor shall be appointed by a majority vote of such HBPC Other
Member (if he is not deceased or incapacitated) and two alternates

- 22 -

56

(the "HBPC Other Member Alternates") upon notice from the Health Benefit Program Committee or such HBPC Other Member of such death, incapacity or resignation; provided, that the HBPC Other Member shall not be a Non-Represented Employee, an employee of the UAW, an Employee represented by the UAW or a Retiree represented by the UAW at the time of his retirement. The initial HBPC Other Member Alternates are the persons specified as such in Appendix A-7. In the event of the death, incapacity or resignation of either of the HBPC Other Member Alternates, his successor shall be appointed by a majority vote of such HBPC Other Member Alternate (if he is not deceased or incapacitated), the other HBPC Other Member Alternate and the HBPC Other Member upon notice from the Health Benefit Program Committee or such HBPC Other Member Alternate of such death, incapacity or resignation. The HBPC Other Member or either of the HBPC Other Member Alternates may also be replaced by the Court upon petition signed by not less than 50 Participants who are Non-Represented Employees, Present Employees who are not represented by the UAW or Retirees who were not represented by the UAW at the time of their retirement, for failure adequately to represent the Participants.

6.7  Expenses.  The Company agrees that, upon demand and the Company's receipt of such detailed supporting documentation as the Company may reasonably request, it will forthwith pay (i) to all HBPC Committee Members that are not employed by the Company, any Employer or the UAW, reasonable compensation for time spent on Health Benefit Program Committee matters, (ii) to each HBPC UAW Member, the HBPC Other Member and any HBPC Other Member Alternate, the amount of any and all out-of-pocket expenses, including reasonable travel expenses, incurred by him in exercising or discharging his powers, rights and duties hereunder and (iii) to the Health Benefit Program Committee, the amount of any and all out-of-pocket costs and expenses (other than expenses of consultants and other professionals) incurred by it in connection with reviewing the administration of the Health Benefit Program and the Life Insurance Program. Such compensation and expenses shall not be considered Plan Expenses.

6.8  Dispute Resolution.  In the event of a dispute regarding any determination by the Actuary hereunder, the Company and the Health Benefit Program Committee will attempt to resolve such dispute. If any such dispute is not so resolved to the satisfaction of the Health Benefit Program Committee, the Health Benefit Program Committee may request that such determination be resolved by an independent actuary. Such independent actuary shall be selected in accordance with the following procedure. First, the Company and the Health Benefit Program Committee shall, for a period not to exceed 10 days, seek to agree on a firm to serve as such independent actuary. Second, in the event that the Company and the Health Benefit Program Committee fail to agree on such a firm, they shall request the Society of Actuaries to prepare a list

- 23 -

of the seven largest actuarial firms with their principal offices in the United States (as measured by the number of enrolled actuaries in such firms) and communicate such list to the parties. Third, the Company and the Health Benefit Program Committee shall, beginning with the Company, alternately strike one name off such list until only one such name remains, and that firm shall act as such independent actuary. The Actuary, the Company and the Health Benefit Program Committee shall cooperate with such independent actuary in reevaluating the disputed determination, and the determination of the independent actuary shall be final and binding on all parties. One-half of the fees and expenses of the independent actuary shall be a Plan Expense, and the other half shall be paid by the Company. For purposes of this Section 6.8, the Health Benefit Program Committee shall act by a vote of any two of the HBPC UAW Members and the HBPC Other Member.

## ARTICLE VII

### General Provisions

7.1 Required Data. Enrolled Participants shall furnish the Plan Administrator with such information as may be necessary to permit the Plan Administrator, claims administrator, medical review agencies or committees to perform their duties with respect to the administration of the Plan.

7.2 Non-Alienation. No Participant or other person shall have any right, title or interest in any assets of the Plan prior to the payment thereof on behalf of such person. No rights or interests of any Participant under the Plan shall be assignable either voluntarily or involuntarily.

7.3 Action by Employers. Any action required or permitted to be taken by any Employer under the Plan shall be taken by resolution of the board of directors of such Employer, or by resolution of a duly authorized committee of its board of directors, or by a person or persons authorized by resolution of its board of directors or such committee.

7.4 Applicable Law. The Plan shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or pre-empted thereby, with the laws of the State of Illinois.

7.5 Limitation of Liability; Indemnification. To the extent permitted by applicable law, no person shall be personally liable for any act done or omitted to be done in good faith in the administration of the Health Benefit Program or the Life Insurance Program or the investment of the assets of the Health Benefit Trust. The Employers shall jointly and severally indemnify and

- 24 -

58

hold harmless, to the extent permitted by applicable law, each present or former employee of an Employer through whom the Plan Administrator is performing or has performed any of its responsibilities hereunder, each present or former director or officer of the Employers, the UAW, each present or former HBPC Committee Member and each HBPC Other Member Alternate from and against any and all losses, costs, liabilities, damages and expenses (including fines, penalties, taxes and the fees and disbursements of actuarial and legal advisors), as incurred, by reason of any act done or omitted to be done in good faith in connection with the administration of the Plan or the investment of the assets of the Health Benefit Trust or in connection with the enforcement of the obligations of Parent, Company or any other Employer under the Health Benefit Program and Life Insurance Program. Any claim for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

7.6  Limitation on Liens as Security for Employers' Contributions. Parent will not, and will not permit any Restricted Subsidiary to, create or assume any mortgage, security interest, pledge or lien (herein referred to as "mortgage"), or permit to exist any mortgage created or assumed since March 1, 1968, or of, upon any Principal Property, or shares of capital stock or indebtedness for borrowed money issued by any Restricted Subsidiary and owned by Parent or any Restricted Subsidiary, whether owned at the Effective Date or thereafter acquired, without making effective provision, and Parent in such case will make or cause to be made effective provision, whereby the obligations of Parent and the Company under the Health Benefit Program and the Basic Life Insurance Program shall be secured by such mortgage equally and ratably with any and all other indebtedness or obligations thereby secured, so long as such indebtedness or obligations shall be so secured; provided, that the foregoing shall not apply to any of the following:

(a)  mortgages on any Principal Property acquired, constructed or improved by Parent or any Restricted Subsidiary after March 1, 1968 which are created or assumed contemporaneously with, or within 90 days after, such acquisition, construction or improvement to secure or provide for the payment of any part of the purchase price of such Principal Property or the cost of such construction or improvement incurred after March 1, 1968, or, in addition to mortgages contemplated by clauses (b) and (c) below, mortgages on any such Principal Property existing at the time of acquisition thereof, provided, that in the case of any such construction or improvement the mortgage shall not apply to any property theretofore owned by Parent or any Restricted Subsidiary other than any theretofore substantially unimproved real property on which the property so constructed, or the improvement, is

- 25 -

located and other than any machinery or equipment installed on the real property on which the property so constructed or the improvement is located;

(b) mortgages on property of a corporation existing at the time such corporation is merged or consolidated with Parent or a Restricted Subsidiary or at the time of a sale, lease or other disposition of the properties of such corporation (or a division thereof) as an entirety or substantially as an entirety to Parent or a Restricted Subsidiary;

(c) mortgages on property of a corporation existing at the time such corporation becomes a Restricted Subsidiary;

(d) mortgages securing indebtedness of a Restricted Subsidiary to Parent or to another Restricted Subsidiary;

(e) mortgages in favor of the United States of America or any State thereof, or any department, agency, instrumentality or political subdivision of any such jurisdiction, to secure partial, progress, advance or other payments pursuant to any contract or statute for the purpose of financing all or any part of the purchase price or the cost of constructing or improving the property subject to such mortgages;

(f) mortgages in favor of any customer to secure partial, progress, advance or other payments for goods produced or services rendered to such customer in the ordinary course of business not exceeding the amount of such payments;

(g) mortgages for the sole purpose of extending, renewing or replacing (or successively extending, renewing or replacing) in whole or in part the indebtedness secured by any mortgage referred to in the foregoing clauses (a) to (f), inclusive, or in this clause (g); provided, that the principal amount of indebtedness secured thereby shall not exceed the principal amount of indebtedness so secured at the time of such extension, renewal or replacement, and that such extension, renewal or replacement shall be limited to all or a part of the property which secured the mortgage so extended, renewed or replaced (plus improvements on such property);

(h) pledges or deposits under workmen's compensation, unemployment insurance or similar statutes and mechanics', workmen's, repairmen's, materialmen's, carriers' or other similar liens arising in the ordinary course of business or deposits or pledges to obtain the release of any such liens;

- 26 -

60

(i)    liens created by or resulting from any litigation or
other proceedings, including liens arising out of
judgments or awards against Parent or any Restricted
Subsidiary with respect to which Parent or such
Restricted Subsidiary is in good faith prosecuting an
appeal or proceeding for review; or liens incurred by
Parent or any Restricted Subsidiary for the purpose of
obtaining a stay or discharge in the course of any legal
proceeding to which Parent or such Restricted Subsidiary
is a party; or

(j)    liens for taxes or assessments or governmental charges or
levies not yet due or delinquent, or which can thereafter
be paid without penalty, or which are being contested in
good faith by appropriate proceedings; landlord's liens
on property held under lease; and any other liens of a
nature similar to those hereinabove described in this
clause (j) which do not, in the opinion of Parent,
materially impair the use of such property in the
operation of the business of Parent or a Restricted
Subsidiary or the value of such property for the purpose
of such business.

Notwithstanding the foregoing provisions, Parent or any Restricted
Subsidiary may, without equally and ratably securing its
contribution obligations under the Plan, create, assume, or permit
to exist mortgages which would otherwise be subject to the
foregoing restrictions if at the time of such creation, assumption
or permission, and after giving effect thereto, such indebtedness
does not exceed 5% of the stockholders' equity in Parent and its
consolidated Subsidiaries, as shown by the audited consolidated
balance sheet of Parent and its consolidated Subsidiaries in the
latest annual report to the stockholders of Parent.

## 7.7   Limitations on Sale and Lease-Back Transactions.

(a)    Parent will not, nor will it permit any Restricted
Subsidiary to, enter into any arrangement, or permit to
exist any arrangement entered into since March 1, 1968,
with any person providing for the leasing by Parent or
any Restricted Subsidiary of any principal property
(except for temporary leases for a term, including any
renewal thereof, of not more than three years and except
for leases between Parent and a Restricted Subsidiary or
between Restricted Subsidiaries) which property has been
or is to be sold or transferred by Parent or a Restricted
Subsidiary to such person (a "Sale and Lease-Back
Transaction") unless the net proceeds of such sale are at
least equal to the fair value (as determined by the
Board) of such property and either (1) Parent or such
Restricted Subsidiary would be entitled to incur a

- 27 -

61

mortgage on such property without equally and ratably securing the obligations of Parent and the Company under the Health Benefit Program and the Basic Life Insurance Program pursuant to Section 7.6(a), or (2) Parent shall contribute an amount equal to the net proceeds of such sale (as so determined) to the Health Benefit Trust, the retirement of Securities or other indebtedness ranking on a parity with the Securities (other than any mandatory retirement or payment at maturity and provided that any retirement of Securities is in accordance with the applicable optional redemption terms adopted pursuant to Section 2.02 of the Indenture), within 120 days of the effective date of any such arrangement.

(b) Notwithstanding the provisions of paragraph (a) of this Section 7.7, Parent or any Restricted Subsidiary may enter into or permit to exist Sale and Lease-Back transactions, if at the time such Sale and Lease-Back Transactions are (or were) entered into, and after giving effect thereto, Exempted Indebtedness does (or did) not exceed 5% of the stockholders' equity in Parent and its consolidated Subsidiaries as shown by the audited consolidated balance sheet of Parent and its consolidated Subsidiaries contained in the latest annual report to the stockholders of parent.

7.8 **Subrogation.** In the event of any payment under the Health Benefit Program on behalf of an Enrolled Participant, the Company or the excess loss insurer of benefits under the Health Benefit Program shall be subrogated to all rights of recovery of the Enrolled Participant against any person or organization in respect of such payment except against insurers on policies of insurance issued to and in the Participant's name, or against a policy of insurance to which the Participant has contributed 50 percent or more of the premium. The Participant shall, at the request of the Company or such insurer, execute and deliver such instruments and papers as may be required and do whatever else is necessary to secure such rights.

7.9 **Assignment and Delegation.** The rights of any party under the Plan may not be assigned without the prior written agreement of the Company and the Supplemental Benefit Committee, and any purported assignment in violation of this sentence shall be void. Any party may delegate any of its obligations under the Health Benefit Program or the Life Insurance Program; provided, that no such delegation shall relieve such party of any of such obligations; and provided, further, that the delegation of any obligations in connection with the transfer of any of the assets of any Employer shall be subject to the express assumption of such obligation by the proposed transferee.

- 28 -

62

for convenience of reference only and do not constitute a part of this Exhibit A and will not be deemed to limit, characterize or in any way affect any provision of this Exhibit A, and all provisions of this Exhibit A will be enforced and construed as if no captions had been used in this Exhibit A.

## ARTICLE VIII

### Amendment and Termination

8.1 **Amendment.** The Plan Administrator and the Health Benefit Program Committee reserve the right to amend the Health Benefit Program and the Life Insurance Program as follows:

(a) The Plan Administrator shall have the right to make non-material technical and administrative amendments thereto and to the Health Benefit Trust which are necessary to comply with the requirements of the IRS and ERISA and other applicable legal requirements; provided, that no such amendment shall adversely affect the level of benefits to any Class Member;

(b) The HBPC Committee Members may by unanimous written consent amend the benefits provided under the Health Benefit Program; provided, that any proposed amendment which adversely impacts the level of Plan benefits to any Class Member shall be subject to approval by the Court after appropriate notice to Class Members; and

(c) The Health Benefit Program Committee may reasonably redesign the Health Benefit Program in accordance with the provisions of Section 6.3.

8.2 **Termination.** The Health Benefit Program and the Basic Life Insurance Program will terminate on the earlier of (a) the termination of the Settlement Agreement as provided in Section 13 thereof and (b) the later of the death of the last Participant entitled to benefits and the payment of any and all claims previously incurred by Participants and any and all benefits payable in respect of the death of any Participant; provided, that the obligations of Parent and the Company under Sections 6.6 and 7.6 shall survive such termination. In the event the Health Benefit Program and the Life Insurance Program terminate in accordance with clause (a) of this Section 8.2, any or all of the assets held in the Health Benefit Trust shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association: within the meaning of Section 501(c)(9) of the IRC, as determined by the Company.

- 29 -

## ARTICLE IX

### Exclusive Benefit and Prohibited Inurement

9.1 **Exclusive Benefit**. No part of the corpus or income of the Health Benefit Trust shall be used for, or diverted to, any purposes other than for the exclusive benefit of persons who are or may become entitled to benefits under the Health Benefit Program or the Life Insurance Program and for defraying reasonable expenses of administering such programs.

9.2 **Prohibited Inurement**. No part of the corpus or income of the Health Benefit Trust shall inure to the benefit of Parent, the Company or any other Employer. All fiduciaries hereunder shall discharge their duties solely in the interests of Participants for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration. No benefit under the Health Benefit Program or the Life Insurance Program or interest, right or claim in or to any part of the Health Benefit Trust or any payment therefrom shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, hypothecation or commutation, nor shall any such benefit or interest, right or claim in or to any part of the Health Benefit Trust or any payment therefrom be in any manner liable for or subject to garnishment, attachment, execution or levy or be liable for or subject to the debts, contracts, liabilities, engagements or torts of the person entitled thereto, and the trustee under such trust shall not recognize any attempt to make it so, except as directed by the Company, in its capacity as Plan Administrator, for the payment of benefits directly to health care providers or provided by the Health Benefit Program and Life Insurance Program in a manner that is consistent with applicable law.

## ARTICLE X

### Events of Default

10.1 Upon the occurrence and during the continuation of a "Health Benefit Program Payment Default," the Health Benefit Program Committee shall have the right, by notice to the Company:

(a) to require the Company to make prefunding contributions to the Health Benefit Trust in an amount equal to the excess, if any, of the Health APBO as most recently determined by the Actuary over the amount of any prefunding contribution (other than prefunding of the Annual Service Cost) made by the Company under the Health Benefit Program and the Life Insurance Program from the Effective Date until the date of such notice; and/or

– 30 –

64

(b) to replace the Company as Plan Administrator and Named Fiduciary of the Health Benefit Program and the Life Insurance Program.

As used herein, the term "Health Benefit Program Payment Default" shall mean the failure at any time by Parent, the Company or any other Employer to make any payment or contribution required to be made by it pursuant to Sections 3.3, 3.6(b), 3.9, 4.1, 4.3 or 7.5 within five days after receipt of written notice of such failure from the Health Benefit Program Committee, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 10.1; provided, that with respect to any failure to make a payment or contribution required to be made by an Employer pursuant to Sections 3.3, 3.4 or 3.6, if such Employer shall have paid or contributed the amount determined by the Actuary in accordance with Article III and such Employer shall be required to make any additional payment or contribution as determined by the independent actuary referred to in Section 6.7, the Health Benefit Program Committee shall not give notice of such failure unless such Employer shall have failed to make such additional payment or contribution within five days of the date of such determination by such independent actuary; and provided, further, that the Health Benefit Program Committee shall not give notice of a failure to make a payment under Section 7.6 unless the Indemnified Party has executed the undertaking provided for in the Indemnification procedures.

10.2 Upon the occurrence and during the continuation of a "Lien/Sale and Lease-back Default," the Health Benefit Program Committee shall have the right, by notice to the Company, to replace the Company as Plan Administrator and Named Fiduciary of the Health Benefit Program and the Life Insurance Program. As used herein, the term "Lien/Sale and Lease-back Default" shall mean the failure by Parent to cure any breach of Section 7.7 or 7.8 within 30 days after receipt of written notice of such failure, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 10.2 (said 30 days being hereinafter referred to as the "Section 10.2 Cure Period").

10.3 In the event any of the failures described in Section 10.2 which would otherwise constitute a Lien/Sale and Lease-back Default cannot be cured as a matter of right solely through the payment of money, the Section 10.2 Cure Period shall be extended for such additional period of time as is reasonably necessary to permit Parent to effect such cure as long as Parent, the Company or any Employer is diligently and in good faith pursuing such cure.

- 31 -

10.4 The rights of the Health Benefit Program Committee under this Article X are in addition to, and not in lieu of, any rights that such Committee, or any other person or entity, including, without limitation, any HBPC Committee Member, HBPC Other Member Alternate or Participant, may have under the Settlement Agreement, any Exhibit thereto or any Appendix to any such Exhibit, whether in equity or at law. The waiver by the Health Benefit Program Committee or any such person or entity of any Health Benefit Program Payment Default, Lien/Sale and Lease-back Default or other breach of any provision of, or any other right to enforce or claim or benefit under, any such document shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, any such document.

- 32 -

66

# NAVISTAR INTERNATIONAL TRANSPORTATION CORP.

## RETIREE HEALTH BENEFIT TRUST

### W I T N E S S E T H:

THIS AGREEMENT OF TRUST (hereinafter referred to as the "Agreement") is made and entered into this 18th day of June, 1993, by and between Navistar International Transportation Corp., a corporation organized under the laws of the State of Delaware (hereinafter referred to as the "Company"), and The Northern Trust Company (hereinafter referred to as the "Trustee").

WHEREAS, the Company was a defendant in Shy v. Navistar International Corporation, Case No. C-3-92-333 (S.D. Ohio) (the "Litigation"), and entered into a settlement agreement (the "Settlement Agreement") with the plaintiffs in the Litigation in order to limit its liability to the plaintiffs; and

WHEREAS, in order to provide Post-retirement health and life insurance benefits to Participants and Beneficiaries (as hereinafter defined), the Company maintains the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program (the "Health Benefit Program"), (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program (the "Life Insurance Program") and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program; and

WHEREAS, under the Settlement Agreement, the Health Benefit Program, and the Life Insurance Program, the Company has agreed to provide certain benefits with an initial accumulated postretirement benefit obligation of $1,000 million ($946 million) for the Health Benefit Program and $54 million for the Life Insurance Program) and to make certain contributions to the Health Benefit Program and the Life Insurance Program (collectively the "Programs") with respect to such obligation; and

WHEREAS, in order to implement and carry out the terms of the Settlement Agreement and the Programs, the Company wishes to establish the Navistar International Transportation Corp. Retiree Health Benefit Trust (hereinafter referred to as the "Trust"), which shall form a part of the Programs, and which is intended to satisfy the requirements of Section 501(c)(9) of the Code (as hereinafter defined) or any successor provision thereto; and

WHEREAS, the Company has authorized the execution of this Agreement and the creation of a trust fund to provide benefits under the Programs; and

WHEREAS, the Company intends, through this Agreement, to provide for management and control of the assets of the Programs through a trust fund; and

WHEREAS, The Northern Trust Company has consented to act as Trustee hereunder and to hold and administer such sums as are transferred or contributed upon the terms set forth herein,

NOW, THEREFORE, the Company and the Trustee hereby agree to establish the Navistar International Transportation Corp. Retiree Health Benefit Trust, subject to the following terms and conditions:

# ARTICLE I

## DEFINITIONS

1.1 **Definitions.** The following words and phrases when used herein shall have the following meanings, except as otherwise required by the context:

(a) **"Administrator"** means the Company.

(b) **"Beneficiary"** means a person designated as a beneficiary of a Participant by the Participant, or by the terms of a Program, and who is or may become entitled to a benefit under a Program.

(c) **"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

(d) **"Committee"** means the committee established pursuant to the Programs.

(e) **"Company"** means Navistar International Transportation Corp.

(f) **"Employer"** means Navistar International Transportation Corp., Navistar International Transportation Corp., Navistar Financial Corporation, Navistar National Insurance Company, and Indianapolis Casting Corporation, HARCO

(g) **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended from time to time.

(h) **"Investment Manager"** means a person or entity who is either:

(1) an investment adviser registered as such under the Investment Advisers Act of 1940; or

(2) a bank, as defined in that Act; or

(3) an insurance company qualified to manage, acquire, or dispose of any asset of an employee benefit plan under the laws of more than one State.

(i) **"Participant"** means a Participant as defined by the Programs.

(j) **"Plan"** means the Navistar International Plan, which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program, (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program, and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program.

(k) **"Program Account"** means that part of the assets of the Trust attributable to a particular Program including contributions, income, gains or losses, and expenses allocable to that Program and insurance contracts, if any, used as vehicles to pay benefits under the Program.

(l) **"Programs"** means the Navistar International Transportation Corp. Retiree Health Benefit Program and the Navistar International Transportation Corp. Retiree Life Insurance Program of the Plan.

(m) **"Trust"** means the assets of the Trust.

(n) **"Trust Year"** means the fiscal year beginning on each November lst and ending on the following October 31st; provided that the first Trust Year shall begin on the effective date specified by Section 12.9 hereof and shall end on the following October 31st.

1.2 **Gender and Number.** Masculine pronouns shall refer both to males and to females. Singular or plural words shall be construed to refer to the plural or the singular, respectively, where appropriate.

## ARTICLE II

## PAYMENTS TO AND FROM THE TRUST

2.1 **Payments to the Trust.** The Trustee shall receive any payments made to it in cash or in the form of such other property as it may from time to time deem acceptable and which shall have been delivered to it. Such payments may be made by the Company, by the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust, or by any other person or entity designated by the Company. All payments so received, together with the income thereon and any other increment thereon, shall be held, invested, reinvested, and administered by the Trustee pursuant to the terms of this Agreement, without distinction between principal and income. The Trustee shall not be responsible for the calculation or collection of any contribution under, or required by, the Programs, but shall be responsible only for cash or other property received by it pursuant to this Agreement.

- 2 -

68

2.2 **Payments from the Trust.** The Trustee shall, from time to time and at the written direction of the Administrator, make, directly or indirectly, payments out of the Trust Fund in such amounts, to such persons, and for such purposes as may be specified in the written directions of the Administrator. To the extent permitted by law, the Trustee shall be under no liability for any payment made pursuant to the written direction of the Administrator or for any payment not made in the absence of a written direction of the Administrator. Any written direction of the Administrator shall constitute a certification that the payment so directed is one that the Administrator or its designated representative is authorized to direct. If a dispute arises with respect to a payment, the Trustee may withhold or cause to be withheld such payment until the dispute has been resolved.

## ARTICLE III

## ADMINISTRATION OF ACCOUNTS

3.1 **Separate Accounts.** The assets allocable to each Program shall be allocated, for accounting purposes, to a separate Program Account for each Program. In addition, the Company may direct the Trustee in writing to account separately for such funds as the Company shall designate in writing, and if so directed, the Trustee shall establish separate accounts or sub-accounts for such funds. The funds allocated to such accounts and sub-accounts (including the Program Accounts) may be commingled for investment purposes. The Company shall designate to the Trustee in writing the account or sub-account to which each payment to and from the Trust is allocable.

## ARTICLE IV

## INVESTMENT AUTHORITY

4.1 **Trustee's Authority.** Except as otherwise provided in this Agreement, the Trustee shall have exclusive authority and discretion to manage and control the Trust Fund; to invest and reinvest the principal and income of the Trust Fund and keep the Trust Fund invested, as a single fund without distinction between principal and income, in such securities or in such property, real or personal, tangible or intangible, as the Trustee shall deem advisable, including but not limited to capital or common stocks (whether voting or nonvoting and whether or not currently paying a dividend), preferred stocks (whether voting or nonvoting and whether or not currently paying a dividend), bonds, notes, debentures, interests in investment companies, trusts, partnerships, and other pooled funds, savings bank deposits (including but not limited to savings accounts and savings investment media that are maintained by the Trustee's own Banking Department), and commercial paper, and in such other property, investments and securities, whether domestic or foreign, of any kind, class, or character as the Trustee may deem suitable for the Trust Fund, and such investment and reinvestment shall not be restricted to properties and securities authorized for investment by trustees under any present or future law; provided that in no event shall the Trustee make any investment prohibited by ERISA. The Trustee in its discretion may keep such portion of the Trust Fund in cash or cash equivalents (including deposits in the Trustee's own Banking Department) as the Trustee may from time to time deem to be in the interest of Participants and Beneficiaries, even if such balances exceed the maximum amount insured from time to time by the Federal Deposit Insurance Corporation. Except as otherwise provided by Article VII hereof, all rights associated with assets of the Trust shall be exercised by the Trustee; all such rights shall in no event be exercisable by or rest with Participants and Beneficiaries.

## ARTICLE V

## POWERS AND DUTIES OF THE TRUSTEE

5.1 **Powers.** The Trustee shall have the following powers with respect to the Trust Fund in addition to those conferred by law:

- 3 -

69

(a) to sell, exchange, convey, transfer, or otherwise dispose of any property held by it, by private contract or at public auction; and no person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition;

(b) to make commitments either alone or in company with others to purchase at any future date any property, investment, or securities set forth in Section 4.1 hereof;

(c) to retain, manage, operate, repair, develop, improve, mortgage, or lease for any period any real property held by the Trustee, upon such terms and conditions as the Trustee deems proper, either alone or by joining with others using other Trust assets for any such purposes if it is deemed advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease; including the waiver of rentals, if by it deemed advisable; and to make provisions for the amortization of the investment or in depreciation of the value of such property as it may deem advisable;

(d) to organize corporations under the laws of any state for the purpose of acquiring or holding title to any property for the Trust Fund or to request the Company to appoint another trustee for such purpose;

(e) to retain any stocks or other property received as a result of the exercise of any of the powers herein granted, whether or not investment in such stocks or other property is authorized by Section 4.1 hereof;

(f) to vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to exercise any conversion privileges, subscription rights, or other options, and to make any payments incidental thereto; to consent to or otherwise participate in corporate reorganizations or other changes affecting corporate securities and to delegate discretionary powers and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to stocks, bonds, securities, or other property held in the Trust Fund;

(g) to make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(h) to retain any investment held in the Trust Fund in its own name or in the name of a nominee and to hold any investment in bearer form, to utilize the services of a depository clearing corporation (such as the Depository Trust Company) to the extent permitted by law, and to combine certificates representing such investments with certificates of the same issue held by the Trustee in other fiduciary capacities under employee benefit plans, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust;

(i) to employ suitable agents and counsel and to pay reasonable expenses and compensation thereto;

(j) to borrow money on such terms and conditions as the Trustee in its discretion may deem advisable;

(k) to transfer monies of the Trust Fund to a common or collective trust fund or pooled investment fund; money and other assets of the Trust Fund invested in such a fund shall be held and administered by the trustee thereof strictly in accordance with the terms of, and under the powers governing, such fund to the extent consistent with this Agreement and the terms of the Programs funded hereunder; the combining of money and other assets of the Trust with money and other assets of such a fund is hereby specifically authorized;

(l) to compromise or otherwise adjust all claims in favor of or against the Trust Fund;

(m) to compromise, compound, and settle any debt or obligations upon such terms as the Trustee may deem advisable and to agree to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon, default, or otherwise enforce any such obligation; and

(n) upon receipt of written direction from the Administrator, to use any monies in the Trust Fund to purchase or maintain insurance or annuity contracts.

5.2 **Dealing with Trustee.** In no event shall any purchaser, vendor, or other person dealing with the Trustee be required to ascertain the authority and power of the Trustee to make any sale, transfer, assignment, or investment of the whole or any part of the Trust Fund at any time held hereunder, or to make any contract in relation thereto, nor shall any insurance company be required to

- 4 -

ascertain the power or authority of the Trustee to apply for and purchase any insurance or annuity contract, or any such person or company may rely upon any factual information furnished by the Trustee in connection therewith. All parties dealing with the Trustee with respect to the Trust Fund shall have the right to assume that the Trustee has full power and authority in all respects to deal with the Trust Fund and shall not be affected by any notice to the contrary, and no purchaser shall be required to see to the application of the purchase money.

5.3    **Fees and Expenses.** The Trustee shall be paid such reasonable compensation as may be agreed upon in writing from time to time between the Trustee and the Company. Such compensation and all fees and expenses incurred by the Trustee in the proper performance of its duties, including fees for legal services rendered to the Trustee and compensation paid to any Investment Manager, shall be paid from the Trust Fund unless paid by the Company. All taxes of any kind that may be levied or assessed under existing or future laws upon, or with respect to, the Trust Fund shall be paid from the Trust Fund.

5.4    **Administration.** The Trustee shall not be responsible in any way for the administration of the Programs.

5.5    **Consultation and Indemnification.** The Trustee may consult with counsel, and the Trustee shall not be deemed imprudent by reason of taking or refraining from taking any action in accordance with the opinion of counsel. The Company shall cause the Trust to indemnify and hold the Trustee harmless from and against any liability that the Trustee may incur in the administration of the Trust Fund, unless such liability arises from the Trustee's negligence or breach of the provisions of this Agreement or ERISA; provided that nothing in this Section 5.5 shall require any payment from any source other than the Trust or require any payment to be made to the Trust. The Trustee shall not be required to give any bond or any other security for the faithful performance of its duties under this Agreement, except such as may be required by law.

5.6    **Responsibilities.** Except as required by ERISA, the Trustee shall be under no duty (i) to take any action other than as herein specified with respect to the Trust unless the Administrator or an Investment Manager shall furnish the Trustee with instructions in proper form as described by Section 5.8 hereof or (ii) to engage in any suit with respect to the Trust unless the Trustee shall have first agreed in writing to do so and shall have been fully indemnified to the satisfaction of the Trustee. To the extent not prohibited by ERISA, the Trustee shall not be responsible or liable in any way for any action or omission of the Company, the Administrator, or the Committee with respect to the performance of their duties and obligations as set forth in the Programs and this Agreement; provided that the Trustee shall not be relieved of responsibility or liability for any responsibility, obligation, or duty imposed upon it under this Agreement or under ERISA. The Trustee is a party to this Agreement solely for the purpose set forth in this Agreement and to perform the acts set forth herein, and no obligation or duty shall be imposed upon it except as expressly stated herein or as required by ERISA.

5.7    **Direction.** The Trustee may request the advice or direction of the Administrator with respect to the administration of the Trust and the distribution of the Trust Fund, and, to the extent permitted by ERISA, shall be protected from liability in relying upon any direction given to it by the Administrator, in writing, in response to such a request.

5.8    **Reliance on Written Instructions.** The Trustee shall be entitled to rely upon any written notice, instruction, direction, certificate, or other communication believed by it to be genuine and to be signed by the Company, the Administrator, an Investment Manager, or their authorized agent(s) or representative(s), unless it knows or should know that the direction or instruction constitutes a breach of the Company's, the Administrator's, or the Investment Manager's fiduciary responsibility with respect to the Trust. The Trustee shall be fully protected in making payments out of the Trust Fund, or in taking or omitting to take any other action, in accordance with the written instructions of the Company, the Administrator, an Investment Manager, or their authorized agent(s) or representative(s), and shall have no responsibility to see to the application of any such payments by the Participants or their Beneficiaries or legal representatives, or by any other recipients thereof specified in such instruction, or to ascertain whether such instructions comply

- 5 -

71

with the terms of the Programs, or to determine the rights or benefits of any person in the Trust or under the Programs, and shall not be liable to any person for or in respect of any payment made by it, or action taken or omitted to be taken by it, in good faith without notice or knowledge of a change in the condition or status of any person affecting that person's rights hereunder; provided that if the Trustee knows or should know that such an instruction constitutes a breach of fiduciary responsibility with respect to the Programs, the Trustee shall inform the Administrator of the breach. The Company, the Administrator, and any Investment Manager(s) shall furnish the Trustee with a list naming their authorized agent(s) and representative(s), and describing the scope of the authority granted and shall notify the Trustee of any changes to the list. Absent such notification, the Trustee may assume no change has occurred with respect to each list.

## ARTICLE VI

## FUNDING POLICY AND INVESTMENT OBJECTIVES

6.1   **Communication to Trustee.**  The Administrator shall inform the Trustee in writing of the funding policy under the Programs and of the investment objectives of the Trust and of any changes or modifications therein. Until the Administrator informs the Trustee in writing of any change in the funding policy under the Programs or of any change in the investment objectives of the Trust, the Trustee may assume that there has been no change in the funding policy or the investment objectives, as the case may be.

## ARTICLE VII

## DUTIES OF THE ADMINISTRATOR

7.1   **Information.**  The Administrator shall furnish the Trustee with such information and data relating to the Programs as are necessary for the Trustee to carry out its duties under this Agreement.

7.2   **Investment Responsibility.**  The Trustee, and not the Administrator, shall have the full responsibility for investment of the Trust Fund, except where the Administrator has appointed an Investment Manager pursuant to Section 7.3 hereof or has established a "segregated fund managed by the Administrator pursuant to Section 7.5 hereof.

7.3   **Appointment of Investment Manager.**  The Administrator may appoint one or more Investment Managers for the purpose of directing the Trustee with respect to the investment or reinvestment of all or any portion of the Trust Fund. The Administrator shall certify to the Trustee the appointment and scope of authority of, and any resignation or removal or change in authority of, any Investment Manager appointed by it under this Section, the appointment of any successor thereto, and the identity of the individual or individuals entitled to act on behalf of the Investment Manager. In particular, the Administrator shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any change or revocation thereof. An Investment Manager shall present evidence to the Trustee of its qualifications as an Investment Manager under Section 3(38) of ERISA, and shall acknowledge in writing its appointment as a fiduciary of the Programs.

7.4   **Responsibility of Investment Manager.**  An Investment Manager shall have sole investment responsibility for that portion of the assets of the Trust Fund that it has been appointed to manage. An Investment Manager that has been thus granted such responsibility shall have all the investment powers enumerated in Article IV hereof that shall be granted to it by the Administrator. Where such an Investment Manager has been appointed by the Administrator, the Trustee shall have no duty to review or recommend any investment or reinvestment of the Trust Fund nor shall the Trustee be charged with the duties imposed by Section 8.1 hereof to the extent of any such grant of discretionary authority for

- 6 -

72

# ACTUARIAL STATEMENT OF OPINION

This report presents the results of the January 1, 1993 valuation of Navistar International Transportation Corporation's postretirement medical and life insurance benefit programs. It has been prepared to support the actuarial mechanics of the proposed settlement. This report also presents an actuarial projection of valuations for January 1, 1994 and January 1, 1995. Results for different accounting periods or for other purposes may differ significantly from the results reported herein.

The calculations reported in this valuation report have been made on a basis consistent with our understanding of SFAS No. 106, Employers' Accounting for Postretirement Benefits Other Than Pensions. It was prepared in accordance with the provisions of the Actuarial Compliance Guideline No. 3 For SFAS No. 106. This report, however, should not be considered to provide accounting advice.

Our calculations were based on the employee/retiree demographic and financial data furnished by Navistar and information gathered through discussions with Navistar personnel. We also relied upon detailed claims data furnished by Navistar and Medstat. The data has not been audited by Coopers & Lybrand and we cannot certify as to the accuracy and completeness of the data supplied. Our calculations are based on our understanding of Navistar's postretirement benefit programs as described by Navistar personnel and presented in this report.

This valuation was based upon generally accepted actuarial methods. We performed such tests as we considered necessary to ensure the accuracy of the results. We certify that the amounts presented in the accompanying report have been determined appropriately according to the actuarial assumptions and methods stated herein. It should be recognized, however, that because future events frequently do not occur exactly as expected, there are usually differences between projected and actual results. Accordingly, there can be no assurance that actual experience will match our projections.

Respectfully submitted,

COOPERS & LYBRAND

By: _____
Jeannie M. Wodarczyk
F.S.A., M.A.A.A.

By: _____
G. Todd Swim
F.S.A., M.A.A.A.

# CONTENTS

SECTION I     VALUATION RESULTS

SECTION II     POSTRETIREMENT BENEFIT PLAN PROVISIONS

SECTION III     PARTICIPANT DATA

SECTION IV     BASELINE COST DETERMINATION

SECTION V     ACTUARIAL ASSUMPTIONS AND METHODS

SECTION VI     DETAILED TABLES OF VALUATION RESULTS

Navistar International
Transportation Corporation

Coopers & Lybrand

# SECTION I
## VALUATION RESULTS

This valuation report summarizes our measurement of Navistar's obligations under the provisions of SFAS No. 106. The valuation incorporates all postretirement medical and life insurance benefits applicable to Navistar's active employees, retirees, and their dependents.

**Please note:** All valuation results presented in this report are based on our understanding of the provisions of SFAS No. 106, Navistar's plan provisions, the census and claims data provided by Navistar and Medstat, and the assumptions chosen by management, as described in this report.

### VALUATION RESULTS

#### January 1, 1993 Valuation Results

The following table summarizes Navistar's accumulated postretirement benefit obligation (APBO) as of January 1, 1993 based on the covered participants and the postretirement medical and life insurance plans in effect at that time.

I-1

APBO as of January 1, 1993
(Medical, Including Drugs and Life — Contributions)
($millions)

|  | Total |
|---|---|
| Medical | $ 998.1 |
| Drugs | 332.9 |
| Life | 54.4 |
| - Contributions | (385.5) |
| Total | 1,000.1 |
| Percent of total | 100.0% |

Navistar International
Transportation Corporation

1

Coopers & Lybrand

# SECTION I
# VALUATION RESULTS
(continued)

## Valuation Results for Future Years

The obligations were projected for fiscal years 1994 and 1995 based on the January 1, 1993 valuation assumptions. The projection assumed retirements, terminations, and deaths according to the valuation assumptions documented in Section V. The projection is a closed group projection.

Tables I-2 and I-3 summarize Navistar's projected APBO for 1993, 1994, and 1995.

### I-2
### Projected APBO
### ($ millions)
### Medical Programs

| | Medical + Drug - Contributions | |
| | Total | |
| | APBO | % Share |
|---|---|---|
| 1/1/93 employer's<br>Covered participants' | $ 945.7 | 71.1% |
| | 385.3 | 28.9% |
| | 1,331.0 | 100.0% |
| 1/1/94 employer's<br>Covered participants' | $ 990.9 | 71.7% |
| | 390.2 | 28.3% |
| | 1,381.1 | 100.0% |
| 1/1/95 employer's<br>Covered participants' | $1,035.3 | 72.6% |
| | 390.0 | 27.4% |
| | 1,425.3 | 100.0% |

# SECTION II
## POSTRETIREMENT BENEFIT PLAN PROVISIONS
(continued)

Exhibit L

Postretirement Life Insurance Plan Provisions

| Plan Feature | Description |
|---|---|
| Retiree eligibility: | |
| Represented | Age 65 with 1+ years of service, or Age 60 with 10+ years of service, or 30+ years of service. |
| Nonrepresented | Age 55 with 10+ years of service, or 30+ years of service. |
| Period of coverage | Lifetime. |
| Spouse/dependent coverage | None. |
| Retiree contributions | None. |
| Death benefit amount | Based on salary and years of service with $5,0 maximum benefit. Limited additional covera can be purchased at group rates. |

Navistar International
Transportation Corporation

9

Coopers & Lybra

89

# SECTION III
# PARTICIPANT DATA

The participant demographic data (active and retired) were provided by Navistar. The following tables summarize the demographic data provided.

**Exhibit III.1** summarizes the active employee census by age and years of service used for the 1/1/93 valuation.

**Exhibit III.2** summarizes the retired participant census, both retirees and their dependents, by age used for the 1/1/93 valuation.

# SECTION III
# PARTICIPANT DATA
(continued)

*Exhibit III-1*

## Active Employee Census as of January 1, 1993

| Age | 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30+ | Total |
|---|---|---|---|---|---|---|---|---|
| < 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 20-24 | 64 | 3 | 0 | 0 | 0 | 0 | 0 | 67 |
| 25-29 | 313 | 102 | 0 | 0 | 0 | 0 | 0 | 415 |
| 30-34 | 240 | 227 | 52 | 3 | 0 | 0 | 0 | 522 |
| 35-39 | 227 | 192 | 146 | 119 | 77 | 0 | 0 | 761 |
| 40-44 | 172 | 175 | 240 | 273 | 1,140 | 140 | 0 | 2,140 |
| 45-49 | 137 | 141 | 251 | 229 | 1,257 | 1,586 | 263 | 3,864 |
| 50-54 | 49 | 112 | 86 | 373 | 911 | 1,472 | 1,231 | 4,234 |
| 55-59 | 46 | 46 | 78 | 137 | 379 | 611 | 918 | 2,215 |
| 60-64 | 7 | 27 | 14 | 31 | 80 | 137 | 244 | 540 |
| 65+ | 0 | 2 | 3 | 7 | 9 | 12 | 36 | 69 |
| Total | 1,255 | 1,027 | 870 | 1,172 | 3,853 | 3,958 | 2,692 | 14,827 |

Average age: 46.1
Average years of service: 21.7
Total employees NFC*: 370
Total employees Navistar (excluding NFC)*: 14,457

*NFC = Navistar Financial Corp.

Navistar International
Transportation Corporation

11

Coopers & Lybrand

91