SECTION III
PARTICIPANT DATA
(continued)

*Exhibit III.-2*

Retired Census as of January 1, 1993

| Age | Medical Program Retirees and Dependents | Life Insurance Retirees |
|---|---|---|
| < 50 | 930 | 165 |
| 50-54 | 1,740 | 390 |
| 55-59 | 4,344 | 1,181 |
| 60-64 | 7,669 | 2,017 |
| 65-69 | 11,297 | 3,262 |
| 70-74 | 11,355 | 3,215 |
| 75-79 | 9,948 | 2,797 |
| 80-84 | 6,454 | 1,695 |
| 85-89 | 3,065 | 740 |
| 90-94 | 1,091 | 195 |
| 95+ | 257 | 13 |
| Total | 58,149 | 15,668 |
| | | |
| Average age: | 70.8 | 70.7 |
| Total NFC*: | 217 | 111 |
| Total Navistar (excluding NFC)*: | 57,932 | 15,557 |

*NFC = Navistar Financial Corp.

Navistar International
Transportation Corporation

12

Coopers & Lybrand

92

# SECTION IV
# BASELINE COST DETERMINATION

The estimation of postretirement benefit obligations is based on average per capita costs for a one-year period. These are referred to as the "baseline costs." The components of baseline costs and the current plan population are projected into the future to estimate future benefit payments using assumptions to estimate the effect of future trends and population changes.

Navistar's baseline costs were based on actual claims data provided by Medstat. Although reviewed for reasonableness, the data used in developing the baseline costs were not audited by Coopers & Lybrand. A description of the data used and the methods employed to develop the baseline cost assumptions is presented in the remainder of this section.

To understand the discussion of baseline costs presented in this section, it is important to differentiate between "eligible charges" and "net incurred claims." Eligible charges generally represent the gross amount of the bills received for retirees. Net incurred claims are eligible charges less retiree copayments and deductibles, other insurance, and Medicare payments. In other words, net incurred claims represent the net claims amount paid by the employer prior to recognition of retiree contributions, if any. SFAS No. 106 calls for trend assumptions to be applied to eligible charges and explicit recognition of the impact of fixed plan design features. Consistent with the FASB intent, we applied the cost trend assumptions to the eligible charges and separately projected copayments, deductibles, other insurance, and Medicare payments.

## 1991 CLAIMS EXPERIENCE

Eligible charges were developed for:

▼ Total medical
▼ Total admin.

Offsets to eligible charges were categorized into the following:

▼ Medical deductible and coinsurance
▼ Drug copayments
▼ COB (other insurance)
▼ Medicare

For each individual, eligible charges minus the offsets (deductible, coinsurance, COB/Medicare) equals the incurred net claims.

The 1991 per capita claims for medical and drugs were adjusted for plan design changes and trended to 1993 as shown on the following page.

Navistar International
Transportation Corporation

13

Coopers & Lybrand

93

## SECTION IV
## BASELINE COST DETERMINATION
### (continued)

*Exhibit IV-1*

### 1993 Average Per Capita Costs

| | Medical | Drug | Admin. | Deductible | Drug Copays | Medicare | COB | Net Claims |
|---|---|---|---|---|---|---|---|---|
| **Nonrepresented age:** | | | | | | | | |
| < 50 | $2,063 | $276 | $156 | $220 | $105 | $ 0 | $417 | $1,753 |
| 50-54 | 1,653 | 302 | 142 | 220 | 116 | 0 | 280 | 1,481 |
| 55-59 | 2,234 | 335 | 174 | 220 | 126 | 0 | 369 | 2,028 |
| 60-64 | 3,907 | 381 | 266 | 220 | 144 | 0 | 593 | 3,597 |
| 65-69 | 3,290 | 318 | 84 | 110 | 123 | 2,563 | 0 | 896 |
| 70-74 | 3,997 | 366 | 83 | 110 | 140 | 3,316 | 0 | 880 |
| 75-79 | 4,979 | 399 | 82 | 110 | 151 | 4,339 | 0 | 860 |
| 80+ | 4,545 | 396 | 80 | 110 | 151 | 3,908 | 0 | 852 |
| **Represented age:** | | | | | | | | |
| < 50 | $2,269 | $276 | $169 | $242 | $105 | $ 0 | $458 | $1,909 |
| 50-54 | 1,819 | 302 | 153 | 242 | 116 | 0 | 308 | 1,608 |
| 55-59 | 2,457 | 335 | 188 | 242 | 126 | 0 | 406 | 2,206 |
| 60-64 | 4,298 | 381 | 289 | 242 | 144 | 0 | 652 | 3,930 |
| 65-69 | 3,619 | 318 | 92 | 121 | 123 | 2,820 | 0 | 965 |
| 70-74 | 4,397 | 366 | 91 | 121 | 140 | 3,648 | 0 | 945 |
| 75-79 | 5,477 | 399 | 90 | 121 | 151 | 4,773 | 0 | 921 |
| 80+ | 4,999 | 396 | 87 | 121 | 151 | 4,299 | 0 | 911 |

# SECTION V
# ACTUARIAL ASSUMPTIONS AND METHODS

## Actuarial Assumptions

**Discount rate** — 9%.

**Health care trend rates** — Trend rates for each year are illustrated in Exhibit V-1.

**Mortality** — Same as used in pension valuation. Rates in Exhibit V-II.

**Retirement** — Same as pension valuation. The following table illustrates the retirement rates applicable to active employees eligible to retire.

| Age | Represented | Nonrepresented |
|---|---|---|
| < 50 | 0% | 0% |
| 50-54 | 5% | 0% |
| 55-59 | 12% | 15% |
| 60-61 | 16% | 25% |
| 62 | 40% | 40% |
| 63-64 | 35% | 35% |
| 65 | 50% | 70% |
| 66-69 | 50% | 40% |
| 70 | 100% | 100% |

**Disability** — Current retired disabled employees are included with normal retirees in the valuation. Any additional disabled employees are assumed to remain in the active medical plan, accruing years of service, until eligible to retire. Separate disability decrement rates are not considered.

**Turnover** — Annual ultimate rates based on attained age are illustrated in Exhibit V-II.

**Coverage** — Where coverage is available, 100% of all retirees will participate in the postretirement benefit plans.

**Dependents of future retirees** — 90% prior to the year 2000; 50% after 2000 to reflect increasing spousal coverage under dual benefits.

**Payment of claims** — Assumed to occur mid-year.

## SECTION V
## ACTUARIAL ASSUMPTIONS AND METHODS
### (continued)

*Exhibit V-1*

**Health Care Trend Rates**

| Year | Medical Pre-65 | Medical Post-65 | Drug | Administrative Costs | Deductible | COB | Medicare |
|------|------|------|------|------|------|------|------|
| 1994 | 11.0 | 9.0 | 14.0 | 8.0 | 6.0 | 11.0 | 9.0 |
| 1995 | 10.7 | 8.8 | 12.5 | 7.5 | 6.0 | 10.7 | 8.8 |
| 1996 | 10.4 | 8.6 | 11.0 | 7.0 | 6.0 | 10.4 | 8.6 |
| 1997 | 10.1 | 8.4 | 9.5 | 6.5 | 6.0 | 10.1 | 8.4 |
| 1998 | 9.8 | 8.2 | 8.6 | 6.0 | 6.0 | 9.8 | 8.2 |
| 1999 | 9.5 | 8.0 | 8.2 | 5.5 | 6.0 | 9.5 | 8.0 |
| 2000 | 9.2 | 7.8 | 8.0 | 5.5 | 6.0 | 9.2 | 7.8 |
| 2001 | 8.9 | 7.6 | 7.8 | 5.5 | 6.0 | 8.9 | 7.6 |
| 2002 | 8.6 | 7.4 | 7.6 | 5.5 | 6.0 | 8.6 | 7.4 |
| 2003 | 8.2 | 7.3 | 7.4 | 5.5 | 6.0 | 8.2 | 7.3 |
| 2004 | 7.9 | 7.1 | 7.2 | 5.5 | 6.0 | 7.9 | 7.1 |
| 2005 | 7.6 | 6.9 | 7.0 | 5.5 | 6.0 | 7.6 | 6.9 |
| 2006 | 7.3 | 6.7 | 6.8 | 5.5 | 6.0 | 7.3 | 6.7 |
| 2007 | 7.0 | 6.5 | 6.6 | 5.5 | 6.0 | 7.0 | 6.5 |
| 2008 | 6.7 | 6.3 | 6.1 | 5.5 | 6.0 | 6.7 | 6.3 |
| 2009 | 6.4 | 6.1 | 6.2 | 5.5 | 6.0 | 6.4 | 6.1 |
| 2010 | 6.1 | 5.9 | 6.0 | 5.5 | 6.0 | 6.1 | 5.9 |
| 2011 | 5.8 | 5.7 | 5.8 | 5.5 | 6.0 | 5.8 | 5.7 |
| 2012+ | 5.5 | 5.5 | 5.5 | 5.5 | 6.0 | 5.5 | 5.5 |

Navistar International
Transportation Corporation

Coopers & Lybrand

96

Navistar International Transportation Corporation

## MORTALITY AND TURNOVER ASSUMPTIONS
## ANNUAL RATES PER 1,000 PARTICIPANTS

| Age | Rep & Non-Rep Mortality | Turnover Represented | Turnover Nonrepresented |
|---|---|---|---|
| 11 | 0.416 | 0.0 | 0.0 |
| 12 | 0.416 | 0.0 | 0.0 |
| 13 | 0.416 | 0.0 | 0.0 |
| 14 | 0.420 | 0.0 | 0.0 |
| 15 | 0.426 | 0.0 | 0.0 |
| 16 | 0.432 | 0.0 | 0.0 |
| 17 | 0.438 | 50.0 | 105.0 |
| 18 | 0.446 | 50.0 | 105.0 |
| 19 | 0.454 | 50.0 | 105.0 |
| 20 | 0.463 | 50.0 | 105.0 |
| 21 | 0.474 | 50.0 | 105.0 |
| 22 | 0.490 | 50.0 | 97.6 |
| 23 | 0.507 | 50.0 | 90.2 |
| 24 | 0.525 | 50.0 | 82.8 |
| 25 | 0.546 | 50.0 | 75.4 |
| 26 | 0.570 | 50.0 | 68.0 |
| 27 | 0.595 | 48.0 | 65.4 |
| 28 | 0.624 | 46.0 | 62.8 |
| 29 | 0.655 | 44.0 | 60.2 |
| 30 | 0.690 | 42.0 | 57.6 |
| 31 | 0.728 | 40.0 | 55.0 |
| 32 | 0.770 | 36.8 | 53.0 |
| 33 | 0.816 | 33.6 | 51.0 |
| 34 | 0.868 | 30.4 | 49.0 |
| 35 | 0.925 | 27.2 | 47.0 |
| 36 | 0.987 | 24.0 | 45.0 |
| 37 | 1.055 | 21.4 | 43.2 |
| 38 | 1.133 | 18.8 | 41.4 |
| 39 | 1.220 | 16.2 | 39.6 |
| 40 | 1.318 | 13.6 | 37.8 |
| 41 | 1.436 | 11.0 | 36.0 |
| 42 | 1.584 | 9.0 | 34.0 |
| 43 | 1.760 | 7.0 | 32.0 |
| 44 | 1.964 | 5.0 | 30.0 |
| 45 | 2.194 | 3.0 | 28.0 |
| 46 | 2.452 | 1.0 | 26.0 |
| 47 | 2.737 | 0.8 | 24.0 |
| 48 | 3.049 | 0.6 | 22.0 |
| 49 | 3.396 | 0.4 | 20.0 |
| 50 | 3.787 | 0.2 | 18.0 |
| 51 | 4.221 | 0.0 | 16.0 |
| 52 | 4.694 | 0.0 | 13.6 |
| 53 | 5.203 | 0.0 | 11.2 |
| 54 | 5.749 | 0.0 | 8.8 |
| 55 | 6.332 | 0.0 | 6.4 |
| 56 | 6.931 | 0.0 | 4.0 |
| 57 | 7.565 | 0.0 | 3.2 |
| 58 | 8.249 | 0.0 | 2.4 |
| 59 | 9.032 | 0.0 | 1.6 |
| 60 | 9.900 | 0.0 | 0.8 |
| 61 | 10.841 | 0.0 | 0.0 |

Exhibit V-1

Coopers & Lybrand

## MORTALITY AND TURNOVER ASSUMPTIONS
## ANNUAL RATES PER 1,000 PARTICIPANTS
### (continued)

| Age | Rep & Non-Rep Mortality | Turnover Represented | Turnover Nonrepresented |
|---|---|---|---|
| 62 | 11.848 | 0.0 | 0.0 |
| 63 | 12.928 | 0.0 | 0.0 |
| 64 | 14.101 | 0.0 | 0.0 |
| 65 | 15.416 | 0.0 | 0.0 |
| 66 | 16.857 | 0.0 | 0.0 |
| 67 | 18.492 | 0.0 | 0.0 |
| 68 | 20.310 | 0.0 | 0.0 |
| 69 | 22.315 | 0.0 | 0.0 |
| 70 | 24.510 | 0.0 | 0.0 |
| 71 | 27.260 | 0.0 | 0.0 |
| 72 | 30.145 | 0.0 | 0.0 |
| 73 | 33.172 | 0.0 | 0.0 |
| 74 | 36.429 | 0.0 | 0.0 |
| 75 | 40.042 | 0.0 | 0.0 |
| 76 | 44.115 | 0.0 | 0.0 |
| 77 | 48.892 | 0.0 | 0.0 |
| 78 | 54.204 | 0.0 | 0.0 |
| 79 | 60.299 | 0.0 | 0.0 |
| 80 | 66.827 | 0.0 | 0.0 |
| 81 | 73.057 | 0.0 | 0.0 |
| 82 | 79.540 | 0.0 | 0.0 |
| 83 | 86.446 | 0.0 | 0.0 |
| 84 | 93.801 | 0.0 | 0.0 |
| 85 | 101.830 | 0.0 | 0.0 |
| 86 | 110.384 | 0.0 | 0.0 |
| 87 | 119.332 | 0.0 | 0.0 |
| 88 | 128.861 | 0.0 | 0.0 |
| 89 | 138.292 | 0.0 | 0.0 |
| 90 | 148.084 | 0.0 | 0.0 |
| 91 | 158.307 | 0.0 | 0.0 |
| 92 | 168.759 | 0.0 | 0.0 |
| 93 | 179.383 | 0.0 | 0.0 |
| 94 | 191.232 | 0.0 | 0.0 |
| 95 | 203.763 | 0.0 | 0.0 |
| 96 | 216.736 | 0.0 | 0.0 |
| 97 | 230.584 | 0.0 | 0.0 |
| 98 | 245.425 | 0.0 | 0.0 |
| 99 | 261.215 | 0.0 | 0.0 |
| 100 | 278.149 | 0.0 | 0.0 |
| 101 | 296.369 | 0.0 | 0.0 |
| 102 | 317.101 | 0.0 | 0.0 |
| 103 | 340.883 | 0.0 | 0.0 |
| 104 | 368.473 | 0.0 | 0.0 |
| 105 | 401.339 | 0.0 | 0.0 |
| 106 | 440.639 | 0.0 | 0.0 |
| 107 | 491.171 | 0.0 | 0.0 |
| 108 | 539.706 | 0.0 | 0.0 |
| 109 | 597.169 | 0.0 | 0.0 |
| 110 | 1000.000 | 0.0 | 0.0 |

Exhibit V-II

# SECTION V
## ACTUARIAL ASSUMPTIONS AND METHODS
(continued)

*Actuarial Methods*

**Obligations**

The actuarial present value of the net medical, dental, and life insurance benefits expected to be paid after retirement (net of retiree contributions) was calculated as of the measurement date. The expected postretirement benefit obligation (EPBO) represents this actuarial present value of all such postretirement benefits expected to be paid after the measurement date for those active and retired participants covered as of the measurement date. The accumulated postretirement benefit obligation (APBO) represents that portion of the EPBO attributable to service rendered prior to the measurement date.

**Attribution method**

Benefit/years-of-service approach; projected unit credit actuarial cost method.

**Attribution period**

Costs are spread ratably from the date of hire to the date the employee is fully eligible to retire and receive all the benefits he/she is expected to receive under the postretirement medical and life insurance plans.

**Service cost**

The increase in the APBO attributable to employee service in the year and based on the attribution method described above (includes interest to the end of the year).

APPENDIX A-6

ACTUARIAL DEFINITIONS

When used in Article III of Exhibit A or in this Appendix A-6 thereto, the following terms shall have the meanings set forth below:

"Actual Number of Retirees and Spouses" at the beginning of a given Measurement Year equals the total of the Actual Number of Retirees and Spouses at the beginning of the previous Measurement Year, aged 1 year, plus the total of the actual number of Participants who became new Retirees, Spouses and Surviving Spouses during that previous Measurement Year, plus the number of Imputed Retirees and Spouses for the prior Measurement Year. Notwithstanding the foregoing, the Actual Number of Retirees and Spouses at the beginning of measurement Year 1994 is zero.

"Annual Service Cost" means the annual service cost of postretirement benefits with respect to the Health Benefit Program as computed by the Actuary in accordance with FASB 106 and the assumptions set forth in Appendix A-5 to Exhibit A to the Settlement Agreement.

"Average Contributing Participants" for a given Measurement Year equals the mathematical average of the number of Contributing Participants at the beginning of the number of Contributing Participants at the end of the prior Measurement Year and the number of Contributing Participants at the end of the current Measurement Year. Notwithstanding the foregoing, during the initial Year the number of Contributing Participants at the beginning of the 45th day after the Effective Date will be used as the number of Contributing Participants at the end of the prior Measurement Year.

"Contributing Participants" has the meaning assigned to it in Exhibit D to the Settlement Agreement.

"Contributing Participants' Annual Contribution" for a given calendar year is the total estimated annual contribution that Contributing Participants will make in twelve monthly installments in that calendar year.

"Cumulative Drop Outs" at the beginning of a given Measurement Year is determined at the sum of each Measurement Year and is the sum of the Surviving Cumulative Drop Outs plus New Drop Outs, reduced by New Drop Ins.

"Expected Average Contributing Participants" for a given calendar year equals the sum of (i) the actual number of active Employees at the end of the prior Measurement Year who were expected to be eligible to be Contributing Participants at the end of the current Measurement Year, using the mortality and retirement

assumptions in Appendix A-5, and (ii) the actual number of Contributing Participants at the end of the prior Measurement Year who were expected to be eligible to be Contributing Participants at the end of the current Measurement Year, using the mortality assumptions in Appendix A-5. Notwithstanding the foregoing, the 1994 Expected Average Contributing Participants equals the actual number of active Employees and Contributing Participants on the Effective Date reduced by Immediate Drop Outs During the First 45 Days projected forward 10 months using the mortality and retirement assumptions in Appendix A-5.

"Expected Company Costs Per Capital" for a given that Measurement Year equals the Expected Medical Per Capita Costs for that Measurement Year plus the Expected Drug Per Capita Costs for that Measurement Year, reduced by the Expected Participant Contributions for that Measurement Year.

"Expected Drug Per Capita Costs" for a given Measurement Year are developed from the numbers in Table I and the following formula : For Measurement Year $(x) = [2/3$ calendar year $(x-1)]$ plus $[1/3$ calendar year $(x)]$. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Expected Drug Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Drug Per Capita Costs for calendar year 1994.

"Expected Medical Per Capita Costs" for a given Measurement Year are developed from the numbers in Table II and the following formula : For Measurement Year $(x) = [2/3$ calendar year $(x-1)]$ plus $[1/3$ calendar year $(x)]$. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Expected Medical Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Medical Per Capita Costs for calendar year 1994.

"Expected Number of Retirees and Spouses" for a given Measurement Year will be based upon the actual number of Employees on the Effective Date, with Retirees and Spouses projected in accordance with retirement rates from Appendix A-5 and with Spouses imputed at the "dependents of future retirees rates" from Appendix A-5. Notwithstanding the foregoing, for Measurement Year 1994, five-sixths of the retirement rates will be applied.

"Expected Participant Contributions" for a given Measurement Year (x) equals 8 times the Monthly Base Contributions for calendar year (x-1) plus 4 times the Monthly Base Contribution for calendar year (x). Notwithstanding the foregoing, for Measurement Year 1994, it equals 6 times the Monthly Base Contributions for calendar year 1993 plus 4 times the Monthly Base Contribution for calendar year 1994.

"FASB 106" has the meaning assigned to it in Exhibit D to the Settlement Agreement.

"Health APBO" have the meaning assigned to them in Exhibit D to the Settlement Agreement.

"Health Accumulated Postretirement Benefit Obligation" and

the First 45 Days and the Immediate Drop Outs During the Second 45 Days.

"Immediate Drop Outs" means the Immediate Drop Outs During

Retirees, Spouses and Surviving Spouses who are eligible to enroll in the Health Benefit Program as of the Effective Date from whom a form is received by the end of the 44th day following the Effective Date indicating their elections not to enroll in the Health Benefit Program.

"Immediate Drop Outs During the First 45 Days" means the

Retirees, Spouses and Surviving Spouses who are eligible to enroll in the Health Benefit Program as of the Effective Date but do not do so by the end of the 89th day following the Effective Date, exclusive of all Immediate Drop Outs During the First 45 days.

"Immediate Drop Outs During the Second 45 Days" means the

beginning of each Measurement Year based on active Employees that have died or terminated prior to retirement in the previous Measurement Year. These deaths and terminations are accumulated and aged each year with retirement rates applied when retirement eligibility is reached. No retirement rates are applied to terminated Employees in their year of termination. In their year of death, 50% of the retirement rates are applied.

"Imputed Retirees and Spouses" are calculated at the

following formula: For Measurement Year (x) = [2/3 calendar year (x-1)] plus [1/3 calendar year (x)]. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Maximum Corridor Medical Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Medical Per Capita Costs for calendar year 1994.

"Maximum Corridor Medical Per Capita Costs" for a given Measurement Year are developed from the numbers in Table III and the

from the Effective Date through April 30, 1994.
Notwithstanding the foregoing, Measurement Year 1994 is the period
May 1 of year (x-1) and ending April 30 of year (x).

"Measurement Year(x)" is the twelve month period beginning

increase 6%, as follows:
over. In each subsequent year the Monthly Base Contribution will
retirees under age 65 and $34 per month for retirees age 65 and
for the first calendar year (1993) shall be $70 per month for

"Monthly Base Contribution" The Monthly Base Contribution

- 3 -

102

## MONTHLY BASE CONTRIBUTION

| Year | Under 65 | 65 and Over |
|------|----------|-------------|
| 1993 | $70.00   | $34.00      |
| 1994 | 74.20    | 36.04       |
| 1995 | 78.65    | 38.20       |
| 1996 | 83.37    | 40.49       |
| 1997 | 88.38    | 42.92       |

$$y \qquad 70.00 \times (1.06)^{(y-1993)} \qquad 34.00 \times (1.06)^{(y-1993)}$$

"New Drop Ins" at the beginning of a given Measurement Year equals the number of Retirees, Spouses, and surviving Spouses (other than new Retirees and their Spouses) who elect to become or again become Contributing Participants during the prior Measurement Year. For this purpose, there will be no mortality imputed during the prior Measurement Year. Notwithstanding the foregoing, there are no New Drop Ins at the beginning of Measurement Year 1994.

"New Drop Outs" at the beginning of a given Measurement Year equals the number of Retirees, Spouses and Surviving Spouses who elect not to be Contributing Participants during the prior Measurement Year. For this purpose, there will be no mortality imputed during the prior Measurement Year. Notwithstanding the foregoing, for Measurement Year 1995 all Immediate Drop outs will be included in New Drop Outs during the previous Measurement Year.

"Plan 1" is the Health Benefit Program as applicable to Contributing Participants who are not eligible for Medicare, as described in Appendix A-1 to Exhibit A to the Settlement Agreement.

"Plan 2" is the Health Benefit Program as applicable to Contributing Participants who are eligible for Medicare, as described in Appendix A-1 to Exhibit A to the Settlement Agreement.

"Retiree Adjustment Ratio" for a given Measurement Year Ratio for calendar year (x) plus 2/3 of the Retiree Cost Sharing Ratio for calendar year (x-1). Notwithstanding the foregoing, for Measurement Year 1994, Retiree Adjustment Ratio equals 3/5 of the Retiree Cost Sharing Ratio for calendar year 1993 plus 2/5 of the Retiree Cost Sharing Ratio for calendar year 1994.

(x) equals the following formula: 1/3 of the Retiree Cost Sharing

"Retiree Cost Sharing Ratio" for a given calendar year equals the Scheduled Contributions for such year divided by the sum of the products of (i) the Expected Medical Per Capita Costs plus the Expected Drug Per Capita Costs for such year in each of the eight age groups, and (ii) the respective number of Expected Average Contributing Participants for such year in each of such age groups. Notwithstanding the foregoing, the 1993 Retiree Cost Sharing Ratio is 36.3%.

- 4 -

103

"Scheduled Contributions" for a calendar year equals the sum of (i) twelve times the applicable Monthly Base Contribution for such year multiplied by the number of Expected Average Contributing Monthly Base Contribution for such year multiplied by the number of Expected Average Contributing Participants under Plan 1, and (ii) twelve times the applicable Monthly Base Contribution for such year multiplied by the number of Expected Average Contributing Participants under Plan 2.

"Surviving Cumulative Drop Outs" at the beginning of a given Measurement Year equals the Cumulative Drop Outs from the beginning of the prior Measurement Year times the probability of survival to the end of that Measurement Year. For the purpose of this calculation, the probability of survival during the Measurement Year will be based upon the mortality rates specified in Appendix A-5. Notwithstanding the foregoing, the Surviving Cumulative Drop Outs at the beginning of Measurement Year 1994 is zero.

"Total Actual Drug Cost" for a given Measurement Year equals the sum of paid drug claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of paid drug claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for such Measurement Year. For Measurement Year 1994, Total Actual Drug Cost equals the sum of paid drug claims and administrative expenses and applicable HMO premiums for the period from October 1, 1993 through April 30, 1994 multiplied by a fraction, the numerator of which is 10 and the denominator of which is 7.

"Total Actual Medical Cost" for a given Measurement Year equals the sum of paid medical claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of paid medical claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for the Measurement Year. For Measurement Year 1994, Total Actual Medical Cost equals the sum of paid medical claims and administrative expenses and applicable HMO premiums for the period from October 1, 1993 through April 30, 1994 multiplied by a fraction the numerator of which is 10 and the denominator of which is 7.

"Total Estimated Annual Cost" for a given Measurement Year means the Actuary's estimate of the total cost of providing all covered benefits and administrative costs of the Health Benefit Program for such year. The Actuary's estimate of administrative costs shall include, but not be limited to, Plan Expenses.

"Total Expected Drug Dollars" for a given Measurement Year equals the Expected Drug Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table I and then totaled.

"Total Expected Medical Dollars" for a given Measurement Year equals the Expected Medical Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table II and then totaled.

"Total Maximum Corridor Medical Dollars" for a given Measurement Year equals the Maximum Corridor Medical Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table III and then totaled.

- 6 -

TABLE I
# EXPECTED DRUG PER CAPITA COSTS
## NET PER CAPITA COSTS (DRUGS)

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 – 79 | 80 + |
| 1993 | $196 | $215 | $239 | $273 | $206 | $235 | $257 | $254 |
| 1994 | 237 | 260 | 288 | 329 | 251 | 287 | 314 | 310 |
| 1995 | 278 | 305 | 338 | 386 | 296 | 340 | 371 | 367 |
| 1996 | 319 | 350 | 388 | 443 | 343 | 392 | 428 | 424 |
| 1997 | 358 | 393 | 436 | 498 | 387 | 442 | 483 | 478 |
| 1998 | 397 | 438 | 483 | 551 | 431 | 492 | 538 | 532 |
| 1999 | 438 | 480 | 532 | 607 | 476 | 542 | 593 | 588 |
| 2000 | 480 | 527 | 584 | 666 | 523 | 598 | 652 | 646 |
| 2001 | $525 | $576 | $638 | $728 | $573 | $655 | $715 | $708 |
| 2002 | 572 | 627 | 695 | 793 | 626 | 715 | 780 | 773 |
| 2003 | 621 | 681 | 755 | 861 | 681 | 778 | 849 | 841 |
| 2004 | 672 | 738 | 817 | 932 | 728 | 844 | 920 | 913 |
| 2005 | 726 | 797 | 882 | 1,006 | 798 | 913 | 995 | 987 |
| 2006 | $782 | $858 | $950 | $1,084 | $861 | $984 | $1,073 | $1,064 |
| 2007 | 840 | 922 | 1,020 | 1,164 | 925 | 1,058 | 1,154 | 1,144 |
| 2008 | 900 | 988 | 1,093 | 1,247 | 992 | 1,135 | 1,227 | 1,227 |
| 2009 | 962 | 1,056 | 1,168 | 1,332 | 1,061 | 1,214 | 1,323 | 1,312 |
| 2010 | 1,026 | 1,125 | 1,245 | 1,421 | 1,132 | 1,295 | 1,411 | 1,399 |
| 2011 | $1,091 | $1,197 | $1,325 | $1,511 | $1,205 | $1,378 | $1,502 | $1,488 |
| 2012 | 1,157 | 1,269 | 1,404 | 1,602 | 1,278 | 1,461 | 1,592 | 1,580 |
| 2013 | 1,226 | 1,346 | 1,489 | 1,698 | 1,356 | 1,550 | 1,688 | 1,675 |
| 2014 | 1,299 | 1,425 | 1,577 | 1,799 | 1,436 | 1,642 | 1,788 | 1,775 |
| 2015 | 1,377 | 1,511 | 1,671 | 1,906 | 1,522 | 1,740 | 1,896 | 1,881 |
| 2016 | $1,458 | $1,600 | $1,770 | $2,019 | $1,612 | $1,843 | $2,009 | $1,993 |
| 2017 | 1,544 | 1,695 | 1,874 | 2,138 | 1,708 | 1,953 | 2,128 | 2,111 |
| 2018 | 1,635 | 1,794 | 1,984 | 2,264 | 1,809 | 2,068 | 2,253 | 2,233 |
| 2019 | 1,730 | 1,899 | 2,100 | 2,396 | 1,916 | 2,190 | 2,385 | 2,365 |
| 2020 | 1,831 | 2,010 | 2,223 | 2,536 | 2,027 | 2,318 | 2,525 | 2,505 |
| 2021 | $1,938 | $2,127 | $2,352 | $2,683 | $2,145 | $2,453 | $2,672 | $2,651 |
| 2022 | 2,050 | 2,251 | 2,489 | 2,839 | 2,270 | 2,596 | 2,827 | 2,805 |
| 2023 | 2,169 | 2,381 | 2,632 | 3,003 | 2,401 | 2,746 | 2,991 | 2,968 |
| 2024 | 2,294 | 2,518 | 2,784 | 3,176 | 2,540 | 2,905 | 3,164 | 3,139 |
| 2025 | 2,426 | 2,663 | 2,944 | 3,358 | 2,687 | 3,072 | 3,346 | 3,320 |
| 2026 | $2,565 | $2,816 | $3,112 | $3,550 | $2,841 | $3,249 | $3,538 | $3,511 |
| 2027 | 2,712 | 2,977 | 3,291 | 3,754 | 3,004 | 3,435 | 3,741 | 3,712 |
| 2028 | 2,867 | 3,147 | 3,478 | 3,969 | 3,176 | 3,632 | 3,955 | 3,925 |
| 2029 | 3,030 | 3,327 | 3,677 | 4,195 | 3,356 | 3,839 | 4,181 | 4,149 |
| 2030 | 3,203 | 3,516 | 3,886 | 4,433 | 3,549 | 4,058 | 4,420 | 4,386 |
| 2031 | $3,384 | $3,716 | $4,107 | $4,685 | $3,751 | $4,289 | $4,671 | $4,636 |
| 2032 | 3,576 | 3,926 | 4,339 | 4,951 | 3,964 | 4,533 | 4,936 | 4,898 |
| 2033 | 3,779 | 4,149 | 4,585 | 5,231 | 4,189 | 4,790 | 5,216 | 5,178 |
| 2034 | 3,992 | 4,383 | 4,844 | 5,527 | 4,426 | 5,061 | 5,511 | 5,469 |
| 2035 | 4,216 | 4,631 | 5,117 | 5,838 | 4,677 | 5,347 | 5,822 | 5,778 |
| 2036 | $4,456 | $4,892 | $5,406 | $6,167 | $4,941 | $5,648 | $6,151 | $6,104 |
| 2037 | 4,706 | 5,167 | 5,710 | 6,513 | 5,219 | 5,967 | 6,497 | 6,448 |
| 2038 | 4,971 | 5,458 | 6,031 | 6,881 | 5,513 | 6,303 | 6,863 | 6,811 |
| 2039 | 5,250 | 5,764 | 6,370 | 7,269 | 5,823 | 6,657 | 7,249 | 7,194 |
| 2040 | 5,545 | 6,088 | 6,727 | 7,678 | 6,150 | 7,031 | 7,657 | 7,598 |
| 2041 | $5,855 | $6,429 | $7,104 | $8,105 | $6,495 | $7,426 | $8,085 | $8,024 |
| 2042 | 6,183 | 6,789 | 7,501 | 8,559 | 6,860 | 7,842 | 8,538 | 8,474 |
| 2043 | 6,529 | 7,169 | 7,921 | 9,037 | 7,243 | 8,281 | 9,016 | 8,948 |
| 2044 | 6,894 | 7,569 | 8,363 | 9,541 | 7,648 | 8,744 | 9,520 | 9,449 |
| 2045 | 7,279 | 7,992 | 8,830 | 10,075 | 8,075 | 9,232 | 10,052 | 9,977 |
| 2046 | $7,685 | $8,436 | $9,323 | $10,637 | $8,526 | $9,748 | $10,613 | $10,534 |
| 2047 | 8,113 | 8,908 | 9,843 | 11,230 | 9,002 | 10,292 | 11,205 | 11,121 |
| 2048 | 8,566 | 9,405 | 10,391 | 11,855 | 9,504 | 10,865 | 11,830 | 11,741 |
| 2049 | 9,042 | 9,928 | 10,969 | 12,515 | 10,033 | 11,471 | 12,489 | 12,395 |
| 2050 | 9,545 | 10,481 | 11,580 | 13,212 | 10,592 | 12,109 | 13,184 | 13,085 |
| 2051 | $10,076 | $11,064 | $12,223 | $13,946 | $11,181 | $12,763 | $13,918 | $13,813 |
| 2052 | 10,636 | 11,679 | 12,903 | 14,721 | 11,803 | 13,494 | 14,691 | 14,581 |
| 2053 | 11,227 | 12,327 | 13,619 | 15,539 | 12,459 | 14,243 | 15,506 | 15,382 |
| 2054 | 11,850 | 13,012 | 14,375 | 16,401 | 13,151 | 15,035 | 16,369 | 16,247 |

TABLE II

## EXPECTED MEDICAL PER CAPITA COSTS
### NET PER CAPITA COSTS (MEDICAL EXCLUDING DRUGS)

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 – 79 | 80 + |
| 1993 | $1,699 | $1,371 | $1,917 | $3,540 | $734 | $685 | $641 | $637 |
| 1994 | 1,895 | 1,544 | 2,140 | 3,948 | 810 | 756 | 708 | 703 |
| 1995 | 2,091 | 1,703 | 2,355 | 4,365 | 876 | 818 | 765 | 760 |
| 1996 | $2,316 | $1,843 | $2,605 | $4,825 | $963 | $880 | $824 | $828 |
| 1997 | 2,652 | 2,046 | 2,874 | 5,311 | 1,036 | 967 | 904 | 898 |
| 1998 | 2,805 | 2,302 | 3,161 | 5,832 | 1,123 | 1,047 | 979 | 973 |
| 1999 | 3,074 | 2,521 | 3,469 | 6,385 | 1,215 | 1,133 | 1,058 | 1,052 |
| 2000 | 3,351 | 2,765 | 3,794 | 6,967 | 1,313 | 1,222 | 1,142 | 1,134 |
| 2001 | $3,650 | $3,016 | $4,136 | $7,590 | $1,415 | $1,315 | $1,230 | $1,221 |
| 2002 | 3,956 | 3,280 | 4,503 | 8,243 | 1,521 | 1,415 | 1,321 | 1,312 |
| 2003 | 4,279 | 3,564 | 4,887 | 8,828 | 1,633 | 1,519 | 1,418 | 1,407 |
| 2004 | 4,626 | 3,840 | 5,278 | 9,649 | 1,748 | 1,627 | 1,506 | 1,506 |
| 2005 | 4,986 | 4,128 | 5,696 | 10,385 | 1,868 | 1,743 | 1,623 | 1,609 |
| 2006 | $5,350 | $4,429 | $6,115 | $11,150 | $1,994 | $1,861 | $1,731 | $1,717 |
| 2007 | 5,718 | 4,728 | 6,532 | 11,947 | 2,124 | 1,981 | 1,844 | 1,827 |
| 2008 | 6,101 | 5,022 | 6,955 | 12,761 | 2,259 | 2,106 | 1,961 | 1,941 |
| 2009 | 6,486 | 5,337 | 7,381 | 13,671 | 2,399 | 2,233 | 2,082 | 2,059 |
| 2010 | 6,876 | 5,672 | 7,803 | 14,414 | 2,539 | 2,364 | 2,208 | 2,181 |
| 2011 | $7,306 | $6,287 | $8,254 | $15,115 | $2,684 | $2,499 | $2,333 | $2,302 |
| 2012 | 7,718 | 6,632 | 8,940 | 16,029 | 2,834 | 2,638 | 2,462 | 2,428 |
| 2013 | 8,127 | 6,965 | 9,605 | 16,876 | 2,991 | 2,783 | 2,597 | 2,461 |
| 2014 | 8,561 | 7,343 | 9,913 | 17,744 | 3,153 | 2,939 | 2,738 | 2,701 |
| 2015 | 9,077 | 7,803 | 10,385 | 18,643 | 3,326 | 3,099 | 2,887 | 2,850 |
| 2016 | $9,617 | $8,132 | $10,454 | $19,623 | $3,500 | $3,269 | $3,044 | $3,006 |
| 2017 | 10,226 | 8,540 | 11,013 | 20,542 | 3,683 | 3,451 | 3,214 | 3,171 |
| 2018 | 10,783 | 8,964 | 11,584 | 21,481 | 3,877 | 3,642 | 3,382 | 3,345 |
| 2019 | 11,371 | 9,429 | 12,165 | 22,511 | 4,076 | 3,839 | 3,582 | 3,528 |
| 2020 | 11,991 | 9,727 | 12,803 | 23,728 | 4,279 | 4,048 | 3,776 | 3,723 |
| 2021 | $12,645 | $10,302 | $13,685 | $25,045 | $4,497 | $4,260 | $3,983 | $3,928 |
| 2022 | 13,334 | 10,831 | 14,403 | 26,410 | 4,711 | 4,485 | 4,205 | 4,144 |
| 2023 | 13,903 | 11,526 | 15,233 | 27,784 | 4,928 | 4,719 | 4,437 | 4,372 |
| 2024 | 14,827 | 12,162 | 16,061 | 29,284 | 5,180 | 4,961 | 4,676 | 4,613 |
| 2025 | 15,835 | 12,813 | 17,049 | 30,921 | 5,454 | 5,207 | 4,931 | 4,865 |
| 2026 | $16,488 | $13,510 | $18,277 | $32,617 | $5,750 | $5,468 | $5,168 | $5,135 |
| 2027 | 17,386 | 14,245 | 19,323 | 34,427 | 6,057 | 5,731 | 5,459 | 5,416 |
| 2028 | 18,334 | 15,020 | 20,317 | 36,384 | 6,387 | 6,025 | 5,747 | 5,713 |
| 2029 | 19,333 | 15,837 | 20,974 | 38,361 | 6,704 | 6,305 | 6,040 | 6,025 |
| 2030 | 20,386 | 16,698 | 21,874 | 40,600 | 7,074 | 6,637 | 6,339 | 6,353 |
| 2031 | $21,497 | $17,606 | $22,856 | $43,343 | $7,448 | $6,997 | $6,660 | $6,694 |
| 2032 | 22,668 | 18,563 | 24,103 | 45,729 | 7,861 | 7,368 | 6,976 | 7,037 |
| 2033 | 23,903 | 19,572 | 25,418 | 48,067 | 8,304 | 7,746 | 7,301 | 7,440 |
| 2034 | 25,205 | 20,632 | 26,804 | 49,709 | 8,765 | 8,157 | 7,674 | 7,840 |
| 2035 | 26,578 | 21,758 | 28,256 | 51,881 | 9,253 | 8,605 | 8,079 | 8,259 |
| 2036 | $28,026 | $22,941 | $29,806 | $54,721 | $9,849 | $9,057 | $8,515 | $8,697 |
| 2037 | 29,555 | 24,181 | 31,434 | 57,717 | 10,376 | 9,560 | 8,967 | 9,161 |
| 2038 | 31,162 | 25,502 | 33,146 | 60,877 | 10,804 | 10,098 | 9,426 | 9,650 |
| 2039 | 32,836 | 26,882 | 34,964 | 64,210 | 11,284 | 10,648 | 9,928 | 10,166 |
| 2040 | 34,649 | 28,350 | 36,862 | 67,725 | 11,782 | 10,670 | 10,166 | 10,701 |
| 2041 | $36,538 | $29,935 | $38,872 | $71,432 | $12,431 | $11,968 | $10,701 | $11,262 |
| 2042 | 38,528 | 31,614 | 40,991 | 75,343 | 13,106 | 12,600 | 11,631 | 11,854 |
| 2043 | 40,624 | 33,224 | 43,235 | 79,467 | 13,817 | 13,248 | 11,854 | 12,476 |
| 2044 | 42,836 | 35,032 | 43,285 | 83,817 | 13,817 | 13,243 | 12,285 | 12,476 |
| 2045 | 45,168 | 36,935 | 45,068 | 88,405 | 15,357 | 13,724 | 12,956 | 13,133 |
| 2046 | $47,628 | $38,941 | $50,618 | $93,244 | $16,180 | $15,106 | $14,619 | $14,659 |
| 2047 | 50,220 | 41,056 | 53,452 | 98,349 | 17,068 | 15,824 | 15,329 | 15,282 |
| 2048 | 52,964 | 43,286 | 56,438 | 103,731 | 17,994 | 16,787 | 16,106 | 16,066 |
| 2049 | 55,837 | 45,637 | 59,438 | 109,408 | 18,970 | 17,697 | 16,939 | 16,939 |
| 2050 | 58,677 | 48,110 | 62,677 | 115,397 | 19,998 | 17,697 | 16,939 | 16,939 |
| 2051 | $62,081 | $50,726 | $66,094 | $121,713 | $21,088 | $18,655 | $18,366 | $17,725 |
| 2052 | 65,460 | 53,423 | 69,696 | 128,374 | 22,226 | 20,731 | 19,335 | 18,747 |
| 2053 | 69,023 | 56,387 | 73,494 | 135,400 | 23,431 | 21,854 | 20,407 | 20,815 |
| 2054 | 72,779 | 59,448 | 77,499 | 142,810 | 24,701 | 23,037 | 21,511 | 21,940 |

107

TABLE III

## MAXIMUM CORRIDOR MEDICAL PER CAPITA COSTS
## NET PER CAPITA COSTS (MEDICAL EXCLUDING DRUGS)

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 – 79 | 80 + |
| 1993 | $1,638 | $1,371 | $1,917 | $3,540 | $734 | $665 | $641 | $637 |
| 1994 | 1,913 | 1,559 | 2,160 | 3,983 | 817 | 763 | 715 | 710 |
| 1995 | 2,129 | 1,735 | 2,398 | 4,442 | 892 | 833 | 779 | 775 |
| 1996 | $2,378 | $1,941 | $2,674 | $4,950 | $979 | $915 | $855 | $851 |
| 1997 | 2,641 | 2,163 | 2,974 | 5,486 | 1,073 | 1,001 | 937 | 931 |
| 1998 | 2,924 | 2,402 | 3,295 | 6,069 | 1,172 | 1,093 | 1,022 | 1,016 |
| 1999 | 3,227 | 2,649 | 3,640 | 6,688 | 1,276 | 1,190 | 1,112 | 1,105 |
| 2000 | 3,540 | 2,849 | 4,008 | 7,343 | 1,388 | 1,292 | 1,208 | 1,200 |
| 2001 | $3,878 | $3,208 | $4,392 | $8,044 | $1,505 | $1,389 | $1,308 | $1,299 |
| 2002 | 4,225 | 3,507 | 4,806 | 8,806 | 1,627 | 1,513 | 1,414 | 1,404 |
| 2003 | 4,592 | 3,819 | 5,241 | 9,554 | 1,764 | 1,632 | 1,524 | 1,513 |
| 2004 | 4,986 | 4,143 | 5,684 | 10,369 | 1,906 | 1,756 | 1,639 | 1,626 |
| 2005 | 5,394 | 4,471 | 6,157 | 11,200 | 2,023 | 1,888 | 1,758 | 1,744 |
| 2006 | $5,805 | $4,808 | $6,631 | $12,063 | $2,167 | $2,022 | $1,887 | $1,867 |
| 2007 | 6,221 | 5,151 | 7,102 | 12,959 | 2,315 | 2,159 | 2,010 | 1,992 |
| 2008 | 6,663 | 5,483 | 7,578 | 13,871 | 2,468 | 2,300 | 2,143 | 2,122 |
| 2009 | 7,083 | 5,837 | 8,055 | 14,775 | 2,624 | 2,443 | 2,278 | 2,254 |
| 2010 | 7,518 | 6,211 | 8,211 | 15,709 | 2,781 | 2,589 | 2,419 | 2,398 |
| 2011 | $7,992 | $6,543 | $8,527 | $16,605 | $2,941 | $2,739 | $2,560 | $2,538 |
| 2012 | 8,444 | 6,889 | 8,845 | 17,479 | 3,106 | 2,889 | 2,699 | 2,663 |
| 2013 | 8,891 | 7,267 | 9,445 | 18,403 | 3,278 | 3,050 | 2,847 | 2,808 |
| 2014 | 9,389 | 7,635 | 10,285 | 19,352 | 3,455 | 3,221 | 3,002 | 2,963 |
| 2015 | $9,932 | 8,046 | 10,837 | 20,330 | 3,645 | 3,397 | 3,166 | 3,126 |
| 2016 | $10,532 | $8,527 | $11,430 | $21,386 | $3,836 | $3,584 | $3,341 | $3,296 |
| 2017 | 11,180 | 8,867 | 12,041 | 22,402 | 4,037 | 3,784 | 3,524 | 3,479 |
| 2018 | 11,800 | 9,438 | 12,645 | 23,394 | 4,250 | 3,983 | 3,720 | 3,670 |
| 2019 | 12,444 | 10,044 | 13,299 | 24,530 | 4,468 | 4,209 | 3,928 | 3,871 |
| 2020 | 13,121 | 10,662 | 14,007 | 25,875 | 4,691 | 4,439 | 4,142 | 4,085 |
| 2021 | $13,848 | $11,292 | $14,665 | $27,375 | $4,931 | $4,639 | $4,370 | $4,310 |
| 2022 | 14,594 | 11,982 | 15,776 | 28,804 | 5,165 | 4,918 | 4,613 | 4,547 |
| 2023 | 15,390 | 12,835 | 16,659 | 30,303 | 5,404 | 5,178 | 4,868 | 4,868 |
| 2024 | 16,230 | 13,323 | 17,565 | 31,918 | 5,680 | 5,440 | 5,131 | 5,063 |
| 2025 | 17,115 | 14,048 | 18,546 | 33,726 | 5,981 | 5,711 | 5,411 | 5,340 |
| 2026 | $18,033 | $14,813 | $19,980 | $35,576 | $6,305 | $6,001 | $5,634 | $5,634 |
| 2027 | 19,033 | 15,619 | 21,135 | 37,551 | 6,642 | 6,287 | 5,945 | 5,945 |
| 2028 | 20,071 | 16,470 | 22,342 | 39,687 | 6,983 | 6,580 | 6,307 | 6,271 |
| 2029 | 21,160 | 17,366 | 22,942 | 41,843 | 7,334 | 6,917 | 6,629 | 6,615 |
| 2030 | 22,320 | 18,312 | 24,500 | 44,287 | 7,759 | 7,232 | 6,958 | 6,975 |
| 2031 | $23,537 | $19,306 | $25,003 | $47,280 | $8,179 | $7,877 | $7,310 | $7,350 |
| 2032 | 24,820 | 20,359 | 26,368 | 49,884 | 8,623 | 8,065 | 7,658 | 7,750 |
| 2033 | 26,174 | 21,467 | 27,807 | 52,435 | 9,110 | 8,065 | 8,018 | 8,170 |
| 2034 | 27,601 | 22,635 | 29,325 | 54,260 | 9,110 | 8,500 | 8,428 | 8,610 |
| 2035 | 29,106 | 23,867 | 30,926 | 56,598 | 10,132 | 8,962 | 8,871 | 9,070 |
| 2036 | $30,683 | $25,166 | $32,614 | $59,697 | $10,592 | $9,443 | $9,070 | $9,553 |
| 2037 | 32,366 | 26,535 | 34,394 | 62,967 | 11,336 | 9,841 | 9,553 | 10,042 |
| 2038 | 34,130 | 27,979 | 34,271 | 66,416 | 11,386 | 10,493 | 9,847 | 10,601 |
| 2039 | 35,991 | 29,501 | 38,250 | 70,033 | 12,395 | 11,068 | 10,351 | 10,601 |
| 2040 | 37,953 | 31,106 | 40,337 | 73,890 | 12,395 | 11,689 | 10,904 | 11,188 |
| 2041 | $40,021 | $32,780 | $42,539 | $77,936 | $13,645 | $12,351 | $11,501 | $11,757 |
| 2042 | 42,203 | 34,562 | 44,860 | 82,204 | 14,396 | 13,140 | 11,689 | 11,188 |
| 2043 | 44,503 | 36,443 | 47,307 | 86,706 | 16,168 | 13,844 | 12,777 | 13,026 |
| 2044 | 46,903 | 38,446 | 49,889 | 91,464 | 15,892 | 14,547 | 13,497 | 13,710 |
| 2045 | 49,426 | 40,557 | 52,611 | 96,462 | 16,680 | 15,071 | 14,235 | 14,434 |
| 2046 | $52,182 | $42,742 | $55,481 | $101,745 | $17,776 | $15,727 | $15,180 | $15,180 |
| 2047 | 55,026 | 45,006 | 58,508 | 107,318 | 18,741 | 16,531 | 16,992 | 15,858 |
| 2048 | 58,024 | 47,317 | 61,700 | 113,182 | 18,759 | 17,491 | 16,846 | 16,798 |
| 2049 | 61,185 | 50,100 | 65,085 | 119,380 | 19,759 | 18,440 | 17,700 | 17,684 |
| 2050 | 64,519 | 52,824 | 68,615 | 125,927 | 20,832 | 18,440 | 18,341 | 17,684 |
| 2051 | $68,034 | $55,686 | $72,357 | $132,822 | $21,963 | $20,498 | $19,152 | $19,600 |
| 2052 | 71,740 | 58,724 | 76,304 | 140,095 | 23,155 | 20,498 | 18,182 | 20,626 |
| 2053 | 75,648 | 61,916 | 80,446 | 147,765 | 24,412 | 22,778 | 21,283 | 21,715 |
| 2054 | 78,769 | 65,281 | 84,854 | 155,855 | 27,135 | 24,013 | 22,436 | 22,891 |
| | | | | | | | 23,852 | 24,131 |

# THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.
## RETIREE SUPPLEMENTAL BENEFIT PROGRAM

EXHIBIT B

# TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| ARTICLE I | Introduction . . . . . . . . . . | 1 |
| 1.1 | Definitions . . . . . . . . . . | 1 |
| 1.2 | Purpose . . . . . . . . . . | 1 |
| ARTICLE II | Supplemental Benefit Trust . . . | 1 |
| 2.1 | Establishment . . . . . . . . . | 1 |
| 2.2 | Initial Funding . . . . . . . . | 2 |
| ARTICLE III | Parent Common Equity . . . . . . | 2 |
| 3.1 | Purchases . . . . . . . . . . | 2 |
| 3.2 | Conversion . . . . . . . . . | 2 |
| 3.3 | Voting . . . . . . . . . . | 2 |
| 3.4 | Sales of Parent Common Equity . . | 2 |
| 3.5 | Registration Rights and Other Transfers | 3 |
| 3.6 | Event Date . . . . . . . . . | 4 |
| ARTICLE IV | Super-Majority Transactions . . . | 4 |
| ARTICLE V | Parent Preference Stock . . . . | 4 |
| 5.1 | Contribution . . . . . . . . | 4 |
| 5.2 | Voting . . . . . . . . . . | 4 |
| 5.3 | No Transfers . . . . . . . . | 5 |
| ARTICLE VI | The Supplemental Benefit Committee | 5 |
| 6.1 | A Supplemental Benefit Program committee | 5 |
| 6.2 | Powers and Duties . . . . . . . | 5 |
| 6.3 | Program Design . . . . . . . | 6 |
| 6.4 | Action by Supplemental Benefit Committee | 7 |
| 6.5 | Provision of Benefits . . . . . | 8 |
| 6.6 | Supplemental Benefit Committee Minutes | 9 |
| ARTICLE VII | Profit Sharing Contributions . . | 9 |
| 7.1 | Contributions . . . . . . . . | 9 |
| 7.2 | Profit Sharing Cessation Date . . | 9 |
| 7.3 | Guarantee of Contributions After the Profit Sharing Cessation Date | 10 |
| 7.4 | Dispute Resolution . . . . . . | 10 |
| ARTICLE VIII | Additional Funding . . . . . . | 11 |
| 8.1 | Expenses of Supplemental Benefit Committee | 11 |
| 8.2 | Advance Funding . . . . . . . | 12 |

ARTICLE IX      Amendments and Termination

9.1   Amendments . . . . . . . . . . . . . . . . . .    12
9.2   Termination . . . . . . . . . . . . . . . . . .    12

ARTICLE X      Miscellaneous . . . . . . . . . . . . . .    13

10.1  Legends and Stop Transfer Orders . . . . . . .    13
10.2  Prohibitions and Restrictions Relating to Net
      Operating Loss Carryovers. . . . . . . . . . .    13
10.3  Limitation of Liability and Indemnification . .    14
10.4  Exclusive Benefit . . . . . . . . . . . . . . .    16
10.5  Prohibited Inurement . . . . . . . . . . . . .    16
10.6  Assignment, Delegation . . . . . . . . . . . .    16
10.7  Captions . . . . . . . . . . . . . . . . . . .    17
10.8  Incorporation of Appendices; References . . . .    17
10.9  Governing Law . . . . . . . . . . . . . . . . .    17

ARTICLE XI      Events of Default . . . . . . . . . . . .    17

11.1  Supplemental Benefit Program Payment Default .    17
11.2  No Limitation of Rights . . . . . . . . . . . .    18

APPENDICES

Appendix B-1    SPD Supplemental Benefit Program

Appendix B-2    Supplemental Benefit Trust Agreement

Appendix B-3    Restated Certificate of Incorporation

Appendix B-4    Registration Rights

Appendix B-5    SBC Committee Members

Appendix B-6    Supplemental Benefit Profit Sharing Plan

Appendix B-7    Calculation of Common and Dilutative Common
                Equivalent Shares

**THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**
**RETIREE SUPPLEMENTAL BENEFIT PROGRAM**

## ARTICLE I

### Introduction

1.1  Definitions.  Capitalized terms used and not defined herein have the meanings assigned to them in Exhibit D to the Settlement Agreement.

1.2  Purpose.  As of the Effective Date, the Company shall establish the Health Benefit Program and the Life Insurance Program.  Effective as of such date, the Company shall further establish the Supplemental Benefit Program (the "Navistar International Transportation Corp. Retiree Supplemental Benefit Program") on the terms and subject to the conditions set forth below for the benefit of Enrolled Participants and Retirees, whether or not they are Enrolled Participants.  From time to time, it is anticipated that cash generated from assets held in the Supplemental Benefit Trust established under the Supplemental Benefit Program may be used to (i) reduce or reimburse premiums, co-payments, deductibles and other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program; (ii) reduce or reimburse premiums which would otherwise be required to participate in Medicare or any part thereof or any successor or comparable program thereto; (iii) provide Enrolled Participants with additional benefits or, (iv) provide additional life insurance benefits to all Retirees, including both those who are Enrolled Participants and those who are not Enrolled Participants (the benefits described in clauses (iii) and (iv), "Additional Permissible Benefits").  All the benefits which may be provided under the Supplemental Benefit Program are limited to those benefits which are permissible under a trust intended to meet the requirements of an organization described in Section 501(c)(9) of the IRC or under any comparable section or sections of any future legislation that amends, supplements or supersedes said section.

## ARTICLE II

### Supplemental Benefit Trust

2.1  Establishment.  The Company has established the Supplemental Benefit Trust for the benefit of the Enrolled Participants, in the case of both health benefits and life insurance benefits, and Retirees who are not Enrolled Participants, in the case of life insurance benefits.  The Supplemental Benefit Trust shall be maintained in accordance with this Supplemental Benefit Program, the SPD attached as Appendix B-1 and the trust agreement attached as Appendix B-2.

112

2.2 Initial Funding. On the Effective Date, the Company shall contribute such number of shares of the Parent Class B Common to the Supplemental Benefit Trust as shall represent 50 percent of the Parent Common Equity on a Fully Diluted Basis immediately following such contribution.

ARTICLE III
Parent Common Equity

3.1 Purchases. Until the Event Date, the Supplemental Benefit Trust will not directly or indirectly purchase, offer or agree to purchase, or otherwise directly or indirectly acquire any shares of Parent Common Equity or any other voting securities of Parent ("Other Voting Securities") or any rights or options to purchase any shares of Parent Common Equity or Other Voting Securities (either individually or as a member of any "group" (as defined in Section 13(d)(3) of the Exchange Act), except (i) from Parent, (ii) by way of any stock dividend, dividend reinvestment program, stock split, reorganization, recapitalization, merger, consolidation, rights offering or other like distribution made available to holders of Parent Common Equity generally or under any rights plan which Parent may adopt in the future or (iii) as may otherwise be allowed or required by the Certificate of Incorporation of Parent.

3.2 Conversion. At the times and on the terms specified in Appendix B-3 hereto, the shares of Parent Class B Common held by the Supplemental Benefit Trust shall automatically convert into shares of Parent Common.

3.3 Voting. The trustee of the Supplemental Benefit Trust shall vote all shares of Parent Common Equity held by the Supplemental Benefit Trust on any matter submitted to holders of Parent Common Equity for their vote, approval or consent as directed by the Supplemental Benefit Committee.

3.4 Sales of Parent Common Equity. Subject to the terms and conditions described in Appendix B-3, the Supplemental Benefit Trust may sell, transfer, pledge or otherwise dispose of any securities of Parent to any person in accordance with the provisions of all applicable laws, rules and regulations, including, without limitation, the Securities Act and all rules and regulations thereunder; provided, that the Supplemental Benefit Trust shall not sell or transfer any interest in any securities of Parent held by it during any period (a "Blackout Period") when, in the opinion of counsel to Parent which is knowledgeable in securities law matters, Parent or the Supplemental Benefit Trust would be required under applicable securities laws to disclose confidential information of Parent in connection with such proposed sale or transfer, including, without limitation, any pending or proposed acquisition, disposition, merger, consolidation, tender offer, corporate reorganization, financial or accounting development or

any other development involving Parent or any of its subsidiaries. Parent shall notify the Supplemental Benefit Committee promptly of the occurrence of any Blackout Period, together with such opinion of counsel and a general statement of the nature of the event or condition giving rise to such Blackout Period; provided, that the Supplemental Benefit Committee, on behalf of the Supplemental Benefit Trust, shall furnish Parent with a confidentiality agreement in form and substance reasonably satisfactory to Parent as a condition to Parent's disclosure of any such general statement. Parent shall furnish the Supplemental Benefit Committee with further such opinions and statements not less than each 90 days during the continuance of any Blackout Period and shall notify the Supplemental Benefit Committee promptly of the termination of any Blackout Period. The Supplemental Benefit Committee shall be entitled to rely on any such notice, opinion or statement.

3.5    Registration Rights and Other Transfers.

(a)    Registration Rights. Parent hereby grants to the Supplemental Benefit Trust the registration rights set forth in Appendix B-4 hereto.

(b)    Other Transfers. After the Event Date, Parent shall use its best efforts to comply with the current public information requirements of Rule 144 under the Securities Act and, upon request by the Supplemental Benefit Committee, Parent shall furnish the Supplemental Benefit Committee with (i) a written statement as to whether or not Parent is in compliance with such requirements and (ii) such other information as the Supplemental Benefit Committee may reasonably request to enable the Supplemental Benefit Trust to make sales of shares of Registrable Securities held by it pursuant to an exemption from registration under the Securities Act; provided, that Parent shall not be required to provide any such information during a Blackout Period. In connection with any transfer of shares of Registrable Securities, the Supplemental Benefit Committee shall deliver written notice to Parent describing the transfer or proposed transfer in reasonable detail, together with an opinion of counsel of its choice which (to Parent's reasonable satisfaction) is knowledgeable in securities law matters to the effect that such transfer of Registrable Securities may be effected without registration under the Securities Act. Upon delivery of an opinion of such counsel that a transfer of shares of Registrable Securities by the Supplemental Benefit Trust qualifies under Rule 144 under the Securities Act and upon presentation of the certificates representing the shares to be transferred, Parent shall promptly deliver new certificates for such shares which do not bear the legend set forth in Section 10.1. If Parent is not required to deliver such certificates for such shares of Registrable Securities not bearing such legend, Parent shall not register the transfer of such shares until the prospective transferee has confirmed in writing to Parent its agreement to be bound by the conditions contained in this Section 3.5(b). Notwithstanding the foregoing

- 3 -

114

provisions of this Section 3.5(b), three years or more after the date on which any shares of Registrable Securities held by the Supplemental Benefit Trust were "acquired," within the meaning of Rule 144, from Parent or an affiliate of Parent, if Parent receives an opinion of such counsel that the Supplemental Benefit Trust is not an "affiliate" of Parent within the meaning of Rule 144 (and has not been such an "affiliate" of Parent during the preceding three months) and upon presentation of certificates representing such shares of Registrable Securities, Parent shall promptly deliver new certificates for such shares which do not bear the legend set forth in Section 10.1.

3.6 Event Date. The Event Date shall be the date upon which the earliest of the following occurs:

(a) the third anniversary of the date on which—the Company has made prefunding contributions (other than prefunding contributions in respect of Annual Service Cost) under Section 3.6 of Exhibit A to the Settlement Agreement which aggregate $500 million or more;

(b) the fifth anniversary of the Effective Date;

and

(c) the occurrence of a Supplemental Benefit Program Payment Default in accordance with Section 11.1.

## ARTICLE IV

### Super-Majority Transactions

Any transaction involving the Company which, if it involved Parent, would be a Super-Majority Transaction, shall be subject to a Super-Majority Vote at any time when the Certificate of Incorporation of Parent requires a Super-Majority Vote on Super-Majority Transactions.

## ARTICLE V

### Parent Preference Stock

5.1 Contribution. On the Effective Date, the Company shall contribute one share of Series A Preference Stock, par value $1.00 per share, of Parent having the terms set forth in Appendix B-3 hereto (the "Parent Series A Preference") to the Supplemental Benefit Trust.

5.2 Voting. The trustee of the Supplemental Benefit Trust shall vote the Parent Series A Preference held by the Supplemental Benefit Trust in accordance with written instructions received from the Supplemental Benefit Committee on all matters on which the Parent Series A Preference is entitled to vote; provided, that the Supplemental Benefit Committee shall not give any proxies or powers of attorney or make any assignments with respect to the

- 4 -

115

voting of, or enter into any voting trusts, voting agreements or similar arrangements with respect to, the Parent Series A Preference. Each director which the holder of Parent Series A Preference is entitled to elect from time to time to time is referred to herein as a "Supplemental Trust Designee."

5.3    No Transfers.    The trustee of the Supplemental Benefit Trust shall not sell, convey, transfer, assign or pledge the Parent Series A Preference.

ARTICLE VI

The Supplemental Benefit Committee

6.1  A Supplemental Benefit Program committee (the "Supplemental Benefit Committee") shall be formed on the Effective Date in accordance with the following procedures:

(a)    The Supplemental Benefit Committee shall consist of two individuals designated by the UAW (the "SBC UAW Members"), who may be replaced at any time by the UAW, two other members (the "SBC Class One Other Members") and a fifth member (the "SBC Class Two Other Member") (each, an "SBC Committee Member" and, collectively, the "SBC Committee Members"). The persons who shall initially serve in such capacities are identified in Appendix B-5 hereto. The Supplemental Benefit Committee shall have a chair-person (the "SBC Chair"), who shall be elected from time to time from among the SBC Class One Other Members, and a Secretary, who shall be elected from time to time from among the SBC Committee Members; each such election shall be by a majority vote of all the SBC Committee Members. Parent shall provide copies of the Supplemental Benefit Program, the Health Benefit Program and the Life Insurance Program to each SBC Committee Member and each SBC Committee Member's successor, if applicable.

(b)    In the event of the death, incapacity or resig-nation of an SBC Class One Other Member, his successor shall be appointed by a majority vote of such SBC Class One Other Member (if he is not deceased or incapacitated), the remaining SBC Class One Other Member and one alternate (the "SBC Class One Other Member Alternate") upon notice from the Supplemental Benefit Committee or such SBC Class One Other Member of such death, incapacity or resig-nation. The person who shall initially serve as the SBC Class One Other Member Alternate is identified in Appendix B-5. In the event of the death, incapacity of the SBC Class One Other Member Alternate, his successor shall be appointed by a majority vote of such SBC Class One Other Member Alternate (if he is not deceased or incapacitated) and the SBC Class One Other Members upon notice from the Supplemental Benefit Committee or such SBC Class One Other Member Alternate of such death, incapacity or resigna-tion.

(c)    In the event of the SBC Class Two Other Member, his successor shall be nation of the SBC Class Two Other Member, his successor shall be

- 5 -

116

appointed by a majority vote of such SBC Class Two Other Member (if he is not deceased or incapacitated) and two alternates (the "SBC Class Two Other Member Alternates"); the SBC Class Two Other Member Alternate and the SBC Class Two Other Member Alternates, collectively, the "SBC Committee Member Alternates") upon notice from the Supplemental Benefit Committee or such SBC Class Two Other Member of such death, incapacity or resignation. The persons who shall initially serve as the SBC Class Two Other Member Alternates are identified in Appendix B-5. In the event of the death, incapacity or resignation of either of the SBC Class Two Other Member Alternates, his successor shall be appointed by a majority vote of such SBC Class Two Other Member Alternate (if he is not deceased or incapacitated), the other SBC Class Two Other Member Alternate and the SBC Class Two Other Member upon notice from the Supplemental Benefit Committee or such SBC Class Two Other Member Alternate of such death, incapacity or resignation.

None of the SBC Class One Other Members, the SBC Class Two Other Members or the SBC Committee Member Alternates shall be a current employee of the UAW or a Retiree who was represented by the UAW at the time of his retirement.

6.2  Powers and Duties.  As the Program Administrator and Named Fiduciary under the Supplemental Benefit Program, the Supplemental Benefit Committee is responsible for the administration of the Supplemental Benefit Program.  The Supplemental Benefit Committee, as the Named Fiduciary, shall have the powers, rights and duties provided for herein and the following additional powers, rights and duties, all of which such powers, rights and duties shall be exercised or discharged in the Supplemental Benefit Committee's sole discretion, consistent with its rights and obligations under this Exhibit B and the Settlement Agreement:

(a)  to adopt such rules and procedures as it may deem appropriate for the efficient administration of the Supplemental Benefit Program or in connection with the exercise or discharge of its powers, rights and duties;

(b)  to engage such consultants, actuaries and other professionals as it may deem appropriate to assist it in the exercise of its powers, rights and duties;

(c)  until the Profit Sharing Cessation Date, to establish the investment policy under the Supplemental Benefit Trust and appoint and remove investment managers and trustees thereunder;

(d)  to review and enforce Parent's and the Company's compliance with their obligations under the Supplemental Benefit Program;

- 6 -

117

(e)  to invest assets consistent with the provisions of the Supplemental Benefit Trust with respect thereto;

(f)  to direct the transfer of funds from the Supplemental Benefit Trust to the appropriate person as determined by the Supplemental Benefit Committee pursuant to Section 6.3 at the beginning of each calendar year;

(g)  to construe and interpret the Supplemental Benefit Program and to decide all questions of eligibility for benefits under such program;

(h)  to appoint claims administrators, medical review agencies and other service providers; and

(i)  to undertake such other actions as are necessary or appropriate in connection with the exercise of such powers, rights and duties.

6.3  Program Design. The Supplemental Benefit Committee, as a matter of appropriate program design, shall have the following powers, rights and duties, all of which such powers, rights and duties shall be exercised or discharged in the Supplemental Benefit Committee's sole discretion, consistent with the terms of this Exhibit B and the Settlement Agreement:

(a)  at the beginning of each calendar year, to determine the amount of assets of the Supplemental Benefit Trust to be used for the purpose of (i) reducing premiums, co-payments, deductibles or other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program, (ii) reducing or reimbursing premiums which would otherwise be required to be paid by or on behalf of Enrolled Participants to participate in Medicare or any part thereof or any successor or comparable program thereto or (iii) providing Additional Permissible Benefits; and

(b)  to determine the manner in which the assets of the Supplemental Benefit Trust shall be used each year in accordance with the provisions hereof in a fair and equitable manner; provided, that, notwithstanding anything else contained herein, after the Profit Sharing Cessation Date, the provision of Additional Permissible Benefits that would result in a higher level of expenditures by the Supplemental Benefit Trust than contemplated on the Profit Sharing Cessation Date, as determined by the Actuary, shall be subject to the prior written approval of the Company, which approval shall be granted in the Company's sole discretion.

6.4  Action by Supplemental Benefit Committee. Any action by the Supplemental Benefit Committee will be subject to the following provisions:

- 7 -

118

(a)    The SBC Chair or any two SBC Committee Members
may call a meeting of the Supplemental Benefit Committee on not
less than two days' advance written notice to all SBC Committee
Members (including telephone conference, video conference and other
technology-assisted meetings of persons at separate locations);

(b)    The Supplemental Benefit Committee shall act by
the majority vote of all of its members, which action shall be as
effective as if such action had been taken by all SBC Committee
Members, or by a written instrument signed by all of the SBC
Committee Members, which instrument may be executed in counter-
parts; provided, that one or more SBC Committee Members or other
persons may be so authorized to act with respect to particular
matters on behalf of all SBC Committee Members; and provided,
further, that no SBC Committee Member shall be liable or
responsible for an act or omission of other SBC Committee Members
in which the former has not concurred; and

(c)    The certificate of the Secretary of the Supple-
mental Benefit Committee or of the majority of the SBC Committee
Members that the Supplemental Benefit Committee has taken or
authorized any action shall be conclusive in favor of any person
relying on such certificate.

6.5    Provision of Benefits.

(a)    The Company shall cooperate with the Supple-
mental Benefit Committee and the Supplemental Benefit Trust to
provide for the reduction or reimbursement of premiums, co-
payments, deductibles and other amounts which would otherwise be
required to be paid by or on behalf of Enrolled Participants under
the Health Benefit Program or to participate in Medicare or any
part thereof or any successor or comparable program thereto through
the Health Benefit Program, including, in the case of reimbursement
of such amounts that would otherwise be required to be paid to
participate in Medicare or any part thereof or any successor or
comparable program thereto, by addition of such reimbursement to
pension payments.

(b)    In the event that Additional Permissible
Benefits are to be provided by the Supplemental Benefit Program,
then, at the request of the Supplemental Benefit Committee, in a
writing signed by both the SBC Chair and the Secretary of the
Supplemental Benefit Committee, the Company shall cooperate with
the Supplemental Benefit Committee and aid it in determining how
such benefits should be administered. Such aid shall include
identifying and negotiating with claims administrators, medical
review agencies and other service providers to provide such
benefits on the terms specified by the Supplemental Benefit
Committee and informing the Supplemental Benefit Committee of the
available alternatives that most closely approximate those
specified by the Supplemental Benefit Committee. Notwithstanding

- 8 -

anything else contained in this Section 6.5, in providing such cooperation and aid the Company shall act in a ministerial capacity only, and shall neither possess, be granted or delegated, nor exercise any discretionary authority, control or responsibility in the development, administration or management of the Additional Permissible Benefits portion of the Supplemental Benefit Program and none of Parent, the Company or any other Employer shall have any obligation to Participants to provide any Additional Permissible Benefits to Participants, or any liability to Participants for failing to provide any Additional Permissible Benefits.

6.6 <u>Supplemental Benefit Committee Minutes</u>. As soon as is reasonably practicable after each meeting of the Supplemental Benefit Committee, the Secretary of the Supplemental Benefit Committee shall prepare draft minutes of such meeting, which shall be delivered to each SBC Committee Member and approved or modified at the following meeting.

## ARTICLE VII

## Profit Sharing Contributions

7.1 <u>Contributions</u>. The Company shall make additional cash contributions ("<u>Profit Sharing Contributions</u>") to the Supplemental Benefit Trust under and in accordance with the terms of the Profit Sharing Plan attached as Appendix B-6 hereto.

7.2 <u>Profit Sharing Cessation Date</u>. The Profit Sharing Plan shall terminate on the first day of the Plan Year following the Plan Year in which the Profit Sharing Cessation Date occurs, without prejudice to the obligation of Parent to make any Profit Sharing Contribution due in respect of the Plan Year in which the Profit Sharing Cessation Date occurred. As from the date of such termination, (i) the Company shall be responsible for establishing the investment policy under the Supplemental Benefit Trust and removing and appointing investment managers and trustees thereunder and (ii) the Company shall make such additional contributions to the Supplemental Benefit Trust as are necessary to make up for any actuarial losses amortized in accordance with the provisions of FASB 106, including investment losses. The Actuary shall determine as of the first day of each Plan Year whether the Profit Sharing Cessation Date occurred during the previous Year and, after the Profit Sharing Cessation Date, the amount of any such actuarial losses during each Plan Year and notify the Company and the Supplemental Benefit Committee of such determinations, together with such additional information as may be necessary or appropriate. The Company shall make any such additional contribution on or before the tenth business day following receipt of notice of such determination. The "<u>Profit Sharing Cessation Date</u>" shall be the date on which the value of the assets held by the Supplemental Benefit Trust plus the then current year's Health APBO equals the Adjusted Health APBO for Participants under the prior postretirement benefit plan known as the "<u>Navistar International</u>

Transportation Corp. Health Plan". The "Adjusted Health APBO," with respect to such prior plan as of any date, shall be the accumulated postretirement benefit obligation for benefits under the prior plan calculated only with respect to remaining Partici-pants and which would exist if such prior plan were reinstated as of such date for such remaining Participants, as determined by the Actuary in good faith on the same basis that the Employers' Health APBO is computed for the then current year.

7.3 Guarantee of Contributions After the Profit Sharing Cessation Date. On and after the Profit Sharing Cessation Date, Parent shall unconditionally and irrevocably guarantee the payment of contributions by the Company under Section 7.2, as a primary obligor and not merely as a surety. Parent's obligations under this guarantee shall not be impaired by any breach or violation of any provisions of the Plan, whether by the Company, any other Employer or otherwise, nor by any modification or amendment of or to, or any waiver of any obligation of any party under, the Plan, any merger, reorganization or bankruptcy of the Company or any other Employer or any other event which may cause the Company or any other Employer to lose its separate legal identity or to cease to exist. This guarantee shall not be affected in any way by the absence of any action to obtain payment of any amount under the Plan. Parent hereby waives all requirements as to promptness, diligence, presentment, demand for payment, protest and notice of any kind with respect to this guarantee. This guarantee shall remain in full force and effect until the termination of the Plan and shall remain in full force and effect or be reinstated, as the case may be, if at any time any amount paid by Parent, the Company or any other Employer under the Plan or this guarantee, in whole or in part, is rescinded or must otherwise be returned upon the insolvency, bankruptcy, or reorganization of Parent, the Company or such Employer or otherwise, all as though such payment had not been made. This guarantee is a guarantee of payment and not of collection. Each of Parent and the Company irrevocably waives any and all rights or claims to indemnity, subrogation, reassessment, exoneration or contribution which it had, has or hereafter may have in respect of any payment under this guarantee to the extent that under applicable law such rights of Parent or the Company would render a payment by the Company or any other Employer (other than Parent) avoidable if made prior to 90 days before a bankruptcy or similar proceeding of the Company or such Employer. To the extent that Parent makes a payment of a type described in the immediately preceding sentence under this guarantee on behalf of any other Employer, and to the extent that the Company makes a payment of such a type on behalf of any other Employer (other than Parent), such payment shall be deemed to be a capital contribution to such Employer.

7.4 Dispute Resolution. In the event of a dispute regarding any determinations made by the Actuary under this Exhibit B, the Company and the Supplemental Benefit Committee will attempt to resolve such dispute. If any such dispute is not so

- 10 -

resolved to the satisfaction of the Supplemental Benefit Committee, the Supplemental Benefit Committee may request that such determination be resolved by an independent actuary. Such independent actuary shall be selected in accordance with the following procedure. First, the Company and the Supplemental Benefit Committee shall, for a period not to exceed 10 days, seek to agree on a firm to serve as such independent actuary. Second, in the event that the Company and the Supplemental Benefit Committee fail to agree on such a firm, they shall request the Society of Actuaries to prepare a list of the seven largest actuarial firms with their principal offices in the United States (as measured by the number of enrolled actuaries in such firms) and to communicate such list to the parties. Third, the Company and the Supplemental Benefit Committee shall, beginning with the Company, alternately strike one name off such list until only one such name remains, and that firm shall act as such independent actuary. The Actuary, the Company and the Supplemental Benefit Committee shall cooperate with such independent actuary in reevaluating the disputed determination, and the determination of the independent actuary shall be final and binding on all parties. One-half of the fees and expenses of, such independent actuary shall be paid from the assets of the Supplemental Benefit Trust, and the remainder of such fees and expenses shall be paid by the Company.

ARTICLE VIII

Additional Funding

8.1  Expenses of Supplemental Benefit Committee. The Company agrees that, during the period commencing on the Effective Date and ending on the Event Date (the "Initial Period"), it will forthwith upon demand and the Company's receipt of such detailed supporting documentation as the Company may reasonably request pay to: (i) all SBC Committee Members and SBC Committee Member Alternates who are not current employees of the UAW, reasonable compensation for time spent on Supplemental Benefit Committee matters, (ii) each SBC Committee Member and each SBC Committee Member Alternate the amount of any and all reasonable out-of-pocket expenses, including reasonable travel expenses incurred by him in exercising or discharging his powers, rights and duties hereunder and (iii) to the Supplemental Benefit Committee the amount of any and all reasonable out-of-pocket costs and expenses (including trustee fees of the Supplemental Benefit Trust, the reasonable fees and disbursements of actuarial, financial and legal advisors, and any other experts), which the Supplemental Benefit Committee may incur in connection with the administration of this Supplemental Benefit Program (including the attached appendices); provided, that the Company shall not be obligated to pay any amounts described in clauses (i), (ii) or (iii) above which exceed $100,000 in the aggregate for any calendar year (pro rated for any partial calendar year included in the Initial Period), excluding fees and expenses which Parent has agreed to pay pursuant to Appendix B-4.

8.2 Advance Funding. On and subject to the terms of this Section 8.2, the Company shall, during the Initial Period, any Blackout Period and any other period (an "Other Period") during which Parent has postponed the filing of, or prohibited sales in connection with, a Demand Registration pursuant to Appendix B-4, advance cash to the Supplemental Benefit Trust ("Advance Funding") for use in accordance with the Supplemental Benefit Program; provided, that the Company shall not be required to provide Advance Funding in excess of $10 million in the aggregate in any calendar year (pro rated for any partial calendar year during the Initial Period, any Blackout Period, any Parent Registration Period or any Other Period). At the option of the Supplemental Benefit Committee, the Company shall provide Advance Funding in either of the following ways:

(a) By purchasing from the Supplemental Benefit Trust for cash shares of Registrable Securities having an aggregate value equal to the amount of such Advance Funding based on the average per share market price of the Registrable Securities (or, if there is no trading market for the Registrable Securities, of the securities of the same class or series into which the Registrable Securities may be converted) at closing on each of the 30 days on which such securities last traded prior to the date of such Advance Funding or at such higher price as may be required by ERISA; provided, that the Company shall not be required to purchase shares of Registrable Securities at any time when it would be prohibited from doing so under applicable law; or

(b) By providing the requested Advance Funding in cash and reducing the amount of the Company's then-due or future Profit Sharing Contributions, if any, by the amount of such Advance Funding and any other Advance Funding or portion thereof that the Company has not previously applied to Profit Sharing Contributions, increased at the Navistar Rate from the date of each such Advance Funding to the date such Profit Sharing Contribution or Contributions would otherwise be due.

The Supplemental Benefit Committee may call for Advance Funding by delivering written notice thereof to the Company (a "Funding Notice"); provided, that the Supplemental Benefit Committee may not give more than one Funding Notice per calendar quarter. The Company shall be required to provide the amount of Advance Funding specified in any Funding Notice on or before the tenth business day following receipt of such Funding Notice.

## ARTICLE IX

## Amendments and Termination

9.1 Amendments. The Supplemental Benefit Program may not be amended except by a written instrument executed by a major-

- 12 -

123

ity of the members of the Supplemental Benefit Committee and the Company; provided, that:

(a) the consent of the Company shall not be required with respect to any amendment of Sections 6.1 through 6.4 (other than any amendments that affect the Company's rights under Section 6.3(b)), so long as no such amendment shall (i) adversely affect the obligations of any Employer or (ii) be inconsistent with any of the obligations of the Supplemental Benefit Committee under this Exhibit B;

(b) Section 3.4 may not be amended except in the event of a change in the applicable securities law;

(c) the effectiveness of any material amendment to the Supplemental Benefit Program shall be subject to the approval of the Court after appropriate notice to the Class Members; and

(d) in the event the IRS asserts that any Employer is or will be subject to an excise tax on any of the benefits paid or payable by the Supplemental Benefit Trust under the IRC as in effect on the date of the Settlement Agreement, then the Company may amend the Supplemental Benefit Program and/or the Supplemental Benefit Trust to minimize the current and future liability for such tax so long as no such amendment adversely affects the level of Supplemental Benefit Program benefits that are then being provided or could be provided in the future to any Participant.

9.2 Termination. The Supplemental Benefit Program shall terminate upon the earlier of (a) the termination of the Settlement Agreement as provided in Section 13 thereof or (b) the termination of the Health Benefit Program and the Life Insurance Program; provided, that the obligations of Parent and the Company under Section 8.1 and 10.3 shall survive such termination. In the event the Supplemental Benefit Program terminates, any or all of the assets held in the Supplemental Benefit Trust shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" within the meaning of Section 501(c)(9) of the IRC, as determined by the Company.

## ARTICLE X
## Miscellaneous

10.1 Legends and Stop Transfer Orders. The following legend shall be placed on the certificates representing the shares of Parent Class B Common and Parent Series A Preference issued to the Supplemental Benefit Trust pursuant to this Supplemental Benefit Program:

"The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be sold or trans- ferred except in compliance with such Act or an

- 13 -

124

exemption from the registration requirements under such Act. In addition, the securities represented by this certificate are subject to voting agreements, transfer restrictions and other provisions contained in the Navistar International Corporation certificate of incorporation and the Navistar International Transportation Corp. Retiree Supplemental Benefit Program, a copy of which is on file at the office of the Secretary of Navistar International Corporation."

Stop transfer orders will be entered with the transfer agent (or agents) and the registrar (or registrars) of Parent's securities against the transfer of legended securities held by the Supplemental Benefit Trust except in compliance with the requirements of this Supplemental Benefit Program.

10.2 Prohibitions and Restrictions Relating to Net Operating Loss Carryovers.

(a) Notwithstanding any other provision of this Supplemental Benefit Program, neither Parent nor the Company shall, without the consent of the Supplemental Benefit Committee, sell, transfer, otherwise dispose of or purchase or otherwise acquire any securities of Parent or the Company constituting Restricted Stock or take any other action (including acquiring or issuing an option to purchase or sell Restricted Stock) if, after giving effect to such sale, transfer, disposition, purchase, acquisition or other action, the percentage of Restricted Stock owned by all "5-percent shareholders" (within the meaning of Treasury Regulations Section 382-2T(g) under Section 382 of the IRC, or any successor regulation having similar effect) of either Parent or the Company shall have increased by 47 percentage points or more over the lowest percentage of such Restricted Stock owned by such 5-percent shareholders at any time during the three-year period preceding the proposed date of such sale, transfer, disposition, purchase, acquisition or other action (such determination to be made in accordance with the provisions of Treasury Regulations Section 1.382-2T(c) under Section 382 of the IRC, or any successor regulation having similar effect); provided, that the foregoing restrictions shall not be applicable in the case of (i) any sale, transfer, disposition, purchase, acquisition or other action which has been approved by the holders of Parent Common or (ii) any tender or exchange offer within the meaning of the Exchange Act with respect to Parent Common Equity constituting more than 50 percent in value of the outstanding Parent Common Equity so long as the Board shall have waived the restrictions contained in Part I of Article Eleventh of the Certificate of Incorporation of Parent with respect to all transfers by the Supplemental Benefit Trust pursuant to such tender or exchange offer.

(b) In addition to the foregoing, neither Parent nor the Company shall, without the consent of the Supplemental

- 14 -

Benefit Committee, sell, transfer or dispose of any securities of Parent or the Company constituting Restricted Stock or take any other action relating to securities of Parent or the Company (including, without limitation, the redemption of such securities or the issuance of options or similar rights with respect thereto) that would decrease the value of shares of securities of Parent or the Company that the Supplemental Benefit Trust could, pursuant to Paragraph B(2) of Part I of Article Eleventh of the Certificate of Incorporation of Parent, sell, transfer or dispose of on or after the Event Date below an aggregate amount equal to (i) $500,000,000, less (ii) all amounts theretofore received by the Supplemental Benefit Trust in any sales, transfers or dispositions on or prior to the determination date, determined, in the case of sales, transfers or dispositions by the Supplemental Benefit Trust to occur after the determination date, as if all such sales and transfers occurred on the Event Date, in the case where the determination date is on or prior to the Event Date, or on the determination date, in the case where such date is after the Event Date; provided, that Parent or the Company may sell, transfer or dispose of securities of Parent or the Company, or take any other action which would otherwise be subject to this Section 10.2(b), (i) to the extent that such sale, transfer, disposition or other action is made or taken for the purpose of Parent or the Company being able to meet its prefunding commitment under Section 3.6(c) of Exhibit A to the Settlement Agreement, (ii) in any case, in an amount of up to an aggregate of $100,000,000 if and to the extent that the Board of Directors of Parent or the Company reasonably and in good faith determines that such amount is required for working capital of Parent or the Company and is actually applied for such purpose, or (iii) to the extent that such sale, transfer, disposition or action is made or taken for the purpose of Parent or the Company meeting outstanding obligations under employee stock option, incentive or other benefit programs, provided that neither the Parent nor the Company shall make any grants under any such programs at a time when such grants could reasonably be anticipated in the good faith judgment of the Compensation Committee of Parent's Board of Directors to result in a decrease which would otherwise be subject to this Section 10.2(b).

(c)     Within ten business days of the end of each calendar quarter or ten business days after Parent receives notice that an individual or entity has acquired an amount of Restricted Stock that would constitute a Prohibited Ownership Percentage within the meaning of Article Eleventh of the Certificate of Incorporation of Parent, Parent or the Company will provide the Supplemental Benefit Committee with information as to the number of Supplemental Benefit Trust shares that could be sold pursuant to Paragraph D of Section 1 of Article Eleventh of the Certificate of Incorporation of Parent as of such end of the calendar quarter.

(d)     The term "Restricted Stock" shall, for purposes of this Section 10.2, include all securities of Parent or the Company, other than (i) stock described in Section 1504(a)(4) of

- 15 -

the IRC and (ii) stock that would be so described solely because it is entitled to vote as a result of dividend arrearages. In addition, the term "Restricted Stock" shall include any other interest in Parent or the Company that would be treated as stock pursuant to Treasury Regulations Section 1.382-2T(f)(18)(iii) under Section 382 of the IRC, or any successor regulation having similar effect.

10.3  Limitation of Liability and Indemnification.  To the extent permitted by applicable law, no person shall be personally liable for any act done or omitted to be done in good faith in the administration of the Supplemental Benefit Program or the investment of the assets of the Supplemental Benefit Trust. The Employers shall jointly and severally indemnify and hold harmless, to the extent permitted by law, the Supplemental Benefit Trust, the UAW, and each present or former SBC Committee Member and SBC Committee Member Alternate from and against any and all losses, costs, liabilities, damages and expenses (including fines, penalties and taxes and the fees and disbursements of actuarial and legal advisors), as incurred, which they may incur (a) in connection with the establishment and implementation of the Supplemental Benefit Program in accordance with the terms hereof, (b) in connection with the enforcement of the obligations of Parent, the Company or any other Employer under the Supplemental Benefit Program or (c) by reason of any act done or omitted to be done in good faith in connection with the Supplemental Benefit Program, other than by reason of the sale of or transfer of any interest in securities of Parent in violation of Section 3.4 or 5.3 or the exercise of the powers, duties and rights of the Supplemental Benefit Committee under Sections 6.2 through 6.6 or any amendment thereof; provided, that the payment of any such amount by any of the Employers in advance of the final disposition of any proceeding for which indemnification is being sought shall be made only upon delivery to each Employer paying such amount of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such amount under this Section 10.3 or otherwise. Any claims for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

10.4  Exclusive Benefit.  No part of the corpus or income of the Supplemental Benefit Trust shall be used for, or diverted to, any purposes other than for the exclusive benefit of persons who are or may become entitled to benefits under the Supplemental Benefit Program and for defraying reasonable expenses of administering such program.

10.5  Prohibited Inurement.  No part of the corpus or income of Parent or the Company. All fiduciaries hereunder shall discharge their duties solely in the interests of Participants for the

- 16 -

127

exlusive purpose of providing benefits and defraying reasonable expenses of plan administration. No benefit under the Supplemental Benefit Program or interest, right or claim in or to any part of the Supplemental Benefit Trust or any payment therefrom shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, hypothecation or commutation, nor shall any such benefit or interest, right or claim in or to any part of the Supplemental Benefit Trust or any payment therefrom be in any manner liable for or subject to garnishment, attachment, execution or levy or be liable for or subject to the debts, contracts, liabilities, engagements or torts of the person entitled thereto, and the trustee under such trust shall not recognize any attempt to make it so, except as directed by the Supplemental Benefit Committee, in its capacity as Program Administrator, to the appropriate person for the payment of benefits in a manner that is consistent with applicable law.

10.6 Assignment, Delegation. The rights of any party under the Supplemental Benefit Program may not be assigned without the prior written consent of the Company and the Supplemental Benefit Committee, and any purported assignment in violation of this sentence shall be void. Any party may delegate any of its obligations under the Supplemental Benefit Program; provided, that no such delegation shall relieve such party of any of such obligations; and, provided, further, that the delegation of any obligation of Parent or the Company in connection with the transfer of any assets of either of them shall be subject to the express assumption of such obligation by the transferee.

10.7 Captions. The captions used in this Exhibit B are for convenience of reference only and do not constitute a part of this Exhibit B and will not be deemed to limit, characterize or in any way affect any provision of this Exhibit B and all provisions of this Exhibit B will be enforced and construed as if no captions had been used in this Exhibit B.

10.8 Incorporation of Appendices; References. The Appendices hereto are incorporated in this Exhibit B as though fully set forth herein. References in this Exhibit B to "Articles," "Sections" and "Appendices" refer to the Articles, Sections and Appendices of this Exhibit B unless otherwise specified.

10.9 Governing Law. This Exhibit B shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or preempted thereby, with the laws of the State of Illinois.

ARTICLE XI
Events of Default

11.1 Supplemental Benefit Program Payment Default. An Event Date shall occur upon the occurrence of a "Supplemental Benefit Program Payment Default." As used herein, the term

- 17 -

"Supplemental Benefit Program Payment Default" shall mean the failure at any time by Parent or the Company to make any payment or contribution required to be made by it pursuant to Sections 7.1, 7.2, 7.3, 8.2 or 10.3 of this Exhibit B within five days after receipt of written notice of such failure from the Supplemental Benefit Committee, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 11.1; provided, that with respect to any failure to make a payment or contribution required to be made by Parent or the Company pursuant to Section 7.3, if Parent or the Company shall have paid or contributed the amount determined by the Actuary in accordance with such section and Parent or the Company shall be required to make any additional payment or contribution as determined by the independent actuary referred to in Section 7.4, the Supplemental Benefit Committee shall not give notice of such failure unless Parent or the Company shall have failed to make such additional payment or contribution within five days of the date of such determination by such independent actuary; and, provided, further, that the Supplemental Benefit Committee shall not give notice of a failure to make a payment under Section 10.3 unless the Indemnified Party has executed the undertaking provided for in Section 10.3.

11.2 No Limitation of Rights. The rights of the Supple-mental Benefit Committee under this Article XI are in addition to, and not in lieu of, any rights that the Supplemental Benefit Committee, or any other person or entity, including, without limitation, any SBC Committee Member, SBC Committee Member Alternate or Participant, may have under the Settlement Agreement, any Exhibit thereto or any Appendix to any such Exhibit, whether in equity or at law. The waiver by the Supplemental Benefit Committee or any person or entity of any Supplemental Benefit Program Payment Default or other breach of any provision of, or any other right to enforce or claim or benefit under, any such document shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, such document.

- 18 -

129

# NAVISTAR INTERNATIONAL TRANSPORTATION CORP.

## RETIREE SUPPLEMENTAL BENEFIT TRUST

THIS AGREEMENT OF TRUST (hereinafter referred to as the "Agreement") is made and entered into this 1st day of July, 1993, by and between Navistar International Transportation Corp., a corporation organized under the laws of the State of Delaware (hereinafter referred to as the "Company"), and Wells Fargo, N.A. (hereinafter referred to as the "Trustee").

## W I T N E S S E T H:

WHEREAS, the Company was a defendant in Shy v. Navistar International Corporation, Case No. C-3-92-333 (S.D. Ohio) (the "Litigation"), and entered into a settlement agreement (the "Settlement Agreement") with the plaintiffs in the Litigation in order to limit its liability to the plaintiffs; and

WHEREAS, the Company maintains the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program, (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program, and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (the "Supplemental Benefit Program")) and

WHEREAS, under the Settlement Agreement and the Supplemental Benefit Program, the Company is obligated to make certain contributions to the Supplemental Benefit Program; and

WHEREAS, in order to implement and carry out the terms of the Settlement Agreement and the Supplemental Benefit Program, the Company wishes to establish the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust (hereinafter referred to as the "Trust"), which shall form a part of the Supplemental Benefit Program, and which is intended to satisfy the requirements of Section 501(c)(9) of the Code (as hereinafter defined) or any successor provision thereto; and

WHEREAS, the Company has authorized the execution of this Agreement and the creation of a trust fund to provide benefits under the Supplemental Benefit Program; and

WHEREAS, the Company intends, through this Agreement, to provide for management and control of the assets of the Supplemental Benefit Program through a trust fund; and

WHEREAS, Wells Fargo, N.A. has consented to act as Trustee hereunder and to hold and administer such sums as are transferred or contributed upon the terms set forth herein,

NOW, THEREFORE, the Company and the Trustee hereby agree to establish the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust, subject to the following terms and conditions:

130

## ARTICLE I

### DEFINITIONS

1.1 **Definitions.** The following words and phrases when used herein shall have the following meanings, except as otherwise required by the context:

(a) "Beneficiary" means a person designated as a beneficiary of a Participant by the Participant, or by the terms of the Program, and who is or may become entitled to a benefit under the Program.

(b) "Cessation Date" means the Profit Sharing Cessation Date as defined by the Program.

(c) "Code" means the Internal Revenue Code of 1986, as amended from time to time.

(d) "Committee" means the Supplemental Benefit Committee established pursuant to the Program.

(e) "Company" means Navistar International Transportation Corp.

(f) "Employers" means Navistar International Corporation, Navistar International Transportation Corp, Navistar Financial Corporation, HARCO National Insurance Company, and Indianapolis Casting Corporation.

(g) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

(h) "Investment Manager" means a person or entity who is either:

(1) an investment adviser registered as such under the Investment Advisers Act of 1940; or

(2) a bank, as defined in that Act; or

(3) an insurance company qualified to manage, acquire, or dispose of any asset of an employee benefit plan under the laws of more than one State.

(i) "Participant" means a Participant as defined by the Program.

(j) "Plan" means the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan, which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program, (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program, and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program.

(k) "Program" means the Navistar International Transportation Corp. Retiree Supplemental Benefit Program.

(l) "Responsible Fiduciary" means (i) before the Cessation Date, the Committee, and (ii) on and after the Cessation Date, the Company.

(m) "Trust Fund" means the assets of the Trust.

(n) "Trust Year" means the fiscal year beginning on each November 1st and ending on the following October 31st; provided that the first Trust Year shall begin on the effective date specified by Section 11.9 hereof and shall end on the following October 31st.

1.2 **Gender and Number.** Masculine pronouns shall refer both to males and to females. Singular or plural words shall be construed to refer to the plural or the singular, respectively, where appropriate.

- 2 -

131

## ARTICLE II

## PAYMENTS TO AND FROM THE TRUST

2.1 **Payments to the Trust.** The Trustee shall receive any payments made to it in cash, securities of the Employer, or in the form of such other property as it may from time to time deem acceptable and which shall have been delivered to it. Such payments may be made by the Company or by any person or entity designated by the Company. All payments so received, together with the income thereon and any other increment thereon, shall be held, invested, reinvested, and administered by the Trustee pursuant to the terms of this Agreement, without distinction between principal and income. The Trustee shall not be responsible for the calculation or collection of any contribution under, or required by, the Program, but shall be responsible only for cash or other property received by it pursuant to this Agreement.

2.2 **Payments from the Trust.** The Trustee shall, from time to time and at the written direction of the Committee, make, directly or indirectly, payments out of the Trust Fund in such amounts, to such persons (including but not limited to the Navistar International Transportation Corp. Retiree Health Benefit Trust) and for such purposes as may be specified in the written direction of the Committee. To the extent permitted by law, the Trustee shall be under no liability for any payment made pursuant to the written direction of the Committee or for any payment not made in the absence of a written direction of the Committee. Any written direction of the Committee shall constitute a certification that the payment so directed is one that the Committee or its designated representative is authorized to direct. If a dispute arises with respect to a payment, the Trustee may withhold or cause to be withheld payment at the direction of the Responsible Fiduciary until the dispute has been resolved.

## ARTICLE III

## INVESTMENT AUTHORITY

3.1 **Trustee's Authority.** Except as otherwise provided in this Agreement, the Trustee shall have exclusive authority and discretion to manage and control the Trust Fund; to invest and reinvest the principal and income of the Trust Fund and keep the Trust Fund invested, as a single fund without distinction between principal and income, in such securities or in such property, real or personal, tangible or intangible, as the Trustee shall deem advisable, including but not limited to capital or common stocks (whether voting or nonvoting and whether or not currently paying a dividend), preferred stocks (whether voting or nonvoting and whether or not currently paying a dividend), bonds, notes, debentures, interest in investment companies, trusts, partnerships, and other pooled funds, savings deposits (including but not limited to savings accounts and savings investment media that are maintained by the Trustee's own Banking Department), and commercial paper, and in such other property, whether and securities, whether domestic or foreign, of any kind, class, or character as the Trustee may deem suitable for the Trust Fund, and such investment and reinvestment shall not be restricted to properties and securities authorized for investment by trustees under any present or future law; provided that in no event shall the Trustee make any investment prohibited by ERISA. The Trustee in its discretion may keep such portion of the Trust Fund in cash or cash equivalents (including deposits in the Trustee's own Banking Department) as the Trustee may from time to time deem to be in the interest of the Participants and Beneficiaries, even if such balances exceed the maximum amount insured from time to time by the Federal Deposit Insurance

- 3 -

132

Corporation. Except as provided by Section 3.2 and Article VI hereof, all rights associated with assets of the Trust shall be exercised by the Trustee; all such rights shall in no event be exercisable by or rest with Participants and Beneficiaries.

3.2 **Limitation on Trustee's Authority.** Notwithstanding anything in this Agreement to the contrary, and regardless of whether the Responsible Fiduciary has appointed an Investment Manager pursuant to Section 6.3 hereof or has established a segregated fund managed by the Responsible Fiduciary pursuant to Section 6.5 hereof, the Trustee shall not acquire, sell, otherwise dispose of, or otherwise take any action with respect to any securities of the Company and its affiliates (including the voting of proxies appurtenant thereto) unless such action is permitted by the terms of the Program.

3.3 **The Program.** Upon the execution of this Agreement, the Company shall deliver to the Trustee a complete copy of the Program. For purposes of this Agreement, the Trustee shall rely conclusively on said copy as a complete and accurate copy of the Program, and the Trustee shall assume that no change has been made in the terms of the Program except to the extent that the Company notifies the Trustee in writing that the Program has been amended and delivers to the Trustee a complete copy of the amendment. The Company shall deliver to the Committee a copy of all documents delivered to the Trustee in accordance with this Section 3.3 at the same time that it delivers such documents to the Trustee.

## ARTICLE IV

## POWERS AND DUTIES OF THE TRUSTEE

4.1 **Powers.** The Trustee shall have the following powers with respect to the Trust Fund in addition to those conferred by law:

(a) to sell, exchange, convey, transfer, or otherwise dispose of any property held by it, by private contract or at public auction; and no person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition;

(b) to make commitments either alone or in company with others to purchase at any future date any property, investment, or securities set forth in Section 3.1 hereof;

(c) to retain, manage, operate, repair, develop, preserve, improve, mortgage, or lease for any period any real property held by the Trustee upon such terms and conditions as the Trustee deems proper, either alone or by joining with others using other Trust assets for any such purposes if by it deemed advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease, including the waiver of rentals, if by it deemed advisable; and to make provisions for the amortization of the investment or in depreciation of the value of such property as it may deem advisable;

(d) to organize corporations under the laws of any state for the purpose of acquiring or holding title to any property for the Trust Fund or to request the Company to appoint another trustee for such purpose;

(e) to retain any stocks or other property received as a result of the exercise of any of the powers herein granted, whether or not investment in such stocks or other property is authorized by Section 3.1 hereof;

(f) to vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to exercise any conversion privileges, subscription rights, or other options, and to make any payments incidental thereto; to consent to or otherwise participate in corporate reorganizations or other

- 4 -

changes affecting corporate securities and to delegate discretionary powers and to pay any assessments or charges in connection therewith; and generally to exercise all the powers of an owner with respect to stocks, bonds, securities, or other property held in the Trust Fund;

(g)     to make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(h)     to register any investment held in the Trust Fund in its own name or in the name of a nominee and to hold any investment in bearer form, to utilize the services of a depository clearing corporation (such as the Depository Trust Company) to the extent permitted by law and to combine certificates representing such investments with certificates of the same issue held by the Trustee in other fiduciary capacities under employee benefit plans, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust;

(i)     to employ suitable agents and counsel and to pay reasonable expenses and compensation thereto;

(j)     to borrow money on such terms and conditions as the Trustee in its discretion may deem advisable;

(k)     to transfer monies of the Trust Fund to a common or collective trust fund or pooled investment fund; money and other assets of the Trust Fund invested in such a fund shall be held and administered by the trustee thereof strictly in accordance with the terms of, and under the powers governing, such fund to the extent consistent with this Agreement and the terms of the Program; the combining of money and other assets of this Trust with money and other assets of such a fund is hereby specifically authorized;

(l)     to compromise or otherwise adjust all claims in favor of or against the Trust Fund;

(m)     to compromise, compound, and settle any debt or obligations upon such terms as the Trustee may deem advisable and to agree to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon, default, or otherwise enforce any such obligation; and

(n)     upon receipt of written direction from the Responsible Fiduciary, to use monies in the Trust Fund to purchase or maintain insurance or annuity contracts.

4.2     Dealing with Trustee. In no event shall any purchaser, vendor, or other person dealing with the Trustee be required to ascertain the authority and power of the Trustee to make any sale, transfer, assignment, or investment of the whole or any part of the Trust Fund at any time held hereunder, or to make any contract in relation thereto, nor shall any insurance company be required to ascertain the power or authority of the Trustee to apply for and purchase any insurance or annuity contracts, and any such person or company may rely upon any factual information furnished by the Trustee in connection therewith. All parties dealing with the Trustee with respect to the Trust Fund shall have the right to assume that the Trustee has full power and authority in all respects to deal with the Trust Fund and shall not be affected by any notice to the contrary, and no purchaser shall be required to see to the application of the purchase money.

4.3     Fees and Expenses. The Trustee shall be paid such reasonable compensation as may be agreed upon in writing initially between the Trustee and the Responsible Fiduciary, subject to such revisions as may be agreed upon in writing from time to time thereafter between the Trustee and the Responsible Fiduciary. Such compensation and all fees and expenses incurred by the Trustee in the proper performance of its duties, including fees for legal services rendered to the Trustee and compensation paid to any Investment Manager, shall be paid from the Trust Fund. All taxes of any kind that may be levied or assessed under existing or future laws upon, or with respect to, the Trust shall be paid from the Trust Fund.

- 5 -

134

4.4   **Administration.**   Except as otherwise provided by Section
3.2 hereof, the Trustee shall not be responsible in any way for the
administration of the Program.

4.5   **Consultation and Indemnification.**   The Trustee may consult
with counsel, and the Trustee shall not be deemed imprudent by reason of
taking or refraining from taking any action in accordance with the opinion
of counsel. The Responsible Fiduciary shall cause the Trust to indemnify and
hold the Trustee harmless from and against any liability that the Trustee may
incur in the administration of the Trust Fund, unless such liability arises
from the Trustee's negligence or breach of the provisions of this Agreement
or ERISA; provided that nothing in this Section 4.5 shall require any payment
from any source other than the Trust or require any payment to be made to the
Trust. The Trustee shall not be required to give any bond or any other
security for the faithful performance of its duties under this Agreement,
except such as may be required by law.

4.6   **Responsibilities.**   Except as required by ERISA, the Trustee
shall be under no duty (i) to take any action other than as herein specified
with respect to the Trust unless the Responsible Fiduciary or an investment
Manager shall furnish the Trustee with instructions in proper form as
described by Section 4.8 hereof or (ii) to engage in any suit with respect
to the Trust unless the Trustee shall have first agreed in writing to do so
and shall have been fully indemnified to the satisfaction of the Trustee.
To the extent not prohibited by ERISA, the Trustee shall not be responsible
or liable in any way for any action or omission of the Company or the
Committee with respect to the performance of their duties and obligations as
set forth in the Program and this Agreement; provided that the Trustee shall
not be relieved of responsibility or liability for any responsibilities,
obligation, or duty imposed upon it under this Agreement or under ERISA. The
Trustee is a party to this Agreement solely for the purpose set forth in this
Agreement and to perform the acts set forth herein, and no obligation or duty
shall be imposed upon it except as expressly stated herein or as required by
ERISA.

4.7   **Direction.**   Except as otherwise provided by Section 3.2
hereof, the Trustee may request the advice or direction of the Responsible
Fiduciary with respect to the administration of the Trust and the
distribution of the Trust Fund, and, to the extent permitted by ERISA, shall
be protected from liability in relying upon any direction given to it by the
Responsible Fiduciary, in writing, in response to such a request.

4.8   **Reliance on Written Instructions.**   The Trustee shall be
entitled to rely upon any notice, instruction, direction,
certificate, or other communication believed by it to be genuine and to be
signed by the Company, the Committee, an Investment Manager, or their
authorized agent(s) or representative(s), unless it knows or should know that
the direction or instruction constitutes a breach of the Company's, the
Committee's, or the Investment Manager's fiduciary responsibility, with
respect to the Trust. The Trustee shall be fully protected in making
payments out of the Trust Fund, or in taking or omitting to take any other
actions, in accordance with the written instructions of the Company, the
Committee, an Investment Manager, or their authorized agent(s) or
representative(s), and shall have no responsibility to see to the application
of any such payments by the Participants or their beneficiaries or legal
representatives, or by any other recipients thereof specified in the
instructions, or to ascertain whether such instructions comply with the terms
of the Program, or to determine the rights or benefits of any person in the
Trust or under the Program, and shall not be liable to any person taken by
respect of any payment made by it, or action taken or omitted to be taken by
it, in good faith without notice or knowledge of a change in the condition
or status of any person affecting that person's rights hereunder; provided

- 6 -

135

that if the Trustee knows or should know that such an instruction constitutes a breach of fiduciary responsibility with respect to the Trust, the Trustee shall inform the Responsible Fiduciary of the breach; and provided further that nothing in this Section 4.8 shall authorize the Trustee to take any action that is inconsistent with the provisions of Section 3.2 hereof. The Company, the Committee, and any Investment Manager(s) shall furnish the Trustee with a list naming their authorized agent(s) or representative(s), and describing the scope of the authority granted, and shall notify the Trustee of any changes to the list. Absent such notification, the Trustee may assume no change has occurred with respect to each list.

## ARTICLE V

## FUNDING POLICY AND INVESTMENT OBJECTIVES

5.1 **Communication to Trustee**. The Responsible Fiduciary shall inform the Trustee in writing of the funding policy under the Program and of the investment objectives of the Trust and of any changes or modifications therein. Until the Responsible Fiduciary informs the Trustee of any change in the funding policy under the Program or of any change in the investment objectives of the Trust, the Trustee may assume that there has been no change in the funding policy or the investment objectives, as the case may be.

## ARTICLE VI

## DUTIES OF THE COMMITTEE AND THE COMPANY

6.1 **Information**. The Committee and the Company shall furnish the Trustee with such information and data relating to the Program as are necessary for the Trustee to carry out its duties under this Agreement.

6.2 **Investment Responsibility**. The Trustee shall have the full responsibility for investment of the Trust Fund, except as provided in Section 3.2 hereof, and except where the Responsible Fiduciary has appointed an Investment Manager pursuant to Section 6.3 hereof or has established a segregated fund managed by the Responsible Fiduciary pursuant to Section 6.5 hereof.

6.3 **Appointment of Investment Manager**. The Responsible Fiduciary may appoint one or more Investment Managers for the purpose of directing the Trustee with respect to the investment or reinvestment of all or any portion of the Trust Fund. The Responsible Fiduciary shall certify to the Trustee the appointment and scope of authority of, and any resignation or removal or change in authority of, any Investment Manager appointed by it under this Section, the appointment of any successor thereto, and the identity of the individual or individuals entitled to act on behalf of the Investment Manager. In particular, the Responsible Fiduciary shall state and certify how investment funds specified by ERISA, the Trustee shall be fully protected in relying on such certification until it receives notice of any change or revocation thereof. An Investment Manager shall present evidence to the Trustee of its qualifications as an investment manager under Section 3(38) of ERISA, and shall acknowledge in writing its appointment as a fiduciary of the Plan.

6.4 **Responsibility of Investment Manager**. An Investment Manager shall have sole investment responsibility for that portion of the assets of the Trust Fund that it has been appointed to manage. Subject to the restrictions imposed by Section 3.2 hereof, an Investment Manager that has been thus granted such responsibility shall have all the investment

- 7 -

powers enumerated in Article III hereof that shall be granted to it by the Responsible Fiduciary. Except as otherwise provided by Section 3.2 hereof, where such an Investment Manager has been appointed by the Responsible Fiduciary, the Trustee shall have no duty to review or recommend any investment or reinvestment of the Trust Fund, nor shall the Trustee be charged with the duties imposed by Section 7.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to any Investment Manager. The Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment pursuant to the direction or lack of direction of this Section. Except as otherwise provided by Section 3.2 hereof, the Trustee shall be under no duty to question the direction or lack of direction of any Investment Manager, but shall act, and shall be fully protected in acting, in accordance with each such direction.

6.5    Segregated Fund.    The Responsible Fiduciary may create a segregated fund by certifying to the Trustee in writing that it has established a segregated fund in accordance with procedures that are consistent with Section 403(a)(1) of ERISA, the investment and control of the assets of which are to be the sole and exclusive responsibility of the Responsible Fiduciary. Subject to the restrictions imposed by Section 3.2 hereof, the Responsible Fiduciary shall have complete discretionary authority to direct the Trustee with respect to the investment and reinvestment of the portion of the Trust Fund constituting the segregated fund, as specified by the Responsible Fiduciary, without any requirement that any other fiduciary be consulted prior to the giving of any such directions to the Trustee or the carrying out of such directions by the Trustee. Except as otherwise provided by Section 3.2 hereof, if the Responsible Fiduciary has thus assumed such discretionary authority, the Responsible Fiduciary shall have all the investment powers enumerated in Article III hereof. The Responsible Fiduciary shall certify to the Trustee the scope of its authority, any change in the authority of the Responsible Fiduciary, and the identity of the individual or individuals entitled to act on behalf of the Responsible Fiduciary. In particular, the Responsible Fiduciary shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any change or revocation thereof, and the Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this Section. Except as otherwise provided by Section 3.2 hereof, the Trustee shall have no duty to review or to recommend any investment or reinvestment of the segregated fund, nor shall the Trustee be charged with the duties imposed by Section 7.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to the Responsible Fiduciary. Except as otherwise provided by Section 3.2 hereof, the Trustee shall have no discretionary authority over a segregated fund, but shall be subject, with respect to the segregated fund, to all proper directions of the Responsible Fiduciary that are not contrary to the terms of ERISA.

6.6    After Cessation Date.    Any appointments and statements made, and certifications and directions given, by the Committee before the Cessation Date in accordance with this Agreement shall remain in effect on and after the Cessation Date until this Agreement is changed by the Company in accordance with this Agreement.

- 8 -

# ARTICLE VII

## FIDUCIARY OBLIGATIONS

7.1 **Standard of Fiduciary Conduct.** The Trustee shall discharge its duties solely in the interest of the Participants and Beneficiaries and

(a) for the exclusive purpose of providing benefits to Participants and Beneficiaries and defraying reasonable expenses of administering the Program (including any such expenses incurred by the Committee or the Company);

(b) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(c) by diversifying the investments of the Program so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so; and

(d) in accordance with this Agreement, except to the extent that this Agreement may be inconsistent with ERISA.

7.2 **Prohibited Inurement.** Except as provided herein and in the Program, none of the assets of the Trust shall inure to the benefit of the Company, any affiliate thereof, or any other person except through the payment of benefits provided under the Program (including the payment of reasonable Program administration expenses). Notwithstanding the foregoing, if the Company makes a contribution to the Trust by a mistake of fact, the contribution (reduced by any investment losses, but not increased by any investment gains) may be returned to the Company within one year after the payment of the contribution. Nothing in this Section or in any other provision of this Agreement shall prevent the Trustee from transferring assets from the Trust to the Navistar International Transportation Corp. Retiree Health Benefit Trust.

7.3 **Scope of Responsibility.** A fiduciary not charged with a specific responsibility under the provisions of the Program or this Agreement shall be under no duty to question any action or lack of action of another fiduciary with respect to such responsibility, and shall not be liable for a breach of fiduciary responsibility by another fiduciary unless (a) having knowledge of a breach by such other fiduciary, the fiduciary fails to make reasonable efforts under the circumstances to remedy the breach.

## ARTICLE VIII

## ACCOUNTING

8.1 **Accounting for Trust Fund.** The Trustee shall keep timely, accurate, and detailed accounts of all investments, receipts, disbursements, and other transactions hereunder, and all accounts, books, and records relating hereto shall be open to inspection and audit at all reasonable times by the Responsible Fiduciary and any other person designated by the Responsible Fiduciary. Within sixty (60) days following the close of each Trust Year within which occurs the removal or resignation of the Trustee, and at such other times as the Responsible Fiduciary reasonably may require, the Trustee shall file with the Responsible Fiduciary a written account setting forth all investments, receipts, disbursements, and other transactions effected by the Trustee during such Trust Year or since the date of its last account. The Trustee, within the same time periods, shall ascertain and certify to the Responsible Fiduciary, in accordance with

- 9 -

138

applicable U.S. Department of Labor regulations, the cost and fair market values as of the close of such Trust Year (or such other period as the Responsible Fiduciary may require) of all securities and other properties held in the Trust Fund. Such fair market values shall be determined by such person or persons selected by the Responsible Fiduciary in accordance with a method consistently followed and uniformly applied. The Trustee may, in its discretion, cause that valuation to be reviewed at the expense of the Trust. The Trustee, within the same time periods, also shall furnish to the Responsible Fiduciary a balance sheet containing a description in reasonable detail of all assets and liabilities of the Trust. The Trustee may rely on valuations performed by the person or persons selected by the Responsible Fiduciary. In the event any portion of the Trust Fund has been transferred to a common or collective trust fund pursuant to Section 4.1 hereof, such account shall include a copy of the latest annual written account of the common or collective trust fund. The Responsible Fiduciary shall have the right to require an audit by certified public accountants of the records and assets of the Trust. The expenses and any special fee charged by the Trustee for any such audit shall be paid pursuant to the provisions of Section 4.3 hereof.

## ARTICLE IX

## RESIGNATION, REMOVAL, AND SUCCESSION OF TRUSTEE

9.1  **Resignation.**  The Trustee may resign at any time by giving sixty (60) days' notice in writing to the Responsible Fiduciary.

9.2  **Removal.**  The Responsible Fiduciary may remove the Trustee at any time by giving thirty (30) days' notice in writing to the Trustee.

9.3  **Successor Trustee.**  In no event shall the resignation or removal of the Trustee terminate this Agreement, but upon such resignation or removal of the Trustee, the Responsible Fiduciary shall have the duty forthwith of appointing a successor trustee, who shall have the same powers and duties conferred upon the Trustee hereunder.  In the event of such resignation or removal of such Trustee and upon the appointment of a successor trustee and acceptance of such Trustee, the Trustee shall turn over to the successor trustee the Trust Fund and all records of books of account and other documents pertaining to this Agreement that are in its possession, reserving such sums in settling its accounts, to pay any of its compensation due and its expenses in discharging any obligation of the Trust Fund for which the Trustee may be liable; and if the sums so reserved are not sufficient for these purposes, the Trustee shall be entitled to recover the amount of any deficiency from either the Company or the successor trustee, or both. To the extent permitted by ERISA, after the Trust Fund has been transferred and delivered to the successor trustee, the Trustee shall be released and discharged from all further accountability or liability for the Trust Fund and shall not be responsible in any way for the further disposition of the Trust Fund or any part thereof.

9.4  **Waiver of Notice.**  In the event of any resignation or removal of the Trustee, the Trustee and the Responsible Fiduciary may in writing waive any notice of resignation or removal as may be provided hereunder.

- 10 -

139

# ARTICLE X

## AMENDMENT AND TERMINATION OF AGREEMENT

10.1  **Amendment.**  This Agreement may be amended in writing at any time or from time to time, in whole or in part, by action of the Responsible Fiduciary, and any such amendment may be retroactive. However, no amendment that affects the rights, duties, or responsibilities of the Trustee shall become effective without the Trustee's written consent. No amendment shall be inconsistent with the requirements of ERISA or with the provisions of the Program. No amendment shall authorize or permit any assets of the Program to be used for, or diverted to, purposes other than for the exclusive benefit of Participants and Beneficiaries and the payment of reasonable Program administration expenses prior to the satisfaction of all liabilities under the Program. No amendment shall cause or permit any portion of the Trust Fund to revert to or become the property of the Employers.

10.2  **Termination.**  The Responsible Fiduciary may terminate the Trust in accordance with the terms of the Program.

10.3  **Distribution Upon Termination.**  In the event of the termination of the Trust, or of all or any part of the Program, the Trustee shall dispose of such funds in accordance with the written order of the Responsible Fiduciary. Such order shall require that the funds of the Program be disposed of in a manner that benefits the Participants and Beneficiaries covered by the Program (including the payment of reasonable Program administration expenses); provided that if all of the liabilities of the Program have been satisfied, any remaining assets of the Program shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code). Notwithstanding the foregoing, in the event the Program is terminated pursuant to the termination of the Settlement Agreement in *Shy v. Navistar International Corporation*, any assets of the Program shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code) as determined by the Company in its discretion. Except as provided in Section 7.2 hereof, under no circumstances shall the termination of the Trust result in a distribution of any portion of the Trust Fund to the Employers.

# ARTICLE XI

## MISCELLANEOUS

11.1  **Limited Effect of Program and Trust.**  Neither the establishment of the Program nor the Trust nor any modification thereof, nor the creation of any fund or account, nor the payment of any amounts from the Trust, shall be construed as giving to any Participant or Beneficiary any legal or equitable right against the Trustee, the Company, the Committee, or any affiliate, director, officer, employee, agent, or representative thereof, except as may otherwise be expressly provided in the Program and except as may otherwise be provided by ERISA. Under no circumstances shall the terms of employment of any employee be modified or in any way affected by the Trust or this Agreement.

11.2  **Nonalienation of Benefits.**  Except as otherwise required by law, neither the benefits payable from the Program nor any Participant's or Beneficiary's interest in any of the assets of the Trust shall be subject to any manner of anticipation, alienation, sale, transfer, assignment,

- 11 -

140

pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, garnish, execute, levy upon, or otherwise dispose of any right to benefits payable under, or any interest in, the Trust Fund shall be void. Neither the Trust Fund nor the Trustee shall in any manner be liable for, or be subject to, the debts, contracts, liabilities, engagements, or torts of any person entitled to benefits from the Program.

11.3  **Governing Law.**  This Agreement shall be administered, construed, and enforced according to the laws of the State of California, except to the extent superseded by ERISA or any other federal law.

11.4  **Severability.**  If any provision of this Agreement shall be held illegal or invalid, such illegality or invalidity shall not affect the remaining provisions of this Agreement but shall be fully severable, and this Agreement shall be construed and administered as if said illegal or invalid provision had never been inserted herein.

11.5  **Binding Effect.**  The provisions of this Agreement shall be binding upon and inure to the benefit of the Company and its successors, the Trustee and its successors in Trust, and the Participants and their Beneficiaries, and their respective heirs, personal representatives, successors and assigns, in accordance with and subject to the terms hereof.

11.6  **Number of Originals.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and the counterparts shall constitute one and the same instrument, which shall be sufficiently evidenced by any one thereof.

11.7  **Fiduciary Duties.**  Nothing in this Agreement shall relieve or be deemed to relieve the Trustee or any other fiduciary from any responsibility or liability for any responsibility, obligation, or duty imposed by or under ERISA.

11.8  **Evidence of Authority.**  The execution by the Trustee of any instrument, document, or paper in connection with the exercise of any of the powers enumerated herein shall, of itself, be conclusive evidence to all persons of the authority of the Trustee to execute the same and to exercise all powers incident thereto.

11.9  **Effective Date.**  This Agreement shall be effective as of the 1st day of July, 1993.

- 12 -

141

11.9 **Effective Date.**  This Agreement shall be effective as of the 1st day of July, 1993.

**IN WITNESS WHEREOF**, this Agreement has been executed this 29th day of _____ June _____, 1993.

NAVISTAR INTERNATIONAL TRANSPORTATION CORP.

By: _____

Title: Vice President and Treasurer

Attest: _____

Wells Fargo, N.A.
TRUSTEE

By: _____
Title: Vice President

Attest: _____
Managing Exec. V.P.

- 12 -

142

RESTATED
CERTIFICATE OF INCORPORATION
of
NAVISTAR INTERNATIONAL CORPORATION

**First:** The name of the corporation (hereinafter called the "Company") is

NAVISTAR INTERNATIONAL CORPORATION

**Second:** The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

**Third:** The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware, as amended.

**Fourth:** The total number of shares of stock which the Company shall have authority to issue is 176,000,000, consisting of:

(1) 30,000,000 shares, with a par value of $1.00 per share, are to be of a class designated "Preferred Stock;

(2) 10,000,000 shares, with a par value of $1.00 per share, are to be of a class designated "Preference Stock;"

(3) 110,000,000 shares, with a par value of $0.10 per share, are to be of a class designated "Common Stock;" and

(4) 26,000,000 shares with a par value of $0.10 per share, are to be of a class designated "Class B Common."

The Common Stock and Class B Common are hereafter collectively referred to as the "Parent Common Stock."

I. **Preferred Stock.**

The Preferred Stock may be issued from time to time in one or more series of any number of shares, provided that the aggregate number of shares issued and not canceled of any and all such series shall not exceed the total number of shares of Preferred Stock hereinabove authorized, and with distinctive serial designations, all as shall hereafter be stated and expressed in the resolution or resolutions providing for the issue of such Preferred Stock from time to time adopted by the Board of Directors pursuant to. authority so to do which is hereby vested in the Board of Directors. Each series of Preferred Stock (i) may have such voting powers, full or limited, or may be without voting powers; (ii) may

143

be subject to redemption at such time or times and at such prices; (iii) may be entitled to receive dividends (which may be cumulative or noncumulative) at such rate or rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or series of stock; (iv) may have such rights upon the dissolution of, or upon any distribution of the assets of, the corporation; (v) may be made convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of stock of the corporation, at such price or prices or at such rates of exchange, and with such adjustments; (vi) may be entitled to the benefit of a sinking fund to be applied to the purchase or redemption of shares of such series in such amount or amounts; (vii) may be entitled to the benefit of conditions and restrictions upon the issue of any additional stock (including additional shares of such series or of any other series) and upon the payment of dividends or the making of other distributions on, and the purchase, redemption or other acquisition by the Company or any subsidiary of any outstanding stock of the Company; and (viii) may have such other relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof, all as shall be stated in said resolution or resolutions providing for the issue of such Preferred Stock. Shares of any series of Preferred Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or which, if convertible or exchangeable, have been converted into or exchanged for shares of stock of any other class or classes shall have the status of authorized and unissued shares of Preferred Stock of the same series and may be reissued as a part of the series of which they were originally a part or may be reclassified and reissued as part of a new series of Preferred Stock to be created by resolution or resolutions of the Board of Directors or as part of any other series of Preferred Stock, all subject to the conditions or restrictions on issuance set forth in the resolution or resolutions adopted by the Board of Directors providing for the issue of any series of Preferred Stock.

A. Series G Stock. The designated powers, preferences and relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of 4,800,000 shares of a series of Preferred Stock are as follows:

(1) Designation. The designation of this series of Preferred Stock shall be "$6.00 Cumulative Convertible Preferred Stock, Series G (With $1.00 Par Value)" (hereinafter called the "Series G Stock").

(2) Dividends. The holders of shares of the Series G Stock shall be entitled to receive, when and as declared by the Board of Directors, dividends in cash in the amount of $6.00 per share per annum, payable quarterly on the 15th day of January, April, July and October in each year, commencing

- 2 -

144

April 15, 1987 (each of the quarterly periods ending on the 15th day of such months, respectively, being hereinafter called a "dividend period"); provided, however, that the holders of shares of Series G Stock shall be entitled to receive, when and as declared by the Board of Directors, dividends in cash in the amount of $3.75 per share per annum, and such dividends shall accrue at such rate from the Date of Accrual to January 14, 1987. Dividends on shares of the Series G Stock shall be cumulative from the Date of Accrual with respect to such shares (whether or not there shall be net profits or net assets of the Company legally available for the payment of such dividends) so that, if at any time Full Cumulative Dividends upon the Series G Stock to the end of the last completed dividend period shall not have been paid, or declared and a sum sufficient for payment thereof set apart, the amount of the deficiency in such dividends shall be fully paid, but without interest, before any dividend shall be declared or paid or any other distribution made of, any stock ranking upon, or any purchase or redemption made of, any stock ranking as to dividends or upon liquidation junior to the Series G Stock (other than a dividend payable in such junior stock, or a purchase or redemption made by issue or delivery of such junior stock); provided, however, that any moneys theretofore deposited in any sinking fund with respect to any preferred stock of the Company in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such preferred stock in accordance with the terms of such application regardless of whether at the time of such sinking fund Full Cumulative Dividends upon shares of the Series G Stock outstanding to the end of the last completed dividend period shall have been paid or declared and set apart for payment. All dividends upon the shares of the Series G Stock and any other preferred stock ranking on a parity as to dividends with the Series G Stock shall be declared pro rata, so that the amounts of dividends declared per share on the Series G Stock and such other preferred stock, shall in all cases bear to each other the same ratio that accrued dividends per share on the shares of the Series G Stock and such other preferred stock bear to each other. Holders of shares of the Series G Stock shall not be entitled to any dividends, whether payable in cash, property or stock, in excess of Full Cumulative Dividends.

(3) Rights of Redemption. The shares of the Series G Stock shall be subject to redemption as follows:

(a) Optional Redemption. Subject to subparagraph (3), the shares of the Series G Stock may be redeemed at the option of the Company, in whole or in part, at any time or from time to time upon not less than 30 days prior notice to the holders of record of shares of the Series G Stock to be so redeemed, sent by first class mail, postage prepaid, to each

(b) of this paragraph (3), the shares of the Series G

registered holder of shares of the Series G Stock at his address appearing on the Series G Stock register maintained by the Company, at the redemption price of $50.00 per share, plus an amount equal to Accrued Dividends to and including the date fixed for redemption of such shares (hereinafter called the "Redemption Date").

(b)  Pro Rata Redemption or Redemption by Lot.  If less than all shares of the Series G Stock are to be redeemed pursuant to subparagraph (a) of this paragraph (3), the shares to be redeemed shall be selected (x) by lot or (y) pro rata so that there shall be redeemed from each registered holder of such shares that number of whole shares, as nearly as practicable to the nearest share, as bears the same ratio to the total number of shares of such Series held by such holder as the total number of shares to be redeemed bears to the total number of shares of the Series G Stock at the time outstanding. The determination of whether such selection shall be made by lot or pro rata shall be made by the Board of Directors.  If the Board of Directors shall determine to redeem less than all shares of the Series G Stock by lot, the selection by lot of the shares of the Series G Stock shall be conducted by an independent bank or trust company selected by the Board of Directors of the Company.

(c)  Sinking Fund, Etc.  Shares of the Series G Stock are not subject or entitled to the benefit of a sinking fund.  All or a portion of the shares of the series G Stock may be purchased by the Company from time to time upon the best terms obtainable.

(d)  Effect of Redemption.  Unless default be made in the payment in full of the redemption price and any accumulated and unpaid dividends, dividends on the shares of Series G Stock called for redemption shall cease to accumulate on the Redemption Date, and all rights of the holders of such shares as stockholders of the Company by reason of the ownership of such shares shall cease on the Redemption Date, except the right to receive the amount payable upon redemption of such shares on presentation and surrender of the respective certificates representing such shares.  After the Redemption Date, such shares shall not be deemed to be outstanding and shall not be transferable on the books of the Company except to the Company.

(e)  Receipt of Redemption Price.  At any time on or after the Redemption Date, the respective holders of record of shares of Series G Stock to be redeemed shall be entitled to receive the redemption price upon actual

- 4 -

146

delivery to the Company of certificates for the shares to be redeemed, such certificates, if required by the company, to be properly stamped for transfer and duly endorsed in blank or accompanied by proper instruments of assignment and transfer thereof duly executed in blank.

(f) Return of Deposits, Etc. Any moneys deposited with the transfer agent, or other redemption agent, for the redemption of any shares of Series G Stock which shall not be claimed after five years from the Redemption Date shall be repaid to the Company by such agent on demand, and the holder of any such shares of Series G Stock shall thereafter look only to the Company for any payment to which such holder may he entitled. Any interest accrued on moneys so deposited shall belong to the Company and shall be paid to it from time to time on demand.

(4) Rights on Liquidation, Dissolution, Winding Up.

(a) In the event of any involuntary liquidation, dissolution or winding up of the Company, the holders of shares of the Series G Stock then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the company ranking junior upon liquidation to the Series G Stock, an amount equal to $50 per share plus an amount equal to all Accrued Dividends thereon to and including the date of payment.

(b) In the event of any voluntary liquidation, dissolution or winding up of the Company, the holders of shares of the Series G Stock then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the company ranking junior upon liquidation to the Series G Stock, an amount per share equal to the then applicable redemption price specified in subparagraph (a) of paragraph (3) of this Section B regarding Series G Stock, plus in each case an amount equal to all Accrued Dividends thereon to and including the date of payment. The merger or consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a dissolution, liquidation or winding up of the Company under this paragraph (4).

(c) In the event the assets of the Company available for distribution to the holders of shares of Series G Stock upon any involuntary or voluntary liquidation,

- 5 -

147

dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holders are entitled pursuant to subparagraph (4), no such distribution shall be made on this paragraph (a) or (b), as the case may be, of account of any shares of any other class or series of preferred stock ranking on a parity with the shares of Series G Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the shares of Series G Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5)  Voting.  The shares of the Series G stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a)  Without the affirmative vote or consent of the holders of at least two-thirds of the number of shares of Series G stock at the time outstanding, voting or consenting (as the case may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) create any preferred stock ranking prior to the Series G stock as to dividends or upon liquidation, or securities convertible into stock ranking prior to the Series G Stock as to dividends or upon liquidation or (ii) amend, alter or repeal any of the preferences, special rights or powers of the holders of the Series G Stock so as adversely to affect such preferences, special rights or powers.

(b)  Whenever dividends payable on any series of Preferred Stock shall be in default in an aggregate amount equivalent to six full quarterly dividends on all shares of such series at the time outstanding, the number of directors constituting the Board of Directors of the Company shall be increased by two, and the holders of Preferred Stock shall have, in addition to any other voting rights, the exclusive and special right, voting separately as a class without regard to series, to elect two persons to fill such newly created directorships. Whenever such right of holders of shares of Preferred Stock shall have vested, it may be exercised initially either at a special meeting of such holders called as provided below, or at any annual meeting of stockholders, and thereafter at annual meetings of stockholders.  The right of holders of shares of Preferred Stock voting separately as a class to elect members of the Board of Directors as aforesaid shall continue until such time as all dividends accumulated on all series of Preferred Stock shall have been paid in full, at which time the special right of the holders of shares of Preferred Stock

- 6 -

148

so to vote separately as a class for the election of directors shall terminate, subject to revesting in the event of each and every subsequent default in an aggregate amount equivalent to six full quarterly dividends. For purposes only of this subparagraph (b), each holder of Series G Stock shall be entitled to cast one-half vote for each share of Series G Stock held by such holder.

At any time when such special voting power shall have vested in the holders of shares of Preferred Stock as provided in this subparagraph (b), a proper officer of the Company shall, upon written request of the holders of record of at least 10% of the number of shares of Preferred Stock at the time outstanding, regardless of series, addressed to the Secretary of the Company, call a special meeting of the holders of shares of Preferred Stock and of any other class of stock having voting power, for the purpose of electing directors. Such meeting shall be held at the earliest practicable date at the principal office of the Company. If such meeting shall not be called by a proper officer of the Company within 20 days after personal service of said written request upon the Secretary of the Company, or within 20 days after mailing the same within the United States of America by registered mail addressed to the Secretary of the Company at its principal office, then the holders of record of at least 10% of the number of shares of Preferred Stock at the time outstanding, regardless of series, may designate in writing one of their number to call such meeting at the expense of the Company, and such meeting may be called by such person so designated upon the notice required for annual meetings of stockholders and shall be held at said principal office. Any holder of shares of Preferred Stock so designated shall have access to the stock books of the Company for the purpose of causing meetings of stockholders to be called pursuant to these provisions. Notwithstanding the provisions of this subparagraph (b), no such special meeting shall be called during the 90 days immediately preceding the date fixed for the next annual meeting of stockholders.

At any meeting held for the purpose of electing directors at which the holders of shares of Preferred Stock shall have the special right, voting separately as a class, to elect directors as provided in this subparagraph (b), the presence, in person or by proxy, of the holders of 51% of the number of shares of Preferred Stock at the time outstanding shall be required to constitute a quorum of such class for the election of any director by the holders of the Preferred Stock as a class, each share of Series G Stock counting, for purposes only of determining the presence of such a

quorum, as one-half share of Preferred Stock. At any such meeting or adjournment thereof, (i) the absence of a quorum of Preferred Stock shall not prevent the election of directors other than those to be elected by the holders of shares of Preferred Stock voting as a class and the absence of a quorum for the election of such other directors shall not prevent the election of the directors to be elected by holders of shares of Preferred Stock voting as a class and (ii) in the absence of either or both such quorums, a majority of the holders present in person or by proxy of the stock or stocks which lack a quorum shall have power to adjourn the meeting for the election of directors which they are entitled to elect from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

During any period the holders of shares of Preferred stock have the right to vote as a class for directors as provided in this subparagraph (b), (i) the directors so elected by the holders of the Preferred Stock shall continue in office until termination of the right of the holders of the Preferred Stock to vote as a class for directors, and (ii) any vacancies in the Board of Directors shall be filled only by vote of a majority (which majority may consist of only a single director) of the remaining directors theretofore elected by the holders of the class or classes of stock which elected the director whose office shall have become vacant.

(6)  Conversion Rights.  The holders of shares of the Series G Stock shall have the right, at their option, to convert each share of the Series G Stock into two-fifteenths of a share of Common Stock of the Company at any time on and subject to the following terms and conditions:

(a)  The shares of the Series G Stock shall be convertible at the office of any transfer agent for the Series G Stock, and at such other office or offices, if any, as the Board of Directors may designate, into fully paid and nonassessable shares (calculated as to each conversion to the nearest 1/100th of a share) of Common Stock of the Company, at the conversion price, determined as hereinafter provided, in effect at the time of conversion, each share of the Series G Stock being taken at $50.00 for the purpose of such conversion. The price at which shares of Common Stock shall be delivered upon conversion (herein called the "conversion price") shall be initially $375.00 per share of Common Stock. The conversion price shall be adjusted as provided in subparagraph (d) of this paragraph (6).

- 8 -

(b) In order to convert shares of the Series G Stock into Common Stock the holder thereof shall surrender at any office hereinabove mentioned the certificate or certificates thereof, duly endorsed to the Company or in blank, and give written notice to the Company at said office that such holder elects to convert such shares. No payment or adjustment shall be made upon any conversion on account of any dividends accrued on the shares of the Series G Stock surrender for conversion or on account of any dividends on the Common Stock issued upon such conversion.

Shares of the Series G Stock shall be deemed to have been converted immediately prior to the close of business on the day of the surrender of such shares for conversion in accordance with the foregoing provisions, and the person or persons entitled to receive the Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such Common Stock at such time. As promptly as practicable on or after the conversion date, the Company shall issue and shall deliver at said office a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion, together with a cash payment in lieu of any fraction of a share, as hereinafter provided, to the person or persons entitled to receive the same. In case shares of the Series G Stock are called for redemption, the right to convert such shares shall cease and terminate at the close of business on the Redemption Date, unless default shall be made in payment of the redemption price.

(c) No fractional shares of Common Stock shall be issued upon conversion of shares of the Series G Stock, but, instead of any fraction of a share of Common Stock which would otherwise be issuable in respect of the aggregate number of shares of the Series G Stock surrendered for conversion at one time by the same holder, the Company shall pay a cash adjustment of such fraction in an amount equal to the same fraction of the Closing Date Price on the date on which shares of the Series G Stock were duly surrendered for conversion, or, if such date is not a Trading Day, on the next Trading Day.

(d) The conversion price shall be adjusted from time to time as follows:

(I) In case the Company shall (i) pay a dividend or make a distribution on its outstanding shares of Common Stock in Common Stock, (ii) subdivide its outstanding shares of Common Stock, (iii) combine its outstanding shares of

- 9 -

151

Common Stock into a smaller number of shares, or (iv) issue any shares by reclassification of its shares of Common Stock, the conversion price in effect at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be adjusted so that the holder of any shares of the Series G Stock surrendered for conversion after such time shall be entitled to receive the number of shares of capital stock of the Company which he would have owned or been entitled to receive had such shares of the Series G Stock been converted immediately prior to such time.

(II) In case the company shall hereafter issue rights or warrants to all holders of its Common Stock entitling them (for a period expiring within forty-five days after the record date mentioned below) to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share--as determined pursuant to clause (IV) of this subparagraph (d)--on the record date mentioned below, the conversion price shall be adjusted so that the same conversion price in effect immediately prior to the date of issuance of such rights or warrants by a fraction, of which the numerator shall be the number of shares of Common Stock outstanding on the record date mentioned below plus the number of shares of Common Stock which the aggregate offering price of the total number of shares of Common Stock so offered would purchase at such current market price and of which the denominator shall be the number of shares of Common Stock outstanding on such record date plus the number of additional shares of Common Stock offered for subscription or purchase. Such adjustment shall become effective at the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such rights or warrants; and to the extent that shares of Common Stock are not delivered after the expiration of such rights or warrants, the conversion price shall be readjusted (but only with respect to shares of the Series C Stock converted after such expiration) to the conversion price which would then be in effect had the adjustments made upon the distribution of such rights or warrants been made upon the basis of delivery of only the number of shares of Common Stock actually delivered. No adjustment in the conversion price shall be required or made under this clause (II) or clause

- 10 -

152

(III) immediately below or otherwise under this paragraph (6) in respect of any right granted by the Company to all holders of its Common Stock to purchase additional shares of Common Stock from the Company at a discount from the current market price per share of Common Stock by reinvestment of dividends on Common Stock if either (i) such discount does not exceed 6% of such current market price or (ii) the holders of the Series G Stock shall be entitled to purchase shares of Common Stock from the Company at the same discount by reinvestment of dividends on the Series G Stock.

(III) In case the Company shall distribute to all holders of its Common Stock evidences of its indebtedness or assets—excluding any cash dividend or distributions and dividends referred to in clause (I) of this paragraph (6)—or subscription rights or warrants (excluding those referred to in clause (II) immediately above), then in each such case the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the date of such distribution by a fraction of which the numerator shall be the current market price per share (determined as provided in clause (IV) immediately below) of the Common Stock on the record date mentioned below less the then fair market value (as determined by the Board of Directors of the Company, whose determination shall be conclusive) of the portion of the assets or evidences of indebtedness so distributed or of such subscription rights or warrants applicable to one share of Common Stock, and the denominator shall be such current market price per share of the Common Stock. Such adjustment shall become effective on the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such distribution.

(IV) For the purpose of any computation under clause (II) or (III) immediately above, the current market price per share of Common Stock on any date shall be deemed to be the average of the daily Closing Price for the thirty consecutive Trading Days selected by the Company commencing not more than forty-five Trading Days before the day in question.

(V) In any case in which this paragraph (6) shall require that an adjustment as a result of any event become effective at the opening of business

- 11 -

153

on the business day next following a record date, the Company may elect to defer until after the occurrence of such event (i) issuing to the holder of any shares of the Series G Stock converted after such record date and before the occurrence of such event the additional shares of Common Stock issuable upon such conversion over and above the shares of Common Stock issuable upon such conversion on the basis of the conversion price prior to adjustment and (ii) paying to such holder any amount in cash in lieu of a fractional share of Common Stock pursuant to subparagraph (c) of this paragraph (6); and, in lieu of the shares the issuance of which is so deferred, the Company shall issue or cause its transfer agents to issue due bills or other appropriate evidence of the right to receive such shares.

(VI)    Any adjustment in the conversion price otherwise required by this paragraph (6) to be made may be postponed up to, but not beyond, three years from the date on which it would otherwise be required to be made provided that such adjustment (plus any other adjustments postponed pursuant to this clause (VI) and not theretofore made) would not require an increase or decrease of more than $0.50 in such price and would not, if made, entitle the holders of all then outstanding shares of the Series G Stock upon conversion to receive additional shares of Common Stock equal in the aggregate to 3% or more of the then issued and outstanding shares of Common Stock. All calculations under this paragraph (6) shall be made to the nearest cent or to the nearest 1/100 of a share, as the case may be.

(e)    Whenever the conversion price is adjusted as herein provided:

(I)    the Company shall compute the adjusted conversion price in accordance with this paragraph (6) and shall prepare a certificate signed by the Treasurer of the Company setting forth the adjusted conversion price, and such certificate shall forthwith be filed with the transfer agent or agents for the Series G Stock; and

(II)    a notice stating that the conversion price has been adjusted and setting forth the adjusted conversion price shall, as soon as practicable, be mailed to the holders of record of the outstanding shares of the Series G Stock.

- 12 -

(f)  In case of any consolidation of the Company
with, or merger of the Company with or into, any other
corporation (other than a merger in which the Company is
the surviving corporation and which does not result in
any reclassification or change of the outstanding shares
of the Company into which shares of the Series G Stock
are then convertible), or in case of any conveyance or
transfer of the property and assets of the Company
substantially as an entirety, each share of Series G
Stock shall thereafter be convertible into the number and
kind of shares of stock and other securities and cash,
property and rights receivable upon such consolidation,
merger, conveyance or transfer by a holder of the number
and kind of shares of the Company into which such shares
of Series G Stock might have been converted immediately
prior to such consolidation, merger, conveyance or
transfer. The above provisions of this subparagraph (f)
shall similarly apply to successive consolidations,
mergers, conveyances or transfers.

(g)  In case:

(I)  the Company shall declare a dividend (or
any other distribution) on its Common Stock payable
otherwise than in cash out of its retained
earnings; or

(II)  the Company shall authorize the granting
to the holders of its Common Stock of rights to
subscribe for or purchase any shares of capital
stock of any class or of any other rights; or

(III)  of any reclassification of the capital
stock of the Company (other than a subdivision or
combination of its outstanding shares of Common
Stock), or of any consolidation or merger to which
the Company is a party and for which approval of
any stockholders of the Company is required, or of
the sale or transfer of all or substantially all of
the assets of the Company; or

(IV)  of the voluntary or involuntary
dissolution, liquidation or winding up of the
Company;

then the Company shall cause to be mailed to the transfer
agent or agents for the Series G Stock and to the holders
of record of the outstanding shares of the Series G Stock
at least 20 days--or 10 days in any case specified in
clause (I) or (II) of this subparagraph (g)--prior to the
applicable record date hereinafter specified, a notice
stating (x) the date on which a record is to be taken for
the purpose of such dividend, distribution or rights, or,

- 13 -

155

if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution or rights are to be determined, or (y) the date on which such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding up is expected to become effective, and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange their shares of Common Stock for securities or other property deliverable upon such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding up.

(h) The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of the shares of the Series G stock, the full number of shares of Common Stock then deliverable upon the conversion of all shares of the Series G Stock then outstanding.

(i) The Company will pay any and all taxes that may be payable in respect of the issuance or delivery of shares of Common Stock on conversion of shares of this Series pursuant hereto. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of this Series so converted were registered, and no such issue or delivery shall be made unless and until the person requesting such issue has paid to the Company the amount of any such tax, or has established, to the satisfaction of the Company, that such tax has been paid.

(j) For the purpose of this paragraph (6) the term "Common Stock" shall include any stock of any class of the Company which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and which is not subject to redemption by the Company. However, shares issuable on conversion of shares of the Series G Stock shall include only shares of the class designated as Common Stock of the Company as of the original date of issue of the Series G Stock or shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company, provided that if at any time there shall be more than one such resulting class, the

shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

(k) As used in this paragraph (6), the term "closing Price" on any day shall mean the reported last sales price regular way on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices regular way, in each case on the New York Stock Exchange, or, if the Common Stock is not listed or admitted to trading on such Exchange, on the principal national securities exchange on which the Common Stock is listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices as furnished by any New York Stock Exchange member firm selected from time to time by the Company for that purpose; and the term "Trading Day" shall mean a date on which the New York Stock Exchange (or any successor to such Exchange) is open for the transaction of business.

(7) Definitions.

(a) The term "Accrued Dividends" shall mean Full Cumulative Dividends to the date as of which Accrued Dividends are to be computed, less the amount of all dividends paid, upon the relevant shares of Series G Stock.

(b) The term "Date of Accrual" shall mean, as to any shares of the Series G Stock issued, January 1, 1987.

(c) The term "Full Cumulative Dividends" shall mean (whether or not in any dividend period, or any part thereof, in respect of which such term is used there shall have been net profits or net assets of the Company legally available for the payment of such dividends) that amount which shall be equal to dividends at the full rate fixed for the Series G Stock provided in paragraph (2) of this Section B regarding Series G Stock for the period of time elapsed from the Date of Accrual to the date as of which Full Cumulative Dividends are to be computed (including an amount equal to the dividend at such rate for any fraction of a dividend period included in such period of time calculated on the basis of a 360-day year of 12 30-day months).

(d) The term "Preferred Stock" shall mean any Preferred Stock created and issued under this Article Fourth; provided, however, that for purposes only of

subparagraph (b) of paragraph (5) of this Section B regarding Series G Stock, each holder of Series G Stock shall be entitled to cast one-half vote for each share of Series G Stock held by such holder and for purposes of determining a quorum at any meeting held for the purpose of electing directors at which the holders of Preferred Stock shall have this special right, voting separately as a class, to elect directors as provided in such subparagraph (b), each share of Series G Stock shall count, for purposes of determining the presence of a quorum of such class at such meeting, as one-half share of Preferred Stock. The term "preferred stock" shall mean shares of any class of stock (including Preferred Stock) if the holders of such class shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, in preference or priority to the holders of shares of Common Stock.

(e) For the purposes hereof any stock of any class or classes of the Company shall be deemed to rank (i) prior to shares of the Series G Stock, either as to dividends, or upon liquidation, if the holders of such class or classes shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Series G Stock; (ii) on a parity with shares of the Series G Stock, either as to dividends or upon liquidation, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Series G Stock, if the holders of such stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rate or liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Series G Stock; and (iii) junior to shares of the Series G Stock, either as to dividends or upon liquidation, if such class shall be Common Stock or if the holders of the Series G Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of such class of classes.

(f) The shares of the Series G Stock shall rank senior as to the dividends and upon liquidation to the shares of the $120 Redeemable Convertible Preferred Stock, Series E (with $1.00 Par Value) of the Company and to the shares of the Convertible Junior Preference Stock, Series G (with $1.00 Par Value) of the Company.

- 16 -

(8)  Retirement of Redeemed or Converted Shares, Etc.

Shares of the Series G Stock which have been (i) redeemed or (ii) converted into Common Stock pursuant to the provisions of paragraph (6) of this Section B regarding Series G Stock shall have the status of authorized and unissued Preferred Stock.

II.  Preference Stock.

The Preference Stock may be issued from time to time in one or more series of any number of shares, provided that the aggregate number of shares issued and not canceled of any and all such series shall not exceed the total number of shares of Preference Stock hereinabove authorized, and with distinctive serial designations, all as shall hereafter be stated and expressed in the resolution or resolutions providing for the issue of such Preference Stock from time to time adopted by the Board of Directors pursuant to authority so to do which is hereby vested in the Board of Directors. Each series of Preference Stock (i) may have such voting powers, full or limited, or may be without voting powers; (ii) may be subject to redemption at such time or times and at such prices; (iii) may be entitled to receive dividends (which may be cumulative or noncumulative) at such rate or rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or series of stock; (iv) may have such rights upon the dissolution of, or upon any distribution of the assets of, the corporation; (v) may be made convertible into, or exchangeable for, shares of any other class or classes of stock or of any other series of the same or any other class or classes of stock of the corporation, at such price or prices or at such rates of exchange, and with such adjustments; (vi) may be entitled to the benefit of a sinking fund to be applied to the purchase or redemption of shares of such series in such amount or amounts; (vii) may be entitled to the benefit of conditions and restrictions upon the creation of indebtedness of the Company or any subsidiary, upon the issue of any additional stock (including additional shares of such series or of any other series) and upon the payment of dividends or the making of other distributions on, and the purchase, redemption or other acquisition by the Company or any subsidiary of any outstanding stock of the Company; and (viii) may have such other relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof; all as shall be stated in said resolution or resolutions providing for the issue of such Preference Stock. Shares of any series of Preference Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or which, if convertible or exchangeable, have been converted into or exchanged for shares of stock of any other class or classes shall have the status of authorized and unissued shares of Preference Stock of the same series and may be reissued as a part of the series of which they were originally a part or may be reclassified and reissued as part of a new series of Preference Stock to be created by resolution or resolutions by the Board of Directors or as part of any other

- 17 -

159

series of Preference Stock, all subject to the conditions or
restrictions on issuance set forth in the resolution or resolutions
adopted by the Board of Directors providing for the issue of any
series of Preference Stock.

A. Series A Stock. The designated powers, preferences and
relative participating, optional or other special rights and the
qualifications, limitations or restrictions thereof, of one (1)
share of a series of Preference Stock are as follows:

(1) Designation. The designation of this series of
Preference Stock shall be "Nonconvertible Junior Preference
Stock, Series A (With Par Value of $1.00)" (hereinafter called
the "Series A Stock").

(2) Dividends. The holder of the Series A Stock shall
not be entitled to receive dividends with respect to the
Series A Stock.

(3) Rights of Redemption. The Series A Stock shall be
subject to redemption as follows:

(a) Optional Redemption. At any time after the
date of the earliest to occur of (i) the passage of
twelve consecutive calendar months at all times during
which the Supplemental Benefit Trust holds less than 5%
of the total number of then outstanding shares of Parent
Common Stock, (ii) the date on which the Supplemental
Benefit Program terminates and (iii) the Profit Sharing
Cessation Date, the Series A stock may be redeemed at the
option of the Company at any time upon not less than five
days' prior notice to the holder of record of the Series
A Stock sent by first class mail, postage prepaid, to
such holder at its address appearing on the Series A
Stock register maintained by the Company, at a redemption
price of $1.00 (hereinafter called the "Series A
Redemption Date").

(b) Effect of Redemption. All rights of the holder
of Series A Stock as a stockholder of the Company by
reason of the ownership of Series A Stock shall cease on
the Series A Redemption Date, except the right to receive
the amount payable upon redemption of such share on
presentation and surrender of the certificate
representing such share. After the Series A Redemption
Date, such share shall not be deemed to be outstanding.

(4) Rights on Liquidation, Dissolution, Winding Up.

(a) Liquidation Payment. In the event of any
involuntary liquidation, dissolution or winding up of the
Company, the holder of the Series A Stock (if then
outstanding) shall be entitled to be paid out of the

- 18 -

160

assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the Company ranking junior upon liquidation to the Series A Stock, an amount equal to $1.00 per share. The merger or consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a dissolution, liquidation or winding up of the Company under this paragraph (4).

(b)  **Proportionate Distribution.**  In the event the assets of the Company available for distribution to the holder of the Series A Stock upon any involuntary or voluntary liquidation, dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holder is entitled pursuant to subparagraph (a) of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preference stock ranking on a parity with the Series A Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the Series A stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5)  **Voting.**  The Series A stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a)  **Change of Priority or Rights.**  Without the affirmative vote or consent of the holder of the Series A Stock, voting or consenting (as the case may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) change the number of authorized shares of the Series A Stock or (ii) amend this Certificate of Incorporation or take any other action (including, without limitation, a merger or consolidation to which the Company is a constituent party) which would have the effect of eliminating the Series A Stock or of amending, altering or repealing any of the preferences, special rights or powers of the holder of the Series A Stock so as adversely to affect such preferences, special rights or powers.

(b)  **Election of Directors.**  For so long as the Supplemental Benefit Trust holds 20% or more of the total number of then outstanding shares of Parent Common Stock, the number of directors constituting the Board of Directors of the Company shall be increased by two, and

the holder of the Series A Stock shall have, in addition to any other voting rights, the exclusive and special right, voting separately as a class, to elect two persons to serve as directors of the Company (one of whom shall be designated the "First Designee," and the other of whom shall be designated the "Second Designee") to fill such two directorships. Except for the involuntary resignation of any such director under clauses (i) or (ii) of this first paragraph of this subparagraph (b) or the removal of any such director by the holder of the Series A Stock, each director elected by the holder of the Series A Stock shall have a one year term of office. The right of the holder of Series A Stock to elect directors may be exercised by written consent of such holder. The right of the holder of the Series A Stock, voting separately as a class to elect two members of the Board of Directors as aforesaid shall continue until such time as the Supplemental Benefit Trust holds less than 20% of the total number of then outstanding shares of Parent Common Stock. At such time, the special right of the holder of the Series A Stock to vote separately as a class for the election of directors shall be subject to the following restrictions:

(i)     Upon the earlier to occur of (A) the date on which the Supplemental Benefit Trust has held less than 20% but 19% or more of the total number of then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds less than 19% of the total number of then outstanding shares of Parent Common Stock, the holder of the Series A Stock shall be entitled to elect only one director in total and the Second Designee shall be deemed to have resigned as a director effective immediately without any further action on such person's part; and

(ii)    Notwithstanding anything to the contrary contained in clause (i) immediately above, upon the earlier to occur of (A) the date on which the Supplemental Benefit Trust has held less than 10% but 9% or more of the total number of then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds less than 9% of the total number of then outstanding shares of Parent Common Stock, the holder of the Series A Stock shall not be entitled to elect any directors and each remaining director elected by such holder shall be deemed to have resigned as a member of the Board of Directors effective

- 20 -

162

immediately without further action on such person's part.

The special right of the holder of the Series A Stock to vote separately as a class for the election of directors shall be subject to revesting as follows:

(i)  Upon the earlier to occur of (A) the date on which the Supplemental Benefit Trust has held more than 10% but not more than 11% of the total number of the then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds more than 11% of the total number of then outstanding shares of Parent Common Stock, the right of the holder of Series A Stock to elect a total of one director shall vest immediately; and

(ii)  Notwithstanding anything to the contrary contained in clause (i) immediately above, upon the earlier to occur of (A) the date on which the Supplemental Benefit Trust has held more than 20% but not more than 21% of the total number of the then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds more than 21% of the total then outstanding shares of Parent Common Stock, the right of the holder of Series A Stock to elect a total of two directors shall vest immediately.

For purposes of this subparagraph (b), all calculations of the Supplemental Benefit Trust's holdings of the then outstanding shares of Parent Common Stock shall be made as if the Common Stock and Class B Common were a single class.

At any time when the holder of the Series A Stock has the right to elect directors as provided in this subparagraph (b), (i) such holder shall have the exclusive right to remove the First Designee and/or the Second Designee, with or without cause, from time to time and elect their successors and (ii) any vacancies in the seats held by the First Designee or the Second Designee shall be filled only by a vote of the holder of the Series A Stock.

(6)  Conversion Rights.  The holder of the share of the Series A Stock shall have no conversion rights with respect to such share.

(7)  Nontransferability.  The Series A Stock will be issued to the Supplemental Benefit Trust and the Series A

- 21 -

163

Stock and any rights thereunder shall be nontransferable. Any attempted transfer shall be void and of no effect. The Company shall place on the certificate representing any issued share of the Series A Stock a legend consistent with the provisions hereof.

(8)  Definitions.

(a)  Profit Sharing Cessation Date.  The term "Profit Sharing Cessation Date" shall have the meaning assigned to such term in the Settlement Agreement.

(b)  Settlement Agreement.  The term "Settlement Agreement" shall mean the Settlement Agreement, dated as of March 31, 1993, and the exhibits thereto, in the class action of Shy, et al. v. Navistar, (Civil Action No. C-3-92-333) (S.D.O.), as any of the same may be amended from time to time in accordance with the terms thereof. The Company shall provide a copy of the Settlement Agreement to any holder of shares of its stock upon request by such holder.

(c)  Supplemental Benefit Program.  The term "Supplemental Benefit Program" shall have the meaning assigned to such term in the Settlement Agreement.

(d)  Supplemental Benefit Trust.  The term "Supplemental Benefit Trust" shall have the meaning assigned to such term in the Settlement Agreement.

(9)  Rank of Series A Stock.  The share of the Series A Stock shall rank junior upon liquidation to (i) the shares of the Series G Stock, (ii) the shares of the Convertible Junior Preference Stock, Series D (With Par Value of $1.00) (the "Series D Stock"), and (iii) any other series of Preferred Stock or Preference Stock (other than the Nonconvertible Junior Preference Stock, Series B (With Par Value of $1.00) of the Company) (the "Series B Stock") authorized or designated after the initial date of issuance of the Series A Stock. The share of the Series A Stock shall rank on a parity upon liquidation with the Series B Stock. The share of the Series A Stock shall rank senior upon liquidation to the shares of the Parent Common Stock.

(10)  Retirement of Redeemed Shares, Etc.  When redeemed, the share of the Series A Stock shall have the status of authorized and unissued Preference Stock.

(11)  No Fractional Shares.  No fractional shares of Series A Stock shall be issued.

(12)  Stock Calculations.  In making any calculations with respect to holdings or ownership of the Company's stock, the

- 22 -

164

Company's stock records shall be conclusive evidence of such holdings and ownership.

B. **Series B Stock.** The designated powers, preferences and, relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of one (1) share of a series of Preference Stock are as follows:

(1) **Designation.** The designation of this series of Preference Stock shall be "Nonconvertible Junior Preference Stock, Series B (With Par Value of $1.00)" (referred to herein as the "Series B Stock").

(2) **Dividends.** The holder of the share of the Series B stock shall not be entitled to receive dividends with respect to the Series B Stock.

(3) **Rights of Redemption.** The Series B Stock shall be subject to redemption as follows:

(a) **Optional Redemption.** At any time after the holder of Series B Stock has not been entitled to vote separately as a class to elect a director at any time for five consecutive years, the Series B Stock may be redeemed at the option of the Company, in whole or in part, at any time or from time to time upon not less than five days' prior notice to the holder of record of the Series B Stock sent by first class mail, postage prepaid, to such holder at its address appearing on the Series B Stock register maintained by the Company, at a redemption price of $1.00 (hereinafter called the "Series B Redemption Date").

(b) **Effect of Redemption.** All rights of the holder of Series B Stock as a stockholder of the Company by reason of the ownership of Series B Stock shall cease on the Series B Redemption Date, except the right to receive the amount payable upon redemption of such share on presentation and surrender of the certificate representing such share. After the Series B Redemption Date, such share shall not be deemed to be outstanding.

(4) **Rights on Liquidation, Dissolution, Winding Up.**

(a) **Liquidation Payment.** In the event of any involuntary liquidation, dissolution or winding up of the Company, the holder of the Series B Stock (if then outstanding) shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the Company ranking junior upon liquidation to the Series B Stock, an amount equal to $1.00 per share. The merger or

- 23 -

165

consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a dissolution, liquidation or winding up of the Company under this paragraph (4).

(b) Proportionate Distribution. In the event the assets of the Company available for distribution to the holder of the Series B Stock upon any involuntary or voluntary liquidation, dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holder is entitled pursuant to subparagraph (a) of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preference stock ranking on a parity with the Series B Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the Series B Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5) Voting. The Series B Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a) Change of Priority or Rights. Without the affirmative vote or consent of the holder of the Series B Stock, voting or consenting (as the case may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) change the number of authorized shares of the Series B Stock or (ii) amend this Certificate of Incorporation or take any other action (including, without limitation, a merger or consolidation to which the Company is a constituent party) which would have the effect of eliminating the Series B stock or of amending, altering or repealing any of the preferences, special rights or powers of the holder of the Series B Stock so as adversely to affect such preferences, special rights or powers.

(b) Election of Director. Until the Fully Funded Date, the number of directors constituting the Board of Directors of the Company shall be increased by one, and the holder of the Series B Stock shall have, in addition to any other voting rights, the exclusive and special right, voting separately as a class, to elect one person to fill such newly created directorship. Except for the involuntary resignation of any such director by the subparagraph b or the removal of any such director by the holder of the Series B Stock, the director elected by the

- 24 -

holder of the Series B stock shall have a one year term of office. The right of the holder of Series B Stock to elect a director may be exercised by written consent of such holder. On the Fully Funded Date, the special right of the holder of the Series B Stock so to vote separately as a class for the election of a director shall terminate (subject to subsequent revesting as provided below) and the director elected by the holder of the Series B Stock shall be deemed to have resigned effective immediately without any further action upon such person's part. Subsequent to the Fully Funded Date, the special right of the holder of Series B Stock to vote separately as a class for the election of a director shall revest at any time when the balance of the Employers' funding contribution held under the Health Benefit Trust falls below 85% of the Fully Funded Amount; provided, however, that such revested special right of the holder of Series B Stock to vote separately as a class for the election of a director shall terminate (subject to revesting as provided by this subparagraph (b)) if the balance of the Employers' funding contribution held under the Health Benefit Trust rises above 85% of the Fully Funded Amount.

At any time when the holder of the Series B Stock has the right to elect a director as provided in this subparagraph (b), (i) such holder shall have the exclusive right to remove such director, with or without cause, from time to time and elect his or her successor and (ii) any vacancies in the seat held by the director elected by the holder of the Series B Stock shall be filled only by vote of the holder of the Series B Stock.

(6) **Conversion Rights.** The holder of the share of the Series B Stock shall have no conversion rights with respect to such share.

(7) **Nontransferability.** The Series B Stock shall be issued to the UAW and the Series B Stock and any rights thereunder shall be nontransferable. Any attempted transfer shall be void and of no effect. The Company shall place on the certificate representing any issued share of the Series A Stock a legend consistent with the provisions hereof.

(8) **Definitions.**

(a) **Employers.** The term "Employers" shall have the meaning assigned to such term in the Settlement Agreement.

(b) **Fully Funded Amount.** The term "Fully Funded Amount" shall have the meaning assigned to such term in the Settlement Agreement.

- 25 -

167

(c) **Fully Funded Date.** The term "Fully Funded Date" shall have the meaning assigned to such term in the Settlement Agreement.

(d) **Health Benefit Trust.** The term "Health Benefit Trust" shall have the meaning assigned to such term in the Settlement Agreement.

(e) **UAW.** The term "UAW" shall have the meaning assigned to such term in the Settlement Agreement.

(9) **Rank of Series B Stock.** The share of the Series B stock shall rank junior upon liquidation to (i) the shares of the Series G Stock, (ii) the shares of the Series D Stock, and (iii) any other series of Preferred or Preference Stock (other than the Series A Stock) authorized or designated after the initial date of issuance of the Series B Stock. The share of the Series B Stock shall rank on a parity upon liquidation with the Series A stock. The share of the Series B Stock shall rank senior upon liquidation to the shares of the Parent Common Stock.

(10) **Retirement of Redeemed Shares, Etc.** When redeemed, the share of the Series B Stock shall have the status of authorized and unissued Preference Stock.

(11) **Fractional Shares.** No fractional shares of Series B Stock shall be issued.

(12) **Stock Calculations.** In making any calculations with respect to holdings or ownership of the Company's stock, the Company's stock records shall be conclusive evidence of such holdings and ownership.

C. **Series D Stock.** The designated powers, preferences and relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of 3,000,000 shares of a series of Preference Stock are as follows:

(1) **Designation.** The designation of this series of Preference Stock shall be "Convertible Junior Preference Stock, Series D (with Par Value of $1.00)" (referred to herein as the "Series D Stock").

(2) **Dividends.** The holders of shares of the Series D Stock shall not be entitled to receive any dividends unless cash dividends are declared on the shares of stock issuable upon conversion of the Series D Stock (herein called "conversion stock"). In the event any cash dividend is declared on the shares of conversion stock, following the record date for such dividend the holders of shares of the Series D Stock shall be entitled to receive, when, as, and to the extent declared by the Board of Directors, a dividend in cash in an

- 26 -

168

amount per share equal to 120% of the cash dividend per share declared on the shares of conversion stock multiplied by the number of shares of conversion stock which, as of such record date, is deliverable on the conversion on the conversion Date upon the conversion of a share of Series D Stock, if at any time after the right to receive such dividend shall have accrued such dividend shall not have been paid, or declared and a sum sufficient for payment thereof set apart, the amount of the deficiency in such dividend shall be fully paid, but without interest, before the dividend on the conversion stock which gave rise to the accrual of such dividend shall be paid and before any other dividend shall be declared on or paid or any other distribution ordered or made upon, or any other purchase or redemption made of, any stock ranking as to dividends or upon liquidation junior to the Series D Stock (other than a dividend payable in such junior stock or a purchase or redemption made by issue or delivery of such junior stock); provided, however, that any moneys theretofore deposited in any sinking fund with respect to any preferred stock of the Company in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such preferred stock in accordance with the terms of such sinking fund regardless of whether at the time of such application Full Accrued Dividends upon shares of the Series D Stock shall have been paid or declared and set apart for payment. At any time when any dividend has accrued on the Series D Stock but has not been paid, all dividends declared upon the shares of the Series D Stock and any other preferred stock ranking on a parity as to dividends with the Series D stock shall be declared pro rata, so that the amounts of dividends declared per share on the Series D Stock and such other preferred stock shall in all cases bear to each other the same ratio that accrued unpaid dividends per share on the shares of the Series D Stock and such other preferred stock (determined immediately prior to payment) bear to each other, provided that in making such calculation, dividends accrued on such other parity stock since the most recent January 15 or July 15 may be ignored. Holders of shares of the Series D Stock shall not be entitled to any dividends, whether payable in cash, property or stock, in excess of Full Accrued Dividends.

(3) Rights Of Redemption. The shares of the Series D Stock shall be subject to redemption as follows:

(a) Optional Redemption. Subject to the succeeding provisions of this subparagraph (a), the shares of the Series D Stock may be redeemed at the option of the Company, in whole or in part, at any time or from time to time upon not less than 30 days' prior notice to the holders of record of shares of the Series D Stock to be so redeemed, sent by first class mail, postage prepaid, to each registered holder of shares of the Series D Stock

- 27 -

169

at his address appearing on the Series D Stock register maintained by the Company, at the redemption price per share of $25.00, plus in each case an amount equal to Unpaid Accrued Dividends to and including the date fixed for redemption of such shares (hereinafter called a "Redemption Date"). If less than all shares of the Series D Stock are to be redeemed pursuant to this subparagraph (a), the shares to be redeemed shall be selected pro rata so that there shall be redeemed from each registered holder of such shares that number of whole shares, as nearly as practicable to the nearest whole shares, as bears the same ratio to the total number of shares of such Series held by such holder as the total number of shares to be redeemed bears to the total number of shares of the Series D Stock at the time outstanding.

(b) No Mandatory Redemption. The shares of the Series D Stock shall not be subject to mandatory redemption.

(c) No Sinking Fund. Shares of the Series D Stock are not subject or entitled to the benefit of a sinking fund.

(d) Effect of Redemption. Unless default be made in the payment in full of the redemption price and any Accrued Dividends; dividends on the shares of Series D Stock called for redemption shall cease to accrue on the Redemption Date on which such shares are to be redeemed; all rights of the holders of such shares as stockholders of the Company by reason of the ownership of such shares shall cease on such Redemption Date, except the right to receive the amount payable upon redemption of such shares on presentation and surrender of the respective certificates representing such shares; and after such Redemption Date, such shares shall not be deemed to be outstanding and shall not be transferable on the books of the Company except to the Company.

(e) Receipt of Redemption Price. At any time on or after a Redemption Date, the respective holders of record of shares of Series D Stock to be redeemed on such Redemption Date shall be entitled to receive the redemption price upon actual delivery to the company of certificates for the shares to be redeemed, such certificates, if required by the Company, to be properly stamped for transfer and duly endorsed in blank or accompanied by proper instruments of assignment and transfer thereof duly executed in blank.

(f) Return of Deposits. Any moneys deposited with the transfer agent, or other redemption agent, for the redemption of any shares of Series D Stock on a Redemp-

tion Date which shall not be claimed after five years from such Redemption Date shall be repaid to the Company by such agent on demand, and the holder of any such shares of Series D Stock shall thereafter look only to the Company for any payment to which such holder may be entitled. Any interest accrued on moneys so deposited shall belong to the Company and shall be paid to it from time to time on demand.

(4)  Rights on Liquidation, Dissolution, Winding up.

(a)  Liquidation Payment.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, the holders of shares of the Series D Stock then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the Company ranking junior upon liquidation to the Series D Stock, an amount equal to $25.00 per share plus an amount equal to all Accrued Dividends thereon as of the date of payment. The merger or consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a liquidation, dissolution or winding up of the Company under this paragraph (4).

(b)  Proportionate Distribution.  In the event the assets of the Company available for distribution to the holders of shares of Series D Stock upon any voluntary or involuntary liquidation, dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holders are entitled pursuant to subparagraph (a) of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preferred stock ranking on a parity with the shares of Series D Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the shares of Series D Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5)  Voting.  The shares of the Series D Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a)  Change of Priority or Rights.  Without the affirmative vote or consent of the holders of at least two-thirds of the number of shares of Series D Stock at the time outstanding, voting or consenting (as the case

- 29 -

171