tion Date which shall not be claimed after five years from such Redemption Date shall be repaid to the Company by such agent on demand, and the holder of any such shares of Series D Stock shall thereafter look only to the Company for any payment to which such holder may be entitled. Any interest accrued on moneys so deposited shall belong to the Company and shall be paid to it from time to time on demand.

(4) Rights on Liquidation, Dissolution, Winding up.

(a) Liquidation Payment. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, the holders of shares of Series D Stock then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the Company ranking junior upon liquidation to the Series D Stock, an amount equal to $25.00 per share plus an amount equal to all Accrued Dividends thereon as of the date of payment. The merger or consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a liquidation, dissolution or winding up of the Company under this paragraph (4).

(b) Proportionate Distribution. In the event the assets of the Company available for distribution to the holders of shares of Series D Stock upon any voluntary or involuntary liquidation, dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holders are entitled pursuant to subparagraph (a) of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preferred stock ranking on a parity with the shares of Series D Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the shares of Series D Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5) Voting. The shares of the Series D Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a) Change of Priority or Rights. Without the affirmative vote or consent of the holders of at least two-thirds of the number of shares of Series D Stock at the time outstanding, voting or consenting (as the case

may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) amend, alter or repeal any of the preferences, special rights or powers of the holders of, the Series D Stock so as adversely to affect such preferences, special rights or powers or (ii) increase above 3,000,000 the aggregate number of shares constituting the Series D Stock or issue or reissue any shares of Series D Stock (other than for purposes of exchanges or transfers) in excess of the first 3,000,000 shares issued. No vote or consent by the holders of the Series D Stock shall be required as a condition to the creation or issuance of any class or series of capital stock of the Company (including, without limitation, capital stock which may rank senior to, or on a parity with, the Series D Stock as to dividends or upon liquidation or both).

(b)   Default in Dividend Payments.   Whenever dividends payable on any series of Preference Stock shall be in default in an aggregate amount equivalent to six full quarterly dividends on all shares of such series at the time outstanding, the number of directors constituting the Board of Directors of the Company shall be increased by one and the holders of Preference Stock shall have, in addition to any other voting rights, the exclusive and special right, voting separately as a class without regard to series, to elect one person to fill such newly created directorship. Whenever such right of holders of Preference Stock shall have vested, it may be exercised initially either at a special meeting of such holders called as provided below, or at any annual meeting of stockholders, and thereafter at annual meetings of stockholders. The right of holders of shares of Preference Stock voting separately as a class to elect one member of the Board of Directors as aforesaid shall continue until such time as all dividends accumulated on all series of Preference Stock shall have been paid in full, at which time the special right of the holders of shares of Preference Stock so to vote separately as a class for the election of directors shall terminate, subject to revesting in the event of each and every subsequent default in an aggregate amount equivalent to six full quarterly dividends.

At any time when such special voting power shall have vested in the holders of Preference Stock as provided in this subparagraph (b), a proper officer of the Company shall, upon the written request of the holders of record of at least 10% of the number of shares of Preference Stock at the time outstanding and entitled to vote, regardless of series, addressed to the Secretary of the Company, call a special meeting of the holders of

- 30 -

shares of Preference Stock and of any other class of stock having voting power, for the purpose of electing directors. Such meeting shall be held at the earliest practicable date at the principal office of the Company. If such meeting shall not be called by a proper officer of the Company within 20 days after personal service of said written request upon the Secretary of the Company, or within 20 days after mailing the same within the United States of America by registered mail addressed to the Secretary of the Company at its principal office, then the holders of record of at least 10% of the number of shares of Preference Stock at the time outstanding and entitled to vote, regardless of series, may designate in writing one of their number to call such meeting at the expense of the Company, and such meeting may be called by such person so designated upon the notice required for annual meetings of stockholders and shall be held at said principal office. Any holder of shares of Preference Stock so designated shall have access to the stock books of the Company for the purpose of causing meetings of stockholders to be called pursuant to these provisions. Notwithstanding the provisions of this subparagraph (b), no such special meeting shall be called during the 90 days immediately preceding the date fixed for the next annual meeting of stockholders.

At any meeting held for the purpose of electing directors at which the holders of shares of Preference Stock shall have the special right, voting separately as a class, to elect a director as provided in this subparagraph (b), the presence, in person or by proxy, of the holders of 51% of the number of shares of Preference Stock at the time outstanding and entitled to vote shall be required to constitute a quorum of such class for the election of any director by the holders of the Preference Stock as a class, each share of Series D Stock outstanding and entitled to vote counting, for purposes only of determining the presence of such a quorum, as one share of Preference Stock. At any such meeting or adjournment thereof, (i) the absence of a quorum of Preference Stock shall not prevent the election of directors other than those to be elected by the holders of shares of Preference Stock voting as a class and the absence of a quorum for the election of such other directors shall not prevent the election of the directors to be elected by holders of shares of Preference Stock voting as a class and (ii) in the absence of either or both such quorums, a majority of the holders present in person or by proxy of the stock or stocks which lack a quorum shall have power to adjourn the meeting for the election of directors which they are entitled to elect from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

During any period the holders of Preference Stock have the right to vote as a class for a director as provided in this subparagraph (b), (i) the director so elected by the holders of the Preference Stock shall continue in office until termination of the right of the holders of the Preference Stock to vote as a class for directors, and (ii) any vacancies in the Board of Directors, shall be filled only by vote of a majority (which majority may consist of only a single director) of the remaining directors theretofore elected by the holders of the class or classes of stock which elected the director whose office shall have become vacant.

(6) **Conversion Rights.** The shares of the Series D Stock shall be subject to conversion as follows:

(a) **Optional Conversion.** At any time, the holders of shares of the Series D Stock shall have the right, at their option, to convert each share of Series D Stock into shares of any other stock of the Company on the following terms:

(I) **Conversion Price.** The shares of the Series D Stock shall be convertible at the Company's principal office and at such other office or offices, if any, as the Board of Directors may designate, into fully paid and nonassessable shares (calculated as to each conversion to the nearest 1/100th of a share) of Common Stock of the Company, at the conversion price, determined as hereinafter provided, in effect at the time of conversion, each share of Series D Stock being taken at $25.00 for the purpose of such conversion. The price at which shares of Common Stock shall be delivered upon conversion (herein called the "conversion price") shall be initially $80.00 per share of Common Stock. The conversion price shall be adjusted as provided in clause (IV) of this subparagraph (a).

(II) **Conversion Procedure.** No payment or adjustment shall be made upon the conversion of the Series D Stock on account of any dividends declared but unpaid on the shares of the Series D Stock converted or on account of any dividends on the Common Stock issued upon such conversion.

Shares of the Series D Stock shall be deemed to have been converted immediately prior to the close of business on the Conversion Date, and the person or persons entitled to receive the Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such Common Stock at such time.

Following the Conversion Date, each holder of shares of the Series D Stock converted will surrender, at the Company's principal office or at any other office as the Board of Directors may designate, the certificate or certificates therefor, duly endorsed to the Company or in blank. As promptly as practicable after such surrender, the Company shall issue and shall deliver at said office a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion to the person or persons entitled to receive the same.

In case shares of Series D Stock are called for redemption, the right to convert such shares shall cease and terminate at the close of business on the Redemption Date on which such shares are to be redeemed, unless default shall be made in payment of the redemption price (in which event the right to convert such shares shall cease when such redemption price shall actually be paid).

(iii) Cash Payment. No fractional shares of Common Stock shall be issued upon conversion of shares of the Series D Stock, but, instead of any fraction of a share of Common Stock which would otherwise be issuable in respect of the aggregate number of shares of the Series D Stock held by the same holder, the company shall pay a cash adjustment of such fraction in an amount equal to the same fraction of the Closing Price on the Conversion Date, or, if the Conversion Date is not a Trading Day, on the next Trading Day.

(IV) Conversion Price Adjustments. The conversion price shall be adjusted from time to time as follows:

(A) In case the Company shall hereafter (i) pay a dividend or make a distribution on its outstanding shares of Common Stock in Common Stock, (ii) subdivide its outstanding shares of Common Stock, (iii) combine its outstanding shares of Common Stock into a smaller number of shares, or (iv) issue any shares by reclassification of its shares of Common Stock, the conversion price in effect at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be adjusted so that the holder of any shares of the Series D Stock converted after such time shall be entitled to

- 33 -

175

receive the number of shares of capital stock of the Company which he would have owned or been entitled to receive by reason of the conversion of such shares of the Series D Stock had such shares of the Series D Stock been converted immediately prior to such time.

(B) In case the Company shall hereafter issue rights or warrants to all holders of its Common Stock entitling them (for a period expiring within fortyfive days after the record date mentioned below) to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share—as determined pursuant to subclause (D) of this clause (IV)—on the record date for the determination of the stockholders entitled to receive such rights or warrants, the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the date of issuance of such rights or warrants by a fraction, of which the numerator shall be the number of shares of Common Stock outstanding on the record date for the determination of the stockholders entitled to receive such rights or warrants plus the number of shares of Common Stock which the aggregate offering price of the total number of shares of Common Stock so offered would purchase at such current market price and of which the denominator shall be the number of shares of Common Stock outstanding on such record date plus the number of additional shares of Common Stock offered for subscription or purchase. Such adjustment shall become effective at the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such rights or warrants; and to the extent that shares of Common Stock are not delivered after the expiration of such rights or warrants, the conversion price shall be readjusted (but only with respect to shares of the Series D Stock converted after such expiration) to the conversion price which would then be in effect had the adjustments made upon the distribution of such rights or warrants been made upon the basis of delivery of only the number of shares of Common Stock actually delivered. No adjustment in the conversion price shall be required or made

- 34 -

under this subclause (B) or subclause (C) immediately below or otherwise under this subparagraph (a) in respect of any right granted by the Company to all holders of its Common Stock to purchase additional shares of Common Stock from the Company at a discount from the current market price per share of Common Stock by reinvestment of dividends on Common Stock if either (i) such discount does not exceed 6% of such current market price or (ii) the holders of the Series D Stock shall be entitled to purchase shares of Common Stock from the Company at the same discount by reinvestment of dividends on the Series D Stock.

(C) In case the Company shall hereafter distribute to all holders of its Common Stock evidences of its indebtedness or assets-- excluding any cash dividend or distributions and dividends referred to in subclause (A) of this clause (IV)--or subscription rights or warrants (excluding those referred to in subclause (B) immediately above), then in each such case the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the date of such distribution by a fraction of which the numerator shall be the current market price per share (determined as provided in subclause (D) immediately below) of the Common Stock on the record date for the determination of stockholders entitled to receive such distribution less the then fair market value (as determined by the Board of Directors of the Company, whose determination shall be conclusive) of the portion of the assets or evidences of indebtedness so distributed or of such subscription rights or warrants applicable to one share of Common Stock, and the denominator shall be such current market price per share of the Common Stock. Such adjustment shall become effective on the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such distribution.

(D) For the purpose of any computation under subclause (B) or (C) immediately above, the current market price per share of Common Stock on any date shall be deemed to be the

- 35 -

177

average of the daily Closing Price for the thirty consecutive Trading Days selected by the Company commencing not more than forty-five Trading Days before the day in question.

(E) In any case in which this subparagraph (a) shall require that an adjustment as a result of any event become effective at the opening of business on the business day next following a record date, the Company may elect to defer until after the occurrence of such event (i) issuing to the holder of any shares of the Series D Stock converted after such record date and before the occurrence of such event the additional shares of Common Stock issuable upon such conversion over and above the shares of Common Stock issuable upon such conversion on the basis of the conversion price prior to adjustment and (ii) paying to such holder any amount in cash in lieu of a fraction share of Common Stock pursuant to clause (IV) of this subparagraph (a); and, in lieu of the shares the issuance of which is so deferred, the Company shall issue or cause its transfer agents to issue due bills or other appropriate evidence of the right to receive such shares.

(F) Any adjustment in the conversion price otherwise required by this subparagraph (a) to be made may be postponed up to, but not beyond, three years from the date on which it would otherwise be required to be made provided that such adjustment (plus any other adjustments postponed pursuant to this subclause (F) and not theretofore made) would not require an increase or decrease of more than $.50 in such price and would not, if made, entitle the holders of all then outstanding shares of the Series D Stock upon conversion to receive additional shares of Common Stock equal in the aggregate to 3% or more of the then issued and outstanding shares of Common Stock. All calculations under this subparagraph (a) shall be made to the nearest cent or to the nearest 1/100 of a share of Common Stock, as the case may be.

(V) Conversion Price Adjustment Certificates and Notices. Whenever the conversion price is adjusted as herein provided, the Company shall compute the adjusted conversion price in accordance with this subparagraph (a), shall

prepare a notice stating that the conversion price has been adjusted and setting forth the adjusted conversion price and shall mail such notice as soon as practicable to the holders of record of the outstanding shares of the Series D Stock.

(VI)  Mergers, etc.  In case of any consolidation of the Company with, or merger of the Company with or into, any other corporation (other than a merger in which the Company is the surviving corporation and which does not result in any reclassification or change of the outstanding shares of the Company into which shares of the Series D Stock would have been converted had the automatic conversion of the Series D Stock occurred immediately prior thereto), or in case of any conveyance or transfer of the property and assets of the Company substantially as an entirety, lawful provision shall be made as a part of the terms of such transaction so that each share of Series D Stock shall be converted on the Conversion Date into the number and kind of shares of stock (and/or other securities, cash, property or rights) receivable upon such consolidation, merger, conveyance or transfer by a holder of the number and kind of shares of the Company into which such share of Series D Stock would have been converted had the automatic conversion of the Series D Stock occurred immediately prior to such consolidation, merger, conveyance or transfer, subject to subsequent adjustments as nearly equivalent as practicable to the adjustments provided for in this subparagraph (a). The above provisions of this clause (VI) shall similarly apply to successive consolidations, mergers, conveyances or transfers.

(VII)  Reservation of Shares. The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of the shares of the Series D Stock on the Conversion Date, the full number of shares of Common Stock which at the time is deliverable on the Conversion Date upon the conversion of all shares of the Series D Stock outstanding at such time.

(VIII)  Taxes. The Company shall pay any and all taxes that may be payable in respect of the issuance or delivery of shares of Common Stock on conversion of shares of Series D Stock pursuant hereto. The Company shall not, however, be required to pay any tax which may be payable in

- 37 -

179

respect of any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of Series D Stock so converted were registered, and no such issue or delivery shall be made unless and until the person requesting such issue has paid to the Company the amount of any such tax, or has established, to the satisfaction of the Company, that such tax has been paid.

(IX) Common Stock. For the purpose of this paragraph (6) the term "Common Stock" shall include any stock of any class of the Company which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and which is not subject to redemption by the Company. However, shares issuable on conversion of shares of the Series D Stock shall include only shares of the class designated as Common Stock of the Company as of the original date of issue of the Series D Stock or shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company, provided that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

(X) Closing Price. As used in this paragraph (6), the term "Closing Price" on any day shall mean the reported last sales price regular way on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices regular way, in each case on the New York Stock Exchange, or, if the Common Stock is not listed or admitted to trading on such Exchange, on the principal national securities exchange on which the Common Stock is listed or admitted to trading, or, if not listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices as furnished by any New York Stock Exchange member firm selected from time to time by the Company for that purpose; and the term "Trading Day" shall mean a date on which

the New York Stock Exchange (or any successor to such Exchange) is open for the transaction of business.

(7) <u>Definitions</u>.

(a) <u>Conversion Date</u>. The term "Conversion Date" shall mean the date on which the holder of shares of Series D Stock exercises his or its option to convert the shares of Series D Stock into Common Stock.

(b) <u>Accrued Dividends</u>. The term "Accrued Dividends" shall mean Full Accrued Dividends as of the date as of which Accrued Dividends are to be computed, less the amount of all dividends paid, upon the relevant shares of Series D Stock.

(c) <u>Full Accrued Dividends</u>. The term "Full Accrued Dividends" shall mean the aggregate amount of dividends, if any, which the holders of shares of Series D Stock shall have become entitled to receive as of the date as of which Full Accrued Dividends are to be computed.

(d) <u>Preferred Stock</u>. The term "Preferred Stock" shall mean any Preferred Stock created and issued under this Article Fourth. The term "preferred stock" shall mean shares of any class of stock (including any class of Preferred Stock or Preference Stock) if the holders of such class shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, in preference or priority to the holders of shares of Common Stock.

(e) <u>Preference Stock</u>. The term "Preference Stock" shall mean any Preference Stock created and issued under this Article Fourth.

(f) <u>Ranking of Shares</u>. For the purposes hereof any stock of any class or classes of the Company shall be deemed to rank (i) prior to shares of the Series D Stock, either as to dividends or upon liquidation, if the holders of such class or classes shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Series D Stock; (ii) on a parity with shares of the Series D Stock, either as to dividends or upon liquidation, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Series D Stock, if the holders of such stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may

be, in proportion to their respective dividend rates or liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Series D Stock; and (iii) junior to shares of the Series D Stock, either as to dividends or upon liquidation, if such class shall be Common Stock or if the holders of the Series D Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of such class or classes.

(8) Rank of Series D Stock. The shares of the Series D Stock shall rank junior as to dividends and upon liquidation to the shares of the $6.00 Cumulative Convertible Preferred Stock, Series G (With Par Value of $1.00) of the Company. Except as otherwise fixed at the time such class is created, the shares of the Series D Stock shall rank on a parity as to dividends and upon liquidation with the shares of the stock of any other class of Preferred Stock or Preference Stock.

(9) Fractional Shares. The Series D Stock may be issued in fractions of a share equal to one one-hundredth (.01) of a share or any integral multiple thereof. Each fractional share of Series D Stock issued shall have a corresponding fraction of the voting powers, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, attributable to a full share of Series D Stock.

(10) Retirement of Converted Shares, etc. Shares of the Series D Stock which have been converted into Common Stock pursuant to the provisions of paragraph (6) of this Section C regarding Series D Stock shall have the status of authorized and unissued Preferred Stock but shall not be reissued as Series D Stock.

III.  Parent Common Stock.

Except as otherwise provided in this Section III or as otherwise required by applicable law, all shares of Common Stock and Class B Common shall be identical in all respects and shall entitle the holders thereof to the same rights and privileges, subject to the same qualifications, limitations and restrictions.

A.  Voting Rights.

(1)  Common Stock. Except as otherwise provided in this Section III, as otherwise required by law or by the resolution or resolutions providing for the issuance of any series of Preferred Stock or Preference Stock and subject to the provisions of any applicable law or of the By-laws of the Company, as from time to time amended, with respect to the

- 40 -

182

closing of the transfer books or the fixing of a record date for the determination of stockholders entitled to vote, the holders of outstanding shares of Common Stock shall exclusively possess voting power for the election of directors and for other purposes, each holder of record of shares of Common Stock being entitled to one vote for each Share of Common Stock standing in his name on the books of the Company.

(2) Class B Common. The holders of shares of Class B Common shall have no right to vote on any matters to be voted on by the stockholders of the Company except as follows:

(a) Without the affirmative vote or consent of the holders of the Class B Common, voting or consenting (as the case may be) separately as a class, in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) change the number of authorized shares of the Class B Common or (ii) amend this Certificate of Incorporation or take any other action (including, without limitation, a merger or consolidation to which the Company is a constituent party) which would have the effect of eliminating the Class B Common or of amending, altering or repealing any of the preferences, special rights or powers of the holders of the Class B Common so as adversely to affect such preferences, special rights or powers.

(b) The holders of shares of Class B Common shall have the right to vote together with the holders of shares of the Common Stock as a single class on any Super-Majority Transaction submitted to the holders of Parent Common Stock for their vote, approval or consent. When voting on any Super-Majority Transaction, each holder of shares of Class B Common shall be entitled to cast one vote for each share of Class B Common standing in his name on the books of the Company.

(3) Super-Majority Transactions. The affirmative vote or consent of (a) the holders of at least 85% of the shares of the Parent Common Stock, voting as a single class, present in person or by proxy at a meeting at which a Super-Majority Transaction is submitted for a vote of the Company's stockholders and (b) the holders of a majority of the voting power of all of the Parent Common Stock shall be required to approve any Super-Majority Transaction.

B. Dividends. Except as otherwise provided by the resolution or resolutions providing for the issue of any series of Preferred Stock or Preference Stock, the holders of Parent Common Stock shall be entitled, to the exclusion of the holders of Preferred Stock and Preference Stock of any and all series, to receive such dividends as from time to time may be declared by the

- 41 -

183

Board of Directors. As and when dividends are declared or paid thereon, whether in cash, property or securities of the Company, the holders of Common Stock and the holders of Class B Common shall be entitled to participate in such dividends ratably on a per share basis; provided, that (i) if dividends are declared which are payable in shares of Common Stock or Class B Common, such dividends shall be payable at the same rate on both Common Stock and Class B Common and the dividends payable in shares of Common Stock shall be payable to holders of that class of stock and the dividends payable in shares of Class B Common shall be payable to holders of that class of stock, (ii) if the dividends consist of other voting securities of the Company, the Company shall declare and pay in respect of each share of Class B Common dividends consisting of an equal number of non-voting securities of the Company which are otherwise identical to the voting securities, which shall entitle the holder thereof to cast the same number of votes upon any Super-majority Transaction as such holder would have been entitled to cast had such holder received voting securities, rather than non-voting securities, with respect to such dividend and which are convertible into or exchangeable for such voting securities on the same terms as the Class B Common is convertible into the Common Stock, (iii) if the dividends consist of the right to purchase additional shares of Common Stock or Class B Common, at the Company's option, either (A) dividends shall be declared which are payable at the same rate on both classes of stock and the dividends payable in the right to purchase additional shares of Common Stock shall be payable to holders of that class of stock and the dividends payable in the right to purchase additional shares of Class B Common shall be payable to holders of that class of stock and the additional shares of Common Stock, such dividend shall be payable or (B) in the case of a dividend payable in the right to purchase to holders of that class of stock and the Class B Common Conversion Ratio (as hereinafter defined) shall be adjusted as provided in subparagraph 2 of Paragraph D of this Section III.

C.    **Rights on Liquidation, Dissolution, Winding Up.** In the event of any liquidation, dissolution or winding up of the Company, whether voluntary or involuntary, after payment shall have been made to the holders of Preferred Stock and Preference Stock of the full amount for which they shall be entitled pursuant to the resolution or resolutions providing for the issue of any series of Preferred Stock or Preference Stock, the holders of the Parent Common Stock shall be entitled, to the exclusion of the holders of Preferred Stock or Preference Stock of any and all series, to share, ratably according to the number of shares of Parent Common Stock held by them, in all remaining assets of the Company available for distribution to its stockholders.

D.    **Conversion Rights.**

(1)    **Conversion of Common Stock.** The holders of shares of Common Stock shall have no conversion rights with respect to such shares.

- 42 -

184

(2) _Conversion of Class B Common Stock._ With respect to each share of Class B Common, upon the earlier to occur of (i) any transfer of such share of Class B Common in accordance with Paragraph E of this Section III (except for transfers permitted by subparagraph 3 of Paragraph E) and (ii) the Event Date, such share shall convert automatically into shares of Common Stock at a ratio (the "Class B Common Conversion Ratio") which initially shall be one share of Common Stock per share of Class B Common so converted; provided, that if and whenever the Company shall hereafter issue rights pursuant to clause (iii)(B) of Paragraph B of this Section III to all holders of its Common Stock entitling them to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share--as determined pursuant to the penultimate sentence of this subparagraph 2 of this paragraph D--on the record date for the determination of the stockholders entitled to receive such rights, the Class B Common Conversion Ratio shall be adjusted to an amount equal to the product of the Class B Common Conversion Ratio in effect immediately prior to the date of issuance of such rights and a fraction, of which the numerator shall be the number of shares of Common Stock outstanding on such record date plus the number of additional shares of Common Stock offered for subscription or purchase and of which the denominator shall be the number of shares of Common Stock outstanding on such record date plus the number of shares of Common Stock which the aggregate offering price of the total number of shares of Common Stock so offered would purchase at such current market price. Such adjustment shall become effective at the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such rights; and to the extent that shares of Common Stock are not delivered after the expiration of such rights, the Class B Common Conversion Ratio shall be readjusted (but only with respect to shares of the Class B Common converted after such expiration) to the Class B Common Conversion Ratio which would then be in effect had the adjustments made upon the distribution of such rights been made upon the basis of delivery of only the number of shares of Common Stock actually delivered. For the purpose of any computation under the immediately preceding sentence, the current market price per share of Common Stock on any date shall be deemed to be the average of the daily Closing Prices for the thirty consecutive Trading Days selected by the company commencing not more than forty-five Trading Days before the day in question. Notwithstanding anything else contained in this subparagraph 2 of this Paragraph D, upon the termination of the Settlement Agreement in accordance with the provisions of Section 13 thereof, all then outstanding shares of Class B Common in the aggregate shall convert automatically, without any further action on the Company's part, into one (1) share of Common Stock.

- 43 -

(I) Mergers, etc. In case of any consolidation of the Company with, or merger of the Company with or into, any other corporation (other than a merger in which the Company is the surviving corporation and which does not result in any reclassification or change of the outstanding shares of the Company into which shares of the Class B Common would have been converted had the automatic conversion of the Class B Common occurred immediately prior thereto), or in case of any conveyance or transfer of the property and assets of the Company substantially as an entirety, lawful provision shall be made as a part of the terms of such transaction so that each share of Class B Common (i) shall entitle the holder thereof to receive, at the same time and on the same terms as applicable to the shares of the Company into which the Class B Common shall be convertible, any cash, securities (other than equity securities of the Company), rights or other property receivable upon such consolidation, merger, conveyance or transfer by a holder of the number and kind of shares of the Company into which such share of Class B Common would have been converted had the automatic conversion of the Class B Common occurred immediately prior to such consolidation, merger, conveyance or transfer and (ii) shall be converted on the Class B Common Conversion Date into the number and kind of equity of the Company, if any, receivable upon such consolidation, merger, conveyance or transfer by a holder of the number and kind of share of the Company into which such share of Class B Common would have been converted had the automatic conversion of the Class B Common occurred immediately prior to such consolidation, merger, conveyance or transfer subject to subsequent adjustments as nearly equivalent as practicable to the adjustments provided for in this subparagraph 2 of paragraph D; provided however, that any instrument convertible into or exchangeable for equity securities of the Company shall be deemed for purposes of this subparagraph 2(I) not to be equity securities of the Company; and provided, further, that in the event that any instrument convertible into or exchangeable for shares of Common Stock or other voting securities of the Company is paid in any such consolidation, merger, conveyance or transfer in respect of the shares of the Company into which the shares of Class B Common shall be convertible or exchangeable, the corresponding instrument paid in respect of the Class B Common pursuant to this subparagraph 2(I) may be convertible into or exchangeable for Class B Common or non-voting securities of the Company, respectively, in the manner contemplated by paragraph B of this Section III. The above provisions of this clause (I) shall similarly apply to successive consolidations, mergers, conveyances or transfers.

- 44 -

186

(II) Reservation of Shares. The Company shall at all times reserve and keep available, free from pre-emptive rights, out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of the shares of the Class B Common on the Class B Common Conversion Date, the full number of shares of Common Stock which at the time is deliverable on the Class B Common Conversion Date upon the conversion of all shares of the Class B Common outstanding at such time.

(III) Taxes. The Company shall pay any and all taxes that may be payable in respect of the issuance or delivery of shares of Common Stock on conversion of shares of Class B Common pursuant hereto. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of Class B Common so converted were registered, and no such issue or delivery shall be made unless and until the person requesting such issue has paid to the Company the amount of any such tax, or has established, to the satisfaction of the Company, that such tax has been paid.

(IV) Common Stock. For the purpose of this subparagraph 2 of paragraph D the term "Common Stock" shall include any stock of any class of the Company (other than the Class B Common) which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and which is not subject to redemption by the Company. However, shares issuable on conversion of shares of the Class B Common shall include only shares of the class designated as Common Stock of the Company as of the original date of issue of the Class B Common or shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company, provided that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

(V) Retirement of Converted Shares, etc. Shares of the Class B Common which have been converted into Common Stock pursuant to the provisions of this subparagraph 2

- 45 -

187

of paragraph D regarding Class B Common shall have the status of retired shares of Class B Common and shall not be reissued.

(VI)    Rights Prior to Conversion.   Notwithstanding anything to the contrary contained in this Section III, in case of any adjustment of the Class B Common Conversion Ratio as provided in this subparagraph 2 of this Paragraph D, the determination of the rights of the holders of Class B Common to vote such shares in Super-Majority Transactions, to receive dividends with respect to such shares, and to share ratably with the holders of Common Stock in assets of the Company in the event of any liquidation, dissolution or winding up of the Company shall be made as if the number of shares of Class B Common held by each such holder of the Class B Common were equal to the product of the number of shares of Class B Common actually held by such holder at the time of such determination and the Class B Common Conversion Ratio.

(VII)    No Fractional Shares.   No fractional shares of Common Stock shall be issued upon conversion of shares of the Class B Common, but, instead of any fraction of a share of Common Stock which would otherwise be issuable in respect of the aggregate number of shares of the Class B Common held by the same holder, the Company shall pay a full share of Common Stock.

(VIII)    Conversion Procedure.   Following the Class B Common Conversion Date, each holder of shares of the Class B Common converted will surrender, at the Company's principal office or at any other office as the Board of Directors may designate, the certificate or certificates therefor, duly endorsed to the Company or in blank. As promptly as practicable after such surrender, the Company shall issue and shall deliver at said office a certificate or certificates for the number of shares of Common Stock issuable upon such conversion to the person or persons entitled to receive the same.

E.    Transferability of Class B Common.   Prior to the Event Date, the shares of the Class B Common shall be nontransferable by the Supplemental Benefit Trust or any other holder thereof except:

(1)    pursuant to the terms of Article VIII of Exhibit B to the Settlement Agreement;

(2)    pursuant to any transaction which is approved by the Board of Directors or with respect to which the Board of Directors consents in writing;

(3)     to any financial institution as security for any indebtedness or obligation of the holders of the shares of Class B Common; or

(4)     pursuant to any tender or exchange offer made by any person or "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, or any successor statute thereto), for shares of Parent Common Stock.

Any attempted transfer of shares of the Class B Common in violation of the provisions hereof shall be void and of no effect. The Company shall place on the certificates representing shares of the Class B Common a legend consistent with the provisions hereof.

F.     Stock Splits, Recapitalizations, Etc. If the Company in any manner subdivides or combines the outstanding shares of, or effects any recapitalization or similar transaction with respect to, one class of Parent Common Stock, the outstanding shares of the other class of Parent Common Stock shall be proportionately subdivided, combined, reclassified or the like in a similar manner.

G.     Definitions.

(1)     Class B Common Conversion Date. The term "Class B Common Conversion Date," with respect to each share of Class B Common, shall mean the date on which such share automatically converts into shares of Common Stock pursuant to the terms and conditions contained herein.

(2)     Closing Price. The term "Closing Price" on any day shall mean the reported last sales price regular way on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices regular way, in each case on the New York Stock Exchange, or, if the Common Stock is not listed or admitted to trading on such Exchange, on the principal national securities exchange on which the Common Stock is listed or admitted to trading, or, if not listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices as furnished by any New York Stock Exchange member firm selected from time to time by the Company for that purpose.

(3)     Trading Day. The term "Trading Day" shall mean a day on which the New York Stock Exchange (or any successor to such Exchange) is open for the transaction of business.

(4)     Event Date. The term "Event Date" shall have the meaning assigned to such term in the Settlement Agreement.

(5)     Navistar International Transportation Corp. The term "Navistar International Transportation Corp." shall mean Navistar International Transportation Corp., a Delaware corporation, or any successor corporation thereto.

- 47 -

189

(6) **Super-Majority Transaction.** The term "Super-Majority Transaction" shall mean (i) a merger or consolidation to which the Company is a constituent party, if either (A) the stockholders of the Company immediately before such merger or consolidation, do not own, directly or indirectly, more than 50% of the combined voting power of the then outstanding voting securities of the corporation surviving or resulting from such merger or consolidation or (B) equity securities of the Company or Navistar International Transportation Corp. would be issued to stockholders of the other constituent corporation(s) to such merger or consolidation which have a fair market value at the time of the transaction in excess of $750 million, or (ii) the sale, transfer, pledge or other disposition of all or substantially all of the assets of the Company and its subsidiaries on a consolidated basis or Navistar International Transportation Corp. and its subsidiaries on a consolidated basis.

Subject to the provisions of this Certificate of Incorporation and except as otherwise provided by law, the shares of stock of the Company, regardless of class, may be issued for such consideration and for such corporate purposes as the Board of Directors may from time to time determine.

**Fifth:** The Company is to have perpetual existence.

No holder of stock of the Company shall have any pre-emptive right with respect to stock of the Company.

**Sixth:** Except as otherwise provided herein, any action required or permitted to be taken by the stockholders of the Company must be taken at a duly called annual or special meeting of such stockholders of the Company and may not be effected by any consent in writing by such stockholders.

The private property of the stockholders of the Company shall not be subject to the payment of corporate debts to any extent whatsoever.

**Seventh:** The number of directors which shall constitute the whole Board of Directors of the Company shall be as specified in the By-laws of the corporation, subject to the provisions of this Article Seventh.

The Board of Directors shall be and is divided into three classes: Class I, Class II and Class III, which shall be as nearly equal in number as possible. Each director shall serve for a term ending on the date of the third annual meeting of stockholders following the annual meeting at which the director was elected; provided, however, that each initial director in Class I shall hold office until the annual meeting of stockholders in 1988; each initial director in Class II shall hold office until the annual meeting of stockholders in 1989; and each initial director in Class

- 48 -

III shall hold office until the annual meeting of stockholders in 1990. Notwithstanding the foregoing provisions of this Article, each director shall serve until his successor is duly elected and qualified or until his death, resignation or removal.

In the event of any increase or decrease in the authorized number of directors, the newly created or eliminated directorships resulting from such increase or decrease shall be apportioned by the Board of Directors among the three classes of directors so as to maintain such classes as nearly equal as possible. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

Newly created directorships resulting from any increase in the number of directors to be elected by the holders of the Common Stock and any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other cause shall be filled by the affirmative vote of a majority of the remaining directors elected by the holders of the Common Stock then in office (and not by stockholders), even though less than a quorum of the Board of Directors. Any director elected in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of directors in which the new directorship was created or the vacancy occurred and until such director's successor shall have been elected and qualified.

Notwithstanding the foregoing, wherever the holders of any one or more classes or series of stock issued by this Company having a preference over the Parent Common Stock as to dividends or upon liquidation shall have the right, voting separately by class or series, to elect directors by consent or at an annual or special meeting of stockholders, the number, election, term of office, filling of vacancies, terms of removal and other features of such directorships shall be governed by the terms of the resolution or resolutions establishing such class or series adopted pursuant thereto and such directors so elected shall not be divided into classes pursuant to this Article Seventh unless expressly provided by such terms.

The Board of Directors shall have power to hold its meetings outside the State of Delaware at such place as from time to time may be designated by the By-laws or by resolution of the Board of Directors. The By-laws may prescribe the number of directors necessary to constitute a quorum.

The capital of the Company may be increased from time to time by resolution of the Board of Directors directing that a portion of the net assets of the Company in excess of the amount theretofore determined to be capital be transferred to capital account. Any and all shares of the Parent Common Stock may be issued by the Company from time to time for such consideration as may be fixed from time to time by the Board of Directors.

- 49 -

191

Eighth: The Board of Directors shall have power, without stockholder action:

I.    To make By-laws for the Company, and to amend, alter or repeal any By-laws; but any By-laws made by the directors may be altered, amended or repealed by the stockholders at any meeting, provided notice of such proposed alteration, amendment or repeal be included in the notice of such meeting.

II.    To remove at any time any officer, agent or employee of the Company, provided, however, that such power of removal may be conferred by the By-laws or by the Board of Directors on any committee or officer.

III.    To fix and determine, and to vary the amount of, the working capital of the Company, and to determine the use or investment of any assets of the Company; to set apart out of any of the funds of the Company available for dividends a reserve or reserves for any proper purpose and to abolish any such reserve or reserves; and to declare and authorize payment of such dividends as it shall determine advisable and proper, subject to such restrictions as may be imposed by law.

IV.    To authorize the purchase or other acquisition of shares of stock of the Company or any of its bonds, debentures, notes, scrip or other securities or evidences of indebtedness.

V.    To determine whether and to what extent, at what times and places, and under what conditions and regulations, the accounts, books and documents of the Company, or any of them, shall be open to the inspection of the stockholders; and no stockholder shall have any right to inspect any account, book or document of the Company, except as conferred by the laws of the State of Delaware or as authorized by resolution adopted by the Board of Directors or by the stockholders of the Company entitled to vote in respect thereof.

VI.    Except as otherwise provided by law, to determine the places within or without the State of Delaware where any or all of the books of the Company shall be kept.

VII.    To authorize the sale, lease or other disposition of any part or parts of the properties of the Company and to cease to conduct the business connected therewith or again to resume the same, as it may deem best.

VIII.    To authorize the borrowing of money; the issuance of bonds, notes, debentures and other obligations or evidences of indebtedness of the Company, secured or unsecured, and the inclusion of provisions as to redeemability and convertibility into shares of stock of the Company or otherwise; and the mortgaging or pledging, as security for money borrowed or

- 50 -

192

bonds, notes, debentures or other obligations issued by the Company, of any property of the Company, real or personal, then owned or thereafter acquired by the Company.

The powers and authorities herein conferred upon the Board of Directors are in furtherance and not in limitation of those conferred by the laws of the State of Delaware. In addition to the powers and authorities herein or by statute expressly conferred upon it, the Board of Directors may exercise all such powers and do all such acts and things as may be exercised or done by the Company, subject, nevertheless, to the provisions of the laws of the State of Delaware, of this Certificate of Incorporation and of the By-laws of the Company.

The Board of Directors may, by resolution passed by a majority of the whole Board of Directors, designate one or more committees, each committee to consist of two (2) or more of the directors of the Company, which to the extent provided in said resolution or resolutions or in the By-laws, shall have and may exercise the powers of the Board of Directors in the management of the business and affairs of the Company, and may authorize the seal of the Company to be affixed to all papers which may require it.

Subject to any limitation in the By-laws, the members of the Board of Directors shall be entitled to reasonable fees, salaries or other compensation for their services, as determined from time to time by the Board of Directors, and to reimbursement for their expenses as such members. Nothing herein contained shall preclude any director from serving the Company or its subsidiaries or affiliates in any other capacity and receiving compensation therefor.

To the fullest extent permitted by the General Corporation Law of the State of Delaware as it now exists or may hereafter be amended, no director of the Company shall be liable to the Company or its stockholders for monetary damages arising from a breach of fiduciary duty owed to the Company or its stockholders. Any repeal or modification of this provision by the stockholders of the Company shall not adversely affect any right or protection of a director of the Company existing at the time of such repeal or modification.

Ninth:  Indemnification:

I.  Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative ("proceeding"), by reason of the fact that he or she is or was a director or officer of the Company (which term shall include any predecessor corporation of this Company) or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other

- 51 -

193

enterprise, including service with respect to employee benefit plans ("indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be identified and held harmless by the Company to the fullest extent authorized by the Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment), against all expenses, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith and such indemnification shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the indemnitee's heirs, executors and administrators; provided however, that, except as provided in paragraph II of this Article Ninth with respect to proceedings to enforce rights to indemnification, the Company shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors. The right to indemnification conferred in this Article Ninth shall be a contract right and shall include the right to be paid by the Company the expenses incurred in defending any such proceeding in advance of its final disposition; provided however, that, if the Delaware General Corporation Law requires, the payment of such expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a proceeding, shall be made only upon delivery to the Company of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Article Ninth or otherwise.

II.    If a claim under paragraph I of this Article Ninth is not paid in full by the Company within sixty (60) days after a written claim has been received by the Company, except in the case of a claim for expenses incurred in defending a proceeding in advance of its final disposition, in which case the applicable period shall be twenty (20) days, the indemnitee may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim. If successful in whole or in part in any such suit or in a suit brought by the Company to recover payments by the Company of expenses incurred by an indemnitee in defending in his or her

- 52 -

194

capacity as a director or officer, a proceeding in advance of its final disposition, the Company shall be entitled to be paid also the expense of prosecuting or defending such claim. In any action brought by the indemnitee to enforce a right to indemnification hereunder (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the Company) or by the Company to recover payments by the Company of expenses incurred by an indemnitee in defending, in his or her capacity as a director or officer, a proceeding in advance of its final disposition, the burden of proving that the indemnitee is not entitled to be indemnified under this Article Ninth or otherwise shall be on the Company. Neither the failure of the Company (including the Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Company (including the Board of Directors, independent legal counsel or its stockholders) that the indemnitee has not met such applicable standard of conduct, shall be a presumption that the indemnitee has not met the applicable standard of conduct, or in the case of such an action brought by the indemnitee, be a defense to the action.

III.   The rights conferred on any person by paragraphs I and II of this Article Ninth shall not be exclusive of any other right which such person may have or hereafter acquire under any statute, this certificate of incorporation by-law, agreement, vote of stockholders or disinterested directors or otherwise.

IV.   The Company may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Company or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

V.   Persons who are not included as indemnitees under paragraph I of this Article Ninth but are employees of the Company or any subsidiary may be indemnified to the extent authorized at any time or from time to time by the Board of Directors.

Tenth:  The Company reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, and other provisions authorized by the laws of the State of Delaware at the

- 53 -

195

time in force may be added or inserted, in the manner now or hereafter prescribed by law and this Certificate of Incorporation and all rights, preference and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended are granted subject to the right reserved in this Article Tenth.

Eleventh:

I.   Certain Restrictions on the Transfer of Stock.

In order to preserve the Tax Benefits, the restrictions set forth below shall apply for the period beginning on the Article Eleventh Effective Date and ending on the Expiration Date, unless the Board of Directors shall fix an earlier or later date in accordance with Section VI of this Article Eleventh.

A.   Definitions.

(1)   Article Eleventh Effective Date.  The time and date of the legal effectiveness of the Merger of the former Navistar International Corporation with and into the Company.

(2)   Control.  The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Such definition shall also apply to the terms "controlling," "controlled by" and "under common control with."

(3)   Effective Date Tier Entity.  Any Person that, as of the Article Eleventh Effective Date, was a First Tier Entity or a Higher Tier Entity, for so long as such Person continues to have a Prohibited Ownership Percentage.

(4)   Expiration Date.  The last day of the eight-year period commencing on the Article Eleventh Effective Date.

(5)   First Tier Entity.  A "first tier entity" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T.

(6)   47 Percentage Point Increase.  An increase of 47 percentage points or more of the Stock owned by "5-percent shareholders" of the Company (within the meaning of Treasury Regulations Section 1.382-2T(g)(1)) over the lowest percentage of Stock owned by such 5-percent shareholders at any time during the three-year period preceding any determination date, such determination to be made in accordance with Treasury Regulations Section 1.382-2T(c) as if the determination date were a "testing date."

- 54 -

196

(7) **Higher Tier Entity.** An "higher tier entity" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T.

(8) **Internal Revenue Code.** The Internal Revenue Code of 1986, as amended. Any reference to a particular Section or provision of the Internal Revenue Code shall be deemed to also refer to any successor Section or provision having similar effect.

(9) **Ownership Change.** An "ownership change" with respect to the Company, as that term is used in Section 382(g) of the Internal Revenue Code and Treasury Regulations Section 1.382-2T(a)(1), except that for purposes of determining whether 5-percent shareholders have increased their percentage interests by more than 50 percentage points, there shall be added to the increase in their percentage interests an amount equal to a fraction, the numerator of which is the value of the Stock representing the increase in percentage points, and the denominator of which is the value of all of the Stock. For example, if the value of the Stock is $1,000,000,000 and the percentage increase by 5-percent shareholders is 49.5% (i.e., the value of the Stock representing the 49.5 percentage point increase is $495,000,000), for purposes of determining whether there is an ownership change, there shall be added to the 49.5 percentage points an increase of 0.5 percent (i.e., $50,000,000/$1,000,000,000).

(10) **Other Permitted Holders.** Any Person, other than an Effective Date Tier Entity or a Permitted Transferee, which has a Prohibited Ownership Percentage permitted under Section I, whether pursuant to a waiver under Paragraph D of Section I or otherwise.

(11) **Permitted Transferee.** Any transferee with a Prohibited Ownership Percentage as to which the Board of Directors has consented pursuant to subparagraph C(2) or C(3) of Section I.

(12) **Person.** Any individual, corporation, estate, trust, association, company, partnership, joint venture, or similar organization, or any other entity described in Treasury Regulations Section 1.382-3(a)(1)(i).

(13) **Prohibited Ownership Percentage.** Any ownership in the Company that would cause a Person or Public Group to be a "5-percent shareholder" of the Company within the meaning of Treasury Regulations Section 1.382-2T(g)(1)(i) or (ii). For this purpose, whether a Person or Public Group would be a "5-percent shareholder" shall be determined (u) by substituting "4.5 percent" for "5 percent" each place it appears in such provisions, (v) without giving effect to the following provisions: Treasury Regulations Sections 1.382-2T(g)(2), 1.382-2T(g)(3), 1.382-2T(h)(2)(iii) and 1.382-2T(h)(6)(iii),

- 55 -

197

(w) by treating every Person or Public Group which owns Stock, whether directly or by attribution, as directly owning such Stock notwithstanding any further attribution of such Stock to other Persons and notwithstanding Treasury Regulations Section 1.382-2T(h)(2)(i)(A), (x) by substituting the term "person" in place of "individual" in Treasury Regulations Section 1.382-2T(g)(1)(i), (y) by taking into account ownership of Stock at any time during the "testing period" as defined in Treasury Regulations Section 1.382-2T(d)(1), and (z) by treating each day during the testing period as if it were a "testing date" as defined in Treasury Regulations Section 1.382-2T(a)(2)(i). In addition, for the purpose of determining whether any Person or Public Group has a Prohibited Ownership Percentage as of any date, the definition of Stock set forth in Subparagraph A(15) of Section I shall be applied in lieu of the definition in Treasury Regulations Section 1.382-2T(f)(18), except that any option shall be treated as Stock only to the extent treating it as Stock would cause an increase in ownership of such Person and such option would be deemed exercised pursuant to Treasury Regulations in effect from time to time (disregarding whether treating such option as exercised would cause an ownership change).

(14) Public Group. A "public group" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T(f)(13), excluding any "direct public group" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T(j)(2)(ii).

(15) Stock. All classes of stock of the Company, all options to acquire stock of the Company and all other interests that would be treated as stock in the Company pursuant to Treasury Regulations Section 1.382-2T(f)(18)(iii), other than (x) stock described in Section 1504(a)(4) of the Internal Revenue Code and (y) stock that would be described in such Section 1504(a)(4) but is not so described solely because it is entitled to vote as a result of dividend arrearages. As used in Article Eleventh, the term "option" shall have the meaning set forth in Treasury Regulations Section 1.382-2T(h)(4).

(16) Tax Benefits. The net operating loss carryovers and capital loss carryovers to which the Company is entitled under the Internal Revenue Code, free of restrictions under Section 382 of the Internal Revenue Code.

(17) Testing Date Action. Any Transfer or acquisition of Stock or any other action (including the acquisition or issuance of an option to Transfer or acquire Stock), if the effect of such Transfer, acquisition or other action would be to cause a "testing date" with respect to the Company within the meaning of Treasury Regulations Section 1.382-2T(a)(2)(i), determined by treating every Person and Public Group which has

198

a Prohibited Ownership Percentage as a 5-percent shareholder as used in such Section.

(18) **Transfer.** Any means of conveyance of legal or beneficial ownership of Stock, whether such ownership is direct or indirect, voluntary or involuntary, including, without limitation, an indirect transfer of ownership through the transfer of any ownership interest of any entity that owns Stock.

(19) **Transferee Undertaking.** A duly executed written undertaking for the benefit of the Company by any transferee pursuant to which the transferee agrees that (i) it will not take any of the following actions without the prior consent of the Board of Directors: (x) acquire any additional Stock, (y) Transfer any Stock in violation of Paragraph B of Section I, or (z) take or cause to be taken any Testing Date Action, (ii) upon request by the Company, it will furnish or cause to be furnished to the Company all certificates representing Stock held of record or beneficially, directly or indirectly, by it or by any Person controlling, controlled by or under common control with it for the purpose of placing a legend on such certificates to reflect the undertakings described in clause (i) above, (iii) it acknowledges that stop transfer orders may be entered with the transfer agent (or agents) and the registrar (or registrars) of Stock against the transfer of Stock subject to the undertakings described in clause (i) above except in compliance with the requirements of such undertakings, and (iv) it will agree to such other actions and remedies as the Company may reasonably request in order to preserve the Tax Benefits.

(20) **Treasury Regulations.** The regulations promulgated by the Secretary of the Treasury under the Internal Revenue Code. Any reference to a particular Treasury Regulation or Section or provision thereof shall be deemed to also refer to any successor Regulation or Section or provision having similar effect.

B. **Transfer Restrictions.**

Unless otherwise consented to or waived by the Board of Directors, the following Transfers and actions shall be prohibited:

(1) **General.** No Person shall Transfer any Stock to any other Person to the extent that such Transfer, if effected, (i) would cause the transferee or any Person or Public Group to have a Prohibited Ownership Percentage, or (ii) would increase the ownership percentage of any transferee or any Person or Public Group having a Prohibited Ownership Percentage.

- 57 -

199

(2) **Effective Date Tier Entities.** In addition to the restrictions under Subparagraph B(1), (i) no Effective Date Tier Entity shall Transfer any Stock, and no other Person shall Transfer any Stock to an Effective Date Tier Entity if, in either case, after such Transfer, there would be a 47 Percentage Point Increase, and (ii) no Effective Date Tier Entity shall take any other action (including the acquisition or issuance of an option to Transfer or acquire Stock) if, after such action, there would be a 47 Percentage Point Increase.

(3) **Additional Restrictions on Transfers Involving Other Permitted Holders.** In addition to the restrictions under Subparagraph B(1), (i) no other Permitted Holder shall Transfer any Stock, and no other Person shall Transfer any Stock to an Other Permitted Holder, if, in either case, such Transfer would constitute a Testing Date Action, and (ii) no Other Permitted Holder shall take any other action that would constitute a Testing Date Action.

(4) **Additional Restrictions under Transferee Undertakings.** In addition to the restrictions under Subparagraph B(1), (i) no Person who has delivered a Transferee Undertaking shall Transfer any Stock, and no Person shall Transfer any Stock to any Person who has delivered a Transferee Undertaking, if, in either case, such Transfer would result in a violation of such Transferee Undertaking, and (ii) no Person who has delivered a Transferee Undertaking, shall take or cause to be taken any other action that would constitute a Testing Date Action.

(5) **Exception.** Notwithstanding anything herein to the contrary, the transfer restrictions set forth in this Paragraph B shall not apply to any shares of Series D Stock of the Company which were issued and outstanding on the Article Eleventh Effective Date.

C. **Permitted Transfers.**

(1) **General.** Unless otherwise restricted under other agreement, Transfers of Stock may be made without the consent of the Board of Directors.

(2) **Transfers by Effective Date Tier Entities.** Upon petition by any Effective Date Tier Entity, the Board of Directors shall consent to a proposed Transfer of Stock that complies with Subparagraph B(2) of Section I but would otherwise be prohibited pursuant to Subparagraph B(1) of Section I if it determines that (i) after giving effect to such Transfer, the percentage of Stock owned by all Persons and Public Groups with a Prohibited Ownership Percentage will not have increased by more than 40 percentage points over the

lowest percentage of Stock owned by such Persons and Public Groups at any time during the three-year period preceding the proposed date of such Transfer (such determination to be made in accordance with the provisions of Treasury Regulations Section 1.382-2T(c)) and (ii) the proposed transferee shall have delivered a Transferee Undertaking.

(3)   **Transfers by Permitted Transferees.**  Upon petition by any Permitted Transferee, the Board of Directors shall consent to a proposed Transfer of Stock or Testing Date Action that would otherwise be prohibited pursuant to Subparagraph B(1) or B(4) of Section I or pursuant to any Transferee Undertaking if it determines that (i) after such proposed Transfer or Testing Date Action there would not be an Ownership Change and (ii) in the case of any such proposed Transfer that, if effected, would otherwise be prohibited under Subparagraph B(1) of Section I, such Transfer would otherwise be permitted under Subparagraph C(2) if such Transfer were proposed to be made by an Effective Date Tier Entity.

(4)   **Certain   Additional   Transfers   to   Permitted Transferees.**  Upon petition by any Permitted Transferee, the Board of Directors shall consent to a proposed Transfer of additional Stock to such Permitted Transferee from a Person constituting an Effective Date Tier Entity or another Permitted Transferee if it determines that such proposed Transfer would otherwise be permitted under Subparagraph C(2) or C(3) of Section I, as the case may be.

(5)   **Transfers by Other Permitted Holders.**  Upon petition by any other Permitted Holder, the Board of Directors shall consent to a proposed Transfer of Stock or Testing Date Action that would otherwise be prohibited pursuant to Subparagraph B(1), B(3) or B(4) of Section I or pursuant to any Transferee Undertaking if it determines that (i) after such proposed Transfer or Testing Date Action there would not be an Ownership Change and (ii) in the case of any such proposed Transfer that, if effected, would otherwise be prohibited under Subparagraph (B)(1) of Section I, such Transfer would not cause a .47 Percentage Point Increase and the proposed transferee shall have delivered a Transferee Undertaking.

D.   **Waiver.**   Notwithstanding anything herein to the contrary, the Board of Directors may waive any of the restrictions contained in Paragraph B of Section I of this Article Eleventh: (1) in the case of any issuance of Stock by the Company which would otherwise be prohibited under Subparagraph B(1) of Section I if the transferee agrees to be bound to the restrictions applicable to Permitted Transferees; (2) in the event of a tender or exchange offer within the meaning of the Securities Exchange Act of 1934, as amended, to acquire Stock constituting more than fifty percent in value of the outstanding Common Stock of the Company, so long as

- 59 -

201

such waiver shall apply to all Transfers pursuant to such tender or exchange offer; (3) in connection with any Transfers of Stock in connection with underwritten offerings of such Stock; (4) in connection with any investment in or acquisition of a business or any business combination involving the Company or any subsidiary of the Company; and (5) in any other instance in which the Board of Directors reasonably and in good faith determines that a waiver would be in the best interests of the Company.

II. **Attempted Transfer in Violation of Transfer Restrictions.**

Unless the consent or waiver of the Board of Directors is obtained as provided in Paragraph C or D of Section I, and except as provided in Paragraph C of Section II below, any attempted Transfer of shares of Stock of the Company in excess of the shares that could be Transferred to the transferee without restriction under Paragraph B of Section I is not effective to transfer ownership of such excess shares (the "Prohibited Shares") to the purported acquiror thereof (the "Purported Acquiror"), and the Purported Acquiror shall not be entitled to any rights as a shareholder of the Company with respect to the Prohibited Shares, including, without limitation, the right to vote or to receive dividends with respect thereto. Nothing contained in this Article Eleventh shall preclude the settlement of any transaction involving Stock entered into through the facilities of the New York Stock Exchange or any other national securities exchange. The application of the provisions and remedies described in the first sentence of this Section II and in Paragraphs A, B and C of Section II below shall be deemed not to so preclude any such settlement. Paragraphs A, B and C below shall apply only in the case of violations of the restrictions contained in Subparagraph B(1) of Section I.

A. **Transfer of Certificates; Sale of Stock.** Upon demand by the Company, the Purported Acquiror shall transfer any certificate or other evidence of purported ownership of the Prohibited Shares within the Purported Acquiror's possession or control, together with any dividends or other distributions paid by the Company with respect to the Prohibited Shares that were received by the Purported Acquiror (the "Prohibited Distributions"), to an agent to be designated by the Company (the "Agent"). If the Purported Acquiror has sold the Prohibited Shares to an unrelated party in an arms-length transaction after purportedly acquiring them, the Purported Acquiror shall be deemed to have sold the Prohibited Shares for the Agent, and in lieu of transferring the Prohibited Shares and Prohibited Distributions to the Agent shall transfer to the Agent the Prohibited Distributions and the proceeds of such sale (the "Resale Proceeds") except to the extent that the Agent grants written permission to the Purported Acquiror to retain a portion of the Resale Proceeds not exceeding the amount that would have been payable by the Agent to the Purported Acquiror pursuant to Paragraph B of Section II if the Prohibited Shares had been sold by the Agent rather than by the Purported Acquiror. Any purported

- 60 -

Transfer of the Prohibited Shares by the Purported Acquiror, other than a transfer described in one of the two preceding sentences (unless such transfer itself violated the provisions of Article Eleventh), shall not be effective to transfer any ownership of the Prohibited Shares.

B.    Allocation and Distribution of Proceeds. The Agent shall sell in an arms-length transaction (through the New York Stock Exchange, if possible) any Prohibited Shares transferred to the Agent by the purported Acquiror, and the proceeds of such sale (the "Sales Proceeds"), or the Resale Proceeds, if applicable, shall be allocated to the Purported Acquiror up to the following amount: (1) where applicable, the purported purchase price paid or value of consideration surrendered by the purported Acquiror for the Prohibited Shares and (2) where the purported Transfer of the Prohibited Shares to the Purported Acquiror was by gift, inheritance, or any similar purported transfer, the fair market value of the Prohibited Shares at the time of such purported Transfer. Any Resale Proceeds or Sales Proceeds in excess of the amount allocable to the Purported Acquiror pursuant to the preceding sentence, together with any Prohibited Distributions (such excess amount and Prohibited Distributions are collectively the "Subject Amounts"), shall be transferred to an entity designated by the Company that is described in Section 501(c)(3) of the Internal Revenue Code (the "Designated Charity"). In no event shall any such Prohibited Shares or Subject Amounts inure to the benefit of the Company or the Agent, but such Subject Amounts may be used to cover expenses incurred by the Agent in performing its duties.

C.    Limitation on Enforceability. Notwithstanding anything herein to the contrary, with respect to any Transfer of Stock which would cause a Person or Public Group (the "Prohibited Party") to violate a restriction provided for in Subparagraph B(1) of Section I only on account of the attribution to the Prohibited Party of the ownership of Stock by a Person or Public Group which is not controlling, controlled by or under common control with the Prohibited Party, which ownership is nevertheless attributed to the Prohibited Party, Subparagraph B(1) of Section I shall not apply in a manner that would invalidate such Transfer. In such case, the Prohibited Party and any Persons controlling, controlled by or under common control with the Prohibited Party (collectively, the "Prohibited Party Group") shall automatically be deemed to have disposed of, and shall be required to dispose of, sufficient shares of Stock (which shares shall consist only of shares held legally or beneficially, whether directly or indirectly, by any member of the Prohibited Party Group, but not shares held through another Person, other than shares held through a Person acting as agent or fiduciary for any member of the Prohibited Party Group, and which shares shall be disposed of in the inverse order in which they were acquired by members of the Prohibited Party Group) to cause the Prohibited Party, following such disposition, not to be in violation of Subparagraph B(1) of Section I; provided that in the event no member of the Prohibited Party Group (i) is an Effective

- 61 -

203

Date Tier Entity, Permitted Transferee or Other Permitted Holder and (ii) had any actual knowledge that such Transfer was prohibited under Subparagraph B(1) of Section I, such disposition shall only be effected to the extent necessary in order to prevent an Ownership Change. Such disposition shall be deemed to occur simultaneously with the Transfer giving rise to the application of this provision, and such number of shares which are deemed to be disposed of shall be considered Prohibited Shares and shall be disposed of through the Agent as provided in Paragraph B of Section II, except that the maximum amount payable to the Prohibited Party in connection with such sale shall be the fair market value of the Prohibited Shares at the time of the Prohibited Transfer.

D.   _Other Remedies_.  In the event that the Board of Directors determines that a Person proposes to take any action in violation of Paragraph B of Section I, or in the event that the Board of Directors determines after the fact that an action has been taken in violation of Paragraph B of Section I, the Board of Directors, subject to the second and third sentences of the introductory paragraph of Section II, may take such action as it deems advisable to prevent or to refuse to give effect to any Transfer or other action which would result, or has resulted, in such violation, including, but not limited to, refusing to give effect to such Transfer or other action on the books of the Company or instituting proceedings to enjoin such Transfer or other action. If any Person shall knowingly violate Paragraph B of Section I, then that Person and all other Persons controlling, controlled by or under common control with such Person shall be jointly and severally liable for, and shall pay to the Company, such amount as will, after taking account of all taxes imposed with respect to the receipt or accrual of such amount and all costs incurred by the Company as a result of such loss, put the Company in the same financial position as it would have been in had such violation not occurred.

III.   _Prompt Enforcement Against Purported Acquiror_.

Within 30 business days of learning of a purported Transfer of a Prohibited Shares to a Purported Acquiror or a Transfer of Stock to Assistant Secretary, the Company through its Secretary or any Prohibited Party shall demand that the Purported Acquiror or representing the Prohibited Shares, or any Resale Proceeds, and any Prohibited Distributions, and if such surrender is not made by the Purported Acquiror or Prohibited Party within 30 business days from the date of such demand, the Company shall institute legal proceedings to compel such surrender; provided, however, that nothing in this Section III shall preclude the Company in its discretion from immediately bringing legal proceedings without a prior demand, and also provided that failure of the Company to act within the time periods set out in this Section III shall not constitute a waiver of any right of the Company to compel any transfer required by Section II. Upon a determination by the Board

- 62 -

204

of Directors that there has been or is threatened a purported
Transfer of Prohibited Shares to a Purported Acquiror or a Transfer
of Stock to a Prohibited Party or any other violation of
Paragraph B of Section I, the Board of Directors may authorize such
additional action as it deems advisable to give effect to the
provisions of this Article Eleventh, including, without limitation,
refusing to give effect on the books of the Company to any such
purported Transfer or instituting proceedings to enjoin any such
purported Transfer.

IV.    Obligation to Provide Information.

The Company may require as a condition to the registration of
the Transfer of any Stock that the proposed transferee furnish to
the Company all information reasonably requested by the Company
with respect to all the direct or indirect ownership of Stock by
the proposed transferee and by Persons controlling, controlled by
or under common control with the proposed transferee.

V.    Legends.

All certificates evidencing Stock that is subject to the
restrictions on transfer set forth in this Article Eleventh shall
bear a conspicuous legend referencing such restrictions.

VI.    Further Actions.

Subject to the second and third sentences of the introductory
paragraph of Section II, nothing contained in this Article Eleventh
shall limit the authority of the Board of Directors to take such
other action to the extent permitted by law as it deems necessary
or advisable to protect the Company and the interests of the
holders of its securities in preserving the Tax Benefits. Without
limiting the generality of the foregoing, in the event of a change
in law (including applicable regulations) making one or more of the
following actions necessary, in the case of actions described in
clauses (B), (C) and (D) below, or desirable, in the case of
actions described in clause (A) below, the Board of Directors may
(A) accelerate the Expiration Date, (B) extend the Expiration Date,
(C) conform any terms or numbers set forth in the transfer
restrictions in Section I to make such terms consistent with the
Internal Revenue Code and the Treasury Regulations following any
changes therein to the extent necessary to preserve the Tax
Benefits, or (D) conform the definitions of any terms set forth in
this Article Eleventh to the definitions in effect following such
change in law; provided that the Board of Directors shall determine
in writing that such acceleration, extension, change or
modification is reasonably necessary to preserve the Tax Benefits
or that the continuation of these restrictions is no longer
reasonably necessary for the preservation of the Tax Benefits,
which determination shall be based upon an opinion of legal counsel
to the Company and which determination shall be filed with the
Secretary of the Company and mailed by the Secretary to all

stockholders of the Company within ten days after the date of any such determination.

VII. Severability.

If any provision of this Article Eleventh or the application of any such provision to any Person or under any circumstance shall be held invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Article Eleventh.

- 64 -

APPENDIX B-4

REGISTRATION RIGHTS

1.    Demand Registrations.

(a)    Requests for Registration. At any time and from time to time after the Event Date, but subject to the provisions of this Appendix B-4, the Supplemental Benefit Committee may request registration (a "Registration Request") under the Securities Act of Registrable Securities on Form S-1 or any similar long-form registration statement ("Long-Form Registrations") or on Form S-2 or S-3 or any similar short-form registration statement ("Short-Form Registrations"), if available (any such registration, a "Demand Registration"). All offerings of securities pursuant to Demand Registrations shall be underwritten public offerings, except as provided in Section 1(i) below. Each Registration Request shall specify the approximate number of Registrable Securities requested to be registered and the anticipated per share price range, if applicable. Any Demand Registration may provide for offerings to be made on a continuous or delayed basis under Rule 415 under the Securities Act (such Rule, together with any successor or comparable rule, "Rule 415"), if (i) so specified in the related Registration Request and permitted by applicable rules and regulations under the Securities Act, and (ii) such Demand Registration is made as a Short-Form Registration (a "Rule 415 Demand Registration"). Each Rule 415 Demand Registration and any underwritten public offering thereunder closed within 90 days of the effectiveness of the registration statement filed pursuant to the related Registration Request shall be deemed a single Demand Registration, and each additional underwritten public offering made under such Rule 415 Registration Statement shall be deemed an additional Demand Registration (and each request for such additional Demand Registration shall be deemed an additional Registration Request). No such offering closed under a Rule 415 Demand Registration after the 90-day period referred to in the preceding sentence shall count as one of the five Demand Registrations for which Parent is required to pay Registration Expenses in accordance with Section 1(g), unless the Supplemental Benefit Committee shall so instruct Parent in the related Registration Request.

(b)    Long-Form Registrations. The aggregate value of any Registrable Securities to be sold in a public offering under any Long-Form Registration must equal at least $10,000,000, based on the anticipated per share price set out in the related Registration Request.

(c)    Short-Form Registrations. The aggregate value of the Registrable Securities requested to be registered in any Short-Form Registration must equal at least $5,000,000, based on the anticipated per share price set out in the related Registration Request.

207

(d)    Restrictions on all Demand Registrations.

(i)    Parent will not be obligated to effect any Demand Registration within 180 days after the closing of an underwritten public offering pursuant to any previous Parent Registration or Demand Registration (or such shorter period to which the lead underwriter(s) under such previous Parent Registration or Demand Registration shall consent). As used herein, "Parent Registration" shall mean any underwritten public offering of equity securities of Parent or any of its subsidiaries, other than Permitted Parent Registrations.

(ii)    Upon the occurrence and during the continuance of any Blackout Period, Parent shall postpone the filing or effectiveness of any registration statement otherwise required to be prepared and filed by Parent pursuant to any Demand Registration, and the Supplemental Benefit Trust shall not sell any Registrable Securities previously registered on its behalf under a Demand Registration.

At any time during the continuance of a Blackout Period, the Supplemental Benefit Committee shall have the right by written notice to Parent to withdraw any Registration Request and related Demand Registration pursuant to which Parent would otherwise be required to prepare and file a registration statement or under which the Supplemental Benefit Trust would otherwise be permitted to offer Registrable Securities to the public. In the event of such withdrawal, such Demand Registration shall not be counted for purposes of determining the number of Demand Registrations for which Parent is required to pay the Registration Expenses pursuant to Section 1(g), and Parent will pay or reimburse the Supplemental Benefit Trust for all Registration Expenses incurred in connection with such Demand Registration. In the event the Supplemental Benefit Committee terminates a proposed underwritten offering under a Rule 415 Demand Registration for which Parent is not required to pay the Registration Expenses (in accordance with Section 1(a)) during a Blackout Period, Parent will pay or reimburse the Supplemental Benefit Trust for all of the expenses of such proposed underwritten offering.

(e)    Parent Registrations. Notwithstanding any other provision of this Appendix B-4, at any time, and from time to time, Parent and its subsidiaries may undertake an unlimited number of registrations under the Securities Act of (A) their debt securities for any reason; (B) their equity securities in connection with an acquisition, merger, consolidation, tender offer, corporate reorganization, exchange offer, or similar transaction involving Parent or any of its subsidiaries; (C) their equity securities in connection with any registration on Form S-8 or any successor form; (D) their equity securities in connection with the settlement of litigation or threatened litigation; provided, that neither Parent nor any of its subsidiaries shall register more than 10 million shares of its equity securities with respect to any such settlement; (E) Parent's equity securities in connection with the exercise of warrants outstanding on the Effective Date; and (F) equity securities of any of Parent's subsidiaries, other than the Company, in connection with any public offering of such securities (collectively, "Permitted Parent Registrations"). After the expiration of the Window Period, Parent and its subsidiaries may undertake an

- 2 -

208

unlimited number of registrations of their securities under the Securities Act for any purpose, subject only to Section 2.

(f)    Certain Limitations on Registrations by Parent. During the Window Period. During the Window Period, Parent shall not, and shall not permit any of its subsidiaries to, (i) register any equity securities under the Securities Act, other than pursuant to Demand Registrations or registrations to which the Supplemental Benefit Committee has consented under Sections 8 or 9, or (ii) sell any equity securities registered prior to the commencement of the Window Period, except, in both such cases, pursuant to Permitted Parent Registrations.

(g)    Demand Registration Expenses.    Parent shall pay all Registration Expenses incurred in connection with the first five Demand Registrations; provided, that for each of the second through the fifth of such Demand Registrations, Parent shall not be required to pay any fees of counsel to the Supplemental Benefit Committee in excess of $50,000 per Demand Registration; and, provided, further, that Parent shall not be required to pay SEC filing fees in connection with such five Demand Registrations for more than the aggregate number of shares of Parent Class B Common into which the aggregate number of shares of Parent Class B Common held by the Supplemental Benefit Trust may be converted (plus fees in respect of not more than the aggregate number or amount, if any, of any other Registrable Securities held by the Supplemental Benefit Trust). The Supplemental Benefit Trust shall pay all Registration Expenses for each Demand Registration after such first five Demand Registrations.

(h)    Selection of Underwriters.    The Supplemental Benefit Committee shall have the right to select its counsel and, in connection with any underwritten public offering, the investment bankers and underwriters under any Demand Registration; provided, however, that the lead underwriter(s) in any such underwritten public offering shall be among the top ten underwriting firms, by dollar volume of equity offerings in which such firms acted as lead underwriters, determined on the basis of the most recently available information; provided, further, that in the event no such top underwriting firm will agree to act as lead underwriter, the Supplemental Benefit Committee will select one or more nationally recognized firms as its lead underwriter(s); and provided, further, that in selecting its underwriters and counsel in connection with any such underwritten public offering, the Supplemental Benefit Committee shall give due consideration to the cost savings and efficiencies which may arise from using the same underwriters and counsel, respectively, in connection with each other Demand Registra- tion for which Parent is required to pay Registration Expenses pursuant to Section 1(g) and shall consult with Parent prior to changing such underwriters or counsel in connection with any such Demand Registration.

(i)    Market Offerings. In addition to underwritten public offerings, the Supplemental Benefit Trust may make Market Offerings under any Rule 415 Demand Registration. Until the Piggyback Rights Revision Date, the Supplemental Benefit Trust shall not make Market Offerings, whether under a Rule 415 Demand Registration or in

- 3 -

reliance on Rule 144 under the Securities Act or otherwise (such offerings and any related sales, collectively, "Trust Market Offerings"), where the aggregate number of shares sold pursuant to Trust Market Offerings in any three-month period would exceed the amounts permitted under Rule 144(e), assuming for such purpose that all Trust Market Offerings were made under Rule 144 and that the Supplemental Benefit Trust was an "affiliate" of Parent within the meaning of Rule 144. As used herein, the term "Market Offerings" shall mean any offering or sale of securities into an existing trading market for outstanding securities of the same class either (x) on or through the facilities of a national securities exchange or the NASD National Market System or (y) to or through a market maker otherwise than on an exchange, but not including any private placement transaction.

2. Registrations After the Window Period.

(a) Parent Initiated Registrations. After the expiration of the Window Period, Parent shall notify the Supplemental Benefit Committee in writing if it desires to register any Parent Common under the Securities Act in connection with a public underwriting offering (a "Parent Registration Notice"), other than in connection with a Permitted Parent Registration, as to which no notice shall be required; provided, that Parent shall not give a Parent Registration Notice during the Supplemental Benefit Trust's Registration Period or the period referred to in Section 2(a)(ii) below. Each Parent Registration Notice shall set out (x) the number of shares which Parent proposes to sell in such offering, (y) the estimated per share price range and (z) the estimated number of shares of Parent Common which could be included in such offering without adversely affecting the marketability thereof, as determined by Parent's lead underwriter(s) (which shall be nationally recognized investment banking firm(s)).

(i) Parent shall have the exclusive right to attempt to close the offering described in any Parent Registration Notice within 90 days of the date thereof (the "Parent's 90 Day Period"), and Parent will not be obligated to effect any Demand Registration, and the Supplemental Benefit Trust will not offer or sell any Parent Common Equity in an underwritten public offering (except as provided in Section 2(a)(iii)) or make any Trust Market Offerings, during Parent's 90 Day Period, and if Parent closes any such offering, during a further period of 180 days after such closing or such shorter period to which the lead underwriter(s) under such offering shall consent in writing (the "Parent's Standstill Period;" the Parent's 90 Day Period and the Parent's Standstill Period, collectively, the "Parent's Registration Period").

(ii) If Parent or any of its subsidiaries closes an offering pursuant to Section 2(a)(i), Parent shall not be entitled to give any further notice pursuant to Section 2(a) for the period beginning on the expiration of the Parent's Registration Period and ending 90 days thereafter, during which 90-day period the Supplemental Benefit Committee shall have the exclusive right to make a Registration Request.

(iii) The Supplemental Benefit Committee shall have the right, upon written notice to Parent (a "Piggyback Notice"), which notice shall be given

- 4 -

210

within 15 business days after receipt of the Parent's Registration Notice, to include in the offering described in such Parent's Registration Notice such number of shares of Parent Common Equity as are specified in such Piggyback Notice, up to a number of shares equal to the greater of (x) the total available capacity of the offering as finally determined by Parent's lead underwriter(s), less the number of shares of Parent Common Equity which Parent finally determines to sell in the offering or (y) one-half of such total available capacity. For purposes of determining the number of shares it desires to include in such offering, the Supplemental Benefit Committee shall be entitled to have a representative be present at (but not to participate in) any pricing meeting. Any registration initiated by Parent pursuant to a Parent Registration Notice as to which the Supplemental Benefit Trust has elected to participate pursuant to this Section 2(a)(iii) is herein a "Parent Initiated Piggyback Registration."

(b)    Supplemental Benefit Trust Initiated Registrations. After the expiration of the Window Period, any Registration Request made by the Supplemental Benefit Committee in connection with a public underwritten offering shall set out (x) the number of shares which the Supplemental Benefit Trust proposes to sell in such offering, (y) the estimated per share price range, and (z) the number of shares of Parent Common which could be included in such offering without adversely affecting the marketability thereof, as determined by the Supplemental Benefit Trust's lead underwriter(s) (a "Post-Window Period Registration Request"); provided, that the Supplemental Benefit Committee shall not make any Post-Window Period Registration Request during (x) the Parent's Registration Period, (v) the period referred to in Section 2(b)(ii) below, or (ii) the period beginning on the expiration of the Window Period and ending 90 days after the later of (A) the expiration of the Window Period or (B) the expiration of 180 days after the closing of the last underwritten public offering made pursuant to a Demand Registration during the Window Period (or such shorter period to which the lead underwriters under such offering shall consent).

(i)    The Supplemental Benefit Committee shall have the exclusive right to attempt to close the offering described in any Post-Window Period Registration Request within 90 days of the date thereof (the "Supplemental Benefit Trust's 90 Day Period"), and Parent, except as otherwise provided in this Section 2(b), will not (x) register any public offering of Parent Common Equity under the Securities Act or (y) offer or sell in any public offering any Parent Common Equity previously registered by it pursuant to Rule 415 (in both such cases, other than pursuant to Permitted Parent Registrations) during the Supplemental Benefit Trust's 90 Day Period, and if the Supplemental Benefit Committee closes any such offering, during a further period of 180 days after such closing or such shorter period to which the lead underwriters under such offering shall consent in writing (the "Supplemental Benefit Trust's Standstill Period," the Supplemental Benefit Trust's 90 Day Period and the Supplemental Benefit Trust's Standstill Period, collectively, the "Supplemental Benefit Trust's Registration Period").

(ii)    If the Supplemental Benefit Committee closes an offering pursuant to Section 2(b), the Supplemental Benefit Committee shall not be entitled to give

- 5 -

211

Parent a Post-Window Period Registration Request for the period beginning on the expiration of the Supplemental Benefit Trust's Registration Period and ending 90 days thereafter, during which 90 day period Parent shall have the exclusive right to give a Parent Registration Notice.

(ii)      Parent shall have the right, upon written notice to the Supplemental Benefit Committee, which notice shall be given within 15 business days after the receipt of a Post-Window Period Registration Request, to include in any public offering under a Post-Window Period Registration Request such number of shares of Parent Common Equity as are specified in such notice, up to a number of shares equal to the greater of (x) the total available capacity of the offering as finally determined by the Supplemental Benefit Trust's lead underwriter(s), less the number of shares of Parent Common Equity which the Supplemental Benefit Committee finally determines to sell in such offering, or (y) one-half of such total available capacity.  For purposes of determining the number of shares it desires to include in such offering, Parent shall be entitled to have a representative present at (but not to participate in) any pricing meeting. Any registration initiated by the Supplemental Benefit Committee pursuant to a Post-Window Period Registration Request as to which the Parent has elected to participate in the offering pursuant to this Section 2(b)(iii) is herein a "Supplemental Benefit Trust Initiated Piggyback Registration." (Parent Initiated Piggyback Registrations and Supplemental Benefit Trust Initiated Piggyback Registrations are, collectively, "Piggyback Registrations.")

(c)      Piggyback Registration Expenses. Subject to Section 1(g), the party that initiates a Piggyback Registration shall pay all Registration Expenses of such Piggyback Registration; provided, that each party participating in such Piggyback Registration shall pay its pro rata share of SEC and State "blue sky" filing fees and its pro rata share of any and all underwriters' discounts and commissions.

(d)      Selection of Underwriters.  In the case of a Parent Initiated Piggyback Registration, the selection of investment bankers and underwriters (including lead underwriters) for the offering will be made by Parent. In the case of a Supplemental Benefit Trust Initiated Piggyback Registration, the selection of the investment banker(s) and underwriters (including lead underwriters) shall be made in accordance with Section 1(h).

(e)      Revised Piggyback Rights.  At such time (the "Piggyback Rights Revision Date") as both (i) at least three years have passed since the Supplemental Benefit Trust acquired (as such term is used in Rule 144 of the Securities Act) the Registrable Securities and (ii) either (A) the Supplemental Benefit Trust owns, directly and indirectly, less than 5 percent of the total issued and outstanding Parent Common Equity, or (B) Parent shall have furnished the Supplemental Benefit Committee with an opinion of counsel to Parent knowledgeable in securities law matters to the effect that the Supplemental Benefit Committee is not an "affiliate" of Parent (as such term is defined under Rule 144 of the Securities Act) and has not been such an affiliate for the

preceding three months (it being understood that it is within the sole discretion of Parent as to whether or not to obtain such an opinion); then the provisions set forth in Sections 2(a)(ii) and 2(b) above and any other provisions in Section 2(a) which restrict Parent's ability to initiate and file registrations and sell securities at any time shall terminate and the number of Registrable Securities that the Supplemental Benefit Committee shall be entitled to include in any Parent Initiated Piggyback Registration shall be limited to the amount described in clause (x) of the first sentence of Section 2(a)(iii).

3.   Holdback Agreements.  In connection with each other's underwritten public offerings, the Supplemental Benefit Trust and Parent each agree to enter into such reasonable and customary restrictions on the sale or distribution (including sales pursuant to Rule 144) of Parent's equity securities as may be requested by the underwriters managing such registered public offering.

4.   Registration Procedures.   Whenever   the   Supplemental   Benefit Committee requests that any offering of Registrable Securities be registered pursuant to this Appendix B-4, Parent will use its best efforts to effect the registration of such offering in accordance with the intended method of disposition thereof, and pursuant thereto Parent will as expeditiously as possible:

(a)   prepare and file with the SEC a registration statement with respect to such Registrable Securities in cooperation with the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, and use its best efforts to cause such registration statement to become effective (provided that before filing such registration statement or prospectus or any amendments or supplements thereto (other than any amendment or supplement in connection with any filing incorporated by reference into such registration statement or prospectus), Parent will furnish to the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, copies of such registration statement and all such other documents proposed to be filed);

(b)   in cooperation with the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith (other than with respect to any amendment or supplement in connection with any filing incorporated by reference into such registration statement or prospectus) as may be necessary to keep such registration statement effective until the completion of the disposition of the Registrable Securities to be sold thereunder or so long thereafter as a dealer is required to deliver a prospectus in connection with the offer or sale of any such securities;

(c)   comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition;

- 7 -

213

(d)     furnish to the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus) and such other documents as the Supplemental Benefit Committee may reasonably request in order to facilitate the disposition of the Registrable Securities in accordance with the intended methods of disposition;

(e)     use its best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as the Supplemental Benefit Committee reasonably requests and do any and all other acts and things as the Supplemental Benefit Committee may reasonably request in order to facilitate the disposition in accordance with the intended method of disposition in such jurisdictions of the Registrable Securities (provided that Parent will not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (ii) subject itself to taxation in any such jurisdiction, or (iii) consent to general service of process in any such jurisdiction);

(f)     cause all such Registrable Securities to be listed on each securities exchange and national market quotation system on which similar securities issued by Parent are then listed or quoted;

(g)     provide a transfer agent and registrar for all such Registrable Securities not later than the effective date of such registration statement and furnish, or cause to be furnished, to each purchaser of Registrable Securities registered pursuant to this Appendix B-4 a certificate or certificates for a number of shares of Parent Common equal to the number of shares of Registrable Securities so purchased in the name of such purchaser or in such other name as such purchaser may direct;

(h)     enter into such customary agreements (including, if applicable, underwriting agreements in customary form) and take all such other actions as the Supplemental Benefit Committee or its investment bankers and underwriters, if any, reasonably request in order to facilitate the disposition of such Registrable Securities (including, without limitation, effecting a stock split or a combination of shares);

(i)     make available for inspection by the Supplemental Benefit Committee and its counsel, any investment bankers and underwriters, if any, accountants and other agents retained by the Supplemental Benefit Committee, all financial and other records, pertinent corporate documents and properties of Parent and its subsidiaries, and cause the officers, directors, employees and independent accountants of Parent and its subsidiaries to supply all information reasonably requested by the Supplemental Benefit Committee and such counsel, investment bankers and underwriters, accountants or agents in connection with the preparation and filing of such registration statement and any amendment or supplement thereto;

- 8 -

and regulations of the SEC, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least 12 months beginning with the first day of Parent's first full fiscal quarter after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(k)    permit the Supplemental Benefit Committee and its counsel, investment bankers and underwriters, if any, accountants and agents, to participate in the preparation of such registration statement and to require the insertion therein of material concerning the Supplemental Benefit Trust and its plan of distribution furnished to Parent in writing, which in the reasonable judgment of the Supplemental Benefit Committee and its counsel should be included; Parent will consider insertion in the registration statement of additional material proposed by the Supplemental Benefit Committee, provided, however, that Parent will make all final decisions with respect to the content of the registration statement (other than with respect to information concerning the Supplemental Benefit Trust and the Plan of Distribution) and, provided, further, that in the event Parent declines to include any such additional material proposed by the Supplemental Benefit Committee and the Supplemental Benefit Committee shall have been advised by counsel, knowledgeable in securities laws (which counsel shall be reasonably satisfactory to Parent) to the effect that the failure to insert such material may present a material risk that the registration statement would be materially misleading or would omit to state a material fact, the Supplemental Benefit Committee shall have the right to require Parent to withdraw such registration statement, in which event Parent will pay, or reimburse the Supplemental Benefit Trust for all Registration Expenses incurred in connection with such registration statement, and such registration statement shall not count as one of the five Demand Registration Statements for which Parent is required to pay Registration Expenses as provided in Section 1(g).

(l)    in the event of the issuance of any stop order suspending the effectiveness of a registration statement, or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any Registrable Securities included in such registration statement for sale in any jurisdiction, use its reasonable best efforts promptly to obtain the withdrawal of such order;

(m)    obtain a cold comfort letter from Parent's independent public accountants and an opinion from Parent's counsel, in each case addressed to the Supplemental Benefit Committee in customary form and covering such matters of the type customarily covered by cold comfort letters and such legal opinions, respectively, as the Supplemental Benefit Committee may reasonably request; and

(n)    promptly notify the Supplemental Benefit Committee: (i) of the filing of any registration statement, any amendment or supplement thereto, any related prospectus and prospectus supplement and the effectiveness of such registration statement; (ii) of any request by the SEC for amendments or supplements to such

- 9 -

215

registration statement or the prospectus related thereto or for additional information; (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such registration statement or the initiation of any proceedings for that purpose; (iv) of the receipt by Parent of any notification with respect to the suspension of the qualification of any of the Registrable Securities for sale under the securities or blue sky laws of any jurisdiction or the initiation of any proceeding for such purpose; and (v) of the existence of any fact of which Parent becomes aware which results in such registration statement, the prospectus related thereto or any document incorporated therein by reference containing an untrue statement of a material fact or any document incorporated therein by reference required to be stated therein or necessary to make any statement therein in light of the circumstances under which they were made not misleading; and, in the case of the notification relating to an event described in clause (v) hereof, Parent, except in the case of a Blackout as to which notice has been given under Section 1(d)(ii), shall promptly prepare and furnish to the Supplemental Benefit Committee and each investment banker and underwriter participating in the disposition of Registrable Securities, a reasonable number of copies of a prospectus supplemented or amended (or, if the prospectus is supplemented or amended by means of a filing under the Exchange Act, Parent shall advise the Supplemental Benefit Committee of such filing and furnish it with copies thereof) so that, as thereafter delivered to the purchasers of any such securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein in the light of the circumstances under which they were made not misleading.

The Supplemental Benefit Committee shall cooperate with Parent in connection with, and shall take, or cause to be taken, all actions reasonably requested by Parent that are necessary or customary for Parent to effect the registration of any Registrable Securities of the Supplemental Benefit Trust pursuant to this Appendix B-4.

The Supplemental Benefit Committee hereby agrees that, upon receipt of any notice of Parent of the happening of (A) any event of the kind described in clause (iii) of Section 4(n), the Supplemental Benefit Trust will discontinue its disposition of Registrable Securities pursuant to the registration statement relating to such disposition of Registrable Securities, until the stop order shall have been lifted or rescinded; (B) any event of the kind described in Section 4(n)(iv), the Supplemental Benefit Trust will discontinue its disposition of Registrable Securities pursuant to the registration statement relating to such disposition of Registrable Securities in the jurisdiction with respect to which the suspension of the qualification of any of the Registrable Securities for sale has occurred, until the suspension shall have been lifted or rescinded; and (C) any event of the kind described in Section 4(n)(v), the Supplemental Benefit Trust will discontinue its disposition of Registrable Securities pursuant to the registration statement relating to such Registrable Securities until the Supplemental Benefit Committee's receipt of the copies of the supplemented or amended prospectus contemplated by Section 4(n)(v) and, if so directed by Parent, will deliver to Parent (at Parent's expense) all copies, other than permanent file copies, then in the Supplemental Benefit Committee or Supplemental Benefit Trust's possession of the prospectus relating to such Registrable Securities

- 10 -

216

current at the time of receipt of such notice. In the event Parent gives notice pursuant to Section 4(n)(iii) or 4(n)(v) and the stop order, in the case of Section 4(n)(iii), continues for more than 30 days after such notice, or Parent fails to supplement or amend the prospectus to cure any material untrue statement or material omission within 30 days after such notice, in the case of Section 4(n)(v), the Supplemental Benefit Committee may withdraw the Demand Registration and the related Registration Request in respect of the registration affected by such notice. In the event of such withdrawal, such Demand Registration shall not be counted for the purposes of determining the number of Demand Registrations for which Parent is required to pay the Registration Expenses pursuant to Section 1(G), and Parent will pay and reimburse the Supplemental Benefit Trust for all Registration Expenses incurred by the Supplemental Benefit Trust in connection with such Demand Registration.

5. Registration Expenses. For purposes of this Appendix B-4, "Registration Expenses" shall mean all expenses incurred by Parent or the Supplemental Benefit Committee in connection with a Demand Registration or a Piggyback Registration, including without limitation all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, messenger and delivery expenses, and fees and disbursements of counsel to Parent and the Supplemental Benefit Committee and all independent certified public accountants, investment bankers and other persons retained by or on behalf of Parent or the Supplemental Benefit Committee.

6. Indemnification.

(a) Parent agrees to indemnify, to the extent permitted by law, the Supplemental Benefit Trust, its trustee, the Supplemental Benefit Committee, and each Supplemental Benefit Committee Member, each Supplemental Benefit Committee Member Alternate, and each other person who controls any of such entities within the meaning of the Securities Act against all losses, claims, damages, liabilities and expenses, including the fees and expenses of legal and other advisors, as incurred, arising out of any untrue or alleged untrue statement of material fact contained in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as any such statement is included therein in reliance on and in conformity with any information furnished in writing to Parent by or on behalf of the Supplemental Benefit Trust or the Supplemental Benefit Committee expressly for use therein or by the Supplemental Benefit Trust or Supplemental Benefit Committee's failure to deliver a copy of any prospectus after Parent has furnished the Supplemental Benefit Trust or Supplemental Benefit Committee with a sufficient number of copies of the same.

(b) In connection with any registration statement in which the Supplemental Benefit Trust is participating, the Supplemental Benefit Committee on behalf of the Supplemental Benefit Trust, will furnish such information and affidavits as Parent

- 11 -

reasonably requests for use in connection with any such registration statement or prospectus and, to the extent permitted by law, will indemnify Parent, the Company, their respective directors and officers and each person who controls Parent (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses arising out of any untrue or alleged untrue statement of material fact contained in the registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent that such untrue statement or omission is contained in any information or affidavit so furnished in writing by the Supplemental Benefit Trust or Supplemental Benefit Committee; provided, that the obligation to indemnify will be individual to the Supplemental Benefit Trust and will be limited to the net amount of proceeds received by the Supplemental Benefit Trust from the sale of Registrable Securities under such registration statement.

(c) Any claim for indemnification hereunder will be made in accordance with the Indemnification Procedures.

(d) In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in this Section 6 is due in accordance with the terms hereof but is for any reason held by a court to be unavailable on grounds of policy or otherwise, the Supplemental Benefit Trust and Parent, as between themselves, shall contribute to the aggregate losses, claims, damages, liabilities and expenses (including reasonable fees and expenses of legal and other advisors) to which Parent and any Indemnified Party may be subject in such proportion so that portion thereof for which the Supplemental Benefit Trust shall be responsible shall be limited to the portion finally determined by a court or the parties to any settlement to be directly attributable to an untrue statement of a material fact or an omission to state a material fact in a registration statement, preliminary prospectus, prospectus or any amendment or supplement thereto in specific reliance upon and in conformity with written information furnished to the Parent through an instrument duly executed by the Supplemental Benefit Committee, on behalf of the Supplemental Benefit Trust, stating that it is for use therein, and Parent shall be responsible for the balance; provided, that no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. For purposes of this Section 6(d), each person who controls the Supplemental Benefit Committee or the trustee under the Supplemental Benefit Trust within the meaning of the Securities Act shall have the same rights to contribution as the Supplemental Benefit Committee, and each person who controls Parent within the meaning of the Securities Act and each officer and director of Parent or Company shall have the same rights to contribution as Parent, subject in each case to the proviso in the immediately preceding sentence. Any Party entitled to contribution will, promptly after receipt of notice of commencement of any action, suit or proceeding against such party in respect of which a claim for contribution may be made against another party or parties under this Section 6(d), notify such party or parties from whom contribution may be

- 12 -

218

sought, but the omission to so notify any party shall not relieve such party from any other obligation it may have under this Section 6(d) or otherwise except to the extent that such failure shall have been prejudicial to such party. Parent and the Supplemental Benefit Committee agree that it would not be just and equitable if their respective contribution obligations were to be determined by pro rata allocation, by reference to the proceeds realized by them or in any manner which does not take into account the equitable considerations set forth in this Section 6(d).

(e)    The indemnification and contribution provided for hereunder will remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party, and will survive the transfer of securities.

7.    Participation in Underwritten Registrations.  The Supplemental Benefit Trust (a) agrees to sell its securities on the basis provided in any underwriting arrangements approved by the person or persons entitled to approve such arrangements and (b) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements.  In connection with underwritten offerings under Demand Registrations, Parent shall enter into reasonable and customary indemnification agreements with the Supplemental Benefit Trust's underwriters.

8.    Third Party Registration Rights.  Parent represents and warrants, to the Supplemental Benefit Trust that no person or entity other than Parent and the Company have any right, pursuant to statute, contract or otherwise, to require or cause Parent or the Company to register equity securities of Parent or the Company under the Securities Act. Without the prior written consent of the Supplemental Benefit Committee, Parent shall not, and shall cause the Company not to grant any such right to any person or entity to the extent that such right is exercisable during the Window Period or would restrict, limit or adversely affect the Supplemental Benefit Trust's registration rights during any Supplemental Benefit Trust's Registration Period.

9.    Additional Requests for Registration.  Notwithstanding Sections 1(d) and 2(a), the Supplemental Benefit Committee may request the permission of Parent to register Registrable Securities pursuant to the terms hereof or during any Parent's Registration Period by notice to Parent.  Notwithstanding Section 1(f) and 2(b), Parent or the Company may request the permission of the Supplemental Benefit Committee to register its equity securities during the Window Period or during any Supplemental Benefit Trust's Registration Period by notice to the Supplemental Benefit Committee (except that no such notice will be required in the case of a Permitted Parent Registration).  Each such notice shall specify the nature and number of shares requested to be registered and the anticipated per share price range, if applicable.

10.    Notices.  All notices, requests or other communications required or permitted to be given or made hereunder shall be in writing and shall be deemed to have

- 13 -

219

been given when actually delivered or when delivered to a nationally recognized commercial courier for next day delivery, or when deposited in the United States mail, certified mail, return receipt requested, postage prepaid to the address of the parties as set forth below or at such other address as any party may furnish in writing to the other when transmitted by facsimile to the telecopy number for each party set forth below. Rejection or other refusal to accept, or inability to deliver because of change of address of which no notice was given, shall be deemed to be receipt of good notice, request, or other communication.

(i) If to Parent:

Navistar International Corporation
455 North Cityfront Plaza Drive
Chicago, IL 60611
Attention: General Counsel
Telecopy: 312/836-3982

With copies to:

Kirkland & Ellis
Suite 5700
200 E. Randolph Drive
Chicago, IL 60610
Attention: Michael H. Kerr, P.C.
Telecopy: 312/861-2200

(ii) If to the Supplemental Benefit Trust or Supplemental Benefit Committee:

at such addresses and with copies to such persons as the Supplemental Benefit Committee shall from time to time notify Parent in writing.

- 14 -

220

APPENDIX B-6

## SUPPLEMENTAL BENEFIT TRUST PROFIT SHARING PLAN

Pursuant to the Settlement Agreement in Shy et al v. Navistar et al (Civil Action No. C-3-92-333, S.D. Ohio), together with the exhibits thereto, the "Settlement Agreement", Navistar hereby adopts the Supplemental Benefit Trust Profit Sharing Plan (the "Profit Sharing Plan"), described herein. This Profit Sharing Plan shall become effective upon the Effective Date, as defined in the Settlement Agreement

1. **Definitions.** Unless otherwise defined herein, capitalized terms shall have the meanings given in the Settlement Agreement.

2. **Duration and Coverage.**

   2.1 The Profit Sharing Plan shall be effective as of the Effective Date.

   2.2 Calculations under the Profit Sharing Plan shall be based on plan years which shall be the same as the fiscal year of the Company, beginning with the fiscal year in which the Effective Date occurs.

   2.3 As described in Exhibit B of the Settlement Agreement, the Profit Sharing Plan shall terminate on the first day following the plan year in which the Profit Sharing Cessation Date occurs and Navistar shall not be required to make any payments under the Profit Sharing Plan for any plan year after that date.

   2.4 Payments required under the Profit Sharing Plan shall be made to the Supplemental Benefit Plan Trust and shall be in cash unless otherwise agreed between the Company and the Supplemental Benefit Committee.

3. **Covered Operations.**

   3.1 As used in this Profit Sharing Plan, "Covered Operations" means Navistar International Transportation Corp. ("NITC"), Navistar International Corporation ("NIC", the "Parent"), their successors and all of their affiliates and subsidiaries, with the exception of Navistar International Corporation Canada. Any business acquired after the Effective Date by a Covered Operation will be included in Covered Operations to the extent described in Sections 4.9 and 5.5 below. If NIC is acquired, this Plan will continue in effect for NIC and its then existing and future Covered Operations but will not apply to the acquiror or any of its operations unless otherwise

agreed.

4.  Calculation of Qualifying Hours.

4.1 The calculation of hours worked described below shall include only straight time hours worked by employees of Covered Operations. The hours calculated in accordance with these principles shall be referred to as "Qualifying Hours."

4.2 Only straight time hours worked by employees who are not Bonus Eligible employees (as defined below) shall be counted as Qualifying Hours.

4.3 Only straight time hours worked by employees who worked during the applicable plan year shall be counted as Qualifying Hours.

4.4 Hours worked by employees for which premium (other than shift premium) or overtime payments are required, either pursuant to contract, collective bargaining agreement or statute shall not be counted as Qualifying Hours.

4.5 Hours worked by employees who were either discharged or quit during the applicable plan year shall not be counted as Qualifying Hours provided that hours worked by an employee who quits and is re-hired during the applicable plan year shall be counted based on his or her straight time hours during such plan year, and provided further that hours worked by an employee who is discharged and reinstated shall be counted based on the total of straight time hours worked and any back pay-equivalent hours awarded in connection with such reinstatement.

4.6 Paid time off in connection with union duties (Navistar account .97), excused 'J' time, and union leaves of absence shall be counted as Qualifying Hours.

4.7 Qualifying Hours for employees paid on a weekly payroll shall be determined over a period of 52 weeks for each plan year. Qualifying Hours for employees paid on a salary basis shall be determined based on 40 hours for each full week worked.

4.8 Hours worked by employees who are covered by plans such as the Annual Incentive Plan, the Used Truck Commission Sales Program, the Regional Management Incentive Plan or other similar incentive or bonus plans, but excluding gain sharing plans of the type in effect at Indianapolis engine plant, shall not be counted as Qualifying Hours, with such employees referred to herein as "Bonus Eligible."

- 2 -

222

4.9  Hours worked by employees of affiliates and less than 100% owned subsidiaries included in Covered Operations on the Effective Date will be determined on the basis of the above provisions and included in Qualifying Hours in the same proportions that the income (loss) of such entities are included in Qualifying Profits.

4.10 Hours worked by employees in operations acquired after the Effective Date will be determined on the basis of the above provisions and included in Qualifying Hours in the same proportion that the net income (loss) of such acquired entity is included in Qualifying Profits as provided for in Section 5.5.1 below.

5.  *Calculation of Qualifying Profits.*

5.1  Qualifying Profits shall be the sum of all of the amounts described below in Sections 5.2, 5.3, 5.4, and 5.5.

5.2  Pre-tax income or losses of continuing Covered Operations including unusual items but excluding:

5.2.1  Income or losses from discontinued operations, non-recurring charges or credits directly attributable to the sale or discontinuation of such operations;

5.2.2  Extraordinary Items;

5.2.3  Gain or loss on the sale of assets, other than sale of inventory in the ordinary course of business and trade; and

5.2.4  Pre-tax income (loss) of NFC; pre-tax losses of NIC on an entity basis; pre-tax income (loss) of any business acquired after the Effective Date; dividends received from Navistar International Corporation Canada; equity in income (loss) from affiliates included in income (loss) from Covered Operations on the Effective Date.

5.3  Navistar Financial Corporation (NFC) is a wholly-owned subsidiary of NITC. As long as the NITC, NIC or other subsidiary ownership in NFC remains at 100%, the full net income (losses) of NFC will be included in Qualifying Profits. If this level of investment should change, the amount of net income (loss) to be included in Qualifying Profits, and the associated number of Qualifying Hours, will be based upon such revised percentage of ownership.

- 3 -

223

5.4 Cash dividends received by NIC, NITC, or any of their subsidiaries from affiliates which are included in Covered Operations on the Effective Date.

5.5 The extent to which the operating results of businesses acquired after the Effective Date are to be included in Qualifying Profits shall be determined as follows:

5.5.1 Where the acquisition is located in the U.S. and where the equity interest of NITC, NIC or any affiliate or subsidiary equals or exceeds 50%, the net income (loss) of the acquired entity shall be included in Qualifying Profits in the same proportion as such equity interest. For the year in which the acquisition is completed, amounts will be determined on a pro-rata calendar day basis from the closing date.

5.5.2 Where the acquisition is located outside the U.S. and where the equity interest of NITC, NIC or any affiliate or subsidiary equals or exceeds 50%, only cash dividend payments, management fees and similar payments received by NITC, NIC or any affiliate or subsidiary from such acquired entity shall be included in Qualifying Profits.

5.5.3 Where the equity interest of NITC, NIC or any affiliate or subsidiary in such acquired operation is less than 50%, only cash dividends received by NITC, NIC or any affiliate or subsidiary from such acquired entity shall be included in Qualifying Profits.

5.6 Calculations of income described above in Sections 5.2, 5.3, and 5.5.1 shall be made prior to any deductions from such income attributable to this Profit Sharing Plan, any other profit sharing plan for active employees, or bonuses paid to any Bonus Eligible Employees.

5.7 Calculations of income described above in Sections 5.2, 5.3, and 5.5 shall exclude any amortization of past service costs arising from adoption of Statement of Financial Accounting Standards No. 106, "Employee's Accounting for Postretirement Benefits Other Than Pensions" (SFAS 106) as well as any SFAS 106-related expenses prior to the date upon which the $500 million of prefunding of the Base Plan Trust is completed; i.e. non-pension postretirement benefit costs will be determined for purposes of this Profit Sharing Plan on a "pay-as-

- 4 -

224

"you-go" basis until the $500 million of prefunding is completed.

5.8 Each of the items described in this Section 5 shall, except where otherwise specifically provided herein, be calculated in accordance with generally accepted accounting principles.

6. Calculation of Steps. The determination of the incremental steps to be used in the calculations described below shall be as follows:

6.1 The first step shall cover Qualifying Profits which exceed a dollar amount which is the product of the Qualifying Hours multiplied by $3.00 but which do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $4.50 (this is referred to as "Step One").

6.2 The second step shall cover Qualifying Profits which exceed those covered in Step One but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $6.00 (this is referred to as "Step Two").

6.3 The third step shall cover Qualifying Profits which exceed those covered in Step Two but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $7.50 (this is referred to as "Step Three").

6.4 The fourth step shall cover Qualifying Profits which exceed those covered in Step Three but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $9.00 (this is referred to as "Step Four").

6.5 The fifth step shall cover Qualifying Profits which exceed those covered in Step Four but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $10.50 (this is referred to as "Step Five").

6.6 The sixth step shall cover Qualifying Profits which exceed those covered in Step Five but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $12.00 (this is referred to as "Step Six").

6.7 The seventh step shall cover all Qualifying Profits which exceed those covered in Step Six (this is referred to as "Step Seven").

- 5 -

7. Calculation of Contribution Obligation

7.1 Within 90 calendar days following the end of each plan year, Navistar will make a contribution to the Supplemental Benefit Trust calculated in accordance with the following:

7.2 The Qualifying Profits which fall within each of the steps defined above shall be multiplied by the percentage listed for such Step as follows:

Step One 1%
Step Two 2%
Step Three 4%
Step Four 6%
Step Five 10%
Step Six 12%
Step Seven 16%

7.3 The sum of the amounts determined in accordance with the procedure described in Section 7.2, calculated to the nearest whole dollar amount above shall be Navistar's annual payment obligation under this Profit Sharing Plan (this amount is referred to as the "Contribution Obligation"). An example calculation is attached as Exhibit A hereto.

8. Information and Dispute Resolution.

8.1 The Company will provide both the UAW and the Supplemental Benefit Committee with a worksheet detailing the calculation of the Contribution obligation, the Qualifying Hours, and the Qualifying Profits. Such information shall include a listing by category of the employees included and excluded in the calculation of Qualifying Hours and all information reasonably necessary to review the calculation of Qualifying Profits.

8.2 Data on profits, hours worked, Qualifying Profits, and Qualifying Hours shall be reviewed by a certified public accounting firm selected by the Company, and the report of such firm shall be delivered to the UAW and the Supplemental Benefit Committee. A letter report setting forth the procedures performed and conclusions reached shall be prepared by such firm and delivered to the Company, the UAW and the Supplemental Benefit Committee.

8.3 The information and reports described in Sections 8.1 and 8.2 shall be delivered to the UAW and the Supplemental Benefit Committee on or before the date that the Contribution obligation, if any, is required to be paid. In years in which no Contribution obligation is required

- 6 -

226

to be paid, the Company will deliver information on profits and Qualifying Profits to the UAW and the Supplemental Benefit Committee within 90 calendar days following the end of the plan year for which no contribution is required.

8.4   If, following a review of the information and calculations provided pursuant to Sections 8.1, 8.2, and 8.3 the Supplemental Benefit Committee disputes such information or calculation, it shall inform the Company of such dispute within 30 calendar days of the receipt by the UAW and the Supplemental Benefit Committee of such information. The Company and the Supplemental Benefit Committee shall thereafter attempt, for a period not to exceed 30 calendar days, to resolve such dispute.

8.4.1   If such dispute cannot be resolved during that period, the parties to that dispute will attempt to identify a mutually acceptable third party (such as an accounting firm) to resolve such disputes.

8.4.2   If the parties to such dispute cannot identify a mutually acceptable third party to resolve such dispute, the parties to such dispute shall obtain a list of the seven largest accounting firms, measured by the number of certified public accountants practicing in the United States. The Company and the Supplemental Benefit Committee shall then alternately, beginning with the Company, strike one name off such list until only one name remains. The remaining firm shall be empowered to resolve the dispute.

8.4.3   Following selection of the party to resolve the dispute as provided in Section 8.4.1 or 8.4.2, the parties to the dispute shall present evidence and argument in support of their position and the individual or firm shall render a decision which shall be final and binding on all parties to the dispute.

8.5   The cost of the individual or firm retained to resolve the dispute as described in Sections 8.4.1 and 8.4.2 shall be borne equally by the Company and the Supplemental Benefit Committee. The parties shall bear their own fees and expenses in resolving such disputes.

8.6   In addition to the above, the Company will respond as soon as practicable to any reasonable requests from the UAW or the Supplemental Benefit Committee for information supporting any computation made by the Company to compute

- 7 -

227

ProfitShare8

the Contribution obligation, and will provide the
information so requested.

- 8 -

PROFIT SHARING PLAN
(Example Chart)

**Assumptions:**

Profits eligible for sharing = $250,000,000
10,600 Qualifying Employees x 1,750 Hours = 18,550,000 Hours
Lower boundary of step 1 = $55,650,000 (18,550,000 hours x $3.00)
Step widths = $27,825,000 (18,550,000 hours x $1.50)

| Step | | Step Width | Step % | Payout Step | Cumulati |
|---|---|---|---|---|---|
| 1 | 18,550,000 x $4.50 | $55.650- $83.475 | 1.00% | $.28 | -$.28 |
| 2 | 18,550,000 x $6.00 | $111.300 $27.825 | 2.00% | $.56 | $.84 |
| 3 | 18,550,000 x $7.50 | $139.125 $27.825 | 4.00% | $1.11 | $1.95 |
| 4 | 18,550,000 x $9.00 | $166.950 $27.825 | 6.00% | $1.67 | $3.62 |
| 5 | 18,550,000 x $10.5 | $194.775 $27.825 | 10.00% | $2.78 | $6.40 |
| 6 | 18,550,000 x $12.0 | $222.600 $27.825 | 12.00% | $3.34 | $9.74 |
| 7 | Over $222.6 | $250.000 $27.400 | 16.00% | $4.38 | $14.12 |

- 9 -

EXHIBIT

# DEFINITION SUPPLEMENT

When used in the Settlement Agreement or any Exhibits thereto, the following terms shall have the meanings set forth below:

"Actual Number of Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Actuary" means Coopers & Lybrand or such successor actuary as is selected by the Company from time to time.

"Additional Permissible Benefits" has the meaning assigned to it in Section 1.2 of Exhibit B to the Settlement Agreement.

"Adjusted Health APBO" has the meaning assigned to it in Section 7.2 of Exhibit B to the Settlement Agreement.

"Advance Funding" has the meaning assigned to it in Section 8.2 of Exhibit B to the Settlement Agreement.

"Annual Service Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Applicable Retirement Plan" means (i) The Navistar International Transportation Corp. Retirement Plan for Salaried Employees as in effect on the Effective Date, (ii) The Navistar Financial Corporation Retirement Plan for Salaried Employees as in effect on the Effective Date, (iii) The Navistar International Transportation Corp. Non-Contributory Retirement Plan as in effect on the Effective Date and (iv) those multiemployer pension funds as in effect on the Effective Date to which the Employers have contributed and that have Participants who have been provided with postretirement Health and Life Insurance Benefits by the Employers.

"Attributable Debt" means, as of any particular time, the present value discounted at the rate of 6 ⅓% per annum (compounded semi-annually) of the obligation of a lessee for rental payments during the remaining term of any lease (including any period for which such lease has been extended or may, at the option of the lessor, be extended) included in a Sale and Lease-Back Transaction, other than such a transaction permitted by Section 7.7 of Exhibit A to the Settlement Agreement.

"Average Contributing Participants" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Basic Life Insurance Program" means the part of the life Insurance Program pursuant to which the Employers agree to provide group life insurance, entirely at their own expense, to the Retirees.

"Blackout Period" has the meaning assigned to it in Section 3.4 of Exhibit B to the Settlement Agreement.

"Board" means the Board of Directors of Parent.

"CBA" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Charter Amendments" has the meaning assigned to it in Section 8.1 of the Settlement Agreement.

"Class" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Class Counsel" means the law firms of Bobulsky, Grdina & Altier, 2036 East Prospect Road, Ashtabula, Ohio 44004; Bredhoff & Kaiser, 1000 Connecticut Avenue, N.W., Washington, D.C. 20036; Cloppert, Portman, Sueter, Latanick & Foley, 225 East Board Street, Columbus, Ohio 43215; Gregory, Moore, Jeakle, Heinen, Ellison & Brooks, 3727 Cadillac Tower, Detroit, Michigan 48226; Kleiman, Whitney, Wolfe & Gore, One East Wacker Drive, Chicago, Illinois 60601; Lackey, Nusbaum, Harris, Reny & Torzewski, Two Maritime Plaza, Toledo, Ohio 46304; Macey, Macey & Swanson, 445 North Pennsylvania Street, Suite 401, Indianapolis, Indiana 48204; Miller, Carson & Boxberger, 1400 One Summit Square, Fort Wayne, Indiana 46802; and Daniel W. Sherrick, Associate General Counsel, International UAW, 8000 East Jefferson, Detroit, Michigan 48214.

"Class Member" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Class Representatives" means Art Shy, Fred Burris, Clarence Nuss, John Herring, Carl Potts, Harold Retherford, Henry G. Betley, Richard Spitler, Jack O'Neill, Donald McPhearson, the UAW and its Locals 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293, the UPGWA and its Locals 4, 122 and 134, the IAM and its Locals 1471, 2819 and 2821, the SEE and the USWA and its Local 4320.

"Collective Bargaining Representatives" means the UAW and its Locals 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293; the UPGWA and its Locals 4, 122 and 134; IAM and its Locals 1471, 2819 and 2821; the SEE; the USWA and its Locals 3740 and 4320; the UAW and its Locals 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293, the International Brotherhood of Teamsters and its Locals 705 and 570; the International Union of Operating Engineers and its Local 399; and the International Federation Professional and Technical Employees and its Local 137.

231

"Committee's Standstill Period" has the meaning assigned to it in Section 1(f)(iv) of Appendix B-4 to the Settlement Agreement.

"Company" means Navistar International Transportation Corp., and each successor thereto.

"Company Costs Per Capita" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Contributing Participants" means Retirees, Spouses and Surviving Spouses for such periods as they are making required contributions to the Health Benefit Program.

"Contributing Participant's Annual Contribution" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Court" means the United States District Court for the Southern District of Ohio Western Division.

"Cumulative Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Deferred Retiree Participants" means individuals affected by health care benefit litigation settlements in Ragan, et al. v. Navistar, No. 88-2623-S (D.Kan.); Local Union 369, International Brotherhood of Electrical Workers, AFL-CIO, et al. v. Navistar, No. C-88-6724-L-A (W.D.Ky.); and Bolding et al. v. Navistar, No. 88-9751-9 (Superior Court, GA).

"Demand Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Dependent" means (i) a person's Spouse, and (ii) unmarried children residing in a person's household and unmarried children not residing in a person's household for whom such person is legally required to provide medical care. For purposes of (ii) above, (A) the children of a person include (I) the natural children of such person, (II) legally adopted children of such person, (III) stepchildren of such person for whom legal adoption proceedings have been initiated and (IV) other children related by blood or marriage to such person or who are under such person's legal guardianship and who are dependent on such person for more than one-half of their support as defined in the IRC, who either qualify in the current year for dependency status, or who have been reported as dependents on such person's most recent federal income tax return ("dependency tax status") and (B) children shall continue to qualify as children until the end of the calendar year in which they attain age 19 years; provided, that (1) if a child is totally and permanently disabled at the time he or she would otherwise cease to be a child for purposes of this definition, he

- 3 -

232

or she will continue to be covered as a child for as long as he or she remains totally and permanently disabled, and (II) if a child qualifies in the current year for dependency tax status or has been reported as a dependent on a person's most recent federal tax return, the child will continue to be covered as a child through the end of the calendar year in which the child attains age 25 years provided the child is unmarried and is legally residing in the person's household.

"DOL" means the U.S. Department of Labor.

"DOL Exemption for Parent Common Equity" means an exemption from the DOL permitting the Company to contribute to the Supplemental Benefit Trust and for the Supplemental Benefit Trust to hold Parent Class B Common, and to permit the Parent Class B Common to be voted in accordance with and satisfy the requirements of Article III of Exhibit B to the Settlement Agreement without violating the provisions of Section 406 or 407 of ERISA or Section 4975 of the IRC, such exemption to be in form and substance reasonably satisfactory to the Company and the Supplemental Benefit Committee.

"DOL Exemption for Parent Series A Preference" means an exemption from the DOL permitting the Supplemental Benefit Trust to hold Parent Series A Preference without violating the prohibited transaction rules of ERISA, such exemption to be in form and substance reasonably satisfactory to the Company and the Class Representatives.

"DOL Exemptions" means the DOL Exemption for Parent Common Equity and the DOL Exemption for Parent Series A Preference.

"Effective Date" has the meaning assigned to it in Section 13.1 of the Settlement Agreement.

"Eligible Dependent" means (i) each Dependent of a Retiree, during the life of such Retiree and the life of such Retiree's Surviving Spouse, if any, (ii) each Dependent of a deceased former Employee who died prior to the Effective Date, during the life of such Employee's Present Surviving Spouse, if any, and (iii) each Dependent of a Present Surviving Spouse, if Eligible Former Employee who dies prior to becoming a Future Retiree and who is survived by a Future Surviving Spouse, during the life of such Surviving Spouse; provided, that Eligible Dependents shall not include Dependents who are in military service or the Peace Corps (or similar service) of any country or Dependents covered under any health care plan sponsored by the Employers.

"Employee" means an active employee of an Employer, including all such persons who, although on layoff, sick leave, long-term disability or Employer-approved leave of absence, are treated as active employees by the relevant Employer under relevant

- 4 -

233

CBAs or employment policies, but excluding active employees of an Employer who are nonresident aliens employed outside of the United States and Canada.

"Employers" means Parent, the Company, NFC, HARCO National Insurance Company, Indianapolis Casting Corporation, Navistar International Export Corporation and Navistar International Overseas Corporation, and each successor thereto.

"Enrolled Participant" means each Retiree and Surviving Spouse who has enrolled or re-enrolled in the Health Benefit Program and the Supplemental Benefit Program and their Eligible Dependents, other than a Retiree, Surviving Spouse or Eligible Dependent whose enrollment therein has been terminated in accordance with Section 2.3 of Exhibit A to the Settlement Agreement and who has not re-enrolled in accordance with Section 2.4 of Exhibit A to the Settlement Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Event Date" has the meaning assigned to it in Section 3.6 of Exhibit B to the Settlement Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated thereunder;

"Excluded Retirees" means Retirees and their Dependents who were formerly (i) hourly employees and technical and office employees of the Solar Division (Solar Plan 804 & 805); (ii) hourly Benham Coal employees, Progressive Mine Workers of America, Local Union No. 402, District No. 2; (iii) salaried and management employees of the Chicago, West Pullman and Southern Railroad; and (iv) retirees affected by the litigation settlement in Lumpkin v. Navistar, No. 81C6674 (N.D. Ill. 1981).

"Exempted Indebtedness" means the sum of (i) all outstanding indebtedness of Parent (and any predecessor corporation) and Restricted Subsidiaries incurred after March 1, 1968 and secured by any mortgage, security interest, pledge or lien other than those permitted by paragraph (a) of Section 5.06 of the Indenture, (ii) all Attributable Debt and (iii) all outstanding indebtedness for borrowed money of Restricted Subsidiaries other than that permitted by paragraph (a) of Section 5.08 of the Indenture.

"Existing Plans" means all plans and other arrangements of the Employers, as in effect on the Effective Date, under which Present Retirees, Present Surviving Spouses, Present Eligible Dependents and Present Eligible Former Employees are receiving, are entitled to receive, or would become entitled to receive,

- 5 -

234

postretirement health or life insurance benefits in the absence of the Settlement Agreement.

"Expected Average Contributing Participants" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Company Costs Per Capita" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Drug Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Medical Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Number of Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Participant Contributions" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Fairness Hearing" has the meaning assigned to it in Section 4.1 of the Settlement Agreement.

"FASB 106" means Financial Accounting Standards Board Statement No. 106 regarding accounting for postretirement benefits other than pensions.

"Final" means the earlier of (i) expiration of the time period for an appeal as a matter of right if no appeal has been filed; (ii) any final dismissal or withdrawal of appeal from the Judgment; or (iii) the date of final affirmance of the Judgment following any appeal, including the expiration of the time for petitions for writs of certiorari (or written confirmation by the appellants that no such petition will be filed) and, if certiorari be granted, the date of final affirmance of the Judgment following review pursuant to that grant.

"Foster Case" has the meaning assigned to it in Section 2.2 of the Settlement Agreement.

"Fully Diluted Basis" means, as of a particular date of determination, the total number of shares of Parent Common Equity and equivalents outstanding as calculated in accordance with Appendix B-7 to Exhibit B to the Settlement Agreement.

"Fully Funded" means, as of a particular date of determination, that the balance of the Employers' prefunding

- 6 -

contributions held under the Health Benefit Trust equals the sum of the Employers' share of the Health APBO under the Health Benefit Program plus the actuarial present value of the postretirement benefits under the Basic Life Insurance Program (as determined by the Actuary consistent with the determination of Health APBO).

"Fully Funded Amount" means, as of a particular date or determination, the amount of money necessary so that the balance of the Employers' prefunding contributions held under the Health Benefit Trust equals the sum of the Employers' share of the Health APBO under the Health Benefit Program plus the actuarial present value of the postretirement benefits under the Basic Life Insurance Program (as determined by the Actuary consistent with the determination of Health APBO).

"Fully Funded Date" means the first date on which the Health Benefit Trust is Fully Funded.

"Funding Notice" means the notice described in Section 8.2 of Exhibit B to the Settlement Agreement.

"Future Retiree" means (i) each Present Employee who after the Effective Date becomes eligible to commence the receipt of Pension Benefits, (ii) each other Present Employee who is represented by a Collective Bargaining Representative and who after the Effective Date continues active employment with an Employer beyond attainment of age 65 years and then terminates employment and (iii) each Present Eligible Former Employee who after the Effective Date satisfies the applicable conditions for Health and Life Insurance Benefits.

"Future Surviving Spouse" means (i) the Spouse of a Retiree who dies after the Effective Date and (ii) the Spouse of a Present Employee or of a Present Eligible Former Employee who dies after the Effective Date after becoming eligible for normal or early retirement under the Navistar International Transportation Corp. Retirement Plan for Salaried Employees or the Navistar Financial Corporation Retirement Plan for Salaried Employees; (iii) the husband or wife of a Present Employee or of a Present Eligible Former Employee who dies after the Effective Date after becoming eligible for normal or regular early retirement under the Navistar International Transportation Corp. Noncontributory Retirement Plan.

"HBPC Chair" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Committee Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Company Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

- 7 -

"HBPC Other Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Other Member Alternate" has the meaning assigned to it in Section 6.6 of Exhibit A to the Settlement Agreement.

"HBPC UAW Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"Health APBO" and "Health Accumulated Postretirement Benefit Obligation" mean the actuarial present value of the postretirement benefits under the Health Benefit Program attributed to employee service rendered to the date of determination as determined by the Actuary (i) in accordance with FASB 106, (ii) in a manner consistent with the assumptions reflected in Appendix A-5 to Exhibit A to the Settlement Agreement, and (iii) using methods, factors and procedures determined by the Actuary.

"Health and Life Insurance Benefits" means postretirement health or life insurance benefits payable under any Existing Plan.

"Health Benefit Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Health Benefit Program Committee" means the committee described in Section 6.1 of Exhibit A to the Settlement Agreement.

"Health Benefit Program Letter" has the meaning assigned to it in Section 7.2.1 of the Settlement Agreement.

"Health Benefit Program Payment Default" has the meaning assigned to it in Section 10.1 of Exhibit A to the Settlement Agreement.

"Health Benefit Trust" means the trust established and maintained for the benefit of Participants as set forth in the trust agreement attached as Appendix A-3 to Exhibit A to the Settlement Agreement.

"HMO" means a health maintenance organization.

"IAM" means International Machinists District Lodge 28.

"Immediate Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Immediate Drop Outs During the First 45 Days" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Immediate Drop Outs During the Second 45 Days" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

- 8 -

237

"Imputed Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Indemnification Procedures" mean the following procedures to be followed by any party entitled to indemnification under the Settlement Agreement or the Plan (an "Indemnified Party"): promptly after receipt of notice of the commencement of any action in respect of which the Indemnified Party intends to seek indemnification hereunder, the Indemnified Party shall notify the party obliged to provide such indemnification (the "Indemnifying Party") thereof in writing; provided, that the failure of an Indemnified Party to give such notice shall not affect the right of the Indemnified Party to indemnification hereunder, except to the extent that the Indemnifying Party has been prejudiced by such failure. The Indemnifying Party shall be entitled to assume sole control of the defense of any such action; provided, that the Indemnifying Party shall not be entitled to assume control of such defense if in the opinion of counsel to the Indemnified Party there is a significant possibility of a conflict between the interests of the Indemnifying Party and those of the Indemnified Party or such counsel intends to assert a separate legal defense. If the Indemnifying Party does not assume the defense of two or more Indemnified Parties in any action where such indemnity may be available such indemnity shall include the reasonable defense costs of one counsel for such Indemnified Parties as a group; provided, that if in the opinion of counsel to any such Indemnified Party there is a significant possibility of a conflict between the interests of such Indemnified Party and those of any other such Indemnified Party or if such counsel intends to assert a separate legal defense, such Indemnified Party shall be entitled to separate counsel; and, provided, further, that such Indemnified Party shall obtain the prior written approval of the Indemnifying Party before entering into any settlement of any claim for which it is seeking indemnification hereunder or ceasing to defend against such claim.

"Indenture" means the Indenture, dated as of March 1, 1985, between a predecessor of Parent and Commerce Union Bank, as trustee.

"Initial Period" has the meaning assigned to it in Section 8.1 of Exhibit B to the Settlement Agreement.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Judgment" means the Judgment of the Court approving the Settlement Agreement in the form of Exhibit G to the Settlement Agreement.

- 9 -

238

"Lien/Sale and Leaseback Default" has the meaning assigned to it in Section 10.2 of Exhibit A to the Settlement Agreement.

"Life Insurance Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Litigation" means the Shy Case and the Foster Case.

"Long-Form Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Market Offering" has the meaning assigned to it in Section 1(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Maximum Corridor Medical Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Measurement Year (x)" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Monthly Base Contribution" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Named Fiduciary" means a fiduciary within the meaning of Section 402(a)(2) of ERISA.

"Navistar" means Parent, the Company, NFC, HARCO National Insurance Company and Indianapolis Casting Corporation, and each successor thereto.

"Navistar Interest Rate" means (i) the average interest rate paid by the Company from time to time on borrowings pursuant to its revolving credit facility (or its primary revolving credit facility if it has more than one), or (ii) if the Company has no revolving borrowings at a particular time, the average interest rate paid by NFC from time to time on borrowings pursuant to its revolving credit facility (or its primary revolving credit facility if it has more than one) or (iii) if neither the Company nor NFC has revolving borrowings at a particular time, 1.0% over the prime rate announced from time to time by the Morgan Guaranty Trust Company.

"Navistar Parties" means Parent, the Company, NFC, HARCO National Insurance Company and Indianapolis Casting Corporation, and each successor thereto.

"Navistar Released Parties" means Navistar and the present and former officers, directors, committees (including the Pension and Employee Benefit Committee), employees, parents,

- 10 -

239

subsidiaries, attorneys, insurers, partners, consultants, advisers, agents, and representatives of Navistar as well as their respective predecessors, successors, assigns and present and former direct and indirect affiliates.

"New CBA" has the meaning assigned to it in Section 12.1.6 of the Settlement Agreement.

"New Drop Ins" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"NFC" means Navistar Financial Corporation, and each successor thereto.

"Non-Represented Employees" means all Employees who are not represented by Collective Bargaining Representatives.

"Notice Order" has the meaning assigned to it in Section 4.1 of the Settlement Agreement.

"Optional Life Insurance Program" means the part of the life Insurance Program pursuant to which additional group life insurance benefits are provided as described in Section 4.2 of Exhibit A to the Settlement Agreement.

"Optional Life Insurance Program Letter" has the meaning specified in Section 7.2.5 of the Settlement Agreement.

"Other Period" has the meaning assigned to it in Section 8.2 of Exhibit B to the Settlement Agreement.

"Other Voting Securities" has the meaning assigned to it in Section 3.1 of Exhibit B to the Settlement Agreement.

"Parent" means Navistar International Corporation, and each successor thereto.

"Parent Class B Common" means the Class B common stock of Parent, par value $0.01 per share.

"Parent Common" means the common stock of Parent, par value $0.01 per share.

"Parent Common Equity" means Parent Common and Parent Class B Common.

"Parent Initiated Piggyback Registration" has the meaning assigned to it in Section 2(a)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

- 11 -

"Parent Permitted Registrations" has the meaning assigned to it in Section 1(d)(iii) of Appendix B-4 to the Settlement Agreement.

"Parent Postponement" has the meaning assigned to it in Section 1(d)(ii) of Appendix B-3 to Exhibit B to the Settlement Agreement.

"Parent Preference Stock" means Parent Series A Preference and Parent Series B Preference.

"Parent Registration" has the meaning assigned to it in Section 1(d)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent Registration Notice" has the meaning assigned to it in Section 2(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent Securities" means the Parent Common Equity and the Parent Preference Stock.

"Parent Series A Preference" has the meaning assigned to it in Section 5.1 of Exhibit B to the Settlement Agreement.

"Parent Series B Preference" means the Series B preference stock of Parent, par value $1.00 per share.

"Parent's 90 Day Period" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent's Registration Period" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent's Standstill Period" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Participant" means each Present Employee, Retiree, Surviving Spouse and Present Eligible Former Employee who is or may become eligible to receive health or life insurance benefits under the Plan, and their Eligible Dependents, regardless of whether any such person has enrolled in the Plan or whether his enrollment in the Plan has been terminated.

"Pension Benefits" means retirement benefits under an Applicable Retirement Plan, including but not limited to disability and pension benefits, whether paid monthly, in a lump sum or otherwise, including such benefits payable pursuant to the terms of any plant closing agreement, severance arrangement or otherwise, but not including a deferred vested pension or an "Accrued Benefit" as

- 12 -

241

defined in the respective sales agreements regarding the sales of the Solar Turbines International Division and the Construction Equipment Division.

"Permitted Parent Registration" has the meaning assigned to it in Section 1(e) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Piggyback Notice" has the meaning assigned to it in Section 2(a)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Piggyback Registration" has the meaning assigned to it in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Piggyback Rights Revision Date" has the meaning set forth in Section 2(e) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Plan" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Plan 1" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Plan 2" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Plan Administrator" means the administrator of the Plan within the meaning of Section 3(16)(A) of ERISA.

"Plan Expenses" means all out-of-pocket administrative costs of the Health Benefit Program and Life Insurance Program, including but not limited to the costs of the trustee of the Health Benefit Trust, the costs of the Health Benefit Program Committee (other than expenses paid by the Company in accordance with Section 6.7 of Exhibit A to the Settlement Agreement) and the costs of service providers and professionals (other than the Actuary) engaged by the Plan Administrator, the Named Fiduciary or the Health Benefit Program Committee.

"Plan Year" means the fiscal year of the Company, which fiscal year currently ends on October 31.

"Post-Window Period Registration Request" has the meaning assigned to it in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Present Eligible Dependent" means each Eligible Dependent on the Effective Date.

- 13 -

"Present Eligible Former Employee" means each former employee who as of the Effective Date is not a Present Retiree but who, without any further employment by the Employers and upon the satisfaction of any applicable conditions, would become eligible for Health and Life Insurance Benefits in the absence of the Settlement Agreement.

"Present Employee" means (i) each Non-Represented Employee on the Effective Date, (ii) each Employee represented by a Collective Bargaining Representative as of February 28, 1993, and (iii) during the terms of the New CBAs, each other Employee covered by a New CBA to the extent such Employee is eligible to benefits under the Plan pursuant to the terms of such New CBA.

"Present Non-Represented Employee" means each Present Employee who is not a member of a collective bargaining unit represented by a Collective Bargaining Representative on the Effective Date.

"Present Represented Employee" means each Present Employee who is a member of a collective bargaining unit represented by a Collective Bargaining Representative on the Effective Date.

"Present Retiree" means each former Employee, other than an Excluded Retiree, who is receiving Health and Life Insurance Benefits on the Effective Date.

"Present Surviving Spouse" means each Spouse of a deceased former Employee who is receiving Health and Life Insurance Benefits on the Effective Date.

"Principal Property" shall mean any plant used primarily for manufacturing purposes located within the United States of America, excluding its territories and possessions, of Parent or any Restricted Subsidiary except any such Plant which the Board by resolution declares is not of material importance to the total business conducted by Parent and its Restricted Subsidiaries as an entity.

"Profit Sharing Cessation Date" has the meaning assigned to it in Section 7.2 of Exhibit B to the Settlement Agreement.

"Profit Sharing Contributions" has the meaning assigned to it in Section 7.1 of Exhibit B to the Settlement Agreement.

"Profit Sharing Plan" means the SPD Supplemental Benefit Profit Sharing Plan attached as Appendix B-7 to the Supplemental Benefit Program.

"Program Administrator" means the administrator of the Supplemental Benefit Program within the meaning of Section 3(16)(A) of ERISA.

- 14 -

"Registrable Securities" means (a) the Parent Common issued upon the conversion of the Parent Class B Common issued to the Supplemental Benefit Trust by Parent on the Effective Date, (b) any Parent Common issued by Parent to the Supplemental Benefit Trust after the Effective Date, (c) any Parent Common underlying any other Parent Securities issued by Parent to the Supplemental Benefit Trust after the Effective Date, (d) any other securities of Parent issued to the Supplemental Benefit Trust in connection with any distribution made in respect of the Parent Class B Common, and (e) any other securities of Parent issued to the Supplemental Benefit Trust in respect of, or upon conversion or exchange of, any of the securities described in the foregoing clauses (a) through (d); provided, that the securities described in the foregoing clauses (d) and, (e) shall be deemed Registrable Securities only if the class of securities of which they are a part shall have been registered under the Exchange Act. As to any particular Registrable Securities, such securities will cease to be Registrable Securities when they have been sold, transferred or otherwise disposed of by the Supplemental Benefit Trust.

"Registration Expenses" has the meaning assigned to it in Section 5 of Appendix B-4 to Exhibit-B to the Settlement Agreement.

"Registration Request" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Restricted Stock" has the meaning assigned to it in Section 10.2(d) of Exhibit B to the Settlement Agreement.

"Restricted Subsidiary" shall mean any subsidiary of Parent (a) substantially all the property of which is located, or substantially all the business of which is carried on, within the United States of America, excluding its territories and posses- sions, and (b) which owns or leases a Principal Property.

"Retiree" means each Present Retiree and each Future Retiree.

"Retiree Adjustment Ratio" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Retiree Cost Sharing Ratio" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Rule 415" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Rule 415 Demand Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

- 15 -

244

"Sale and Lease-back Transaction" has the meaning assigned to it in Section 7.7(a) of Exhibit A to the Settlement Agreement.

"SBC Chair" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class One Other Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class One Other Member Alternate" has the meaning assigned to it in Section 6.1(b) of Exhibit B to the Settlement Agreement.

"SBC Class Two Other Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class Two Other Member Alternate" has the meaning assigned to it in Section 6.1(c) of Exhibit B to the Settlement Agreement.

"SBC Committee Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Committee Member Alternate" has the meaning assigned to it in Section 6.1(c) of Exhibit B to the Settlement Agreement.

"SBC UAW Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SEC" means the United States Securities and Exchange Commission.

"Scheduled Contributions" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Section 10.2 Cure Period" has the meaning assigned to it in Section 10.2 of Exhibit A to the Settlement Agreement.

"Securities Act" means the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

"Security" means any debenture, note or other evidence of indebtedness, as the case may be, authenticated and delivered under the Indenture.

"SEE" means Society of Engineering Employees, Inc.

"Settlement Agreement" means the settlement agreement entered in the Shy Case and approved by the U.S. District Court for

- 16 -

245

the Southern District of Ohio, as amended from time to time in accordance with the provisions therein.

"Short-Form Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Shy Case" has the meaning assigned to it in the recitals to the Settlement Agreement.

"SPD" means summary plan description.

"Spouse" means the husband or wife of a person to whom such person is legally married and does not include a former spouse from whom such person is divorced.

"State or National Health Insurance Program" means any program pursuant to which the federal government of the United States, the government of any State or territory thereof or any governmental authority thereof or therein, mandates or provides directly or indirectly health care benefits.

"Stay Orders" has the meaning assigned to it in Section 13 of the Settlement Agreement.

"Subsidiary" means any corporation of which at least a majority of the outstanding voting stock having voting power under ordinary circumstances to elect a majority of the board of directors of said corporation shall at the time be owned by Parent or by Parent and one or more Subsidiaries or by one or more Subsidiaries.

"Super-Majority Transaction" means (i) a merger or consolidation to which Parent is a constituent corporation, if either (A) the stockholders of Parent immediately before such merger or consolidation, do not own, directly or indirectly, more than 50% of the combined voting power of the then outstanding voting securities of the corporation surviving or resulting from such merger or consolidation or (B) equity securities of Parent or the Company would be issued to stockholders of the other constituent corporation(s) to such merger or consolidation which have a fair market value at the time of the transaction in excess of $750 million, or (ii) the sale, transfer, pledge or other disposition of all or substantially all of the assets of Parent and its subsidiaries on a consolidated basis or the Company and its subsidiaries on a consolidated basis.

"Super-Majority Vote" means the vote of at least 85% of the shares of Parent Common Equity, voting as a single class, present in person or by proxy at a meeting at which a Super-Majority Transaction is submitted for a stockholder vote and a quorum is present.

- 17 -

246

"Supplemental Benefit Committee" has the meaning assigned to it in Section 6.1 of Exhibit B to the Settlement Agreement.

"Supplemental Benefit Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Supplemental Benefit Program Payment Default" has the meaning assigned to it in Section 11.1 of Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust" means the trust established and maintained for the benefit of Enrolled Participants and Retirees, whether or not they are Enrolled Participants, as set forth in the trust agreement attached as Appendix B-2 to Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust Initiated Piggyback Registration" has the meaning assigned to it in Section 2(b)(iii) of Appendix B-4 to the Settlement Agreement.

"Supplemental Benefit Trust's 90 Day Period" has the meaning assigned to it in Section 2(b)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust's Registration Period" has the meaning assigned to it in Section 2(b)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust's Standstill Period" has the meaning assigned to it in Section 2(b)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Supplement Trust Designee" has the meaning assigned to it in Section 5.2 of Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust's Piggyback Registration" has the meaning assigned to it in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Surviving Cumulative Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Surviving Spouse" means each Present Surviving Spouse and each Future Surviving Spouse.

"Total Actual Drug Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Actual Medical Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Estimated Annual Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

- 18 -

"Total Expected Drug Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Expected Medical Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Maximum Corridor Medical Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Trust Market Offerings" has the meaning assigned to it in Section 1(i) of Appendix B-3 to Exhibit B to the Settlement Agreement.

"UAW" means the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, an unincorporated association with its principal offices in the State of Michigan.

"UAW Designee" means the member of the Board which the UAW is entitled to elect in accordance with the terms of the Series B Preference.

"UAW/Navistar Joint Committee" has the meaning assigned to it in the current Health Security Agreement between the Company and the UAW.

"UPGWA" means the International Union, United Plant Guard Workers of America.

"USWA" means the International Union, United Steelworkers of America.

"Window Period" means that period of time (extended by the length of time of any Blackout Period or Other Period that occurs during what would constitute the Window Period without such extension) which shall commence on the Window Period Commencement Day and shall be the shorter of the following:

(i)  the period from the Window Period Commencement Day until the date following completion of the sale which causes the net proceeds received by the Supplemental Benefit Trust in respect of the sale of Parent Common Equity to equal or exceed $500 million (including any such proceeds received upon sales approved by the Board or through tender offers, but excluding amounts received in connection with Advance Funding sales); and

(ii)  the period equal in duration to the period from the Effective Date to the Window Period Commencement Day.

"Window Period Commencement Day" means the first day on

- 19 -

or after the Event Date that is not during a Blackout Period or Other Period.

- 20 -