APPENDIX B-6

## SUPPLEMENTAL BENEFIT TRUST PROFIT SHARING PLAN

Pursuant to the Settlement Agreement in Shy et al v. Navistar et al (Civil Action No. C-3-92-333, S.D. Ohio), together with the exhibits thereto, the "Settlement Agreement", Navistar hereby adopts the Supplemental Benefit Trust Profit Sharing Plan (the "Profit Sharing Plan"), described herein. This Profit Sharing Plan shall become effective upon the Effective Date, as defined in the Settlement Agreement

1.  *Definitions.* Unless otherwise defined herein, capitalized terms shall have the meanings given in the Settlement Agreement.

2.  *Duration and Coverage.*

    2.1 The Profit Sharing Plan shall be effective as of the Effective Date.

    2.2 Calculations under the Profit Sharing Plan shall be based on plan years which shall be the same as the fiscal year of the Company, beginning with the fiscal year in which the Effective Date occurs.

    2.3 As described in Exhibit B of the Settlement Agreement, the Profit Sharing Plan shall terminate on the first day following the plan year in which the Profit Sharing Cessation Date occurs and Navistar shall not be required to make any payments under the Profit Sharing Plan for any plan year after that date.

    2.4 Payments required under the Profit Sharing Plan shall be made to the Supplemental Benefit Plan Trust and shall be in cash unless otherwise agreed between the Company and the Supplemental Benefit Committee.

3.  *Covered Operations.*

    3.1 As used in this Profit Sharing Plan, "Covered Operations" means Navistar International Transportation Corp. ("NITC"), Navistar International Corporation ("NIC", the "Parent"), their successors and all of their affiliates and subsidiaries, with the exception of Navistar International Corporation Canada. Any business acquired after the Effective Date by a Covered Operation will be included in Covered Operations to the extent described in Sections 4.9 and 5.5 below. If NIC is acquired, this Plan will continue in effect for NIC and its then existing and future Covered Operations but will not apply to the acquiror or any of its operations unless otherwise

221

agreed.

4.   *Calculation of Qualifying Hours.*

4.1   The calculation of hours worked described below shall include only straight time hours worked by employees of Covered Operations.  The hours calculated in accordance with these principles shall be referred to as "Qualifying Hours."

4.2   Only straight time hours worked by employees who are not Bonus Eligible employees (as defined below) shall be counted as Qualifying Hours.

4.3   Only straight time hours worked by employees who worked during the applicable plan year shall be counted as Qualifying Hours.

4.4   Hours worked by employees for which premium (other than shift premium) or overtime payments are required, either pursuant to contract, collective bargaining agreement or statute shall not be counted as Qualifying Hours.

4.5   Hours worked by employees who were either discharged or quit during the applicable plan year shall not be counted as Qualifying Hours provided that hours worked by an employee who quits and is re-hired during the applicable plan year shall be counted based on his or her straight time hours during such plan year, and provided further that hours worked by an employee who is discharged and reinstated shall be counted based on the total of straight time hours worked and any back pay-equivalent hours awarded in connection with such reinstatement.

4.6   Paid time off in connection with union duties (Navistar account 97), excused 'J' time, and union leaves of absence shall be counted as Qualifying Hours.

4.7   Qualifying Hours for employees paid on a weekly payroll shall be determined over a period of 52 weeks for each plan year.  Qualifying Hours for employees paid on a salary basis shall be determined based on 40 hours for each full week worked.

4.8   Hours worked by employees who are covered by plans such as the Annual Incentive Plan, the Used Truck Commission Sales Program, the Regional Management Incentive Plan or other similar incentive or bonus plans, but excluding gain sharing plans of the type in effect at Indianapolis engine plant, shall not be counted as Qualifying Hours, with such employees referred to herein as "Bonus Eligible."

- 2 -

4.9  Hours worked by employees of affiliates and less than 100% owned subsidiaries included in Covered Operations on the Effective Date will be determined on the basis of the above provisions and included in Qualifying Hours in the same proportions that the income (loss) of such entities are included in Qualifying Profits.

4.10  Hours worked by employees in operations acquired after the Effective Date will be determined on the basis of the above provisions and included in Qualifying Hours in the same proportion that the net income (loss) of such acquired entity is included in Qualifying Profits as provided for in Section 5.5.1 below.

5.  *Calculation of Qualifying Profits.*

5.1  Qualifying Profits shall be the sum of all of the amounts described below in Sections 5.2, 5.3, 5.4, and 5.5.

5.2  Pre-tax income or losses of continuing Covered Operations including unusual items but excluding:

5.2.1  Income or losses from discontinued operations, non-recurring charges or credits directly attributable to the sale or discontinuation of such operations;

5.2.2  Extraordinary Items;

5.2.3  Gain or loss on the sale of assets, other than sale of inventory in the ordinary course of business and trade; and

5.2.4  Pre-tax income (loss) of NFC; pre-tax losses of NIC on an entity basis; pre-tax income (loss) of any business acquired after the Effective Date; dividends received from Navistar International Corporation Canada; equity in income (loss) from affiliates included in Covered Operations on the Effective Date.

5.3  Navistar Financial Corporation (NFC) is a wholly-owned subsidiary of NITC. As long as the NITC, NIC or other subsidiary ownership in NFC remains at 100%, the full net income (losses) of NFC will be included in Qualifying Profits. If this level of investment should change, the amount of net income (loss) to be included in Qualifying Profits, and the associated number of Qualifying Hours, will be based upon such revised percentage of ownership.

- 3 -

5.4     Cash dividends received by NIC, NITC, or any of their subsidiaries from affiliates which are included in Covered Operations on the Effective Date.

5.5     The extent to which the operating results of businesses acquired after the Effective Date are to be included in Qualifying Profits shall be determined as follows:

   5.5.1     Where the acquisition is located in the U.S. and where the equity interest of NITC, NIC or any affiliate or subsidiary equals or exceeds 50%, the net income (loss) of the acquired entity shall be included in Qualifying Profits in the same proportion as such equity interest. For the year in which the acquisition is completed, amounts will be determined on a pro-rata calendar day basis from the closing date.

   5.5.2     Where the acquisition is located outside the U.S. and where the equity interest of NITC, NIC or any affiliate or subsidiary equals or exceeds 50%, only cash dividend payments, management fees and similar payments received by NITC, NIC or any affiliate or subsidiary from such acquired entity shall be included in Qualifying Profits.

   5.5.3     Where the equity interest of NITC, NIC or any affiliate or subsidiary in such operation is less than 50%, only cash dividends received by NITC, NIC or any affiliate or subsidiary from such acquired entity shall be included in Qualifying Profits.

5.6     Calculations of income described above in Sections 5.2, 5.3, and 5.5.1 shall be made prior to any deductions from such income attributable to this Profit Sharing Plan, any other profit sharing plan for active employees, or bonuses paid to any Bonus Eligible Employees.

5.7     Calculations of income described above in Sections 5.2, 5.3, and 5.5 shall exclude any amortization of past service costs arising from adoption of Statement of Financial Accounting Standards No. 106, "Employee's Accounting for Postretirement Benefits Other Than Pensions" (SFAS 106) as well as any SFAS 106-related expenses prior to the date upon which the $500 million of prefunding of the Base Plan Trust is completed; i.e. non-pension postretirement benefit costs will be determined for purposes of this Profit Sharing Plan on a "pay-as-

- 4 -

you-go" basis until the $500 million of prefunding is completed.

5.8 Each of the items described in this Section 5 shall, except where otherwise specifically provided herein, be calculated in accordance with generally accepted accounting principles.

6. *Calculation of Steps.* The determination of the incremental steps to be used in the calculations described below shall be as follows:

6.1 The first step shall cover Qualifying Profits which exceed a dollar amount which is the product of the Qualifying Hours multiplied by $3.00 but which do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $4.50 (this is referred to as "Step One").

6.2 The second step shall cover Qualifying Profits which exceed those covered in Step One but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $6.00 (this is referred to as "Step Two").

6.3 The third step shall cover Qualifying Profits which exceed those covered in Step Two but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $7.50 (this is referred to as "Step Three").

6.4 The fourth step shall cover Qualifying Profits which exceed those covered in Step Three but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $9.00 (this is referred to as "Step Four).

6.5 The fifth step shall cover Qualifying Profits which exceed those covered in Step Four but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $10.50 (this is referred to as "Step Five").

6.6 The sixth step shall cover Qualifying Profits which exceed those covered in Step Five but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $12.00 (this is referred to as "Step Six").

6.7 The seventh step shall cover all Qualifying Profits which exceed those covered in Step Six (this is referred to as "Step Seven").

7.    *Calculation of Contribution Obligation*

    7.1  Within 90 calendar days following the end of each plan year, Navistar will make a contribution to the Supplemental Benefit Trust calculated in accordance with the following:

    7.2  The Qualifying Profits which fall within each of the Steps defined above shall be multiplied by the percentage listed for such Step as follows:

                           Step One 1%
                           Step Two 2%
                           Step Three 4%
                           Step Four 6%
                           Step Five 10%
                           Step Six 12%
                           Step Seven 16%

    7.3  The sum of the amounts determined in accordance with the procedure described in Section 7.2, calculated to the nearest whole dollar amount above shall be Navistar's annual payment obligation under this Profit Sharing Plan (this amount is referred to as the "Contribution Obligation"). An example calculation is attached as Exhibit A hereto.

8.    *Information and Dispute Resolution.*

    8.1  The Company will provide both the UAW and the Supplemental Benefit Committee with a worksheet detailing the calculation of the Contribution obligation, the Qualifying Hours, and the Qualifying Profits. Such information shall include a listing by category of the employees included and excluded in the calculation of Qualifying Hours and all information reasonably necessary to review the calculation of Qualifying Profits.

    8.2  Data on profits, hours worked, Qualifying Profits, and Qualifying Hours shall be reviewed by a certified public accounting firm selected by the Company, and the report of such firm shall be delivered to the UAW and the Supplemental Benefit Committee. A letter report setting forth the procedures performed and conclusions reached shall be prepared by such firm and delivered to the Company, the UAW and the Supplemental Benefit Committee.

    8.3  The information and reports described in Sections 8.1 and 8.2 shall be delivered to the UAW and the Supplemental Benefit Committee on or before the date that the Contribution obligation, if any, is required to be paid. In years in which no Contribution obligation is required

to be paid, the Company will deliver information on profits and Qualifying Profits to the UAW and the Supplemental Benefit Committee within 90 calendar days following the end of the plan year for which no contribution is required.

8.4   If, following a review of the information and calculations provided pursuant to Sections 8.1, 8.2, and 8.3 the Supplemental Benefit Committee disputes such information or calculation, it shall inform the Company of such dispute within 30 calendar days of the receipt by the UAW and the Supplemental Benefit Committee of such information. The Company and the Supplemental Benefit Committee shall thereafter attempt, for a period not to exceed 30 calendar days, to resolve such dispute.

   8.4.1   If such dispute cannot be resolved during that period, the parties to that dispute will attempt to identify a mutually acceptable third party (such as an accounting firm) to resolve such disputes.

   8.4.2   If the parties to such dispute cannot identify a mutually acceptable third party to resolve such dispute, the parties to such dispute shall obtain a list of the seven largest accounting firms, measured by the number of certified public accountants practicing in the United States. The Company and the Supplemental Benefit Committee shall then alternately, beginning with the Company, strike one name off such list until only one name remains. The remaining firm shall be empowered to resolve the dispute.

   8.4.3   Following selection of the party to resolve the dispute as provided in Section 8.4.1 or 8.4.2, the parties to the dispute shall present evidence and argument in support of their position and the individual or firm shall render a decision which shall be final and binding on all parties to the dispute.

8.5   The cost of the individual or firm retained to resolve the dispute as described in Sections 8.4.1 and 8.4.2 shall be borne equally by the Company and the Supplemental Benefit Committee. The parties shall bear their own fees and expenses in resolving such disputes.

8.6   In addition to the above, the Company will respond as soon as practicable to any reasonable requests from the UAW or the Supplemental Benefit Committee for information supporting any computation made by the Company to compute

- 7 -

227

the Contribution obligation, and will provide the information so requested.

ProfitShare8

**PROFIT SHARING PLAN**
**(Example Chart)**

**Assumptions:**

Profits eligible for sharing = $250,000,000
10,600 Qualifying Employees x 1,750 Hours = 18,550,000 Hours
Lower boundary of step 1 = $55,650,000 (18,550,000 hours x $3.00)
Step widths = $27,825,000 (18,550,000 hours x $1.50)

| | Step | | | Step Width | Step % | Payout | |
|---|---|---|---|---|---|---|---|
| | | | | | | Step | Cumulati- |
| 1 | 18,550,000 | x $4.50 | $55.650-$83.475 | $27.825 | 1.00% | $.28 | -$.28 |
| 2 | 18,550,000 | x $6.00 | $111.300 | $27.825 | 2.00% | $.56 | $.84 |
| 3 | 18,550,000 | x $7.50 | $139.125 | $27.825 | 4.00% | $1.11 | $1.95 |
| 4 | 18,550,000 | x $9.00 | $166.950 | $27.825 | 6.00% | $1.67 | $3.62 |
| 5 | 18,550,000 | x $10.5 | $194.775 | $27.825 | 10.00% | $2.78 | $6.40 |
| 6 | 18,550,000 | x $12.0 | $222.600 | $27.825 | 12.00% | $3.34 | $9.74 |
| 7 | Over $222.6 | | $250.000 | $27.400 | 16.00% | $4.38 | $14.12 |

- 9 -

## DEFINITION SUPPLEMENT

When used in the Settlement Agreement or any Exhibits thereto, the following terms shall have the meanings set forth below:

"<u>Actual Number of Retirees and Spouses</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Actuary</u>" means Coopers & Lybrand or such successor actuary as is selected by the Company from time to time.

"<u>Additional Permissible Benefits</u>" has the meaning assigned to it in Section 1.2 of Exhibit B to the Settlement Agreement.

"<u>Adjusted Health APBO</u>" has the meaning assigned to it in Section 7.2 of Exhibit B to the Settlement Agreement.

"<u>Advance Funding</u>" has the meaning assigned to it in Section 8.2 of Exhibit B to the Settlement Agreement.

"<u>Annual Service Cost</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Applicable Retirement Plan</u>" means (i) The Navistar International Transportation Corp. Retirement Plan for Salaried Employees as in effect on the Effective Date, (ii) The Navistar Financial Corporation Retirement Plan for Salaried Employees as in effect on the Effective Date, (iii) The Navistar International Transportation Corp. Non-Contributory Retirement Plan as in effect on the Effective Date and (iv) those multiemployer pension funds as in effect on the Effective Date to which the Employers have contributed and that have Participants who have been provided with postretirement Health and Life Insurance Benefits by the Employers.

"<u>Attributable Debt</u>" means, as of any particular time, the present value discounted at the rate of 6 ¼% per annum (compounded semi-annually) of the obligation of a lessee for rental payments during the remaining term of any lease (including any period for which such lease has been extended or may, at the option of the lessor, be extended) included in a Sale and Lease-Back Transaction, other than such a transaction permitted by Section 7.7 of Exhibit A to the Settlement Agreement.

"<u>Average Contributing Participants</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Basic Life Insurance Program" means the part of the Life Insurance Program pursuant to which the Employers agree to provide group life insurance, entirely at their own expense, to the Retirees.

"Blackout Period" has the meaning assigned to it in Section 3.4 of Exhibit B to the Settlement Agreement.

"Board" means the Board of Directors of Parent.

"CBA" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Charter Amendments" has the meaning assigned to it in Section 8.1 of the Settlement Agreement.

"Class" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Class Counsel" means the law firms of Bobulsky, Grdina & Altier, 2036 East Prospect Road, Ashtabula, Ohio 44004; Bredhoff & Kaiser, 1000 Connecticut Avenue, N.W., Washington, D.C. 20036; Cloppert, Portman, Suater, Latanick & Foley, 225 East Board Street, Columbus, Ohio 43215; Gregory, Moore, Jaekle, Heinen, Ellison & Brooks, 3727 Cadillac Tower, Detroit, Michigan 48226; Kleiman, Whitney, Wolfe & Gore, One East Wacker Drive, Chicago, Illinois 60601; Lackey, Nusbaum, Harris, Reny & Torzewski, Two Maritime Plaza, Toledo, Ohio 46304; Macey, Macey & Swanson, 445 North Pennsylvania Street, Suite 401, Indianapolis, Indiana 48204; Miller, Carson & Boxberger, 1400 One Summit Square, Fort Wayne, Indiana 46802; and Daniel W. Sherrick, Associate General Counsel, International UAW, 8000 East Jefferson, Detroit, Michigan 48214.

"Class Member" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Class Representatives" means Art Shy, Fred Burris, Clarence Nuss, John Herring, Carl Potts, Harold Retherford, Henry G. Betley, Richard Spitler, Jack O'Neill, Donald McPhearson, the UAW and its Locals 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293, the UPGWA and its Locals 4, 122 and 134, the IAM and its Locals 1471, 2819 and 2821, the SEE and the USWA and its Local 4320.

"Collective Bargaining Representatives" means the UAW and its Locals 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293; the UPGWA and its Locals 4, 122 and 134; IAM and its Locals 1471, 2819 and 2821; the SEE; the USWA and its Locals 3740 and 4320; the International Brotherhood of Teamsters and its Locals 705 and 570; the International Union of Operating Engineers and its Local 399; and the International Federation Professional and Technical Employees and its Local 137.

- 2 -

231

"<u>Committee's Standstill Period</u>" has the meaning assigned to it in Section 1(f)(iv) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Company</u>" means Navistar International Transportation Corp., and each successor thereto.

"<u>Company Costs Per Capita</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Contributing Participants</u>" means Retirees, Spouses and Surviving Spouses for such periods as they are making required contributions to the Health Benefit Program.

"<u>Contributing Participant's Annual Contribution</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Court</u>" means the United States District Court for the Southern District of Ohio Western Division.

"<u>Cumulative Drop Outs</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Deferred Retiree Participants</u>" means individuals affected by health care benefit litigation settlements in <u>Ragan, et al. v. Navistar</u>, No. 88-2623-S (D.Kan.); <u>Local Union 369, International Brotherhood of Electrical Workers, AFL-CIO, et al. Navistar</u>, No. C-88-6724-L-A (W.D.Ky.); and <u>Bolding et al. v. Navistar</u>, No. 88-9751-9 (Superior Court, GA).

"<u>Demand Registration</u>" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Dependent</u>" means (i) a person's Spouse, and (ii) unmarried children residing in a person's household and unmarried children not residing in a person's household for whom such person is legally required to provide medical care. For purposes of (ii) above, (A) the children of a person include (I) the natural children of such person, (II) legally adopted children of such person, (III) stepchildren of such person for whom legal adoption proceedings have been initiated and (IV) other children related by blood or marriage to such person or who are under such person's legal guardianship and who are dependent on such person for more than one-half of their support as defined in the IRC, who either qualify in the current year for dependency status, or who have been reported as dependents on such person's most recent federal income tax return ("dependency tax status") and (B) children shall continue to qualify as children until the end of the calendar year in which they attain age 19 years; provided, that (I) if a child is totally and permanently disabled at the time he or she would otherwise cease to be a child for purposes of this definition, he

- 3 -

or she will continue to be covered as a child for as long as he or she remains totally and permanently disabled, and (II) if a child qualifies in the current year for dependency tax status or has been reported as a dependent on a person's most recent federal tax return, the child will continue to be covered as a child through the end of the calendar year in which the child attains age 25 years provided the child is unmarried and is legally residing in the person's household.

"DOL" means the U.S. Department of Labor.

"DOL Exemption for Parent Common Equity" means an exemption from the DOL permitting the Company to contribute to the Supplemental Benefit Trust and for the Supplemental Benefit Trust to hold Parent Class B Common, and to permit the Parent Class B Common to be voted in accordance with and satisfy the requirements of Article III of Exhibit B to the Settlement Agreement without violating the provisions of Section 406 or 407 of ERISA or Section 4975 of the IRC, such exemption to be in form and substance reasonably satisfactory to the Company and the Supplemental Benefit Committee.

"DOL Exemption for Parent Series A Preference" means an exemption from the DOL permitting the Supplemental Benefit Trust to hold Parent Series A Preference without violating the prohibited transaction rules of ERISA, such exemption to be in form and substance reasonably satisfactory to the Company and the Class Representatives.

"DOL Exemptions" means the DOL Exemption for Parent Common Equity and the DOL Exemption for Parent Series A Preference.

"Effective Date" has the meaning assigned to it in Section 13.1 of the Settlement Agreement.

"Eligible Dependent" means (i) each Dependent of a Retiree, during the life of such Retiree and the life of such Retiree's Surviving Spouse, if any, (ii) each Dependent of a deceased former Employee who died prior to the Effective Date, during the life of such Employee's Present Surviving Spouse, if any, and (iii) each Dependent of a Present Employee or of a Present Eligible Former Employee who dies prior to becoming a Future Retiree and who is survived by a Future Surviving Spouse, during the life of such Surviving Spouse; provided, that Eligible Dependents shall not include Dependents who are in military service or the Peace Corps (or similar service) of any country or Dependents covered under any health care plan sponsored by the Employers.

"Employee" means an active employee of an Employer, including all such persons who, although on layoff, sick leave, long-term disability or Employer-approved leave of absence, are treated as active employees by the relevant Employer under relevant

- 4 -

CBAs or employment policies, but excluding active employees of an Employer who are nonresident aliens employed outside of the United States and Canada.

"Employers" means Parent, the Company, NFC, HARCO National Insurance Company, Indianapolis Casting Corporation, Navistar International Export Corporation and Navistar International Overseas Corporation, and each successor thereto.

"Enrolled Participant" means each Retiree and Surviving Spouse who has enrolled or re-enrolled in the Health Benefit Program and the Supplemental Benefit Program and their Eligible Dependents, other than a Retiree, Surviving Spouse or Eligible Dependent whose enrollment therein has been terminated in accordance with Section 2.3 of Exhibit A to the Settlement Agreement and who has not re-enrolled in accordance with Section 2.4 of Exhibit A to the Settlement Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Event Date" has the meaning assigned to it in Section 3.6 of Exhibit B to the Settlement Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated thereunder.

"Excluded Retirees" means Retirees and their Dependents who were formerly (i) hourly employees and technical and office employees of the Solar Division (Solar Plan 804 & 805); (ii) hourly Benham Coal employees, Progressive Mine Workers of America, Local Union No. 402, District No. 2; (iii) salaried and management employees of the Chicago, West Pullman and Southern Railroad; and (iv) retirees affected by the litigation settlement in Lumpkin v. Navistar, No. 81C6674 (N.D. Ill. 1981).

"Exempted Indebtedness" means the sum of (i) all outstanding indebtedness of Parent (and any predecessor corporation) and Restricted Subsidiaries incurred after March 1, 1968 and secured by any mortgage, security interest, pledge or lien other than those permitted by paragraph (a) of Section 5.06 of the Indenture, (ii) all Attributable Debt and (iii) all outstanding indebtedness for borrowed money of Restricted Subsidiaries other than that permitted by paragraph (a) of Section 5.08 of the Indenture.

"Existing Plans" means all plans and other arrangements of the Employers, as in effect on the Effective Date, under which Present Retirees, Present Surviving Spouses, Present Eligible Dependents and Present Eligible Former Employees are receiving, are entitled to receive, or would become entitled to receive,

- 5 -

234

postretirement health or life insurance benefits in the absence of the Settlement Agreement.

"Expected Average Contributing Participants" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Company Costs Per Capita" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Drug Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Medical Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Number of Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Participant Contributions" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Fairness Hearing" has the meaning assigned to it in Section 4.1 of the Settlement Agreement.

"FASB 106" means Financial Accounting Standards Board Statement No. 106 regarding accounting for postretirement benefits other than pensions.

"Final" means the earlier of (i) expiration of the time period for an appeal as a matter of right if no appeal has been filed; (ii) any final dismissal or withdrawal of appeal from the Judgment; or (iii) the date of final affirmance of the Judgment following any appeal, including the expiration of the time for petitions for writs of certiorari (or written confirmation by the appellants that no such petition will be filed) and, if certiorari be granted, the date of final affirmance of the Judgment following review pursuant to that grant.

"Foster Case" has the meaning assigned to it in Section 2.2 of the Settlement Agreement.

"Fully Diluted Basis" means, as of a particular date of determination, the total number of shares of Parent Common Equity and equivalents outstanding as calculated in accordance with Appendix B-7 to Exhibit B to the Settlement Agreement.

"Fully Funded" means, as of a particular date of determination, that the balance of the Employers' prefunding

- 6 -

contributions held under the Health Benefit Trust equals the sum of the Employers' share of the Health APBO under the Health Benefit Program plus the actuarial present value of the postretirement benefits under the Basic Life Insurance Program (as determined by the Actuary consistent with the determination of Health APBO).

"Fully Funded Amount" means, as of a particular date of determination, the amount of money necessary so that the balance of the Employers' prefunding contributions held under the Health Benefit Trust equals the sum of the Employers' share of the Health APBO under the Health Benefit Program plus the actuarial present value of the postretirement benefits under the Basic Life Insurance Program (as determined by the Actuary consistent with the determination of Health APBO).

"Fully Funded Date" means the first date on which the Health Benefit Trust is Fully Funded.

"Funding Notice" means the notice described in Section 8.2 of Exhibit B to the Settlement Agreement.

"Future Retiree" means (i) each Present Employee who after the Effective Date becomes eligible to commence the receipt of Pension Benefits, (ii) each other Present Employee who is represented by a Collective Bargaining Representative and who after the Effective Date continues active employment with an Employer beyond attainment of age 65 years and then terminates employment and (iii) each Present Eligible Former Employee who after the Effective Date satisfies the applicable conditions for Health and Life Insurance Benefits.

"Future Surviving Spouse" means (i) the Spouse of a Retiree who dies after the Effective Date and (ii) the Spouse of a Present Employee or of a Present Eligible Former Employee who dies after the Effective Date after becoming eligible for normal or early retirement under the Navistar International Transportation Corp. Retirement Plan for Salaried Employees or the Navistar Financial Corporation Retirement Plan for Salaried Employees; (iii) the husband or wife of a Present Employee or of a Present Eligible Former Employee who dies after the Effective Date after becoming eligible for normal or regular early retirement under the Navistar International Transportation Corp. Noncontributory Retirement Plan.

"HBPC Chair" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Committee Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Company Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

- 7 -

"HBPC Other Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Other Member Alternate" has the meaning assigned to it in Section 6.6 of Exhibit A to the Settlement Agreement.

"HBPC UAW Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"Health Accumulated Postretirement Benefit Obligation" and "Health APBO" mean the actuarial present value of the postretirement benefits under the Health Benefit Program attributed to employee service rendered to the date of determination as determined by the Actuary (i) in accordance with FASB 106, (ii) in a manner consistent with the assumptions reflected in Appendix A-5 to Exhibit A to the Settlement Agreement, and (iii) using methods, factors and procedures determined by the Actuary.

"Health and Life Insurance Benefits" means postretirement health or life insurance benefits payable under any Existing Plan.

"Health Benefit Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Health Benefit Program Committee" means the committee described in Section 6.1 of Exhibit A to the Settlement Agreement.

"Health Benefit Program Letter" has the meaning assigned to it in Section 7.2.1 of the Settlement Agreement.

"Health Benefit Program Payment Default" has the meaning assigned to it in Section 10.1 of Exhibit A to the Settlement Agreement.

"Health Benefit Trust" means the trust established and maintained for the benefit of Participants as set forth in the trust agreement attached as Appendix A-3 to Exhibit A to the Settlement Agreement.

"HMO" means a health maintenance organization.

"IAM" means International Machinists District Lodge 28.

"Immediate Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Immediate Drop Outs During the First 45 Days" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Immediate Drop Outs During the Second 45 Days" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

- 8 -

"Imputed Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Indemnification Procedures" mean the following procedures to be followed by any party entitled to indemnification under the Settlement Agreement or the Plan (an "Indemnified Party"): promptly after receipt of notice of the commencement of any action in respect of which the Indemnified Party intends to seek indemnification hereunder, the Indemnified Party shall notify the party obliged to provide such indemnification (the "Indemnifying Party") thereof in writing; provided, that the failure of an Indemnified Party to give such notice shall not affect the right of the Indemnified Party to indemnification hereunder, except to the extent that the Indemnifying Party has been prejudiced by such failure. The Indemnifying Party shall be entitled to assume sole control of the defense of any such action; provided, that the Indemnifying Party shall not be entitled to assume control of such defense if in the opinion of counsel to the Indemnified Party there is a significant possibility of a conflict between the interests of the Indemnifying Party and those of the Indemnified Party or such counsel intends to assert a separate legal defense. If the Indemnifying Party does not assume the defense of two or more Indemnified Parties in any action where indemnity may be available, such indemnity shall include the reasonable defense costs of one counsel for such Indemnified Parties as a group; provided, that if in the opinion of counsel to any such Indemnified Party there is a significant possibility of a conflict between the interests of such Indemnified Party and those of any other such Indemnified Party or if such counsel intends to assert a separate legal defense, such Indemnified Party shall be entitled to separate counsel; and, provided, further, that such Indemnified Party shall obtain the prior written approval of the Indemnifying Party before entering into any settlement of any claim for which it is seeking indemnification hereunder or ceasing to defend against such claim.

"Indenture" means the Indenture, dated as of March 1, 1985, between a predecessor of Parent and Commerce Union Bank, as trustee.

"Initial Period" has the meaning assigned to it in Section 8.1 of Exhibit B to the Settlement Agreement.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Judgment" means the Judgment of the Court approving the Settlement Agreement in the form of Exhibit G to the Settlement Agreement.

- 9 -

"<u>Lien/Sale and Leaseback Default</u>" has the meaning assigned to it in Section 10.2 of Exhibit A to the Settlement Agreement.

"<u>Life Insurance Program</u>" has the meaning assigned to it in the recitals to the Settlement Agreement.

"<u>Litigation</u>" means the *Shy* Case and the *Foster* Case.

"<u>Long-Form Registration</u>" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Market Offering</u>" has the meaning assigned to it in Section 1(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Maximum Corridor Medical Per Capita Costs</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Measurement Year (x)</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Monthly Base Contribution</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Named Fiduciary</u>" means a fiduciary within the meaning of Section 402(a)(2) of ERISA.

"<u>Navistar</u>" means Parent, the Company, NFC, HARCO National Insurance Company and Indianapolis Casting Corporation, and each successor thereto.

"<u>Navistar Interest Rate</u>" means (i) the average interest rate paid by the Company from time to time on borrowings pursuant its revolving credit facility (or its primary revolving credit facility if it has more than one), or (ii) if the Company has no revolving borrowings at a particular time, the average interest rate paid by NFC from time to time on borrowings pursuant to its revolving credit facility (or its primary revolving credit facility if it has more than one) or (iii) if neither the Company nor NFC has revolving borrowings at a particular time, 1.0% over the prime rate announced from time to time by the Morgan Guaranty Trust Company.

"<u>Navistar Parties</u>" means Parent, the Company, NFC, HARCO National Insurance Company and Indianapolis Casting Corporation, and each successor thereto.

"<u>Navistar Released Parties</u>" means Navistar and the present and former officers, directors, committees (including the Pension and Employee Benefit Committee), employees, parents,

- 10 -

subsidiaries, attorneys, insurers, partners, consultants, advisers, agents, and representatives of Navistar as well as their respective predecessors, successors, assigns and present and former direct and indirect affiliates.

"New CBA" has the meaning assigned to it in Section 12.1.6 of the Settlement Agreement.

"New Drop Ins" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"New Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"NFC" means Navistar Financial Corporation, and each successor thereto.

"Non-Represented Employees" means all Employees who are not represented by Collective Bargaining Representatives.

"Notice Order" has the meaning assigned to it in Section 4.1 of the Settlement Agreement.

"Optional Life Insurance Program" means the part of the Life Insurance Program pursuant to which additional group life insurance benefits are provided as described in Section 4.2 of Exhibit A to the Settlement Agreement.

"Optional Life Insurance Program Letter" has the meaning specified in Section 7.2.5 of the Settlement Agreement.

"Other Period" has the meaning assigned to it in Section 8.2 of Exhibit B to the Settlement Agreement.

"Other Voting Securities" has the meaning assigned to it in Section 3.1 of Exhibit B to the Settlement Agreement.

"Parent" means Navistar International Corporation, and each successor thereto.

"Parent Class B Common" means the Class B common stock of Parent, par value $0.01 per share.

"Parent Common" means the common stock of Parent, par value $0.01 per share.

"Parent Common Equity" means Parent Common and Parent Class B Common.

"Parent Initiated Piggyback Registration" has the meaning assigned to it in Section 2(a)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

- 11 -

240

"Parent Permitted Registrations" has the meaning assigned to it in Section 1(d)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent Postponement" has the meaning assigned to it in Section 1(d)(ii) of Appendix B-3 to Exhibit B to the Settlement Agreement.

"Parent Preference Stock" means Parent Series A Preference and Parent Series B Preference.

"Parent Registration" has the meaning assigned to it in Section 1(d)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent Registration Notice" has the meaning assigned to it in Section 2(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent Securities" means the Parent Common Equity and the Parent Preference Stock.

"Parent Series A Preference" has the meaning assigned to it in Section 5.1 of Exhibit B to the Settlement Agreement.

"Parent Series B Preference" means the Series B preference stock of Parent, par value $1.00 per share.

"Parent's 90 Day Period" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent's Registration Period" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent's Standstill Period" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Participant" means each Present Employee, Retiree, Surviving Spouse and Present Eligible Former Employee who is or may become eligible to receive health or life insurance benefits under the Plan, and their Eligible Dependents, regardless of whether any such person has enrolled in the Plan or whether his enrollment in the Plan has been terminated.

"Pension Benefits" means retirement benefits under an Applicable Retirement Plan, including but not limited to disability and pension benefits, whether paid monthly, in a lump sum or otherwise, including such benefits payable pursuant to the terms of any plant closing agreement, severance arrangement or otherwise, but not including a deferred vested pension or an "Accrued Benefit" as

- 12 -

defined in the respective sales agreements regarding the sales of the Solar Turbines International Division and the Construction Equipment Division.

"Permitted Parent Registration" has the meaning assigned to it in Section 1(e) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Piggyback Notice" has the meaning assigned to it in Section 2(a)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Piggyback Registration" has the meaning set forth in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Piggyback Rights Revision Date" has the meaning set forth in Section 2(e) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Plan" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Plan 1" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Plan 2" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Plan Administrator" means the administrator of the Plan within the meaning of Section 3(16)(A) of ERISA.

"Plan Expenses" means all out-of-pocket administrative costs of the Health Benefit Program and Life Insurance Program, including but not limited to the costs of the trustee of the Health Benefit Trust, the costs of the Health Benefit Program Committee (other than expenses paid by the Company in accordance with Section 6.7 of Exhibit A to the Settlement Agreement) and the costs of service providers and professionals (other than the Actuary) engaged by the Plan Administrator, the Named Fiduciary or the Health Benefit Program Committee.

"Plan Year" means the fiscal year of the Company, which fiscal year currently ends on October 31.

"Post-Window Period Registration Request" has the meaning assigned to it in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Present Eligible Dependent" means each Eligible Dependent on the Effective Date.

- 13 -

"Present Eligible Former Employee" means each former employee who as of the Effective Date is not a Present Retiree but who, without any further employment by the Employers and upon the satisfaction of any applicable conditions, would become eligible for Health and Life Insurance Benefits in the absence of the Settlement Agreement.

"Present Employee" means (i) each Non-Represented Employee on the Effective Date, (ii) each Employee represented by a Collective Bargaining Representative as of February 28, 1993, and (iii) during the terms of the New CBAs, each other Employee covered by a New CBA to the extent such Employee is eligible to benefits under the Plan pursuant to the terms of such New CBA.

"Present Non-Represented Employee" means each Present Employee who is not a member of a collective bargaining unit represented by a Collective Bargaining Representative on the Effective Date.

"Present Represented Employee" means each Present Employee who is a member of a collective bargaining unit represented by a Collective Bargaining Representative on the Effective Date.

"Present Retiree" means each former Employee, other than an Excluded Retiree, who is receiving Health and Life Insurance Benefits on the Effective Date.

"Present Surviving Spouse" means each Spouse of a deceased former Employee who is receiving Health and Life Insurance Benefits on the Effective Date.

"Principal Property" shall mean any plant used primarily for manufacturing purposes located within the United States of America, excluding its territories and possessions, of Parent or any Restricted Subsidiary except any such Plant which the Board by resolution declares is not of material importance to the total business conducted by Parent and its Restricted Subsidiaries as an entity.

"Profit Sharing Cessation Date" has the meaning assigned to it in Section 7.2 of Exhibit B to the Settlement Agreement.

"Profit Sharing Contributions" has the meaning assigned to it in Section 7.1 of Exhibit B to the Settlement Agreement.

"Profit Sharing Plan" means the SPD Supplemental Benefit Profit Sharing Plan attached as Appendix B-7 to the Supplemental Benefit Program.

"Program Administrator" means the administrator of the Supplemental Benefit Program within the meaning of Section 3(16)(A) of ERISA.

- 14 -

"<u>Registrable Securities</u>" means (a) the Parent Common issued upon the conversion of the Parent Class B Common issued to the Supplemental Benefit Trust by Parent on the Effective Date, (b) any Parent Common issued by Parent to the Supplemental Benefit Trust after the Effective Date, (c) any Parent Common underlying any other Parent Securities issued by Parent to the Supplemental Benefit Trust after the Effective Date, (d) any other securities of Parent issued to the Supplemental Benefit Trust in connection with any distribution made in respect of the Parent Class B Common, and (e) any other securities of Parent issued to the Supplemental Benefit Trust in respect of, or upon conversion or exchange of, any of the securities described in the foregoing clauses (a) through (d); provided, that the securities described in the foregoing clauses (d) and (e) shall be deemed Registrable Securities only if the class of securities of which they are a part shall have been registered under the Exchange Act. As to any particular Registrable Securities, such securities will cease to be Registrable Securities when they have been sold, transferred or otherwise disposed of by the Supplemental Benefit Trust.

"<u>Registration Expenses</u>" has the meaning assigned to it in Section 5 of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Registration Request</u>" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Restricted Stock</u>" has the meaning assigned to it in Section 10.2(d) of Exhibit B to the Settlement Agreement.

"<u>Restricted Subsidiary</u>" shall mean any subsidiary of Parent (a) substantially all the property of which is located, or substantially all the business of which is carried on, within the United States of America, excluding its territories and possessions, and (b) which owns or leases a Principal Property.

"<u>Retiree</u>" means each Present Retiree and each Future Retiree.

"<u>Retiree Adjustment Ratio</u>" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"<u>Retiree Cost Sharing Ratio</u>" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"<u>Rule 415</u>" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Rule 415 Demand Registration</u>" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

- 15 -

"<u>Sale and Lease-back Transaction</u>" has the meaning assigned to it in Section 7.7(a) of Exhibit A to the Settlement Agreement.

"<u>SBC Chair</u>" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"<u>SBC Class One Other Member</u>" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"<u>SBC Class One Other Member Alternate</u>" has the meaning assigned to it in Section 6.1(b) of Exhibit B to the Settlement Agreement.

"<u>SBC Class Two Other Member</u>" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"<u>SBC Class Two Other Member Alternate</u>" has the meaning assigned to it in Section 6.1(c) of Exhibit B to the Settlement Agreement.

"<u>SBC Committee Member</u>" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"<u>SBC Committee Member Alternate</u>" has the meaning assigned to it in Section 6.1(c) of Exhibit B to the Settlement Agreement.

"<u>SBC UAW Member</u>" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"<u>SEC</u>" means the United States Securities and Exchange Commission.

"<u>Scheduled Contributions</u>" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"<u>Section 10.2 Cure Period</u>" has the meaning assigned to it in Section 10.2 of Exhibit A to the Settlement Agreement.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

"<u>Security</u>" means any debenture, note or other evidence of indebtedness, as the case may be, authenticated and delivered under the Indenture.

"<u>SEE</u>" means Society of Engineering Employees, Inc.

"<u>Settlement Agreement</u>" means the settlement agreement entered in the *Shy* Case and approved by the U.S. District Court for

- 16 -

245

the Southern District of Ohio, as amended from time to time in accordance with the provisions therein.

"Short-Form Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Shy Case" has the meaning assigned to it in the recitals to the Settlement Agreement.

"SPD" means summary plan description.

"Spouse" means the husband or wife of a person to whom such person is legally married and does not include a former spouse from whom such person is divorced.

"State or National Health Insurance Program" means any program pursuant to which the federal government of the United States, the government of any State or territory thereof or any governmental authority thereof or therein, mandates or provides directly or indirectly health care benefits.

"Stay Orders" has the meaning assigned to it in Section 13 of the Settlement Agreement.

"Subsidiary" means any corporation of which at least a majority of the outstanding stock having voting power under ordinary circumstances to elect a majority of the board of directors of said corporation shall at the time be owned by Parent or by Parent and one or more Subsidiaries or by one or more Subsidiaries.

"Super-Majority Transaction" means (i) a merger or consolidation to which Parent is a constituent corporation, if either (A) the stockholders of Parent immediately before such merger or consolidation, do not own, directly or indirectly, more than 50% of the combined voting power of the then outstanding voting securities of the corporation surviving or resulting from such merger or consolidation or (B) equity securities of Parent or the Company would be issued to stockholders of the other constituent corporation(s) to such merger or consolidation which have a fair market value at the time of the transaction in excess of $750 million, or (ii) the sale, transfer, pledge or other disposition of all or substantially all of the assets of Parent and its subsidiaries on a consolidated basis or the Company and its subsidiaries on a consolidated basis.

"Super-Majority Vote" means the vote of at least 85% of the shares of Parent Common Equity, voting as a single class, present in person or by proxy at a meeting at which a Super-Majority Transaction is submitted for a stockholder vote and a quorum is present.

- 17 -

"<u>Supplemental Benefit Committee</u>" has the meaning assigned to it in Section 6.1 of Exhibit B to the Settlement Agreement.

"<u>Supplemental Benefit Program</u>" has the meaning assigned to it in the recitals to the Settlement Agreement.

"<u>Supplemental Benefit Program Payment Default</u>" has the meaning assigned to it in Section 11.1 of Exhibit B to the Settlement Agreement.

"<u>Supplemental Benefit Trust</u>" means the trust established and maintained for the benefit of Enrolled Participants and Retirees, whether or not they are Enrolled Participants, as set forth in the trust agreement attached as Appendix B-2 to Exhibit B to the Settlement Agreement.

"<u>Supplemental Benefit Trust Initiated Piggyback Registration</u>" has the meaning assigned to it in Section 2(b)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Supplemental Benefit Trust's 90 Day Period</u>" has the meaning assigned to it in Section 2(b)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Supplemental Benefit Trust's Registration Period</u>" has the meaning assigned to it in Section 2(b)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Supplemental Benefit Trust's Standstill Period</u>" has the meaning assigned to it in Section 2(b)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Supplement Trust Designee</u>" has the meaning assigned to it in Section 5.2 of Exhibit B to the Settlement Agreement.

"<u>Supplemental Trust Piggyback Registration</u>" has the meaning assigned to it in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Surviving Cumulative Drop Outs</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Surviving Spouse</u>" means each Present Surviving Spouse and each Future Surviving Spouse.

"<u>Total Actual Drug Cost</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Total Actual Medical Cost</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Total Estimated Annual Cost</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

- 18 -

"Total Expected Drug Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Expected Medical Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Maximum Corridor Medical Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Trust Market Offerings" has the meaning assigned to it in Section 1(i) of Appendix B-3 to Exhibit B to the Settlement Agreement.

"UAW" means the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, an unincorporated association with its principal offices in the State of Michigan.

"UAW Designee" means the member of the Board which the UAW is entitled to elect in accordance with the terms of the Parent Series B Preference.

"UAW/Navistar Joint Committee" has the meaning assigned to it in the current Health Security Agreement between the Company and the UAW.

"UPGWA" means the International Union, United Plant Guard Workers of America.

"USWA" means the International Union, United Steelworkers of America.

"Window Period" means that period of time (extended by the length of time of any Blackout Period or Other Period that occurs during what would constitute the Window Period without such extension) which shall commence on the Window Period Commencement Day and shall be the shorter of the following:

(i)  the period from the Window Period Commencement Day until the date following completion of the sale which causes the net proceeds received by the Supplemental Benefit Trust in respect of the sale of Parent Common Equity to equal or exceed $500 million (including any such proceeds received upon sales approved by the Board or through tender offers, but excluding amounts received in connection with Advance Funding sales); and

(ii)  the period equal in duration to the period from the Effective Date to the Window Period Commencement Day. "Window Period Commencement Day" means the first day on

- 19 -

or after the Event Date that is not during a Blackout Period or
Other Period.

249