IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ART SHY, et al.,                          :

       Plaintiffs,

    v.                                   :        Case No. 3:92cv333

NAVISTAR INTERNATIONAL                           JUDGE WALTER H. RICE
CORPORATION, et al.,
                                         :
       Defendants.

---

DECISION AND ENTRY SUSTAINING THE MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT (DOC. #395) OF INTERVENOR-PLAINTIFF
THE SUPPLEMENTAL BENEFIT COMMITTEE OF THE NAVISTAR
INTERNATIONAL TRANSPORTATION CORPORATION RETIREE
SUPPLEMENTAL BENEFIT PROGRAM; SUSTAINING SAID
INTERVENOR-PLAINTIFF'S AMENDED MOTION TO ENFORCE THE
SETTLEMENT AGREEMENT (DOC #407); OVERRULING DEFENDANT
NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION'S
MOTION TO DISMISS SAID INTERVENOR-PLAINTIFF'S COMPLAINT
(DOC. #422);  SAID INTERVENOR-PLAINTIFF IS ORDERED TO FILE,
WITHIN TWENTY-ONE (21) DAYS, A REQUEST DETAILING THE
INFORMATION REQUIRED FROM SAID DEFENDANT; SAID
DEFENDANT IS ORDERED TO PROVIDE THE INFORMATION
REQUESTED WITHIN TWENTY-ONE (21) DAYS THEREAFTER OR, IN
THE ALTERNATIVE, SPECIFY WHY PARTICULAR INFORMATION
REQUESTED IS NOT RELEVANT TO THE ISSUE BEFORE THE COURT.

---

The Supplemental Benefit Committee of the Navistar International

Transportation Corporation Retiree Supplemental Benefit Program (the

"Committee," "Intervenor") is the administrator and fiduciary of the Supplemental

Benefit Program and Trust ("Supplemental Program" or "Supplemental Plan"), a

creation of the Settlement Agreement approved by this Court on June 8, 1993.

Doc. #327. The Settlement Agreement terminated the above-captioned class action, brought by retired employees and their union representatives against Defendant Navistar International Corporation ("Navistar," "Company"), after the company reduced the medical benefits of its retired employees.

Pending before the Court is the Committee's Motion to Enforce the Settlement Agreement (Doc. #395), the Committee's Amended Motion to Enforce the Settlement Agreement (Doc. #407), and Navistar's Motion to Dismiss the Intervenor-Plaintiff's Complaint (Doc. #422). For the reasons set forth below, the Court will SUSTAIN both of the Committee's motions, and the Court will OVERRULE Navistar's Motion to Dismiss.

## I.    BACKGROUND AND PROCEDURAL HISTORY

This litigation arose out of a decision by Navistar, announced on July 28, 1992, to make major reductions in the insurance and health benefits offered to the company's retired employees and their dependents. Doc. #324 at 1. During the 1980s, Navistar suffered a decline in revenue, the fate of many American manufacturing concerns during that decade and the decades since. *Id.* By 1992, Navistar's annual revenue had declined to $3.8 billion after reaching highs during the late 1970s of $8.25 billion. *Id.* The company reduced its workforce during the same time period, shrinking its base of employees from over 100,000 to approximately 13,500 by 1992. *Id.* In addition, Navistar shuttered or sold many of its manufacturing facilities as it "downsized" its workforce. *Id.* Even as it did

2

so, the company retained the obligation to pay for the insurance and health benefits it owed to its retired employees. *Id.* at 1-2.

However, by 1992, Navistar no longer had the financial ability to provide the retirees' benefits and at the same time remain solvent. *Id.* at 5. Negotiations between the company and the retirees' union occurred during much of that year. *Id.* at 5. The talks broke down, in July of 1992, after Navistar announced that it was unilaterally making drastic changes to the retirees' health insurance benefits. *Id.* at 6-8. The Navistar retirees filed suit as a class in August of 1992, along with a number of unions that had represented them during their years of employment with the company. *Id.* at 9. After hundreds of meetings, the parties reached a Settlement Agreement. *Id.* at 10.

### A. The Settlement Agreement & the Supplemental Plan

The Court's Opinion of May 27, 1993, announced its factual findings and certified the class of retirees. Doc. #324. In its Opinion, the Court described the portion of the Settlement Agreement relevant to the present matter as follows:

> The settlement agreement contains two plans, the Base Plan and the Supplemental Plan. The Base Plan provides basic life and health insurance benefits to retirees. Navistar is obligated to provide $1 billion to the Base Plan. Under the Base Plan, retirees' health and life insurance benefits would be reduced. For instance, company-provided life insurance would be reduced to a maximum of $5,000. In addition, retirees would be required to pay monthly premiums for their health insurance, as well as deductibles and, for those under the age of 65, co-payments. **However, the Supplemental Plan, which is a truly innovative concept, turns over much of the ownership of Navistar to the very retirees who must sacrifice benefits under the settlement agreement, a Plan which could well alleviate some**

3

**(perhaps as much as one-half or more) of the hardship which the settlement will require retirees to endure. The Supplemental Plan is a trust which will be administered by retirees and their representatives.** Navistar must contribute 50% of the shares of its common stock and a portion of its future profits to the trust established under the Supplemental Plan. The income generated by the Supplemental Plan can be used, for instance, to reduce the premiums which retirees must pay for their health insurance. Thus, if the retirees' sacrifices allow Navistar to return to prosperity, the retirees will own a significant share of the consequent gain in the value of the company. The $1 billion which Navistar must contribute to the Base Plan will reduce retiree health and life insurance benefits to 38% of the former value of those benefits, $2.6 billion; however, conservative projections set the value of the stock and Navistar's profits which will be contributed to the Supplemental Plan at $750 million; thus, the value of the settlement agreement could rise to 68% of the former amount of $2.6 billion, or even more. Indeed, 67% of the value of the restructured Navistar will be in the Base and Supplemental Plans, and thus be owned by the retirees.

*Id.* at 10-11 (emphasis added).

The Supplemental Plan, set forth in Exhibit B of the Settlement Agreement, was established "for the benefit of Enrolled Participants and Retirees, whether or not they are Enrolled Participants."[1] Doc. #399-3 at 21. The benefits provided are funded by the Supplemental Benefit Trust, which in turn is funded by profits from Navistar. Doc. #399-3 at 25.

Article VI establishes the Supplemental Benefit Committee ("Committee") to administer the plan and the trust, and the Committee consists of five members,

---

[1] As stated in the Definitional Supplement, Exhibit D to the Settlement Agreement, "'Enrolled Participant' means each Retiree and Surviving Spouse who was enrolled or re-enrolled in the Health Benefit Program and the Supplemental Benefit Program and their Eligible Dependents," with the exception of certain persons who had not re-enrolled after termination of their enrollment. Doc. #399-5 at 14.

two of whom are UAW designees.[2]  Doc. #399-3 at 25.  The Committee is the

Plan Administrator and Named Fiduciary of the Supplemental Plan, with the

"Powers and Duties" described in Article VI.  *Id*.  Specifically, Article VI states that

the Committee's "powers, rights, and duties shall be exercised or discharged in the

Supplemental Benefit Committee's sole discretion, consistent with its rights and

obligations under this Exhibit B and the Settlement Agreement:

> (a)    to adopt such rules and procedures . . . appropriate [to administer its duties];
>
> (b)    to engage such consultants, actuaries and other professionals as it may deem appropriate to assist it in the exercise of its powers, rights, and duties;
>
> (c)    until the Profit Sharing Cessation Date, to establish the investment policy under the Supplemental Benefit Trust and appoint and remove investment managers and trustees thereunder;
>
> (d)    to review and enforce the Parent's and the Company's compliance with their obligations under the Supplemental Benefit Program;
>
> . . .
>
> (g)    to construe and interpret the Supplemental Benefit Program and to decide all questions of eligibility for benefits under such program;
>
> (h)    to appoint claims administrators . . . .; and
>
> (i)    to undertake such other actions are as necessary or appropriate in connection with the exercise of such powers, rights and duties.

_____

[2] Several branches of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") were original plaintiffs to this action.

*Id.* 26-27.

As stated previously, two sources fund the Supplemental Benefit Trust: an initial contribution of 50% of Navistar's common stock, followed by profit sharing contributions from Navistar. Doc. #399-3 at 22, 29; Doc. #399-5 at 1.

**B.    The Supplemental Benefit Trust Profit Sharing Plan**

Navistar's contributions to the Supplemental Benefit Trust are calculated in accordance with the Supplemental Benefit Trust Profit Sharing Plan ("PSP"), Appendix B-6 of the Settlement Agreement. Doc. #399-4 at 51; Doc. #399-5. Calculations are based on Navistar's fiscal year, and any payments required under the PSP are to be made directly to the Supplemental Benefit Trust within 90 calendar days of the end of each fiscal year. *Id.*

The PSP contains a detailed explanation of how to calculate the contributions to the trust, based on several defined terms used as variables in the calculation formulas. Doc. #399-4 at 52- 56. Contributions are derived from the profits of "Covered Operations," which are certain defined entities in the Navistar family of companies. *Id.* at 51. "Qualifying Hours" are "straight time" (non-overtime) hours worked by employees at the Covered Operations. *Id.* at 52-53. "Qualifying Profits" include "[p]re-tax income or losses of continuing Covered

6

Operations including unusual items," with certain exclusions.[3] *Id.* at 53.

Qualifying Profits also include the net income from Navistar Financial Corporation,

as long as it remains a subsidiary of Navistar; cash dividends received by the

Navistar entities; and diminishing percentages of the net income of certain entities

that are acquired after the Settlement Agreement, or are located outside of the

United States. Doc. #399-4 at 53-54.

After the amount of Qualifying Profits is determined, a series of seven

"incremental steps" are calculated, which are based on the number of Qualifying

Hours multiplied by predetermined dollar amounts that correspond to increased

profits. *Id.* at 55. Thus, the Qualifying Profits are allocated into seven different

portions, and a predetermined percentage of each portion constitutes the

contribution obligation owed to the Supplemental Benefit Trust. *Id.* The steps

allocate increasing percentages of Qualifying Profits that must go to the trust,

---

[3] The exclusions to Qualifying Profits based on the pre-tax income or losses of Covered Operations are described as:

| | |
|---|---|
| 5.2.1 | Income or losses from discontinued operations, non-recurring charges or credits directly attributable to the sale or discontinuation of such operations; |
| 5.2.2 | Extraordinary Items; |
| 5.2.3 | Gain or loss on the sale of assets, other than sale of inventory in the ordinary course of business and trade; and |
| 5.2.4 | Pre-tax income (loss) of [Navistar Financial Corporation]; pre-tax losses of [the Parent] on an entity basis; pre-tax income (loss) of any business acquired after the Effective Date; dividends received from Navistar International Corporation Canada; equity in income (loss) from affiliates included in covered Operations on the Effective Date. |

Doc. #399-4 at 53.

ranging from one percent in the first step to sixteen percent in the seventh step. *Id.* at 56. This illustrates how the amount of profit-based contributions to the Supplemental Benefit Trust increases as company's profits increase.

In addition, Section 8.1, Section 8.2, and Section 8.3 of the PSP describe Navistar's disclosure obligations. *Id.* at 56-58. Navistar must provide the Committee "with a worksheet detailing the calculation of the Contribution obligation, the Qualifying Hours, and the Qualifying Profits." *Id.* at 56. A certified public accountant, selected by Navistar, must review the "[d]ata on profits, hours worked, Qualifying Profits, and Qualifying Hours," and provide a report to the UAW and the Committee. *Id.* In addition, the firm must provide a "letter report" that "set[s] forth the procedures performed and conclusions reached" to Navistar, the UAW, and the Committee. *Id.* The information and report must be delivered "before the date that the Contribution obligation, if any, is required to be paid." *Id.* In years in which a lack of Qualifying Profits results in no contribution to the Supplemental Benefit Trust, the PSP requires that Navistar deliver the information and report before 90 days after the end of the fiscal year. *Id.* at 56-57.

Section 8.6 of the PSP places a further disclosure obligation on Navistar, stating: "In addition to the above, the Company will respond as soon as practicable to any reasonable requests from the UAW or the Supplemental Benefit Committee for information supporting any computation made by the Company to compute the Contribution obligation, and will provide the information so requested." *Id.* at 57-58.

8

The PSP also provides for a dispute resolution process, triggered by "a review of the information and calculations provided," if the Committee disputes the information and calculations provided by the company. *Id.* at 57. The process requires the Committee to provide notice of dispute within 30 days of receiving the information and calculations, at which point the parties have another 30 days to try to resolve the dispute. *Id.* At that point, the dispute is referred to "a mutually acceptable third party," either by consent, or by a process of elimination described in the PSP. *Id.* The third party's determination is to be "final and binding on all parties to the dispute." *Id.*

On June 8, 1993, the Court approved the Settlement Agreement in its Supplemental Opinion (Doc. #326), and entered final judgment as a consent decree (Doc. #327).

### C.   Declining Contributions and a Breakdown in Communications

According to the Committee, Navistar contributed an average of $30 million per year between 1995 and 2001, ranging from annual contributions of $126,070 to over $70 million. Doc. #415 at 6. During the next eight years, however, Navistar's sole annual contribution was $1.4 million, for fiscal year 2004. *Id.*; *see* Chart of Profit Sharing Payments, Doc. #415-1. In 2006, the audit committee of Navistar's board of directors conducted a review that called into question the company's financial reports of recent years, resulting in their restatement. Doc.

#415-2 at 6. The effects were cataclysmic, and included "a $2.4 billion reduction to the Company's previously reported stockholder's equity, the de-listing of the Company's common stock by the New York Stock Exchange, and a formal investigation by the [SEC] that resulted in actions against the former senior Company officers who had direct responsibility for Navistar's financial and management reporting." Doc. #415 at 6.

Those events also resulted in the delay of the disclosures required by the PSP and the calculations of benefit contributions to the Supplemental Benefit Trust. The Committee waited until 2007 to receive the restated financial statements for 2004 and 2005. Doc. #415 at 6-7. Schedules of calculations of Qualifying Profits for those years, as well as for 2006, did not arrive until 2009. *Id.* Moreover, the schedules provided by Navistar indicated that no contribution was required of it for any of those years. *Id.*

Similarly, the Committee waited until April 7, 2010, to receive Navistar's schedules of calculations of Qualifying Profits for 2007, 2008, and 2009. Doc. #415-2 at 16. As with the previous three years, no profit sharing contribution for 2007, 2008, or 2009 resulted from Navistar's calculations. *Id.*

In response to the schedules sent by Navistar on April 7, 2010, the Committee sent Navistar a detailed letter "expressing both general and specific concerns relating to the schedules of Qualifying Profits that Navistar had provided, or neglected to provide, to the Committee per the terms of the PSP." Doc. #415 at 7; Doc. #415-3. The letter noted Navistar's untimely disclosures, disputed the

10

company's calculation of Qualifying Profits for 2007, 2008, and 2009, and "noted that the schedules did not provide sufficient information to verify the accuracy and reasonableness" of Navistar's calculations. Doc. #415 at 8. The letter also noted the lack of information pertaining to Qualifying Hours, as required by Section 8 of the PSP. *Id.*

Almost a year later, on April 6, 2011 Navistar responded. *Id.* The company provided its schedule for the calculation of Qualifying Profits for fiscal year 2010, which again resulted in no contribution to the Supplemental Benefit Trust. *Id.* In addition, Navistar "declined to respond to any of the other questions or concerns" expressed in the Committee's letter from the year before. *Id.*

The Committee then "retained an expert to evaluate the public information released by the Company," believing that the lack of contributions may have resulted from "internal accounting and management decisions in order to shield profits in a manner that is inconsistent with the intent of the parties" under the Settlement Agreement. *Id.* The Committee then sent Navistar "a detailed request for information" on November 11, 2011.

Navistar responded on February 15, 2012. Doc. #415-6. The company stated a series of "General Objections" before addressing the Committee's requests. *Id.* at 2. The objections included Navistar's assertion that its disclosure obligations did not extend to "written responses to questions" or explanations; that the Committee sought "information extending back in time many years and/or information that is not relevant to currently pending issues," to which it could not

11

accurately respond; that "virtually all of the Committee's requests seek information which is not relevant or reasonably necessary to review and evaluate Navistar's computation of its Contribution Obligation," as the company's calculations had been reviewed by a certified public accountant firm; and that the Committee's requests sought "information which is highly proprietary" to Navistar. *Id*. In response to one of the Committee's specific requests, Navistar attached "Calculation Reconciliation" worksheets for 2004 through 2009, but refused to disclose income statements for its individual entities. *Id.* at 3.

In response to the Committee's request for an explanation of how Navistar "defines certain terms used in the calculation of Qualifying Profits," such as "assets," the company referred the Committee to its General Objections and stated that it "identifie[d] 'assets' pursuant to GAAP."[4]  Navistar refused to explain how it defined "businesses acquired" or to provide a list of businesses acquired after the Settlement Agreement went into effect, instead referring the Committee to its General Objections and its publicly available annual report. *Id.* at 4.  The Committee's request for "additional information regarding the Company's management reporting methodology, processes, procedures," as well as detailed information regarding Navistar's management and financial structure, also

---

[4] "GAAP" is an acronym that stands for "Generally Accepted Accounting Principles," which are specific to a particular context or a specific jurisdiction. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995) (stating that "GAAP is not [a] lucid or encyclopedic set of pre-existing rules" and that "[f]ar from a single-source accounting rulebook, GAAP 'encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.'") (internal citation omitted).

prompted only references to the General Objections and general GAAP reporting principles. *Id.* at 5.

The Committee also requested an explanation of the discrepancy between the $3.6 million that Navistar contributed to the Supplemental Benefit Trust for fiscal year 2000, and that year's annual report filed with the SEC "that reported an accrued liability to the Supplemental Profit Sharing Trust of $24 million." *Id.* at 6. Navistar responded by stating "Please see the General Objections above." *Id.* Navistar concluded by stating that it "intend[ed] to fully recoup" the only profit-sharing contribution that it had given to the Supplemental Benefit Trust between 2002 and 2010, its 2004 contribution of $1.4 million. After the restatement of its 2004 financial data, the company considered that contribution an overpayment. *Id.* at 6.

### D. The Committee Moves the Court for Intervention

Three weeks later, on March 23, 2012, the Committee filed a Motion to Intervene under Rule 24 of the Federal Rules of Civil Procedure. Doc. #394. Three days after filing its Motion to Intervene, the Committee filed its Motion to Enforce the Settlement Agreement. Doc. #395. In addition, the Committee filed an Amended Motion to Enforce the Settlement Agreement (Doc. #407) on June 6, 2012, which requested that the company disclose its financial information for the most recent fiscal year of 2011.

The Court sustained the Committee's Motion to Intervene on February 6, 2013 (Doc. #414), and ordered the Committee to file a complaint with the Court, so that its Motion to Intervene complied with the procedural requirements for intervention under Civil Rule 24(c). The Court also ordered Navistar to file a Response to the Committee's Motion to the Enforce Settlement Agreement, as Navistar had requested to delay any response until the Court ruled on the Committee's Motion to Intervene. Doc. #401.

The Committee, as Intervenor-Plaintiff, filed a Complaint for Breach of Settlement Agreement and for Injunctive Relief (Doc. #415) on February 15, 2013. On March 11, 2013, Navistar filed its Response to the Committee's Motion to Enforce (Doc. #421) and a Motion to Dismiss Intervenor-Plaintiff's Complaint (Doc. #422). The Committee then filed both a Response to Navistar's Motion to Dismiss (Doc. #423) and a Reply to Navistar's Response to the Motion to Enforce the Settlement Agreement (Doc. #424) on March 18, 2013. Finally, Navistar filed its Reply to the Committee's Response to the Motion to Dismiss on March 29, 2013 (Doc. #425).

## II.   <u>ANALYSIS</u>

The Court will first address the Committee's Motion to Enforce the Settlement Agreement, and then turn to Navistar's Motion to Dismiss. The Court notes that many of the arguments presented in the parties' memoranda overlap, as the Committee's Complaint largely restates its Motion to Enforce the Settlement

14

Agreement.  Similarly, Navistar's Motion to Dismiss basically restates the
arguments presented in its Response to the Motion to Enforce the Settlement
Agreement.

**A.**     **The Committee's Motion to Enforce the Settlement Agreement (Doc.
#395)**

In its Judgment Entry of June 8, 1993, the Court adopted the Settlement
Agreement as a consent decree.  Doc. #326.  As a consent decree, the Settlement
Agreement has "attributes of both a contract and a judicial act" and is "subject to
continued judicial policing."  *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132
F.3d 1142, 1145 (6th Cir. 1997) (quoting *Williams v. Vukovich*, 720 F.2d 909,
920 (6th Cir. 1983).  Although the Settlement Agreement "memorializes the
bargained for position of the parties," it also exists as "a final judicial order" and its
"provisions ... operate as an injunction."  *Williams*, 720 F. 2d at 920.  "Courts
'have a duty to enforce ... their consent decrees as required by circumstance.'"
*Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 532  (6th Cir. 2012) (quoting *Waste
Mgmt.*, 1132 F.3d at 1146)).  Furthermore, if a party is "injured by [a] violation of
the consent decree, 'the injured party must ask the court for an equitable
remedy.'"  *Shy*, 701 F.3d at 531-32 (quoting *Cook v. City of Chicago*, 192 F.3d
693, 695 (7th Cir.1999)).  A federal court has broad equitable powers when
enforcing a consent decree and when choosing a remedy for its violation.  *Shy*,
701 F.3d at 533 (internal citations omitted).

The Committee believes that the reports and calculations provided by Navistar are insufficiently detailed to determine whether the company is meeting its required disclosures, and consequently, its contribution obligations under the Settlement Agreement. Doc. #395-1 at 7-10. The Committee suspects that Navistar has engaged in "internal management decisions" that shift profits from one unit of the company to the other, "in ways that materially affect the profit-sharing calculations." *Id.* at 9. However, the Committee cannot assess "the adequacy and accuracy" of the Navistar's disclosures because of their limited nature. *Id.*

In response, Navistar argues that it "has fully satisfied its obligations under the PSP." Doc. #421 at 5. The company points out that it has provided worksheets for each of the years 2004 through 2010, as well as audit reports. *Id.* Navistar states that it has only refused to provide information when the Committee's requests were unreasonable, as the PSP only allows for reasonable requests by the Committee. *Id.* at 10. The company also faults the Committee for "not specify[ing] what reports it believes Navistar has failed to provide or what requests remain unanswered." *Id.* at 9.

When the parties reached the Settlement Agreement, Navistar expressly agreed to "respond to any reasonable requests from the [Committee] for information supporting any computation made by the Company to compute the Contribution obligation," and to "provide the information so requested." Doc. #399-5 at 8. The Court has reviewed the requests made by the Committee and

16

Navistar's disclosures to date (Doc. #415-2), but the Court does not agree with Navistar's assessment of the Committee's requests as unreasonable. Navistar has posted net annual profits, ranging from $134 million to $1.7 billion, in most years since 2005, with the exception of 2007 and in 2012.[5]  There is a fundamental discrepancy between the company's overall profitability and its reports to the Committee that zero Qualifying Profits resulted from its calculations every year. Every annual auditor's report provided to the Committee contains a schedule stating a flat figure of loss from pre-tax income of Covered Operations, accompanied by the auditor's boilerplate assertion that, "[i]n our opinion, the Schedule ... presents fairly, in all material respects, the calculation of Qualifying Profits ... in accordance with the provisions of the Plan referred to above."  Doc. #415-2 at 3-38.  Many (if not all) of these reports were provided years after the timeframes mandated in Section 8 of the PSP.  See Doc. #399-5 at 6-7. Furthermore, there is a discrepancy between the $3.6 million contribution to the Supplemental Benefit Trust and the $24 million liability to the trust allegedly reported to the SEC, both for fiscal year 2000, which Navistar fails to explain. Doc. #415-6 at 6.  In this context, the Committee's attempts to obtain the details supporting the Company's calculations is an understandable and <u>reasonable</u> exercise of its power "to review and enforce" Navistar's compliance with its

---

[5] Navistar's annual report is filed with the Securities and Exchange Commission, and is a matter of public record of which the Court may take judicial notice. *See Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001) (noting that judicial notice extends to "the full text of SEC filings").

obligations under the Settlement Agreement, the Supplemental Plan, and the PSP.
Doc. #399-3 at 26.  "Reasonableness" must be defined, not in light of what the
Company thinks is reasonable, but from the view of what is necessary to allow the
Committee to perform its review and enforcement duties in accordance with
Article VI of the Supplemental Plan.  *See* Doc. #399-3 at 25-27.  It is certainly
reasonable, therefore, for the Committee to request sufficient information for it to
determine whether or not contributions are being withheld from company profits.
The Committee would have shirked its fiduciary duty if it had not pursued the
information.  In fact, the Court questions if the degree of patience the Committee
has shown year after year in the face of Navistar's delays has entirely served its
fiduciary responsibilities.

Accordingly, the Court SUSTAINS the Committee's Motion to Enforce the
Settlement Agreement (Doc. #395) and SUSTAINS the Committee's Amended
Motion to Enforce the Settlement Agreement (Doc. #407), which requested
information for fiscal year 2011.  The Court ORDERS the Committee to file a
detailed request for all the information that it requires to perform its duties under
Section 6.2 of the Supplemental Benefit Program, and in particular, its duty under
subsection (d) "to review and enforce Parent's and Company's compliance with

18

their obligations under the Supplemental Benefit Program."[6]  Doc. #399-3 at 25.
Said request must be filed within twenty-one (21) days.

      The Court ORDERS Navistar to then provide, within twenty-one (21) days of
the filing of the Committee's request, all the information requested, or provide a
detailed explanation indicating why a particular request cannot or should not be
fulfilled.  General objections will not suffice, nor will repeated protestations of
fidelity to GAAP principles.  The Court notes that it has already determined that
the Committee's requests to date have been reasonable, and "unreasonableness"
will, therefore, not be an acceptable basis for not providing the information.

      If the Court cannot resolve this document issue on paper, a hearing will be
convened, featuring, inter alia, testimony from an expert witness appointed by this
Court who, armed with the results of this Court's liberal (albeit reasonable) use of
its subpoena power, will opine as to which documentation and other information is
necessary for the Committee to determine whether contributions have been and
are continuing to be withheld from Company profits.

     **B.**    **Navistar's Motion to Dismiss (Doc. #422)**

      In response to the Complaint that the Committee filed in accordance with
Rule 24(c) after filing its Motion to Intervene, Navistar filed a Motion to Dismiss

---

[6] As noted previously, "Parent" and "Company" are defined as "Navistar
International Corporation, and each successor thereto," according to the
Settlement Agreement.  See, Doc. #399-4 at 60, Exhibit D, Definition Supplement
to the Settlement Agreement.

Intervenor-Plaintiff's Complaint (Doc. #422). Therein, Navistar argues that the Committee lacks standing to enforce the PSP, and that the Committee's only recourse is through the dispute resolution process described within that document.

1.  *Standard of Review of a Motion to Dismiss under Rule 12(b)(6)*

Federal Rule 12(b)(6) allows a party to move for dismissal of an adversary's claim on the basis that it "fail[s] to state a claim upon which relief can be granted" by the Court. The moving party bears the burden of showing that the non-moving party's pleading has failed to adequately state a claim for relief. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citing *Carver v. Bunch*, 946 F.2d 451, 454-55 (6th Cir. 1991)). The Rule 12(b)(6) analysis requires a court to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012) (quoting *Treesh*, 487 F. 3d at 476); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss under Rule 12(b)(6). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Unless the facts as alleged show that the plaintiff's claim crosses "the line from conceivable

20

to plausible, [the] complaint must be dismissed." *Id.* "Although this standard does not require 'detailed factual allegations,' it does require more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555).

2.    *The Committee has Standing to Enforce the Terms of the PSP*

In Navistar's Motion to Dismiss, it first challenges the Committee's standing to enforce the Settlement Agreement. Doc. #422 at 7. Under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), a non-party may not enforce a consent agreement, either directly or in collateral proceedings, even if the non-party is an intended third-party beneficiary of the agreement. *See also Aiken v. City of Memphis*, 37 F.3d 1155, 1168 (6th Cir. 1994) ("The plain language of *Blue Chip* indicates that even *intended* third-party beneficiaries of a consent decree lack standing to enforce its terms"). Navistar argues that "[t]he Sixth Circuit applies this rule unequivocally" and that the Committee, therefore, lacks standing to enforce the Settlement Agreement.

Navistar is correct that under *Blue Chip* and *Aiken,* the Sixth Circuit does not recognize the standing of non-parties to enforce consent decrees. Navistar is incorrect, however, in its contention that this demonstrates the Committee's lack of standing in this matter. First, the Committee is not a third-party beneficiary to the Settlement Agreement. A third-party beneficiary is "[a] person who, though

21

not a party to a contract, stands to benefit from the contract's performance."
Black's Law Dictionary 9th Ed. The Committee itself derives no benefit from
Navistar's performance under the Settlement Agreement. Benefits under the
Settlement Agreement, the Plan, and the PSP accrue to the retirees, not the
Committee. This is clear from Article 1.2 of the Supplemental Plan, its "Purpose"
clause, which specifically states that it was established "for the benefit of Enrolled
Participants and Retirees ... ." Doc. #399-3 at 21.

Second, the Court does not consider the Committee a non-party to the
Settlement Agreement, the Plan, or the PSP. The Committee is a creation of the
Plan itself, with the express purpose and duty of enforcing the terms of the
Supplemental Plan and the PSP. *See, e.g.*, *Keith v. Volpe*, 833 F.2d 850 (9th Cir.
1987) (recognizing standing of committee to repeatedly enforce consent decree
designed to remedy discriminatory displacement of citizens during freeway
construction project when upholding attorney fees for committee's counsel).
Furthermore, "[a]n intervenor need not have the same standing necessary to
initiate a lawsuit in order to intervene in an existing district court suit where the
plaintiff has standing." *Associated Builders & Contractors v. Perry*, 16 F.3d 688,
690 (6th Cir. 1994) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 535-
36 (1972)). Although Navistar opposed the Committee's intervention, it did not
challenge the Committee's standing in its Response in Opposition to the
Committee's Intervention (Doc. #404). The Court has already recognized that the
Committee has the standing necessary to enforce the Settlement Agreement by

sustaining its Motion to Intervene, because the impetus to enforce the agreement formed the basis for the Committee's proposed intervention. Thus, the issue of the Committee's standing was settled when it allowed the Committee to intervene.

Finally, under the civil enforcement provisions of the Employee Retirement Income Security Program ("ERISA"), the Committee clearly has standing to enforce the terms of the Supplemental Plan. 29 U.S.C. § 1132. The Committee administers the Supplemental Plan, also referred to as the Retiree Supplemental Benefit Program. Doc. #399-3 at 26. The Retiree Supplemental Benefit Program, the Health Benefit Program, and the Life Insurance Program are the three constituent parts of the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"). The Plan is subject to ERISA, and is a registered ERISA plan. Doc. #399-2 at 6 (Settlement Agreement at 2); *see also Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 529 (6th Cir. 2012) (analyzing Plan under ERISA).

An ERISA fiduciary is one who "exercises any discretionary authority or discretionary control respecting management . . . or disposition of [Plan] assets," who provides investment advice to a Plan, or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Under Section 6.2 of the Supplemental Benefit Program, the Committee is described as the Supplemental Benefit Program's Program Administrator and Named Fiduciary. Doc. #399-3 at 26. Furthermore, the Committee is given "sole discretion" to adopt rules and procedures to administer

23

the program; to "establish the investment policy" of the Supplemental Trust and appoint investment managers; to invest assets and direct the trustee; to direct fund transfers to beneficiaries; and to "construe and interpret" the Supplemental Benefit Program and "decide all questions of eligibility for benefits." *Id.* Clearly, the Committee is a fiduciary under ERISA, as defined by that statute.

ERISA expressly allows for a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan." 29 U.S.C. § 1132(a)(1)(3) (emphasis added). Moreover, the Committee itself has the power and duty, under the express terms of the Plan, "to review and enforce [Navistar and subsidiaries'] compliance with their obligations under the Supplemental Benefit Program." Doc. #399-3 at 26.

The Committee's Complaint for Breach of Settlement Agreement and for Injunctive Relief (Doc. #415) describes the types of Plan violations contemplated by the language of 29 U.S.C. § 1132(a)(1)(3). The Committee alleges that Navistar violated the terms of the Profit Sharing Plan, the funding source of the Supplemental Benefit Program. Doc. #415 at 4-10; *see* Supplemental Benefit Program, Article VII (Doc. #398-3 at 29) (stating that Navistar "shall make additional cash contributions . . . to the Supplemental Benefit Trust under and in accordance with the terms of the Profit Sharing Plan"). The Committee alleges a series of incomplete and untimely disclosures that violate the terms of the Profit

24

Sharing Plan.  Doc. #415 at 6-8.  The Committee also alleges that Navistar is

withholding information about its accounting methodology that the Committee

requires in order to properly execute its oversight responsibilities and to make

certain that the company is not shielding or shifting profits owed to the retirees.

*Id.* at 8.

In addition, the Committee requests precisely the type of relief contemplated

by a civil action under 29 U.S.C. § 1132(a)(1)(3).  In its Prayer for Relief, the

Committee requests injunctive relief in the form of orders to Navistar that it

produce its undisclosed worksheets for calculating profits, an order that Navistar

"fully respond to the information requests" of the Committee, and any other order

necessary "to compel compliance" with the terms allegedly violated.  Thus, in

addition to the Committee's status as the entity created to enforce Navistar's

compliance with the Supplemental Plan, a statutory cause of action for

enforcement also exists.  Accordingly, the Court concludes that the Committee has

standing to enforce the Supplemental Plan and the PSP.

3. *Proper Disclosure is a Prerequisite to the Dispute Resolution Process*

Navistar also argues that the PSP contains a dispute resolution process that

is the Committee's only recourse for settling any dispute.  Section 8 of the

Supplemental Benefit Trust Profit Sharing Plan ("PSP") concerns "Information and

Dispute Resolution."  The first three subsections of Section 8 describe the

25

information that Navistar must disclose to the Committee, and Section 8.4 begins

the description of the dispute resolution procedures:

> If, following a review of the information and calculations provided pursuant to Sections 8.1, 8.2, and 8.3 the Supplemental Benefit Committee disputes such information or calculation, it shall inform the Company of such dispute within 30 calendar days of the receipt by the UAW and the Supplemental Benefit Committee of such information. The Company and the Supplemental Benefit Committee shall thereafter attempt, for a period not to exceed 30 calendar days, to resolve such dispute.

Doc. #399-5 at 7.

The dispute resolution process of the PSP presupposes the disclosure of

information by Navistar. The process commences "following a review of the

information and calculations provided pursuant to Sections 8.1, 8.2, and 8.3," at

which point the Committee may dispute the calculations and information Navistar

provides. Because the Committee has not yet received the "information

supporting" Navistar's calculations that it must disclose under Section 8.6 of the

PSP, the Committee has not yet conducted the kind of substantive review that

would trigger the dispute resolution process. After all, the Committee may be

satisfied with the information it receives, find nothing to dispute after its review,

and voluntarily dismiss its complaint against Navistar.

The Court notes that the Committee has taken two seemingly contradictory

positions on whether the dispute resolution process has begun. Although it argues

that the process has not yet been triggered (Doc. #424 at 4-5), the Committee

provided notice of dispute and expressly invoked Section 8.4 of the PSP in its May

26

4, 2010, letter to Navistar. Doc. #415-3 at 2. In its Reply Brief, Navistar argues that the process has begun, based on its disclosures to date. Doc. #425 at 5. However, the Court finds that there is no need to resolve the issue, because, even if the process has begun, the Committee still lacks sufficient information to decide whether or not to pursue that process. And, as noted above, there may ultimately be no cause to dispute Navistar's forthcoming disclosures, thereby ending the controversy entirely.

Finally, Navistar argues that the complaint is "predominantly moot," because the company eventually provided the Committee with worksheets of its calculations of Qualifying Profits. Doc. #422 at 10-11. As stated previously, *see supra* Section II.A., the Court has concluded that the depth of disclosure to date does not satisfy the requirements of the PSP, and, therefore, the issues raised by the Committee are not moot.

The Court notes that it reaches no conclusion as to the merits of the Committee's claim for breach of contract, as stated in the Complaint that the Court ordered the Committee to file in order to comply with Rule 24(c). Doc. #415 at 10. Therein, the Committee alleges that Navistar "knowingly and intentionally withheld" information from the Committee. Doc. #415 at 10. The Court's orders herein are made only for purposes of ruling on the Committee's Motion to Enforce the Settlement Agreement (Doc. #395 and Doc. #407) and to determine whether information necessary to the Committee has been withheld. Depending upon whether the Court orders further information to be provided by Defendant to the

27

Committee and, if so, the nature and details of same, said information may constitute necessary discovery on the merits of the claim for breach of contract in the Committee's Intervening Complaint, should proceedings eventually go forward on that claim. The Court simply prefers to proceed on the Motions to Enforce the Settlement Agreement (Doc. #395 and Doc. #407) as a necessary predicate to any determination on the merits of the breach of contract claim set forth in the Committee's Complaint. Ultimately, there may be a sound basis for the lack of contributions of Qualifying Profits from Navistar of which the Committee complains, resolving any need to invoke the dispute resolution process or to involve the Court in any proceedings on the Intervening Complaint.

Accordingly, for the foregoing reasons, the Court OVERRULES Navistar's Motion to Dismiss Intervenor-Plaintiff's Complaint (Doc. #422).

## III. **CONCLUSION**

Based on the foregoing, the Court SUSTAINS the Committee's Motion to Enforce the Settlement Agreement (Doc. #395), and SUSTAINS the Committee's Amended Motion to Enforce the Settlement Agreement (Doc. #407).

The Court ORDERS the Committee to file a detailed request for all the information that it requires to perform its duties under Section 6.2 of the Supplemental Benefit Program, and in particular its duty under subsection (d) "to review and enforce" Navistar's compliance with the Supplemental Benefit Program. Doc. #399-3 at 25. Said request must be filed within twenty-one (21) days.

28

The Court ORDERS Navistar to provide <u>all</u> the information requested by the Committee within twenty-one (21) days of its filed request, or otherwise specify why particular information is not relevant to the issue before the Court, that issue being the providing of sufficient information to the Committee for it to determine whether contributions have been and are continuing to be withheld from company profits, in order for the Committee to perform its duties under Section 6.2 of the Supplemental Benefit Program, and, in particular, its duty under subsection (d) "to review and enforce" Navistar's compliance with the Supplemental Benefit Program."  Doc. #399-3 at 25.

Navistar's Motion to Dismiss Intervenor-Plaintiff's Complaint (Doc. #422) is OVERRULED.


Date: March 29, 2013

WALTER H. RICE
UNITED STATES DISTRICT JUDGE