**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**


ART SHY, et al.　　　　　　　　　　|
　　　　　　　　　　　　　　　　　|
　　　Plaintiffs,　　　　　　　　 |
　　　　　　　　　　　　　　　　　|
v.　　　　　　　　　　　　　　　　| 　　Case No. C-3-92-333
　　　　　　　　　　　　　　　　　| 　　Judge Walter Herbert Rice
NAVISTAR INTERNATIONAL　　　　　　|
CORPORATION, et al.　　　　　　　 |
　　　　　　　　　　　　　　　　　|
　　　Defendants.　　　　　　　　 |
_____ |
SUPPLEMENTAL BENEFIT　　　　　　　|
COMMITTEE OF THE NAVISTAR　　　　 |
INTERNATIONAL TRANSPORTATION　　　|
CORP. RETIREE SUPPLEMENTAL　　　　|
BENEFIT PROGRAM,　　　　　　　　　|
　　　　　　　　　　　　　　　　　|
　　　Intervenor-Plaintiff,　　　 |
　　　　　　　　　　　　　　　　　|
v.　　　　　　　　　　　　　　　　|
　　　　　　　　　　　　　　　　　|
NAVISTAR, INC.,　　　　　　　　　 |
　　　　　　　　　　　　　　　　　|
　　　Defendant.　　　　　　　　　|
　　　　　　　　　　　　　　　　　|


**AMENDED COMPLAINT FOR BREACH OF SETTLEMENT AGREEMENT
AND VIOLATION OF ERISA**

COMES NOW Intervenor-Plaintiff, the Supplemental Benefit Committee of the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (the "Committee"), by and through its undersigned counsel, and hereby files this Amended Complaint for Breach of Settlement Agreement and Violation of ERISA against Defendant Navistar, Inc. and its affiliates ("Navistar" or "the Company") and alleges as follows:

## I.    <u>NATURE OF ACTION</u>

1.    The Committee brings this suit against Navistar to remedy the Company's failure to make profit sharing contributions to the trust established to provide supplemental health benefits to the Company's retirees.  Beginning in or about 2000, Navistar adopted a scheme to avoid profit sharing contributions through various intra-corporate transactions and other actions that violates the letter and spirit of the Amended and Restated Settlement Agreement entered in *Shy v. Navistar International Corp.*, Civ. No. 3:92:cv:333-WHR (S.D. Ohio), Dkt. No. 398-2 – 398-4 (the "Shy Agreement").  This scheme involved, among other things, the creation of subsidiaries, affiliates, and joint ventures which the Company then characterized as "acquired businesses" for purposes of profit-sharing; the deliberate reallocation of expenses and income among these affiliates and other entities; the routing of profits from overseas entities through various affiliates and the failure to include dividends paid by those entities; the failure to include Medicare Part D subsidies in the Shy Agreement calculation; and the failure to exclude certain employees from that calculation.  The Company then concealed this scheme from the Committee by providing materially misleading information in reports required by the Shy Agreement.  As a result, despite recording millions and even billions of dollars of profits in many of the years from 2000 to the present, Navistar has contributed not one single dime under the Shy Agreement during that time, save for a small contribution it has since sought to recover.  When Navistar's contribution obligations are recalculated in a manner consistent with the Shy Agreement, the difference between the profit-sharing contributions made by Navistar and those actually owed is in excess of $50 million, and could prove to be significantly more once all the relevant facts are revealed through discovery.

2.       This is a civil action seeking (1) damages and equitable relief based upon Navistar's breach of the Shy Agreement; and (2) equitable relief under Section 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

## II.       JURISDICTION

3.       This Court has subject matter jurisdiction and personal jurisdiction over this matter pursuant to Section 15.4 of the Shy Agreement.  Such jurisdiction was confirmed by this Court in its decision granting the Committee's Motion to Intervene (Dkt. No. 414).

4.       This Court also has subject matter jurisdiction pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and pursuant to 28 U.S.C. § 1331 to order relief under section 502(a)(3) of ERISA.

## III.       FACTUAL AND PROCEDURAL BACKGROUND

### A.       Litigation and Settlement

5.       In 1992, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") and other parties commenced a class action lawsuit, *Shy v. Navistar International Corp.*, Civ. No. 3:92:cv:333-WHR (S.D. Ohio), seeking declaratory and injunctive relief against Navistar related to its attempt to make substantial reductions in the provision of retiree medical benefits (hereinafter referred to as the "Shy Litigation").

6.       On March 30, 1993, the parties to the Shy Litigation entered into a settlement agreement.  The agreement was approved by this Court on May 27, 1993 (Dkt. No. 324), and amended and restated as of June 30, 1993.

**B.**    **The Profit Sharing Plan**

7.      The Shy Agreement required that the Company establish the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), comprised of three components:  a health insurance plan, a life insurance plan, and the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (the "Supplemental Program").  The purpose of the Supplemental Program was to defray the cost of premiums, co-pays, and deductibles that retirees would be required to pay to obtain benefits after the settlement.

8.      The Shy Agreement provided that the initial funding of the Supplemental Program would consist of a stock contribution by Navistar to the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust ("Supplemental Trust"), followed by contributions in subsequent years calculated pursuant to a profit-sharing formula included in the Shy Agreement ("Profit-Sharing Contributions").  The parties also drafted a Supplemental Benefit Trust Profit Sharing Plan ("PSP") to provide a blueprint for receiving, investing, and making decisions with respect to the Profit-Sharing Contributions.

9.      Section 7.1 of the PSP requires the Company to calculate an annual Profit-Sharing Contribution to the Supplemental Trust.  The PSP sets forth a formula for calculating the Profit-Sharing Contributions based generally on "Qualifying Profits" from "Covered Operations" attributable to "Qualifying Hours," as those terms are defined in Sections 3, 4, and 5 of the PSP (the "Profit-Sharing Calculation").

10.     The Plan is an "employee benefit plan" or a "plan" under ERISA § 3(3), 29 U.S.C. § 1002(3).  The PSP is part of the Supplemental Program, which is part of the Plan.

11.     The Supplemental Program created the Committee to act as the named fiduciary and administrator of the Supplemental Program, including the PSP.  Supplemental Program § 6.2.  The Committee was created to protect the interests of the Navistar retirees who are eligible for benefits under the Supplemental Program.  The Committee has the authority to review and enforce Navistar's compliance with its obligations under the Supplemental Program, including the PSP.

12.     Section 8.1 of the PSP requires the Company to annually provide both the UAW and the Committee a worksheet detailing the calculation of the Profit-Sharing Contribution, including the Qualifying Hours and the Qualifying Profits utilized to determine whether the Company is required to make an annual contribution to the Supplemental Trust.  These worksheets must include a listing by category of employees included and excluded in the calculation of Qualifying Hours and all of the information reasonably necessary to review the calculation of Qualifying Profits.

13.     Per Section 8.2 of the PSP, "data on profits, hours worked, Qualifying Profits, and Qualifying Hours shall be reviewed by a certified public accounting firm . . . and the report . . . shall be delivered to the UAW and the Supplemental Benefit Committee.  A letter report setting forth the procedures performed and conclusions reached shall be prepared by such firm and delivered to the Company, the UAW and the Supplemental Benefit Committee."

14.     Section 8.3 of the PSP requires the reports to "be delivered to the UAW and the Supplemental Benefit Committee on or before the date that the contribution obligation, if any, is required to be paid . . . [which, under section 7.1 of the PSP, is 90 calendar days following the end of the plan year] [or if] no contribution obligation is required to be paid, the Company will

deliver [the] information . . . to the UAW and the Supplemental Benefit Committee within 90 calendar days following the end of the plan year for which no contribution is required."

15.     Section 8.6 of the PSP requires that Navistar respond as soon as practicable to any reasonable requests from the Committee for information supporting any computation relating to its Profit-Sharing Contribution obligation, and provide such information as requested.

16.     The information set forth in Section 8.3 of the PSP, along with the responses required by Section 8.6 of the PSP, constitute the primary means by which the Committee can evaluate and determine whether Navistar has complied with the terms of the PSP.

**C.     Navistar's Contributions to the Plan**

17.     For Fiscal Years 1994 through the present, Navistar calculated the Profit-Sharing Contributions to the Supplemental Trust as set forth in the chart below:

| Fiscal Year | Contribution to Supplemental Trust (millions) |
|---|---|
| 1994 | $3.7 |
| 1995 | $25.7 |
| 1996 | $0.1 |
| 1997 | $20.9 |
| 1998 | $61.1 |
| 1999 | $71.6 |
| 2000 | $3.6 |
| 2001 | $0.0 |
| 2002 | $0.0 |
| 2003 (Original) | $0.0 |
| 2003 (Restated) | Not calculated |

| | |
|---|---|
| **2004 (Original)** | $1.4 |
| **2004 (Restated)** | $0.0 |
| **2005** | $0.0 |
| **2006** | $0.0 |
| **2007** | $0.0 |
| **2008** | $0.0 |
| **2009** | $0.0 |
| **2010** | $0.0 |
| **2011** | $0.0 |
| **2012** | $0.0 |

**D.**     **The Financial Restatement and the Committee's Attempts to Obtain Information from Navistar**

18.     Beginning in January 2006, Navistar's parent company, Navistar International Corporation (the "Corporation"), undertook a comprehensive review of its previous consolidated financial statements.  In April 2006, the audit committee of the Corporation's board of directors concluded that its previously prepared and audited consolidated financial statements could not be relied upon and should be restated.  The effects of this review and related restatements included a $2.4 billion reduction to the Corporation's previously reported stockholders' equity, the de-listing of the Corporation's common stock by the New York Stock Exchange, and a formal investigation by the U.S. Securities and Exchange Commission that resulted in actions against the former senior officers who had direct responsibility for Navistar's financial and management reporting.

19.     From January 2006 into 2009, Navistar told the Committee that it was unable to provide accurate information pursuant to its PSP obligations because of this restatement of its

7

financial results.  Consequently, the Committee had no way of evaluating Navistar's compliance with the Shy Agreement with respect to these years during that time.

20.     On June 9, 2009, Navistar sent the Committee schedules of calculations of Qualifying Profits for plan years 2004 and 2005 which indicated that no profit-sharing contribution was required for either year.  Navistar also provided a partially-complete schedule of Qualifying Profits for 2006, which also indicated that no profit sharing contribution was required.  It did not provide the required schedules for the 2007 and 2008 Plan years.

21.     On May 4, 2010,  the Committee sent the Company a letter expressing both general and specific concerns relating to the schedules of Qualifying Profits that Navistar had provided, or neglected to provide, to the Committee per the terms of the PSP.  Specifically, the Committee:  1) noted that Navistar had not been timely meeting all of its reporting obligations under the PSP; 2) raised questions concerning the Company's calculation of Qualifying Profits for each of the years 2007, 2008, and 2009; 3) noted that the schedules did not provide sufficient information to verify the accuracy and reasonableness of the Company's calculations; and 4) pointed out that the schedules lacked information relating to "Qualifying Hours," as required under Sections 8.1, 8.2, and 8.3 of the PSP.

22.     On April 6, 2011,  the Company provided the Committee with a schedule detailing the Qualifying Profits for plan year 2010.  The Company declined to respond to any of the other questions or concerns set forth in the Committee's May 4, 2010 letter.

23.     The Committee retained an expert to determine, to the extent possible, whether the lack of contributions was based on actual financial performance, or whether the Company had engaged in activities intended to shield profits in a manner that was inconsistent with the intent of the parties, as expressed in the Shy Agreement.

24.     The Committee sent a detailed request for information to Navistar on November 15, 2011.

25.     On February 15, 2012, Navistar responded to the Committee's November 15, 2011 requests, but the response did not provide the information the Committee needed to evaluate whether the Company had complied with the terms of the PSP.  In that response, the Company also promised to respond "in the near future" to the Committee's May 4, 2010 request, but the Company never responded. In addition, Navistar's February 15, 2012 response consisted of a series of "General Objections" and summaries claiming to establish that the Company, despite its overall profitability, owed no Profit-Sharing Contributions.  The Company refused to respond to any of the Committee's questions about the components of the Profit-Sharing Calculation that are set forth in the Shy Agreement, claiming generally that it did not have to explain itself to the Committee.

E.     **The Current Litigation**

26.     On March 23, 2012, the Committee filed a Motion to Intervene in the Shy Litigation (Dkt. No. 394).  Three days later, the Committee filed a Motion to Enforce the Settlement Agreement (Dkt No. 395).  On June 6, 2012, the Committee filed an Amended Motion to Enforce the Settlement Agreement (Dkt. No. 407), requesting that the Company disclose its financial information for the most recent fiscal year of 2011.

27.     On February 6, 2013, the Court granted the Committee's Motion to Intervene.  At the Court's instruction, on February 15, 2013, the Committee filed a Complaint for Breach of Settlement Agreement and for Injunctive Relief (Dkt. No. 415) as Intervenor-Plaintiff.

28.     On March 11, 2013, Navistar filed its Response to the Committee's Motion to Enforce (Dkt. No. 421), along with a Motion to Dismiss Intervenor-Plaintiff's Complaint (Dkt. No. 422).  The Committee timely responded to these filings.

29.     On March 29, 2013, the Court granted the Committee's Motion to Enforce the Settlement Agreement and denied Navistar's Motion to Dismiss (Dkt. No. 426) (the "Decision"). In the Decision, the Court recognized that the Committee did not yet have sufficient information to determine whether Navistar has breached the Shy Agreement by failing to make contributions, or to make sufficient contributions, to the Supplemental Trust.  Accordingly, the Court ordered the Committee "to file a detailed request for all the information that it requires to perform its duties" under the PSP within 21 days of the Decision (Decision at 28 (emphasis in original)). The Court further ordered Navistar to provide the Committee with "all the information requested" within 21 days of the Committee's request, or else explain why particular information requested is not relevant  (Decision at 29 (emphasis in original)).

30.     In accordance with the Decision, the Committee filed its Information Request on April 19, 2013 (Dkt. No. 427).  On May 10, 2013, Navistar notified the Court that it had complied with its obligation to respond to the Information Request (Dkt. No. 428).  On May 13, 2013, the Committee received the documents and information submitted by Navistar.

31.     The Committee has analyzed the documents and information produced by Navistar and has concluded that Navistar has repeatedly breached the Shy Agreement and failed to act in accordance with the PSP, causing losses to the Supplemental Trust and its participants and beneficiaries, as set forth in detail below.  Additionally, in an effort to conceal its breaches, Navistar has provided materially misleading information to the Committee and has ignored and denied (until ordered by the Court) the Committee's requests for the information that would

allow the Committee to conclude that Navistar breached the Shy Agreement and failed to act in accordance with the PSP.

### IV.     NAVISTAR HAS BREACHED THE SHY AGREEMENT AND HAS FAILED TO COMPLY WITH THE TERMS OF THE PLAN

#### A.     Navistar's Profit-Sharing Contributions

32.     As set forth in the following chart, beginning with the fiscal year ended October 31, 1994 and continuing through the fiscal year ended October 31, 2000, Navistar reported net income in each year and paid more than $186 million in Profit-Sharing Contributions to the Supplemental Trust.  From 2001 onward, Navistar reported losses in some years, but also made no Profit-Sharing Contributions even in years where it reported substantial net income – even hundreds of millions or *billions* of dollars in income.

| Fiscal Year | Net Income (Loss) | Qualifying Profits | Contribution to Supplemental Trust |
|---|---|---|---|
| 1994 | $82.0 | $167.5 | $3.7 |
| 1995 | $164.4 | $331.0 | $25.7 |
| 1996 | $64.6 | $71.5 | $0.1 |
| 1997 | $150.1 | $293.0 | $20.9 |
| 1998 | $299.0 | $549.6 | $61.1 |
| 1999 | $544.5 | $631.6 | $71.6 |
| 2000 | $158.9 | $183.9 | $3.6 |
| 2001 | ($23.0) | ($77.9) | $0.0 |
| 2002 | ($538.0) | ($691.0) | $0.0 |
| 2003 (Original) | ($21.0) | ($231.3) | $0.0 |
| 2003 (Restated) | ($333.0) | Not calculated | Not calculated |
| 2004 (Original) | $246.4 | $113.7 | $1.4 |

| | | | |
|---|---|---|---|
| **2004 (Restated)** | ($44.0) | ($163.6) | $0.0 |
| **2005** | $139.0 | ($172.1) | $0.0 |
| **2006** | $301.0 | ($34.2) | $0.0 |
| **2007** | ($120.0) | ($513.6) | $0.0 |
| **2008** | $134.0 | ($215.8) | $0.0 |
| **2009** | $345.0 | ($27.2) | $0.0 |
| **2010** | $267.0 | ($168.0) | $0.0 |
| **2011** | $1,778.0 | ($7.9) | $0.0 |
| **2012** | ($2,962.0) | ($1,028.6) | $0.0[1] |

33.     The post-2000 disappearance of the Profit-Sharing Contributions was also marked by an increase in the number of entities owned or controlled by affiliates of Navistar.  In fiscal year 1997 (a year when the reported Profit-Sharing Contribution due was $20.9 million), Navistar's calculation of Qualifying Profits included only eleven entities.  For fiscal year 2000 (a year when the reported Profit-Sharing Contribution due was $3.6 million), Navistar's calculation included twenty-three entities.  By fiscal year 2011 (a year when the reported Profit-Sharing Contribution due was $0 despite more than $1 billion in reported net income), Navistar's calculation included more than sixty entities.

34.     The increase in the number of entities included in the calculation of Qualifying Profits was accompanied by a dramatic contrast between the reported income and loss of Navistar, Inc. versus that of these new entities.  Similarly, since fiscal year 2000, the pattern has changed from Qualifying Profits generally being *higher* than the consolidated net income of all the Navistar-related entities to now being generally much lower.  Both of these facts suggest that

---

[1] Navistar submitted draft, unaudited Profit-Sharing Calculations for 2011 and 2012 as part of its response to the Committee's Information Request.

income is being generated by Navistar as a whole that is not being reflected in Qualifying Profits.

35.    This contrast between the reported income and loss of Navistar, Inc. versus that of these new entities is no accident, nor is it a product of the ebbs and flows of Navistar's business prospects.  As explained more fully below, Navistar created new entities, and then engaged in various stratagems involving them, in order to depress the income allocable to the original Navistar operations that form the basis for the Profit-Sharing Contribution obligation in the Shy Agreement.  This scheme resulted in a significant decrease in the  amount of Qualifying Profits Navistar claimed and, in turn, virtually eliminated any chance that Navistar would ever make Profit-Sharing Contributions.

**B.    <u>Navistar Breached the Shy Agreement and Failed to Act in Accordance with the Terms of the Plan by Incorrectly Classifying Formed Entities as "Businesses Acquired after the Effective Date".</u>**

36.    Pursuant to the terms of the PSP, Navistar is required to make contributions to the Supplemental Trust based on a formula that combines Qualifying Profits and Qualifying Hours in a particular manner.  The term "Covered Operations" is critical to this calculation.  The PSP defines "Covered Operations" to include "Navistar International Transportation Corp. ('NITC') [now known as Navistar, Inc.], Navistar International Corporation ('NIC', the 'Parent'), their successors and all of their affiliates and subsidiaries, with the exception of Navistar International Corporation Canada."  PSP § 3.1.

37.    The PSP further provides, "Any business acquired after the Effective Date [June 30, 1993] by a Covered Operation will be included in Covered Operations to the extent described in Section 4.9 and 5.5 below."  PSP § 3.1.  The way the PSP treats income from "business[es] acquired after the Effective Date" versus income from Covered Operations has a material impact

on Qualifying Profits in that income and loss from the latter generally are included in Qualifying Profits on a *pre-tax* basis, whereas income and losses from companies acquired after the Effective Date are included on an *after-tax* basis.  Assuming a combined federal, state and/or local income tax rate of approximately 40%, this distinction alone has the effect of excluding 40% of the profits from acquired businesses from the calculation of Qualifying Profits.

38.     The Shy Agreement contains no definition of "business acquired" or related terms.  However, section 5.8  provides that "[e]ach of the items described in this Section 5 shall, except where otherwise specifically provided herein, be calculated in accordance with generally accepted accounting principles."  Consistent with those principles, a "business acquired" is an existing business or going concern purchased by another business.  While an existing business or going concern can include anything from a single product or service to a large corporate entity, it will always have had existing assets in place pre-acquisition that had allowed it to offer, sell and provide its products or services.

39.     Navistar has improperly classified as acquired businesses numerous entities or ventures that it organized, formed and capitalized that had no previously existing business activity (hereinafter referred to as "Formed Entities").  Such Formed Entities are not "businesses acquired", as contemplated by the PSP, because Navistar did not purchase an existing business in those circumstances.  Indeed, the costs associated with the formation are generally classified in the Corporation's or Navistar's consolidated financial statements as capital expenditures or investments in non-consolidated affiliates and not treated as costs relating to business acquisitions.

40.     The establishment of these Formed Entities was just the first step in the scheme. Navistar then allocated pre-existing business and revenue opportunities away from what were

Covered Operations at the time of the Shy Agreement and to the Formed Entities. Finally, when Navistar did its Profit-Sharing Calculation, it included only the after-tax (rather than the pre-tax) income of various Formed Entities. Navistar further achieved a dramatic reduction in Qualifying Profits by establishing foreign Formed Entities. As discussed below, Navistar also engaged in a scheme to exclude all income from foreign "acquired businesses" from Qualifying Profits so when it transferred existing operations to foreign Formed Entities, it claimed the right to wall off all of the income generated by them from the Profit-Sharing Calculation.

41. Such Formed Entities include, but are not limited to:

- Navistar Diesel of Alabama, LLC;

- Blue Diamond Truck Company, LLC

- Blue Diamond Parts, LLC; and

- International Holding Company of Mexico

42. Most of the Formed Entities were established for the purpose of evading the requirements of the Shy Agreement. In addition, upon information and belief, to increase the effect on Qualifying Profits of this scheme to move profitable businesses out of "Covered Operations," Navistar has also allocated many of the expenses that are used to generate income in the Formed Entities onto Covered Operations. This generates losses in these entities that offset the income that would otherwise be fully reflected in the Profit-Sharing Calculation. While that allocation scheme results in more net income in the Formed Entities, those profits are, as explained above, significantly reduced or eliminated from the calculation of Qualifying Profits.

43. By misclassifying Formed Entities as businesses acquired after the Effective Date, Navistar has breached the terms of the Shy Agreement and failed to act in accordance with the

terms of the PSP, causing damage to the Supplemental Trust and the PSP's participants and beneficiaries.

**C.**  **Navistar Breached the Shy Agreement and Failed to Act in Accordance with the Terms of the PSP by Failing Properly to Include Certain Cash Dividends and Other Payments.**

44.    Navistar has actually acquired a number of existing businesses located outside the United States.  Even in those circumstances, however, Navistar has in many cases evaded its obligations under the Shy Agreement.

45.    Section 5.5.2 of the PSP provides generally that, where Navistar acquires an interest in a foreign entity that is greater than 50%, it must include "cash dividend payments, management fees and similar payments" it subsequently receives in Qualifying Profits.

46.    Based on its review, the Committee has determined that Navistar has engaged in numerous form-over-substance schemes to shield income and payments from foreign acquisitions from the calculation of Qualifying Profits.  These schemes include, but are not limited to, using Navistar International Corporation Canada, the only entity in existence at the time of the Shy Agreement that is excluded from Covered Operations, to nominally purchase foreign entities when, in substance, the acquisition was made by a Covered Operation.  The schemes also include improperly treating dividends, management fees or similar payments received from or by other entities by not including such receipts in Qualifying Profits when, in fact, they should be included in the Profit-Sharing Calculation.  Such foreign acquisitions include, at a minimum, International Engines South America Ltd. and its related purchase of MWM Motores Diesel Ltda.

47.    By shielding income and payments from foreign acquisitions from the calculation of Qualifying Profits, Navistar has breached the terms of the Shy Agreement and failed to act in

accordance with the terms of the PSP, causing damage to the Supplemental Trust and the PSP's participants and beneficiaries.

D.     **Navistar Breached the Shy Agreement and Failed to Act in Accordance with the Terms of the PSP by Excluding the Medicare Part D Subsidy from the Calculation of Qualifying Profits.**

48.     From 2004 through 2010, the Company excluded a total of $229,891,000 from Qualifying Profits attributable to the Medicare Part D subsidy that the Company received from the United States government.  Such exclusion was improper under the plain language of the PSP.

49.     Under the PSP, Qualifying Profits include "[p]re-tax income or losses of continuing Covered Operations including unusual items but excluding: [certain items set forth in subsection 5.2.1 through 5.2.4 that are not applicable to the Medicare Part D subsidy.]"  PSP § 5.2.

50.     The Company accounted for these Medicare Part D subsidies received from the United States government as reductions in its expenses, which effectively means the Company considered them income.

51.     By failing to include the Medicare Part D subsidies as income in the calculations of Qualifying Profits, Navistar has breached the terms of the Shy Agreement and failed to act in accordance with the terms of the PSP, causing damage to the Supplemental Trust and the PSP's participants and beneficiaries.

E.     **Navistar Has Breached the Shy Agreement and Failed to Act in Accordance with the Terms of the PSP by Failing to Exclude Certain Employees' Hours from Qualifying Hours.**

52.     In addition to manipulating Qualifying Profits to reduce its Profit-Sharing Contributions, the Company has also incorrectly calculated the other factor in the Profit-Sharing

Calculation: Qualifying Hours.

53.     Under Section 6 of the PSP, Qualifying Hours are used to establish a series of "steps."  These steps establish multipliers which are then applied to the fixed amount of Qualifying Profits to yield the actual Profit-Sharing Contribution.  The multipliers increase at every step, so the quicker one moves through the steps, the larger the resulting Profit-Sharing Contribution.  The lower the amount of Qualifying Hours, the lower the step thresholds and the easier it is to move through them and generate larger Profit-Sharing Contributions.

54.     Upon information and belief, Navistar acted on this incentive to increase Qualifying Hours by failing to follow the PSP's terms regarding which employees' hours should be included in "Qualifying Hours."  Under the PSP, Qualifying Hours include "[o]nly straight time hours worked by employees who are not Bonus Eligible employees[.]"  PSP § 4.2.

55.     Section 4.8 of the PSP provides, "Hours worked by employees who are covered by plans such as the Annual Incentive Plan, the Used Truck Commission Sales Program, the Regional Management Incentive Plan or other similar incentive or bonus plans, but excluding gain sharing plans of the type in effect at Indianapolis engine plant, shall not be counted as Qualifying Hours, with such employees referred to herein as 'Bonus Eligible.'"

56.     Upon information and belief, Navistar has incorrectly classified numerous employees as not "Bonus Eligible," including but not limited to salaried employees and others who participate in "other similar incentive or bonus plans" as referred to in section 4.8 of the PSP.

57.     By incorrectly classifying certain employees as not "Bonus Eligible," Navistar has breached the terms of the Shy Agreement and failed to act in accordance with the terms of the PSP, causing damage to the Supplemental Trust and the PSP's participants and beneficiaries.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION:  BREACH OF CONTRACT

58.    The Committee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

59.    The Shy Agreement is a contract enforceable by the Committee.

60.    As set forth above, the Company has breached the terms of the Shy Agreement by (1) forming entities which it then treats as acquired businesses and then reallocating their revenues or not properly or completely allocating costs and expenses among the Covered Operations; (2) excluding dividends and similar payments from the calculation of Qualifying Profits; (3) excluding its Medicare Part D subsidy payments from the calculation of Qualifying Profits; and (4) failing to exclude Bonus Eligible employees from the calculation of Qualifying Hours.

61.    The Company's breach of the Shy Agreement has damaged the Supplemental Trust, its participants, and beneficiaries in the amount of the Profit-Sharing Contributions the Company has failed to make, plus interest.

### SECOND CAUSE OF ACTION: VIOLATION OF ERISA

62.    The Committee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

63.    The PSP and Supplemental Trust are parts of the Plan, which is governed by ERISA.  The Plan is a "plan" under section 3(3) of ERISA.

64.    The Committee is a fiduciary of the PSP and the Supplemental Trust under the PSP and is therefore empowered to bring a civil action on behalf of the PSP by ERISA section 502(a)(3).

65. As set forth above, the Company has violated and failed to act in accordance with the terms of the PSP by (1) forming entities which it then treats as acquired businesses and then reallocating their revenues or not properly or completely allocating costs and expenses among the Covered Operations; (2) excluding dividends and similar payments from the calculation of Qualifying Profits; (3) excluding its Medicare Part D subsidy payments from the calculation of Qualifying Profits; and (4) failing to exclude Bonus Eligible employees from the calculation of Qualifying Hours.

## VI. PRAYER FOR RELIEF

Wherefore, the Supplemental Benefit Committee of the Navistar International Transportation Corp. Retiree Supplemental Benefit Program prays for the following:

A. That this Court find that Navistar has breached the terms of the Shy Agreement, causing damage to the Supplemental Trust and the PSP's participants and beneficiaries;

B. That this Court enter an order awarding damages to the Committee, on behalf of the Supplemental Trust, in the amount the Company improperly withheld from the Supplemental Trust, plus pre-judgment interest;

C. That this Court find that the Company has violated and has failed to act in accordance with the terms of the PSP;

D. That this Court enjoin the acts and practices described above that violate the terms of the PSP;

E. That this Court order appropriate equitable relief to redress the violations of the PSP and enforce the terms of the PSP by ordering the Company to comply with the terms of the PSP and to correct its previous lack of compliance by making appropriate contributions to the Supplemental Trust, plus interest;

F.      That this Court enter any other such orders as necessary to compel compliance with the Shy Agreement;

G.      That this Court award the Committee attorneys' fees and costs related to the enforcement of the Shy Agreement and the initiation of this action; and

H.      That this Court grant such other and further relief in favor of the Committee as is deemed just.

Dated:  August 21, 2013                    Respectfully submitted,

                                           /s/ Kevin L. Murphy
                                           Kevin L. Murphy (#0021810)
                                           Graydon Head & Ritchey LLP
                                           2400 Chamber Center Drive
                                           Suite 300
                                           Ft. Mitchell, KY  41017
                                           Phone: 859-578-3060
                                           Fax:    859-525-0214
                                           kmurphy@graydon.com

                                           *Trial Attorney for Intervenor-Plaintiff Supplemental Benefit Committee of the Navistar International Transportation Corp. Retiree Supplemental Benefit Program*

                                           Edward A. Scallet (admitted *pro hac vice*)
                                           Sarah A. Zumwalt (admitted *pro hac vice*)
                                           Will E. Wilder (admitted *pro hac vice*)
                                           Groom Law Group, Chartered
                                           1701 Pennsylvania Avenue, NW
                                           Washington, DC 20006
                                           202-857-0620 (p)
                                           202-659-4503 (f)
                                           eas@groom.com
                                           szumwalt@groom.com
                                           wwilder@groom.com

                                           *Attorneys for Intervenor-Plaintiff Supplemental Benefit Committee of the Navistar International Transportation Corp. Retiree Supplemental Benefit Program*

4380846_1