IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ART SHY, et al.,                    :

        Plaintiffs,

      v.                              :        Case No. 3:92cv333

NAVISTAR INTERNATIONAL                       JUDGE WALTER H. RICE
CORPORATION, et al.,
                                    :
        Defendants.

---

DECISION AND ENTRY OVERRULING DEFENDANT NAVISTAR
INTERNATIONAL TRANSPORTATION CORPORATION'S MOTION TO
DISMISS INTERVENOR-PLAINTIFF'S AMENDED COMPLAINT AND
COMPEL DISPUTE RESOLUTION PROCESS (DOC. #438) AND
ORDERING THE TO PARTIES TO FILE, FOURTEEN (14) DAYS FROM
DATE, SIMULTANEOUS MEMORANDA ADDRESSING THE LEGAL
VIABILITY OF INTERVENOR-PLAINTIFF'S BREACH OF CONTRACT
CLAIM; SIMULTANEOUS RESPONSIVE MEMORANDA DUE
FOURTEEN (14) DAYS THEREAFTER; NO FURTHER MEMORANDA
ARE TO BE FILED

---

The Supplemental Benefit Committee of the Navistar International

Transportation Corporation Retiree Supplemental Benefit Program (the

"Committee") is the administrator and fiduciary of the Supplemental Benefit

Program and Trust ("Supplemental Program" or "Supplemental Plan"), a creation of

the Settlement Agreement approved by this Court on June 8, 1993.  Doc. #327.

The Settlement Agreement terminated the above-captioned class action, brought

by retired employees and their union representatives against Defendant Navistar

International Corporation ("Navistar," "Company"), after the company reduced the benefits of its retired employees.

Pending before the Court is Navistar's Motion to Dismiss Intervenor-Plaintiff's Amended Complaint and Compel Dispute Resolution Process (Doc. #438). For the reasons set forth below, the Court OVERRULES Navistar's Motion, insofar as the company seeks to compel the dispute resolution process and dismiss the Committee's ERISA claim. The Court, however, reserves ruling on whether to dismiss the Committee's breach of contract claim, in order to give the parties opportunity to brief the viability of same.

The Court ORDERS the parties to file, within fourteen (14) days from date, simultaneous memoranda briefing the issue of whether the Court should dismiss the Committee's breach of contract claim, based on the issues discussed below. *See infra* Part II.C. Simultaneous responsive memoranda will be due fourteen (14) days thereafter.

## I.    BACKGROUND AND PROCEDURAL HISTORY

This litigation originally arose after Navistar, on July 28, 1992, announced major reductions in the insurance and health benefits offered to the company's retired employees and their dependents. Doc. #324 at 1. After hundreds of hours of settlement negotiations, a Settlement Agreement was reached, and was described by the Court in its Opinion of May 27, 1993:

2

The settlement agreement contains two plans, the Base Plan and the Supplemental Plan. The Base Plan provides basic life and health insurance benefits to retirees. Navistar is obligated to provide $1 billion to the Base Plan. Under the Base Plan, retirees' health and life insurance benefits would be reduced. For instance, company-provided life insurance would be reduced to a maximum of $5,000. In addition, retirees would be required to pay monthly premiums for their health insurance, as well as deductibles and, for those under the age of 65, co-payments. **However, the Supplemental Plan, which is a truly innovative concept, turns over much of the ownership of Navistar to the very retirees who must sacrifice benefits under the settlement agreement, a Plan which could well alleviate some (perhaps as much as one-half or more) of the hardship which the settlement will require retirees to endure. The Supplemental Plan is a trust which will be administered by retirees and their representatives.** Navistar must contribute 50% of the shares of its common stock and a portion of its future profits to the trust established under the Supplemental Plan. The income generated by the Supplemental Plan can be used, for instance, to reduce the premiums which retirees must pay for their health insurance. Thus, if the retirees' sacrifices allow Navistar to return to prosperity, the retirees will own a significant share of the consequent gain in the value of the company. The $1 billion which Navistar must contribute to the Base Plan will reduce retiree health and life insurance benefits to 38% of the former value of those benefits, $2.6 billion; however, conservative projections set the value of the stock and Navistar's profits which will be contributed to the Supplemental Plan at $750 million; thus, the value of the settlement agreement could rise to 68% of the former amount of $2.6 billion, or even more. Indeed, 67% of the value of the restructured Navistar will be in the Base and Supplemental Plans, and thus be owned by the retirees.

*Id.* at 10-11 (emphasis added).

Of particular relevance to the present controversy is the Supplemental Plan, set forth in Exhibit B of the Settlement Agreement. The Supplemental Plan was established "for the benefit of Enrolled Participants and Retirees, whether or not they are Enrolled Participants." Doc. #399-3 at 21. The benefits provided are

funded by the Supplemental Benefit Trust, which in turn is funded by profits from Navistar. *Id.* at 25.

Article VI of the Supplemental Plan establishes the Committee, the present Intervenor, to administer the plan and the trust. *Id.* The Committee is the Plan Administrator and Named Fiduciary of the Supplemental Plan, with the "Powers and Duties" described in Article VI. *Id.* Specifically, Article VI states that the Committee's "powers, rights, and duties shall be exercised or discharged in the Supplemental Benefit Committee's sole discretion, consistent with its rights and obligations under this Exhibit B" and the Settlement Agreement. Its duties include establishing the investment policy of the Supplemental Benefit Trust, and the Committee has the power "to review and enforce the Parent's and the Company's compliance with their obligations under the Supplemental Benefit Program . . . ." *Id.* at 26. The Supplemental Benefit Trust is funded by 1) an initial contribution of 50% of Navistar's common stock; and 2) profit sharing contributions from Navistar. Doc. #399-3 at 22, 29; Doc. #399-5 at 1.

## A.    The Supplemental Benefit Trust Profit Sharing Plan

Navistar's contributions to the Supplemental Benefit Trust are calculated in accordance with the Supplemental Benefit Trust Profit Sharing Plan ("PSP"), Appendix B-6 of the Settlement Agreement. Doc. #399-4 at 51; Doc. #399-5. Calculations are based on Navistar's fiscal year, and any payments required under

4

the PSP are to be made directly to the Supplemental Benefit Trust within 90 calendar days of the end of each fiscal year. *Id.*

The PSP contains a detailed explanation of how to calculate the contributions to the trust, based on several defined terms used as variables in the calculation formulas. Doc. #399-4 at 52- 56. Contributions are derived from the profits of "Covered Operations," which are certain defined entities in the Navistar family of companies. *Id.* at 51. "Qualifying Hours" are "straight time" (non-overtime) hours worked by employees at the Covered Operations. *Id.* at 52-53. "Qualifying Profits" include "[p]re-tax income or losses of continuing Covered Operations including unusual items," with certain exclusions.[1] *Id.* at 53. Qualifying Profits also include the net income from Navistar Financial Corporation, as long as it remains a subsidiary of Navistar; cash dividends received by the Navistar entities; and diminishing percentages of the net income of certain entities

---

[1] The exclusions to Qualifying Profits based on the pre-tax income or losses of Covered Operations are described as:

| | |
|---|---|
| 5.2.1 | Income or losses from discontinued operations, non-recurring charges or credits directly attributable to the sale or discontinuation of such operations; |
| 5.2.2 | Extraordinary Items; |
| 5.2.3 | Gain or loss on the sale of assets, other than sale of inventory in the ordinary course of business and trade; and |
| 5.2.4 | Pre-tax income (loss) of [Navistar Financial Corporation]; pre-tax losses of [the Parent] on an entity basis; pre-tax income (loss) of any business acquired after the Effective Date; dividends received from Navistar International Corporation Canada; equity in income (loss) from affiliates included in covered Operations on the Effective Date. |

Doc. #399-4 at 53.

that are acquired after the Settlement Agreement, or are located outside of the United States. Doc. #399-4 at 53-54.

After the amount of Qualifying Profits is determined, a series of seven "incremental steps" are calculated, which are based on the number of Qualifying Hours multiplied by predetermined dollar amounts that correspond to increased profits. *Id.* at 55. Thus, the Qualifying Profits are allocated into seven different portions, and a predetermined percentage of each portion constitutes the contribution obligation owed to the Supplemental Benefit Trust. *Id.* The steps allocate increasing percentages of Qualifying Profits that must go to the trust, ranging from one percent in the first step to sixteen percent in the seventh step. *Id.* at 56. This illustrates how the amount of profit-based contributions to the Supplemental Benefit Trust increases as the company's profits increase.

In addition, Section 8.1, Section 8.2, and Section 8.3 of the PSP describe Navistar's disclosure obligations. *Id.* at 56-58. Navistar must provide the Committee "with a worksheet detailing the calculation of the Contribution obligation, the Qualifying Hours, and the Qualifying Profits." *Id.* at 56. A certified public accountant, selected by Navistar, must review the "[d]ata on profits, hours worked, Qualifying Profits, and Qualifying Hours," and provide a report to the UAW and the Committee. *Id.* In addition, the firm must provide a "letter report" that "set[s] forth the procedures performed and conclusions reached" to Navistar, the UAW, and the Committee. *Id.* The information and report must be delivered "before the date that the Contribution obligation, if any, is required to be paid." *Id.*

6

In years in which a lack of Qualifying Profits results in no contribution to the Supplemental Benefit Trust, the PSP requires that Navistar deliver the information and report before 90 days after the end of the fiscal year.  *Id.* at 56-57.

Section 8.6 of the PSP places a further disclosure obligation on Navistar, stating: "In addition to the above, the Company will respond as soon as practicable to any reasonable requests from the UAW or the Supplemental Benefit Committee for information supporting any computation made by the Company to compute the Contribution obligation, and will provide the information so requested."  *Id.* at 57-58.

The PSP also provides for a dispute resolution process, triggered by "a review of the information and calculations provided," if the Committee disputes the information and calculations provided by the company.  *Id.* at 57.  The process requires the Committee to provide notice of dispute within 30 days of receiving the information and calculations, at which point the parties have another 30 days to try to resolve the dispute.  *Id.*  At that point, the dispute is referred to "a mutually acceptable third party," either by consent, or by a process of elimination described in the PSP.  *Id.*  The third party's determination is to be "final and binding on all parties to the dispute."  *Id.*

On June 8, 1993, the Court approved the Settlement Agreement in its Supplemental Opinion (Doc. #326), and entered final judgment as a consent decree (Doc. #327).

7

**B.    Declining Contributions and a Breakdown in Communications**

According to the Committee, Navistar contributed an average of $30 million per year between 1995 and 2001, ranging from annual contributions of $126,070 to over $70 million. Doc. #439 at 6. During the next eight years, however, Navistar's sole annual contribution was $1.4 million, for fiscal year 2004. *Id.* at 7. In 2006, the audit committee of Navistar's board of directors conducted a review that called into question the company's financial reports of recent years, requiring their restatement and a resulting "$2.4 billion reduction to the Company's previously reported stockholder's equity, the de-listing of the Company's common stock by the New York Stock Exchange, and a formal investigation by the [SEC] that resulted in actions against the former senior Company officers who had direct responsibility for Navistar's financial and management reporting." *Id.*

Those events also resulted in the delay of the disclosures required by the PSP and the calculations of benefit contributions to the Supplemental Benefit Trust. Because of the need to review and restate its financial reports, the Committee was informed by Navistar that "it was unable to provide accurate information pursuant to its PSP obligations" to contribute Qualifying Profits. *Id.* at 7-8. As a consequence, there was no way for the Committee to evaluate compliance from January 2006 until 2009. *Id.* The Committee received schedules for 2004 and 2005 on June 9, 2009. *Id.* at 8. The calculations therein "indicated that no profit-sharing contribution was required for either year." *Id.* At that time, "Navistar also provided a partially-complete schedule of Qualifying Profits for

8

2006, which also indicated that no profit sharing contribution was required. It did not provide the required schedules for the 2007 and 2008 Plan years." *Id*.

The Committee sent Navistar a detailed letter on May 4, 2010, "expressing both general and specific concerns relating to the schedules of Qualifying Profits that Navistar had provided, or neglected to provide, to the Committee per the terms of the PSP." *Id*. The letter noted Navistar's untimely disclosures, disputed the company's calculation of Qualifying Profits for 2007, 2008, and 2009, and "noted that the schedules did not provide sufficient information to verify the accuracy and reasonableness" of Navistar's calculations. *Id*. The letter also noted the lack of information pertaining to Qualifying Hours, as required by Section 8 of the PSP. *Id*.

Almost a year later, on April 6, 2011, Navistar responded. *Id.* The company provided its schedule for the calculation of Qualifying Profits for fiscal year 2010, which again resulted in no contribution to the Supplemental Benefit Trust. *Id.* at 7, 8. Navistar also "declined to respond to any of the other questions or concerns" expressed in the Committee's letter of May 4, 2010. *Id.* at 8.

The Committee then "retained an expert to determine, to the extent possible, whether the lack of contributions was based on actual financial performance, or whether the Company had engaged in activities intended to shield profits in a manner that was inconsistent with the intent of the parties" under the Settlement Agreement. *Id.* The Committee then sent Navistar "a detailed request for information" on November 11, 2011. *Id.* at 9.

9

Navistar responded on February 15, 2012, "but the response did not provide the information the Committee needed to evaluate whether the Company had complied with the terms of the PSP." *Id*. The company stated a series of "General Objections" to the Committee's requests, claiming that "despite its overall profitability, [it] owed no Profit-Sharing Contributions." *Id.* In addition, Navistar "refused to respond to any of the Committee's questions about the components of the Profit-Sharing Calculation . . . claiming generally that it did not have to explain itself to the Committee." *Id*.

## C.    The Committee's Intervention and Recent Procedural History

Three weeks later, on March 23, 2012, the Committee filed a Motion to Intervene under Rule 24 of the Federal Rules of Civil Procedure. Doc. #394. Three days after filing its Motion to Intervene, the Committee filed its Motion to Enforce the Settlement Agreement. Doc. #395. In addition, the Committee filed an Amended Motion to Enforce the Settlement Agreement (Doc. #407) on June 6, 2012, which requested that the company disclose its financial information for fiscal year 2011.

The Court sustained the Committee's Motion to Intervene on February 6, 2013 (Doc. #414), and ordered the Committee to file a complaint with the Court, so that its Motion to Intervene complied with the procedural requirements for intervention under Civil Rule 24(c). The Court also ordered Navistar to file a Response to the Committee's Motion to the Enforce Settlement Agreement, as

10

Navistar had requested to delay any response until the Court ruled on the Committee's Motion to Intervene.  Doc. #401.

The Committee, as Intervenor-Plaintiff, filed a Complaint for Breach of Settlement Agreement and for Injunctive Relief (Doc. #415) on February 15, 2013. On March 11, 2013, Navistar filed its Response to the Committee's Motion to Enforce (Doc. #421) and a Motion to Dismiss Intervenor-Plaintiff's Complaint (Doc. #422).  On March 29, 2013, the Court sustained the Committee's Motion to Enforce the Settlement Agreement and overruled Navistar's Motion to Dismiss. Doc. #426.  Therein, the Court ordered the Committee to file a detailed request for the information that it needed to fulfill its duty to review and enforce Navistar's compliance with the Supplemental Benefit Program.  The Court also ordered Navistar to fully comply with the Committee's information request.

The Committee filed its request on April 19, 2013.  Doc. #427.  On July 16, 2013, Navistar filed a Status Report, in which it detailed the actions it had taken to comply with the Court's order and the Committee's information request. Doc. #431.

On August 21, 2013, the Committee filed a Motion for Leave to File an Amended Complaint Instanter, seeking to add a claim under ERISA in an attached Amended Complaint.  Doc. #432.  Navistar filed a Response in Opposition on September 11, 2013.  Doc. #433.  On October 4, 2013, the Court sustained the Committee's Motion, and allowed the filing of the Amended Complaint.  Doc. #437.  The Court also allowed Navistar to re-file its Motion to Dismiss, recognizing

11

that such a motion would be the proper method for bringing Navistar's arguments in opposition to the Committee's Amended Complaint before the Court.

Navistar filed its Motion to Dismiss on October 17, 2013. Doc. #438. The Committee then filed both its Amended Complaint (Doc. #439) on October 18, 2013, and a Response to Navistar's Motion to Dismiss (Doc. #441) on October 31, 2013. On November 13, 2013, Navistar filed a Reply to the Committee's Response to the Motion to Dismiss. Doc. #425.

### D.    The Allegations in the Amended Complaint

In addition to the background already presented, the Committee's Amended Complaint makes a series of allegations to support its claim for breach of contract and its claim under ERISA § 1132(a)(3). The Committee notes that after 2001, Navistar made no contributions to the Supplemental Benefit Trust, "even in years where it reported substantial net income – even hundreds of millions or *billions* of dollars in income." Doc. #439 at 11. The Committee points to an increase in the number of entities owned or controlled by Navistar affiliates, rising from eleven in 1997 to more than sixty in 2011, that corresponds to the dearth of contributions:

> The increase in the number of entities included in the calculation of Qualifying Profits was accompanied by a dramatic contrast between the reported income and loss of Navistar, Inc. versus that of these new entities. Similarly, since fiscal year 2000, the pattern has changed from Qualifying Profits generally being *higher* than the consolidated net income of all the Navistar-related entities to now being generally much lower. Both of these facts suggest that income is being generated by Navistar as a whole that is not being reflected in Qualifying Profits.

12

*Id.* at 12-13.

The Committee then describes a "scheme" in which "Navistar created new entities, and then engaged in various stratagems involving them, in order to depress the income allocable to the original Navistar operations that form the basis for the Profit-Sharing Contribution obligation in the [Settlement] Agreement." *Id.* at 13. These alleged maneuvers "resulted in a significant decrease in the amount of Qualifying Profits Navistar claimed and, in turn, virtually eliminated any chance that Navistar would ever make Profit-Sharing Contributions." *Id.*

According to the Committee, Navistar's "scheme" involved the formula for determining profit sharing calculations that is defined in the PSP, which is based on calculations involving Qualifying Profits and Qualifying Hours. *Id.* Qualifying Profits are derived from "Covered Operations," which include Navistar's parent, Navistar, and their subsidiaries and affiliates. The Committee notes that the PSP's definition of "Covered Operations" is "critical," because the proceeds from such operations are used to calculate Qualifying Profits. Doc. #399-4 at 53-54; Doc. #439 at 13. However, for a "business acquired after the Effective Date" of June 30, 1993, its income and loss is included in Qualifying Profits only on an *after-tax* basis, as opposed to the calculation of other Covered Operations' income on a *pre-tax basis*. The Committee alleges that "this distinction alone has the effect of excluding 40% of the profits from acquired businesses from the calculation of Qualifying Profits." Doc. #439 at 14.

13

Furthermore, the Committee alleges that "Navistar has improperly classified as acquired businesses numerous entities or ventures that it organized, formed and capitalized that had no previously existing business activity," which it refers to as "Formed Entitles." *Id.* Creation or acquisition of the Formed Entities, as well as foreign Formed entities, allegedly allowed Navistar to "allocat[e] pre-existing business and revenue opportunities away from what were Covered Operations at the time of the [Settlement] Agreement and to the Formed Entities." *Id.* at 14-15. The Committee further alleges that Navistar also shifted expenses from the Formed Entities to Covered Operations, allowing income that would otherwise be included in Qualifying Profits to be artificially reduced by losses. *Id.* at 15. The Committee alleges that Navistar's classification of such Formed Entities as "businesses acquired after the Effective Date" constituted a breach of the Settlement Agreement. *Id.* at 14-16.

The Committee also alleges that Navistar failed to include cash dividends and management fees from its foreign operations in the profit-sharing calculations, improperly excluded the Medicare Part D subsidy it received from the United States in the calculation of Qualifying Profits, and incorrectly classified certain employees in order to have their "Qualifying Hours" excluded from the calculation of Qualifying Profits. *Id.* at 16-20. According to the Committee, each of the foregoing allegations constituted a breach of the Settlement Agreement, as well as a violation of ERISA's mandate to act in accordance with its terms. *Id*.

14

## II.  **ANALYSIS**

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of an adversary's claim on the basis that it "fail[s] to state a claim upon which relief can be granted" by the Court.  The moving party bears the burden of showing that the non-moving party's pleading has failed to adequately state a claim for relief.  *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citing *Carver v. Bunch*, 946 F.2d 451, 454-55 (6th Cir. 1991)).  The Rule 12(b)(6) analysis requires a court to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (quoting *Treesh*, 487 F. 3d at 476); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  The foregoing "tenet" only applies to factual allegations, but does not apply to legal conclusions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss under Rule 12(b)(6).  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Unless the facts as alleged show that the plaintiff's claim crosses "the line from conceivable to plausible, [the] complaint must be dismissed."  *Id.*  "Although this standard does not require 'detailed factual allegations,' it does require more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"

15

*Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting
*Twombly*, 550 U.S. at 555).

The Court notes that Navistar presents several distinct arguments to support

dismissal of the Committee's Amended Complaint, not all of which neatly fall

within the typical Rule 12(b)(6) analysis. In particular, Navistar does not attack the

legal sufficiency of the Committee's breach of contract claim, and instead argues

that PSP's dispute resolution process requires the parties to arbitrate the claim.

Because Navistar asks for an order to compel arbitration, the Court will address its

arguments under the applicable standards of the Federal Arbitration Act, ("FAA"),

9 U.S.C. § 1, *et seq*. Doc. #438 at 8; *see Stepp v. NCR Corp.*, 494 F. Supp. 2d

826, 828-29 (S.D. Ohio 2007) (recognizing that a defendant's motion to dismiss

and compel arbitration "is not one which comes within the ambit of Rule 12(b) of

the Federal Rules of Civil Procedure" and applying the standards of the FAA to rule

on the motion). After addressing Navistar's arguments to compel arbitration, the

Court will return to the Rule 12(b)(6) standards and address its arguments for

dismissal of the Committee's ERISA claim. Finally, the Court will voice its

concerns regarding the legal sufficiency of the breach of contract claim, which the

parties' memoranda have not addressed.

### A.    Navistar's Motion to Compel Arbitration

Navistar argues that the dispute resolution procedure of the PSP and the

Federal Arbitration Act require the Committee to arbitrate its dispute. Doc. #438

16

at 8-9.  According to Navistar, all of the allegations set forth by the Committee in the Amended Complaint "fall squarely within the scope" of the dispute resolution provision in Section 8 of the PSP, which should be construed as a binding arbitration clause. *Id.* at 8-10.  Navistar argues that the parties to the original litigation intended for a dispute over profit-sharing contributions to be arbitrated, which is demonstrated by the fact that the dispute involves financial analysis and accounting intricacies that a court is ill-equipped to perform.  *Id.* at 10.

Furthermore, Navistar states that the parties' original intent to avoid the costs of litigation and discovery with the dispute resolution process would be defeated by allowing the Committee to litigate the current dispute. *Id.* at 11.  The company also argues that it is a contradiction for the Committee to urge the Court to enforce the consent decree while ignoring the dispute resolution provisions of the same agreement. *Id.* at 12.  The dispute resolution provision gives an arbitrator authority to interpret the consent decree above and beyond mere mathematical or accounting verification, Navistar argues, making it unnecessary to litigate the dispute.  *Id.* at 12-13.  Navistar also points to the Committee's "past invocation" of the dispute resolution process, arguing that the process should apply to all disputes between the parties.  *Id.* at 14-15.[2]

---

[2] Navistar also again raises the issue of the Committee's standing to bring a breach of contract claim against it, while acknowledging that the Court previously ruled in the Committee's favor on that issue.  Doc. #438 at 15-16.  The Court previously concluded that the Committee, as a fiduciary created by the agreement itself to enforce its terms, unquestionably had standing to intervene. *See* Doc. #426.

In response, the Committee argues that the Federal Arbitration Act should not apply to a consent decree, and points to the Court's past "dominant role in the interpretation and enforcement" of the Settlement Agreement. Doc. #441 at 2. The Committee argues that an accountant would be ill-equipped to perform the type of contract interpretation the dispute requires, as the issues between the parties go beyond the type of "routine accounting disputes" that the dispute resolution procedure was intended to address. *Id.* at 3-4. The Committee also argues that the type of discovery that will be necessary to resolve its claim involves complex legal issues that an arbitrating accountant could not effectively resolve, as such discovery may involve documents and communications created by Navistar and its attorneys concerning their interpretation of the consent decree and the creation of the company's subsidiaries. *Id.* at 4-6. Similarly, the Committee argues that the expert testimony it will present requires evaluation by a court, not an arbitrator, and that the prospective injunctive relief that it seeks "is relief that only this Court can award." *Id.* at 6-7.

1.      *Is the dispute arbitrable?*

Under the Federal Arbitration Act, there is a presumption in favor of arbitration. *See* 9 U.S.C. § 3 (requiring a stay of any proceedings involving an issue that the parties have previously agreed to arbitrate). Because of the "strong federal policy in favor of arbitration," a court should "resolv[e] any doubts as to the parties' intentions in favor of arbitration." *Albert M. Higley Co. v. N/S Corp.*, 445

18

F.3d 861, 863 (6th Cir. 2006). "However, the federal policy in favor of arbitration is not an absolute one." *Id.* A court should resolve "doubts concerning the scope of arbitrable issues . . . in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). In order to grant a motion to compel arbitration, a court must conclude that "the dispute is arbitrable." *Landis v. Pinnacle Eye Care, LLC*, 537 F.3d 559, 561 (6th Cir. 2008). The test of arbitrability involves two inquiries: 1) whether "a valid agreement to arbitrate exists between the parties," and 2) whether "the specific dispute falls within the substantive scope of the agreement." *Id.*

Here, there is no doubt that Section 8 of the PSP contains a valid agreement to arbitrate disputes over "information or calculations" provided by Navistar. The determinative inquiry on arbitrability, then, is whether the specific dispute between the Committee falls within the substantive scope of the provision: "information and calculations provided pursuant to Sections 8.1, 8.2, and 8.3" of the PSP. Doc. #399-4 at 56. The answer to this inquiry requires a comparison of the language of the dispute resolution provision in Section 8 of the PSP, which illustrates the scope of "information or calculations," with the scope of the substantive allegations of the Committee's Amended Complaint. The dispute is only arbitrable if the former encompasses the latter. *See Landis*, 537 F.3d at 561.

19

Section 8.1 requires Navistar to provide "a worksheet detailing the calculation of the Contribution obligation, the Qualifying Hours, and the Qualifying Profits, which must also include "a listing by category of the employees included and excluded in the calculation of Qualifying Hours and *all information reasonably necessary to review the calculation of Qualifying Profits*." Doc. #399-4 at 56 (emphasis added). Section 8.2 describes other information that triggers the dispute resolution process: "[d]ata on profits, hours worked, Qualifying Profits, and Qualifying Hours," which are reviewed by an accounting firm and presented to the Committee in a report.[3] *Id.*

The Committee makes a number of allegations in its Amended Complaint regarding Navistar's calculation of Qualifying Profits. *See supra* Part I.D. As noted previously, the PSP treats income from a "business acquired after the Effective Date" by a Covered Operation as susceptible to a contribution calculation only on a diminished, post-tax basis. Doc. #399-4 at 53-54. Thus, the Committee alleges that the Formed Entities were created or acquired in order to take advantage of the fact that they may make decreased contributions to Qualifying Profits, even though they had no actual pre-existing assets or business activity. Doc. #439 at 14-15. The Committee alleges that Navistar then "allocated pre-existing business and revenue opportunities away from what were Covered Operations at the time of the [Settlement] Agreement and to the Formed Entities," and then performed the

_____

[3] Section 8.3 provides a timeframe for disclosure, but does not further describe "information or calculations." Doc. #399-4 at 56.

profit-sharing calculations based on their post-tax income.  *Id.*  Foreign entities, which were completely insulated from any profit-sharing obligation, were also allegedly used.  *Id.*  In addition, the Committee claims that Navistar shifted income-generating expenses from Covered Operations to Formed Entities, thereby "generat[ing] losses in [Covered Operations] that offset the income that would otherwise be fully reflected in the Profit-Sharing Calculation."  *Id.*  The Committee also alleges that Navistar failed to include cash dividends and management fees from its foreign operations in the profit-sharing calculations, improperly excluded the Medicare Part D subsidy it received from the United States in the calculation of Qualifying Profits, and incorrectly classified certain employees in order to have their "Qualifying Hours" excluded from the calculation of Qualifying Profits.  *Id.* at 16-19.

None of the foregoing allegations exceeds the scope of the "information or calculations" described in Section 8 of the PSP's dispute resolution provision.  All of the Committee's allegations are squarely directed at the methodology employed by Navistar to calculate Qualifying Profits, Qualifying Hours, and the criteria the company applied to determine which entities constituted Covered Operations.  Similarly, the justification for inclusion or exclusion of the Formed Entities from Covered Operations was based on facts that surely fall within "all information reasonably necessary to review the calculation of Qualifying Profits."  Doc. #399-4 at 56.  The "specific dispute" between the parties clearly "falls within the

21

substantive scope of the agreement," and is, therefore, arbitrable. *Landis v. Pinnacle Eye Care, LLC*, 537 F.3d 559, 561 (6th Cir. 2008).

The Committee argues that Court is the proper forum for deciding the present dispute because the dispute arises under the Court's "exclusive jurisdiction to resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of this Settlement Agreement," and not the "information or calculation" described by the dispute resolution provision. Doc. #441 at 8 n.2. However, the Committee does not elaborate on its argument or demonstrate how its dispute falls outside the scope of the dispute resolution provision. The Court's own reading of the dispute locates it entirely within the "information and calculations" that the provision describes, without ambiguity. Furthermore, the Court cannot agree that its general jurisdiction over the Settlement Agreement can override the specific exception to that jurisdiction that the drafters of the agreement created within the dispute resolution provision of the PSP. Based on the foregoing, the Court concludes that the dispute resolution provision of Section 8.1 is arbitrable.

2. *Did Navistar waive its right to arbitrate?*

Because of the federal presumption favoring arbitration, a court should not "lightly infer a party's waiver of its right to arbitration." *Hurley v. Deutsche Bank Trust Co. Americas*, 610 F.3d 334, 338 (6th Cir. 2010) (citing *O.J. Distrib., Inc. v. Hornell Brewing Co., Inc.*, 340 F.3d 345, 356 (6th Cir. 2003)). "However, a party

22

may waive an agreement to arbitrate by engaging in two courses of conduct: (1) taking actions that are completely inconsistent with any reliance on an arbitration agreement; and (2) delaying its assertion to such an extent that the opposing party incurs actual prejudice." *Hurley*, 610 F. 3d at 338 (internal quotations and citations omitted); *see also Manasher v. NECC Telecom*, 310 Fed. App'x 804, 806 (6th Cir. 2009); *American Locomotive Co. v. Gyro Process Co.*, 185 F. 2d 316 (6th Cir. 1951) (upholding determination that defendant waived right to arbitrate where defendant did not apply for a stay of proceedings until after litigating case for seven years, even though defendant raised arbitration as a defense in answer to complaint).

Over a period of years, Navistar's actions have been completely inconsistent with any reliance on the PSP's dispute resolution procedures. In fact, the company explicitly refused to comply with them. In an August 3, 2009, letter to the Committee, David P. Radelet, counsel for Navistar, stated the following:

> Given the circumstances, **we must at this time respectfully decline your request that the parties initiate the dispute resolution procedures in the Plan**, as the dispute you identify has no impact whatsoever on the profit sharing payments under the Plan. **Navistar will agree**, however, **that this issue has been timely raised** by Supplemental Trust Committee **in the event the dispute becomes material** in any future year.

Doc. #415-2 at 41-42 (emphasis added).

Thereafter, on May 4, 2010, the Committee responded to the calculations of qualifying profits for 2007, 2008, and 2009 that Navistar had sent on April 7, 2010, and expressly provided the notice of dispute required by Section 8 of the

23

PSP. Doc. #415-3 at 2. This indicated the Committee's continuing willingness, at that time, to enter into the dispute resolution process. Navistar's April 6, 2011, response did not recognize that the Committee had again invoked the dispute resolution process, nor did it or mention any next steps the parties might take to implement it. Doc. #415-4 at 1.

On November 14, 2011, the Committee sent Navistar a demand letter, claiming that the Company had failed to provide any information requested in its May 4, 2010, letter, as Navistar's April 6, 2011, response only contained the company's 2010 calculations. Doc. #415-5. At that point, the Committee no longer invoked the alternate dispute provisions of the PSP, indicating instead that it would "seek the assistance of the Court" if Navistar did not provide the information requested within sixty days. *Id.* at 5. Thus, it is clear that the Committee attempted to invoke the dispute resolution procedure, and was rebuffed by Navistar.

Ninety days later, on February 15, 2012, Navistar replied. Doc. #415-6. The response wholly failed to satisfy the Committee, however, as it then filed a Motion to Intervene (Doc. #394) and a Motion to Enforce the Settlement Agreement (Doc. #395) with the Court. It was only after the Court sustained the Committee's Motion to Intervene that Navistar brought up the dispute resolution procedure, nearly a year after the Committee filed the foregoing motions. *See* Doc. #421.

24

The situation is analogous to *Johnson Associates Corp. v. HL Operating Corp.*, 680 F.3d 713 (6th Cir. 2012), in which a defendant was found to have waived its right to arbitration when it did not raise the right to arbitrate as an affirmative defense in its answer, and then allowed eight months to pass before raising the issue. Although not a technical requirement of Rule 8, "a defendant's failure to raise arbitration as an affirmative defense shows his intent to litigate rather than arbitrate." *Id.* at 718. Similarly, Navistar failed to invoke a right to arbitrate in its Response in Opposition to the Committee's Motion to Intervene. Doc. #404. Like an answer, which is "the main opportunity for a defendant to give notice of potentially dispositive issues to the plaintiff," Navistar's Response presented an opportunity to assert the potentially dispositive issue of arbitration. *Johnson Associates Corp.*, 680 F.3d at 718. Instead, at that time, as an argument against intervention, Navistar adopted the position that the Committee should instead bring a breach of contract claim against it, a position completely inconsistent with any desire to arbitrate. Doc. #404 at 6. The company urged the Court to overrule the Committee's Motion to Intervene, taking the position that the Committee had an "adequate means for asserting its rights" by "asserting a claim for relief in an independent action." *Id.* Several months later, Navistar reiterated its belief that the Committee should file a claim against it: "More specifically, it is Navistar's position that if the [Committee] believes that it has cognizable claims against Navistar, it should be required to properly assert those claims as a new action by filing a complaint in compliance with Fed. R. Civ. P. 8." Doc. #408 at 2.

25

Navistar did not request a stay or move the Court to compel arbitration until *after* the Court granted the Committee leave to intervene, when, suddenly, Navistar no longer believed the Court was the proper forum for the Committee to assert its rights. This request occurred nearly a year after the Committee filed its Motion to Intervene, longer than the eight month delay in *Johnson Associates*, when Navistar responded to the Committee's Motion to Enforce the Settlement Agreement. *See* Doc. #421. By refusing to arbitrate, suggesting litigation, and then waiting to demand arbitration, the company's actions have been "completely inconsistent with any reliance on an arbitration agreement" in the PSP. *Hurley*, 610 F. 3d at 338.

Navistar's delay also resulted in the actual prejudice required to establish a waiver of the right to arbitrate. *Hurley*, 610 F. 3d at 338. According to the Sixth Circuit, the prejudice necessary for a finding of waiver may "be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense." *Johnson Associates*, 680 F. 3d at 719-20 (quoting *Kramer v. Hammond*, 943 F.2d 176, 179 (2nd Cir. 1991)). In *Johnson Associates*, such actual prejudice to the plaintiffs resulted from the combination of a delay of eight months, the resources expended to file motions and engage in discovery and settlement discussions. Here, too, the Committee has incurred unnecessary delay and expense that supports a finding of actual prejudice. After Navistar's August 3, 2009, refusal to arbitrate, the Committee offered, "in the interest of saving time and expense for

26

both the Company and the Committee," to schedule a meeting of Navistar and Committee representatives in order to resolve their issues. Doc. #415-3 at 4. However, saving time and expense did not appear to be of concern to the company because, after the offer, the Committee alleges that Navistar delayed by months, or even years, its responses to the Committee's requests and the disclosures required by the PSP. After two and a half years of frustrated attempts to procure the information from Navistar, with the requisite expense associated with those attempts, the Committee finally sought to intervene and enforce the Settlement Agreement. Then, after a year of litigation and opposition to the Committee's intervention, the Company sought to dismiss the Committee's Amended Complaint by invoking the dispute resolution procedure. This represents a far longer period of delay than the eight months endured by the plaintiffs in *Johnson Associates*, with the associated expense of litigation that such delay entails. Finally, drawing inferences from the factual allegations of the Amended Complaint in the Committee's favor, if Navistar had submitted to arbitration at the Committee's request in 2009, benefits would have been paid out to the beneficiaries of the Supplemental Trust long ago. Thus, Navistar's delay in invoking arbitration has also prejudiced the rights of the beneficiaries of the Supplemental Trust, as well as those of the Committee while representing them.

To summarize, on multiple occasions, the Committee attempted to provide notice and invoke the alternative dispute provisions in Section 8 of the PSP. In response, over a three year period, Navistar refused to enter into the dispute

resolution process; ignored the Committee's attempts to invoke the process; argued that the Committee should bring a breach of contract action against it; and then, when said claim was brought against it, after substantial delay and expense, asserted its right to arbitrate.  The foregoing combination of circumstances demonstrates both "actions that are completely inconsistent with any reliance on an arbitration agreement" and delay of any right to arbitrate "to such an extent that the opposing party incurs actual prejudice."  *Hurley*, 610 F. 3d at 338. Navistar has, therefore, waived its right to compel arbitration.

The Court concludes that, although the parties' dispute is arbitrable, Navistar's own actions demonstrate waiver of its right to arbitrate the dispute between the parties.  The Court has retained subject matter jurisdiction over any dispute arising out of or in connection with the interpretation or enforcement of the Settlement Agreement, which includes the PSP, and will continue to exercise its jurisdiction over the dispute between the parties.  Accordingly, insofar as it moves the Court to compel arbitration, the Court OVERRULES Navistar's Motion to Dismiss Intervenor-Plaintiff's Complaint and Motion to Compel (Doc. #422).

### B.    The Committee's ERISA Claim

Navistar also argues for dismissal of the Committee's ERISA claim.  The company argues that unless the Committee enters into the PSP's dispute resolution process, it has failed to exhaust its administrative remedies, precluding it from bringing an ERISA claim at this time.  Doc. #438 at 16.  Navistar believes that

referring the parties to the dispute resolution procedure in the consent decree would further the policy rationale policy behind exhaustion, even though it is unclear that Sixth Circuit law requires a fiduciary such as the Committee to exhaust administrative remedies before bringing an ERISA claim. *Id.* at 16-18. The company also points out that the Committee has failed to allege futility as an exception to the exhaustion requirement. *Id.* at 19. Finally, Navistar argues that because the damages that the Committee seeks are not available as a remedy under ERISA, which only allows for equitable relief, the Court should dismiss the Committee's ERISA claim. *Id.* at 20-23.

In response, the Committee argues that the exhaustion requirement only applies to an entity's internal, non-adversarial process, not the type of adversarial dispute between the parties. Doc. #441 at 8. The Committee also argues that the damages that it seeks are for breach of contract, not an ERISA violation. *Id.* at 9. Furthermore, the Committee argues that ERISA does authorize injunctive relief requiring the payment of past due contributions in order to enforce the terms of a plan, and its claim is therefore viable under the statute. *Id.* at 9-10.

The Committee has brought its ERISA claim under 29 U.S.C. § 1132(a)(3), which allows a "participant, beneficiary, or fiduciary" to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The Supreme Court has characterized Section 1132(a)(3) as a "catchall"

provision, which exists to provide the equitable relief necessary to remedy a violation that claims brought under other provisions of ERISA cannot reach. *Varity v. Howe*, 516 U.S. 489, 512 (1996) (recognizing that Section 1132(a)(3) allows a claim against an employer-administrator who deliberately used "trickery" to convince its employees to forfeit their benefits because no other ERISA provision provided plaintiffs with a remedy). The Committee has alleged that it is a fiduciary of the PSP and the Supplemental Trust under the PSP, and that it therefore has standing to bring a claim under Section 1132(a)(3). The Committee alleges that Navistar has violated the terms of the Plan, and therefore ERISA, with the same conduct alleged in its breach of contract claim:

> by (1) forming entities which it then treats as acquired businesses and then reallocating their revenues or not properly or completely allocating costs and expenses among the Covered Operations; (2) excluding dividends and similar payments from the calculation of Qualifying Profits; (3) excluding its Medicare Part D subsidy payments from the calculation of Qualifying Profits; and (4) failing to exclude Bonus Eligible employees from the calculation of Qualifying Hours.

Doc. #439 at 20. The Committee's allegations properly state a claim under Section 1132(a)(3) for failure to act in accordance with the PSP, because "a breach of a contractual duty is required for liability to attach under § 1132(a)(3)." *Richards v. General Motors Corp.*, 991 F.2d 1227, 1231 (6th Cir. 1993).

      1.   <u>*Does the exhaustion requirement apply to the Committee's ERISA claim?*</u>

Every ERISA plan must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the

appropriate named fiduciary of the decision denying the claim." 29 U.S.C.

§1133(2). This statutory mandate has been interpreted to place a concomitant

requirement on "a participant to exhaust his or her administrative remedies prior to

commencing suit in federal court." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d

979 (6th Cir. 1991). By requiring plan participants to fully avail themselves of

administrative remedies before filing suit, exhaustion reinforces the policy

considerations of the statutorily-imposed administrative review procedure. *Amato*

*v. Bernard*, 618 F.2d 559 (9th Cir. 1980). The exhaustion requirement does not

apply if the administrative remedy would be futile or inadequate. *Costantino v.*

*TRW, Inc.*, 13 F.3d 969, 974 (6th Cir. 1994).

Navistar admits that "[t]he Sixth Circuit has not yet decided whether a

fiduciary must exhaust administrative remedies before pursuing a claim under

Section 502(a)(3) of ERISA," but argues that the Court should require exhaustion

because several "analogous" Sixth Circuit opinions, in which the plaintiffs asserted

statutory rights under ERISA, "suggest" that exhaustion applies. Doc. #438 at 16-

17 (citing *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710 (6th Cir. 2005)

and *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499 (6th Cir. 2004)). In *Coomer*,

the plaintiffs brought suit after a fiduciary amended a pension benefit plan to allow

a lump sum payout to one employee, a non-party to the suit. 370 F.3d at 503.

After the fiduciary refused to do the same for another employee, he and other

employees alleged discrimination under 29 U.S.C. 1140, based on the belief that

the fiduciary's refusal to provide one plaintiff with a lump sum payout of vested

31

pension benefits amounted to discrimination against all of them. *Id.* However, only the one plaintiff had actually requested the payout. *Id.* at 505. Thus, the other plaintiffs had failed to exhaust their administrative remedy, because they had not applied for or been refused the payout before filing suit. *Id.* at 505-06.

In *Hill*, plaintiffs were participants in an employer-sponsored health plan who brought claims against a third-party plan administrator for wrongful denial of benefits and breach of fiduciary duty. 409 F.3d 710. The Sixth Circuit expressly acknowledged that it had "not yet decided whether a beneficiary must exhaust administrative remedies prior to bringing claims based on statutory rights, such as §§ 1104 and 1105 fiduciary duty claims." *Id.* at 717. However, because it would have been futile for the plaintiffs to exhaust their fiduciary duty claims, the court found "it unnecessary to decide the more difficult issue of whether exhaustion of administrative remedies should be required for statutorily created rights." *Id.*; *see also Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 418 (6th Cir. 1998) (recognizing that "[t]he question of whether one must exhaust administrative remedies when bringing an action to assert rights granted by ERISA itself is generally unsettled" and citing to cases illustrating a circuit split).

Neither *Coomer* nor *Hill* provides real guidance. Both *Hill* and *Coomer* were brought by employee participant-beneficiaries *against* the plan fiduciaries for decisions that deprived them of plan benefits. Navistar argues that these cases are "analogous" because they both involve "statutory claims." However, that talismanic phrase is not enough. Many ERISA claims, such as *Hill's* breach of

32

fiduciary duty claim and *Coomer*'s discrimination claim, are "statutory claims." Other than the fact that their resolution does not depend on plan interpretation, they are otherwise unrelated. Nor are they factually comparable to the Committee's ERISA claim.

The real comparison must involve the particular administrative review process in question. The issue is whether the dispute resolution procedure in Section 8 the PSP is the type of administrative review described in 29 U.S.C. §1133(2), because the exhaustion doctrine developed to further the type of administrative review mandated by that provision. *See Amato v. Bernard*, 618 F.2d 559 (9th Cir. 1980). Section 1132(2) places an obligation on the *fiduciary* to provide a review process for the denied *benefits claims* of plan *participants*. In contrast, the dispute resolution provision of the PSP has nothing to do with reviewing the denied claims of participants in the Plan. It is a method for resolving adversarial disputes between the Committee and Navistar by a third party, not an internal review of a previous decision to deny a participant's claim for benefits.

This distinction is also illustrated by the fact that requiring exhaustion of the Committee's ERISA claim would fail to further the policy reasons that underlie exhaustion in any meaningful way. In *Costantino v. TRW, Inc.*, 13 F.3d 969, 974 (6th Cir. 1994), the Sixth Circuit upheld a determination that futility excused the plaintiff's failure to exhaust, but the court also emphasized the need for the purposes of the exhaustion doctrine to be served when requiring exhaustion of a particular ERISA claim. "If these purposes would not be furthered, there would be

33

no sense in exhausting administrative remedies." *Id.* at 975. *Costantino* identified

the following policy reasons that motivate the exhaustion requirement:

> (1) To help reduce the number of frivolous law-suits under ERISA.
>
> (2) To promote the consistent treatment of claims for benefits.
>
> (3) To provide a nonadversarial method of claims settlement.
>
> (4) To minimize the costs of claims settlement for all concerned.
>
> (5) To enhance the ability of trustees of benefit plans to expertly and efficiently manage their funds by preventing premature judicial intervention in their decision-making processes.
>
> (6) To enhance the ability of trustees of benefit plans to correct their errors.
>
> (7) To enhance the ability of trustees of benefit plans to interpret plan provisions.
>
> (8) To help assemble a factual record which will assist a court in reviewing the fiduciaries' actions.

*Id.* (citing *Makar v. Health Care Corp. of Mid-Atlantic (CareFirst)*, 872 F.2d 80 (4th

Cir. 1989)); *see also Amato v. Bernard*, 618 F.2d 559 (9th Cir. 1980).

Here, there is no indication that the Committee's claims are frivolous. The

second and third factors apply to benefits claims, and entering into dispute

resolution would not suddenly render the parties' dispute "nonadversarial." They

would still be engaged as adversaries with a third party overseeing the dispute, as

they are before the Court. Dispute resolution may be less costly than litigating the

dispute, but even that is unclear, because the process requires the retention of a

professional as a neutral. Section 8 requires the parties to retain a "mutually

acceptable third party (such as an accounting firm)," and, if the parties cannot

34

agree, one of the "seven largest accounting firms" in the United States, with costs to be borne equally by the parties. Doc. #399-4 at 57.  The fifth factor is totally inapplicable, as the fiduciary here is the party bringing the ERISA claim.  The sixth and seventh factors are inapplicable as well.  The current dispute does not center around administrative error in the provision of benefits, and the type of plan interpretation that exhaustion might "enhance" refers to the consistent interpretation of plan terms when an administrator evaluates multiple individual benefits claims.  Finally, there is no indication that it would be more desirable to develop a factual record in dispute resolution when discovery procedures exist that will be available to the parties.  The last factor also presupposes administrative review preliminary to a possible ERISA lawsuit.  Here, the dispute resolution provision of the PSP is meant to be binding and would *preclude* any judicial review, further distinguishing the present process from the type of review that exhaustion serves.

In short, as in *Costantino*, it would be "purposeless" to require the parties to implement the dispute resolution provision of the PSP, as that process is not the type of administrative review furthered by the exhaustion doctrine.  13 F.3d at 975.  Because exhaustion does not apply, the Court will not analyze the futility exception.  *Id.* at 974.  Accordingly, the Court declines to dismiss the Committee's ERISA claim based on a failure to administratively exhaust the claim.

35

2.    *Does the Committee's ERISA claim authorize the remedy it seeks?*

Navistar also argues that the Committee's ERISA claim should be dismissed because the Committee seeks damages, a remedy that is not available under Section 1132(a)(3) of ERISA, which only provides equitable relief. Doc. #438 at 20-23. In response, the Committee argues that the damages it seeks are only "in connection with its claim for breach of contract," and points to a number of cases in which equitable relief took the form of money payments. *Id.* at 9-10.

An ERISA claim under 29 U.S.C. § 1132(a)(3) authorizes a "participant, beneficiary, or fiduciary" to bring suit "(A) to *enjoin* any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain *other appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." (emphasis added.) According to the Supreme Court, the "appropriate equitable relief" authorized by Section 1132(a)(3) refers only to "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 257-58 (1993).

As *Mertens* makes clear, compensatory damages are not an available remedy under Section 1132(a)(3), the provision under which the Committee has stated its ERISA claim. However, as the Committee has clarified, the reference to "damages" in its prayer for relief pertains to its breach of contract claim, not its

36

ERISA claim.  Furthermore, the Committee asks for specific injunctive relief that

Navistar has not challenged the ability of a Section 1132(a)(3) claim to provide,

such as an injunction to "enforce the terms of the PSP by ordering the Company to

comply with the terms of the PSP" or "other orders to compel compliance" with

the Plan terms.  Doc. #432.  Presumably, Navistar takes issue with the

Committee's request for equitable relief that would require the company to make

"appropriate contributions to the Supplemental Trust," but the mere fact that the

Committee seeks money does not preclude that relief from being available under

Section 1132(a)(3).  In *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S.

356 (2006), the Supreme Court recognized that a fiduciary may recover money by

bringing a Section 1132(a)(3) claim because "appropriate equitable relief" may

include "a constructive trust or equitable lien on a specifically identified fund" held

by the defendants.  The Court also observed that "ERISA provides for equitable

remedies *to enforce plan terms*, so the fact that the action involves a breach of

contract can hardly be enough to prove relief is not equitable; that would make

§ 502(a)(3)(B)(ii) an empty promise."  *Id.* at 363.  The Committee has requested

forms of "appropriate equitable relief" contemplated by Section 1132(a)(3), and

the nature of the relief it requests is not, therefore, a reason to dismiss its ERISA

claim.

    In conclusion, Navistar has not demonstrated that the Committee's ERISA

claim under 29 U.S.C. § 1132(a)(3) is subject to exhaustion, or that it requests

37

relief that the statute does not authorize. Accordingly, the Court will not dismiss the Committee's ERISA claim.

### C.    The Committee's Breach of Contract Claim

Finally, the Court notes that although Navistar has only challenged the Committee's breach of contract claim on the basis of arbitrability, there is substantial reason to doubt the viability of such a claim in an ERISA proceeding. Neither party's brief addresses the issue of whether such a breach of contract claim may exist, given the "very limited" federal common law that courts have allowed to develop under ERISA, as well as the statute's complete preemption of state law under 29 U.S.C. § 1144. *Central States, Se. & Sw. Areas Pension Fund v. Mahoning Nat'l Bank*, 112 F.3d 252, 256 (6th Cir. 1997) (citing *Milwaukee v. Illinois*, 451 U.S. 304 (1981)) (rejecting attempt to bring federal common law claims for fraud or judgment collection under ERISA); *Tassinare v. American Nat. Ins. Co.*, 32 F.3d 220 (6th Cir. 1994) (holding that plaintiff's breach of contract claim was preempted if brought under state law and declining to recognizing a federal common law claim). The Committee's Amended Complaint asserts a "breach of contract" claim, without specifying whether it arises under federal or state law. Doc. #439 at 19.

Because the parties have not briefed this issue, the Court will reserve ruling on the dismissal of the Committee's breach of contract claim until the parties have the opportunity to present their arguments, as ordered below.

III.    **CONCLUSION**

Based on the foregoing, the Court OVERRULES Navistar's Motion to Dismiss Intervenor-Plaintiff's Amended Complaint and Compel Dispute Resolution Process (Doc. #438), as the Court has determined that Navistar waived its right to arbitration, and the Committee has stated a viable ERISA claim.

The Court will, however, reserve its ruling on whether to dismiss the Committee's breach of contract claim.  Thus, the Court ORDERS the parties to file, fourteen (14) days from date, simultaneous memoranda briefing the issue of whether the Court should dismiss the Committee's breach of contract claim. Simultaneous responsive memoranda will be due fourteen (14) days thereafter.  No further memoranda are to be filed.


Date: March 6, 2014                      _____
                                         WALTER H. RICE
                                         UNITED STATES DISTRICT JUDGE