*Exhibit-G Page 1*



Navistar, Inc.
Law Department
4201 Winfield Road
Warrenville, IL 60555 USA

P : 630-753-5000
W : navistar.com

Jeffrey L. Dash
Senior Counsel

jeffrey.dash@navistar.com
Phone: 630-753-2328
Fax:    630-753-2261

October 15, 2014

**VIA EMAIL (DSchellenberg@emrslaw.com)**

Mr. David Schellenberg
Elias, Meginnes & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, IL  61602

Re: Letter Dated August 19, 2014 (Payment of HBPC Other Member Expenses)

Mr. Schellenberg:

Mr. Brian Delphey, Secretary of the Navistar, Inc. Health and Life Insurance Plan ("Shy Plan") Health Benefit Program Committee ("HBPC") forwarded me your above-referenced letter to him.

Please note that I represent Navistar, Inc. ("Navistar"), and not the HBPC, nor any members of the HBPC. However, as your letter to Mr. Delphey was requesting reimbursement from Navistar for certain matters for HBPC "Other Member" Mr. Jack D. Hall, I am responding to your letter on behalf of Navistar.

Contrary to your assertion that Mr. Delphey's July 14, 2014 letter to Mr. Jack D. Hall "is seriously flawed in several aspects", in fact Mr. Delphey's letter is consistent with the Shy Plan terms and conditions.

One key section of the Shy Base Plan document you failed to cite was Section 6.2(a). That Section provides, in relevant part:

"The Health Benefit Program Committee shall have the powers, rights and duties set forth herein and the following additional powers, rights and duties consistent with its rights and obligations under this Exhibit A:  (a) to adopt such rules of procedure consistent with the Health Benefit Program and Life Insurance Program as it may deem appropriate in its sole discretion in connection with the exercise or discharge of its powers, rights and duties hereunder."

As Mr. Delphey explained to Mr. Hall in his July 14th letter, the HBPC exercised the discretion afforded to it by Section 6.2(a) of the Shy Base Plan when it adopted a procedure whereby HBPC members get pre-approval from the HBPC for compensation/expense reimbursement requests outside of scheduled HPBC meetings.   Please see attached extract from the September 29, 2009 HBPC minutes. Per Section 6.2(a) of the Shy Base Plan, it is well within the HBPC's authority to adopt such a procedure.

The HBPC's valid adoption of this rule also makes logical sense. Who is in a better position to determine what is valid, reimbursable HBPC member activity than the HBPC itself? And who is in a better position to determine what a reasonable rate of compensation is for the HBPC Other Member than the HBPC itself? Even if Mr. Hall disagrees with this HBPC rule, as a member of the HBPC his recourse is to raise the issue at an HBPC meeting. Section 6.2(a) of the Base Plan gives the HBPC the discretion to adopt the procedure in place, and Mr. Hall is certainly free to discuss the issue with other HPBC members if he does not agree with the HBPC's current validly adopted rule.

However, it is Navistar's understanding from our discussions with Mr. Delphey that Mr. Hall may not have been made aware of the HBPC's pre-approval procedure prior to him submitting his first reimbursement request for the period May 19, 2014 – July 8, 2014. As such, Navistar agrees to reimburse Mr. Hall for the entire reimbursement request for that period of time - $2993.90. In addition, Mr. Hall recently requested compensation for time spent from July 8, 2014 through August 29, 2014. As Mr. Hall was apparently not aware of the HBPC pre-approval rule for reimbursement prior to receiving Mr. Delphey's July 14th letter to him, Navistar agrees to reimburse Mr. Hall for time spent from July 8, 2014 through July 18, 2014. Per Mr. Hall's schedule, Navistar will reimburse Mr. Hall $1481.25 (19.75 hours x $75.00 per hour) for the period July 8, 2014 through July 18, 2014.

As for Mr. Hall's compensation as the HBPC Other Member for time spent after July 18, 2014 and going forward, that is a decision for the HPBC to make pursuant to the pre-approval process it validly put in place under its authority under Section 6.2(a) of the Shy Base Plan.

In terms of the legal expenses your firm incurred representing Mr. Hall, Navistar will pay him the amount of the submitted invoice in the amount of $587.10. However, we do not concede Mr. Hall's personal attorneys' fees are reimbursable under the Shy Settlement Agreement, and we in no way agree to pay for any additional personal attorneys' fees going forward.

Very truly yours,

Jeffrey L. Dash
Senior Counsel

cc: Brian Delphey
Attachment

*EXTRACT FROM 9/29/09 HBPC MINUTES* 83
*EX-E PAGE 3*

```
 1   Settlement Agreement and see how that language reads.
 2            DAN PIKELNY:  That's all we are doing.
 3   We're not asking you to do anything.  We're just asking
 4   you guys to start looking at this.  Our interpretation
 5   is it doesn't need to be done by 1/1/2010.  It needs to
 6   be done for 1/1/2011 for Shy.  If you disagree with that
 7   timing, let us know.
 8            BRIAN DELPHEY:  I'd like to go off the
 9   record for a moment.
10            (The Committee had a brief discussion off
11   the record.)
12            BRIAN DELPHEY:  That's an issue we are going
13   to have to start looking at.  We're not asking any
14   determinations or anything right now.
15            (Craig Miller and Sarah Doyle step out
16   briefly.)
17            CRAIG MILLER:  I just had to get my head
18   straightened out.
19            BRIAN DELPHEY:  Were there any other new
20   business items that anyone would like to discuss?
21            (No response.)
22            Okay.  I guess our next item is to set the
23   --
24            CRAIG MILLER:  I guess the thing I e-mailed
25   you about, Sarah answered and you were going to talk to
```

1  everybody else.

2  BRIAN DELPHEY: We can bring that up. I
3  haven't heard back from everybody. I'll let you go
4  ahead and say what it is.

5  CRAIG MILLER: There's a meeting at Memphis
6  that was announced. The call went out, basically, with
7  Mike LeCour is going to be there, Sarah is going to be
8  there, retiree liaisons are going to be there. It,
9  basically, to discuss issues with the Plan, particularly
10  now with Humana. As such I identified to Brian as I had
11  in the past, in Indianapolis in particular, I requested
12  authorization to be compensated as a member of the
13  Health Benefit Plan.

14  SARAH DOYLE: I'm not sure it was set up to
15  discuss issues. Of course issues arise. But the
16  meeting was set up specifically so that we could address
17  the change over to Humana and educate the liaisons as
18  they are usually a first point of contact for most
19  retirees. The better we educate them, the better we all
20  are sitting here as a Committee as well as just phone
21  calls to ERIC, to the Health Plan, or Craig, or
22  whomever. It's not something that's regularly
23  scheduled, but it was a request made. I think it was an
24  appropriate request given the nature of the changes
25  coming up.

1        BRIAN DELPHEY: Is this a retiree liaison
2  meeting?

*EX-5 PAGE 5*

3        SARAH DOYLE: Yes.
4        BRIAN DELPHEY: Craig is both. He's a
5  retiree liaison and an HBPC member. There's different
6  expectations for both. As a retiree liaison there is a
7  monthly stipend. As a member of this Committee, there's
8  a different process. I guess that was my question.
9  This is not my decision to make.
10       DAN PIKELNY: You're getting compensated the
11  same as the other retiree liaisons to attend that
12  meeting already; right?
13       CRAIG MILLER: I don't know how they're
14  getting compensated. I just know as a member of the
15  Health Benefit Plan, in the past when there were
16  meetings of this type where the Supplemental Trust was
17  there, I have always been. Never before had I been not.
18       DAN PIKELNY: It's a specific meeting for
19  the retiree liaisons. You're a retiree liaison; right?
20       CRAIG MILLER: Do I take my hat off and say
21  I'm not a member of the Health Benefit Plan Committee?
22  How do I do that? I mean, I have fiduciary
23  responsibilities that I have to pay for. I won't even
24  go if you don't want me to.
25       SARAH DOYLE: I would prefer he go.

1    CRAIG MILLER: As a retiree liaison, my
2  responsibility is to the Quad City and their group. I
3  also get phone calls from Florida that doesn't have
4  anything to do with my Quad City area, but I do that as
5  a member of the Health Benefit Plan Committee just
6  because I get them, and I had even before the liaisons
7  were created. I don't know how you draw the line. It
8  just so happens that I am both.

9    JOHN MINDIOLA: One of the things I had come
10 up to me, I called Brian on it immediately after I got
11 the first phone call, and then I got another phone call
12 from Local 6. They called and wanted to know what was
13 going on. I said, "With what?" That's when Bob
14 Brigman, local retiree president, called me also. I
15 said, "Guys don't worry about it. If we are going to
16 have to have anyone go out to all the locals, it's going
17 to be Craig Miller."

18   That's why I was real glad to hear when this
19 fellow called back, and I can't remember his name right
20 now. He says, "Yeah, we're setting up a meeting. We
21 are all going to be there. Is someone from your
22 Committee going to be there?" I said, "I'm sure Craig
23 will be there." I will endorse Craig to go to that
24 meeting representing our Committee, and I would make
25 that a motion also.

1          DAN PIKELNY: Are all the liaisons going to
2     be there? Are they all invited?
3          CRAIG MILLER: Yes, I suppose. I didn't
4     send the letter out. I have no idea who are going and
5     who are not going.
6          DAN PIKELNY: So the letter you got is as a
7     liaison?
8          CRAIG MILLER: No. The letter was as a
9     Health Benefit Plan Committee member.
10         DAN PIKELNY: Did John get one?
11         CRAIG MILLER: I don't think so. He
12    represents the UAW, but I don't know why he couldn't go
13    if he wanted to.
14         JOHN MINDIOLA: I think Craig would do well.
15         DR. BILL BUNN: I guess the question would
16    be would you go in your other capacity if you only had
17    that capacity? Are we getting hit up twice?
18         SARAH DOYLE: Honestly, I don't know why he
19    would go if he's going only as a liaison, because he
20    knows this stuff. So why would he go to be educated
21    when he's sitting right here? My expectation is, I
22    didn't think about him going as a liaison. I was
23    thinking he's part of the education piece. He's part of
24    that. I didn't even think about him being a retiree
25    liaison.

1    ANNETTE FREUND:  How big a group is this?
2    CRAIG MILLER:  There are five liaisons.
3    BRIAN DELPHEY:  That's specifically a UAW
4    thing.
5    CRAIG MILLER:  The last time we were all
6    called together was here when they presented all these
7    books to us.
8    SARAH DOYLE:  I had never known another
9    time.
10   CRAIG MILLER:  The other times were Retiree
11   Chapter Chair meetings.  Most of them go because they're
12   Chapter Chairs or their local sent them, but we haven't
13   even had one for two years.
14   DAN PIKELNY:  I guess the question Bill and
15   I are trying to ask is it feels like you're
16   double-dipping.
17   CRAIG MILLER:  No, I'm not.
18   DAN PIKELNY:  Because you went to the Quad
19   Cities meeting as a retiree liaison, because that's your
20   area; right.
21   CRAIG MILLER:  What?
22   DAN PIKELNY:  You went to the Base Plan
23   Committee meeting, but you're the retiree liaison for
24   that area; right?
25   CRAIG MILLER:  I am.

EX-6 PAGE 9

1             DAN PIKELNY: So.

2             CRAIG MILLER: That wasn't on the same day.
3 I didn't short the retirees from the days I'm normally
4 there to withhold their duties.

5             DAN PIKELNY: Let's say we're talking about
6 somebody in Fort Wayne. Dan Alter. Is he a liaison
7 too?

8             CRAIG MILLER: Uh-huh.

9             SARAH DOYLE: He's a retiree liaison? I
10 thought he was active.

11             BRIAN DELPHEY: He's been retired for two or
12 three years now.

13             DAN PIKELNY: Say there was a meeting like
14 you just did in the Quad Cities in Fort Wayne.

15             CRAIG MILLER: Let me tell you first of all
16 the difference. Mike LeCour goes out to different
17 locals to report on the Supplemental Trust periodically.

18             DAN PIKELNY: He has that role from the
19 Supplemental Trust.

20             CRAIG MILLER: As such, if it was in my
21 area, in the past I had went to report on issues,
22 because they have a large contingent of retirees there.
23 Managers as well. Not just UAW people. I went there as
24 a Base Plan member. Dan Clemens said, as far as he was
25 concerned, that's history. That was what I did at that

1    meeting September 4th. I didn't know about this
2    meeting. Humana hadn't yet been announced, because I
3    didn't get the letter sent to me until a week later.
4    Now we have a different issue where we have all these
5    retiree liaisons who I am one of, but they are also
6    going to be searching for answers from Base Plan people,
7    not just Mike LeCour, who doesn't represent the Base
8    Plan. He represents the Supplemental Trust.
9            DAN PIKELNY: Why is Mike LeCour even
10   organizing it? What does Supplemental Trust have to do
11   with Humana?
12           CRAIG MILLER: Do they not pay some?
13           SARAH DOYLE: I'm not sure what Mike is
14   going to go over there, but the main topic of the
15   meeting is the change to Humana, what kinds of phone
16   calls, how to direct people. That's one main topic, but
17   there are other things that are going to be discussed.
18   What are the common appeals we see so they can educate
19   people calling them. Say you're wrong on the ambulance
20   charge. Very sorry, but the Plan doesn't cover that.
21           CRAIG MILLER: How many appeals did we have
22   in the last year just on ambulance charges alone? Can
23   we not educate our retiree liaisons so we, hopefully, in
24   the future don't have 20 ambulance call appeals? Just
25   an example.

1         My intent on even wanting to go is just to
2    help educate the retiree liaisons to prevent issues that
3    are both injurious to the mental health of the member,
4    because he thinks he has something he ain't got coming
5    and the retiree liaison is of the same impression, then
6    we wind up with the appeal and we're the bad guys
7    because we have to apply the Plan.  That's the only role
8    I'm going to take.  Educational.  To help the
9    transition.
10        You've seen last year I turned in additional
11   hours as a Quad City liaison that were denied because
12   that language only covers eight hours a month.  I've
13   still got those bills.  You were real quick to deny them
14   saying I can only give you eight hours a month as a
15   retiree liaison.  Hopefully we can reduce those.  That's
16   our role in this meeting.
17        ANNETTE FREUND:  I'll say that I didn't
18   really fully understand this request.  I think I fully
19   understand it now.  I'm sure I didn't prior to this
20   discussion.  But what is in the back of my mind more
21   than anything else is not so much the issue Dan
22   mentioned, but the issue I'm more concerned about is I
23   think about what we're doing in the Company right now in
24   our efforts to hold costs down.  One of the things we've
25   done is we're not sending two people to a meeting when

92

*Ex-C Page 12*

1  one person can do the job. It sounds like this is a
2  fairly small group of people; half a dozen or so.
3  Sarah, if I understood correctly, you're going to be
4  there.
5        SARAH DOYLE:  Not wantingly.
6        ANNETTE FREUND:  One of the things I'm
7  finding myself wondering is, is it really necessary to
8  have a second member of the Base Plan Committee there?
9        SARAH DOYLE:  That's a valid point.  I
10 understand sending multiple people.  Again, maybe this
11 is just selfish on my part, but he's got the history.  A
12 lot of those liaisons have the history.  I don't.  So
13 I'm going to be telling them very unpopular things, and
14 who am I?  Other than the person sitting here for how
15 many years.  Craig has the history and went through a
16 lot of this the same as those liaisons.  Just knowing
17 the personalities of Tom Van Houten and Gene Keenum.
18        BRIAN DELPHEY:  Tom's not a bad guy.
19        SARAH DOYLE:  I'm not saying he is, but
20 they're the Dickens to deal with on the phone.  As far
21 as getting the message across having it credible, it
22 goes a long way.
23        CRAIG MILLER:  Like it or not, the members
24 of the Health Benefit Plan were established at the time
25 of the Settlement.  Two members of the UAW, and I just

1    happened to be one of them.                 Ex-E Page 13

2                I will say the rates down there --

3                SARAH DOYLE:  They're cheap.  I'm a little

4    frightened.

5                CRAIG MILLER:  They're cheap.  $50 for a

6    night.

7                DR. BILL BUNN:  I guess one question, are

8    you going to report back to us on what happened at that

9    meeting?

10               CRAIG MILLER:  I always do.

11               DAN PIKELNY:  You never brought back

12   anything the Supplemental Trust passed out.

13               CRAIG MILLER:  I gave Brian a report.  As

14   far as passing out, the last meeting, there wasn't any

15   handouts given.  It was all verbal information.  The

16   report I made was based on the retiree contributions

17   booklet that I just got and discussions and whatever I

18   told Brian was in the meeting was reported on.

19   Obviously, when you do that, there are questions.

20               DAN PIKELNY:  What about, thinking from

21   another perspective, if Mike LeCour is calling the

22   meeting why isn't the Supplemental Trust picking up the

23   expenses?

24               CRAIG MILLER:  I don't know.  I just said

25   Mike was going, but I don't know that he called it.

94

EX-6 PAGE 14

1   DAN PIKELNY: Somebody has to call the
2   meeting. People don't just all of a sudden show up in
3   Memphis without somebody sending something out.
4   SARAH DOYLE: I think this was an off-shoot
5   of a conversation with, I don't remember if it was Tom
6   VanHouten or Gene Keenum, but in the course of many
7   phone calls discussing that, it would be a good idea to
8   be able to sit down and go over all of this information.
9   Although I didn't generate the request. I think it may
10  have come out of the retiree liaison pocket. I'm not
11  sure.
12  CRAIG MILLER: I think it would be a benefit
13  to the Committee. I think it would be a benefit to the
14  Company. I think it would be a benefit to the
15  information transitionable out to the members via the
16  conduit of the retiree liaisons.
17  DAN PIKELNY: You're probably right, Craig.
18  If somebody is calling the meeting, Whoever is calling
19  the meeting should be paying for it. Who is paying Dan
20  Alter to go from Fort Wayne to Memphis?
21  CRAIG MILLER: I have no idea. I don't even
22  know that he's going for sure. I didn't inquire, are
23  you going? All I know is they sent me where it's going
24  to be.
25  DAN PIKELNY: Who sent you where it's going

EX-E PAGE 15

```
 1   to be?
 2              CRAIG MILLER:  I think I got the e-mail from
 3   Mike.
 4              DAN PIKELNY:  So the Supplemental Trust
 5   organized it.
 6              CRAIG MILLER:  I don't know that Mike
 7   organized it.  I'm just saying I think he sent it to me.
 8              DAN PIKELNY:  Somebody had to call the
 9   meeting.
10              CRAIG MILLER:  It was pretty informal.
11              DAN PIKELNY:  Where is the meeting at?
12              SARAH DOYLE:  In Memphis.
13              DAN PIKELNY:  In what facility?
14              CRAIG MILLER:  In a hotel.
15              DAN PIKELNY:  So who's paying for the hotel?
16              CRAIG MILLER:  They gave me a number if I
17   want to go and make a reservation.
18              DAN PIKELNY:  No. Who is paying for the
19   meeting room in the hotel?
20              SARAH DOYLE:  I don't know that.
21              CRAIG MILLER:  I didn't have the funds to do
22   it, so I didn't do it.
23              DAN PIKELNY:  That's my point.  If it's a
24   meeting organized by somebody, that somebody should be
25   paying.
```

1    CRAIG MILLER: Why don't you call us up to
2  Chicago?
3    SARAH DOYLE: That's a good question. They
4  just told me when it was. I put in my air fare request.
5    CRAIG MILLER: At one point in time over the
6  course of some e-mails a couple of years ago, there was
7  discussion about getting us all together. That was from
8  somebody in the Company, but I don't remember who. But
9  it never happened.
10    DR. BILL BUNN: Sarah, how are you getting
11  paid? Is the UAW picking it up?
12    SARAH DOYLE: Yes, just like coming here.
13  It's the same thing. I don't bill you guys.
14    DR. BILL BUNN: Annette has got the correct
15  second question. We have a corporate mandate not to
16  send but one person to meetings. Having said that, if
17  you're not --
18    SARAH DOYLE: I'm not expensing you for me.
19    DR. BILL BUNN: If you're not the person,
20  then maybe we get around it by saying Craig is the
21  person.
22    ANNETTE FREUND: This is going to sound like
23  a really dumb question. Do we know that any of the
24  retiree liaisons are going to show up?
25    SARAH DOYLE: I know two that are.

1      ANNETTE FREUND: It would be a shame to get
2  there and find out nobody else is there.
3      DAN PIKELNY: They're going on their own
4  dime?
5      CRAIG MILLER: I don't know how they're
6  going. Does it have any relevance?
7      DAN PIKELNY: Yes, because if the meeting
8  organizer is paying for them to be there, they should be
9  paying for you to be there.
10     CRAIG MILLER: Might be the regional
11 director. They're different regions.
12     SARAH DOYLE: Let me throw this out.
13 Because he wears the dual hats, and this meeting is a
14 mixture of people that wear one hat, that he has got,
15 and people who wear another hat that he's got, what
16 about the Plan picking up 50 percent? Then the other 50
17 percent has to come from wherever the retiree liaisons
18 get their --
19     DR. BILL BUNN: Sarah is covering hers.
20     CRAIG MILLER: The UAW is covering Sarah.
21     DR. BILL BUNN: Right. Craig is going in
22 two roles. We are covering the half of the role that is
23 Plan. The other half is his other role, and those guys
24 are getting it paid somehow. I'm sure they're not
25 buying their own tickets.

*CX-E Page 18*

```
 1              CRAIG MILLER:  One of them could practically
 2   walk across.
 3              DR. BILL BUNN:  Whether it's small or large,
 4   somebody is getting a bill.
 5              BRIAN DELPHEY:  How many days are we talking
 6   here, Craig?
 7              CRAIG MILLER:  I'm going to have to drive
 8   down.  I'm not going to fly.  Then I'll go to the
 9   meeting and drive back that same day.
10              SARAH DOYLE:  I'm flying down on Monday.
11   The meeting is Tuesday morning, and then I'm flying back
12   on Tuesday.
13              CRAIG MILLER:  As far as expense, it will be
14   comparable to Indianapolis, except that the rates are
15   considerably cheaper, even though that was only a few
16   years ago.
17              DAN PIKELNY:  Without knowing more detail
18   about how the other people are getting it paid, I kind
19   of like Sarah's suggestion about splitting up whatever
20   you would have normally billed us for two days plus
21   travel, we will pay half of that.  Whoever is organizing
22   the meeting will have to pay the other half.
23              DR. BILL BUNN:  If for some reason that's
24   not how it's working, let us know.
25              CRAIG MILLER:  All right.  Better than a
```

99

```
 1   kick in the nose.  This is a little unusual.

 2              SARAH DOYLE:  Very.

 3              DR. BILL BUNN:  There's not much precedent.

 4              JOHN MINDIOLA:  Do we need a motion?  I

 5   think we should.

 6              DR. BILL BUNN:  I'll move.

 7              JOHN MINDIOLA:  I'll second.

 8              BRIAN DELPHEY:  All in favor?

 9              ALL:  Aye.

10              BRIAN DELPHEY:  Opposed?

11              (No response.)

12              CRAIG MILLER:  Thank you.

13              BRIAN DELPHEY:  Next meeting.

14              DAN PIKELNY:  When you guys were in the

15   hall, we were talking about whether we should do

16   December or January, and I suggested maybe a primary

17   date in December with a second in January just like we

18   did last year when we got snowed out in December.

19              CRAIG MILLER:  Wasn't that when we had the

20   snow storm?

21              DAN PIKELNY:  Yeah.  We set the primary in

22   December and the secondary in January.

23              BRIAN DELPHEY:  I caught you about 20 miles

24   into your trip.

25              CRAIG MILLER:  Yeah.
```