IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

:

ART SHY, et al.,

       Plaintiffs,       :     Case No. 3:92-cv-0333

    v.                   JUDGE WALTER H. RICE

NAVISTAR INTERNATIONAL    :
CORPORATION, et. al.,

       Defendants.

---

DECISION AND ENTRY OVERRULING PHASE I OF DEFENDANTS'
MOTION TO REFORM THE 1993 CONSENT DECREE BASED ON
NAVISTAR'S CURRENT FINANCIAL STANDING AND THE
EVOLUTION OF THE HEALTHCARE MARKETPLACE (DOC. #537),
INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW;
ENTIRETY OF MOTION TO REFORM (DOC. #537) OVERRULED

---

Defendants, Navistar International Corporation and Navistar, Inc.

(collectively, "Navistar" or "Company"), have filed a Motion to Reform the 1993

Consent Decree ("Motion" or "Motion to Reform"), pursuant to Fed. R. Civ. P.

60(b), Doc. #537.[1]  A response opposing the Motion to Reform was filed by the

Supplemental Benefit Committee of the Navistar International Transportation

---

[1] On June 8, 1993, the Court entered judgment adopting a Settlement Agreement
("Settlement Agreement"), Doc. #343-3; JX-1, as a Consent Decree, Doc. #327, JX-5.  The
Court retained jurisdiction over the parties to enforce and administer the Settlement
Agreement, Doc. #343-3, PageID#183; JX-1, 27.

Corp. ("SBC"), Doc. #542, and by Plaintiff, International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"),

Doc. #543. Bredhoff & Kaiser, PLLC ("Bredhoff"), has also filed a response "solely

on its own behalf and not on behalf of any client," Doc. #541.[2]

Navistar and the UAW have filed post-hearing briefs, proposed findings of

fact and conclusion of law, Doc. ##553, 554, 554-1, and replies. Doc. ##555 and

556.

For the reasons set forth below, the Court overrules Navistar's Motion for

Reform based on Navistar's current financial standing and the evolution of

healthcare since 1993. Accordingly, the entirety of the Motion to Reform is

overruled.


I.      **Standard of Review and Representation of the Shy Class**

A consent decree is both a contract between the parties and a judicial act

with the prospective qualities of an injunction. *Vanguards of Cleveland v. City of

Cleveland*, 23 F.3d 1013,1018 (6th Cir. 1994) (modification of consent decree

extending promotions to supervisory positions of minorities in firefighting for two

---

[2] Bredhoff asserts in its response that Navistar mischaracterizes it as "class counsel" and states that its response is limited to clarifying "our limited and contingent participation" and "to identifying the procedural protections to which the retirees participating in the *Shy* Agreement . . .are constitutionally entitled to receive" before any modification by the Court. *Id.*, PageID#5123.

additional years affirmed). Because "[J]udicial approval of a consent decree places the power and prestige of the court behind the agreement reached by the parties," *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir.1983), courts have a duty to "enforce, interpret, modify, and terminate their consent decrees as required by circumstance." *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1146 (6th Cir. 1997) (footnote omitted). To accomplish the goals of the decree, courts "are not bound under all circumstances by the terms contained within the four corners of the parties' agreement." *Id.* (citing *NAACP Lorain v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148 (6th Cir.1992), cert. denied, *Lorain Bd. of Educ. v. Ohio Dep't of Educ.*, 509 U.S. 905, 113 S.Ct. 2998 (1993). Rule 60(b) of the Federal Rules of Civil Procedure governs relief from final judgment and Rule 60(b)(5) pertains to modification of consent decrees stating, in relevant part, that "[O]n motion and just terms, the court may relieve a party. . . from a final judgment, order or proceeding [because] . . . applying it prospectively is no longer equitable." *Id.*

Navistar's Motion seeks a modification of the Consent Decree and cites to the two-part test announced by the Supreme Court in *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 112 S. Ct. 748 (1992), as the standard that should be applied. The UAW and SBC, however, contend that the "grievous wrong" standard in *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, (1932) ("Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned"), is controlling. They further argue

3

that *Rufo*, which concerned a county sheriff's motion to modify a consent decree and his attempt to delay the construction of a new jail, is "institutional reform litigation"[3] and inapplicable to private party litigation and the Consent Decree.

Although the Supreme Court rejected the "grievous wrong" standard in *Rufo,* it is unclear whether, as argued by Navistar, the Supreme Court rejected it in all cases involving the modification of consent decrees. Additionally, institutional reform litigation is vastly different from this litigation and the Consent Decree before this Court. Nevertheless, the Sixth Circuit has applied the *Rufo* standard in institutional reform litigation, *Heath v. DeCourcy*, 888 F.2d 1105, 1108–09 (6th Cir.1989; *NAACP Lorain*, 979 F.2d 1141; and *Vanguards*, 23 F.3d 1013, as well as to cases involving modification of consent decrees in non-institutional reform litigation. *See, Northridge Church v. Twp. of Plymouth*, 647 F.3d 606, 613-15 (6th Cir. 2011) (applying *Rufo* and *Vanguards* to motion to modify 1995 consent judgment where church had agreed to township's restrictions on its use of property); *United States v. Wayne County, Mich.*, 369 F.3d 508, 513 (6th Cir. 2004) (*Rufo* standards apply to city's motion to amend negotiated consent decree with county and downriver communities resolving action under Clean Water Act).

---

[3] Institutional reform litigation typically involves consent decrees and injunctions that remain in force for many years with changes occurring that can warrant a review of the original issue addressed. Such cases frequently raise "sensitive federalism concerns" and oftentimes public officials "consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law." *Horne v. Flores*, 557 U.S. 433, 447, 129 S.Ct. 2579 (2009) (court of appeals reversed for "too strict" analysis of Rule 60(b)(5) and failure to follow "flexible approach" of *Rufo* in modification of statewide injunction for violation of Equal Educational Opportunities Act).

Additionally, and as noted by the UAW, the Sixth Circuit has indicated in dicta that the *Rufo* standard should not be limited to institutional reform litigation. *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.* 355 F.3d 574, 588 (6th Cir. 2004) (in case involving allocation order in CERCLA action, Court noted in dicta, without detailed analysis, that *Rufo* should not be limited to and may apply to consent decrees involving private parties).

Because the Sixth Circuit applies *Rufo* in modification of consent decrees in non-institutional reform litigation, the Court will apply the *Rufo* two-part standard of review for Navistar's requested modification of the Consent Decree. Under this standard, Navistar must initially show that "a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383. Assuming this is established, a court must then determine whether the proposed modification is "suitably tailored to the changed circumstance." *Id.*, at 383.

A "significant change in circumstances" can be met "by showing [ ] a significant change either in factual conditions or in law." *Id.*, at 384. "Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous" or "when a decree proves to be unworkable because of unforeseen obstacles." *Id.* A "significant change in circumstances" can also be established when enforcement "without modification would be detrimental to the public interest." *Id.*

In utilizing this "slightly more restrictive but flexible standard" of *Rufo*, *Vanguards*, 23 F.3d at 1018, the Consent Decree "should be construed to preserve

the position for which the parties bargained." *Id.* (citations omitted). Therefore, the Court should not grant a modification of the Consent Decree "where a party relies upon events that actually were anticipated at the time it entered into the decree." *Rufo*, 502 U.S. at 385.

Finally, the UAW and the SBC assert that because notice, an opportunity to object and substitution of class representatives have not occurred pursuant to Fed. R. Civ. P. Rule 23(e), the due process rights of the *Shy* class are being violated. The issues in Phase I of Navistar's Motion, however, concern only evidence of Navistar's current financial standing and the evolution of the healthcare marketplace since 1993. These singular subjects affect no legal right of any absent class member; rather, they are preliminary inquiries, the answers to which would determine whether the Motion to Reform would be overruled without a further hearing being needed or whether, in the alternative, further evidence would be required, before which due process concerns would be thoroughly considered. At this stage, Navistar is merely submitting evidence supporting modification and is not altering any legal right of a class member. "Where no legal right would be hindered, . . .Rule 23(e)'s procedural protections do not apply for the simple reason that there is no risk that an absent class member will be legally harmed by approval of the modification." *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 313 (D.D.C. 2015) (Rule 23(e) notice or hearing not required for modifying the administration of cy pres funds). Accordingly, because the subject matter of the evidentiary hearing in Phase I does not

6

"materially alter" the approved Settlement Agreement, Rule 23(e), notice to the members of the Shy Class is not required.

## II.    Findings of Fact

Navistar's Motion seeks modification of the Consent Decree to create an independent adequately funded VEBA, insulating retirees from risks concerning Navistar's financial health and ending "a history of good-faith disputes between the parties." Doc. #537, PageID##5086-5090. Alternatively, Navistar seeks modification of the Consent Decree to (1) establish a defined contribution and improved governance structure, *Id.*, PageID##5091-97; and (2) provide "objectivity and certainty around future profit sharing." *Id.*, PageID##5097-5102.

Following extensive negotiation among the parties, Navistar filed a Motion to Reform. Pursuant to Sixth Circuit authority, *Wayne Cty., Michigan*, 369 F.3d at 511("The modification of a consent decree by a court without the consent of all parties to the agreement is indeed a signal event that requires a material change in circumstances that only a formal hearing and appropriate findings of fact can demonstrate."). On June 1, June 15, June 26 and July 1, 2020, an evidentiary hearing on Navistar's Motion was held. [4] Evidence for this portion of the Motion

---

[4] Due to the COVID-19 pandemic, and with the agreement of all parties, the Phase I hearing on June 1, 2020, was conducted via video conferencing and the conclusion of the hearing was held on June 15, June 26 and July 1, 2020, and conducted telephonically.

was limited to the following: (1) Navistar's current financial condition and (2) the evolution of the healthcare marketplace since 1993 ("Phase 1"). The hearing included testimony, by affidavit and in-person, via video-conferencing or telephonically, from the following individuals: (1) Walter Borst, Navistar's Executive Vice President and Chief Financial Officer; (2) Adam Schlesinger, the Managing Director in the Special Situations Group at PJT Partners LP, an investment banking firm; (3) Anthony Simone, a healthcare actuary and Director in the Retirement Group at Willis Towers Watson; and (4) Dan Pikelny, Vice President, Analytics at Navistar. Joint exhibits were admitted into evidence along with separate exhibits from both Navistar and the UAW. Neither the UAW nor the SBC offered any testimony. Based upon a review of the testimony and evidence at the hearing, the Court finds as follows.

### A. The *Shy* Litigation

In July 1992, after years of downsizing its workforce and selling its assets to halt declining revenues, Navistar announced unilateral reductions in life insurance and health benefits offered to employees and dependents. Doc. #324; JX-4. These reductions were necessitated due to Navistar's annual revenue decreasing to $3.8 billion in fiscal year 1992, after reaching highs during the late 1970s of $8.25 billion. *Id.* The present (unfunded) value of the retiree health and life insurance benefits in July 1992 was $2.6 billion, placing Navistar on the brink of financial collapse in the summer of 1993. *Id.* Following Navistar's announcement of

8

unilateral reductions in benefits, suit was filed in this Court by a class comprising

most of Navistar's active and retired employees along with the UAW and other

unions. They alleged that Navistar was not permitted to amend its benefit plans

unilaterally. Extensive discovery concerning Navistar's financial distress and

imminent bankruptcy ensued and a Settlement Agreement was entered into,

approved by the Court and adopted as the Consent Decree on June 8, 1993. Doc.

#327; JX-5.

As stated in the Opinion approving the Settlement Agreement, the "basic

premise" underlying the Settlement Agreement was "Navistar's precarious

financial condition." Doc. #324, PageID#60; JX-4 at 12. The Court found that

Navistar spent "$200 million a year" on retiree health and life benefits. *Id.*,

PageID#55; JX-4 at 7. When viewed in light of the $2.6 billion unfunded long-term

liability, this expenditure created "both a short-term liquidity crisis, with the

probability that Navistar would become insolvent during the summer of 1993, and

a long-term financial problem for the company which affected its future ability to

survive." *Id.* "All parties were in agreement that the magnitude of Navistar's

obligation to furnish health insurance would prevent it from borrowing sufficient

funds in the equity market to finance the short-term crisis." *Id.*, PageID#56; JX-4

at 8. The Court also concluded that a bankruptcy filing would "result in the

company's ultimate liquidation." *Id.*, PageID#69. JX-4 at 21. The Court found that

following adoption of the Settlement Agreement, "Navistar's cost for [retiree

health and life insurance] coverage will be reduced by approximately $120 million

per year[,]" from $200 million to $80 million. *Id.*, PageID#80; JX-4 at 32.

      The Settlement Agreement that was approved by the Court and entered as

the Consent Decree created a Base Plan and a Supplemental Plan. *Id.*, PageID#58;

JX-4 at 10. The Base Plan provides basic life and health insurance benefits.

Navistar administers this Plan as Plan Administrator and Named Fiduciary. Doc.

#343-3, PageID#194; JX-1-A at 37-38. Its authority as Plan Administrator, however,

is subject to the review of a Health Benefit Program Committee ("HBPC"). The

Supplemental Plan reduces co-payments, deductibles and monthly premiums that

participants are required to pay under the Base Plan and provides additional

benefits, such as dental and vision coverage. Doc. #343-3, PageID#163; JX-1 at 7.

The Supplemental Plan is funded by 50% of the common stock of Navistar, plus a

portion of Navistar's future profits under a formula stated in the Settlement

Agreement. The Supplemental Trust included profit sharing so that "if Navistar

returns to a condition of profitability in the future, a significant portion of the loss

of benefits imposed by the settlement agreement will be eliminated." Doc. #324,

PageID#51; JX-4 at 3.

      Pursuant to § 15.4 of the Settlement Agreement, the Court retained

jurisdiction to "resolve any disputes relating to or arising out of or in connection

with enforcement, interpretation or implementation" of the Settlement Agreement

except with respect to benefit eligibility disputes. Doc. #343-3, PageID#183; JX-1 at

27.

**B. Navistar's Current Financial Standing and VEBAs**

The Settlement Agreement[5] structured the Base Plan as an unsecured obligation of Navistar consisting of both systematic (general) risk in the market and unsystematic (specific to Navistar) risk. A modification of the Consent Decree, as sought herein, by creating an independent (standalone) and adequately funded VEBA,[6] however, would eliminate any reliance on Navistar and, arguably, any unsystematic risk[7] by permitting complete diversification as opposed to fifty percent diversification of the Base Plan. The financial risks that Navistar currently faces, however, are largely unchanged from those that existed in 1993 when the Consent Decree was issued.

The evidence established that Navistar is still in a highly cyclical (commercial truck) market with high leverage and high financing costs, has

---

[5] Because the Court entered judgment reducing the Settlement Agreement to the Consent Decree, the Court will use these terms interchangeably.

[6] A voluntary employees' beneficiary association (VEBA) plan is a type of tax-exempt trust used by its members and eligible dependents to pay for eligible medical expenses. VEBAs have been part of the tax code since 1928 with the Treasury issuing final regulations for VEBAs in 1981. *See Water Quality Ass'n Employees' Benefit Corp. v. United States*, 795 F.2d 1303, 1306 (7th Cir. 1986); *Koresko v. United States*, 123 F. Supp. 3d 654, 661 (E.D. Pa. 2015) ("In 1928, Congress created a tax exemption for a type of trust called a "voluntary employees' beneficiary association" or VEBA. *See* I.R.C. § 501(c)(9).")

[7] As testified to by Adam Schlesinger, "[A]n unsecured obligation from Navistar, as the *Shy* class consent decree is structured today, exposes retirees to both systematic risk in the market and unsystematic risk specific to Navistar." Doc. #553-2, PageID#5326. "Unsystematic risk is unique to an individual company," in this case "Navistar-specific conditions." *Id.* Conversely, "[s]ystematic risk affects the entire market without being specific to a particular company or industry" and is not eliminated through diversification. *Id.*

significant OPEB (other post employee benefit) liabilities, capital expenditures and warranty spending and still lacks a standalone finance company. As was true in 1993, Navistar's competitors are better positioned and financed. Although the Company's financial situation 27 years after the Consent Decree was entered is far from ideal, it is vastly improved from 1993. For example, prior to the COVID-19 pandemic, fiscal year 2019 was "an outstanding year for Navistar" with it posting its third consecutive year of core market share growth and increased revenues. UAW, X-14 at 8. In fiscal year 2019, Navistar reported that it achieved "[I]mproved quality [ ] reflected in our best-in-class warranty levels for the past 2 years;" had its "seventh consecutive year of adjusted EBITDA growth; paid off maturing debt and generated strong manufacturing free cash flow, ending the year with over $1.3 billion of manufacturing cash." *Id.* at 7.

In 2020, however, industry analysts expect Navistar to suffer a meaningful net loss. As of January 31, 2020, the balance sheet for Navistar included the following: $3.0 billion of manufacturing debt; $2.1 billion of pension and OPEB liabilities; $0.5 billion of warranties; $2.5 billion of current liabilities; and $1.4 billion of manufacturing cash. Doc. #553-1, PageID#5306; Supplemental Declaration of Walter Borst, June 23, 2020, Hr'g Tr. at 4-5 . "Navistar's total liabilities as of January 31, 2020, exceed its total assets, which results in negative book equity of ($3.7) billion." *Id.*

Concerning Navistar's health and life benefits, however, its situation has improved significantly from 1993. Before the Consent Decree, Navistar's cost for

the health and life benefits was $200 million, with $80 million being the projected

cost after the Settlement Agreement. Hearing Transcript, June 1, 2020 ("Hr'g Tr.),

p. 35. From 1993 to 2019, however, Navistar's total contributions for retiree health

and life benefits was $1.5 billion or approximately $60 million per year. *Id.* In

2018 and 2019, Navistar paid approximately $37 million for the retiree health and

life insurance benefits. DX-2 at 74; Hr'g Tr. at pp. 38-39. For a company the size of

Navistar, the auditors have specifically determined that this is not a "material"

amount. DXR-8 at 28. As stated in Navistar's Form 10-Q filing with the Securities

and Exchange Commission for the quarterly period ending April 30, 2020, the

"[C]ontributions for the six months ended April 30, 2020, as well as anticipated

contributions for the remainder of 2020, are not material." DXR-8 at 28.

Moreover, as of October 31, 2019, the unfunded portion of retiree health and life

insurance benefit was valued at approximately $804 million. DX-2 at 74. At that

same time, Navistar had total current and long-term liabilities of $10,640,000. DX-

2 at 45. Unfunded retiree benefits, then, constituted less than 10% (7.6%) of

Navistar's current and long-term liabilities. This is significantly different than the

situation the Company faced in 1993 when the "present value of its obligation to

provide health and life insurance benefits to its retirees was $2.6 billion,"

constituting "approximately 60% its current and long-term liabilities." Doc. #324,

PageID#65-66; JX-4 at 17-18.

Even in the COVID-19 downturn, Navistar raised $600 million of debt.

Although the interest rate is 9.50% today, in 1993 Navistar was unable to raise any

13

capital. JX-4 at 8 (effect of "magnitude" of retiree obligation is to "deny it [Navistar] access to the equity and debt markets"); *Id.* at 18-19 (the "long-term problem excludes Navistar from the debt and equity markets; therefore, the short-term liquidity crisis cannot be addressed by borrowing funds or by raising capital in the equity markets.").

On January 30, 2020, TRATON, a subsidiary of Volkswagon Group, a commercial vehicle manufacturer and owner of approximately 17% of Navistar's shares, announced an all-cash offer to purchase the remaining shares for $35 per share, valuing Navistar's equity at approximately $3.5 billion. Doc. #553-1, PageID#5312-13.  Although COVID had slowed the process, as of June 2020, the TRATON negotiations were continuing with Navistar's Executive Chairman managing the discussions.[8]

On April 21, 2020, S&P issued a credit rating of "CCC+" and a recovery rating of 6 to Navistar's unsecured notes. The CCC rating is six ratings below the

---

[8] Following the evidentiary hearing and submission by the parties of post hearing briefs and proposed findings of fact and conclusions of law, Navistar and TRATON reached an agreement of $44.50 per share in cash, or approximately $3.7 billion, as the purchase price of the outstanding Navistar common shares. Navistar shareholders approved the acquisition at their annual meeting on March 2, 2021.  Because the Volkswagon subsidiary already held a nearly 17% interest in Navistar, the Company has an approximate value of $4.4 billion.
TRATON and Navistar agreement in principle,(press release 2020-10-16) https://traton.com/en/newsroom/press_releases/press_release_16102020.html; Navistar Stockholders Approve Acquisition by Traton, (March 2, 2021), https://ir.navistar.com/news/news-details/2021/Navistar-Stockholders-Approve-Acquisition-by-TRATON/default.aspx; Dan Mihalascu, VW Group's Traton Unit Finalizes Merger with U.S. Truck Maker Navistar International, Carscoops, (Nov. 10., 2020), https://www.carscoops.com/2020/11/vw-groups-traton-unit-finalizes-merger-with-u-s-truck-maker-navistar-international/

strongest rating and just three ratings above the weakest such. On April 21, 2020, Moody's kept unchanged a credit rating of B3 for Navistar's unsecured notes, which is the weakest subset of B ratings. Moody's, however, stated that Navistar's "improved competitive position and adequate liquidity profile should afford it the resources necessary to contend with the 2020 market contraction." UAWX-21

In its June 4, 2020, announcement of second quarter earnings, Navistar noted decreases in revenue and earnings as a result of COVID-19, but also stated that it had taken action to "weather the crisis" and that the Company and its facilities largely remained in operation with production facilities experiencing limited disruption. UAW X-18. It maintained strong liquidity with no near-term manufacturing debt maturities. *Id.* In June 2020, Navistar held a "virtual" groundbreaking on a new $250 million, 900,000 square foot San Antonio manufacturing plant and also announced new product programs under development including those with TRATON. UAW SRX-2.

Whether a VEBA would eliminate risk for the *Shy* retirees depends on the level of its funding, an issue not addressed in this hearing. Because an independent, prefunded VEBA separates the sponsorship and funding of the plan from the employer, if something happens to the employer and the employer's ability to pay, benefits are not put at risk. In this case, however, both the Base Trust and the Supplemental Trust are VEBA trusts with approximately fifty percent of their assets diversified and protected from Navistar's creditors. JX-1 at 20;

15

UAW SRX-1 at 4; DX-2 at 74; Hr'g Tr. at 97-98. The remaining approximately fifty percent of each trust is reliant upon Navistar's continued funding. Approximately $804 million is the amount that is dependent on Navistar's continued financial health, as compared to $767 million already in diversified accounts and not subject to a reduction in a bankruptcy proceeding. DX-2; UAW SRX-1 at 4.

### C. The Evolution of the Healthcare Marketplace Since 1993 and the Shy Governance Structure (Health Benefit Program Committee)

Since the Consent Decree was entered in 1993, healthcare has changed dramatically and, as a result, the healthcare market has undergone substantial changes. Changes to the healthcare market have affected both the prescription drug and medical coverage aspects of health plans. The average age of the more than 25,000 retired participants in the *Shy* plan, and the fewer than 1,000 active and disabled employees, is greater than 77 years of age. The parties to the Settlement Agreement were aware that legislative changes in the health care system could occur and provided a contingency to address such changes should they occur." Doc. #373, PageID #911.[9]

---

[9] *See* Decision and Entry Sustaining in Part and Overruling in Part Plaintiffs' Motion for an Injunction to Compel Compliance with the Settlement Agreement (Doc.#343); Decision and Entry Overruling as moot Plaintiffs' Motion to Expedite Consideration of Motion to Compel Compliance (Doc. #344); Conference Call Set (dispute over the prescription drug benefit for Medicare eligible retirees).

As the plan administrator and the named fiduciary of the Base Plan, Navistar is responsible for administering that Plan, and according to the Settlement Agreement, it is subject to the review by the Health Benefit Program Committee ("HBPC").

The HBPC is composed of two members appointed by the UAW, three members appointed by Navistar, one member to represent the non-UAW retirees (the "HBPC Other Member"), and the final member to be appointed by a majority of the six other members (the "Seventh Member"). With three retiree representatives and three Navistar representatives, the HBPC is evenly divided between labor and management. The Seventh Member is appointed by a majority of the other six members, serves as a tie-breaker in case of deadlocks and "may be recalled at any time by a vote of a majority of the HBPC UAW Members and the HBPC Other Member." Doc. #343-3, PageID#210; JX-1A at 54. The appointment of the Seventh Member has been an ongoing source of dispute. The Court first named Francine Parker to Chair the HBPC. However, because it appeared that the UAW's selection would be conflicted, a motion for reconsideration was filed by Navistar and Dr. Schummary Chao, the Company's choice was selected as Chair. However, after three years of litigation and the Court's appointment of Dr. Chao, Navistar refused to allow Dr. Chao to resolve a drug co-payment dispute at which time he was recalled as the Seventh Member. UAW X-24. Other than the Court's appointment of Dr. Chao as the Seventh

17

Member in August 2010, an appointment which ended in March 2011, the HBPC has been without a Seventh Member since 1993.

Despite the lack of a seventh member, the HBPC fulfills its duties involving administrative, clerical and claims appeal matters. The appeals primarily involve whether particular health services for a participant were covered by the Plan and involve substantial amounts of documentation and take up a large portion of meeting time. The HBPC meets quarterly, has handled 220 of these appeals since 2005, or 15 per year. Over the course of its 27-year history, the HBPC has only had three disputes that have resulted in arbitration or litigation. Nonetheless, Navistar would like to modernize the Base Plan to include the cost containment features that exist in the "Big 3 VEBAs" (Daimler, Volvo and Ford). DX-7. Such features include a formulary,[10] restrictions on the quantity of units supplied for each prescription so as to remain consistent with clinical dosing guidelines, prior drug authorization to determine if the drug qualifies for coverage along with "step therapy" and a requirement that less expensive drugs be prescribed and found to be ineffective before another more expensive higher tier drug is prescribed. Navistar also proposes certain exclusions used in the Big 3 VEBAs. Many of these changes that Navistar wants either limit retiree benefits (such as exclusions) or limit retiree choice (such as a formulary which would limit choice of drugs).

---

[10] A formulary is a drug list of both brand name and generic drugs selected and covered by a health plan.

Section 3.8 of the Base Plan, titled "State or National Health Insurance Programs," states that in the event of any legislative change in a state or national health insurance program that results in participants receiving post-retirement health care benefits greater or lesser than those provided under the plan, "the Health Benefit Program Committee may redesign the Health Benefit Program, including, in its sole discretion, by modifying the benefits thereunder and the amount of contributions required to be made by or on behalf of Enrolled Participants." DX-9 at 17-18.

Although the HBPC has the ability under the Base Plan to make changes, and Navistar wants changes made, the Navistar-appointed members of the HBPC have never formally moved to have the changes enacted. Accordingly, there has never been a vote on the cost-containment and modernization issues that Navistar asserts are needed due to changes in the healthcare industry. Finally, Navistar will not agree to the modernizations that help retirees and increase their benefits absent wholesale reform of the Settlement Agreement. Hr'g Tr. at 182.

## III. Legal Analysis

### A. *Rufo* and Navistar's Current Financial Condition

Navistar argues that because its current financial condition is "precarious," it is "risky" for it to continue to "guarantee" more than half of the *Shy* retirees's healthcare funding in the Base Plan. Therefore, it contends, the Consent Decree

19

should be modified to establish an independent, or "standalone" VEBA,[11] that is adequately funded and fully diversified to better guarantee benefits for the *Shy* retirees.

The standard to modify a consent decree, however, is not whether an investment in Navistar is "risky" or whether an adequately funded and standalone VEBA is better than the Base Plan. Instead, Navistar must show (1) "a significant change in circumstances warrants revision of the decree" and (2) that its proposed change is "suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383. Although the "significant change in circumstances" can be either factual or legal, it must be one that makes "compliance with the decree substantially more onerous," where the decree is "unworkable because of unforeseen obstacles" or where enforcement without modification would be "detrimental to the public interest." *Id.* at 384.

Navistar has not offered evidence that the Consent Decree is "substantially more onerous" or "unworkable because of unforeseen obstacles." Instead, it argues only that the "significant change in circumstances" justifying modification is the risky nature of its present financial condition. There is no dispute, however, that as "risky" and "precarious" as Navistar's present financial condition might

---

[11] Navistar asserts that in an independent or standalone VEBA, "[T]he employer does not control the benefits, the liability comes off of its balance sheet (protecting the VEBA assets from risks of insolvency), and the VEBA then funds the retirees' benefits." Doc. #537, PageID#5075.

be, it is a significant improvement from its 1993 financial condition which resulted in the Settlement Agreement and Consent Decree. As testified to by Walter Borst, Navistar's Executive Vice President and Chief Financial Officer, a failure to modify the Consent Decree to include a standalone VEBA would not result in any adverse financial outcome for the Company, since Navistar, unlike 1993, is not on the verge of bankruptcy, about to be declared insolvent or unable to obtain loans. Additionally, in 1993, the liability for retiree health and life insurance was 60% of Navistar's current and long-term liabilities. Although Navistar was unable to "attract generous buyers" in 1993, Doc. #324, PageID#70; JX-4 at 22, in January 2020, Navistar received the unsolicited cash offer to purchase the remaining shares of Navistar for $35 per share, from TRATON SE. Although at the time of the hearing negotiations were occurring between Navistar and the Volkswagon subsidiary at a high level, the TRATON offer shows that Navistar's financial condition has improved dramatically from 27 years ago when it was on the verge of filing bankruptcy and considered unlikely to emerge as an operating company. As of the date of the hearing, the TRATON offer "remains on the table." Therefore, Navistar has not shown that its current financial condition represents a significantly changed factual condition that makes "compliance with the decree substantially more onerous" or "unworkable because of unforeseen obstacles." *Rufo*, 502 U.S. at 384. Finally, Navistar argues that modification of the Consent Decree should be made based on the "public interest." It argues that if adverse financial conditions occur and it cannot meet its commitments under *Shy*, the

21

retirees would be forced to secure healthcare coverage on the open market which would be cost prohibitive or through Medicaid imposing additional financial burdens on the federal system. Doc. #553, PageID#5295. The Company's "public interest" argument, however, is not supported by the evidence. As stated, Navistar's current financial condition does not indicate that any such adverse financial situation exists. Accordingly, Navistar has failed to show a "significant change in circumstances" based on "the public interest" that justifies a modification of the Consent Decree.

Because Navistar has not satisfied the first step of *Rufo*, the Court cannot consider whether its proposed standalone and adequately funded VEBA is "suitably tailored to the changed circumstance."[12] *Id.* at 383. Although the *Rufo* standard has been described as "flexible," *Vanguards*, 23 F.3d at 1018, modification of a consent decree is still "an extraordinary remedy that should not be undertaken lightly." *Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 614 (6th Cir. 2011) (citing *E. Brooks Books, Inc. v. City of Memphis*, 633 F.3d 459, 465 (6th Cir. 2011). In short, the Consent Decree has functioned as the parties intended, resulting in Navistar becoming a far more stable company than it was in 1993. The Company has not shown any "unanticipated circumstances" justifying

---

[12] Navistar contends that because of the "parties' alignment on the concept of an adequately and properly funded VEBA, the Court should hold further evidentiary proceedings to determine the amount of 'adequate' and 'proper' funding and the assumptions necessary to determine that amount." The UAW and the SBC, however, are not in "alignment" on Navistar's proposed modification and motion to reform.

modification of the Consent Decree. *Northeast Ohio Coalition for Homeless v. Husted*, 696 F.3d 580, 603 (6th Cir. 2012) ("[M]odification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree," citing *Rufo*, 502 U.S. at 384). Navistar's Motion to Reform the Consent Decree to establish a standalone and adequately funded VEBA, because its current financial condition is "precarious" and "risky" does not satisfy the *Rufo* standard.

### B. *Rufo* and the Shy Governance Structure (Health Benefit Program Committee)

As an alternative to the modification of the Consent Decree and the establishment of a standalone and adequately funded VEBA, Navistar contends that the Consent Decree should be modified to create a new governance structure replacing the Health Benefit Program Committee ("HBPC") with a single fiduciary committee. This is needed, Navistar argues, because there have been substantial changes in the healthcare market that have affected both prescription drug and medical coverage aspects of health plans and the HBPC has not worked as intended. The HBPC is not working as intended, Navistar argues, because there is no "Seventh Member to cast a deciding vote in the event of an impasse" resulting in numerous unresolved disputes. Doc. #553, PageID#5294.

Although Rule 60(b)(5) permits relief based on equitable considerations, a consent decree cannot be modified simply because it is "no longer convenient to

live with the terms." *Rufo*, 502 U.S. at 383. Additionally, a party cannot "escape a

consent judgment based on its own voluntary actions." *Northridge Church*, 647

F.3d at 618. The HBPC's purpose, authority, composition and procedure are set

forth in the Settlement Agreement, Supplemental Plan Health Benefit and Life

Insurance Plan, Doc. #343-3, PageID##210-215; JX-1A at 54-59. Navistar admits,

that although any cost containment measures and modernization of specific

healthcare programs that it wants passed must first be discussed and approved

by the HBPC, it has failed to make any motion requesting that the Committee

enact any of the Company's proposed changes. It contends that any such motion

would result in a deadlock since there is no Seventh Member of the HBPC, and

that the Committee prefers to take votes only after there is consensus. However,

there is no evidence that a motion cannot be made or that a Seventh Member

cannot be named to the HBPC.

Because Navistar has failed to make a motion to the HBPC for any of its cost

containment or modernization programs, or to take steps to name a Seventh

Member, it has not satisfied the first step of *Rufo* by showing that "a significant

change in circumstances warrants revision of the decree." Accordingly, the Court

need not consider whether its proposed modification of a single fiduciary

committee is suitably tailored to any changed circumstances.

## III. Conclusion

For the reasons set forth above, Navistar's Motion to Reform the Consent Decree based on its current financial standing and the evolution of the healthcare marketplace, (Phase I), Doc. #537, is OVERRULED.

Navistar's Motion to Reform the Consent Decree, Doc. #537, is OVERRULED in its entirety.

Date: April 14, 2021

_____

WALTER H. RICE
UNITED STATES DISTRICT JUDGE