# EXHIBIT 1

## CLASS SETTLEMENT AGREEMENT

This agreement (the "Class Settlement Agreement") is made as of December 22, 2021, by and among (i) Carl Potts, Richard Zounes and Miller Rodgers, as class representatives, on behalf of themselves and the Modified Shy Class (defined below) (together, the "Class Representatives"), (ii) Navistar, Inc. (*f/k/a* Navistar International Transportation Corp.) and Navistar International Corporation (together, "Navistar"), and (iii) the Supplemental Benefit Program Committee of the Navistar Inc. Retiree Supplemental Benefit Program (the "SBC") (each a "Party" and collectively the "Parties").

**This Class Settlement Agreement reflects the terms of a new proposed class-action settlement to resolve claims that have arisen since the entry of the original consent decree by the U.S. District Court for the Southern District of Ohio (the "Court") in the matter captioned *Shy, et al. v. Navistar Inc., et al.,* Case No. C-3:92-cv-0333 (the "Shy Action") on June 8, 1993 (as amended by Order of the Court dated August 11, 2021, the "1993 Consent Decree"). The terms memorialized herein are intended to result in the modification of the 1993 Consent Decree, as set forth further below, and to be binding on the members of the Modified Shy Class, as defined below. This Class Settlement Agreement is subject to approval by the Court, and members of the Modified Shy Class are to be given the best notice practicable under the circumstances and an opportunity to be heard and object to this Class Settlement Agreement.**

## RECITALS

A.      Pursuant to the 1993 Consent Decree, Navistar and a class (the "Shy Class") composed of most of Navistar's active employees and retirees at the time (and their dependents), the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") and several other unions, entered into the Shy Settlement Agreement (the "Shy Agreement").

B.      The Shy Agreement created, among other things, the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (now known as the Navistar, Inc. Retiree Health Benefit and Life Insurance Plan) (the "Shy Plan"), which provides health and life insurance benefits for certain retirees, including coverage for prescription drugs. Navistar, Inc. is the Administrator and a Named Fiduciary of the Health Benefit Program and Life Insurance Program components of the Shy Plan (collectively, the "Base Plan"), subject to the review authority of the Health Benefit Program Committee (the "HBPC"). Base Plan benefits are provided from a trust (the "Health Benefit Trust"), which is funded in part by certain monthly premiums paid by retirees. Each year, Navistar, Inc., in conjunction with the Base Plan's actuary, calculates the Contributing Participants' Annual Contribution (as defined in Appendix A-6 of the Shy Plan) (the "Retiree Contribution") based, in part, on the cost of prescription drugs covered under Medicare Part D.

C.      The Shy Agreement established a Supplemental Benefit Trust (the "Supplemental Trust") administered by the SBC. Among other things, the Supplemental Trust contributes money to "buy down," or reduce, the Retiree Contribution.

1

D.     The SBC is also the Program Administrator and Named Fiduciary of the Retiree Supplemental Benefit Program component of the Shy Plan (the "Supplemental Benefit Program") established under the terms of the Shy Agreement.

E.     The Supplemental Trust is funded in part through contributions from Navistar, Inc. Pursuant to Section 7.1 of the Supplemental Benefit Program, Navistar is obligated to make certain contributions under the Supplemental Benefit Trust Profit Sharing Plan, attached to the Supplemental Benefit Program as Appendix B-6 (the "Profit Sharing Plan"), consisting of a portion of its Qualifying Profits (as that term is defined in the Profit Sharing Plan).

F.     The Profit Sharing Plan terminates on the first day of the Supplemental Benefit Program's Plan Year following the "Profit Sharing Cessation Date" (the "PSCD") as defined in Section 7.2 of the Supplemental Benefit Program.

G.     In March 2012, the SBC filed a Motion to Intervene in the Shy Action and then filed a complaint in 2014 with the Court (as amended, the "Complaint"), raising disputes under the Profit Sharing Plan regarding the calculation of Navistar's profit sharing contributions for certain years.

H.     In 2015, the United States Court of Appeals for the Sixth Circuit ruled that the disputes raised in the Complaint must be arbitrated under Section 8.4 of the Profit Sharing Plan.

I.     CliftonLarsonAllen LLP (the "Arbitrator") was appointed in 2015, and since then the matters raised in the Complaint have been the subject of an arbitration proceeding (the "Profit Sharing Arbitration").

J.     In the course of the Profit Sharing Arbitration, the SBC agreed that out of the years at issue (2001 to 2014) it sought an award only with respect to the calculations under the Profit Sharing Plan for the years ending October 31, 2006, 2008, 2009, 2010 and 2011 (the "Challenged Years").

K.     The SBC also has raised disputes regarding the profit sharing calculations for the years ending October 31, 2015, 2016, 2017, 2018, 2019 and 2020.

L.     On February 5, 2021, the Arbitrator issued an Amended Final Award (the "Arbitration Award") in the Profit Sharing Arbitration, in which the Arbitrator concluded that Navistar Inc.'s calculation of Qualifying Profits for the Challenged Years should be adjusted in certain respects and that Navistar, Inc. owed past due profit sharing contributions and pre-award interest totaling $239 million. That same day, the SBC filed with the Court a Motion to Confirm Arbitration Award and Assess Interest (the "Motion to Confirm").

M.     On February 16, 2021, Navistar filed with the Court a Motion to Vacate and/or Stay Arbitration Award (the "Motion to Vacate"). The Motion to Vacate and Motion to Confirm remain pending with the Court, although both are currently stayed.

N.     Additional disagreements have arisen between Navistar and the SBC regarding whether the PSCD has occurred, and if not, whether payment of some or all of the Arbitration Award would cause the PSCD to occur.

2

O.     On October 21, 2016, Mr. Krzysiak (a current member of the SBC and the Shy Class) and Mr. LaCour (a former member of the SBC and a current member of the Shy Class) filed a complaint in the Court against Navistar in a civil action captioned *Krzysiak, et al. v. Navistar International Corporation, et al.*, S.D. Ohio Case No. 3:16-CV-00443-WHR (the "Krzysiak Action"). Plaintiffs in the Krzysiak Action assert that Navistar is improperly failing to account for Medicare Part D subsidies as a reduction in the cost of prescription drugs for purposes of calculating the Retiree Contribution. The Krzysiak Action remains pending before the Court.

P.     The SBC is not a party to the Krzysiak Action, but it agrees with the positions advanced by the plaintiffs in the Krzysiak Action and has paid the plaintiffs' attorneys' fees and expenses. The SBC has also stated that Navistar's conduct with regard to the Medicare Part D subsidies has the effect of increasing the Retiree Contribution, which in turn increases the amount payable by the Supplemental Trust to buy down that cost on behalf of beneficiaries and thereby causes harm to the Supplemental Trust.

Q.     On October 14, 2021, the HBPC duly passed the "Subaccount A Resolution," attached hereto as Exhibit A, regarding the funds in VEBA Subaccount A of the Health Benefit Trust.

R.     On October 22, 2021, Navistar, the SBC, Mr. LaCour, Mr. Krzysiak and the UAW signed a Letter of Intent (the "LOI") containing certain material terms of their agreement to reach a resolution of certain disputes and disagreements as specifically described in the LOI, including to provide for the amendment of the Supplemental Benefit Program to eliminate Navistar's obligation to make profit sharing and post-PSCD contributions to the Supplemental Trust, in exchange for an immediate cash payment (collectively, the "Settlement").

S.     The Parties have agreed to certain modifications to the 1993 Consent Decree to reflect the terms of the Settlement. These agreed modifications are collectively set out in redline form on Exhibit B hereto and are referred to herein as the "Consent Decree Modifications." The 1993 Consent Decree, as modified pursuant to the Consent Decree Modifications, is referred to as the "Modified Consent Decree," and is attached hereto as Exhibit C.

T.     The Consent Decree Modifications include the following agreed addition to the definition of "Total Actual Drug Cost" in Appendix A-6 of the Shy Plan (the "Part D Credit Modification"):

> Commencing with the Measurement Year to be used for determining the Contributing Participants' Annual Contribution for the 2022 Plan Year, "Total Actual Drug Cost" shall equal (i) the sum of paid drug claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of paid drug claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for such Measurement Year, less (ii) the total amount of any subsidies, manufacturer rebates or similar payments for Medicare Part D Plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year, including, but not limited to, the manufacturer discount under 42 CFR 423 Subpart W: Medicare Coverage Gap Discount Program (42 CFR 423.2300 – 42 CFR 423.2345); the federal reinsurance subsidy, the direct subsidy and the low income cost-sharing subsidy under 42

3

CFR 423 Subpart G: Payments to Part D Plan Sponsors for Qualified Prescription Drug Coverage (42 CFR 423.301 – 42 CFR 423.360); and the low income premium subsidy under 42 CFR 423 Subpart P: Premiums and Cost-Sharing Subsidies for Low-Income Individuals (42 CFR 423.771 – 42 CFR 423.800), less (iii) manufacturer rebates for non-Medicare Part D prescription drug plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year.

U.      Consistent with the LOI, on October 23, 2021, Navistar paid $75 million to the Supplemental Trust as a partial prepayment of amounts to be paid under the Profit Sharing Settlement Agreement (defined below) (the "$75 Million Prepayment").

V.      Consistent with the LOI, within one (1) business day of the execution of this Class Settlement Agreement, the Profit Sharing Settlement Agreement, and the Krzysiak Settlement Agreement (defined below), Navistar will pay $25 million to the Supplemental Trust as a further partial prepayment of amounts to be paid under the Profit Sharing Settlement Agreement (the "$25 Million Prepayment," and, together with the $75 Million Prepayment, the "Prepayments").

W.      After signing the LOI, the parties to the LOI cooperated in good faith to identify proposed class representatives and class counsel to represent the interests of the Shy Class with respect to the Settlement.

X.      As a result of this process, on November 24, 2021, the SBC filed a motion (the "Class Representative Motion") to appoint Messrs. Zounes and Rodgers as Class Representatives (in addition to Mr. Potts), and to appoint Markovits, Stock & DeMarco, LLC, as class counsel ("Class Counsel"). The Court granted the Class Representative Motion on December 10, 2021.

Y.      The Class Representatives and Class Counsel have reviewed documents relating to this settlement, have consulted with experts, and have examined and considered the benefits to be provided to the Modified Shy Class members (defined below) under the Settlement as provided for in this Class Settlement Agreement. The Class Representatives and Class Counsel believe the proposed Settlement is fair, adequate, reasonable, and in the best interests of the Modified Shy Class members, taking into account the benefits provided to the Modified Shy Class members through the terms of the Class Action Settlement, the risks of continued litigation and possible trial and appeals, and the length of time and the costs that would be required to complete the litigation. The Class Representatives have reviewed the proposed amendment of the Supplemental Benefit Program concerning future profit sharing and agree to move for approval of the amendment to provide appropriate notice to the Modified Shy Class, as provided for in Section 9.1(c) of the Supplemental Benefit Program.

Z.      The Parties entered into this Class Settlement Agreement after extensive arm's length negotiations. The Parties agreed on the benefits to be provided to the Modified Shy Class described in this Class Settlement Agreement before agreeing upon Class Counsel's attorneys' fees and expenses.

AA.     Upon the execution of this Class Settlement Agreement, Class Counsel will move for an order preliminarily: (1) approving this Class Settlement Agreement as fair, adequate and

reasonable to the settlement class; (2) modifying the Shy Class to reflect the current composition of that class (as so modified, the "Modified Shy Class"); (3) adding Modified Shy Class members Robert Bergmann and Fred Cortright as additional Class Representatives; (4) approving the form, content and method of notice to the Modified Shy Class; (5) establishing procedures and scheduling deadlines for notice to the Modified Shy Class members, and for Modified Shy Class members to object to the Settlement; (6) scheduling deadlines for the filing of papers in support of final approval and in support of attorneys' fees and expenses; (7) setting a time and date for a hearing (the "Fairness Hearing") for consideration of final approval of this Class Settlement Agreement as well as Class Counsel's fees and expenses; (8) establishing other requirements and procedures necessary to effectuate the Settlement; and (9) seeking further modification of the 1993 Consent Decree consistent with the Settlement (the "Preliminary Approval Motion"). The Parties support the Preliminary Approval Motion. Class Counsel will also move pursuant to Section 9.1(c) of the Supplemental Benefit Program for approval of the amendment of the Supplemental Benefit Program concerning future profit sharing. The Parties support this motion.

BB.     Consistent with the LOI, and contemporaneously with the execution of this Class Settlement Agreement, Navistar and the SBC have entered into the "Profit Sharing Settlement Agreement," attached hereto as Exhibit D, and Navistar and the plaintiffs in the Krzysiak Action have entered into the "Krzysiak Action Settlement Agreement," attached hereto as Exhibit E.

CC.     In exchange for the payments set out in the Profit Sharing Settlement Agreement and the Krzysiak Settlement Agreement, and the other consideration provided by Navistar, the Class Representatives have agreed to the provision of releases, to be binding on the Modified Shy Class, for the benefit of Navistar (as set forth on Exhibit F hereto, the "Class Releases"), all subject to notice, an opportunity to be heard and object, and approval by the Court.

DD.     The Class Representatives and Class Counsel reviewed and analyzed the Settlement in its entirety and believe the Settlement to be in the best interests of the Modified Shy Class.

EE.     The UAW also reviewed and analyzed the Settlement in its entirety and has agreed to support the Settlement.

FF.     The Parties wish to effectuate and finalize the Settlement by cooperating in seeking Court approval of the Settlement, affording the Modified Shy Class the opportunity to be heard and object to the terms of the Settlement, and providing appropriate notice of the Supplemental Benefit Program amendment prior to approval by the Court.

*Now therefore*, intending to be legally bound, the Parties agree to the following:

## Effectiveness

1.      This Agreement and all associated attachments and exhibits are made for the sole purpose of settling the disputes between and among the Parties and are made in compromise of disputed claims. Because the Settlement resolves claims on a classwide basis, it must receive preliminary and final approval from the Court. Accordingly, the Parties enter into this Agreement on a conditional basis.

2.      Preliminary Effectiveness.  This Class Settlement Agreement will become effective on a preliminary basis ("Preliminary Effectiveness") upon the earliest date on which both (i) it has been executed by all Parties and (ii) an Order granting the Preliminary Approval Motion, in substantially the form submitted to the Court with the Preliminary Approval Motion (the "Preliminary Approval Order"), has been entered.

3.      Final Effectiveness.  This Class Settlement Agreement will become effective on a final basis ("Final Effectiveness") upon the earliest date on which all of the following are true: (i) Interim Effectiveness has been achieved and not terminated; (ii) an Order granting the Final Approval Motion (defined below), in a form to be agreed by the Parties and submitted with the Final Approval Motion (the "Final Approval Order") has been entered; and (iii) the time for any appeal of the Final Approval Order has expired, or any appeal has been resolved with the effect of leaving the Final Approval Order materially undisturbed, with the time for any further appeal having expired (a "Final Order").  The period between Preliminary Effectiveness and Final Effectiveness shall be referred to as the "Preliminary Effectiveness Period."

**The Preliminary Effectiveness Period**

4.      Cooperation.  During the Preliminary Effectiveness Period, and subject in all cases to their respective fiduciary duties, the Parties will cooperate together in good faith to effectuate the terms of the Settlement and achieve Final Effectiveness.  This provision shall not be read to affect any cooperation obligation a Party may have under the LOI.

5.      No Action Contrary to Settlement.  During the Preliminary Effectiveness Period, no Party shall take any action in opposition to the Preliminary Approval Motion, the Final Approval Motion (as agreed by the Parties) or the terms of this Class Settlement Agreement, including, without limitation, by making any public filing or statement, by encouraging any third party to oppose the Preliminary Approval Motion or the Final Approval Motion or the relief sought therein, by supporting any objection to the Preliminary Approval Motion or the Final Approval Motion, or by taking any action that would inhibit or impair the approval or enforcement of this Class Settlement Agreement, the Consent Decree Modifications, the Class Releases, the Profit Sharing Settlement Agreement or the Krzysiak Settlement Agreement.  The Parties may support the right of any person or group to be heard and object to the Preliminary Approval Motion or the Final Approval Motion, but may not support the merits of any such objection.

6.      Interim Amendments to Settlement.  During the Preliminary Effectiveness Period, and subject to any applicable notice and Court approval requirements, the Parties may agree in writing to any changes to this Class Settlement Agreement and/or the relief sought in the Preliminary Approval Motion, and the remaining provisions of this Class Settlement Agreement shall remain in effect upon such agreement.

7.      During the Preliminary Effectiveness Period:

          a.  Navistar (including Navistar Inc., in its capacity as Shy Plan administrator) shall:

                i.  not take any action to progress or prosecute the Motion to Vacate;

      ii.   continue to comply with the Profit Sharing Plan (and any amounts paid pursuant to the Profit Sharing Plan for plan years after October 31, 2020, will be credited as set out in the Profit Sharing Settlement Agreement and recited in paragraph 14 below, including by reducing Navistar's interest burden), except that Navistar's obligations to obtain a review of profit sharing data from a certified public accounting firm and provide the results of that review to the SBC and the UAW under section 8.2 of the Profit Sharing Plan shall be waived; and

      iii.   Calculate the Retiree Contribution for the 2022 Plan Year (and onward, if applicable) in accordance with the agreed language of the Part D Credit Modification; and

  b.   the SBC shall:

      i.   not take any action to progress or prosecute the Motion to Confirm;

      ii.   not increase the monthly spend toward the Retiree Contribution that it pays on behalf of beneficiaries;

      iii.   not alter the level of benefit buydowns provided by the Supplemental Benefit Plan from those applicable for 2021 as set forth in the October 2020 letter from the SBC to the Shy Plan participants, except that the SBC may reduce deductibles applicable to medical benefits provided under the Shy Plan to $0; and

      iv.   other than as provided herein, not make any payments to further enhance benefits beyond the Shy Plan level of benefits in effect for the plan year beginning November 1, 2020, including reimbursement of beneficiaries' Medicare Part B premiums.  The SBC may continue to make payments for consulting, investment, administrative, and legal fees and costs.

  c.   Except as otherwise set forth herein or separately ordered by the Court, the 1993 Consent Decree shall remain effective in its current form until Final Effectiveness has been achieved.

8.     In addition, the Parties agree and acknowledge that, pending Final Effectiveness, beginning with the plan year beginning November 1, 2021, the Retiree Contribution shall be lowered in the manner and on the terms specified in the Subaccount A Resolution (Exhibit A hereto).

9.     The Parties agree that Class Counsel will seek, conditionally and for settlement purposes, a "Modified Shy Class" defined as follows:

     Present participants (including spouses and dependents) and those eligible to become participants, whether upon retirement or election (including eligible spouses and dependents), in the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (n/k/a the Navistar, Inc. Retiree

Health Benefit and Life Insurance Plan). This includes all eligible present retirees, individuals eligible upon retirement or election, and participating, eligible, or future-eligible spouses and dependents in the Navistar International Transportation Corp. Retiree Health Benefit Program (n/k/a the Navistar, Inc. Retiree Health Benefit Program), the Navistar International Transportation Corp. Retiree Life Insurance Program (n/k/a the Navistar, Inc. Retiree Life Insurance Program), and the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (n/k/a the Navistar, Inc. Retiree Supplemental Benefit Program).

For the avoidance of doubt, the definition of "Modified Shy Class" and the Parties' agreement to seek approval of the Modified Shy Class are not intended to expand eligibility for benefits under any benefit plan(s), all of which remains governed by the terms of the applicable benefit plan(s).

10. <u>CAFA Notices.</u> As soon as practicable, but no later than ten (10) days after the Preliminary Approval Motion is filed with the Court, Navistar shall serve notices as required by the notice provisions of the Class Action Fairness Act.

11. <u>Class Notice.</u> The Preliminary Approval Motion will seek approval of the following Notice Plan, administered by Navistar under the supervision of Class Counsel:

    a. On or by the Notice Date (defined below), Navistar shall mail, by first class U.S. Mail, a "<u>Long Form Notice</u>" substantially in the form attached hereto as <u>Exhibit G</u>, to all Modified Shy Class members for whom Navistar has a mailing address. For any Long Form Notice that is returned without a forwarding address, Navistar will attempt to obtain a current address using the National Change of Address database maintained by the U.S. Postal Service. Long Form Notices returned with forwarding addresses or where current addresses can be found will be resent as soon as practicable.

    b. On or by the Notice Date, Navistar shall send, via email, an email notice substantially in the form attached hereto as <u>Exhibit H</u>, to all Modified Shy Class members for whom Navistar has an email address.

    c. On or by the Notice Date, Navistar shall cause to be published, via PRNewswire, a publication notice substantially in the form attached hereto as <u>Exhibit I</u>.

    d. On or by the Notice Date, Navistar will establish a settlement website, located at www.navistar.com/ShySettlement, available for Modified Shy Class members to learn more about the Class Action Settlement. The website will have a "Frequently Asked Question" notice substantially in the form of the Long Form Notice, links to important documents including this Class Settlement Agreement, and a link to a toll-free hotline that Modified Shy Class members can call to have questions answered. Contact information for Class Counsel will be provided in the event Modified Shy Class members have questions that cannot otherwise be resolved by the information provided.

      e. On or by the Notice Date, Navistar will establish a toll-free hotline, reasonably staffed during most business hours with persons knowledgeable about the Settlement, so that Modified Shy Class members can have questions answered.

12.    <u>Final Approval.</u> Class Counsel, supported by the Parties, will request in the Preliminary Approval Motion a schedule leading to a Fairness Hearing, at which Class Counsel will request entry of the Final Approval Order. The proposed schedule, assuming the Preliminary Approval Order is granted on January 20, 2022, would be:

      a. A "<u>Notice Date</u>" of February 9, 2022;

      b. An objection deadline of April 11, 2022, with the same deadline for the filing of a notice of appearance by any objector's counsel;

      c. A deadline of March 27, 2022 for the filing of the Final Approval Motion, and for the filing of Class Counsel's fee and expense application;

      d. A deadline of May 26, 2022 for Class Counsel's replies to objections;

      e. A deadline of May 26, 2022 for Navistar's report to the Court regarding the Notice Plan;

      f. A Fairness Hearing on or after June 9, 2022.

If the Preliminary Approval Order is entered later or earlier than January 20, 2022, these dates will be adjusted accordingly. Dates falling on weekends or federal holidays will be extended until the following non-holiday weekday.

## Settlement Payments

13.    The "<u>Payment Date</u>" shall be three (3) business days after each of the following is true:

      a. Final Effectiveness has occurred; and

      b. The Court has entered an Order dismissing the Krzysiak Action with prejudice, and such Order has become a Final Order.

14.    Consistent with the Profit Sharing Settlement Agreement (<u>Exhibit D</u> hereto), on or before the Payment Date, Navistar will pay or cause to be paid to the Supplemental Trust $556 million in cash, less certain credits, plus an additional interest amount, as follows:

      a. The $75 Million Prepayment and the $25 Million Prepayment will be credited;

      b. Any amount paid by Navistar under the Profit Sharing Plan for any plan year after the plan year ending October 31, 2020, will be credited;

      c. Navistar will pay the difference between $556 million and the credits identified in subparagraphs (a) and (b); and

d. Navistar will pay an additional amount equal to the sum of daily simple interest accruals for the period beginning August 11, 2021, and ending on the day before the Payment Date, where each day's interest accrual is equal to 0.01369863% (i.e., 5% per annum) of the difference between $192 million and the amounts that have been paid by Navistar as of such day under the Profit Sharing Plan for any plan year after October 31, 2020.

15.    Consistent with the Krzysiak Action Settlement Agreement (<u>Exhibit E</u> hereto), on or before the Payment Date, Navistar will pay or cause to be paid the following amounts in cash:

a. $17 million to the VEBA Subaccount A of the Health Benefit Trust; and

b. $3 million to the Supplemental Trust (in addition to the amounts payable under the Profit Sharing Settlement Agreement).

16.    For the avoidance of doubt, the payments specified in paragraphs 14 and 15 above are recitations of, and not in addition to, the payments required under the Profit Sharing Settlement Agreement and the Krzysiak Action Settlement Agreement.  Furthermore, no such payment shall count toward any future contribution or payment obligation of Navistar or the Employers to the Health Benefit Trust under the Health Benefit Program or Life Insurance Program or the Health Benefit Trust Agreement (as such terms are defined in the 1993 Consent Decree).

17.    In addition to the foregoing payments, Navistar has agreed to the inclusion of the Part D Credit Modification as part of the Consent Decree Modifications.

**<u>Class Releases</u>**

18.    The Final Approval Order shall provide that, upon payment of each of the amounts set forth in paragraphs 14 and 15 above, the "<u>Class Releases</u>" attached hereto as <u>Exhibit F</u> will be deemed effective and binding on the Modified Shy Class and its members.

**<u>Consent Decree Modifications</u>**

19.    Upon Final Effectiveness, the 1993 Consent Decree will be deemed modified in accordance with the Consent Decree Modifications identified on <u>Exhibit B</u> hereto.  These changes include, without limitation:

a. The elimination of the Profit Sharing Plan and Navistar's obligations with respect thereto; and

b. The Part D Credit Modification.

For the avoidance of doubt, the foregoing descriptions of the Consent Decree Modifications are for ease of reference, and are qualified entirely by the Consent Decree Modifications and the Modified Consent Decree, as set out on <u>Exhibits B and C</u> hereto.  In the event of a conflict between the foregoing descriptions and the Consent Decree Modifications/Modified Consent Decree, the Consent Decree Modifications/Modified Consent Decree shall control.

**Other Terms**

20.     <u>Class Counsel Fees and Expenses.</u>  Navistar agrees to pay the fees and expenses of Class Counsel in this matter, subject to a $750,000 cap that Navistar and Class Counsel agree upon and believe is reasonable.  If this Class Settlement Agreement is approved by the Court, the fees of Class Counsel will be subject to review by the Court as part of the settlement process.  Navistar agrees to pay the fees and expenses of Class Counsel whether or not this Class Settlement Agreement is ultimately approved.  Payment to Class Counsel will be made following Court review, if any, or upon the occurrence of the Reset Date (defined below).  Once the Class Settlement Agreement is approved or the Reset Date has occurred and the work of Class Counsel is complete, Class Counsel will make a request for fees and expenses of a specific amount.

21.     <u>Term.</u>

      a.     If the Court declines to enter the Preliminary Approval Order for any reason, or if the Preliminary Approval Order has not been entered by March 30, 2022, this Class Settlement Agreement will be null and void *ab initio* (unless the Parties mutually agree in writing to an extension of the March 30, 2022 date); provided that, in such an event, the parties to the LOI shall not be relieved of any obligations thereunder.

      b.     This Class Settlement Agreement will expire and terminate automatically, without the need for any notice, upon the earlier of (a) the occurrence of the Reset Date (defined below) (in which case the provisions of paragraph 24 shall remain in effect), (b) Final Effectiveness, and (c) written agreement of each of the Parties.

      c.     This Class Settlement Agreement may be terminated by any Party in accordance with the provisions of Paragraph 28.

22.     <u>Court Rejection.</u>  If at any time the Court enters an Order declining to approve any part of the Settlement and/or the Final Approval Motion ("<u>Court Rejection</u>"), Navistar, the SBC and the Class Representatives shall promptly confer and cooperate in good faith to determine whether the terms of the Settlement and/or the Final Approval Motion may be modified to their mutual satisfaction and the satisfaction of the UAW, and, if such a resolution can be reached, promptly seek approval of the modified Settlement and/or file a revised Final Approval Motion.  In the event Navistar, the SBC and the Class Representatives cannot agree on such modification(s) within 60 days of Court Rejection, or if a Final Order approving the modified Settlement and/or Final Approval Motion is not obtained within 120 days of Court Rejection, the Reset Date shall be deemed to have occurred.

23.     <u>Failure to Obtain Court Approval.</u>  If Final Effectiveness has not been achieved on or by October 31, 2022 (other than as a result of Court Rejection), the Parties shall promptly confer with the Court to try and determine the cause for the failure to obtain Court Approval, and shall thereafter cooperate in good faith to resolve any issues that may be identified by the Court.  If, despite these efforts, Final Effectiveness is not obtained by December 31, 2022, the Reset Date shall be deemed to have occurred on that date.

24.     <u>Reset Date.</u>  Upon the occurrence of any Reset Date:

a. The Parties' obligations under paragraphs 1 through 20 of this Class Settlement Agreement shall be null and void;

b. the SBC and Navistar may request that the Court rule on the Motion to Confirm and the Motion to Vacate; and

c. any Prepayment that Navistar has made as of the Reset Date shall operate as a credit towards any final judgment entered against Navistar as a result of the proceedings arising out of the Arbitration Award. To the extent this credit exceeds the amount of any final judgment or in the event the Arbitration Award is vacated in whole or in part, the excess shall be treated as a credit against (i) Navistar's 2021 and future obligations under the Profit Sharing Plan, if any, and/or (ii) Navistar's post-PSCD obligations under Section 7.2 of the Supplemental Benefit Program, in Navistar's sole discretion.

The provisions of this paragraph 24 shall survive any termination of this Class Settlement Agreement that results from the occurrence of the Reset Date.

25. <u>Governing Law and Jurisdiction.</u> This Class Settlement Agreement shall be governed by the laws of the State of Illinois without regard to its conflict of law provisions. In the event of any dispute arising out of or in connection with this agreement, the Court shall have exclusive jurisdiction to resolve such dispute(s).

26. <u>Integration / Entire Agreement.</u> This Class Settlement Agreement, together with the Profit Sharing Settlement Agreement and the Krzysiak Settlement Agreement, form the entire agreement of the Parties (as applicable) regarding the Settlement, and all prior communications, whether oral or written, by or among any of the Parties shall be of no further effect or evidentiary value.

27. <u>Non-reliance.</u> Each Party acknowledges that, in executing this Class Settlement Agreement, it has not relied on any representation or statement made by any other Party, except as expressly set forth herein.

28. <u>Severability.</u> Should any material provision of any of this Class Settlement Agreement, the Profit Sharing Settlement Agreement, or the Krzysiak Settlement Agreement be deemed unenforceable or contrary to law by a court of competent jurisdiction, any Party may cause the termination of this Agreement with immediate effect by written notice to the other Parties, <u>provided</u> that in such an event, Navistar shall have the right to credit any payments made in connection with the Settlement as provided in paragraph 24.

29. <u>Modification of Agreement.</u> This Class Settlement Agreement may only be amended by written agreement of each of the Parties, with due notice to the Modified Shy Class and approval of the Court; <u>provided</u> that the Parties may agree to ministerial and/or clerical amendments without such notice and approval.

30. <u>Failure to Enforce.</u> The failure by any Party to enforce any provision of this Class Settlement Agreement at any time, or for any period of time, shall not be construed as a waiver of any right of enforcement the Party may have.

31.     <u>No Third-party Beneficiaries.</u>   The provisions of this Class Settlement Agreement are intended solely for the benefit of each Party hereto and the members of the Modified Shy Class, and their respective successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other person; provided that the UAW shall be considered a third-party beneficiary for purposes of paragraph 22.

32.     <u>Interpretation.</u>   This Class Settlement Agreement has been negotiated and reviewed by the Parties with the advice of counsel, and in the event of an ambiguity its provisions are not to be construed against or in favor of any Party.  The Parties agree that none of the Parties shall be considered the primary drafter of this Class Settlement Agreement, or any part of it, for purposes of any rule or doctrine of construction or interpretation.

33.     <u>No Admission.</u>  This Settlement Approval and Consent Decree Modification shall not be construed as an admission as to any Party's liability or the merits of any Party's claims or legal positions regarding the subject matter of this Class Settlement Agreement.

[SIGNATURE BLOCKS TO FOLLOW]

**Navistar, Inc.**

_[signature] o/b/o Curt A. Kramer_

By: Curt A. Kramer

Its: Senior Vice President and General Counsel

**Navistar International Corporation**

_[signature] o/b/o Curt A. Kramer_

By: Curt A. Kramer

Its: Senior Vice President and General Counsel

**The Supplemental Benefit Program Committee of the Navistar, Inc. Retiree Supplemental Benefit Program**

By:

Its:

14

**Navistar, Inc.**

_____

By:

Its:

**Navistar International Corporation**

_____

By:

Its:

**The Supplemental Benefit Program Committee of the Navistar, Inc. Retiree Supplemental Benefit Program**

_____

By: Ted Scallet

Its: Counsel

**Class Representatives**


 /s/ Carl Potts

Carl Potts

and


 /s/ Richard Zounes

Richard Zounes

and


 /s/ Miller Rodgers

Miller Rodgers



**Class Counsel**


_____

W. B. Markovits

Terence R. Coates

Markovits, Stock & DeMarco, LLC

**Class Representatives**

_____

Carl Potts

and


_____

Richard Zounes

and


_____

Miller Rodgers


**Class Counsel**

_____

W. B. Markovits
Terence R. Coates
Markovits, Stock & DeMarco, LLC

## Exhibit A

**Subaccount A Resolution**

<u>ANNEX 2</u>

RESOLUTIONS OF THE
NAVISTAR, INC. RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN
HEALTH BENEFIT PROGRAM COMMITTEE
RELATED TO SHY BASE PLAN SUBACCOUNT A

At a meeting of the Navistar, Inc. Retiree Health Benefit and Life Insurance Plan (the "**Shy Plan**") Health Benefit Program Committee (the "**Committee**"), held on October 14, 2021, the Committee duly adopted the following resolutions, and directed that this record of its action be filed with the minutes of the proceedings of the Committee.

WHEREAS, pursuant to Section 6.3(c) of the Shy Plan, the Committee retains the sole authority to make adjustments in the Contributing Participants' Annual Contribution, as defined in the Shy Plan, as may be required to prevent the Contributing Participants' Sub-account as defined in the Shy Plan ("**Subaccount A**") from maintaining an unnecessary and inappropriate surplus or deficit for an extended period of time.

WHEREAS, Subaccount A currently has approximately $48,000,000 in assets and, in connection with a proposed settlement (the "**Krzysiak Settlement**") of the litigation in *Krzysiak, et al. v. Navistar International Corporation, et al.*, S.D. Ohio Case No. 3:16-CV-00443-WHR (the "**Krzysiak Action**"), Navistar, Inc. ("**Navistar**") will be required to contribute an additional $17,000,000 to Subaccount A, after which Subaccount A will have a total of approximately $65,000,000 in assets.

WHEREAS, the Committee has determined that there is an unnecessary and inappropriate surplus in Subaccount A, and that such unnecessary surplus will increase after the Krzysiak Settlement is finalized, and that it is therefore prudent and appropriate for the Committee to exercise its authority to adjust the Contributing Participants' Annual Contribution in order to reduce the assets in Subaccount A.

WHEREAS, the Shy Plan was created through the 1993 consent decree (the "**1993 Consent Decree**") entered by the U.S. District Court for the Southern District of Ohio (the "**Court**") in *Shy, et al. v. Navistar, Inc., et al.*, Case No. 3:92-cv-0333-WHR.

WHEREAS, Navistar has informed the Committee that the Krzysiak Settlement is part of a global settlement of both the Krzysiak Action and a dispute related to Navistar's compliance with past and future obligations under the Supplemental Benefit Trust Profit Sharing Plan under the 1993 Consent Decree (such dispute, the "**Profit Sharing Arbitration**"; the proposed settlement of such profit sharing dispute, the "**Profit Sharing Settlement**", and together with the Krzysiak Settlement, the "**Settlement**").

WHEREAS, Navistar has also informed the Committee that the Settlement is contingent upon, among other things, the execution of a mutually acceptable letter of intent by and among Navistar, the Supplemental Benefit Program Committee, Wayne Krzysiak, Michael LaCour, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, which will outline the terms of the Settlement (the "**Letter of Intent**").

## ANNEX 2

**RESOLUTIONS OF THE
NAVISTAR, INC. RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN
HEALTH BENEFIT PROGRAM COMMITTEE
RELATED TO SHY BASE PLAN SUBACCOUNT A**

**NOW, THEREFORE, BE IT RESOLVED**, that pursuant to the Committee's authority under Section 6.3(c) of the Shy Plan, effective January 1, 2022, the Committee approves the use of Subaccount A to reduce the Contributing Participants' Annual Contribution to $5 per person per month until the total assets in Subaccount A reach $5,000,000, upon which time the Committee will reassess future expenditures of Subaccount A assets, if any, pursuant to the Committee's fiduciary duties and authority under the Shy Plan.

**BE IT FURTHER RESOLVED**, that each of the above resolutions is contingent and will only become effective upon full execution of the Letter of Intent.

*         *         *

The undersigned being the Secretary of the Committee certifies that the above resolutions were unanimously approved by the Committee at a meeting held on October 14, 2021.

Secretary

**<u>Exhibit B</u>**

**Consent Decree Modifications**

(in redline format)

**NAVISTAR INTERNATIONAL CORPORATION**
**FINAL VERSIONS OF KEY**
**SETTLEMENT AGREEMENT DOCUMENTS**

| Document | Page Number |
|---|---|
| Amended and Restated Settlement Agreement | [1] |
| Exhibit A - Base Plan | [32] |
| Appendix A-3 - Health Benefit Trust Agreement | [67] |
| Appendix A-5 - Initial Actuarial Valuation | [78] |
| Appendix A-6 - Actuarial Definitions Supplement | [100] |
| Exhibit B - Supplemental Plan | [109] |
| Appendix B-2 - Supplemental Benefit Trust Agreement | [130] |
| Appendix B-3 -- Restated Certificate of Incorporation | [143] |
| Appendix B-4 - Registration Rights | [207] |
| Appendix B-6 - ~~Supplemental Benefit Profit Sharing Plan~~*Reserved* | [221] |
| Exhibit D - Definition Supplement | [230] |

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ART SHY, FRED BURRIS, CLARENCE
NUSS, JOHN HERRING, CARL POTTS,
HAROLD RETHERFORD, HENRY G. BETLEY,
RICHARD A. SPITLER, JACK O'NEAL, and
DONALD McPHEARSON on behalf of
themselves and other persons
similarly situated, and
INTERNATIONAL UNION, UNITED
AUTOMOBILE AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA AND ITS LOCAL UNIONS 6,
66, 98, 119, 226, 305, 402, 472, 658,
2274, and 2293, INTERNATIONAL UNION,
UNITED PLANT GUARD WORKERS OF AMERICA          Case No. C-3-92-333
("UPGWA") AND ITS LOCAL UNIONS 122,            Judge Walter H. Rice
4 AND 134 AND INTERNATIONAL
MACHINISTS DISTRICT LODGE 28 AND ITS
LOCAL LODGES 1471, 2819, AND 2821,
SOCIETY OF ENGINEERING EMPLOYEES, INC.
("SEE"), INTERNATIONAL UNION, UNITED
STEELWORKERS OF AMERICA ("USWA")
AND ITS LOCAL UNION 4320 on behalf of
themselves and other similarly
situated unions,

                                    Plaintiffs,

        vs.

NAVISTAR INTERNATIONAL CORPORATION,
NAVISTAR INTERNATIONAL TRANSPORTATION
CORP., NAVISTAR FINANCIAL CORPORATION,
HARCO NATIONAL INSURANCE COMPANY, the
NAVISTAR INTERNATIONAL TRANSPORTATION
CORP. HEALTH PLAN and the INDIANAPOLIS
CASTING CORPORATION,

                                    Defendants.

_____/

## TABLE OF CONTENTS

Page

Summary of Settlement Agreement.................................................................... 2
1. Discovery ....................................................................................... 4
2. Benefits Of Settlement ................................................................... 4
3. No Admissions ............................................................................... 6
4. Class Action Notice Order ............................................................. 7
5. Judgment to be Entered Approving the Settlement ....................... 7
6. Releases and Related Matters ........................................................ 7
7. Initial Eligibility and Enrollment in the Plan............................... 9
8. Corporate Approvals ...................................................................... 13
9. Contribution of Parent Securities.................................................. 13
10. Board of Directors......................................................................... 14
11. Costs, Attorneys Fees and Indemnification ................................. 15
12. Conditions and Effective Date of Settlement............................... 16
13. Effect of Disapproval or Modification.......................................... 20
14. Representations and Warranties.................................................... 20
15. Miscellaneous Provisions.............................................................. 22

Exhibits

| | | |
|---|---|---|
| Exhibit A | - | The Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan |
| Exhibit B | - | The Navistar International Corp. Retiree Supplemental Benefit Program |
| Exhibit C | - | List of Class Members |
| Exhibit D | - | Definition Supplement |
| Exhibit E | - | Notice order |
| Exhibit F | - | Cover Letter |
| Exhibit G | - | Judgment |
| Exhibit H | - | Health Benefit Program Letter |
| Exhibit I | - | Premium Bill |
| Exhibit J | - | Fees and Expenses |
| Exhibit K | - | Legal Opinions |

Amended and Restated
Settlement Agreement

This Settlement Agreement, dated as of March 30, 1993, and amended and restated as of June 30, 1993, and further amended and restated as of December 22, 2021 (which, together with the Exhibits hereto, is referred to as the "Settlement Agreement"), is between Navistar, by and through its attorneys, and the Class Representatives, on behalf of the Class, by and through Class Counsel, in the class action of *Shy et al. v. Navistar*, Civil Action No. C-3-92-333 (S.D. Ohio) (the "*Shy* Case"). This Settlement Agreement shall apply to:

(i)         Present Retirees, Present Surviving Spouses and Eligible Dependents of Class Members;

(ii)       Present Eligible Former Employees and Present Non-Represented Employees who will be eligible for Health and Life Insurance Benefits after the Effective Date; and

(iii)     all labor organizations which presently are or were in the past parties to collective bargaining agreements ("CBAs") pursuant to which Navistar maintains an Existing Plan.

Each such natural person constitutes a "Class Member" and all of such natural persons and entities constitute the "Class".

In the event of an inconsistency between this Settlement Agreement and any Exhibit hereto, this Settlement Agreement shall control; provided, that any reference to or description of the Health Benefit Program or the Life Insurance Program is qualified entirely by reference to Exhibit A, and any reference to or description of the Supplemental Benefit Program is qualified entirely by reference to Exhibit B (as amended effective December 31, 2021). In the event of any inconsistency between the Health Benefit Program SPD or the Life Insurance Program SPD and Exhibit A, Exhibit A shall control. In the event of any inconsistency between the Supplemental Benefit Program SPD (as amended) and Exhibit B (as amended), Exhibit B shall control.

Capitalized terms used and not otherwise defined in this Settlement Agreement have the meanings given them in the Definition Supplement attached as Exhibit D.

This Settlement Agreement affects only the duration and level of, and not eligibility for, Health and Life Insurance Benefits. All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan in the absence of this Settlement Agreement (other than Excluded Retirees) shall be eligible for benefits under the Plan. No person not otherwise eligible for Health and Life Insurance Benefits under an Existing Plan shall be eligible for any benefit by virtue of this Settlement Agreement.

**Summary of**
**Settlement Agreement**

This Settlement Agreement finally resolves and settles all claims of the Class Members in the *Shy* Case, subject to Court approval and the other terms and conditions set out below.

On the Effective Date, the Company will establish the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), ERISA Plan number 584, EIN 36-1264810, which will be comprised of:

    (i)        the Navistar International Transportation Corp. Retiree Health Benefit Program (the "Health Benefit Program"), described in Exhibit A;

    (ii)       the Navistar International Transportation Corp. Retiree Life Insurance Program (the "Life Insurance Program"), described in Exhibit A, which consists of the Basic Life Insurance Program and the Optional Life Insurance Program; and

    (iii)     the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (the "Supplemental Benefit Program"), described in Exhibit B (as amended).

Subject to the contribution requirements described in Exhibit A, the Company agrees that the benefits provided by the Health Benefit Program will be made available for the lifetime of:

    (i)        Present Retirees and Class Members who are or will become Surviving Spouses;

    (ii)       Present Eligible Former Employees at such time as they would have been entitled to receive Health and Life Insurance Benefits under the Existing Plans in the absence of this Settlement Agreement; and

    (iii)     Present Non-Represented Employees at such time as they become eligible to commence the receipt of Pension Benefits or as described below.

The Company has further agreed that (i) the benefits provided by the Health Benefit Program will be made available to Eligible Dependents of Class Members for as long as they remain such, (ii) the benefits provided by the Basic Life Insurance Program will be made available to Present Retirees for the duration of their lives, and (iii) the benefits provided by the Optional Life Insurance Program will be made available to Class Member Retirees who satisfy the eligibility requirements set out in the Life Insurance SPD.

Pursuant to the New CBAs and not through this Settlement Agreement, the Company has also agreed that the benefits provided by the Health Benefit Program and the Basic Life Insurance Program will be made available to Present Represented Employees and their Surviving Spouses at such time as they would have been entitled to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the New CBAs for the duration of their lives and to their Eligible Dependents for so long as they remain such, subject, in the case of the Health Benefit Program to the contribution requirements described in Exhibit A.

The Company's share of the initial estimated accumulated post-retirement benefit obligation in connection with the Plan is $1 billion ($946 million for the Health Benefit Program and $54 million for the Basic Life Insurance Program). The Company will fund the Health Benefit Program and the Basic Life Insurance Program by making contributions to the Health Benefit Trust, including contributions of the Annual Service Cost and pre-funding contributions up to $500 million on or before the Event Date from the proceeds of sales of securities or from other sources. The Health Benefit Program will be administered by the Company in its capacity as Plan Administrator, subject to the review authority of the Health Benefit Program Committee. The Health Benefit Program Committee shall consist of seven members, including three Company appointees, two UAW appointees and two other appointees, one of whom shall preside as chairperson. The initial members of such committee shall be approved by the Court.

The Supplemental Benefit Program will be established for the purposes of reducing or reimbursing premiums, co-payments and deductibles that would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program and of providing Additional Permissible Benefits. The Supplemental Benefit Program will be funded on the Effective Date by the issuance to the Supplemental Benefit Trust of new shares of Parent Class B Common equal to 50 percent of the total amount of the Parent Common Equity outstanding immediately after such contribution on a Fully Diluted Basis (estimated to be approximately 255 million shares of Parent Class B Common). Upon the occurrence of an Event Date or a permitted sale of shares of Parent Class B Common to a third party, all of such shares (in the case of an Event Date) or the shares to be transferred (in the case of a permitted sale) will convert automatically into shares of Parent Common. ~~In addition, the Company will make profit-sharing contributions to the Supplemental Benefit Trust under the Profit Sharing Plan, which provides for payments up to a maximum of 16 percent of eligible profits above a specified threshold.~~

The Supplemental Benefit Program will be administered by the Supplemental Benefit Committee, which shall consist of five members, including two UAW appointees and three other appointees, one of whom shall preside as chairperson. The initial members of such committee shall be approved by the Court. On the Effective Date, Parent will transfer one share of Parent Series A Preference to the Supplemental Benefit Trust, which will entitle the Supplemental Benefit Committee to elect two members of the Board during such time as the Supplemental Benefit Trust holds 20 percent or more of the shares of Parent Common Equity then outstanding and one member of the Board during such time as the Supplemental Benefit Trust holds between 10 percent and 20 percent of the shares of Parent Common Equity then outstanding. In addition, on the Effective Date Parent will transfer one share of Parent Series B Preference to the UAW, which will entitle it to elect one member of the Board until such time as the Health Benefit Program and the Life Insurance Program are Fully Funded, subject to certain reinstatement rights.

The Plan can only be amended under certain limited conditions specified herein and in Exhibits A and B, including in the event of the adoption of a State or National Health Insurance Program.

In exchange, the coverage of Class Members for Health and Life Insurance Benefits under the Existing Plans will be terminated at the end of the day before the Effective Date, except that claims incurred prior to the Effective Date will be paid in accordance with the Existing Plans. At that time, all of the claims of the Class in the *Shy* Case will be released, and the *Shy* Case will be dismissed with prejudice.

1.      *Discovery*.

The Class Representatives conducted substantial discovery both prior to and after the commencement of the Litigation. This discovery included, among other things, the review of documents produced by Navistar and third parties, interviews of witnesses and the analysis of Navistar's relevant retiree health care documents. The Class Representatives have thoroughly investigated the law applicable to the Class Members' claims. The Class Representatives and their retained experts and consultants have also conducted an extensive review of Navistar's current and projected future financial condition. Similarly, counsel for Navistar has thoroughly reviewed the various defenses available to Navistar.

2.      *Benefits Of Settlement*.

2.1     *To The Class*.  The Class Representatives and Class Counsel have conducted a thorough and detailed analysis of Navistar's financial situation and have determined that unless the costs incurred by the Employers to provide Health and Life Insurance Benefits under the Existing Plans are immediately and permanently reduced, Navistar is likely to file for bankruptcy and may be liquidated. In the event of Navistar's bankruptcy and liquidation, there is a high likelihood that benefits for the Class Members would be dramatically reduced or eliminated. Even in the event of a successful reorganization of Navistar, it is likely that continued retiree benefits would be reduced by more than is required in this Settlement Agreement.  Thus, the Class Representatives and Class Counsel have concluded that further proceedings to continue the *Shy* Case against Navistar would not be in the best interests of the Class. In reaching this conclusion, the Class Representatives and Class Counsel further recognize the length and cost of further proceedings necessary to continue the *Shy* Case against Navistar through trial and appeals. The Class Representatives and Class Counsel have also taken into account the uncertainty and delay that such proceedings would entail and the risk of an adverse outcome. The Class Representatives and Class Counsel are also mindful of problems of proof and the various defenses available to Navistar.

In exchange for the reduction in benefits received by the Class Members to the levels described herein, the Class Members will have the opportunity to benefit from Navistar's future growth. As a result of Parent's contributions of Parent Class B Common to the Supplemental Benefit Trust, the Supplemental Benefit Trust will be Parent's largest single stockholder. Thus, the Class Members, through the holdings of the Supplemental Benefit Trust, may receive increased benefits based on the increase in value of such holdings in the event Navistar returns to financial stability.

As described in Exhibit A, the Company also expects to fund the Health Benefit Program through the sale of Parent Common. To facilitate this course of action and to stabilize the market for Parent Common, the Parent Class B Common held by the Supplemental Benefit Trust will not be sold for a period up to five years except under limited circumstances. If any or all of this stock could be sold freely in the market in the short term, the willingness of the market to invest in the planned offerings of Parent Common would be diminished. It is in the interests of the Class Members, however, that Parent be able to make such offerings on commercially attractive terms to enable the Company to make prefunding contributions to the Health Benefit Trust. Thus, the five-year restriction period works to the advantage of the Class Members and fosters the goals of ERISA -- to promote soundness and stability in employer-sponsored retiree benefit arrangements.

Given these considerations, but without admitting that their contentions in the *Shy* Case lack merit or any liability of any kind to Navistar, the Class Representatives and the Class Counsel have determined that it is desirable, beneficial and in the best interests of the Class that the claims of the Class be settled in the manner and on the terms set forth herein, and that these terms are fair and reasonable.

2.2     *To Navistar*.  Navistar has concluded that the further conduct of the *Shy* Case would be protracted and expensive for all parties. This Settlement Agreement will allow Navistar to avoid the expense of litigating multiple lawsuits concerning its Health Benefit and Life Insurance obligations. Navistar previously sought to reduce its retiree health benefits pursuant to a declaratory judgment action filed in the Northern District of Illinois (the "*Foster Case*"), which was dismissed by the agreement of the parties as a condition of the commencement of settlement discussions in the *Shy* Case.

Substantial amounts of time, energy and resources have been spent on and, absent this Settlement Agreement, would continue to be spent on the defense of the claims asserted by or on behalf of the Class. Although Navistar's current financial position permits it to pay its debts as they become due, Navistar's net assets are dwarfed by its potential long-term liability for Health and Life Insurance Benefits. Unless definite and swift action is taken permanently to reduce the costs of such benefits, Navistar will be threatened with insolvency. Without admitting liability of any kind to the Class, or that its defense in the *Shy* Case lacks merit, Navistar has therefore determined that it is desirable, beneficial and in the best interest of Navistar that the claims of all Class Members be settled in the manner and on the terms set forth herein, and that these terms are fair and reasonable.

3.     *No Admissions*.

3.1     Navistar continues to deny any wrongdoing or legal liability arising out of any of the claims and contentions alleged against it in the *Shy* Case. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement is, may be construed as, or may be used as, an admission by or against Navistar of any fault, wrongdoing or liability whatsoever.

3.2     The Class Representatives have claimed and continue to claim that the contentions made by or on behalf of the Class in the *Shy* Case have merit. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement

is, may be construed as, or may be used as, an admission by or against the Class or the Class Representatives, or any of them, that any of their contentions lacked merit.

3.3     There has been no determination by any court as to the factual or legal allegations made by or against Navistar in the *Shy* Case. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement is, may be construed as, or may be used as, an admission by any of the parties hereto or a waiver of any applicable statute of limitations, and neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement shall be offered or received in evidence in any action or proceeding by or against Navistar, the Class or the Class Representatives, or any of them, in any court, administrative agency or other tribunal for any purpose whatsoever other than to enforce the provisions of this Settlement Agreement or to obtain or seek approval of this Settlement Agreement in accordance with Rule 23 of the Federal Rules of Civil Procedure.

4.      *Class Action Notice Order*.

4.1     The parties shall submit this Settlement Agreement to the Court and shall seek from the Court an order (the "Notice Order"), substantially in the form of Exhibit E hereto, providing that the *Shy* Case will continue to be stayed and that notice of the hearing on the proposed settlement (the "Fairness Hearing") shall be given to the Class. Following entry of the Notice Order, the Company shall (i) mail a copy of the notice contemplated in the Notice Order to the Class, together with the documents referred to in Section 4.2, (ii) cause the notice contemplated by the Notice Order to be published in the daily newspaper of largest circulation in Springfield, Ohio, Chicago, Illinois, Indianapolis, Indiana, Fort Wayne, Indiana, Moline, Illinois, and Milwaukee, Wisconsin, and (iii) submit a proof of such mailing and publication to the Court. Until entry of the Judgment, copies of this Settlement Agreement shall also be made available for inspection by Class Members at the Court, at the UAW offices in Springfield, Ohio, Indianapolis, Indiana, Chicago, Illinois, Moline, Illinois, Dallas, Texas, Memphis, Tennessee, and Louisville, Kentucky, and at the offices of each of the other labor organization Class Representatives and Class Counsel. In addition, prior to entry of the Judgment, Class Counsel shall conduct such meetings or make such other communications as Class Counsel shall deem appropriate to inform the Class Members of the proposed terms of this Settlement Agreement, which meetings and communications will be ineffective to vary the terms hereof.

4.2     The notice sent to the Class Members shall include a cover letter substantially in the form of Exhibit F, and copies of this Settlement Agreement, definitions of certain terms used in this Settlement Agreement, the Health Benefit Program SPD (Appendix A-1), the Life Insurance Program SPD (Appendix A-2) and the Supplemental Benefit Program SPD (Appendix B-1). The Company shall send additional copies of any of such materials and/or copies of any other Exhibit or Appendix to any Class Member upon request.

5.      *Judgment to be Entered Approving the Settlement*.

After notice to the Class Members and upon approval by the Court of this Settlement Agreement, the parties will request the Court to enter the Judgment substantially in the form of Exhibit G hereto.

6.    *Releases and Related Matters*.

6.1    In consideration of Navistar's entry into this Settlement Agreement, the establishment of the Plan and the other obligations of Navistar contained herein, the Class Representatives and the Class Counsel hereby consent to the entry of the Judgment, which will be binding upon the Class pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.

6.1.1    As of the Effective Date, the Class, the Class Representatives and anyone claiming on behalf of, through or under them by way of subrogation or otherwise shall be released and discharged, and shall be forever barred and enjoined from instituting or prosecuting, either directly or indirectly, against the Navistar Released Parties or the Employers, any and all rights, claims or causes of action, whether known or unknown, suspected or unsuspected, concealed or hidden, which they had, have or hereafter may have, arising out of or based upon or otherwise related to any of the claims that were or could have been asserted in the *Shy* Case with respect to Health and Life Insurance Benefits, including all rights to continuation of such benefits under expired collective bargaining agreements, as well as any claims that this Settlement Agreement, any document referred to herein or any action taken to carry out this Settlement Agreement is not in compliance with applicable laws and regulations; provided, that nothing contained in this Settlement Agreement shall preclude the Class or the Class Representatives, or any of them, from asserting any right or claim or bringing any action to enforce the terms of this Settlement Agreement or the Judgment.

6.1.2    Each of the Navistar Released Parties, the Employers, the Class Representatives and the Class Counsel shall refrain from taking any action to challenge the compliance of this Settlement Agreement, any document referred to herein or any action taken to carry out this Settlement Agreement with applicable laws and regulations or from encouraging any other person or entity to do so.

6.1.3    As of the Effective Date, the Navistar Released Parties and the Employers shall be forever released and discharged with respect to any and all rights, claims or causes of action that the Class or anyone claiming on behalf of, through or under the Class by way of subrogation or otherwise, has, had or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to any of the claims that were or could have been asserted in the *Shy* Case with respect to Health and Life Insurance Benefits, including all rights to continuation of such benefits under expired collective bargaining agreements, as well as any claims that this Settlement Agreement, any document referred to herein or any action taken to carry out this Settlement Agreement is not in compliance with applicable laws and regulations.

6.2    Neither the entry into of this Settlement Agreement nor the consent to the Judgment is, may be construed as, or may be used as, an admission by or against the Navistar Released Parties, the Employers, the Class, the Class Representatives, or any of them, of any fault, wrongdoing or liability whatsoever.

6.3    Neither the entry into of this Settlement Agreement nor the consent to the Judgment waives or releases any right, claim or cause of action, whether known or unknown, suspected or

unsuspected, concealed or hidden, which the Class or the Class Representatives, or any of them, has, had or hereafter may have with respect to (i) any matter not related to Health and Life Insurance Benefits, including, but not limited to, rights, claims or causes of action relating to workers' compensation, pension benefits, sickness or accident programs, salary continuation or disability or pension programs maintained by the Employers or any of them or (ii) the implementation and enforcement of this Settlement Agreement or the Judgment.

7. *Initial Eligibility and Enrollment in the Plan*.

7.1    Termination of Existing Plans. The Company will, and will cause the other Employers to, terminate the coverage of the Class Members (other than Deferred Retiree Participants) for Health and Life Insurance Benefits under the Existing Plans as of the end of the day before the Effective Date, whereupon the Plan will be established as described below and in Exhibits A and B. The Company will, and will cause the other Employers to, terminate the coverage of Deferred Retiree Participants for Health and Life Insurance Benefits under the Existing Plans as of the end of the first day permitted by the applicable settlement agreements, whereupon they will be entitled to receive benefits under the Health Benefit Program and the Supplemental Benefit Program. Claims incurred prior to the Effective Date or such day will be paid under the Existing Plans as provided in Exhibit A.

7.2    Initial Eligibility. Present Retirees (other than the Deferred Retiree Participants), Present Surviving spouses and Present Eligible Dependents will be entitled to receive benefits under the Health Benefit Program on the Effective Date, subject to the applicable enrollment requirements set forth below. Present Retirees will receive benefits under the Basic Life Insurance Program without contribution or enrollment. Present Retirees will receive benefits under the Optional Life Insurance Program if they make required premium contributions and if they meet the eligibility requirements set forth in the Life Insurance Program SPD. Deferred Retiree Participants will be entitled to receive benefits under the Health Benefit Program at such time as may be permitted under the applicable Settlement Agreement. Present Eligible Former Employees and Present Non-Represented Employees shall be eligible for benefits under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of this Settlement Agreement. Class Members will receive benefits under the Health Benefit Program and the Supplemental Benefit Program subject to the payment of any required premium contributions, except that supplemental life insurance benefits may be provided to all Retirees, including those who are not Enrolled Participants.

7.2.1    Enrollment. Not less than two weeks before the Effective Date, Present Retirees (other than the Deferred Retiree Participants) and Present Surviving Spouses will be sent a letter, substantially in the form of Exhibit H (the "Health Benefit Program Letter"), a premium bill, substantially in the form of Exhibit I, and a stamped, preaddressed envelope.

7.2.2    Health Benefit Program Letter and Bill. The Health Benefit Program Letter sent to each Present Retiree (other than Deferred Retiree Participants) and Present Surviving Spouse will state that the Health Benefit Program will be effective on the beginning of the Effective Date and that payment of the enclosed bill will automatically enroll the Participants for whom coverage is elected in the Health Benefit Program and the Supplemental Benefit Program. The letter will also list the names of any Present Eligible Dependents of such Present Retiree or Present

Surviving Spouse in the Company's records, whether or not such Present Retiree, Present Surviving Spouse and such Eligible Dependents are eligible for Medicare, and the premium due. The letter will provide instructions for declining coverage and correcting the information with respect to Eligible Dependents and Medicare eligibility contained in the letter.

The letter will further explain that failure to pay will lead to termination of health benefit coverage under the Health Benefit Program and the Supplemental Benefit Program. The letter will summarize the right to re-enroll for health benefits under the Health Benefit Program and the Supplemental Benefit Program and will refer to specific pages of the Health Benefit Program SPD for further detail. The bill will provide that Present Retirees or Present Surviving Spouses who do not wish to enroll in the Health Benefit Program and the Supplemental Benefit Program may decline coverage by checking a box on the back of the bill. The back of the bill will also provide spaces for electing or declining coverage for Spouses. The letter will include a toll-free number which the Present Retirees or Present Surviving Spouses may call for assistance.

7.2.3  <u>Payments</u>.  The letter and bill will both specify that payment may be made by personal check, bank check or money order. Pension deduction will be made available at the first feasible opportunity and forms for such election will be sent at that time. Until such option is made available, Present Retirees and Present Surviving Spouses who enroll in the Health Benefit Program and the Supplemental Benefit Program will receive bills,, reminder notices and termination notices in accordance with Exhibit A, and the due dates and grace periods for payment of bills set out in Exhibit A shall apply.

7.2.4  <u>Due Dates</u>.  Payment of the applicable initial premium contribution will be due on the Effective Date. Payments received within 31 days of the due date will be considered as received as of such date. A reminder notice will be sent 14 days after the due date. A termination notice will be sent 31 days after the due date, stating that coverage is terminated, but that coverage will be reinstated without penalty as of the Effective Date if payment is received within 90 days of the Effective Date.

7.2.5  <u>Enrollment in the Optional Life Insurance Program</u>.  Each Present Retiree who meets the eligibility requirements for the Optional Life Insurance Program set forth in the Life Insurance Program SPD will receive an enrollment letter (the "<u>Optional Life Insurance Program Letter</u>") prior to the Effective Date. The Optional Life Insurance Program Letter sent to each such Present Retiree will state the amount of Company-paid life insurance benefits provided to such Present Retiree under the Existing Plans as of the day before the Effective Date and the amount of Company-paid life insurance that will be discontinued as of the Effective Date. The Optional Life Insurance Program Letter will further state that such Present Retiree will have the right, as a one-time option, to purchase optional life insurance directly from Aetna Life Insurance company in $1,000 increments up to the discontinued amount, rounding upwards if necessary. To receive such optional life insurance, such Present Retiree must enroll within 31 days of the date of the Optional Life Insurance Program Letter. An enrollment form will be included with the Optional Life Insurance Program Letter, together with a rate schedule with examples of premium cost, and a space to designate beneficiaries. Subsequent bills will be sent quarterly. Upon payment of the applicable premium for the first month, individual certificates of coverage will be sent to Present Retirees electing optional life insurance.

7.2.6    Enrollment for Class Members Not Yet Eligible for Retirement.  Present Eligible Former Employees and Present Non-Represented Employees may apply to enroll in the Health Benefit Program, the Supplemental Benefit Program and (if they meet the eligibility requirements set out in the Life Insurance Program SPD) the Optional Life Insurance Program as of the date on which they apply to receive Pension Benefits. If such Present Eligible Former Employees and Present Non-Represented Employees are eligible to enroll in the Health Benefit Program and the Supplemental Program at such time, they will receive a notice containing substantially the information set out in Section 7.2.2 and a bill for the applicable initial premium contribution, payable in accordance with Exhibit A, and they shall be enrolled in the Basic Life Insurance Program automatically at such time. Upon payment of such premium contribution, such Present Eligible Former Employees and Present Non-Represented Employees shall also be enrolled in the Health Benefit Program and the Supplemental Benefit Program. If any such person is eligible to enroll in the optional Life Insurance Program at such time, he will receive substantially the information set out in Section 7.2.5. In the event of a change in the eligibility requirements under any of the Applicable Retirement Plans, if a Present Eligible Former Employee or a Present Non-Represented Employee applies for Pension Benefits prior to the time such person is eligible to receive benefits under the Plan, the Company shall inform such person of the date on which such person shall be so eligible.

7.2.7    Enrollment for Deferred Retiree Participants.  Not less than two weeks before the date on which Deferred Retiree Participants become eligible to receive benefits under the Health Benefit Program, they will be sent a letter containing substantially the information set out in Section 7.2.2 and a bill for the applicable initial premium contribution, payable in accordance with Exhibit A. Upon payment of such premium contribution, such Deferred Retiree Participants shall be enrolled in the Health Benefit Program and the Supplemental Benefit Program.

7.3    List of Eligible Class Members.  Exhibit C sets out the names of Present Retirees, Present Surviving Spouses, Present Eligible Former Employees and Present Non-Represented Employees, all as reflected in the records of the Company. At any time prior to the Effective Date, if the Company, the Class Members or the Class Representatives, or any of them, believes that an individual has been erroneously included in or excluded from Exhibit C, the inclusion or exclusion will be brought to the attention of the other parties. If the Company, the Class Members or the Class Representatives, or any of them, does not agree to the inclusion or exclusion of any such individual in or from Exhibit C, the disagreement shall be resolved through the claims dispute procedure set forth in the Health Benefit Program SPD. After the Effective Date, an individual who believes that he or she has been erroneously excluded from Exhibit C should contact the Plan Administrator, and any dispute shall be determined pursuant to the claims dispute procedures set forth in Exhibit A. No person erroneously included in Exhibit C shall be entitled to any benefits under this Settlement Agreement or the Exhibits. No person who would otherwise be entitled to Health and Life Insurance Benefits under any existing Plan shall lose his or her eligibility for benefits under this Settlement Agreement because he or she was erroneously excluded from Exhibit C.

7.4    Erroneous Exclusion Remedy.  In the event that an individual who has been erroneously excluded from Exhibit C is later determined to be a Class Member, such individual's participation shall be recognized as of the Effective Date or such later date as such individual first

became eligible to enroll in the Health Benefit Program and the Supplemental Benefit Program or, at the option of such Class Member, the date on which he or she receives the Health Benefit Program Letter and other material described in Section 7.2.2. The Company shall send the Health Benefit Program Letter and such other material to each individual erroneously excluded from Exhibit C as promptly as practicable upon learning that such individual was so excluded, explaining such person's enrollment options and offering to permit such individual to pay premium arrearages in installments as may be agreed between the Company and such individual.

8.    *Corporate Approvals*.

Navistar shall take all actions required in connection with the execution and delivery of this Settlement Agreement and the performance of its obligations hereunder. Without limiting the generality of the foregoing, Parent shall use its best efforts to obtain any necessary stockholder approval to ensure that the Certificate of Incorporation of Parent as of the Effective Date shall be in the form of the amended and restated certificate of incorporation attached as Appendix B-3 (the "Charter Amendments").

9.    Contribution of Parent Securities

9.1    On the Effective Date, the Company shall contribute such number of shares of Parent Class B Common to the Supplemental Benefit Trust as shall ensure that the number of shares of Parent Common Equity held by the Supplemental Benefit Trust immediately following such contribution will represent 50 percent of the total shares of Parent Common Equity on a Fully Diluted Basis.

9.2    On the Effective Date, the Company shall contribute one share of Parent Series A Preference to the Supplemental Benefit Trust as described in Exhibit B.

9.3    On the Effective Date, the Company shall contribute one share of Parent Series B Preference to the UAW. This share may not be transferred, since the sole purpose of its issuance is to permit the UAW to elect the UAW Designee in accordance with Section 10.1. The following legend shall be placed on the certificate representing the Parent Series B Preference issued to the UAW:

"The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be sold or transferred except in compliance with such Act or an exemption from the registration requirements under such Act. In addition, the securities represented by this certificate are subject to voting agreements, transfer restrictions and other provisions contained in the Navistar International Corporation certificate of incorporation, and the Settlement Agreement, dated as of March 30, 1993 in the class action of *Shy et al. v. Navistar Civil* Action No. C-3-92-33 (S.D. Ohio), a copy of which is on file at the office of the Secretary of Navistar International Corporation."

Stop transfer orders will be entered with the transfer agent (or agents) and the registrar (or registrars) of such securities against the transfer of legended securities held by the UAW. Other than as provided herein, the UAW shall not give any proxies or powers of attorney or make any assignments with respect to the voting of, or enter into any voting trusts, voting agreements or similar arrangements with respect to the Parent Series B Preference.

10. *Board of Directors*.

10.1    Until the Fully Funded Date, the UAW shall be entitled to elect the UAW Designee. After the Fully Funded Date, the UAW shall be entitled, pursuant to the terms of its share of the Parent Series B Preference, to elect the UAW Designee at any time when the funding level of the Health Benefit Trust falls below 85 percent of the Fully Funded Amount. The UAW Designee shall not be entitled to any compensation from Parent for the performance of his services as such; provided, that the Company shall, at the option of the UAW (i) pay such director the value of any compensation paid to a non-employee director of Parent, (ii) contribute such amount to the ~~Supplemental Benefit Trust~~ Contributing Participants' Sub-account or (iii) pay and contribute such amount to the UAW Designee and the ~~Supplemental Benefit Trust~~ Contributing Participants' Sub-account in such proportions as the UAW shall direct in each case in a lump sum in cash within 30 days following the end of the year for which such payment or contribution is paid; and provided, further, that this Section 10.1 shall not affect the UAW Designee's right to any amount paid as or in lieu of reimbursement for expense. For the avoidance of doubt, any contribution of the Company to the Contributing Participants' Sub-account under this Section 10.1 shall not count toward any contribution or payment obligation of the Company or the Employers to the Health Benefit Trust under the Health Benefit Program or Life Insurance Program or the Health Benefit Trust Agreement.

10.2    The Supplemental Benefit Trust shall be entitled, pursuant to the terms of the Parent Series A Preference, to elect two Supplemental Trust Designees during such time as the Supplemental Benefit Trust holds 20 percent or more of the shares of Parent Common Equity then outstanding and one Supplemental Trust Designee during such time as the Supplemental Benefit Trust holds between 10 percent and 20 percent of the shares of Parent Common Equity then outstanding.

10.3    Parent shall indemnify each present or former UAW Designee and Supplemental Trust Designee for, and hold each such person harmless from and against, any and all losses, costs, liabilities, damages and expenses (including fees and disbursements of legal advisors), as incurred, which any such person may incur as a result of his or her actions or omissions as a director of Parent to the greatest extent that Parent then indemnifies or holds harmless any other director of Parent, whether pursuant to the Delaware General Corporation Law, Parent's Certificate of Incorporation, contract or otherwise. From and after the Effective Date and until the sixth anniversary of such time as no UAW Designee or Supplemental Trust Designee is entitled to serve on the Board, Parent shall cause to be maintained in effect its current policies of directors' and officers' liability insurance for the benefit of such Designees and, if such current policies cannot be maintained, Parent shall use its reasonable best efforts to obtain appropriate substitute policies of directors' and officers, liability insurance; provided, that the terms and conditions of any such policies with respect to such Designees, or any of them, shall not be less favorable to such Designees than the terms and conditions of any directors' and officers' liability insurance then maintained by Parent for any of its other directors.

10.4    The Board shall cause the number of directors constituting the Board to be increased or decreased from time to time in order to include the UAW Designee and the Supplemental Trust Designees.

10.5    The UAW Designee and the Supplemental Trust Designees will be assigned to the committees of the Board in the same manner as the current members of the Board.

11.    *Costs, Attorneys Fees and Indemnification.*

11.1    Navistar has agreed to support the award of the fees and expenses of actuarial, financial and legal advisors retained by the non-Navistar parties to the Foster Case and by the Class Representatives through the date of the Fairness Hearing up to an estimated aggregate amount not to exceed $3 million. This amount includes such fees and expenses already paid or payable pursuant to the Stay Orders. The amount of the fees and expenses of each of such advisors through the date of this Settlement Agreement shall be set out in Exhibit J.  Exhibit J shall also set out the reasonably projected additional fees and expenses of actuarial, financial and legal advisors retained by the Class Representatives. All attorneys' fees included in such amounts shall be determined on a strict hourly fee basis with no claims for premium billing. Navistar agrees to support the award of the fees and expenses described above, including such estimated projected fees and expenses. As promptly as practicable after the date hereof, Navistar and the Class Representatives shall prepare a petition jointly requesting the award of such fees and expenses, which shall be submitted to the Court for approval prior to the date of the Fairness Hearing.

11.2    Navistar further agrees to support the award of reasonable fees and expenses of actuarial, financial and legal advisors retained by the Class Representatives from the date of the Fairness Hearing until the Judgment has become Final; provided, that the amount of such fees and expenses will be determined in accordance with the principles set forth in Section 11.1.  Each party to this Settlement Agreement agrees not to seek any other future fees or expenses from any other party in connection with the *Shy* Case, except that the Class Representatives or any other party prevailing in any action to enforce the terms of this Settlement Agreement may seek any such fees and costs as may be allowed by law or as provided herein.

11.3    Parent and the Company shall indemnify the Class Representatives for, and hold them harmless from and against, any and all losses, costs, liabilities, damages and expenses (including, without limitation, fines, penalties, taxes and the fees and disbursements of actuarial, financial and legal advisors) as incurred, which they may incur (a) in connection with or arising out of the Litigation, including, without limitation, the execution, delivery, performance and enforcement of this Settlement Agreement, (b) as a result of the failure of Navistar to comply with its obligations hereunder or the failure of any representation or warranty made by Navistar to be true and complete on and as of the date on which it was made or (c) as a result of any limitation on the legality, validity, binding nature or enforceability of this Settlement Agreement as a result of the bankruptcy of Navistar or any Employer, except that Navistar's obligation to indemnify the non-Navistar parties to the *Foster Case* and the Class Representatives for the fees and expenses of actuarial, financial and legal advisors retained by them through the date on which the Judgment becomes Final shall be limited to the fees and expenses specified in Sections 11.1 and 11.2. Any claim for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

12.    *Conditions and Effective Date of Settlement.*

12.1     This Settlement Agreement shall become effective on the date on which each of the following conditions has been satisfied or waived in accordance with Section 12.2 or 12.3 (the "Effective Date").

    12.1.1      The Court entering the Notice Order and such order not being materially modified after being entered.

    12.1.2      The Court entering the Judgment and the Judgment becoming Final without being materially modified.

    12.1.3      The parties receiving the DOL Exemptions.

    12.1.4      Receipt of (a) a private ruling or rulings from the IRS or (b) a favorable reasoned opinion of Covington & Burling addressed and in form and substance satisfactory to Navistar and the Class Representatives to the effect that the Health Benefit Trust and the Supplement Benefit Trust will be organizations described in Section 501(c)(9) of the IRC, assuming that such trusts (i) are operated in accordance with Appendices A-3 and B-2 to Exhibits A and B, respectively, and (ii) satisfy the notification requirement imposed by Section 505(c) of the IRC.

    12.1.5      The receipt of (I) (a) a private letter ruling or rulings from the IRS or (b) a favorable reasoned opinion of Covington & Burling addressed and in form and substance satisfactory to Navistar and the Class Representatives to the effect that (i) the Health Benefit Trust and the Supplemental Benefit Trust will be eligible for the exclusion from the application of the account limits under Section 419A of the IRC by reason of Section 419A(f)(5)(A) of the IRC, and (ii) the income of the Health Benefit Trust and the Supplemental Benefit Trust (other than any gross income derived from any unrelated trade or business regularly carried on by the Health Benefit Trust or the Supplemental Benefit Trust) that is set aside to provide for post-retirement benefits will be exempt function income within the meaning of Section 512(a)(3)(B) of the IRC, assuming that such trusts are operated in accordance with Appendices A-3 and B-2 to Exhibits A and B, respectively, and (II) a favorable reasoned opinion of Covington & Burling addressed and in form and substance satisfactory to Navistar and the Class Representatives to the effect that the Health Benefit Trust and the Supplemental Benefit Trust will not be subject to income tax under the IRC or to the excise tax imposed by Section 4976 of the IRC, assuming that (a) such trusts are operated in accordance with Appendices A-3 and B-2 to Exhibits A and B, respectively, (b) all of the income of each of such trusts is set aside to provide for the payment of life, sick, accident, or other benefits within the meaning of section 512(a)(3)(B)(ii) of the IRC, (c) such trusts derive no gross income from any unrelated trade or business regularly carried on by such trusts computed as if the trusts were subject to Section 512(a)(1), and (d) such trusts satisfy the notification requirement imposed by Section 505(c) of the IRC.

    12.1.6      Ratification of CBAs between Navistar and the Collective Bargaining Representatives such that all Present Employees who are represented by Collective Bargaining Representatives shall, upon such Present Employees becoming Retirees, be eligible to receive benefits under the Plan (the "New CBAs").

12.1.7      All necessary actions required in connection with Navistar's execution and delivery of this Settlement Agreement and the performance of its obligations hereunder (including approval of the Charter Amendments) having been taken.

12.1.8      The Health Benefit Trust and the Supplemental Benefit Trust having been established in the form set forth in Appendices A-3 and B-2 to Exhibits A and B, respectively, or in such amended form as may be approved by the Company and the Class Representatives; provided, that no such amendment shall adversely impact the level of benefits to any Class Member.

12.1.9      The contribution of Parent Class B Common and the Parent Series A Preference to the Supplemental Benefit Trust and the Parent Series B Preference to the UAW, in each case in accordance with Section 9.

12.1.10      The size of the Board of Directors of Parent having been increased to the extent necessary to permit the election to the Board of the Supplemental Trust Designees and the UAW Designee, and the holders of the Parent Series A Preference and Parent Series B Preference having the ability forthwith to elect the Supplemental Trust Designees and the UAW Designee, respectively, to the Board.

12.1.11      The delivery of legal opinions substantially in the form of Exhibit K attached hereto.

12.1.12      The NFC Revolving Credit Agreement dated as of November 9, 1990 and the NFC Retail Note Purchase Facility dated as of August 23, 1989 having been amended on terms and conditions consistent in all material respects with the term sheet dated December 17, 1992 including with respect to the extension of the maturity of such agreements to November 15, 1995 and authorization of the payment of a special dividend by NFC to the Company in the amount of $20 million in excess of the amount of any dividends of NFC permitted under such agreements immediately prior to the effectiveness of such amendments.

12.1.13      The delivery of a notice from the office of the Secretary of State of Delaware, dated the Effective Date, of the filing of amendments to the Certificate of Incorporation of Parent or articles of merger with respect to the merger of Parent into a wholly-owned subsidiary of Parent.

12.1.14      The delivery of a certificate executed by the secretary of Parent as to the adoption and effectiveness of the certificate of incorporation of Parent.

12.1.15      The delivery of certificates of the secretaries of state of the respective states of incorporation of each of the Employers that each such party is a corporation duly organized, validly existing and in good standing in such state as of the Effective Date.

12.1.16      The delivery of a certificate executed by the secretary of each of the Employers as to the adoption and effectiveness of resolutions of the board of directors of each of such parties authorizing the appropriate officers to execute and deliver each document referred to herein required to be executed by such party and to take any and all such further actions as may be necessary or appropriate in connection with the performance of its obligations hereunder.

12.1.17    The delivery of a certificate executed by the secretary of each of the Employers as to the incumbency of each officer of such party executing any document referred to herein or taking any and all such further actions as may be necessary or appropriate in connection with the performance of its obligations hereunder.

12.1.18    The delivery of a certificate of an authorized officer of Parent to the effect that the shares of Parent Class B Common contributed to the Supplemental Benefit Trust represent 50% of the Parent Common Equity issued and outstanding on a Fully Diluted Basis immediately after giving effect to such contribution.

12.1.19    The delivery of a certificate of an authorized officer of each of the Navistar Parties to the effect that (a) the representations of such party in Section 14.2 are true and correct on and as of the Effective Date and (b) such party has performed and complied with all terms of this Settlement Agreement to be performed or complied with by it on or before the Effective Date.

12.1.20    The delivery of a waiver executed by a duly authorized officer of each Employer of its rights to seek any amendment or modification of the Plan pursuant to Section 1114 of the Bankruptcy Code or of any New CBA pursuant to Section 1113 of the Bankruptcy Code substantially in the form of Sections 15.1.1 and 15.1.2 hereto.

12.1.21    The delivery of such further information and documents as Class Counsel or the Class Representatives, or any of them, may reasonably request (a) to evidence the compliance of Navistar with its obligations under this Settlement Agreement, (b) to substantiate the representations of Navistar contained in Section 14.2 and (C) to consummate the transactions contemplated by this Settlement Agreement.

12.1.22    The establishment of the Plan, which shall occur on the first day of a calendar month.

12.2    Navistar and the Class Representatives may jointly waive any of the conditions set out in Sections 12.1.2 to 12.1.21 by means of a written instrument executed by each of such parties; provided, that Navistar and the UAW may jointly waive the condition set out in Section 12.1.6 by means of a written instrument executed by both of such parties. If any such condition is waived as provided in this Section 12.2, then such waiver shall include a waiver of any representation or warranty made in Section 14.2 which would otherwise be untrue as a result of such condition being unsatisfied.

12.3    In the event that an appeal remains pending at the conclusion of the appeal period following the entry of the Judgment, Navistar and the Class Representatives will jointly make every effort to expedite resolution of such appeal because it is their intent to implement this Settlement Agreement as expeditiously as possible. If such efforts are unsuccessful then, notwithstanding Section 12.1.2, if each of the conditions set out in Section 12.1.1 and Sections 12.1.3 through 12.1.21 have been satisfied or waived in accordance with Section 12.2, Navistar may proceed with the implementation of the Plan unless implementation of a material aspect of this Settlement Agreement is enjoined or unless counsel for either the UAW or the Company delivers an opinion that it is probable that such appeal will be successful.

13.     *Effect of Disapproval or Modification*.

In the event that the Judgment is materially modified as the result of any ruling by the Court or by the Court of Appeals (which, for purposes of clarification, do not include those agreed pursuant to that certain Letter of Intent by and among the UAW, the Supplemental Benefit Committee, and the Company (among others), dated as of October 22, 2021, or pursuant to ~~that certain~~ the Class Settlement Agreement modifying the terms of this Settlement, dated as of December 22, 2021), either of Navistar or the Class Representatives may terminate this Settlement Agreement by notice to the others within 90 days of such modification after negotiating in good faith to agree on such amendments to this Settlement Agreement as will effectuate the purposes hereof while complying with the terms of such modification; provided, that the obligations of Navistar in Sections 10.3 and 11 shall survive such termination. In the event of such termination, the positions of Navistar, the Class, the Class Representatives, or any of them, shall be deemed to have reverted to the positions of such parties as of the date and time immediately prior to the execution of this Settlement Agreement as provided under the executed Stipulations and Orders for Stay of Litigation and Certain Other Matters ("Stay Orders"), including reinstatement of the Existing Plans. As promptly as practicable following such termination, the UAW Designee and the Supplemental Trust Designees shall resign from the Board. In the event of a termination under this Section, the Company shall apply assets held in the Health Benefit Trust ~~or the Supplemental Benefit Trust~~ to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the IRC). Monies disbursed (i) by Navistar pursuant to the Stay Orders or Section 11 or (ii) which have been used to provide benefits to Participants shall not be reimbursed and, except as otherwise expressly provided herein, the parties shall thereafter proceed in all respects as if this Settlement Agreement had not been executed, without prejudice to the right of any party to assert any claims or to be reimbursed for costs and expenses incurred by it pursuant to the Stay Orders, this Settlement Agreement or any other agreement. In the event of such termination, the parties specifically agree that in the event any subsequent proceedings in the *Shy* Case are necessary, each of the parties will bear its own costs and expenses (including the fees and expenses of actuarial, financial and legal advisors), without prejudice to its right to seek reimbursement of such costs and expenses as permitted by law or pursuant to any future stay order or agreement among the parties.

14.     *Representations and Warranties*.

14.1     Class Counsel represent and warrant to Navistar that they have full power and authority to execute and deliver this Settlement Agreement on behalf of the Class Representatives and to perform their obligations hereunder.

14.2     Navistar represents and warrants to Class Counsel and the Class Representatives as of the Effective Date as follows:

(a)     The Navistar Parties and the other Employers are all corporations duly incorporated, validly existing and in good standing in the jurisdictions of their incorporation;

(b)     Navistar and the other Employers have all necessary power and authority to execute and deliver this Settlement Agreement and each document referred to herein

to be executed and delivered by them and to take any action required or appropriate to be taken by them in connection with the performance of their obligations hereunder;

(c)　　The execution and delivery of this Settlement Agreement and any document referred to herein to be executed and delivered by Navistar or any other Employer and any action required or appropriate to be taken by any of them in connection with the performance of its obligations hereunder have been duly authorized by all necessary action on the part of such party;

(d)　　This Settlement Agreement and each other document required to be executed and delivered by Navistar or any other Employer are the legal, valid and binding obligations of Navistar or such other Employer enforceable against them in accordance with their terms except to the extent such enforceability is limited by bankruptcy;

(e)　　The Class Members include all of the individuals entitled to receive Health and Life Insurance Benefits under Existing Plans, except for the Excluded Retirees. All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan (except for the Excluded Retirees) in the absence of this Settlement Agreement shall be eligible for benefits under the Plan. No person not otherwise eligible for Health and Life Insurance Benefits under an Existing Plan shall be eligible for any benefit by virtue of this Settlement Agreement.

(f)　　The execution and delivery of this Settlement Agreement and any document referred to herein and the performance of the obligations of Navistar and the other Employers hereunder will not (i) violate or conflict with the certificate of incorporation, by-laws or other constituent documents of Navistar or any other Employer, (ii) require the consent of any person, or violate or conflict with or accelerate the performance required, under any agreement to which Navistar or any other Employer is a party or by which it is bound, (iii) violate or conflict with any statute, rule or regulation applicable to Navistar or any other Employer or by which any of such parties is bound, (iv) require the authorization or approval of, any other action by, or any notice to or filing with, any governmental authority in connection with Navistar's execution and delivery of this Settlement Agreement or the performance of the obligations of Navistar or any other Employer hereunder, other than the authorizations, approvals, notices and filings referred to in Section 12.1, (v) violate or conflict with any order, ruling, decree, judgment or award of any court, arbitrator or government agency applicable to Navistar or any other Employer or (vi) result in the creation of any lien, claim, security interest, encumbrance, charge, restriction or right of any kind whatsoever of any third party upon any of the properties or assets of Navistar or any other Employer;

(g)　　Upon their issuance in accordance with the terms of this Settlement Agreement, the shares of Parent Class B Common, Parent Series A Preference and Parent Series B Preference to be issued by Parent will be duly and validly authorized, issued and outstanding, fully paid and non-assessable;

(h)　　Immediately following their issuance in accordance with the terms of this Settlement Agreement, the shares of Parent Class B Common to be issued by Parent will

represent 50 percent of the shares of Parent Common Equity issued and outstanding on a Fully Diluted Basis;

(i)    Upon the issuance of the shares of Parent Class B Common, Parent Series A Preference and Parent Series B Preference to be issued by the Parent in accordance with the terms of this Settlement Agreement, the Supplemental Benefit Trust and the UAW will acquire valid title to, and full rights of ownership of, the shares issued to them, free and clear of any and all liens, claims, security interests, encumbrances, charges, restrictions or rights of third parties of any kind (other than restrictions set out in Exhibit B or under the Securities Act); and

(j)    Except as specifically set forth herein, the execution, delivery and performance of this Settlement Agreement shall not result in the creation of any rights in, or in any payments to, any employee, officer or director of any of the Navistar Parties and shall not constitute a change in control or similar event under any plan, program, arrangement or agreement with, or benefitting, any such employee, officer or director.

14.3    Counsel to Navistar represent and warrant to the Class Representatives that they have full power and authority to execute and deliver this Settlement Agreement on behalf of Navistar.

15.    *Miscellaneous Provisions*.

15.1.    Waiver of Sections 1113 and 1114.

15.1.1    In consideration of the agreements of the Class Representatives in this Settlement Agreement, Navistar hereby waives, and shall cause each of the other Employers to waive, its rights to seek any amendment or modification of the Plan pursuant to Section 1114 of the Bankruptcy Code. In the event that the waiver set forth in the preceding sentence is held to be unenforceable and any court of competent jurisdiction should approve any such amendment or modification, then Navistar will be obligated to take, and to cause such other Employers to take, such remedial actions as the Class Representatives may deem appropriate in order to place the Participants in substantially the same position as they would have been in had the waiver been held valid.

15.1.2    In consideration of the agreements of the Class Representatives in this Settlement Agreement, Navistar hereby waives, and shall cause each of the other Employers to waive, its rights to seek amendment or modification of the New CBAs pursuant to Section 1113 of the Bankruptcy Code. In the event that the waiver set forth in the preceding sentence is found to be unenforceable and a court of competent jurisdiction should approve any such amendment or modification, then Navistar will be obligated to take such remedial actions as the Class Representatives may deem appropriate in order to place the Employees covered by the New CBAs in substantially the same position as they would have been in had the waiver been held valid.

15.2    The Exhibits hereto are incorporated in this Settlement Agreement as though fully set forth herein. References in this Settlement Agreement to "Sections" and "Exhibits" refer to the Sections and Exhibits of this Settlement Agreement unless otherwise specified.

15.3    The waiver by one party of (a) any breach by the other party of, or (b) any other right to enforce or claim or benefit under, this Settlement Agreement shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, this Settlement Agreement.

15.4    This Court will retain exclusive jurisdiction to resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of this Settlement Agreement, except for disputes relating solely to eligibility or entitlement to benefits hereunder. Each of the parties hereto expressly and irrevocably submits to the jurisdiction of the Court in connection with any proceedings in connection with the enforcement, interpretation or implementation of this Settlement Agreement, except for disputes relating solely to eligibility or entitlement to benefits hereunder, and expressly waives any argument it may have with respect to venue or forum non conveniens.

15.5    This Settlement Agreement constitutes the entire agreement between the parties, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than the representations, warranties and covenants contained and memorialized in this Settlement Agreement.  This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, which are related to the subject matter hereof.

15.6    The captions used in this Settlement Agreement are for convenience of reference only and do not constitute a part of this Settlement Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Settlement Agreement, and all provisions of this Settlement Agreement will be enforced and construed as if no captions had been used in this Settlement Agreement.

15.7    The Class Representatives expressly authorize Class Counsel to take all appropriate action required or permitted to be taken by the Class Representatives pursuant to this Settlement Agreement to effectuate its terms and also expressly authorize Class Counsel to enter into any non-material modifications or amendments to this Settlement Agreement on behalf of them that Class Counsel deems appropriate from the date this Settlement Agreement is signed until the Effective Date; provided, that the effectiveness of any amendment which adversely impacts the level of Plan benefits to any Class Member as well as any material amendment shall be subject to the approval of the Court after appropriate notice to the Class Members.

15.8    This Settlement Agreement may be executed in two or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument, provided that counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

15.9    No party to this Settlement Agreement may assign any of its rights hereunder without the prior written consent of the other parties, and any purported assignment in violation of this sentence shall be void. Any party to this Settlement Agreement may delegate any of its obligations under this Settlement Agreement; provided, that no such delegation shall relieve such party of such obligation; and provided, further, that the delegation of any of the obligations of Navistar under this Settlement Agreement to the transferee of all or any part of the assets of any Employer shall be subject to the express written assumption of such obligations by such transferee.

15.10   By executing and supporting this Settlement Agreement, and by agreeing to its provisions regarding the role of the Class Representatives in corporate governance, administration of the Plan, claims dispute resolution, and other matters, the Class Representatives are not undertaking any legal duty or standard of care with respect to such future activities except as otherwise may be required by law. In all instances where individual Class Members have the right to initiate claims review or arbitration proceedings, no failure of the Class Representatives to participate in such proceedings shall bar or prejudice any such Class Members.

15.11   Each of Navistar, the Class Representatives and the Class Counsel shall do any and all acts and things, and shall execute and deliver any and all documents, as may be necessary or appropriate to effect the purposes of this Settlement Agreement.

15.12   This Settlement Agreement shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or preempted thereby, with the laws of the State of Illinois.

15.13   Any notice, request, information or other document to be given under this Settlement Agreement to any of the parties by any other party shall be in writing or delivered personally, or sent by Federal Express or other carrier which guarantees next-day delivery, transmitted by facsimile, or sent by registered or certified mail, postage prepaid, as follows:

If to the Class Representatives
or Class Counsel, addressed to Class
Counsel at the addresses indicated on the
signature pages of this Settlement
Agreement

If to Navistar, addressed to:

Navistar, Inc.  International Transportation Corp.
Benefits Department
2701 Navistar Drive 455 North Cityfront Plaza Drive
ChicagoLisle, Illinois  6061160532

in each case with copies to:

General Counsel
Navistar, Inc. International Transportation Corp.
455 North Cityfront Plaza Drive2701 Navistar Drive
ChicagoLisle, Illinois  6061160532

and

Emily NicklinJohn C. Goodchild, III, Esq.
Kirkland & EllisMorgan, Lewis & Bockius LLP
200 East Randolph Drive1701 Market Street
Chicago, Illinois  60601Philadelphia, Pennsylvania 19103-2921

IN WITNESS WHEREOF, the parties hereto have caused this Settlement Agreement to be executed by themselves or their duly authorized attorneys.

/s/ David S. Cupps_____, Trial Attorney
David S. Cupps                    (0017002)
Anne C. Griffin                   (0017571)
VORYS, SATER, SEYMOUR & PEASE
52 East Gay Street
P.O. Box 1008
Columbus, Ohio  43216-1008
(614) 464-6319

/s/ Emily Nicklin_____
Emily Nicklin
Ruben Castillo
KIRKLAND & ELLIS
200 E. Randolph Drive
Chicago, Illinois  60601
(312) 861-2000

Attorneys for Defendants Navistar International
Corporation, Navistar International Transportation Corp.,
Navistar Financial Corporation, Harco National Insurance
Company, the Navistar International Transportation Corp.
Health Plan and the Indianapolis Casting Corporation

/s/ Daniel W. Sherrick_____
Daniel W. Sherrick
Associate General Counsel
International Union, United Automobile, Aerospace
and Agricultural Implement Workers of America, UAW
8000 East Jefferson
Detroit, Michigan  48214
(313) 926-5216

Counsel for Plaintiffs International Union,
United Automobile, Aerospace, and Agricultural
Implement Workers of America, and its Local
Unions 6, 66, 98, 119, 226, 305, 402, 472,
658, 2274 and 2293

/s/ Betty Grdina_____, Trial Attorney
Betty Grdina                      (0014602)
BOBULSKY, GRDINA & ALTIER
2036 East Prospect Road
Ashtabula, Ohio  44004
(216) 998-4214

Counsel for Plaintiffs Art Shy,
Fred Burris, Clarence Nuss, John Herring,
Henry G. Betley and Richard A. Spitler

/s/ Gerald B. Lackey _____, Trial Attorney
Gerald B. Lackey                    (0017244)
LACKEY, NUSBAUM, HARRIS, RENY & TORZEWSKI
Two Maritime Plaza, 3rd Floor
Toledo, Ohio  46304
(419) 243-1105

Counsel for Plaintiffs Carl Potts and
Harold Retherford

/s/ Barry Macey _____
Barry Macey
MACEY, MACEY & SWANSON
445 North Pennsylvania Street
Suite 401
Indianapolis, Indiana  46204
(317) 637-2345

Counsel for Plaintiffs Jack O'Neal &
    Donald McPhearson

/s/ Gordon A. Gregory _____
Gordon A. Gregory
GREGORY, MOORE, JAEKLE, HEINEN
    ELLISON & BROOKS
3727 Cadillac Tower
Detroit, Michigan  48226
(313) 964-5600

Counsel for Plaintiffs International Union,
United Plant Guard Workers of America, and its Local
Unions 122, 4 and 134

/s/ Mark Schneider _____
Mark Schneider
Associate General Counsel
International Association of Machinists
900 Machinists Place
Upper Marlboro, Maryland  20772
(301) 967-4500

Counsel for International Association
of Machinists, its District Lodge 28,
and its Local Lodges 1471, 2819, and 2821

/s/ Bruce O. Boxberger _____
Bruce O. Boxberger
Arthur E. Mandelbaum

MILLER, CARSON & BOXBERGER
1400 One Summit Square
Fort Wayne, Indiana 46802
(219) 423-9411

Counsel for Society of Engineering
Employees, Inc.

/s/ David Gore
David Gore
KLEIMAN, WHITNEY, WOLFE & GORE
One East Wacker Drive
Suite 1910
Chicago, Illinois 60601
(312) 467-4380

Counsel for International Union,
United Steelworkers of America, and its Local 4320
and USWA, Local 4320

/s/ Frederick G. Cloppert, Jr. , Trial Attorney
Frederick G. Cloppert, Jr.        (0010371)
Michael J. Hunter                 (0018756)
CLOPPERT, PORTMAN, SAUTER, LATANICK & FOLEY
225 East Broad Street
Columbus, Ohio 43215
(614) 461-4455

Local Counsel for all Unions and
Individual Plaintiffs listed above

/s/ Ian D. Lanoff
Ian D. Lanoff
Julia Penny Clark
BREDHOFF & KAISER
1000 Connecticut Ave., N.W.
Suite 1300
Washington, D.C. 20036
(202) 833-9340

Additional Counsel for all Unions and
Individuals listed above

**EXHIBIT A**

**THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**
**RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN**

TABLE OF CONTENTS

ARTICLE I          Introduction ...................................................................................1

    1.1    Definitions.................................................................................................1
    1.2    Purpose of the Plan ...................................................................................1
    1.3    Health Benefit Program, Life Insurance Program, Supplemental Benefit
           Program....................................................................................................1
    1.4    Trust Funds................................................................................................2
    1.5    Administration, Plan Year .........................................................................2
    1.6    Amendments ..............................................................................................3
    1.7    Termination of Existing Health and Life Insurance Benefits .....................3

ARTICLE II         Plan Participants ............................................................................3

    2.1    Eligibility ..................................................................................................3
    2.2    Enrollment..................................................................................................4
    2.3    Termination of Coverage Under the Health Benefit Program. ...................5
    2.4    Re-Enrollment............................................................................................6

ARTICLE III        Contributions to the Health Benefit Program .................................6

    3.1    Determinations by the Actuary. .................................................................6
    3.2    Contributing Participants' Annual Contributions .......................................7
    3.3    Employers' Annual Contribution..............................................................10
    3.4    Transfers of Funds between Sub-accounts ...............................................10
    3.5    Transfers from the Supplemental Benefit Trust to the Health Benefit Trust ..... 11
    3.6    Employers' Prefunding Contributions. ..................................................... 11
    3.7    Payment of Benefits. ............................................................................... 12
    3.8    State or National Health Insurance Programs ..........................................
    3.9    Guarantee of Health Benefit Program ......................................................15

ARTICLE IV        Contributions to Life Insurance Program ......................................16

    4.1    Employer Contributions............................................................................16
    4.2    Optional Life Insurance ...........................................................................16
    4.3    Guarantee of Life Insurance Program .......................................................17

ARTICLE V         Administration of the Health Benefit Program and the Life Insurance
                   Program ........................................................................................18

ARTICLE VI        Health Benefit Program Committee...............................................19

    6.1    Health Benefit Program Committee ..........................................................19
    6.2    Committee Powers ...................................................................................19

6.3     Program Design ................................................................................................21
6.4     Action by Health Benefit Program Committee.................................................21
6.5     Health Benefit Program Committee Minutes ...................................................22
6.6     HBPC Other Member .......................................................................................22
6.7     Expenses ...........................................................................................................23
6.8     Dispute Resolution............................................................................................23

ARTICLE VII General Provisions...................................................................................24

7.1     Required Data ...................................................................................................24
7.2     Non-Alienation .................................................................................................24
7.3     Action by Employers ........................................................................................24
7.4     Applicable Law .................................................................................................24
7.5     Limitation of Liability; Indemnification ..........................................................24
7.6     Limitation on Liens as Security for Employers' Contributions.........................25
7.7     Limitations on Sale and Lease-Back Transactions ...........................................27
7.8     Subrogation .......................................................................................................28
7.9     Assignment and Delegations.............................................................................28
7.10    Captions ............................................................................................................29

ARTICLE VIII Amendment and Termination .................................................................29

8.1     Amendment .......................................................................................................29
8.2     Termination........................................................................................................29

ARTICLE IX Exclusive Benefit and Prohibited Inurement ...........................................30

9.1     Exclusive Benefit .............................................................................................30
9.2     Prohibited Inurement ........................................................................................30

ARTICLE X Events of Default........................................................................................30

APPENDICES

Appendix A-1 Health Benefit Program SPD

Appendix A-2 Life Insurance Program SPD

Appendix A-3 Health Benefit Trust Agreement

Appendix A-4 Present Represented Employees

Appendix A-5 Initial Actuarial Report

Appendix A-6 Actuarial Definitions Supplement

Appendix A-7 HBPC Committee Members

- ii -

**NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**

**RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN**

ARTICLE I

Introduction

      1.1    Definitions.  Capitalized terms used and not defined herein have the meanings assigned to them in Exhibit D to the Settlement Agreement.

      1.2    Purpose of the Plan.  The Plan shall be established by the Employers effective as of the Effective Date. The purpose of the Plan is (i) to provide Enrolled Participants with the health insurance benefits described herein, (ii) to provide all Retirees, whether or not they are Enrolled Participants, with the life insurance benefits described here, and (iii) to provide Enrolled Participants and all Retirees with the additional benefits described in Exhibit B to the Settlement Agreement. Enrolled Participants who are (i) Retirees and Surviving Spouses will be eligible to receive such health insurance and additional benefits for the duration of their lives and (ii) Eligible Dependents will be eligible to receive such health insurance and additional benefits for so long as they remain Eligible Dependents. Basic life insurance benefits shall be provided to Retirees for the duration of their lives.

      1.3    Health Benefit Program. Life Insurance Program. Supplemental Benefit Program. The Plan ("Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan") consists of the Health Benefit Program ("Navistar International Transportation Corp. Retiree Health Benefit Program"), the Life Insurance Program ("Navistar International Transportation Corp. Retiree Life Insurance Program") and the Supplemental Benefit Program ("Navistar International Transportation Corp. Retiree Supplemental Benefit Program").

      (a)    The Health Benefit Program provides for the health benefits described in the SPD attached as Appendix A-1 hereto. Such SPD also describes the preferred provider organization and coordinated care features of the Health Benefit Program and the HMO alternatives to the Health Benefit Program. The Plan Administrator will make arrangements for Contributing Participants to be afforded the option to subscribe to HMO alternatives as required by law or as determined by the UAW/Navistar Joint Committee, in lieu of receiving the benefits under the Health Benefit Program described in Appendix A-1. Contributing Participants who are Retirees or Surviving Spouses will be given the opportunity not less than once each year to elect to change their enrollment (and that of their Eligible Dependents) from the Health Benefit Program to such HMO alternatives or from such HMO alternatives to the Health Benefit Program. If such a Retiree or Surviving Spouse elects an HMO alternative, the Actuary shall determine the per capita cost of benefits under the Health Benefit Program for such Contributing Participant, and the excess of the premium contribution payable to the HMO for such Contributing Participant over such amount shall be added to the required contributions of such Contributing Participant under the Health Benefit Program. Promptly after receiving notice from a Contributing Participant who has elected to enroll in an HMO alternative that he or she has moved out of an area where such HMO

alternative is offered, the Plan Administrator shall notify such Contributing Participant of the premium contribution required to be made to the Health Benefit Trust to receive coverage under the Health Benefit Program. Such Contributing Participant will be transferred to coverage under the Health Benefit Program as of the first day of the calendar month following the month for which premium payments are last made to the HMO on behalf of the Contributing Participant.

(b)     The Life Insurance Program provides Retirees with the life insurance benefits described in the SPD attached as Appendix A-2 hereto.

(c)     The Supplemental Benefit Program provides for the reduction or reimbursement of premiums, co-payments, deductibles and other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program or to participate in Medicare or any part thereof, or any successor or comparable program thereto, and for the provision of Additional Permissible Benefits to Enrolled Participants and Retirees whether or not they are Enrolled Participants, as set forth in Exhibit B to the Settlement Agreement.

1.4    <u>Trust Funds.</u>  The Health Benefit Program and the Life Insurance Program shall be implemented by the Health Benefit Trust. The Supplemental Benefit Program shall be implemented by the Supplemental Benefit Trust. The Health Benefit Trust and the Supplemental Benefit Trust are intended to meet the requirements of tax exempt organizations under Section 501(c)(9) of the IRC, or under any comparable section or sections of any future legislation that amends, supplements or supersedes said section.

1.5    <u>Administration. Plan Year.</u>  The Plan is administered for plan reporting purposes on the basis of the Plan Year, although the determinations to be made by the Actuary hereunder are made on the basis of the calendar year or the Measurement Year. The Health Benefit Program and the Life Insurance Program are administered by the Company as the Plan Administrator and Named Fiduciary in accordance with Article V, subject to the review authority of the Health Benefit Program Committee provided in Article VI.

1.6    <u>Amendments</u>.  The benefits provided under the Plan may be amended only to the limited extent provided in Section 8.1.

1.7    <u>Termination of Existing Health and Life Insurance Benefits</u>. The Company will, and will cause the other Employers to, terminate coverage for Health and Life Insurance Benefits under Existing Plans (other than for Excluded Retirees and Deferred Retiree Participants) as of the end of the day immediately before the Effective Date. The Company will, and will cause the other Employers to, terminate the coverage of Deferred Retiree Participants for Health and Life Insurance Benefits under the Existing Plans as of the end of the first day permitted by the applicable settlement agreements, whereupon they will be eligible to receive benefits under the Health Benefit Program and the Supplemental Benefit Program. Claims incurred prior to the Effective Date or such day will be paid under the Existing Plans in accordance with the terms thereof. Claims for hospital stays which commenced and pregnancies which occurred prior to the Effective Date will be paid as described in the Health Benefit Program SPD.

## ARTICLE II

### Plan Participants

2.1 <u>Eligibility.</u> The following shall apply with respect to eligibility:

(a) Each Present Employee, Present Eligible Former Employee, Present Retiree, Present Eligible Dependent and Present Surviving Spouse shall be a Participant in the Plan as of the Effective Date;

(b) Present Retirees (other than Deferred Retiree Participants), Present Surviving Spouses and Present Eligible Dependents will be entitled to receive benefits under the Health Benefit Program on the Effective Date, subject to the applicable enrollment requirements set forth below. Present Retirees will receive benefits under the Basic Life Insurance Program without contribution or enrollment. Present Retirees will receive benefits under the Optional Life Insurance Program if they make required premium contributions and if they meet the eligibility requirements set forth in the Life Insurance Program SPD. Deferred Retiree Participants will be entitled to receive benefits under the Health Benefit Program at such time as may be permitted under the applicable settlement agreement. Present Eligible Employees and Present Non-Represented Employees shall be eligible for benefits under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement;

(c) Present Represented Employees shall be eligible for benefits under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement;

(d) Exhibit C is intended to list all President Non-Represented Employees, Present Eligible Former Employees, Present Retirees and Present Surviving Spouses, as reflected in the records of the Company. Appendix A-4 is intended to list all Present Represented Employees, as reflected in the records of the Company. The Company shall correct each error in Exhibit C and Appendix A-4 (including each omission therefrom) as it becomes known. All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan in the absence of the Settlement Agreement (other than Excluded Retirees) shall be eligible for benefits under the Plan. No person erroneously listed on Exhibit C or Appendix A-4 shall be entitled to any benefits hereunder. Any disputes concerning eligibility to participate in the Plan shall be resolved through the claims dispute procedure set forth in Appendix A-1.

2.2 <u>Enrollment.</u> Participants may enroll in the Health Benefit Program and the Supplemental Benefit Program as follows:

(a) Each Present Retiree, Present Surviving Spouse, Present Eligible Former Employee and Present Non-Represented Employee may enroll in the Health Benefit Program and the Supplemental Benefit Program for themselves and for their Eligible Dependents as provided in the Settlement Agreement;

(b) Each Present Represented Employee may apply to enroll in the Health Benefit Program, the Supplemental Benefit Program and (if they meet the eligibility requirements set out in the Life Insurance Program SPD) the Optional Life Insurance Program as of the date on which they apply to receive Pension Benefits. If such Present Represented Employees are eligible

to enroll in the Health Benefit program and the Supplemental Program at such time, they will receive a notice and a bill for the applicable initial premium contribution, in accordance with the reasonable enrollment procedures adopted by the Plan Administrator from time to time, and they shall be enrolled in the Basic Life Insurance Program automatically at such time. Upon payment of such premium contribution, such Presented Represented Employee shall also be enrolled in the Health Benefit Program and the Supplemental Benefit Program. If any such person is eligible to enroll in the Optional Life Insurance Program at such time, he will receive information in accordance with the reasonable enrollment procedures adopted by the Plan Administrator from time to time. In the event of a change in the eligibility requirements under any of the Applicable Retirement Plans, if a Present Represented Employee applies for Pension Benefits prior to the time such person is eligible to receive benefits under the Plan, the Plan Administrator shall inform such person of the date on which such person shall be so eligible; and

(c)    Each Future Surviving Spouse not otherwise enrolled at the death of his or her wife or husband shall become eligible to enroll in the Health Benefit Program and the Supplemental Benefit Program for himself or herself and any other Eligible Dependents at that time.

The Plan Administrator shall notify each person described in subparagraphs (b) and (c) of their eligibility to enroll in the Plan without any pre-existing condition limitation or health screening requirement. Notices of the monthly contributions required to be made to the Health Benefit Program by or on behalf of Enrolled Participants shall be sent each month to all Contributing Participants and to all Participants who become eligible to become Contributing Participants as provided in Appendix A-1. Such contributions shall be due on the first day of that month. The Plan Administrator shall establish reasonable procedures for enrollment and payment of required contributions, including procedures for the payment of such contributions by voluntary deductions from pension payments under pension plans of the Employers. Present Employees shall be enrolled in the Basic Life Insurance Program for the duration of their lives automatically as of the dates they would have become eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement, irrespective of whether they become or continue as Enrolled Participants in the Health Benefit Program and the Supplemental Benefit Program

2.3    Termination of Coverage Under the Health Benefit Program. An Enrolled Participant shall continue as an Enrolled Participant in the Health Benefit Program and the Supplemental Benefit Program only during the periods for which required contributions have been made to the Health Benefit Program by or on behalf of that Enrolled Participant in accordance with Article III. Following the enrollment of each Contributing Participant as described above, a bill will be sent to such Contributing Participant approximately three weeks prior to the first day of each month. A reminder notice shall be sent approximately two weeks after the first day of each month to each Contributing Participant for whom the required contribution for that month had not yet been received. If such contribution still has not been received, a termination notice will be sent at the end of the month to each Contributing Participant for whom the required contribution for that month has not yet been received, stating that coverage will be reinstated without penalty if such contribution is received within 45 days of the original due date. If a contribution required to be made by or on behalf of an Enrolled Participant to enroll or to continue as an Enrolled Participant for any month is not received within 45 days of the first day of such month, such Enrolled Participant's participation in the Health Benefit Program and the Supplemental Benefit Program shall cease

as of the first day of the calendar month for which the contribution was not made, except that Retirees who are not Enrolled Participants may continue to receive life insurance benefits under the Life Insurance Program. Except for required contributions so received during the 45 days following the due date therefor, premium contributions may not be paid retroactively. Notwithstanding any other provisions hereof, the participation of an Eligible Dependent in the Health Benefit Program and the Supplemental Benefit Program shall cease when such person ceases to be an Eligible Dependent. If the participation of an Enrolled Participant in the Health Benefit Program and the Supplemental Benefit Program ceases for any reason, benefits will be paid for claims incurred prior to the date on which his or her participation ceases.

2.4     Re-Enrollment.          Re-Enrollments (including enrollments for those who decline to participate when first eligible) in the Health Benefit Program and the Supplemental Benefit Program are permitted as provided in Appendix A-1, subject to certain pre-existing condition and other limitations. Except as provided in Appendix A-1, no Retiree, Eligible Dependent or Surviving Spouse who is not enrolled when eligible or who ceases enrollment shall be eligible to re-enroll in the Health Benefit Program.

## ARTICLE III

## Contributions to the Health Benefit Program

3.1     Determinations by the Actuary. The Actuary shall make the determinations required to be made by it pursuant to the Health Benefit Program on behalf of the Plan Administrator in the Plan Administrator's capacity as a fiduciary hereunder. Such determinations include determining annually the Retiree Cost Sharing Ratio, the Contributing Participants' Annual Contributions, the Total Estimated Annual Cost of the Health Benefit Program and such other liability and expense calculations as may be required under the Health Benefit Program or by the Health Benefit Program Committee in the exercise of its powers, rights and duties hereunder. The Actuary will furnish these determinations and such additional information as may be necessary or appropriate, including but not limited to workpapers and computer readable spreadsheets, to verify the accuracy thereof to the Company, the Health Benefit Program Committee and the Supplemental Benefit Committee as promptly as practicable, but not later than September 1 of each year for the following calendar year. The Actuary will be available to answer reasonable questions from the Health Benefit Program Committee and the Supplemental Benefit Committee and their designees at no cost to the Health Benefit Trust or the Supplement Benefit Trust. The Health Benefit Program Committee may choose to review or reproduce such determinations and information itself or hire another actuary to review or reproduce all or part of such determinations and information. The initial determinations of the Actuary are detailed in the initial actuarial report attached hereto as Appendix A-5. All determinations by the Actuary hereunder are subject to the dispute resolution provisions of Section 6.8.

3.2     Contributing Participants' Annual Contributions. The Employers and the Contributing Participants shall share the total cost of the Health Benefit Program. All definitions and mathematical formulas relating to the calculation of Contributing Participants' Annual Contributions for a given calendar year are set out in Appendix A-6. The Actuary will determine the Contributing Participants' Annual Contribution for each year. The Contributing Participants' Annual Contribution for a given calendar year ("calendar year (x)") shall be the Scheduled Contributions for calendar year (x) adjusted for the following:

(a)     <u>Adjustment 1</u> (T1) - The Contributing Participants' Annual Contribution for calendar year (x) shall be increased by (T1) if the Total Actual Medical Cost for Measurement Year (x-1) exceeds the Total Expected Medical Dollars for Measurement Year (x-1). T1 will equal the lesser of Total Maximum Corridor Medical Dollars for Measurement Year (x-1) or Total Actual Medical Cost for Measurement Year (x-1), reduced by Total Expected Medical Dollars for Measurement Year (x-1).

(b)     <u>Adjustment 2</u> (T2). The Contributing Participants' Annual Contribution for calendar year (x) shall be adjusted by (T2) if the Total Actual Medical Cost for Measurement Year (x-1) is less than Total Expected Medical Dollars for Measurement Year (x-1) or if the Total Actual Medical Cost for Measurement Year (x-1) is greater than the Total Maximum Corridor Medical Dollars for Measurement Year (x-1). T2 equals (i) the Retiree Adjustment Ratio for Measurement Year (x-1), multiplied by (ii) the Total Actual Medical Cost for Measurement Year (x-1) reduced by the sum of the Total Expected Medical Dollars for Measurement Year (x-1) and T1. T2 can be positive or negative, resulting in an increase or decrease in the Contributing. Participants' Annual Contribution.

(c)     <u>Adjustment 3</u> (T3) - The Contributing Participants' Annual Contribution for calendar year (x) shall be adjusted by (T3) if the Total Actual Drug Cost for Measurement Year (x-I) is greater or less than Total Expected Drug Dollars for Measurement Year (x-1). T3 equals (i) the Total Actual Drug Cost for Measurement Year (x-1) reduced by Total Expected Drug Dollars for Measurement Year (x-1), multiplied by (ii) the Retiree Adjustment Ratio for Measurement Year (x-1). T3 can be positive or negative resulting in an increase or decrease in contributions.

(d)     <u>Adjustment 4</u> (DRP) - The Contributing Participants' Annual Contribution for calendar year (x) shall be decreased by (DRP) to account for savings due to the failure of Participants who are or became eligible to enroll in the Health Benefit Program to do so. For calendar year 1994, DRP will equal the Expected Company Costs Per Capita for Measurement Year 1994 times the number of Immediate Drop Outs During the First 45 Days.

For calendar year 1995, DRP will equal the sum of (i) Expected Company Costs Per Capita for Measurement Year 1994 multiplied by the number of Immediate Drop Outs During the Second 45 Days, (ii) the number of Cumulative Drop Outs at the beginning of Measurement Year 1995 reduced by the number of Immediate Drop Outs, multiplied by 50 percent of Expetted Company Costs Per Capita for Measurement Year 1994, and (iii) the number of Cumulative Drop Outs at the beginning of Measurement Year 1995 multiplied by the Expected Company Costs Per Capita for Measurement Year 1995.

For calendar years after 1995, DRP will equal the Expected Company Costs Per Capita for Measurement Year (x) multiplied by the number of Cumulative Drop Outs at the beginning of that Measurement Year.

In all years, DRP will be calculated for each of the eight age groupings shown in Tables I and II of Appendix A-6 and the eight calculations will be totaled.

(e)     <u>Adjustment 5</u> (DEF) - The Contributing Participants' Annual Contribution for calendar year (x) shall be decreased by (DEF) to account for savings due to potential Retirees who elect to defer their retirements beyond the dates assumed in the initial retirement rate assumptions. DEF equals (i) the Expected Number of Retirees and Spouses at the beginning of Measurement Year (x) reduced by the Actual Number of Retirees and Spouses at the beginning of Measurement Year (x), multiplied by (ii) the Expected Company Costs Per Capita for Measurement Year (x). The DEF calculation will be performed for each of the eight age groupings shown in Table IV of Appendix A-6 and multiplied by the Retiree Adjustment Ratio for such calendar year for any age group in which the Actual Number of Retirees and Spouses for Measurement Year (x) is greater than the Expected Number of Retirees and Spouses for Measurement Year (x). DEF will equal the sum of the above calculation for each of the eight age groupings.

(f)     <u>Adjustment 6</u> (I) - The Contributing Participants' Annual Contributions for calendar year (x) shall be adjusted by (I) for any interest accrued on (i) late payments from the Supplemental Benefit Trust to reduce or reimburse premiums, co-payments, deductibles and costs or to provide Additional Permissible Benefits, (ii) advances from the Employers' Sub-account to the Contributing Participants' Sub-account during Measurement Year (x-1), (iii) general interest accrued in the Contributing Participants' Sub-account during Measurement Year (x-1), and (iv) interest accrued on adjustments to the Contributing Participants' Annual Contributions for T1, T2, T3, DRP and DEF.

Interest accrued due to late payments from the Supplemental Benefit Program will be calculated monthly and will be the average daily late payment during such month times the number of days late divided by 365 times the Navistar Adjustment Rate at the end of the prior Measurement Year.

The interest adjustment will include the net result of any interest accrued on the Employers' funding any Contributing Participants' contribution shortfalls as described in section 3.7. Interest accrued for advances from the Employer Sub-account to the Contributing Participants' Sub-account will be calculated monthly and be the average daily advance times the number of days advanced divided by 365 times the Navistar Rate at the end of the prior Measurement Year.

Interest will be credited on excess Contributing Participants' contributions as described in Section 3.7. Interest will be calculated monthly and be the greater of (i) the actual earnings on the Contributing Participants' Sub-account, and (ii) the average daily balance for such month of the Contributing Participants' Sub-account multiplied by the average for such month of the 90-day LIBOR rates during such month.

Interest will be adjusted for delays in the recognition of T1, T2, T3, DRP and DEF. The adjustment to the Contributing Participants' Annual Contributions for calendar year 1994 will be calculated as the negative of the DRP adjustment times the Navistar Rate at the beginning of Measurement Year 1994 times seven divided by 12. The calendar year 1995 adjustment to the Contributing Participants' Annual Contributions will be calculated as (i) the Navistar Rate at the beginning of Measurement Year 1995, multiplied by (ii) the sum of T1, T2 and T3, times 19, divided by 12, reduced by the sum of (A) DEF

times eight, divided by 12, (B) DRP component (i) times 19 divided by 12, (C) DRP component (ii) times 16.5 divided by 12, and (D) DRP component (iii) times eight divided by 12. The adjustment to the Contributing Participants' Annual Contributions for all years after 1995 will be calculated as (i) the Navistar Rate at the beginning of the Measurement Year, multiplied by (ii) the result of (A) the sum of T1, T2 and T3, times 20, divided by 12, reduced by (B) the sum of DEF and DRP times eight, divided by 12.

The net amount of the aggregate increases or decreases required by Adjustments 1 through 6 above shall be determined and shall be used to determine the uniform percentage adjustment to the Monthly Base Contributions for the year. Each year the Monthly Base Contribution shall be multiplied by a fraction the numerator of which will be [Scheduled Contributions plus (T1) plus (T2) plus (T3) minus (DEF) minus (DRP) plus (I)] and the denominator of which will be Scheduled Contributions.

3.3     Employers' Annual Contribution.     The Employers' annual contribution shall equal the Total Estimated Annual Cost less the Contributing Participants' share of the Total Estimated Annual Cost. The Contributing Participants' share of the Total Estimated Annual Cost shall equal the sum of the Plan 1 and Plan 2 Contributing Participants' Annual Contributions (detailed in section 3.2) times the respective number of Plan 1 and Plan 2 Contributing Participants.

3.4     Transfers of Funds between Sub-accounts.     The Actuary will determine the amount of transfers from the Employers' Sub-account to the Contributing Participants' Sub-account and vice versa for each calendar year required by the Section 3.2 adjustments. Transfers will be made on the first of each month and will be equal to one twelfth of the annual transfer amount. The annual amount of transfers for calendar year x will equal:

(a)     T1 times (1-Retiree Adjustment Ratio for Measurement Year x-1), minus

(b)     DRP, minus

(c)     DEF, plus

(d)     I accrued on T1, multiplied by (1-Retiree Adjustment Ratio for Measurement Year (x-1)), minus

(e)     I accrued on DRP minus

(f)     I accrued on DEF

If the amount of transfers is greater than zero, the transfer will be made from the Contributing Participants' Sub-account to the Employers' Sub-account. If the amount of transfers is less than zero, the transfer will be made to the Contributing Participants' Sub-account from the Employers' Sub-account.

3.5     Transfers from the Supplemental Benefit Trust to the Health Benefit Trust. At the discretion of the Supplemental Benefit Committee, contributions may be made from the Supplemental Benefit Trust to the Health Benefit Trust. If contributions are to be made by the Supplemental Benefit Trust in lieu of Participant Contributions in calendar year (x), Supplemental Benefit Trust contributions will be made on the first of each month and be credited to the Contributing Participants' Sub-

account. If the Supplemental Benefit Trust makes contributions are to reduce or reimburse premiums, co-payments, deductibles and other amounts that would otherwise be required to be paid by or on behalf of Enrolled Participants or to provide Additional Permissible Benefits, the value of the enhanced benefits will be determined by the claims administrator and billed monthly by the Plan Administrator to the Supplemental Benefit Committee. Payment of such amounts is due within 15 days of notification and will be allocated to the Contributing Participants' and Employers' Sub-accounts. The amount allocated to the Contributing Participants' Sub-account will be the payment amount times the Retiree Cost Sharing Ratio. The balance of the payment will be allocated to the Employers' sub-account according to Section 3.7 (b).

3.6     Employers' Prefunding Contributions. The following shall apply with respect to prefunding contributions:

(a)     The Employers will make a prefunding contribution of $2 million as of the Effective Date to pay all then accrued administrative costs of establishing the Plan and initial claims.

(b)     As of the end of each calendar quarter, the Employers will make a prefunding contribution equal to one-quarter of the Employers' share of the estimated Annual Service Cost as determined by the Actuary.

(c)     Prior to six months after the Effective Date, Parent shall make a pre-funding contribution or contributions to the Health Benefit Trust totalling $100 million. Prior to the Event Date and as quickly as is prudent, the Parent shall use its best efforts to sell $500 million of Parent Common. From the Effective Date until the Event Date, Parent shall make pre-funding contributions to the Health Benefit Trust of any and all net cash proceeds from the sale of Parent Common; provided, that Parent may use whatever portion of the proceeds from the sale of Parent Common as the Board reasonably determines is appropriate for working capital; and provided, further, that by the Event Date, the amount of pre-funding contributions made to the Health Benefit Trust shall equal the lesser of $500 million or the total amount of the cash proceeds of all sales of Parent Common between the Effective Date and the Event Date. Nothing herein shall prevent Parent from making pre-funding contributions to the Health Benefit Trust from sources other than the sale of the Parent Common. Parent may defer the initial $100 million contribution, or any portion thereof, required by the first sentence of this Section 3.6(c) only if, and only for so long as, the Board reasonably and in good faith determines that failure to defer such contribution, or such portion, will cause Parent or the Company to become unable to pay its obligations arising in the ordinary course of its business when due. Any deferral described in the preceding sentence shall be permitted only upon notice to the HBPC Committee, by an authorized officer of Parent, that the Board has made the determination described in the preceding sentence.

3.7     Payment of Benefits. For purposes of accounting for contributions and the payment of benefits, the following shall apply.

(a)     The Contributing Participants' share of actual benefit payments and administrative costs will be charged to the accumulated Contributing Participants' accumulated contributions according to the Retiree Cost Sharing Ratio. Any excess contributions shall be accumulated and used to offset any actual benefit payments and administrative costs incurred in subsequent months in excess of contributions collected. Should the balance in the Contributing Participants' Sub-account be

insufficient to pay the Contributing Participants' share of actual benefit payments and administrative costs, the Employers' Sub-account (prefunding contribution balance) will advance sufficient funds to the Contributing Participants' Sub-account to cover such shortfalls. Such amounts advanced to the Contributing Participants' Sub-account will be repaid to the Employers' Sub-account immediately upon the availability of funds in the Contributing Participants' Sub-account.

(b)     The Employers' share of actual benefit payments and administrative costs will be one minus the Retiree Cost Sharing Ratio and will be allocated to the Employers' monthly contribution or to Employers' prefunding contributions. The amount of the actual benefit payments and administrative costs to be paid from Employers' prefunding contributions shall be the amount equal to the aggregate of such amounts to be paid by the Employers multiplied by the ratio of the prior year end outstanding balance of Employers' prefunding contributions (plus the balance of any advances to the Contributing Participants' Sub-account) divided by the Employers' share of the Health APBO as of the prior year end. Should the Employers make prefunding contributions at times other than the beginning of the year (other than prefunding contributions for estimated Annual Service Cost), the ratio used to allocate amounts to be paid by the Employers after such additional contribution shall be adjusted as if such additional contribution were made at the beginning of the calendar year less an earnings adjustment equal to the amount of additional contribution times the discount rate used to calculate the Health APBO for the prior year and multiplied by the ratio of the number of months elapsed from the beginning of the year to the date of additional contribution divided by 12.

(c)     Should the amount of Employers' contributions not be sufficient to pay the portion of the Employers' share of actual benefit payments and administrative costs not allocated to Employers' prefunding contributions, the Employers shall make additional contributions to cover the deficiency. Should the amount of Employers' contributions exceed such share, such excess contributions shall be used to offset subsequent months' actual benefit payments and administrative costs described above.

(d)     The balance of any Employers' and Contributing Participants' contributions not required to pay actual benefit payments and administrative costs shall be invested by the trustee of the Health Benefit Trust and the actual earnings on such invested balance will be credited to the respective account balances and used in determining contributions described in sections 3.2.

3.8     State or National Health Insurance Programs. Notwithstanding the foregoing, in the event of the adoption of, or any legislative change in, a State or National Health Insurance Program as a result of which, following such adoption or change, Participants receive post-retirement health care benefits greater or lesser than those provided under such programs on the Effective Date, the following shall apply:

(a)     The Actuary (i) shall determine the actuarial present value of any new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or

change attributable to the provision of such post-retirement benefits to such Participants, and (ii) shall redetermine the Health APBO immediately following the implementation of such adoption or change by subtracting such actuarial present value determined in (i) above from the Health APBO immediately prior to the implementation of such adoption or change; provided that the resulting Health APBO immediately following the implementation of such adoption or change, plus the actuarial present value of the new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or change attributable to the provision of such post-retirement benefits to such Participants, shall not exceed the Health APBO immediately prior to the implementation of such adoption or change.

In addition, if any new taxes, premiums or other amounts are required to be paid by the Employers as a result of such adoption or change based on the number of Participants or on the value of benefits provided to Participants under the Health Benefit Program or contributions made by the Employers under the Health Benefit Program for the benefit of Participants, after the Actuary has made the calculations described in the preceding paragraph, the Actuary shall determine the actuarial present value of such new taxes, premiums or other amounts, and the excess thereof over the actuarial present value determined in (i) above will be allocated between the Employers and the Participants by the Health Benefit Program Committee in a fair and equitable manner to further reduce the Health APBO immediately following the implementation of such adoption or change; provided that the Health APBO immediately following the implementation of such adoption or change, plus the actuarial present value of the new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or change attributable to the provision of such post-retirement benefits to such Participants, plus the actuarial present value of the allocated additional taxes, premiums or other amounts used to further reduce the Health APBO, shall not exceed the Health APBO immediately prior to the implementation of such adoption or change. If the Health Benefit Program Committee cannot reach a consensus in 30 days as to how such allocation shall be made, the Health Benefit Program Committee shall select a qualified individual or firm to make such determination, and the determination of such individual or firm shall be final and binding. If the Health Benefit Program Committee is unable to agree upon an individual or firm to resolve such dispute, the Health Benefit Program Committee shall petition the Court to select an individual or firm to assist the parties by resolving the dispute. In such event, the Health Benefit Program Committee shall suggest to the court at least five individuals or firms with appropriate background to be so appointed. One-half of the fees and expenses of the individual or firm appointed by the court shall be a Plan Expense, and the other half shall be paid by the Company.

(b)     Following such determinations as are required in Section 3.8(a) above, the Health Benefit Program Committee may redesign the Health Benefit Program, including, in its sole discretion, by modifying the benefits thereunder and the amount of contributions required to be made by or on behalf of Enrolled Participants; provided that any changes in required contributions must be reasonably related to changes in the redesigned benefits provided under the Health Benefit Program. Further, the duration of the Employers' liability under the Health Benefit Program following

such redesign shall be consistent with such duration immediately prior to such redesign. This redesign opportunity shall be a one-time opportunity available to the Health Benefit Program Committee with respect to each such adoption or change.

If the Employers are required as a result of such adoption or change to provide benefits which are not available under the Health Benefit Program, the Health Benefit Program Committee will redesign the Health Benefit Program to provide such mandated benefits while maintaining the Health APBO in effect prior to such mandate.

(c)     Following any such redetermination of the Health APBO, the Actuary shall continue to make the determinations required to be made by it hereunder in accordance with the other provisions of this Exhibit A on the basis of the Health APBO as so redetermined.

The Actuary's determinations under this Section 3.8 shall be made based upon actuarial data, methods, factors, procedures and assumptions consistent with those used in the determination of the Health APBO and Retiree Cost-Sharing Ratio as of the Effective Date.

3.9 <u>Guarantee of Health Benefit Program.</u> The Parent and the Company hereby jointly and severally, unconditionally and irrevocably guarantee the provision of benefits under and in accordance with the terms of the Health Benefit Program as primary obligors and not merely as sureties. The Parent's and the Company's obligations under this guarantee shall not be impaired by (i) any breach or violation of any provision of the Health Benefit Program, whether by the Company, any other Employer or otherwise, (ii) any modification or amendment of or to, or any waiver of any obligation of any party under, the Health Benefit Program, provided that as of the effectiveness of any such modification, amendment or waiver this guarantee shall thereafter be deemed to apply to the Health Benefit Program as so modified, amended or waived, (iii) any merger, re-organization or bankruptcy of the Company or any other Employer or (iv) any other event which may cause the Company or any other Employer to lose its separate legal identity or to cease to exist. This guarantee shall not be affected in any way by the absence of any action to obtain payment of any amount under the Health Benefit Program. The Parent and the Company hereby waive all requirements as to promptness, diligence, presentment, demand for payment, protest and notice of any kind with respect to this guarantee. This guarantee shall remain in full force and effect until the termination of the Health Benefit Program and shall remain in full force and effect or be reinstated, as the case may be, if at any time any amount paid by the Parent, the Company or any other Employer under the Health Benefit Program or this guarantee, in whole or in part, is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Parent, the Company or such other Employer or otherwise, all as though such payment had not been made. This guarantee is a guarantee of payment and not of collection. Each of Parent and the Company irrevocably waives any and all rights or claims to indemnity, subrogation, reassessment, exoneration or contribution which it had, has, or hereafter may have in respect of any payment under this guarantee to the extent that under applicable law such rights of Parent or the Company would render a payment by the Company or any other Employer (other than Parent) avoidable if made prior to 90 days before a bankruptcy or similar proceeding of the Company or such Employer. To the extent that Parent makes a payment of a type described in the immediately preceding sentence under this guarantee on behalf of any other Employer, and to the extent that the Company makes

a payment of such a type on behalf of any other Employer (other than Parent), such payment shall be deemed to be a capital contribution to such Employer.

ARTICLE IV

Contributions to Life Insurance Program

      4.1    <u>Employer Contributions</u>. The Employers shall make monthly contributions to the Health Benefit Trust sufficient to permit such trust to pay all premiums necessary to obtain the life insurance benefits (other than the optional additional life insurance benefits referred to in Section 4.2) for Retirees under the Basic Life Insurance Program. Such contributions shall be segregated from the contributions to the Health Benefit Program and invested in a separate sub-account under the Health Benefit Trust prior to applying such amounts to pay such premiums.

      4.2    <u>Optional Life Insurance</u>. In addition to the coverage referred to in Section 4.1, Retirees who meet the eligibility requirements set out in the Life Insurance Program SPD shall have the right to purchase, at group rates but entirely at their own cost, optional additional life insurance coverage up to the maximum of the coverage that would have been available to such Retirees under the Existing Plans. As more fully described in Appendix A-2, this opportunity is a one-time election available to each such Retiree as of the later of the Effective Date or such Retiree's date of retirement which shall be exercised in accordance with the procedures set forth in Appendix A-2. The Plan Administrator shall arrange for such coverage to be provided directly to Retirees electing to purchase such coverage by a designated insurance company, which as of the Effective Date shall be Aetna Life Insurance Company. Retirees shall be given reasonable notice of this optional coverage and of any changes in the insurance company designated to provide such coverage, or in the terms and conditions thereof, as provided in Appendix A-2. The Plan Administrator shall use its best efforts to ensure that the terms and conditions of the coverage made available to Retirees from time to time pursuant to this Section 4.2 are competitive. The Optional Life Insurance Program is provided directly to Retirees by the designated life insurance company under a group insurance arrangement, not under the Life Insurance Program. Although the eligibility and benefit amount provisions of this program are included in the Life Insurance Program SPD attached as Appendix A-2, it is intended that the Optional Life Insurance Program shall not be considered a plan as such term is defined in ERISA.

      4.3    <u>Guarantee of Life Insurance Program</u>. Parent and the Company hereby jointly and severally, unconditionally and irrevocably guarantee the provision of benefits under and in accordance with the terms of the Basic Life Insurance Program, as primary obligors and not merely as sureties. Parent's and the Company's obligations under this guarantee shall not be impaired by (i) any breach or violation of any provision of the Basic Life Insurance Program, whether by Parent, the Company, any other Employer or otherwise, (ii) any modification or amendment of or to, or any waiver of any obligation of any party under, the Basic Life Insurance Program, provided that as of the effectiveness of any such modification, amendment or waiver this guarantee shall thereafter be deemed to apply to the Basic Life Insurance Program as so modified, amended or waived, (iii) any merger, reorganization or bankruptcy of Parent, the Company or any other Employer or (iv) any other event which may cause Parent, the Company or any other Employer to lose its separate legal identity or to cease to exist. This guarantee shall not be affected in any way by the absence of any action to obtain payment of any amount under the Basic Life Insurance Program. Parent and the Company hereby waive all requirements as to promptness,

diligence, presentment, demand for payment, protest and notice of any kind with respect to this guarantee. This guarantee shall remain in full force and effect until the termination of the Basic Life Insurance Program and shall remain in full force and effect or be reinstated, as the case may be, if at any time any amount paid by Parent, the Company or any other Employer under the Basic Life Insurance Program or this guarantee, in whole or in part, is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Parent, the Company or such other Employer or otherwise, all as though such payment had not been made.  This guarantee is a guarantee of payment and not of collection. Each of Parent and the Company irrevocably waives any and all rights or claims to indemnity, subrogation, reassessment, exoneration or contribution which it had, has, or hereafter may have in respect of any payment under this guarantee to the extent that under applicable law such rights of Parent or the Company would render a payment by the Company or any other Employer (other than Parent) avoidable if made prior to 90 days before a bankruptcy or similar proceeding of the Company or such Employer. To the extent that Parent makes a payment of a type described in the immediately preceding sentence under this guarantee on behalf of any other Employer, and to the extent that the Company makes a payment of such a type on behalf of any other Employer (other than Parent), such payment shall be deemed to be a capital contribution to such Employer.

<u>ARTICLE V</u>

Administration of the Health Benefit Program
<u>and the Life Insurance Program</u>

As the Plan Administrator and Named Fiduciary, the Company is responsible for the administration of the Health Benefit Program and the Life Insurance Program, subject to re-view by the Health Benefit Program Committee as provided in Article VI. Subject to such review, the Plan Administrator shall have the following powers, rights and duties, which it shall perform in its capacity as a fiduciary under ERISA:

(a)     to adopt such rules of procedure consistent with the Health Benefit Program and the Life Insurance Program as it may deem appropriate for the efficient administration of such programs or in connection with the exercise or discharge of its powers, rights and duties;

(b)     to construe and interpret the Health Benefit Program and the Life Insurance Program and to decide all questions of eligibility under such programs;

(c)     to appoint claims administrators, medical review agencies and other service providers;

(d)     to enroll Participants in the Health Benefit Program, and the Life Insurance Program, to distribute and receive plan administration forms  and to comply with all applicable governmental reporting and disclosure requirements; and

(e)     to respond to requests for information by the Health Benefit Program Committee relating to the Plan.

The Plan Administrator shall perform its duties with respect to plan administration on a reasonable and non-discriminatory basis and shall apply uniform rules to all persons similarly situated.

ARTICLE VI

Health Benefit Program Committee

6.1     Health Benefit Program Committee.  The Health Benefit Program Committee shall consist of seven members, including two members appointed by the UAW (the "HBPC UAW Members"), who may be replaced at any time by the UAW, three members appointed by the Company (the "HBPC Company Members"); who may be replaced at any time by the Company, one member appointed as representative of the non-UAW Retirees in accordance with Section 6.6 (the "HBPC Other Member") and a seventh member appointed by a majority of the other six members, who shall be the chairperson of the Health Benefit Program Committee (the "HBPC Chair"; the HBPC Chair, the HBPC UAW Members, the HBPC Other Member and the HBPC Company Members, collectively, the "HBPC Committee Members"); provided that such seventh member may be recalled at any time by a vote of a majority of the HBPC UAW Members and the HBPC Other Member, on the one hand, or a majority of the HBPC Company Members, on the other hand, whereupon a new member shall be appointed by a majority of the other six members. The persons who shall initially serve in such capacities are identified in Appendix A-7 hereto. The Health Benefit Program Committee shall have a Secretary, who shall be elected by the HBPC Committee Members.

6.2     Committee Powers.  The Health Benefit Program Committee shall be a fiduciary under ERISA with respect to its responsibilities hereunder. The Health Benefit Program Committee shall have the powers, rights and duties set forth herein and the following additional powers, rights and duties consistent with its rights and obligations under this Exhibit A:

(a)     to adopt such rules of procedure consistent with the Health Benefit Program and the Life Insurance Program as it may deem appropriate in its sole discretion in connection with the exercise or discharge of its powers, rights and duties hereunder;

(b)     to resolve disputes with respect to determinations of the Plan Administrator regarding benefits and eligibility in its sole discretion in accordance with the dispute resolution procedure set forth in the relevant SPD; provided, that the Health Benefit Program Committee shall apply the terms of the Existing Plans in a manner consistent with the prior interpretations of such Existing Plans by the Company; and provided, further, that the Health Benefit Program Committee may not provide for the payment of any benefits not provided under the Health Benefit Program;

(c)     to review any and all determinations made by the Actuary under the Health Benefit Program, as well as the calculations and experience trends and other assumptions used by the Actuary in making such determinations and to initiate the dispute resolution procedure referred to in Section 6.8, such decision to review or initiate being in its sole discretion;

(d)     to bring to the attention of the Plan Administrator and to discuss with the Plan Administrator such administrative problems under the Health Benefit Program of which it has knowledge as it may deem appropriate in its sole discretion;

(e)     to require the Plan Administrator to provide it with such information regarding the administration of the Plan as it may deem appropriate in its sole discretion;

(f)     to make such recommendations to the Plan Administrator and Named Fiduciary in connection with the administration of the Health Benefit Program and the Life Insurance Program as it may deem appropriate in its sole discretion;

(g)     to engage such consultants and other professionals to assist it in the exercise or discharge of its powers, rights and duties hereunder as it may deem appropriate in its sole discretion;

(h)     to review and enforce Parent's, the Company's and the other Employers' compliance with their obligations under the Health Benefit Program and the Life Insurance Program, such decision to review or enforce being in its sole discretion; and

(i)     to undertake such other actions as are necessary or appropriate in connection with the exercise or discharge of such powers, rights and duties.

provided, that the Health Benefit Program Committee shall have no authority to modify benefits except as expressly provided herein or to waive any contribution obligation of the Employers under the Health Benefit Program or the Life Insurance Program; and provided, further, that the Health Benefit Program Committee shall be bound by the instructions of the Supplemental Benefit Program Committee with respect to the use of any assets transferred to the Health Benefit Trust from the Supplemental Benefit Trust.

6.3     <u>Program Design</u>. The Health Benefit Program Committee, as a matter of appropriate program design and not as a fiduciary, shall have the following powers, rights and duties:

(a)     reasonably to redesign benefits under the Health Benefit Program as provided in Section 3.8 as it may deem appropriate in its sole discretion;

(b)     reasonably to redesign benefits under the Health Benefit Program as necessary to implement such coordinated care systems as may be recommended by the UAW/Navistar Joint Committee or, if such committee ceases to exist, reasonably to redesign benefits under the Health Benefit Program as it deems necessary or appropriate to implement coordinated care systems in its sole discretion and otherwise to give effect to the powers granted to such committee in Appendix A-1; provided, that no such redesign shall increase the Employers' share of the Health APBO;

(c)     to make such adjustments in the Contributing Participants' Annual Contribution by a unanimous vote of the HBPC Committee Members as may be required to prevent the Contributing Participant's Sub-account from maintaining an unnecessary and inappropriate surplus or deficit for an extended period of time.

6.4     <u>Action by Health Benefit Program Committee.</u> Any action by the Health Benefit Program Committee will be subject to the following provisions:

(a)     The HBPC Chair or any two members may call a meeting of the Health Benefit Program Committee on not less than two days' advance written

notice to all members (including telephone conference, video conference and other technology-assisted meetings of persons at separate locations);

(b)     At all meetings of the Health Benefit Program Committee the HBPC Company Members shall have a total of three votes and the HBPC UAW Members and the HBPC Other Member together shall have a total of three votes, the vote of any absent HBPC Company Members being divided equally between the HBPC Company Members present and the vote of any absent HBPC UAW Member or the absent HBPC Other Member being divided equally between the HBPC UAW Members and HBPC Other Member present;

(c)     A meeting of the Health Benefit Committee shall be validly constituted if both HBPC UAW Members or one UAW Member and the HBPC Other Member, on the one hand, and two HBPC Company Members, on the other hand, participate in such meeting;

(d)     Except as otherwise specifically provided herein, the Health Benefit Program Committee shall act by the majority vote of all of its members at a duly called and validly constituted meeting, which action shall be as effective as if such action had been taken by all members of the Health Benefit Program Committee, or by written instrument signed by all of the HBPC Committee Members, which instrument may be executed in counterparts; provided, that one or more HBPC Committee Members or other persons may be so authorized to act with respect to particular matters on behalf of all HBPC Committee Members; and provided, further, that no HBPC Committee Member shall be liable or responsible for any act or omission of other HBPC Committee Members in which the former has not concurred; and

(e)     The HBPC Chair shall vote only in case of a failure of the other HBPC Committee Members to adopt a decision as to any matter which is properly before the Health Benefit Committee and within its authority to determine; and

(f)     The certificate of the Secretary of the Health Benefit Program Committee or of a majority of the HBPC Committee Members that the Health Benefit Program Committee has taken or authorized any action shall be conclusive in favor of any person relying on such certificate.

6.5     <u>Health Benefit Program Committee Minutes</u>. As soon as is reasonably practicable after each meeting of the Health Benefit Program Committee, its Secretary shall prepare draft minutes of such meeting, which shall be delivered to each HBPC Committee Member and approved or modified at the following meeting.

6.6     <u>HBPC Other Member</u>. The initial HBPC Other Member is the person specified as such in Appendix A-7. In the event of the death, incapacity or resignation of the HBPC Other Member, his successor shall be appointed by a majority vote of such HBPC Other Member (if he is not deceased or incapacitated) and two alternates (the "<u>HBPC Other Member Alternates</u>") upon notice from the Health Benefit Program Committee or such HBPC Other Member of such

death, incapacity or resignation; provided, that the HBPC Other Member shall not be a Non-Represented Employee, an employee of the UAW, an Employee represented by the UAW or a Retiree represented by the UAW at the time of his retirement. The initial HBPC Other Member Alternates are the persons specified as such in Appendix A-7. In the event of the death, incapacity or resignation of either of the HBPC Other Member Alternates, his successor shall be appointed by a majority vote of such HBPC Other Member Alternate (if he is not deceased or incapacitated), the other HBPC Other Member Alternate and the HBPC Other Member upon notice from the Health Benefit Program Committee or such HBPC Other Member Alternate of such death, incapacity or resignation. The HBPC Other Member or either of the HBPC Other Member Alternates may also be replaced by the Court upon petition signed by not less than 50 Participants who are Non-Represented Employees, Present Employees who are not represented by the UAW or Retirees who were not represented by the UAW at the time of their retirement, for failure adequately to represent the Participants.

6.7    Expenses. The Company agrees that, upon demand and the Company's receipt of such detailed supporting documentation as the Company may reasonably request, it will forthwith pay (i) to all HBPC Committee Members that are not employed by the Company, any Employer or the UAW, reasonable compensation for time spent on Health Benefit Program Committee matters, (ii) to each HBPC UAW Member, the HBPC Other Member and any HBPC Other Member Alternate, the amount of any and all out-of-pocket expenses, including reasonable travel expenses, incurred by him in exercising or discharging his powers, rights and duties hereunder and (iii) to the Health Benefit Program Committee, the amount of any and all out-of-pocket costs and expenses (other than expenses of consultants and other professionals) incurred by it in connection with reviewing the administration of the Health Benefit Program and the Life Insurance Program. Such compensation and expenses shall not be considered Plan Expenses.

6.8    Dispute Resolution. In the event of a dispute regarding any determination by the Actuary hereunder, the Company and the Health Benefit Program Committee will attempt to resolve such dispute. If any such dispute is not so resolved to the satisfaction of the Health Benefit Program Committe, the Health Benefit Program Committee may request that such determination be resolved by an independent actuary. Such independent actuary shall be selected in accordance with the following procedure. First, the Company and the Health Benefit Program Committee shall, for a period not to exceed 10 days, seek to agree on a firm to serve as such independent actuary. Second, in the event that the Company and the Health Benefit Program Committee fail to agree on such a firm, they shall request the Society of Actuaries to prepare a list of the seven largest actuarial firms with their principal offices in the United States (as measured by the number of enrolled actuaries in such firms) and communicate such list to the parties. Third, the Company and the Health Benefit Program Committee shall, beginning with the Company, alternately strike one name off such list until only one such name remains, and that firm shall act as such independent actuary. The Actuary, the Company and the Health Benefit Program Committee shall cooperate with such independent actuary in reevaluating the disputed determination, and the determination of the independent actuary shall be final and binding on all parties. One-half of the fees and expenses of the independent actuary shall be a Plan Expense, and the other half shall be paid by the Company. For purposes of this Section 6.8, the Health Benefit Program Committee shall act by a vote of any two of the HBPC UAW Members and the HBPC Other Member.

<u>ARTICLE VII</u>

<u>General Provisions</u>

7.1  <u>Required Data</u>.  Enrolled Participants shall furnish the Plan Administrator with such information as may be necessary to permit the Plan Administrator, claims administrators, medical review agencies or committees to perform their duties with respect to the administration of the Plan.

7.2  <u>Non-Alienation</u>.  No Participant or other person shall have any right, title or interest in any assets of the Plan prior to the payment thereof on behalf of such person. No rights or interests of any Participant under the Plan shall be assignable either voluntarily or involuntarily.

7.3  <u>Action by Employers</u>.  Any action required or permitted to be taken by any Employer under the Plan shall be taken by resolution of the board of directors of such Employer, or by resolution of a duly authorized committee of its board of directors, or by a person or persons authorized by resolution of its board of directors or such committee.

7.4  <u>Applicable Law</u>.  The Plan shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or pre-empted thereby, with the laws of the State of Illinois.

7.5  <u>Limitation of Liability; Indemnification</u>.  To the extent permitted by applicable law, no person shall be personally liable for any act done or omitted to be done in good faith in the administration of the Health Benefit Program or the Life Insurance Program or the investment of the assets of the Health Benefit Trust. The Employers shall jointly and severally indemnify and hold harmless, to the extent permitted by applicable law, each present or former employee of an Employer through whom the Plan Administrator is performing or has performed any of its responsibilities hereunder, each present or former director or officer of the Employers, the UAW, each present or former HBPC Committee Member and each HBPC Other Member Alternate from and against any and all losses, costs, liabilities, damages and expenses (including fines, penalties, taxes and the fees and disbursements of actuarial and legal advisors), as incurred, by reason of any act done or omitted to be done in good faith in connection with the administration of the Plan or the investment of the assets of the Health Benefit Trust or in connection with the enforcement of the obligations of Parent, Company or any other Employer under the Health Benefit Program and Life Insurance Program. Any claim for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

7.6  <u>Limitation on Liens as Security for Employers' Contributions</u>.  Parent will not, and will not permit any Restricted Subsidiary to, create or assume any mortgage, security interest, pledge or lien (herein referred to as "mortgage"), or permit to exist any mortgage created or assumed since March 1, 1968, of or upon any Principal Property, or shares of capital stock or indebtedness for borrowed money issued by any Restricted Subsidiary and owned by Parent or any Restricted Subsidiary, whether owned at the Effective Date or thereafter acquired, without making effective provision, and Parent in such case will make or cause to be made effective provision, whereby the obligations of Parent and the Company under the Health Benefit Program and the Basic Life Insurance Program shall be secured by such mortgage equally and ratably with

any and all other indebtedness or obligations thereby secured, so long as such indebtedness or obligations shall be so secured; provided, that the foregoing shall not apply to any of the following:

(a)     mortgages on any Principal Property acquired, constructed or improved by Parent or any Restricted Subsidiary after March 1, 1968 which are created or assumed contemporaneously with, or within 90 days after, such acquisition, construction or improvement to secure or provide for the payment of any part of the purchase price of such Principal Property or the cost of such construction or improvement incurred after March 1, 1968, or, in addition to mortgages contemplated by clauses (b) and (c) below, mortgages on any such Principal Property existing at the time of acquisition thereof, provided, that in the case of any such construction or improvement the mortgage shall not apply to any property theretofore owned by Parent or any Restricted Subsidiary other than any theretofore substantially unimproved real property on which the property so constructed, or the improvement, is located and other than any machinery or equipment installed on the real property on which the property so constructed or the improvement is located;

(b)     mortgages on property of a corporation existing at the time such corporation is merged or consolidated with Parent or a Restricted Subsidiary or at the time of a sale, lease or other disposition of the properties of such corporation (or a division thereof) as an entirety or substantially as an entirety to Parent or a Restricted Subsidiary;

(c)     mortgages on property of a corporation existing at the time such corporation becomes a Restricted Subsidiary;

(d)     mortgages securing indebtedness of a Restricted Subsidiary to Parent or to another Restricted Subsidiary;

(e)     mortgages in favor of the United States of America or any State thereof, or any department, agency, instrumentality or political subdivision of any such jurisdiction, to secure partial, progress, advance or other payments pursuant to any contract or statute for the purpose of financing all or any part of the purchase price or the cost of constructing or improving the property subject to such mortgages;

(f)     mortgages in favor of any customer to secure partial, progress, advance or other payments for goods produced or services rendered to such customer in the ordinary course of business not exceeding the amount of such payments;

(g)     mortgages for the sole purpose of extending, renewing or replacing (or successively extending, renewing or replacing) in whole or in part the indebtedness secured by any mortgage referred to in the foregoing clauses (a) to (f), inclusive, or in this clause (g); provided, that the principal amount of indebtedness secured thereby shall not exceed the principal amount of indebtedness so secured at the time of such extension, renewal or replacement, and that such extension, renewal or replacement shall be limited to all or a part of the property which secured the mortgage so extended, renewed or replaced (plus improvements on such property);

(h)  pledges or deposits under workmen's compensation, unemployment insurance or similar statutes and mechanics', workmen's, repairmen's, materialmen's, carriers' or other similar liens arising in the ordinary course of business or deposits or pledges to obtain the release of any such liens;

(i)  liens created by or resulting from any litigation or other proceedings, including liens arising out of judgments or awards against Parent or any Restricted Subsidiary with respect to which Parent or such Restricted Subsidiary is in good faith prosecuting an appeal or proceeding for review; or liens incurred by Parent or any Restricted Subsidiary for the purpose of obtaining a stay or discharge in the course of any legal proceeding to which Parent or such Restricted Subsidiary is a party; or

(j)  liens for taxes or assessments or governmental charges or levies not yet due or delinquent, or which can thereafter be paid without penalty, or which are being contested in good faith by appropriate proceedings; landlord's liens on property held under lease; and any other liens of a nature similar to those hereinabove described in this clause (j) which do not, in the opinion of Parent, materially impair the use of such property in the operation of the business of Parent or a Restricted Subsidiary or the value of such property for the purpose of such business.

Notwithstanding the foregoing provisions, Parent or any Restricted Subsidiary may, without equally and ratably securing its contribution obligations under the Plan, create, assume, or permit to exist mortgages which would otherwise be subject to the foregoing restrictions if at the time of such creation, assumption or permission, and after giving effect thereto, such indebtedness does not exceed 5% of the stockholders' equity in Parent and its consolidated Subsidiaries, as shown by the audited consolidated balance sheet of Parent and its consolidated Subsidiaries in the latest annual report to the stockholders of Parent.

7.7  <u>Limitations on Sale and Lease-Back Transactions</u>.

(a)  Parent will not, nor will it permit any Restricted Subsidiary to, enter into any arrangement, or permit to exist any arrangement entered into since March 1, 1968, with any person providing for the leasing by Parent or any Restricted Subsidiary of any principal property (except for temporary leases for a term, including any renewal thereof, of not more than three years and except for leases between Parent and a Restricted Subsidiary or between Restricted Subsidiaries) which property has been or is to be sold or transferred by Parent or a Restricted Subsidiary to such person (a "<u>Sale and Lease-Back Transaction</u>") unless the net proceeds of such sale are at least equal to the fair value (as determined by the Board) of such property and either (1) Parent or such Restricted Subsidiary would be entitled to incur a mortgage on such property without equally and ratably securing the obligations of Parent and the Company under the Health Benefit Program and the Basic Life Insurance Program pursuant to Section 7.6(a), or (2) Parent shall contribute an amount equal to the net proceeds of such sale (as so determined) to the Health Benefit Trust, the retirement of Securities or other indebtedness ranking on a parity with the Securities (other than any mandatory retirement or payment at maturity and provided that any retirement of Securities is in accordance with the applicable optional redemption terms adopted pursuant to

Section 2.02 of the Indenture), within 120 days of the effective date of any such arrangement.

(b)     Notwithstanding the provisions of paragraph (a) of this Section 7.7, Parent or any Restricted Subsidiary may enter into or permit to exist Sale and Lease-Back transactions, if at the time such Sale and Lease-Back Transactions are (or were) entered into, and after giving effect thereto, Exempted Indebtedness does (or did) not exceed 5% of the stockholders' equity in Parent and its consolidated Subsidiaries as shown by the audited consolidated balance sheet of Parent and its consolidated Subsidiaries contained in the latest annual report to the stockholders of parent.

7.8     Subrogation. In the event of any payment under the Health Benefit Program on behalf of an Enrolled Participant, the Company or the excess loss insurer of benefits under the Health Benefit Program shall be subrogated to all rights of recovery of the Enrolled Participant against any person or organization in respect of such payment except against insurers on policies of insurance issued to and in the Participant's name, or against a policy of insurance to which the Participant has contributed 50 percent or more of the premium. The Participant shall, at the request of the Company or such insurer, execute and deliver such instruments and papers as may be required and do whatever else is necessary to secure such rights.

7.9     Assignment and Delegations. The rights of any party under the Plan may not be assigned without the prior written agreement of the Company and the Supplemental Benefit Committee, and any purported assignment in violation of this sentence shall be void. Any party may delegate any of its obligations under the Health Benefit Program or the Life Insurance Program; provided, that no such delegation shall relieve such party of any of such obligations; and provided, further, that the delegation of any obligations in connection with the transfer of any of the assets of any Employer shall be subject to the express assumption of such obligation by the proposed transferee.

7.10     Captions. The captions used in this Exhibit A are for convenience of reference only and do not constitute a part of this Exhibit A and will not be deemed to limit, characterize or in any way affect any provision of this Exhibit A, and all provisions of this Exhibit A will be enforced and construed as if no captions had been used in this Exhibit A.

ARTICLE VIII

Amendment and Termination

8.1     Amendment.   The Plan Administrator and the Health Benefit Program Committee reserve the right to amend the Health Benefit Program and the Life Insurance Program as follows:

(a)     The Plan Administrator shall have the right to make nonmaterial technical and administrative amendments thereto and to the Health Benefit Trust which are necessary to comply with the requirements of the IRS and ERISA and other applicable legal requirements; provided, that no such amendment shall adversely affect the level of benefits to any Class Member;

(b)     The HBPC Committee Members may by unanimous written consent amend the benefits provided under the Health Benefit Program; provided, that any proposed amendment which adversely impacts the level of Plan benefits to any Class Member shall be subject to approval by the Court after appropriate notice to Class Members; and

(c)     The Health Benefit Program Committee may reasonably redesign the Health Benefit Program in accordance with the provisions of Section 6.3.

8.2     <u>Termination</u>.  The Health Benefit Program and the Basic Life Insurance Program will terminate on the earlier of (a) the termination of the Settlement Agreement as provided in Section 13 thereof and (b) the later of the death of the last Participant entitled to benefits and the payment of any and all claims previously incurred by Participants and any and all benefits payable in respect of the death of any Participant; provided, that the obligations of Parent and the Company under Sections 6.6 and 7.6 shall survive such termination.   In the event the Health Benefit Program and the Life Insurance Program terminate in accordance with clause (a) of this Section 8.2, any or all of the assets held in the Health Benefit Trust shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association: within the meaning of Section 501(c) (9) of the IRC, as determined by the Company.

ARTICLE IX

Exclusive Benefit and Prohibited Inurement

9.1     Exclusive Benefit.  No part of the corpus or income of the Health Benefit Trust shall be used for, or diverted to, any purposes other than for the exclusive benefit of persons who are or may become entitled to benefits under the Health Benefit Program or the Life Insurance Program and for defraying reasonable expenses of administering such programs.

9.2     Prohibited Inurement.  No part of the corpus or income of the Health Benefit Trust shall inure to the benefit of Parent, the Company or any other Employer.  All fiduciaries hereunder shall discharge their duties solely in the interests of Participants for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration. No benefit under the Health Benefit Program or the Life Insurance Program or interest, right or claim in or to any part of the Health Benefit Trust or any payment therefrom shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, hypothecation or commutation, nor shall any such benefit or interest, right or claim in or to any part of the Health Benefit Trust or any payment therefrom be in any manner liable for or subject to garnishment, attachment, execution or levy or be liable for or subject to the debts, contracts, liabilities, engagements or torts of the person entitled thereto, and the trustee under such trust shall not recognize any attempt to make it so, except as directed by the Company, in its capacity as Plan Administrator, for the payment of benefits directly to health care providers or provided by the Health Benefit Program and Life Insurance Program in a manner that is consistent with applicable law.

ARTICLE X

Events of Default

10.1     Upon the occurrence and during the continuation of a "Health Benefit Program Payment Default," the Health Benefit Program Committee shall have the right, by notice to the Company:

(a)     to require the Company to make prefunding contributions to the Health Benefit Trust in an amount equal to the excess, if any, of the Health APBO as most recently determined by the Actuary over the amount of any prefunding contribution (other than prefunding of the Annual Service Cost) made by the Company under the Health Benefit Program and the Life Insurance Program from the Effective Date until the date of such notice; and/or

(b)     to replace the Company as Plan Administrator and Named Fiduciary of the Health Benefit Program and the Life Insurance Program.

As used herein, the term "Health Benefit Program Payment Default" shall mean the failure at any time by Parent, the Company or any other Employer to make any payment or contribution required to be made by it pursuant to Sections 3.3, 3.6(b), 3.9, 4.1, 4.3 or 7.5 within five days after receipt of written notice of such failure from the Health Benefit Program Committee, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 10.1; provided, that with respect to any failure to make a payment or contribution required to be made by an Employer pursuant to Sections 3.3, 3.4 or 3.6,

if such Employer shall have paid or contributed the amount determined by the Actuary in accordance with Article III and such Employer shall be required to make any additional payment or contribution as determined by the independent actuary referred to in Section 6.7, the Health Benefit Program Committee shall not give notice of such failure unless such Employer shall have failed to make such additional payment or contribution within five days of the date of such determination by such independent actuary; and provided, further, that the Health Benefit Program Committee shall not give notice of a failure to make a payment under Section 7.6 unless the Indemnified Party has executed the undertaking provided for in the Indemnification Procedures.

    10.2    Upon the occurrence and during the continuation of a "Lien/Sale and Lease-back Default," the Health Benefit Program Committee shall have the right, by notice to the Company, to replace the Company as Plan Administrator and Named Fiduciary of the Health Benefit Program and the Life Insurance Program. As used herein, the term "Lien/Sale and Lease-back Default" shall mean the failure by Parent to cure any breach of Section 7.7 or 7.8 within 30 days after receipt of written notice of such failure, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 10.2 (said 30 days being hereinafter referred to as the "Section 10.2 Cure Period").

    10.3    In the event any of the failures described in Section 10.2 which would otherwise constitute a Lien/Sale and Lease-back Default cannot be cured as a matter of right solely through the payment of money, the Section 10.2 Cure Period shall be extended for such additional period of time as is reasonably necessary to permit Parent to effect such cure as long as Parent, the Company or any Employer is diligently and in good faith pursuing such cure.

    10.4    The rights of the Health Benefit Program Committee under this Article X are in addition to, and not in lieu of, any rights that such Committee, or any other person or entity, including, without limitation, any HBPC Committee Member, HBPC Other Member Alternate or Participant, may have under the Settlement Agreement, any Exhibit thereto or any Appendix to any such Exhibit, whether in equity or at law. The waiver by the Health Benefit Program Committee or any such person or entity of any Health Benefit Program Payment Default, Lien/Sale and Lease-back Default or other breach of any provision of, or any other right to enforce or claim or benefit under, any such document shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, any such document.

## NAVISTAR INTERNATIONAL TRANSPORTATION CORP.

## RETIREE HEALTH BENEFIT TRUST

THIS AGREEMENT OF TRUST (hereinafter referred to as the "Agreement") is made and entered into this 18th day of June, 1993, by and between Navistar International Transportation Corp., a corporation organized under the laws of the State of Delaware (hereinafter referred to as the "Company"), and The Northern Trust Company (hereinafter referred to as the "Trustee").

### W I T N E S S E T H:

**WHEREAS**, the Company was a defendant in <u>Shy</u> v. <u>Navistar International Corporation</u>, Case No. C-3-92-333 (S.D. Ohio) (the "Litigation"), and entered into a settlement agreement (the "Settlement Agreement") with the plaintiffs in the Litigation in order to limit its liability to the plaintiffs; and

**WHEREAS**, in order to provide post-retirement health and life insurance benefits to Participants and Beneficiaries (as hereinafter defined), the Company maintains the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program (the "Health Benefit Program"), (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program (the "Life Insurance Program"), and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program; and

**WHEREAS**, under the Settlement Agreement, the Health Benefit Program, and the Life Insurance Program, the Company has agreed to provide certain benefits with an initial accumulated postretirement benefit obligation of $1,000 million ($946 million for the Health Benefit Program and $54 million for the Life Insurance Program) and to make certain contributions to the Health Benefit Program and the Life Insurance Program (collectively the "Programs") with respect to such obligation; and

**WHEREAS**, in order to implement and carry out the terms of the Settlement Agreement and the Programs, the Company wishes to establish the Navistar International Transportation Corp. Retiree Health Benefit Trust (hereinafter referred to as the "Trust"), which shall form a part of the Programs, and which is intended to satisfy the requirements of Section 501(c)(9) of the Code (as hereinafter defined) or any successor provision thereto; and

**WHEREAS**, the Company has authorized the execution of this Agreement and the creation of a trust fund to provide benefits under the Programs; and

**WHEREAS**, the Company intends, through this Agreement, to provide for management and control of the assets of the Programs through a trust fund; and

**WHEREAS**, The Northern Trust Company has consented to act as Trustee hereunder and to hold and administer such sums as are transferred or contributed upon the terms set forth herein,

**NOW, THEREFORE**, the Company and the Trustee hereby agree to establish the Navistar International Transportation Corp. Retiree Health Benefit Trust, subject to the following terms and conditions:

### ARTICLE I

### DEFINITIONS

1.1 **Definitions.** The following words and phrases when used herein shall have the following meanings, except as otherwise required by the context:

(a) **"Administrator"** means the Company.

(b) **"Beneficiary"** means a person designated as a beneficiary of a Participant by the Participant, or by the terms of a Program, and who is or may become entitled to a benefit under a Program.

(c) **"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

(d) **"Committee"** means the committee established pursuant to the Programs.

(e) **"Company"** means Navistar International Transportation Corp.

(f) **"Employers"** means Navistar International Corporation, Navistar International Transportation Corp., Navistar Financial Corporation, HARCO National Insurance Company, and Indianapolis Casting Corporation.

(g) **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended from time to time.

(h) **"Investment Manager"** means a person or entity who is either:

   (1) an investment adviser registered as such under the Investment Advisers Act of 1940; or

   (2) a bank, as defined in that Act; or

   (3) an insurance company qualified to manage, acquire, or dispose of any asset of an employee benefit plan under the laws of more than one State.

(i) **"Participant"** means a Participant as defined by the Programs.

(j) **"Plan"** means the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan, which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program, (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program, and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program.

(k) **"Program Account"** means that part of the assets of the Trust attributable to a particular Program, including contributions, income, gains or losses, and expenses allocable to that Program and insurance contracts, if any, used as vehicles to pay benefits under the Program.

(1) **"Programs"** means the Navistar International Transportation Corp. Retiree Health Benefit Program and the Navistar International Transportation Corp. Retiree Life Insurance Program of the Plan.

(m) **"Trust Fund"** means the assets of the Trust.

(n) **"Trust Year"** means the fiscal year beginning on each November 1st and ending on the following October 31st; provided that the first Trust Year shall begin on the effective date specified by Section 12.9 hereof and shall end on the following October 31st.

1.2 **Gender and Number**. Masculine pronouns shall refer both to males and to females. Singular or plural words shall be construed to refer to the plural or the singular, respectively, where appropriate.

## ARTICLE II

## PAYMENTS TO AND FROM THE TRUST

2.1 **Payments to the Trust**. The Trustee shall receive any payments made to it in cash or in the form of such other property as it may from time to time deem acceptable and which shall have been delivered to it. Such payments may be made by the Company, by the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust, or by any other person or entity designated by the Company. All payments so received, together with the income therefrom and any other increment thereon, shall be held, invested, reinvested, and administered by the Trustee pursuant to the terms of this Agreement, without distinction between principal and income. The Trustee shall not be responsible for the calculation or collection of any contribution under, or required by, the Programs, but shall be responsible only for cash or other property received by it pursuant to this Agreement.

2.2 **Payments from the Trust**. The Trustee shall, from time to time and at the written direction of the Administrator, make, directly or indirectly, payments out of the Trust Fund in such amounts, to such persons, and for such purposes as may be specified in the written directions of the Administrator. To the extent permitted by law, the Trustee shall be under no liability for any payment made pursuant to the written direction of the Administrator or for any payment not made in the absence of a written direction of the Administrator. Any written direction of the Administrator shall constitute a certification that the

payment so directed is one that the Administrator or its designated representative is authorized to direct. If a dispute arises with respect to a payment, the Trustee may withhold or cause to be withheld such payment until the dispute has been resolved.

## ARTICLE III

## ADMINISTRATION OF ACCOUNTS

3.1 **Separate Accounts**. The assets allocable to each Program shall be allocated, for accounting purposes, to a separate Program Account for each Program. In addition, the Company may direct the Trustee in writing to account separately for such funds as the Company shall designate in writing, and if so directed, the Trustee shall establish separate accounts or sub-accounts for such funds. The funds allocated to such accounts and sub-accounts (including the Program Accounts) may be commingled for investment purposes. The Company shall designate to the Trustee in writing the account or sub-account to which each payment to and from the Trust is allocable.

## ARTICLE IV

## INVESTMENT AUTHORITY

4.1 **Trustee's Authority**. Except as otherwise provided in this Agreement, the Trustee shall have exclusive authority and discretion to manage and control the Trust Fund; to invest and reinvest the principal and income of the Trust Fund and keep the Trust Fund invested, as a single fund without distinction between principal and income, in such securities or in such property, real or personal, tangible or intangible, as the Trustee shall deem advisable, including but not limited to capital or common stocks (whether voting or nonvoting and whether or not currently paying a dividend), preferred stocks (whether voting or nonvoting and whether or not currently paying a dividend), bonds, notes, debentures, interests in investment companies, trusts, partnerships, and other pooled funds, savings bank deposits (including but not limited to savings accounts and savings investment media that are maintained by the Trustee's own Banking Department), and commercial paper, and in such other property, investments and securities, whether domestic or foreign, of any kind, class, or character as the Trustee may deem suitable for the Trust Fund, and such investment and reinvestment shall not be restricted to properties and securities authorized for investment by trustees under any present or future law; provided that in no event shall the Trustee make any investment prohibited by ERISA. The Trustee in its discretion may keep such portion of the Trust Fund in cash or cash equivalents (including deposits in the Trustee's own Banking Department) as the Trustee may from time to time deem to be in the interest of Participants and Beneficiaries, even if such balances exceed the maximum amount insured from time to time by the Federal Deposit Insurance Corporation. Except as otherwise provided by Article VII hereof, all rights associated with assets of the Trust shall be exercised by the Trustee; all such rights shall in no event be exercisable by or rest with Participants and Beneficiaries.

## ARTICLE V

## POWERS AND DUTIES OF THE TRUSTEE

5.1 **Powers**. The Trustee shall have the following powers with respect to the Trust Fund in addition to those conferred by laws:

(a) to sell, exchange, convey, transfer, or otherwise dispose of any property held by it, by private contract or at public auction; and no person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition;

(b) to make commitments either alone or in company with others to purchase at any future date any property, investments, or securities set forth in Section 4.1 hereof;

(c) to retain, manage, operate, repair, develop, preserve, improve, mortgage, or lease for any period any real property held by the Trustee upon such terms and conditions as the Trustee deems proper, either alone or by joining with others using other Trust assets for any such purposes if by it deemed

advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease, including the waiver of rentals, if by it deemed advisable; and to make provisions for the amortization of the investment or in depreciation of the value of such property as it may deem advisable;

(d)    to organize corporations under the laws of any State for the purpose of acquiring or holding title to any property for the Trust Fund or to request the Company to appoint another trustee for such purpose;

(e)    to retain any stocks or other property received as a result of the exercise of any of the powers herein granted, whether or not investment in such stocks or other property is authorized by Section 4.1 hereof;

(f)    to vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to exercise any conversion privileges, subscription rights, or other options, and to make any payments incidental thereto; to consent to or otherwise participate in corporate reorganizations or other changes affecting corporate securities and to delegate discretionary powers and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to stocks, bonds, securities, or other property held in the Trust Fund;

(g)    to make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(h)    to register any investment held in the Trust Fund in its own name or in the name of a nominee and to hold any investment in bearer form, to utilize the services of a depository clearing corporation (such as the Depository Trust Company) to the extent permitted by law, and to combine certificates representing such investments with certificates of the same issue held by the Trustee in other fiduciary capacities under employee benefit plans, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust;

(i)    to employ suitable agents and counsel and to pay reasonable expenses and compensation thereto;

(j)    to borrow money on such terms and conditions as the Trustee in its discretion may deem advisable;

(k)    to transfer monies of the Trust Fund to a common or collective trust fund or pooled investment fund; money and other assets of the Trust Fund invested in such a fund shall be held and administered by the trustee thereof strictly in accordance with the terms of, and under the powers governing, such fund to the extent consistent with this Agreement and the terms of the Programs funded hereunder; the combining of money and other assets of this Trust with money and other assets of such a fund is hereby specifically authorized;

(l)    to compromise or otherwise adjust all claims in favor of or against the Trust Fund;

(m)    to compromise, compound, and settle any debt or obligations upon such terms as the Trustee may deem advisable and to agree to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon, default, or otherwise enforce any such obligation; and

(n)    upon receipt of written direction from the Administrator, to use monies in the Trust Fund to purchase or maintain insurance or annuity contracts.

5.2    **Dealing with Trustee**.  In no event shall any purchaser, vendor, or other person dealing with the Trustee be required to ascertain the authority and power of the Trustee to make any sale, transfer, assignment, or investment of the whole or any part of the Trust Fund at any time held hereunder, or to make any contract in relation thereto, nor shall any insurance company be required to ascertain the power or authority of the Trustee to apply for and purchase any insurance or annuity contract, and any such person or company may rely upon any factual information furnished by the Trustee in connection therewith. All parties dealing with the Trustee with respect to the Trust Fund shall have the right to assume that the Trustee has full power and authority in all respects to deal with the Trust Fund and shall not be affected by any notice to the contrary, and no purchaser shall be required to see to the application of the purchase money.

5.3    **Fees and Expenses**. The Trustee shall be paid such reasonable compensation as may be agreed upon in writing from time to time between the Trustee and the Company. Such compensation and all fees and expenses incurred by the Trustee in the proper performance of its duties, including fees for legal services rendered to the Trustee and compensation paid to any Investment Manager, shall be paid

from the Trust Fund unless paid by the Company. All taxes of any kind that may be levied or assessed under existing or future laws upon, or with respect to, the Trust shall be paid from the Trust Fund.

        5.4    **Administration**. The Trustee shall not be responsible in any way for the administration of the Programs.

        5.5    **Consultation and Indemnification**. The Trustee may consult with counsel, and the Trustee shall not be deemed imprudent by reason of taking or refraining from taking any action in accordance with the opinion of counsel. The Company shall cause the Trust to indemnify and hold the Trustee harmless from and against any liability that the Trustee may incur in the administration of the Trust Fund, unless such liability arises from the Trustee's negligence or breach of the provisions of this Agreement or ERISA; provided that nothing in this Section 5.5 shall require any payment from any source other than the Trust or require any payment to be made to the Trust. The Trustee shall not be required to give any bond or any other security for the faithful performance of its duties under this Agreement, except such as may be required by law.

        5.6    **Responsibilities**. Except as required by ERISA, the Trustee shall be under no duty (i) to take any action other than as herein specified with respect to the Trust unless the Administrator or an Investment Manager shall furnish the Trustee with instructions in proper form as described by Section 5.8 hereof or (ii) to engage in any suit with respect to the Trust unless the Trustee shall have first agreed in writing to do so and shall have been fully indemnified to the satisfaction of the Trustee. To the extent not prohibited by ERISA, the Trustee shall not be responsible or liable in any way for any action or omission of the Company, the Administrator, or the Committee with respect to the performance of their duties and obligations as set forth in the Programs and this Agreement; provided that the Trustee shall not be relieved of responsibility or liability for any responsibility, obligation, or duty imposed upon it under this Agreement or under ERISA. The Trustee is a party to this Agreement solely for the purpose set forth in this Agreement and to perform the acts set forth herein, and no obligation or duty shall be imposed upon it except as expressly stated herein or as required by ERISA.

        5.7    **Direction**. The Trustee may request the advice or direction of the Administrator with respect to the administration of the Trust and the distribution of the Trust Fund, and, to the extent permitted by ERISA, shall be protected from liability in relying upon any direction given to it by the Administrator, in writing, in response to such a request.

        5.8    **Reliance on Written Instructions**. The Trustee shall be entitled to rely upon any written notice, instruction, direction, certificate, or other communication believed by it to be genuine and to be signed by the Company, the Administrator, an Investment Manager, or their authorized agent(s) or representative(s), unless it knows or should know that the direction or instruction constitutes a breach of the Company's, the Administrator's, or the Investment Manager's fiduciary responsibility with respect to the Trust. The Trustee shall be fully protected in making payments out of the Trust Fund, or in taking or omitting to take any other actions, in accordance with the written instructions of the Company, the Administrator, an Investment Manager, or their authorized agent(s) or representative(s), and shall have no responsibility to see to the application of any such payments by the Participants or their Beneficiaries or legal representatives, or by any other recipients thereof specified in such instructions, or to ascertain whether such instructions comply with the terms of the Programs, or to determine the rights or benefits of any person in the Trust or under the Programs, and shall not be liable to any person for or in respect of any payment made by it, or action taken or omitted to be taken by it, in good faith without notice or knowledge of a change in the condition or status of any person affecting that person's rights hereunder; provided that if the Trustee knows or should know that such an instruction constitutes a breach of fiduciary responsibility with respect to the Programs, the Trustee shall inform the Administrator of the breach. The Company, the Administrator, and any Investment Manager(s) shall furnish the Trustee with a list naming their authorized agent(s) or representative(s), and describing the scope of the authority granted, and shall notify the Trustee of any changes to the list. Absent such notification, the Trustee may assume no change has occurred with respect to each list.

**ARTICLE VI**

**FUNDING POLICY AND INVESTMENT OBJECTIVES**

6.1     **Communication to Trustee**. The Administrator shall inform the Trustee in writing of the funding policy under the Programs and of the investment objectives of the Trust and of any changes or modifications therein. Until the Administrator informs the Trustee in writing of any change in the funding policy under the Programs or of any change in the investment objectives of the Trust, the Trustee may assume that there has been no change in the funding policy or the investment objectives, as the case may be.

## ARTICLE VII

## DUTIES OF THE ADMINISTRATOR

7.1     **Information**. The Administrator shall furnish the Trustee with such information and data relating to the Programs as are necessary for the Trustee to carry out its duties under this Agreement.

7.2     **Investment Responsibility**.  The Trustee, and not the Administrator, shall have the full responsibility for investment of the Trust Fund, except where the Administrator has appointed an Investment Manager pursuant to Section 7.3 hereof or has established a segregated fund managed by the Administrator pursuant to Section 7.5 hereof.

7.3     **Appointment of Investment Manager**. The Administrator may appoint one or more Investment Managers for the purpose of directing the Trustee with respect to the investment or reinvestment of all or any portion of the Trust Fund. The Administrator shall certify to the Trustee the appointment and scope of authority of, and any resignation or removal or change in authority of, any Investment Manager appointed by it under this Section, the appointment of any successor thereto, and the identity of the individual or individuals entitled to act on behalf of the Investment Manager. In particular, the Administrator shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any change or revocation thereof. An Investment Manager shall present evidence to the Trustee of its qualifications as an Investment Manager under Section 3(38) of ERISA, and shall acknowledge in writing its appointment as a fiduciary of the Programs.

7.4     **Responsibility of Investment Manager**. An Investment Manager shall have sole investment responsibility for that portion of the assets of the Trust Fund that it has been appointed to manage. An Investment Manager that has been thus granted such responsibility shall have all the investment powers enumerated in Article IV hereof that shall be granted to it by the Administrator. Where such an Investment Manager has been appointed by the Administrator, the Trustee shall have no duty to review or recommend any investment or reinvestment of the Trust Fund, nor shall the Trustee be charged with the duties imposed by Section 8.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to any Investment Manager. The Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this Section. The Trustee shall be under no duty to question the direction or lack of direction of any Investment Manager, but shall act, and shall be fully protected in acting, in accordance with each such direction.

7.5     **Segregated Fund**.  The Administrator may create a segregated fund by certifying to the Trustee in writing that it has established a segregated fund in accordance with procedures that are consistent with Section 403(a)(1) of ERISA, the investment and control of the assets of which are to be the sole and exclusive responsibility of the Administrator. The Administrator shall have complete discretionary authority to direct the Trustee with respect to the investment and reinvestment of the portion of the Trust Fund constituting the segregated fund, as specified by the Administrator, without any requirement that any other fiduciary be consulted prior to the giving of any such directions to the Trustee or the carrying out of such directions by the Trustee. If the Administrator has thus assumed such discretionary authority, the Administrator shall have all the investment powers enumerated in Article IV hereof. The Administrator shall certify to the Trustee the scope of its authority, any change in the authority of the Administrator, and the identity of the individual or individuals entitled to act on behalf of the Administrator. In particular, the Administrator shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such

certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any change or revocation thereof, and the Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this Section. The Trustee shall have no duty to review or to recommend any investment or reinvestment of the segregated fund, nor shall the Trustee be charged with the duties imposed by Section 8.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to the Administrator. The Trustee shall have no discretionary authority over a segregated fund, but shall be subject, with respect to the segregated fund, to all proper directions of the Administrator that are not contrary to the terms of ERISA.

## ARTICLE VIII
## FIDUCIARY OBLIGATIONS

8.1 **Standard of Fiduciary Conduct**. The Trustee shall discharge its duties solely in the interest of the Participants and Beneficiaries and

(a) for the exclusive purpose of providing benefits to Participants and Beneficiaries and defraying reasonable expenses of administering the Programs (including any such expenses incurred by the Administrator or the Committee);

(b) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(c) by diversifying the investments of the Programs so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so; and

(d) in accordance with this Agreement, except to the extent that this Agreement may be inconsistent with ERISA.

8.2 **Prohibited Inurement**. Except as provided herein and in the Programs, none of the assets of the Trust shall inure to the benefit of the Company, any affiliate thereof, or any other person except through the payment of benefits provided under the Programs (including the payment of reasonable Program administration expenses). Notwithstanding the foregoing, if the Company makes a contribution to the Trust by a mistake of fact, the contribution (reduced by any investment losses, but not increased by any investment gains) may be returned to the Company within one year after the payment of the contribution.

8.3 **Scope of Responsibility**. A fiduciary not charged with a specific responsibility under the provisions of the Programs or this Agreement shall be under no duty to question any action or lack of action of another fiduciary with respect to such responsibility, and shall not be liable for a breach of fiduciary responsibility by another fiduciary, unless the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary knowing such act is a breach, or if, having knowledge of a breach by such other fiduciary, the fiduciary fails to make reasonable efforts under the circumstances to remedy the breach.

## ARTICLE IX
## ACCOUNTING

9.1 **Accounting for Trust Fund**. The Trustee shall keep timely, accurate, and detailed accounts of all investments, receipts, disbursements, and other transactions hereunder, and all accounts, books, and records relating hereto shall be open to inspection and audit at all reasonable times by the Administrator and any other person designated by the Administrator. Within sixty (60) days following the close of each Trust Year, within sixty (60) days after the removal or resignation of the Trustee, and at such other times as the Administrator reasonably may require, the Trustee shall file with the Administrator a written account setting forth all investments, receipts, disbursements, and other transactions effected by the Trustee during such Trust Year or since the date of its last account. The Trustee, within the same time periods, shall ascertain and certify to the Administrator, in accordance with applicable U.S. Department of Labor regulations, the cost and fair market values as of the close of such Trust Year (or such other period as the Administrator may require) of all securities and other properties held in the Trust Fund. Such fair market

values shall be determined either by the Trustee itself or by such person or persons believed by the Trustee to be competent to make such determination as the Trustee may select, but in accordance with a method consistently followed and uniformly applied. The Trustee, within the same time periods, also shall furnish to the Administrator a balance sheet containing a description in reasonable detail of all assets and liabilities of the Trust. In the event any portion of the Trust Fund has been transferred to a common or collective trust fund pursuant to Section 5.1 hereof, such account shall include a copy of the latest annual written account of the common or collective trust fund. The Administrator shall have the right to require an audit by certified public accountants of the records and assets of the Trust. The expenses and any special fee charged by the Trustee for any such audit shall be paid pursuant to the provisions of Section 5.3 hereof.

**ARTICLE X**

**RESIGNATION, REMOVAL, AND SUCCESSION OF TRUSTEE**

10.1 **Resignation**. The Trustee may resign at any time by giving sixty (60) days' notice in writing to the Company.

10.2 **Removal**. The Company may remove the Trustee at any time by giving thirty (30) days' notice in writing to the Trustee.

10.3 **Successor Trustee**. In no event shall the resignation or removal of the Trustee terminate this Agreement, but upon such resignation or removal of the Trustee, the Company shall have the duty forthwith of appointing a successor trustee, who shall have the same powers and duties conferred upon the Trustee hereunder. In the event of such resignation or removal of such Trustee and upon the appointment of a successor trustee and acceptance of such Trustee, the Trustee shall turn over to the successor trustee the Trust Fund and all records of books of account and other documents pertaining to this Agreement that are in its possession, reserving such sums as the Trustee shall reasonably deem necessary to defray its expenses in settling its accounts, to pay any of its compensation due and unpaid, and to discharge any obligation of the Trust Fund for which the Trustee may be liable; and if the sums so reserved are not sufficient for these purposes, the Trustee shall be entitled to recover the amount of any deficiency from either the Company or the successor trustee, or both. To the extent permitted by ERISA, after the Trust Fund has been properly transferred and delivered to the successor trustee, the Trustee shall be released and discharged from all further accountability or liability for the Trust Fund and shall not be responsible in any way for the further disposition of the Trust Fund or any part thereof.

10.4 **Waiver of Notice**. In the event of any resignation or removal of the Trustee, the Trustee and the Company may in writing waive any notice of resignation or removal as may be provided hereunder.

**ARTICLE XI**

**AMENDMENT AND TERMINATION OF AGREEMENT**

11.1 **Amendment**. This Agreement may be amended in writing at any time or from time to time, in whole or in part, by action of the Company, and any such amendment may be retroactive. However, no amendment that affects the rights, duties, or responsibilities of the Trustee shall become effective without the Trustee's written consent. No amendment shall be inconsistent with the requirements of ERISA or with the provisions of the Programs. No amendment shall authorize or permit any assets of the Programs to be used for, or diverted to, purposes other than for the exclusive benefit of Participants and Beneficiaries of the Programs and the payment of reasonable Program administration expenses prior to the satisfaction of all liabilities under the Programs. No amendment shall cause or permit any portion of the Trust Fund to revert to or become the property of the Employers.

11.2 **Termination**. The Company may terminate the Trust in accordance with the terms of the Programs.

11.3 **Distribution Upon Termination**. In the event of the termination of the Trust, or of all or any part of a Program, the funds of which are held hereunder, the Trustee shall dispose of such funds in accordance with the written order of the Administrator. Such order shall require that the funds of each Program be disposed of in a

manner that benefits the Participants and Beneficiaries covered by the Program (including the payment of reasonable Program administration expenses); provided that if all of the liabilities of a Program have been satisfied, any remaining assets of that Program shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code) as the Company shall determine in its discretion. Notwithstanding the foregoing, in the event the Programs are terminated pursuant to a termination of the Settlement Agreement in Shy v. Navistar International Corporation, any assets of the Programs shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code) as determined by the Company in its discretion. Except as provided by Section 8.2 hereof, under no condition shall the termination of the Trust result in a distribution of any portion of the Trust Fund to the Employers.

## ARTICLE XII

## MISCELLANEOUS

12.1 **Limited Effect of Programs and Trust**.  Neither the establishment of the Programs nor the Trust nor any modification thereof, nor the creation of any fund or account, nor the payment of any amounts from the Trust, shall be construed as giving to any Participant or Beneficiary any legal or equitable right against the Trustee, the Company, the Administrator, the Committee, or any affiliate, director, officer, employee, agent, or representative thereof, except as may otherwise be expressly provided in the Programs and except as may otherwise be provided by ERISA.  Under no circumstances shall the terms of employment of any employee be modified or in any way affected by the Trust or this Agreement.

12.2 **Nonalienation of Benefits**. Except as otherwise required by law, neither the benefits payable from any Program Account nor any Participant's or Beneficiary's interest in any of the assets of the Trust shall be subject to any manner of anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, garnish, execute, levy upon, or otherwise dispose of any right to benefits payable under, or any interest in, the Trust Fund shall be void. Neither the Trust Fund nor the Trustee shall in any manner be liable for, or be subject to, the debts, contracts, liabilities, engagements, or torts of any person entitled to benefits from a Program.

12.3 **Governing Law**. This Agreement shall be administered, construed, and enforced according to the laws of the State of Illinois, except to the extent superseded by ERISA or any other federal law.

12.4 **Severability**.  If any provision of this Agreement shall be held illegal or invalid, such illegality or invalidity shall not affect the remaining provisions of this Agreement but shall be fully severable, and this Agreement shall be construed and administered as if said illegal or invalid provision had never been inserted herein.

12.5 **Binding Effect**.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Company and its successors, the Trustee and its successors in Trust, and the Participants and their Beneficiaries, and their respective heirs, personal representatives, successors and assigns, in accordance with and subject to the terms hereof.

12.6 **Number of Originals**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and the counterparts shall constitute one and the same instrument, which shall be sufficiently evidenced by any one thereof.

12.7 **Fiduciary Duties**.  Nothing in this Agreement shall relieve or be deemed to relieve the Trustee or any other fiduciary from any responsibility or liability for any responsibility, obligation, or duty imposed by or under ERISA.

12.8 **Evidence of Authority**.  The execution by the Trustee of any instrument, document, or paper in connection with the exercise of any of the powers enumerated herein shall, of itself,

be conclusive evidence to all persons of the authority of the Trustee to execute the same and to exercise all powers incident thereto.

       12.9   **Effective Date**.  This Agreement shall be effective as of the 1st day of July, 1993.

        12.9   <u>Effective Date</u>.  This Agreement shall be effective as of the 1st day of July, 1993.

        **IN WITNESS WHEREOF**, this Agreement has been executed this 18th day of June, 1993.

<table>
<tr><td></td><td>NAVISTAR INTERNATIONAL<br>TRANSPORTATION CORP.</td></tr>
<tr><td>Attest:<br><br>_____</td><td>By: _____<br>        Thomas M. Hough<br>       Vice President and Treasurer</td></tr>
<tr><td></td><td>THE NORTHERN TRUST COMPANY, as Trustee for the Navistar International Transportation Corp. Retiree Health Benefit Trust</td></tr>
<tr><td>Attest:<br>_____<br>ASSISTANT SECRETARY</td><td>By: _____<br><br>Title: _____</td></tr>
</table>

- 11 -

APPENDIX A-5

**Navistar International Transportation
Corporation
Postretirement Benefit Programs**

**Actuarial Valuation
as of January 1, 1993**

## ACTUARIAL STATEMENT OF OPINION

This report presents the results of the January 1, 1993 valuation of Navistar International Transportation Corporation's postretirement medical and life insurance benefit program. It has been prepared to support the actuarial mechanics of the proposed settlement. The report also presents an actuarial projection of valuations for January 1, 1994 and January 1, 1995. Results for different accounting periods or for other purposes may differ significantly from the results reported herein.

The calculations reported in this valuation report have been made on a basis consistent with our understanding of *SFAS No. 106, Employers' Accounting for Postretirement Benefits Other Than Pensions.* It was prepared in accordance with the provisions of the *Actuarial Compliance Guideline No. 3 For SFAS No. 106.* This report, however, should not be considered to provide accounting advice.

Our calculations were based on the employee/retiree demographic and financial data, furnished by Navistar and information gathered through discussions with Navistar personnel. We also relied upon detailed claims data furnished by Navistar and Medstat. The data have not been audited by Coopers & Lybrand and we cannot certify as to the accuracy of completeness of the data supplied. Our calculations are based on our understanding of Navistar's postretirement benefit programs as described by Navistar personnel and presented in this report.

This valuation was based upon generally accepted actuarial methods. We performed such tests as we considered necessary to ensure the accuracy of the results. We certify that the amounts presented in the accompanying report have been determined appropriately according to the actuarial assumptions and methods stated herein. It should be recognized, however, that because future events frequently do not occur exactly as expected, there are usually differences between projected and actual results. Accordingly, there can be no assurance that actual experience will match our projections.

Respectfully submitted,

COOPERS & LYBRAND

By: _____     By: _____
    Jeannie M. Wodarczyk                                                G. Todd Swim
    F.S.A., M.A.A.A.                                                          F.S.A., M.A.A.A.

# CONTENTS

SECTION I            VALUATION RESULTS

SECTION II           POSTRETIREMENT BENEFIT PLAN PROVISIONS

SECTION III          PARTICIPANT DATA

SECTION IV           BASELINE COST DETERMINATION

SECTION V            ACTUARIAL ASSUMPTIONS AND METHODS

SECTION VI           DETAILED TABLES OF VALUATION RESULTS

Navistar International
Transportation Corporation                                    Coopers & Lybrand

# SECTION I
# VALUATION RESULTS

This valuation report summarizes our measurement of Navistar's obligations under the provisions of SFAS No. 106. The valuation incorporates all postretirement medical and life insurance benefits applicable to Navistar's active employees, retirees, and their dependents.

**Please note: All valuation results presented in this report are based on our understanding of the provisions of SFAS No. 106, Navistar's plan provisions, the census and claims data provided by Navistar and Medstat, and the assumptions chosen by management, as described in this report.**

## *VALUATION RESULTS*

### January 1, 1993 Valuation Results

The following table summarizes Navistar's accumulated postretirement benefit obligation (APBO) as of January 1, 1993 based on the covered participants and the postretirement medical and life insurance plans in effect at that time.

---

**I-1**

**APBO as of January 1, 1993**
**(Medical, Including Drugs and Life – Contributions)**
**($millions)**

|  | Total |
|---|---|
| Medical | $ 998.1 |
| Drugs | 332.9 |
| Life | 54.4 |
| Contributions | (385.3) |
| Total | 1,000.1 |
| Percent of total | 100.0% |

---

**SECTION I**
**VALUATION RESULTS**
**(continued)**


**Valuation Results for Future Years**

The obligations were projected for fiscal years 1994 and 1995 based on the January 1, 1993 valuation assumptions. The projection assumed retirements, terminations, and deaths according to the valuation assumptions documented in Section V. The projection is a closed group projection.

Tables I-2 and I-3 summarize Navistar's projected APBO for 1993, 1994, and 1995.

---

**I-2**

**Projected APBO**
**($ millions)**
**Medical Programs**

| | Medical + Drug - Contributions | |
|---|---|---|
| | Total | |
| | APBO | % Share |
| 1/1/93 employer's share | $  945.7 | 71.1% |
| Covered participants' | 385.3 | 28.9% |
| | 1,331.0 | 100.0% |
| 1/1/94 employer's | $  990.9 | 71.7% |
| Covered participants' | 390.2 | 28.3% |
| | 1,381.1 | 100.0% |
| 1/1/95 employer's | $ 1,035.3 | 72.6% |
| Covered participants' | 390.0 | 27.4% |
| | 1,425.3 | 100.0% |

---

**SECTION I**
**VALUATION RESULTS**
**(continued)**

---

**I-3**

**Projected APBO**
**($ millions)**
**Medical and Life Insurance Programs**

1/1/93 <u>Total</u>

| | | |
|---|---|---|
| Medical | $ | 998.1 |
| Drugs | | 332.9 |
| Life | | 54.4 |
| Retiree contributions | | 385.3 |

Net medical =
(Medical + Drugs + Life – Cont.)                $    1,000.1

1/1/94 <u>Total</u>

| | | |
|---|---|---|
| Medical | $ | 1,031.3 |
| Drugs | | 349.9 |
| Life | | 54.7 |
| Retiree contributions | | 390.2 |

Net medical =
(Medical + Drugs + Life – Cont.)                $    1,045.7

1/1/95                                    <u>Total</u>

| | | |
|---|---|---|
| Medical | $ | 1,060.5 |
| Drugs | | 364.8 |
| Life | | 54.7 |
| Retiree contributions | | 390.0 |

Net medical =
(Medical + Drugs + Life – Cont.)                $    1,090.0

---

Navistar International
Transportation Corporation                              Coopers & Lybrand

**SECTION I**
**VALUATION RESULTS**
**(continued)**

Obligations were projected through 2002 on the same closed group basis. The following two tables summarize Navistar's projected covered participants, cash flows, and service cost.

---

**I-4**

**Projected Cash Flows and Covered Participants**
**($ thousands)**

| Year | Covered Participants<br>Retirees and Dependents | Cash Flows Less Contributions | | |
| --- | --- | --- | --- | --- |
| | | Medical<br>+ Drugs | Life | Total |
| 1993 | 58,149 | $53,524 | $4,663 | $ 58,187 |
| 1994 | 56,881 | 58,831 | 4,798 | 63,629 |
| 1995 | 55,368 | 64,434 | 4,920 | 69,354 |
| 1996 | 53,920 | 70,365 | 5,060 | 75,425 |
| 1997 | 52,540 | 76,654 | 5,157 | 81,811 |
| 1998 | 51,303 | 83,345 | 5,241 | 88,586 |
| 1999 | 50,092 | 90,583 | 5,312 | 95,895 |
| 2000 | 48,991 | 97,397 | 5,367 | 102,764 |
| 2001 | 47,773 | 103,961 | 5,405 | 109,366 |
| 2002 | 46,560 | 109,584 | 5,425 | 115,009 |

Navistar International
Transportation Corporation
Coopers & Lybrand

**SECTION I**
**VALUATION RESULTS**
**(continued)**

---

**I-5**

**Projected Annual Service Cost**
**($ thousands)**

| Year | Medical + Drugs | Life | Total |
|------|-----------------|------|-------|
| 1993 | $11,466 | $177 | $11,643 |
| 1994 | 11,566 | 172 | 11,737 |
| 1995 | 11,653 | 160 | 11,813 |
| 1996 | 8,926 | 115 | 9,041 |
| 1997 | 8,564 | 107 | 8,671 |
| 1998 | 8,364 | 101 | 8,465 |
| 1999 | 7,243 | 80 | 7,323 |
| 2000 | 7,275 | 77 | 7,351 |
| 2001 | 5,672 | 57 | 5,729 |
| 2002 | 5,303 | 51 | 5,354 |

---

Navistar International
Transportation Corporation

Coopers & Lybrand

## SECTION II
## POSTRETIREMENT BENEFIT PLAN PROVISIONS

Navistar's postretirement medical and life insurance plan provisions are summarized in the following pages.

**Exhibit II-1** summarizes our understanding of the major provisions of the postretirement medical plans.

**Exhibit II-2** summarizes our understanding of the major provisions of the postretirement life insurance plans.

**SECTION II**
**POSTRETIREMENT BENEFIT PLAN PROVISIONS**
(continued)

*Exhibit II-1*

**Postretirement Medical Plan Provisions**

| Plan Feature | Description |
|---|---|
| Retiree eligibility: | |
|    Represented | Age 65 with 1+ years of service, or Age 60 with 10+ years of service, or 30+ years of service. |
|    Nonrepresented | Age 55 with 10+ years of service, or 30+ years of service. |
| Period of coverage | Lifetime. |
| Spouse/dependent coverage | Spouses at date of retirement have lifetime coverage. Dependent children covered to age 1(?) (25 under certain conditions), or lifetime if permanently disabled. |
| Plan type | Comprehensive major medical. |
| Deductible | $200. |
| Coinsurance | Pre-65 — 80%. Post-65 — 100%. |
| Annual out-of-pocket maximum | Pre-65 — $500. Post-65 — $200. |
| Lifetime maximum | None. |

Navistar International
Transportation Corporation

Coopers & Lybrand

**SECTION II**
**POSTRETIREMENT BENEFIT PLAN PROVISIONS**
(continued)

---

*Exhibit II-1*

**Postretirement Medical Plan Provisions**
**(continued)**

| Plan Feature | Description |
|---|---|
| Retiree contributions | Pre-65 — $70/month in 1993.<br>Post-65 — $34/month in 1993.<br><br>Base contributions are scheduled to increase at 6% per year. Contributions may increase or decrease due to cost sharing of certain actuarial gains and losses as described in Section 3.4 of Article III. |
| Part B Medicare premium | Paid by retiree. |
| Drug copayments | Retail pharmacy: $18 for brand name; $8 for generics.<br><br>Mail order: $7; 30-day maximum in mail order. |

---

**SECTION II**
**POSTRETIREMENT BENEFIT PLAN PROVISIONS**
(continued)

---

*Exhibit II-2*

**Postretirement Life Insurance Plan Provisions**

| Plan Feature | Description |
|---|---|
| Retiree eligibility: | |
|     Represented | Age 65 with 1+ years of service, or Age 60 with 10+ years of service, or 30+ years of service. |
|     Nonrepresented | Age 55 with 10+ years of service, or 30+ years of service. |
| Period of coverage | Lifetime. |
| Spouse/dependent coverage | None. |
| Retiree contributions | None. |
| Death benefit amount | Based on salary and years of service with $5,000 maximum benefit. Limited additional coverage can be purchased at group rates. |

---

Navistar International
Transportation Corporation

Coopers & Lybrand

# SECTION III
## PARTICIPANT DATA

The participant demographic data (active and retired) were provided by Navistar. The following tables summarize the demographic data provided.

**Exhibit III-1** summarizes the active employee census by age and years of service used for the 1/1/93 valuation.

**Exhibit III-2** summarizes the retired participant census, both retirees and their dependents, by age used for the 1/1/93 valuation.

# SECTION III
# PARTICIPANT DATA
(continued)

*Exhibit III-1*

### Active Employee Census as of January 1, 1993

| Age | Years of Service 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30+ | Total |
|---|---|---|---|---|---|---|---|---|
| < 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 20-24 | 64 | 3 | 0 | 0 | 0 | 0 | 0 | 67 |
| 25-29 | 313 | 102 | 0 | 0 | 0 | 0 | 0 | 415 |
| 30-34 | 240 | 227 | 52 | 3 | 0 | 0 | 0 | 522 |
| 35-39 | 227 | 192 | 146 | 119 | 77 | 0 | 0 | 761 |
| 40-44 | 172 | 175 | 240 | 273 | 1,140 | 140 | 0 | 2,140 |
| 45-49 | 137 | 141 | 251 | 229 | 1,257 | 1,586 | 263 | 3,864 |
| 50-54 | 49 | 112 | 86 | 373 | 911 | 1,472 | 1,231 | 4,234 |
| 55-59 | 46 | 46 | 78 | 137 | 379 | 611 | 918 | 2,215 |
| 60-64 | 7 | 27 | 14 | 31 | 80 | 137 | 244 | 540 |
| 65+ | 0 | 2 | 3 | 7 | 9 | 12 | 36 | 69 |
| Total | 1,255 | 1,027 | 870 | 1,172 | 3,853 | 3,958 | 2,692 | 14,827 |

*Average age: 48.1*

*Average years of service: 21.7*

*Total employees NFC*: 370*

*Total employees Navistar (excluding NFC)*: 14,457*

•**NFC = Navistar Financial Corp.**

Navistar International
Transportation Corporation

Coopers & Lybrand

**SECTION III**

**PARTICIPANT DATA**
(continued)

*Exhibit III-2*

**Retired Census as of January 1, 1993**

| Age | Medical Program Retirees and Dependents | Life Insurance Retirees |
|---|---|---|
| < 50 | 930 | 165 |
| 50-54 | 1,740 | 390 |
| 55-59 | 4,344 | 1,181 |
| 60-64 | 7,669 | 2,017 |
| 65-69 | 11,297 | 3,262 |
| 70-74 | 11,355 | 3,215 |
| 75-79 | 9,948 | 2,797 |
| 80-84 | 6,454 | 1,695 |
| 85-89 | 3,065 | 740 |
| 90-94 | 1,091 | 195 |
| 95+ | 257 | 13 |
| Total | 58,149 | 15,668 |
| | | |
| **Average age:** | 70.8 | 70.7 |
| **Total NFC*:** | 217 | 111 |
| **Total Navistar (excluding NFC)*:** | 57,932 | 15,557 |

*NFC = Navistar Financial Corp.

Navistar International
Transportation Corporation

Coopers & Lybrand

## SECTION IV
## BASELINE COST DETERMINATION

The estimation of postretirement benefit obligations is based on average per capita costs for a one-year period. These are referred to as the "baseline costs." The components of baseline costs and the current plan population are projected into the future to estimate future benefit payments using assumptions to estimate the effect of future trends and population changes.

Navistar's baseline costs were based on actual claims data provided by Medstat. Although reviewed for reasonableness, the data used in developing the baseline costs were not audited by Coopers & Lybrand. A description of the data used and the methods employed to develop the baseline cost assumptions is presented in the remainder of this section.

To understand the discussion of baseline costs presented in this section, it is important to differentiate between "eligible charges" and "net incurred claims." Eligible charges generally represent the gross amount of the bills received for retirees. Net incurred claims are eligible charges less retiree copayments and deductibles, other insurance, and Medicare payments. In other words, net incurred claims represent the net claims amount paid by the employer prior to recognition of retiree contributions, if any. SFAS No. 106 calls for trend assumptions to be applied to eligible charges and explicit recognition of the impact of fixed plan design features. Consistent with the FASB intent, we applied the cost trend assumptions to the eligible charges and separately projected copayments, deductibles, other insurance, and Medicare payments.

### *1991 CLAIMS EXPERIENCE*

Eligible charges were developed for:

> ➢ Total medical
> ➢ Total admin.

Offsets to eligible charges were categorized into the following:

> ➢ Medical deductible and coinsurance
> ➢ Drug copayments
> ➢ COB (other insurance)
> ➢ Medicare

For each individual, eligible charges minus the offsets (deductible, coinsurance, COB Medicare) equals the incurred net claims.

The 1991 per capita claims for medical and drugs were adjusted for plan design changes and trended to 1993 as shown on the following page.

**SECTION IV**
**BASELINE COST DETERMINATION**
**(continued)**

*Exhibit IV-1*

**1993 Average Per Capita Costs**

| | Medical | Drug | Admin. | Deductible | Drug Copays | Medicare | COB | Net Claims |
|---|---|---|---|---|---|---|---|---|
| **Nonrepresented age:** | | | | | | | | |
| < 50 | $2,063 | $276 | $156 | $220 | $105 | $ 0 | $417 | $1,753 |
| 50-54 | 1,653 | 302 | 142 | 220 | 116 | 0 | 280 | 1,481 |
| 55-59 | 2,234 | 335 | 174 | 220 | 126 | 0 | 369 | 2,028 |
| 60-64 | 3,907 | 381 | 266 | 220 | 144 | 0 | 593 | 3,597 |
| 65-69 | 3,290 | 318 | 84 | 110 | 123 | 2,563 | 0 | 896 |
| 70-74 | 3,997 | 366 | 83 | 110 | 140 | 3,316 | 0 | 880 |
| 75-79 | 4,979 | 399 | 82 | 110 | 151 | 4,339 | 0 | 860 |
| 80+ | 4,545 | 396 | 80 | 110 | 151 | 3,908 | 0 | 852 |
| **Represented age:** | | | | | | | | |
| < 50 | $2,269 | $276 | $169 | $242 | $105 | $ 0 | $458 | $1,909 |
| 50-54 | 1,819 | 302 | 153 | 242 | 116 | 0 | 308 | 1,608 |
| 55-59 | 2,457 | 335 | 188 | 242 | 126 | 0 | 406 | 2,206 |
| 60-64 | 4,298 | 381 | 289 | 242 | 144 | 0 | 652 | 3,930 |
| 65-69 | 3,619 | 318 | 92 | 121 | 123 | 2,820 | 0 | 965 |
| 70-74 | 4,397 | 366 | 91 | 121 | 140 | 3,648 | 0 | 945 |
| 75-79 | 5,477 | 399 | 90 | 121 | 151 | 4,773 | 0 | 921 |
| 80+ | 4,999 | 396 | 87 | 121 | 151 | 4,299 | 0 | 911 |

# SECTION V
## ACTUARIAL ASSUMPTIONS AND METHODS

### *Actuarial Assumptions*

| | |
|---|---|
| Discount rate | 9%. |
| Health care trend rates | Trend rates for each year are illustrated in Exhibit V-II |
| Mortality | Same as used in pension valuation. Rates in Exhibit V-II. |
| Retirement | Same as pension valuation. The following table illustrates the retirement rates applicable to active employees eligible to retire. |

| Age | Represented | Nonrepresented |
|---|---|---|
| < 50 | 0% | 0% |
| 50-54 | 5% | 0% |
| 55-59 | 12% | 15% |
| 60-61 | 16% | 25% |
| 62 | 40% | 40% |
| 63-64 | 35% | 35% |
| 65 | 50% | 70% |
| 66-69 | 50% | 40% |
| 70 | 100% | 100% |

| | |
|---|---|
| Turnover | Annual ultimate rates based on attained age are illustrated in Exhibit V-II. |
| Disability | Current retired disabled employees are included with normal retirees in the valuation. Any additional disabled employees are assumed to remain in the active medical plan, accruing years of service, until eligible to retire. Separate disability decrement rates are not considered. |
| Coverage | Where coverage is available, 100% of all retirees will participate in the postretirement benefit plans. |
| Dependents of future retirees | 90% prior to the year 2000; 50% after 2000 to reflect increasing spousal coverage under dual benefits. |
| Payment of claims | Assumed to occur mid-year. |

Navistar International
Transportation Corporation

Coopers & Lybrand

**SECTION V**
**ACTUARIAL ASSUMPTIONS AND METHODS**
**(continued)**

*Exhibit V-1*

**Health Care Trend Rates**

| Year | Medical Pre-65 | Medical Post-65 | Drug | Administrative Costs | Deductible | COB | Medicare |
|------|------|------|------|------|------|------|------|
| 1994 | 11.0 | 9.0 | 14.0 | 8.0 | 6.0 | 11.0 | 9.0 |
| 1995 | 10.7 | 8.8 | 12.5 | 7.5 | 6.0 | 10.7 | 8.8 |
| 1996 | 10.4 | 8.6 | 11.0 | 7.0 | 6.0 | 10.4 | 8.6 |
| 1997 | 10.1 | 8.4 | 9.5 | 6.5 | 6.0 | 10.1 | 8.4 |
| 1998 | 9.8 | 8.2 | 8.6 | 6.0 | 6.0 | 9.8 | 8.2 |
| 1999 | 9.5 | 8.0 | 8.2 | 5.5 | 6.0 | 9.5 | 8.0 |
| 2000 | 9.2 | 7.8 | 8.0 | 5.5 | 6.0 | 9.2 | 7.8 |
| 2001 | 8.9 | 7.6 | 7.8 | 5.5 | 6.0 | 8.9 | 7.6 |
| 2002 | 8.6 | 7.4 | 7.6 | 5.5 | 6.0 | 8.6 | 7.4 |
| 2003 | 8.2 | 7.3 | 7.4 | 5.5 | 6.0 | 8.2 | 7.3 |
| 2004 | 7.9 | 7.1 | 7.2 | 5.5 | 6.0 | 7.9 | 7.1 |
| 2005 | 7.6 | 6.9 | 7.0 | 5.5 | 6.0 | 7.6 | 6.9 |
| 2006 | 7.3 | 6.7 | 6.8 | 5.5 | 6.0 | 7.3 | 6.7 |
| 2007 | 7.0 | 6.5 | 6.6 | 5.5 | 6.0 | 7.0 | 6.5 |
| 2008 | 6.7 | 6.3 | 6.1 | 5.5 | 6.0 | 6.7 | 6.3 |
| 2009 | 6.4 | 6.1 | 6.2 | 5.5 | 6.0 | 6.4 | 6.1 |
| 2010 | 6.1 | 5.9 | 6.0 | 5.5 | 6.0 | 6.1 | 5.9 |
| 2011 | 5.8 | 5.7 | 5.8 | 5.5 | 6.0 | 5.8 | 5.7 |
| 2012+ | 5.5 | 5.5 | 5.5 | 5.5 | 6.0 | 5.5 | 5.5 |

Navistar International
Transportation Corporation

Coopers & Lybrand

**MORTALITY AND TURNOVER ASSUMPTIONS**
**ANNUAL RATES PER 1,000 PARTICIPANTS**

| Age | Rep & Non-Rep Mortality | Turnover Represented | Turnover Nonrepresented |
|---|---|---|---|
| 11 | 0.416 | 0.0 | 0.0 |
| 12 | 0.416 | 0.0 | 0.0 |
| 13 | 0.416 | 0.0 | 0.0 |
| 14 | 0.420 | 0.0 | 0.0 |
| 15 | 0.426 | 0.0 | 0.0 |
| 16 | 0.432 | 50.0 | 105.0 |
| 17 | 0.438 | 50.0 | 105.0 |
| 18 | 0.446 | 50.0 | 105.0 |
| 19 | 0.454 | 50.0 | 105.0 |
| 20 | 0.463 | 50.0 | 105.0 |
| 21 | 0.474 | 50.0 | 97.6 |
| 22 | 0.490 | 50.0 | 90.2 |
| 23 | 0.507 | 50.0 | 82.8 |
| 24 | 0.525 | 50.0 | 75.4 |
| 25 | 0.546 | 50.0 | 68.0 |
| 26 | 0.570 | 48.0 | 65.4 |
| 27 | 0.595 | 46.0 | 62.8 |
| 28 | 0.624 | 44.0 | 60.2 |
| 29 | 0.655 | 42.0 | 57.6 |
| 30 | 0.690 | 40.0 | 55.0 |
| 31 | 0.728 | 36.8 | 53.0 |
| 32 | 0.770 | 33.6 | 51.0 |
| 33 | 0.816 | 30.4 | 49.0 |
| 34 | 0.868 | 27.2 | 47.0 |
| 35 | 0.925 | 24.0 | 45.0 |
| 36 | 0.987 | 21.4 | 43.2 |
| 37 | 1.055 | 18.8 | 41.4 |
| 38 | 1.133 | 16.2 | 39.6 |
| 39 | 1.220 | 13.6 | 37.8 |
| 40 | 1.318 | 11.0 | 36.0 |
| 41 | 1.436 | 9.0 | 34.0 |
| 42 | 1.584 | 7.0 | 32.0 |
| 43 | 1.760 | 5.0 | 30.0 |
| 44 | 1.964 | 3.0 | 28.0 |
| 45 | 2.194 | 1.0 | 26.0 |
| 46 | 2.452 | 0.8 | 24.0 |
| 47 | 2.737 | 0.6 | 22.0 |
| 48 | 3.049 | 0.4 | 20.0 |
| 49 | 3.396 | 0.2 | 18.0 |
| 50 | 3.787 | 0.0 | 16.0 |
| 51 | 4.221 | 0.0 | 13.6 |
| 52 | 4.694 | 0.0 | 11.2 |
| 53 | 5.203 | 0.0 | 8.8 |
| 54 | 5.749 | 0.0 | 6.4 |
| 55 | 6.332 | 0.0 | 4.0 |
| 56 | 6.931 | 0.0 | 3.2 |
| 57 | 7.565 | 0.0 | 2.4 |
| 58 | 8.249 | 0.0 | 1.6 |
| 59 | 9.032 | 0.0 | 0.8 |
| 60 | 9.900 | 0.0 | 0.0 |
| 61 | 10.841 | 0.0 | 0.0 |

## MORTALITY AND TURNOVER ASSUMPTIONS
## ANNUAL RATES PER 1,000 PARTICIPANTS
### (continued)

| Age | Rep & Non-Rep Mortality | Turnover Represented | Turnover Nonrepresented |
|---|---|---|---|
| 62 | 11.848 | 0.0 | 0.0 |
| 63 | 12.928 | 0.0 | 0.0 |
| 64 | 14.101 | 0.0 | 0.0 |
| 65 | 15.416 | 0.0 | 0.0 |
| 66 | 16.857 | 0.0 | 0.0 |
| 67 | 18.492 | 0.0 | 0.0 |
| 68 | 20.310 | 0.0 | 0.0 |
| 69 | 22.315 | 0.0 | 0.0 |
| 70 | 24.510 | 0.0 | 0.0 |
| 71 | 27.260 | 0.0 | 0.0 |
| 72 | 30.145 | 0.0 | 0.0 |
| 73 | 33.172 | 0.0 | 0.0 |
| 74 | 36.429 | 0.0 | 0.0 |
| 75 | 40.042 | 0.0 | 0.0 |
| 76 | 44.115 | 0.0 | 0.0 |
| 77 | 48.892 | 0.0 | 0.0 |
| 78 | 54.204 | 0.0 | 0.0 |
| 79 | 60.299 | 0.0 | 0.0 |
| 80 | 66.827 | 0.0 | 0.0 |
| 81 | 73.057 | 0.0 | 0.0 |
| 82 | 79.540 | 0.0 | 0.0 |
| 83 | 86.446 | 0.0 | 0.0 |
| 84 | 93.801 | 0.0 | 0.0 |
| 85 | 101.830 | 0.0 | 0.0 |
| 86 | 110.384 | 0.0 | 0.0 |
| 87 | 119.332 | 0.0 | 0.0 |
| 88 | 128.861 | 0.0 | 0.0 |
| 89 | 138.292 | 0.0 | 0.0 |
| 90 | 148.084 | 0.0 | 0.0 |
| 91 | 158.307 | 0.0 | 0.0 |
| 92 | 168.759 | 0.0 | 0.0 |
| 93 | 179.383 | 0.0 | 0.0 |
| 94 | 191.232 | 0.0 | 0.0 |
| 95 | 203.763 | 0.0 | 0.0 |
| 96 | 216.736 | 0.0 | 0.0 |
| 97 | 230.584 | 0.0 | 0.0 |
| 98 | 245.425 | 0.0 | 0.0 |
| 99 | 261.215 | 0.0 | 0.0 |
| 100 | 278.149 | 0.0 | 0.0 |
| 101 | 296.369 | 0.0 | 0.0 |
| 102 | 317.101 | 0.0 | 0.0 |
| 103 | 340.883 | 0.0 | 0.0 |
| 104 | 368.473 | 0.0 | 0.0 |
| 105 | 401.339 | 0.0 | 0.0 |
| 106 | 440.639 | 0.0 | 0.0 |
| 107 | 491.171 | 0.0 | 0.0 |
| 108 | 539.706 | 0.0 | 0.0 |
| 109 | 597.169 | 0.0 | 0.0 |
| 110 | 1000.000 | 0.0 | 0.0 |

**SECTION V**
**ACTUARIAL ASSUMPTIONS AND METHODS**
**(continued)**

*Actuarial Methods*

Obligations

The actuarial present value of the net medical dental, and life insurance benefits expected to be paid after retirement (net of retiree contributions) was calculated as of the measurement date The expected postretirement benefit obligation. (EPBO) represents this actuarial present value of all such postretirement benefits expected to be paid after the measurement date for those active and retired participants covered as of the measurement date. The accumulated postretirement benefit obligation (APBO) represents that portion of the EPBO attributable to service rendered prior to the measurement date.

Attribution method

Benefit/years-of-service approach; projected unit credit actuarial cost method.

Attribution period

Costs are spread ratably from the date of hire to the date the employee is fully eligible to retire and receive all the benefits he/she is expected to receive under the postretirement medical and life insurance plans.

Service cost

The increase in the APBO attributable to employee service in the year and based on the attribution method described above (includes interest to the end of the year).

Navistar International
Transportation Corporation

Coopers & Lybrand

## APPENDIX A-6

## ACTUARIAL DEFINITIONS

When used in Article III of Exhibit A or in this Appendix A-6 thereto, the following terms shall have the meanings set forth below:

"Actual Number of Retirees and Spouses" at the beginning of a given Measurement Year equals the total of the Actual Number of Retirees and Spouses at the beginning of the previous Measurement Year, aged 1 year, plus the total of the actual number of Participants who became new Retirees, Spouses and Surviving Spouses during that previous Measurement Year, plus the number of Imputed Retirees and spouses for the prior Measurement Year. Notwithstanding the foregoing, the Actual Number of Retirees and Spouses at the beginning of measurement Year 1994 is zero.

"Annual Service Cost" means the annual service cost of postretirement benefits with respect to the Health Benefit Program as computed by the Actuary in accordance with FASB 106 and the assumptions set forth in Appendix A-5 to Exhibit A to the Settlement Agreement.

"Average Contributing Participants" for a given Measurement Year equals the mathematical average of the number of Contributing Participants at the end of the prior Measurement Year and the number of Contributing Participants at the end of the current Measurement Year. Notwithstanding the foregoing, during the initial year the number of Contributing Participants at the beginning of the 45th day after the Effective Date will be used as the number of Contributing Participants at the end of the prior Measurement Year.

"Contributing Participants" has the meaning assigned to it in Exhibit D to the Settlement Agreement.

"Contributing Participants' Annual Contribution" for a given calendar year is the total estimated annual contribution that Contributing Participants will make in twelve monthly installments in that calendar year.

"Cumulative Drop Outs" at the beginning of a given Measurement Year is determined at the beginning of each Measurement Year and is the sum of the Surviving Cumulative Drop Outs plus New Drop Outs, reduced by New Drop Ins.

"Expected Average Contributing Participants" for a given calendar year equals the sum of (i) the actual number of active Employees at the end of the prior Measurement Year who were expected to be eligible to be Contributing Participants at the end of the current Measurement Year, using the mortality and retirement

assumptions in Appendix A-5, and (ii) the actual number of Contributing Participants at the end of the prior Measurement Year who were expected to be eligible to be Contributing Participants at the end of the current Measurement Year, using the mortality assumptions in Appendix A-5. Notwithstanding the foregoing, the 1994 Expected Average Contributing Participants equals the actual number of active Employees and Contributing Participants on the Effective Date reduced by Immediate Drop Outs During the First 45 Days projected forward 10 months using the mortality and retirement assumptions in Appendix A-5.

"Expected Company Costs Per Capital" for a given Measurement Year equals the Expected Medical Per Capita Costs for that Measurement Year plus the Expected Drug Per Capita Costs for that Measurement Year, reduced by the Expected Participant Contributions for that Measurement Year.

"Expected Drug Per Capita Costs" for a given Measurement Year are developed from the numbers in Table I and the following formula : For Measurement Year (x) = [2/3 calendar year (x-1) ] plus [1/3 calendar year (x)]. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Expected Drug Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Drug Per Capita Costs for calendar year 1994.

"Expected Medical Per Capita Costs" for a given Measurement Year are developed from the numbers in Table II and the following formula : For Measurement Year (x) = [2/3 calendar year (x-1)] plus [1/3 calendar year (x)]. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Expected Medical Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Medical Per Capita Costs for calendar year 1994.

"Expected Number of Retirees and Spouses" for a given Measurement Year will be based upon the actual number of Employees on the Effective Date, with Retirees and Spouses projected in accordance with retirement rates from Appendix A-5 and with spouses imputed at the "dependents of future retirees rates" from Appendix A-5. Notwithstanding the foregoing, for Measurement Year 1994, five-sixths of the retirement rates will be applied.

"Expected Participant Contributions" for a given Measurement Year (x) equals 8 times the Monthly Base Contributions for calendar year (x-1) plus 4 times the Monthly Base Contribution for calendar year (x). Notwithstanding the foregoing, for Measurement Year 1994, it equals 6 times the Monthly Base Contributions for calendar year 1993 plus 4 times the Monthly Base Contribution for calendar year 1994.

"FASB 10611" has the meaning assigned to it in Exhibit D to the Settlement Agreement.

"Health Accumulated Postretirement Benefit Obligation" and "Health APBO" have the meaning assigned to them in Exhibit D to the Settlement Agreement.

"Immediate Drop Outs" means the Immediate Drop Outs During the First 45 Days and the Immediate Drop Outs During the Second 45 Days.

"Immediate Drop Outs During the First 45 Days" means the Retirees, Spouses and Surviving Spouses who are eligible to enroll in the Health Benefit Program as of the Effective Date from whom a form is received by the end of the 44th day following the Effective Date indicating their elections not to enroll in the Health Benefit Program.

"Immediate Drop Outs During the Second 45 Days" means the Retirees, Spouses and Surviving Spouses who are eligible to enroll in the Health Benefit Program as of the Effective Date but do not do so by the end of the 89th day following the Effective Date, exclusive of all Immediate Drop Outs During the First 45 days.

"Imputed Retirees and Spouses" are calculated at the beginning of each Measurement Year based on active Employees that have died or terminated prior to retirement in the previous Measurement Year. These deaths and terminations are accumulated and aged each year with retirement rates applied when retirement eligibility is reached. No retirement rates are applied to terminated Employees in their year of termination. In their year of death, 50% of the retirement rates are applied.

"Maximum Corridor Medical Per Capita Costs" for a given Measurement Year are developed from the numbers in Table III and the following formula: For Measurement Year (x) [2/3 calendar year (x-1)] plus [1/3 calendar year (x)]. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Maximum Corridor Medical Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Medical Per Capita Costs for calendar year 1994.

"Measurement Year (x)" is the twelve month period beginning May 1 of year (x-1) and ending April 30 of year (x) . Notwithstanding the foregoing, Measurement Year 1994 is the period from the Effective Date through April 30, 1994.

"Monthly Base Contribution" The Monthly Base Contribution for the first calendar year (1993) shall be $70 per month for retirees under age 65 and $34 per month for retirees age 65 and over. In each subsequent year the Monthly Base Contribution will increase 6%, as follows:

MONTHLY BASE CONTRIBUTION

| Year | | Under 65 | | 65 and Over |
|------|--|----------|--|-------------|
| 1993 | | $70.00 | | $34.00 |
| 1994 | | 74.20 | | 36.04 |
| 1995 | | 78.65 | | 38.20 |
| 1996 | | 83.37 | | 40.49 |
| 1997 | | 88.38 | | 42.92 |
| y | $70.00 \times (1.06)$ | $(y-1993)$ | $34.00 \times (1.06)$ | $(y-1993)$ |

"New Drop Ins" at the beginning of a given Measurement Year equals the number of Retirees, Spouses, and surviving Spouses (other than new Retirees and their Spouses) who elect to become or again become Contributing Participants during the prior Measurement Year. For this purpose, there will be no mortality imputed during the prior Measurement Year. Notwithstanding the foregoing, there are no New Drop Ins at the beginning of Measurement Year 1994.

"New Drop Outs" at the beginning of a given Measurement Year equals the number of Retirees, Spouses and Surviving Spouses who elect not to be Contributing Participants during the prior Measurement Year. For this purpose, there will be no mortality imputed during the prior Measurement Year. Notwithstanding the foregoing, for Measurement Year 1995 all Immediate Drop outs will be included in New Drop Outs during the previous Measurement Year.

"Plan 1" is the Health Benefit Program as applicable to Contributing Participants who are not eligible for Medicare, as described in Appendix A-1 to Exhibit A to the Settlement Agreement.

"Plan 2" is the Health Benefit Program as applicable to Contributing Participants who are eligible for Medicare, as described in Appendix A-1 to Exhibit A to the Settlement Agreement.

"Retiree Adjustment Ratio" for a given Measurement Year (x) equals the following formula: 1/3 of the Retiree Cost Sharing Ratio for calendar year (x) plus 2/3 of the Retiree Cost Sharing Ratio for calendar year (x-1). Notwithstanding the foregoing, for Measurement Year 1994, Retiree Adjustment Ratio equals 3/5 of the Retiree Cost Sharing Ratio for calendar year 1993 plus 2/5 of the Retiree Cost Sharing Ratio for calendar year 1994.

"Retiree Cost Sharing Ratio" for a given calendar year equals the Scheduled Contributions for such year divided by the sum of the products of (i) the Expected Medical Per Capita Costs plus the Expected Drug Per Capita Costs for such year in each of the eight age groups, and (ii) the respective number of Expected Average Contributing Participants for such year in each of such age groups. Notwithstanding the foregoing, the 1993 Retiree Cost Sharing Ratio is 36.3%.

"Scheduled Contributions" for a calendar year equals the sum of (i) twelve times the applicable Monthly Base Contribution for such year multiplied by the number of Expected Average Contributing Participants under Plan 1, and (ii) twelve times the applicable Monthly Base Contribution for such year multiplied by the number of Expected Average Contributing Participants under Plan 2.

"Surviving Cumulative Drop Outs" at the beginning of a given Measurement Year equals the Cumulative Drop Outs from the beginning of the prior Measurement Year times the probability of survival to the end of that Measurement Year. For the purpose of this calculation, the probability of survival during the Measurement Year will be based upon the mortality rates specified in Appendix A-5. Notwithstanding the foregoing, the Surviving Cumulative Drop Outs at the beginning of Measurement Year 1994 is zero.

"Total Actual Drug Cost" for a given Measurement Year equals the sum of paid drug claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of paid drug claims to all paid drug and medical claims*)* for Contributing Participants and their Eligible Dependents for such Measurement Year. For Measurement Year 1994, Total Actual Drug Cost equals the sum of paid drug claims and administrative expenses and applicable HMO premiums for the period from October 1, 1993 through April 30, 1994 multiplied by a fraction, the numerator of which is 10 and the denominator of which is 7. Commencing with the Measurement Year to be used for determining the Contributing Participants' Annual Contribution for the 2022 Plan Year, "Total Actual Drug Cost" shall equal (i) the sum of paid drug claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of paid drug claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for such Measurement Year, less (ii) the total amount of any subsidies, manufacturer rebates or similar payments for Medicare Part D Plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year, including, but not limited to, the manufacturer discount under 42 CFR 423 Subpart W: Medicare Coverage Gap Discount Program (42 CFR 423.2300 – 42 CFR 423.2345); the federal reinsurance subsidy, the direct subsidy and the low income cost-sharing subsidy under 42 CFR 423 Subpart G: Payments to Part D Plan Sponsors for Qualified Prescription Drug Coverage (42 CFR 423.301 – 42 CFR 423.360); and the low income premium subsidy under 42 CFR 423 Subpart P: Premiums and Cost-Sharing Subsidies for Low-Income Individuals (42 CFR 423.771 – 42 CFR 423.800), less (iii) manufacturer rebates for non-Medicare Part D prescription drug plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year.

"Total Actual Medical Cost" for a given Measurement Year equals the sum of paid medical claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of

paid medical claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for the Measurement Year. For Measurement Year 1994, Total Actual Medical Cost equals the sum of paid medical claims and administrative expenses and applicable HMO premiums for the period from October 1, 1993 through April 30, 1994 multiplied by a fraction the numerator of which is 10 and the denominator of which is 7.

"Total Estimated Annual Cost" for a given Measurement Year means the Actuary's estimate of the total cost of providing all covered benefits and administrative costs of the Health Benefit Program for such year. The Actuary's estimate of administrative costs shall include, but not be limited to, Plan Expenses.

"Total Expected Drug Dollars" for a given Measurement Year equals the Expected Drug Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table I and then totaled.

"Total Expected Medical Dollars" for a given Measurement Year equals the Expected Medical Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table II and then totaled.

"Total Maximum Corridor Medical Dollars" for a given Measurement Year equals the Maximum Corridor Medical Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table III and then totaled.

TABLE I
EXPECTED DRUG PER CAPITA COSTS
NET PER CAPITA COSTS *(DRUGS)*

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 – 79 | 80 + |
| 1993 | $196 | $215 | $239 | $273 | $206 | $235 | $257 | $254 |
| 1994 | 237 | 260 | 288 | 329 | 251 | 287 | 314 | 310 |
| 1995 | 278 | 305 | 338 | 386 | 298 | 340 | 371 | 367 |
| 1996 | $319 | $350 | $388 | $443 | $343 | $392 | $428 | $424 |
| 1997 | 358 | 393 | 436 | 498 | 387 | 442 | 483 | 478 |
| 1998 | 397 | 436 | 483 | 551 | 431 | 492 | 537 | 532 |
| 1999 | 438 | 480 | 532 | 607 | 476 | 544 | 593 | 588 |
| 2000 | 480 | 527 | 584 | 666 | 523 | 598 | 652 | 646 |
| 2001 | $525 | $576 | $638 | $728 | $573 | $655 | $715 | $708 |
| 2002 | 572 | 627 | 695 | 793 | 626 | 715 | 780 | 773 |
| 2003 | 621 | 681 | 755 | 861 | 681 | 778 | 849 | 841 |
| 2004 | 672 | 738 | 817 | 932 | 738 | 844 | 920 | 913 |
| 2005 | 726 | 797 | 882 | 1,006 | 798 | 913 | 995 | 987 |
| 2006 | $782 | $858 | $950 | $1,084 | $861 | $984 | $1,073 | $1,054 |
| 2007 | 840 | 922 | 1,020 | 1,164 | 925 | 1,058 | 1,154 | 1,144 |
| 2008 | 900 | 988 | 1,093 | 1,247 | 992 | 1,135 | 1,237 | 1,227 |
| 2009 | 962 | 1,056 | 1,168 | 1,332 | 1,061 | 1,214 | 1,323 | 1,312 |
| 2010 | 1,026 | 1,125 | 1,245 | 1,421 | 1,132 | 1,295 | 1,411 | 1,399 |
| 2011 | $1,091 | $1,197 | $1,325 | $1,511 | $1,205 | $1,378 | $1,502 | $1,489 |
| 2012 | 1,157 | 1,269 | 1,404 | 1,602 | 1,278 | 1,461 | 1,592 | 1,580 |
| 2013 | 1,226 | 1,346 | 1,489 | 1,698 | 1,355 | 1,550 | 1,588 | 1,675 |
| 2014 | 1,299 | 1,426 | 1,577 | 1,799 | 1,436 | 1,642 | 1,759 | 1,775 |
| 2015 | 1,377 | 1,511 | 1,671 | 1,906 | 1,522 | 1,740 | 1,896 | 1,881 |
| 2016 | $1,458 | $1,600 | $1,770 | $2,019 | $1,612 | $1,844 | $2,009 | $1,993 |
| 2017 | 1,544 | 1,895 | 1,874 | 2,138 | 1,708 | 1,963 | 2,128 | 2,111 |
| 2018 | 1,635 | 1,794 | 1,984 | 2,264 | 1,809 | 2,068 | 2,253 | 2,235 |
| 2019 | 1,730 | 1,899 | 2,100 | 2,396 | 1,915 | 2,190 | 2,385 | 2,366 |
| 2020 | 1,831 | 2,010 | 2,223 | 2,536 | 2,027 | 2,318 | 2,525 | 2,505 |
| 2021 | $1,938 | $2,127 | $2,352 | $2,683 | $2,145 | $2,453 | $2,672 | $2,651 |
| 2022 | 2,050 | 2,251 | 2,488 | 2,839 | 2,270 | 2,596 | 2,827 | 2,805 |
| 2023 | 2,169 | 2,381 | 2,632 | 3,003 | 2,401 | 2,746 | 2,991 | 2,968 |
| 2024 | 2,294 | 2,518 | 2,784 | 3,176 | 2,540 | 2,905 | 3,164 | 3,139 |
| 2025 | 2,426 | 2,663 | 2,944 | 3,358 | 2,687 | 3,072 | 3,346 | 3,320 |
| 2026 | $2,565 | $2,816 | $3,112 | $3,551 | $2,841 | $3,249 | $3,538 | $3,511 |
| 2027 | 2,712 | 2,977 | 3,291 | 3,754 | 3,004 | 3,435 | 3,741 | 3,712 |
| 2028 | 2,867 | 3,147 | 3,478 | 3,969 | 3,176 | 3,632 | 3,955 | 3,925 |
| 2029 | 3,030 | 3,327 | 3,677 | 4,195 | 3,358 | 3,839 | 4,181 | 4,149 |
| 2030 | 3,203 | 3,516 | 3,886 | 4,433 | 3,549 | 4,058 | 4,419 | 4,386 |
| 2031 | $3,384 | $3,716 | $4,107 | $4,685 | $3,751 | $4,289 | $4,671 | $4,635 |
| 2032 | 3,576 | 3,926 | 4,339 | 4,951 | 3,964 | 4,533 | 4,936 | 4,898 |
| 2033 | 3,779 | 4,149 | 4,585 | 5,231 | 4,189 | 4,790 | 5,216 | 5,178 |
| 2034 | 3,992 | 4,383 | 4,844 | 5,527 | 4,426 | 5,061 | 5,511 | 5,469 |
| 2035 | 4,218 | 4,631 | 5,117 | 5,838 | 4,677 | 5,347 | 5,822 | 5,778 |
| 2036 | $4,456 | $4,892 | $5,406 | $6,167 | $4,941 | $5,649 | $6,151 | $6,104 |
| 2037 | 4,706 | 5,167 | 5,710 | 6,515 | 5,219 | 5,967 | 6,497 | 6,448 |
| 2038 | 4,971 | 5,458 | 6,031 | 6,881 | 5,513 | 6,303 | 6,863 | 6,811 |
| 2039 | 5,250 | 5,764 | 6,370 | 7,267 | 5,823 | 6,657 | 7,249 | 7,194 |
| 2040 | 5,545 | 6,088 | 6,727 | 7,675 | 6,150 | 7,031 | 7,656 | 7,598 |
| 2041 | $5,855 | $6,429 | $7,104 | $8,105 | $6,495 | $7,425 | $8,085 | $8,024 |
| 2042 | 6,183 | 6,789 | 7,501 | 8,559 | 6,859 | 7,842 | 8,538 | 8,474 |
| 2043 | 8,523 | 7,169 | 7,921 | 9,037 | 7,243 | 8,281 | 9,018 | 8,948 |
| 2044 | 6,894 | 7,569 | 8,363 | 9,542 | 7,648 | 8,744 | 9,520 | 9,449 |
| 2045 | 7,279 | 7,992 | 8,830 | 10,075 | 8,075 | 9,232 | 10,052 | 9,977 |
| 2046 | $7,685 | $8,438 | $9,323 | $10,637 | $8,526 | $9,748 | $10,613 | $10,534 |
| 2047 | 8,113 | 8,908 | 9,843 | 11,230 | 9,002 | 10,292 | 11,205 | 11,121 |
| 2048 | 8,566 | 9,405 | 10,391 | 11,855 | 9,604 | 10,865 | 11,830 | 11,741 |
| 2049 | 9,042 | 9,928 | 10,969 | 12,515 | 10,033 | 11,471 | 12,489 | 12,395 |
| 2050 | 9,546 | 10,481 | 11,580 | 13,212 | 10,592 | 12,109 | 13,184 | 13,085 |
| 2051 | $10,076 | $11,064 | $12,223 | $13,946 | $11,181 | $12,783 | $13,918 | $13,813 |
| 2052 | 10,636 | 11,679 | 12,903 | 14,721 | 11,803 | 13,494 | 14,691 | 14,581 |
| 2053 | 11,227 | 12,327 | 13,619 | 15,539 | 12,459 | 14,243 | 15,506 | 15,392 |
| 2054 | 11,850 | 13,012 | 14,375 | 16,401 | 13,151 | 15,035 | 16,369 | 16,247 |

TABLE II
EXPECTED DRUG PER CAPITA COSTS
NET PER CAPITA COSTS *(DRUGS)*

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 - 79 | 80 + |
| 1993 | $1,689 | $1,371 | $1,917 | $3,540 | $734 | $685 | $641 | $637 |
| 1994 | 1,895 | 1,544 | 2,140 | 3,948 | 810 | 756 | 706 | 703 |
| 1995 | 2,091 | 1,703 | 2,355 | 4,365 | 876 | 818 | 765 | 760 |
| 1996 | $2,316 | $1,889 | $2,605 | $4,825 | $853 | $890 | $832 | $828 |
| 1997 | 2,552 | 2,088 | 2,874 | 5,311 | 1,036 | 967 | 904 | 898 |
| 1998 | 2,805 | 2,302 | 3,161 | 5,832 | 1,123 | 1,047 | 979 | 973 |
| 1999 | 3,074 | 2,521 | 3,469 | 6,385 | 1,215 | 1,133 | 1,058 | 1,052 |
| 2000 | 3,351 | 2,765 | 3,794 | 6,967 | 1,313 | 1,222 | 1,142 | 1,134 |
| 2001 | $3,650 | $3,016 | $4,136 | $7,590 | $1,415 | $1,315 | $1,230 | $1,221 |
| 2002 | 3,956 | 3280 | 4,503 | 8,243 | 1,521 | 1,415 | 1,321 | 1,312 |
| 2003 | 4,279 | 3,554 | 4,887 | 8,928 | 1,633 | 1,519 | 1,418 | 1,407 |
| 2004 | 4,626 | 3,840 | 5,278 | 9,649 | 1,748 | 1,627 | 1,519 | 1,506 |
| 2005 | 4,986 | 4,126 | 5,696 | 10,385 | 1,868 | 1,743 | 1,623 | 1,609 |
| 2006 | $5,350 | $4,429 | $6,115 | $11,150 | $1,994 | $1,861 | $1,731 | $1,717 |
| 2007 | 5,718 | 4,728 | 6,532 | 11,947 | 2,124 | 1,981 | 1,844 | 1,827 |
| 2008 | 6,101 | 5,022 | 6,955 | 12,751 | 2,259 | 2,106 | 1,961 | 1,941 |
| 2009 | 6,486 | 5,337 | 7,381 | 13,571 | 2,399 | 2,233 | 2,082 | 2,059 |
| 2010 | 6,875 | 5,672 | 7,803 | 14,414 | 2,539 | 2,364 | 2,208 | 2,179 |
| 2011 | $7,306 | $5,972 | $8,254 | $15,227 | $2,684 | $2,499 | $2,335 | $2,302 |
| 2012 | 7,718 | 6,287 | 8,640 | 16,029 | 2,834 | 2,638 | 2,462 | 2,428 |
| 2013 | 8,127 | 6,632 | 9,005 | 16,876 | 2,991 | 2,783 | 2,597 | 2,661 |
| 2014 | 8,581 | 6,967 | 9,417 | 17,746 | 3,153 | 2,939 | 2,738 | 2,701 |
| 2015 | 9,077 | 7,343 | 9,913 | 18,643 | 3,326 | 3,099 | 2,887 | 2,850 |
| 2016 | $9,617 | $7,781 | $10,454 | $19,620 | $3,500 | $3,269 | $3,046 | $3,006 |
| 2017 | 10,226 | 8,173 | 11,013 | 20,542 | 3,683 | 3,451 | 3,214 | 3,171 |
| 2018 | 10,783 | 8,611 | 11,584 | 21,451 | 3,877 | 3,642 | 3,392 | 3,345 |
| 2019 | 11,371 | 9,164 | 12,163 | 22,511 | 4,076 | 3,839 | 3,582 | 3,528 |
| 2020 | 11,991 | 9,727 | 12,883 | 23,725 | 4,279 | 4,048 | 3,776 | 3,723 |
| 2021 | $12,645 | $10,302 | $13,685 | $25,045 | $4,497 | $4,260 | $3,983 | $3,928 |
| 2022 | 13,334 | 10,931 | 14,426 | 26,410 | 4,711 | 4,483 | 4,205 | 4,144 |
| 2023 | 14,061 | 11,526 | 15,233 | 27,784 | 4,928 | 4,719 | 4,437 | 4,372 |
| 2024 | 14,827 | 12,152 | 16,061 | 29,264 | 5,180 | 4,960 | 4,676 | 4,613 |
| 2025 | 15,635 | 12,813 | 17,049 | 30,921 | 5,454 | 5,207 | 4,931 | 4,865 |
| 2026 | $16,488 | $13,510 | $18,277 | $32,617 | $5,750 | $5,471 | $5,188 | $5,133 |
| 2027 | 17,386 | 14,245 | 19,323 | 34,427 | 6,057 | 5,731 | 5,459 | 5,416 |
| 2028 | 18,334 | 15,020 | 20,317 | 36,384 | 6,387 | 5,998 | 5,747 | 5,713 |
| 2029 | 19,333 | 15,837 | 20,974 | 38,361 | 6,704 | 6,305 | 6,040 | 6,025 |
| 2030 | 20,386 | 16,698 | 21,674 | 40,600 | 7,074 | 6,637 | 6,339 | 6,353 |
| 2031 | $21,497 | $17,606 | $22,856 | $43,343 | $7,448 | $6,997 | $6,660 | $6,694 |
| 2032 | 22,668 | 18,563 | 24,103 | 45,729 | 7,861 | 7,368 | 6,976 | 7,057 |
| 2033 | 23,903 | 19,572 | 25,418 | 48,067 | 6,304 | 7,746 | 7,301 | 7,440 |
| 2034 | 25,205 | 20,636 | 26,804 | 49,739 | 8,755 | 8,157 | 7,676 | 7,640 |
| 2035 | 26,578 | 21,758 | 28,266 | 51,881 | 9,253 | 8,605 | 8,079 | 8,258 |
| 2036 | $28,026 | $22,941 | $29,808 | $54,721 | $9,849 | $9,057 | $8,515 | $8,697 |
| 2037 | 29,553 | 24,188 | 31,434 | 57,717 | 10,376 | 9,560 | 8,967 | 9,161 |
| 2038 | 31,162 | 25,502 | 33,148 | 60,877 | 10,904 | 10,098 | 9,426 | 9,650 |
| 2039 | 32,860 | 25,886 | 34,955 | 64,210 | 11,294 | 10,648 | 9,928 | 10,166 |
| 2040 | 34,649 | 28,350 | 36,862 | 67,725 | 11,792 | 11,250 | 10,471 | 10,701 |
| 2041 | $36,536 | $29,890 | $38,872 | $71,432 | $12,431 | $11,968 | $11,019 | $11,262 |
| 2042 | 38,526 | 31,514 | 40,691 | 75,343 | 13,106 | 12,608 | 11,631 | 11,854 |
| 2043 | 40,624 | 33,226 | 43,226 | 79,467 | 13,817 | 13,248 | 12,285 | 12,476 |
| 2044 | 42,836 | 35,032 | 45,583 | 83,817 | 14,567 | 13,724 | 12,956 | 13,133 |
| 2045 | 45,168 | 36,935 | 48,068 | 88,405 | 15,357 | 14,329 | 13,689 | 13,811 |
| 2046 | $47,626 | $38,941 | $50,688 | $93,244 | $16,190 | $15,106 | $14,553 | $14,519 |
| 2047 | 50,220 | 41,056 | 53,452 | 98,348 | 17,068 | 15,824 | 15,329 | 15,282 |
| 2048 | 52,964 | 43,286 | 56,365 | 103,731 | 17,994 | 16,787 | 16,105 | 16,086 |
| 2049 | 55,837 | 45,637 | 59,438 | 109,409 | 18,970 | 17,697 | 16,687 | 16,939 |
| 2050 | 58,877 | 48,116 | 62,677 | 115,397 | 19,998 | 18,655 | 17,423 | 17,826 |
| 2051 | $62,081 | $50,728 | $66,094 | $121,713 | $21,083 | $19,666 | $18,366 | $18,756 |
| 2052 | 65,460 | 53,483 | 69,699 | 128,374 | 22,226 | 20,731 | 19,359 | 19,747 |
| 2053 | 69,023 | 56,387 | 73,494 | 135,400 | 23,431 | 21,854 | 20,407 | 20,815 |
| 2054 | 72,779 | 59,448 | 77,499 | 142,810 | 24,701 | 23,037 | 21,511 | 21,940 |

Navistar International
Transportation Corporation

Coopers & Lybrand

TABLE III
MAXIMUM CORRIDOR MEDICAL PER CAPITA COSTS
NET PER CAPITA COSTS *(MEDICAL EXCLUDING DRUGS)*

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 - 79 | 80 + |
| 1993 | $1,689 | $1,371 | $1,917 | $3,540 | $734 | $685 | $641 | $637 |
| 1994 | 1,913 | 1,559 | 2,160 | 3,983 | 817 | 763 | 715 | 710 |
| 1995 | 2,129 | 1,735 | 2,398 | 4,442 | 892 | 833 | 779 | 775 |
| 1996 | $2,379 | $1,941 | $2,674 | $4,949 | $979 | $915 | $855 | $851 |
| 1997 | 2,641 | 2,163 | 2,974 | 5,488 | 1,073 | 1,001 | 937 | 931 |
| 1998 | 2,924 | 2,402 | 3,295 | 6,069 | 1,172 | 1,093 | 1,022 | 1,016 |
| 1999 | 3,227 | 2,649 | 3,640 | 6,688 | 1,276 | 1,190 | 1,112 | 1,105 |
| 2000 | 3,540 | 2,924 | 4,006 | 7,343 | 1,388 | 1,292 | 1,208 | 1,200 |
| 2001 | $3,878 | $3,208 | $4,392 | $8,044 | $1,505 | $1,399 | $1,308 | $1,299 |
| 2002 | 4,225 | 3,507 | 4,806 | 8,781 | 1,627 | 1,513 | 1,414 | 1,404 |
| 2003 | 4,592 | 3,819 | 5,241 | 9,554 | 1,754 | 1,632 | 1,524 | 1,513 |
| 2004 | 4,986 | 4,143 | 5,884 | 10,369 | 1,886 | 1,756 | 1,639 | 1,626 |
| 2005 | 5,394 | 4,471 | 6,157 | 11,200 | 2,023 | 1,888 | 1,758 | 1,744 |
| 2006 | $5,805 | $4,813 | $6,631 | $12,063 | $2,167 | $2,022 | $1,881 | $1,867 |
| 2007 | 6,222 | 5,151 | 7,102 | 12,959 | 2,315 | 2,159 | 2,010 | 1,992 |
| 2008 | 6,653 | 5,483 | 7,578 | 13,871 | 2,468 | 2,300 | 2,143 | 2,122 |
| 2009 | 7,083 | 5,837 | 8,055 | 14,775 | 2,624 | 2,443 | 2,278 | 2,254 |
| 2010 | 7,518 | 6,211 | 8,525 | 15,709 | 2,781 | 2,589 | 2,419 | 2,388 |
| 2011 | $7,992 | $6,543 | $9,023 | $16,605 | $2,941 | $2,739 | $2,550 | $2,524 |
| 2012 | 8,444 | 6,889 | 9,445 | 17,479 | 3,106 | 2,891 | 2,699 | 2,663 |
| 2013 | 8,891 | 7,267 | 9,845 | 18,403 | 3,278 | 3,050 | 2,847 | 2,808 |
| 2014 | 9,389 | 7,635 | 10,295 | 19,352 | 3,455 | 3,221 | 3,002 | 2,963 |
| 2015 | 9,932 | 8,046 | 10,837 | 20,330 | 3,645 | 3,397 | 3,166 | 3,126 |
| 2016 | $10,524 | $8,527 | $11,430 | $21,396 | $3,836 | $3,584 | $3,341 | $3,298 |
| 2017 | 11,190 | 8,957 | 12,041 | 22,402 | 4,037 | 3,784 | 3,525 | 3,479 |
| 2018 | 11,800 | 9,438 | 12,645 | 23,394 | 4,250 | 3,993 | 3,720 | 3,670 |
| 2019 | 12,444 | 10,044 | 13,289 | 24,550 | 4,468 | 4,209 | 3,928 | 3,871 |
| 2020 | 13,123 | 10,662 | 14,087 | 25,875 | 4,691 | 4,439 | 4,142 | 4,085 |
| 2021 | $13,839 | $11,292 | $14,965 | $27,315 | $4,931 | $4,671 | $4,370 | $4,310 |
| 2022 | 14,594 | 11,982 | 15,776 | 28,804 | 5,165 | 4,916 | 4,613 | 4,547 |
| 2023 | 16,390 | 12,635 | 16,659 | 30,303 | 5,404 | 5,176 | 4,8658 | 4,797 |
| 2024 | 16,230 | 13,323 | 17,565 | 31,918 | 5,680 | 5,440 | 5,131 | 5,063 |
| 2025 | 17,115 | 14,048 | 18,646 | 33,726 | 5,981 | 5,711 | 5,411 | 5,340 |
| 2026 | $18,048 | $14,813 | $19,900 | $35,576 | $6,306 | $6,001 | $5,683 | $5,634 |
| 2027 | 19,033 | 15,619 | 21,135 | 37,551 | 6,642 | 6,287 | 5,991 | 5,945 |
| 2028 | 20,071 | 16,470 | 22,223 | 39,687 | 6,983 | 6,580 | 6,307 | 6,271 |
| 2029 | 21,166 | 17,356 | 22,942 | 41,843 | 7,354 | 6,917 | 6,629 | 6,615 |
| 2030 | 22,320 | 18,312 | 23,709 | 44,297 | 7,759 | 7,282 | 6,958 | 6,975 |
| 2031 | $23,537 | $19,308 | $25,003 | $47,280 | $8,170 | $7,677 | $7,310 | $7,350 |
| 2032 | 24,820 | 20,359 | 26,368 | 49,884 | 8,623 | 8,086 | 7,655 | 7,730 |
| 2033 | 26,174 | 21,467 | 27,807 | 52,435 | 9,110 | 8,600 | 8,016 | 8,170 |
| 2034 | 27,501 | 22,635 | 29,325 | 54,260 | 9,606 | 8,952 | 8,428 | 8,610 |
| 2035 | 29,106 | 23,667 | 30,925 | 56,598 | 10,152 | 9,443 | 8,871 | 9,070 |
| 2036 | $50,693 | $25,166 | $32,614 | $59,697 | $10,807 | $9,941 | $9,350 | $9,553 |
| 2037 | 32,366 | 26,535 | 34,394 | 62,967 | 11,386 | 10,493 | 9,847 | 10,063 |
| 2038 | 34,130 | 27,979 | 38,271 | 66,416 | 11,966 | 11,065 | 10,351 | 10,601 |
| 2039 | 35,991 | 29,501 | 38,250 | 70,053 | 12,395 | 11,689 | 10,904 | 11,168 |
| 2040 | 37,953 | 31,106 | 40,337 | 73,890 | 12,942 | 12,351 | 11,501 | 11,757 |
| 2041 | $40,021 | $32,796 | $42,539 | $77,936 | $13,645 | $13,140 | $12,104 | $12,374 |
| 2042 | 42,203 | 34,582 | 44,860 | 82,204 | 14,386 | 13,843 | 12,777 | 13,026 |
| 2043 | 44,503 | 36,463 | 47,307 | 86,706 | 15,168 | 14,547 | 13,497 | 13,710 |
| 2044 | 46,928 | 38,446 | 49,889 | 91,454 | 15,992 | 15,071 | 14,235 | 14,434 |
| 2045 | 49,485 | 40,537 | 52,611 | 96,462 | 16,880 | 15,737 | 15,041 | 15,160 |
| 2046 | $52,182 | $42,742 | $55,481 | $101,745 | $17,776 | $16,591 | $16,992 | $15,958 |
| 2047 | 55,026 | 45,066 | 58,508 | 107,316 | 18,741 | 17,491 | 16,846 | 16,796 |
| 2048 | 58,024 | 47,517 | 61,700 | 113,192 | 19,759 | 18,440 | 17,700 | 17,684 |
| 2049 | 61,185 | 50,100 | 65,065 | 119,390 | 20,832 | 19,440 | 18,341 | 18,623 |
| 2050 | 64,519 | 52,824 | 88,615 | 125,927 | 21,963 | 23,495 | 19,162 | 19,600 |
| 2051 | $68,034 | $55,696 | $72,357 | $132,822 | $23,155 | $21,608 | $20,189 | $20,626 |
| 2052 | 71,740 | 58,724 | 76,304 | 140,095 | 24,412 | 22,778 | 21,283 | 21,715 |
| 2053 | 75,648 | 61,916 | 80,488 | 147,765 | 25,738 | 24,013 | 22,436 | 22,891 |
| 2054 | 79,769 | 65,281 | 84,854 | 155,855 | 27,135 | 25,316 | 23,652 | 24,131 |

Navistar International
Transportation Corporation

Coopers & Lybrand

**EXHIBIT B**

**THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**
**<u>RETIREE SUPPLEMENTAL BENEFIT PROGRAM</u>**

# TABLE OF CONTENTS

**PAGE**

ARTICLE I        Introduction   ......................................................... 1

    1.1   Definitions   ........................................................... 1
    1.2   Purpose   ................................................................ 1

ARTICLE II       Supplemental Benefit Trust   .................................. 1

    2.1   Establishment   ...................................................... 1
    2.2   Initial Funding   ..................................................... 2

ARTICLE III      Parent Common Equity   ..................................... 2

    3.1   Purchases   ............................................................ 2
    3.2   Conversion   .......................................................... 2
    3.3   Voting   .................................................................. 2
    3.4   Sales of Parent Common Equity   ......................... 2
    3.5   Registration Rights and Other Transfers   ............ 3
    3.6   Event Date   ........................................................... 4

ARTICLE IV      Super-Majority Transactions   ............................ 4

ARTICLE V       Parent Preference Stock   .................................... 4

    5.1   Contribution   ........................................................ 4
    5.2   Voting   .................................................................. 4
    5.3   No Transfers   ........................................................ 5

ARTICLE VI      The Supplemental Benefit committee   ............... 5

    6.1   A Supplemental Benefit Program Committee   .... 5
    6.2   Powers and Duties   .............................................. 6
    6.3   Program Design   ................................................... 7
    6.4   Action by Supplemental Benefit Committee   ...... 7
    6.5   Provision of Benefits   .......................................... 8
    6.6   Supplemental Benefit Committee Minutes   ........ 9

ARTICLE VII     ~~Profit Sharing~~Company Contributions   ........................... 9

    7.1   Contributions   ..................................................... 9
    ~~7.2   Profit Sharing Cessation Date~~   .............................. 9
    ~~7.3   Guarantee of Contributions After the Profit Sharing Cessation Date~~   ........... 10
    ~~7.4   Dispute Resolution~~   ........................................... 10

ARTICLE VIII    Additional Funding   ......................................... 11

    8.1   Expenses of Supplemental Benefit Committee   .. 11

| | | |
|---|---|---|
| 8.2 | Advance Funding | 12 |
| ARTICLE IX | Amendments and Termination | 12 |
| 9.1 | Amendments | 12 |
| 9.2 | Termination | 13 |
| ARTICLE X | Miscellaneous | 13 |
| 10.1 | Legends and Stop Transfer Orders | 13 |
| 10.2 | Prohibitions and Restrictions Relating to Net Operating Loss Carryovers | 14 |
| 10.3 | Limitation of Liability and Indemnification | 16 |
| 10.4 | Exclusive Benefit | 16 |
| 10.5 | Prohibited Inurement | 16 |
| 10.6 | Assignment, Delegation | 17 |
| 10.7 | Captions | 17 |
| 10.8 | Incorporation of Appendices; References | 17 |
| 10.9 | Governing Law | 17 |
| ARTICLE XI | Events of Default | 17 |
| 11.1 | Supplemental Benefit Program Payment Default | 17 |
| 11.2 | No Limitation of Rights | 18 |

**Appendices**

| | |
|---|---|
| Appendix B-1 | SPA Supplemental Benefit Program |
| Appendix B-2 | Supplemental Benefit Trust Agreement |
| Appendix B-3 | Restated Certificate of Incorporation |
| Appendix B-4 | Registration Rights |
| Appendix B-5 | SBC Committee Members |
| Appendix B-6 | ~~Supplemental Benefit Profit Sharing Plan~~*[Reserved]* |
| Appendix B-7 | Calculation of Common and Dilutative Common Equivalent Shares |

**THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**
**RETIREE SUPPLEMENTAL BENEFIT PROGRAM**

ARTICLE I
Introduction

       1.1    Definitions. Capitalized terms used and not defined herein have the meanings assigned to them in Exhibit D to the Settlement Agreement.

       1.2    Purpose. As of the Effective Date, the Company shall establish the Health Benefit Program and the Life Insurance Program. Effective as of such date, the Company shall further establish the Supplemental Benefit Program (the "Navistar International Transportation Corp. Retiree Supplemental Benefit Program") on the terms and subject to the conditions set forth below for the benefit of Enrolled Participants and Retirees, whether or not they are Enrolled Participants. From time to time, it is anticipated that cash generated from assets held in the Supplemental Benefit Trust established under the Supplemental Benefit Program may be used to (i) reduce or reimburse premiums, co-payments, deductibles and other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program, (ii) reduce or reimburse premiums which would otherwise be required to be paid by or on behalf of Enrolled Participants to participate in Medicare or any part thereof or any successor or comparable program thereto, (iii) provide Enrolled Participants with additional benefits or (iv) provide additional life insurance benefits to all Retirees, including both those who are Enrolled Participants and those who are not Enrolled Participants (the benefits described in clauses (iii) and (iv), "Additional Permissible Benefits"). All the benefits which may be provided under the Supplemental Benefit Program are limited to those benefits which are permissible under a trust intended to meet the requirements of an organization described in Section 501(c) (9) of the IRC or under any comparable section or sections of any future legislation that amends, supplements or supersedes said section.

ARTICLE II
Supplemental Benefit Trust

       2.1    Establishment. The Company has established the Supplemental Benefit Trust for the benefit of the Enrolled Participants, in the case of both health benefits and life insurance benefits, and Retirees who are not Enrolled Participants, in the case of life insurance benefits. The Supplemental Benefit Trust shall be maintained in accordance with this Supplemental Benefit Program, the SPD attached as Appendix B-1 and the trust agreement attached as Appendix B-2.

2.2    Initial Funding.  On the Effective Date, the Company shall contribute such number of shares of the Parent Class B Common to the Supplemental Benefit Trust as shall represent 50 percent of the Parent Common Equity on a Fully Diluted Basis immediately following such contribution.

ARTICLE III
Parent Common Equity

3.1    Purchases.  Until the Event Date, the Supplemental Benefit Trust will not directly or indirectly purchase, offer or agree to purchase, or otherwise directly or indirectly acquire any shares of Parent Common Equity or any other voting securities of Parent ("Other Voting Securities") or any rights or options to purchase any shares of Parent Common Equity or Other Voting Securities (either individually or as a member of any "group" (as defined in Section 13(d)(3) of the Exchange Act), except (i) from Parent, (ii) by way of any stock dividend, dividend reinvestment program, stock split, reorganization, recapitalization, merger, consolidation, rights offering or other like distribution made available to holders of Parent Common Equity generally or under any rights plan which Parent may adopt in the future or (iii) as may otherwise be allowed or required by the Certificate of Incorporation of Parent.

3.2    Conversion.  At the times and on the terms specified in Appendix B-3 hereto, the shares of Parent Class B Common held by the Supplemental Benefit Trust shall automatically convert into shares of Parent Common.

3.3    Voting.  The trustee of the Supplemental Benefit Trust shall vote all shares of Parent Common Equity held by the Supplemental Benefit Trust on any matter submitted to holders of Parent Common Equity for their vote, approval or consent as directed by the Supplemental Benefit Committee.

3.4    Sales of Parent Common Equity.  Subject to the terms and conditions described in Appendix B-3, the Supplemental Benefit Trust may sell, transfer, pledge or otherwise dispose of any securities of Parent to any person in accordance with the provisions of all applicable laws, rules and regulations, including, without limitation, the Securities Act and all rules and regulations thereunder; provided, that the Supplemental Benefit Trust shall not sell or transfer any interest in any securities of Parent held by it during any period (a "Blackout Period") when, in the opinion of counsel to Parent which is knowledgeable in securities law matters, Parent or the Supplemental Benefit Trust would be required under applicable securities laws to disclose confidential information of Parent in connection with such proposed sale or transfer, including, without limitation, any pending or proposed acquisition, disposition, merger, consolidation, tender offer, corporate reorganization, financial or accounting development or

any other development involving Parent or any of its subsidiaries. Parent shall notify the Supplemental Benefit Committee promptly of the occurrence of any Blackout Period, together with such opinion of counsel and a general statement of the nature of the event or condition giving rise to such Blackout Period; provided, that the Supplemental Benefit Committee, on behalf of the Supplemental Benefit Trust, shall furnish Parent with a confidentiality agreement in form and substance reasonably satisfactory to Parent as a condition to Parent's disclosure of any such general statement. Parent shall furnish the Supplemental Benefit Committee with further such opinions and statements not less than each 90 days during the continuance of any Blackout Period and shall notify the Supplemental Benefit Committee promptly of the termination of any Blackout Period. The Supplemental Benefit Committee shall be entitled to rely on *any* such notice, opinion or statement.

3.5    Registration Rights and Other Transfers.

(a) Registration Rights. Parent hereby grants to the Supplemental Benefit Trust the registration rights set forth in Appendix B-4 hereto.

(b) Other Transfers. After the Event Date, Parent shall use its best efforts to comply with the current public information requirements of Rule 144 under the Securities Act and, upon request by the Supplemental Benefit Committee, Parent shall furnish the Supplemental Benefit Committee with (i) a written statement as to whether or not Parent is in compliance with such requirements and (ii) such other information as the Supplemental Benefit Committee may reasonably request to enable the Supplemental Benefit Trust to make sales of shares of Registrable Securities held by it pursuant to an exemption from registration under the Securities Act; provided, that Parent shall not be required to provide any such information during a Blackout Period. In connection with any such transfer of shares of Registrable Securities, the Supplemental Benefit Committee shall deliver written notice to Parent describing the transfer or proposed transfer in reasonable detail, together with an opinion of counsel of its choice which (to Parent's reasonable satisfaction) is knowledgeable in securities law matters to the effect that such transfer of Registrable Securities may be effected without registration under. the Securities Act. Upon delivery of an opinion of such counsel that a transfer of shares of Registrable Securities by the Supplemental Benefit Trust qualifies under Rule 144 under the Securities Act and upon presentation of the certificates representing the shares to be transferred, Parent shall promptly deliver *new* certificates for such shares which do not bear the legend set forth in Section 10.1. If Parent is not required to deliver new certificates for such shares of Registrable Securities not bearing such legend, Parent shall not register the transfer of such shares until the prospective transferee has confirmed in writing to Parent its agreement to be bound by the conditions contained in this Section 3.5(b). Notwithstanding the foregoing

provisions of this Section 3.5(b), three years or more after the date on which any shares of Registrable Securities held by the Supplemental Benefit Trust were "acquired," within the meaning of Rule 144, from Parent or an affiliate of Parent, if Parent receives an opinion of such counsel that the Supplemental Benefit Trust is not an "affiliate" of Parent within the meaning of Rule 144 (and has not been such an "affiliate" of Parent during the preceding three months) and upon presentation of certificates representing such shares of Registrable Securities, Parent shall promptly deliver new certificates for such shares which do not bear the legend set forth in Section 10.1.

       3.6    Event Date. The Event Date shall be the date upon which the earliest of the following occurs:

       (a)    the third anniversary of the date on which the Company has made prefunding contributions (other than prefunding contributions in respect of Annual Service Cost) under Section 3.6 of Exhibit A to the Settlement Agreement which aggregate $500 million or more;

       (b)    the fifth anniversary of the Effective Date; and

       (c)    the occurrence of a Supplemental Benefit Program Payment Default in accordance with Section 11.1.

### ARTICLE IV
### Super-Majority Transactions

       Any transaction involving the Company which, if it involved Parent, would be a Super-Majority Transaction, shall be subject to a Super-Majority Vote at any time when the Certificate of Incorporation of Parent requires a Super-Majority Vote on Super Majority Transactions.

### ARTICLE V
### Parent Preference Stock

       5.1    Contribution. On the Effective Date, the Company shall contribute one share of Series A Preference Stock, par value $1.00 per share, of Parent having the terms set forth in Appendix B-3 hereto (the "Parent Series A Preference") to the Supplemental Benefit Trust.

       5.2    Voting. The trustee of the Supplemental Benefit Trust shall vote the Parent Series A Preference held by the Supplemental Benefit Trust in accordance with written instructions received from the Supplemental Benefit Committee on all matters on which the Parent Series A Preference is entitled to vote; provided, that the Supplemental Benefit Committee shall not give any proxies or powers of attorney or make any assignments with respect to the

voting of, or enter into any voting trusts, voting agreements or similar arrangements with respect to, the Parent Series A Preference. Each director which the holder of Parent Series A Preference is entitled to elect from time to time is referred to herein as a "Supplemental Trust Designee."

      5.3    <u>No Transfers.</u> The trustee of the Supplemental Benefit Trust shall not sell, convey, transfer, assign or pledge the Parent Series A Preference.

ARTICLE VI
The Supplemental Benefit Committee

      6.1    A Supplemental Benefit Program committee (the "<u>Supplemental Benefit Committee</u>") shall be formed on the Effective Date in accordance with the following procedures:

      (a) The Supplemental Benefit Committee shall consist of two individuals designated by the UAW (the "<u>SBC UAW Members</u>"), who may be replaced at any time by the UAW, two other members (the "<u>BBC Class One Other Members</u>") and a fifth member (the "<u>SBC Class Two Other Member</u>") (each, an "<u>SBC Committee Member</u>" and, collectively, the "<u>SBC Committee Members</u>"). The persons who shall initially serve in such capacities are identified in Appendix B-5 hereto. The Supplemental Benefit Committee shall have a chairperson (the "<u>SSC Chair</u>"), who shall be elected from time to time from among the SBC Class One Other Members, and a Secretary, who shall be elected from time to time from among the SBC Committee Members; each such election shall be by a majority vote of all the SBC Committee Members. Parent shall provide copies of the Supplemental Benefit Program, the Health Benefit Program and the Life Insurance Program to each SBC Committee Member and each SBC Committee Member's successor, if applicable.

      (b) In the event of the death, incapacity or resignation of an SBC Class One Other Member, his successor shall be appointed by a majority vote of such SBC Class One Other Member (if he is not deceased or incapacitated), the remaining SBC Class One Other Member and one alternate (the "<u>SBC Class One Other Member Alternate</u>") upon notice from the supplemental Benefit Committee or such SBC Class One Other Member of such death, incapacity or resignation. The person who shall initially serve as the SBC Class One Other Member Alternate is identified in Appendix B-5. In the event of the death, incapacity or resignation of the SBC Class One Other Member Alternate, his successor shall be appointed by a majority vote of such SBC Class One Other Member Alternate (if he is not deceased or incapacitated) and the SBC Class One Other Members upon notice from the Supplemental Benefit Committee or such SBC Class One Other Member Alternate of such death, incapacity or resignation.

      (c) In the event of the death, incapacity or resignation of the SBC Class Two Other Member, his successor shall be

appointed by a majority vote of such SBC Class Two Other Member (if he is not deceased or incapacitated) and two alternates (the "SBC Class Two Other Member Alternates"; the SBC Class One Other Member Alternate and the BBC Class Two Other Member Alternates, collectively, the "SBC Committee Member Alternates") upon notice from the Supplemental Benefit Committee or such SBC Class Two Other Member of such death, incapacity or resignation. The persons who shall initially serve as the SBC Class Two Other Member Alternates are identified in Appendix B-5. In the event of the death, incapacity or resignation of either of the SBC Class Two Other Member Alternates, his successor shall be appointed by a majority vote of such SBC Class Two Other Member Alternate (if he is not deceased or incapacitated), the other SBC Class Two Other Member Alternate and the SBC Class Two Other Member upon notice from the Supplemental Benefit Committee or such SBC Class Two Other Member Alternate of such death, incapacity or resignation.

None of the SBC Class One Other Members, the SBC Class Two Other Member or the SBC Committee Member Alternates shall be a current employee of the UAW or a Retiree who was represented by the UAW at the time of his retirement.

6.2    Powers and Duties. As the Program Administrator and Named Fiduciary under the Supplemental Benefit Program, the Supplemental Benefit Committee is responsible for the administration of the Supplemental Benefit Program. The Supplemental Benefit Committee, as the Named Fiduciary, shall have the powers, rights and duties provided for herein and the following additional powers, rights and duties, all of which such powers, rights and duties shall be exercised or discharged in the Supplemental Benefit Committee's sole discretion, consistent with its rights and obligations under this Exhibit B and the Settlement Agreement:

(a) to adopt such rules and procedures as it may deem appropriate for the efficient administration of the Supplemental Benefit Program or in connection with the exercise or discharge of its powers, rights and duties;

(b) to engage such consultants, actuaries and other professionals as it may deem appropriate to assist it in the exercise of its powers, rights and duties;

(c) until the Profit Sharing Cessation Date, to establish the investment policy under the Supplemental Benefit Trust and appoint and remove investment managers and trustees thereunder;

(d) to review and enforce Parent's and the Company's compliance with their obligations under the Supplemental Benefit Program;

(e) to invest assets consistent with the provisions of the Supplemental Benefit Program and to direct the trustee of the Supplemental Benefit Trust with respect thereto;

(f) to direct the transfer of funds from the Supplemental Benefit Trust to the appropriate person as determined by the Supplemental Benefit Committee pursuant to Section 6.3 at the beginning of each calendar year;

(g) to construe and interpret the Supplemental Benefit Program and to decide all questions of eligibility for benefits under such program;

(h) to appoint claims administrators, medical review agencies and other service providers; and

(i) to undertake such other actions as are necessary or appropriate in connection with the exercise of such powers, rights and duties.

6.3 _Program Design._ The Supplemental Benefit Committee, as a matter of appropriate program design, shall have the following powers, rights and duties, all of which such powers, rights and duties shall be exercised or discharged in the Supplemental Benefit Committee's sole discretion, consistent with the terms of this Exhibit B and the Settlement Agreement:

(a) at the beginning of each calendar year, to determine the amount of assets of the Supplemental Benefit Trust to be used for the purpose of (i) reducing premiums, co-payments, deductibles or other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program, (ii) reducing or reimbursing premiums which would otherwise be required to be paid by or on behalf of Enrolled Participants to participate in Medicare or any part thereof or any successor or comparable program thereto or (iii) providing Additional Permissible Benefits; and

(b) to determine the manner in which the assets of the Supplemental Benefit Trust shall be used each year in accordance with the provisions hereof in a fair and equitable manner.~~; provided, that, notwithstanding anything else contained herein, after the Profit Sharing Cessation Date, the provision of Additional Permissible Benefits that would result in a higher level of expenditures by the Supplemental Benefit Trust than contemplated on the Profit Sharing Cessation Date, as determined by the Actuary, shall be subject to the prior written approval of the Company, which approval shall be granted in the Company's sole discretion.~~

6.4 _Action by Supplemental Benefit Committee._ Any action by the Supplemental Benefit Committee will be subject to the following provisions:

(a) The SBC Chair or any two SBC Committee Members may call a meeting of the Supplemental Benefit Committee on not less than two days' advance written notice to all SBC Committee Members (including telephone conference, video conference and other technology-assisted meetings of persons at separate locations);

(b) The Supplemental Benefit Committee shall act by the majority vote of all of its members, which action shall be as effective as if such action had been taken by all SBC Committee Members, or by a written instrument signed by all of the SBC Committee Members, which instrument may be executed in counterparts; provided, that one or more SBC Committee Members or other persons may be so authorized to act with respect to particular matters on behalf of all SBC Committee Members; and provided, further, that no SBC Committee Member shall be liable or responsible for an act or omission of other SEC Committee Members in which the former has not concurred; and

(c) The certificate of the secretary of the Supplemental Benefit Committee or of the majority of the SBC Committee Members that the Supplemental Benefit Committee has taken or authorized any action shall be conclusive in favor of any person relying on such certificate.

## 6.5 Provision of Benefits.

(a)   The Company shall cooperate with the Supplemental Benefit Committee and the Supplemental Benefit Trust to provide for the reduction or reimbursement of premiums, co-payments, deductibles and other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program or to participate in Medicare or any part thereof or any successor or comparable program thereto through the Health Benefit Program, including, in the case of reimbursement of such amounts that would otherwise be required to be paid to participate in Medicare or any part thereof or any successor or comparable program thereto, by addition of such reimbursement to pension payments.

(b) In the event that Additional Permissible Benefits are to be provided by the Supplemental Benefit Program, then, at the request of the Supplemental Benefit Committee, in a writing signed by both the SBC Chair and the Secretary of the Supplemental Benefit Committee, the Company shall cooperate with the Supplemental Benefit Committee and aid it in determining how such benefits should be administered. Such aid shall include identifying and negotiating with claims administrators, medical review agencies and other service providers to provide such benefits on the terms specified by the Supplemental Benefit Committee and informing the Supplemental Benefit Committee of the available alternatives that most closely approximate those specified by the Supplemental Benefit Committee. Notwithstanding anything else contained in this Section 6.5, in providing such cooperation and aid the Company shall act in a ministerial capacity

only, and shall neither possess, be granted or delegated, nor exercise any discretionary authority, control or responsibility in the development, administration or management of the Additional Permissible Benefits portion of the Supplemental Benefit Program and none of Parent, the Company or any other Employer shall have any obligation to Participants to provide any Additional Permissible Benefits to Participants, or any liability to Participants for failing to provide any Additional Permissible Benefits.

6.6 <u>Supplemental Benefit Committee Minutes.</u> As soon as is reasonably practicable after each meeting of the Supplemental Benefit Committee, the Secretary of the Supplemental Benefit Committee shall prepare draft minutes of such meeting, which shall be delivered to each SBC Committee Member and approved or modified at the following meeting.

<u>ARTICLE VII</u>

~~Profit Sharing~~<u>Company</u> Contributions

7.1 <u>Contributions.</u> The Company shall <u>have no obligation to</u> make ~~additional any~~ cash contributions ~~("Profit Sharing Contributions")~~ to the Supplemental Benefit Trust<u>, and the Supplemental Benefit Trust Profit Sharing Plan is terminated effective as of December 31, 2021.</u> ~~under and in accordance with the terms of the Profit Sharing Plan attached as Appendix B-6 hereto.~~

~~7.2 Profit Sharing Cessation Date. The Profit Sharing Plan shall terminate on the first day of the Plan Year following the Plan Year in which the Profit Sharing Cessation Date occurs, without prejudice to the obligation of Parent to make any Profit Sharing Contribution due in respect of the Plan Year in which the Profit Sharing Cessation Date occurred. As from the date of such termination, (i) the Company shall be responsible for establishing the investment policy under the Supplemental Benefit Trust and removing and appointing investment managers and trustees thereunder and (ii) the Company shall make such additional contributions to the Supplemental Benefit Trust as are necessary to make up for any actuarial losses amortized in accordance with the provisions of FASB 106, including investment losses. The Actuary shall determine as of the first day of each Plan Year whether the Profit Sharing Cessation Date occurred during the previous year and, after the Profit Sharing Cessation Date, the amount of any such actuarial losses during each Plan Year and notify the Company and the Supplemental Benefit Committee of such determinations, together with such additional information as may be necessary or appropriate. The Company shall make any such additional contribution on or before the tenth business day following receipt of notice of such determination. The "Profit Sharing Cessation Date" shall be the date on which the value of the assets held by the Supplemental Benefit Trust plus the then current year's Health APBO equals the Adjusted Health APBO for Participants under the prior postretirement benefit plan known as the "Navistar International~~

Transportation Corp, Health Plan". The "Adjusted Health APBO," with respect to such prior plan as of any date, shall be the accumulated postretirement benefit obligation for benefits under the prior plan calculated only with respect to remaining Participants and which would exist if such prior plan were reinstated as of such date for such remaining Participants, as determined by the Actuary in good faith on the same basis that the Employers' Health APBO is computed for the then current year.

7.3     Guarantee of Contributions After the Profit Sharing Cessation Date. On and after the Profit Sharing Cessation Date, Parent shall unconditionally and irrevocably guarantee the payment of contributions by the Company under Section 7.2, as a primary obligor and not merely as a surety. Parent's obligations under this guarantee shall not be impaired by any breach or violation of any provisions of the Plan, whether by the Company, any other Employer or otherwise, nor by any modification or amendment of or to, or any waiver of any obligation of any party under, the Plan, any merger, reorganization or bankruptcy of the Company or any other Employer or any other event which may cause the Company or any other Employer to lose its separate legal identity or to cease to exist. This guarantee shall not be affected in any way by the absence of any action to obtain payment of any amount under the Plan. Parent hereby waives all requirements as to promptness, diligence, presentment, demand for payment, protest and notice of any kind with respect to this guarantee. This guarantee shall remain in full force and effect until the termination of the Plan and shall remain in full force and effect or be reinstated, as the case may be, if at any time any amount paid by Parent, the Company or any other Employer under the Plan or this guarantee, in whole or in part, is rescinded or must otherwise be returned upon the insolvency, bankruptcy, or reorganization of Parent, the Company or such Employer or otherwise, all as though such payment had not been made. This guarantee is a guarantee of payment and not of collection. Each of Parent and the Company irrevocably waives any and all rights or claims to indemnity, subrogation, reassessment, exoneration or contribution which it had, has or hereafter may have in respect of any payment under this guarantee to the extent that under applicable law such rights of Parent or the Company would render a payment by the Company or any other Employer (other than Parent) avoidable if made prior to 90 days before a bankruptcy or similar proceeding of the Company or such Employer. To the extent that Parent makes a payment of a type described in the immediately preceding sentence under this guarantee on behalf of any other Employer, and to the extent that the Company makes a payment of such a type on behalf of any other Employer (other than Parent), such payment shall be deemed to be a capital contribution to such Employer.

7.4     Dispute Resolution. In the event of a dispute regarding any determinations made by the Actuary under this Exhibit B, the Company and the Supplemental Benefit Committee will attempt to resolve such dispute. If any such dispute is not so resolved to the satisfaction of the Supplemental Benefit

~~Committee, the Supplemental Benefit Committee may request that such determination be resolved by an independent actuary. Such independent actuary shall be selected in accordance with the following procedure. First, the Company and the Supplemental Benefit Committee shall, for a period not to exceed 10 days, seek to agree on a firm to serve as such independent actuary. Second, in the event that the Company and the Supplemental Benefit Committee fail to agree on such a firm, they shall request the Society of Actuaries to prepare a list of the seven largest actuarial firms with their principal offices in the United States (as measured by the number of enrolled actuaries in such firms) and to communicate such list to the parties. Third, the Company and the Supplemental Benefit Committee shall, beginning with the Company, alternately strike one name off such list until only one such name remains, and that firm shall act as such independent actuary. The Actuary, the Company and the Supplemental Benefit Committee shall cooperate with such independent actuary in reevaluating the disputed determination, and the determination of the independent actuary shall be final and binding on all parties. One-half of the fees and expenses of such independent actuary shall be paid from the assets of the Supplemental Benefit Trust, and the remainder of such fees and expenses shall be paid by the Company.~~

<u>ARTICLE VIII</u>
<u>Additional Funding</u>

8.1     <u>Expenses of Supplemental Benefit Committee.</u>  The Company agrees that, during the period commencing on the Effective Date and ending on the Event Date (the "<u>Initial Period</u>"), it will forthwith upon demand and the Company's receipt of such detailed supporting documentation as the Company may reasonably request pay to (i) all SBC Committee Members and SBC Committee Member Alternates who are not current employees of the UAW, reasonable compensation for time spent on Supplemental Benefit Committee matters, (ii) each SBC Committee Member and each SBC Committee Member Alternate the amount of any and all reasonable out-of-pocket expenses, including reasonable travel expenses incurred by him in exercising or discharging his powers, rights and duties hereunder and (iii) to the Supplemental Benefit Committee the amount of any and all reasonable out-of-pocket costs and expenses (including trustee fees of the Supplemental Benefit Trust, the reasonable fees and disbursements of actuarial, financial and legal advisors, and any other experts), which the Supplemental Benefit Committee may incur in connection with the administration of this Supplemental Benefit Program (including the attached appendices); provided, that the Company shall not be obligated to pay any amounts described in clauses (i), (ii) or (iii) above which exceed $100,000 in the aggregate for any calendar year (pro rated for any partial calendar year included in the Initial Period), excluding fees and expenses which Parent has agreed to pay pursuant to Appendix B-4.

8.2 <u>Advance Funding</u>. On and subject to the terms of this Section 8.2, the Company shall, during the Initial Period, any Blackout Period and any other period (an "<u>Other Period</u>") during which Parent has postponed the filing of, or prohibited sales in connection with, a Demand Registration pursuant to Appendix B-4, advance cash to the Supplemental Benefit Trust ("<u>Advance Funding</u>") for use in accordance with the Supplemental Benefit Program; provided, that the Company shall not be required to provide Advance Funding in excess of $10 million in the aggregate in any calendar year (pro rated for any partial calendar year during the Initial Period, any Blackout Period, any Parent Registration Period or any Other Period). At the option of the Supplemental Benefit Committee, the Company shall provide Advance Funding in either of the following ways:

(a) By purchasing from the Supplemental Benefit Trust for cash shares of Registrable Securities having an aggregate value equal to the amount of such Advance Funding based on the average per share market price of the Registrable Securities (or, if there is no trading market for the Registrable Securities, of the securities of the same class or series into which the Registrable Securities may be converted) at closing on each of the 30 days on which such securities last traded prior to the date of such Advance Funding or at such higher price and on such other terms and conditions as may be required by ERISA; provided, that notwithstanding anything herein to the contrary, the Company shall not be required to purchase shares of Registrable Securities at any time when it would be prohibited from doing so under applicable law; or

(b) By providing the requested Advance Funding in cash and reducing the amount of the Company's then-due or future Profit Sharing Contributions, if any, by the amount of such Advance Funding and any other Advance Funding or portion thereof that the Company has not previously applied to Profit Sharing Contributions, increased at the Navistar Rate from the date of each such Advance Funding to the date such Profit Sharing Contribution or Contributions would otherwise be due.

The Supplemental Benefit Committee may call for Advance Funding by delivering written notice thereof to the Company (a "<u>Funding Notice</u>"); provided, that the Supplemental Benefit Committee may not give more than one Funding Notice per calendar quarter. The Company shall be required. to provide the amount of Advance Funding specified in any Funding Notice on or before the tenth business day following receipt of such Funding Notice.

<u>ARTICLE IX</u>

<u>Amendments and Termination</u>

9.1 <u>Amendments.</u> The Supplemental Benefit Program may not be amended except by a written instrument executed by a majority of the members of the Supplemental Benefit Committee and the Company; provided, that:

(a)     the consent of the Company shall not be required with respect to any amendment of Sections 6.1 through 6.4 (other than any amendments that affect the Company's rights under Section 6.3(b)), so long as no such amendment shall (i) adversely affect the obligations of any Employer or (ii) be inconsistent with any of the obligations of the Supplemental Benefit Committee under this Exhibit B;

(b)     Section 3.4 may not be amended except in the event of a change in the applicable securities law;

(c)     the effectiveness of any material amendment to the Supplemental Benefit Program shall be subject to the approval of the Court after appropriate notice to the Class Members; and

(d)     in the event the IRS asserts that any Employer is or will be subject to an excise tax on any of the benefits paid or payable by the Supplemental Benefit Trust under the IRC as in effect on the date of the Settlement Agreement, then the Company may amend the Supplemental Benefit Program and/or the Supplemental Benefit Trust to minimize the current and future liability for such tax so long as no such amendment adversely affects the level of Supplemental Benefit Program benefits that are then being provided or could be provided in the future to any Participant.

9.2     <u>Termination.</u> The Supplemental Benefit Program shall terminate upon the earlier of (a) the termination of the Settlement Agreement as provided in Section 13 thereof or (b) the termination of the Health Benefit Program and the Life Insurance Program; provided, that the obligations of Parent and the Company under Sections 8.1 and 10.3 shall survive such termination. In the event the Supplemental Benefit Program terminates, any or all of the assets held in the Supplemental Benefit Trust shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" within the meaning of Section 501(c) (9) of the IRC, as determined by the Companyset forth herein.  If there are any living Participants at or after the time the Supplemental Benefit Program terminates, the Supplemental Benefit Committee shall determine the disposition of such Supplemental Benefit Trust assets solely to any such living Participants for the remainder of their lives, consistent with this Section 9.2.  If there are no living Participants at or any time after the Supplemental Benefit Program terminates, then the Company and the Supplemental Benefit Committee shall attempt in good faith to reach consensus regarding the disposition of any residual assets in the Supplemental Benefit Trust consistent with this Section 9.2, provided that, if such consensus cannot be achieved promptly, either the Company or the Supplemental Benefit Committee may apply to the Court for a determination as to the disposition of such residual assets consistent with this Section 9.2, and the Court's determination shall be binding.

<u>ARTICLE X</u>
<u>Miscellaneous</u>

10.1    <u>Legends and Stop Transfer Orders.</u> The following legend shall be placed on the certificates representing the shares of Parent Class B Common and Parent Series A Preference issued to the Supplemental Benefit Trust pursuant to this Supplemental Benefit Program:

> "The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be sold or transferred except in compliance with such Act or an exemption from the registration requirements under such Act. In addition, the securities represented by this certificate are subject to voting agreements, transfer restrictions and other provisions contained in the Navistar International Corporation certificate of incorporation and the Navistar International Transportation Corp. Retiree Supplemental Benefit Program, a copy of which is on file at the office of the Secretary of Navistar International Corporation."

Stop transfer orders will be entered with the transfer agent (or agents) and the registrar (or registrars) of Parent's securities against the transfer of legended securities held by the Supplemental Benefit Trust except in compliance with the requirements of this Supplemental Benefit Program.

10.2    <u>Prohibitions and Restrictions Relating to Net Operating Loss Carryovers.</u>

(a)    Notwithstanding any other provision of this Supplemental Benefit Program, neither Parent nor the Company shall, without the consent of the Supplemental Benefit Committee, sell, transfer, otherwise dispose of or purchase or otherwise acquire any securities of Parent or the Company constituting Restricted Stock or take any other action (including acquiring or issuing an option to purchase or sell Restricted Stock) if, after giving effect to such sale, transfer, disposition, purchase, acquisition or other action, the percentage of Restricted Stock owned by all "5-percent shareholders" (within the meaning of Treasury Regulations Section 382-2T(g) under Section 382 of the IRC, or any successor regulation having similar effect) of either Parent or the Company shall have increased by 47 percentage points or more over the lowest percentage of such Restricted Stock owned by such 5-percent shareholders at any time during the three-year period preceding the proposed date of such sale, transfer, disposition, purchase, acquisition or other action (such determination to be made in accordance with the provisions of Treasury Regulations Section 1.382-2T(c)

under Section 382 of the IRC, or any successor regulation having similar effect); provided, that the foregoing restrictions shall not be applicable in the case of (i) any sale, transfer, disposition, purchase, acquisition or other action which has been approved by the holders of Parent Common or (ii) any tender or exchange offer within the meaning of the Exchange Act with respect to Parent Common Equity constituting more than 50 percent in value of the outstanding Parent Common Equity so long as the Board shall have waived the restrictions contained in Part I of Article Eleventh of the Certificate of Incorporation of Parent with respect to all transfers by the Supplemental Benefit Trust pursuant to such tender or exchange offer.

(b)     In addition to the foregoing, neither Parent nor the Company shall, without the consent of the Supplemental Benefit Committee, sell, transfer or dispose of any securities of *Parent* or *the* Company constituting Restricted Stock or take any other action relating to securities of Parent or the Company (including, without limitation, the redemption of such securities or the issuance of options or similar rights with respect thereto) that would decrease the value of shares of securities of Parent or the Company that the Supplemental Benefit Trust could, pursuant to Paragraph B(2) of Part I of Article Eleventh of the Certificate of Incorporation of Parent, sell, transfer or dispose of on or after the Event Date below an aggregate amount equal to (i) $500,000,000, less (ii) all amounts theretofore received by the Supplemental Benefit Trust in any sales, transfers or dispositions on or prior to the determination date, determined, in the case of sales, transfers or dispositions by the Supplemental Benefit Trust to occur after the determination date, as if all such sales and transfers occurred on the Event Date, in the case where the determination date is on or prior to the Event Date, or on the determination date; in the case where such date is after the Event Date; provided, that Parent or the Company may sell, transfer or dispose of securities of Parent or the Company, or take any other action which would otherwise be subject to this Section 10.2(b), (i) to the extent that such sale, transfer, disposition or other action is made or taken for the purpose of Parent or the Company being able to meet its prefunding commitment under Section 3.6(c) of Exhibit A to the Settlement Agreement, (ii) in any case, in an amount of up to an aggregate of $100,000,000 if and to the extent that

the Board of Directors of Parent or the Company reasonably and in good faith determines that such amount is required for working capital of Parent or the Company and is actually applied for such purpose, or (iii) to the extent that such sale, transfer, disposition or action is made or taken for the purpose of Parent or the Company meeting outstanding obligations under employee stock option, incentive or other benefit programs, provided that neither the Parent nor the Company shall make any grants under any such programs at a time when such grants could reasonably be anticipated in the good faith judgment of the Compensation Committee of Parent's Board of Directors to result in a decrease which would otherwise be subject to this Section 10.2(b).

(c)     Within ten business days of the end of each calendar quarter or ten business days after Parent receives notice that an individual or entity has acquired an amount of Restricted Stock that would constitute a Prohibited Ownership Percentage within the meaning of Article Eleventh of the Certificate of Incorporation of Parent, Parent or the Company will provide the Supplemental Benefit Committee with information as to the number of Supplemental Benefit Trust shares that could be sold pursuant to Paragraph D of Section 1 of Article Eleventh of the Certificate of Incorporation of Parent as of such end of the calendar quarter.

(d) The term "Restricted Stock" shall, for purposes of this Section 10.2, include all securities of Parent or the Company, other than (i) stock described in Section 1504(a)(4) of the IRC and (ii) stock that would be so described solely because it is entitled to vote as a result of dividend arrearages. In addition, the term "Restricted Stock" shall include any other interest in Parent or the Company that would be treated as stock pursuant to Treasury Regulations Section 1.382-2T (f) (18) (iii) under Section 382 of the IRC, or any successor regulation having similar effect.

10.3     Limitation of Liability and Indemnification.  To the extent permitted by applicable law, no person shall be personally liable for any act done or omitted to be done in good faith in the administration of the Supplemental Benefit Program or the investment of the assets of the Supplemental Benefit Trust. The Employers shall jointly and severally indemnify and hold harmless, to the extent permitted by law, the Supplemental Benefit Trust, the UAW, and each

present or former SBC Committee Member and SBC Committee Member Alternate from and against any and all losses, costs, liabilities, damages and expenses (including fines, penalties and taxes and the fees and disbursements of actuarial and legal advisors), as incurred, which they may incur (a) in connection with the establishment and implementation of the Supplemental Benefit Program in accordance with the terms hereof, (b) in connection with the enforcement of the obligations of Parent, the Company or any other Employer under the Supplemental Benefit Program or (c) by reason of any act done or omitted to be done in good faith in connection with the Supplemental Benefit Program, other than by reason of the sale of or transfer of any interest in securities of Parent in violation of Section 3.4 or 5.3 or the exercise of the powers, duties and rights of the Supplemental Benefit Committee under Sections 6.2 through 6.6 or any amendment thereof; provided, that the payment of any such amount by any of the Employers in advance of the final disposition of any proceeding for which indemnification is being sought shall be made only upon delivery to each Employer paying such amount of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such amount under this Section 10.3 or otherwise. Any claims for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

10.4   Exclusive Benefit. No part of the corpus or income of the Supplemental Benefit Trust shall be used for, or diverted to, any purposes other than for the exclusive benefit of persons who are or may become entitled to benefits under the Supplemental Benefit Program and for defraying reasonable expenses of administering such program.

10.5   Prohibited Inurement. No part of the corpus or income of the Supplemental Benefit Trust shall inure to the benefit of Parent or the Company. All fiduciaries hereunder shall discharge their duties solely in the interests of Participants for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration. No benefit under the Supplemental Benefit Program or interest, right or claim in or to any part of the Supplemental Benefit Trust or any payment therefrom shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, hypothecation or commutation, nor shall any such benefit or interest, right or claim in or to any part of the Supplemental Benefit Trust or any payment therefrom be in any manner liable for or subject to garnishment, attachment, execution or levy or be liable for or subject to the debts, contracts, liabilities, engagements or torts of the person entitled thereto, and the trustee under such trust shall not recognize any attempt to make it so, except as directed by the Supplemental Benefit Committee, in its capacity as Program Administrator, to the .appropriate person for the payment of benefits in a manner that is consistent with applicable law.

10.6  Assignment. Delegation. The rights of any party under the Supplemental Benefit Program may not be assigned without the prior written consent of the Company and the Supplemental Benefit Committee, and any purported assignment in violation of this sentence shall be void. Any party may delegate any of its obligations under the Supplemental Benefit Program; provided, that no such delegation shall relieve such party of any of such obligations; and, provided, further, that the delegation of any obligation of Parent or the Company in connection with the transfer of any assets of either of them shall be subject to the express assumption of such obligation by the transferee.

10.7  Captions. The captions used in this Exhibit B are for convenience of reference only and do not constitute a part of this Exhibit B and will not be deemed to limit, characterize or in any way affect any provision of this Exhibit B and all provisions of this Exhibit B will be enforced and construed as if no captions had been used in this Exhibit B.

10.8  Incorporation of Appendices: References. The Appendices hereto are incorporated in this Exhibit B as though fully set forth herein. References in this Exhibit B to "Articles," "Sections" and "Appendices" refer to the Articles, Sections and Appendices of this Exhibit B unless otherwise specified.

10.9  Governing Law. This Exhibit B shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or preempted thereby, with the laws of the State of Illinois.

ARTICLE XI
Events of Default

11.1  Supplemental Benefit Program Payment Default. An Event Date shall occur upon the occurrence of a "Supplemental Benefit Program Payment Default." As used herein, the term

"Supplemental Benefit Program Payment Default" shall mean the failure at any time by Parent or the Company to make any payment or contribution required to be made by it pursuant to Sections ~~7.1, 7.2, 7.3,~~ 8.2 or 10.3 of this Exhibit B within five days after receipt of written notice of such failure from the Supplemental Benefit Committee, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 11.1; provided, ~~that with respect to any failure to make a payment or contribution required to be made by Parent or the Company pursuant to Section 7.3, if Parent or the Company shall have paid or contributed the amount determined by the Actuary in accordance with such section and Parent or the Company shall be required to make any additional payment or contribution as determined by the independent actuary referred to in Section 7.4, the Supplemental Benefit Committee shall not give notice of such failure unless Parent or the Company shall~~

~~have failed to make such additional payment or contribution within five days of the date of such determination by such independent actuary; and, provided, further,~~ that the Supplemental Benefit Committee shall not give notice of a failure to make a payment under Section 10.3 unless the Indemnified Party has executed the undertaking provided for in Section 10.3.

        11.2   <u>No Limitation of Rights.</u> The rights of the Supplemental Benefit Committee under this Article XI are in addition to, and not in lieu of, any rights that the Supplemental Benefit Committee, or any other person or entity, including, without limitation, any SBC Committee Member, SBC Committee Member Alternate or Participant, may have under the Settlement Agreement, any Exhibit thereto or any Appendix to any such Exhibit, whether in equity or at law. The waiver by the Supplemental Benefit Committee or any such person or entity of any Supplemental Benefit Program Payment Default or other breach of any provision of, or any other right to enforce or claim or benefit under, any such document shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, such document.

NAVISTAR INTERNATIONAL TRANSPORTATION CORP.

RETIREE SUPPLEMENTAL BENEFIT TRUST

THIS AGREEMENT OF TRUST (hereinafter referred to as the "Agreement") is made and entered into this 1st day of July, 1993, by and between Navistar International Transportation Corp., a corporation organized under the laws of the State of Delaware (hereinafter referred to as the "Company"), and Wells Fargo, N.A. (hereinafter referred to as the "Trustee").

**W I T N E S S E T H:**

**WHEREAS,** the Company was a defendant in <u>Shy</u> v. <u>Navistar International Corporation,</u> Case No. C-3-92-333 (S.D. Ohio) (the "Litigation"), and entered into a settlement agreement (the "Settlement Agreement") with the plaintiffs in the Litigation in order to limit its liability to the plaintiffs; and

**WHEREAS,** the Company maintains the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program, (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program, and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (the "Supplemental Benefit Program"); and

**WHEREAS,** under the Settlement Agreement and the Supplemental Benefit Program, the Company is obligated to make certain contributions to the Supplemental Benefit Program; and

**WHEREAS**, in order to implement and carry out the terms of the Settlement Agreement and the Supplemental Benefit Program, the Company wishes to establish the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust (hereinafter referred to as the "Trust"), which shall form a part of the Supplemental Benefit Program, and which is intended to satisfy the requirements of Section 501(c)(9) of the Code (as hereinafter defined) or any successor provision thereto; and

**WHEREAS,** the Company has authorized the execution of this Agreement and the creation of a trust fund to provide benefits under the Supplemental Benefit Program; and

**WHEREAS,** the Company intends, through this Agreement, to provide for management and control of the assets of the Supplemental Benefit Program through a trust fund; and

**WHEREAS,** Wells Fargo, N.A. has consented to act as Trustee hereunder and to hold and administer such sums as are transferred or contributed upon the terms set forth herein,

**NOW, THEREFORE**, the Company and the Trustee hereby agree to establish the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust, subject to the following terms and conditions:

# ARTICLE I

# DEFINITIONS

1.1    Definitions. The following words and phrases when used herein shall have the following meanings, except as otherwise required by the context:

(a)    "Beneficiary" means a person designated as a beneficiary of a Participant by the Participant, or by the terms of the Program, and who is or may become entitled to a benefit under the Program.

(b)    "Cessation Date" means the Profit Sharing Cessation Date as defined by the Program.

(c)    "Code" means the Internal Revenue Code of 1986, as amended from time to time.

(d)    "Committee" means the Supplemental Benefit Committee established pursuant to the Program.

(e)    "Company" means Navistar International Transportation Corp.

(f)    "Employers" means Navistar International Corporation, Navistar International Transportation Corp., Navistar Financial Corporation, HARCO National Insurance Company, and Indianapolis Casting Corporation.

(g)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

(h)    "Investment Manager" means a person or entity who is either:

(1)    an investment adviser registered as such under the Investment Advisers Act of 1940; or

(2)    a bank, as defined in that Act;

(3)    or an insurance company qualified to manage, acquire, or dispose of any asset of an employee benefit plan under the laws of more than one State.

(i)    "Participant" means a Participant as defined by the Program/

(j)    "Plan" means the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan, which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program, (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program, and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program.

(k)    "Program" means the Navistar International Transportation Corp. Retiree Supplemental Benefit Program.

(1)    "Responsible Fiduciary" means (i) before the Cessation Date, the Committee, and (ii) on and after the Cessation Date, the Company.

(m)    "Trust Fund" means the assets of the Trust.

(n)    "Trust Year" means the fiscal year beginning on each November let and ending on the following October 31st; provided that the first Trust Year shall begin on the effective date specified by Section 11.9 hereof and shall end on the following October 31st.

1.2    Gender and Number. Masculine pronouns shall refer both to males and to females. Singular or plural words shall be construed to refer to the plural or the singular, respectively, where appropriate.

## ARTICLE II
## PAYMENT TO AND FROM THE TRUST

2.1 <u>Payments to the Trust</u>. The Trustee shall receive any payments made to it in cash, securities of the Employers, or in the form of such other property as it may from time to time deem acceptable and which shall have been delivered to it. Such payments may be made by the Company or by any person or entity designated by the Company. All payments so received, together with the income therefrom and any other increment thereon, shall be held, invested, reinvested, and administered by the Trustee pursuant to the terms of this Agreement, without distinction between principal and income. The Trustee shall not be responsible for the calculation or collection of any contribution under, or required by, the Program, but shall be responsible only for cash or other property received by it pursuant to this Agreement.

2.2 <u>Payments from the Trust.</u> The Trustee shall, from time to time and at the written direction of the Committee, make, directly or indirectly, payments out of the Trust Fund in such amounts, to such persons (including but not limited to the Navistar International Transportation Corp. Retiree Health Benefit Trust) and for such purposes as may be specified in the written directions of the Committee. To the extent permitted by law, the Trustee shall be under no liability for any payment made pursuant to the written direction of the Committee or for any payment not made in the absence of a written direction of the Committee. Any written direction of the Committee shall constitute a certification that the payment so directed is one that the Committee or its designated representative is authorized to direct. If a dispute arises with respect to a payment, the Trustee may withhold or cause to be withheld such payment at the direction of the Responsible Fiduciary until the dispute has been resolved.

## ARTICLE III
## INVESTMENT AUTHORITY

3.1 <u>Trustee's Authority.</u> Except as otherwise provided in this Agreement, the Trustee shall have exclusive authority and discretion to manage and control the Trust Fund; to invest and reinvest the principal and income of the Trust Fund and keep the Trust Fund invested, as a single fund without distinction between principal and income, in such securities or in such property, real or personal, tangible or intangible, as the Trustee shall deem advisable, including but not limited to capital or common stocks (whether voting or nonvoting and whether or not currently paying a dividend), preferred stocks (whether voting or nonvoting and whether or not currently paying a dividend), bonds, notes, debentures, interests in investment companies, trusts, partnerships, and other pooled funds, savings bank deposits (including but not limited to savings accounts and savings investment media that are maintained by the Trustee's own Banking Department), and commercial paper, and in such other property, investments and securities, whether domestic or foreign, of any kind, class, or character as the Trustee may deem suitable for the Trust Fund, and such investment and reinvestment shall not be restricted to properties and securities authorized for investment by trustees under any present or future law; provided that in no event shall the Trustee make any investment prohibited by ERISA. The Trustee in its discretion may keep such portion of the Trust Fund in cash or cash equivalents, (including deposits in the Trustee's own Banking Department) as the Trustee may from time to time deem to be in the interest of Participants and Beneficiaries, even if such balances exceed the maximum amount insured from time to time by the Federal Deposit Insurance

Corporation. Except as provided by Section 3.2 and Article VI hereof, all rights associated with assets of the Trust shall be exercised by the Trustee; all such rights shall in no event be exercisable by or rest with Participants and Beneficiaries.

3.2     <u>Limitation on Trustee's Authority.</u>     Notwithstanding anything in this Agreement to the contrary, and regardless of whether the Responsible Fiduciary has appointed an Investment Manager pursuant to Section 6.3 hereof or has established a segregated fund managed by the Responsible Fiduciary pursuant to Section 6.5 hereof, the Trustee shall not acquire, sell, otherwise dispose of, or otherwise take any action with respect to any securities of the Company and its affiliates (including the voting of proxies appurtenant thereto) unless such action is permitted by the terms of the Program.

3.3     <u>The Program.</u>     Upon the execution of this Agreement, the Company shall deliver to the Trustee a complete copy of the Program. For purposes of this Agreement, the Trustee shall rely conclusively on said copy as a complete and accurate copy of the Program, and the Trustee shall assume that no change has been made in the terms of the Program except to the extent that the Company notifies the Trustee in writing that the Program has been amended and delivers to the Trustee a complete copy of the amendment. The Company shall deliver to the Committee a copy of all documents delivered to the Trustee in accordance with this Section 3.3 at the same time that it delivers such documents to the Trustee.

## ARTICLE IV
## POWERS AND DUTIES OF THE TRUSTEE

4.1     <u>Powers.</u>     The Trustee shall have the following powers with respect to the Trust Fund in addition to those conferred by law:

(a)     to sell, exchange, convey, transfer, or otherwise dispose of any property held by it, by private contract or at public auction; and no person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition;

(b)     to make commitments either alone or in company with others to purchase at any future date any property, investments, or securities set forth in Section 3.1 hereof;

(c)     to retain, manage, operate, repair, develop, preserve, improve, mortgage, or lease for any period any real property held by the Trustee upon such terms and conditions as the Trustee deems proper, either alone or by joining with others using other Trust assets for any such purposes if by it deemed advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease, including the waiver of rentals, if by it deemed advisable; and to make provisions for the amortization of the investment or in depreciation of the value of such property as it may deem advisable;

(d)     to organize corporations under the laws of any State for the purpose of acquiring or holding title to any property for the Trust Fund or to request the Company to appoint another trustee for such purpose;

(e)     to retain any stocks or other property received as a result of the exercise of any of the powers herein granted, whether or not investment in much stocks or other property is authorized by Section 3.1 hereof;

(f)     to vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to exercise any conversion privileges, subscription rights, or other options, and to make any payments incidental thereto; to consent to or otherwise participate in corporate reorganizations or other changes affecting corporate securities and to delegate discretionary powers and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to stocks, bonds, securities, or other property held in the Trust Fund;

(g)     to make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(h)     to register any investment held in the Trust Fund in its own name or in the name of a nominee and to hold any investment in bearer form, to utilize the services of a depository clearing corporation (such as the Depository Trust Company) to the extent permitted

by law, and to combine certificates representing such investments with certificates of the same issue held by the Trustee in other fiduciary capacities under employee benefit plans, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust;

(i)     to employ suitable agents and counsel and to pay reasonable expenses and compensation thereto;

(j)     to borrow money on such terms and conditions as the Trustee in its discretion may deem advisable;

(k)     to transfer monies of the Trust Fund to a common or collective trust fund or pooled investment fund; money and other assets of the Trust Fund invested in such a fund shall be held and administered by the trustee thereof strictly in accordance with the terms of, and under the powers governing, such fund to the extent consistent with this Agreement and the terms of the Program; the combining of money and other assets of this Trust with money and other assets of such a fund is hereby specifically authorized;

(1)     to compromise or otherwise adjust all claims in favor of or against the Trust Fund;

(m)    to compromise, compound, and settle any debt or obligations upon such terms as the Trustee may deem advisable and to agree to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon, default, or otherwise enforce any such obligation; and

(n)     upon receipt of written direction from the Responsible Fiduciary, to use monies in the Trust Fund to purchase or maintain insurance or annuity contracts.

4.2     <u>Dealing with Trustees</u>. In no event shall any purchaser, vendor, or other person dealing with the Trustee be required to ascertain the authority and power of the Trustee to make any sale, transfer, assignment, or investment of the whole or any part of the Trust Fund at any time held hereunder, or to make any contract in relation thereto, nor shall any insurance company be required to ascertain the power or authority of the Trustee to apply for and purchase any insurance or annuity contract, and any such person or company may rely upon any factual information furnished by the Trustee in connection therewith. All parties dealing with the Trustee with respect to the Trust Fund shall have the right to assume that the Trustee has full power and authority in all respects to deal with the Trust Fund and shall not be affected by any notice to the contrary, and no purchaser shall be required to see to the application of the purchase money.

4.3     <u>Fees and Expenses.</u> The Trustee shall be paid such reasonable compensation as may be agreed upon in writing initially between the Trustee and the Responsible Fiduciary, subject to such revisions as may be agreed upon in writing from time to time thereafter between the Trustee and the Responsive Fiduciary. Such compensation and all fees and expenses incurred by the Trustee in the proper performance of its duties, including fees for legal services rendered to the Trustee and compensation paid to any Investment Manager, shall be paid from the Trust Fund. All taxes of any kind that may be levied or assessed under existing or future laws upon, or with respect to, the Trust shall be paid from the Trust Fund.

4.4     <u>Administration</u>. Except as otherwise provided by Section 3.2 hereof, the Trustee shall not be responsible in any way for the administration of the Program.

4.5     <u>Consultation and Indemnification.</u> The Trustee may consult with counsel, and the Trustee shall not be deemed imprudent by reason of taking or refraining from taking any action in accordance with the opinion of counsel. The Responsible Fiduciary shall cause the Trust to indemnify and hold the Trustee harmless from and against any liability that the Trustee may incur in the administration of the Trust Fund, unless such liability arises from the Trustee's negligence or breach of the provisions of this Agreement or ERISA; provided that nothing in this Section 4.5 shall require any payment from any source other than the Trust or require any payment to be made to the Trust. The Trustee shall not be required to give any bond or any other security for the faithful performance of its duties under this Agreement, except such as may be required by law.

4.6     <u>Responsibilities.</u> Except as required by ERISA, the Trustee shall be under no duty (i) to take any action other than as herein specified with respect to the Trust unless the Responsible Fiduciary or an Investment Manager shall furnish the Trustee with instructions in proper form as described by Section 4.8 hereof or (ii) to engage in any suit with respect to the Trust unless the Trustee shall have first agreed in writing to do so and shall have been fully indemnified to the satisfaction of the Trustee. To the extent not prohibited by ERISA, the Trustee shall not be responsible or liable in any way for any action or omission of the Company or the Committee with respect to the performance of their duties and obligations as set forth in the Program and this Agreement; provided that the Trustee shall not be relieved of responsibility or liability for any responsibility, obligation, or duty imposed upon it under this Agreement or under ERISA. The Trustee is a party to this Agreement solely for the purpose set forth in this Agreement and to perform the acts set forth herein, and no obligation or duty shall be imposed upon it except as expressly stated herein or as required by ERISA.

4.7     <u>Direction</u>. Except as otherwise provided by Section 3.2 hereof, the Trustee may request the advice or direction of the Responsible Fiduciary with respect to the administration of the Trust and the distribution of the Trust Fund, and, to the extent permitted by ERISA, shall be protected from liability in relying upon any direction given to it by the Responsible Fiduciary, in writing, in response to such a request.

4.8     <u>Reliance on Written Instructions.</u> The Trustee shall be entitled to rely upon any written notice, instruction, direction, certificate, or other communication believed by it to be genuine and to be signed by the Company, the Committee, an Investment Manager, or their authorized agent(s) or representative(s), unless it knows or should know that the direction or instruction constitutes a breach of the Company's, the Committee's, or the Investment Manager's fiduciary responsibility with respect to the Trust. The Trustee shall be fully protected in making payments out of the Trust Fund, or in taking or omitting to take any other actions, in accordance with the written instructions of the Company, the Committee, an Investment Manager, or their authorized agent(s) or representative(s), and shall have no responsibility to see to the application of any such payments by the Participants or their Beneficiaries or legal representatives, or by any other recipients thereof specified in such instructions, or to ascertain whether such instructions comply with the terms of the Program, or to determine the rights or benefits of any person in the Trust or under the Program, and shall not be liable to any person for or in respect of any payment made by it, or action taken or omitted to be taken by it, in good faith without notice or knowledge of a change in the condition or status of any person affecting that person's rights hereunder; provided that if the Trustee knows or should know that such an instruction constitutes a breach of fiduciary responsibility with respect to the Trust, the Trustee shall inform the Responsible Fiduciary of the breach; and provided further that nothing in this Section 4.8 shall authorize the Trustee to take any action that is inconsistent with the provisions of Section 3.2 hereof. The Company, the Committee, and any Investment Manager(s) shall furnish the Trustee with a list naming their authorized agent(s) or representative(s), and describing the scope of the authority granted, and shall notify the Trustee of any changes to the list. Absent such notification, the Trustee may assume no change has occurred with respect to each list.

## ARTICLE V

## FUNDING POLICY AND INVESTMENT OBJECTIVES

5.1     **Communication to Trustee**. The Responsible Fiduciary shall inform the Trustee in writing of the funding policy under the Program and of the investment objectives of the Trust and of any changes or modifications therein. Until the Responsible Fiduciary informs the Trustee of any change in the funding policy under the Program or of any change in the investment objectives of the Trust, the Trustee may assume that there has been no change in the funding policy or the investment objectives, as the case may be.

# ARTICLE VI

## DUTIES OF THE COMMITTEE AND THE COMPANY

      6.1    **Information**. The Committee and the Company shall furnish the Trustee with such information and data relating to the Program as are necessary for the Trustee to carry out its duties under this Agreement.

      6.2    **Investment Responsibility**. The Trustee shall have the full responsibility for investment of the Trust Fund, except as provided in Section 3.2 hereof, and except where the Responsible Fiduciary has appointed an Investment Manager pursuant to Section 6.3 hereof or has established a segregated fund managed by the Responsible Fiduciary pursuant to Section 6.5 hereof.

      6.3    **Appointment of Investment Manager**. The Responsible Fiduciary may appoint one or more Investment Managers for the purpose of directing the Trustee with respect to the investment or reinvestment of all or any portion of the Trust Fund. The Responsible Fiduciary shall certify to the Trustee the appointment and scope of authority of, and any resignation or removal or change in authority of, my Investment Manager appointed by it under this Section, the appointment of any successor thereto, and the identity of the individual or individuals entitled to act on behalf of the Investment Manager. In particular, the Responsible Fiduciary shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any change or revocation thereof. An Investment Manager shall present evidence to the Trustee of its qualifications as an investment manager under Section 3(38) of ERISA, and shall acknowledge in writing its appointment as a fiduciary of the Plan.

      6.4    **Responsibility of Investment Manager**.  An Investment Manager shall have sole investment responsibility for that portion of the assets of the Trust Fund that it has been appointed to manage. Subject to the restrictions imposed by Section 3.2 hereof, an Investment Manager that has been thus granted such responsibility shall have all the investment powers enumerated in Article III hereof that shall be granted to it by the Responsible Fiduciary. Except as otherwise provided by Section 3.2 hereof, where such an Investment Manager has been appointed by the Responsible Fiduciary, the Trustee shall have no duty to review or recommend any investment or reinvestment of the Trust Fund, nor shall the Trustee be charged with the duties imposed by Section 7.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to any Investment Manager. The Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this section. Except as otherwise provided by Section 3.2 hereof, the Trustee shall be under no duty to question the direction or lack of direction of any Investment Manager, but shall act, and shall be fully protected in acting, in accordance with each such direction.

      6.5    **Segregated Fund**. The Responsible Fiduciary may create a segregated fund by certifying to the Trustee in writing that it has established a segregated fund in accordance with procedures that are consistent with Section 403(a)(1) of ERISA, the investment and control of the assets of which are to be the sole and exclusive responsibility of the Responsible Fiduciary. Subject to the restrictions imposed by Section 3.2 hereof, the Responsible Fiduciary shall have complete discretionary authority to direct the Trustee with respect to the investment and reinvestment of the portion of the Trust Fund constituting the segregated fund, as specified by the Responsible Fiduciary, without any requirement that any other fiduciary be consulted prior to the giving of any such directions to the Trustee or the carrying out of such directions by the Trustee. Except as

otherwise provided by Section 3.2 hereof, if the Responsible Fiduciary has thus assumed such discretionary authority, the Responsible Fiduciary shall have all the investment powers enumerated in Article III hereof. The Responsible Fiduciary shall certify to the Trustee the scope of its authority, any change in the authority of the Responsible Fiduciary, and the identity of the individual or individuals entitled to act on behalf of the Responsible Fiduciary. In particular, the Responsible Fiduciary shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any chance or revocation thereof, and the Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this Section. Except as otherwise provided by Section 3.2 hereof, the Trustee shall have no duty to review or to recommend any investment or reinvestment of the segregated fund, nor shall the Trustee be charged with the duties imposed by Section 7.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to the Responsible Fiduciary. Except as otherwise provided by Section 3.2 hereof, the Trustee shall have no discretionary authority over a segregated fund, but shall ь. subject, with respect to the segregated fund, to all proper directions of the Responsible Fiduciary that are not contrary to the terms of ERISA.

6.6 **Alter Cessation Date**. Any appointments and statements made, and certifications and directions given, by the Committee before the Cessation Date in accordance with this Agreement shall remain in effect on and after the Cessation Date until and unless changed by the Company in accordance with this Agreement.

## ARTICLE VII

## FIDUCIARY OBLIGATIONS

7.1 **Standard of Fiduciary Conduct**. The Trustee shall discharge its duties solely in the interest of the Participants and Beneficiaries and

(a) for the exclusive purpose of providing benefits to Participants and Beneficiaries and defraying reasonable expenses of administering the Program (including any such expenses incurred by the Committee or the Company);

(b) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(c) by diversifying the investments of the Program so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so; and

(d) in accordance with. this Agreement, except to the extent that this Agreement may be inconsistent with ERISA.

7.2 **Prohibited Inurement**. Except as provided herein and in the Program, none of the assets of the Trust shall inure to the benefit of the Company, any affiliate thereof, or any other person except through the payment of benefits provided under the Program (including the payment of reasonable Program administration expenses). Notwithstanding the foregoing, if the Company makes a contribution to the Trust by a mistake of fact, the contribution (reduced by any investment losses, but not increased by any investment gains) may be returned to the Company within one year after the payment of the contribution. Nothing in this section or in any other provision of this Agreement shall prevent the Trustee from transferring assets from the Trust to the Navistar International Transportation Corp. Retiree Health Benefit Trust.

7.3 **Scope of Responsibility**. A fiduciary not charged with a specific responsibility under the provisions of the Program or this Agreement shall be under no duty to question any action or lack of action of another fiduciary with respect to such responsibility, and shall not be liable for a breach of fiduciary responsibility by another fiduciary, unless the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary knowing such act is a breach, or if, having knowledge of a breach by such other fiduciary, the fiduciary fails to make reasonable efforts under the circumstances to remedy the breach.

## ARTICLE VIII

## ACCOUNTING

8.1 **Accounting for Trust Fund**. The Trustee shall keep timely, accurate, and detailed accounts of all investments, receipts, disbursements, and other transactions hereunder, and all accounts, books, and records relating hereto shall be open to inspection and audit at all reasonable times by the Responsible Fiduciary and any other person designated by the Responsible Fiduciary. Within sixty (60) days following the close of each Trust Year, within sixty (60) days after the removal or resignation of the Trustee, and at such other times as the Responsible Fiduciary reasonably may require, the Trustee shall file. with the Responsible Fiduciary a written account setting forth all investments, receipts, disbursements, and other transactions effected by the Trustee during ouch Trust Year or since the date of its last account. The Trustee, within the same time

periods, shall ascertain and certify to the Responsible Fiduciary, in accordance with applicable U.S. Department of Labor regulations, the coot and fair market values as of the close of such Trust Year (or such other period as the Responsible Fiduciary may require) of all securities and other properties held in the. Trust Fund. Such fair market values shall be determined by such person or persons selected by the Responsible Fiduciary in accordance with a method consistently followed and uniformly applied. The Trustee may, in its discretion, cause that valuation to be reviewed at the expense of the Trust. The Trustee, within the same time periods, also shall furnish to the Responsible Fiduciary a balance sheet containing a description in reasonable detail of all assets and liabilities of the Trust. The Trustee may rely on valuations performed by the person or persons selected by the Responsible Fiduciary. In the event any portion of the Trust Fund has been transferred to a common or collective trust fund pursuant to Section 4.1 hereof, such account shall include a copy of the latest annual written account of the common or collective trust fund. The Responsible Fiduciary shall have the right to require an audit by certified public accountants of the records and assets of the Trust. The expenses and any special fee charged by the Trustee for any such audit shall be paid pursuant to the provisions of Section 4.3 hereof.

## ARTICLE IX

## RESIGNATION, REMOVAL, AND SUCCESSION or TRUSTEE

9.1     **Resignation**. The Trustee may resign at any time by giving sixty (60) days' notice in writing to the Responsible Fiduciary.

9.2     **Removal**. The Responsible Fiduciary may remove the Trustee at any time by giving thirty (30) days' notice in writing to the Trustee.

9.3     **Successor Trustee**. In no event shall the resignation or removal of the Trustee terminate this Agreement, but upon such resignation or removal of the Trustee, the Responsible Fiduciary shall have the duty forthwith of appointing a successor trustee, who shall have the same powers and duties conferred upon the Trustee hereunder. In the event of such resignation or removal of such Trustee and upon the appointment of a successor trustee and acceptance of such Trustee, the Trustee shall turn over to the successor trustee the Trust Fund and all records of books of account and other documents pertaining to this Agreement that are in its possession, reserving such sums as the Trustee shall reasonably deem necessary to defray its expenses in settling its accounts, to pay any of its compensation due and unpaid, and to discharge any obligation of the Trust Fund for which the Trustee may be liable; and if the sums so reserved are not sufficient for these purposes, the Trustee shall be entitled to recover the amount of any deficiency from either the Company or the successor trustee, or both. To the extent permitted by ERISA, after the Trust Fund has been transferred and delivered to the successor trustee, the Trustee shall be released and discharged from all further accountability or liability for the Trust Fund and shall not be responsible in any way for the further disposition of the Trust Fund or any part thereof.

9.4     **Waiver of Notice**. In the event of any resignation or removal of the Trustee, the Trustee and the Responsible Fiduciary may in writing, waive any notice of resignation or removal as may be provided hereunder.

## ARTICLE X

## AMENDMENT AND TERMINATION OF AGREEMENT

      10.1   **Amendment**. This Agreement may be amended in writing at any time or from time to time, in whole or in part, by action of the Responsible Fiduciary, and any such amendment may be retroactive. However, no amendment that affects the rights, duties, or responsibilities of the Trustee shall become effective without the Trustee's written consent. No amendment shall be inconsistent with the requirements of ERISA or with the provisions of the Program. No amendment shall authorize or permit any assets of the Program to be used for, or diverted to, purposes other than for the exclusive benefit of Participants and Beneficiaries and the payment of reasonable Program administration expenses prior to the satisfaction of all liabilities under the Program. No amendment shall cause or permit any portion of the Trust Fund to revert to or become the property of the Employers.

      10.2   **Termination**. The Responsible Fiduciary may terminate the. Trust in accordance with the terms of the Program.

      10.3   **Distribution Upon Termination**. In the event of the termination of the Trust, or of all or any part of the Program, the Trustee shall dispose of such funds in accordance with the written order of the Responsible Fiduciary. Such order shall require that the funds of the Program be disposed of in a manner that benefits the Participants and Beneficiaries covered by the Program (including the payment of reasonable Program administration expenses); provided that if all of the liabilities of the Program have been satisfied, any remaining assets of the Program shall be applied to provide such benefits as may be provided by a 'voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code) as the Committee shall determine in its discretion. Notwithstanding the foregoing, in the event the Program is terminated pursuant to a termination of the Settlement Agreement in <u>Shy v. Navistar International Corporation</u>, any assets of the Program shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code) as determined by the Company in its discretion. Except as provided in Section 7.2 hereof, under no condition shall the termination of the Trust result in a distribution of any portion of the Trust Fund to the Employers.

## ARTICLE XI

## MISCELLANEOUS

      11.1   **Limited Effect of Program and Trust**. Neither the establishment of the Program nor the Trust nor any modification thereof, nor the creation of any fund or account, nor the payment of any amounts from the Trust, shall be construed as giving to any Participant or Beneficiary any legal or equitable right against the Trustee, the Company, the Committee, or any affiliate, director, officer, employee, agent, or representative thereof, except as may otherwise be expressly provided in the Program and except as may otherwise be provided by ERISA. Under no circumstances shall the terms of employment of any employee be modified or in any way affected by the Trust or this Agreement.

      11.2   **Nonalienation of Benefits**. Except as otherwise required by law, neither the benefits payable from the Program nor any Participant's or Beneficiary's interest in any of the assets of the Trust shall be subject to any manner of anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either

voluntary or involuntary, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, garnish, execute, levy upon, or otherwise dispose of any right to benefits payable under, or any interest in, the Trust Fund shall be void. Neither the Trust Fund nor the Trustee shall in any manner be liable for, or be subject to, the debts, contracts, liabilities, engagements, or torte of any person entitled to benefits from the Program.

       11.3   **Governing Law**. This Agreement shall be administered, construed, and enforced according to the laws of the state of California, except to the extent superseded by ERISA or any other federal law.

       11.4   **Severability**. If any provision of this Agreement shall be held illegal or invalid, such illegality or invalidity shall not affect the remaining provisions of this Agreement but shall be fully severable, and this Agreement shall be construed and administered as if said illegal or invalid provision had never been inserted herein.

       11.5   **Binding Effect**. The provisions of this Agreement shall be binding upon and inure to the benefit of the Company and its successors, the Trustee and its successors in Trust, and the Participants and their Beneficiaries, and their respective heirs, personal representatives, successors and assigns, in accordance with and subject to the term• hereof.

       11.6   **Number of Originals**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and the counterparts shall constitute one and the same instrument, which shall be sufficiently evidenced by any one thereof.

       11.7   **Fiduciary Duties**. Nothing in this Agreement shall relieve or be deemed to relieve the Trustee or any other fiduciary from any responsibility or liability for any responsibility, obligation, or duty imposed by or under ERISA.

       11.8   **Evidence of Authority**. The execution by the Trustee of any instrument, document, or paper in connection with the exercise of any of the powers enumerated herein shall, of itself, be conclusive evidence to all persons of the authority of the Trustee to execute the same and to exercise all powers incident thereto.

       11.9   **Effective Date**. This Agreement shall be effective as of the 1st day of July, 1993.

11.9    **<u>Effective Date</u>**. This Agreement shall be effective as of the 1st day of July, 1993.

   **IN WITNESS WHEREOF**, thus Agreement has been executed this <u>29th</u> day of <u>June</u> 1993.

NAVISTAR INTERNATIONAL TRANSPORTATION CORP.

By: _____

Title: Vice President and Treasurer

Attest:

_____

_____<u>Wells Fargo, N.A.</u>_____

         TRUSTEE

By: _____

Title: Vice President

_____

_____

_____

RESTATED
CERTIFICATE OF INCORPORATION
of
NAVISTAR INTERNATIONAL CORPORATION

First: The name of the corporation (hereinafter called the "Company") is

NAVISTAR INTERNATIONAL CORPORATION

Second: The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name, of its registered agent at such address is The Corporation Trust Company.

Third: The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the state of Delaware, as amended.

Fourth: The total number of shares of stock which the Company shall have authority to issue is 176,000,000, consisting of:

(1)     30,000,000 shares, with a par value of $1.00 per share, are to be of a class designated "Preferred Stock;

(2)     10,000,000 shares, with a par value of $1.00 per share, are to be of a class designated "Preference Stock;"

(3)     110,000,000 shares, with a par value of $0.10 per share, are to be of ы class designated "Common Stock;" and

(4)     26,000,000 shares with a par value of $0.10 per share, are to be of a class designated "Class B Common."

The Common Stock and Class B Common are hereafter collectively referred to as the "Parent Common Stock."

I.     Preferred Stock.

The Preferred Stock may be issued from time to time in one or more series of any number of shares, provided that the aggregate number of shares issued and not canceled of any and all such series shall not exceed the total number of shares of Preferred Stock hereinabove authorized, and with distinctive serial designations, all as shall hereafter be stated and expressed in the resolution or resolutions providing for the issue of such Preferred Stock from time to time adopted by the Board of Directors pursuant to® authority so to do which is hereby vested in the Board of Directors. Each series of Preferred Stock (i) may have such voting powers, full or limited, or may be without voting powers; (ii) may

be subject to redemption at such time or times and at such prices; (iii) may be entitled to receive dividends (which may be cumulative or noncumulative) at such rate or rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or series of stock; (iv) may have such rights upon the dissolution of, or upon any distribution of the assets of, the corporation; (v) may be made convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of stock of the corporation, at such price or prices or at such rates of exchange, and with such adjustments; (vi) may be entitled to the benefit of a sinking fund to be applied to the purchase or redemption of shares of such series in such amount or amounts; (vii) may be entitled to the benefit of conditions and restrictions upon the creation of indebtedness of the Company or any subsidiary, upon the issue of any additional stock (including additional shares of such series or of any other series) and upon the payment of dividends or the making of other distributions on, and the purchase, redemption or other acquisition by the Company or any subsidiary of any outstanding stock of the Company; and (viii) may have such other relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof; all as shall be stated in said resolution or resolutions providing for the issue of such Preferred Stock. Shares of any series of Preferred Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or which, if convertible or exchangeable, have been converted into or exchanged for shares of stock of any other class or classes shall have the status of authorized and unissued shares of Preferred stock of the same series and may be reissued as a part of the series of which they were originally a part or may be reclassified and reissued as part of a new series of Preferred Stock to be created by resolution or resolutions of the Board of Directors or as part of any other series of Preferred Stock, all subject to the conditions or restrictions on issuance set forth in the resolution or resolutions adopted by the Board of Directors providing for the issue of any series of Preferred Stock.

      A.   <u>Series G Stock</u>. The designated powers, preferences and relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of 4,800,000 shares of a series of Preferred Stock are as follows:

      (1)   <u>Designation</u>. The designation of this series of Preferred Stock shall be "$6.00 Cumulative Convertible Preferred Stock, Series G (With $1.00 Par Value)" (hereinafter called the "Series G Stock").

      (2)   <u>Dividends</u>. The holders of shares of the Series G Stock shall be entitled to receive, when and as declared by the Board of Directors, dividends in cash in the amount of $6.00 per share per annum, payable quarterly on the 15th day of January, April, July and October in each year, commencing

April 15, 1987 (each of the quarterly periods ending on the 15th day of such months, respectively, being hereinafter called a "dividend period"); provided, however, that the holders of shares of Series G Stock shall be entitled to receive, when and as declared by the Board of Directors, dividends in cash in the amount of $3.75 per share per annum, and such dividends shall accrue at such rate from the Date of Accrual to January 14, 1987. Dividends on shares of the Series G Stock shall be cumulative from the Date of Accrual with respect to such shares (whether or not there shall be net profits or net assets of the company legally available for the payment of such dividends) so that, if at any time Full Cumulative Dividends upon the Series G Stock to the end of the last completed dividend period shall not have been paid, or declared and a sum sufficient for payment thereof set apart, the amount of the deficiency in such dividends shall be fully paid, but without interest, before any dividend shall be declared or paid or any other distribution ordered or made upon, or any purchase or redemption made of, any stock ranking as to dividends or upon liquidation junior to the Series G Stock (other than a dividend payable in such junior stock, or a purchase or redemption made by issue or delivery of such junior stock); provided, however, that any moneys theretofore deposited in any sinking fund with respect to any preferred stock of the Company in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such preferred stock in accordance with the terms of such sinking fund regardless of whether at the time of such application Full Cumulative Dividends upon shares of the Series G Stock outstanding to the end of the last completed dividend period shall have been paid or declared and set apart for payment. All dividends upon the shares of the Series G Stock and any other preferred stock ranking on a parity as to dividends with the Series G Stock shall be declared pro rata, so that the amounts of dividends declared per share on the Series G Stock and such other preferred stock, shall in all cases bear to each other the same ratio that accrued dividends per share on the shares of the Series G Stock and such other preferred stock bear to each other. Holders of shares of the Series G Stock shall not be entitled to any dividends, whether payable in cash, property or stock, in excess of Full Cumulative Dividends.

(3)  <u>Rights of Redemption</u>. The shares of the Series G Stock shall be subject to redemption as follows:

(a)  <u>Optional Redemption</u>. Subject to subparagraph (b) of this paragraph (3), the shares of the Series G Stock may be redeemed at the option of the Company, in whole or in part, at any time or from time to time upon not less than 30 days prior notice to the holders of record of shares of the Series G Stock to be so redeemed, sent by first class mail, postage prepaid, to each

registered holder of shares of the Series G Stock at his address appearing on the Series G Stock register maintained by the Company, at the redemption price of $50.00 per share, plus an amount equal to Accrued Dividends to and including the date fixed for redemption of such shares (hereinafter called the "Redemption Date").

(b) <u>Pro Rata Redemption or Redemption by Lot</u>. If less than all shares of the Series G Stock are to be redeemed pursuant to subparagraph (a) of this paragraph (3), the shares to be redeemed shall be selected (x) by lot or (y) pro rata so that there shall be redeemed from each registered holder of such shares that number of whole shares, as nearly as practicable to the nearest share, as bears the same ratio to the total number of shares of such Series held by such holder as the total number of shares to be redeemed bears to the total number of shares of the Series G Stock at the time outstanding. The determination of whether such selection shall be made by lot or pro rata shall be made by the Board of Directors. If the Board of Directors shall determine to redeem less than all shares of the Series G Stock by lot, the selection by lot of the shares of the Series G Stock shall be conducted by an independent bank or trust company selected by the Board of Directors of the Company.

(c) <u>Sinking Fund, Etc.</u> Shares of the Series G Stock are not subject or entitled to the benefit of a sinking fund. All or a portion of the shares of the Series G Stock may be purchased by the Company from time to time upon the best terms obtainable.

(d) <u>Effect of Redemption</u>. Unless default be made in the payment in full of the redemption price and any accumulated and unpaid dividends, dividends on the shares of Series G Stock called for redemption shall cease to accumulate on the Redemption Date, and all rights of the holders of such shares as stockholders of the Company by reason of the ownership of such shares shall cease on the Redemption Date, except the right to receive the amount payable upon redemption of such shares on presentation and surrender of the respective certificates representing such shares. After the Redemption Date, such shares shall not be deemed to be outstanding and shall not be transferable on the books of the Company except to the Company.

(e) <u>Receipt of Redemption Price</u>. At any time on or after the Redemption Date, the respective holders of record of shares of Series G Stock to be redeemed shall be entitled to receive the redemption price upon actual

delivery to the Company of certificates for the shares to be redeemed, such certificates, if required by the company, to be properly stamped for transfer and duly endorsed in blank or accompanied by proper instruments of assignment and transfer thereof duly executed in blank.

(f) <u>Return of Deposits, Etc.</u> Any moneys deposited with the transfer agent, or other redemption agent, for the redemption of any shares of Series G Stock which shall not be claimed after five years from the Redemption Date shall be repaid to the Company by such agent on demand, and the holder of any such shares of Series G Stock shall thereafter look only to the Company for any payment to which such holder may he entitled. Any interest accrued on moneys so deposited shall belong to the Company and shall be paid to it from time to time on demand.

(4) <u>Rights on Liquidation. Dissolution. Winding Up</u>.

(a) In the event of any involuntary liquidation, dissolution or winding up of the Company, the holders of shares of the Series G Stock then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the company ranking junior upon liquidation to the Series G Stock, an amount equal to $50 per share plus an amount equal to all Accrued Dividends thereon to and including the date of payment

(b) In the event of any voluntary liquidation, dissolution or winding up of the Company, the holders of shares of the Series G Stock then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the company ranking junior upon liquidation to the Series G Stock, an amount per share equal to the then applicable redemption price specified in subparagraph (a) of paragraph (3) of this Section B regarding Series G Stock, plus in each case an amount equal to all Accrued Dividends thereon to and including the date of payment. The merger or consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a dissolution, liquidation or winding up of the Company under this paragraph (4).

(c) In the event the assets of the Company available for distribution to the holders of shares of Series G Stock upon any involuntary or voluntary liquidation,

dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holders are entitled pursuant to subparagraph (a) or (b) , as the case may be, of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preferred stock ranking on a parity with the shares of Series G Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the shares of Series G Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5)    <u>Voting</u>. The shares of the Series G Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a)    Without the affirmative vote or consent of the holders of at least two-thirds of the number of shares of Series G Stock at the time outstanding, voting or consenting (as the case may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) create any preferred stock ranking prior to the Series G Stock as to dividends or upon liquidation, or securities convertible into stock ranking prior to the Series G Stock as to dividends or upon liquidation or (ii) amend, alter or repeal any of the preferences, special rights or powers of the holders of the Series G Stock so as adversely to affect such preferences, special rights or powers.

(b)    Whenever dividends payable on any series of Preferred Stock shall be in default in an aggregate amount equivalent to six full quarterly dividends on all shares of such series at the time outstanding, the number of directors constituting the Board of Directors of the Company shall be increased by two, and the holders of Preferred Stock shall have, in addition to any other voting rights, the exclusive and special right, voting separately as a class without regard to series, to elect two persons to fill such newly created directorships. Whenever such right of holders of shares of Preferred Stock shall have vested, it may be exercised initially either at a special meeting of such holders called as provided below, or at any annual meeting of stockholders, and thereafter at annual meetings of stockholders. The right of holders of shares of Preferred Stock voting separately as a class to elect members of the Board of Directors as aforesaid shall continue until such time as all dividends accumulated on all series of Preferred Stock shall have been paid in full, at which time the special right of the holders of shares of Preferred Stock

so to vote separately as a class for the election of directors shall terminate, subject to revesting in the event of each and every subsequent default in an aggregate amount equivalent to six full quarterly dividends. For purposes only of this subparagraph (b), each holder of Series G Stock shall be entitled to cast one-half vote for each share of Series G Stock held by such holder.

At any time when such special voting power shall have vested in the holders of shares of Preferred Stock as provided in this subparagraph (b), a proper officer of the Company shall, upon written request of the holders of record of at least 10% of the number of shares of Preferred Stock at the time outstanding, regardless of series, addressed to the Secretary of the Company, call a special meeting of the holders of shares of Preferred Stock and of any other class of stock having voting power, for the purpose of electing directors. Such meeting shall be held at the earliest practicable date at the principal office of the Company. If such meeting shall not be called by a proper officer of the Company within 20 days after personal service of said written request upon the Secretary of the Company, or within 20 days after mailing the same within the United States of America by registered mail addressed to the Secretary of the Company at its principal office, then the holders of record of at least 10% of the number of shares of Preferred Stock at the time outstanding, regardless of series, may designate in writing one of their number to call such meeting at the expense of the Company, and such meeting may be called by such person. so designated upon the notice required for annual meetings of stockholders and shall be held at said principal office. Any holder of shares of Preferred Stock so designated shall have access to the stock books of the Company for the purpose of causing meetings of stockholders to be called pursuant to these provisions. Notwithstanding the provisions of this subparagraph (b), no such special meeting shall be called during the 90 days immediately preceding the date fixed for the next annual meeting of stockholders.

At any meeting held for the purpose of electing directors at which the holders of shares of Preferred Stock shall have the special right, voting separately as a class, to elect directors as provided in this subparagraph (b), the presence, in person or by proxy, of the holders of 51% of the number of shares of Preferred Stock at the time outstanding shall be required to constitute a quorum of such class for the election of any director by the holders of the Preferred Stock as a class, each share of Series G Stock counting, for purposes only of determining the presence of such a

quorum, as one-half share of Preferred Stock. At any such meeting or adjournment thereof, (i) the absence of a quorum of Preferred Stock shall not prevent the election of directors other than those to be elected by the holders of shares of Preferred Stock voting as a class and the absence of a quorum for the election of such other directors shall not prevent the election of the directors to be elected by holders of shares of Preferred Stock voting as a class and (ii) in the absence of either or both such quorums, a majority of the holders present in person or by proxy of the stock or stocks which lack a quorum shall have power to adjourn the meeting for the election of directors which they are entitled to elect from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

During any period the holders of shares of Preferred Stock have the right to vote as a class for directors as provided in this subparagraph (b), (i) the directors so elected by the holders of the Preferred Stock shall continue in office until termination of the right of the holders of the Preferred Stock to vote as a class for directors, and (ii) any vacancies in the Board of Directors shall be filled only by vote of a majority (which majority may consist of only a single director) of the remaining directors theretofore elected by the holders of the class or classes of stock which elected the director whose office shall have become vacant.

(6)     Conversion Rights. The holders of shares of the Series G Stock shall have the right, at their option, to convert each share of the Series G Stock into two-fifteenths of a share of Common Stock of the Company at any time on and subject to the following terms and conditions:

(a)     The shares of the Series G Stock shall be convertible at the office of any transfer agent for the Series G Stock, and at such other office or offices, if any, as the Board of Directors may designate, into fully paid and nonassessable shares (calculated as to each conversion to the nearest 1/100th of a share) of Common Stock of the Company, at the conversion price, determined as hereinafter provided, in effect at the time of conversion, each share of the Series G Stock being taken at $50.00 for the purpose of such conversion. The price at which shares of Common Stock shall be delivered upon conversion (herein called the "conversion price") shall be initially $375.00 per share of Common Stock. The conversion price shall be adjusted as provided in subparagraph (d) of this paragraph (6).

(b)     In order to convert shares of the Series G Stock into Common Stock the holder thereof shall surrender at any office hereinabove mentioned the certificate or certificates therefor, duly endorsed to the Company or in blank, and give written notice to the Company at said office that such holder elects to convert such shares. No payment or adjustment shall be made upon any conversion on account of any dividends accrued on the shares of the Series G Stock surrender for conversion or on account of any dividends on the Common Stock issued upon such conversion.

Shares of the Series G Stock shall be deemed to have been converted immediately prior to the close of business on the day of the surrender of such shares for conversion in accordance with the foregoing provisions, and the person or persons entitled to receive the Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such Common Stock at such time. As promptly as practicable on or after the conversion date, the Company shall issue and shall deliver at said office a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion, together with a cash payment in lieu of any fraction of a share, as hereinafter provided, to the person or persons entitled to receive the same. In case shares of the Series G Stock are called for redemption, the right to convert such shares shall cease and terminate at the close of business on the Redemption Date, unless default shall be made in payment of the redemption price.

(c)     No fractional shares of Common Stock shall be issued upon conversion of shares of the Series G Stock, but, instead of any fraction of a share of Common Stock which would otherwise be issuable in respect of the aggregate number of shares of the Series G Stock surrendered for conversion at one time by the same holder, the Company shall pay a cash adjustment of such fraction in an amount equal to the same fraction of the Closing Date Price on the date on which such shares of the Series G Stock were duly surrendered for conversion, or, if such date is not a Trading Day, on the next Trading Day.

(d)     The conversion price shall be adjusted from time to time as follows:

(I)     In case the Company shall (i) pay a dividend or make a distribution on its outstanding shares of Common Stock in Common Stock, (ii) subdivide its outstanding shares of Common Stock, (iii) combine its outstanding shares of

Common Stock into a smaller number of shares, or (iv) issue any shares by reclassification of its shares of Common Stock, the conversion price in effect at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be adjusted so that the holder of any shares of the Series G Stock surrendered for conversion after such time shall be entitled to receive the number of shares of capital stock of the Company which he would have owned or been entitled to receive had such shares of the Series G Stock been converted immediately prior to such time.

(II)     In case the company shall hereafter issue rights or warrants to all holders of its Common Stock entitling them (for a period expiring within forty-five days after the record date mentioned below) to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share--as determined pursuant to clause (IV) of this subparagraph (d)--on the record date mentioned below, the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the date of issuance of such rights or warrants by a fraction, of which the numerator shall be the number of shares of Common Stock outstanding on the record date mentioned below plus the number of shares of Common Stock which the aggregate offering price of the total number of shares of Common Stock so offered would purchase at such current market price and of which the denominator shall be the number of shares of Common Stock outstanding on such record date plus the number of additional shares of Common Stock offered for subscription or purchase. Such adjustment shall become effective at the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such rights or warrants; and to the extent that shares of Common Stock are not delivered after the expiration of such rights or warrants, the conversion price shall be readjusted (but only with respect to shares of the Series C Stock converted after such expiration) to the conversion price which would then be in effect had the adjustments made upon the distribution of such rights or warrants been made upon the basis of delivery of only the number of shares of Common Stock actually delivered. No adjustment in the conversion price shall be required or made under this clause (II) or clause

(III) immediately below or otherwise under this paragraph (6) in respect of any right granted by the Company to all holders of its Common Stock to purchase additional shares of Common Stock from the Company at a discount from the current market price per share of Common Stock by reinvestment of dividends on Common Stock if either, (i) such discount does not exceed 6% of such current market price or (ii) the holders of the Series G Stock shall be entitled to purchase shares of Common Stock from the Company at the same discount by reinvestment of dividends on the Series G Stock.

(III)    In case the Company shall distribute to all holders of its Common Stock evidences of its indebtedness or assets-excluding any cash dividend or distributions and dividends referred to in clause (I) of this paragraph (6)--or subscription rights or warrants (excluding those referred to in clause (II) immediately above), then in each such case the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the date of such distribution by a fraction of which the numerator shall be the current market price per share (determined as provided in clause (IV) immediately below) of the Common Stock on the record date mentioned below less the then fair market value (as determined by the Board of Directors of the Company, whose determination shall be conclusive) of the portion of the assets or evidences of indebtedness so distributed or of such subscription rights or warrants applicable to one share of Common Stock, and the denominator shall be such current market price per share of the Common Stocks Such adjustment shall become effective on the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such distribution.

(IV) For the purpose of any computation under clause (II) or (III) immediately above, the current market price per share of Common Stock on any date. shall be deemed to be the average of the daily Closing Price for the thirty consecutive Trading Days selected by the Company commencing not more than forty-five Trading Days before the day in question.

(V)    In any case in which this paragraph (6) shall require that an adjustment as a result of any event become effective at the opening of business

on the business day next following a record date, the Company may elect to defer until after the occurrence of such event (i) issuing to the holder of any shares of the Series G Stock converted after such record date and before the occurrence of such event the additional shares of Common Stock issuable upon such conversion over and above the shares of Common Stock issuable upon such conversion on the basis of the conversion price prior to adjustment and (ii) paying to such holder any amount in cash in lieu of a fractional share of Common Stock pursuant to subparagraph (c) of this paragraph (6); and, in lieu of the shares the issuance of which is so deferred, the Company shall issue or cause its transfer agents to issue due bills or other appropriate evidence of the right to receive such shares.

(VI)    Any adjustment in the conversion price otherwise required by this paragraph (6) to be made may be postponed up to, but not beyond, three years from the date on which it would otherwise be required to be made provided that such adjustment (plus any other adjustments postponed pursuant to this clause (VI) and not theretofore made) would not require an increase or decrease of more than $0.50 in such price and would not, if made, entitle the holders of all then outstanding shares of the Series G Stock upon conversion to receive additional shares of Common Stock equal in the aggregate to 3% or more of the then issued and outstanding shares of Common Stock. All calculations under this paragraph (6) shall be made to the nearest cent or to the nearest 1/100 of a share, as the case may be.

(e)    Whenever the conversion price is adjusted as herein provided:

(I)    the Company shall compute the adjusted conversion price in accordance with this paragraph (6) and shall prepare a certificate signed by the Treasurer of the Company setting forth the adjusted conversion price, and such certificate shall forthwith be filed with the transfer agent or agents for the Series G Stock; and

(II)    a notice stating that the conversion price has been adjusted and setting forth the adjusted conversion price shall, as soon as practicable, be mailed to the holders of record of the outstanding shares of the Series G Stock.

(f)     In case of any consolidation of the Company with, or merger of the Company with or into, any other corporation (other than a merger in which the Company is the surviving corporation and which does not result in any reclassification or change of the outstanding shares of the Company into which shares of the Series G Stock are then convertible), or in case of any conveyance or transfer of the property and assets of the Company substantially as an entirety, each share of Series C Stock shall thereafter be convertible into the number and kind of shares of stock and other securities and cash, property and rights receivable upon such consolidation, merger, conveyance or transfer by a holder of the number and kind of shares of the Company into which such shares of Series G Stock might have been converted immediately prior to such consolidation, merger, conveyance or transfer. The above provisions of this subparagraph (f) shall similarly apply to successive consolidations, mergers, conveyances or transfers.

(g)     In case:

(I) the Company shall declare a dividend (or any other distribution) on its Common Stock payable otherwise than .in cash out of its retained earnings; or

(II) the Company shall authorize the granting to the holders of its Common Stock of rights to subscribe for or purchase any shares of capital stock of any class or of any other rights; or

(III) of any reclassification of the capital stock of the Company (other than a subdivision or combination of its outstanding shares of Common Stock), or of any consolidation or merger to which the Company is a party and for which approval of any stockholders of the Company is required, or of the sale or transfer of all or substantially all of the assets of the Company; or

(IV) of the voluntary or involuntary dissolution, liquidation or winding up of the Company;

then the Company shall cause to be mailed to the transfer agent or agents for the Series G Stock and to the holders of record of the outstanding shares of the Series G Stock at least 20 days--or 10 days in any case specified in clause (I) or (II) of this subparagraph (g)--prior to the applicable record date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution or rights, or,

if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution or rights are to be determined, or (y) the date on which such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding up is expected to become effective, and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange their shares of Common Stock for securities or other property deliverable upon such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding up.

(h)     The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of the shares of the Series G Stock, the full number of shares of Common Stock then deliverable upon the conversion of all shares of the Series G Stock then outstanding.

(i)     The Company will pay any and all taxes that may be payable in respect of the issuance or delivery of shares of Common Stock on conversion of shares of this Series pursuant hereto. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of this Series so converted were registered, and no such issue or delivery shall be made unless and until the person requesting such issue has paid to the company the amount of any such tax, or has established, to the satisfaction of the Company, that such tax has been paid.

(j)     For the purpose of this paragraph (6) the term "Common Stock" shall include any stock of any class of the Company which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and which is not subject to redemption by the Company. However, shares issuable on conversion of shares of the Series G Stock shall include only shares of the class designated as Common Stock of the Company as of the original date of issue of the Series G Stock or Shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company, provided that if at any time there shall be more than one such resulting class, the

shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

(k)     As used in this paragraph (6), the term "Closing Price" on any day shall mean the reported last sales price regular way on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices regular way, in each case on the New York Stock Exchange, or, if the Common Stock is not listed or admitted to trading on such Exchange, on the principal national securities exchange on which the Common Stock is listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices as furnished by any New York Stock Exchange member firm selected from time to time by the Company for that purpose; and the term "Trading Day" shall mean a date on which the New York Stock Exchange (or any successor to such Exchange) is open for the transaction of business.

(7)     <u>Definitions</u>.

(a)     The term "Accrued Dividends" shall mean Full Cumulative Dividends to the date as of which Accrued Dividends are to be computed, less the amount of all dividends paid, upon the relevant shares of Series C Stock.

(b)     The term "Date of Accrual" shall mean, as to any shares of the Series G Stock issued, January 1, 1987.

(c)     The term "Full Cumulative Dividends" shall mean (whether or not in any dividend period, or any part thereof, in respect of which such term is used there shall have been net profits or net assets of the Company legally available for the payment of such dividends) that amount which shall be equal to dividends at the full rate fixed for the Series G Stock provided in paragraph (2) of this Section B regarding Series G Stock for the period of time elapsed from the Date of Accrual to the date as of which Full Cumulative Dividends are to be computed (including an amount equal to the dividend at such rate for any fraction of a dividend period included in such period of time calculated on the basis of a 360-day year of 12 30-day months).

(d)     The term "Preferred Stock" shall mean any Preferred Stock created and issued under this Article Fourth; provided, however, that for purposes only of

subparagraph (b) of paragraph (5) of this Section B regarding Series G Stock, each holder of Series G Stock shall be entitled to cast one-half vote for each share of Series G Stock held by such holder and for purposes of determining a quorum at any meeting held for the purpose of electing directors at which the holders of Preferred Stock shall have this special right, voting separately as a class, to elect directors as provided in such subparagraph (b), each share of Series G Stock shall count, for purposes of determining the presence of a quorum of such class at such meeting, as one-half share of Preferred Stock. The term "preferred stock" shall mean shares of any class of stock (including Preferred Stock) if the holders of such class shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, in preference or priority to the holders of shares of Common Stock.

(e)     For the purposes hereof any stock of any class or classes of the Company shall be deemed to rank (i) prior to shares of the Series G Stock, either as to dividends or upon liquidation, if the holders of such class or classes shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Series G Stock; (ii) on a parity with shares of the Series G Stock, either as to dividends or upon liquidation, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Series G Stock, if the holders of such stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rate or liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Series G Stock; and (iii) junior to shares of the Series G Stock, either as to dividends or upon liquidation, if such class shall be Common Stock or if the holders of the Series G Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of such class of classes.

(f)     The shares of the Series G Stock shall rank senior as to the dividends and upon liquidation to the shares of the $120 Redeemable Convertible Preferred Stock, Series E (With $1.00 Par Value) of the Company and to the shares of the Convertible Junior Preference Stock, Series G (With $1.00 Par Value) of the Company.

(8)   Retirement of Redeemed or Converted Shares Etc.  Shares of the Series G Stock which have been (i) redeemed or (ii) converted into Common Stock pursuant to the provisions of paragraph (6) of this Section B regarding Series G Stock shall have the status of authorized and unissued Preferred Stock.

II.   Preference Stock.

The Preference Stock may be issued from time to time in one or more series of any number of shares, provided that the aggregate number of shares issued and not canceled of any and all such series shall not exceed the total number of shares of Preference Stock hereinabove authorized, and with distinctive serial designations, all as shall hereafter be stated and expressed in the resolution or resolutions providing for the issue of such Preference Stock from time to time adopted by the Board of Directors pursuant to authority so to do which is hereby vested in the Board of Directors. Each series of Preference Stock (i) may have such voting powers, full or limited, or may be without voting powers; (ii) may be subject to redemption at such time or times and at such prices; (iii) may be entitled to receive dividends (which may be cumulative or noncumulative) at such rate or rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or series of stock; (iv) may have such rights upon the dissolution of, or upon any distribution of the assets of, the corporation; (v) may be made convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of stock of the corporation, at such price or prices or at such rates of exchange, and with such adjustments; (vi) may be entitled to the benefit of a sinking fund to be applied to the purchase or redemption of shares of such series in such amount or amounts; (vii) may be entitled to the benefit of conditions and restrictions upon the creation of indebtedness of the Company or any subsidiary, upon the issue of any additional stock (including additional shares of such series or of any other series) and upon the payment of dividends or the making of other distributions on, and the purchase, redemption or other acquisition by the Company or any subsidiary of any outstanding stock of the Company; and (viii) may have such other relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof; all as shall be stated in said resolution or resolutions providing for the issue of such Preference Stock. Shares of any series of Preference Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or which, if convertible or exchangeable, have been converted into or exchanged for shares of stock of any other class or classes shall have the status of authorized and unissued shares of Preference Stock of the same series and may be reissued as a part of the series of which they were originally a part or may be reclassified and reissued as part of a new series of Preference Stock to be created by resolution or resolutions by the Board of Directors or as part of any other

series of Preference Stock, all subject to the conditions or restrictions on issuance set forth in the resolution or resolutions adopted by the Board of Directors providing for the issue of any series of Preference Stock.

A. <u>Series A Stock</u>. The designated powers, preferences and relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of one (1) share of a series of Preference Stock are as follows:

(1) <u>Designation</u>. The designation of this series of Preference Stock shall be "Nonconvertible Junior Preference Stock, Series A (With Par Value of $1.00)" (hereinafter called the "Series A Stock").

(2) <u>Dividends</u>. The holder of the Series A Stock shall not be entitled to receive dividends with respect to the Series A stock.

(3) <u>Rights of Redemption</u>. The Series A Stock shall be subject to redemption as follows:

(a) <u>Optional Redemption</u>. At any time after the date of the earliest to occur of (i) the passage of twelve consecutive calendar months at all times during which the supplemental Benefit Trust holds less than 5% of the total number of then outstanding shares of Parent Common Stock, (ii) the date on which the Supplemental Benefit Program terminates and (iii) the Profit Sharing Cessation Date, the Series A Stock may be redeemed at the option of the Company at any time upon not less than five days' prior notice to the holder of record of the Series A Stock sent by first class mail, postage prepaid, to such holder at its address appearing on the Series A Stock register maintained by the Company, at a redemption price of $1.00 (hereinafter called the "Series A Redemption Date").

(b) <u>Effect of Redemption</u>. All rights of the holder of Series A Stock as a stockholder of the Company by reason of the ownership of Series A Stock shall cease on the Series A Redemption Date, except the right to receive the amount payable upon redemption of such share on presentation and surrender of the certificate representing such share. After the Series A Redemption Date, such share shall not be deemed to be outstanding.

(4) <u>Rights on Liquidation, Dissolution. Winding Up</u>.

(a) <u>Liquidation Payment</u>. In the event of any involuntary liquidation, dissolution or winding up of the Company, the holder of the Series A Stock (if then outstanding) shall be entitled to be paid out of the

assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the Company ranking junior upon liquidation to the Series A Stock, an amount equal to $1.00 per share. The merger or consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a dissolution, liquidation or winding up of the Company under this paragraph (4).

(b)  <u>Proportionate Distribution</u>. In the event the assets of the Company available for distribution to the holder of the Series A Stock upon any involuntary or voluntary liquidation, dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holder is entitled pursuant to subparagraph (a) of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preference stock ranking on a parity with the Series A Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the Series A Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5)  <u>Voting</u>. The Series A Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a)  <u>Change of Priority or Rights</u>. Without the affirmative vote or consent of the holder of the Series A Stock, voting or consenting (as the case may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) change the number of authorized shares of the Series A Stock or (ii) amend this Certificate of Incorporation or take any other action (including, without limitation, a merger or consolidation to which the Company is a constituent party) which would have the effect of eliminating the Series A Stock or of amending, altering or repealing any of the preferences, special rights or powers of the holder of the Series A Stock so as adversely to affect such preferences, special rights or powers.

(b)  <u>Election of Directors</u>. For so long as the Supplemental Benefit Trust holds 20% or more of the total number of then outstanding shares of Parent Common Stock, the number of directors constituting the Board of Directors of the Company shall be increased by two, and

the holder of the Series A Stock shall have, in addition to any other voting rights, the exclusive and special right, voting separately as a class, to elect two persons to serve as directors of the Company (one of whom shall be designated the "First Designee," and the other of whom shall be designated the "Second Designee") to fill such two directorships. Except for the involuntary resignation of any such director under clauses (i) or (ii) of this first paragraph of this subparagraph (b) or the removal of any such director by the holder of the Series A Stock, each director elected by the holder of the Series A Stock shall have a one year term of office. The right of the holder of Series A Stock to elect directors may be exercised by written consent of such holder. The right of the holder of the Series A Stock voting separately as a class to elect two members of the Board of Directors as aforesaid shall continue until such time as the Supplemental Benefit Trust holds less than 20% of the total number of then outstanding shares of Parent Common Stock. At such time, the special right of the holder of the Series A Stock to vote separately as a class for the election of directors shall be subject to the following restrictions:

(i)     Upon the earlier to occur of .(A) the date on which the Supplemental Benefit Trust has held less than 20% but 19% or more of the total number of then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds less than 19% of the total number of then outstanding shares of Parent Common Stock, the holder of the Series A Stock shall be entitled to elect only one director in total and the Second Designee shall be deemed to have resigned as a director effective immediately without any further action on such person's part; and

(ii) Notwithstanding anything to the contrary contained in clause (i) immediately above, upon the earlier to occur of (A) the date on which the Supplemental Benefit Trust has held less than 10% but 9% or more of the total number of then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds less than 9% of the total number of then outstanding shares of Parent Common Stock, the holder of the Series A Stock shall not be entitled to elect any directors and each remaining director elected by such holder shall be deemed to have resigned as a member of the Board of Directors effective

immediately without further action on such person's part.

The special right of the holder of the Series A Stock to vote separately as a class for the election of directors shall be subject to revesting as follows:

(i) Upon the earlier to occur of (A) the date on which the Supplemental Benefit Trust has held more than 10% but not more than 11% of the total number of then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds more than 11% of the total number of then outstanding shares of Parent Common Stock, the right of the holder of Series A Stock to elect a total of one director shall vest immediately; and

(ii) Notwithstanding anything to the contrary contained in clause (i) immediately above, upon the earlier to occur of (A) the date on which the Supplemental Benefit Trust has held more than 20% but not more than 21% of the total number of then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds more than 21% of the total then outstanding shares of Parent Common Stock, the right of the holder of Series A Stock to elect a total of two directors shall vest immediately.

For purposes of this subparagraph (b), all calculations of the Supplemental Benefit Trust's holdings of the then outstanding shares of Parent Common Stock shall be made as if the Common Stock and Class B Common were a single class.

At any time when the holder of the Series A Stock has the right to elect directors as provided in this subparagraph (b), (i) such holder shall have the exclusive right to remove the First Designee and/or the Second Designee, with or without cause, from time to time and elect their successors and (ii) any vacancies in the seats held by the First Designee or the Second Designee shall be filled only by a vote of the holder of the Series A Stock.

(6) Conversion Rights. The holder of the share of the Series A Stock shall have no conversion rights with respect to such share.

(7) Nontransferability. The Series A Stock will be issued to the Supplemental Benefit Trust and the Series A

Stock and any rights thereunder shall be nontransferable. Any attempted transfer shall be void and of no effect. The Company shall place on the certificate representing any issued share of the Series A Stock a legend consistent with the provisions hereof.

(8)    Definitions.

(a)    Profit Sharing Cessation Date. The term "Profit Sharing Cessation Date" shall have the meaning assigned to such term in the Settlement Agreement.

(b)    Settlement Agreement. The term "Settlement Agreement" shall mean the Settlement Agreement, dated as of March 31, 1993, and the exhibits thereto, in the class action of Shy, et al. v. Navistar, (Civil Action No. C-3-92-333) (S.D.O.), as any of the same may be amended from time to time in accordance with the terms thereof. The Company shall provide a copy of the Settlement Agreement to any holder of shares of its stock upon request by such holder.

(c)    Supplemental Benefit Program. The term "Supplemental Benefit Program" shall have the meaning assigned to such term in the Settlement Agreement.

(d)    Supplemental Benefit Trust. The term "Supplemental Benefit Trust" shall have the meaning assigned to such term in the Settlement Agreement.

(9)    Rank of Series A Stock. The share of the Series A Stock shall rank junior upon liquidation to (i) the shares of the Series G Stock, (ii) the shares of the Convertible Junior Preference Stock, Series D (With Par Value of $1.00) (the "Series D Stock"), and (iii) any other series of Preferred Stock or Preference Stock (other than the Nonconvertible Junior Preference Stock, Series B (With Par Value of $1.00) of the Company) (the "Series B Stock") authorized or designated after the initial date of issuance of the Series A Stock. The share of the Series A Stock shall rank on a parity upon liquidation with the Series B Stock. The share of the Series A Stock shall rank senior upon liquidation to the shares of the Parent Common Stock.

(10)    Retirement of Redeemed Shares, Etc. When redeemed, the share of the Series A Stock shall have the status of authorized and unissued Preference Stock.

(11)    No Fractional Shares. No fractional shares of Series A Stock shall be issued.

(12)    Stock Calculations. In making any calculations with respect to holdings or ownership of the Company's stock, the

Company's stock records shall be conclusive evidence of such holdings and ownership.

B.    Series B Stock. The designated powers, preferences and relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of one (1) share of a series of Preference Stock are as follows:

(1)    Designation. The designation of this series of Preference Stock shall be "Nonconvertible Junior Preference Stock, Series B (With Par Value of $1.00)" (referred to herein as the "Series B Stock").

(2)    Dividends. The holder of the share of the Series B Stock shall not be entitled to receive dividends with respect to the Series B Stock.

(3)    Rights of Redemption. The Series B Stock shall be subject to redemption as follows:

(a)    Optional Redemption. At any time after the holder of Series B Stock has not been entitled to vote separately as a class to elect a director at any time for five consecutive years, the Series R Stock .may be redeemed at the option of the Company, in whole or in part, at any time or from time to time upon not less than five days' prior notice to the holder of record of the Series B Stock sent by first class mail, postage prepaid, to such holder at its address appearing on the Series B. Stock register maintained by the Company, at a redemption price of $1.00 (hereinafter called the "Series B Redemption Date")

(b)    Effect of Redemption. All rights of the holder of Series B Stock as a stockholder of the Company by reason of the ownership of Series B Stock shall cease on the Series B Redemption Date, except the right to receive the amount payable upon redemption of such share on presentation and surrender of the certificate representing such share. After the Series R Redemption Date, such share shall not be deemed to be outstanding.

(4)    Rights on Liquidation. Dissolution. Winding Up.

(a)    Liquidation Payment. In the event of any involuntary liquidation, dissolution or winding up of the Company, the holder of the Series B Stock (if then outstanding) shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the Company ranking junior upon liquidation to the Series B Stock, an amount equal to $1.00 per share. The merger or

consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a dissolution, liquidation or winding up of the Company under this paragraph (4).

(b) <u>Proportionate Distribution</u>. In the event the assets of the Company available for distribution to the holder of the Series B Stock upon any involuntary or voluntary liquidation, dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holder is entitled pursuant to subparagraph (a) of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preference stock ranking on a parity with the Series B Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the Series B Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5) <u>Voting</u>. The Series B Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a) <u>Change of Priority or Rights</u>. Without the affirmative vote or consent of the holder of the Series B Stock, voting or consenting (as the case may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) change the number of authorized shares of the Series B Stock or (ii) amend this Certificate of Incorporation or take any other action (including, without limitation, a merger or consolidation to which the Company is a constituent party) which would have the effect of eliminating the Series B Stock or of amending, altering or repealing any of the preferences, special rights or powers of the holder of the Series B Stock so as adversely to affect such preferences, special rights or powers.

(b) <u>Election of Director</u>. Until the Fully Funded Date, the number of directors constituting the Board of Directors of the Company shall be increased by one, and the holder of the Series B Stock shall have, in addition to any other voting rights, the exclusive and special right, voting separately as a class, to elect one person to fill such newly created directorship. Except for the involuntary resignation of any such director this subparagraph b or the removal of any such director by the holder of the Series B Stock, the director elected by the holder of the Series B Stock shall have a one year term of office. The right of the holder of Series B Stock to elect a director may be exercised by written consent of such holder. On the Fully Funded Date, the special right of the holder of the Series B Stock so to vote separately as a class for the election of a director shall terminate (subject to subsequent revesting as provided below) and the director elected by the

holder of the Series B Stock shall be deemed to have resigned effective immediately without any further action upon such person's part. Subsequent to the Fully Funded Date, the special right of the holder of Series B Stock to vote separately as a class for the election of a director shall revest at any time when the balance of the Employers' funding contribution held under the Health Benefit Trust falls below 85% of the Fully Funded Amount; provided, however, that such revested special right of the holder of Series B Stock to vote separately as a class for the election of a director shall terminate (subject to revesting as provided by this subparagraph (b)) if the balance of the Employers' funding contribution held under the Health Benefit Trust rises above 85% of the Fully Funded Amount.

At any time when the holder of the Series B Stock has the right to elect a director as provided In this subparagraph (b), (i) such holder shall have the exclusive right to remove such director, with or without cause, from time to time and elect his or her successor and (ii) any vacancies in the seat held by the director elected by the holder of the Series B Stock shall be filled only by vote of the holder of the Series B Stock.

(6)     Conversion Rights. The holder of the share of the Series B Stock shall have no conversion rights with respect to such share.

(7)     Nontransferability. The Series B Stock shall be issued to the UAW and the Series B Stock and any rights thereunder shall be nontransferable. Any attempted transfer shall be void and of no effect. The Company shall place on the certificate representing any issued share of the Series A Stock a legend consistent with the provisions hereof.

(8)     Definitions.

(a)     Employers. The term "Employers" shall have the meaning assigned to such term in the Settlement Agreement.

(b)     Fully Funded Amount. The term "Fully Funded Amount" shall have the meaning assigned to such term in the Settlement Agreement.

(c)     Fully Funded Date. The term "Fully Funded Date" shall have the meaning assigned to such term in the Settlement Agreement.

(d)     Health Benefit Trust. The term "Health Benefit Trust" shall have the meaning assigned to such terra in the Settlement Agreement.

(e)     UAW. The term "UAW" shall have the meaning assigned to such term in the Settlement Agreement.

(9)     Rank of Series B Stock. The share of the Series B Stock shall rank junior upon liquidation to (i) shares of the Series G Stock, (ii) the shares of the Series D Stock, and (iii) any other series of Preferred or Preference Stock (other than the Series A Stock) authorized or designated after the initial date of issuance of the Series B Stock. The share of the Series B Stock shall rank on a parity upon liquidation with the Series A Stock. The share of the Series B Stock shall rank senior upon liquidation to the shares of the Parent Common Stock.

(10)     Retirement of Redeemed Shares, Etc. When redeemed, the share of the

Series B Stock shall have the status of authorized and unissued Preference Stock.

(11)    Fractional Shares. No fractional shares of Series B Stock shall be issued.

(12)    Stock Calculations. In making any calculations with respect to holdings or ownership of the Company's stock, the Company's stock records shall be conclusive evidence of such holdings and ownership.

C.    Series D Stock. The designated powers, preferences and relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of 3,000,000 shares of a series of Preference Stock are as follows:

(1)    Designation. The designation of this series of Preference Stock shall be "Convertible Junior Preference Stock, Series D (with Par Value of $1.00)" (referred to herein as the "Series D Stock").

(2)    Dividends. The holders of shares of the Series D Stock shall not be entitled to receive any dividends unless cash dividends are declared on the shares of stock issuable upon conversion of the Series D Stock (herein called "conversion stock"). In the event any cash dividend is declared on the shares of conversion stock, following the record date for such dividend the holders of shares of the Series D Stock shall be entitled to receive, when, as, and to the extent declared by the Board of Directors, a dividend in cash in an

amount per share equal to 120% of the cash dividend per share declared on the shares of conversion stock multiplied by the number of shares of conversion stock which, as of such record date, is deliverable on the Conversion Date upon the conversion of a share of Series D Stock. if at any time after the right to receive such dividend shall have accrued such dividend shall not have been paid, or declared and a sum sufficient for payment thereof set apart, the amount of the deficiency in such dividend shall be fully paid, but without interest, before the dividend on the conversion stock which gave rise to the accrual of such dividend shall be paid and before any other dividend shall be declared or paid or any other distribution ordered or made upon, or any other purchase or redemption made of, any stock ranking as to dividends or upon liquidation junior to the Series D Stock (other than a dividend payable in such junior stock or a purchase or redemption made by issue or delivery of such junior stock); provided, however, that any moneys theretofore deposited in any sinking fund with respect to any preferred stock of the Company in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such preferred stock in accordance with the terms of such sinking fund regardless of whether at the time of such application Full Accrued Dividends upon shares of the Series D Stock shall have been paid or declared and set apart for payment. At any time when any dividend has accrued on the Series D Stock but has not been paid, all dividends declared upon the shares of the Series D Stock and any other preferred stock ranking on a parity as to dividends with the Series D Stock shall be declared pro rata, so that the amounts of dividends declared per share on the Series D Stock and such other preferred stock shall in all cases bear to each other the same ratio that accrued unpaid dividends per share on the shares of the Series D Stock and such other preferred stock (determined immediately prior to payment) bear to each other, provided that in making such calculation, dividends accrued on such other parity stock since the most recent January 15 or July 15 may be ignored. Holders of shares of the Series D Stock shall not be entitled to any dividends, whether payable in cash, property or stock, in excess of Full Accrued Dividends.

(3)    Rights Of Redemption. The shares of the Series d Stock shall be subject to redemption as follows:

(a)    Optional Redemption. Subject to the succeeding provisions of this subparagraph (a) , the shares of the Series D Stock may be redeemed at the option of the Company, in whole or in part, at any time or from time to time upon not less than 30 days' prior notice to the holders of record of shares of the Series D Stock to be so redeemed, sent by first class mail, postage prepaid, to each registered holder of shares of the Series D Stock

at his address appearing on the Series D Stock register maintained by the Company, at the redemption price per share of $25.00, plus in each case an amount equal to Unpaid Accrued Dividends to and including the date fixed for redemption of such shares (hereinafter called a "Redemption Date"). If less than all shares of the Series D Stock are to be redeemed pursuant to this subparagraph (a), the shares to be redeemed shall be selected pro rata so that there shall be redeemed from each registered holder of such shares that number of whole shares, as nearly as practicable to the nearest share, as bears the same ratio to the total number of shares of such Series held by such holder as the total number of shares to be redeemed bears to the total number of shares of the Series D Stock at the time outstanding.

(b) <u>No Mandatory Redemption</u>. The shares of the Series D Stock shall not be subject to mandatory redemption.

(c) <u>No Sinking Fund</u>. Shares of the Series D Stock are not subject or entitled to the benefit of a sinking fund.

(d) <u>Effect of Redemption</u>. Unless default be made in the payment in full of the redemption price and any Accrued Dividends: dividends on the shares of Series D Stock called for redemption shall cease to accrue on the Redemption Date on which such shares are to be redeemed; all rights of the holders of such shares as stockholders of the Company by reason of the ownership of such shares shall cease on such Redemption Date, except the right to receive the amount payable upon redemption of such shares on presentation and surrender of the respective certificates representing such shares; and after such Redemption Date, such shares shall not be deemed to be outstanding and shall not be transferable on the books of the Company except to the Company.

(e) <u>Receipt of Redemption Price</u>. At any time on or after a Redemption Date, the respective holders of record of shares of Series D Stock to be redeemed on such Redemption Date shall be entitled to receive the redemption price upon actual delivery to the Company of certificates for the shares to be redeemed, such certificates, if required by the Company, to be properly stamped for transfer and duly endorsed in blank or accompanied by proper instruments of assignment and transfer thereof duly executed in blank.

(f) <u>Return of Deposits</u>. Any moneys deposited with the transfer agent, or other redemption agent, for the redemption of any shares of Series D Stock on a Redemp-

tion Date which shall not be claimed after five years from such Redemption Date shall be repaid to the Company by such agent on demand, and the holder of any such shares of Series D Stock shall thereafter look only to the Company for any payment to which such holder may be entitled. Any interest accrued on moneys so deposited shall belong to the Company and shall be paid to it from time to time on demand.

(4)     Rights on Liquidation. Dissolution. Winding up.

(a)     Liquidation Payment. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, the holders of shares of the Series D Stock then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the Company ranking junior upon liquidation to the Series D Stock, an amount equal to $25.00 per share plus an amount equal to all Accrued Dividends thereon as of the date of payment. The merger or consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a liquidation, dissolution or winding up of the Company under this paragraph (4).

(b)     Proportionate Distribution. In the event the assets of the Company available for distribution to the holders of shares of Series D Stock upon any voluntary or involuntary liquidation, dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holders are entitled pursuant to subparagraph (a) of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preferred stock ranking on a parity with the shares of Series D Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the shares of Series D Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5)     Voting. The shares of the Series D Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a)     Change of Priority or Rights. Without the affirmative vote or consent of the holders of at least two-thirds of the number of shares of Series D Stock at the time outstanding, voting or consenting (as the case

may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) amend, alter or repeal any of the preferences, special rights or powers of the holders of, the Series D Stock so as adversely to affect such preferences, special rights or powers or (ii) increase above 3,000,000 the aggregate number of shares constituting the Series D Stock or issue or reissue any shares of Series D Stock (other than for purposes of exchanges or transfers) in excess of the first 3,000,000 shares issued. No vote or consent by the holders of the Series D Stock shall be required as a condition to the creation or issuance of any class or series of capital stock of the Company (including, without limitation, capital stock which may rank senior to, or on a parity with, the Series D Stock as to dividends or upon liquidation or both).

(b)     <u>Default in Dividend Payments</u>. Whenever dividends payable on any series of Preference Stock shall be in default in an aggregate amount equivalent to six full quarterly dividends on all shares of such series at the time outstanding, the number of directors constituting the Board of Directors of the Company shall be increased by one and the holders of Preference Stock shall have, in addition to any other, voting rights, the exclusive and special right, voting separately as a class without regard to series, to elect one person to fill such newly created directorship. Whenever such right of holders of Preference Stock shall have vested, it may be exercised initially either at a special meeting of such holders called as provided below, or at any annual meeting of stockholders, and thereafter at annual meetings of stockholders. The right of holders of shares of Preference Stock voting separately as a class to elect one member of the Board of Directors as aforesaid shall continue until such time as all dividends accumulated on all series of Preference Stock shall have been paid in full, at which time the special right of the holders of shares of Preference Stock so to vote separately as a class for the election of directors shall terminate, subject to revesting in the event of each and every subsequent default in an aggregate amount equivalent to six full quarterly dividends.

At any time when such special voting power shall have vested in the holders of Preference Stock as provided in this subparagraph (b), a proper officer of the Company shall, upon the written request of the holders of record of at least 10% of the number of shares of Preference Stock at the time outstanding and entitled to vote, regardless of series, addressed to the Secretary of the Company, call a special meeting of the holders of

shares of Preference Stock and of any other class of stock having voting power, for the purpose of electing directors. Such meeting shall be held at the earliest practicable date at the principal office of the Company. If such meeting shall not be called by a proper officer of the Company within 20 days after personal service of said written request upon the secretary of the Company, or within 20 days after mailing the same within the United States of America by registered mail addressed to the Secretary of the Company at its principal office, then the holders of record of at least 10% of the number of shares of Preference Stock at the time outstanding and entitled to vote, regardless of series, may designate in writing one of their number to call such meeting at the expense of the Company, and such meeting may be called by such person so designated upon the notice required for annual meetings of stockholders and shall be held at said principal office. Any holder of shares of Preference Stock so designated shall have access to the stock books of the Company for the purpose of causing meetings of stockholders to be called pursuant to these provisions. Notwithstanding the provisions of this subparagraph (b), no such special meeting shall be called during the 90 days immediately preceding the date fixed for the next annual meeting of stockholders.

At any meeting held for the purpose of electing directors at which the holders of shares of Preference Stock shall have the special right, voting separately as a class, to elect a director as provided in this subparagraph (b), the presence, in person or by proxy, of the holders of 51% of the number of shares of Preference Stock at the time outstanding and entitled to vote shall be required to constitute a quorum of such class for the election of any director by the holders of the Preference Stock as a class, each share of Series D Stock outstanding and entitled to vote counting, for purposes only of determining the presence of such a quorum, as one share of Preference Stock. At any such meeting or adjournment thereof, (i) the absence of a quorum of Preference Stock shall not prevent the election of directors other than those to be elected by the holders of shares of Preference Stock voting as a class and the absence of a quorum for the election of such other directors shall not prevent the election of the directors to be elected by holders of shares of Preference Stock voting as a class and (ii) in the absence of either or both such quorums, a majority of the holders present in person or by proxy of the stock or stocks which lack a quorum shall have power to adjourn the meeting for the election of directors which they are entitled to elect from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

During any period the holders of Preference Stock have the right to vote as a class for a director as provided in this subparagraph (b), (i) the director so elected by the holders of the Preference Stock shall continue in office until termination of the right of the holders of the Preference Stock to vote as a class for directors, and (ii) any vacancies in the Board of Directors shall be filled only by vote of a majority (which majority may consist of only a single director) of the remaining directors theretofore elected by the holders of the class or classes of stock which elected the director whose office shall have become vacant.

(6)     <u>Conversion Rights</u>. The shares of the Series D Stock shall be subject to conversion as follows:

(a)     <u>Optional Conversion</u>. At any time, the holders of shares of the Series D Stock shall have the right, at their option, to convert each share of Series D Stock into shares of any other stock of the Company on the following terms:

(I)     <u>Conversion Price</u>. The shares of the Series D Stock shall be convertible at the Company's principal office and at such other office or offices, if any, as the Board of Directors may designate, into fully paid and nonassessable shares (calculated as to each conversion to the nearest 1/100th of a share) of Common Stock of the Company, at the conversion price, determined as hereinafter provided, in effect at the time of conversion, each share of Series D Stock being taken at $25.00 for the purpose of such conversion. The price at which shares of Common Stock shall be delivered upon conversion (herein called the "conversion price") shall be initially $80.00 per share of Common Stock. The conversion price shall be adjusted as provided in clause (IV) of this subparagraph (a).

(II)     <u>Conversion Procedure</u>. No payment or adjustment shall be made upon the conversion of the Series D Stock on account of any dividends declared but unpaid on the shares of the Series D Stock converted or on account of any dividends on the Common Stock issued upon such conversion.

Shares of the Series D Stock shall be deemed to have been converted immediately prior to the close of business on the Conversion Date, and the person or persons entitled to receive the Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such Common Stock at such time.

Following the Conversion Date, each holder of shares of the Series D Stock converted will surrender, at the Company's principal office or at any other office as the Board of Directors may designate, the certificate or certificates therefor, duly endorsed to the Company or in blank. As promptly as practicable after such surrender, the Company shall issue and shall deliver at said office a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion to the person or persons entitled to receive the same.

In case shares of Series D Stock are called for redemption, the right to convert such shares shall cease and terminate at the close of business on the Redemption Date on which such shares are to be redeemed, unless default shall be made in payment of the redemption price (in which event the right to convert such shares shall cease when such redemption price shall actually be paid).

(III)　Cash Payment. No fractional shares of Common Stock shall be issued upon conversion of shares of the Series D Stock; but, instead of any fraction of a share of Common Stock which would otherwise be issuable in respect of the aggregate number of shares of the Series D Stock held by the same holder, the company shall pay a cash adjustment of such fraction in an amount equal to the same fraction of the Closing Price on the Conversion Date, or. if the Conversion Date is not a Trading Day, on the next Trading Day.

(IV)　Conversion Price Adjustments. The conversion price shall be adjusted from time to time as follows:

(A)　In case the Company shall hereafter (i) pay a dividend or make a distribution on its outstanding shares of Common Stock in Common Stock, (ii) subdivide its outstanding shares of Common Stock, (iii) combine its outstanding shares of Common Stock into a smaller number of shares, or (iv) issue any shares by reclassification of its shares of Common Stock, the conversion price in effect at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be adjusted so that the holder of any shares of the Series D Stock converted after such time shall be entitled to receive the number of shares of capital stock of the Company which he would have owned or been entitled to

receive by reason of the conversion of such shares of the Series D Stock had such shares of the Series D Stock been converted immediately prior to such time.

(B)     In case the Company shall hereafter issue rights or warrants to all holders of its Common Stock entitling them (for a period expiring within forty-five days after the record date mentioned below) to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share--as determined pursuant to subclause (D) of this clause (IV)--on the record date for the determination of the stockholders entitled to receive such rights or warrants, the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the date of issuance of such rights or warrants by a fraction, of which the numerator shall be the number of shares of Common Stock outstanding on the record date for the determination of the stockholders entitled to receive such rights or warrants plus the number of shares of Common Stock which the aggregate offering price of the total number of shares of Common Stock so offered would purchase at such current market price and of which the denominator shall be the number of shares of Common Stock outstanding on such record date plus the number of additional shares of Common Stock offered for subscription or purchase. Such adjustment shall become effective at the opening. of business on the business day next following the record date for the determination of stockholders entitled to receive such rights or warrants; and to the extent that shares of Common Stock are not delivered after the expiration of such rights or warrants, the conversion price shall be readjusted (but only with respect to shares of the Series D Stock converted after such expiration) to the conversion price which would then be in effect had the adjustments made upon the distribution of such rights or warrants been made upon the basis of delivery of only the number of shares of Common Stock actually delivered. No adjustment in the conversion price shall be required or made

under this subclause (B) or subclause (C) immediately below or otherwise under this subparagraph (a) in respect of any right granted by the Company to all holders of its Common Stock to purchase additional shares of Common Stock from the Company at a discount from the current market price per share of Common Stock by reinvestment of dividends on Common Stock if either (i) such discount does not exceed 6% of such current market price or (ii) the holders of the Series D Stock shall be entitled to purchase shares of Common Stock from the Company at the same discount by reinvestment of dividends on the Series D Stock.

(C)     In case the Company shall hereafter distribute to all holders of its Common Stock evidences of its indebtedness or assets-- excluding any cash dividend or distributions and dividends referred to in subclause (A) of this clause (IV)--or subscription rights or warrants (excluding those referred to in subclause (B) immediately above), then in each such case the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the date of such distribution by a fraction of which the numerator shall be the current market price per share (determined as provided in subclause (D) immediately below) of the Common Stock on the record date for the determination of stockholders entitled to receive such distribution less the then fair market value (as determined by the Board of Directors of the Company, whose determination shall be conclusive) of the portion of the assets or evidences of indebtedness so distributed or of such subscription rights or warrants applicable to one share of Common Stock, and the denominator shall be such current market price per share of the Common Stock. Such adjustment shall become effective on the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such distribution.

(D)     For the purpose of any computation under subclause (B) or (C) immediately above, the current market price per share of Common Stock on any date shall be deemed to be the

average of the daily Closing Price for the thirty consecutive Trading Days selected by the Company commencing not more than forty-five Trading Days before the day in question.

(E)      In any case in which this subparagraph (a) shall require that an adjustment as a result of any event become effective at the opening of business on the business day next following a record date, the Company may elect to defer until after the occurrence of such event (i) issuing to the holder of any shares of the Series D Stock converted after such record date and before the occurrence of such event the additional shares of Common Stock issuable upon such conversion over and above the shares of Common Stock issuable upon such conversion on the basis of the conversion price prior to adjustment and (ii) paying to such holder any amount in cash in lieu of a fraction share of Common Stock pursuant to clause (IV) of this subparagraph (a); and, in lieu of the shares the issuance of which is so deferred, the Company shall issue or cause its transfer agents to issue due bills or other appropriate evidence of the right to receive such shares.

(F) Any adjustment in the conversion price otherwise required by this subparagraph (a) to be made may be postponed up to, but not beyond, three years from the date on which it would otherwise be required to be made provided that such adjustment (plus any other adjustments postponed pursuant to this subclause (F) and not theretofore made) would not require an increase or decrease of more than $.50 in such price and would not, if made, entitle the holders of all then outstanding shares of the Series D Stock upon conversion to receive additional shares of Common Stock equal in the aggregate to 3% or more of the then issued and outstanding shares of Common Stock. All calculations under this subparagraph (a) shall be made to the nearest cent or to the nearest 1/100 of a share of Common Stock, as the case may be.

(V)      <u>Conversion Price Adjustment Certificates and Notices</u>. Whenever the conversion price is adjusted as herein provided, the Company shall compute the adjusted conversion price in accordance with this subparagraph (a), shall

prepare a notice stating that the conversion price has been adjusted and setting forth the adjusted conversion price and shall mail such notice as soon as practicable to the holders of record of the outstanding shares of the Series D Stock.

(VI)  <u>Mergers, etc.</u> In case of any consolidation of the Company with, or merger of the Company with or into, any other corporation (other than a merger in which the Company is the surviving corporation and which does not result in any reclassification or change of the outstanding shares of the Company into which shares of the Series D Stock would have been converted had the automatic conversion of the Series D Stock occurred immediately prior thereto), or in case of any conveyance or transfer of the property and assets of the Company substantially as an entirety, lawful provision shall be made as a part of the terms of such transaction so that each share of Series D Stock shall be converted on the Conversion Date into the number and kind of shares of stock (and/or other securities, cash, property or rights) receivable upon such consolidation, merger, conveyance or transfer by a holder of the number and kind of shares of the Company into which such share of Series D Stock would have been converted had the automatic conversion of the Series D Stock occurred immediately prior to such consolidation, merger, conveyance or transfer, subject to subsequent adjustments as nearly equivalent as practicable to the adjustments provided for in this subparagraph (a). The above provisions of this clause (VI) shall similarly apply to successive consolidations, mergers, conveyances or transfers.

(VII)  <u>Reservation of Shares.</u> The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of the shares of the Series D Stock on the Conversion Date, the full number of- shares of Common Stock which at the time is deliverable on the Conversion Date upon the conversion of all shares of the Series D Stock outstanding at such time.

(VIII)  <u>Taxes.</u> The Company shall pay any and all taxes that may be payable in respect of the issuance or delivery of shares of Common Stock on conversion of shares of Series D Stock pursuant hereto. The Company shall not, however, be required to pay any tax which may be payable in

respect of any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of Series D Stock so converted were registered, and no such issue or delivery shall be made unless and until the person requesting such issue has paid to the Company the amount of any such tax, or has established, to the satisfaction of the Company, that such tax has been paid.

(IX) <u>Common Stock</u>. For the purpose of this paragraph (6) the term "Common Stock" shall include any stock of any class of the Company which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and which is not subject to redemption by the Company. However, shares issuable on conversion of shares of the Series D Stock shall include only shares of the class designated as Common Stock of the Company as of the original date of issue of the Series D Stock or shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company, provided that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

(X) <u>Closing Price</u>. As used in this paragraph (6), the term "Closing Price" on any day shall mean the reported last sales price regular way on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices regular way, in each case on the New York Stock Exchange, or, if the Common Stock is not listed or admitted to trading on such Exchange, on the principal national securities exchange on which the Common Stock is listed or admitted to trading, or, if not listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices as furnished by any New York Stock Exchange member firm selected from time to time by the Company for that purpose; and the term "Trading Day" shall mean a date on which

the New York Stock Exchange (or any successor to such Exchange) is open for the transaction of business.

(7)    Definitions

(a)    Conversion Date. The term "Conversion Date" shall mean the date on which the holder of shares of Series D Stock exercises his or its option to convert the shares of Series D Stock into Common Stock.

(b)    Accrued Dividends. The term "Accrued Dividends" shall mean Full Accrued Dividends as of the date as of which Accrued Dividends are to be computed, less the amount of all dividends paid, upon the relevant shares of Series D Stock.

(c)    Full Accrued Dividends. The term "Full Accrued Dividends" shall mean the aggregate amount of dividends, if any, which the holders of shares of Series D Stock shall have become entitled to receive as of the date as of which Full Accrued Dividends are to be computed.

(d)    Preferred Stock. The tern "Preferred Stock" shall mean any Preferred Stock created and issued under this Article Fourth. The term "preferred stock" shall mean shares of any class of stock (including any class of Preferred Stock or Preference Stock) if the holders of such class shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, in preference or priority to the holders of shares of Common Stock.

(e)    Preference Stock. The term "Preference Stock" shall mean any Preference Stock created and issued under this Article Fourth.

(f)    Ranking of Shares. For the purposes hereof any stock of any class or classes of the Company shall be deemed to rank (i) prior to shares of the Series D Stock, either as to dividends or upon liquidation, if the holders of such class or classes shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Series D Stock; (ii) on a parity with shares of the Series D Stock, either as to dividends or upon liquidation, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Series D Stock, if the holders of such stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may

be, in proportion to their respective dividend rates or liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Series D Stock; and (iii) junior to shares of the Series D Stock, either as to dividends or upon liquidation, if such class shall be Common Stock or if the holders of the Series D Stock shall, be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of such class or classes.

(8)    Rank of Series D Stock. The shares of the Series D Stock shall rank junior as to dividends and upon liquidation to the shares of the $6.00 Cumulative Convertible Preferred Stock, Series G (With Par Value of $1.00) of the Company. Except as otherwise fixed at the time such class is created, the shares of the Series D Stock shall rank on a parity as to dividends and upon liquidation with the shares of the stock of any other class of Preferred Stock or Preference Stock.

(9)    Fractional Shares. The Series D Stock may be issued in fractions of a share equal to one one-hundredth (.01) of a share or any integral multiple thereof. Each fractional share of Series D Stock issued shall have a corresponding fraction of the voting powers, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, attributable to a full share of Series D Stock.

(10)    Retirement of Converted Shares, etc. Shares of the Series D Stock which have been converted into Common Stock pursuant to the provisions of paragraph (6) of this Section C regarding Series D Stock shall have the status of authorized and unissued Preferred Stock but shall not be reissued as Series D Stock.

III.    Parent Common Stock.

Except as otherwise provided in this Section III or as otherwise required by applicable law, all shares of Common Stock and Class B Common shall be identical in all respects and shall entitle the holders thereof to the same rights and privileges, subject to the same qualifications, limitations and restrictions.

A.    Voting Rights.

(1)    Common Stock. Except as otherwise provided in this Section III, as otherwise required by law or by the resolution or resolutions providing for the issuance of any series of Preferred Stock or Preference Stock and subject to the provisions of any applicable law or of the By-laws of the Company, as from time to time amended, with respect to the

closing of the transfer books or the fixing of a record date for the determination of stockholders entitled to vote, the holders of outstanding shares of Common Stock shall exclusively possess voting power for the election of directors and for other purposes, each holder of record of shares of Common Stock being entitled to one vote for each Share of Common Stock standing in his name on the books of the Company.

(2)    <u>Class B Common</u>. The holders of shares of Class B Common shall have no right to vote on any matters to be voted on by the stockholders of the Company except as follows:

(a)    Without the affirmative vote or consent of the holders of the Class B Common, voting or consenting (as the case may be) separately as a class, in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) change the number of authorized shares of the Class B Common or (ii) amend this Certificate of incorporation or take any other action (including, without limitation, a merger or consolidation to which the Company is a constituent party) which would have the effect of eliminating the Class B Common or of amending, altering or repealing any of the preferences, special rights or powers of the holders of the Class B Common so as adversely to affect such preferences, special rights or powers.

(b)    The holders of shares of Class B Common shall have the right to vote together with the holders of shares of the Common Stock as a single class on any Super-Majority Transaction submitted to the holders of Parent Common Stock for their vote, approval or consent. When voting on any Super-Majority Transaction, each holder of shares of Class B Common shall be entitled to cast one vote for each share of Class B Common standing in his name on the books of the Company.

(3)    <u>Super-Majority Transactions</u>. The affirmative vote or consent of the greater of (a) the holders of at least 85% of the shares of the Parent Common Stock, voting as a single class, present in person or by proxy at a meeting at which a Super-Majority Transaction is submitted for a vote of the Company's stockholders and (b) the holders of a majority of the voting power of all of the Parent Common Stock shall be required to approve any Super-Majority Transaction.

B.    <u>Dividends</u>. Except as otherwise provided by the resolution or resolutions providing for the issue of any series of Preferred Stock or Preference Stock, the holders of Parent Common Stock shall be entitled, to the exclusion of the holders of Preferred Stock and Preference Stock of any and all series, to receive such dividends as from time to time may be declared by the Board of Directors. As and when dividends are declared or paid thereon, whether in cash, property or securities of the Company, the holders of Common Stock and the holders of Class B Common shall be entitled to participate in such dividends ratably on a per share basis; provided, that (i) if dividends are declared which are payable in shares of Common Stock or Class B Common, such dividends shall be payable at the same rate on both Common Stock and Class B Common and the dividends payable in shares of Common Stock shall be payable to holders of that class of stock and the dividends payable in shares of Class B Common shall be payable to holders of that class of stock, (ii) if the dividends consist of other voting securities of the Company, the Company shall declare and pay in respect of each share of Class B Common dividends consisting of an equal number of non-voting securities of the Company which are otherwise identical to the voting securities, which shall entitle the holder thereof to cast the same number of votes upon any Super-

majority Transaction as such holder would have been entitled to cast had such, holder received voting securities, rather than nonvoting securities, with respect to such dividend arid which are convertible into or exchangeable for such voting securities on the same terms as the Class B Common is convertible into the Common Stock, (iii) if the dividends consist of the right to purchase additional shares of Common Stock or Class B Common, at the Company's option, either (A) dividends shall be declared which are payable at the same rate on both classes of stock and the dividends payable in the right to purchase additional shares of Common Stock shall be payable to holders of that class of Stock and the dividends payable in the right to purchase additional shares of Class B Common shall be payable to holders of that class of stock or (B) in the case of a dividend payable in the right to purchase additional shares of Common Stock, such dividend shall be payable to holders of that class of stock and the Class B Common Conversion Ratio (as hereinafter defined) shall be adjusted as provided in subparagraph 2 of Paragraph D of this Section III.

C. <u>Rights on Liquidation, Dissolution, Winding Up</u>. In the event of any liquidation, dissolution or winding up of the Company, whether voluntary or involuntary, after payment shall have been made to the holders of Preferred Stock and Preference Stock of the full amount for which they shall be entitled pursuant to the resolution or resolutions providing for the issue of any series of Preferred Stock or Preference Stock, the holders of the Parent Common Stock shall be entitled, to the exclusion of the holders of Preferred Stock or Preference Stock of any and all series, to share, ratably according to the number of shares of Parent Common Stock held by them, in all remaining assets of the Company available for distribution to its stockholders.

D. <u>Conversion Rights</u>.

(1) <u>Conversion of Common Stock</u>. The holders of shares of Common Stock shall have no conversion rights with respect to such shares.

(2) <u>Conversion of Class B Common Stock</u>. With respect to each share of Class B Common, upon the earlier to occur of (i) any transfer of such share of Class B Common in accordance with Paragraph E of this Section III (except for transfers permitted by subparagraph 3 of Paragraph E) and (ii) the Event Date, such share shall convert automatically into shares of Common Stock at a ratio (the "Class B Common Conversion Ratio") which initially shall be one share of Common Stock per share of Class B Common so converted; provided, that if and whenever the Company shall hereafter issue rights pursuant to clause (iii) (B) of Paragraph B of this Section III to all holders of its Common Stock entitling them to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share--as determined pursuant to the penultimate sentence of this subparagraph 2 of this paragraph D--on the record date for the determination of the stockholders entitled to receive such rights, the Class B Common Conversion Ratio shall be adjusted to an amount equal to the product of the Class B Common Conversion Ratio in effect immediately prior to the date of issuance of such rights and a fraction, of which the numerator shall be the number of shares of Common Stock outstanding on such record date plus the number of additional shares of Common Stock offered for subscription or purchase and of which the denominator shall be the number of shares of Common Stock outstanding on such record date plus the number of shares of Common Stock which the aggregate offering price of the total number of shares of Common Stock so offered would purchase at such current market price. Such adjustment shall become effective at the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such rights; and to the extent that shares of Common Stock are not delivered after the expiration of such rights, the Class B Common Conversion Ratio shall be readjusted (but only with respect to shares

of the Class B Common converted after such expiration) to the Class B Common Conversion Ratio which would then be in effect had the adjustments made upon the distribution of such rights been made upon the basis of delivery of only the number of shares of Common Stock actually delivered. For the purpose of any computation under the immediately preceding sentence, the current market price per share of Common Stock on any date shall be deemed to be the average of the daily Closing Prices for the thirty consecutive Trading Days selected by the company commencing not more than fortyfive Trading Days before the day in question. Notwithstanding anything else contained in this subparagraph 2 of this Paragraph D, upon the termination of the Settlement Agreement in accordance with the provisions of Section 13 thereof, all then outstanding shares of Class B Common in the aggregate shall convert automatically, without any further action on the Company's part, into one (1) share of Common Stock.

(I)    Mergers, etc. In case of any consolidation of the Company with, or merger of the Company with or into, any other corporation (other than a merger in which the Company is the surviving corporation and which does not result in any reclassification or change of the outstanding shares of the Company into which shares of the Class B Common would have been converted had the automatic conversion of the Class B Common occurred immediately prior thereto), or in case of any conveyance or transfer of the property and assets of the Company substantially as an entirety, lawful provision shall be made as a part of the terms of such transaction so that each share of Class B Common (i) shall entitle the holder thereof to receive, at the same time and on the same terms as applicable to the shares of the Company into which the Class B Common shall, be convertible, any cash, securities (other than equity securities of the Company), rights or other property receivable upon such consolidation, merger, conveyance or transfer by a holder of the number and kind of shares of the Company into which such share of Class B Common would have been converted had the automatic conversion of the Class B Common occurred immediately prior to such consolidation, merger, conveyance or transfer and (ii) shall be converted on the Class B Common Conversion Date into the number and kind of equity of the Company, if any, receivable upon such consolidation, merger, conveyance or transfer by a holder of the number and kind of share of the Company into which such share of Class B Common would have been converted had the automatic conversion of the Class B Common occurred immediately prior to such consolidation, merger, conveyance or transfer subject to subsequent adjustments as nearly equivalent as practicable to the adjustments provided for in this subparagraph 2 of paragraph D; provided however, that any instrument convertible into or exchangeable for equity securities of the Company shall be deemed for purposes of this subparagraph 2(I) not to be equity securities of the Company; and provided, further, that in the event that any instrument convertible into or exchangeable for shares of Common Stock or other voting securities of the Company is paid in any such consolidation, merger, conveyance or transfer in respect of the shares of the Company into which the shares of Class B Common shall be convertible or exchangeable, the corresponding instrument paid in respect of the Clash B Common pursuant to this subparagraph 2(I) may be convertible into or exchangeable for Class B common or non-voting securities of the Company, respectively, in the manner contemplated by paragraph B of this Section III. The above

provisions of this clause (I) shall similarly apply to successive consolidations, mergers, conveyances or transfers.

(II)     Reservation of Shares. The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of the shares of the Class B Common on the Class B Common Conversion Date, the full number of shares of Common Stock which at the time is deliverable on the Class B Common Conversion Date upon the conversion of all shares of the Class B Common outstanding at such time.

(III)     Taxes. The Company shall pay any and all taxes that may be payable in respect of the issuance or delivery of shares of Common Stock on conversion of shares of Class B Common pursuant hereto. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of Class B Common so converted were registered, and no such issue or delivery shall be made unless and until the person requesting such issue has paid to the Company the amount of any such tax, or has established, to the satisfaction of the Company, that such tax has been paid.

(IV)     Common Stock. For the purpose of this subparagraph 2 of paragraph D the term "Common Stock" shall include any stock of any class of the Company (other than the Class B Common) which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and which is not subject to redemption by the Company. However, shares issuable on conversion of shares of the Class B Common shall include only shares of the class designated as Common Stock of the Company as of the original date of issue of the Class B Common or shares of any class or classes resulting from any reclassification or reclassifications, thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company, provided that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

(V)     Retirement of Converted Shares, etc. Shares of the Class B Common which have been converted into Common Stock pursuant to the provisions of this subparagraph 2

of paragraph D regarding Class B Common shall have the status of retired shares of Class B Common and shall not be reissued.

(VI)    Rights Prior to Conversion. Notwithstanding anything to the contrary contained in this Section III, in case of any adjustment of the Class B Common Conversion Ratio as provided in this subparagraph 2 of this Paragraph D, the determination of the rights of the holders of Class B Common to vote such shares in Super-Majority Transactions, to receive dividends with respect to such shares, and to share ratably with the holders of Common Stock in assets of the Company in the event of any liquidation, dissolution or winding up of the Company shall be made as if the number of shares of Class B Common held by each such holder of the Class B Common were equal to the product of the number of shares of Class B Common actually held by such holder at the time of such determination and the Class B Common Conversion Ratio.

(VII)    No Fractional Shares. No fractional shares of Common Stock shall be issued upon conversion of shares of the Class B Common, but, instead of any fraction of a share of Common Stock which would otherwise be issuable in respect of the aggregate number of shares of the Class B Common held by the same holder, the Company shall pay a full share of Common Stock.

(VIII)   Conversion Procedure. Following the Class B Common Conversion Date, each holder of shares of the Class B Common converted will surrender, at the Company's principal office or at any other office as the Board of Directors may designate, the certificate or certificates therefor, duly endorsed to the Company or in blank. As promptly as practicable after such surrender, the Company shall issue and shall deliver at said office a certificate or certificates for the number of shares of Common Stock issuable upon such conversion to the person or persons entitled to receive the same.

E.    Transferability of Class B Common. Prior to the Event Date, the shares of the Class B Common shall be nontransferable by the Supplemental Benefit Trust or any other holder thereof except:

(1)    pursuant to the terms of Article VIII of Exhibit B to the Settlement Agreement;

(2)    pursuant to any transaction which is approved by the Board of Directors or with respect to which the Board of Directors consents in writing;

(3)     to any financial institution as security for any indebtedness or obligation of the holders of the shares of Class B Common; or

(4)     pursuant to any tender or exchange offer made by any person or "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, or any successor statute thereto), for shares of Parent Common Stock. Any attempted transfer of shares of the Class B Common in violation of the provisions hereof shall be void and of no effect. The Company shall place on the certificates representing shares of the Class B Common a legend consistent with the provisions hereof.

F.     <u>Stock Splits, Recapitalizations, Etc</u>. If the Company in any manner subdivides or combines the outstanding shares of, or effects any recapitalization or similar transaction with respect to, one class of Parent Common Stock, the outstanding shares of the other class of Parent Common Stock shall be proportionately subdivided, combined, reclassified or the like in a similar manner.

G.     <u>Definitions</u>.

(1)     <u>Class B Common Conversion Date</u>. The term "Class B Common Conversion Date," with respect to each share of Class B Common, shall mean the date on which such share automatically converts into shares of Common Stock pursuant to the terms and conditions contained herein.

(2)     <u>Closing Price</u>. The term "Closing Price" on any day shall mean the reported last sales price regular way on such day or, in case no such sale л takes place on such day, the average of the reported closing bid and asked prices regular way, in each case on the New York Stock Exchange, or, if the Common Stock is not listed or admitted to trading on such Exchange, on the principal national securities exchange on which the Common Stock is listed or admitted to trading, or, if not listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices as furnished by any New York Stock Exchange member firm selected from time to time by the Company for that purpose.

(3)     <u>Trading Day</u>. The term "Trading Day" shall mean a day on which the New York Stock Exchange (or any successor to such Exchange) is open for the transaction of business.

(4)     <u>Event Date</u>. The term "Event Date" shall have the meaning assigned to such term in the Settlement Agreement.

(5)     <u>Navistar International Transportation Corp</u>. The term "Navistar International Transportation Corp." shall mean Navistar International Transportation Corp., a Delaware corporation, or any successor corporation thereto.

(6) <u>Super-Majority Transaction</u>. The term "Super-Majority Transaction" shall mean (i) a merger or consolidation to which the Company is a constituent party, if either (A) the stockholders of the Company immediately before such merger or consolidation, do not own, directly or indirectly, more than 50% of the combined voting power of the then outstanding voting securities of the corporation surviving or resulting from such merger or consolidation or (B) equity securities of the Company or Navistar International Transportation Corp. would be issued to stockholders of the other constituent corporation(s) to such merger or consolidation which have a fair market value at the time of the transaction in excess of $750 million, or (ii) the sale, transfer, pledge or other disposition of all or substantially all of the assets of the Company and its subsidiaries on a consolidated basis or Navistar International Transportation Corp. and its subsidiaries on a consolidated basis.

Subject to the provisions of this Certificate of Incorporation and except as otherwise provided by law, the shares of stock of the Company, regardless of class, may be issued for such consideration and for such corporate purposes as the Board of Directors may from time to time determine.

No holder of stock of the Company shall have any pre-emptive right with respect to stock of the Company.

Fifth: The Company is to have perpetual existence.

Sixth: Except as otherwise provided herein, any action required or permitted to be taken by the stockholders of the Company must be taken at a duly called annual or special meeting of such stockholders of the Company and may not be effected by any consent in writing by such stockholders.

The private property of the stockholders of the Company shall net be subject to the payment of corporate debts to any extent whatsoever.

Seventh: The number of directors which shall constitute the whole Board of Directors of the Company shall be as specified in the By-laws of the corporation, subject to the provisions of this Article Seventh.

The Board of Directors shall be and is divided into three classes: Class I, Class II and Class III, which shall be as nearly equal in number as possible. Each director shall serve for a term ending on the date of the third annual meeting of stockholders following the annual meeting at which the director was elected; provided, however, that each initial director in Class I shall hold office until the annual meeting of stockholders in 1988; each initial director in Class II shall hold office until the annual meeting of stockholders in 1989; and each initial director in Class III shall hold office until the annual meeting of stockholders in 1990. Notwithstanding the foregoing provisions of this Article, each director shall serve until his successor is duly elected and qualified or until his death, resignation or removal.

In the event of any increase or decrease in the authorized number of directors, the newly created or eliminated directorships resulting from such increase or decrease shall be apportioned by the Board of Directors among the three classes of directors so as to maintain such classes as nearly equal as possible. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

Newly created directorships resulting from any increase in the number of directors to be

elected by the holders of the Common Stock and any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other cause shall be filled by the affirmative vote of a majority of the remaining directors elected by the holders of the Common Stock then in office (and not by stockholders), even though less than a quorum of the Board of Directors. Any director elected in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of directors in which the new directorship was created or the vacancy occurred and until such director's successor shall have been elected and qualified.

Notwithstanding the foregoing, wherever the holders of any one or more classes or series of stock issued by this Company having a preference over the Parent Common Stock as to dividends or upon liquidation shall have the right, voting separately by class or series, to elect directors by consent or at annual or special meeting of stockholders, the number, election, term of office, filling of vacancies, terms of removal and other features of such directorships shall be governed by the terms of the resolution or resolutions establishing such class or series adopted pursuant thereto and such directors so elected shall not be divided into classes pursuant to this Article Seventh unless expressly provided by such terms.

The Board of Directors shall have power to hold its meetings outside the State of Delaware at such place ass from time to time may be designated by the By-laws or by resolution of the Board of Directors. The By-laws may prescribe the number of directors necessary to constitute a quorum.

The capital of the Company may be increased from time to time by resolution of the Board of Directors directing that a portion of the net assets of the Company in excess of the amount theretofore determined to be capital be transferred to capital account. Any and all shares of the Parent Common Stock may be issued by the Company from time to time for such consideration as may be fixed from time to time by the Board of Directors.

Eighth: The Board of Directors shall have power, without stockholder action:

I.     To make By-laws for the Company, and to amend, alter or repeal any By-laws; but any By-laws made by the directors may be altered, amended or repealed by the stockholders at any meeting, provided notice of such proposed alteration, amendment or repeal be included in the notice of such meeting.

II.     To remove at any time any officer, agent or employee of the Company, provided, however, that such power of removal may be conferred by the By-laws or by the Board of Directors on any committee or officer.

III.     To fix and determine, and to vary the amount of, the working capital of the Company, and to determine the use or investment of any assets of the Company; to set apart out of any of the funds of the Company available for dividends a reserve or reserves for any proper purpose and to abolish any such reserve or reserves; and to declare and authorize payment of such dividends as it shall determine advisable and proper, subject to such restrictions as may be imposed by law.

IV.     To authorize the purchase or other acquisition of shares of stock of the Company or any of its bonds, debentures, notes, scrip or other securities or evidences of indebtedness.

V.     To determine whether and to what extent, at what times and places, and under what conditions and regulations, the accounts, books and documents of the Company, or any of them, shall be open to the inspection of the stockholders; and no

stockholder shall have any right to inspect any account, book or document of the Company, except as conferred by the laws of the State of Delaware or as authorized by resolution adopted by the Board of Directors or by the stockholders of the Company entitled to vote in respect thereof.

VI.     Except as otherwise provided by law, to determine the places within or without the state of Delaware where any or all of the books of the Company shall be kept.

VII. To authorize the sale, lease or other disposition of any part or parts of the properties of the Company and to cease to conduct the business connected therewith or again to resume the same, as it may deem best.

VIII.   To authorize the borrowing of money; the issuance of bonds, notes, debentures and other obligations or evidences of indebtedness of the Company, secured or unsecured, and the inclusion of provisions as to redeemability and convertibility into shares of stock of the Company or otherwise; and the mortgaging or pledging, as security for money borrowed or bonds, notes, debentures or other obligations issued by the Company, of any property of the Company, real or personal, then owned or thereafter acquired by the Company.

The powers and authorities herein conferred upon the Board of Directors are in furtherance and not in limitation of those conferred by the laws of the State of Delaware. In addition to the powers and authorities herein or by statute expressly conferred upon it, the Board of Directors may exercise all such powers and do all such acts and things as may be exercised or done by the Company, subject, nevertheless, to the provisions of the laws of the State of Delaware, of this Certificate of Incorporation and of the By-laws of the Company.

The Board of Directors may, by resolution passed by a majority of the whole Board of Directors, designate one or more committees, each committee to consist of two (2) or more of the directors of the Company, which to the extent provided in said resolution or resolutions or in the By-laws, shall have and may exercise the powers of the Board of Directors in the management of the business and affairs of the Company, and may authorize the seal of the Company to be affixed to all papers which may require it.

Subject to any limitation in the By-laws, the members of the Board of Directors shall be entitled to reasonable fees, salaries or other compensation for their services, as determined from time to time by the Board of Directors, and to reimbursement for their expenses as such members. Nothing herein contained shall preclude any director from serving the Company or its subsidiaries or affiliates in any other capacity and receiving compensation therefor.

To the fullest extent permitted by the General Corporation Law of the State of Delaware as it now exists or may hereafter be amended, no director of the Company shall be liable to the Company or its stockholders for monetary damages arising from a breach of fiduciary duty owed to the Company or its stockholders. Any repeal or modification of this provision by the stockholders of the Company shall not adversely affect any right or protection of a director of the Company existing at the time of such repeal or modification.

Ninth: Indemnification:

I.      Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative ("proceeding"), by reason of the fact that he or she is or was

a director or officer of the Company (which term shall include any predecessor corporation of this Company) or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans ("indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be identified and held harmless by the Company to the fullest extent authorized by the Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment), against all expenses, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith and such indemnification shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the indemnitee's heirs, executors and administrators; provided however, that, except as provided in paragraph II of this Article Ninth with respect to proceedings to enforce rights to indemnification, the Company shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors. The right to indemnification conferred in this Article Ninth shall be a contract right and shall include the right to be paid by the Company the expenses incurred in defending any such proceeding in advance of its final disposition; provided however, that, if the Delaware General Corporation Law requires, the payment of such expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a proceeding, shall be made only upon delivery to the Company of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Article Ninth or otherwise.

      II.     If a claim under paragraph I of this Article Ninth is not paid in full by the Company within sixty (60) days after a written claim has been received by the Company, except in the case of a claim for expenses incurred in defending a proceeding in advance of its final disposition, in which case the applicable period shall be twenty (20) days, the indemnitee may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim. If successful in whole or in part in any such suit or in a suit brought by the Company to recover payments by the Company of expenses incurred by an indemnitee in defending in his or her

capacity as a director or officer, a proceeding in advance of its final disposition, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such claim. In any action brought by the indemnitee to enforce a right to indemnification hereunder (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the Company) or by the Company to recover payments by the Company of expenses incurred by an indemnitee in defending, in his or her capacity as a director or officer, a proceeding in advance of its final disposition, the burden of proving that the indemnitee is not entitled to be indemnified under this Article Ninth or otherwise shall be on the Company. Neither the failure of the Company (including the Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Company (including the Board of Directors, independent legal counsel or its stockholders) that the indemnitee has not met such applicable standard of conduct, shall be a presumption that the indemnitee has not met the applicable standard of conduct, or in the case of such an action brought by the indemnitee, be a defense to the action.

III.     The rights conferred on any person by paragraphs I and II of this Article Ninth shall not be exclusive of any other right which such person may have or hereafter acquire under any statute, this certificate of incorporation by=law, agreement, vote of stockholders or disinterested directors or otherwise.

IV.     The Company may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Company or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

V.     Persons who are not included as indemnitees under paragraph I of this Article Ninth but are employees of the Company or any subsidiary may be indemnified to the extent authorized at any time or from time to time by the Board of Directors.

Tenth: The Company reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, and other provisions authorized by the laws of the state of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed by law and this Certificate of Incorporation and all rights, preference and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended are granted subject to the right reserved in this Article Tenth.

Eleventh:

I.     <u>Certain Restrictions on the Transfer of Stock</u>.

In order to preserve the Tax Benefits, the restrictions set forth below shall apply for the period beginning on the Article Eleventh Effective Date and ending on the Expiration Date, unless the Board of Directors shall fix an earlier or later date in accordance with Section VI of this Article Eleventh.

A.      Definitions.

(1)     Article Eleventh Effective Date. The time and date of the legal effectiveness of the merger of the former Navistar International Corporation with and into the Company.

(2)     Control. The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Such definition shall also apply to the terms "controlling," "controlled by" and "under common control with."

(3)     Effective Date Tier Entity. Any Person that, as of the Article Eleventh Effective Date, was a First Tier Entity or a Higher Tier Entity, for so long as such Person continues to have a Prohibited Ownership Percentage.

(4)     Expiration Date. The last day of the eight-year period commencing on the Article Eleventh Effective Date.

(5)     First Tier Entity. A "first tier entity" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T.

(6)     47 Percentage Point Increase. An increase of 47 percentage points or more of the Stock owned by "5-percent shareholders" of the Company (within the meaning of Treasury Regulations Section 1.382-2T(g)(1)) over the lowest percentage of Stock owned by such 5-percent shareholders at any time during the three-year period preceding any determination date, such determination to be made in accordance with Treasury Regulations Section 1.382-2T(c) as if the determination date were a "testing date."

(7)     Higher Tier Entity. An "higher tier entity" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T.

(8)     Internal Revenue Code. The Internal Revenue Code of 1986, as amended. Any reference to a particular Section or provision of the Internal Revenue Code shall be deemed to also refer to any successor Section or provision having similar effect.

(9)     Ownership Change. An "ownership change" with respect to the Company, as that term is used in Section 382(g) of the Internal Revenue Code and Treasury Regulations Section 1.382-2T(a)(1), except that for purposes of determining whether 5-percent shareholders have increased their percentage interests by more than 50 percentage points, there shall be added to the increase in their percentage interests an amount equal to a fraction, the numerator of which is $50 million, and the denominator of which is the value of all of the Stock. For example, if the value of the Stock is $1,000,000,000 and the percentage increase by 5-percent shareholders is 49.5% (i.e., the value of the Stock representing the 49.5 percentage point increase is $495,000,000), for purposes of determining whether there is an ownership change, there shall be added to the 49.5 percentage points an increase of 0.5 percent (i.e., $50,000,000/$1,000,000,000).

(10)    Other Permitted Holders. Any Person, other than an Effective Date Tier Entity or a Permitted Transferee, which has a Prohibited Ownership Percentage permitted under Section I, whether pursuant to a waiver under Paragraph D of Section I or otherwise.

(11)    Permitted Transferee. Any transferee with a Prohibited Ownership Percentage as to which the Board of Directors has consented pursuant to Subparagraph

C(2) or C(3) of Section I.

(12) <u>Person</u>. Any individual, corporation, estate, trust, association, company, partnership, joint venture, or similar organization, or any other entity described in Treasury Regulations Section 1.382-3(a)(1)(i).

(13) <u>Prohibited Ownership Percentage</u>. Any ownership in the Company that would cause a Person or Public Group to be a "5-percent shareholder" of the Company within the meaning of Treasury Regulations Section 1.382-2T(g)(1)(i) or (ii). For this purpose, whether a Person or Public Group would be a "5-percent shareholder" shall be determined (u) by substituting "4.5 percent" for "5 percent" each place it appears in such provisions, (v) without giving effect to the following provisions: Treasury Regulations Sections 1.382-2T(g)(2), 1.382-2T(g)(3), 1.382-2T(h)(2)(iii) and 1.382-2T(h)(6)(iii), (w) by treating every Person or Public Group which owns stock, whether directly or by attribution, as directly owning such Stock notwithstanding any further attribution of such Stock to other Persons and notwithstanding Treasury Regulations Section 1.382-2T(h)(2)(i) (A), (x) by substituting the term "Person" in. place of "individual" in Treasury Regulations Section 1.382-2T(g)(1)(i), (y) by taking into account ownership of Stock at any time during the "testing period" as defined in Treasury Regulations Section 1.382-2T(d)(1), and (z) by treating each day during the testing period as if it were a "testing date" as defined in Treasury Regulations Section 1.382-2T(a)(2)(i). In addition, for the purpose of determining whether any Person or Public Group has a Prohibited Ownership Percentage as of any date, the definition of stock set forth in Subparagraph A(15) of Section I shall be applied in lieu of the definition in Treasury Regulations Section 1. 382-2T(f)(18), except that any option shall be treated as Stock only to the extent treating it as Stock would cause an increase in ownership of such Person and such option would be deemed exercised pursuant to Treasury Regulations. in effect from time to time (disregarding whether treating such option as exercised would cause an ownership change).

(14) <u>Public Group</u>. A "public group" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T(f)(13), excluding any "direct public group" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T(j)(2)(ii).

(15) <u>Stock</u>. All classes of stock of the Company, all options to acquire stock of the Company and all other interests that would be treated as stock in the Company pursuant to Treasury Regulations Section 1.382-2T(f)(18)(iii), other than (x) stock described in Section 1504(a)(4) of the Internal Revenue Code and (y) stock that would be described in such Section 1504(a)(4) but is not so described solely because it is entitled to vote as a result of dividend arrearages. As used in Article Eleventh, the term "option" shall have the meaning set forth in Treasury Regulations Section 1.382-2(T)(h)(4).

(16) <u>Tax Benefits</u>. The net operating loss carryovers and capital loss carryovers to which the Company is entitled under the Internal Revenue Code, free of restrictions under Section 382 of the Internal Revenue Code.

(17) <u>Testing Date Action</u>. Any Transfer or acquisition of Stock or any other action (including the acquisition or issuance of an option to Transfer or acquire stock), if the effect of such Transfer, acquisition or other action would be to cause a "testing date" with respect to the Company within the meaning of Treasury Regulations Section 1.382-2T(a)(2)(i), determined by treating every Person and Public Group which has a Prohibited Ownership Percentage as a 5-percent shareholder as used in such Section.

(18)    Transfer. Any means of conveyance of legal or beneficial ownership of. Stock, whether such ownership is direct or indirect, voluntary or involuntary, including, without limitation, an indirect transfer of ownership through the transfer of any ownership interest of any entity that owns Stock

(19)    Transferee Undertaking. A duly executed written undertaking for the benefit of the Company by any transferee pursuant to which the transferee agrees that (i) it will not take any of the following actions without the prior consent of the Board of Directors: (x) acquire any additional Stock, (y) Transfer any Stock in violation of Paragraph B of Section I, or (z) take or cause to be taken any Testing Date Action, (ii) upon request by the Company, it will furnish or cause to be furnished to the Company all certificates representing Stock held of record or beneficially, directly or indirectly, by it or by any Person controlling, controlled by or under common control with it for the purpose of placing a legend on such certificates to reflect the undertakings described in clause (i) above, (iii) it acknowledges that stop transfer orders may be entered with the transfer agent (or agents) and the registrar (or registrars) of stock against the transfer of Stock subject to the undertakings described in clause (i) above except in compliance with the requirements of such undertakings, and (iv) it will agree to such other actions and remedies as the Company may reasonably request in order to preserve the Tax Benefits.

(20)    Treasury Regulations. The regulations promulgated by the Secretary of the Treasury under the Internal Revenue Code. Any reference to a particular Treasury Regulation or Section or provision thereof shall be deemed to also refer to any successor Regulation or Section or provision having similar effect.

B.      Transfer Restrictions.

Unless otherwise consented to or waived by the Board of Directors, the following Transfers and actions shall be prohibited:

(1)    General. No Person shall Transfer any stock to any other Person to the extent that such Transfer, if effected, (i) would cause the transferee or any Person or Public Group to have a Prohibited Ownership Percentage, or (ii) would increase the ownership percentage of any transferee or any Person or Public Group having a Prohibited Ownership Percentage.

(2)    Additional Restrictions on Transform Involving Effective Date Tier Entities. In addition to the restrictions under Subparagraph B(i), (i) no Effective Date Tier Entity shall Transfer any stock, and no other Person shall Transfer any Stock to an Effective Date Tier Entity if, in either case, after such Transfer, there would be a 47 Percentage Point Increase, and (ii) no Effective Date Tier Entity shall take any other action (including the acquisition or issuance of an option to Transfer or acquire Stock) if, after such action, there would be a 47 Percentage Point Increase.

(3)    Additional Restrictions on Transfers Involving Other Permitted Holders. In addition to the restrictions under Subparagraph B(i), (i) no other Permitted Holder shall Transfer any Stock, and no other Person shall Transfer any Stock to an Other Permitted Holder, if, in either case, such Transfer would constitute a Testing Date Action, and (ii) no Other Permitted Holder shall take any other action that would constitute a Testing Date Action.

(4)    Additional Restrictions under Transferee Undertakings. In addition to the

restrictions under Subparagraph B(1), (i) no Person who has delivered a Transferee Undertaking shall Transfer any Stock, and no Person shall Transfer any Stock to any Person who has delivered a Transferee Undertaking, if, in either case, such Transfer would result in a violation of such Transferee Undertaking, and (ii) no Person who has delivered a Transferee Undertaking shall take or cause to be taken any other action that would constitute a Testing Date Action.

(5)    Exception. Notwithstanding anything herein to the contrary, the transfer restrictions set forth in this Paragraph B shall not apply to any shares of Series D Stock of the Company which were issued and outstanding on the Article Eleventh Effective Date.

C.    Permitted Transfers.

(1)    General. Unless otherwise restricted under Paragraph B of Section I or under a Transferee Undertaking or other agreement, Transfers of Stock may be made without the consent of the Board of Directors.

(2)    Transfers by Effective Date Tier Entities. Upon petition by any Effective Date Tier Entity, the Board of Directors shall consent to a proposed Transfer of Stock that complies with Subparagraph B(2) of Section I but would otherwise be prohibited pursuant to Subparagraph B(l) of Section I if it determines that (i) after giving effect to such Transfer, the percentage of Stock owned by all Persons and Public Groups with a Prohibited Ownership Percentage will not have increased by more than 40 percentage points over the lowest percentage of Stock owned by such Persons and Public Groups at any time during the three-year period preceding the proposed date of such Transfer (such determination to be made in accordance with the provisions of Treasury Regulations Section 1.382-2T(c)) and (ii) the proposed transferee shall have delivered a Transferee Undertaking.

(3)    Transfers by Permitted Transferees. Upon petition by any Permitted Transferee, the Board of Directors shall consent to a proposed Transfer of stock or Testing Date Action that would otherwise be prohibited pursuant to Subparagraph B(i) or B(4) of Section I or pursuant to any Transferee undertaking if it determines that (i) after such proposed Transfer or. Testing Date Action there would not be an Ownership Change and (ii) in the case of any such proposed Transfer that, if effected, would otherwise be prohibited under Subparagraph B(1) of Section I, such Transfer would otherwise be permitted under Subparagraph C(2) if such Transfer were proposed to be made by an Effective Date Tier Entity.

(4)    Certain Additional Transfers to Permitted Transferees. Upon petition by any Permitted Transferee, the Board of Directors shall consent to a proposed Transfer of additional stock to such Permitted Transferee from a Person constituting an Effective Date Tier Entity or another Permitted Transferee if it determines that such proposed Transfer would otherwise be permitted under Subparagraph C(2) or C(3) of Section I, as the case may be.

(5)    Transfers by Other Permitted Holders. Upon petition by any other Permitted Holder, the Board of Directors shall consent to a proposed Transfer of Stock or Testing Date Action that would otherwise be prohibited pursuant to Subparagraph B(1), B(3) or B(4) of Section I or pursuant to any Transferee Undertaking if it determines that (i) after such proposed Transfer or Testing Date Action there would not be an Ownership Change and (ii) in the case of any such proposed Transfer that, if effected, would otherwise be

prohibited under Subparagraph (B)(1) of Section I, such Transfer would not cause a 47 Percentage Point Increase and the proposed transferee shall have delivered a Transferee Undertaking.

D.     Waivers. Notwithstanding anything herein to the contrary, the Board of Directors may waive any of the restrictions contained in Paragraph B of Section I of this Article Eleventh: (1) in the case of any issuance of Stock by the Company which would otherwise be prohibited under Subparagraph B(1) of Section I, if the transferee agrees to be bound to the restrictions applicable to Permitted Transferees; (2) in the event of a tender or exchange offer within the meaning of the Securities Exchange Act of 1934, as amended, to acquire Stock constituting more than fifty percent in value of the outstanding Common Stock of the Company, so long as such waiver shall apply to all Transfers pursuant to such tender or exchange offer; (3) in connection with any Transfers of Stock in connection with underwritten offerings of such Stock; (4) in connection with any investment in or acquisition of a business or any business combination involving the Company or any subsidiary of the Company; and (5) in any other instance in which the Board of Directors reasonably and in good faith determines that a waiver would be in the best interests of the Company.

II.     Attempted Transfer in Violation of Transfer Restrictions.

Unless the consent or waiver of the Board of Directors is obtained as provided in Paragraph C or D of Section I, and except as provided in Paragraph C of Section II below, any attempted Transfer of shares of stock of the Company in excess of the shares that could be Transferred to the transferee without restriction under Paragraph B of Section I is not effective to transfer ownership of such excess shares (the "Prohibited Shares") to the purported acquirer thereof (the "Purported Acquirer"), and the Purported Acquirer shall not be entitled to any rights as a shareholder of the Company with respect to the Prohibited Shares, including, without limitation, the right to vote or to receive dividends with respect thereto. Nothing contained in this Article Eleventh shall preclude the settlement of any transaction involving Stock entered into through the facilities of the New York Stock Exchange or any other national securities exchange. The application of the provisions and remedies described in the first sentence of this Section II and in Paragraphs A, B and C of Section II below shall be deemed not to so preclude any such settlement. Paragraphs A, B and C below shall apply only in the case of violations of the restrictions contained in Subparagraph B(1) of Section I.

A.     Transfer of Certificates; Sale of Stock. Upon demand by the Company, the Purported Acquirer shall transfer any certificate or other evidence of purported ownership of the Prohibited Shares within the Purported Acquirer's possession or control, together with any dividends or other distributions paid by the Company with respect to the Prohibited Shares that were received by the Purported Acquirer (the "Prohibited Distributions"), to an agent to be designated by the Company (the "Agent").

If the Purported Acquirer has sold the Prohibited Shares to an unrelated party in an arms-length transaction after purportedly acquiring them, the Purported Acquirer shall be deemed to have sold the Prohibited Shares for the Agent, and in lieu of transferring the Prohibited Shares and Prohibited Distributions to the Agent shall transfer to the Agent the Prohibited Distributions and the proceeds of such sale (the "Resale Proceeds") except to the extent that the Agent grants written permission to the Purported Acquirer to retain a portion of the Resale Proceeds not exceeding the amount that would have been payable by the Agent to the Purported Acquirer pursuant to Paragraph B of Section II if the Prohibited Shares had been sold by the Agent rather than by the Purported Acquirer. Any purported Transfer of the Prohibited Shares by the Purported Acquirer,

other than a transfer described in one of the two preceding sentences (unless such transfer itself violated the provisions of Article Eleventh), shall not be effective to transfer any ownership of the Prohibited Shares.

        B.    <u>Allocation and Distribution of Proceeds</u>. The Agent shall sell in an arms-length transaction (through the New York Stock Exchange, if possible) any Prohibited Shares transferred to the Agent by the purported Acquirer, and the proceeds of such sale (the "Sales Proceeds"), or the Resale Proceeds, if applicable, shall be allocated to the Purported Acquirer up to the following amount: (1) where applicable, the purported purchase price paid or value of consideration surrendered, by the Purported Acquiror for the Prohibited Shares and (2) where the purported Transfer of the Prohibited Shares to the Purported Acquirer was by gift, inheritance, or any similar purported transfer, the fair market value of the Prohibited Shares at the time of such purported Transfer. Any Resale Proceeds or Sales Proceeds in excess of the amount allocable to the Purported Acquirer pursuant to the preceding sentence, together with any Prohibited Distributions (such excess amount and Prohibited Distributions are collectively the "Subject Amounts"), shall be transferred to an entity designated by the Company that is described in Section 501(c)(3) of the Internal Revenue Code (the "Designated Charity"). In no event shall any such Prohibited Shares or Subject Amounts inure to the benefit of the Company or the Agent, but such Subject Amounts may be used to cover expenses incurred by the Agent in performing its duties.

        C.    <u>Limitation on Enforceability</u>. Notwithstanding anything herein to the contrary, with respect to any Transfer of Stock which would cause a Person or Public Group (the "Prohibited Party") to violate a restriction provided for in subparagraph B(1) of Section I only on account of the attribution to the Prohibited Party of the ownership of stock by a Person or Public Group which is not controlling, controlled by or under common control with the Prohibited Party, which ownership is nevertheless attributed to the Prohibited Party, Subparagraph B(1) of Section I shall not apply in a manner that would invalidate such Transfer. In such case, the Prohibited Party and any Persons controlling, controlled by or under common control with the Prohibited Party (collectively, the "Prohibited Party Group") shall automatically be deemed to have disposed of, and shall be required to dispose of, sufficient shares of Stock (which shares shall consist only of shares held legally or beneficially, whether directly or indirectly, by any member of the Prohibited Party Group, but not shares held through another Person, other than shares held through a Person acting as agent or fiduciary for any member of the Prohibited Party Group, and which shares shall be disposed of in the inverse order in which they were acquired by members of the Prohibited Party Group) to cause the Prohibited Party, following such disposition, not to be in violation of Subparagraph B(1) of Section I; provided that in the event no member of the Prohibited Party Group (i) is an Effective Date Tier Entity, Permitted Transferee or Other Permitted Holder and (ii) had any actual knowledge that such Transfer was prohibited under Subparagraph B(l) of Section I, such disposition shall only be effected to the extent necessary in order to prevent an Ownership Change. Such disposition shall be deemed to occur simultaneously with the Transfer giving rise to the application of this provision, and such number of shares which are deemed to be disposed of shall be considered Prohibited Shares and shall be disposed of through the Agent as provided in Paragraph B of Section II, except that the maximum amount payable to the Prohibited Party in connection with such sale shall be the fair market value of the Prohibited Shares at the time of the Prohibited Transfer.

        D.    <u>Other Remedies</u>. In the event that the Board of Directors determines that a Person proposes to take any action in violation of Paragraph B of Section I, or in the event that the Board of Directors determines after the fact that an action has been taken in violation of Paragraph B of Section I, the Board of Directors, subject to the second and third sentences of the introductory paragraph of Section II, may take such action as it deems advisable to prevent or to refuse to give

effect to any Transfer or other action which would result, or has resulted, in such violation, including, but not limited to, refusing to give effect to such Transfer or other action on the books of the Company or instituting proceedings to enjoin such Transfer or other action. If any Person shall knowingly violate Paragraph B of Section I, then that Person and all other Persons controlling, controlled by or under common control with such Person shall be jointly and severally liable for, and shall pay to the Company, such amount as will, after taking account of all taxes imposed with respect to the receipt or accrual of such amount and all costs incurred by the Company as a result of such loss, put the Company in the same financial position as it would have been in had such violation not occurred.

III.     Prompt Enforcement Against Purported Acquiror.

Within 30 business days of learning of a purported Transfer of Prohibited Shares to a Purported Acquiror or a Transfer of stock to a Prohibited Party, the Company through its secretary or any Assistant Secretary shall demand that the Purported Acquiror or Prohibited Party surrender to the Agent the certificates representing the Prohibited Shares, or any Resale Proceeds, and any Prohibited Distributions, and if such surrender is not made by the Purported Acquiror or Prohibited Party within 30 business days from the date of such demand, the Company shall institute legal proceedings to compel such surrender; provided, however, that nothing in this Section III shall preclude the Company in its discretion from immediately bringing legal proceedings without a prior demand, and also provided that failure of the Company to act within the time periods set out in this Section III shall not constitute a waiver of any right of the Company to compel any transfer required by Section II. Upon a determination by the Board of Directors that there has been or is threatened a purported Transfer of Prohibited Shares to a Purported Acquiror or a Transfer of stock to a Prohibited Party or any other violation of Paragraph B of Section I, the Board of Directors may authorize such additional action as it deems advisable to give effect to the provisions of this Article Eleventh, including, without limitation, refusing to give effect on the books of the Company to any such purported Transfer or instituting proceedings to enjoin any such purported Transfer.

IV.     Obligation to Provide Information.

The Company may require as a condition to the registration of the Transfer of any stock that the proposed transferee furnish to the Company all information reasonably requested by the Company with respect to all the direct or indirect ownership of Stock by the proposed transferee and by Persons controlling, controlled by or under common control with the proposed transferee.

V.     Legends.

All certificates evidencing Stock that is subject. to the restrictions on transfer set forth in this Article Eleventh shall bear a conspicuous legend referencing such restrictions.

VI.     Further Actions.

Subject to the second and third sentences of the introductory paragraph of Section II, nothing contained in this Article Eleventh shall limit the authority of the Board of Directors to take such other action to the extent permitted by law as it deems necessary or advisable to protect the Company and the interests of the holders of its securities in preserving the Tax Benefits. Without limiting the generality of the foregoing, in the event of a change in law (including applicable regulations) making one or more of the following actions necessary, in the case of actions described in clauses (B), (C) and (D) below, or desirable, in the case of actions described in clause (A) below, the Board of Directors may (A) accelerate the Expiration Date, (B) extend the

Expiration Date, (C) conform any terms or numbers set forth in the transfer restrictions in Section I to make such terms consistent with the Internal Revenue Code and the Treasury Regulations following any changes therein to the extent necessary to preserve the Tax Benefits, or (D) conform the definitions of any terms set forth in this Article Eleventh to the definitions in effect following such change in law; provided that the Board o€ Directors shall determine in writing that such acceleration, extension, change or modification is reasonably necessary to preserve the Tax Benefits or that the continuation of these restrictions is no longer reasonably necessary for the preservation of the Tax Benefits, which determination shall be based upon an opinion of legal counsel to the Company and which determination shall be filed with the Secretary of the Company and mailed by the Secretary to all stockholders of the Company within ten days after the date of any such determination.

VII.   <u>Severability</u>.

If any provision of this Article Eleventh or the application of any such provision to any Person or under any circumstance shall be held invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Article Eleventh.

APPENDIX B-4

**REGISTRATION RIGHTS**

1.    <u>Demand Registrations</u>.

(a)    <u>Requests for Registration</u>. At any time and from time to time after the Event Date, but subject to the provisions of this Appendix B-4, the Supplemental Benefit Committee may request registration (a "<u>Registration Request</u>") under the Securities Act of Registrable Securities on Form SA or any similar long-form registration statement ("<u>Long-Form Registrations</u>") or on Form S-2 or S-3 or any similar short-form registration statement ("<u>Short-Form Registrations</u>"), if available (any such registration, a "<u>Demand Registration</u>"). All offerings of securities pursuant to Demand Registrations shall be underwritten public offerings, except as provided in Section 1(i) below. Each Registration Request shall specify the approximate number of Registrable Securities requested to be registered and the anticipated per share price range, if applicable. Any Demand Registration may provide for offerings to be made on a continuous or delayed basis under Rule 415 under the Securities Act (such Rule, together with any successor or comparable rule, "<u>Rule 415</u>"), if (i) so specified in the related Registration Request and permitted by applicable rules and regulations under the Securities Act, and (ii) such Demand Registration is made as a Short-Form Registration (a "<u>Rule 415 Demand Registration</u>"). Each Rule 415 Demand Registration and any underwritten public offering thereunder closed within 90 days of the effectiveness of the registration statement filed pursuant to the related Registration Request shall be deemed a single Demand Registration, and each additional underwritten public offering made under such Rule 415 Registration Statement shall be deemed an additional Demand Registration (and each request for such additional Demand Registration shall be deemed an additional Registration Request). No such offering closed under a Rule 415 Demand Registration after the 90-day period referred to in the preceding sentence shall count as one of the five Demand Registrations for which Parent is required to pay Registration Expenses in accordance with Section 1(g), unless the Supplemental Benefit Committee shall so instruct Parent in the related Registration Request.

(b)    <u>Long Form Registrations</u>. The aggregate value of any Registrable Securities to be sold in a public offering under any Long-Form Registration must equal at least $10,000,000, based on the anticipated per share price set out in the related Registration Request.

(c)    <u>Short-Form Registrations</u>. The aggregate value of the Registrable Securities requested to be registered in any Short-Form Registration must equal at least $5,000,000, based on the anticipated per share price set out in the related Registration Request.

(d)    <u>Restrictions on all Demand Registrations</u>.

(i)    Parent will not be obligated to effect any Demand Registration within 180 days after the closing of an underwritten public offering pursuant to any previous Parent Registration or Demand Registration (or such shorter period to which the lead underwriter(s) under such previous Parent Registration or Demand Registration shall consent). As used herein, "<u>Parent Registration</u>" shall mean any underwritten public offering of equity securities of Parent or any of its subsidiaries, other than Permitted Parent Registrations.

(ii)    Upon the occurrence and during the continuance of any Blackout Period, Parent shall postpone the filing or effectiveness of any registration statement otherwise required to be prepared and filed by Parent pursuant to any Demand Registration, and the Supplemental Benefit Trust shall not sell any Registrable Securities previously registered on its behalf under a Demand Registration.

At any time during the continuance of a Blackout Period, the Supplemental Benefit Committee shall have the right by written notice to Parent to withdraw any Registration Request and related Demand Registration pursuant to which Parent would otherwise be required to prepare and file a registration statement or under which the Supplemental Benefit Trust would otherwise be permitted to offer Registrable Securities to the public. In the event of such withdrawal, such Demand Registration shall not be counted for purposes of determining the number of Demand Registrations for which Parent is required to pay the Registration Expenses pursuant to Section 1(g), and Parent will pay or reimburse the Supplemental Benefit Trust for all Registration Expenses incurred in connection with such Demand Registration. In the event the Supplemental Benefit Committee terminates a proposed underwritten offering under a Rule 415 Demand Registration for which Parent is not required to pay Registration Expenses (in accordance with Section 1(a)) during a Blackout Period, Parent will pay or reimburse the Supplemental Benefit Trust for all of the expenses of such proposed underwritten offering.

(e)    <u>Parent Registrations</u>. Notwithstanding any other provision of this Appendix B-4, at any time, and from time to time, Parent and its subsidiaries may undertake an unlimited number of registrations under the Securities Act of (A) their debt securities for any reason; (B) their equity securities in connection with an acquisition, merger, consolidation, tender offer, corporate reorganization, exchange offer, or similar transaction involving Parent or any of its subsidiaries; (C) their equity securities in connection with any registration on Form S-8 or any successor form; (D) their equity securities in connection with the settlement of litigation or threatened litigation; provided, that neither Parent nor any of its subsidiaries shall register more than 10 million shares of its equity securities with respect to any such settlement; (E) Parent's equity securities in connection with the exercise of warrants outstanding on the Effective Date; and (F) equity securities of any of Parent's subsidiaries, other than the Company, in connection with any public offering of such securities (collectively, "<u>Permitted Parent Registrations</u>"). After the expiration of the Window Period, Parent and its subsidiaries may undertake an unlimited number of registrations of their securities under the Securities Act for any purpose, subject only to Section 2.

(f)    <u>Certain Limitations on Registrations by Parent During the Window Period</u>. During the Window Period, Parent shall not, and shall not permit any of its subsidiaries to, (i) register any equity securities under the Securities Act, other than pursuant to Demand Registrations or registrations to which the Supplemental Benefit Committee has consented under Sections 8 or 9, or (ii) sell any equity securities registered prior to the commencement of the Window Period, except, in both such cases, pursuant to Permitted Parent Registrations.

(g)     Demand Registration Expenses. Parent shall pay all Registration Expenses incurred in connection with the first five Demand Registrations; provided, that for each of the second through the fifth of such Demand Registrations, Parent shall not be required to pay any fees of counsel to the Supplemental Benefit Committee in excess of $50,000 per Demand Registration; and, provided, further, that Parent shall not be required to pay SEC filing fees in connection with such five Demand Registrations for more than the aggregate number of shares of Parent Common into which the aggregate number of shares of Parent Class B Common held by the Supplemental Benefit Trust may be converted (plus fees in respect of not more than the aggregate number or amount, if any, of any other Registrable Securities held by the Supplemental Benefit Trust). The Supplemental Benefit Trust shall pay all Registration Expenses for each Demand Registration after such first five Demand Registrations.

(h)     Selection of Underwriters. The Supplemental Benefit Committee shall have the right to select its counsel and, in connection with any underwritten public offering, the investment bankers and underwriters under any Demand Registration; provided, however, that the lead underwriter(s) in any such underwritten public offering shall be among the top ten under-writing firms, by dollar volume of equity offerings in which such firms acted as lead underwriters, determined on the basis of the most recently available information; provided, further, that in the event no such top underwriting firm will agree to act as lead underwriter, the Supplemental Benefit Committee will select one or more nationally recognized firms as its lead underwriter(s); and provided, further, that in selecting its underwriters and counsel in connection with any such underwritten public offering. the Supplemental Benefit Committee shall give due consideration to the cost savings and efficiencies which may arise from using the same underwriters and counsel, respectively, in connection with each other Demand Registration for which Parent is required to pay Registration Expenses pursuant to Section 1(g) and shall consult with Parent prior to changing such underwriters or counsel in connection with any such Demand Registration.

(i)     Market Offerings. in addition to underwritten public offerings, the Supplemental Benefit Trust may make Market Offerings under any Rule 415 Demand Registration. Until the Piggyback Rights Revision Date, the Supplemental Benefit Trust shall not make Market Offerings, whether under a Rule 415 Demand Registration or in reliance on Rule 144 under the Securities Act or otherwise (such offerings and any related sales, collectively, "Trust Market Offerings"), where the aggregate number of shares sold pursuant to Trust Market Offerings in any three-month period would exceed the amounts permitted under Rule 144(e), assuming for such purpose that all Trust Market Offerings were made under Rule 144 and that the Supplemental Benefit Trust was an "affiliate" of Parent within the meaning of Rule 144. As used herein, the term "Market Offerings" shall mean any offering or sale of securities into an existing trading market for outstanding securities of the same class either (x) on or through the facilities of a national securities exchange or the NASD National Market System or (y) to or through a market maker otherwise than on an exchange, but not including any private placement transaction.

2.     Registrations After the Window Period.

(a)     Parent Initiated Registrations. After the expiration of the Window Period, Parent shall notify the Supplemental Benefit Committee in writing if it desires to register any Parent Common under the Securities Act in connection with a public underwritten offering (a "Parent Registration Notice"), other than in connection with a Permitted Parent Registration, as to which no notice shall be required; provided, that Parent shall not give a Parent Registration Notice during the Supplemental Benefit Trust's Registration Period or the period referred to in Section 2(a)(ii) below. Each Parent Registration Notice shall set out (x) the number of shares which Parent

proposes to sell in such offering, (y) the estimated per share price range and (z) the estimated number of shares of Parent Common which could be included in such offering without adversely affecting the marketability thereof, as determined by Parent's lead underwriter(s) (which shall be nationally recognized investment banking firm(s)).

(i)     Parent shall have the exclusive right to attempt to close the offering described in any Parent Registration Notice within 90 days of the date thereof (the "Parent's 90 Day Period"), and Parent will not be obligated to effect any Demand Registration, and the Supplemental Benefit Trust will not offer or sell any Parent Common Equity in an underwritten public offering (except as provided in Section 2(a)(iii)) or make any Trust Market Offerings, during Parent's 90 Day Period, and if Parent closes any such offering, during a further period of 180 days after such closing or such shorter period to which the lead underwriter(s) under such offering shall consent in writing (the "Parent's Standstill Period;" the Parent's 90 Day Period and the Parent's Standstill Period, collectively, the "Parent's Registration Period").

(ii)    If Parent or any of its subsidiaries closes an offering pursuant to Section 2(a)(i), Parent shall not be entitled to give any further notice pursuant to Section 2(a) for the period beginning on the expiration of the Parent's Registration Period and ending 90 days thereafter, during which 90-day period the Supplemental Benefit Committee shall have the exclusive right to make a Registration Request.

(iii)   The Supplemental Benefit Committee shall have the right, upon written notice to Parent (a "Piggyback Notice"), which notice shall be given within 15 business days after receipt of the Parent's Registration Notice, to include in the offering described in such Parent's Registration Notice such number of shares of Parent Common Equity as are specified in such Piggyback Notice, up to a number of shares equal to the greater of (x) the total available capacity of the offering as finally determined by Parent's lead underwriter(s), less the number of shares of Parent Common Equity which Parent finally determines to sell in the offering or (y) one-half of such total available capacity. For purposes of determining the number of shares it desires to include in such offering, the Supplemental Benefit Committee shall be entitled to have a representative be present at (but not to participate in) any pricing meeting. Any registration initiated by Parent pursuant to a Parent Registration Notice as to which the Supplemental Benefit Trust has elected to participate pursuant to this Section 2(a)(iii) is herein a "Parent Initiated Piggyback Registration."

(b)     Supplemental Benefit Trust Initiated Registrations. After the expiration of the Window Period, any Registration Request made by the Supplemental Benefit Committee in connection with a public underwritten offering shall set out (x) the number of shares which the Supplemental Benefit Trust proposes to sell in such offering, (y) the estimated per share price range, and (z) the number of shares of Parent Common which could be included in such offering without adversely affecting the marketability thereof, as determined by the Supplemental Benefit Trust's lead underwriter(s) (a "Post-Window Period Registration Request"); provided, that the Supplemental Benefit Committee shall not make any Post-Window Period Registration Request during (x) the Parent's Registration Period, (y) the period referred to in Section 2(b)(ii) below, or (iii) the period beginning on the expiration of the Window Period and ending 90 days after the later of (A) the expiration of the Window Period or (B) the expiration of 180 days after the closing of the last underwritten public offering made pursuant to a Demand Registration during the Window Period (or such shorter period to which the lead underwriters under such offering shall consent).

(i) The Supplemental Benefit Committee shall have the exclusive right to attempt to close the offering described in any Post-Window Period Registration Request within 90 days of the date thereof (the "Supplemental Benefit Trust's 90 Day Period"), and Parent, except as otherwise provided in this Section 2(b), will not (x) register any public offering of Parent Common Equity under the Securities Act or (y) offer or sell in any public offering any Parent Common Equity previously registered by it pursuant to Rule 415 (in both such cases, other than pursuant to Permitted Parent Registrations) during the Supplemental Benefit Trust's 90 Day Period, and if the Supplemental Benefit Committee closes any such offering, during a further period of 180 days after such closing or such shorter period to which the lead underwriters under such offering shall consent in writing (the "Supplemental Benefit Trust's Standstill Period;" the Supplemental Benefit Trust's 90 Day Period and the Supplemental Benefit Trust's Standstill Period, collectively, the "Supplemental Benefit Trust's Registration Period").

(ii) If the Supplemental Benefit Committee closes an offering pursuant to Section 2(b), the Supplemental Benefit Committee shall not be entitled to give Parent a Post-Window Period Registration Request for the period beginning on the expiration of the Supplemental Benefit Trust's Registration Period and ending 90 days thereafter, during which 90 day period Parent shall have the exclusive right to give a Parent Registration Notice.

(iii) Parent shall have the right, upon written notice to the Supplemental Benefit Committee, which notice shall be given within 15 business days after the receipt of a Post-Window Period Registration Request, to include in any public offering under a Post-Window Period Registration Request such number of shares of Parent Common Equity as are specified in such notice, up to a number of shares equal to the greater of (x) the total available capacity of the offering as finally determined by the Supplemental Benefit Trust's lead underwriter(s), less the number of shares of Parent Common Equity which the Supplemental Benefit Committee finally determines to sell in such offering, or (y) one-half of such total available capacity. For purposes of determining the number of shares it desires to include in such offering, Parent shall be entitled to have a representative present at (but not to participate in) any pricing meeting. Any registration initiated by the Supplemental Benefit Committee pursuant to a Post-Window Period Registration Request as to which the Parent has elected to participate in the offering pursuant to this Section 2(b)(iii) is herein a "Supplemental Benefit Trust Initiated Piggyback Registration." (Parent Initiated Piggyback Registrations and Supplemental Benefit Trust Initiated Piggyback Registrations are, collectively, "Piggyback Registrations.")

(c) Piggyback Registration Expenses. Subject to Section 1(g), the party that initiates a Piggyback Registration shall pay all Registration Expenses of such Piggyback Registration; provided, that each party participating in such Piggyback Registration shall pay its pro rata share of SEC and State "blue sky" filing fees and its pro rata share of any and all underwriters' discounts and commissions.

(d) Selection of Underwriters. In the case of a Parent Initiated Piggyback Registration, the selection of investment bankers and underwriters (including lead underwriters) for the offering will be made by Parent. In the case of a Supplemental Benefit Trust Initiated Piggyback Registration, the selection of the investment banker(s) and underwriters (including lead underwriters) shall be made in accordance with Section 1(h).

(e) Revised Piggyback Rights. At such time (the "Piggyback Rights Revision Date") as both (i) at least three years have passed since the Supplemental Benefit Trust acquired (as such term is used in Rule 144 of the Securities Act) the Registrable Securities and (ii) either

(A) the Supplemental Benefit Trust owns, directly and indirectly, less than 5 percent of the total issued and outstanding Parent Common Equity, or (B) Parent shall have furnished the Supplemental Benefit Committee with an opinion of counsel to Parent knowledgeable in securities law matters to the effect that the Supplemental Benefit Committee is not an "affiliate" of Parent (as such term is defined under Rule 144 of the Securities Act) and has not been such an affiliate for the preceding three months (it being understood that it is within the sole discretion of Parent as to whether or not to obtain such an opinion), then the provisions set forth in Sections 2(a)(ii) and 2(b) above and any other provisions in Section 2(a) which restrict Parent's ability to initiate and file registrations and sell securities at any time shall terminate and the number of Registrable Securities that the Supplemental Benefit Committee shall be entitled to include in any Parent Initiated Piggyback Registration shall be limited to the amount described in clause (x) of the first sentence of Section 2(a)(iii).

3.     Holdback Agreements. In connection with each other's underwritten public offerings, the Supplemental Benefit Trust and Parent each agree to enter into such reasonable and customary restrictions on the sale or distribution (including sales pursuant to Rule 144) of Parent's equity securities as may be requested by the underwriters managing such registered public offering.

4.     Registration Procedures. Whenever the Supplemental Benefit Committee requests that any offering of Registrable Securities be registered pursuant to this Appendix B-4, Parent will use its best efforts to effect the registration of such offering in accordance with the intended method of disposition thereof, and pursuant thereto Parent will as expeditiously as possible:

(a)     prepare and file with the SEC a registration statement with respect to such Registrable Securities in cooperation with the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, and use its best efforts to cause such registration statement to become effective (provided that before filing such registration statement or prospectus or any amendments or supplements thereto (other than any amendment or supplement in connection with any filing incorporated by reference into such registration statement or prospectus), Parent will furnish to the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, copies of such registration statement and all such other documents proposed to be filed);

(b)     in cooperation with the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith (other than with respect to any amendment or supplement in connection with any filing incorporated by reference into such registration statement or prospectus) as may be necessary to keep such registration statement effective until the completion of the disposition of the Registrable Securities to be sold thereunder or so long thereafter as a dealer is required to deliver a prospectus in connection with the offer or sale of any such securities;

(c)     comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition;

(d)     furnish to the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement

(including each preliminary prospectus) and such other documents as the Supplemental Benefit Committee may reasonably request in order to facilitate the disposition of the Registrable Securities in accordance with the intended methods of disposition;

(e)    use its best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as the Supplemental Benefit Committee reasonably requests and do any and all other acts and things as the Supplemental Benefit Committee may reasonably request in order to facilitate the disposition in accordance with the intended method of disposition in such jurisdictions of the Registrable Securities (provided that Parent will not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (ii) subject itself to taxation in any such jurisdiction, or (iii) consent to general service of process in any such jurisdiction);

(f)    cause all such Registrable Securities to be listed on each securities exchange and national market quotation system on which similar securities issued by Parent are then listed or quoted;

(g)    provide a transfer agent and registrar for all such Registrable Securities not later than the effective date of such registration statement and furnish, or cause to be furnished, to each purchaser of Registrable Securities registered pursuant to this Appendix B-4 a certificate or certificates for a number of shares of Parent Common equal to the number of shares of Registrable Securities so purchased in the name of such purchaser or in such other name as such purchaser may direct;

(h)    enter into such customary agreements (including, if applicable, underwriting agreements in customary form) and take all such other actions as the Supplemental Benefit Committee or its investment bankers and underwriters, if any, reasonably request in order to facilitate the disposition of such Registrable Securities (including, without limitation, effecting a stock split or a combination of shares);

(i)    make available for inspection by the Supplemental Benefit Committee and its counsel, any investment bankers and underwriters, if any, accountants and other agents retained by the Supplemental Benefit Committee, all financial and other records, pertinent corporate documents and properties of Parent and its subsidiaries, and cause the officers, directors, employees and independent accountants of Parent and its subsidiaries to supply all information reasonably requested by the Supplemental Benefit Committee and such counsel, investment bankers and underwriters, accountants or agents in connection with the preparation and filing of such registration statement and any amendment or supplement thereto;

(j)    otherwise use its best efforts to comply with all applicable rules and regulations of the SEC, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least 12 months beginning with the first day of Parent's first full fiscal quarter after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(k)    permit the Supplemental Benefit Committee and its counsel, investment bankers and underwriters, if any, accountants and agents, to participate in the preparation of such registration statement and to require the insertion therein of material concerning the Supplemental Benefit Trust and its plan of distribution furnished to Parent in writing, which in the reasonable judgment of the Supplemental Benefit Committee and its counsel should be included; Parent will consider insertion in the registration statement of additional material proposed by the Supplemental Benefit Committee, provided, however, that Parent will make all final decisions with respect to the content of the registration statement (other than with respect to information concerning the Supplemental Benefit Trust and the Plan of Distribution), and, provided, further, that in the event Parent declines to include any such additional material proposed by the Supplemental Benefit Committee and the Supplemental Benefit Committee shall have been advised by counsel knowledgeable in securities laws (which counsel shall be reasonably satisfactory to Parent) to the effect that the failure to insert such material may present a material risk that the registration statement would be materially misleading or would omit to state a material fact, the Supplemental Benefit Committee shall have the right to require Parent to withdraw such registration statement, in which event Parent will pay or reimburse the Supplemental Benefit Trust for all Registration Expenses incurred in connection with such registration statement, and such registration statement shall not count as one of the five Demand Registration Statements for which Parent is required to pay Registration Expenses as provided in Section 1(g).

(l)    in the event of the issuance of any stop order suspending the effectiveness of a registration statement, or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any Registrable Securities included in such registration statement for sale in any jurisdiction, use its reasonable best efforts promptly to obtain the withdrawal of such order;

(m)    obtain a cold comfort letter from Parent's independent public accountants and an opinion from Parent's counsel, in each case addressed to the Supplemental Benefit Committee in customary form and covering such matters of the type customarily covered by cold comfort letters and such legal opinions, respectively, as the Supplemental Benefit Committee may reasonably request; and

(n)    promptly notify the Supplemental Benefit Committee: (i) of the filing of any registration statement, any amendment or supplement thereto, any related prospectus and prospectus supplement and the effectiveness of such registration statement; (ii) of any request by the SEC for amendments or supplements to such registration statement or the prospectus related thereto or for additional information; (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such registration statement or the initiation of any proceedings for that purpose; (iv) of the receipt by Parent of any notification with respect to the suspension of the qualification of any of the Registrable Securities for sale under the securities or blue sky laws of any jurisdiction or the initiation of any proceeding for such purpose; and (v) of the existence of any fact of which Parent becomes aware which results in such registration statement, the prospectus related thereto or any document incorporated therein by reference containing an untrue statement of a material fact or omitting to state a material fact required to be stated therein or

necessary to make any statement therein in light of the circumstances under which they were made not misleading; and, in the case of the notification relating to an event described in clause (v) hereof, Parent, except in the case of a Blackout as to which notice has been given under Section 1(d)(ii), shall promptly prepare and furnish to the Supplemental Benefit Committee and each investment banker and underwriter participating in the disposition of Registrable Securities, a reasonable number of copies of a prospectus supplemented or amended (or, if the prospectus is supplemented or amended by means of a filing under the Exchange Act, Parent shall advise the Supplemental Benefit Committee of such filing and furnish it with copies thereof) so that, as thereafter delivered to the purchasers of any such securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein in the light of the circumstances under which they were made not misleading.

The Supplemental Benefit Committee shall cooperate with Parent in connection with, and shall take, or cause to be taken, all actions reasonably requested by Parent that are necessary or customary for Parent to effect the registration of any Registrable Securities of the Supplemental Benefit Trust pursuant to this Appendix B-4.

The Supplemental Benefit Committee hereby agrees that, upon receipt of any notice of Parent of the happening of (A) any event of the kind described in clause (iii) of Section 4(n), the Supplemental Benefit Trust will discontinue its disposition of Registrable Securities pursuant to the registration statement relating to such Registrable Securities, until the stop order shall have been lifted or rescinded; (B) any event of the kind described in Section 4(n)(iv), the Supplemental Benefit Trust will discontinue its disposition of Registrable Securities pursuant to the registration statement relating to such Registrable Securities in the jurisdiction with respect to which the suspension of the qualification of any of the Registrable Securities for sale has occurred, until the suspension shall have been lifted or rescinded; and (C) any event of the kind described in Section 4(n)(v), the Supplemental Benefit Trust will discontinue its disposition of Registrable Securities pursuant to the registration statement relating to such Registrable Securities until the Supplemental Benefit Committee's receipt of the copies of the supplemented or amended prospectus contemplated by Section 4(n)(v) and, if so directed by Parent, will deliver to Parent (at Parent's expense) all copies, other than permanent file copies, then in the Supplemental Benefit Committee or Supplemental Benefit Trust's possession of the prospectus relating to such Registrable Securities current at the time of receipt of such notice. In the event Parent gives notice pursuant to Section 4(n)(iii) or 4(n)(v) and the stop order, in the case of Section 4(n)(iii), continues for more than 30 days after such notice, or Parent fails to supplement or amend the prospectus to cure any material untrue statement or material omission within 30 days after such notice, in the case of Section 4(n)(v), the Supplemental Benefit Committee may withdraw the Demand Registration and the related Registration Request in respect of the registration affected by such notice. In the event of such withdrawal, such Demand Registration shall not be counted for the purposes of determining the number of Demand Registrations for which Parent is required to pay the Registration Expenses pursuant to Section 1(g), and Parent will pay and reimburse the Supplemental Benefit Trust for all Registration Expenses incurred by the Supplemental Benefit Trust in connection with such Demand Registration.

5.    Registration Expenses. For purposes of this Appendix B-4, "Registration Expenses" shall mean all expenses incurred by Parent or the Supplemental Benefit Committee in connection with a Demand Registration or a Piggyback Registration, including without limitation all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, messenger and delivery expenses, and fees and disbursements of counsel to

Parent and the Supplemental Benefit Committee and all independent certified public accountants, investment bankers and other persons retained by or on behalf of Parent or the Supplemental Benefit Committee.

6. <u>Indemnification</u>.

(a) Parent agrees to indemnify, to the extent permitted by law, the Supplemental Benefit Trust, its trustee, the Supplemental Benefit Committee, and each Supplemental Benefit Committee Member, each Supplemental Benefit Committee Member Alternate, and each other person who controls any of such entities within the meaning of the Securities Act against all losses, claims, damages, liabilities and expenses, including the fees and expenses of legal and other advisors, as incurred, arising out of any untrue or alleged untrue statement of material fact contained in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as any such statement is included therein in reliance on and in conformity with any information furnished in writing to Parent by or on behalf of the Supplemental Benefit Trust or the Supplemental Benefit Committee expressly for use therein or by the Supplemental Benefit Trust or Supplemental Benefit Committee's failure to deliver a copy of any prospectus after Parent has furnished the Supplemental Benefit Trust or Supplemental Benefit Committee with a sufficient number of copies of the same.

(b) In connection with any registration statement in which the Supplemental Benefit Trust is participating, the Supplemental Benefit Committee on behalf of the Supplemental Benefit Trust, will furnish such information and affidavits as Parent reasonably requests for use in connection with any such registration statement or prospectus and, to the extent permitted by law, will indemnify Parent, the Company, their respective directors and officers and each person who controls Parent (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses arising out of any untrue or alleged untrue statement of material fact contained in the registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent that such untrue statement or omission is contained in any information or affidavit so furnished in writing by the Supplemental Benefit Trust or Supplemental Benefit Committee; provided, that the obligation to indemnify will be individual to the Supplemental Benefit Trust and will be limited to the net amount of proceeds received by the Supplemental Benefit Trust from the sale of Registrable Securities under such registration statement.

(c) Any claim for indemnification hereunder will be made in accordance with the Indemnification Procedures.

(d) In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in this Section 6 is due in accordance with the terms hereof but is for any reason held by a court to be unavailable on grounds of policy or otherwise, the Supplemental Benefit Trust and Parent, as between themselves, shall contribute to the aggregate losses, claims, damages, liabilities and expenses (including reasonable fees and expenses of legal and other advisors) to which Parent and any Indemnified Party may be subject in such proportion so that portion thereof for which the Supplemental Benefit Trust shall be responsible shall be limited to the portion finally determined by a court or the parties to any settlement to be directly attributable to an untrue statement of a material fact or an omission to state a material fact in a

registration statement, preliminary prospectus, prospectus or any amendment or supplement thereto in specific reliance upon and in conformity with written information furnished to the Parent through an instrument duly executed by the Supplemental Benefit Committee, on behalf of the Supplemental Benefit Trust, stating that it is for use therein, and Parent shall be responsible for the balance; provided, that no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. For purposes of this Section 6(d), each person who controls the Supplemental Benefit Committee or the trustee under the Supplemental Benefit Trust within the meaning of the Securities Act shall have the same rights to contribution as the Supplemental Benefit Committee, and each person who controls Parent within the meaning of the Securities Act and each officer and director of Parent or Company shall have the same rights to contribution as Parent, subject in each case to the proviso in the immediately preceding sentence. Any Party entitled to contribution will, promptly after receipt of notice of commencement of any action, suit or proceeding against such party in respect of which a claim for contribution may be made against another party or parties under this Section 6(d), notify such party or parties from whom contribution may be sought, but the omission to so notify any party shall not relieve such party from any other obligation it may have under this Section 6(d) or otherwise except to the extent that such failure shall have been prejudicial to such party. Parent and the Supplemental Benefit Committee agree that it would not be just and equitable if their respective contribution obligations were to be determined by pro rata allocation, by reference to the proceeds realized by them or in any manner which does not take into account the equitable considerations set forth in this Section 6(d).

(e)    The indemnification and contribution provided for hereunder will remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party, and will survive the transfer of securities.

7.    Participation in Underwritten Registrations. The Supplemental Benefit Trust may not participate in any underwritten offering unless the Supplemental Benefit Trust (a) agrees to sell its securities on the basis provided in any underwriting arrangements approved by the person or persons entitled to approve such arrangements and (b) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements. In connection with underwritten offerings under Demand Registrations, Parent shall enter into reasonable and customary indemnification agreements with the Supplemental Benefit Trust's underwriters.

8.    Third Party Registration Rights. Parent represents and warrants, to the Supplemental Benefit Trust that no person or entity other than Parent and the Company have any right, pursuant to statute, contract or otherwise, to require or cause Parent or the Company to register equity securities of Parent or the Company under the Securities Act. Without the prior written consent of the Supplemental Benefit Committee, Parent shall not, and shall cause the Company not to grant any such right to any person or entity to the extent that such right is exercisable during the Window Period or would restrict, limit or adversely affect the Supplemental Benefit Trust's registration rights during any Supplemental Benefit Trust's Registration Period.

9.    Additional Requests for Registration. Notwithstanding Sections 1(d) and 2(a), the Supplemental Benefit Committee may request the permission of Parent to register Registrable Securities pursuant to the terms hereof or during any Parent's Registration Period by notice to Parent. Notwithstanding Section 1(f) and 2(b), Parent or the Company may request the permission of the Supplemental Benefit Committee to register its equity securities during the Window Period

or during any Supplemental Benefit Trust's Registration Period by notice to the Supplemental Benefit Committee (except that no such notice will be required in the case of a Permitted Parent Registration). Each such notice shall specify the nature and number of shares requested to be registered and the anticipated per share price range, if applicable.

      10.    <u>Notices</u>. All notices, requests or other communications required or permitted to be given or made hereunder shall be in writing and shall be deemed to have been given when actually delivered or when delivered to a nationally recognized commercial courier for next day delivery, or when deposited in the United States mail, certified mail, return receipt requested, postage prepaid to the address of the parties as set forth below or at such other address as any party may furnish in writing to the other when transmitted by facsimile to the telecopy number for each party set forth below. Rejection or other refusal to accept, or inability to deliver because of change of address of which no notice was given, shall be deemed to be receipt of good notice, request, or other communication.

            (i)    If to Parent:
                  Navistar International Corporation
                  455 North Cityfront Plaza Drive
                  Chicago, IL 60611
                  Attention: General Counsel
                  Telecopy: 312/836-3982

            With copies to:

                  Kirkland & Ellis
                  Suite 5700
                  200 E. Randolph Drive
                  Chicago, IL 60610
                  Attention: Michael H. Kerr, P.C.
                  Telecopy: 312/861-2200

            (ii)    If to the Supplemental Benefit Trust or Supplemental Benefit Committee:

                  at such addresses and with copies to such persons as the Supplemental Benefit Committee shall from time to time notify Parent in writing.

**APPENDIX B-6**

~~*SUPPLEMENTAL BENEFIT TRUST PROFIT SHARING PLAN*~~[*RESERVED*]

~~Pursuant to the Settlement Agreement in Shy et al v. Navistar et al (Civil Action No. C-3-92-333, S.D. Ohio), together with the exhibits thereto, the "Settlement Agreement", Navistar hereby adopts the Supplemental Benefit Trust Profit Sharing Plan (the "Profit Sharing Plan"), described herein. This Profit Sharing Plan shall become effective upon the Effective Date, as defined in the Settlement Agreement~~

~~1.     *Definitions.* Unless otherwise defined herein, capitalized terms shall have the meanings given in the Settlement Agreement.~~

~~2.     *Duration and Coverage.*~~

~~2.1     The Profit Sharing Plan shall be effective as of the Effective Date.~~

~~2.2     Calculations under the Profit Sharing Plan shall be based on plan years which shall be the same as the fiscal year of the Company, beginning with the fiscal year in which the Effective Date occurs.~~

~~2.3     As described in Exhibit B of the Settlement Agreement, the Profit Sharing Plan shall terminate on the first day following the plan year in which the Profit Sharing Cessation Date occurs and Navistar shall not be required to make any payments under the Profit Sharing Plan for any plan year after that date.~~

~~2.4     Payments required under the Profit Sharing Plan shall be made to the Supplemental Benefit Plan Trust and shall be in cash unless otherwise agreed between the Company and the Supplemental Benefit Committee.~~

~~3.     *Covered Operations.*~~

~~3.1     As used in this Profit Sharing Plan, "Covered Operations" means Navistar International Transportation Corp. ("NITC"), Navistar International Corporation ("NIC", the "Parent"), their successors and all of their affiliates and subsidiaries, with the exception of Navistar International Corporation Canada. Any business acquired after the Effective Date by a Covered Operation will be included in Covered Operations to the extent described in Sections 4.9 and 5.5 below. If NIC is acquired, this Plan will continue in effect for NIC and its then existing and future Covered Operations but will not apply to the acquiror or any of its operations unless otherwise~~

agreed.

4. *Calculation of Qualifying Hours.*

4.1 The calculation of hours worked described below shall include only straight time hours worked by employees of Covered Operations. The hours calculated in accordance with these principles shall be referred to as "Qualifying Hours."

4.2 Only straight time hours worked by employees who are not Bonus Eligible employees (as defined below) shall be counted as Qualifying Hours.

4.3 Only straight time hours worked by employees who worked during the applicable plan year shall be counted as Qualifying Hours.

4.4 Hours worked by employees for which premium (other than shift premium) or overtime payments are required, either pursuant to contract, collective bargaining agreement or statute shall not be counted as Qualifying Hours.

4.5 Hours worked by employees who were either discharged or quit during the applicable plan year shall not be counted as Qualifying Hours provided that hours worked by an employee who quits and is re-hired during the applicable plan year shall be counted based on his or her straight time hours during such plan year, and provided further that hours worked by an employee who is discharged and reinstated shall be counted based on the total of straight time hours worked and any back pay-equivalent hours awarded in connection with such reinstatement.

4.6 Paid time off in connection with union duties (Navistar account 97), excused 'J' time, and union leaves of absence shall be counted as Qualifying Hours.

4.7 Qualifying Hours for employees paid on a weekly payroll shall be determined over a period of 52 weeks for each plan year. Qualifying Hours for employees paid on a salary basis shall be determined based on 40 hours for each full week worked.

4.8 Hours worked by employees who are covered by plans such as the Annual Incentive Plan, the Used Truck Commission Sales Program, the Regional Management Incentive Plan or other similar incentive or bonus plans, but excluding gain sharing plans of the type in effect at Indianapolis engine plant, shall not be counted as Qualifying Hours, with such employees referred to herein as "Bonus Eligible."

4.9 Hours worked by employees of affiliates and less than 100% owned subsidiaries included in Covered Operations on the Effective Date will be determined on the basis of the above provisions and included in Qualifying Hours in the same proportions that the income (loss) of such entities are included in Qualifying Profits.

4.10 Hours worked by employees in operations acquired after the Effective Date will be determined on the basis of the above provisions and included in Qualifying Hours in the same proportion that the net income (loss) of such acquired entity is included in Qualifying Profits as provided for in Section 5.5.1 below.

5.     *Calculation of Qualifying Profits.*

5.1     Qualifying Profits shall be the sum of all of the amounts described below in Sections 5.2, 5.3, 5.4, and 5.5.

5.2     Pre-tax income or losses of continuing Covered Operations including unusual items but excluding:

5.2.1     Income or losses from discontinued operations, non-recurring charges or credits directly attributable to the sale or discontinuation of such operations;

5.2.2     Extraordinary Items;

5.2.3     Gain or loss on the sale of assets, other than sale of inventory in the ordinary course of business and trade; and

5.2.4     Pre-tax income (loss) of NFC; pre-tax losses of NIC on an entity basis; pre-tax income (loss) of any business acquired after the Effective Date; dividends received from Navistar International Corporation Canada; equity in income (loss) from affiliates included in Covered Operations on the Effective Date.

5.3     Navistar Financial Corporation (NFC) is a wholly-owned subsidiary of NITC. As long as the NITC, NIC or other subsidiary ownership in NFC remains at 100%, the full net income (losses) of NFC will be included in Qualifying Profits. If this level of investment should change, the amount of net income (loss) to be included in Qualifying Profits, and the associated number of Qualifying Hours, will be based upon such revised percentage of ownership.

5.4     Cash dividends received by NIC, NITC, or any of their subsidiaries from affiliates which are included in Covered Operations on the Effective Date.

5.5     The extent to which the operating results of businesses acquired after the Effective Date are to be included in Qualifying Profits shall be determined as follows:

5.5.1     Where the acquisition is located in the U.S. and where the equity interest of NITC, NIC or any affiliate or subsidiary equals or exceeds 50%, the net income (loss) of the acquired entity shall be included in Qualifying Profits in the same proportion as such equity interest. For the year in which the acquisition is completed, amounts will be determined on a pro-rata calendar day basis from the closing date.

5.5.2     Where the acquisition is located outside the U.S. and where the equity interest of NITC, NIC or any affiliate or subsidiary equals or exceeds 50%, only cash dividend payments, management fees and similar payments received by NITC, NIC or any affiliate or subsidiary from such acquired entity shall be included in Qualifying Profits.

5.5.3   Where the equity interest of NITC, NIC or any affiliate or subsidiary in such acquired operation is less than 50%, only cash dividends received by NITC, NIC or any affiliate or subsidiary from such acquired entity shall be included in Qualifying Profits.

5.6   Calculations of income described above in Sections 5.2, 5.3, and 5.5.1 shall be made prior to any deductions from such income attributable to this Profit Sharing Plan, any other profit sharing plan for active employees, or bonuses paid to any Bonus Eligible Employees.

5.7   Calculations of income described above in Sections 5.2, 5.3, and 5.5 shall exclude any amortization of past service costs arising from adoption of Statement of Financial Accounting Standards No. 106, "Employee's Accounting for Postretirement Benefits Other Than Pensions" (SFAS 106) as well as any SFAS 106-related expenses prior to the date upon which the $500 million of prefunding of the Base Plan Trust is completed; i.e. non-pension postretirement benefit costs will be determined for purposes of this Profit Sharing Plan on a "pay-as-you-go" basis until the $500 million of prefunding is completed.

5.8   Each of the items described in this Section 5 shall, except where otherwise specifically provided herein, be calculated in accordance with generally accepted accounting principles.

6.   *Calculation of Steps*. The determination of the incremental steps to be used in the calculations described below shall be as follows:

6.1   The first step shall cover Qualifying Profits which exceed a dollar amount which is the product of the Qualifying Hours multiplied by $3.00 but which do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $4.50 (this is referred to as "Step One").

6.2   The second step shall cover Qualifying Profits which exceed those covered in Step One but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $6.00 (this is referred to as "Step Two").

6.3   The third step shall cover Qualifying Profits which exceed those covered in Step Two but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $7.50 (this is referred to as "Step Three")

6.4   The fourth step shall cover Qualifying Profits which exceed those covered in Step Three but do not exceed dollar amount which is the product of the Qualifying Hours multiplied by $9.00 (this is referred to as "Step Four).

6.5   The fifth step shall cover Qualifying Profits which exceed those covered in Step Four but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $10.50 (this is referred to as "Step Five").

6.6 The sixth step shall cover Qualifying Profits which exceed those covered in Step Five but do not exceed a dollar amount which is the product of the Qualifying Hours multiplied by $12.00 (this is referred to as "Step Six").

6.7 The seventh step shall cover all Qualifying Profits which exceed those covered in Step Six (this is referred to as "Step Seven").

7. *Calculation of Contribution Obligation*

7.1 Within 90 calendar days following the end of each plan year, Navistar will make a contribution to the Supplemental Benefit Trust calculated in accordance with the following:

7.2 The Qualifying Profits which fall within each of the Steps defined above shall be multiplied by the percentage listed for such Step as follows:

Step One 1%
Step Two 2%
Step Three 4%
Step Four 6%
Step Five 10%
Step Six 12%
Step Seven 16%

7.3 The sum of the amounts determined in accordance with the procedure described in Section 7.2, calculated to the nearest whole dollar amount above shall be Navistar's annual payment obligation under this Profit Sharing Plan (this amount is referred to as the "Contribution Obligation"). An example calculation is attached as Exhibit A hereto.

8. *Information and Dispute Resolution.*

8.1 The Company will provide both the UAW and the Supplemental Benefit Committee with a worksheet detailing the calculation of the Contribution obligation, the Qualifying Hours, and the Qualifying Profits. Such information shall include a listing by category of the employees included and excluded in the calculation of Qualifying Hours and all information reasonably necessary to review the calculation of Qualifying Profits.

8.2 Data on profits, hours worked, Qualifying Profits, and Qualifying Hours shall be reviewed by a certified public accounting firm selected by the Company, and the report of such firm shall be delivered to the UAW and the Supplemental Benefit Committee. A letter report setting forth the procedures performed and conclusions reached shall be prepared by such firm and delivered to the Company, the UAW and the Supplemental Benefit Committee.

8.3 The information and reports described in Sections 8.1 and 8.2 shall be delivered to the UAW and the Supplemental Benefit Committee on or before the date that the

Contribution obligation, if any, is required to be paid. In years in which no Contribution obligation is required to be paid, the Company will deliver information on profits and Qualifying Profits to the UAW and the Supplemental Benefit Committee within 90 Calendar days following the end of the plan year for which no contribution is required.

8.4    If, following a review of the information and calculations provided pursuant to Sections 8.1, 8.2, and 8.3 the Supplemental Benefit Committee disputes such information or calculation, it shall inform the Company of such dispute within 30 calendar days of the receipt by the UAW and the Supplemental Benefit Committee of such information. The Company and the Supplemental Benefit Committee shall thereafter attempt, for a period not to exceed 30 calendar days, to resolve such dispute.

8.4.1    If such dispute cannot be resolved during that period, the parties to that dispute will attempt to identify a mutually acceptable third party (such as an accounting firm) to resolve such disputes.

8.4.2    If the parties to such dispute cannot identify a mutually acceptable third party to resolve such dispute, the parties to such dispute shall obtain a list of the seven largest accounting firms, measured by the number of certified public accountants practicing in the United States. The Company and the Supplemental Benefit Committee shall then alternately, beginning with the Company, strike one name off such list until only one name remains. The remaining firm shall be empowered to resolve the dispute.

8.4.3    Following selection of the party to resolve the dispute as provided in Section 8.4.1 or 8.4.2, the parties to the dispute shall present evidence and argument in support of their position and the individual or firm shall render a decision which shall be final and binding on all parties to the dispute.

8.5    The cost of the individual or firm retained to resolve the dispute as described in Sections 8.4.1 and 8.4.2 shall be borne equally by the Company and the Supplemental Benefit Committee. The parties shall bear their own fees and expenses in resolving such disputes.

8.6    In addition to the above, the Company will respond as soon as practicable to any reasonable requests from the UAW or the Supplemental Benefit Committee for information supporting any computation made by the Company to compute the Contribution obligation, and will provide the information so requested.

ProfitShare8

EXHIBIT

## PROFIT SHARING PLAN
### (Example Chart)

**Assumptions:**

Profits eligible for sharing = $250,000,000
10,600 Qualifying Employees x 1,750 Hours = 18,550,000 Hours
Lower boundary of step 1 = $55,650,000 (18,550,000 hours x $3.00)
Step widths = $27,825,000 (18,550,000 hours x $1.50)

|   | Step | | | Step Width | Step % | Payout Step | Cumulative |
|---|---|---|---|---|---|---|---|
|   |   |   | $55.650 |   |   |   |   |
| 1 | 18,550,000 | x $4.50 | $83.475 | $27.825 | 1.00% | $.28 | $.28 |
| 2 | 18,550,000 | x $6.00 | $111.300 | $27.825 | 2.00% | $.56 | $.84 |
| 3 | 18,550,000 | x $7.50 | $139.125 | $27.825 | 4.00% | $1.11 | $1.95 |
| 4 | 18,550,000 | x $9.00 | $166.950 | $27.825 | 6.00% | $1.67 | $3.62 |
| 5 | 18,550,000 | x $10.5 | $194.775 | $27.825 | 10.00% | $2.78 | $6.40 |
| 6 | 18,550,000 | x $12.0 | $222.600 | $27.825 | 12.00% | $3.34 | $9.74 |
| 7 | Over $222.6 | | $250.000 | $27.400 | 16.00% | $4.38 | $14.12 |

**EXHIBIT D**

DEFINITION SUPPLEMENT

When used in the Settlement Agreement or any Exhibits thereto, the following terms shall have the meanings set forth below:

"Actual Number of Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Actuary" means Coopers & Lybrand or such successor actuary as is selected by the Company from time to time.

"Additional Permissible Benefits" has the meaning assigned to it in Section 1.2 of Exhibit B to the Settlement Agreement.

"Adjusted Health APBO" has the meaning assigned to it in Section 7.2 of Exhibit B to the Settlement Agreement.

"Advance Funding" has the meaning assigned to it in Section 8.2 of Exhibit B to the Settlement Agreement.

"Annual Service Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Applicable Retirement Plan" means (i) The Navistar International Transportation Corp. Retirement Plan for Salaried Employees as in effect on the Effective Date, (ii) The Navistar Financial Corporation Retirement Plan for Salaried Employees as in effect on the Effective Date, (iii) The Navistar International Transportation Corp. Non-Contributory Retirement Plan as in effect on the Effective Date and (iv) those multiemployer pension funds as in effect on the Effective Date to which the Employers have contributed and that have Participants who have been provided with postretirement Health and Life Insurance Benefits by the Employers.

"Attributable Debt" means, as of any particular time, the present value discounted at the rate of 6 ½% per annum (compounded semi-annually) of the obligation of a lessee for rental payments during the remaining term of any lease (including any period for which such lease has been extended or may, at the option of the lessor, be extended) included in a Sale and Lease-Back Transaction, other than such a transaction permitted by Section 7.7 of Exhibit A to the Settlement Agreement.

"Average Contributing Participants" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Basic Life Insurance Program" means the part of the Life Insurance Program pursuant to which the Employers agree to provide group life insurance, entirely at their own expense, to the Retirees.

"Blackout Period" has the meaning assigned to it in Section 3.4 of Exhibit B to the Settlement Agreement.

"Board" means the Board of Directors of Parent.

"CBA" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Charter Amendments" has the meaning assigned to it in Section 8.1 of the Settlement Agreement.

"Class" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Class Counsel" means the law firms of Bobulsky, Grdina & Altier, 2036 East Prospect Road, Ashtabula, Ohio 44004; Bredhoff & Kaiser, 1000 Connecticut Avenue, N.W., Washington, D.C. 20036; Cloppert, Portman, Suater, Latanick & Foley, 225 East Board Street, Columbus, Ohio 43215; Gregory, Moore, Jaekle, Heinen, Ellison & Brooks, 3727 Cadillac Tower, Detroit, Michigan 48226; Kleiman, Whitney, Wolfe & Gore, One East Wacker Drive, Chicago, Illinois 60601; Lackey, Nusbaum, Harris, Reny & Torzewski, Two Maritime Plaza, Toledo, Ohio 46304; Macey, Macey & Swanson, 445 North Pennsylvania Street, Suite 401, Indianapolis, Indiana 48204; Miller, Carson & Boxberger, 1400 One Summit Square, Fort Wayne, Indiana 46802; and Daniel W. Sherrick, Associate General Counsel, International UAW, 8000 East Jefferson, Detroit, Michigan 48214.

"Class Member" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Class Representatives" means Art Shy, Fred Burris, Clarence Nuss, John Herring, Carl Potts, Harold Retherford, Henry G. Betley, Richard Spitler, Jack O'Neill, Donald McPhearson, the UAW and its Locals 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293, the UPGWA and its Locals 4, 122 and 134, the IAM and its Locals 1471, 2819 and 2821, the SEE and the USWA and its Local 4320.

"Collective Bargaining Representatives" means the UAW and its Locals 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293; the UPGWA and its Locals 4, 122 and 134; IAM and its Locals 1471, 2819 and 2821; the SEE; the USWA and its Locals 3740 and 4320; the International Brotherhood of Teamsters and its Locals 705 and 570; the International Union of Operating Engineers and its Local 399; and the International Federation Professional and Technical Employees and its Local 137.

"Committee's Standstill Period" has the meaning assigned to it in Section 1(f)(iv) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Company" means Navistar International Transportation Corp., and each successor thereto.

"Company Costs Per Capita" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Contributing Participants" means Retirees, Spouses and Surviving Spouses for such periods as they are making required contributions to the Health Benefit Program.

"Contributing Participant's Annual Contribution" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Court" means the United States District Court for the Southern District of Ohio Western Division.

"Cumulative Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Deferred Retiree Participants" means individuals affected by health care benefit litigation settlements in Ragan, et al. v. Navistar, No. 88-2623-S (D.Kan.); Local Union 369, International Brotherhood of Electrical Workers, AFL-CIO, et al. Navistar, No. C-88-6724-L-A (W.D.Ky.); and Bolding et al. v. Navistar, No. 88-9751-9 (Superior Court, GA).

"Demand Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Dependent" means (i) a person's Spouse, and (ii) unmarried children residing in a person's household and unmarried children not residing in a person's household for whom such person is legally required to provide medical care. For purposes of (ii) above, (A) the children of a person include (I) the natural children of such person, (II) legally adopted children of such person, (III) stepchildren of such person for whom legal adoption proceedings have been initiated and (IV) other children related by blood or marriage to such person or who are under such person's legal guardianship and who are dependent on such person for more than one-half of their support as defined in the IRC, who either qualify in the current year for dependency status, or who have been reported as dependents on such person's most recent federal income tax return ("dependency tax status") and (B) children shall continue to qualify as children until the end of the calendar year in which they attain age 19 years; provided, that (I) if a child is totally and permanently disabled at the time he or she would otherwise cease to be a child for purposes of this definition, he or she will continue to be covered as a child for as long as he or she remains totally and permanently disabled, and (II) if a child qualifies in the current year for dependency tax status or has been reported as a dependent on a person's most recent federal tax return, the child will continue to be covered as a child through the end of the calendar year in which the child attains age 25 years provided the child is unmarried and is legally residing in the person's household.

"DOL" means the U.S. Department of Labor.

"DOL Exemption for Parent Common Equity" means an exemption from the DOL permitting the Company to contribute to the Supplemental Benefit Trust and for the Supplemental Benefit Trust to hold Parent Class B Common, and to permit the Parent Class B Common to be voted in accordance with and satisfy the requirements of Article III of Exhibit B to the Settlement Agreement without violating the provisions of Section 406 or 407 of ERISA or Section 4975 of the IRC, such exemption to be in form and substance reasonably satisfactory to the Company and the Supplemental Benefit Committee.

"DOL Exemption for Parent Series A Preference" means an exemption from the DOL permitting the Supplemental Benefit Trust to hold Parent Series A Preference without violating the prohibited transaction rules of ERISA, such exemption to be in form and substance reasonably satisfactory to the Company and the Class Representatives.

"DOL Exemptions" means the DOL Exemption for Parent Common Equity and the DOL Exemption for Parent Series A Preference.

"Effective Date" has the meaning assigned to it in Section 13.1 of the Settlement Agreement.

"Eligible Dependent" means (i) each Dependent of a Retiree, during the life of such Retiree and the life of such Retiree's Surviving Spouse, if any, (ii) each Dependent of a deceased former Employee who died prior to the Effective Date, during the life of such Employee's Present Surviving Spouse, if any, and (iii) each Dependent of a Present Employee or of a Present Eligible Former Employee who dies prior to becoming a Future Retiree and who is survived by a Future Surviving Spouse, during the life of such Surviving Spouse; provided, that Eligible Dependents shall not include Dependents who are in military service or the Peace Corps (or similar service) of any country or Dependents covered under any health care plan sponsored by the Employers.

"Employee" means an active employee of an Employer, including all such persons who, although on layoff, sick leave, long-term disability or Employer-approved leave of absence, are treated as active employees by the relevant Employer under relevant CBAs or employment policies, but excluding active employees of an Employer who are nonresident aliens employed outside of the United States and Canada.

"Employers" means Parent, the Company, NFC, HARCO National Insurance Company, Indianapolis Casting Corporation, Navistar International Export Corporation and Navistar International Overseas Corporation, and each successor thereto.

"Enrolled Participant" means each Retiree and Surviving Spouse who has enrolled or re-enrolled in the Health Benefit Program and the Supplemental Benefit Program and their Eligible Dependents, other than a Retiree, Surviving Spouse or Eligible Dependent whose enrollment therein has been terminated in accordance with Section 2.3 of Exhibit A to the Settlement Agreement and who has not re-enrolled in accordance with Section 2.4 of Exhibit A to the Settlement Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Event Date" has the meaning assigned to it in Section 3.6 of Exhibit B to the Settlement Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated thereunder.

"Excluded Retirees" means Retirees and their Dependents who were formerly (i) hourly employees and technical and office employees of the Solar Division (Solar Plan 804 & 805); (ii) hourly Benham Coal employees, Progressive Mine Workers of America, Local Union No. 402,

District No. 2; (iii) salaried and management employees of the Chicago, West Pullman and Southern Railroad; and (iv) retirees affected by the litigation settlement in Lumpkin v. Navistar, No. 81C6674 (N.D. Ill. 1981).

"Exempted Indebtedness" means the sum of (i) all outstanding indebtedness of Parent (and any predecessor corporation) and Restricted Subsidiaries incurred after March 1, 1968 and secured by any mortgage, security interest, pledge or lien other than those permitted by paragraph (a) of Section 5.06 of the Indenture, (ii) all Attributable Debt and (iii) all outstanding indebtedness for borrowed money of Restricted Subsidiaries other than that permitted by paragraph (a) of Section 5.08 of the Indenture.

"Existing Plans" means all plans and other arrangements of the Employers, as in effect on the Effective Date, under which Present Retirees, Present Surviving Spouses, Present Eligible Dependents and Present Eligible Former Employees are receiving, are entitled to receive, or would become entitled to receive, postretirement health or life insurance benefits in the absence of the Settlement Agreement.

"Expected Average Contributing Participants" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Company Costs Per Capita" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Drug Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Medical Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Number of Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Participant Contributions" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Fairness Hearing" has the meaning assigned to it in Section 4.1 of the Settlement Agreement.

"FASB 106" means Financial Accounting Standards Board Statement No. 106 regarding accounting for postretirement benefits other than pensions.

"Final" means the earlier of (i) expiration of the time period for an appeal as a matter of right if no appeal has been filed; (ii) any final dismissal or withdrawal of appeal from the Judgment; or (iii) the date of final affirmance of the Judgment following any appeal, including the expiration of the time for petitions for writs of certiorari (or written confirmation by the appellants that no such petition will be filed) and, if certiorari be granted, the date of final affirmance of the Judgment following review pursuant to that grant.

"Foster Case" has the meaning assigned to it in Section 2.2 of the Settlement Agreement.

"Fully Diluted Basis" means, as of a particular date of determination, the total number of shares of Parent Common Equity and equivalents outstanding as calculated in accordance with Appendix B-7 to Exhibit B to the Settlement Agreement.

"Fully Funded" means, as of a particular date of determination, that the balance of the Employers' prefunding contributions held under the Health Benefit Trust equals the sum of the Employers' share of the Health APBO under the Health Benefit Program plus the actuarial present value of the postretirement benefits under the Basic Life Insurance Program (as determined by the Actuary consistent with the determination of Health APBO).

"Fully Funded Amount" means, as of a particular date of determination, the amount of money necessary so that the balance of the Employers' prefunding contributions held under the Health Benefit Trust equals the sum of the Employers' share of the Health APBO under the Health Benefit Program plus the actuarial present value of the postretirement benefits under the Basic Life Insurance Program (as determined by the Actuary consistent with the determination of Health APBO).

"Fully Funded Date" means the first date on which the Health Benefit Trust is Fully Funded.

"Funding Notice" means the notice described in Section 8.2 of Exhibit B to the Settlement Agreement.

"Future Retiree" means (i) each Present Employee who after the Effective Date becomes eligible to commence the receipt of Pension Benefits, (ii) each other Present Employee who is represented by a Collective Bargaining Representative and who after the Effective Date continues active employment with an Employer beyond attainment of age 65 years and then terminates employment and (iii) each Present Eligible Former Employee who after the Effective Date satisfies the applicable conditions for Health and Life Insurance Benefits.

"Future Surviving Spouse" means (i) the Spouse of a Retiree who dies after the Effective Date and (ii) the Spouse of a Present Employee or of a Present Eligible Former Employee who dies after the Effective Date after becoming eligible for normal or early retirement under the Navistar International Transportation Corp. Retirement Plan for Salaried Employees or the Navistar Financial Corporation Retirement Plan for Salaried Employees; (iii) the husband or wife of a Present Employee or of a Present Eligible Former Employee who dies after the Effective Date after becoming eligible for normal or regular early retirement under the Navistar International Transportation Corp. Noncontributory Retirement Plan.

"HBPC Chair" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Committee Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Company Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Other Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Other Member Alternate" has the meaning assigned to it in Section 6.6 of Exhibit A to the Settlement Agreement.

"HBPC UAW Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"Health Accumulated Postretirement Benefit Obligation" and "Health APBO" mean the actuarial present value of the postretirement benefits under the Health Benefit Program attributed to employee service rendered to the date of determination as determined by the Actuary (i) in accordance with FASB 106, (ii) in a manner consistent with the assumptions reflected in Appendix A-5 to Exhibit A to the Settlement Agreement, and (iii) using methods, factors and procedures determined by the Actuary.

"Health and Life Insurance Benefits" means postretirement health or life insurance benefits payable under any Existing Plan.

"Health Benefit Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Health Benefit Program Committee" means the committee described in Section 6.1 of Exhibit A to the Settlement Agreement.

"Health Benefit Program Letter" has the meaning assigned to it in Section 7.2.1 of the Settlement Agreement.

"Health Benefit Program Payment Default" has the meaning assigned to it in Section 10.1 of Exhibit A to the Settlement Agreement.

"Health Benefit Trust" means the trust established and maintained for the benefit of Participants as set forth in the trust agreement attached as Appendix A-3 to Exhibit A to the Settlement Agreement.

"HMO" means a health maintenance organization.

"IAM" means International Machinists District Lodge 28.

"Immediate Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Immediate Drop Outs During the First 45 Days" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Immediate Drop Outs During the Second 45 Days" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Imputed Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Indemnification Procedures" mean the following procedures to be followed by any party entitled to indemnification under the Settlement Agreement or the Plan (an "Indemnified Party"): promptly after receipt of notice of the commencement of any action in respect of which the Indemnified Party intends to seek indemnification hereunder, the Indemnified Party shall notify the party obliged to provide such indemnification (the "Indemnifying Party") thereof in writing; provided, that the failure of an Indemnified Party to give such notice shall not affect the right of the Indemnified Party to indemnification hereunder, except to the extent that the Indemnifying Party has been prejudiced by such failure. The Indemnifying Party shall be entitled to assume sole control of the defense of any such action; provided, that the Indemnifying Party shall not be entitled to assume control of such defense if in the opinion of counsel to the Indemnified Party there is a significant possibility of a conflict between the interests of the Indemnifying Party and those of the Indemnified Party or such counsel intends to assert a separate legal defense. If the Indemnifying Party does not assume the defense of two or more Indemnified Parties in any action where indemnity may be available, such indemnity shall include the reasonable defense costs of one counsel for such Indemnified Parties as a group; provided, that if in the opinion of counsel to any such Indemnified Party there is a significant possibility of a conflict between the interests of such Indemnified Party and those of any other such Indemnified Party or if such counsel intends to assert a separate legal defense, such Indemnified Party shall be entitled to separate counsel; and, provided, further, that such Indemnified Party shall obtain the prior written approval of the Indemnifying Party before entering into any settlement of any claim for which it is seeking indemnification hereunder or ceasing to defend against such claim.

"Indenture" means the Indenture, dated as of March 1, 1985, between a predecessor of Parent and Commerce Union Bank, as trustee.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Judgment" means the Judgment of the Court approving the Settlement Agreement in the form of Exhibit G to the Settlement Agreement.

"Lien/Sale and Leaseback Default" has the meaning assigned to it in Section 10.2 of Exhibit A to the Settlement Agreement.

"Life Insurance Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Litigation" means the *Shy* Case and the *Foster* Case.

"Long-Form Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Market Offering" has the meaning assigned to it in Section 1(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Maximum Corridor Medical Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Measurement Year (x)" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Monthly Base Contribution" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Named Fiduciary" means a fiduciary within the meaning of Section 402(a)(2) of ERISA.

"Navistar" means Parent, the Company, NFC, HARCO National Insurance Company and Indianapolis Casting Corporation, and each successor thereto.

"Navistar Interest Rate" means (i) the average interest rate paid by the Company from time to time on borrowings pursuant its revolving credit facility (or its primary revolving credit facility if it has more than one), or (ii) if the Company has no revolving borrowings at a particular time, the average interest rate paid by NFC from time to time on borrowings pursuant to its revolving credit facility (or its primary revolving credit facility if it has more than one) or (iii) if neither the Company nor NFC has revolving borrowings at a particular time, 1.0% over the prime rate announced from time to time by the Morgan Guaranty Trust Company.

"Navistar Parties" means Parent, the Company, NFC, HARCO National Insurance Company and Indianapolis Casting Corporation, and each successor thereto.

"Navistar Released Parties" means Navistar and the present and former officers, directors, committees (including the Pension and Employee Benefit Committee), employees, parents, subsidiaries, attorneys, insurers, partners, consultants, advisers, agents, and representatives of Navistar as well as their respective predecessors, successors, assigns and present and former direct and indirect affiliates.

"New CBA" has the meaning assigned to it in Section 12.1.6 of the Settlement Agreement.

"New Drop Ins" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"New Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"NFC" means Navistar Financial Corporation, and each successor thereto.

"Non-Represented Employees" means all Employees who are not represented by Collective Bargaining Representatives.

"Notice Order" has the meaning assigned to it in Section 4.1 of the Settlement Agreement.

"Optional Life Insurance Program" means the part of the Life Insurance Program pursuant to which additional group life insurance benefits are provided as described in Section 4.2 of Exhibit A to the Settlement Agreement.

"Optional Life Insurance Program Letter" has the meaning specified in Section 7.2.5 of the Settlement Agreement.

"Other Period" has the meaning assigned to it in Section 8.2 of Exhibit B to the Settlement Agreement.

"Other Voting Securities" has the meaning assigned to it in Section 3.1 of Exhibit B to the Settlement Agreement.

"Parent" means Navistar International Corporation, and each successor thereto.

"Parent Class B Common" means the Class B common stock of Parent, par value $0.01 per share.

"Parent Common" means the common stock of Parent, par value $0.01 per share.

"Parent Common Equity" means Parent Common and Parent Class B Common.

"Parent Initiated Piggyback Registration" has the meaning assigned to it in Section 2(a)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent Permitted Registrations" has the meaning assigned to it in Section 1(d)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent Postponement" has the meaning assigned to it in Section 1(d)(ii) of Appendix B-3 to Exhibit B to the Settlement Agreement.

"Parent Preference Stock" means Parent Series A Preference and Parent Series B Preference.

"Parent Registration" has the meaning assigned to it in Section 1(d)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Parent Registration Notice</u>" has the meaning assigned to it in Section 2(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Parent Securities</u>" means the Parent Common Equity and the Parent Preference Stock.

"<u>Parent Series A Preference</u>" has the meaning assigned to it in Section 5.1 of Exhibit B to the Settlement Agreement.

"<u>Parent Series B Preference</u>" means the Series B preference stock of Parent, par value $1.00 per share.

"<u>Parent's 90 Day Period</u>" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Parent's Registration Period</u>" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Parent's Standstill Period</u>" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Participant</u>" means each Present Employee, Retiree, Surviving Spouse and Present Eligible Former Employee who is or may become eligible to receive health or life insurance benefits under the Plan, and their Eligible Dependents, regardless of whether any such person has enrolled in the Plan or whether his enrollment in the Plan has been terminated.

"<u>Pension Benefits</u>" means retirement benefits under an Applicable Retirement Plan, including but not limited to disability and pension benefits, whether paid monthly, in a lump sum or otherwise, including such benefits payable pursuant to the terms of any plant closing agreement, severance arrangement or otherwise, but not including a deferred vested pension or an "Accrued Benefit" as defined in the respective sales agreements regarding the sales of the Solar Turbines International Division and the Construction Equipment Division.

"<u>Permitted Parent Registration</u>" has the meaning assigned to it in Section 1(e) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Piggyback Notice</u>" has the meaning assigned to it in Section 2(a)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Piggyback Registration</u>" has the meaning set forth in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Piggyback Rights Revision Date</u>" has the meaning set forth in Section 2(e) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"<u>Plan</u>" has the meaning assigned to it in the recitals to the Settlement Agreement.

"<u>Plan 1</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Plan 2" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Plan Administrator" means the administrator of the Plan within the meaning of Section 3(16)(A) of ERISA.

"Plan Expenses" means all out-of-pocket administrative costs of the Health Benefit Program and Life Insurance Program, including but not limited to the costs of the trustee of the Health Benefit Trust, the costs of the Health Benefit Program Committee (other than expenses paid by the Company in accordance with Section 6.7 of Exhibit A to the Settlement Agreement) and the costs of service providers and professionals (other than the Actuary) engaged by the Plan Administrator, the Named Fiduciary or the Health Benefit Program Committee.

"Plan Year" means the fiscal year of the Company, which fiscal year currently ends on October 31.

"Post-Window Period Registration Request" has the meaning assigned to it in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Present Eligible Dependent" means each Eligible Dependent on the Effective Date.

"Present Eligible Former Employer" means each former employee who as of the Effective Date is not a Present Retiree but who, without any further employment by the Employers and upon the satisfaction of any applicable conditions, would become eligible for Health and Life Insurance Benefits in the absence of the Settlement Agreement.

"Present Employee" means (i) each Non-Represented Employee on the Effective Date, (ii) each Employee represented by a Collective Bargaining Representative as of February 28, 1993, and (iii) during the terms of the New CBAs, each other Employee covered by a New CBA to the extent such Employee is eligible to benefits under the Plan pursuant to the terms of such New CBA.

"Present Non-Represented Employee" means each Present Employee who is not a member of a collective bargaining unit represented by a Collective Bargaining Representative on the Effective Date.

"Present Represented Employee" means each Present Employee who is a member of a collective bargaining unit represented by a Collective Bargaining Representative on the Effective Date.

"Present Retiree" means each former Employee, other than an Excluded Retiree, who is receiving Health and Life Insurance Benefits on the Effective Date.

"Present Surviving Spouse" means each Spouse of a deceased former Employee who is receiving Health and Life Insurance Benefits on the Effective Date.

"Principal Property" shall mean any plant used primarily for manufacturing purposes located within the United States of America, excluding its territories and possessions, of Parent or

any Restricted Subsidiary except any such Plant which the Board by resolution declares is not of material importance to the total business conducted by Parent and its Restricted Subsidiaries as an entity.

"Profit Sharing Cessation Date" has the meaning assigned to it in Section 7.2 of Exhibit B to the Settlement Agreement.

"Profit Sharing Contributions" has the meaning assigned to it in Section 7.1 of Exhibit B to the Settlement Agreement.

"Profit Sharing Plan" means the SPD Supplemental Benefit Profit Sharing Plan attached as Appendix B-7 to the Supplemental Benefit Program.

"Program Administrator" means the administrator of the Supplemental Benefit Program within the meaning of Section 3(16)(A) of ERISA.

"Registrable Securities" means (a) the Parent Common issued upon the conversion of the Parent Class B Common issued to the Supplemental Benefit Trust by Parent on the Effective Date, (b) any Parent Common issued by Parent to the Supplemental Benefit Trust after the Effective Date, (c) any Parent Common underlying any other Parent Securities issued by Parent to the Supplemental Benefit Trust after the Effective Date, (d) any other securities of Parent issued to the Supplemental Benefit Trust in connection with any distribution made in respect of the Parent Class B Common, and (e) any other securities of Parent issued to the Supplemental Benefit Trust in respect of, or upon conversion or exchange of, any of the securities described in the foregoing clauses (a) through (d); provided, that the securities described in the foregoing clauses (d) and (e) shall be deemed Registrable Securities only if the class of securities of which they are a part shall have been registered under the Exchange Act. As to any particular Registrable Securities, such securities will cease to be Registrable Securities when they have been sold, transferred or otherwise disposed of by the Supplemental Benefit Trust.

"Registration Expenses" has the meaning assigned to it in Section 5 of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Registration Request" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Restricted Stock" has the meaning assigned to it in Section 10.2(d) of Exhibit B to the Settlement Agreement.

"Restricted Subsidiary" shall mean any subsidiary of Parent (a) substantially all the property of which is located, or substantially all the business of which is carried on, within the United States of America, excluding its territories and possessions, and (b) which owns or leases a Principal Property.

"Retiree" means each Present Retiree and each Future Retiree.

"Retiree Adjustment Ratio" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Retiree Cost Sharing Ratio" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Rule 415" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Rule 415 Demand Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Sale and Lease-back Transaction" has the meaning assigned to it in Section 7.7(a) of Exhibit A to the Settlement Agreement.

"SBC Chair" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class One Other Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class One Other Member Alternate" has the meaning assigned to it in Section 6.1(b) of Exhibit B to the Settlement Agreement.

"SBC Class Two Other Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class Two Other Member Alternate" has the meaning assigned to it in Section 6.1(c) of Exhibit B to the Settlement Agreement.

"SBC Committee Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Committee Member Alternate" has the meaning assigned to it in Section 6.1(c) of Exhibit B to the Settlement Agreement.

"SBC UAW Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SEC" means the United States Securities and Exchange Commission.

"Scheduled Contributions" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Section 10.2 Cure Period" has the meaning assigned to it in Section 10.2 of Exhibit A to the Settlement Agreement.

"Securities Act" means the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

"Security" means any debenture, note or other evidence of indebtedness, as the case may be, authenticated and delivered under the Indenture.

"SEE" means Society of Engineering Employees, Inc.

"Settlement Agreement" means the settlement agreement entered in the *Shy* Case and approved by the U.S. District Court for the Southern District of Ohio, as amended from time to time in accordance with the provisions therein.

"Short-Form Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"*Shy* Case" has the meaning assigned to it in the recitals to the Settlement Agreement.

"SPD" means summary plan description.

"Spouse" means the husband or wife of a person to whom such person is legally married and does not include a former spouse from whom such person is divorced.

"State or National Health Insurance Program" means any program pursuant to which the federal government of the United States, the government of any State or territory thereof or any governmental authority thereof or therein, mandates or provides directly or indirectly health care benefits.

"Stay Orders" has the meaning assigned to it in Section 13 of the Settlement Agreement.

"Subsidiary" means any corporation of which at least a majority of the outstanding stock having voting power under ordinary circumstances to elect a majority of the board of directors of said corporation shall at the time be owned by Parent or by Parent and one or more Subsidiaries or by one or more Subsidiaries.

"Super-Majority Transaction" means (i) a merger or consolidation to which Parent is a constituent corporation, if either (A) the stockholders of Parent immediately before such merger or consolidation, do not own, directly or indirectly, more than 50% of the combined voting power of the then outstanding voting securities of the corporation surviving or resulting from such merger or consolidation or (B) equity securities of Parent or the Company would be issued to stockholders of the other constituent corporation(s) to such merger or consolidation which have a fair market value at the time of the transaction in excess of $750 million, or (ii) the sale, transfer, pledge or other disposition of all or substantially all of the assets of Parent and its subsidiaries on a consolidated basis or the Company and its subsidiaries on a consolidated basis.

"Super-Majority Vote" means the vote of at least 85% of the shares of Parent Common Equity, voting as a single class, present in person or by proxy at a meeting at which a Super-Majority Transaction is submitted for a stockholder vote and a quorum is present.

"Supplemental Benefit Committee" has the meaning assigned to it in Section 6.1 of Exhibit B to the Settlement Agreement.

"Supplemental Benefit Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Supplemental Benefit Program Payment Default" has the meaning assigned to it in Section 11.1 of Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust" means the trust established and maintained for the benefit of Enrolled Participants and Retirees, whether or not they are Enrolled Participants, as set forth in the trust agreement attached as Appendix B-2 to Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust Initiated Piggyback Registration" has the meaning assigned to it in Section 2(b)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust's 90 Day Period" has the meaning assigned to it in Section 2(b)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust's Registration Period" has the meaning assigned to it in Section 2(b)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust's Standstill Period" has the meaning assigned to it in Section 2(b)(1) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Supplement Trust Designee" has the meaning assigned to it in Section 5.2 of Exhibit B to the Settlement Agreement.

"Supplemental Trust Piggyback Registration" has the meaning assigned to it in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Surviving Cumulative Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Surviving Spouse" means each Present Surviving Spouse and each Future Surviving Spouse.

"Total Actual Drug Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Actual Medical Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Estimated Annual Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Expected Drug Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Expected Medical Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Maximum Corridor Medical Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Trust Market Offerings" has the meaning assigned to it in Section 1(i) of Appendix B-3 to Exhibit B to the Settlement Agreement.

"UAW" means the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, an unincorporated association with its principal offices in the State of Michigan.

"UAW Designee" means the member of the Board which the UAW is entitled to elect in accordance with the terms of the Parent Series B Preference.

"UAW/Navistar Joint Committee" has the meaning assigned to it in the current Health Security Agreement between the Company and the UAW.

"UPGWA" means the International Union, United Plant Guard Workers of America.

"USWA" means the International Union, United Steelworkers of America.

"Window Period" means that period of time (extended by the length of time of any Blackout Period or Other Period that occurs during what would constitute the Window Period without such extension) which shall commence on the Window Period Commencement Day and shall be the shorter of the following:

(i)     the period from the Window Period Commencement Day until the date following completion of the sale which causes the net proceeds received by the Supplemental Benefit Trust in respect of the sale of Parent Common Equity to equal or exceed $500 million (including any such proceeds received upon sales approved by the Board or through tender offers, but excluding amounts received in connection with Advance Funding sales); and

(ii)    the period equal in duration to the period from the Effective Date to the Window Period Commencement Day. "Window Period Commencement Day" means the first day on or after the Event Date that is not during a Blackout Period or Other Period.

**<u>Exhibit C</u>**

**Modified Consent Decree**

(in clean / final format)

**NAVISTAR INTERNATIONAL CORPORATION**
**FINAL VERSIONS OF KEY**
**SETTLEMENT AGREEMENT DOCUMENTS**

| Document | Page Number |
|---|---|
| Amended and Restated Settlement Agreement | [3] |
|     Exhibit A - Base Plan | [29] |
|         Appendix A-3 - Health Benefit Trust Agreement | [57] |
|         Appendix A-5 - Initial Actuarial Valuation | [68] |
|         Appendix A-6 - Actuarial Definitions Supplement | [90] |
|     Exhibit B - Supplemental Plan | [99] |
|         Appendix B-2 - Supplemental Benefit Trust Agreement | [119] |
|         Appendix B-3 - Restated Certificate of Incorporation | [131] |
|         Appendix B-4 - Registration Rights | [180] |
|         Appendix B-6 - *Reserved* | [192] |
|     Exhibit D - Definition Supplement | [193] |

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

ART SHY, FRED BURRIS, CLARENCE
NUSS, JOHN HERRING, CARL POTTS,
HAROLD RETHERFORD, HENRY G. BETLEY,
RICHARD A. SPITLER, JACK O'NEAL, and
DONALD McPHEARSON on behalf of
themselves and other persons
similarly situated, and
INTERNATIONAL UNION, UNITED
AUTOMOBILE AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA AND ITS LOCAL UNIONS 6,
66, 98, 119, 226, 305, 402, 472, 658,
2274, and 2293, INTERNATIONAL UNION,
UNITED PLANT GUARD WORKERS OF AMERICA              Case No. C-3-92-333
("UPGWA") AND ITS LOCAL UNIONS 122,               Judge Walter H. Rice
4 AND 134 AND INTERNATIONAL
MACHINISTS DISTRICT LODGE 28 AND ITS
LOCAL LODGES 1471, 2819, AND 2821,
SOCIETY OF ENGINEERING EMPLOYEES, INC.
("SEE"), INTERNATIONAL UNION, UNITED
STEELWORKERS OF AMERICA ("USWA")
AND ITS LOCAL UNION 4320 on behalf of
themselves and other similarly
situated unions,

                                    Plaintiffs,

        vs.

NAVISTAR INTERNATIONAL CORPORATION,
NAVISTAR INTERNATIONAL TRANSPORTATION
CORP., NAVISTAR FINANCIAL CORPORATION,
HARCO NATIONAL INSURANCE COMPANY, the
NAVISTAR INTERNATIONAL TRANSPORTATION
CORP. HEALTH PLAN and the INDIANAPOLIS
CASTING CORPORATION,

                                    Defendants.

_____/

2

## <u>TABLE OF CONTENTS</u>

|  |  | <u>Page</u> |
|---|---|---|
| Summary of Settlement Agreement | | 6 |
| 1. | Discovery | 8 |
| 2. | Benefits Of Settlement | 8 |
| 3. | No Admissions | 9 |
| 4. | Class Action Notice Order | 10 |
| 5. | Judgment to be Entered Approving the Settlement | 10 |
| 6. | Releases and Related Matters | 10 |
| 7. | Initial Eligibility and Enrollment in the Plan | 12 |
| 8. | Corporate Approvals | 15 |
| 9. | Contribution of Parent Securities | 15 |
| 10. | Board of Directors | 15 |
| 11. | Costs, Attorneys Fees and Indemnification | 16 |
| 12. | Conditions and Effective Date of Settlement | 17 |
| 13. | Effect of Disapproval or Modification | 20 |
| 14. | Representations and Warranties | 21 |
| 15. | Miscellaneous Provisions | 23 |

<u>Exhibits</u>

Exhibit A   -    The Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan

Exhibit B   -    The Navistar International Corp. Retiree Supplemental Benefit Program

Exhibit C   -    List of Class Members

Exhibit D   -    Definition Supplement

Exhibit E   -    Notice order

Exhibit F   -    Cover Letter

Exhibit G   -    Judgment

Exhibit H   -    Health Benefit Program Letter

Exhibit I   -    Premium Bill

Exhibit J   -    Fees and Expenses

Exhibit K   -    Legal Opinions

Amended and Restated
Settlement Agreement

This Settlement Agreement, dated as of March 30, 1993, amended and restated as of June 30, 1993, and further amended and restated as of December 22, 2021 (which, together with the Exhibits hereto, is referred to as the "Settlement Agreement"), is between Navistar, by and through its attorneys, and the Class Representatives, on behalf of the Class, by and through Class Counsel, in the class action of *Shy et al. v. Navistar*, Civil Action No. C-3-92-333 (S.D. Ohio) (the "*Shy Case*"). This Settlement Agreement shall apply to:

(i)     Present Retirees, Present Surviving Spouses and Eligible Dependents of Class Members;

(ii)    Present Eligible Former Employees and Present Non-Represented Employees who will be eligible for Health and Life Insurance Benefits after the Effective Date; and

(iii)   all labor organizations which presently are or were in the past parties to collective bargaining agreements ("CBAs") pursuant to which Navistar maintains an Existing Plan.

Each such natural person constitutes a "Class Member" and all of such natural persons and entities constitute the "Class".

In the event of an inconsistency between this Settlement Agreement and any Exhibit hereto, this Settlement Agreement shall control; provided, that any reference to or description of the Health Benefit Program or the Life Insurance Program is qualified entirely by reference to Exhibit A, and any reference to or description of the Supplemental Benefit Program is qualified entirely by reference to Exhibit B (as amended effective December 31, 2021). In the event of any inconsistency between the Health Benefit Program SPD or the Life Insurance Program SPD and Exhibit A, Exhibit A shall control. In the event of any inconsistency between the Supplemental Benefit Program SPD (as amended) and Exhibit B (as amended), Exhibit B shall control.

Capitalized terms used and not otherwise defined in this Settlement Agreement have the meanings given them in the Definition Supplement attached as Exhibit D.

This Settlement Agreement affects only the duration and level of, and not eligibility for, Health and Life Insurance Benefits. All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan in the absence of this Settlement Agreement (other than Excluded Retirees) shall be eligible for benefits under the Plan. No person not otherwise eligible for Health and Life Insurance Benefits under an Existing Plan shall be eligible for any benefit by virtue of this Settlement Agreement.

5

## Summary of
## Settlement Agreement

This Settlement Agreement finally resolves and settles all claims of the Class Members in the *Shy* Case, subject to Court approval and the other terms and conditions set out below.

On the Effective Date, the Company will establish the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), ERISA Plan number 584, EIN 36-1264810, which will be comprised of:

(i)     the Navistar International Transportation Corp. Retiree Health Benefit Program (the "Health Benefit Program"), described in Exhibit A;

(ii)    the Navistar International Transportation Corp. Retiree Life Insurance Program (the "Life Insurance Program"), described in Exhibit A, which consists of the Basic Life Insurance Program and the Optional Life Insurance Program; and

(iii)   the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (the "Supplemental Benefit Program"), described in Exhibit B (as amended).

Subject to the contribution requirements described in Exhibit A, the Company agrees that the benefits provided by the Health Benefit Program will be made available for the lifetime of:

(i)     Present Retirees and Class Members who are or will become Surviving Spouses;

(ii)    Present Eligible Former Employees at such time as they would have been entitled to receive Health and Life Insurance Benefits under the Existing Plans in the absence of this Settlement Agreement; and

(iii)   Present Non-Represented Employees at such time as they become eligible to commence the receipt of Pension Benefits or as described below.

The Company has further agreed that (i) the benefits provided by the Health Benefit Program will be made available to Eligible Dependents of Class Members for as long as they remain such, (ii) the benefits provided by the Basic Life Insurance Program will be made available to Present Retirees for the duration of their lives, and (iii) the benefits provided by the Optional Life Insurance Program will be made available to Class Member Retirees who satisfy the eligibility requirements set out in the Life Insurance SPD.

Pursuant to the New CBAs and not through this Settlement Agreement, the Company has also agreed that the benefits provided by the Health Benefit Program and the Basic Life Insurance Program will be made available to Present Represented Employees and their Surviving Spouses at such time as they would have been entitled to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the New CBAs for the duration of their lives and to their Eligible Dependents for so long as they remain such, subject, in the case of the Health Benefit Program to the contribution requirements described in Exhibit A.

6

The Company's share of the initial estimated accumulated post-retirement benefit obligation in connection with the Plan is $1 billion ($946 million for the Health Benefit Program and $54 million for the Basic Life Insurance Program). The Company will fund the Health Benefit Program and the Basic Life Insurance Program by making contributions to the Health Benefit Trust, including contributions of the Annual Service Cost and pre-funding contributions up to $500 million on or before the Event Date from the proceeds of sales of securities or from other sources. The Health Benefit Program will be administered by the Company in its capacity as Plan Administrator, subject to the review authority of the Health Benefit Program Committee. The Health Benefit Program Committee shall consist of seven members, including three Company appointees, two UAW appointees and two other appointees, one of whom shall preside as chairperson. The initial members of such committee shall be approved by the Court.

The Supplemental Benefit Program will be established for the purposes of reducing or reimbursing premiums, co-payments and deductibles that would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program and of providing Additional Permissible Benefits. The Supplemental Benefit Program will be funded on the Effective Date by the issuance to the Supplemental Benefit Trust of new shares of Parent Class B Common equal to 50 percent of the total amount of the Parent Common Equity outstanding immediately after such contribution on a Fully Diluted Basis (estimated to be approximately 255 million shares of Parent Class B Common). Upon the occurrence of an Event Date or a permitted sale of shares of Parent Class B Common to a third party, all of such shares (in the case of an Event Date) or the shares to be transferred (in the case of a permitted sale) will convert automatically into shares of Parent Common.

The Supplemental Benefit Program will be administered by the Supplemental Benefit Committee, which shall consist of five members, including two UAW appointees and three other appointees, one of whom shall preside as chairperson. The initial members of such committee shall be approved by the Court. On the Effective Date, Parent will transfer one share of Parent Series A Preference to the Supplemental Benefit Trust, which will entitle the Supplemental Benefit Committee to elect two members of the Board during such time as the Supplemental Benefit Trust holds 20 percent or more of the shares of Parent Common Equity then outstanding and one member of the Board during such time as the Supplemental Benefit Trust holds between 10 percent and 20 percent of the shares of Parent Common Equity then outstanding. In addition, on the Effective Date Parent will transfer one share of Parent Series B Preference to the UAW, which will entitle it to elect one member of the Board until such time as the Health Benefit Program and the Life Insurance Program are Fully Funded, subject to certain reinstatement rights.

The Plan can only be amended under certain limited conditions specified herein and in Exhibits A and B, including in the event of the adoption of a State or National Health Insurance Program.

In exchange, the coverage of Class Members for Health and Life Insurance Benefits under the Existing Plans will be terminated at the end of the day before the Effective Date, except that claims incurred prior to the Effective Date will be paid in accordance with the Existing Plans. At that time, all of the claims of the Class in the *Shy* Case will be released, and the *Shy* Case will be dismissed with prejudice.

7

1. *Discovery*.

The Class Representatives conducted substantial discovery both prior to and after the commencement of the Litigation. This discovery included, among other things, the review of documents produced by Navistar and third parties, interviews of witnesses and the analysis of Navistar's relevant retiree health care documents. The Class Representatives have thoroughly investigated the law applicable to the Class Members' claims. The Class Representatives and their retained experts and consultants have also conducted an extensive review of Navistar's current and projected future financial condition. Similarly, counsel for Navistar has thoroughly reviewed the various defenses available to Navistar.

2. *Benefits Of Settlement*.

2.1     *To The Class*.  The Class Representatives and Class Counsel have conducted a thorough and detailed analysis of Navistar's financial situation and have determined that unless the costs incurred by the Employers to provide Health and Life Insurance Benefits under the Existing Plans are immediately and permanently reduced, Navistar is likely to file for bankruptcy and may be liquidated. In the event of Navistar's bankruptcy and liquidation, there is a high likelihood that benefits for the Class Members would be dramatically reduced or eliminated. Even in the event of a successful reorganization of Navistar, it is likely that continued retiree benefits would be reduced by more than is required in this Settlement Agreement.  Thus, the Class Representatives and Class Counsel have concluded that further proceedings to continue the *Shy* Case against Navistar would not be in the best interests of the Class. In reaching this conclusion, the Class Representatives and Class Counsel further recognize the length and cost of further proceedings necessary to continue the *Shy* Case against Navistar through trial and appeals. The Class Representatives and Class Counsel have also taken into account the uncertainty and delay that such proceedings would entail and the risk of an adverse outcome. The Class Representatives and Class Counsel are also mindful of problems of proof and the various defenses available to Navistar.

In exchange for the reduction in benefits received by the Class Members to the levels described herein, the Class Members will have the opportunity to benefit from Navistar's future growth. As a result of Parent's contributions of Parent Class B Common to the Supplemental Benefit Trust, the Supplemental Benefit Trust will be Parent's largest single stockholder. Thus, the Class Members, through the holdings of the Supplemental Benefit Trust, may receive increased benefits based on the increase in value of such holdings in the event Navistar returns to financial stability.

As described in Exhibit A, the Company also expects to fund the Health Benefit Program through the sale of Parent Common. To facilitate this course of action and to stabilize the market for Parent Common, the Parent Class B Common held by the Supplemental Benefit Trust will not be sold for a period up to five years except under limited circumstances. If any or all of this stock could be sold freely in the market in the short term, the willingness of the market to invest in the planned offerings of Parent Common would be diminished. It is in the interests of the Class Members, however, that Parent be able to make such offerings on commercially attractive terms to enable the Company to make prefunding contributions to the Health Benefit Trust. Thus, the

five-year restriction period works to the advantage of the Class Members and fosters the goals of ERISA -- to promote soundness and stability in employer-sponsored retiree benefit arrangements.

Given these considerations, but without admitting that their contentions in the *Shy* Case lack merit or any liability of any kind to Navistar, the Class Representatives and the Class Counsel have determined that it is desirable, beneficial and in the best interests of the Class that the claims of the Class be settled in the manner and on the terms set forth herein, and that these terms are fair and reasonable.

2.2     *To Navistar*.  Navistar has concluded that the further conduct of the *Shy* Case would be protracted and expensive for all parties. This Settlement Agreement will allow Navistar to avoid the expense of litigating multiple lawsuits concerning its Health Benefit and Life Insurance obligations. Navistar previously sought to reduce its retiree health benefits pursuant to a declaratory judgment action filed in the Northern District of Illinois (the "*Foster Case*"), which was dismissed by the agreement of the parties as a condition of the commencement of settlement discussions in the *Shy* Case.

Substantial amounts of time, energy and resources have been spent on and, absent this Settlement Agreement, would continue to be spent on the defense of the claims asserted by or on behalf of the Class. Although Navistar's current financial position permits it to pay its debts as they become due, Navistar's net assets are dwarfed by its potential long-term liability for Health and Life Insurance Benefits. Unless definite and swift action is taken permanently to reduce the costs of such benefits, Navistar will be threatened with insolvency. Without admitting liability of any kind to the Class, or that its defense in the *Shy* Case lacks merit, Navistar has therefore determined that it is desirable, beneficial and in the best interest of Navistar that the claims of all Class Members be settled in the manner and on the terms set forth herein, and that these terms are fair and reasonable.

3.     *No Admissions*.

3.1     Navistar continues to deny any wrongdoing or legal liability arising out of any of the claims and contentions alleged against it in the *Shy* Case. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement is, may be construed as, or may be used as, an admission by or against Navistar of any fault, wrongdoing or liability whatsoever.

3.2     The Class Representatives have claimed and continue to claim that the contentions made by or on behalf of the Class in the *Shy* Case have merit. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement is, may be construed as, or may be used as, an admission by or against the Class or the Class Representatives, or any of them, that any of their contentions lacked merit.

3.3     There has been no determination by any court as to the factual or legal allegations made by or against Navistar in the *Shy* Case. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement is, may be construed as, or may be used as, an admission by any of the parties hereto or a waiver of any applicable statute of limitations, and neither this Settlement Agreement nor any document referred to herein

nor any action taken to carry out this Settlement Agreement shall be offered or received in evidence in any action or proceeding by or against Navistar, the Class or the Class Representatives, or any of them, in any court, administrative agency or other tribunal for any purpose whatsoever other than to enforce the provisions of this Settlement Agreement or to obtain or seek approval of this Settlement Agreement in accordance with Rule 23 of the Federal Rules of Civil Procedure.

4. *Class Action Notice Order*.

4.1 The parties shall submit this Settlement Agreement to the Court and shall seek from the Court an order (the "Notice Order"), substantially in the form of Exhibit E hereto, providing that the *Shy* Case will continue to be stayed and that notice of the hearing on the proposed settlement (the "Fairness Hearing") shall be given to the Class. Following entry of the Notice Order, the Company shall (i) mail a copy of the notice contemplated in the Notice Order to the Class, together with the documents referred to in Section 4.2, (ii) cause the notice contemplated by the Notice Order to be published in the daily newspaper of largest circulation in Springfield, Ohio, Chicago, Illinois, Indianapolis, Indiana, Fort Wayne, Indiana, Moline, Illinois, and Milwaukee, Wisconsin, and (iii) submit a proof of such mailing and publication to the Court. Until entry of the Judgment, copies of this Settlement Agreement shall also be made available for inspection by Class Members at the Court, at the UAW offices in Springfield, Ohio, Indianapolis, Indiana, Chicago, Illinois, Moline, Illinois, Dallas, Texas, Memphis, Tennessee, and Louisville, Kentucky, and at the offices of each of the other labor organization Class Representatives and Class Counsel. In addition, prior to entry of the Judgment, Class Counsel shall conduct such meetings or make such other communications as Class Counsel shall deem appropriate to inform the Class Members of the proposed terms of this Settlement Agreement, which meetings and communications will be ineffective to vary the terms hereof.

4.2 The notice sent to the Class Members shall include a cover letter substantially in the form of Exhibit F, and copies of this Settlement Agreement, definitions of certain terms used in this Settlement Agreement, the Health Benefit Program SPD (Appendix A-1), the Life Insurance Program SPD (Appendix A-2) and the Supplemental Benefit Program SPD (Appendix B-1). The Company shall send additional copies of any of such materials and/or copies of any other Exhibit or Appendix to any Class Member upon request.

5. *Judgment to be Entered Approving the Settlement*.

After notice to the Class Members and upon approval by the Court of this Settlement Agreement, the parties will request the Court to enter the Judgment substantially in the form of Exhibit G hereto.

6. *Releases and Related Matters*.

6.1 In consideration of Navistar's entry into this Settlement Agreement, the establishment of the Plan and the other obligations of Navistar contained herein, the Class Representatives and the Class Counsel hereby consent to the entry of the Judgment, which will be binding upon the Class pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.

6.1.1 As of the Effective Date, the Class, the Class Representatives and anyone claiming on behalf of, through or under them by way of subrogation or otherwise shall be released

and discharged, and shall be forever barred and enjoined from instituting or prosecuting, either directly or indirectly, against the Navistar Released Parties or the Employers, any and all rights, claims or causes of action, whether known or unknown, suspected or unsuspected, concealed or hidden, which they had, have or hereafter may have, arising out of or based upon or otherwise related to any of the claims that were or could have been asserted in the *Shy* Case with respect to Health and Life Insurance Benefits, including all rights to continuation of such benefits under expired collective bargaining agreements, as well as any claims that this Settlement Agreement, any document referred to herein or any action taken to carry out this Settlement Agreement is not in compliance with applicable laws and regulations; provided, that nothing contained in this Settlement Agreement shall preclude the Class or the Class Representatives, or any of them, from asserting any right or claim or bringing any action to enforce the terms of this Settlement Agreement or the Judgment.

6.1.2 Each of the Navistar Released Parties, the Employers, the Class Representatives and the Class Counsel shall refrain from taking any action to challenge the compliance of this Settlement Agreement, any document referred to herein or any action taken to carry out this Settlement Agreement with applicable laws and regulations or from encouraging any other person or entity to do so.

6.1.3 As of the Effective Date, the Navistar Released Parties and the Employers shall be forever released and discharged with respect to any and all rights, claims or causes of action that the Class or anyone claiming on behalf of, through or under the Class by way of subrogation or otherwise, has, had or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to any of the claims that were or could have been asserted in the *Shy* Case with respect to Health and Life Insurance Benefits, including all rights to continuation of such benefits under expired collective bargaining agreements, as well as any claims that this Settlement Agreement, any document referred to herein or any action taken to carry out this Settlement Agreement is not in compliance with applicable laws and regulations.

6.2 Neither the entry into of this Settlement Agreement nor the consent to the Judgment is, may be construed as, or may be used as, an admission by or against the Navistar Released Parties, the Employers, the Class, the Class Representatives, or any of them, of any fault, wrongdoing or liability whatsoever.

6.3 Neither the entry into of this Settlement Agreement nor the consent to the Judgment waives or releases any right, claim or cause of action, whether known or unknown, suspected or unsuspected, concealed or hidden, which the Class or the Class Representatives, or any of them, has, had or hereafter may have with respect to (i) any matter not related to Health and Life Insurance Benefits, including, but not limited to, rights, claims or causes of action relating to workers' compensation, pension benefits, sickness or accident programs, salary continuation or disability or pension programs maintained by the Employers or any of them or (ii) the implementation and enforcement of this Settlement Agreement or the Judgment.

7. *Initial Eligibility and Enrollment in the Plan*.

7.1    Termination of Existing Plans. The Company will, and will cause the other Employers to, terminate the coverage of the Class Members (other than Deferred Retiree Participants) for Health and Life Insurance Benefits under the Existing Plans as of the end of the day before the Effective Date, whereupon the Plan will be established as described below and in Exhibits A and B. The Company will, and will cause the other Employers to, terminate the coverage of Deferred Retiree Participants for Health and Life Insurance Benefits under the Existing Plans as of the end of the first day permitted by the applicable settlement agreements, whereupon they will be entitled to receive benefits under the Health Benefit Program and the Supplemental Benefit Program. Claims incurred prior to the Effective Date or such day will be paid under the Existing Plans as provided in Exhibit A.

7.2    Initial Eligibility. Present Retirees (other than the Deferred Retiree Participants), Present Surviving spouses and Present Eligible Dependents will be entitled to receive benefits under the Health Benefit Program on the Effective Date, subject to the applicable enrollment requirements set forth below. Present Retirees will receive benefits under the Basic Life Insurance Program without contribution or enrollment. Present Retirees will receive benefits under the Optional Life Insurance Program if they make required premium contributions and if they meet the eligibility requirements set forth in the Life Insurance Program SPD. Deferred Retiree Participants will be entitled to receive benefits under the Health Benefit Program at such time as may be permitted under the applicable Settlement Agreement. Present Eligible Former Employees and Present Non-Represented Employees shall be eligible for benefits under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of this Settlement Agreement. Class Members will receive benefits under the Health Benefit Program and the Supplemental Benefit Program subject to the payment of any required premium contributions, except that supplemental life insurance benefits may be provided to all Retirees, including those who are not Enrolled Participants.

7.2.1    Enrollment. Not less than two weeks before the Effective Date, Present Retirees (other than the Deferred Retiree Participants) and Present Surviving Spouses will be sent a letter, substantially in the form of Exhibit H (the "Health Benefit Program Letter"), a premium bill, substantially in the form of Exhibit I, and a stamped, preaddressed envelope.

7.2.2    Health Benefit Program Letter and Bill. The Health Benefit Program Letter sent to each Present Retiree (other than Deferred Retiree Participants) and Present Surviving Spouse will state that the Health Benefit Program will be effective on the beginning of the Effective Date and that payment of the enclosed bill will automatically enroll the Participants for whom coverage is elected in the Health Benefit Program and the Supplemental Benefit Program. The letter will also list the names of any Present Eligible Dependents of such Present Retiree or Present Surviving Spouse in the Company's records, whether or not such Present Retiree, Present Surviving Spouse and such Eligible Dependents are eligible for Medicare, and the premium due. The letter will provide instructions for declining coverage and correcting the information with respect to Eligible Dependents and Medicare eligibility contained in the letter.

The letter will further explain that failure to pay will lead to termination of health benefit coverage under the Health Benefit Program and the Supplemental Benefit Program. The

letter will summarize the right to re-enroll for health benefits under the Health Benefit Program and the Supplemental Benefit Program and will refer to specific pages of the Health Benefit Program SPD for further detail. The bill will provide that Present Retirees or Present Surviving Spouses who do not wish to enroll in the Health Benefit Program and the Supplemental Benefit Program may decline coverage by checking a box on the back of the bill. The back of the bill will also provide spaces for electing or declining coverage for Spouses. The letter will include a toll-free number which the Present Retirees or Present Surviving Spouses may call for assistance.

7.2.3    Payments.    The letter and bill will both specify that payment may be made by personal check, bank check or money order. Pension deduction will be made available at the first feasible opportunity and forms for such election will be sent at that time. Until such option is made available, Present Retirees and Present Surviving Spouses who enroll in the Health Benefit Program and the Supplemental Benefit Program will receive bills,, reminder notices and termination notices in accordance with Exhibit A, and the due dates and grace periods for payment of bills set out in Exhibit A shall apply.

7.2.4    Due Dates.    Payment of the applicable initial premium contribution will be due on the Effective Date. Payments received within 31 days of the due date will be considered as received as of such date. A reminder notice will be sent 14 days after the due date. A termination notice will be sent 31 days after the due date, stating that coverage is terminated, but that coverage will be reinstated without penalty as of the Effective Date if payment is received within 90 days of the Effective Date.

7.2.5    Enrollment in the Optional Life Insurance Program.    Each Present Retiree who meets the eligibility requirements for the Optional Life Insurance Program set forth in the Life Insurance Program SPD will receive an enrollment letter (the "Optional Life Insurance Program Letter") prior to the Effective Date. The Optional Life Insurance Program Letter sent to each such Present Retiree will state the amount of Company-paid life insurance benefits provided to such Present Retiree under the Existing Plans as of the day before the Effective Date and the amount of Company-paid life insurance that will be discontinued as of the Effective Date. The Optional Life Insurance Program Letter will further state that such Present Retiree will have the right, as a one-time option, to purchase optional life insurance directly from Aetna Life Insurance company in $1,000 increments up to the discontinued amount, rounding upwards if necessary. To receive such optional life insurance, such Present Retiree must enroll within 31 days of the date of the Optional Life Insurance Program Letter. An enrollment form will be included with the Optional Life Insurance Program Letter, together with a rate schedule with examples of premium cost, and a space to designate beneficiaries. Subsequent bills will be sent quarterly. Upon payment of the applicable premium for the first month, individual certificates of coverage will be sent to Present Retirees electing optional life insurance.

7.2.6    Enrollment for Class Members Not Yet Eligible for Retirement.    Present Eligible Former Employees and Present Non-Represented Employees may apply to enroll in the Health Benefit Program, the Supplemental Benefit Program and (if they meet the eligibility requirements set out in the Life Insurance Program SPD) the Optional Life Insurance Program as of the date on which they apply to receive Pension Benefits. If such Present Eligible Former Employees and Present Non-Represented Employees are eligible to enroll in the Health Benefit Program and the Supplemental Program at such time, they will receive a notice containing

13

substantially the information set out in Section 7.2.2 and a bill for the applicable initial premium contribution, payable in accordance with Exhibit A, and they shall be enrolled in the Basic Life Insurance Program automatically at such time. Upon payment of such premium contribution, such Present Eligible Former Employees and Present Non-Represented Employees shall also be enrolled in the Health Benefit Program and the Supplemental Benefit Program. If any such person is eligible to enroll in the optional Life Insurance Program at such time, he will receive substantially the information set out in Section 7.2.5. In the event of a change in the eligibility requirements under any of the Applicable Retirement Plans, if a Present Eligible Former Employee or a Present Non-Represented Employee applies for Pension Benefits prior to the time such person is eligible to receive benefits under the Plan, the Company shall inform such person of the date on which such person shall be so eligible.

7.2.7    Enrollment for Deferred Retiree Participants.   Not less than two weeks before the date on which Deferred Retiree Participants become eligible to receive benefits under the Health Benefit Program, they will be sent a letter containing substantially the information set out in Section 7.2.2 and a bill for the applicable initial premium contribution, payable in accordance with Exhibit A. Upon payment of such premium contribution, such Deferred Retiree Participants shall be enrolled in the Health Benefit Program and the Supplemental Benefit Program.

7.3    List of Eligible Class Members.   Exhibit C sets out the names of Present Retirees, Present Surviving Spouses, Present Eligible Former Employees and Present Non-Represented Employees, all as reflected in the records of the Company. At any time prior to the Effective Date, if the Company, the Class Members or the Class Representatives, or any of them, believes that an individual has been erroneously included in or excluded from Exhibit C, the inclusion or exclusion will be brought to the attention of the other parties. If the Company, the Class Members or the Class Representatives, or any of them, does not agree to the inclusion or exclusion of any such individual in or from Exhibit C, the disagreement shall be resolved through the claims dispute procedure set forth in the Health Benefit Program SPD. After the Effective Date, an individual who believes that he or she has been erroneously excluded from Exhibit C should contact the Plan Administrator, and any dispute shall be determined pursuant to the claims dispute procedures set forth in Exhibit A. No person erroneously included in Exhibit C shall be entitled to any benefits under this Settlement Agreement or the Exhibits. No person who would otherwise be entitled to Health and Life Insurance Benefits under any existing Plan shall lose his or her eligibility for benefits under this Settlement Agreement because he or she was erroneously excluded from Exhibit C.

7.4    Erroneous Exclusion Remedy.   In the event that an individual who has been erroneously excluded from Exhibit C is later determined to be a Class Member, such individual's participation shall be recognized as of the Effective Date or such later date as such individual first became eligible to enroll in the Health Benefit Program and the Supplemental Benefit Program or, at the option of such Class Member, the date on which he or she receives the Health Benefit Program Letter and other material described in Section 7.2.2. The Company shall send the Health Benefit Program Letter and such other material to each individual erroneously excluded from Exhibit C as promptly as practicable upon learning that such individual was so excluded, explaining such person's enrollment options and offering to permit such individual to pay premium arrearages in installments as may be agreed between the Company and such individual.

14

8.      *Corporate Approvals*.

Navistar shall take all actions required in connection with the execution and delivery of this Settlement Agreement and the performance of its obligations hereunder. Without limiting the generality of the foregoing, Parent shall use its best efforts to obtain any necessary stockholder approval to ensure that the Certificate of Incorporation of Parent as of the Effective Date shall be in the form of the amended and restated certificate of incorporation attached as Appendix B-3 (the "Charter Amendments").

9.      *Contribution of Parent Securities*.

9.1     On the Effective Date, the Company shall contribute such number of shares of Parent Class B Common to the Supplemental Benefit Trust as shall ensure that the number of shares of Parent Common Equity held by the Supplemental Benefit Trust immediately following such contribution will represent 50 percent of the total shares of Parent Common Equity on a Fully Diluted Basis.

9.2     On the Effective Date, the Company shall contribute one share of Parent Series A Preference to the Supplemental Benefit Trust as described in Exhibit B.

9.3     On the Effective Date, the Company shall contribute one share of Parent Series B Preference to the UAW. This share may not be transferred, since the sole purpose of its issuance is to permit the UAW to elect the UAW Designee in accordance with Section 10.1. The following legend shall be placed on the certificate representing the Parent Series B Preference issued to the UAW:

"The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be sold or transferred except in compliance with such Act or an exemption from the registration requirements under such Act. In addition, the securities represented by this certificate are subject to voting agreements, transfer restrictions and other provisions contained in the Navistar International Corporation certificate of incorporation, and the Settlement Agreement, dated as of March 30, 1993 in the class action of *Shy et al. v. Navistar Civil Action No. C-3-92-33* (S.D. Ohio), a copy of which is on file at the office of the Secretary of Navistar International Corporation."

Stop transfer orders will be entered with the transfer agent (or agents) and the registrar (or registrars) of such securities against the transfer of legended securities held by the UAW. Other than as provided herein, the UAW shall not give any proxies or powers of attorney or make any assignments with respect to the voting of, or enter into any voting trusts, voting agreements or similar arrangements with respect to the Parent Series B Preference.

10.     *Board of Directors*.

10.1    Until the Fully Funded Date, the UAW shall be entitled to elect the UAW Designee. After the Fully Funded Date, the UAW shall be entitled, pursuant to the terms of its share of the Parent Series B Preference, to elect the UAW Designee at any time when the funding level of the Health Benefit Trust falls below 85 percent of the Fully Funded Amount. The UAW Designee shall not be entitled to any compensation from Parent for the performance of his services as such;

15

provided, that the Company shall, at the option of the UAW (i) pay such director the value of any compensation paid to a non-employee director of Parent, (ii) contribute such amount to the Contributing Participants' Sub-account or (iii) pay and contribute such amount to the UAW Designee and the Contributing Participants' Sub-account in such proportions as the UAW shall direct in each case in a lump sum in cash within 30 days following the end of the year for which such payment or contribution is paid; and provided, further, that this Section 10.1 shall not affect the UAW Designee's right to any amount paid as or in lieu of reimbursement for expense. For the avoidance of doubt, any contribution of the Company to the Contributing Participants' Sub-account under this Section 10.1 shall not count toward any contribution or payment obligation of the Company or the Employers to the Health Benefit Trust under the Health Benefit Program or Life Insurance Program or the Health Benefit Trust Agreement.

10.2    The Supplemental Benefit Trust shall be entitled, pursuant to the terms of the Parent Series A Preference, to elect two Supplemental Trust Designees during such time as the Supplemental Benefit Trust holds 20 percent or more of the shares of Parent Common Equity then outstanding and one Supplemental Trust Designee during such time as the Supplemental Benefit Trust holds between 10 percent and 20 percent of the shares of Parent Common Equity then outstanding.

10.3    Parent shall indemnify each present or former UAW Designee and Supplemental Trust Designee for, and hold each such person harmless from and against, any and all losses, costs, liabilities, damages and expenses (including fees and disbursements of legal advisors), as incurred, which any such person may incur as a result of his or her actions or omissions as a director of Parent to the greatest extent that Parent then indemnifies or holds harmless any other director of Parent, whether pursuant to the Delaware General Corporation Law, Parent's Certificate of Incorporation, contract or otherwise. From and after the Effective Date and until the sixth anniversary of such time as no UAW Designee or Supplemental Trust Designee is entitled to serve on the Board, Parent shall cause to be maintained in effect its current policies of directors' and officers' liability insurance for the benefit of such Designees and, if such current policies cannot be maintained, Parent shall use its reasonable best efforts to obtain appropriate substitute policies of directors' and officers' liability insurance; provided, that the terms and conditions of any such policies with respect to such Designees, or any of them, shall not be less favorable to such Designees than the terms and conditions of any directors' and officers' liability insurance then maintained by Parent for any of its other directors.

10.4    The Board shall cause the number of directors constituting the Board to be increased or decreased from time to time in order to include the UAW Designee and the Supplemental Trust Designees.

10.5    The UAW Designee and the Supplemental Trust Designees will be assigned to the committees of the Board in the same manner as the current members of the Board.

11.    *Costs, Attorneys Fees and Indemnification.*

11.1    Navistar has agreed to support the award of the fees and expenses of actuarial, financial and legal advisors retained by the non-Navistar parties to the Foster Case and by the Class Representatives through the date of the Fairness Hearing up to an estimated aggregate amount not

16

to exceed $3 million. This amount includes such fees and expenses already paid or payable pursuant to the Stay Orders. The amount of the fees and expenses of each of such advisors through the date of this Settlement Agreement shall be set out in Exhibit J. Exhibit J shall also set out the reasonably projected additional fees and expenses of actuarial, financial and legal advisors retained by the Class Representatives. All attorneys' fees included in such amounts shall be determined on a strict hourly fee basis with no claims for premium billing. Navistar agrees to support the award of the fees and expenses described above, including such estimated projected fees and expenses. As promptly as practicable after the date hereof, Navistar and the Class Representatives shall prepare a petition jointly requesting the award of such fees and expenses, which shall be submitted to the Court for approval prior to the date of the Fairness Hearing.

11.2    Navistar further agrees to support the award of reasonable fees and expenses of actuarial, financial and legal advisors retained by the Class Representatives from the date of the Fairness Hearing until the Judgment has become Final; provided, that the amount of such fees and expenses will be determined in accordance with the principles set forth in Section 11.1. Each party to this Settlement Agreement agrees not to seek any other future fees or expenses from any other party in connection with the *Shy* Case, except that the Class Representatives or any other party prevailing in any action to enforce the terms of this Settlement Agreement may seek any such fees and costs as may be allowed by law or as provided herein.

11.3    Parent and the Company shall indemnify the Class Representatives for, and hold them harmless from and against, any and all losses, costs, liabilities, damages and expenses (including, without limitation, fines, penalties, taxes and the fees and disbursements of actuarial, financial and legal advisors) as incurred, which they may incur (a) in connection with or arising out of the Litigation, including, without limitation, the execution, delivery, performance and enforcement of this Settlement Agreement, (b) as a result of the failure of Navistar to comply with its obligations hereunder or the failure of any representation or warranty made by Navistar to be true and complete on and as of the date on which it was made or (c) as a result of any limitation on the legality, validity, binding nature or enforceability of this Settlement Agreement as a result of the bankruptcy of Navistar or any Employer, except that Navistar's obligation to indemnify the non-Navistar parties to the *Foster Case* and the Class Representatives for the fees and expenses of actuarial, financial and legal advisors retained by them through the date on which the Judgment becomes Final shall be limited to the fees and expenses specified in Sections 11.1 and 11.2. Any claim for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

12.    *Conditions and Effective Date of Settlement*.

12.1    This Settlement Agreement shall become effective on the date on which each of the following conditions has been satisfied or waived in accordance with Section 12.2 or 12.3 (the "Effective Date").

12.1.1    The Court entering the Notice Order and such order not being materially modified after being entered.

12.1.2    The Court entering the Judgment and the Judgment becoming Final without being materially modified.

12.1.3     The parties receiving the DOL Exemptions.

12.1.4     Receipt of (a) a private ruling or rulings from the IRS or (b) a favorable reasoned opinion of Covington & Burling addressed and in form and substance satisfactory to Navistar and the Class Representatives to the effect that the Health Benefit Trust and the Supplement Benefit Trust will be organizations described in Section 501(c)(9) of the IRC, assuming that such trusts (i) are operated in accordance with Appendices A-3 and B-2 to Exhibits A and B, respectively, and (ii) satisfy the notification requirement imposed by Section 505(c) of the IRC.

12.1.5     The receipt of (I) (a) a private letter ruling or rulings from the IRS or (b) a favorable reasoned opinion of Covington & Burling addressed and in form and substance satisfactory to Navistar and the Class Representatives to the effect that (i) the Health Benefit Trust and the Supplemental Benefit Trust will be eligible for the exclusion from the application of the account limits under Section 419A of the IRC by reason of Section 419A(f)(5)(A) of the IRC, and (ii) the income of the Health Benefit Trust and the Supplemental Benefit Trust (other than any gross income derived from any unrelated trade or business regularly carried on by the Health Benefit Trust or the Supplemental Benefit Trust) that is set aside to provide for post-retirement benefits will be exempt function income within the meaning of Section 512(a)(3)(B) of the IRC, assuming that such trusts are operated in accordance with Appendices A-3 and B-2 to Exhibits A and B, respectively, and (II) a favorable reasoned opinion of Covington & Burling addressed and in form and substance satisfactory to Navistar and the Class Representatives to the effect that the Health Benefit Trust and the Supplemental Benefit Trust will not be subject to income tax under the IRC or to the excise tax imposed by Section 4976 of the IRC, assuming that (a) such trusts are operated in accordance with Appendices A-3 and B-2 to Exhibits A and B, respectively, (b) all of the income of each of such trusts is set aside to provide for the payment of life, sick, accident, or other benefits within the meaning of section 512(a)(3)(B)(ii) of the IRC, (c) such trusts derive no gross income from any unrelated trade or business regularly carried on by such trusts computed as if the trusts were subject to Section 512(a)(1), and (d) such trusts satisfy the notification requirement imposed by Section 505(c) of the IRC.

12.1.6     Ratification of CBAs between Navistar and the Collective Bargaining Representatives such that all Present Employees who are represented by Collective Bargaining Representatives shall, upon such Present Employees becoming Retirees, be eligible to receive benefits under the Plan (the "New CBAs").

12.1.7     All necessary actions required in connection with Navistar's execution and delivery of this Settlement Agreement and the performance of its obligations hereunder (including approval of the Charter Amendments) having been taken.

12.1.8     The Health Benefit Trust and the Supplemental Benefit Trust having been established in the form set forth in Appendices A-3 and B-2 to Exhibits A and B, respectively, or in such amended form as may be approved by the Company and the Class Representatives; provided, that no such amendment shall adversely impact the level of benefits to any Class Member.

18

12.1.9 The contribution of Parent Class B Common and the Parent Series A Preference to the Supplemental Benefit Trust and the Parent Series B Preference to the UAW, in each case in accordance with Section 9.

12.1.10 The size of the Board of Directors of Parent having been increased to the extent necessary to permit the election to the Board of the Supplemental Trust Designees and the UAW Designee, and the holders of the Parent Series A Preference and Parent Series B Preference having the ability forthwith to elect the Supplemental Trust Designees and the UAW Designee, respectively, to the Board.

12.1.11 The delivery of legal opinions substantially in the form of Exhibit K attached hereto.

12.1.12 The NFC Revolving Credit Agreement dated as of November 9, 1990 and the NFC Retail Note Purchase Facility dated as of August 23, 1989 having been amended on terms and conditions consistent in all material respects with the term sheet dated December 17, 1992 including with respect to the extension of the maturity of such agreements to November 15, 1995 and authorization of the payment of a special dividend by NFC to the Company in the amount of $20 million in excess of the amount of any dividends of NFC permitted under such agreements immediately prior to the effectiveness of such amendments.

12.1.13 The delivery of a notice from the office of the Secretary of State of Delaware, dated the Effective Date, of the filing of amendments to the Certificate of Incorporation of Parent or articles of merger with respect to the merger of Parent into a wholly-owned subsidiary of Parent.

12.1.14 The delivery of a certificate executed by the secretary of Parent as to the adoption and effectiveness of the certificate of incorporation of Parent.

12.1.15 The delivery of certificates of the secretaries of state of the respective states of incorporation of each of the Employers that each such party is a corporation duly organized, validly existing and in good standing in such state as of the Effective Date.

12.1.16 The delivery of a certificate executed by the secretary of each of the Employers as to the adoption and effectiveness of resolutions of the board of directors of each of such parties authorizing the appropriate officers to execute and deliver each document referred to herein required to be executed by such party and to take any and all such further actions as may be necessary or appropriate in connection with the performance of its obligations hereunder.

12.1.17 The delivery of a certificate executed by the secretary of each of the Employers as to the incumbency of each officer of such party executing any document referred to herein or taking any and all such further actions as may be necessary or appropriate in connection with the performance of its obligations hereunder.

12.1.18 The delivery of a certificate of an authorized officer of Parent to the effect that the shares of Parent Class B Common contributed to the Supplemental Benefit Trust represent 50% of the Parent Common Equity issued and outstanding on a Fully Diluted Basis immediately after giving effect to such contribution.

12.1.19    The delivery of a certificate of an authorized officer of each of the Navistar Parties to the effect that (a) the representations of such party in Section 14.2 are true and correct on and as of the Effective Date and (b) such party has performed and complied with all terms of this Settlement Agreement to be performed or complied with by it on or before the Effective Date.

12.1.20    The delivery of a waiver executed by a duly authorized officer of each Employer of its rights to seek any amendment or modification of the Plan pursuant to Section 1114 of the Bankruptcy Code or of any New CBA pursuant to Section 1113 of the Bankruptcy Code substantially in the form of Sections 15.1.1 and 15.1.2 hereto.

12.1.21    The delivery of such further information and documents as Class Counsel or the Class Representatives, or any of them, may reasonably request (a) to evidence the compliance of Navistar with its obligations under this Settlement Agreement, (b) to substantiate the representations of Navistar contained in Section 14.2 and (C) to consummate the transactions contemplated by this Settlement Agreement.

12.1.22    The establishment of the Plan, which shall occur on the first day of a calendar month.

12.2    Navistar and the Class Representatives may jointly waive any of the conditions set out in Sections 12.1.2 to 12.1.21 by means of a written instrument executed by each of such parties; provided, that Navistar and the UAW may jointly waive the condition set out in Section 12.1.6 by means of a written instrument executed by both of such parties. If any such condition is waived as provided in this Section 12.2, then such waiver shall include a waiver of any representation or warranty made in Section 14.2 which would otherwise be untrue as a result of such condition being unsatisfied.

12.3    In the event that an appeal remains pending at the conclusion of the appeal period following the entry of the Judgment, Navistar and the Class Representatives will jointly make every effort to expedite resolution of such appeal because it is their intent to implement this Settlement Agreement as expeditiously as possible. If such efforts are unsuccessful then, notwithstanding Section 12.1.2, if each of the conditions set out in Section 12.1.1 and Sections 12.1.3 through 12.1.21 have been satisfied or waived in accordance with Section 12.2, Navistar may proceed with the implementation of the Plan unless implementation of a material aspect of this Settlement Agreement is enjoined or unless counsel for either the UAW or the Company delivers an opinion that it is probable that such appeal will be successful.

13.    *Effect of Disapproval or Modification.*

In the event that the Judgment is materially modified as the result of any ruling by the Court or by the Court of Appeals (which, for purposes of clarification, do not include those agreed pursuant to that certain Letter of Intent by and among the UAW, the Supplemental Benefit Committee, and the Company (among others), dated as of October 22, 2021, or pursuant to the Class Settlement Agreement modifying the terms of this Settlement, dated as of December 22, 2021), either of Navistar or the Class Representatives may terminate this Settlement Agreement by notice to the others within 90 days of such modification after negotiating in good faith to agree

on such amendments to this Settlement Agreement as will effectuate the purposes hereof while complying with the terms of such modification; provided, that the obligations of Navistar in Sections 10.3 and 11 shall survive such termination. In the event of such termination, the positions of Navistar, the Class, the Class Representatives, or any of them, shall be deemed to have reverted to the positions of such parties as of the date and time immediately prior to the execution of this Settlement Agreement as provided under the executed Stipulations and Orders for Stay of Litigation and Certain Other Matters ("Stay Orders"), including reinstatement of the Existing Plans. As promptly as practicable following such termination, the UAW Designee and the Supplemental Trust Designees shall resign from the Board. In the event of a termination under this Section, the Company shall apply assets held in the Health Benefit Trust to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the IRC). Monies disbursed (i) by Navistar pursuant to the Stay Orders or Section 11 or (ii) which have been used to provide benefits to Participants shall not be reimbursed and, except as otherwise expressly provided herein, the parties shall thereafter proceed in all respects as if this Settlement Agreement had not been executed, without prejudice to the right of any party to assert any claims or to be reimbursed for costs and expenses incurred by it pursuant to the Stay Orders, this Settlement Agreement or any other agreement. In the event of such termination, the parties specifically agree that in the event any subsequent proceedings in the *Shy* Case are necessary, each of the parties will bear its own costs and expenses (including the fees and expenses of actuarial, financial and legal advisors), without prejudice to its right to seek reimbursement of such costs and expenses as permitted by law or pursuant to any future stay order or agreement among the parties.

14. *Representations and Warranties*.

14.1 Class Counsel represent and warrant to Navistar that they have full power and authority to execute and deliver this Settlement Agreement on behalf of the Class Representatives and to perform their obligations hereunder.

14.2 Navistar represents and warrants to Class Counsel and the Class Representatives as of the Effective Date as follows:

(a) The Navistar Parties and the other Employers are all corporations duly incorporated, validly existing and in good standing in the jurisdictions of their incorporation;

(b) Navistar and the other Employers have all necessary power and authority to execute and deliver this Settlement Agreement and each document referred to herein to be executed and delivered by them and to take any action required or appropriate to be taken by them in connection with the performance of their obligations hereunder;

(c) The execution and delivery of this Settlement Agreement and any document referred to herein to be executed and delivered by Navistar or any other Employer and any action required or appropriate to be taken by any of them in connection with the performance of its obligations hereunder have been duly authorized by all necessary action on the part of such party;

21

(d)     This Settlement Agreement and each other document required to be executed and delivered by Navistar or any other Employer are the legal, valid and binding obligations of Navistar or such other Employer enforceable against them in accordance with their terms except to the extent such enforceability is limited by bankruptcy;

(e)     The Class Members include all of the individuals entitled to receive Health and Life Insurance Benefits under Existing Plans, except for the Excluded Retirees.  All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan (except for the Excluded Retirees) in the absence of this Settlement Agreement shall be eligible for benefits under the Plan. No person not otherwise eligible for Health and Life Insurance Benefits under an Existing Plan shall be eligible for any benefit by virtue of this Settlement Agreement.

(f)     The execution and delivery of this Settlement Agreement and any document referred to herein and the performance of the obligations of Navistar and the other Employers hereunder will not (i) violate or conflict with the certificate of incorporation, by-laws or other constituent documents of Navistar or any other Employer, (ii) require the consent of any person, or violate or conflict with or accelerate the performance required, under any agreement to which Navistar or any other Employer is a party or by which it is bound, (iii) violate or conflict with any statute, rule or regulation applicable to Navistar or any other Employer or by which any of such parties is bound, (iv) require the authorization or approval of, any other action by, or any notice to or filing with, any governmental authority in connection with Navistar's execution and delivery of this Settlement Agreement or the performance of the obligations of Navistar or any other Employer hereunder, other than the authorizations, approvals, notices and filings referred to in Section 12.1, (v) violate or conflict with any order, ruling, decree, judgment or award of any court, arbitrator or government agency applicable to Navistar or any other Employer or (vi) result in the creation of any lien, claim, security interest, encumbrance, charge, restriction or right of any kind whatsoever of any third party upon any of the properties or assets of Navistar or any other Employer;

(g)     Upon their issuance in accordance with the terms of this Settlement Agreement, the shares of Parent Class B Common, Parent Series A Preference and Parent Series B Preference to be issued by Parent will be duly and validly authorized, issued and outstanding, fully paid and non-assessable;

(h)     Immediately following their issuance in accordance with the terms of this Settlement Agreement, the shares of Parent Class B Common to be issued by Parent will represent 50 percent of the shares of Parent Common Equity issued and outstanding on a Fully Diluted Basis;

(i)     Upon the issuance of the shares of Parent Class B Common, Parent Series A Preference and Parent Series B Preference to be issued by the Parent in accordance with the terms of this Settlement Agreement, the Supplemental Benefit Trust and the UAW will acquire valid title to, and full rights of ownership of, the shares issued to them, free and clear of any and all liens, claims, security interests, encumbrances, charges, restrictions or rights of third parties of any kind (other than restrictions set out in Exhibit B or under the Securities Act); and

(j)     Except as specifically set forth herein, the execution, delivery and performance of this Settlement Agreement shall not result in the creation of any rights in, or in any payments to, any employee, officer or director of any of the Navistar Parties and shall not constitute a change in control or similar event under any plan, program, arrangement or agreement with, or benefitting, any such employee, officer or director.

14.3     Counsel to Navistar represent and warrant to the Class Representatives that they have full power and authority to execute and deliver this Settlement Agreement on behalf of Navistar.

15.     *Miscellaneous Provisions*.

15.1.     Waiver of Sections 1113 and 1114.

15.1.1     In consideration of the agreements of the Class Representatives in this Settlement Agreement, Navistar hereby waives, and shall cause each of the other Employers to waive, its rights to seek any amendment or modification of the Plan pursuant to Section 1114 of the Bankruptcy Code. In the event that the waiver set forth in the preceding sentence is held to be unenforceable and any court of competent jurisdiction should approve any such amendment or modification, then Navistar will be obligated to take, and to cause such other Employers to take, such remedial actions as the Class Representatives may deem appropriate in order to place the Participants in substantially the same position as they would have been in had the waiver been held valid.

15.1.2     In consideration of the agreements of the Class Representatives in this Settlement Agreement, Navistar hereby waives, and shall cause each of the other Employers to waive, its rights to seek amendment or modification of the New CBAs pursuant to Section 1113 of the Bankruptcy Code. In the event that the waiver set forth in the preceding sentence is found to be unenforceable and a court of competent jurisdiction should approve any such amendment or modification, then Navistar will be obligated to take such remedial actions as the Class Representatives may deem appropriate in order to place the Employees covered by the New CBAs in substantially the same position as they would have been in had the waiver been held valid.

15.2     The Exhibits hereto are incorporated in this Settlement Agreement as though fully set forth herein. References in this Settlement Agreement to "Sections" and "Exhibits" refer to the Sections and Exhibits of this Settlement Agreement unless otherwise specified.

15.3     The waiver by one party of (a) any breach by the other party of, or (b) any other right to enforce or claim or benefit under, this Settlement Agreement shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, this Settlement Agreement.

15.4     This Court will retain exclusive jurisdiction to resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of this Settlement Agreement, except for disputes relating solely to eligibility or entitlement to benefits hereunder. Each of the parties hereto expressly and irrevocably submits to the jurisdiction of the Court in connection with any proceedings in connection with the enforcement, interpretation or implementation of this Settlement Agreement, except for disputes relating solely to eligibility or

entitlement to benefits hereunder, and expressly waives any argument it may have with respect to venue or forum non conveniens.

15.5    This Settlement Agreement constitutes the entire agreement between the parties, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than the representations, warranties and covenants contained and memorialized in this Settlement Agreement.  This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, which are related to the subject matter hereof.

15.6    The captions used in this Settlement Agreement are for convenience of reference only and do not constitute a part of this Settlement Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Settlement Agreement, and all provisions of this Settlement Agreement will be enforced and construed as if no captions had been used in this Settlement Agreement.

15.7    The Class Representatives expressly authorize Class Counsel to take all appropriate action required or permitted to be taken by the Class Representatives pursuant to this Settlement Agreement to effectuate its terms and also expressly authorize Class Counsel to enter into any non-material modifications or amendments to this Settlement Agreement on behalf of them that Class Counsel deems appropriate from the date this Settlement Agreement is signed until the Effective Date; provided, that the effectiveness of any amendment which adversely impacts the level of Plan benefits to any Class Member as well as any material amendment shall be subject to the approval of the Court after appropriate notice to the Class Members.

15.8    This Settlement Agreement may be executed in two or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument, provided that counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

15.9    No party to this Settlement Agreement may assign any of its rights hereunder without the prior written consent of the other parties, and any purported assignment in violation of this sentence shall be void. Any party to this Settlement Agreement may delegate any of its obligations under this Settlement Agreement; provided, that no such delegation shall relieve such party of such obligation; and provided, further, that the delegation of any of the obligations of Navistar under this Settlement Agreement to the transferee of all or any part of the assets of any Employer shall be subject to the express written assumption of such obligations by such transferee.

15.10   By executing and supporting this Settlement Agreement, and by agreeing to its provisions regarding the role of the Class Representatives in corporate governance, administration of the Plan, claims dispute resolution, and other matters, the Class Representatives are not undertaking any legal duty or standard of care with respect to such future activities except as otherwise may be required by law. In all instances where individual Class Members have the right to initiate claims review or arbitration proceedings, no failure of the Class Representatives to participate in such proceedings shall bar or prejudice any such Class Members.

15.11   Each of Navistar, the Class Representatives and the Class Counsel shall do any and all acts and things, and shall execute and deliver any and all documents, as may be necessary or appropriate to effect the purposes of this Settlement Agreement.

15.12   This Settlement Agreement shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or preempted thereby, with the laws of the State of Illinois.

15.13   Any notice, request, information or other document to be given under this Settlement Agreement to any of the parties by any other party shall be in writing or delivered personally, or sent by Federal Express or other carrier which guarantees next-day delivery, transmitted by facsimile, or sent by registered or certified mail, postage prepaid, as follows:

>    If to the Class Representatives
>    or Class Counsel, addressed to Class
>    Counsel at the addresses indicated on the
>    signature pages of this Settlement
>    Agreement

>    If to Navistar, addressed to:

>         Navistar, Inc.
>         Benefits Department
>         2701 Navistar Drive
>         Lisle, Illinois  60532

>    in each case with copies to:

>         General Counsel
>         Navistar, Inc.
>         2701 Navistar Drive
>         Lisle, Illinois  60532

>              and

>         John C. Goodchild, III
>         Morgan, Lewis & Bockius LLP
>         1701 Market Street
>         Philadelphia, Pennsylvania 19103-2921

25

IN WITNESS WHEREOF, the parties hereto have caused this Settlement Agreement to be executed by themselves or their duly authorized attorneys.

/s/ David S. Cupps, Trial Attorney
David S. Cupps            (0017002)
Anne C. Griffin           (0017571)
VORYS, SATER, SEYMOUR & PEASE
52 East Gay Street
P.O. Box 1008
Columbus, Ohio  43216-1008
(614) 464-6319

/s/ Emily Nicklin
Emily Nicklin
Ruben Castillo
KIRKLAND & ELLIS
200 E. Randolph Drive
Chicago, Illinois  60601
(312) 861-2000

Attorneys for Defendants Navistar International
Corporation, Navistar International Transportation Corp.,
Navistar Financial Corporation, Harco National Insurance
Company, the Navistar International Transportation Corp.
Health Plan and the Indianapolis Casting Corporation

/s/ Daniel W. Sherrick
Daniel W. Sherrick
Associate General Counsel
International Union, United Automobile, Aerospace
and Agricultural Implement Workers of America, UAW
8000 East Jefferson
Detroit, Michigan  48214
(313) 926-5216

Counsel for Plaintiffs International Union,
United Automobile, Aerospace, and Agricultural
Implement Workers of America, and its Local
Unions 6, 66, 98, 119, 226, 305, 402, 472,
658, 2274 and 2293

/s/ Betty Grdina, Trial Attorney
Betty Grdina               (0014602)
BOBULSKY, GRDINA & ALTIER
2036 East Prospect Road
Ashtabula, Ohio  44004
(216) 998-4214

Counsel for Plaintiffs Art Shy,
Fred Burris, Clarence Nuss, John Herring,
Henry G. Betley and Richard A. Spitler

/s/ Gerald B. Lackey_____, Trial Attorney
Gerald B. Lackey            (0017244)
LACKEY, NUSBAUM, HARRIS, RENY & TORZEWSKI
Two Maritime Plaza, 3rd Floor
Toledo, Ohio  46304
(419) 243-1105

Counsel for Plaintiffs Carl Potts and
Harold Retherford

/s/ Barry Macey_____
Barry Macey
MACEY, MACEY & SWANSON
445 North Pennsylvania Street
Suite 401
Indianapolis, Indiana  46204
(317) 637-2345

Counsel for Plaintiffs Jack O'Neal &
    Donald McPhearson

/s/ Gordon A. Gregory_____
Gordon A. Gregory
GREGORY, MOORE, JAEKLE, HEINEN
    ELLISON & BROOKS
3727 Cadillac Tower
Detroit, Michigan  48226
(313) 964-5600

Counsel for Plaintiffs International Union,
United Plant Guard Workers of America, and its Local
Unions 122, 4 and 134

/s/ Mark Schneider_____
Mark Schneider
Associate General Counsel
International Association of Machinists
900 Machinists Place
Upper Marlboro, Maryland  20772
(301) 967-4500

Counsel for International Association
of Machinists, its District Lodge 28,
and its Local Lodges 1471, 2819, and 2821

/s/ Bruce O. Boxberger
Bruce O. Boxberger
Arthur E. Mandelbaum
MILLER, CARSON & BOXBERGER
1400 One Summit Square
Fort Wayne, Indiana 46802
(219) 423-9411

Counsel for Society of Engineering
Employees, Inc.

/s/ David Gore
David Gore
KLEIMAN, WHITNEY, WOLFE & GORE
One East Wacker Drive
Suite 1910
Chicago, Illinois 60601
(312) 467-4380

Counsel for International Union,
United Steelworkers of America, and its Local 4320
and USWA, Local 4320

/s/ Frederick G. Cloppert, Jr. , Trial Attorney
Frederick G. Cloppert, Jr.          (0010371)
Michael J. Hunter                   (0018756)
CLOPPERT, PORTMAN, SAUTER, LATANICK & FOLEY
225 East Broad Street
Columbus, Ohio 43215
(614) 461-4455

Local Counsel for all Unions and
Individual Plaintiffs listed above

/s/ Ian D. Lanoff
Ian D. Lanoff
Julia Penny Clark
BREDHOFF & KAISER
1000 Connecticut Ave., N.W.
Suite 1300
Washington, D.C. 20036
(202) 833-9340

Additional Counsel for all Unions and
Individuals listed above

28

**EXHIBIT A**

**THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.
RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN**

TABLE OF CONTENTS

ARTICLE I          Introduction  ..................................................................................32

    1.1    Definitions................................................................................................32
    1.2    Purpose of the Plan .................................................................................32
    1.3    Health Benefit Program, Life Insurance Program, Supplemental Benefit
           Program......................................................................................................32
    1.4    Trust Funds .............................................................................................33
    1.5    Administration, Plan Year  ......................................................................33
    1.6    Amendments ............................................................................................33
    1.7    Termination of Existing Health and Life Insurance Benefits ....................33

ARTICLE II         Plan Participants  .........................................................................34

    2.1    Eligibility  ...............................................................................................34
    2.2    Enrollment...............................................................................................34
    2.3    Termination of Coverage Under the Health Benefit Program. ..................35
    2.4    Re-Enrollment .........................................................................................36

ARTICLE III        Contributions to the Health Benefit Program  ...........................36

    3.1    Determinations by the Actuary. ...............................................................36
    3.2    Contributing Participants' Annual Contributions .....................................36
    3.3    Employers' Annual Contribution .............................................................39
    3.4    Transfers of Funds between Sub-accounts  ..............................................39
    3.5    Transfers from the Supplemental Benefit Trust to the Health Benefit Trust ..... 39
    3.6    Employers' Prefunding Contributions. .................................................... 40
    3.7    Payment of Benefits. ............................................................................... 40
    3.8    State or National Health Insurance Programs .................................... 41
    3.9    Guarantee of Health Benefit Program .....................................................43

ARTICLE IV         Contributions to Life Insurance Program  ..................................44

    4.1    Employer Contributions...........................................................................44
    4.2    Optional Life Insurance ...........................................................................44
    4.3    Guarantee of Life Insurance Program ......................................................44

ARTICLE V          Administration of the Health Benefit Program and the Life Insurance
                    Program ...................................................................................................45

ARTICLE VI         Health Benefit Program Committee..............................................46

    6.1    Health Benefit Program Committee ........................................................46
    6.2    Committee Powers...................................................................................46

30

6.3    Program Design ........................................................................................47
6.4    Action by Health Benefit Program Committee......................................... 47
6.5    Health Benefit Program Committee Minutes ............................................48
6.6    HBPC Other Member ...............................................................................48
6.7    Expenses ...................................................................................................49
6.8    Dispute Resolution ...................................................................................49

ARTICLE VII General Provisions...........................................................................50

7.1    Required Data ...........................................................................................50
7.2    Non-Alienation .........................................................................................50
7.3    Action by Employers ................................................................................50
7.4    Applicable Law .........................................................................................50
7.5    Limitation of Liability; Indemnification ..................................................50
7.6    Limitation on Liens as Security for Employers' Contributions................50
7.7    Limitations on Sale and Lease-Back Transactions ..................................52
7.8    Subrogation ...............................................................................................53
7.9    Assignment and Delegations.....................................................................53
7.10   Captions ....................................................................................................53

ARTICLE VIII Amendment and Termination ...........................................................53

8.1    Amendment...............................................................................................53
8.2    Termination...............................................................................................54

ARTICLE IX Exclusive Benefit and Prohibited Inurement ...................................54

9.1    Exclusive Benefit .....................................................................................54
9.2    Prohibited Inurement ................................................................................54

ARTICLE X Events of Default................................................................................55

APPENDICES

Appendix A-1 Health Benefit Program SPD

Appendix A-2 Life Insurance Program SPD

Appendix A-3 Health Benefit Trust Agreement

Appendix A-4 Present Represented Employees

Appendix A-5 Initial Actuarial Report

Appendix A-6 Actuarial Definitions Supplement

Appendix A-7 HBPC Committee Members

31

**NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**

**RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN**

ARTICLE I

Introduction

1.1 Definitions. Capitalized terms used and not defined herein have the meanings assigned to them in Exhibit D to the Settlement Agreement.

1.2 Purpose of the Plan. The Plan shall be established by the Employers effective as of the Effective Date. The purpose of the Plan is (i) to provide Enrolled Participants with the health insurance benefits described herein, (ii) to provide all Retirees, whether or not they are Enrolled Participants, with the life insurance benefits described here, and (iii) to provide Enrolled Participants and all Retirees with the additional benefits described in Exhibit B to the Settlement Agreement. Enrolled Participants who are (i) Retirees and Surviving Spouses will be eligible to receive such health insurance and additional benefits for the duration of their lives and (ii) Eligible Dependents will be eligible to receive such health insurance and additional benefits for so long as they remain Eligible Dependents. Basic life insurance benefits shall be provided to Retirees for the duration of their lives.

1.3 Health Benefit Program. Life Insurance Program. Supplemental Benefit Program. The Plan ("Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan") consists of the Health Benefit Program ("Navistar International Transportation Corp. Retiree Health Benefit Program"), the Life Insurance Program ("Navistar International Transportation Corp. Retiree Life Insurance Program") and the Supplemental Benefit Program ("Navistar International Transportation Corp. Retiree Supplemental Benefit Program").

(a) The Health Benefit Program provides for the health benefits described in the SPD attached as Appendix A-1 hereto. Such SPD also describes the preferred provider organization and coordinated care features of the Health Benefit Program and the HMO alternatives to the Health Benefit Program. The Plan Administrator will make arrangements for Contributing Participants to be afforded the option to subscribe to HMO alternatives as required by law or as determined by the UAW/Navistar Joint Committee, in lieu of receiving the benefits under the Health Benefit Program described in Appendix A-1. Contributing Participants who are Retirees or Surviving Spouses will be given the opportunity not less than once each year to elect to change their enrollment (and that of their Eligible Dependents) from the Health Benefit Program to such HMO alternatives or from such HMO alternatives to the Health Benefit Program. If such a Retiree or Surviving Spouse elects an HMO alternative, the Actuary shall determine the per capita cost of benefits under the Health Benefit Program for such Contributing Participant, and the excess of the premium contribution payable to the HMO for such Contributing Participant over such amount shall be added to the required contributions of such Contributing Participant under the Health Benefit Program. Promptly after receiving notice from a Contributing Participant who has elected to enroll in an HMO alternative that he or she has moved out of an area where such HMO

32

alternative is offered, the Plan Administrator shall notify such Contributing Participant of the premium contribution required to be made to the Health Benefit Trust to receive coverage under the Health Benefit Program. Such Contributing Participant will be transferred to coverage under the Health Benefit Program as of the first day of the calendar month following the month for which premium payments are last made to the HMO on behalf of the Contributing Participant.

(b)    The Life Insurance Program provides Retirees with the life insurance benefits described in the SPD attached as Appendix A-2 hereto.

(c)    The Supplemental Benefit Program provides for the reduction or reimbursement of premiums, co-payments, deductibles and other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program or to participate in Medicare or any part thereof, or any successor or comparable program thereto, and for the provision of Additional Permissible Benefits to Enrolled Participants and Retirees whether or not they are Enrolled Participants, as set forth in Exhibit B to the Settlement Agreement.

        1.4    <u>Trust Funds.</u>  The Health Benefit Program and the Life Insurance Program shall be implemented by the Health Benefit Trust. The Supplemental Benefit Program shall be implemented by the Supplemental Benefit Trust. The Health Benefit Trust and the Supplemental Benefit Trust are intended to meet the requirements of tax exempt organizations under Section 501(c)(9) of the IRC, or under any comparable section or sections of any future legislation that amends, supplements or supersedes said section.

        1.5    <u>Administration. Plan Year.</u>  The Plan is administered for plan reporting purposes on the basis of the Plan Year, although the determinations to be made by the Actuary hereunder are made on the basis of the calendar year or the Measurement Year. The Health Benefit Program and the Life Insurance Program are administered by the Company as the Plan Administrator and Named Fiduciary in accordance with Article V, subject to the review authority of the Health Benefit Program Committee provided in Article VI.

        1.6    <u>Amendments.</u>  The benefits provided under the Plan may be amended only to the limited extent provided in Section 8.1.

        1.7    <u>Termination of Existing Health and Life Insurance Benefits</u>. The Company will, and will cause the other Employers to, terminate coverage for Health and Life Insurance Benefits under Existing Plans (other than for Excluded Retirees and Deferred Retiree Participants) as of the end of the day immediately before the Effective Date. The Company will, and will cause the other Employers to, terminate the coverage of Deferred Retiree Participants for Health and Life Insurance Benefits under the Existing Plans as of the end of the first day permitted by the applicable settlement agreements, whereupon they will be eligible to receive benefits under the Health Benefit Program and the Supplemental Benefit Program. Claims incurred prior to the Effective Date or such day will be paid under the Existing Plans in accordance with the terms thereof. Claims for hospital stays which commenced and pregnancies which occurred prior to the Effective Date will be paid as described in the Health Benefit Program SPD.

ARTICLE II

Plan Participants

2.1     Eligibility. The following shall apply with respect to eligibility:

(a)     Each Present Employee, Present Eligible Former Employee, Present Retiree, Present Eligible Dependent and Present Surviving Spouse shall be a Participant in the Plan as of the Effective Date;

(b)     Present Retirees (other than Deferred Retiree Participants), Present Surviving Spouses and Present Eligible Dependents will be entitled to receive benefits under the Health Benefit Program on the Effective Date, subject to the applicable enrollment requirements set forth below. Present Retirees will receive benefits under the Basic Life Insurance Program without contribution or enrollment. Present Retirees will receive benefits under the Optional Life Insurance Program if they make required premium contributions and if they meet the eligibility requirements set forth in the Life Insurance Program SPD. Deferred Retiree Participants will be entitled to receive benefits under the Health Benefit Program at such time as may be permitted under the applicable settlement agreement. Present Eligible Employees and Present Non-Represented Employees shall be eligible for benefits under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement;

(c)     Present Represented Employees shall be eligible for benefits under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement;

(d)     Exhibit C is intended to list all President Non-Represented Employees, Present Eligible Former Employees, Present Retirees and Present Surviving Spouses, as reflected in the records of the Company. Appendix A-4 is intended to list all Present Represented Employees, as reflected in the records of the Company. The Company shall correct each error in Exhibit C and Appendix A-4 (including each omission therefrom) as it becomes known. All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan in the absence of the Settlement Agreement (other than Excluded Retirees) shall be eligible for benefits under the Plan. No person erroneously listed on Exhibit C or Appendix A-4 shall be entitled to any benefits hereunder. Any disputes concerning eligibility to participate in the Plan shall be resolved through the claims dispute procedure set forth in Appendix A-1.

2.2     Enrollment. Participants may enroll in the Health Benefit Program and the Supplemental Benefit Program as follows:

(a)     Each Present Retiree, Present Surviving Spouse, Present Eligible Former Employee and Present Non-Represented Employee may enroll in the Health Benefit Program and the Supplemental Benefit Program for themselves and for their Eligible Dependents as provided in the Settlement Agreement;

(b)     Each Present Represented Employee may apply to enroll in the Health Benefit Program, the Supplemental Benefit Program and (if they meet the eligibility requirements set out in the Life Insurance Program SPD) the Optional Life Insurance Program as of the date on which they apply to receive Pension Benefits. If such Present Represented Employees are eligible

34

to enroll in the Health Benefit program and the Supplemental Program at such time, they will receive a notice and a bill for the applicable initial premium contribution, in accordance with the reasonable enrollment procedures adopted by the Plan Administrator from time to time, and they shall be enrolled in the Basic Life Insurance Program automatically at such time. Upon payment of such premium contribution, such Presented Represented Employee shall also be enrolled in the Health Benefit Program and the Supplemental Benefit Program. If any such person is eligible to enroll in the Optional Life Insurance Program at such time, he will receive information in accordance with the reasonable enrollment procedures adopted by the Plan Administrator from time to time. In the event of a change in the eligibility requirements under any of the Applicable Retirement Plans, if a Present Represented Employee applies for Pension Benefits prior to the time such person is eligible to receive benefits under the Plan, the Plan Administrator shall inform such person of the date on which such person shall be so eligible; and

(c)     Each Future Surviving Spouse not otherwise enrolled at the death of his or her wife or husband shall become eligible to enroll in the Health Benefit Program and the Supplemental Benefit Program for himself or herself and any other Eligible Dependents at that time.

The Plan Administrator shall notify each person described in subparagraphs (b) and (c) of their eligibility to enroll in the Plan without any pre-existing condition limitation or health screening requirement.  Notices of the monthly contributions required to be made to the Health Benefit Program by or on behalf of Enrolled Participants shall be sent each month to all Contributing Participants and to all Participants who become eligible to become Contributing Participants as provided in Appendix A-1. Such contributions shall be due on the first day of that month.  The Plan Administrator shall establish reasonable procedures for enrollment and payment of required contributions, including procedures for the payment of such contributions by voluntary deductions from pension payments under pension plans of the Employers. Present Employees shall be enrolled in the Basic Life Insurance Program for the duration of their lives automatically as of the dates they would have become eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement, irrespective of whether they become or continue as Enrolled Participants in the Health Benefit Program and the Supplemental Benefit Program

2.3     Termination of Coverage Under the Health Benefit Program. An Enrolled Participant shall continue as an Enrolled Participant in the Health Benefit Program and the Supplemental Benefit Program only during the periods for which required contributions have been made to the Health Benefit Program by or on behalf of that Enrolled Participant in accordance with Article III.    Following the enrollment of each Contributing Participant as described above, a bill will be sent to such Contributing Participant approximately three weeks prior to the first day of each month. A reminder notice shall be sent approximately two weeks after the first day of each month to each Contributing Participant for whom the required contribution for that month had not yet been received. If such contribution still has not been received, a termination notice will be sent at the end of the month to each Contributing Participant for whom the required contribution for that month has not yet been received, stating that coverage will be reinstated without penalty if such contribution is received within 45 days of the original due date.  If a contribution required to be made by or on behalf of an Enrolled Participant to enroll or to continue as an Enrolled Participant for any month is not received within 45 days of the first day of such month, such Enrolled Participant's participation in the Health Benefit Program and the Supplemental Benefit Program shall cease

35

as of the first day of the calendar month for which the contribution was not made, except that Retirees who are not Enrolled Participants may continue to receive life insurance benefits under the Life Insurance Program. Except for required contributions so received during the 45 days following the due date therefor, premium contributions may not be paid retroactively. Notwithstanding any other provisions hereof, the participation of an Eligible Dependent in the Health Benefit Program and the Supplemental Benefit Program shall cease when such person ceases to be an Eligible Dependent.  If the participation of an Enrolled Participant in the Health Benefit Program and the Supplemental Benefit Program ceases for any reason, benefits will be paid for claims incurred prior to the date on which his or her participation ceases.

       2.4    Re-Enrollment.    Re-Enrollments (including enrollments for those who decline to participate when first eligible) in the Health Benefit Program and the Supplemental Benefit Program are permitted as provided in Appendix A-1, subject to certain pre-existing condition and other limitations. Except as provided in Appendix A-1, no Retiree, Eligible Dependent or Surviving Spouse who is not enrolled when eligible or who ceases enrollment shall be eligible to re-enroll in the Health Benefit Program.

## ARTICLE III

### Contributions to the Health Benefit Program

       3.1    Determinations by the Actuary. The Actuary shall make the determinations required to be made by it pursuant to the Health Benefit Program on behalf of the Plan Administrator in the Plan Administrator's capacity as a fiduciary hereunder.  Such determinations include determining annually the Retiree Cost Sharing Ratio, the Contributing Participants' Annual Contributions, the Total Estimated Annual Cost of the Health Benefit Program and such other liability and expense calculations as may be required under the Health Benefit Program or by the Health Benefit Program Committee in the exercise of its powers, rights and duties hereunder. The Actuary will furnish these determinations and such additional information as may be necessary or appropriate, including but not limited to workpapers and computer readable spreadsheets, to verify the accuracy thereof to the Company, the Health Benefit Program Committee and the Supplemental Benefit Committee as promptly as practicable, but not later than September 1 of each year for the following calendar year. The Actuary will be available to answer reasonable questions from the Health Benefit Program Committee and the Supplemental Benefit Committee and their designees at no cost to the Health Benefit Trust or the Supplement Benefit Trust. The Health Benefit Program Committee may choose to review or reproduce such determinations and information itself or hire another actuary to review or reproduce all or part of such determinations and information. The initial determinations of the Actuary are detailed in the initial actuarial report attached hereto as Appendix A-5.  All determinations by the Actuary hereunder are subject to the dispute resolution provisions of Section  6.8.

       3.2    Contributing Participants' Annual Contributions.  The Employers and the Contributing Participants shall share the total cost of the Health Benefit Program. All definitions and mathematical formulas relating to the calculation of Contributing Participants' Annual Contributions for a given calendar year are set out in Appendix A-6.  The Actuary will determine the Contributing Participants' Annual Contribution for each year. The Contributing Participants' Annual Contribution for a given calendar year ("calendar year (x)") shall be the Scheduled Contributions for calendar year (x) adjusted for the following:

(a)   Adjustment 1 (T1) - The Contributing Participants' Annual Contribution for calendar year (x) shall be increased by (T1) if the Total Actual Medical Cost for Measurement Year (x-1) exceeds the Total Expected Medical Dollars for Measurement Year (x-1). T1 will equal the lesser of Total Maximum Corridor Medical Dollars for Measurement Year (x-1) or Total Actual Medical Cost for Measurement Year (x-1), reduced by Total Expected Medical Dollars for Measurement Year (x-1).

(b)   Adjustment 2 (T2). The Contributing Participants' Annual Contribution for calendar year (x) shall be adjusted by (T2) if the Total Actual Medical Cost for Measurement Year (x-1) is less than Total Expected Medical Dollars for Measurement Year (x-1) or if the Total Actual Medical Cost for Measurement Year (x-1) is greater than the Total Maximum Corridor Medical Dollars for Measurement Year (x-1). T2 equals (i) the Retiree Adjustment Ratio for Measurement Year (x-1), multiplied by (ii) the Total Actual Medical Cost for Measurement Year (x-1) reduced by the sum of the Total Expected Medical Dollars for Measurement Year (x-1) and T1. T2 can be positive or negative, resulting in an increase or decrease in the Contributing. Participants' Annual Contribution.

(c)   Adjustment 3 (T3) - The Contributing Participants' Annual Contribution for calendar year (x) shall be adjusted by (T3) if the Total Actual Drug Cost for Measurement Year (x-I) is greater or less than Total Expected Drug Dollars for Measurement Year (x-1). T3 equals (i) the Total Actual Drug Cost for Measurement Year (x-1) reduced by Total Expected Drug Dollars for Measurement Year (x-1), multiplied by (ii) the Retiree Adjustment Ratio for Measurement Year (x-1). T3 can be positive or negative resulting in an increase or decrease in contributions.

(d)   Adjustment 4 (DRP) - The Contributing Participants' Annual Contribution for calendar year (x) shall be decreased by (DRP) to account for savings due to the failure of Participants who are or became eligible to enroll in the Health Benefit Program to do so. For calendar year 1994, DRP will equal the Expected Company Costs Per Capita for Measurement Year 1994 times the number of Immediate Drop Outs During the First 45 Days.

For calendar year 1995, DRP will equal the sum of (i) Expected Company Costs Per Capita for Measurement Year 1994 multiplied by the number of Immediate Drop Outs During the Second 45 Days, (ii) the number of Cumulative Drop Outs at the beginning of Measurement Year 1995 reduced by the number of Immediate Drop Outs, multiplied by 50 percent of Expetted Company Costs Per Capita for Measurement Year 1994, and (iii) the number of Cumulative Drop Outs at the beginning of Measurement Year 1995 multiplied by the Expected Company Costs Per Capita for Measurement Year 1995.

For calendar years after 1995, DRP will equal the Expected Company Costs Per Capita for Measurement Year (x) multiplied by the number of Cumulative Drop Outs at the beginning of that Measurement Year.

In all years, DRP will be calculated for each of the eight age groupings shown in Tables I and II of Appendix A-6 and the eight calculations will be totaled.

37

(e)     Adjustment 5 (DEF) - The Contributing Participants' Annual Contribution for calendar year (x) shall be decreased by (DEF) to account for savings due to potential Retirees who elect to defer their retirements beyond the dates assumed in the initial retirement rate assumptions. DEF equals (i) the Expected Number of Retirees and Spouses at the beginning of Measurement Year (x) reduced by the Actual Number of Retirees and Spouses at the beginning of Measurement Year (x), multiplied by (ii) the Expected Company Costs Per Capita for Measurement Year (x). The DEF calculation will be performed for each of the eight age groupings shown in Table IV of Appendix A-6 and multiplied by the Retiree Adjustment Ratio for such calendar year for any age group in which the Actual Number of Retirees and Spouses for Measurement Year (x) is greater than the Expected Number of Retirees and Spouses for Measurement Year (x). DEF will equal the sum of the above calculation for each of the eight age groupings.

(f)     Adjustment 6 (I) - The Contributing Participants' Annual Contributions for calendar year (x) shall be adjusted by (I) for any interest accrued on (i) late payments from the Supplemental Benefit Trust to reduce or reimburse premiums, co-payments, deductibles and costs or to provide Additional Permissible Benefits, (ii) advances from the Employers' Sub-account to the Contributing Participants' Sub-account during Measurement Year (x-1), (iii) general interest accrued in the Contributing Participants' Sub-account during Measurement Year (x-1), and (iv) interest accrued on adjustments to the Contributing Participants' Annual Contributions for T1, T2, T3, DRP and DEF.

Interest accrued due to late payments from the Supplemental Benefit Program will be calculated monthly and will be the average daily late payment during such month times the number of days late divided by 365 times the Navistar Adjustment Rate at the end of the prior Measurement Year.

The interest adjustment will include the net result of any interest accrued on the Employers' funding any Contributing Participants' contribution shortfalls as described in section 3.7. Interest accrued for advances from the Employer Sub-account to the Contributing Participants' Sub-account will be calculated monthly and be the average daily advance times the number of days advanced divided by 365 times the Navistar Rate at the end of the prior Measurement Year.

Interest will be credited on excess Contributing Participants' contributions as described in Section 3.7. Interest will be calculated monthly and be the greater of (i) the actual earnings on the Contributing Participants' Sub-account, and (ii) the average daily balance for such month of the Contributing Participants' Sub-account multiplied by the average for such month of the 90-day LIBOR rates during such month.

Interest will be adjusted for delays in the recognition of T1, T2, T3, DRP and DEF. The adjustment to the Contributing Participants' Annual Contributions for calendar year 1994 will be calculated as the negative of the DRP adjustment times the Navistar Rate at the beginning of Measurement Year 1994 times seven divided by 12. The calendar year 1995 adjustment to the Contributing Participants' Annual Contributions will be calculated as (i) the Navistar Rate at the beginning of Measurement Year 1995, multiplied by (ii) the sum of T1, T2 and T3, times 19, divided by 12, reduced by the sum of (A) DEF

times eight, divided by 12, (B) DRP component (i) times 19 divided by 12, (C) DRP component (ii) times 16.5 divided by 12, and (D) DRP component (iii) times eight divided by 12. The adjustment to the Contributing Participants' Annual Contributions for all years after 1995 will be calculated as (i) the Navistar Rate at the beginning of the Measurement Year, multiplied by (ii) the result of (A) the sum of T1, T2 and T3, times 20, divided by 12, reduced by (B) the sum of DEF and DRP times eight, divided by 12.

The net amount of the aggregate increases or decreases required by Adjustments 1 through 6 above shall be determined and shall be used to determine the uniform percentage adjustment to the Monthly Base Contributions for the year. Each year the Monthly Base Contribution shall be multiplied by a fraction the numerator of which will be [Scheduled Contributions plus (T1) plus (T2) plus (T3) minus (DEF) minus (DRP) plus (I)] and the denominator of which will be Scheduled Contributions.

      3.3    <u>Employers' Annual Contribution</u>.    The Employers' annual contribution shall equal the Total Estimated Annual Cost less the Contributing Participants' share of the Total Estimated Annual Cost. The Contributing Participants' share of the Total Estimated Annual Cost shall equal the sum of the Plan 1 and Plan 2 Contributing Participants' Annual Contributions (detailed in section 3.2) times the respective number of Plan 1 and Plan 2 Contributing Participants.

      3.4    <u>Transfers of Funds between Sub-accounts</u>.  The Actuary will determine the amount of transfers from the Employers' Sub-account to the Contributing Participants' Sub-account and vice versa for each calendar year required by the Section 3.2 adjustments. Transfers will be made on the first of each month and will be equal to one twelfth of the annual transfer amount. The annual amount of transfers for calendar year x will equal:

(a)    T1 times (1-Retiree Adjustment Ratio for Measurement Year x-1), minus

(b)    DRP, minus

(c)    DEF, plus

(d)    I accrued on T1, multiplied by (1-Retiree Adjustment Ratio for Measurement Year (x-1)), minus

(e)    I accrued on DRP minus

(f)    I accrued on DEF

If the amount of transfers is greater than zero, the transfer will be made from the Contributing Participants' Sub-account to the Employers' Sub-account. If the amount of transfers is less than zero, the transfer will be made to the Contributing Participants' Sub-account from the Employers' Sub-account.

      3.5    <u>Transfers from the Supplemental Benefit Trust to the Health Benefit Trust</u>. At the discretion of the Supplemental Benefit Committee, contributions may be made from the Supplemental Benefit Trust to the Health Benefit Trust. If contributions are to be made by the Supplemental Benefit Trust in lieu of Participant Contributions in calendar year (x), Supplemental Benefit Trust contributions will be made on the first of each month and be credited to the Contributing Participants' Sub-

account. If the Supplemental Benefit Trust makes contributions are to reduce or reimburse premiums, co-payments, deductibles and other amounts that would otherwise be required to be paid by or on behalf of Enrolled Participants or to provide Additional Permissible Benefits, the value of the enhanced benefits will be determined by the claims administrator and billed monthly by the Plan Administrator to the Supplemental Benefit Committee. Payment of such amounts is due within 15 days of notification and will be allocated to the Contributing Participants' and Employers' Sub-accounts. The amount allocated to the Contributing Participants' Sub-account will be the payment amount times the Retiree Cost Sharing Ratio. The balance of the payment will be allocated to the Employers' sub-account according to Section 3.7 (b).

3.6     Employers' Prefunding Contributions. The following shall apply with respect to prefunding contributions:

(a)     The Employers will make a prefunding contribution of $2 million as of the Effective Date to pay all then accrued administrative costs of establishing the Plan and initial claims.

(b)     As of the end of each calendar quarter, the Employers will make a prefunding contribution equal to one-quarter of the Employers' share of the estimated Annual Service Cost as determined by the Actuary.

(c)     Prior to six months after the Effective Date, Parent shall make a pre-funding contribution or contributions to the Health Benefit Trust totalling $100 million. Prior to the Event Date and as quickly as is prudent, the Parent shall use its best efforts to sell $500 million of Parent Common. From the Effective Date until the Event Date, Parent shall make pre-funding contributions to the Health Benefit Trust of any and all net cash proceeds from the sale of Parent Common; provided, that Parent may use whatever portion of the proceeds from the sale of Parent Common as the Board reasonably determines is appropriate for working capital; and provided, further, that by the Event Date, the amount of pre-funding contributions made to the Health Benefit Trust shall equal the lesser of $500 million or the total amount of the cash proceeds of all sales of Parent Common between the Effective Date and the Event Date. Nothing herein shall prevent Parent from making pre-funding contributions to the Health Benefit Trust from sources other than the sale of the Parent Common. Parent may defer the initial $100 million contribution, or any portion thereof, required by the first sentence of this Section 3.6(c) only if, and only for so long as, the Board reasonably and in good faith determines that failure to defer such contribution, or such portion, will cause Parent or the Company to become unable to pay its obligations arising in the ordinary course of its business when due. Any deferral described in the preceding sentence shall be permitted only upon notice to the HBPC Committee, by an authorized officer of Parent, that the Board has made the determination described in the preceding sentence.

3.7     Payment of Benefits. For purposes of accounting for contributions and the payment of benefits, the following shall apply.

(a)     The Contributing Participants' share of actual benefit payments and administrative costs will be charged to the accumulated Contributing Participants' accumulated contributions according to the Retiree Cost Sharing Ratio. Any excess contributions shall be accumulated and used to offset any actual benefit payments and administrative costs incurred in subsequent months in excess of contributions collected. Should the balance in the Contributing Participants' Sub-account be

40

insufficient to pay the Contributing Participants' share of actual benefit payments and administrative costs, the Employers' Sub-account (prefunding contribution balance) will advance sufficient funds to the Contributing Participants' Sub-account to cover such shortfalls. Such amounts advanced to the Contributing Participants' Sub-account will be repaid to the Employers' Sub-account immediately upon the availability of funds in the Contributing Participants' Sub-account.

(b)     The Employers' share of actual benefit payments and administrative costs will be one minus the Retiree Cost Sharing Ratio and will be allocated to the Employers' monthly contribution or to Employers' prefunding contributions. The amount of the actual benefit payments and administrative costs to be paid from Employers' prefunding contributions shall be the amount equal to the aggregate of such amounts to be paid by the Employers multiplied by the ratio of the prior year end outstanding balance of Employers' prefunding contributions (plus the balance of any advances to the Contributing Participants' Sub-account) divided by the Employers' share of the Health APBO as of the prior year end. Should the Employers make prefunding contributions at times other than the beginning of the year (other than prefunding contributions for estimated Annual Service Cost), the ratio used to allocate amounts to be paid by the Employers after such additional contribution shall be adjusted as if such additional contribution were made at the beginning of the calendar year less an earnings adjustment equal to the amount of additional contribution times the discount rate used to calculate the Health APBO for the prior year and multiplied by the ratio of the number of months elapsed from the beginning of the year to the date of additional contribution divided by 12.

(c)     Should the amount of Employers' contributions not be sufficient to pay the portion of the Employers' share of actual benefit payments and administrative costs not allocated to Employers' prefunding contributions, the Employers shall make additional contributions to cover the deficiency. Should the amount of Employers' contributions exceed such share, such excess contributions shall be used to offset subsequent months' actual benefit payments and administrative costs described above.

(d)     The balance of any Employers' and Contributing Participants' contributions not required to pay actual benefit payments and administrative costs shall be invested by the trustee of the Health Benefit Trust and the actual earnings on such invested balance will be credited to the respective account balances and used in determining contributions described in sections 3.2.

3.8     State or National Health Insurance Programs.     Notwithstanding the foregoing, in the event of the adoption of, or any legislative change in, a State or National Health Insurance Program as a result of which, following such adoption or change, Participants receive post-retirement health care benefits greater or lesser than those provided under such programs on the Effective Date, the following shall apply:

(a)     The Actuary (i) shall determine the actuarial present value of any new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or

41

change attributable to the provision of such post-retirement benefits to such Participants, and (ii) shall redetermine the Health APBO immediately following the implementation of such adoption or change by subtracting such actuarial present value determined in (i) above from the Health APBO immediately prior to the implementation of such adoption or change; provided that the resulting Health APBO immediately following the implementation of such adoption or change, plus the actuarial present value of the new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or change attributable to the provision of such post-retirement benefits to such Participants, shall not exceed the Health APBO immediately prior to the implementation of such adoption or change.

In addition, if any new taxes, premiums or other amounts are required to be paid by the Employers as a result of such adoption or change based on the number of Participants or on the value of benefits provided to Participants under the Health Benefit Program or contributions made by the Employers under the Health Benefit Program for the benefit of Participants, after the Actuary has made the calculations described in the preceding paragraph, the Actuary shall determine the actuarial present value of such new taxes, premiums or other amounts, and the excess thereof over the actuarial present value determined in (i) above will be allocated between the Employers and the Participants by the Health Benefit Program Committee in a fair and equitable manner to further reduce the Health APBO immediately following the implementation of such adoption or change; provided that the Health APBO immediately following the implementation of such adoption or change, plus the actuarial present value of the new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or change attributable to the provision of such post-retirement benefits to such Participants, plus the actuarial present value of the allocated additional taxes, premiums or other amounts used to further reduce the Health APBO, shall not exceed the Health APBO immediately prior to the implementation of such adoption or change. If the Health Benefit Program Committee cannot reach a consensus in 30 days as to how such allocation shall be made, the Health Benefit Program Committee shall select a qualified individual or firm to make such determination, and the determination of such individual or firm shall be final and binding. If the Health Benefit Program Committee is unable to agree upon an individual or firm to resolve such dispute, the Health Benefit Program Committee shall petition the Court to select an individual or firm to assist the parties by resolving the dispute. In such event, the Health Benefit Program Committee shall suggest to the court at least five individuals or firms with appropriate background to be so appointed. One-half of the fees and expenses of the individual or firm appointed by the court shall be a Plan Expense, and the other half shall be paid by the Company.

(b)     Following such determinations as are required in Section 3.8(a) above, the Health Benefit Program Committee may redesign the Health Benefit Program, including, in its sole discretion, by modifying the benefits thereunder and the amount of contributions required to be made by or on behalf of Enrolled Participants; provided that any changes in required contributions must be reasonably related to changes in the redesigned benefits provided under the Health Benefit Program. Further, the duration of the Employers' liability under the Health Benefit Program following

such redesign shall be consistent with such duration immediately prior to such redesign. This redesign opportunity shall be a one-time opportunity available to the Health Benefit Program Committee with respect to each such adoption or change.

If the Employers are required as a result of such adoption or change to provide benefits which are not available under the Health Benefit Program, the Health Benefit Program Committee will redesign the Health Benefit Program to provide such mandated benefits while maintaining the Health APBO in effect prior to such mandate.

(c)     Following any such redetermination of the Health APBO, the Actuary shall continue to make the determinations required to be made by it hereunder in accordance with the other provisions of this Exhibit A on the basis of the Health APBO as so redetermined.

The Actuary's determinations under this Section 3.8 shall be made based upon actuarial data, methods, factors, procedures and assumptions consistent with those used in the determination of the Health APBO and Retiree Cost-Sharing Ratio as of the Effective Date.

3.9 <u>Guarantee of Health Benefit Program.</u> The Parent and the Company hereby jointly and severally, unconditionally and irrevocably guarantee the provision of benefits under and in accordance with the terms of the Health Benefit Program as primary obligors and not merely as sureties.  The Parent's and the Company's obligations under this guarantee shall not be impaired by (i) any breach or violation of any provision of the Health Benefit Program, whether by the Company, any other Employer or otherwise, (ii) any modification or amendment of or to, or any waiver of any obligation of any party under, the Health Benefit Program, provided that as of the effectiveness of any such modification, amendment or waiver this guarantee shall thereafter be deemed to apply to the Health Benefit Program as so modified, amended or waived, (iii) any merger, re-organization or bankruptcy of the Company or any other Employer or (iv) any other event which may cause the Company or any other Employer to lose its separate legal identity or to cease to exist. This guarantee shall not be affected in any way by the absence of any action to obtain payment of any amount under the Health Benefit Program. The Parent and the Company hereby waive all requirements as to promptness, diligence, presentment, demand for payment, protest and notice of any kind with respect to this guarantee. This guarantee shall remain in full force and effect until the termination of the Health Benefit Program and shall remain in full force and effect or be reinstated, as the case may be, if at any time any amount paid by the Parent, the Company or any other Employer under the Health Benefit Program or this guarantee, in whole or in part, is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Parent, the Company or such other Employer or otherwise, all as though such payment had not been made.  This guarantee is a guarantee of payment and not of collection. Each of Parent and the Company irrevocably waives any and all rights or claims to indemnity, subrogation, reassessment, exoneration or contribution which it had, has, or hereafter may have in respect of any payment under this guarantee to the extent that under applicable law such rights of Parent or the Company would render a payment by the Company or any other Employer (other than Parent) avoidable if made prior to 90 days before a bankruptcy or similar proceeding of the Company or such Employer. To the extent that Parent makes a payment of a type described in the immediately preceding sentence under this guarantee on behalf of any other Employer, and to the extent that the Company makes

43

a payment of such a type on behalf of any other Employer (other than Parent), such payment shall be deemed to be a capital contribution to such Employer.

## ARTICLE IV

### Contributions to Life Insurance Program

4.1     Employer Contributions.  The Employers shall make monthly contributions to the Health Benefit Trust sufficient to permit such trust to pay all premiums necessary to obtain the life insurance benefits (other than the optional additional life insurance benefits referred to in Section 4.2) for Retirees under the Basic Life Insurance Program. Such contributions shall be segregated from the contributions to the Health Benefit Program and invested in a separate sub-account under the Health Benefit Trust prior to applying such amounts to pay such premiums.

4.2     Optional Life Insurance.  In addition to the coverage referred to in Section 4.1, Retirees who meet the eligibility requirements set out in the Life Insurance Program SPD shall have the right to purchase, at group rates but entirely at their own cost, optional additional life insurance coverage up to the maximum of the coverage that would have been available to such Retirees under the Existing Plans. As more fully described in Appendix A-2, this opportunity is a one-time election available to each such Retiree as of the later of the Effective Date or such Retiree's date of retirement which shall be exercised in accordance with the procedures set forth in Appendix A-2.  The Plan Administrator shall arrange for such coverage to be provided directly to Retirees electing to purchase such coverage by a designated insurance company, which as of the Effective Date shall be Aetna Life Insurance Company. Retirees shall be given reasonable notice of this optional coverage and of any changes in the insurance company designated to provide such coverage, or in the terms and conditions thereof, as provided in Appendix A-2. The Plan Administrator shall use its best efforts to ensure that the terms and conditions of the coverage made available to Retirees from time to time pursuant to this Section 4.2 are competitive. The Optional Life Insurance Program is provided directly to Retirees by the designated life insurance company under a group insurance arrangement, not under the Life Insurance Program. Although the eligibility and benefit amount provisions of this program are included in the Life Insurance Program SPD attached as Appendix A-2, it is intended that the Optional Life Insurance Program shall not be considered a plan as such term is defined in ERISA.

4.3     Guarantee of Life Insurance Program.  Parent and the Company hereby jointly and severally, unconditionally and irrevocably guarantee the provision of benefits under and in accordance with the terms of the Basic Life Insurance Program, as primary obligors and not merely as sureties. Parent's and the Company's obligations under this guarantee shall not be impaired by (i) any breach or violation of any provision of the Basic Life Insurance Program, whether by Parent, the Company, any other Employer or otherwise, (ii) any modification or amendment of or to, or any waiver of any obligation of any party under, the Basic Life Insurance Program, provided that as of the effectiveness of any such modification, amendment or waiver this guarantee shall thereafter be deemed to apply to the Basic Life Insurance Program as so modified, amended or waived, (iii) any merger, reorganization or bankruptcy of Parent, the Company or any other Employer or (iv) any other event which may cause Parent, the Company or any other Employer to lose its separate legal identity or to cease to exist. This guarantee shall not be affected in any way by the absence of any action to obtain payment of any amount under the Basic Life Insurance Program. Parent and the Company hereby waive all requirements as to promptness,

44

diligence, presentment, demand for payment, protest and notice of any kind with respect to this guarantee. This guarantee shall remain in full force and effect until the termination of the Basic Life Insurance Program and shall remain in full force and effect or be reinstated, as the case may be, if at any time any amount paid by Parent, the Company or any other Employer under the Basic Life Insurance Program or this guarantee, in whole or in part, is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Parent, the Company or such other Employer or otherwise, all as though such payment had not been made.  This guarantee is a guarantee of payment and not of collection. Each of Parent and the Company irrevocably waives any and all rights or claims to indemnity, subrogation, reassessment, exoneration or contribution which it had, has, or hereafter may have in respect of any payment under this guarantee to the extent that under applicable law such rights of Parent or the Company would render a payment by the Company or any other Employer (other than Parent) avoidable if made prior to 90 days before a bankruptcy or similar proceeding of the Company or such Employer. To the extent that Parent makes a payment of a type described in the immediately preceding sentence under this guarantee on behalf of any other Employer, and to the extent that the Company makes a payment of such a type on behalf of any other Employer (other than Parent), such payment shall be deemed to be a capital contribution to such Employer.

<u>ARTICLE V</u>

Administration of the Health Benefit Program
<u>and the Life Insurance Program</u>

As the Plan Administrator and Named Fiduciary, the Company is responsible for the administration of the Health Benefit Program and the Life Insurance Program, subject to review by the Health Benefit Program Committee as provided in Article VI. Subject to such review, the Plan Administrator shall have the following powers, rights and duties, which it shall perform in its capacity as a fiduciary under ERISA:

(a)     to adopt such rules of procedure consistent with the Health Benefit Program and the Life Insurance Program as it may deem appropriate for the efficient administration of such programs or in connection with the exercise or discharge of its powers, rights and duties;

(b)     to construe and interpret the Health Benefit Program and the Life Insurance Program and to decide all questions of eligibility under such programs;

(c)     to appoint claims administrators, medical review agencies and other service providers;

(d)     to enroll Participants in the Health Benefit Program, and the Life Insurance Program, to distribute and receive plan administration forms  and to comply with all applicable governmental reporting and disclosure requirements; and

 (e)     to respond to requests for information by the Health Benefit Program Committee relating to the Plan.

The Plan Administrator shall perform its duties with respect to plan administration on a reasonable and non-discriminatory basis and shall apply uniform rules to all persons similarly situated.

## ARTICLE VI

### Health Benefit Program Committee

6.1     <u>Health Benefit Program Committee</u>.  The Health Benefit Program Committee shall consist of seven members, including two members appointed by the UAW (the "<u>HBPC UAW Members</u>"), who may be replaced at any time by the UAW, three members appointed by the Company (the "<u>HBPC Company Members</u>"); who may be replaced at any time by the Company, one member appointed as representative of the non-UAW Retirees in accordance with Section 6.6 (the "<u>HBPC Other Member</u>") and a seventh member appointed by a majority of the other six members, who shall be the chairperson of the Health Benefit Program Committee (the "<u>HBPC Chair</u>"; the HBPC Chair, the HBPC UAW Members, the HBPC Other Member and the HBPC Company Members, collectively, the "<u>HBPC Committee Members</u>"); provided that such seventh member may be recalled at any time by a vote of a majority of the HBPC UAW Members and the HBPC Other Member, on the one hand, or a majority of the HBPC Company Members, on the other hand, whereupon a new member shall be appointed by a majority of the other six members. The persons who shall initially serve in such capacities are identified in Appendix A-7 hereto. The Health Benefit Program Committee shall have a Secretary, who shall be elected by the HBPC Committee Members.

6.2     <u>Committee Powers</u>.  The Health Benefit Program Committee shall be a fiduciary under ERISA with respect to its responsibilities hereunder. The Health Benefit Program Committee shall have the powers, rights and duties set forth herein and the following additional powers, rights and duties consistent with its rights and obligations under this Exhibit A:

(a)     to adopt such rules of procedure consistent with the Health Benefit Program and the Life Insurance Program as it may deem appropriate in its sole discretion in connection with the exercise or discharge of its powers, rights and duties hereunder;

(b)     to resolve disputes with respect to determinations of the Plan Administrator regarding benefits and eligibility in its sole discretion in accordance with the dispute resolution procedure set forth in the relevant SPD; provided, that the Health Benefit Program Committee shall apply the terms of the Existing Plans in a manner consistent with the prior interpretations of such Existing Plans by the Company; and provided, further, that the Health Benefit Program Committee may not provide for the payment of any benefits not provided under the Health Benefit Program;

(c)     to review any and all determinations made by the Actuary under the Health Benefit Program, as well as the calculations and experience trends and other assumptions used by the Actuary in making such determinations and to initiate the dispute resolution procedure referred to in Section 6.8, such decision to review or initiate being in its sole discretion;

(d)     to bring to the attention of the Plan Administrator and to discuss with the Plan Administrator such administrative problems under the Health Benefit Program of which it has knowledge as it may deem appropriate in its sole discretion;

(e)     to require the Plan Administrator to provide it with such information regarding the administration of the Plan as it may deem appropriate in its sole discretion;

(f)     to make such recommendations to the Plan Administrator and Named Fiduciary in connection with the administration of the Health Benefit Program and the Life Insurance Program as it may deem appropriate in its sole discretion;

(g)     to engage such consultants and other professionals to assist it in the exercise or discharge of its powers, rights and duties hereunder as it may deem appropriate in its sole discretion;

(h)     to review and enforce Parent's, the Company's and the other Employers' compliance with their obligations under the Health Benefit Program and the Life Insurance Program, such decision to review or enforce being in its sole discretion; and

(i)     to undertake such other actions as are necessary or appropriate in connection with the exercise or discharge of such powers, rights and duties.

provided, that the Health Benefit Program Committee shall have no authority to modify benefits except as expressly provided herein or to waive any contribution obligation of the Employers under the Health Benefit Program or the Life Insurance Program; and provided, further, that the Health Benefit Program Committee shall be bound by the instructions of the Supplemental Benefit Program Committee with respect to the use of any assets transferred to the Health Benefit Trust from the Supplemental Benefit Trust.

6.3     <u>Program Design</u>.  The Health Benefit Program Committee, as a matter of appropriate program design and not as a fiduciary, shall have the following powers, rights and duties:

(a)     reasonably to redesign benefits under the Health Benefit Program as provided in Section 3.8 as it may deem appropriate in its sole discretion;

(b)     reasonably to redesign benefits under the Health Benefit Program as necessary to implement such coordinated care systems as may be recommended by the UAW/Navistar Joint Committee or, if such committee ceases to exist, reasonably to redesign benefits under the Health Benefit Program as it deems necessary or appropriate to implement coordinated care systems in its sole discretion and otherwise to give effect to the powers granted to such committee in Appendix A-1; provided, that no such redesign shall increase the Employers' share of the Health APBO;

(c)     to make such adjustments in the Contributing Participants' Annual Contribution by a unanimous vote of the HBPC Committee Members as may be required to prevent the Contributing Participant's Sub-account from maintaining an unnecessary and inappropriate surplus or deficit for an extended period of time.

6.4     <u>Action by Health Benefit Program Committee.</u> Any action by the Health Benefit Program Committee will be subject to the following provisions:

(a)     The HBPC Chair or any two members may call a meeting of the Health Benefit Program Committee on not less than two days' advance written

notice to all members (including telephone conference, video conference and other technology-assisted meetings of persons at separate locations);

(b)    At all meetings of the Health Benefit Program Committee the HBPC Company Members shall have a total of three votes and the HBPC UAW Members and the HBPC Other Member together shall have a total of three votes, the vote of any absent HBPC Company Members being divided equally between the HBPC Company Members present and the vote of any absent HBPC UAW Member or the absent HBPC Other Member being divided equally between the HBPC UAW Members and HBPC Other Member present;

(c)    A meeting of the Health Benefit Committee shall be validly constituted if both HBPC UAW Members or one UAW Member and the HBPC Other Member, on the one hand, and two HBPC Company Members, on the other hand, participate in such meeting;

(d)    Except as otherwise specifically provided herein, the Health Benefit Program Committee shall act by the majority vote of all of its members at a duly called and validly constituted meeting, which action shall be as effective as if such action had been taken by all members of the Health Benefit Program Committee, or by written instrument signed by all of the HBPC Committee Members, which instrument may be executed in counterparts; provided, that one or more HBPC Committee Members or other persons may be so authorized to act with respect to particular matters on behalf of all HBPC Committee Members; and provided, further, that no HBPC Committee Member shall be liable or responsible for any act or omission of other HBPC Committee Members in which the former has not concurred; and

(e)    The HBPC Chair shall vote only in case of a failure of the other HBPC Committee Members to adopt a decision as to any matter which is properly before the Health Benefit Committee and within its authority to determine; and

(f)    The certificate of the Secretary of the Health Benefit Program Committee or of a majority of the HBPC Committee Members that the Health Benefit Program Committee has taken or authorized any action shall be conclusive in favor of any person relying on such certificate.

6.5    <u>Health Benefit Program Committee Minutes</u>. As soon as is reasonably practicable after each meeting of the Health Benefit Program Committee, its Secretary shall prepare draft minutes of such meeting, which shall be delivered to each HBPC Committee Member and approved or modified at the following meeting.

6.6    <u>HBPC Other Member</u>. The initial HBPC Other Member is the person specified as such in Appendix A-7. In the event of the death, incapacity or resignation of the HBPC Other Member, his successor shall be appointed by a majority vote of such HBPC Other Member (if he is not deceased or incapacitated) and two alternates (the "<u>HBPC Other Member Alternates</u>") upon notice from the Health Benefit Program Committee or such HBPC Other Member of such

48

death, incapacity or resignation; provided, that the HBPC Other Member shall not be a Non-Represented Employee, an employee of the UAW, an Employee represented by the UAW or a Retiree represented by the UAW at the time of his retirement. The initial HBPC Other Member Alternates are the persons specified as such in Appendix A-7. In the event of the death, incapacity or resignation of either of the HBPC Other Member Alternates, his successor shall be appointed by a majority vote of such HBPC Other Member Alternate (if he is not deceased or incapacitated), the other HBPC Other Member Alternate and the HBPC Other Member upon notice from the Health Benefit Program Committee or such HBPC Other Member Alternate of such death, incapacity or resignation. The HBPC Other Member or either of the HBPC Other Member Alternates may also be replaced by the Court upon petition signed by not less than 50 Participants who are Non-Represented Employees, Present Employees who are not represented by the UAW or Retirees who were not represented by the UAW at the time of their retirement, for failure adequately to represent the Participants.

6.7     <u>Expenses</u>. The Company agrees that, upon demand and the Company's receipt of such detailed supporting documentation as the Company may reasonably request, it will forthwith pay (i) to all HBPC Committee Members that are not employed by the Company, any Employer or the UAW, reasonable compensation for time spent on Health Benefit Program Committee matters, (ii) to each HBPC UAW Member, the HBPC Other Member and any HBPC Other Member Alternate, the amount of any and all out-of-pocket expenses, including reasonable travel expenses, incurred by him in exercising or discharging his powers, rights and duties hereunder and (iii) to the Health Benefit Program Committee, the amount of any and all out-of-pocket costs and expenses (other than expenses of consultants and other professionals) incurred by it in connection with reviewing the administration of the Health Benefit Program and the Life Insurance Program. Such compensation and expenses shall not be considered Plan Expenses.

6.8     <u>Dispute Resolution</u>.  In the event of a dispute regarding any determination by the Actuary hereunder, the Company and the Health Benefit Program Committee will attempt to resolve such dispute.  If any such dispute is not so resolved to the satisfaction of the Health Benefit Program Committe, the Health Benefit Program Committee may request that such determination be resolved by an independent actuary. Such independent actuary shall be selected in accordance with the following procedure. First, the Company and the Health Benefit Program Committee shall, for a period not to exceed 10 days, seek to agree on a firm to serve as such independent actuary. Second, in the event that the Company and the Health Benefit Program Committee fail to agree on such a firm, they shall request the Society of Actuaries to prepare a list of the seven largest actuarial firms with their principal offices in the United States (as measured by the number of enrolled actuaries in such firms) and communicate such list to the parties. Third, the Company and the Health Benefit Program Committee shall, beginning with the Company, alternately strike one name off such list until only one such name remains, and that firm shall act as such independent actuary. The Actuary, the Company and the Health Benefit Program Committee shall cooperate with such independent actuary in reevaluating the disputed determination, and the determination of the independent actuary shall be final and binding on all parties. One-half of the fees and expenses of the independent actuary shall be a Plan Expense, and the other half shall be paid by the Company. For purposes of this Section 6.8, the Health Benefit Program Committee shall act by a vote of any two of the HBPC UAW Members and the HBPC Other Member.

49

ARTICLE VII

General Provisions

7.1    Required Data.  Enrolled Participants shall furnish the Plan Administrator with such information as may be necessary to permit the Plan Administrator, claims administrators, medical review agencies or committees to perform their duties with respect to the administration of the Plan.

7.2    Non-Alienation.  No Participant or other person shall have any right, title or interest in any assets of the Plan prior to the payment thereof on behalf of such person. No rights or interests of any Participant under the Plan shall be assignable either voluntarily or involuntarily.

7.3    Action by Employers.  Any action required or permitted to be taken by any Employer under the Plan shall be taken by resolution of the board of directors of such Employer, or by resolution of a duly authorized committee of its board of directors, or by a person or persons authorized by resolution of its board of directors or such committee.

7.4    Applicable Law.  The Plan shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or pre-empted thereby, with the laws of the State of Illinois.

7.5    Limitation of Liability; Indemnification.  To the extent permitted by applicable law, no person shall be personally liable for any act done or omitted to be done in good faith in the administration of the Health Benefit Program or the Life Insurance Program or the investment of the assets of the Health Benefit Trust. The Employers shall jointly and severally indemnify and hold harmless, to the extent permitted by applicable law, each present or former employee of an Employer through whom the Plan Administrator is performing or has performed any of its responsibilities hereunder, each present or former director or officer of the Employers, the UAW, each present or former HBPC Committee Member and each HBPC Other Member Alternate from and against any and all losses, costs, liabilities, damages and expenses (including fines, penalties, taxes and the fees and disbursements of actuarial and legal advisors), as incurred, by reason of any act done or omitted to be done in good faith in connection with the administration of the Plan or the investment of the assets of the Health Benefit Trust or in connection with the enforcement of the obligations of Parent, Company or any other Employer under the Health Benefit Program and Life Insurance Program. Any claim for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

7.6    Limitation on Liens as Security for Employers' Contributions.  Parent will not, and will not permit any Restricted Subsidiary to, create or assume any mortgage, security interest, pledge or lien (herein referred to as "mortgage"), or permit to exist any mortgage created or assumed since March 1, 1968, of or upon any Principal Property, or shares of capital stock or indebtedness for borrowed money issued by any Restricted Subsidiary and owned by Parent or any Restricted Subsidiary, whether owned at the Effective Date or thereafter acquired, without making effective provision, and Parent in such case will make or cause to be made effective provision, whereby the obligations of Parent and the Company under the Health Benefit Program and the Basic Life Insurance Program shall be secured by such mortgage equally and ratably with

50

any and all other indebtedness or obligations thereby secured, so long as such indebtedness or obligations shall be so secured; provided, that the foregoing shall not apply to any of the following:

(a)   mortgages on any Principal Property acquired, constructed or improved by Parent or any Restricted Subsidiary after March 1, 1968 which are created or assumed contemporaneously with, or within 90 days after, such acquisition, construction or improvement to secure or provide for the payment of any part of the purchase price of such Principal Property or the cost of such construction or improvement incurred after March 1, 1968, or, in addition to mortgages contemplated by clauses (b) and (c) below, mortgages on any such Principal Property existing at the time of acquisition thereof, provided, that in the case of any such construction or improvement the mortgage shall not apply to any property theretofore owned by Parent or any Restricted Subsidiary other than any theretofore substantially unimproved real property on which the property so constructed, or the improvement, is located and other than any machinery or equipment installed on the real property on which the property so constructed or the improvement is located;

(b)   mortgages on property of a corporation existing at the time such corporation is merged or consolidated with Parent or a Restricted Subsidiary or at the time of a sale, lease or other disposition of the properties of such corporation (or a division thereof) as an entirety or substantially as an entirety to Parent or a Restricted Subsidiary;

(c)   mortgages on property of a corporation existing at the time such corporation becomes a Restricted Subsidiary;

(d)   mortgages securing indebtedness of a Restricted Subsidiary to Parent or to another Restricted Subsidiary;

(e)   mortgages in favor of the United States of America or any State thereof, or any department, agency, instrumentality or political subdivision of any such jurisdiction, to secure partial, progress, advance or other payments pursuant to any contract or statute for the purpose of financing all or any part of the purchase price or the cost of constructing or improving the property subject to such mortgages;

(f)   mortgages in favor of any customer to secure partial, progress, advance or other payments for goods produced or services rendered to such customer in the ordinary course of business not exceeding the amount of such payments;

(g)   mortgages for the sole purpose of extending, renewing or replacing (or successively extending, renewing or replacing) in whole or in part the indebtedness secured by any mortgage referred to in the foregoing clause (a) to (f), inclusive, or in this clause (g); provided, that the principal amount of indebtedness secured thereby shall not exceed the principal amount of indebtedness so secured at the time of such extension, renewal or replacement, and that such extension, renewal or replacement shall be limited to all or a part of the property which secured the mortgage so extended, renewed or replaced (plus improvements on such property);

(h)     pledges or deposits under workmen's compensation, unemployment insurance or similar statutes and mechanics', workmen's, repairmen's, materialmen's, carriers' or other similar liens arising in the ordinary course of business or deposits or pledges to obtain the release of any such liens;

(i)     liens created by or resulting from any litigation or other proceedings, including liens arising out of judgments or awards against Parent or any Restricted Subsidiary with respect to which Parent or such Restricted Subsidiary is in good faith prosecuting an appeal or proceeding for review; or liens incurred by Parent or any Restricted Subsidiary for the purpose of obtaining a stay or discharge in the course of any legal proceeding to which Parent or such Restricted Subsidiary is a party; or

(j)     liens for taxes or assessments or governmental charges or levies not yet due or delinquent, or which can thereafter be paid without penalty, or which are being contested in good faith by appropriate proceedings; landlord's liens on property held under lease; and any other liens of a nature similar to those hereinabove described in this clause (j) which do not, in the opinion of Parent, materially impair the use of such property in the operation of the business of Parent or a Restricted Subsidiary or the value of such property for the purpose of such business.

Notwithstanding the foregoing provisions, Parent or any Restricted Subsidiary may, without equally and ratably securing its contribution obligations under the Plan, create, assume, or permit to exist mortgages which would otherwise be subject to the foregoing restrictions if at the time of such creation, assumption or permission, and after giving effect thereto, such indebtedness does not exceed 5% of the stockholders' equity in Parent and its consolidated Subsidiaries, as shown by the audited consolidated balance sheet of Parent and its consolidated Subsidiaries in the latest annual report to the stockholders of Parent.

7.7     <u>Limitations on Sale and Lease-Back Transactions</u>.

(a)     Parent will not, nor will it permit any Restricted Subsidiary to,  enter into any arrangement, or permit to exist any arrangement entered into since March 1, 1968, with any person providing for the leasing by Parent or any Restricted Subsidiary of any principal property (except for temporary leases for a term, including any renewal thereof, of not more than three years and except for leases between Parent and a Restricted Subsidiary or between Restricted Subsidiaries) which property has been or is to be sold or transferred by Parent or a Restricted Subsidiary to such person (a "<u>Sale and Lease-Back Transaction</u>") unless the net proceeds of such sale are at least equal to the fair value (as determined by the Board) of such property and either (1) Parent or such Restricted Subsidiary would be entitled to incur a mortgage on such property without equally and ratably securing the obligations of Parent and the Company under the Health Benefit Program and the Basic Life Insurance Program pursuant to Section 7.6(a), or (2) Parent shall contribute an amount equal to the net proceeds of such sale (as so determined) to the Health Benefit Trust, the retirement of Securities or other indebtedness ranking on a parity with the Securities (other than any mandatory retirement or payment at maturity and provided that any retirement of Securities is in accordance with the applicable optional redemption terms adopted pursuant to

Section 2.02 of the Indenture), within 120 days of the effective date of any such arrangement.

(b)    Notwithstanding the provisions of paragraph (a) of this Section 7.7, Parent or any Restricted Subsidiary may enter into or permit to exist Sale and Lease-Back transactions, if at the time such Sale and Lease-Back Transactions are (or were) entered into, and after giving effect thereto, Exempted Indebtedness does (or did) not exceed 5% of the stockholders' equity in Parent and its consolidated Subsidiaries as shown by the audited consolidated balance sheet of Parent and its consolidated Subsidiaries contained in the latest annual report to the stockholders of parent.

7.8    <u>Subrogation</u>. In the event of any payment under the Health Benefit Program on behalf of an Enrolled Participant, the Company or the excess loss insurer of benefits under the Health Benefit Program shall be subrogated to all rights of recovery of the Enrolled Participant against any person or organization in respect of such payment except against insurers on policies of insurance issued to and in the Participant's name, or against a policy of insurance to which the Participant has contributed 50 percent or more of the premium. The Participant shall, at the request of the Company or such insurer, execute and deliver such instruments and papers as may be required and do whatever else is necessary to secure such rights.

7.9    <u>Assignment and Delegations</u>. The rights of any party under the Plan may not be assigned without the prior written agreement of the Company and the Supplemental Benefit Committee, and any purported assignment in violation of this sentence shall be void. Any party may delegate any of its obligations under the Health Benefit Program or the Life Insurance Program; provided, that no such delegation shall relieve such party of any of such obligations; and provided, further, that the delegation of any obligations in connection with the transfer of any of the assets of any Employer shall be subject to the express assumption of such obligation by the proposed transferee.

7.10    <u>Captions</u>. The captions used in this Exhibit A are for convenience of reference only and do not constitute a part of this Exhibit A and will not be deemed to limit, characterize or in any way affect any provision of this Exhibit A, and all provisions of this Exhibit A will be enforced and construed as if no captions had been used in this Exhibit A.

<u>ARTICLE VIII</u>

<u>Amendment and Termination</u>

8.1    <u>Amendment</u>. The Plan Administrator and the Health Benefit Program Committee reserve the right to amend the Health Benefit Program and the Life Insurance Program as follows:

(a)    The Plan Administrator shall have the right to make nonmaterial technical and administrative amendments thereto and to the Health Benefit Trust which are necessary to comply with the requirements of the IRS and ERISA and other applicable legal requirements; provided, that no such amendment shall adversely affect the level of benefits to any Class Member;

(b)      The HBPC Committee Members may by unanimous written consent amend the benefits provided under the Health Benefit Program; provided, that any proposed amendment which adversely impacts the level of Plan benefits to any Class Member shall be subject to approval by the Court after appropriate notice to Class Members; and

(c)      The Health Benefit Program Committee may reasonably redesign the Health Benefit Program in accordance with the provisions of Section 6.3.

8.2    <u>Termination</u>.  The Health Benefit Program and the Basic Life Insurance Program will terminate on the earlier of (a) the termination of the Settlement Agreement as provided in Section 13 thereof and (b) the later of the death of the last Participant entitled to benefits and the payment of any and all claims previously incurred by Participants and any and all benefits payable in respect of the death of any Participant; provided, that the obligations of Parent and the Company under Sections 6.6 and 7.6 shall survive such termination.  In the event the Health Benefit Program and the Life Insurance Program terminate in accordance with clause (a) of this Section 8.2, any or all of the assets held in the Health Benefit Trust shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association: within the meaning of Section 501(c) (9) of the IRC, as determined by the Company.

ARTICLE IX

Exclusive Benefit and Prohibited Inurement

9.1    <u>Exclusive Benefit</u>.  No part of the corpus or income of the Health Benefit Trust shall be used for, or diverted to, any purposes other than for the exclusive benefit of persons who are or may become entitled to benefits under the Health Benefit Program or the Life Insurance Program and for defraying reasonable expenses of administering such programs.

9.2    <u>Prohibited Inurement</u>.  No part of the corpus or income of the Health Benefit Trust shall inure to the benefit of Parent, the Company or any other Employer.  All fiduciaries hereunder shall discharge their duties solely in the interests of Participants for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration. No benefit under the Health Benefit Program or the Life Insurance Program or interest, right or claim in or to any part of the Health Benefit Trust or any payment therefrom shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, hypothecation or commutation, nor shall any such benefit or interest, right or claim in or to any part of the Health Benefit Trust or any payment therefrom be in any manner liable for or subject to garnishment, attachment, execution or levy or be liable for or subject to the debts, contracts, liabilities, engagements or torts of the person entitled thereto, and the trustee under such trust shall not recognize any attempt to make it so, except as directed by the Company, in its capacity as Plan Administrator, for the payment of benefits directly to health care providers or provided by the Health Benefit Program and Life Insurance Program in a manner that is consistent with applicable law.

<u>ARTICLE X</u>

<u>Events of Default</u>

10.1     Upon the occurrence and during the continuation of a "Health Benefit Program Payment Default," the Health Benefit Program Committee shall have the right, by notice to the Company:

(a)     to require the Company to make prefunding contributions to the Health Benefit Trust in an amount equal to the excess, if any, of the Health APBO as most recently determined by the Actuary over the amount of any prefunding contribution (other than prefunding of the Annual Service Cost) made by the Company under the Health Benefit Program and the Life Insurance Program from the Effective Date until the date of such notice; and/or

(b)     to replace the Company as Plan Administrator and Named Fiduciary of the Health Benefit Program and the Life Insurance Program.

As used herein, the term "<u>Health Benefit Program Payment Default</u>" shall mean the failure at any time by Parent, the Company or any other Employer to make any payment or contribution required to be made by it pursuant to Sections 3.3, 3.6(b), 3.9, 4.1, 4.3 or 7.5 within five days after receipt of written notice of such failure from the Health Benefit Program Committee, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 10.1; provided, that with respect to any failure to make a payment or contribution required to be made by an Employer pursuant to Sections 3.3, 3.4 or 3.6, if such Employer shall have paid or contributed the amount determined by the Actuary in accordance with Article III and such Employer shall be required to make any additional payment or contribution as determined by the independent actuary referred to in Section 6.7, the Health Benefit Program Committee shall not give notice of such failure unless such Employer shall have failed to make such additional payment or contribution within five days of the date of such determination by such independent actuary; and provided, further, that the Health Benefit Program Committee shall not give notice of a failure to make a payment under Section 7.6 unless the Indemnified Party has executed the undertaking provided for in the Indemnification Procedures.

10.2     Upon the occurrence and during the continuation of a "Lien/Sale and Lease-back Default," the Health Benefit Program Committee shall have the right, by notice to the Company, to replace the Company as Plan Administrator and Named Fiduciary of the Health Benefit Program and the Life Insurance Program. As used herein, the term "<u>Lien/Sale and Lease-back Default</u>" shall mean the failure by Parent to cure any breach of Section 7.7 or 7.8 within 30 days after receipt of written notice of such failure, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 10.2 (said 30 days being hereinafter referred to as the "<u>Section 10.2 Cure Period</u>").

10.3     In the event any of the failures described in Section 10.2 which would otherwise constitute a Lien/Sale and Lease-back Default cannot be cured as a matter of right solely through the payment of money, the Section 10.2 Cure Period shall be extended for such additional period of time as

55

is reasonably necessary to permit Parent to effect such cure as long as Parent, the Company or any Employer is diligently and in good faith pursuing such cure.

     10.4 The rights of the Health Benefit Program Committee under this Article X are in addition to, and not in lieu of, any rights that such Committee, or any other person or entity, including, without limitation, any HBPC Committee Member, HBPC Other Member Alternate or Participant, may have under the Settlement Agreement, any Exhibit thereto or any Appendix to any such Exhibit, whether in equity or at law. The waiver by the Health Benefit Program Committee or any such person or entity of any Health Benefit Program Payment Default, Lien/Sale and Lease-back Default or other breach of any provision of, or any other right to enforce or claim or benefit under, any such document shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, any such document.

## NAVISTAR INTERNATIONAL TRANSPORTATION CORP.
## RETIREE HEALTH BENEFIT TRUST

THIS AGREEMENT OF TRUST (hereinafter referred to as the "Agreement") is made and entered into this 18th day of June, 1993, by and between Navistar International Transportation Corp., a corporation organized under the laws of the State of Delaware (hereinafter referred to as the "Company"), and The Northern Trust Company (hereinafter referred to as the "Trustee").

### W I T N E S S E T H:

**WHEREAS**, the Company was a defendant in Shy v. Navistar International Corporation, Case No. C-3-92-333 (S.D. Ohio) (the "Litigation"), and entered into a settlement agreement (the "Settlement Agreement") with the plaintiffs in the Litigation in order to limit its liability to the plaintiffs; and

**WHEREAS**, in order to provide post-retirement health and life insurance benefits to Participants and Beneficiaries (as hereinafter defined), the Company maintains the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program (the "Health Benefit Program"), (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program (the "Life Insurance Program"), and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program; and

**WHEREAS**, under the Settlement Agreement, the Health Benefit Program, and the Life Insurance Program, the Company has agreed to provide certain benefits with an initial accumulated postretirement benefit obligation of $1,000 million ($946 million for the Health Benefit Program and $54 million for the Life Insurance Program) and to make certain contributions to the Health Benefit Program and the Life Insurance Program (collectively the "Programs") with respect to such obligation; and

**WHEREAS**, in order to implement and carry out the terms of the Settlement Agreement and the Programs, the Company wishes to establish the Navistar International Transportation Corp. Retiree Health Benefit Trust (hereinafter referred to as the "Trust"), which shall form a part of the Programs, and which is intended to satisfy the requirements of Section 501(c)(9) of the Code (as hereinafter defined) or any successor provision thereto; and

**WHEREAS**, the Company has authorized the execution of this Agreement and the creation of a trust fund to provide benefits under the Programs; and

**WHEREAS**, the Company intends, through this Agreement, to provide for management and control of the assets of the Programs through a trust fund; and

**WHEREAS**, The Northern Trust Company has consented to act as Trustee hereunder and to hold and administer such sums as are transferred or contributed upon the terms set forth herein,

**NOW, THEREFORE**, the Company and the Trustee hereby agree to establish the Navistar International Transportation Corp. Retiree Health Benefit Trust, subject to the following terms and conditions:

# ARTICLE I

## DEFINITIONS

1.1    **Definitions.** The following words and phrases when used herein shall have the following meanings, except as otherwise required by the context:

(a)    **"Administrator"** means the Company.

(b)    **"Beneficiary"** means a person designated as a beneficiary of a Participant by the Participant, or by the terms of a Program, and who is or may become entitled to a benefit under a Program.

(c)    **"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

(d)    **"Committee"** means the committee established pursuant to the Programs.

(e)    **"Company"** means Navistar International Transportation Corp.

(f)    **"Employers"** means Navistar International Corporation, Navistar International Transportation Corp., Navistar Financial Corporation, HARCO National Insurance Company, and Indianapolis Casting Corporation.

(g)    **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended from time to time.

(h)    **"Investment Manager"** means a person or entity who is either:

(1)    an investment adviser registered as such under the Investment Advisers Act of 1940; or

(2)    a bank, as defined in that Act; or

(3)    an insurance company qualified to manage, acquire, or dispose of any asset of an employee benefit plan under the laws of more than one State.

(i)    **"Participant"** means a Participant as defined by the Programs.

(j)    **"Plan"** means the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan, which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program, (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program, and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program.

(k)    **"Program Account"** means that part of the assets of the Trust attributable to a particular Program, including contributions, income, gains or losses, and expenses allocable to that Program and insurance contracts, if any, used as vehicles to pay benefits under the Program.

(l)    **"Programs"** means the Navistar International Transportation Corp. Retiree Health Benefit Program and the Navistar International Transportation Corp. Retiree Life Insurance Program of the Plan.

(m)    **"Trust Fund"** means the assets of the Trust.

(n)    **"Trust Year"** means the fiscal year beginning on each November 1st and ending on the following October 31st; provided that the first Trust Year shall begin on the effective date specified by Section 12.9 hereof and shall end on the following October 31st.

1.2    **Gender and Number**. Masculine pronouns shall refer both to males and to females. Singular or plural words shall be construed to refer to the plural or the singular, respectively, where appropriate.

# ARTICLE II

## PAYMENTS TO AND FROM THE TRUST

2.1    **Payments to the Trust**. The Trustee shall receive any payments made to it in cash or in the form of such other property as it may from time to time deem acceptable and which shall have been delivered to it. Such payments may be made by the Company, by the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust, or by any other person or entity designated by the Company. All payments so received, together with the income therefrom and any other increment thereon, shall be held, invested, reinvested, and administered by the Trustee pursuant to the terms of this

Agreement, without distinction between principal and income. The Trustee shall not be responsible for the calculation or collection of any contribution under, or required by, the Programs, but shall be responsible only for cash or other property received by it pursuant to this Agreement.

      2.2    **Payments from the Trust**. The Trustee shall, from time to time and at the written direction of the Administrator, make, directly or indirectly, payments out of the Trust Fund in such amounts, to such persons, and for such purposes as may be specified in the written directions of the Administrator. To the extent permitted by law, the Trustee shall be under no liability for any payment made pursuant to the written direction of the Administrator or for any payment not made in the absence of a written direction of the Administrator. Any written direction of the Administrator shall constitute a certification that the payment so directed is one that the Administrator or its designated representative is authorized to direct. If a dispute arises with respect to a payment, the Trustee may withhold or cause to be withheld such payment until the dispute has been resolved.

## ARTICLE III

## ADMINISTRATION OF ACCOUNTS

      3.1    **Separate Accounts**. The assets allocable to each Program shall be allocated, for accounting purposes, to a separate Program Account for each Program. In addition, the Company may direct the Trustee in writing to account separately for such funds as the Company shall designate in writing, and if so directed, the Trustee shall establish separate accounts or sub-accounts for such funds. The funds allocated to such accounts and sub-accounts (including the Program Accounts) may be commingled for investment purposes. The Company shall designate to the Trustee in writing the account or sub-account to which each payment to and from the Trust is allocable.

## ARTICLE IV

## INVESTMENT AUTHORITY

      4.1    **Trustee's Authority**. Except as otherwise provided in this Agreement, the Trustee shall have exclusive authority and discretion to manage and control the Trust Fund; to invest and reinvest the principal and income of the Trust Fund and keep the Trust Fund invested, as a single fund without distinction between principal and income, in such securities or in such property, real or personal, tangible or intangible, as the Trustee shall deem advisable, including but not limited to capital or common stocks (whether voting or nonvoting and whether or not currently paying a dividend), preferred stocks (whether voting or nonvoting and whether or not currently paying a dividend), bonds, notes, debentures, interests in investment companies, trusts, partnerships, and other pooled funds, savings bank deposits (including but not limited to savings accounts and savings investment media that are maintained by the Trustee's own Banking Department), and commercial paper, and in such other property, investments and securities, whether domestic or foreign, of any kind, class, or character as the Trustee may deem suitable for the Trust Fund, and such investment and reinvestment shall not be restricted to properties and securities authorized for investment by trustees under any present or future law; provided that in no event shall the Trustee make any investment prohibited by ERISA. The Trustee in its discretion may keep such portion of the Trust Fund in cash or cash equivalents (including deposits in the Trustee's own Banking Department) as the Trustee may from time to time deem to be in the interest of Participants and Beneficiaries, even if such balances exceed the maximum amount insured from time to time by the Federal Deposit Insurance Corporation. Except as otherwise provided by Article VII hereof, all rights associated with assets of the Trust shall be exercised by the Trustee; all such rights shall in no event be exercisable by or rest with Participants and Beneficiaries.

## ARTICLE V

## POWERS AND DUTIES OF THE TRUSTEE

5.1 **Powers**. The Trustee shall have the following powers with respect to the Trust Fund in addition to those conferred by laws:

(a)     to sell, exchange, convey, transfer, or otherwise dispose of any property held by it, by private contract or at public auction; and no person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition;

(b)     to make commitments either alone or in company with others to purchase at any future date any property, investments, or securities set forth in Section 4.1 hereof;

(c)     to retain, manage, operate, repair, develop, preserve, improve, mortgage, or lease for any period any real property held by the Trustee upon such terms and conditions as the Trustee deems proper, either alone or by joining with others using other Trust assets for any such purposes if by it deemed advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease, including the waiver of rentals, if by it deemed advisable; and to make provisions for the amortization of the investment or in depreciation of the value of such property as it may deem advisable;

(d)     to organize corporations under the laws of any State for the purpose of acquiring or holding title to any property for the Trust Fund or to request the Company to appoint another trustee for such purpose;

(e)     to retain any stocks or other property received as a result of the exercise of any of the powers herein granted, whether or not investment in such stocks or other property is authorized by Section 4.1 hereof;

(f)     to vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to exercise any conversion privileges, subscription rights, or other options, and to make any payments incidental thereto; to consent to or otherwise participate in corporate reorganizations or other changes affecting corporate securities and to delegate discretionary powers and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to stocks, bonds, securities, or other property held in the Trust Fund;

(g)     to make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(h)     to register any investment held in the Trust Fund in its own name or in the name of a nominee and to hold any investment in bearer form, to utilize the services of a depository clearing corporation (such as the Depository Trust Company) to the extent permitted by law, and to combine certificates representing such investments with certificates of the same issue held by the Trustee in other fiduciary capacities under employee benefit plans, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust;

(i)     to employ suitable agents and counsel and to pay reasonable expenses and compensation thereto;

(j)     to borrow money on such terms and conditions as the Trustee in its discretion may deem advisable;

(k)     to transfer monies of the Trust Fund to a common or collective trust fund or pooled investment fund; money and other assets of the Trust Fund invested in such a fund shall be held and administered by the trustee thereof strictly in accordance with the terms of, and under the powers governing, such fund to the extent consistent with this Agreement and the terms of the Programs funded hereunder; the combining of money and other assets of this Trust with money and other assets of such a fund is hereby specifically authorized;

(1)     to compromise or otherwise adjust all claims in favor of or against the Trust Fund;

(m)     to compromise, compound, and settle any debt or obligations upon such terms as the Trustee may deem advisable and to agree to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon, default, or otherwise enforce any such obligation; and

(n)     upon receipt of written direction from the Administrator, to use monies in the Trust Fund to purchase or maintain insurance or annuity contracts.

5.2     **Dealing with Trustee**.  In no event shall any purchaser, vendor, or other person dealing with the Trustee be required to ascertain the authority and power of the Trustee to make any sale, transfer, assignment, or investment of the whole or any part of the Trust Fund at any time held hereunder, or to make any contract in relation thereto, nor shall any insurance company be required to ascertain the power or authority of the Trustee to apply for and purchase any insurance or annuity contract, and any such person or company may rely upon any factual information furnished by the Trustee in connection therewith. All parties dealing with the Trustee with respect to the Trust Fund shall have the right to assume that the Trustee has full power and authority in all respects to deal with the Trust Fund and shall not be affected by any notice to the contrary, and no purchaser shall be required to see to the application of the purchase money.

5.3     **Fees and Expenses**. The Trustee shall be paid such reasonable compensation as may be agreed upon in writing from time to time between the Trustee and the Company. Such compensation and all fees and expenses incurred by the Trustee in the proper performance of its duties, including fees for legal services rendered to the Trustee and compensation paid to any Investment Manager, shall be paid from the Trust Fund unless paid by the Company. All taxes of any kind that may be levied or assessed under existing or future laws upon, or with respect to, the Trust shall be paid from the Trust Fund.

5.4     **Administration**.  The Trustee shall not be responsible in any way for the administration of the Programs.

5.5     **Consultation and Indemnification**.  The Trustee may consult with counsel, and the Trustee shall not be deemed imprudent by reason of taking or refraining from taking any action in accordance with the opinion of counsel. The Company shall cause the Trust to indemnify and hold the Trustee harmless from and against any liability that the Trustee may incur in the administration of the Trust Fund, unless such liability arises from the Trustee's negligence or breach of the provisions of this Agreement or ERISA; provided that nothing in this Section 5.5 shall require any payment from any source other than the Trust or require any payment to be made to the Trust. The Trustee shall not be required to give any bond or any other security for the faithful performance of its duties under this Agreement, except such as may be required by law.

5.6     **Responsibilities**. Except as required by ERISA, the Trustee shall be under no duty (i) to take any action other than as herein specified with respect to the Trust unless the Administrator or an Investment Manager shall furnish the Trustee with instructions in proper form as described by Section 5.8 hereof or (ii) to engage in any suit with respect to the Trust unless the Trustee shall have first agreed in writing to do so and shall have been fully indemnified to the satisfaction of the Trustee. To the extent not prohibited by ERISA, the Trustee shall not be responsible or liable in any way for any action or omission of the Company, the Administrator, or the Committee with respect to the performance of their duties and obligations as set forth in the Programs and this Agreement; provided that the Trustee shall not be relieved of responsibility or liability for any responsibility, obligation, or duty imposed upon it under this Agreement or under ERISA. The Trustee is a party to this Agreement solely for the purpose set forth in this Agreement and to perform the acts set forth herein, and no obligation or duty shall be imposed upon it except as expressly stated herein or as required by ERISA.

5.7     **Direction**. The Trustee may request the advice or direction of the Administrator with respect to the administration of the Trust and the distribution of the Trust Fund, and, to the extent

61

permitted by ERISA, shall be protected from liability in relying upon any direction given to it by the Administrator, in writing, in response to such a request.

5.8 **Reliance on Written Instructions**. The Trustee shall be entitled to rely upon any written notice, instruction, direction, certificate, or other communication believed by it to be genuine and to be signed by the Company, the Administrator, an Investment Manager, or their authorized agent(s) or representative(s), unless it knows or should know that the direction or instruction constitutes a breach of the Company's, the Administrator's, or the Investment Manager's fiduciary responsibility with respect to the Trust. The Trustee shall be fully protected in making payments out of the Trust Fund, or in taking or omitting to take any other actions, in accordance with the written instructions of the Company, the Administrator, an Investment Manager, or their authorized agent(s) or representative(s), and shall have no responsibility to see to the application of any such payments by the Participants or their Beneficiaries or legal representatives, or by any other recipients thereof specified in such instructions, or to ascertain whether such instructions comply with the terms of the Programs, or to determine the rights or benefits of any person in the Trust or under the Programs, and shall not be liable to any person for or in respect of any payment made by it, or action taken or omitted to be taken by it, in good faith without notice or knowledge of a change in the condition or status of any person affecting that person's rights hereunder; provided that if the Trustee knows or should know that such an instruction constitutes a breach of fiduciary responsibility with respect to the Programs, the Trustee shall inform the Administrator of the breach. The Company, the Administrator, and any Investment Manager(s) shall furnish the Trustee with a list naming their authorized agent(s) or representative(s), and describing the scope of the authority granted, and shall notify the Trustee of any changes to the list. Absent such notification, the Trustee may assume no change has occurred with respect to each list.

**ARTICLE VI**

**FUNDING POLICY AND INVESTMENT OBJECTIVES**

6.1 **Communication to Trustee**. The Administrator shall inform the Trustee in writing of the funding policy under the Programs and of the investment objectives of the Trust and of any changes or modifications therein. Until the Administrator informs the Trustee in writing of any change in the funding policy under the Programs or of any change in the investment objectives of the Trust, the Trustee may assume that there has been no change in the funding policy or the investment objectives, as the case may be.

**ARTICLE VII**

**DUTIES OF THE ADMINISTRATOR**

7.1 **Information**. The Administrator shall furnish the Trustee with such information and data relating to the Programs as are necessary for the Trustee to carry out its duties under this Agreement.

7.2 **Investment Responsibility**. The Trustee, and not the Administrator, shall have the full responsibility for investment of the Trust Fund, except where the Administrator has appointed an Investment Manager pursuant to Section 7.3 hereof or has established a segregated fund managed by the Administrator pursuant to Section 7.5 hereof.

7.3 **Appointment of Investment Manager**. The Administrator may appoint one or more Investment Managers for the purpose of directing the Trustee with respect to the investment or reinvestment of all or any portion of the Trust Fund. The Administrator shall certify to the Trustee the appointment and scope of authority of, and any resignation or removal or change in authority of, any Investment Manager appointed by it under this Section, the appointment of any successor thereto, and the identity of the individual or individuals entitled to act on behalf of the Investment Manager. In particular, the Administrator shall state and certify how

62

investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any change or revocation thereof. An Investment Manager shall present evidence to the Trustee of its qualifications as an Investment Manager under Section 3(38) of ERISA, and shall acknowledge in writing its appointment as a fiduciary of the Programs.

7.4 **Responsibility of Investment Manager**. An Investment Manager shall have sole investment responsibility for that portion of the assets of the Trust Fund that it has been appointed to manage. An Investment Manager that has been thus granted such responsibility shall have all the investment powers enumerated in Article IV hereof that shall be granted to it by the Administrator. Where such an Investment Manager has been appointed by the Administrator, the Trustee shall have no duty to review or recommend any investment or reinvestment of the Trust Fund, nor shall the Trustee be charged with the duties imposed by Section 8.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to any Investment Manager. The Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this Section. The Trustee shall be under no duty to question the direction or lack of direction of any Investment Manager, but shall act, and shall be fully protected in acting, in accordance with each such direction.

7.5 **Segregated Fund**. The Administrator may create a segregated fund by certifying to the Trustee in writing that it has established a segregated fund in accordance with procedures that are consistent with Section 403(a)(1) of ERISA, the investment and control of the assets of which are to be the sole and exclusive responsibility of the Administrator. The Administrator shall have complete discretionary authority to direct the Trustee with respect to the investment and reinvestment of the portion of the Trust Fund constituting the segregated fund, as specified by the Administrator, without any requirement that any other fiduciary be consulted prior to the giving of any such directions to the Trustee or the carrying out of such directions by the Trustee. If the Administrator has thus assumed such discretionary authority, the Administrator shall have all the investment powers enumerated in Article IV hereof. The Administrator shall certify to the Trustee the scope of its authority, any change in the authority of the Administrator, and the identity of the individual or individuals entitled to act on behalf of the Administrator. In particular, the Administrator shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any change or revocation thereof, and the Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this Section. The Trustee shall have no duty to review or to recommend any investment or reinvestment of the segregated fund, nor shall the Trustee be charged with the duties imposed by Section 8.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to the Administrator. The Trustee shall have no discretionary authority over a segregated fund, but shall be subject, with respect to the segregated fund, to all proper directions of the Administrator that are not contrary to the terms of ERISA.

## ARTICLE VIII

## FIDUCIARY OBLIGATIONS

8.1 **Standard of Fiduciary Conduct**. The Trustee shall discharge its duties solely in the interest of the Participants and Beneficiaries and

> (a) for the exclusive purpose of providing benefits to Participants and Beneficiaries and defraying reasonable expenses of administering the Programs (including any such expenses incurred by the Administrator or the Committee);

(b)      with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(c)      by diversifying the investments of the Programs so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so; and

(d)      in accordance with this Agreement, except to the extent that this Agreement may be inconsistent with ERISA.

8.2      **Prohibited Inurement**. Except as provided herein and in the Programs, none of the assets of the Trust shall inure to the benefit of the Company, any affiliate thereof, or any other person except through the payment of benefits provided under the Programs (including the payment of reasonable Program administration expenses). Notwithstanding the foregoing, if the Company makes a contribution to the Trust by a mistake of fact, the contribution (reduced by any investment losses, but not increased by any investment gains) may be returned to the Company within one year after the payment of the contribution.

8.3      **Scope of Responsibility**. A fiduciary not charged with a specific responsibility under the provisions of the Programs or this Agreement shall be under no duty to question any action or lack of action of another fiduciary with respect to such responsibility, and shall not be liable for a breach of fiduciary responsibility by another fiduciary, unless the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary knowing such act is a breach, or if, having knowledge of a breach by such other fiduciary, the fiduciary fails to make reasonable efforts under the circumstances to remedy the breach.

## ARTICLE IX

## ACCOUNTING

9.1      **Accounting for Trust Fund**.  The Trustee shall keep timely, accurate, and detailed accounts of all investments, receipts, disbursements, and other transactions hereunder, and all accounts, books, and records relating hereto shall be open to inspection and audit at all reasonable times by the Administrator and any other person designated by the Administrator. Within sixty (60) days following the close of each Trust Year, within sixty (60) days after the removal or resignation of the Trustee, and at such other times as the Administrator reasonably may require, the Trustee shall file with the Administrator a written account setting forth all investments, receipts, disbursements, and other transactions effected by the Trustee during such Trust Year or since the date of its last account. The Trustee, within the same time periods, shall ascertain and certify to the Administrator, in accordance with applicable U.S. Department of Labor regulations, the cost and fair market values as of the close of such Trust Year (or such other period as the Administrator may require) of all securities and other properties held in the Trust Fund. Such fair market values shall be determined either by the Trustee itself or by such person or persons believed by the Trustee to be competent to make such determination as the Trustee may select, but in accordance with a method consistently followed and uniformly applied. The Trustee, within the same time periods, also shall furnish to the Administrator a balance sheet containing a description in reasonable detail of all assets and liabilities of the Trust. In the event any portion of the Trust Fund has been transferred to a common or collective trust fund pursuant to Section 5.1 hereof, such account shall include a copy of the latest annual written account of the common or collective trust fund. The Administrator shall have the right to require an audit by certified public accountants of the records and assets of the Trust. The expenses and any special fee charged by the Trustee for any such audit shall be paid pursuant to the provisions of Section 5.3 hereof.

## ARTICLE X

## RESIGNATION, REMOVAL, AND SUCCESSION OF TRUSTEE

10.1 **Resignation**. The Trustee may resign at any time by giving sixty (60) days' notice in writing to the Company.

10.2 **Removal**. The Company may remove the Trustee at any time by giving thirty (30) days' notice in writing to the Trustee.

10.3 **Successor Trustee**. In no event shall the resignation or removal of the Trustee terminate this Agreement, but upon such resignation or removal of the Trustee, the Company shall have the duty forthwith of appointing a successor trustee, who shall have the same powers and duties conferred upon the Trustee hereunder. In the event of such resignation or removal of such Trustee and upon the appointment of a successor trustee and acceptance of such Trustee, the Trustee shall turn over to the successor trustee the Trust Fund and all records of books of account and other documents pertaining to this Agreement that are in its possession, reserving such sums as the Trustee shall reasonably deem necessary to defray its expenses in settling its accounts, to pay any of its compensation due and unpaid, and to discharge any obligation of the Trust Fund for which the Trustee may be liable; and if the sums so reserved are not sufficient for these purposes, the Trustee shall be entitled to recover the amount of any deficiency from either the Company or the successor trustee, or both. To the extent permitted by ERISA, after the Trust Fund has been properly transferred and delivered to the successor trustee, the Trustee shall be released and discharged from all further accountability or liability for the Trust Fund and shall not be responsible in any way for the further disposition of the Trust Fund or any part thereof.

10.4 **Waiver of Notice**. In the event of any resignation or removal of the Trustee, the Trustee and the Company may in writing waive any notice of resignation or removal as may be provided hereunder.

## ARTICLE XI

## AMENDMENT AND TERMINATION OF AGREEMENT

11.1 **Amendment**. This Agreement may be amended in writing at any time or from time to time, in whole or in part, by action of the Company, and any such amendment may be retroactive. However, no amendment that affects the rights, duties, or responsibilities of the Trustee shall become effective without the Trustee's written consent. No amendment shall be inconsistent with the requirements of ERISA or with the provisions of the Programs. No amendment shall authorize or permit any assets of the Programs to be used for, or diverted to, purposes other than for the exclusive benefit of Participants and Beneficiaries of the Programs and the payment of reasonable Program administration expenses prior to the satisfaction of all liabilities under the Programs. No amendment shall cause or permit any portion of the Trust Fund to revert to or become the property of the Employers.

11.2 **Termination**. The Company may terminate the Trust in accordance with the terms of the Programs.

11.3 **Distribution Upon Termination**. In the event of the termination of the Trust, or of all or any part of a Program, the funds of which are held hereunder, the Trustee shall dispose of such funds in accordance with the written order of the Administrator. Such order shall require that the funds of each Program be disposed of in a manner that benefits the Participants and Beneficiaries covered by the Program (including the payment of reasonable Program administration expenses); provided that if all of the liabilities of a Program have been satisfied, any remaining assets of that Program shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code) as the Company shall determine in its

discretion. Notwithstanding the foregoing, in the event the Programs are terminated pursuant to a termination of the Settlement Agreement in Shy v. Navistar International Corporation, any assets of the Programs shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code) as determined by the Company in its discretion. Except as provided by Section 8.2 hereof, under no condition shall the termination of the Trust result in a distribution of any portion of the Trust Fund to the Employers.

## ARTICLE XII

## MISCELLANEOUS

12.1 **Limited Effect of Programs and Trust**. Neither the establishment of the Programs nor the Trust nor any modification thereof, nor the creation of any fund or account, nor the payment of any amounts from the Trust, shall be construed as giving to any Participant or Beneficiary any legal or equitable right against the Trustee, the Company, the Administrator, the Committee, or any affiliate, director, officer, employee, agent, or representative thereof, except as may otherwise be expressly provided in the Programs and except as may otherwise be provided by ERISA. Under no circumstances shall the terms of employment of any employee be modified or in any way affected by the Trust or this Agreement.

12.2 **Nonalienation of Benefits**. Except as otherwise required by law, neither the benefits payable from any Program Account nor any Participant's or Beneficiary's interest in any of the assets of the Trust shall be subject to any manner of anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, garnish, execute, levy upon, or otherwise dispose of any right to benefits payable under, or any interest in, the Trust Fund shall be void. Neither the Trust Fund nor the Trustee shall in any manner be liable for, or be subject to, the debts, contracts, liabilities, engagements, or torts of any person entitled to benefits from a Program.

12.3 **Governing Law**. This Agreement shall be administered, construed, and enforced according to the laws of the State of Illinois, except to the extent superseded by ERISA or any other federal law.

12.4 **Severability**. If any provision of this Agreement shall be held illegal or invalid, such illegality or invalidity shall not affect the remaining provisions of this Agreement but shall be fully severable, and this Agreement shall be construed and administered as if said illegal or invalid provision had never been inserted herein.

12.5 **Binding Effect**. The provisions of this Agreement shall be binding upon and inure to the benefit of the Company and its successors, the Trustee and its successors in Trust, and the Participants and their Beneficiaries, and their respective heirs, personal representatives, successors and assigns, in accordance with and subject to the terms hereof.

12.6 **Number of Originals**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and the counterparts shall constitute one and the same instrument, which shall be sufficiently evidenced by any one thereof.

12.7 **Fiduciary Duties**. Nothing in this Agreement shall relieve or be deemed to relieve the Trustee or any other fiduciary from any responsibility or liability for any responsibility, obligation, or duty imposed by or under ERISA.

12.8 **Evidence of Authority**. The execution by the Trustee of any instrument, document, or paper in connection with the exercise of any of the powers enumerated herein shall, of itself,

66

be conclusive evidence to all persons of the authority of the Trustee to execute the same and to exercise all powers incident thereto.

        12.9    **Effective Date**.  This Agreement shall be effective as of the 1st day of July, 1993.

        **IN WITNESS WHEREOF**, this Agreement has been executed this 18th day of June, 1993.

NAVISTAR INTERNATIONAL TRANSPORTATION CORP.

Attest:

By: _____

                    Thomas M. Hough
               Vice President and Treasurer

_____

THE NORTHERN TRUST COMPANY, as Trustee for the Navistar International Transportation Corp. Retiree Health Benefit Trust

Attest:

By: _____

_____
ASSISTANT SECRETARY

Title: _____

67

**Navistar International Transportation
Corporation
Postretirement Benefit Programs**

**Actuarial Valuation
as of January 1, 1993**

## ACTUARIAL STATEMENT OF OPINION

This report presents the results of the January 1, 1993 valuation of Navistar International Transportation Corporation's postretirement medical and life insurance benefit program. It has been prepared to support the actuarial mechanics of the proposed settlement. The report also presents an actuarial projection of valuations for January 1, 1994 and January 1, 1995. Results for different accounting periods or for other purposes may differ significantly from the results reported herein.

The calculations reported in this valuation report have been made on a basis consistent with our understanding of *SFAS No. 106, Employers' Accounting for Postretirement Benefits Other Than Pensions.* It was prepared in accordance with the provisions of the *Actuarial Compliance Guideline No. 3 For SFAS No. 106.* This report, however, should not be considered to provide accounting advice.

Our calculations were based on the employee/retiree demographic and financial data, furnished by Navistar and information gathered through discussions with Navistar personnel. We also relied upon detailed claims data furnished by Navistar and Medstat. The data have not been audited by Coopers & Lybrand and we cannot certify as to the accuracy of completeness of the data supplied. Our calculations are based on our understanding of Navistar's postretirement benefit programs as described by Navistar personnel and presented in this report.

This valuation was based upon generally accepted actuarial methods. We performed such tests as we considered necessary to ensure the accuracy of the results. We certify that the amounts presented in the accompanying report have been determined appropriately according to the actuarial assumptions and methods stated herein. It should be recognized, however, that because future events frequently do not occur exactly as expected, there are usually differences between projected and actual results. Accordingly, there can be no assurance that actual experience will match our projections.

Respectfully submitted,

COOPERS & LYBRAND

By: _____     By: _____
    Jeannie M. Wodarczyk                          G. Todd Swim
    F.S.A., M.A.A.A.                                   F.S.A., M.A.A.A.

# CONTENTS

SECTION I              VALUATION RESULTS

SECTION II             POSTRETIREMENT BENEFIT PLAN PROVISIONS

SECTION III            PARTICIPANT DATA

SECTION IV             BASELINE COST DETERMINATION

SECTION V              ACTUARIAL ASSUMPTIONS AND METHODS

SECTION VI             DETAILED TABLES OF VALUATION RESULTS

Navistar International
Transportation Corporation                                    Coopers & Lybrand

# SECTION I
# VALUATION RESULTS

This valuation report summarizes our measurement of Navistar's obligations under the provisions of SFAS No. 106. The valuation incorporates all postretirement medical and life insurance benefits applicable to Navistar's active employees, retirees, and their dependents.

**Please note: All valuation results presented in this report are based on our understanding of the provisions of SFAS No. 106, Navistar's plan provisions, the census and claims data provided by Navistar and Medstat, and the assumptions chosen by management, as described in this report.**

*VALUATION RESULTS*

**January 1, 1993 Valuation Results**

The following table summarizes Navistar's accumulated postretirement benefit obligation (APBO) as of January 1, 1993 based on the covered participants and the postretirement medical and life insurance plans in effect at that time.

---

### I-1

### APBO as of January 1, 1993
### (Medical, Including Drugs and Life – Contributions)
### ($millions)

|  | Total |
|---|---|
| Medical | $ 998.1 |
| Drugs | 332.9 |
| Life | 54.4 |
| Contributions | (385.3) |
| Total | 1,000.1 |
| Percent of total | 100.0% |

---

# SECTION I
# VALUATION RESULTS
# (continued)

## Valuation Results for Future Years

The obligations were projected for fiscal years 1994 and 1995 based on the January 1, 1993 valuation assumptions. The projection assumed retirements, terminations, and deaths according to the valuation assumptions documented in Section V. The projection is a closed group projection.

Tables I-2 and I-3 summarize Navistar's projected APBO for 1993, 1994, and 1995.

## I-2

### Projected APBO
### ($ millions)
### Medical Programs

|  | Medical + Drug - Contributions | |
|---|---|---|
|  | Total | |
|  | APBO | % Share |
| 1/1/93 employer's share | $ 945.7 | 71.1% |
| Covered participants' | 385.3 | 28.9% |
|  | 1,331.0 | 100.0% |
| 1/1/94 employer's | $ 990.9 | 71.7% |
| Covered participants' | 390.2 | 28.3% |
|  | 1,381.1 | 100.0% |
| 1/1/95 employer's | $ 1,035.3 | 72.6% |
| Covered participants' | 390.0 | 27.4% |
|  | 1,425.3 | 100.0% |

**SECTION I**
**VALUATION RESULTS**
**(continued)**

---

**I-3**

**Projected APBO**
**($ millions)**
**Medical and Life Insurance Programs**

1/1/93 <u>Total</u>

| | | |
|---|---|---|
| Medical | $ | 998.1 |
| Drugs | | 332.9 |
| Life | | 54.4 |
| Retiree contributions | | 385.3 |

Net medical =
(Medical + Drugs + Life – Cont.) $ 1,000.1

1/1/94 <u>Total</u>

| | | |
|---|---|---|
| Medical | $ | 1,031.3 |
| Drugs | | 349.9 |
| Life | | 54.7 |
| Retiree contributions | | 390.2 |

Net medical =
(Medical + Drugs + Life – Cont.) $ 1,045.7

1/1/95                                    <u>Total</u>

| | | |
|---|---|---|
| Medical | $ | 1,060.5 |
| Drugs | | 364.8 |
| Life | | 54.7 |
| Retiree contributions | | 390.0 |

Net medical =
(Medical + Drugs + Life – Cont.) $ 1,090.0

---

Navistar International
Transportation Corporation                                    Coopers & Lybrand

**SECTION I**
**VALUATION RESULTS**
**(continued)**


Obligations were projected through 2002 on the same closed group basis.  The following two tables summarize Navistar's projected covered participants, cash flows, and service cost.

---

**I-4**

**Projected Cash Flows and Covered Participants**
**($ thousands)**

| Year | Covered Participants Retirees and Dependents | Medical + Drugs | Life | Total |
|------|------|------|------|------|
| | | Cash Flows Less Contributions | | |
| 1993 | 58,149 | $53,524 | $4,663 | $ 58,187 |
| 1994 | 56,881 | 58,831 | 4,798 | 63,629 |
| 1995 | 55,368 | 64,434 | 4,920 | 69,354 |
| 1996 | 53,920 | 70,365 | 5,060 | 75,425 |
| 1997 | 52,540 | 76,654 | 5,157 | 81,811 |
| 1998 | 51,303 | 83,345 | 5,241 | 88,586 |
| 1999 | 50,092 | 90,583 | 5,312 | 95,895 |
| 2000 | 48,991 | 97,397 | 5,367 | 102,764 |
| 2001 | 47,773 | 103,961 | 5,405 | 109,366 |
| 2002 | 46,560 | 109,584 | 5,425 | 115,009 |

---

Navistar International
Transportation Corporation                                    Coopers & Lybrand

# SECTION I
## VALUATION RESULTS
### (continued)

---

### I-5

### Projected Annual Service Cost
### ($ thousands)

| Year | Medical + Drugs | Life | Total |
|------|------|------|------|
| 1993 | $11,466 | $177 | $11,643 |
| 1994 | 11,566 | 172 | 11,737 |
| 1995 | 11,653 | 160 | 11,813 |
| 1996 | 8,926 | 115 | 9,041 |
| 1997 | 8,564 | 107 | 8,671 |
| 1998 | 8,364 | 101 | 8,465 |
| 1999 | 7,243 | 80 | 7,323 |
| 2000 | 7,275 | 77 | 7,351 |
| 2001 | 5,672 | 57 | 5,729 |
| 2002 | 5,303 | 51 | 5,354 |

---

Navistar International
Transportation Corporation

Coopers & Lybrand

**SECTION II**
**POSTRETIREMENT BENEFIT PLAN PROVISIONS**


Navistar's postretirement medical and life insurance plan provisions are summarized in the following pages.

> **Exhibit II-1** summarizes our understanding of the major provisions of the postretirement medical plans.

> **Exhibit II-2** summarizes our understanding of the major provisions of the postretirement life insurance plans.

**SECTION II**
**POSTRETIREMENT BENEFIT PLAN PROVISIONS**
(continued)

_**Exhibit II-1**_
<hr>

**Postretirement Medical Plan Provisions**

| Plan Feature | Description |
|---|---|
| Retiree eligibility: | |
|     Represented | Age 65 with 1+ years of service, or Age 60 with 10+ years of service, or 30+ years of service. |
|     Nonrepresented | Age 55 with 10+ years of service, or 30+ years of service. |
| Period of coverage | Lifetime. |
| Spouse/dependent coverage | Spouses at date of retirement have lifetime coverage. Dependent children covered to age 1(?) (25 under certain conditions), or lifetime if permanently disabled. |
| Plan type | Comprehensive major medical. |
| Deductible | $200. |
| Coinsurance | Pre-65 — 80%. Post-65 — 100%. |
| Annual out-of-pocket maximum | Pre-65 — $500. Post-65 — $200. |
| Lifetime maximum | None. |

<hr>

**SECTION II**
**POSTRETIREMENT BENEFIT PLAN PROVISIONS**
(continued)

*Exhibit II-1*

**Postretirement Medical Plan Provisions**
**(continued)**

| Plan Feature | Description |
|---|---|
| Retiree contributions | Pre-65 — $70/month in 1993. |
| | Post-65 — $34/month in 1993. |
| | |
| | Base contributions are scheduled to increase at 6% per year. Contributions may increase or decrease due to cost sharing of certain actuarial gains and losses as described in Section 3.4 of Article III. |
| Part B Medicare premium | Paid by retiree. |
| Drug copayments | Retail pharmacy: $18 for brand name; $8 for generics. |
| | |
| | Mail order: $7; 30-day maximum in mail order. |

**SECTION II**
**POSTRETIREMENT BENEFIT PLAN PROVISIONS**
(continued)

_**Exhibit II-2**_

**Postretirement Life Insurance Plan Provisions**

| Plan Feature | Description |
|---|---|
| Retiree eligibility: | |
| Represented | Age 65 with 1+ years of service, or Age 60 with 10+ years of service, or 30+ years of service. |
| Nonrepresented | Age 55 with 10+ years of service, or 30+ years of service. |
| Period of coverage | Lifetime. |
| Spouse/dependent coverage | None. |
| Retiree contributions | None. |
| Death benefit amount | Based on salary and years of service with $5,000 maximum benefit. Limited additional coverage can be purchased at group rates. |

Navistar International
Transportation Corporation

Coopers & Lybrand

# SECTION III
# PARTICIPANT DATA

The participant demographic data (active and retired) were provided by Navistar. The following tables summarize the demographic data provided.

**Exhibit III-1** summarizes the active employee census by age and years of service used for the 1/1/93 valuation.

**Exhibit III-2** summarizes the retired participant census, both retirees and their dependents, by age used for the 1/1/93 valuation.

**SECTION III**
**PARTICIPANT DATA**
(continued)

*Exhibit III-1*

**Active Employee Census as of January 1, 1993**

|  | | | | Years of Service | | | | |
| Age | 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30+ | Total |
|---|---|---|---|---|---|---|---|---|
| < 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 20-24 | 64 | 3 | 0 | 0 | 0 | 0 | 0 | 67 |
| 25-29 | 313 | 102 | 0 | 0 | 0 | 0 | 0 | 415 |
| 30-34 | 240 | 227 | 52 | 3 | 0 | 0 | 0 | 522 |
| 35-39 | 227 | 192 | 146 | 119 | 77 | 0 | 0 | 761 |
| 40-44 | 172 | 175 | 240 | 273 | 1,140 | 140 | 0 | 2,140 |
| 45-49 | 137 | 141 | 251 | 229 | 1,257 | 1,586 | 263 | 3,864 |
| 50-54 | 49 | 112 | 86 | 373 | 911 | 1,472 | 1,231 | 4,234 |
| 55-59 | 46 | 46 | 78 | 137 | 379 | 611 | 918 | 2,215 |
| 60-64 | 7 | 27 | 14 | 31 | 80 | 137 | 244 | 540 |
| 65+ | 0 | 2 | 3 | 7 | 9 | 12 | 36 | 69 |
| Total | 1,255 | 1,027 | 870 | 1,172 | 3,853 | 3,958 | 2,692 | 14,827 |

*Average age:  48.1*

*Average years of service:  21.7*

*Total employees NFC*:  370*

*Total employees Navistar (excluding NFC)*:  14,457*

•**NFC = Navistar Financial Corp.**

Navistar International
Transportation Corporation                                   Coopers & Lybrand

**SECTION III**

**PARTICIPANT DATA**
(continued)

*Exhibit III-2*

**Retired Census as of January 1, 1993**

| Age | Medical Program Retirees and Dependents | Life Insurance Retirees |
|---|---|---|
| < 50 | 930 | 165 |
| 50-54 | 1,740 | 390 |
| 55-59 | 4,344 | 1,181 |
| 60-64 | 7,669 | 2,017 |
| 65-69 | 11,297 | 3,262 |
| 70-74 | 11,355 | 3,215 |
| 75-79 | 9,948 | 2,797 |
| 80-84 | 6,454 | 1,695 |
| 85-89 | 3,065 | 740 |
| 90-94 | 1,091 | 195 |
| 95+ | 257 | 13 |
| Total | 58,149 | 15,668 |
| | | |
| **Average age:** | 70.8 | 70.7 |
| **Total NFC*:** | 217 | 111 |
| **Total Navistar (excluding NFC)*:** | 57,932 | 15,557 |

*NFC = Navistar Financial Corp.

## SECTION IV
## BASELINE COST DETERMINATION

The estimation of postretirement benefit obligations is based on average per capita costs for a one-year period. These are referred to as the "baseline costs." The components of baseline costs and the current plan population are projected into the future to estimate future benefit payments using assumptions to estimate the effect of future trends and population changes.

Navistar's baseline costs were based on actual claims data provided by Medstat. Although reviewed for reasonableness, the data used in developing the baseline costs were not audited by Coopers & Lybrand. A description of the data used and the methods employed to develop the baseline cost assumptions is presented in the remainder of this section.

To understand the discussion of baseline costs presented in this section, it is important to differentiate between "eligible charges" and "net incurred claims." Eligible charges generally represent the <u>gross</u> amount of the bills received for retirees. Net incurred claims are eligible charges less retiree copayments and deductibles, other insurance, and Medicare payments. In other words, net incurred claims represent the <u>net</u> claims amount paid by the employer prior to recognition of retiree contributions, if any. SFAS No. 106 calls for trend assumptions to be applied to eligible charges and explicit recognition of the impact of fixed plan design features. Consistent with the FASB intent, we applied the cost trend assumptions to the eligible charges and separately projected copayments, deductibles, other insurance, and Medicare payments.

### *1991 CLAIMS EXPERIENCE*

Eligible charges were developed for:

- ➢ Total medical
- ➢ Total admin.

Offsets to eligible charges were categorized into the following:

- ➢ Medical deductible and coinsurance
- ➢ Drug copayments
- ➢ COB (other insurance)
- ➢ Medicare

For each individual, eligible charges minus the offsets (deductible, coinsurance, COB Medicare) equals the incurred net claims.

The 1991 per capita claims for medical and drugs were adjusted for plan design changes and trended to 1993 as shown on the following page.

**SECTION IV**
**BASELINE COST DETERMINATION**
**(continued)**

*Exhibit IV-1*

**1993 Average Per Capita Costs**

| | Medical | Drug | Admin. | Deductible | Drug Copays | Medicare | COB | Net Claims |
|---|---|---|---|---|---|---|---|---|
| Nonrepresented age: | | | | | | | | |
| < 50 | $2,063 | $276 | $156 | $220 | $105 | $ 0 | $417 | $1,753 |
| 50-54 | 1,653 | 302 | 142 | 220 | 116 | 0 | 280 | 1,481 |
| 55-59 | 2,234 | 335 | 174 | 220 | 126 | 0 | 369 | 2,028 |
| 60-64 | 3,907 | 381 | 266 | 220 | 144 | 0 | 593 | 3,597 |
| 65-69 | 3,290 | 318 | 84 | 110 | 123 | 2,563 | 0 | 896 |
| 70-74 | 3,997 | 366 | 83 | 110 | 140 | 3,316 | 0 | 880 |
| 75-79 | 4,979 | 399 | 82 | 110 | 151 | 4,339 | 0 | 860 |
| 80+ | 4,545 | 396 | 80 | 110 | 151 | 3,908 | 0 | 852 |
| Represented age: | | | | | | | | |
| < 50 | $2,269 | $276 | $169 | $242 | $105 | $ 0 | $458 | $1,909 |
| 50-54 | 1,819 | 302 | 153 | 242 | 116 | 0 | 308 | 1,608 |
| 55-59 | 2,457 | 335 | 188 | 242 | 126 | 0 | 406 | 2,206 |
| 60-64 | 4,298 | 381 | 289 | 242 | 144 | 0 | 652 | 3,930 |
| 65-69 | 3,619 | 318 | 92 | 121 | 123 | 2,820 | 0 | 965 |
| 70-74 | 4,397 | 366 | 91 | 121 | 140 | 3,648 | 0 | 945 |
| 75-79 | 5,477 | 399 | 90 | 121 | 151 | 4,773 | 0 | 921 |
| 80+ | 4,999 | 396 | 87 | 121 | 151 | 4,299 | 0 | 911 |

# SECTION V
## ACTUARIAL ASSUMPTIONS AND METHODS

### *Actuarial Assumptions*

| | |
|---|---|
| Discount rate | 9%. |
| Health care trend rates | Trend rates for each year are illustrated in Exhibit V-II |
| Mortality | Same as used in pension valuation. Rates in Exhibit V-II. |
| Retirement | Same as pension valuation. The following table illustrates the retirement rates applicable to active employees eligible to retire. |

| Age | Represented | Nonrepresented |
|---|---|---|
| < 50 | 0% | 0% |
| 50-54 | 5% | 0% |
| 55-59 | 12% | 15% |
| 60-61 | 16% | 25% |
| 62 | 40% | 40% |
| 63-64 | 35% | 35% |
| 65 | 50% | 70% |
| 66-69 | 50% | 40% |
| 70 | 100% | 100% |

| | |
|---|---|
| Turnover | Annual ultimate rates based on attained age are illustrated in Exhibit V-II. |
| Disability | Current retired disabled employees are included with normal retirees in the valuation. Any additional disabled employees are assumed to remain in the active medical plan, accruing years of service, until eligible to retire. Separate disability decrement rates are not considered. |
| Coverage | Where coverage is available, 100% of all retirees will participate in the postretirement benefit plans. |
| Dependents of future retirees | 90% prior to the year 2000; 50% after 2000 to reflect increasing spousal coverage under dual benefits. |
| Payment of claims | Assumed to occur mid-year. |

Navistar International
Transportation Corporation

Coopers & Lybrand

**SECTION V**
**ACTUARIAL ASSUMPTIONS AND METHODS**
**(continued)**

*Exhibit V-1*

**Health Care Trend Rates**

| Year | Medical Pre-65 | Medical Post-65 | Drug | Administrative Costs | Deductible | COB | Medicare |
|------|------|------|------|------|------|------|------|
| 1994 | 11.0 | 9.0 | 14.0 | 8.0 | 6.0 | 11.0 | 9.0 |
| 1995 | 10.7 | 8.8 | 12.5 | 7.5 | 6.0 | 10.7 | 8.8 |
| 1996 | 10.4 | 8.6 | 11.0 | 7.0 | 6.0 | 10.4 | 8.6 |
| 1997 | 10.1 | 8.4 | 9.5 | 6.5 | 6.0 | 10.1 | 8.4 |
| 1998 | 9.8 | 8.2 | 8.6 | 6.0 | 6.0 | 9.8 | 8.2 |
| 1999 | 9.5 | 8.0 | 8.2 | 5.5 | 6.0 | 9.5 | 8.0 |
| 2000 | 9.2 | 7.8 | 8.0 | 5.5 | 6.0 | 9.2 | 7.8 |
| 2001 | 8.9 | 7.6 | 7.8 | 5.5 | 6.0 | 8.9 | 7.6 |
| 2002 | 8.6 | 7.4 | 7.6 | 5.5 | 6.0 | 8.6 | 7.4 |
| 2003 | 8.2 | 7.3 | 7.4 | 5.5 | 6.0 | 8.2 | 7.3 |
| 2004 | 7.9 | 7.1 | 7.2 | 5.5 | 6.0 | 7.9 | 7.1 |
| 2005 | 7.6 | 6.9 | 7.0 | 5.5 | 6.0 | 7.6 | 6.9 |
| 2006 | 7.3 | 6.7 | 6.8 | 5.5 | 6.0 | 7.3 | 6.7 |
| 2007 | 7.0 | 6.5 | 6.6 | 5.5 | 6.0 | 7.0 | 6.5 |
| 2008 | 6.7 | 6.3 | 6.1 | 5.5 | 6.0 | 6.7 | 6.3 |
| 2009 | 6.4 | 6.1 | 6.2 | 5.5 | 6.0 | 6.4 | 6.1 |
| 2010 | 6.1 | 5.9 | 6.0 | 5.5 | 6.0 | 6.1 | 5.9 |
| 2011 | 5.8 | 5.7 | 5.8 | 5.5 | 6.0 | 5.8 | 5.7 |
| 2012+ | 5.5 | 5.5 | 5.5 | 5.5 | 6.0 | 5.5 | 5.5 |

## MORTALITY AND TURNOVER ASSUMPTIONS
## ANNUAL RATES PER 1,000 PARTICIPANTS

| Age | Rep & Non-Rep Mortality | Turnover Represented | Turnover Nonrepresented |
|---|---|---|---|
| 11 | 0.416 | 0.0 | 0.0 |
| 12 | 0.416 | 0.0 | 0.0 |
| 13 | 0.416 | 0.0 | 0.0 |
| 14 | 0.420 | 0.0 | 0.0 |
| 15 | 0.426 | 0.0 | 0.0 |
| 16 | 0.432 | 50.0 | 105.0 |
| 17 | 0.438 | 50.0 | 105.0 |
| 18 | 0.446 | 50.0 | 105.0 |
| 19 | 0.454 | 50.0 | 105.0 |
| 20 | 0.463 | 50.0 | 105.0 |
| 21 | 0.474 | 50.0 | 97.6 |
| 22 | 0.490 | 50.0 | 90.2 |
| 23 | 0.507 | 50.0 | 82.8 |
| 24 | 0.525 | 50.0 | 75.4 |
| 25 | 0.546 | 50.0 | 68.0 |
| 26 | 0.570 | 48.0 | 65.4 |
| 27 | 0.595 | 46.0 | 62.8 |
| 28 | 0.624 | 44.0 | 60.2 |
| 29 | 0.655 | 42.0 | 57.6 |
| 30 | 0.690 | 40.0 | 55.0 |
| 31 | 0.728 | 36.8 | 53.0 |
| 32 | 0.770 | 33.6 | 51.0 |
| 33 | 0.816 | 30.4 | 49.0 |
| 34 | 0.868 | 27.2 | 47.0 |
| 35 | 0.925 | 24.0 | 45.0 |
| 36 | 0.987 | 21.4 | 43.2 |
| 37 | 1.055 | 18.8 | 41.4 |
| 38 | 1.133 | 16.2 | 39.6 |
| 39 | 1.220 | 13.6 | 37.8 |
| 40 | 1.318 | 11.0 | 36.0 |
| 41 | 1.436 | 9.0 | 34.0 |
| 42 | 1.584 | 7.0 | 32.0 |
| 43 | 1.760 | 5.0 | 30.0 |
| 44 | 1.964 | 3.0 | 28.0 |
| 45 | 2.194 | 1.0 | 26.0 |
| 46 | 2.452 | 0.8 | 24.0 |
| 47 | 2.737 | 0.6 | 22.0 |
| 48 | 3.049 | 0.4 | 20.0 |
| 49 | 3.396 | 0.2 | 18.0 |
| 50 | 3.787 | 0.0 | 16.0 |
| 51 | 4.221 | 0.0 | 13.6 |
| 52 | 4.694 | 0.0 | 11.2 |
| 53 | 5.203 | 0.0 | 8.8 |
| 54 | 5.749 | 0.0 | 6.4 |
| 55 | 6.332 | 0.0 | 4.0 |
| 56 | 6.931 | 0.0 | 3.2 |
| 57 | 7.565 | 0.0 | 2.4 |
| 58 | 8.249 | 0.0 | 1.6 |
| 59 | 9.032 | 0.0 | 0.8 |
| 60 | 9.900 | 0.0 | 0.0 |
| 61 | 10.841 | 0.0 | 0.0 |

Navistar International
Transportation Corporation                                    Coopers & Lybrand

## MORTALITY AND TURNOVER ASSUMPTIONS
## ANNUAL RATES PER 1,000 PARTICIPANTS
### (continued)

| Age | Rep & Non-Rep Mortality | Turnover Represented | Turnover Nonrepresented |
|---|---|---|---|
| 62 | 11.848 | 0.0 | 0.0 |
| 63 | 12.928 | 0.0 | 0.0 |
| 64 | 14.101 | 0.0 | 0.0 |
| 65 | 15.416 | 0.0 | 0.0 |
| 66 | 16.857 | 0.0 | 0.0 |
| 67 | 18.492 | 0.0 | 0.0 |
| 68 | 20.310 | 0.0 | 0.0 |
| 69 | 22.315 | 0.0 | 0.0 |
| 70 | 24.510 | 0.0 | 0.0 |
| 71 | 27.260 | 0.0 | 0.0 |
| 72 | 30.145 | 0.0 | 0.0 |
| 73 | 33.172 | 0.0 | 0.0 |
| 74 | 36.429 | 0.0 | 0.0 |
| 75 | 40.042 | 0.0 | 0.0 |
| 76 | 44.115 | 0.0 | 0.0 |
| 77 | 48.892 | 0.0 | 0.0 |
| 78 | 54.204 | 0.0 | 0.0 |
| 79 | 60.299 | 0.0 | 0.0 |
| 80 | 66.827 | 0.0 | 0.0 |
| 81 | 73.057 | 0.0 | 0.0 |
| 82 | 79.540 | 0.0 | 0.0 |
| 83 | 86.446 | 0.0 | 0.0 |
| 84 | 93.801 | 0.0 | 0.0 |
| 85 | 101.830 | 0.0 | 0.0 |
| 86 | 110.384 | 0.0 | 0.0 |
| 87 | 119.332 | 0.0 | 0.0 |
| 88 | 128.861 | 0.0 | 0.0 |
| 89 | 138.292 | 0.0 | 0.0 |
| 90 | 148.084 | 0.0 | 0.0 |
| 91 | 158.307 | 0.0 | 0.0 |
| 92 | 168.759 | 0.0 | 0.0 |
| 93 | 179.383 | 0.0 | 0.0 |
| 94 | 191.232 | 0.0 | 0.0 |
| 95 | 203.763 | 0.0 | 0.0 |
| 96 | 216.736 | 0.0 | 0.0 |
| 97 | 230.584 | 0.0 | 0.0 |
| 98 | 245.425 | 0.0 | 0.0 |
| 99 | 261.215 | 0.0 | 0.0 |
| 100 | 278.149 | 0.0 | 0.0 |
| 101 | 296.369 | 0.0 | 0.0 |
| 102 | 317.101 | 0.0 | 0.0 |
| 103 | 340.883 | 0.0 | 0.0 |
| 104 | 368.473 | 0.0 | 0.0 |
| 105 | 401.339 | 0.0 | 0.0 |
| 106 | 440.639 | 0.0 | 0.0 |
| 107 | 491.171 | 0.0 | 0.0 |
| 108 | 539.706 | 0.0 | 0.0 |
| 109 | 597.169 | 0.0 | 0.0 |
| 110 | 1000.000 | 0.0 | 0.0 |

**SECTION V**
**ACTUARIAL ASSUMPTIONS AND METHODS**
**(continued)**

*Actuarial Methods*

| | |
|---|---|
| Obligations | The actuarial present value of the net medical dental, and life insurance benefits expected to be paid after retirement (net of retiree contributions) was calculated as of the measurement date The expected postretirement benefit obligation. (EPBO) represents this actuarial present value of all such postretirement benefits expected to be paid after the measurement date for those active and retired participants covered as of the measurement date. The accumulated postretirement benefit obligation (APBO) represents that portion of the EPBO attributable to service rendered prior to the measurement date. |
| Attribution method | Benefit/years-of-service approach; projected unit credit actuarial cost method. |
| Attribution period | Costs are spread ratably from the date of hire to the date the employee is fully eligible to retire and receive all the benefits he/she is expected to receive under the postretirement medical and life insurance plans. |
| Service cost | The increase in the APBO attributable to employee service in the year and based on the attribution method described above (includes interest to the end of the year). |

Navistar International
Transportation Corporation                                        Coopers & Lybrand

## APPENDIX A-6

## ACTUARIAL DEFINITIONS

When used in Article III of Exhibit A or in this Appendix A-6 thereto, the following terms shall have the meanings set forth below:

"Actual Number of Retirees and Spouses" at the beginning of a given Measurement Year equals the total of the Actual Number of Retirees and Spouses at the beginning of the previous Measurement Year, aged 1 year, plus the total of the actual number of Participants who became new Retirees, Spouses and Surviving Spouses during that previous Measurement Year, plus the number of Imputed Retirees and spouses for the prior Measurement Year. Notwithstanding the foregoing, the Actual Number of Retirees and Spouses at the beginning of measurement Year 1994 is zero.

"Annual Service Cost" means the annual service cost of postretirement benefits with respect to the Health Benefit Program as computed by the Actuary in accordance with FASB 106 and the assumptions set forth in Appendix A-5 to Exhibit A to the Settlement Agreement.

"Average Contributing Participants" for a given Measurement Year equals the mathematical average of the number of Contributing Participants at the end of the prior Measurement Year and the number of Contributing Participants at the end of current Measurement Year. Notwithstanding the foregoing, during the initial year the number of Contributing Participants at the beginning of the 45th day after the Effective Date will be used as the number of Contributing Participants at the end of the prior Measurement Year.

"Contributing Participants" has the meaning assigned to it in Exhibit D to the Settlement Agreement.

"Contributing Participants' Annual Contribution" for a given calendar year is the total estimated annual contribution that Contributing Participants will make in twelve monthly installments in that calendar year.

"Cumulative Drop Outs" at the beginning of a given Measurement Year is determined at the beginning of each Measurement Year and is the sum of the Surviving Cumulative Drop Outs plus New Drop Outs, reduced by New Drop Ins.

"Expected Average Contributing Participants" for a given calendar year equals the sum of (i) the actual number of active Employees at the end of the prior Measurement Year who were expected to be eligible to be Contributing Participants at the end of the current Measurement Year, using the mortality and retirement

assumptions in Appendix A-5, and (ii) the actual number of Contributing Participants at the end of the prior Measurement Year who were expected to be eligible to be Contributing Participants at the end of the current Measurement Year, using the mortality assumptions in Appendix A-5. Notwithstanding the foregoing, the 1994 Expected Average Contributing Participants equals the actual number of active Employees and Contributing Participants on the Effective Date reduced by Immediate Drop Outs During the First 45 Days projected forward 10 months using the mortality and retirement assumptions in Appendix A-5.

"Expected Company Costs Per Capital" for a given Measurement Year equals the Expected Medical Per Capita Costs for that Measurement Year plus the Expected Drug Per Capita Costs for that Measurement Year, reduced by the Expected Participant Contributions for that Measurement Year.

"Expected Drug Per Capita Costs" for a given Measurement Year are developed from the numbers in Table I and the following formula : For Measurement Year (x) = [2/3 calendar year (x-1) ] plus [1/3 calendar year (x)]. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Expected Drug Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Drug Per Capita Costs for calendar year 1994.

"Expected Medical Per Capita Costs" for a given Measurement Year are developed from the numbers in Table II and the following formula : For Measurement Year (x) = [2/3 calendar year (x-1)] plus [1/3 calendar year (x)]. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Expected Medical Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Medical Per Capita Costs for calendar year 1994.

"Expected Number of Retirees and Spouses" for a given Measurement Year will be based upon the actual number of Employees on the Effective Date, with Retirees and Spouses projected in accordance with retirement rates from Appendix A-5 and with spouses imputed at the "dependents of future retirees rates" from Appendix A-5. Notwithstanding the foregoing, for Measurement Year 1994, five-sixths of the retirement rates will be applied.

"Expected Participant Contributions" for a given Measurement Year (x) equals 8 times the Monthly Base Contributions for calendar year (x-1) plus 4 times the Monthly Base Contribution for calendar year (x). Notwithstanding the foregoing, for Measurement Year 1994, it equals 6 times the Monthly Base Contributions for calendar year 1993 plus 4 times the Monthly Base Contribution for calendar year 1994.

"FASB 10611" has the meaning assigned to it in Exhibit D to the Settlement Agreement.

"Health Accumulated Postretirement Benefit Obligation" and "Health APBO" have the meaning assigned to them in Exhibit D to the Settlement Agreement.

"Immediate Drop Outs" means the Immediate Drop Outs During the First 45 Days and the Immediate Drop Outs During the Second 45 Days.

"Immediate Drop Outs During the First 45 Days" means the Retirees, Spouses and Surviving Spouses who are eligible to enroll in the Health Benefit Program as of the Effective Date from whom a form is received by the end of the 44th day following the Effective Date indicating their elections not to enroll in the Health Benefit Program.

"Immediate Drop Outs During the Second 45 Days" means the Retirees, Spouses and Surviving Spouses who are eligible to enroll in the Health Benefit Program as of the Effective Date but do not do so by the end of the 89th day following the Effective Date, exclusive of all Immediate Drop Outs During the First 45 days.

"Imputed Retirees and Spouses" are calculated at the beginning of each Measurement Year based on active Employees that have died or terminated prior to retirement in the previous Measurement Year. These deaths and terminations are accumulated and aged each year with retirement rates applied when retirement eligibility is reached. No retirement rates are applied to terminated Employees in their year of termination. In their year of death, 50% of the retirement rates are applied.

"Maximum Corridor Medical Per Capita Costs" for a given Measurement Year are developed from the numbers in Table III and the following formula: For Measurement Year (x) [2/3 calendar year (x-1)] plus [1/3 calendar year (x)]. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Maximum Corridor Medical Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Medical Per Capita Costs for calendar year 1994.

"Measurement Year (x)" is the twelve month period beginning May 1 of year (x-1) and ending April 30 of year (x) . Notwithstanding the foregoing, Measurement Year 1994 is the period from the Effective Date through April 30, 1994.

"Monthly Base Contribution" The Monthly Base Contribution for the first calendar year (1993) shall be $70 per month for retirees under age 65 and $34 per month for retirees age 65 and over. In each subsequent year the Monthly Base Contribution will increase 6%, as follows:

MONTHLY BASE CONTRIBUTION

| Year | | Under 65 | | 65 and Over |
|------|---|----------|---|-------------|
| 1993 | | $70.00 | | $34.00 |
| 1994 | | 74.20 | | 36.04 |
| 1995 | | 78.65 | | 38.20 |
| 1996 | | 83.37 | | 40.49 |
| 1997 | | 88.38 | | 42.92 |
| y | 70.00 x (1. 06) | (y-1993) | 34. 00 x (1. 06) | (y-1993) |

"New Drop Ins" at the beginning of a given Measurement Year equals the number of Retirees, Spouses, and surviving Spouses (other than new Retirees and their Spouses) who elect to become or again become Contributing Participants during the prior Measurement Year. For this purpose, there will be no mortality imputed during the prior Measurement Year. Notwithstanding the foregoing, there are no New Drop Ins at the beginning of Measurement Year 1994.

"New Drop Outs" at the beginning of a given Measurement Year equals the number of Retirees, Spouses and Surviving Spouses who elect not to be Contributing Participants during the prior Measurement Year. For this purpose, there will be no mortality imputed during the prior Measurement Year. Notwithstanding the foregoing, for Measurement Year 1995 all Immediate Drop outs will be included in New Drop Outs during the previous Measurement Year.

"Plan 1" is the Health Benefit Program as applicable to Contributing Participants who are not eligible for Medicare, as described in Appendix A-1 to Exhibit A to the Settlement Agreement.

"Plan 2" is the Health Benefit Program as applicable to Contributing Participants who are eligible for Medicare, as described in Appendix A-1 to Exhibit A to the Settlement Agreement.

"Retiree Adjustment Ratio" for a given Measurement Year (x) equals the following formula: 1/3 of the Retiree Cost Sharing Ratio for calendar year (x) plus 2/3 of the Retiree Cost Sharing Ratio for calendar year (x-1). Notwithstanding the foregoing, for Measurement Year 1994, Retiree Adjustment Ratio equals 3/5 of the Retiree Cost Sharing Ratio for calendar year 1993 plus 2/5 of the Retiree Cost Sharing Ratio for calendar year 1994.

"Retiree Cost Sharing Ratio" for a given calendar year equals the Scheduled Contributions for such year divided by the sum of the products of (i) the Expected Medical Per Capita Costs plus the Expected Drug Per Capita Costs for such year in each of the eight age groups, and (ii) the respective number of Expected Average Contributing Participants for such year in each of such age groups. Notwithstanding the foregoing, the 1993 Retiree Cost Sharing Ratio is 36.3%.

93

"Scheduled Contributions" for a calendar year equals the sum of (i) twelve times the applicable Monthly Base Contribution for such year multiplied by the number of Expected Average Contributing Participants under Plan 1, and (ii) twelve times the applicable Monthly Base Contribution for such year multiplied by the number of Expected Average Contributing Participants under Plan 2.

"Surviving Cumulative Drop Outs" at the beginning of a given Measurement Year equals the Cumulative Drop Outs from the beginning of the prior Measurement Year times the probability of survival to the end of that Measurement Year. For the purpose of this calculation, the probability of survival during the Measurement Year will be based upon the mortality rates specified in Appendix A-5. Notwithstanding the foregoing, the Surviving Cumulative Drop Outs at the beginning of Measurement Year 1994 is zero.

"Total Actual Drug Cost" for a given Measurement Year equals the sum of paid drug claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of paid drug claims to all paid drug and medical claims*)* for Contributing Participants and their Eligible Dependents for such Measurement Year. For Measurement Year 1994, Total Actual Drug Cost equals the sum of paid drug claims and administrative expenses and applicable HMO premiums for the period from October 1, 1993 through April 30, 1994 multiplied by a fraction, the numerator of which is 10 and the denominator of which is 7. Commencing with the Measurement Year to be used for determining the Contributing Participants' Annual Contribution for the 2022 Plan Year, "Total Actual Drug Cost" shall equal (i) the sum of paid drug claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of paid drug claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for such Measurement Year, less (ii) the total amount of any subsidies, manufacturer rebates or similar payments for Medicare Part D Plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year, including, but not limited to, the manufacturer discount under 42 CFR 423 Subpart W: Medicare Coverage Gap Discount Program (42 CFR 423.2300 – 42 CFR 423.2345); the federal reinsurance subsidy, the direct subsidy and the low income cost-sharing subsidy under 42 CFR 423 Subpart G: Payments to Part D Plan Sponsors for Qualified Prescription Drug Coverage (42 CFR 423.301 – 42 CFR 423.360); and the low income premium subsidy under 42 CFR 423 Subpart P: Premiums and Cost-Sharing Subsidies for Low-Income Individuals (42 CFR 423.771 – 42 CFR 423.800), less (iii) manufacturer rebates for non-Medicare Part D prescription drug plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year.

"Total Actual Medical Cost" for a given Measurement Year equals the sum of paid medical claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of

paid medical claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for the Measurement Year. For Measurement Year 1994, Total Actual Medical Cost equals the sum of paid medical claims and administrative expenses and applicable HMO premiums for the period from October 1, 1993 through April 30, 1994 multiplied by a fraction the numerator of which is 10 and the denominator of which is 7.

"Total Estimated Annual Cost" for a given Measurement Year means the Actuary's estimate of the total cost of providing all covered benefits and administrative costs of the Health Benefit Program for such year. The Actuary's estimate of administrative costs shall include, but not be limited to, Plan Expenses.

"Total Expected Drug Dollars" for a given Measurement Year equals the Expected Drug Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table I and then totaled.

"Total Expected Medical Dollars" for a given Measurement Year equals the Expected Medical Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table II and then totaled.

"Total Maximum Corridor Medical Dollars" for a given Measurement Year equals the Maximum Corridor Medical Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table III and then totaled.

TABLE I
EXPECTED DRUG PER CAPITA COSTS
NET PER CAPITA COSTS *(DRUGS)*

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 - 79 | 80 + |
| 1993 | $196 | $215 | $239 | $273 | $206 | $235 | $257 | $254 |
| 1994 | 237 | 260 | 288 | 329 | 251 | 287 | 314 | 310 |
| 1995 | 278 | 305 | 338 | 386 | 298 | 340 | 371 | 367 |
| 1996 | $319 | $350 | $388 | $443 | $343 | $392 | $428 | $424 |
| 1997 | 358 | 393 | 436 | 498 | 387 | 442 | 483 | 478 |
| 1998 | 397 | 436 | 483 | 551 | 431 | 492 | 537 | 532 |
| 1999 | 438 | 480 | 532 | 607 | 476 | 544 | 593 | 588 |
| 2000 | 480 | 527 | 584 | 666 | 523 | 598 | 652 | 646 |
| 2001 | $525 | $576 | $638 | $728 | $573 | $655 | $715 | $708 |
| 2002 | 572 | 627 | 695 | 793 | 626 | 715 | 780 | 773 |
| 2003 | 621 | 681 | 755 | 861 | 681 | 778 | 849 | 841 |
| 2004 | 672 | 738 | 817 | 932 | 738 | 844 | 920 | 913 |
| 2005 | 726 | 797 | 882 | 1,006 | 798 | 913 | 995 | 987 |
| 2006 | $782 | $858 | $950 | $1,084 | $861 | $984 | $1,073 | $1,054 |
| 2007 | 840 | 922 | 1,020 | 1,164 | 925 | 1,058 | 1,154 | 1,144 |
| 2008 | 900 | 988 | 1,093 | 1,247 | 992 | 1,135 | 1,237 | 1,227 |
| 2009 | 962 | 1,056 | 1,168 | 1,332 | 1,061 | 1,214 | 1,323 | 1,312 |
| 2010 | 1,026 | 1,125 | 1,245 | 1,421 | 1,132 | 1,295 | 1,411 | 1,399 |
| 2011 | $1,091 | $1,197 | $1,325 | $1,511 | $1,205 | $1,378 | $1,502 | $1,489 |
| 2012 | 1,157 | 1,269 | 1,404 | 1,602 | 1,278 | 1,461 | 1,592 | 1,580 |
| 2013 | 1,226 | 1,346 | 1,489 | 1,698 | 1,355 | 1,550 | 1,588 | 1,675 |
| 2014 | 1,299 | 1,426 | 1,577 | 1,799 | 1,436 | 1,642 | 1,759 | 1,775 |
| 2015 | 1,377 | 1,511 | 1,671 | 1,906 | 1,522 | 1,740 | 1,896 | 1,881 |
| 2016 | $1,458 | $1,600 | $1,770 | $2,019 | $1,612 | $1,844 | $2,009 | $1,993 |
| 2017 | 1,544 | 1,895 | 1,874 | 2,138 | 1,708 | 1,963 | 2,128 | 2,111 |
| 2018 | 1,635 | 1,794 | 1,984 | 2,264 | 1,809 | 2,068 | 2,253 | 2,235 |
| 2019 | 1,730 | 1,899 | 2,100 | 2,396 | 1,915 | 2,190 | 2,385 | 2,366 |
| 2020 | 1,831 | 2,010 | 2,223 | 2,536 | 2,027 | 2,318 | 2,525 | 2,505 |
| 2021 | $1,938 | $2,127 | $2,352 | $2,683 | $2,145 | $2,453 | $2,672 | $2,651 |
| 2022 | 2,050 | 2,251 | 2,488 | 2,839 | 2,270 | 2,596 | 2,827 | 2,805 |
| 2023 | 2,169 | 2,381 | 2,632 | 3,003 | 2,401 | 2,746 | 2,991 | 2,968 |
| 2024 | 2,294 | 2,518 | 2,784 | 3,176 | 2,540 | 2,905 | 3,164 | 3,139 |
| 2025 | 2,426 | 2,663 | 2,944 | 3,358 | 2,687 | 3,072 | 3,346 | 3,320 |
| 2026 | $2,565 | $2,816 | $3,112 | $3,551 | $2,841 | $3,249 | $3,538 | $3,511 |
| 2027 | 2,712 | 2,977 | 3,291 | 3,754 | 3,004 | 3,435 | 3,741 | 3,712 |
| 2028 | 2,867 | 3,147 | 3,478 | 3,969 | 3,176 | 3,632 | 3,955 | 3,925 |
| 2029 | 3,030 | 3,327 | 3,677 | 4,195 | 3,358 | 3,839 | 4,181 | 4,149 |
| 2030 | 3,203 | 3,516 | 3,886 | 4,433 | 3,549 | 4,058 | 4,419 | 4,386 |
| 2031 | $3,384 | $3,716 | $4,107 | $4,685 | $3,751 | $4,289 | $4,671 | $4,635 |
| 2032 | 3,576 | 3,926 | 4,339 | 4,951 | 3,964 | 4,533 | 4,936 | 4,898 |
| 2033 | 3,779 | 4,149 | 4,585 | 5,231 | 4,189 | 4,790 | 5,216 | 5,178 |
| 2034 | 3,992 | 4,383 | 4,844 | 5,527 | 4,426 | 5,061 | 5,511 | 5,469 |
| 2035 | 4,218 | 4,631 | 5,117 | 5,838 | 4,677 | 5,347 | 5,822 | 5,778 |
| 2036 | $4,456 | $4,892 | $5,406 | $6,167 | $4,941 | $5,649 | $6,151 | $6,104 |
| 2037 | 4,706 | 5,167 | 5,710 | 6,515 | 5,219 | 5,967 | 6,497 | 6,448 |
| 2038 | 4,971 | 5,458 | 6,031 | 6,881 | 5,513 | 6,303 | 6,863 | 6,811 |
| 2039 | 5,250 | 5,764 | 6,370 | 7,267 | 5,823 | 6,657 | 7,249 | 7,194 |
| 2040 | 5,545 | 6,088 | 6,727 | 7,675 | 6,150 | 7,031 | 7,656 | 7,598 |
| 2041 | $5,855 | $6,429 | $7,104 | $8,105 | $6,495 | $7,425 | $8,085 | $8,024 |
| 2042 | 6,183 | 6,789 | 7,501 | 8,559 | 6,859 | 7,842 | 8,538 | 8,474 |
| 2043 | 8,523 | 7,169 | 7,921 | 9,037 | 7,243 | 8,281 | 9,018 | 8,948 |
| 2044 | 6,894 | 7,569 | 8,363 | 9,542 | 7,648 | 8,744 | 9,520 | 9,449 |
| 2045 | 7,279 | 7,992 | 8,830 | 10,075 | 8,075 | 9,232 | 10,052 | 9,977 |
| 2046 | $7,685 | $8,438 | $9,323 | $10,637 | $8,526 | $9,748 | $10,613 | $10,534 |
| 2047 | 8,113 | 8,908 | 9,843 | 11,230 | 9,002 | 10,292 | 11,205 | 11,121 |
| 2048 | 8,566 | 9,405 | 10,391 | 11,855 | 9,604 | 10,865 | 11,830 | 11,741 |
| 2049 | 9,042 | 9,928 | 10,969 | 12,515 | 10,033 | 11,471 | 12,489 | 12,395 |
| 2050 | 9,546 | 10,481 | 11,580 | 13,212 | 10,592 | 12,109 | 13,184 | 13,085 |
| 2051 | $10,076 | $11,064 | $12,223 | $13,946 | $11,181 | $12,783 | $13,918 | $13,813 |
| 2052 | 10,636 | 11,679 | 12,903 | 14,721 | 11,803 | 13,494 | 14,691 | 14,581 |
| 2053 | 11,227 | 12,327 | 13,619 | 15,539 | 12,459 | 14,243 | 15,506 | 15,392 |
| 2054 | 11,850 | 13,012 | 14,375 | 16,401 | 13,151 | 15,035 | 16,369 | 16,247 |

TABLE II
EXPECTED DRUG PER CAPITA COSTS
NET PER CAPITA COSTS *(DRUGS)*

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 – 79 | 80 + |
| 1993 | $1,689 | $1,371 | $1,917 | $3,540 | $734 | $685 | $641 | $637 |
| 1994 | 1,895 | 1,544 | 2,140 | 3,948 | 810 | 756 | 706 | 703 |
| 1995 | 2,091 | 1,703 | 2,355 | 4,365 | 876 | 818 | 765 | 760 |
| 1996 | $2,316 | $1,889 | $2,605 | $4,825 | $853 | $890 | $832 | $828 |
| 1997 | 2,552 | 2,088 | 2,874 | 5,311 | 1,036 | 967 | 904 | 898 |
| 1998 | 2,805 | 2,302 | 3,161 | 5,832 | 1,123 | 1,047 | 979 | 973 |
| 1999 | 3,074 | 2,521 | 3,469 | 6,385 | 1,215 | 1,133 | 1,058 | 1,052 |
| 2000 | 3,351 | 2,765 | 3,794 | 6,967 | 1,313 | 1,222 | 1,142 | 1,134 |
| 2001 | $3,650 | $3,016 | $4,136 | $7,590 | $1,415 | $1,315 | $1,230 | $1,221 |
| 2002 | 3,956 | 3280 | 4,503 | 8,243 | 1,521 | 1,415 | 1,321 | 1,312 |
| 2003 | 4,279 | 3,554 | 4,887 | 8,928 | 1,633 | 1,519 | 1,418 | 1,407 |
| 2004 | 4,626 | 3,840 | 5,278 | 9,649 | 1,748 | 1,627 | 1,519 | 1,506 |
| 2005 | 4,986 | 4,126 | 5,696 | 10,385 | 1,868 | 1,743 | 1,623 | 1,609 |
| 2006 | $5,350 | $4,429 | $6,115 | $11,150 | $1,994 | $1,861 | $1,731 | $1,717 |
| 2007 | 5,718 | 4,728 | 6,532 | 11,947 | 2,124 | 1,981 | 1,844 | 1,827 |
| 2008 | 6,101 | 5,022 | 6,955 | 12,751 | 2,259 | 2,106 | 1,961 | 1,941 |
| 2009 | 6,486 | 5,337 | 7,381 | 13,571 | 2,399 | 2,233 | 2,082 | 2,059 |
| 2010 | 6,875 | 5,672 | 7,803 | 14,414 | 2,539 | 2,364 | 2,208 | 2,179 |
| 2011 | $7,306 | $5,972 | $8,254 | $15,227 | $2,684 | $2,499 | $2,335 | $2,302 |
| 2012 | 7,718 | 6,287 | 8,640 | 16,029 | 2,834 | 2,638 | 2,462 | 2,428 |
| 2013 | 8,127 | 6,632 | 9,005 | 16,876 | 2,991 | 2,783 | 2,597 | 2,661 |
| 2014 | 8,581 | 6,967 | 9,417 | 17,746 | 3,153 | 2,939 | 2,738 | 2,701 |
| 2015 | 9,077 | 7,343 | 9,913 | 18,643 | 3,326 | 3,099 | 2,887 | 2,850 |
| 2016 | $9,617 | $7,781 | $10,454 | $19,620 | $3,500 | $3,269 | $3,046 | $3,006 |
| 2017 | 10,226 | 8,173 | 11,013 | 20,542 | 3,683 | 3,451 | 3,214 | 3,171 |
| 2018 | 10,783 | 8,611 | 11,584 | 21,451 | 3,877 | 3,642 | 3,392 | 3,345 |
| 2019 | 11,371 | 9,164 | 12,163 | 22,511 | 4,076 | 3,839 | 3,582 | 3,528 |
| 2020 | 11,991 | 9,727 | 12,883 | 23,725 | 4,279 | 4,048 | 3,776 | 3,723 |
| 2021 | $12,645 | $10,302 | $13,685 | $25,045 | $4,497 | $4,260 | $3,983 | $3,928 |
| 2022 | 13,334 | 10,931 | 14,426 | 26,410 | 4,711 | 4,483 | 4,205 | 4,144 |
| 2023 | 14,061 | 11,526 | 15,233 | 27,784 | 4,928 | 4,719 | 4,437 | 4,372 |
| 2024 | 14,827 | 12,152 | 16,061 | 29,264 | 5,180 | 4,960 | 4,676 | 4,613 |
| 2025 | 15,635 | 12,813 | 17,049 | 30,921 | 5,454 | 5,207 | 4,931 | 4,865 |
| 2026 | $16,488 | $13,510 | $18,277 | $32,617 | $5,750 | $5,471 | $5,188 | $5,133 |
| 2027 | 17,386 | 14,245 | 19,323 | 34,427 | 6,057 | 5,731 | 5,459 | 5,416 |
| 2028 | 18,334 | 15,020 | 20,317 | 36,384 | 6,387 | 5,998 | 5,747 | 5,713 |
| 2029 | 19,333 | 15,837 | 20,974 | 38,361 | 6,704 | 6,305 | 6,040 | 6,025 |
| 2030 | 20,386 | 16,698 | 21,674 | 40,600 | 7,074 | 6,637 | 6,339 | 6,353 |
| 2031 | $21,497 | $17,606 | $22,856 | $43,343 | $7,448 | $6,997 | $6,660 | $6,694 |
| 2032 | 22,668 | 18,563 | 24,103 | 45,729 | 7,861 | 7,368 | 6,976 | 7,057 |
| 2033 | 23,903 | 19,572 | 25,418 | 48,067 | 6,304 | 7,746 | 7,301 | 7,440 |
| 2034 | 25,205 | 20,636 | 26,804 | 49,739 | 8,755 | 8,157 | 7,676 | 7,640 |
| 2035 | 26,578 | 21,758 | 28,266 | 51,881 | 9,253 | 8,605 | 8,079 | 8,258 |
| 2036 | $28,026 | $22,941 | $29,808 | $54,721 | $9,849 | $9,057 | $8,515 | $8,697 |
| 2037 | 29,553 | 24,188 | 31,434 | 57,717 | 10,376 | 9,560 | 8,967 | 9,161 |
| 2038 | 31,162 | 25,502 | 33,148 | 60,877 | 10,904 | 10,098 | 9,426 | 9,650 |
| 2039 | 32,860 | 25,886 | 34,955 | 64,210 | 11,294 | 10,648 | 9,928 | 10,166 |
| 2040 | 34,649 | 28,350 | 36,862 | 67,725 | 11,792 | 11,250 | 10,471 | 10,701 |
| 2041 | $36,536 | $29,890 | $38,872 | $71,432 | $12,431 | $11,968 | $11,019 | $11,262 |
| 2042 | 38,526 | 31,514 | 40,691 | 75,343 | 13,106 | 12,608 | 11,631 | 11,854 |
| 2043 | 40,624 | 33,226 | 43,226 | 79,467 | 13,817 | 13,248 | 12,285 | 12,476 |
| 2044 | 42,836 | 35,032 | 45,583 | 83,817 | 14,567 | 13,724 | 12,956 | 13,133 |
| 2045 | 45,168 | 36,935 | 48,068 | 88,405 | 15,357 | 14,329 | 13,689 | 13,811 |
| 2046 | $47,626 | $38,941 | $50,688 | $93,244 | $16,190 | $15,106 | $14,553 | $14,519 |
| 2047 | 50,220 | 41,056 | 53,452 | 98,348 | 17,068 | 15,824 | 15,329 | 15,282 |
| 2048 | 52,964 | 43,286 | 56,365 | 103,731 | 17,994 | 16,787 | 16,105 | 16,086 |
| 2049 | 55,837 | 45,637 | 59,438 | 109,409 | 18,970 | 17,697 | 16,687 | 16,939 |
| 2050 | 58,877 | 48,116 | 62,677 | 115,397 | 19,998 | 18,655 | 17,423 | 17,826 |
| 2051 | $62,081 | $50,728 | $66,094 | $121,713 | $21,083 | $19,666 | $18,366 | $18,756 |
| 2052 | 65,460 | 53,483 | 69,699 | 128,374 | 22,226 | 20,731 | 19,359 | 19,747 |
| 2053 | 69,023 | 56,387 | 73,494 | 135,400 | 23,431 | 21,854 | 20,407 | 20,815 |
| 2054 | 72,779 | 59,448 | 77,499 | 142,810 | 24,701 | 23,037 | 21,511 | 21,940 |

Navistar International
Transportation Corporation                     Coopers & Lybrand

TABLE III
MAXIMUM CORRIDOR MEDICAL PER CAPITA COSTS
NET PER CAPITA COSTS *(MEDICAL EXCLUDING DRUGS)*

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 – 79 | 80 + |
| 1993 | $1,689 | $1,371 | $1,917 | $3,540 | $734 | $685 | $641 | $637 |
| 1994 | 1,913 | 1,559 | 2,160 | 3,983 | 817 | 763 | 715 | 710 |
| 1995 | 2,129 | 1,735 | 2,398 | 4,442 | 892 | 833 | 779 | 775 |
| 1996 | $2,379 | $1,941 | $2,674 | $4,949 | $979 | $915 | $855 | $851 |
| 1997 | 2,641 | 2,163 | 2,974 | 5,488 | 1,073 | 1,001 | 937 | 931 |
| 1998 | 2,924 | 2,402 | 3,295 | 6,069 | 1,172 | 1,093 | 1,022 | 1,016 |
| 1999 | 3,227 | 2,649 | 3,640 | 6,688 | 1,276 | 1,190 | 1,112 | 1,105 |
| 2000 | 3,540 | 2,924 | 4,006 | 7,343 | 1,388 | 1,292 | 1,208 | 1,200 |
| 2001 | $3,878 | $3,208 | $4,392 | $8,044 | $1,505 | $1,399 | $1,308 | $1,299 |
| 2002 | 4,225 | 3,507 | 4,806 | 8,781 | 1,627 | 1,513 | 1,414 | 1,404 |
| 2003 | 4,592 | 3,819 | 5,241 | 9,554 | 1,754 | 1,632 | 1,524 | 1,513 |
| 2004 | 4,986 | 4,143 | 5,884 | 10,369 | 1,886 | 1,756 | 1,639 | 1,626 |
| 2005 | 5,394 | 4,471 | 6,157 | 11,200 | 2,023 | 1,888 | 1,758 | 1,744 |
| 2006 | $5,805 | $4,813 | $6,631 | $12,063 | $2,167 | $2,022 | $1,881 | $1,867 |
| 2007 | 6,222 | 5,151 | 7,102 | 12,959 | 2,315 | 2,159 | 2,010 | 1,992 |
| 2008 | 6,653 | 5,483 | 7,578 | 13,871 | 2,468 | 2,300 | 2,143 | 2,122 |
| 2009 | 7,083 | 5,837 | 8,055 | 14,775 | 2,624 | 2,443 | 2,278 | 2,254 |
| 2010 | 7,518 | 6,211 | 8,525 | 15,709 | 2,781 | 2,589 | 2,419 | 2,388 |
| 2011 | $7,992 | $6,543 | $9,023 | $16,605 | $2,941 | $2,739 | $2,550 | $2,524 |
| 2012 | 8,444 | 6,889 | 9,445 | 17,479 | 3,106 | 2,891 | 2,699 | 2,663 |
| 2013 | 8,891 | 7,267 | 9,845 | 18,403 | 3,278 | 3,050 | 2,847 | 2,808 |
| 2014 | 9,389 | 7,635 | 10,295 | 19,352 | 3,455 | 3,221 | 3,002 | 2,963 |
| 2015 | 9,932 | 8,046 | 10,837 | 20,330 | 3,645 | 3,397 | 3,166 | 3,126 |
| 2016 | $10,524 | $8,527 | $11,430 | $21,396 | $3,836 | $3,584 | $3,341 | $3,298 |
| 2017 | 11,190 | 8,957 | 12,041 | 22,402 | 4,037 | 3,784 | 3,525 | 3,479 |
| 2018 | 11,800 | 9,438 | 12,645 | 23,394 | 4,250 | 3,993 | 3,720 | 3,670 |
| 2019 | 12,444 | 10,044 | 13,289 | 24,550 | 4,468 | 4,209 | 3,928 | 3,871 |
| 2020 | 13,123 | 10,662 | 14,087 | 25,875 | 4,691 | 4,439 | 4,142 | 4,085 |
| 2021 | $13,839 | $11,292 | $14,965 | $27,315 | $4,931 | $4,671 | $4,370 | $4,310 |
| 2022 | 14,594 | 11,982 | 15,776 | 28,804 | 5,165 | 4,916 | 4,613 | 4,547 |
| 2023 | 16,390 | 12,635 | 16,659 | 30,303 | 5,404 | 5,176 | 4,8658 | 4,797 |
| 2024 | 16,230 | 13,323 | 17,565 | 31,918 | 5,680 | 5,440 | 5,131 | 5,063 |
| 2025 | 17,115 | 14,048 | 18,646 | 33,726 | 5,981 | 5,711 | 5,411 | 5,340 |
| 2026 | $18,048 | $14,813 | $19,900 | $35,576 | $6,306 | $6,001 | $5,683 | $5,634 |
| 2027 | 19,033 | 15,619 | 21,135 | 37,551 | 6,642 | 6,287 | 5,991 | 5,945 |
| 2028 | 20,071 | 16,470 | 22,223 | 39,687 | 6,983 | 6,580 | 6,307 | 6,271 |
| 2029 | 21,166 | 17,356 | 22,942 | 41,843 | 7,354 | 6,917 | 6,629 | 6,615 |
| 2030 | 22,320 | 18,312 | 23,709 | 44,297 | 7,759 | 7,282 | 6,958 | 6,975 |
| 2031 | $23,537 | $19,308 | $25,003 | $47,280 | $8,170 | $7,677 | $7,310 | $7,350 |
| 2032 | 24,820 | 20,359 | 26,368 | 49,884 | 8,623 | 8,086 | 7,655 | 7,730 |
| 2033 | 26,174 | 21,467 | 27,807 | 52,435 | 9,110 | 8,600 | 8,016 | 8,170 |
| 2034 | 27,501 | 22,635 | 29,325 | 54,260 | 9,606 | 8,952 | 8,428 | 8,610 |
| 2035 | 29,106 | 23,667 | 30,925 | 56,598 | 10,152 | 9,443 | 8,871 | 9,070 |
| 2036 | $50,693 | $25,166 | $32,614 | $59,697 | $10,807 | $9,941 | $9,350 | $9,553 |
| 2037 | 32,366 | 26,535 | 34,394 | 62,967 | 11,386 | 10,493 | 9,847 | 10,063 |
| 2038 | 34,130 | 27,979 | 38,271 | 66,416 | 11,966 | 11,065 | 10,351 | 10,601 |
| 2039 | 35,991 | 29,501 | 38,250 | 70,053 | 12,395 | 11,689 | 10,904 | 11,168 |
| 2040 | 37,953 | 31,106 | 40,337 | 73,890 | 12,942 | 12,351 | 11,501 | 11,757 |
| 2041 | $40,021 | $32,796 | $42,539 | $77,936 | $13,645 | $13,140 | $12,104 | $12,374 |
| 2042 | 42,203 | 34,582 | 44,860 | 82,204 | 14,386 | 13,843 | 12,777 | 13,026 |
| 2043 | 44,503 | 36,463 | 47,307 | 86,706 | 15,168 | 14,547 | 13,497 | 13,710 |
| 2044 | 46,928 | 38,446 | 49,889 | 91,454 | 15,992 | 15,071 | 14,235 | 14,434 |
| 2045 | 49,485 | 40,537 | 52,611 | 96,462 | 16,880 | 15,737 | 15,041 | 15,160 |
| 2046 | $52,182 | $42,742 | $55,481 | $101,745 | $17,776 | $16,591 | $16,992 | $15,958 |
| 2047 | 55,026 | 45,066 | 58,508 | 107,316 | 18,741 | 17,491 | 16,846 | 16,796 |
| 2048 | 58,024 | 47,517 | 61,700 | 113,192 | 19,759 | 18,440 | 17,700 | 17,684 |
| 2049 | 61,185 | 50,100 | 65,065 | 119,390 | 20,832 | 19,440 | 18,341 | 18,623 |
| 2050 | 64,519 | 52,824 | 88,615 | 125,927 | 21,963 | 23,495 | 19,162 | 19,600 |
| 2051 | $68,034 | $55,696 | $72,357 | $132,822 | $23,155 | $21,608 | $20,189 | $20,626 |
| 2052 | 71,740 | 58,724 | 76,304 | 140,095 | 24,412 | 22,778 | 21,283 | 21,715 |
| 2053 | 75,648 | 61,916 | 80,488 | 147,765 | 25,738 | 24,013 | 22,436 | 22,891 |
| 2054 | 79,769 | 65,281 | 84,854 | 155,855 | 27,135 | 25,316 | 23,652 | 24,131 |

Navistar International
Transportation Corporation                                              Coopers & Lybrand

**EXHIBIT B**

**THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**
**RETIREE SUPPLEMENTAL BENEFIT PROGRAM**

# TABLE OF CONTENTS

**PAGE**

ARTICLE I          Introduction .................................... 102

    1.1   Definitions ........................................ 102
    1.2   Purpose ........................................... 102

ARTICLE II         Supplemental Benefit Trust ............... 102

    2.1   Establishment ..................................... 102
    2.2   Initial Funding ................................... 103

ARTICLE III        Parent Common Equity ..................... 103

    3.1   Purchases ......................................... 103
    3.2   Conversion ........................................ 103
    3.3   Voting ............................................ 103
    3.4   Sales of Parent Common Equity ..................... 103
    3.5   Registration Rights and Other Transfers ........... 104
    3.6   Event Date ........................................ 105

ARTICLE IV         Super-Majority Transactions .............. 105

ARTICLE V          Parent Preference Stock .................. 105

    5.1   Contribution ...................................... 105
    5.2   Voting ............................................ 105
    5.3   No Transfers ...................................... 106

ARTICLE VI         The Supplemental Benefit committee ....... 106

    6.1   A Supplemental Benefit Program Committee .......... 106
    6.2   Powers and Duties ................................. 107
    6.3   Program Design .................................... 108
    6.4   Action by Supplemental Benefit Committee .......... 108
    6.5   Provision of Benefits ............................. 109
    6.6   Supplemental Benefit Committee Minutes ............ 110

ARTICLE VII        Company Contributions .................... 110

    7.1   Contributions ..................................... 110

ARTICLE VIII       Additional Funding ....................... 110

    8.1   Expenses of Supplemental Benefit Committee ........ 110
    8.2   Advance Funding ................................... 110

ARTICLE IX         Amendments and Termination ............... 111

    9.1   Amendments ........................................ 111
    9.2   Termination ....................................... 112

100

ARTICLE X       Miscellaneous ............................................................... 113

    10.1  Legends and Stop Transfer Orders .................................................. 113
    10.2  Prohibitions and Restrictions Relating to Net Operating Loss Carryovers .. 113
    10.3  Limitation of Liability and Indemnification ................................... 115
    10.4  Exclusive Benefit ......................................................................... 116
    10.5  Prohibited Inurement .................................................................... 116
    10.6  Assignment, Delegation ................................................................ 117
    10.7  Captions ...................................................................................... 117
    10.8  Incorporation of Appendices; References ...................................... 117
    10.9  Governing Law ............................................................................ 117

ARTICLE XI       Events of Default ............................................................... 117

    11.1  Supplemental Benefit Program Payment Default ........................... 117
    11.2  No Limitation of Rights ................................................................ 118

**<u>Appendices</u>**

| | |
|---|---|
| Appendix B-1 | SPA Supplemental Benefit Program |
| Appendix B-2 | Supplemental Benefit Trust Agreement |
| Appendix B-3 | Restated Certificate of Incorporation |
| Appendix B-4 | Registration Rights |
| Appendix B-5 | SBC Committee Members |
| Appendix B-6 | [*Reserved*] |
| Appendix B-7 | Calculation of Common and Dilutative Common Equivalent Shares |

**THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**
**RETIREE SUPPLEMENTAL BENEFIT PROGRAM**

ARTICLE I
Introduction

1.1     Definitions. Capitalized terms used and not defined herein
have the meanings assigned to them in Exhibit D to the Settlement Agreement.

1.2     Purpose. As of the Effective Date, the Company shall
establish the Health Benefit Program and the Life Insurance Program. Effective as
of such date, the Company shall further establish the Supplemental Benefit Program
(the "Navistar International Transportation Corp. Retiree Supplemental Benefit
Program") on the terms and subject to the conditions set forth below for the benefit
of Enrolled Participants and Retirees, whether or not they are Enrolled Participants.
From time to time, it is anticipated that cash generated from assets held in the
Supplemental Benefit Trust established under the Supplemental Benefit Program
may be used to (i) reduce or reimburse premiums, co-payments, deductibles and
other amounts which would otherwise be required to be paid by or on behalf of
Enrolled Participants under the Health Benefit Program, (ii) reduce or reimburse
premiums which would otherwise be required to be paid by or on behalf of Enrolled
Participants to participate in Medicare or any part thereof or any successor or
comparable program thereto, (iii) provide Enrolled Participants with additional
benefits or (iv) provide additional life insurance benefits to all Retirees, including
both those who are Enrolled Participants and those who are not Enrolled
Participants (the benefits described in clauses (iii) and (iv), "Additional Permissible
Benefits"). All the benefits which may be provided under the Supplemental Benefit
Program are limited to those benefits which are permissible under a trust intended
to meet the requirements of an organization described in Section 501(c) (9) of the
IRC or under any comparable section or sections of any future legislation that
amends, supplements or supersedes said section.

ARTICLE II
Supplemental Benefit Trust

2.1     Establishment. The Company has established the
Supplemental Benefit Trust for the benefit of the Enrolled Participants, in the case
of both health benefits and life insurance benefits, and Retirees who are not
Enrolled Participants, in the case of life insurance benefits. The Supplemental
Benefit Trust shall be maintained in accordance with this Supplemental Benefit
Program, the SPD attached as Appendix B-1 and the trust agreement attached as
Appendix B-2.

2.2     <u>Initial Funding.</u>  On the Effective Date, the Company shall contribute such number of shares of the Parent Class B Common to the Supplemental Benefit Trust as shall represent 50 percent of the Parent Common Equity on a Fully Diluted Basis immediately following such contribution.

<u>ARTICLE III</u>
<u>Parent Common Equity</u>

3.1     <u>Purchases.</u> Until the Event Date, the Supplemental Benefit Trust will not directly or indirectly purchase, offer or agree to purchase, or otherwise directly or indirectly acquire any shares of Parent Common Equity or any other voting securities of Parent ("<u>Other Voting Securities</u>") or any rights or options to purchase any shares of Parent Common Equity or Other Voting Securities (either individually or as a member of any "<u>group</u>" (as defined in Section 13(d)(3) of the Exchange Act), except (i) from Parent, (ii) by way of any stock dividend, dividend reinvestment program, stock split, reorganization, recapitalization, merger, consolidation, rights offering or other like distribution made available to holders of Parent Common Equity generally or under any rights plan which Parent may adopt in the future or (iii) as may otherwise be allowed or required by the Certificate of Incorporation of Parent.

3.2     <u>Conversion.</u> At the times and on the terms specified in Appendix B-3 hereto, the shares of Parent Class B Common held by the Supplemental Benefit Trust shall automatically convert into shares of Parent Common.

3.3     <u>Voting.</u> The trustee of the Supplemental Benefit Trust shall vote all shares of Parent Common Equity held by the Supplemental Benefit Trust on any matter submitted to holders of Parent Common Equity for their vote, approval or consent as directed by the Supplemental Benefit Committee.

3.4     <u>Sales of Parent Common Equity.</u> Subject to the terms and conditions described in Appendix B-3, the Supplemental Benefit Trust may sell, transfer, pledge or otherwise dispose of any securities of Parent to any person in accordance with the provisions of all applicable laws, rules and regulations, including, without limitation, the Securities Act and all rules and regulations thereunder; provided, that the Supplemental Benefit Trust shall not sell or transfer any interest in any securities of Parent held by it during any period (a "<u>Blackout Period</u>") when, in the opinion of counsel to Parent which is knowledgeable in securities law matters, Parent or the Supplemental Benefit Trust would be required under applicable securities laws to disclose confidential information of Parent in connection with such proposed sale or transfer, including, without limitation, any pending or proposed acquisition, disposition, merger, consolidation, tender offer, corporate reorganization, financial or accounting development or any other

103

development involving Parent or any of its subsidiaries. Parent shall notify the Supplemental Benefit Committee promptly of the occurrence of any Blackout Period, together with such opinion of counsel and a general statement of the nature of the event or condition giving rise to such Blackout Period; provided, that the Supplemental Benefit Committee, on behalf of the Supplemental Benefit Trust, shall furnish Parent with a confidentiality agreement in form and substance reasonably satisfactory to Parent as a condition to Parent's disclosure of any such general statement. Parent shall furnish the Supplemental Benefit Committee with further such opinions and statements not less than each 90 days during the continuance of any Blackout Period and shall notify the Supplemental Benefit Committee promptly of the termination of any Blackout Period. The Supplemental Benefit Committee shall be entitled to rely on *any* such notice, opinion or statement.

### 3.5    Registration Rights and Other Transfers.

(a) Registration Rights. Parent hereby grants to the Supplemental Benefit Trust the registration rights set forth in Appendix B-4 hereto.

(b) Other Transfers. After the Event Date, Parent shall use its best efforts to comply with the current public information requirements of Rule 144 under the Securities Act and, upon request by the Supplemental Benefit Committee, Parent shall furnish the Supplemental Benefit Committee with (i) a written statement as to whether or not Parent is in compliance with such requirements and (ii) such other information as the Supplemental Benefit Committee may reasonably request to enable the Supplemental Benefit Trust to make sales of shares of Registrable Securities held by it pursuant to an exemption from registration under the Securities Act; provided, that Parent shall not be required to provide any such information during a Blackout Period. In connection with any such transfer of shares of Registrable Securities, the Supplemental Benefit Committee shall deliver written notice to Parent describing the transfer or proposed transfer in reasonable detail, together with an opinion of counsel of its choice which (to Parent's reasonable satisfaction) is knowledgeable in securities law matters to the effect that such transfer of Registrable Securities may be effected without registration under. the Securities Act. Upon delivery of an opinion of such counsel that a transfer of shares of Registrable Securities by the Supplemental Benefit Trust qualifies under Rule 144 under the Securities Act and upon presentation of the certificates representing the shares to be transferred, Parent shall promptly deliver *new* certificates for such shares which do not bear the legend set forth in Section 10.1. If Parent is not required to deliver new certificates for such shares of Registrable Securities not bearing such legend, Parent shall not register the transfer of such shares until the prospective transferee has confirmed in writing to Parent its agreement to be bound by the conditions contained in this Section 3.5(b). Notwithstanding the foregoing provisions of this Section 3.5(b), three years or more after the date on which any shares of Registrable Securities held by the

Supplemental Benefit Trust were "acquired," within the meaning of Rule 144, from Parent or an affiliate of Parent, if Parent receives an opinion of such counsel that the Supplemental Benefit Trust is not an "affiliate" of Parent within the meaning of Rule 144 (and has not been such an "affiliate" of Parent during the preceding three months) and upon presentation of certificates representing such shares of Registrable Securities, Parent shall promptly deliver new certificates for such shares which do not bear the legend set forth in Section 10.1.

        3.6     <u>Event Date.</u> The Event Date shall be the date upon which the earliest of the following occurs:

        (a)     the third anniversary of the date on which the Company has made prefunding contributions (other than prefunding contributions in respect of Annual Service Cost) under Section 3.6 of Exhibit A to the Settlement Agreement which aggregate $500 million or more;

        (b)     the fifth anniversary of the Effective Date; and

        (c)     the occurrence of a Supplemental Benefit Program Payment Default in accordance with Section 11.1.

ARTICLE IV
<u>Super-Majority Transactions</u>

        Any transaction involving the Company which, if it involved Parent, would be a Super-Majority Transaction, shall be subject to a Super-Majority Vote at any time when the Certificate of Incorporation of Parent requires a Super-Majority Vote on Super Majority Transactions.

ARTICLE V
<u>Parent Preference Stock</u>

        5.1     <u>Contribution</u>. On the Effective Date, the Company shall contribute one share of Series A Preference Stock, par value $1.00 per share, of Parent having the terms set forth in Appendix B-3 hereto (the "<u>Parent Series A Preference</u>") to the Supplemental Benefit Trust.

        5.2     <u>Voting.</u> The trustee of the Supplemental Benefit Trust shall vote the Parent Series A Preference held by the Supplemental Benefit Trust in accordance with written instructions received from the Supplemental Benefit Committee on all matters on which the Parent Series A Preference is entitled to vote; provided, that the Supplemental Benefit Committee shall not give any proxies or powers of attorney or make any assignments with respect to the voting of, or enter into any voting trusts, voting agreements or similar arrangements with respect to, the Parent Series A Preference. Each director which the holder of Parent Series

105

A Preference is entitled to elect from time to time is referred to herein as a "<u>Supplemental Trust Designee.</u>"

        5.3    <u>No Transfers.</u> The trustee of the Supplemental Benefit Trust shall not sell, convey, transfer, assign or pledge the Parent Series A Preference.

ARTICLE VI<br>The Supplemental Benefit Committee

        6.1    A Supplemental Benefit Program committee (the "<u>Supplemental Benefit Committee</u>") shall be formed on the Effective Date in accordance with the following procedures:

        (a) The Supplemental Benefit Committee shall consist of two individuals designated by the UAW (the "<u>SBC UAW Members</u>"), who may be replaced at any time by the UAW, two other members (the "<u>BBC Class One Other Members</u>") and a fifth member (the "<u>SBC Class Two Other Member</u>") (each, an "<u>SBC Committee Member</u>" and, collectively, the "<u>SBC Committee Members</u>"). The persons who shall initially serve in such capacities are identified in Appendix B-5 hereto. The Supplemental Benefit Committee shall have a chairperson (the "<u>SSC Chair</u>"), who shall be elected from time to time from among the SBC Class One Other Members, and a Secretary, who shall be elected from time to time from among the SBC Committee Members; each such election shall be by a majority vote of all the SBC Committee Members. Parent shall provide copies of the Supplemental Benefit Program, the Health Benefit Program and the Life Insurance Program to each SBC Committee Member and each SBC Committee Member's successor, if applicable.

        (b) In the event of the death, incapacity or resignation of an SBC Class One Other Member, his successor shall be appointed by a majority vote of such SBC Class One Other Member (if he is not deceased or incapacitated), the remaining SBC Class One Other Member and one alternate (the "<u>SBC Class One Other Member Alternate</u>") upon notice from the supplemental Benefit Committee or such SBC Class One Other Member of such death, incapacity or resignation. The person who shall initially serve as the SBC Class One Other Member Alternate is identified in Appendix B-5. In the event of the death, incapacity or resignation of the SBC Class One Other Member Alternate, his successor shall be appointed by a majority vote of such SBC Class One Other Member Alternate (if he is not deceased or incapacitated) and the SBC Class One Other Members upon notice from the Supplemental Benefit Committee or such SBC Class One Other Member Alternate of such death, incapacity or resignation.

        (c) In the event of the death, incapacity or resignation of the SBC Class Two Other Member, his successor shall be appointed by a majority vote of such SBC Class Two Other Member (if he is not deceased or incapacitated) and

106

two alternates (the "SBC Class Two Other Member Alternates"; the SBC Class One Other Member Alternate and the BBC Class Two Other Member Alternates, collectively, the "SBC Committee Member Alternates") upon notice from the Supplemental Benefit Committee or such SBC Class Two Other Member of such death, incapacity or resignation. The persons who shall initially serve as the SBC Class Two Other Member Alternates are identified in Appendix B-5. In the event of the death, incapacity or resignation of either of the SBC Class Two Other Member Alternates, his successor shall be appointed by a majority vote of such SBC Class Two Other Member Alternate (if he is not deceased or incapacitated), the other SBC Class Two Other Member Alternate and the SBC Class Two Other Member upon notice from the Supplemental Benefit Committee or such SBC Class Two Other Member Alternate of such death, incapacity or resignation.

None of the SBC Class One Other Members, the SBC Class Two Other Member or the SBC Committee Member Alternates shall be a current employee of the UAW or a Retiree who was represented by the UAW at the time of his retirement.

6.2    Powers and Duties. As the Program Administrator and Named Fiduciary under the Supplemental Benefit Program, the Supplemental Benefit Committee is responsible for the administration of the Supplemental Benefit Program. The Supplemental Benefit Committee, as the Named Fiduciary, shall have the powers, rights and duties provided for herein and the following additional powers, rights and duties, all of which such powers, rights and duties shall be exercised or discharged in the Supplemental Benefit Committee's sole discretion, consistent with its rights and obligations under this Exhibit B and the Settlement Agreement:

(a) to adopt such rules and procedures as it may deem appropriate for the efficient administration of the Supplemental Benefit Program or in connection with the exercise or discharge of its powers, rights and duties;

(b) to engage such consultants, actuaries and other professionals as it may deem appropriate to assist it in the exercise of its powers, rights and duties;

(c) to establish the investment policy under the Supplemental Benefit Trust and appoint and remove investment managers and trustees thereunder;

(d) to review and enforce Parent's and the Company's compliance with their obligations under the Supplemental Benefit Program;

(e) to invest assets consistent with the provisions of the Supplemental Benefit Program and to direct the trustee of the Supplemental Benefit Trust with respect thereto;

(f) to direct the transfer of funds from the Supplemental Benefit Trust to the appropriate person as determined by the Supplemental Benefit Committee pursuant to Section 6.3 at the beginning of each calendar year;

(g) to construe and interpret the Supplemental Benefit Program and to decide all questions of eligibility for benefits under such program;

(h) to appoint claims administrators, medical review agencies and other service providers; and

(i) to undertake such other actions as are necessary or appropriate in connection with the exercise of such powers, rights and duties.

6.3 <u>Program Design.</u> The Supplemental Benefit Committee, as a matter of appropriate program design, shall have the following powers, rights and duties, all of which such powers, rights and duties shall be exercised or discharged in the Supplemental Benefit Committee's sole discretion, consistent with the terms of this Exhibit B and the Settlement Agreement:

(a) at the beginning of each calendar year, to determine the amount of assets of the Supplemental Benefit Trust to be used for the purpose of (i) reducing premiums, co-payments, deductibles or other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program, (ii) reducing or reimbursing premiums which would otherwise be required to be paid by or on behalf of Enrolled Participants to participate in Medicare or any part thereof or any successor or comparable program thereto or (iii) providing Additional Permissible Benefits; and

(b) to determine the manner in which the assets of the Supplemental Benefit Trust shall be used each year in accordance with the provisions hereof in a fair and equitable manner

6.4 <u>Action by Supplemental Benefit Committee.</u> Any action by the Supplemental Benefit Committee will be subject to the following provisions:

(a) The SBC Chair or any two SBC Committee Members may call a meeting of the Supplemental Benefit Committee on not less than two days' advance written notice to all SBC Committee Members (including telephone conference, video conference and other technology-assisted meetings of persons at separate locations);

(b) The Supplemental Benefit Committee shall act by the majority vote of all of its members, which action shall be as effective as if such action had been taken by all SBC Committee Members, or by a written instrument signed by all of the SBC Committee Members, which instrument may be executed in counterparts; provided, that one or more SBC Committee Members or other persons may be so authorized to act with respect to particular matters on behalf of all SBC Committee Members; and provided, further, that no SBC Committee Member shall be liable or responsible for an act or omission of other SEC Committee Members in which the former has not concurred; and

(c) The certificate of the secretary of the Supplemental Benefit Committee or of the majority of the SBC Committee Members that the Supplemental Benefit Committee has taken or authorized any action shall be conclusive in favor of any person relying on such certificate.

6.5 <u>Provision of Benefits.</u>

(a) The Company shall cooperate with the Supplemental Benefit Committee and the Supplemental Benefit Trust to provide for the reduction or reimbursement of premiums, co-payments, deductibles and other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program or to participate in Medicare or any part thereof or any successor or comparable program thereto through the Health Benefit Program, including, in the case of reimbursement of such amounts that would otherwise be required to be paid to participate in Medicare or any part thereof or any successor or comparable program thereto, by addition of such reimbursement to pension payments.

(b) In the event that Additional Permissible Benefits are to be provided by the Supplemental Benefit Program, then, at the request of the Supplemental Benefit Committee, in a writing signed by both the SBC Chair and the Secretary of the Supplemental Benefit Committee, the Company shall cooperate with the Supplemental Benefit Committee and aid it in determining how such benefits should be administered. Such aid shall include identifying and negotiating with claims administrators, medical review agencies and other service providers to provide such benefits on the terms specified by the Supplemental Benefit Committee and informing the Supplemental Benefit Committee of the available alternatives that most closely approximate those specified by the Supplemental Benefit Committee. Notwithstanding anything else contained in this Section 6.5, in providing such cooperation and aid the Company shall act in a ministerial capacity only, and shall neither possess, be granted or delegated, nor exercise any discretionary authority, control or responsibility in the development, administration or management of the Additional Permissible Benefits portion of the Supplemental Benefit Program and none of Parent, the Company or any other Employer shall

have any obligation to Participants to provide any Additional Permissible Benefits to Participants, or any liability to Participants for failing to provide any Additional Permissible Benefits.

6.6 <u>Supplemental Benefit Committee Minutes.</u> As soon as is reasonably practicable after each meeting of the Supplemental Benefit Committee, the Secretary of the Supplemental Benefit Committee shall prepare draft minutes of such meeting, which shall be delivered to each SBC Committee Member and approved or modified at the following meeting.

ARTICLE VII

Company Contributions

7.1 <u>Contributions</u>. The Company shall have no obligation to make any cash contributions to the Supplemental Benefit Trust, and the Supplemental Benefit Trust Profit Sharing Plan is terminated effective as of December 31, 2021.

ARTICLE VIII
Additional Funding

8.1 <u>Expenses of Supplemental Benefit Committee.</u> The Company agrees that, during the period commencing on the Effective Date and ending on the Event Date (the "<u>Initial Period</u>"), it will forthwith upon demand and the Company's receipt of such detailed supporting documentation as the Company may reasonably request pay to (i) all SBC Committee Members and SBC Committee Member Alternates who are not current employees of the UAW, reasonable compensation for time spent on Supplemental Benefit Committee matters, (ii) each SBC Committee Member and each SBC Committee Member Alternate the amount of any and all reasonable out-of-pocket expenses, including reasonable travel expenses incurred by him in exercising or discharging his powers, rights and duties hereunder and (iii) to the Supplemental Benefit Committee the amount of any and all reasonable out-of-pocket costs and expenses (including trustee fees of the Supplemental Benefit Trust, the reasonable fees and disbursements of actuarial, financial and legal advisors, and any other experts), which the Supplemental Benefit Committee may incur in connection with the administration of this Supplemental Benefit Program (including the attached appendices); provided, that the Company shall not be obligated to pay any amounts described in clauses (i), (ii) or (iii) above which exceed $100,000 in the aggregate for any calendar year (pro rated for any partial calendar year included in the Initial Period), excluding fees and expenses which Parent has agreed to pay pursuant to Appendix B-4.

8.2 <u>Advance Funding.</u> On and subject to the terms of this Section 8.2, the Company shall, during the Initial Period, any Blackout Period and any other period

110

(an "Other Period") during which Parent has postponed the filing of, or prohibited sales in connection with, a Demand Registration pursuant to Appendix B-4, advance cash to the Supplemental Benefit Trust ("Advance Funding") for use in accordance with the Supplemental Benefit Program; provided, that the Company shall not be required to provide Advance Funding in excess of $10 million in the aggregate in any calendar year (pro rated for any partial calendar year during the Initial Period, any Blackout Period, any Parent Registration Period or any Other Period). At the option of the Supplemental Benefit Committee, the Company shall provide Advance Funding in either of the following ways:

(a) By purchasing from the Supplemental Benefit Trust for cash shares of Registrable Securities having an aggregate value equal to the amount of such Advance Funding based on the average per share market price of the Registrable Securities (or, if there is no trading market for the Registrable Securities, of the securities of the same class or series into which the Registrable Securities may be converted) at closing on each of the 30 days on which such securities last traded prior to the date of such Advance Funding or at such higher price and on such other terms and conditions as may be required by ERISA; provided, that notwithstanding anything herein to the contrary, the Company shall not be required to purchase shares of Registrable Securities at any time when it would be prohibited from doing so under applicable law; or

(b)     By providing the requested Advance Funding in cash and reducing the amount of the Company's then-due or future Profit Sharing Contributions, if any, by the amount of such Advance Funding and any other Advance Funding or portion thereof that the Company has not previously applied to Profit Sharing Contributions, increased at the Navistar Rate from the date of each such Advance Funding to the date such Profit Sharing Contribution or Contributions would otherwise be due.

The Supplemental Benefit Committee may call for Advance Funding by delivering written notice thereof to the Company (a "Funding Notice"); provided, that the Supplemental Benefit Committee may not give more than one Funding Notice per calendar quarter. The Company shall be required. to provide the amount of Advance Funding specified in any Funding Notice on or before the tenth business day following receipt of such Funding Notice.

## ARTICLE IX
### Amendments and Termination

9.1     Amendments.  The Supplemental Benefit Program may not be amended except by a written instrument executed by a majority of the members of the Supplemental Benefit Committee and the Company; provided, that:

(a)    the consent of the Company shall not be required with respect to any amendment of Sections 6.1 through 6.4, so long as no such amendment shall (i) adversely affect the obligations of any Employer or (ii) be inconsistent with any of the obligations of the Supplemental Benefit Committee under this Exhibit B;

(b)    Section 3.4 may not be amended except in the event of a change in the applicable securities law;

(c)    the effectiveness of any material amendment to the Supplemental Benefit Program shall be subject to the approval of the Court after appropriate notice to the Class Members; and

(d)    in the event the IRS asserts that any Employer is or will be subject to an excise tax on any of the benefits paid or payable by the Supplemental Benefit Trust under the IRC as in effect on the date of the Settlement Agreement, then the Company may amend the Supplemental Benefit Program and/or the Supplemental Benefit Trust to minimize the current and future liability for such tax so long as no such amendment adversely affects the level of Supplemental Benefit Program benefits that are then being provided or could be provided in the future to any Participant.

9.2    Termination. The Supplemental Benefit Program shall terminate upon the earlier of (a) the termination of the Settlement Agreement as provided in Section 13 thereof or (b) the termination of the Health Benefit Program and the Life Insurance Program; provided, that the obligations of Parent and the Company under Sections 8.1 and 10.3 shall survive such termination. In the event the Supplemental Benefit Program terminates, all of the assets held in the Supplemental Benefit Trust shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" within the meaning of Section 501(c) (9) of the IRC, as set forth herein.  If there are any living Participants at or after the time the Supplemental Benefit Program terminates, the Supplemental Benefit Committee shall determine the disposition of such Supplemental Benefit Trust assets solely to any such living Participants for the remainder of their lives, consistent with this Section 9.2.  If there are no living Participants at or any time after the Supplemental Benefit Program terminates, then the Company and the Supplemental Benefit Committee shall attempt in good faith to reach consensus regarding the disposition of any residual assets in the Supplemental Benefit Trust consistent with this Section 9.2, provided that, if such consensus cannot be achieved promptly, either the Company or the Supplemental Benefit Committee may apply to the Court for a determination as to the disposition of such residual assets consistent with this Section 9.2, and the Court's determination shall be binding.

ARTICLE X
Miscellaneous

10.1 <u>Legends and Stop Transfer Orders.</u> The following legend shall be placed on the certificates representing the shares of Parent Class B Common and Parent Series A Preference issued to the Supplemental Benefit Trust pursuant to this Supplemental Benefit Program:

> "The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be sold or transferred except in compliance with such Act or an exemption from the registration requirements under such Act. In addition, the securities represented by this certificate are subject to voting agreements, transfer restrictions and other provisions contained in the Navistar International Corporation certificate of incorporation and the Navistar International Transportation Corp. Retiree Supplemental Benefit Program, a copy of which is on file at the office of the Secretary of Navistar International Corporation."

Stop transfer orders will be entered with the transfer agent (or agents) and the registrar (or registrars) of Parent's securities against the transfer of legended securities held by the Supplemental Benefit Trust except in compliance with the requirements of this Supplemental Benefit Program.

10.2 <u>Prohibitions and Restrictions Relating to Net Operating Loss Carryovers.</u>

(a) Notwithstanding any other provision of this Supplemental Benefit Program, neither Parent nor the Company shall, without the consent of the Supplemental Benefit Committee, sell, transfer, otherwise dispose of or purchase or otherwise acquire any securities of Parent or the Company constituting Restricted Stock or take any other action (including acquiring or issuing an option to purchase or sell Restricted Stock) if, after giving effect to such sale, transfer, disposition, purchase, acquisition or other action, the percentage of Restricted Stock owned by all "5-percent shareholders" (within the meaning of Treasury Regulations Section 382-2T(g) under Section 382 of the IRC, or any successor regulation having similar effect) of either Parent or the Company shall have increased by 47 percentage points or more over the lowest percentage of such Restricted Stack owned by such 5-percent shareholders at any time during the three-year period preceding the proposed date of such sale, transfer, disposition, purchase, acquisition or other action

(such determination to be made in accordance with the provisions of Treasury Regulations Section 1.382-2T(c) under Section 382 of the IRC, or any successor regulation having similar effect); provided, that the foregoing restrictions shall not be applicable in the case of (i) any sale, transfer, disposition, purchase, acquisition or other action which has been approved by the holders of Parent Common or (ii) any tender or exchange offer within the meaning of the Exchange Act with respect to Parent Common Equity constituting more than 50 percent in value of the outstanding Parent Common Equity so long as the Board shall have waived the restrictions contained in Part I of Article Eleventh of the Certificate of Incorporation of Parent with respect to all transfers by the Supplemental Benefit Trust pursuant to such tender or exchange offer.

(b)     In addition to the foregoing, neither Parent nor the Company shall, without the consent of the Supplemental Benefit Committee, sell, transfer or dispose of any securities of *Parent* or *the* Company constituting Restricted Stock or take any other action relating to securities of Parent or the Company (including, without limitation, the redemption of such securities or the issuance of options or similar rights with respect thereto) that would decrease the value of shares of securities of Parent or the Company that the Supplemental Benefit Trust could, pursuant to Paragraph B(2) of Part I of Article Eleventh of the Certificate of Incorporation of Parent, sell, transfer or dispose of on or after the Event Date below an aggregate amount equal to (i) $500,000,000, less (ii) all amounts theretofore received by the Supplemental Benefit Trust in any sales, transfers or dispositions on or prior to the determination date, determined, in the case of sales, transfers or dispositions by the Supplemental Benefit Trust to occur after the determination date, as if all such sales and transfers occurred on the Event Date, in the case where the determination date is on or prior to the Event Date, or on the determination date; in the case where such date is after the Event Date; provided, that Parent or the Company may sell, transfer or dispose of securities of Parent or the Company, or take any other action which would otherwise be subject to this Section 10.2(b), (i) to the extent that such sale*,* transfer, disposition or other action is made or taken for the purpose of Parent or the Company being able to meet its prefunding commitment under Section 3.6(c) of Exhibit A to

the Settlement Agreement, (ii) in any case, in an amount of up to an aggregate of $100,000,000 if and to the extent that the Board of Directors of Parent or the Company reasonably and in good faith determines that such amount is required for working capital of Parent or the Company and is actually applied for such purpose, or (iii) to the extent that such sale, transfer, disposition or action is made or taken for the purpose of Parent or the Company meeting outstanding obligations under employee stock option, incentive or other benefit programs, provided that neither the Parent nor the Company shall make any grants under any such programs at a time when such grants could reasonably be anticipated in the good faith judgment of the Compensation Committee of Parent's Board of Directors to result in a decrease which would otherwise be subject to this Section 10.2(b).

(c) Within ten business days of the end of each calendar quarter or ten business days after Parent receives notice that an individual or entity has acquired an amount of Restricted Stock that would constitute a Prohibited Ownership Percentage within the meaning of Article Eleventh of the Certificate of Incorporation of Parent, Parent or the Company will provide the Supplemental Benefit Committee with information as to the number of Supplemental Benefit Trust shares that could be sold pursuant to Paragraph D of Section 1 of Article Eleventh of the Certificate of Incorporation of Parent as of such end of the calendar quarter.

(d) The term "Restricted Stock" shall, for purposes of this Section 10.2, include all securities of Parent or the Company, other than (i) stock described in Section 1504(a)(4) of the IRC and (ii) stock that would be so described solely because it is entitled to vote as a result of dividend arrearages. In addition, the term "Restricted Stock" shall include any other interest in Parent or the Company that would be treated as stock pursuant to Treasury Regulations Section 1.382-2T (f) (18) (iii) under Section 382 of the IRC, or any successor regulation having similar effect.

10.3    Limitation of Liability and Indemnification.  To the extent permitted by applicable law, no person shall be personally liable for any act done or omitted to be done in good faith in the administration of the Supplemental Benefit Program or the investment of the assets of the Supplemental Benefit Trust.

The Employers shall jointly and severally indemnify and hold harmless, to the extent permitted by law, the Supplemental Benefit Trust, the UAW, and each present or former SBC Committee Member and SBC Committee Member Alternate from and against any and all losses, costs, liabilities, damages and expenses (including fines, penalties and taxes and the fees and disbursements of actuarial and legal advisors), as incurred, which they may incur (a) in connection with the establishment and implementation of the Supplemental Benefit Program in accordance with the terms hereof, (b) in connection with the enforcement of the obligations of Parent, the Company or any other Employer under the Supplemental Benefit Program or (e) by reason of any act done or omitted to be done in good faith in connection with the Supplemental Benefit Program, other than by reason of the sale of or transfer of any interest in securities of Parent in violation of Section 3.4 or 5.3 or the exercise of the powers, duties and rights of the Supplemental Benefit Committee under Sections 6.2 through 6.6 or any amendment thereof; provided, that the payment of any such amount by any of the Employers in advance of the final disposition of any proceeding for which indemnification is being sought shall be made only upon delivery to each Employer paying such amount of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such amount under this Section 10.3 or otherwise. Any claims for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

10.4    <u>Exclusive Benefit.</u> No part of the corpus or income of the Supplemental Benefit Trust shall be used for, or diverted to, any purposes other than for the exclusive benefit of persons who are or may become entitled to benefits under the Supplemental Benefit Program and for defraying reasonable expenses of administering such program.

10.5    <u>Prohibited Inurement.</u> No part of the corpus or income of the Supplemental Benefit Trust shall inure to the benefit of Parent or the Company. All fiduciaries hereunder shall discharge their duties solely in the interests of Participants for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration. No benefit under the Supplemental Benefit Program or interest, right or claim in or to any part of the Supplemental Benefit Trust or any payment therefrom shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, hypothecation or commutation, nor shall any such benefit or interest, right or claim in or to any part of the Supplemental Benefit Trust or any payment therefrom be in any manner liable for or subject to garnishment, attachment, execution or levy or be liable for or subject to the debts, contracts, liabilities, engagements or torts of the person entitled thereto, and the trustee under such trust shall not recognize any attempt to make it so, except as directed by the Supplemental Benefit Committee,

in its capacity as Program Administrator, to the .appropriate person for the payment of benefits in a manner that is consistent with applicable law.

10.6    Assignment. Delegation. The rights of any party under the Supplemental Benefit Program may not be assigned without the prior written consent of the Company and the Supplemental Benefit Committee, and any purported assignment in violation of this sentence shall be void. Any party may delegate any of its obligations under the Supplemental Benefit Program; provided, that no such delegation shall relieve such party of any of such obligations; and, provided, further, that the delegation of any obligation of Parent or the Company in connection with the transfer of any assets of either of them shall be subject to the express assumption of such obligation by the transferee.

10.7    Captions. The captions used in this Exhibit B are for convenience of reference only and do not constitute a part of this Exhibit B and will not be deemed to limit, characterize or in any way affect any provision of this Exhibit B and all provisions of this Exhibit B will be enforced and construed as if no captions had been used in this Exhibit B.

10.8    Incorporation of Appendices: References. The Appendices hereto are incorporated in this Exhibit B as though fully set forth herein. References in this Exhibit B to "Articles," "Sections" and "Appendices" refer to the Articles, Sections and Appendices of this Exhibit B unless otherwise specified.

10.9    Governing Law. This Exhibit B shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or preempted thereby, with the laws of the State of Illinois.

ARTICLE XI
Events of Default

11.1    Supplemental Benefit Program Payment Default. An Event Date shall occur upon the occurrence of a "Supplemental Benefit Program Payment Default." As used herein, the term

"Supplemental Benefit Program Payment Default" shall mean the failure at any time by Parent or the Company to make any payment or contribution required to be made by it pursuant to Sections 8.2 or 10.3 of this Exhibit B within five days after receipt of written notice of such failure from the Supplemental Benefit Committee, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 11.1; provided, that the Supplemental Benefit Committee shall not give notice of a failure to make a payment under Section 10.3 unless the Indemnified Party has executed the undertaking provided for in Section 10.3.

        11.2   <u>No Limitation of Rights.</u> The rights of the Supplemental Benefit Committee under this Article XI are in addition to, and not in lieu of, any rights that the Supplemental Benefit Committee, or any other person or entity, including, without limitation, any SBC Committee Member, SBC Committee Member Alternate or Participant, may have under the Settlement Agreement, any Exhibit thereto or any Appendix to any such Exhibit, whether in equity or at law. The waiver by the Supplemental Benefit Committee or any such person or entity of any Supplemental Benefit Program Payment Default or other breach of any provision of, or any other right to enforce or claim or benefit under, any such document shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, such document.

NAVISTAR INTERNATIONAL TRANSPORTATION CORP.

RETIREE SUPPLEMENTAL BENEFIT TRUST

THIS AGREEMENT OF TRUST (hereinafter referred to as the "Agreement") is made and entered into this 1st day of July, 1993, by and between Navistar International Transportation Corp., a corporation organized under the laws of the State of Delaware (hereinafter referred to as the "Company"), and Wells Fargo, N.A. (hereinafter referred to as the "Trustee").

**W I T N E S S E T H:**

WHEREAS, the Company was a defendant in Shy v. Navistar International Corporation, Case No. C-3-92-333 (S.D. Ohio) (the "Litigation"), and entered into a settlement agreement (the "Settlement Agreement") with the plaintiffs in the Litigation in order to limit its liability to the plaintiffs; and

WHEREAS, the Company maintains the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program, (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program, and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (the "Supplemental Benefit Program"); and

WHEREAS, under the Settlement Agreement and the Supplemental Benefit Program, the Company is obligated to make certain contributions to the Supplemental Benefit Program; and

WHEREAS, in order to implement and carry out the terms of the Settlement Agreement and the Supplemental Benefit Program, the Company wishes to establish the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust (hereinafter referred to as the "Trust"), which shall form a part of the Supplemental Benefit Program, and which is intended to satisfy the requirements of Section 501(c)(9) of the Code (as hereinafter defined) or any successor provision thereto; and

WHEREAS, the Company has authorized the execution of this Agreement and the creation of a trust fund to provide benefits under the Supplemental Benefit Program; and

WHEREAS, the Company intends, through this Agreement, to provide for management and control of the assets of the Supplemental Benefit Program through a trust fund; and

WHEREAS, Wells Fargo, N.A. has consented to act as Trustee hereunder and to hold and administer such sums as are transferred or contributed upon the terms set forth herein,

NOW, THEREFORE, the Company and the Trustee hereby agree to establish the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust, subject to the following terms and conditions:

# ARTICLE I

## DEFINITIONS

1.1 <u>Definitions.</u> The following words and phrases when used herein shall have the following meanings, except as otherwise required by the context:

(a) "Beneficiary" means a person designated as a beneficiary of a Participant by the Participant, or by the terms of the Program, and who is or may become entitled to a benefit under the Program.

(b) "Cessation Date" means the Profit Sharing Cessation Date as defined by the Program.

(c) "Code" means the Internal Revenue Code of 1986, as amended from time to time.

(d) "Committee" means the Supplemental Benefit Committee established pursuant to the Program.

(e) "Company" means Navistar International Transportation Corp.

(f) "Employers" means Navistar International Corporation, Navistar International Transportation Corp., Navistar Financial Corporation, HARCO National Insurance Company, and Indianapolis Casting Corporation.

(g) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

(h) "Investment Manager" means a person or entity who is either:

(1) an investment adviser registered as such under the Investment Advisers Act of 1940; or

(2) a bank, as defined in that Act;

(3) or an insurance company qualified to manage, acquire, or dispose of any asset of an employee benefit plan under the laws of more than one State.

(i) "Participant" means a Participant as defined by the Program/

(j) "Plan" means the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan, which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program, (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program, and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program.

(k) "Program" means the Navistar International Transportation Corp. Retiree Supplemental Benefit Program.

(1) "Responsible Fiduciary" means (i) before the Cessation Date, the Committee, and (ii) on and after the Cessation Date, the Company.

(m) "Trust Fund" means the assets of the Trust.

(n) "Trust Year" means the fiscal year beginning on each November let and ending on the following October 31st; provided that the first Trust Year shall begin on the effective date specified by Section 11.9 hereof and shall end on the following October 31st.

1.2 <u>Gender and Number.</u> Masculine pronouns shall refer both to males and to females. Singular or plural words shall be construed to refer to the plural or the singular, respectively, where appropriate.

120

## ARTICLE II

## PAYMENT TO AND FROM THE TRUST

2.1 <u>Payments to the Trust</u>. The Trustee shall receive any payments made to it in cash, securities of the Employers, or in the form of such other property as it may from time to time deem acceptable and which shall have been delivered to it. Such payments may be made by the Company or by any person or entity designated by the Company. All payments so received, together with the income therefrom and any other increment thereon, shall be held, invested, reinvested, and administered by the Trustee pursuant to the terms of this Agreement, without distinction between principal and income. The Trustee shall not be responsible for the calculation or collection of any contribution under, or required by, the Program, but shall be responsible only for cash or other property received by it pursuant to this Agreement.

2.2 <u>Payments from the Trust.</u> The Trustee shall, from time to time and at the written direction of the Committee, make, directly or indirectly, payments out of the Trust Fund in such amounts, to such persons (including but not limited to the Navistar International Transportation Corp. Retiree Health Benefit Trust) and for such purposes as may be specified in the written directions of the Committee. To the extent permitted by law, the Trustee shall be under no liability for any payment made pursuant to the written direction of the Committee or for any payment not made in the absence of a written direction of the Committee. Any written direction of the Committee shall constitute a certification that the payment so directed is one that the Committee or its designated representative is authorized to direct. If a dispute arises with respect to a payment, the Trustee may withhold or cause to be withheld such payment at the direction of the Responsible Fiduciary until the dispute has been resolved.

## ARTICLE III

## INVESTMENT AUTHORITY

3.1 <u>Trustee's Authority.</u> Except as otherwise provided in this Agreement, the Trustee shall have exclusive authority and discretion to manage and control the Trust Fund; to invest and reinvest the principal and income of the Trust Fund and keep the Trust Fund invested, as a single fund without distinction between principal and income, in such securities or in such property, real or personal, tangible or intangible, as the Trustee shall deem advisable, including but not limited to capital or common stocks (whether voting or nonvoting and whether or not currently paying a dividend), preferred stocks (whether voting or nonvoting and whether or not currently paying a dividend), bonds, notes, debentures, interests in investment companies, trusts, partnerships, and other pooled funds, savings bank deposits (including but not limited to savings accounts and savings investment media that are maintained by the Trustee's own Banking Department), and commercial paper, and in such other property, investments and securities, whether domestic or foreign, of any kind, class, or character as the Trustee may deem suitable for the Trust Fund, and such investment and reinvestment shall not be restricted to properties and securities authorized for investment by trustees under any present or future law; provided that in no event shall the Trustee make any investment prohibited by ERISA. The Trustee in its discretion may keep such portion of the Trust Fund in cash or cash equivalents, (including deposits in the Trustee's own Banking Department) as the Trustee may from time to time deem to be in the interest of Participants and Beneficiaries, even if such balances exceed the maximum amount insured from time to time by the Federal Deposit Insurance Corporation. Except as provided by Section 3.2 and Article VI hereof, all rights associated with assets of the Trust shall be exercised by the Trustee; all such rights shall in no event be exercisable by or rest with Participants and Beneficiaries.

121

3.2     Limitation on Trustee's Authority.   Notwithstanding anything in this Agreement to the contrary, and regardless of whether the Responsible Fiduciary has appointed an Investment Manager pursuant to Section 6.3 hereof or has established a segregated fund managed by the Responsible Fiduciary pursuant to Section 6.5 hereof, the Trustee shall not acquire, sell, otherwise dispose of, or otherwise take any action with respect to any securities of the Company and its affiliates (including the voting of proxies appurtenant thereto) unless such action is permitted by the terms of the Program.

3.3     The Program.   Upon the execution of this Agreement, the Company shall deliver to the Trustee a complete copy of the Program. For purposes of this Agreement, the Trustee shall rely conclusively on said copy as a complete and accurate copy of the Program, and the Trustee shall assume that no change has been made in the terms of the Program except to the extent that the Company notifies the Trustee in writing that the Program has been amended and delivers to the Trustee a complete copy of the amendment. The Company shall deliver to the Committee a copy of all documents delivered to the Trustee in accordance with this Section 3.3 at the same time that it delivers such documents to the Trustee.

## ARTICLE IV

## POWERS AND DUTIES OF THE TRUSTEE

4.1     Powers.   The Trustee shall have the following powers with respect to the Trust Fund in addition to those conferred by law:

(a)     to sell, exchange, convey, transfer, or otherwise dispose of any property held by it, by private contract or at public auction; and no person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition;

(b)     to make commitments either alone or in company with others to purchase at any future date any property, investments, or securities set forth in Section 3.1 hereof;

(c)     to retain, manage, operate, repair, develop, preserve, improve, mortgage, or lease for any period any real property held by the Trustee upon such terms and conditions as the Trustee deems proper, either alone or by joining with others using other Trust assets for any such purposes if by it deemed advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease, including the waiver of rentals, if by it deemed advisable; and to make provisions for the amortization of the investment or in depreciation of the value of such property as it may deem advisable;

(d)     to organize corporations under the laws of any State for the purpose of acquiring or holding title to any property for the Trust Fund or to request the Company to appoint another trustee for such purpose;

(e)     to retain any stocks or other property received as a result of the exercise of any of the powers herein granted, whether or not investment in much stocks or other property is authorized by Section 3.1 hereof;

(f)     to vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to exercise any conversion privileges, subscription rights, or other options, and to make any payments incidental thereto; to consent to or otherwise participate in corporate reorganizations or other changes affecting corporate securities and to delegate discretionary powers and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to stocks, bonds, securities, or other property held in the Trust Fund;

(g)     to make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

122

(h)     to register any investment held in the Trust Fund in its own name or in the name of a nominee and to hold any investment in bearer form, to utilize the services of a depository clearing corporation (such as the Depository Trust Company) to the extent permitted by law, and to combine certificates representing such investments with certificates of the same issue held by the Trustee in other fiduciary capacities under employee benefit plans, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust;

(i)     to employ suitable agents and counsel and to pay reasonable expenses and compensation thereto;

(j)     to borrow money on such terms and conditions as the Trustee in its discretion may deem advisable;

(k)     to transfer monies of the Trust Fund to a common or collective trust fund or pooled investment fund; money and other assets of the Trust Fund invested in such a fund shall be held and administered by the trustee thereof strictly in accordance with the terms of, and under the powers governing, such fund to the extent consistent with this Agreement and the terms of the Program; the combining of money and other assets of this Trust with money and other assets of such a fund is hereby specifically authorized;

(1)     to compromise or otherwise adjust all claims in favor of or against the Trust Fund;

(m)    to compromise, compound, and settle any debt or obligations upon such terms as the Trustee may deem advisable and to agree to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon, default, or otherwise enforce any such obligation; and

(n)     upon receipt of written direction from the Responsible Fiduciary, to use monies in the Trust Fund to purchase or maintain insurance or annuity contracts.

4.2     Dealing with Trustees. In no event shall any purchaser, vendor, or other person dealing with the Trustee be required to ascertain the authority and power of the Trustee to make any sale, transfer, assignment, or investment of the whole or any part of the Trust Fund at any time held hereunder, or to make any contract in relation thereto, nor shall any insurance company be required to ascertain the power or authority of the Trustee to apply for and purchase any insurance or annuity contract, and any such person or company may rely upon any factual information furnished by the Trustee in connection therewith. All parties dealing with the Trustee with respect to the Trust Fund shall have the right to assume that the Trustee has full power and authority in all respects to deal with the Trust Fund and shall not be affected by any notice to the contrary, and no purchaser shall be required to see to the application of the purchase money.

4.3     Fees and Expenses. The Trustee shall be paid such reasonable compensation as may be agreed upon in writing initially between the Trustee and the Responsible Fiduciary, subject to such revisions as may be agreed upon in writing from time to time thereafter between the Trustee and the Responsive Fiduciary. Such compensation and all fees and expenses incurred by the Trustee in the proper performance of its duties, including fees for legal services rendered to the Trustee and compensation paid to any Investment Manager, shall be paid from the Trust Fund. All taxes of any kind that may be levied or assessed under existing or future laws upon, or with respect to, the Trust shall be paid from the Trust Fund.

4.4     Administration. Except as otherwise provided by Section 3.2 hereof, the Trustee shall not be responsible in any way for the administration of the Program.

4.5     Consultation and Indemnification. The Trustee may consult with counsel, and the Trustee shall not be deemed imprudent by reason of taking or refraining from taking any action in accordance with the opinion of counsel. The Responsible Fiduciary shall cause the Trust to indemnify and hold the Trustee harmless from and against any liability that the Trustee may incur in the administration of the Trust Fund, unless such liability arises from the Trustee's

negligence or breach of the provisions of this Agreement or ERISA; provided that nothing in this Section 4.5 shall require any payment from any source other than the Trust or require any payment to be made to the Trust. The Trustee shall not be required to give any bond or any other security for the faithful performance of its duties under this Agreement, except such as may be required by law.

4.6     Responsibilities. Except as required by ERISA, the Trustee shall be under no duty (i) to take any action other than as herein specified with respect to the Trust unless the Responsible Fiduciary or an Investment Manager shall furnish the Trustee with instructions in proper form as described by Section 4.8 hereof or (ii) to engage in any suit with respect to the Trust unless the Trustee shall have first agreed in writing to do so and shall have been fully indemnified to the satisfaction of the Trustee. To the extent not prohibited by ERISA, the Trustee shall not be responsible or liable in any way for any action or omission of the Company or the Committee with respect to the performance of their duties and obligations as set forth in the Program and this Agreement; provided that the Trustee shall not be relieved of responsibility or liability for any responsibility, obligation, or duty imposed upon it under this Agreement or under ERISA. The Trustee is a party to this Agreement solely for the purpose set forth in this Agreement and to perform the acts set forth herein, and no obligation or duty shall be imposed upon it except as expressly stated herein or as required by ERISA.

4.7     Direction. Except as otherwise provided by Section 3.2 hereof, the Trustee may request the advice or direction of the Responsible Fiduciary with respect to the administration of the Trust and the distribution of the Trust Fund, and, to the extent permitted by ERISA, shall be protected from liability in relying upon any direction given to it by the Responsible Fiduciary, in writing, in response to such a request.

4.8     Reliance on Written Instructions. The Trustee shall be entitled to rely upon any written notice, instruction, direction, certificate, or other communication believed by it to be genuine and to be signed by the Company, the Committee, an Investment Manager, or their authorized agent(s) or representative(s), unless it knows or should know that the direction or instruction constitutes a breach of the Company's, the Committee's, or the Investment Manager's fiduciary responsibility with respect to the Trust. The Trustee shall be fully protected in making payments out of the Trust Fund, or in taking or omitting to take any other actions, in accordance with the written instructions of the Company, the Committee, an Investment Manager, or their authorized agent(s) or representative(s), and shall have no responsibility to see to the application of any such payments by the Participants or their Beneficiaries or legal representatives, or by any other recipients thereof specified in such instructions, or to ascertain whether such instructions comply with the terms of the Program, or to determine the rights or benefits of any person in the Trust or under the Program, and shall not be liable to any person for or in respect of any payment made by it, or action taken or omitted to be taken by it, in good faith without notice or knowledge of a change in the condition or status of any person affecting that person's rights hereunder; provided that if the Trustee knows or should know that such an instruction constitutes a breach of fiduciary responsibility with respect to the Trust, the Trustee shall inform the Responsible Fiduciary of the breach; and provided further that nothing in this Section 4.8 shall authorize the Trustee to take any action that is inconsistent with the provisions of Section 3.2 hereof. The Company, the Committee, and any Investment Manager(s) shall furnish the Trustee with a list naming their authorized agent(s) or representative(s), and describing the scope of the authority granted, and shall notify the Trustee of any changes to the list. Absent such notification, the Trustee may assume no change has occurred with respect to each list.

## ARTICLE V

## FUNDING POLICY AND INVESTMENT OBJECTIVES

5.1 **Communication to Trustee**. The Responsible Fiduciary shall inform the Trustee in writing of the funding policy under the Program and of the investment objectives of the Trust and of any changes or modifications therein. Until the Responsible Fiduciary informs the Trustee of any change in the funding policy under the Program or of any change in the investment objectives of the Trust, the Trustee may assume that there has been no change in the funding policy or the investment objectives, as the case may be.

## ARTICLE VI

## DUTIES OF THE COMMITTEE AND THE COMPANY

6.1 **Information**. The Committee and the Company shall furnish the Trustee with such information and data relating to the Program as are necessary for the Trustee to carry out its duties under this Agreement.

6.2 **Investment Responsibility**. The Trustee shall have the full responsibility for investment of the Trust Fund, except as provided in Section 3.2 hereof, and except where the Responsible Fiduciary has appointed an Investment Manager pursuant to Section 6.3 hereof or has established a segregated fund managed by the Responsible Fiduciary pursuant to Section 6.5 hereof.

6.3 **Appointment of Investment Manager**. The Responsible Fiduciary may appoint one or more Investment Managers for the purpose of directing the Trustee with respect to the investment or reinvestment of all or any portion of the Trust Fund. The Responsible Fiduciary shall certify to the Trustee the appointment and scope of authority of, and any resignation or removal or change in authority of, my Investment Manager appointed by it under this Section, the appointment of any successor thereto, and the identity of the individual or individuals entitled to act on behalf of the Investment Manager. In particular, the Responsible Fiduciary shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any change or revocation thereof. An Investment Manager shall present evidence to the Trustee of its qualifications as an investment manager under Section 3(38) of ERISA, and shall acknowledge in writing its appointment as a fiduciary of the Plan.

6.4 **Responsibility of Investment Manager**. An Investment Manager shall have sole investment responsibility for that portion of the assets of the Trust Fund that it has been appointed to manage. Subject to the restrictions imposed by Section 3.2 hereof, an Investment Manager that has been thus granted such responsibility shall have all the investment powers enumerated in Article III hereof that shall be granted to it by the Responsible Fiduciary. Except as otherwise provided by Section 3.2 hereof, where such an Investment Manager has been appointed by the Responsible Fiduciary, the Trustee shall have no duty to review or recommend any investment or reinvestment of the Trust Fund, nor shall the Trustee be charged with the duties imposed by Section 7.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to any Investment Manager. The Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this section. Except as otherwise provided by Section 3.2 hereof, the Trustee shall be under no duty to question the direction or lack

125

of direction of any Investment Manager, but shall act, and shall be fully protected in acting, in accordance with each such direction.

6.5 **Segregated Fund**. The Responsible Fiduciary may create a segregated fund by certifying to the Trustee in writing that it has established a segregated fund in accordance with procedures that are consistent with Section 403(a)(1) of ERISA, the investment and control of the assets of which are to be the sole and exclusive responsibility of the Responsible Fiduciary. Subject to the restrictions imposed by Section 3.2 hereof, the Responsible Fiduciary shall have complete discretionary authority to direct the Trustee with respect to the investment and reinvestment of the portion of the Trust Fund constituting the segregated fund, as specified by the Responsible Fiduciary, without any requirement that any other fiduciary be consulted prior to the giving of any such directions to the Trustee or the carrying out of such directions by the Trustee. Except as otherwise provided by Section 3.2 hereof, if the Responsible Fiduciary has thus assumed such discretionary authority, the Responsible Fiduciary shall have all the investment powers enumerated in Article III hereof. The Responsible Fiduciary shall certify to the Trustee the scope of its authority, any change in the authority of the Responsible Fiduciary, and the identity of the individual or individuals entitled to act on behalf of the Responsible Fiduciary. In particular, the Responsible Fiduciary shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any chance or revocation thereof, and the Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this Section. Except as otherwise provided by Section 3.2 hereof, the Trustee shall have no duty to review or to recommend any investment or reinvestment of the segregated fund, nor shall the Trustee be charged with the duties imposed by Section 7.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to the Responsible Fiduciary. Except as otherwise provided by Section 3.2 hereof, the Trustee shall have no discretionary authority over a segregated fund, but shall b. subject, with respect to the segregated fund, to all proper directions of the Responsible Fiduciary that are not contrary to the terms of ERISA.

6.6 **Alter Cessation Date**. Any appointments and statements made, and certifications and directions given, by the Committee before the Cessation Date in accordance with this Agreement shall remain in effect on and after the Cessation Date until and unless changed by the Company in accordance with this Agreement.

## ARTICLE VII

## FIDUCIARY OBLIGATIONS

7.1 **Standard of Fiduciary Conduct**. The Trustee shall discharge its duties solely in the interest of the Participants and Beneficiaries and

(a) for the exclusive purpose of providing benefits to Participants and Beneficiaries and defraying reasonable expenses of administering the Program (including any such expenses incurred by the Committee or the Company);

(b) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(c) by diversifying the investments of the Program so as to minimize

the risk of large losses unless under the circumstances it is clearly prudent not to do so; and

(d) in accordance with. this Agreement, except to the extent that this Agreement may be inconsistent with ERISA.

7.2 **Prohibited Inurement**. Except as provided herein and in the Program, none of the assets of the Trust shall inure to the benefit of the Company, any affiliate thereof, or any other person except through the payment of benefits provided under the Program (including the payment of reasonable Program administration expenses). Notwithstanding the foregoing, if the Company makes a contribution to the Trust by a mistake of fact, the contribution (reduced by any investment losses, but not increased by any investment gains) may be returned to the Company within one year after the payment of the contribution. Nothing in this section or in any other provision of this Agreement shall prevent the Trustee from transferring assets from the Trust to the Navistar International Transportation Corp. Retiree Health Benefit Trust.

7.3 **Scope of Responsibility**. A fiduciary not charged with a specific responsibility under the provisions of the Program or this Agreement shall be under no duty to question any action or lack of action of another fiduciary with respect to such responsibility, and shall not be liable for a breach of fiduciary responsibility by another fiduciary, unless the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary knowing such act is a breach, or if, having knowledge of a breach by such other fiduciary, the fiduciary fails to make reasonable efforts under the circumstances to remedy the breach.

# ARTICLE VIII

## ACCOUNTING

8.1 **Accounting for Trust Fund**. The Trustee shall keep timely, accurate, and detailed accounts of all investments, receipts, disbursements, and other transactions hereunder, and all accounts, books, and records relating hereto shall be open to inspection and audit at all reasonable times by the Responsible Fiduciary and any other person designated by the Responsible Fiduciary. Within sixty (60) days following the close of each Trust Year, within sixty (60) days after the removal or resignation of the Trustee, and at such other times as the Responsible Fiduciary reasonably may require, the Trustee shall file. with the Responsible Fiduciary a written account setting forth all investments, receipts, disbursements, and other transactions effected by the Trustee during ouch Trust Year or since the date of its last account. The Trustee, within the same time periods, shall ascertain and certify to the Responsible Fiduciary, in accordance with applicable U.S. Department of Labor regulations, the coot and fair market values as of the close of such Trust Year (or such other period as the Responsible Fiduciary may require) of all securities and other properties held in the. Trust Fund. Such fair market values shall be determined by such person or persons selected by the Responsible Fiduciary in accordance with a method consistently followed and uniformly applied. The Trustee may, in its discretion, cause that valuation to be reviewed at the expense of the Trust. The Trustee, within the same time periods, also shall furnish to the Responsible Fiduciary a balance sheet containing a description in reasonable detail of all assets and liabilities of the Trust. The Trustee may rely on valuations performed by the person or persons selected by the Responsible Fiduciary. In the event any portion of the Trust Fund has been transferred to a common or collective trust fund pursuant to Section 4.1 hereof, such account shall include a copy of the latest annual written account of the common or collective trust fund. The Responsible Fiduciary shall have the right to require an audit by certified public accountants of the records and assets of the Trust. The expenses and any special fee charged by the Trustee for any such audit shall be paid pursuant to the provisions of Section 4.3 hereof.

# ARTICLE IX

## RESIGNATION, REMOVAL, AND SUCCESSION OF TRUSTEE

9.1 **Resignation**. The Trustee may resign at any time by giving sixty (60) days' notice in writing to the Responsible Fiduciary.

9.2 **Removal**. The Responsible Fiduciary may remove the Trustee at any time by giving thirty (30) days' notice in writing to the Trustee.

9.3 **Successor Trustee**. In no event shall the resignation or removal of the Trustee terminate this Agreement, but upon such resignation or removal of the Trustee, the Responsible Fiduciary shall have the duty forthwith of appointing a successor trustee, who shall have the same powers and duties conferred upon the Trustee hereunder. In the event of such resignation or removal of such Trustee and upon the appointment of a successor trustee and acceptance of such Trustee, the Trustee shall turn over to the successor trustee the Trust Fund and all records of books of account and other documents pertaining to this Agreement that are in its possession, reserving such sums as the Trustee shall reasonably deem necessary to defray its expenses in settling its accounts, to pay any of its compensation due and unpaid, and to discharge any obligation of the Trust Fund for which the Trustee may be liable; and if the sums so reserved are not sufficient for these purposes, the Trustee shall be entitled to recover the amount of any deficiency from either the Company or the successor trustee, or both. To the extent permitted by ERISA, after the Trust Fund has been transferred and delivered to the successor trustee, the Trustee shall be released and discharged from all further accountability or liability for the Trust Fund and shall not be responsible in any way for the further disposition of the Trust Fund or any part thereof.

9.4 **Waiver of Notice**. In the event of any resignation or removal of the Trustee, the Trustee and the Responsible Fiduciary may in writing, waive any notice of resignation or removal as may be provided hereunder.

# ARTICLE X

## AMENDMENT AND TERMINATION OF AGREEMENT

10.1 **Amendment**. This Agreement may be amended in writing at any time or from time to time, in whole or in part, by action of the Responsible Fiduciary, and any such amendment may be retroactive. However, no amendment that affects the rights, duties, or responsibilities of the Trustee shall become effective without the Trustee's written consent. No amendment shall be inconsistent with the requirements of ERISA or with the provisions of the Program. No amendment shall authorize or permit any assets of the Program to be used for, or diverted to, purposes other than for the exclusive benefit of Participants and Beneficiaries and the payment of reasonable Program administration expenses prior to the satisfaction of all liabilities under the Program. No amendment shall cause or permit any portion of the Trust Fund to revert to or become the property of the Employers.

10.2 **Termination**. The Responsible Fiduciary may terminate the. Trust in accordance with the terms of the Program.

10.3 **Distribution Upon Termination**. In the event of the termination of the Trust, or of all or any part of the Program, the Trustee shall dispose of such funds in accordance with the written order of the Responsible Fiduciary. Such order shall require that the funds of the Program be disposed of in a manner that benefits the Participants and Beneficiaries covered by the Program (including the payment of reasonable Program administration expenses); provided that if

all of the liabilities of the Program have been satisfied, any remaining assets of the Program shall be applied to provide such benefits as may be provided by a 'voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code) as the Committee shall determine in its discretion. Notwithstanding the foregoing, in the event the Program is terminated pursuant to a termination of the Settlement Agreement in <u>Shy v. Navistar International Corporation</u>, any assets of the Program shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code) as determined by the Company in its discretion. Except as provided in Section 7.2 hereof, under no condition shall the termination of the Trust result in a distribution of any portion of the Trust Fund to the Employers.

## ARTICLE XI

## MISCELLANEOUS

11.1 **Limited Effect of Program and Trust**. Neither the establishment of the Program nor the Trust nor any modification thereof, nor the creation of any fund or account, nor the payment of any amounts from the Trust, shall be construed as giving to any Participant or Beneficiary any legal or equitable right against the Trustee, the Company, the Committee, or any affiliate, director, officer, employee, agent, or representative thereof, except as may otherwise be expressly provided in the Program and except as may otherwise be provided by ERISA. Under no circumstances shall the terms of employment of any employee be modified or in any way affected by the Trust or this Agreement.

11.2 **Nonalienation of Benefits**. Except as otherwise required by law, neither the benefits payable from the Program nor any Participant's or Beneficiary's interest in any of the assets of the Trust shall be subject to any manner of anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, garnish, execute, levy upon, or otherwise dispose of any right to benefits payable under, or any interest in, the Trust Fund shall be void. Neither the Trust Fund nor the Trustee shall in any manner be liable for, or be subject to, the debts, contracts, liabilities, engagements, or torte of any person entitled to benefits from the Program.

11.3 **Governing Law**. This Agreement shall be administered, construed, and enforced according to the laws of the state of California, except to the extent superseded by ERISA or any other federal law.

11.4 **Severability**. If any provision of this Agreement shall be held illegal or invalid, such illegality or invalidity shall not affect the remaining provisions of this Agreement but shall be fully severable, and this Agreement shall be construed and administered as if said illegal or invalid provision had never been inserted herein.

11.5 **Binding Effect**. The provisions of this Agreement shall be binding upon and inure to the benefit of the Company and its successors, the Trustee and its successors in Trust, and the Participants and their Beneficiaries, and their respective heirs, personal representatives, successors and assigns, in accordance with and subject to the term• hereof.

11.6 **Number of Originals**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and the counterparts shall constitute one and the same instrument, which shall be sufficiently evidenced by any one thereof.

      11.7   **Fiduciary Duties**. Nothing in this Agreement shall relieve or be deemed to relieve the Trustee or any other fiduciary from any responsibility or liability for any responsibility, obligation, or duty imposed by or under ERISA.

      11.8   **Evidence of Authority**. The execution by the Trustee of any instrument, document, or paper in connection with the exercise of any of the powers enumerated herein shall, of itself, be conclusive evidence to all persons of the authority of the Trustee to execute the same and to exercise all powers incident thereto.

      11.9   **Effective Date**. This Agreement shall be effective as of the 1st day of July, 1993.

      **IN WITNESS WHEREOF**, thus Agreement has been executed this 29th day of June 1993.

NAVISTAR INTERNATIONAL TRANSPORTATION CORP.

By: _____
Title: Vice President and Treasurer

Attest:

_____

_____ Wells Fargo, N.A. _____
          TRUSTEE

By: _____
Title: Vice President

_____

_____
_____

130

RESTATED
CERTIFICATE OF INCORPORATION
of
NAVISTAR INTERNATIONAL CORPORATION

First: The name of the corporation (hereinafter called the "Company") is

NAVISTAR INTERNATIONAL CORPORATION

Second: The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name, of its registered agent at such address is The Corporation Trust Company.

Third: The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the state of Delaware, as amended.

Fourth: The total number of shares of stock which the Company shall have authority to issue is 176,000,000, consisting of:

(1)     30,000,000 shares, with a par value of $1.00 per share, are to be of a class designated "Preferred Stock;

(2)     10,000,000 shares, with a par value of $1.00 per share, are to be of a class designated "Preference Stock;"

(3)     110,000,000 shares, with a par value of $0.10 per share, are to be of ы class designated "Common Stock;" and

(4)     26,000,000 shares with a par value of $0.10 per share, are to be of a class designated "Class B Common."

The Common Stock and Class B Common are hereafter collectively referred to as the "Parent Common Stock."

I.     Preferred Stock.

The Preferred Stock may be issued from time to time in one or more series of any number of shares, provided that the aggregate number of shares issued and not canceled of any and all such series shall not exceed the total number of shares of Preferred Stock hereinabove authorized, and with distinctive serial designations, all as shall hereafter be stated and expressed in the resolution or resolutions providing for the issue of such Preferred Stock from time to time adopted by the Board of Directors pursuant to® authority so to do which is hereby vested in the Board of Directors. Each series of Preferred Stock (i) may have such voting powers, full or limited, or may be without voting powers; (ii) may be subject to redemption at such time or times and at such prices; (iii) may be entitled to receive dividends (which may be cumulative or noncumulative) at such rate or rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or series of stock; (iv) may have such rights upon the dissolution of, or upon any distribution of the assets of, the corporation; (v) may be made convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of stock of the corporation, at such price or

prices or at such rates of exchange, and with such adjustments; (vi) may be entitled to the benefit of a sinking fund to be applied to the purchase or redemption of shares of such series in such amount or amounts; (vii) may be entitled to the benefit of conditions and restrictions upon the creation of indebtedness of the Company or any subsidiary, upon the issue of any additional stock (including additional shares of such series or of any other series) and upon the payment of dividends or the making of other distributions on, and the purchase, redemption or other acquisition by the Company or any subsidiary of any outstanding stock of the Company; and (viii) may have such other relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof; all as shall be stated in said resolution or resolutions providing for the issue of such Preferred Stock. Shares of any series of Preferred Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or which, if convertible or exchangeable, have been converted into or exchanged for shares of stock of any other class or classes shall have the status of authorized and unissued shares of Preferred stock of the same series and may be reissued as a part of the series of which they were originally a part or may be reclassified and reissued as part of a new series of Preferred Stock to be created by resolution or resolutions of the Board of Directors or as part of any other series of Preferred Stock, all subject to the conditions or restrictions on issuance set forth in the resolution or resolutions adopted by the Board of Directors providing for the issue of any series of Preferred Stock.

A.     Series G Stock. The designated powers, preferences and relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of 4,800,000 shares of a series of Preferred Stock are as follows:

(1)     Designation. The designation of this series of Preferred Stock shall be "$6.00 Cumulative Convertible Preferred Stock, Series G (With $1.00 Par Value)" (hereinafter called the "Series G Stock").

(2)     Dividends. The holders of shares of the Series G Stock shall be entitled to receive, when and as declared by the Board of Directors, dividends in cash in the amount of $6.00 per share per annum, payable quarterly on the 15th day of January, April, July and October in each year, commencing April 15, 1987 (each of the quarterly periods ending on the 15th day of such months, respectively, being hereinafter called a "dividend period"); provided, however, that the holders of shares of Series G Stock shall be entitled to receive, when and as declared by the Board of Directors, dividends in cash in the amount of $3.75 per share per annum, and such dividends shall accrue at such rate from the Date of Accrual to January 14, 1987. Dividends on shares of the Series G Stock shall be cumulative from the Date of Accrual with respect to such shares (whether or not there shall be net profits or net assets of the company legally available for the payment of such dividends) so that, if at any time Full Cumulative Dividends upon the Series G Stock to the end of the last completed dividend period shall not have been paid, or declared and a sum sufficient for payment thereof set apart, the amount of the deficiency in such dividends shall be fully paid, but without interest, before any dividend shall be declared or paid or any other distribution ordered or made upon, or any purchase or redemption made of, any stock ranking as to dividends or upon liquidation junior to the Series G Stock (other than a dividend payable in such junior stock, or a purchase or redemption made by issue or delivery of such junior stock); provided, however, that any moneys theretofore deposited in any sinking fund with respect to any preferred stock of the Company in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such preferred stock in accordance with the terms of such sinking fund regardless of whether at the time of such application Full Cumulative Dividends upon shares of the

132

Series G Stock outstanding to the end of the last completed dividend period shall have been paid or declared and set apart for payment. All dividends upon the shares of the Series G Stock and any other preferred stock ranking on a parity as to dividends with the Series G Stock shall be declared pro rata, so that the amounts of dividends declared per share on the Series G Stock and such other preferred stock, shall in all cases bear to each other the same ratio that accrued dividends per share on the shares of the Series G Stock and such other preferred stock bear to each other. Holders of shares of the Series G Stock shall not be entitled to any dividends, whether payable in cash, property or stock, in excess of Full Cumulative Dividends.

(3)    Rights of Redemption. The shares of the Series G Stock shall be subject to redemption as follows:

(a)    Optional Redemption. Subject to subparagraph (b) of this paragraph (3), the shares of the Series G Stock may be redeemed at the option of the Company, in whole or in part, at any time or from time to time upon not less than 30 days prior notice to the holders of record of shares of the Series G Stock to be so redeemed, sent by first class mail, postage prepaid, to each registered holder of shares of the Series G Stock at his address appearing on the Series G Stock register maintained by the Company, at the redemption price of $50.00 per share, plus an amount equal to Accrued Dividends to and including the date fixed for redemption of such shares (hereinafter called the "Redemption Date").

(b)    Pro Rata Redemption or Redemption by Lot. If less than all shares of the Series G Stock are to be redeemed pursuant to subparagraph (a) of this paragraph (3), the shares to be redeemed shall be selected (x) by lot or (y) pro rata so that there shall be redeemed from each registered holder of such shares that number of whole shares, as nearly as practicable to the nearest share, as bears the same ratio to the total number of shares of such Series held by such holder as the total number of shares to be redeemed bears to the total number of shares of the Series G Stock at the time outstanding. The determination of whether such selection shall be made by lot or pro rata shall be made by the Board of Directors. If the Board of Directors shall determine to redeem less than all shares of the Series G Stock by lot, the selection by lot of the shares of the Series G Stock shall be conducted by an independent bank or trust company selected by the Board of Directors of the Company.

(c)    Sinking Fund, Etc. Shares of the Series G Stock are not subject or entitled to the benefit of a sinking fund. All or a portion of the shares of the Series G Stock may be purchased by the Company from time to time upon the best terms obtainable.

(d)    Effect of Redemption. Unless default be made in the payment in full of the redemption price and any accumulated and unpaid dividends, dividends on the shares of Series G Stock called for redemption shall cease to accumulate on the Redemption Date, and all rights of the holders of such shares as stockholders of the Company by reason of the ownership of such shares shall cease on the Redemption Date, except the right to receive the amount payable upon redemption of such shares on presentation and surrender of the respective certificates representing such shares. After the Redemption Date, such shares shall not be deemed to be

133

outstanding and shall not be transferable on the books of the Company except to the Company.

(e)    Receipt of Redemption Price. At any time on or after the Redemption Date, the respective holders of record of shares of Series G Stock to be redeemed shall be entitled to receive the redemption price upon actual delivery to the Company of certificates for the shares to be redeemed, such certificates, if required by the company, to be properly stamped for transfer and duly endorsed in blank or accompanied by proper instruments of assignment and transfer thereof duly executed in blank.

(f)    Return of Deposits, Etc. Any moneys deposited with the transfer agent, or other redemption agent, for the redemption of any shares of Series G Stock which shall not be claimed after five years from the Redemption Date shall be repaid to the Company by such agent on demand, and the holder of any such shares of Series G Stock shall thereafter look only to the Company for any payment to which such holder may he entitled. Any  interest accrued on moneys so deposited shall belong to the Company and shall be paid to it from time to time on demand.

(4)    Rights on Liquidation. Dissolution. Winding Up.

(a)    In the event of any involuntary liquidation, dissolution or winding up of the Company, the holders of shares of the Series G Stock then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the company ranking junior upon liquidation to the Series G Stock, an amount equal to $50 per share plus an amount equal to all Accrued Dividends thereon to and including the date of payment

(b)    In the event of any voluntary liquidation, dissolution or winding up of the Company, the holders of shares of the Series G Stock then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the company ranking junior upon liquidation to the Series G Stock, an amount per share equal to the then applicable redemption price specified in subparagraph (a) of paragraph (3) of this Section B regarding Series G Stock, plus in each case an amount equal to all Accrued Dividends thereon to and including the date of payment. The merger or consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a dissolution, liquidation or winding up of the Company under this paragraph (4).

(c)    In the event the assets of the Company available for distribution to the holders of shares of Series G Stock upon any involuntary or voluntary liquidation, dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holders are entitled pursuant to subparagraph (a) or (b) , as the case may be, of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preferred stock ranking on a parity with the shares of Series G Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the shares of Series G Stock,

134

ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5)     Voting. The shares of the Series G Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a)     Without the affirmative vote or consent of the holders of at least two-thirds of the number of shares of Series G Stock at the time outstanding, voting or consenting (as the case may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) create any preferred stock ranking prior to the Series G Stock as to dividends or upon liquidation, or securities convertible into stock ranking prior to the Series G Stock as to dividends or upon liquidation or (ii) amend, alter or repeal any of the preferences, special rights or powers of the holders of the Series G Stock so as adversely to affect such preferences, special rights or powers.

(b)     Whenever dividends payable on any series of Preferred Stock shall be in default in an aggregate amount equivalent to six full quarterly dividends on all shares of such series at the time outstanding, the number of directors constituting the Board of Directors of the Company shall be increased by two, and the holders of Preferred Stock shall have, in addition to any other voting rights, the exclusive and special right, voting separately as a class without regard to series, to elect two persons to fill such newly created directorships. Whenever such right of holders of shares of Preferred Stock shall have vested, it may be exercised initially either at a special meeting of such holders called as provided below, or at any annual meeting of stockholders, and thereafter at annual meetings of stockholders. The right of holders of shares of Preferred Stock voting separately as a class to elect members of the Board of Directors as aforesaid shall continue until such time as all dividends accumulated on all series of Preferred Stock shall have been paid in full, at which time the special right of the holders of shares of Preferred Stock so to vote separately as a class for the election of directors shall terminate, subject to revesting in the event of each and every subsequent default in an aggregate amount equivalent to six full quarterly dividends. For purposes only of this subparagraph (b), each holder of Series G Stock shall be entitled to cast one-half vote for each share of Series G Stock held by such holder.

At any time when such special voting power shall have vested in the holders of shares of Preferred Stock as provided in this subparagraph (b), a proper officer of the Company shall, upon written request of the holders of record of at least 10% of the number of shares of Preferred Stock at the time outstanding, regardless of series, addressed to the Secretary of the Company, call a special meeting of the holders of shares of Preferred Stock and of any other class of stock having voting power, for the purpose of electing directors. Such meeting shall be held at the earliest practicable date at the principal office of the Company. If such meeting shall not be called by a proper officer of the Company within 20 days after personal service of said written request upon the Secretary of the Company, or within 20 days after mailing the same within the United States of America by registered mail addressed to the Secretary of the Company at its principal office, then the holders of record of at least 10% of the number of shares of Preferred Stock at the time

135

outstanding, regardless of series, may designate in writing one of their number to call such meeting at the expense of the Company, and such meeting may be called by such person. so designated upon the notice required for annual meetings of stockholders and shall be held at said principal office. Any holder of shares of Preferred Stock so designated shall have access to the stock books of the Company for the purpose of causing meetings of stockholders to be called pursuant to these provisions. Notwithstanding the provisions of this subparagraph (b), no such special meeting shall be called during the 90 days immediately preceding the date fixed for the next annual meeting of stockholders.

At any meeting held for the purpose of electing directors at which the holders of shares of Preferred Stock shall have the special right, voting separately as a class, to elect directors as provided in this subparagraph (b), the presence, in person or by proxy, of the holders of 51% of the number of shares of Preferred Stock at the time outstanding shall be required to constitute a quorum of such class for the election of any director by the holders of the Preferred Stock as a class, each share of Series G Stock counting, for purposes only of determining the presence of such a quorum, as one-half share of Preferred Stock. At any such meeting or adjournment thereof, (i) the absence of a quorum of Preferred Stock shall not prevent the election of directors other than those to be elected by the holders of shares of Preferred Stock voting as a class and the absence of a quorum for the election of such other directors shall not prevent the election of the directors to be elected by holders of shares of Preferred Stock voting as a class and (ii) in the absence of either or both such quorums, a majority of the holders present in person or by proxy of the stock or stocks which lack a quorum shall have power to adjourn the meeting for the election of directors which they are entitled to elect from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

During any period the holders of shares of Preferred Stock have the right to vote as a class for directors as provided in this subparagraph (b), (i) the directors so elected by the holders of the Preferred Stock shall continue in office until termination of the right of the holders of the Preferred Stock to vote as a class for directors, and (ii) any vacancies in the Board of Directors shall be filled only by vote of a majority (which majority may consist of only a single director) of the remaining directors theretofore elected by the holders of the class or classes of stock which elected the director whose office shall have become vacant.

(6)    Conversion Rights. The holders of shares of the Series G Stock shall have the right, at their option, to convert each share of the Series G Stock into two-fifteenths of a share of Common Stock of the Company at any time on and subject to the following terms and conditions:

(a)    The shares of the Series G Stock shall be convertible at the office of any transfer agent for the Series G Stock, and at such other office or offices, if any, as the Board of Directors may designate, into fully paid and nonassessable shares (calculated as to each conversion to the nearest 1/100th of a share) of Common Stock of the Company, at the conversion price, determined as hereinafter provided, in effect at the time of conversion, each share of the Series G Stock being taken at $50.00 for the purpose of such conversion. The price at which shares of Common

Stock shall be delivered upon conversion (herein called the "conversion price") shall be initially $375.00 per share of Common Stock. The conversion price shall be adjusted as provided in subparagraph (d) of this paragraph (6).

(b)     In order to convert shares of the Series G Stock into Common Stock the holder thereof shall surrender at any office hereinabove mentioned the certificate or certificates therefor, duly endorsed to the Company or in blank, and give written notice to the Company at said office that such holder elects to convert such shares. No payment or adjustment shall be made upon any conversion on account of any dividends accrued on the shares of the Series G Stock surrender for conversion or on account of any dividends on the Common Stock issued upon such conversion.

Shares of the Series G Stock shall be deemed to have been converted immediately prior to the close of business on the day of the surrender of such shares for conversion in accordance with the foregoing provisions, and the person or persons entitled to receive the Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such Common Stock at such time. As promptly as practicable on or after the conversion date, the Company shall issue and shall deliver at said office a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion, together with a cash payment in lieu of any fraction of a share, as hereinafter provided, to the person or persons entitled to receive the same. In case shares of the Series G Stock are called for redemption, the right to convert such shares shall cease and terminate at the close of business on the Redemption Date, unless default shall be made in payment of the redemption price.

(c)     No fractional shares of Common Stock shall be issued upon conversion of shares of the Series G Stock, but, instead of any fraction of a share of Common Stock which would otherwise be issuable in respect of the aggregate number of shares of the Series G Stock surrendered for conversion at one time by the same holder, the Company shall pay a cash adjustment of such fraction in an amount equal to the same fraction of the Closing Date Price on the date on which such shares of the Series G Stock were duly surrendered for conversion, or, if such date is not a Trading Day, on the next Trading Day.

(d)     The conversion price shall be adjusted from time to time as follows:

(I)     In case the Company shall (i) pay a dividend or make a distribution on its outstanding shares of Common Stock in Common Stock, (ii) subdivide its outstanding shares of Common Stock, (iii) combine its outstanding shares of Common Stock into a smaller number of shares, or (iv) issue any shares by reclassification of its shares of Common Stock, the conversion price in effect at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be adjusted so that the holder of any shares of the Series G Stock surrendered for conversion after such time shall be entitled to receive the number of shares of capital stock of the Company which he would have owned or been entitled to receive had such shares of the Series G Stock been converted immediately prior to such time.

137

(II)    In case the company shall hereafter issue rights or warrants to all holders of its Common Stock entitling them (for a period expiring within forty-five days after the record date mentioned below) to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share--as determined pursuant to clause (IV) of this subparagraph (d)--on the record date mentioned below, the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the date of issuance of such rights or warrants by a fraction, of which the numerator shall be the number of shares of Common Stock outstanding on the record date mentioned below plus the number of shares of Common Stock which the aggregate offering price of the total number of shares of Common Stock so offered would purchase at such current market price and of which the denominator shall be the number of shares of Common Stock outstanding on such record date plus the number of additional shares of Common Stock offered for subscription or purchase. Such adjustment shall become effective at the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such rights or warrants; and to the extent that shares of Common Stock are not delivered after the expiration of such rights or warrants, the conversion price shall be readjusted (but only with respect to shares of the Series C Stock converted after such expiration) to the conversion price which would then be in effect had the adjustments made upon the distribution of such rights or warrants been made upon the basis of delivery of only the number of shares of Common Stock actually delivered. No adjustment in the conversion price shall be required or made under this clause (II) or clause (III) immediately below or otherwise under this paragraph (6) in respect of any right granted by the Company to all holders of its Common Stock to purchase additional shares of Common Stock from the Company at a discount from the current market price per share of Common Stock by reinvestment of dividends on Common Stock if either, (i) such discount does not exceed 6% of such current market price or (ii) the holders of the Series G Stock shall be entitled to purchase shares of Common Stock from the Company at the same discount by reinvestment of dividends on the Series G Stock.

(III)    In case the Company shall distribute to all holders of its Common Stock evidences of its indebtedness or assets-excluding any cash dividend or distributions and dividends referred to in clause (I) of this paragraph (6)--or subscription rights or warrants (excluding those referred to in clause (II) immediately above), then in each such case the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the date of such distribution by a fraction of which the numerator shall be the current market price per share (determined as provided in clause (IV) immediately below) of the Common Stock on the record date mentioned below less the then fair market value (as determined by the Board of Directors of the Company, whose determination shall be conclusive) of the portion of the assets or evidences of indebtedness so distributed or of such subscription rights or warrants applicable to one share of Common Stock, and the

denominator shall be such current market price per share of the Common Stocks Such adjustment shall become effective on the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such distribution.

(IV) For the purpose of any computation under clause (II) or (III) immediately above, the current market price per share of Common Stock on any date. shall be deemed to be the average of the daily Closing Price for the thirty consecutive Trading Days selected by the Company commencing not more than forty-five Trading Days before the day in question.

(V)     In any case in which this paragraph (6) shall require that an adjustment as a result of any event become effective at the opening of business on the business day next following a record date, the Company may elect to defer until after the occurrence of such event (i) issuing to the holder of any shares of the Series G Stock converted after such record date and before the occurrence of such event the additional shares of Common Stock issuable upon such conversion over and above the shares of Common Stock issuable upon such conversion on the basis of the conversion price prior to adjustment and (ii) paying to such holder any amount in cash in lieu of a fractional share of Common Stock pursuant to subparagraph (c) of this paragraph (6); and, in lieu of the shares the issuance of which is so deferred, the Company shall issue or cause its transfer agents to issue due bills or other appropriate evidence of the right to receive such shares.

(VI)     Any adjustment in the conversion price otherwise required by this paragraph (6) to be made may be postponed up to, but not beyond, three years from the date on which it would otherwise be required to be made provided that such adjustment (plus any other adjustments postponed pursuant to this clause (VI) and not theretofore made) would not require an increase or decrease of more than $0.50 in such price and would not, if made, entitle the holders of all then outstanding shares of the Series G Stock upon conversion to receive additional shares of Common Stock equal in the aggregate to 3% or more of the then issued and outstanding shares of Common Stock. All calculations under this paragraph (6) shall be made to the nearest cent or to the nearest 1/100 of a share, as the case may be.

(e)     Whenever the conversion price is adjusted as herein provided:

(I)     the Company shall compute the adjusted conversion price in accordance with this paragraph (6) and shall prepare a certificate signed by the Treasurer of the Company setting forth the adjusted conversion price, and such certificate shall forthwith be filed with the transfer agent or agents for the Series G Stock; and

(II)     a notice stating that the conversion price has been adjusted and setting forth the adjusted conversion price shall, as soon as practicable, be mailed to the holders of record of the outstanding shares of the Series G Stock.

(f)     In case of any consolidation of the Company with, or merger of the

139

Company with or into, any other corporation (other than a merger in which the Company is the surviving corporation and which does not result in any reclassification or change of the outstanding shares of the Company into which shares of the Series G Stock are then convertible), or in case of any conveyance or transfer of the property and assets of the Company substantially as an entirety, each share of Series C Stock shall thereafter be convertible into the number and kind of shares of stock and other securities and cash, property and rights receivable upon such consolidation, merger, conveyance or transfer by a holder of the number and kind of shares of the Company into which such shares of Series G Stock might have been converted immediately prior to such consolidation, merger, conveyance or transfer. The above provisions of this subparagraph (f) shall similarly apply to successive consolidations, mergers, conveyances or transfers.

(g)     In case:

(I) the Company shall declare a dividend (or any other distribution) on its Common Stock payable otherwise than .in cash out of its retained earnings; or

(II) the Company shall authorize the granting to the holders of its Common Stock of rights to subscribe for or purchase any shares of capital stock of any class or of any other rights; or

(III) of any reclassification of the capital stock of the Company (other than a subdivision or combination of its outstanding shares of Common Stock), or of any consolidation or merger to which the Company is a party and for which approval of any stockholders of the Company is required, or of the sale or transfer of all or substantially all of the assets of the Company; or

(IV) of the voluntary or involuntary dissolution, liquidation or winding up of the Company;

then the Company shall cause to be mailed to the transfer agent or agents for the Series G Stock and to the holders of record of the outstanding shares of the Series G Stock at least 20 days--or 10 days in any case specified in clause (I) or (II) of this subparagraph (g)--prior to the applicable record date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution or rights, or, if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution or rights are to be determined, or (y) the date on which such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding up is expected to become effective, and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange their shares of Common Stock for securities or other property deliverable upon such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding up.

(h)     The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of the shares of the Series G Stock, the full number of shares of Common Stock then deliverable upon the conversion of all

shares of the Series G Stock then outstanding.

(i)    The Company will pay any and all taxes that may be payable in respect of the issuance or delivery of shares of Common Stock on conversion of shares of this Series pursuant hereto. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of this Series so converted were registered, and no such issue or delivery shall be made unless and until the person requesting such issue has paid to the company the amount of any such tax, or has established, to the satisfaction of the Company, that such tax has been paid.

(j)    For the purpose of this paragraph (6) the term "Common Stock" shall include any stock of any class of the Company which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and which is not subject to redemption by the Company. However, shares issuable on conversion of shares of the Series G Stock shall include only shares of the class designated as Common Stock of the Company as of the original date of issue of the Series G Stock or Shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company, provided that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

(k)    As used in this paragraph (6), the term "Closing Price" on any day shall mean the reported last sales price regular way on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices regular way, in each case on the New York Stock Exchange, or, if the Common Stock is not listed or admitted to trading on such Exchange, on the principal national securities exchange on which the Common Stock is listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices as furnished by any New York Stock Exchange member firm selected from time to time by the Company for that purpose; and the term "Trading Day" shall mean a date on which the New York Stock Exchange (or any successor to such Exchange) is open for the transaction of business.

(7)    <u>Definitions</u>.

(a)    The term "Accrued Dividends" shall mean Full Cumulative Dividends to the date as of which Accrued Dividends are to be computed, less the amount of all dividends paid, upon the relevant shares of Series C Stock.

(b)    The term "Date of Accrual" shall mean, as to any shares of the Series G Stock issued, January 1, 1987.

(c)    The term "Full Cumulative Dividends" shall mean (whether or not

141

in any dividend period, or any part thereof, in respect of which such term is used there shall have been net profits or net assets of the Company legally available for the payment of such dividends) that amount which shall be equal to dividends at the full rate fixed for the Series G Stock provided in paragraph (2) of this Section B regarding Series G Stock for the period of time elapsed from the Date of Accrual to the date as of which Full Cumulative Dividends are to be computed (including an amount equal to the dividend at such rate for any fraction of a dividend period included in such period of time calculated on the basis of a 360-day year of 12 30-day months).

(d)     The term "Preferred Stock" shall mean any Preferred Stock created and issued under this Article Fourth; provided, however, that for purposes only of subparagraph (b) of paragraph (5) of this Section B regarding Series G Stock, each holder of Series G Stock shall be entitled to cast one-half vote for each share of Series G Stock held by such holder and for purposes of determining a quorum at any meeting held for the purpose of electing directors at which the holders of Preferred Stock shall have this special right, voting separately as a class, to elect directors as provided in such subparagraph (b), each share of Series G Stock shall count, for purposes of determining the presence of a quorum of such class at such meeting, as one-half share of Preferred Stock. The term "preferred stock" shall mean shares of any class of stock (including Preferred Stock) if the holders of such class shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, in preference or priority to the holders of shares of Common Stock.

(e)     For the purposes hereof any stock of any class or classes of the Company shall be deemed to rank (i) prior to shares of the Series G Stock, either as to dividends or upon liquidation, if the holders of such class or classes shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Series G Stock; (ii) on a parity with shares of the Series G Stock, either as to dividends or upon liquidation, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Series G Stock, if the holders of such stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rate or liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Series G Stock; and (iii) junior to shares of the Series G Stock, either as to dividends or upon liquidation, if such class shall be Common Stock or if the holders of the Series G Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of such class of classes.

(f)     The shares of the Series G Stock shall rank senior as to the dividends and upon liquidation to the shares of the $120 Redeemable Convertible Preferred Stock, Series E (With $1.00 Par Value) of the Company and to the shares of the Convertible Junior Preference Stock, Series G (With $1.00 Par Value) of the Company.

(8)    <u>Retirement of Redeemed or Converted Shares Etc.</u>  Shares of the Series G Stock which have been (i) redeemed or (ii) converted into Common Stock pursuant to the provisions of paragraph (6) of this Section B regarding Series G Stock shall have the status of authorized and unissued Preferred Stock.

II.    <u>Preference Stock</u>.

The Preference Stock may be issued from time to time in one or more series of any number of shares, provided that the aggregate number of shares issued and not canceled of any and all such series shall not exceed the total number of shares of Preference Stock hereinabove authorized, and with distinctive serial designations, all as shall hereafter be stated and expressed in the resolution or resolutions providing for the issue of such Preference Stock from time to time adopted by the Board of Directors pursuant to authority so to do which is hereby vested in the Board of Directors. Each series of Preference Stock (i) may have such voting powers, full or limited, or may be without voting powers; (ii) may be subject to redemption at such time or times and at such prices; (iii) may be entitled to receive dividends (which may be cumulative or noncumulative) at such rate or rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or series of stock; (iv) may have such rights upon the dissolution of, or upon any distribution of the assets of, the corporation; (v) may be made convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of stock of the corporation, at such price or prices or at such rates of exchange, and with such adjustments; (vi) may be entitled to the benefit of a sinking fund to be applied to the purchase or redemption of shares of such series in such amount or amounts; (vii) may be entitled to the benefit of conditions and restrictions upon the creation of indebtedness of the Company or any subsidiary, upon the issue of any additional stock (including additional shares of such series or of any other series) and upon the payment of dividends or the making of other distributions on, and the purchase, redemption or other acquisition by the Company or any subsidiary of any outstanding stock of the Company; and (viii) may have such other relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof; all as shall be stated in said resolution or resolutions providing for the issue of such Preference Stock. Shares of any series of Preference Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or which, if convertible or exchangeable, have been converted into or exchanged for shares of stock of any other class or classes shall have the status of authorized and unissued shares of Preference Stock of the same series and may be reissued as a part of the series of which they were originally a part or may be reclassified and reissued as part of a new series of Preference Stock to be created by resolution or resolutions by the Board of Directors or as part of any other series of Preference Stock, all subject to the conditions or restrictions on issuance set forth in the resolution or resolutions adopted by the Board of Directors providing for the issue of any series of Preference Stock.

A.    <u>Series A Stock</u>. The designated powers, preferences and relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of one (1) share of a series of Preference Stock are as follows:

(1)    <u>Designation</u>. The designation of this series of Preference Stock shall be "Nonconvertible Junior Preference Stock, Series A (With Par Value of $1.00)" (hereinafter called the "Series A Stock").

(2)    <u>Dividends</u>. The holder of the Series A Stock shall not be entitled to receive dividends with respect to the Series A stock.

(3)    <u>Rights of Redemption</u>. The Series A Stock shall be subject to redemption as follows:

(a)    <u>Optional Redemption</u>. At any time after the date of the earliest to occur of (i) the passage of twelve consecutive calendar months at all times during which the supplemental Benefit Trust holds less than 5% of the total number of then outstanding shares of Parent Common Stock, (ii) the date on which the Supplemental Benefit Program terminates and (iii) the Profit Sharing Cessation Date, the Series A Stock may be redeemed at the option of the Company at any time upon not less than five days' prior notice to the holder of record of the Series A Stock sent by first class mail, postage prepaid, to such holder at its address appearing on the Series A Stock register maintained by the Company, at a redemption price of $1.00 (hereinafter called the "Series A Redemption Date").

(b)    <u>Effect of Redemption</u>. All rights of the holder of Series A Stock as a stockholder of the Company by reason of the ownership of Series A Stock shall cease on the Series A Redemption Date, except the right to receive the amount payable upon redemption of such share on presentation and surrender of the certificate representing such share. After the Series A Redemption Date, such share shall not be deemed to be outstanding.

(4)    <u>Rights on Liquidation, Dissolution. Winding Up</u>.

(a)    <u>Liquidation Payment</u>. In the event of any involuntary liquidation, dissolution or winding up of the Company, the holder of the Series A Stock (if then outstanding) shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the Company ranking junior upon liquidation to the Series A Stock, an amount equal to $1.00 per share. The merger or consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a dissolution, liquidation or winding up of the Company under this paragraph (4).

(b)    <u>Proportionate Distribution</u>. In the event the assets of the Company available for distribution to the holder of the Series A Stock upon any involuntary or voluntary liquidation, dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holder is entitled pursuant to subparagraph (a) of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preference stock ranking on a parity with the Series A Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the Series A Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5)    <u>Voting</u>. The Series A Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a)    <u>Change of Priority or Rights</u>. Without the affirmative vote or consent of the holder of the Series A Stock, voting or consenting (as the case may be) separately as a class, given in person or by proxy, either in writing or by

resolution adopted at a special meeting called for the purpose, the Company shall not (i) change the number of authorized shares of the Series A Stock or (ii) amend this Certificate of Incorporation or take any other action (including, without limitation, a merger or consolidation to which the Company is a constituent party) which would have the effect of eliminating the Series A Stock or of amending, altering or repealing any of the preferences, special rights or powers of the holder of the Series A Stock so as adversely to affect such preferences, special rights or powers.

(b)    Election of Directors. For so long as the Supplemental Benefit Trust holds 20% or more of the total number of then outstanding shares of Parent Common Stock, the number of directors constituting the Board of Directors of the Company shall be increased by two, and the holder of the Series A Stock shall have, in addition to any other voting rights, the exclusive and special right, voting separately as a class, to elect two persons to serve as directors of the Company (one of whom shall be designated the "First Designee," and the other of whom shall be designated the "Second Designee") to fill such two directorships. Except for the involuntary resignation of any such director under clauses (i) or (ii) of this first paragraph of this subparagraph (b) or the removal of any such director by the holder of the Series A Stock, each director elected by the holder of the Series A Stock shall have a one year term of office. The right of the holder of Series A Stock to elect directors may be exercised by written consent of such holder. The right of the holder of the Series A Stock voting separately as a class to elect two members of the Board of Directors as aforesaid shall continue until such time as the Supplemental Benefit Trust holds less than 20% of the total number of then outstanding shares of Parent Common Stock. At such time, the special right of the holder of the Series A Stock to vote separately as a class for the election of directors shall be subject to the following restrictions:

(i)     Upon the earlier to occur of .(A) the date on which the Supplemental Benefit Trust has held less than 20% but 19% or more of the total number of then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds less than 19% of the total number of then outstanding shares of Parent Common Stock, the holder of the Series A Stock shall be entitled to elect only one director in total and the Second Designee shall be deemed to have resigned as a director effective immediately without any further action on such person's part; and

(ii) Notwithstanding anything to the contrary contained in clause (i) immediately above, upon the earlier to occur of (A) the date on which the Supplemental Benefit Trust has held less than 10% but 9% or more of the total number of then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds less than 9% of the total number of then outstanding shares of Parent Common Stock, the holder of the Series A Stock shall not be entitled to elect any directors and each remaining director elected by such holder shall be deemed to have resigned as a member of the Board of Directors effective immediately without further action on such person's part.

The special right of the holder of the Series A Stock to vote separately as a class for the election of directors shall be subject to revesting as follows:

(i)      Upon the earlier to occur of (A) the date on which the Supplemental Benefit Trust has held more than 10% but not more than 11% of the total number of then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds more than 11% of the total number of then outstanding shares of Parent Common Stock, the right of the holder of Series A Stock to elect a total of one director shall vest immediately; and

(ii)      Notwithstanding anything to the contrary contained in clause (i) immediately above, upon the earlier to occur of (A) the date on which the Supplemental Benefit Trust has held more than 20% but not more than 21% of the total number of then outstanding shares of Parent Common Stock at all times for six consecutive months and (B) the date on which the Supplemental Benefit Trust holds more than 21% of the total then outstanding shares of Parent Common Stock, the right of the holder of Series A Stock to elect a total of two directors shall vest immediately.

For purposes of this subparagraph (b), all calculations of the Supplemental Benefit Trust's holdings of the then outstanding shares of Parent Common Stock shall be made as if the Common Stock and Class B Common were a single class.

At any time when the holder of the Series A Stock has the right to elect directors as provided in this subparagraph (b), (i) such holder shall have the exclusive right to remove the First Designee and/or the Second Designee, with or without cause, from time to time and elect their successors and (ii) any vacancies in the seats held by the First Designee or the Second Designee shall be filled only by a vote of the holder of the Series A Stock.

(6)      <u>Conversion Rights</u>. The holder of the share of the Series A Stock shall have no conversion rights with respect to such share.

(7)      <u>Nontransferability</u>. The Series A Stock will be issued to the Supplemental Benefit Trust and the Series A Stock and any rights thereunder shall be nontransferable. Any attempted transfer shall be void and of no effect. The Company shall place on the certificate representing any issued share of the Series A Stock a legend consistent with the provisions hereof.

(8)      <u>Definitions</u>.

(a)      <u>Profit Sharing Cessation Date</u>. The term "Profit Sharing Cessation Date" shall have the meaning assigned to such term in the Settlement Agreement.

(b)      <u>Settlement Agreement</u>. The term "Settlement Agreement" shall mean the Settlement Agreement, dated as of March 31, 1993, and the exhibits thereto, in the class action of <u>Shy, et al. v. Navistar</u>, (Civil Action No. C-3-92-333) (S.D.O.), as any of the same may be amended from time to time in accordance with the terms thereof. The Company shall provide a copy of the Settlement Agreement to any holder of shares of its stock upon request by such holder.

146

(c)    <u>Supplemental Benefit Program</u>. The term "Supplemental Benefit Program" shall have the meaning assigned to such term in the Settlement Agreement.

(d)    <u>Supplemental Benefit Trust</u>. The term "Supplemental Benefit Trust" shall have the meaning assigned to such term in the Settlement Agreement.

(9)    <u>Rank of Series A Stock</u>. The share of the Series A Stock shall rank junior upon liquidation to (i) the shares of the Series G Stock, (ii) the shares of the Convertible Junior Preference Stock, Series D (With Par Value of $1.00) (the "Series D Stock"), and (iii) any other series of Preferred Stock or Preference Stock (other than the Nonconvertible Junior Preference Stock, Series B (With Par Value of $1.00) of the Company) (the "Series B Stock") authorized or designated after the initial date of issuance of the Series A Stock. The share of the Series A Stock shall rank on a parity upon liquidation with the Series B Stock. The share of the Series A Stock shall rank senior upon liquidation to the shares of the Parent Common Stock.

(10)    <u>Retirement of Redeemed Shares, Etc</u>. When redeemed, the share of the Series A Stock shall have the status of authorized and unissued Preference Stock.

(11)    <u>No Fractional Shares</u>. No fractional shares of Series A Stock shall be issued.

(12)    <u>Stock Calculations</u>. In making any calculations with respect to holdings or ownership of the Company's stock, the Company's stock records shall be conclusive evidence of such holdings and ownership.

B.    <u>Series B Stock</u>. The designated powers, preferences and relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of one (1) share of a series of Preference Stock are as follows:

(1)    <u>Designation.</u> The designation of this series of Preference Stock shall be "Nonconvertible Junior Preference Stock, Series B (With Par Value of $1.00)" (referred to herein as the "Series B Stock").

(2)    <u>Dividends</u>. The holder of the share of the Series B Stock shall not be entitled to receive dividends with respect to the Series B Stock.

(3)    <u>Rights of Redemption</u>. The Series B Stock shall be subject to redemption as follows:

(a)    <u>Optional Redemption</u>. At any time after the holder of Series B Stock has not been entitled to vote separately as a class to elect a director at any time for five consecutive years, the Series R Stock .may be redeemed at the option of the Company, in whole or in part, at any time or from time to time upon not less than five days' prior notice to the holder of record of the Series B Stock sent by first class mail, postage prepaid, to such holder at its address appearing on the Series B. Stock register maintained by the Company, at a redemption price of $1.00 (hereinafter called the "Series B Redemption Date")

(b)    <u>Effect of Redemption</u>. All rights of the holder of Series B Stock as a stockholder of the Company by reason of the ownership of Series B Stock shall

cease on the Series B Redemption Date, except the right to receive the amount payable upon redemption of such share on presentation and surrender of the certificate representing such share. After the Series R Redemption Date, such share shall not be deemed to be outstanding.

(4) <u>Rights on Liquidation. Dissolution. Winding Up</u>.

(a) <u>Liquidation Payment</u>. In the event of any involuntary liquidation, dissolution or winding up of the Company, the holder of the Series B Stock (if then outstanding) shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the Company ranking junior upon liquidation to the Series B Stock, an amount equal to $1.00 per share. The merger or consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a dissolution, liquidation or winding up of the Company under this paragraph (4).

(b) <u>Proportionate Distribution</u>. In the event the assets of the Company available for distribution to the holder of the Series B Stock upon any involuntary or voluntary liquidation, dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holder is entitled pursuant to subparagraph (a) of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preference stock ranking on a parity with the Series B Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the Series B Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5) <u>Voting</u>. The Series B Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a) <u>Change of Priority or Rights</u>. Without the affirmative vote or consent of the holder of the Series B Stock, voting or consenting (as the case may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) change the number of authorized shares of the Series B Stock or (ii) amend this Certificate of Incorporation or take any other action (including, without limitation, a merger or consolidation to which the Company is a constituent party) which would have the effect of eliminating the Series B Stock or of amending, altering or repealing any of the preferences, special rights or powers of the holder of the Series B Stock so as adversely to affect such preferences, special rights or powers.

(b) <u>Election of Director</u>. Until the Fully Funded Date, the number of directors constituting the Board of Directors of the Company shall be increased by one, and the holder of the Series B Stock shall have, in addition to any other voting rights, the exclusive and special right, voting separately as a class, to elect one person to fill such newly created directorship. Except for the involuntary resignation of any such director this subparagraph b or the removal of any such director by the holder of the Series B Stock, the director elected by the holder of

148

the Series B Stock shall have a one year term of office. The right of the holder of Series B Stock to elect a director may be exercised by written consent of such holder. On the Fully Funded Date, the special right of the holder of the Series B Stock so to vote separately as a class for the election of a director shall terminate (subject to subsequent revesting as provided below) and the director elected by the holder of the Series B Stock shall be deemed to have resigned effective immediately without any further action upon such person's part. Subsequent to the Fully Funded Date, the special right of the holder of Series B Stock to vote separately as a class for the election of a director shall revest at any time when the balance of the Employers' funding contribution held under the Health Benefit Trust falls below 85% of the Fully Funded Amount; provided, however, that such revested special right of the holder of Series B Stock to vote separately as a class for the election of a director shall terminate (subject to revesting as provided by this subparagraph (b)) if the balance of the Employers' funding contribution held under the Health Benefit Trust rises above 85% of the Fully Funded Amount.

At any time when the holder of the Series B Stock has the right to elect a director as provided In this subparagraph (b), (i) such holder shall have the exclusive right to remove such director, with or without cause, from time to time and elect his or her successor and (ii) any vacancies in the seat held by the director elected by the holder of the Series B Stock shall be filled only by vote of the holder of the Series B Stock.

(6)    Conversion Rights. The holder of the share of the Series B Stock shall have no conversion rights with respect to such share.

(7)    Nontransferability. The Series B Stock shall be issued to the UAW and the Series B Stock and any rights thereunder shall be nontransferable. Any attempted transfer shall be void and of no effect. The Company shall place on the certificate representing any issued share of the Series A Stock a legend consistent with the provisions hereof.

(8)    Definitions.

    (a)    Employers. The term "Employers" shall have the meaning assigned to such term in the Settlement Agreement.

    (b)    Fully Funded Amount. The term "Fully Funded Amount" shall have the meaning assigned to such term in the Settlement Agreement.

    (c)    Fully Funded Date. The term "Fully Funded Date" shall have the meaning assigned to such term in the Settlement Agreement.

    (d)    Health Benefit Trust. The term "Health Benefit Trust" shall have the meaning assigned to such terra in the Settlement Agreement.

    (e)    UAW. The term "UAW" shall have the meaning assigned to such term in the Settlement Agreement.

(9)    Rank of Series B Stock. The share of the Series B Stock shall rank junior upon liquidation to (i) the shares of the Series G Stock, (ii) the shares of the Series D Stock, and (iii) any other series of Preferred or Preference Stock (other than the Series A Stock)

149

authorized or designated after the initial date of issuance of the Series B Stock. The share of the Series B Stock shall rank on a parity upon liquidation with the Series A Stock. The share of the Series B Stock shall rank senior upon liquidation to the shares of the Parent Common Stock.

(10) _Retirement of Redeemed Shares, Etc._ When redeemed, the share of the Series B Stock shall have the status of authorized and unissued Preference Stock.

(11) _Fractional Shares_. No fractional shares of Series B Stock shall be issued.

(12) _Stock Calculations_. In making any calculations with respect to holdings or ownership of the Company's stock, the Company's stock records shall be conclusive evidence of such holdings and ownership.

C. _Series D Stock_. The designated powers, preferences and relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of 3,000,000 shares of a series of Preference Stock are as follows:

(1) _Designation_. The designation of this series of Preference Stock shall be "Convertible Junior Preference Stock, Series D (with Par Value of $1.00)" (referred to herein as the "Series D Stock").

(2) _Dividends_. The holders of shares of the Series D Stock shall not be entitled to receive any dividends unless cash dividends are declared on the shares of stock issuable upon conversion of the Series D Stock (herein called "conversion stock"). In the event any cash dividend is declared on the shares of conversion stock, following the record date for such dividend the holders of shares of the Series D Stock shall be entitled to receive, when, as, and to the extent declared by the Board of Directors, a dividend in cash in an amount per share equal to 120% of the cash dividend per share declared on the shares of conversion stock multiplied by the number of shares of conversion stock which, as of such record date, is deliverable on the Conversion Date upon the conversion of a share of Series D Stock. if at any time after the right to receive such dividend shall have accrued such dividend shall not have been paid, or declared and a sum sufficient for payment thereof set apart, the amount of the deficiency in such dividend shall be fully paid, but without interest, before the dividend on the conversion stock which gave rise to the accrual of such dividend shall be paid and before any other dividend shall be declared or paid or any other distribution ordered or made upon, or any other purchase or redemption made of, any stock ranking as to dividends or upon liquidation junior to the Series D Stock (other than a dividend payable in such junior stock or a purchase or redemption made by issue or delivery of such junior stock); provided, however, that any moneys theretofore deposited in any sinking fund with respect to any preferred stock of the Company in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such preferred stock in accordance with the terms of such sinking fund regardless of whether at the time of such application Full Accrued Dividends upon shares of the Series D Stock shall have been paid or declared and set apart for payment. At any time when any dividend has accrued on the Series D Stock but has not been paid, all dividends declared upon the shares of the Series D Stock and any other preferred stock ranking on a parity as to dividends with the Series D Stock shall be declared pro rata, so that the amounts of dividends declared per share on the Series D Stock and such other preferred stock shall in all cases bear to each other the same ratio that accrued unpaid dividends per share on the shares of the Series D

Stock and such other preferred stock (determined immediately prior to payment) bear to each other, provided that in making such calculation, dividends accrued on such other parity stock since the most recent January 15 or July 15 may be ignored. Holders of shares of the Series D Stock shall not be entitled to any dividends, whether payable in cash, property or stock, in excess of Full Accrued Dividends.

(3)     Rights Of Redemption. The shares of the Series d Stock shall be subject to redemption as follows:

(a)     Optional Redemption. Subject to the succeeding provisions of this subparagraph (a) , the shares of the Series D Stock may be redeemed at the option of the Company, in whole or in part, at any time or from time to time upon not less than 30 days' prior notice to the holders of record of shares of the Series D Stock to be so redeemed, sent by first class mail, postage prepaid, to each registered holder of shares of the Series D Stock at his address appearing on the Series D Stock register maintained by the Company, at the redemption price per share of $25.00, plus in each case an amount equal to Unpaid Accrued Dividends to and including the date fixed for redemption of such shares (hereinafter called a "Redemption Date"). If less than all shares of the Series D Stock are to be redeemed pursuant to this subparagraph (a), the shares to be redeemed shall be selected pro rata so that there shall be redeemed from each registered holder of such shares that number of whole shares, as nearly as practicable to the nearest share, as bears the same ratio to the total number of shares of such Series held by such holder as the total number of shares to be redeemed bears to the total number of shares of the Series D Stock at the time outstanding.

(b)     No Mandatory Redemption. The shares of the Series D Stock shall not be subject to mandatory redemption.

(c)     No Sinking Fund. Shares of the Series D Stock are not subject or entitled to the benefit of a sinking fund.

(d)     Effect of Redemption. Unless default be made in the payment in full of the redemption price and any Accrued Dividends: dividends on the shares of Series D Stock called for redemption shall cease to accrue on the Redemption Date on which such shares are to be redeemed; all rights of the holders of such shares as stockholders of the Company by reason of the ownership of such shares shall cease on such Redemption Date, except the right to receive the amount payable upon redemption of such shares on presentation and surrender of the respective certificates representing such shares; and after such Redemption Date, such shares shall not be deemed to be outstanding and shall not be transferable on the books of the Company except to the Company.

(e)     Receipt of Redemption Price. At any time on or after a Redemption Date, the respective holders of record of shares of Series D Stock to be redeemed on such Redemption Date shall be entitled to receive the redemption price upon actual delivery to the Company of certificates for the shares to be redeemed, such certificates, if required by the Company, to be properly stamped for transfer and duly endorsed in blank or accompanied by proper instruments of assignment and transfer thereof duly executed in blank.

151

(f)   Return of Deposits. Any moneys deposited with the transfer agent, or other redemption agent, for the redemption of any shares of Series D Stock on a Redemption Date which shall not be claimed after five years from such Redemption Date shall be repaid to the Company by such agent on demand, and the holder of any such shares of Series D Stock shall thereafter look only to the Company for any payment to which such holder may be entitled. Any interest accrued on moneys so deposited shall belong to the Company and shall be paid to it from time to time on demand.

(4)   Rights on Liquidation. Dissolution. Winding up.

(a)   Liquidation Payment. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, the holders of shares of the Series D Stock then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the Company ranking junior upon liquidation to the Series D Stock, an amount equal to $25.00 per share plus an amount equal to all Accrued Dividends thereon as of the date of payment. The merger or consolidation of the Company into or with any other corporation or the merger or consolidation of any other corporation into or with the Company shall not in any event be considered a liquidation, dissolution or winding up of the Company under this paragraph (4).

(b)   Proportionate Distribution. In the event the assets of the Company available for distribution to the holders of shares of Series D Stock upon any voluntary or involuntary liquidation, dissolution or winding up of the Company shall be insufficient to pay in full all amounts to which such holders are entitled pursuant to subparagraph (a) of this paragraph (4), no such distribution shall be made on account of any shares of any other class or series of preferred stock ranking on a parity with the shares of Series D Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the shares of Series D Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(5)   Voting. The shares of the Series D Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

(a)   Change of Priority or Rights. Without the affirmative vote or consent of the holders of at least two-thirds of the number of shares of Series D Stock at the time outstanding, voting or consenting (as the case may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) amend, alter or repeal any of the preferences, special rights or powers of the holders of, the Series D Stock so as adversely to affect such preferences, special rights or powers or (ii) increase above 3,000,000 the aggregate number of shares constituting the Series D Stock or issue or reissue any shares of Series D Stock (other than for purposes of exchanges or transfers) in excess of the first 3,000,000 shares issued. No vote or consent by the holders of the Series D Stock shall be required as a condition to the creation or issuance of any class or series of capital stock of the Company

152

(including, without limitation, capital stock which may rank senior to, or on a parity with, the Series D Stock as to dividends or upon liquidation or both).

(b) <u>Default in Dividend Payments</u>. Whenever dividends payable on any series of Preference Stock shall be in default in an aggregate amount equivalent to six full quarterly dividends on all shares of such series at the time outstanding, the number of directors constituting the Board of Directors of the Company shall be increased by one and the holders of Preference Stock shall have, in addition to any other, voting rights, the exclusive and special right, voting separately as a class without regard to series, to elect one person to fill such newly created directorship. Whenever such right of holders of Preference Stock shall have vested, it may be exercised initially either at a special meeting of such holders called as provided below, or at any annual meeting of stockholders, and thereafter at annual meetings of stockholders. The right of holders of shares of Preference Stock voting separately as a class to elect one member of the Board of Directors as aforesaid shall continue until such time as all dividends accumulated on all series of Preference Stock shall have been paid in full, at which time the special right of the holders of shares of Preference Stock so to vote separately as a class for the election of directors shall terminate, subject to revesting in the event of each and every subsequent default in an aggregate amount equivalent to six full quarterly dividends.

At any time when such special voting power shall have vested in the holders of Preference Stock as provided in this subparagraph (b), a proper officer of the Company shall, upon the written request of the holders of record of at least 10% of the number of shares of Preference Stock at the time outstanding and entitled to vote, regardless of series, addressed to the Secretary of the Company, call a special meeting of the holders of shares of Preference Stock and of any other class of stock having voting power, for the purpose of electing directors. Such meeting shall be held at the earliest practicable date at the principal office of the Company. If such meeting shall not be called by a proper officer of the Company within 20 days after personal service of said written request upon the secretary of the Company, or within 20 days after mailing the same within the United States of America by registered mail addressed to the Secretary of the Company at its principal office, then the holders of record of at least 10% of the number of shares of Preference Stock at the time outstanding and entitled to vote, regardless of series, may designate in writing one of their number to call such meeting at the expense of the Company, and such meeting may be called by such person so designated upon the notice required for annual meetings of stockholders and shall be held at said principal office. Any holder of shares of Preference Stock so designated shall have access to the stock books of the Company for the purpose of causing meetings of stockholders to be called pursuant to these provisions. Notwithstanding the provisions of this subparagraph (b), no such special meeting shall be called during the 90 days immediately preceding the date fixed for the next annual meeting of stockholders.

At any meeting held for the purpose of electing directors at which the holders of shares of Preference Stock shall have the special right, voting separately as a class, to elect a director as provided in this subparagraph (b), the presence, in person or by proxy, of the holders of 51% of the number of shares of Preference Stock at the time outstanding and entitled to vote shall be required to constitute a

quorum of such class for the election of any director by the holders of the Preference Stock as a class, each share of Series D Stock outstanding and entitled to vote counting, for purposes only of determining the presence of such a quorum, as one share of Preference Stock. At any such meeting or adjournment thereof, (i) the absence of a quorum of Preference Stock shall not prevent the election of directors other than those to be elected by the holders of shares of Preference Stock voting as a class and the absence of a quorum for the election of such other directors shall not prevent the election of the directors to be elected by holders of shares of Preference Stock voting as a class and (ii) in the absence of either or both such quorums, a majority of the holders present in person or by proxy of the stock or stocks which lack a quorum shall have power to adjourn the meeting for the election of directors which they are entitled to elect from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

During any period the holders of Preference Stock have the right to vote as a class for a director as provided in this subparagraph (b), (i) the director so elected by the holders of the Preference Stock shall continue in office until termination of the right of the holders of the Preference Stock to vote as a class for directors, and (ii) any vacancies in the Board of Directors shall be filled only by vote of a majority (which majority may consist of only a single director) of the remaining directors theretofore elected by the holders of the class or classes of stock which elected the director whose office shall have become vacant.

(6)     Conversion Rights. The shares of the Series D Stock shall be subject to conversion as follows:

(a)     Optional Conversion. At any time, the holders of shares of the Series D Stock shall have the right, at their option, to convert each share of Series D Stock into shares of any other stock of the Company on the following terms:

(I)     Conversion Price. The shares of the Series D Stock shall be convertible at the Company's principal office and at such other office or offices, if any, as the Board of Directors may designate, into fully paid and nonassessable shares (calculated as to each conversion to the nearest 1/100th of a share) of Common Stock of the Company, at the conversion price, determined as hereinafter provided, in effect at the time of conversion, each share of Series D Stock being taken at $25.00 for the purpose of such conversion. The price at which shares of Common Stock shall be delivered upon conversion (herein called the "conversion price") shall be initially $80.00 per share of Common Stock. The conversion price shall be adjusted as provided in clause (IV) of this subparagraph (a).

(II)     Conversion Procedure. No payment or adjustment shall be made upon the conversion of the Series D Stock on account of any dividends declared but unpaid on the shares of the Series D Stock converted or on account of any dividends on the Common Stock issued upon such conversion.

Shares of the Series D Stock shall be deemed to have been converted immediately prior to the close of business on the Conversion Date, and the

154

person or persons entitled to receive the Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such Common Stock at such time. Following the Conversion Date, each holder of shares of the Series D Stock converted will surrender, at the Company's principal office or at any other office as the Board of Directors may designate, the certificate or certificates therefor, duly endorsed to the Company or in blank. As promptly as practicable after such surrender, the Company shall issue and shall deliver at said office a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion to the person or persons entitled to receive the same.

In case shares of Series D Stock are called for redemption, the right to convert such shares shall cease and terminate at the close of business on the Redemption Date on which such shares are to be redeemed, unless default shall be made in payment of the redemption price (in which event the right to convert such shares shall cease when such redemption price shall actually be paid).

(III)    Cash Payment. No fractional shares of Common Stock shall be issued upon conversion of shares of the Series D Stock; but, instead of any fraction of a share of Common Stock which would otherwise be issuable in respect of the aggregate number of shares of the Series D Stock held by the same holder, the company shall pay a cash adjustment of such fraction in an amount equal to the same fraction of the Closing Price on the Conversion Date, or. if the Conversion Date is not a Trading Day, on the next Trading Day.

(IV)    Conversion Price Adjustments. The conversion price shall be adjusted from time to time as follows:

(A)    In case the Company shall hereafter (i) pay a dividend or make a distribution on its outstanding shares of Common Stock in Common Stock, (ii) subdivide its outstanding shares of Common Stock, (iii) combine its outstanding shares of Common Stock into a smaller number of shares, or (iv) issue any shares by reclassification of its shares of Common Stock, the conversion price in effect at the time of the record date for such dividend or distribution or the effective date of such subdivision, combination or reclassification shall be adjusted so that the holder of any shares of the Series D Stock converted after such time shall be entitled to receive the number of shares of capital stock of the Company which he would have owned or been entitled to receive by reason of the conversion of such shares of the Series D Stock had such shares of the Series D Stock been converted immediately prior to such time.

(B)    In case the Company shall hereafter issue rights or warrants to all holders of its Common Stock entitling them (for a period expiring within forty-five days after the record date mentioned below) to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share--as

155

determined pursuant to subclause (D) of this clause (IV)--on the record date for the determination of the stockholders entitled to receive such rights or warrants, the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the date of issuance of such rights or warrants by a fraction, of which the numerator shall be the number of shares of Common Stock outstanding on the record date for the determination of the stockholders entitled to receive such rights or warrants plus the number of shares of Common Stock which the aggregate offering price of the total number of shares of Common Stock so offered would purchase at such current market price and of which the denominator shall be the number of shares of Common Stock outstanding on such record date plus the number of additional shares of Common Stock offered for subscription or purchase. Such adjustment shall become effective at the opening. of business on the business day next following the record date for the determination of stockholders entitled to receive such rights or warrants; and to the extent that shares of Common Stock are not delivered after the expiration of such rights or warrants, the conversion price shall be readjusted (but only with respect to shares of the Series D Stock converted after such expiration) to the conversion price which would then be in effect had the adjustments made upon the distribution of such rights or warrants been made upon the basis of delivery of only the number of shares of Common Stock actually delivered. No adjustment in the conversion price shall be required or made under this subclause (B) or subclause (C) immediately below or otherwise under this subparagraph (a) in respect of any right granted by the Company to all holders of its Common Stock to purchase additional shares of Common Stock from the Company at a discount from the current market price per share of Common Stock by reinvestment of dividends on Common Stock if either (i) such discount does not exceed 6% of such current market price or (ii) the holders of the Series D Stock shall be entitled to purchase shares of Common Stock from the Company at the same discount by reinvestment of dividends on the Series D Stock.

(C)     In case the Company shall hereafter distribute to all holders of its Common Stock evidences of its indebtedness or assets-- excluding any cash dividend or distributions and dividends referred to in subclause (A) of this clause (IV)--or subscription rights or warrants (excluding those referred to in subclause (B) immediately above), then in each such case the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the date of such distribution by a fraction of which the numerator shall be the current market price per share (determined as provided in subclause (D) immediately below) of the Common Stock on the record date for the determination of stockholders entitled to receive such distribution less the then fair market value (as determined by the Board of

Directors of the Company, whose determination shall be conclusive) of the portion of the assets or evidences of indebtedness so distributed or of such subscription rights or warrants applicable to one share of Common Stock, and the denominator shall be such current market price per share of the Common Stock. Such adjustment shall become effective on the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such distribution.

(D)     For the purpose of any computation under subclause (B) or (C) immediately above, the current market price per share of Common Stock on any date shall be deemed to be the average of the daily Closing Price for the thirty consecutive Trading Days selected by the Company commencing not more than forty-five Trading Days before the day in question.

(E)     In any case in which this subparagraph (a) shall require that an adjustment as a result of any event become effective at the opening of business on the business day next following a record date, the Company may elect to defer until after the occurrence of such event (i) issuing to the holder of any shares of the Series D Stock converted after such record date and before the occurrence of such event the additional shares of Common Stock issuable upon such conversion over and above the shares of Common Stock issuable upon such conversion on the basis of the conversion price prior to adjustment and (ii) paying to such holder any amount in cash in lieu of a fraction share of Common Stock pursuant to clause (IV) of this subparagraph (a); and, in lieu of the shares the issuance of which is so deferred, the Company shall issue or cause its transfer agents to issue due bills or other appropriate evidence of the right to receive such shares.

(F) Any adjustment in the conversion price otherwise required by this subparagraph (a) to be made may be postponed up to, but not beyond, three years from the date on which it would otherwise be required to be made provided that such adjustment (plus any other adjustments postponed pursuant to this subclause (F) and not theretofore made) would not require an increase or decrease of more than $.50 in such price and would not, if made, entitle the holders of all then outstanding shares of the Series D Stock upon conversion to receive additional shares of Common Stock equal in the aggregate to 3% or more of the then issued and outstanding shares of Common Stock. All calculations under this subparagraph (a) shall be made to the nearest cent or to the nearest 1/100 of a share of Common Stock, as the case may be.

(V)     Conversion Price Adjustment Certificates and Notices. Whenever the conversion price is adjusted as herein provided, the Company shall compute the adjusted conversion price in accordance with this subparagraph (a), shall prepare a notice stating that the conversion price has

157

been adjusted and setting forth the adjusted conversion price and shall mail such notice as soon as practicable to the holders of record of the outstanding shares of the Series D Stock.

(VI) <u>Mergers, etc.</u> In case of any consolidation of the Company with, or merger of the Company with or into, any other corporation (other than a merger in which the Company is the surviving corporation and which does not result in any reclassification or change of the outstanding shares of the Company into which shares of the Series D Stock would have been converted had the automatic conversion of the Series D Stock occurred immediately prior thereto), or in case of any conveyance or transfer of the property and assets of the Company substantially as an entirety, lawful provision shall be made as a part of the terms of such transaction so that each share of Series D Stock shall be converted on the Conversion Date into the number and kind of shares of stock (and/or other securities, cash, property or rights) receivable upon such consolidation, merger, conveyance or transfer by a holder of the number and kind of shares of the Company into which such share of Series D Stock would have been converted had the automatic conversion of the Series D Stock occurred immediately prior to such consolidation, merger, conveyance or transfer, subject to subsequent adjustments as nearly equivalent as practicable to the adjustments provided for in this subparagraph (a). The above provisions of this clause (VI) shall similarly apply to successive consolidations, mergers, conveyances or transfers.

(VII) <u>Reservation of Shares</u>. The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of the shares of the Series D Stock on the Conversion Date, the full number of- shares of Common Stock which at the time is deliverable on the Conversion Date upon the conversion of all shares of the Series D Stock outstanding at such time.

(VIII) <u>Taxes</u>. The Company shall pay any and all taxes that may be payable in respect of the issuance or delivery of shares of Common Stock on conversion of shares of Series D Stock pursuant hereto. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of Series D Stock so converted were registered, and no such issue or delivery shall be made unless and until the person requesting such issue has paid to the Company the amount of any such tax, or has established, to the satisfaction of the Company, that such tax has been paid.

(IX) <u>Common Stock</u>. For the purpose of this paragraph (6) the term "Common Stock" shall include any stock of any class of the Company which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and which is not subject to redemption by the Company. However, shares issuable on conversion of shares of the Series D Stock shall

158

include only shares of the class designated as Common Stock of the Company as of the original date of issue of the Series D Stock or shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company, provided that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

(X)  Closing Price. As used in this paragraph (6), the term "Closing Price" on any day shall mean the reported last sales price regular way on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices regular way, in each case on the New York Stock Exchange, or, if the Common Stock is not listed or admitted to trading on such Exchange, on the principal national securities exchange on which the Common Stock is listed or admitted to trading, or, if not listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices as furnished by any New York Stock Exchange member firm selected from time to time by the Company for that purpose; and the term "Trading Day" shall mean a date on which the New York Stock Exchange (or any successor to such Exchange) is open for the transaction of business.

(7)  Definitions

(a)  Conversion Date. The term "Conversion Date" shall mean the date on which the holder of shares of Series D Stock exercises his or its option to convert the shares of Series D Stock into Common Stock.

(b)  Accrued Dividends. The term "Accrued Dividends" shall mean Full Accrued Dividends as of the date as of which Accrued Dividends are to be computed, less the amount of all dividends paid, upon the relevant shares of Series D Stock.

(c)  Full Accrued Dividends. The term "Full Accrued Dividends" shall mean the aggregate amount of dividends, if any, which the holders of shares of Series D Stock shall have become entitled to receive as of the date as of which Full Accrued Dividends are to be computed.

(d)  Preferred Stock. The tern "Preferred Stock" shall mean any Preferred Stock created and issued under this Article Fourth. The term "preferred stock" shall mean shares of any class of stock (including any class of Preferred Stock or Preference Stock) if the holders of such class shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, in preference or priority to the holders of shares of Common Stock.

(e)  Preference Stock. The term "Preference Stock" shall mean any Preference Stock created and issued under this Article Fourth.

159

(f)     Ranking of Shares. For the purposes hereof any stock of any class or classes of the Company shall be deemed to rank (i) prior to shares of the Series D Stock, either as to dividends or upon liquidation, if the holders of such class or classes shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Series D Stock; (ii) on a parity with shares of the Series D Stock, either as to dividends or upon liquidation, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Series D Stock, if the holders of such stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rates or liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Series D Stock; and (iii) junior to shares of the Series D Stock, either as to dividends or upon liquidation, if such class shall be Common Stock or if the holders of the Series D Stock shall, be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of such class or classes.

(8)     Rank of Series D Stock. The shares of the Series D Stock shall rank junior as to dividends and upon liquidation to the shares of the $6.00 Cumulative Convertible Preferred Stock, Series G (With Par Value of $1.00) of the Company. Except as otherwise fixed at the time such class is created, the shares of the Series D Stock shall rank on a parity as to dividends and upon liquidation with the shares of the stock of any other class of Preferred Stock or Preference Stock.

(9)     Fractional Shares. The Series D Stock may be issued in fractions of a share equal to one one-hundredth (.01) of a share or any integral multiple thereof. Each fractional share of Series D Stock issued shall have a corresponding fraction of the voting powers, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, attributable to a full share of Series D Stock.

(10)     Retirement of Converted Shares, etc. Shares of the Series D Stock which have been converted into Common Stock pursuant to the provisions of paragraph (6) of this Section C regarding Series D Stock shall have the status of authorized and unissued Preferred Stock but shall not be reissued as Series D Stock.

III.     Parent Common Stock.

Except as otherwise provided in this Section III or as otherwise required by applicable law, all shares of Common Stock and Class B Common shall be identical in all respects and shall entitle the holders thereof to the same rights and privileges, subject to the same qualifications, limitations and restrictions.

A.     Voting Rights.

(1)     Common Stock. Except as otherwise provided in this Section III, as otherwise required by law or by the resolution or resolutions providing for the issuance of any series of Preferred Stock or Preference Stock and subject to the provisions of any applicable law or of the By-laws of the Company, as from time to time amended, with

respect to the closing of the transfer books or the fixing of a record date for the determination of stockholders entitled to vote, the holders of outstanding shares of Common Stock shall exclusively possess voting power for the election of directors and for other purposes, each holder of record of shares of Common Stock being entitled to one vote for each Share of Common Stock standing in his name on the books of the Company.

(2) <u>Class B Common</u>. The holders of shares of Class B Common shall have no right to vote on any matters to be voted on by the stockholders of the Company except as follows:

(a) Without the affirmative vote or consent of the holders of the Class B Common, voting or consenting (as the case may be) separately as a class, in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Company shall not (i) change the number of authorized shares of the Class B Common or (ii) amend this Certificate of incorporation or take any other action (including, without limitation, a merger or consolidation to which the Company is a constituent party) which would have the effect of eliminating the Class B Common or of amending, altering or repealing any of the preferences, special rights or powers of the holders of the Class B Common so as adversely to affect such preferences, special rights or powers.

(b) The holders of shares of Class B Common shall have the right to vote together with the holders of shares of the Common Stock as a single class on any Super-Majority Transaction submitted to the holders of Parent Common Stock for their vote, approval or consent. When voting on any Super-Majority Transaction, each holder of shares of Class B Common shall be entitled to cast one vote for each share of Class B Common standing in his name on the books of the Company.

(3) <u>Super-Majority Transactions</u>. The affirmative vote or consent of the greater of (a) the holders of at least 85% of the shares of the Parent Common Stock, voting as a single class, present in person or by proxy at a meeting at which a Super-Majority Transaction is submitted for a vote of the Company's stockholders and (b) the holders of a majority of the voting power of all of the Parent Common Stock shall be required to approve any Super-Majority Transaction.

B. <u>Dividends</u>. Except as otherwise provided by the resolution or resolutions providing for the issue of any series of Preferred Stock or Preference Stock, the holders of Parent Common Stock shall be entitled, to the exclusion of the holders of Preferred Stock and Preference Stock of any and all series, to receive such dividends as from time to time may be declared by the Board of Directors. As and when dividends are declared or paid thereon, whether in cash, property or securities of the Company, the holders of Common Stock and the holders of Class B Common shall be entitled to participate in such dividends ratably on a per share basis; provided, that (i) if dividends are declared which are payable in shares of Common Stock or Class B Common, such dividends shall be payable at the same rate on both Common Stock and Class B Common and the dividends payable in shares of Common Stock shall be payable to holders of that class of stock and the dividends payable in shares of Class B Common shall be payable to holders of that class of stock, (ii) if the dividends consist of other voting securities of the Company, the Company shall declare and pay in respect of each share of Class B Common dividends consisting of an equal number of non-voting securities of the Company which are otherwise identical to the voting

securities, which shall entitle the holder thereof to cast the same number of votes upon any Super-majority Transaction as such holder would have been entitled to cast had such, holder received voting securities, rather than nonvoting securities, with respect to such dividend arid which are convertible into or exchangeable for such voting securities on the same terms as the Class B Common is convertible into the Common Stock, (iii) if the dividends consist of the right to purchase additional shares of Common Stock or Class B Common, at the Company's option, either (A) dividends shall be declared which are payable at the same rate on both classes of stock and the dividends payable in the right to purchase additional shares of Common Stock shall be payable to holders of that class of Stock and the dividends payable in the right to purchase additional shares of Class B Common shall be payable to holders of that class of stock or (B) in the case of a dividend payable in the right to purchase additional shares of Common Stock, such dividend shall be payable to holders of that class of stock and the Class B Common Conversion Ratio (as hereinafter defined) shall be adjusted as provided in subparagraph 2 of Paragraph D of this Section III.

C.  <u>Rights on Liquidation, Dissolution, Winding Up</u>. In the event of any liquidation, dissolution or winding up of the Company, whether voluntary or involuntary, after payment shall have been made to the holders of Preferred Stock and Preference Stock of the full amount for which they shall be entitled pursuant to the resolution or resolutions providing for the issue of any series of Preferred Stock or Preference Stock, the holders of the Parent Common Stock shall be entitled, to the exclusion of the holders of Preferred Stock or Preference Stock of any and all series, to share, ratably according to the number of shares of Parent Common Stock held by them, in all remaining assets of the Company available for distribution to its stockholders.

D.  <u>Conversion Rights</u>.

(1)  <u>Conversion of Common Stock</u>. The holders of shares of Common Stock shall have no conversion rights with respect to such shares.

(2)  <u>Conversion of Class B Common Stock</u>. With respect to each share of Class B Common, upon the earlier to occur of (i) any transfer of such share of Class B Common in accordance with Paragraph E of this Section III (except for transfers permitted by subparagraph 3 of Paragraph E) and (ii) the Event Date, such share shall convert automatically into shares of Common Stock at a ratio (the "Class B Common Conversion Ratio") which initially shall be one share of Common Stock per share of Class B Common so converted; provided, that if and whenever the Company shall hereafter issue rights pursuant to clause (iii) (B) of Paragraph B of this Section III to all holders of its Common Stock entitling them to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share--as determined pursuant to the penultimate sentence of this subparagraph 2 of this paragraph D--on the record date for the determination of the stockholders entitled to receive such rights, the Class B Common Conversion Ratio shall be adjusted to an amount equal to the product of the Class B Common Conversion Ratio in effect immediately prior to the date of issuance of such rights and a fraction, of which the numerator shall be the number of shares of Common Stock outstanding on such record date plus the number of additional shares of Common Stock offered for subscription or purchase and of which the denominator shall be the number of shares of Common Stock outstanding on such record date plus the number of shares of Common Stock which the aggregate offering price of the total number of shares of Common Stock so offered would purchase at such current market price. Such adjustment shall become effective at the opening of business on the business day next following the record date for the determination of stockholders entitled to receive such rights; and to the

extent that shares of Common Stock are not delivered after the expiration of such rights, the Class B Common Conversion Ratio shall be readjusted (but only with respect to shares of the Class B Common converted after such expiration) to the Class B Common Conversion Ratio which would then be in effect had the adjustments made upon the distribution of such rights been made upon the basis of delivery of only the number of shares of Common Stock actually delivered. For the purpose of any computation under the immediately preceding sentence, the current market price per share of Common Stock on any date shall be deemed to be the average of the daily Closing Prices for the thirty consecutive Trading Days selected by the company commencing not more than fortyfive Trading Days before the day in question. Notwithstanding anything else contained in this subparagraph 2 of this Paragraph D, upon the termination of the Settlement Agreement in accordance with the provisions of Section 13 thereof, all then outstanding shares of Class B Common in the aggregate shall convert automatically, without any further action on the Company's part, into one (1) share of Common Stock.

(I) Mergers, etc. In case of any consolidation of the Company with, or merger of the Company with or into, any other corporation (other than a merger in which the Company is the surviving corporation and which does not result in any reclassification or change of the outstanding shares of the Company into which shares of the Class B Common would have been converted had the automatic conversion of the Class B Common occurred immediately prior thereto), or in case of any conveyance or transfer of the property and assets of the Company substantially as an entirety, lawful provision shall be made as a part of the terms of such transaction so that each share of Class B Common (i) shall entitle the holder thereof to receive, at the same time and on the same terms as applicable to the shares of the Company into which the Class B Common shall, be convertible, any cash, securities (other than equity securities of the Company), rights or other property receivable upon such consolidation, merger, conveyance or transfer by a holder of the number and kind of shares of the Company into which such share of Class B Common would have been converted had the automatic conversion of the Class B Common occurred immediately prior to such consolidation, merger, conveyance or transfer and (ii) shall be converted on the Class B Common Conversion Date into the number and kind of equity of the Company, if any, receivable upon such consolidation, merger, conveyance or transfer by a holder of the number and kind of share of the Company into which such share of Class B Common would have been converted had the automatic conversion of the Class B Common occurred immediately prior to such consolidation, merger, conveyance or transfer subject to subsequent adjustments as nearly equivalent as practicable to the adjustments provided for in this subparagraph 2 of paragraph D; provided however, that any instrument convertible into or exchangeable for equity securities of the Company shall be deemed for purposes of this subparagraph 2(I) not to be equity securities of the Company; and provided, further, that in the event that any instrument convertible into or exchangeable for shares of Common Stock or other voting securities of the Company is paid in any such consolidation, merger, conveyance or transfer in respect of the shares of the Company into which the shares of Class B Common shall be convertible or exchangeable, the corresponding instrument paid in respect of the Clash B Common pursuant

163

to this subparagraph 2(I) may be convertible into or exchangeable for Class B common or non-voting securities of the Company, respectively, in the manner contemplated by paragraph B of this Section III. The above provisions of this clause (I) shall similarly apply to successive consolidations, mergers, conveyances or transfers.

(II)    Reservation of Shares. The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of the shares of the Class B Common on the Class B Common Conversion Date, the full number of shares of Common Stock which at the time is deliverable on the Class B Common Conversion Date upon the conversion of all shares of the Class B Common outstanding at such time.

(III)    Taxes. The Company shall pay any and all taxes that may be payable in respect of the issuance or delivery of shares of Common Stock on conversion of shares of Class B Common pursuant hereto. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of Class B Common so converted were registered, and no such issue or delivery shall be made unless and until the person requesting such issue has paid to the Company the amount of any such tax, or has established, to the satisfaction of the Company, that such tax has been paid.

(IV)    Common Stock. For the purpose of this subparagraph 2 of paragraph D the term "Common Stock" shall include any stock of any class of the Company (other than the Class B Common) which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, and which is not subject to redemption by the Company. However, shares issuable on conversion of shares of the Class B Common shall include only shares of the class designated as Common Stock of the Company as of the original date of issue of the Class B Common or shares of any class or classes resulting from any reclassification or reclassifications, thereof which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company, provided that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

(V)    Retirement of Converted Shares, etc. Shares of the Class B Common which have been converted into Common Stock pursuant to the provisions of this subparagraph 2 of paragraph D regarding Class B Common shall have the status of retired shares of Class B Common and shall not be reissued.

(VI)     Rights Prior to Conversion. Notwithstanding anything to the contrary contained in this Section III, in case of any adjustment of the Class B Common Conversion Ratio as provided in this subparagraph 2 of this Paragraph D, the determination of the rights of the holders of Class B Common to vote such shares in Super-Majority Transactions, to receive dividends with respect to such shares, and to share ratably with the holders of Common Stock in assets of the Company in the event of any liquidation, dissolution or winding up of the Company shall be made as if the number of shares of Class B Common held by each such holder of the Class B Common were equal to the product of the number of shares of Class B Common actually hold by such holder at the time of such determination and the Class B Common Conversion Ratio.

(VII)     No Fractional Shares. No fractional shares of Common Stock shall be issued upon conversion of shares of the Class B Common, but, instead of any fraction of a share of Common Stock which would otherwise be issuable in respect of the aggregate number of shares of the Class B Common held by the same holder, the Company shall pay a full share of Common Stock.

(VIII)     Conversion Procedure. Following the Class B Common Conversion Date, each holder of shares of the Class B Common converted will surrender, at the Company's principal office or at any other office as the Board of Directors may designate, the certificate or certificates therefor, duly endorsed to the Company or in blank. As promptly as practicable after such surrender, the Company shall issue and shall deliver at said office a certificate or certificates for the number of shares of Common Stock issuable upon such conversion to the person or persons entitled to receive the same.

E.     Transferability of Class B Common. Prior to the Event Date, the shares of the Class B Common shall be nontransferable by the Supplemental Benefit Trust or any other holder thereof except:

(1)     pursuant to the terms of Article VIII of Exhibit B to the Settlement Agreement;

(2)     pursuant to any transaction which is approved by the Board of Directors or with respect to which the Board of Directors consents in writing;

(3)     to any financial institution as security for any indebtedness or obligation of the holders of the shares of Class B Common; or

(4)     pursuant to any tender or exchange offer made by any person or "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, or any successor statute thereto), for shares of Parent Common Stock. Any attempted transfer of shares of the Class B Common in violation of the provisions hereof shall be void and of no effect. The Company shall place on the certificates representing shares of the Class B Common a legend consistent with the provisions hereof.

F. **Stock Splits, Recapitalizations, Etc**. If the Company in any manner subdivides or combines the outstanding shares of, or effects any recapitalization or similar transaction with respect to, one class of Parent Common Stock, the outstanding shares of the other class of Parent Common Stock shall be proportionately subdivided, combined, reclassified or the like in a similar manner.

G.     **Definitions**.

(1)     **Class B Common Conversion Date**. The term "Class B Common Conversion Date," with respect to each share of Class B Common, shall mean the date on which such share automatically converts into shares of Common Stock pursuant to the terms and conditions contained herein.

(2)     **Closing Price**. The term "Closing Price" on any day shall mean the reported last sales price regular way on such day or, in case no such sale л takes place on such day, the average of the reported closing bid and asked prices regular way, in each case on the New York Stock Exchange, or, if the Common Stock is not listed or admitted to trading on such Exchange, on the principal national securities exchange on which the Common Stock is listed or admitted to trading, or, if not listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices as furnished by any New York Stock Exchange member firm selected from time to time by the Company for that purpose.

(3)     **Trading Day**. The term "Trading Day" shall mean a day on which the New York Stock Exchange (or any successor to such Exchange) is open for the transaction of business.

(4)     **Event Date**. The term "Event Date" shall have the meaning assigned to such term in the Settlement Agreement.

(5)     **Navistar International Transportation Corp**. The term "Navistar International Transportation Corp." shall mean Navistar International Transportation Corp., a Delaware corporation, or any successor corporation thereto.

(6)     **Super-Majority Transaction**. The term "Super-Majority Transaction" shall mean (i) a merger or consolidation to which the Company is a constituent party, if either (A) the stockholders of the Company immediately before such merger or consolidation, do not own, directly or indirectly, more than 50% of the combined voting power of the then outstanding voting securities of the corporation surviving or resulting from such merger or consolidation or (B) equity securities of the Company or Navistar International Transportation Corp. would be issued to stockholders of the other constituent corporation(s) to such merger or consolidation which have a fair market value at the time of the transaction in excess of $750 million, or (ii) the sale, transfer, pledge or other disposition of all or substantially all of the assets of the Company and its subsidiaries on a consolidated basis or Navistar International Transportation Corp. and its subsidiaries on a consolidated basis.

Subject to the provisions of this Certificate of Incorporation and except as otherwise provided by law, the shares of stock of the Company, regardless of class, may be issued for such consideration and for such corporate purposes as the Board of Directors may from time to time determine.

No holder of stock of the Company shall have any pre-emptive right with respect to stock of the Company.

Fifth: The Company is to have perpetual existence.

Sixth: Except as otherwise provided herein, any action required or permitted to be taken by the stockholders of the Company must be taken at a duly called annual or special meeting of such stockholders of the Company and may not be effected by any consent in writing by such stockholders.

The private property of the stockholders of the Company shall net be subject to the payment of corporate debts to any extent whatsoever.

Seventh: The number of directors which shall constitute the whole Board of Directors of the Company shall be as specified in the By-laws of the corporation, subject to the provisions of this Article Seventh.

The Board of Directors shall be and is divided into three classes: Class I, Class II and Class III, which shall be as nearly equal in number as possible. Each director shall serve for a term ending on the date of the third annual meeting of stockholders following the annual meeting at which the director was elected; provided, however, that each initial director in Class I shall hold office until the annual meeting of stockholders in 1988; each initial director in Class II shall hold office until the annual meeting of stockholders in 1989; and each initial director in Class III shall hold office until the annual meeting of stockholders in 1990. Notwithstanding the foregoing provisions of this Article, each director shall serve until his successor is duly elected and qualified or until his death, resignation or removal.

In the event of any increase or decrease in the authorized number of directors, the newly created or eliminated directorships resulting from such increase or decrease shall be apportioned by the Board of Directors among the three classes of directors so as to maintain such classes as nearly equal as possible. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

Newly created directorships resulting from any increase in the number of directors to be elected by the holders of the Common Stock and any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other cause shall be filled by the affirmative vote of a majority of the remaining directors elected by the holders of the Common Stock then in office (and not by stockholders), even though less than a quorum of the Board of Directors. Any director elected in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of directors in which the new directorship was created or the vacancy occurred and until such director's successor shall have been elected and qualified.

Notwithstanding the foregoing, wherever the holders of any one or more classes or series of stock issued by this Company having a preference over the Parent Common Stock as to dividends or upon liquidation shall have the right, voting separately by class or series, to elect directors by consent or at annual or special meeting of stockholders, the number, election, term of office, filling of vacancies, terms of removal and other features of such directorships shall be governed by the terms of the resolution or resolutions establishing such class or series adopted pursuant thereto and such directors so elected shall not be divided into classes pursuant to this Article Seventh unless expressly provided by such terms.

The Board of Directors shall have power to hold its meetings outside the State of Delaware at such place ass from time to time may be designated by the By-laws or by resolution of the Board of Directors. The By-laws may prescribe the number of directors necessary to constitute a quorum.

The capital of the Company may be increased from time to time by resolution of the Board of Directors directing that a portion of the net assets of the Company in excess of the amount theretofore determined to be capital be transferred to capital account. Any and all shares of the Parent Common Stock may be issued by the Company from time to time for such consideration as may be fixed from time to time by the Board of Directors.

Eighth: The Board of Directors shall have power, without stockholder action:

I.      To make By-laws for the Company, and to amend, alter or repeal any By-laws; but any By-laws made by the directors may be altered, amended or repealed by the stockholders at any meeting, provided notice of such proposed alteration, amendment or repeal be included in the notice of such meeting.

II.     To remove at any time any officer, agent or employee of the Company, provided, however, that such power of removal may be conferred by the By-laws or by the Board of Directors on any committee or officer.

III.    To fix and determine, and to vary the amount of, the working capital of the Company, and to determine the use or investment of any assets of the Company; to set apart out of any of the funds of the Company available for dividends a reserve or reserves for any proper purpose and to abolish any such reserve or reserves; and to declare and authorize payment of such dividends as it shall determine advisable and proper, subject to such restrictions as may be imposed by law.

IV.     To authorize the purchase or other acquisition of shares of stock of the Company or any of its bonds, debentures, notes, scrip or other securities or evidences of indebtedness.

V.      To determine whether and to what extent, at what times and places, and under what conditions and regulations, the accounts, books and documents of the Company, or any of them, shall be open to the inspection of the stockholders; and no stockholder shall have any right to inspect any account, book or document of the Company, except as conferred by the laws of the State of Delaware or as authorized by resolution adopted by the Board of Directors or by the stockholders of the Company entitled to vote in respect thereof.

VI.     Except as otherwise provided by law, to determine the places within or without the state of Delaware where any or all of the books of the Company shall be kept.

VII. To authorize the sale, lease or other disposition of any part or parts of the properties of the Company and to cease to conduct the business connected therewith or again to resume the same, as it may deem best.

VIII.   To authorize the borrowing of money; the issuance of bonds, notes, debentures and other obligations or evidences of indebtedness of the Company, secured or unsecured, and the inclusion of provisions as to redeemability and convertibility into shares of stock of the Company or otherwise; and the mortgaging or pledging, as security for

money borrowed or bonds, notes, debentures or other obligations issued by the Company, of any property of the Company, real or personal, then owned or thereafter acquired by the Company.

The powers and authorities herein conferred upon the Board of Directors are in furtherance and not in limitation of those conferred by the laws of the State of Delaware. In addition to the powers and authorities herein or by statute expressly conferred upon it, the Board of Directors may exercise all such powers and do all such acts and things as may be exercised or done by the Company, subject, nevertheless, to the provisions of the laws of the State of Delaware, of this Certificate of Incorporation and of the By-laws of the Company.

The Board of Directors may, by resolution passed by a majority of the whole Board of Directors, designate one or more committees, each committee to consist of two (2) or more of the directors of the Company, which to the extent provided in said resolution or resolutions or in the By-laws, shall have and may exercise the powers of the Board of Directors in the management of the business and affairs of the Company, and may authorize the seal of the Company to be affixed to all papers which may require it.

Subject to any limitation in the By-laws, the members of the Board of Directors shall be entitled to reasonable fees, salaries or other compensation for their services, as determined from time to time by the Board of Directors, and to reimbursement for their expenses as such members. Nothing herein contained shall preclude any director from serving the Company or its subsidiaries or affiliates in any other capacity and receiving compensation therefor.

To the fullest extent permitted by the General Corporation Law of the State of Delaware as it now exists or may hereafter be amended, no director of the Company shall be liable to the Company or its stockholders for monetary damages arising from a breach of fiduciary duty owed to the Company or its stockholders. Any repeal or modification of this provision by the stockholders of the Company shall not adversely affect any right or protection of a director of the Company existing at the time of such repeal or modification.

Ninth: Indemnification:

I.      Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative ("proceeding"), by reason of the fact that he or she is or was a director or officer of the Company (which term shall include any predecessor corporation of this Company) or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans ("indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be identified and held harmless by the Company to the fullest extent authorized by the Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment), against all expenses, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith and such indemnification shall continue as to an indemnitee who has

169

ceased to be a director, officer, employee or agent and shall inure to the benefit of the indemnitee's heirs, executors and administrators; provided however, that, except as provided in paragraph II of this Article Ninth with respect to proceedings to enforce rights to indemnification, the Company shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors. The right to indemnification conferred in this Article Ninth shall be a contract right and shall include the right to be paid by the Company the expenses incurred in defending any such proceeding in advance of its final disposition; provided however, that, if the Delaware General Corporation Law requires, the payment of such expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a proceeding, shall be made only upon delivery to the Company of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Article Ninth or otherwise.

II.     If a claim under paragraph I of this Article Ninth is not paid in full by the Company within sixty (60) days after a written claim has been received by the Company, except in the case of a claim for expenses incurred in defending a proceeding in advance of its final disposition, in which case the applicable period shall be twenty (20) days, the indemnitee may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim. If successful in whole or in part in any such suit or in a suit brought by the Company to recover payments by the Company of expenses incurred by an indemnitee in defending in his or her capacity as a director or officer, a proceeding in advance of its final disposition, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such claim. In any action brought by the indemnitee to enforce a right to indemnification hereunder (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the Company) or by the Company to recover payments by the Company of expenses incurred by an indemnitee in defending, in his or her capacity as a director or officer, a proceeding in advance of its final disposition, the burden of proving that the indemnitee is not entitled to be indemnified under this Article Ninth or otherwise shall be on the Company. Neither the failure of the Company (including the Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Company (including the Board of Directors, independent legal counsel or its stockholders) that the indemnitee has not met such applicable standard of conduct, shall be a presumption that the indemnitee has not met the applicable standard of conduct, or in the case of such an action brought by the indemnitee, be a defense to the action.

III.     The rights conferred on any person by paragraphs I and II of this Article Ninth shall not be exclusive of any other right which such person may have or hereafter acquire under any statute, this certificate of incorporation by=law, agreement, vote of stockholders or disinterested directors or otherwise.

IV.     The Company may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Company or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

V.     Persons who are not included as indemnitees under paragraph I of this Article Ninth but are employees of the Company or any subsidiary may be indemnified to the extent authorized at any time or from time to time by the Board of Directors.

Tenth: The Company reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, and other provisions authorized by the laws of the state of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed by law and this Certificate of Incorporation and all rights, preference and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended are granted subject to the right reserved in this Article Tenth.

Eleventh:

## I.     Certain Restrictions on the Transfer of Stock.

In order to preserve the Tax Benefits, the restrictions set forth below shall apply for the period beginning on the Article Eleventh Effective Date and ending on the Expiration Date, unless the Board of Directors shall fix an earlier or later date in accordance with Section VI of this Article Eleventh.

A.     Definitions.

(1)     Article Eleventh Effective Date. The time and date of the legal effectiveness of the merger of the former Navistar International Corporation with and into the Company.

(2)     Control. The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Such definition shall also apply to the terms "controlling," "controlled by" and "under common control with."

(3)     Effective Date Tier Entity. Any Person that, as of the Article Eleventh Effective Date, was a First Tier Entity or a Higher Tier Entity, for so long as such Person continues to have a Prohibited Ownership Percentage.

(4)     Expiration Date. The last day of the eight-year period commencing on the Article Eleventh Effective Date.

(5)     First Tier Entity. A "first tier entity" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T.

(6)     47 Percentage Point Increase. An increase of 47 percentage points or more of the Stock owned by "5-percent shareholders" of the Company (within the meaning of Treasury Regulations Section 1.382-2T(g)(1)) over the lowest percentage of Stock owned

171

by such 5-percent shareholders at any time during the three-year period preceding any determination date, such determination to be made in accordance with Treasury Regulations Section 1.382-2T(c) as if the determination date were a "testing date."

(7)    <u>Higher Tier Entity</u>. An "higher tier entity" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T.

(8)    <u>Internal Revenue Code</u>. The Internal Revenue Code of 1986, as amended. Any reference to a particular Section or provision of the Internal Revenue Code shall be deemed to also refer to any successor Section or provision having similar effect.

(9)    <u>Ownership Change</u>. An "ownership change" with respect to the Company, as that term is used in Section 382(g) of the Internal Revenue Code and Treasury Regulations Section 1.382-2T(a)(1), except that for purposes of determining whether 5-percent shareholders have increased their percentage interests by more than 50 percentage points, there shall be added to the increase in their percentage interests an amount equal to a fraction, the numerator of which is $50 million, and the denominator of which is the value of all of the Stock. For example, if the value of the Stock is $1,000,000,000 and the percentage increase by 5-percent shareholders is 49.5% (i.e., the value of the Stock representing the 49.5 percentage point increase is $495,000,000), for purposes of determining whether there is an ownership change, there shall be added to the 49.5 percentage points an increase of 0.5 percent (i.e., $50,000,000/$1,000,000,000).

(10)    <u>Other Permitted Holders</u>. Any Person, other than an Effective Date Tier Entity or a Permitted Transferee, which has a Prohibited Ownership Percentage permitted under Section I, whether pursuant to a waiver under Paragraph D of Section I or otherwise.

(11)    <u>Permitted Transferee</u>. Any transferee with a Prohibited Ownership Percentage as to which the Board of Directors has consented pursuant to Subparagraph C(2) or C(3) of Section I.

(12)    <u>Person</u>. Any individual, corporation, estate, trust, association, company, partnership, joint venture, or similar organization, or any other entity described in Treasury Regulations Section 1.382-3(a)(1)(i).

(13)    <u>Prohibited Ownership Percentage</u>. Any ownership in the Company that would cause a Person or Public Group to be a "5-percent shareholder" of the Company within the meaning of Treasury Regulations Section 1.382-2T(g)(1)(i) or (ii). For this purpose, whether a Person or Public Group would be a "5-percent shareholder" shall be determined (u) by substituting "4.5 percent" for "5 percent" each place it appears in such provisions, (v) without giving effect to the following provisions: Treasury Regulations Sections 1.382-2T(g)(2), 1.382-2T(g)(3), 1.382-2T(h)(2)(iii) and 1.382-2T(h)(6)(iii), (w) by treating every Person or Public Group which owns stock, whether directly or by attribution, as directly owning such Stock notwithstanding any further attribution of such Stock to other Persons and notwithstanding Treasury Regulations Section 1.382-2T(h)(2) (i) (A), (x) by substituting the term "Person" in. place of "individual" in Treasury Regulations Section 1.382-2T(g)(1)(i), (y) by taking into account ownership of Stock at any time during the "testing period" as defined in Treasury Regulations Section 1.382-2T(d)(1), and (z) by treating each day during the testing period as if it were a "testing date" as defined in Treasury Regulations Section 1.382-2T(a)(2)(i). In addition, for the purpose of determining whether any Person or Public Group has a Prohibited Ownership Percentage

as of any date, the definition of stock set forth in Subparagraph A(15) of Section I shall be applied in lieu of the definition in Treasury Regulations Section 1. 382-2T(f)(18), except that any option shall be treated as Stock only to the extent treating it as Stock would cause an increase in ownership of such Person and such option would be deemed exercised pursuant to Treasury Regulations. in effect from time to time (disregarding whether treating such option as exercised would cause an ownership change).

(14)    Public Group. A "public group" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T(f)(13), excluding any "direct public group" with respect to the Company, as that term is used in Treasury Regulations Section 1.382-2T(j)(2)(ii).

(15)    Stock. All classes of stock of the Company, all options to acquire stock of the Company and all other interests that would be treated as stock in the Company pursuant to Treasury Regulations Section 1.382-2T(f)(18)(iii), other than (x) stock described in Section 1504(a)(4) of the Internal Revenue Code and (y) stock that would be described in such Section 1504(a)(4) but is not so described solely because it is entitled to vote as a result of dividend arrearages. As used in Article Eleventh, the term "option" shall have the meaning set forth in Treasury Regulations Section 1.382-2(T)(h)(4).

(16)    Tax Benefits. The net operating loss carryovers and capital loss carryovers to which the Company is entitled under the Internal Revenue Code, free of restrictions under Section 382 of the Internal Revenue Code.

(17)    Testing Date Action. Any Transfer or acquisition of Stock or any other action (including the acquisition or issuance of an option to Transfer or acquire stock), if the effect of such Transfer, acquisition or other action would be to cause a "testing date" with respect to the Company within the meaning of Treasury Regulations Section 1.382-2T(a)(2)(i), determined by treating every Person and Public Group which has a Prohibited Ownership Percentage as a 5-percent shareholder as used in such Section.

(18)    Transfer. Any means of conveyance of legal or beneficial ownership of. Stock, whether such ownership is direct or indirect, voluntary or involuntary, including, without limitation, an indirect transfer of ownership through the transfer of any ownership interest of any entity that owns Stock

(19)    Transferee Undertaking. A duly executed written undertaking for the benefit of the Company by any transferee pursuant to which the transferee agrees that (i) it will not take any of the following actions without the prior consent of the Board of Directors: (x) acquire any additional Stock, (y) Transfer any Stock in violation of Paragraph B of Section I, or (z) take or cause to be taken any Testing Date Action, (ii) upon request by the Company, it will furnish or cause to be furnished to the Company all certificates representing Stock held of record or beneficially, directly or indirectly, by it or by any Person controlling, controlled by or under common control with it for the purpose of placing a legend on such certificates to reflect the undertakings described in clause (i) above, (iii) it acknowledges that stop transfer orders may be entered with the transfer agent (or agents) and the registrar (or registrars) of stock against the transfer of Stock subject to the undertakings described in clause (i) above except in compliance with the requirements of such undertakings, and (iv) it will agree to such other actions and remedies as the Company may reasonably request in order to preserve the Tax Benefits.

(20)    <u>Treasury Regulations</u>. The regulations promulgated by the Secretary of the Treasury under the Internal Revenue Code. Any reference to a particular Treasury Regulation or Section or provision thereof shall be deemed to also refer to any successor Regulation or Section or provision having similar effect.

B.    <u>Transfer Restrictions</u>.

Unless otherwise consented to or waived by the Board of Directors, the following Transfers and actions shall be prohibited:

(1)    <u>General</u>. No Person shall Transfer any stock to any other Person to the extent that such Transfer, if effected, (i) would cause the transferee or any Person or Public Group to have a Prohibited Ownership Percentage, or (ii) would increase the ownership percentage of any transferee or any Person or Public Group having a Prohibited Ownership Percentage.

(2)    <u>Additional Restrictions on Transform Involving Effective Date Tier Entities</u>. In addition to the restrictions under Subparagraph B(i), (i) no Effective Date Tier Entity shall Transfer any stock, and no other Person shall Transfer any Stock to an Effective Date Tier Entity if, in either case, after such Transfer, there would be a 47 Percentage Point Increase, and (ii) no Effective Date Tier Entity shall take any other action (including the acquisition or issuance of an option to Transfer or acquire Stock) if, after such action, there would be a 47 Percentage Point Increase.

(3)    <u>Additional Restrictions on Transfers Involving Other Permitted Holders</u>. In addition to the restrictions under Subparagraph B(i), (i) no other Permitted Holder shall Transfer any Stock, and no other Person shall Transfer any Stock to an Other Permitted Holder, if, in either case, such Transfer would constitute a Testing Date Action, and (ii) no Other Permitted Holder shall take any other action that would constitute a Testing Date Action.

(4)    <u>Additional Restrictions under Transferee Undertakings</u>. In addition to the restrictions under Subparagraph B(1), (i) no Person who has delivered a Transferee Undertaking shall Transfer any Stock, and no Person shall Transfer any Stock to any Person who has delivered a Transferee Undertaking, if, in either case, such Transfer would result in a violation of such Transferee Undertaking, and (ii) no Person who has delivered a Transferee Undertaking shall take or cause to be taken any other action that would constitute a Testing Date Action.

(5)    <u>Exception</u>. Notwithstanding anything herein to the contrary, the transfer restrictions set forth in this Paragraph B shall not apply to any shares of Series D Stock of the Company which were issued and outstanding on the Article Eleventh Effective Date.

C.    <u>Permitted Transfers</u>.

(1)    <u>General</u>. Unless otherwise restricted under Paragraph B of Section I or under a Transferee Undertaking or other agreement, Transfers of Stock may be made without the consent of the Board of Directors.

(2)    <u>Transfers by Effective Date Tier Entities</u>. Upon petition by any Effective Date Tier Entity, the Board of Directors shall consent to a proposed Transfer of Stock that

174

complies with Subparagraph B(2) of Section I but would otherwise be prohibited pursuant to Subparagraph B(l) of Section I if it determines that (i) after giving effect to such Transfer, the percentage of Stock owned by all Persons and Public Groups with a Prohibited Ownership Percentage will not have increased by more than 40 percentage points over the lowest percentage of Stock owned by such Persons and Public Groups at any time during the three-year period preceding the proposed date of such Transfer (such determination to be made in accordance with the provisions of Treasury Regulations Section 1.382-2T(c)) and (ii) the proposed transferee shall have delivered a Transferee Undertaking.

(3)     <u>Transfers by Permitted Transferees</u>. Upon petition by any Permitted Transferee, the Board of Directors shall consent to a proposed Transfer of stock or Testing Date Action that would otherwise be prohibited pursuant to Subparagraph B(i) or B(4) of Section I or pursuant to any Transferee undertaking if it determines that (i) after such proposed Transfer or. Testing Date Action there would not be an Ownership Change and (ii) in the case of any such proposed Transfer that, if effected, would otherwise be prohibited under Subparagraph B(1) of Section I, such Transfer would otherwise be permitted under Subparagraph C(2) if such Transfer were proposed to be made by an Effective Date Tier Entity.

(4)     <u>Certain Additional Transfers to Permitted Transferees</u>. Upon petition by any Permitted Transferee, the Board of Directors shall consent to a proposed Transfer of additional stock to such Permitted Transferee from a Person constituting an Effective Date Tier Entity or another Permitted Transferee if it determines that such proposed Transfer would otherwise be permitted under Subparagraph C(2) or C(3) of Section I, as the case may be.

(5)     <u>Transfers by Other Permitted Holders</u>. Upon petition by any other Permitted Holder, the Board of Directors shall consent to a proposed Transfer of Stock or Testing Date Action that would otherwise be prohibited pursuant to Subparagraph B(1), B(3) or B(4) of Section I or pursuant to any Transferee Undertaking if it determines that (i) after such proposed Transfer or Testing Date Action there would not be an Ownership Change and (ii) in the case of any such proposed Transfer that, if effected, would otherwise be prohibited under Subparagraph (B)(1) of Section I, such Transfer would not cause a 47 Percentage Point Increase and the proposed transferee shall have delivered a Transferee Undertaking.

D.     <u>Waivers.</u> Notwithstanding anything herein to the contrary, the Board of Directors may waive any of the restrictions contained in Paragraph B of Section I of this Article Eleventh: (1) in the case of any issuance of Stock by the Company which would otherwise be prohibited under Subparagraph B(1) of Section I, if the transferee agrees to be bound to the restrictions applicable to Permitted Transferees; (2) in the event of a tender or exchange offer within the meaning of the Securities Exchange Act of 1934, as amended, to acquire Stock constituting more than fifty percent in value of the outstanding Common Stock of the Company, so long as such waiver shall apply to all Transfers pursuant to such tender or exchange offer; (3) in connection with any Transfers of Stock in connection with underwritten offerings of such Stock; (4) in connection with any investment in or acquisition of a business or any business combination involving the Company or any subsidiary of the Company; and (5) in any other instance in which the Board of Directors reasonably and in good faith determines that a waiver would be in the best interests of the Company.

175

II.    Attempted Transfer in Violation of Transfer Restrictions.

Unless the consent or waiver of the Board of Directors is obtained as provided in Paragraph C or D of Section I, and except as provided in Paragraph C of Section II below, any attempted Transfer of shares of stock of the Company in excess of the shares that could be Transferred to the transferee without restriction under Paragraph B of Section I is not effective to transfer ownership of such excess shares (the "Prohibited Shares") to the purported acquirer thereof (the "Purported Acquirer"), and the Purported Acquirer shall not be entitled to any rights as a shareholder of the Company with respect to the Prohibited Shares, including, without limitation, the right to vote or to receive dividends with respect thereto. Nothing contained in this Article Eleventh shall preclude the settlement of any transaction involving Stock entered into through the facilities of the New York Stock Exchange or any other national securities exchange. The application of the provisions and remedies described in the first sentence of this Section II and in Paragraphs A, B and C of Section II below shall be deemed not to so preclude any such settlement. Paragraphs A, B and C below shall apply only in the case of violations of the restrictions contained in Subparagraph B(1) of Section I.

A.    Transfer of Certificates; Sale of Stock. Upon demand by the Company, the Purported Acquirer shall transfer any certificate or other evidence of purported ownership of the Prohibited Shares within the Purported Acquirer's possession or control, together with any dividends or other distributions paid by the Company with respect to the Prohibited Shares that were received by the Purported Acquirer (the "Prohibited Distributions"), to an agent to be designated by the Company (the "Agent").

If the Purported Acquirer has sold the Prohibited Shares to an unrelated party in an arms-length transaction after purportedly acquiring them, the Purported Acquirer shall be deemed to have sold the Prohibited Shares for the Agent, and in lieu of transferring the Prohibited Shares and Prohibited Distributions to the Agent shall transfer to the Agent the Prohibited Distributions and the proceeds of such sale (the "Resale Proceeds") except to the extent that the Agent grants written permission to the Purported Acquirer to retain a portion of the Resale Proceeds not exceeding the amount that would have been payable by the Agent to the Purported Acquirer pursuant to Paragraph B of Section II if the Prohibited Shares had been sold by the Agent rather than by the Purported Acquirer. Any purported Transfer of the Prohibited Shares by the Purported Acquirer, other than a transfer described in one of the two preceding sentences (unless such transfer itself violated the provisions of Article Eleventh), shall not be effective to transfer any ownership of the Prohibited Shares.

B.    Allocation and Distribution of Proceeds. The Agent shall sell in an arms-length transaction (through the New York Stock Exchange, if possible) any Prohibited Shares transferred to the Agent by the purported Acquirer, and the proceeds of such sale (the "Sales Proceeds"), or the Resale Proceeds, if applicable, shall be allocated to the Purported Acquirer up to the following amount: (1) where applicable, the purported purchase price paid or value of consideration surrendered, by the Purported Acquiror for the Prohibited Shares and (2) where the purported Transfer of the Prohibited Shares to the Purported Acquirer was by gift, inheritance, or any similar purported transfer, the fair market value of the Prohibited Shares at the time of such purported Transfer. Any Resale Proceeds or Sales Proceeds in excess of the amount allocable to the Purported Acquirer pursuant to the preceding sentence, together with any Prohibited Distributions (such excess amount and Prohibited Distributions are collectively the "Subject Amounts"), shall be transferred to an entity designated by the Company that is described in Section 501(c)(3) of the Internal Revenue Code (the "Designated Charity"). In no event shall any such Prohibited Shares

176

or Subject Amounts inure to the benefit of the Company or the Agent, but such Subject Amounts may be used to cover expenses incurred by the Agent in performing its duties.

C.    <u>Limitation on Enforceability</u>. Notwithstanding anything herein to the contrary, with respect to any Transfer of Stock which would cause a Person or Public Group (the "Prohibited Party") to violate a restriction provided for in subparagraph  B(1) of Section I only on account of the attribution to the Prohibited Party of the ownership of stock by a Person or Public Group which is not controlling, controlled by or under common control with the Prohibited Party, which ownership is nevertheless attributed to the Prohibited Party, Subparagraph B(1) of Section I shall not apply in a manner that would invalidate such Transfer. In such case, the Prohibited Party and any Persons controlling, controlled by or under common control with the Prohibited Party (collectively, the "Prohibited Party Group") shall automatically be deemed to have disposed of, and shall be required to dispose of, sufficient shares of Stock (which shares shall consist only of shares held legally or beneficially, whether directly or indirectly, by any member of the Prohibited Party Group, but not shares held through another Person, other than shares held through a Person acting as agent or fiduciary for any member of the Prohibited Party Group, and which shares shall be disposed of in the inverse order in which they were acquired by members of the Prohibited Party Group) to cause the Prohibited Party, following such disposition, not to be in violation of Subparagraph B(1) of Section I; provided that in the event no member of the Prohibited Party Group (i) is an Effective Date Tier Entity, Permitted Transferee or Other Permitted Holder and (ii) had any actual knowledge that such Transfer was prohibited under Subparagraph B(l) of Section I, such disposition shall only be effected to the extent necessary in order to prevent an Ownership Change. Such disposition shall be deemed to occur simultaneously with the Transfer giving rise to the application of this provision, and such number of shares which are deemed to be disposed of shall be considered Prohibited Shares and shall be disposed of through the Agent as provided in Paragraph B of Section II, except that the maximum amount payable to the Prohibited Party in connection with such sale shall be the fair market value of the Prohibited Shares at the time of the Prohibited Transfer.

D.    <u>Other Remedies</u>. In the event that the Board of Directors determines that a Person proposes to take any action in violation of Paragraph B of Section I, or in the event that the Board of Directors determines after the fact that an action has been taken in violation of Paragraph B of Section I, the Board of Directors, subject to the second and third sentences of the introductory paragraph of Section II, may take such action as it deems advisable to prevent or to refuse to give effect to any Transfer or other action which would result, in such violation, including, but not limited to, refusing to give effect to such Transfer or other action on the books of the Company or instituting proceedings to enjoin such Transfer or other action. If any Person shall knowingly violate Paragraph B of Section I, then that Person and all other Persons controlling, controlled by or under common control with such Person shall be jointly and severally liable for, and shall pay to the Company, such amount as will, after taking account of all taxes imposed with respect to the receipt or accrual of such amount and all costs incurred by the Company as a result of such loss, put the Company in the same financial position as it would have been in had such violation not occurred.

III.    <u>Prompt Enforcement Against Purported Acquiror</u>.

Within 30 business days of learning of a purported Transfer of Prohibited Shares to a Purported Acquiror or a Transfer of stock to a Prohibited Party, the Company through its secretary or any Assistant Secretary shall demand that the Purported Acquiror or Prohibited Party surrender to the Agent the certificates representing the Prohibited Shares, or any Resale Proceeds, and any

177

Prohibited Distributions, and if such surrender is not made by the Purported Acquiror or Prohibited Party within 30 business days from the date of such demand, the Company shall institute legal proceedings to compel such surrender; provided, however, that nothing in this Section III shall preclude the Company in its discretion from immediately bringing legal proceedings without a prior demand, and also provided that failure of the Company to act within the time periods set out in this Section III shall not constitute a waiver of any right of the Company to compel any transfer required by Section II. Upon a determination by the Board of Directors that there has been or is threatened a purported Transfer of Prohibited Shares to a Purported Acquiror or a Transfer of stock to a Prohibited Party or any other violation of Paragraph B of Section I, the Board of Directors may authorize such additional action as it deems advisable to give effect to the provisions of this Article Eleventh, including, without limitation, refusing to give effect on the books of the Company to any such purported Transfer or instituting proceedings to enjoin any such purported Transfer.

IV.     Obligation to Provide Information.

        The Company may require as a condition to the registration of the Transfer of any stock that the proposed transferee furnish to the Company all information reasonably requested by the Company with respect to all the direct or indirect ownership of Stock by the proposed transferee and by Persons controlling, controlled by or under common control with the proposed transferee.

V.      Legends.

        All certificates evidencing Stock that is subject. to the restrictions on transfer set forth in this Article Eleventh shall bear a conspicuous legend referencing such restrictions.

VI.     Further Actions.

        Subject to the second and third sentences of the introductory paragraph of Section II, nothing contained in this Article Eleventh shall limit the authority of the Board of Directors to take such other action to the extent permitted by law as it deems necessary or advisable to protect the Company and the interests of the holders of its securities in preserving the Tax Benefits. Without limiting the generality of the foregoing, in the event of a change in law (including applicable regulations) making one or more of the following actions necessary, in the case of actions described in clauses (B), (C) and (D) below, or desirable, in the case of actions described in clause (A) below, the Board of Directors may (A) accelerate the Expiration Date, (B) extend the Expiration Date, (C) conform any terms or numbers set forth in the transfer restrictions in Section I to make such terms consistent with the Internal Revenue Code and the Treasury Regulations following any changes therein to the extent necessary to preserve the Tax Benefits, or (D) conform the definitions of any terms set forth in this Article Eleventh to the definitions in effect following such change in law; provided that the Board o€ Directors shall determine in writing that such acceleration, extension, change or modification is reasonably necessary to preserve the Tax Benefits or that the continuation of these restrictions is no longer reasonably necessary for the preservation of the Tax Benefits, which determination shall be based upon an opinion of legal counsel to the Company and which determination shall be filed with the Secretary of the Company and mailed by the Secretary to all stockholders of the Company within ten days after the date of any such determination.

VII.    Severability.

        If any provision of this Article Eleventh or the application of any such provision to any

Person or under any circumstance shall be held invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Article Eleventh.

APPENDIX B-4

## REGISTRATION RIGHTS

1.    <u>Demand Registrations</u>.

(a)    <u>Requests for Registration</u>. At any time and from time to time after the Event Date, but subject to the provisions of this Appendix B-4, the Supplemental Benefit Committee may request registration (a "<u>Registration Request</u>") under the Securities Act of Registrable Securities on Form SA or any similar long-form registration statement ("<u>Long-Form Registrations</u>") or on Form S-2 or S-3 or any similar short-form registration statement ("<u>Short-Form Registrations</u>"), if available (any such registration, a "<u>Demand Registration</u>"). All offerings of securities pursuant to Demand Registrations shall be underwritten public offerings, except as provided in Section 1(i) below. Each Registration Request shall specify the approximate number of Registrable Securities requested to be registered and the anticipated per share price range, if applicable. Any Demand Registration may provide for offerings to be made on a continuous or delayed basis under Rule 415 under the Securities Act (such Rule, together with any successor or comparable rule, "<u>Rule 415</u>"), if (i) so specified in the related Registration Request and permitted by applicable rules and regulations under the Securities Act, and (ii) such Demand Registration is made as a Short-Form Registration (a "<u>Rule 415 Demand Registration</u>"). Each Rule 415 Demand Registration and any underwritten public offering thereunder closed within 90 days of the effectiveness of the registration statement filed pursuant to the related Registration Request shall be deemed a single Demand Registration, and each additional underwritten public offering made under such Rule 415 Registration Statement shall be deemed an additional Demand Registration (and each request for such additional Demand Registration shall be deemed an additional Registration Request). No such offering closed under a Rule 415 Demand Registration after the 90-day period referred to in the preceding sentence shall count as one of the five Demand Registrations for which Parent is required to pay Registration Expenses in accordance with Section 1(g), unless the Supplemental Benefit Committee shall so instruct Parent in the related Registration Request.

(b)    <u>Long Form Registrations</u>. The aggregate value of any Registrable Securities to be sold in a public offering under any Long-Form Registration must equal at least $10,000,000, based on the anticipated per share price set out in the related Registration Request.

(c)    <u>Short-Form Registrations</u>. The aggregate value of the Registrable Securities requested to be registered in any Short-Form Registration must equal at least $5,000,000, based on the anticipated per share price set out in the related Registration Request.

(d)    <u>Restrictions on all Demand Registrations</u>.

(i)    Parent will not be obligated to effect any Demand Registration within 180 days after the closing of an underwritten public offering pursuant to any previous Parent Registration or Demand Registration (or such shorter period to which the lead underwriter(s) under such previous Parent Registration or Demand Registration shall consent). As used herein, "<u>Parent Registration</u>" shall mean any underwritten public offering of equity securities of Parent or any of its subsidiaries, other than Permitted Parent Registrations.

(ii)    Upon the occurrence and during the continuance of any Blackout Period, Parent shall postpone the filing or effectiveness of any registration statement otherwise

required to be prepared and filed by Parent pursuant to any Demand Registration, and the Supplemental Benefit Trust shall not sell any Registrable Securities previously registered on its behalf under a Demand Registration.

At any time during the continuance of a Blackout Period, the Supplemental Benefit Committee shall have the right by written notice to Parent to withdraw any Registration Request and related Demand Registration pursuant to which Parent would otherwise be required to prepare and file a registration statement or under which the Supplemental Benefit Trust would otherwise be permitted to offer Registrable Securities to the public. In the event of such withdrawal, such Demand Registration shall not be counted for purposes of determining the number of Demand Registrations for which Parent is required to pay the Registration Expenses pursuant to Section 1(g), and Parent will pay or reimburse the Supplemental Benefit Trust for all Registration Expenses incurred in connection with such Demand Registration. In the event the Supplemental Benefit Committee terminates a proposed underwritten offering under a Rule 415 Demand Registration for which Parent is not required to pay Registration Expenses (in accordance with Section 1(a)) during a Blackout Period, Parent will pay or reimburse the Supplemental Benefit Trust for all of the expenses of such proposed underwritten offering.

(e)     Parent Registrations. Notwithstanding any other provision of this Appendix B-4, at any time, and from time to time, Parent and its subsidiaries may undertake an unlimited number of registrations under the Securities Act of (A) their debt securities for any reason; (B) their equity securities in connection with an acquisition, merger, consolidation, tender offer, corporate reorganization, exchange offer, or similar transaction involving Parent or any of its subsidiaries; (C) their equity securities in connection with any registration on Form S-8 or any successor form; (D) their equity securities in connection with the settlement of litigation or threatened litigation; provided, that neither Parent nor any of its subsidiaries shall register more than 10 million shares of its equity securities with respect to any such settlement; (E) Parent's equity securities in connection with the exercise of warrants outstanding on the Effective Date; and (F) equity securities of any of Parent's subsidiaries, other than the Company, in connection with any public offering of such securities (collectively, "Permitted Parent Registrations"). After the expiration of the Window Period, Parent and its subsidiaries may undertake an unlimited number of registrations of their securities under the Securities Act for any purpose, subject only to Section 2.

(f)     Certain Limitations on Registrations by Parent During the Window Period. During the Window Period, Parent shall not, and shall not permit any of its subsidiaries to, (i) register any equity securities under the Securities Act, other than pursuant to Demand Registrations or registrations to which the Supplemental Benefit Committee has consented under Sections 8 or 9, or (ii) sell any equity securities registered prior to the commencement of the Window Period, except, in both such cases, pursuant to Permitted Parent Registrations.

(g)     Demand Registration Expenses. Parent shall pay all Registration Expenses incurred in connection with the first five Demand Registrations; provided, that for each of the second through the fifth of such Demand Registrations, Parent shall not be required to pay any fees of counsel to the Supplemental Benefit Committee in excess of $50,000 per Demand Registration; and, provided, further, that Parent shall not be required to pay SEC filing fees in connection with such five Demand Registrations for more than the aggregate number of shares of Parent Common into which the aggregate number of shares of Parent Class B Common held by the Supplemental Benefit Trust may be converted (plus fees in respect of not more than the aggregate number or amount, if any, of any other Registrable Securities held by the Supplemental

Benefit Trust). The Supplemental Benefit Trust shall pay all Registration Expenses for each Demand Registration after such first five Demand Registrations.

(h) <u>Selection of Underwriters</u>. The Supplemental Benefit Committee shall have the right to select its counsel and, in connection with any underwritten public offering, the investment bankers and underwriters under any Demand Registration; provided, however, that the lead underwriter(s) in any such underwritten public offering shall be among the top ten under-writing firms, by dollar volume of equity offerings in which such firms acted as lead underwriters, determined on the basis of the most recently available information; provided, further, that in the event no such top underwriting firm will agree to act as lead underwriter, the Supplemental Benefit Committee will select one or more nationally recognized firms as its lead underwriter(s); and provided, further, that in selecting its underwriters and counsel in connection with any such underwritten public offering. the Supplemental Benefit Committee shall give due consideration to the cost savings and efficiencies which may arise from using the same underwriters and counsel, respectively, in connection with each other Demand Registration for which Parent is required to pay Registration Expenses pursuant to Section 1(g) and shall consult with Parent prior to changing such underwriters or counsel in connection with any such Demand Registration.

(i) <u>Market Offerings</u>. in addition to underwritten public offerings, the Supplemental Benefit Trust may make Market Offerings under any Rule 415 Demand Registration. Until the Piggyback Rights Revision Date, the Supplemental Benefit Trust shall not make Market Offerings, whether under a Rule 415 Demand Registration or in reliance on Rule 144 under the Securities Act or otherwise (such offerings and any related sales, collectively, "<u>Trust Market Offerings</u>"), where the aggregate number of shares sold pursuant to Trust Market Offerings in any three-month period would exceed the amounts permitted under Rule 144(e), assuming for such purpose that all Trust Market Offerings were made under Rule 144 and that the Supplemental Benefit Trust was an "affiliate" of Parent within the meaning of Rule 144. As used herein, the term "<u>Market Offerings</u>" shall mean any offering or sale of securities into an existing trading market for outstanding securities of the same class either (x) on or through the facilities of a national securities exchange or the NASD National Market System or (y) to or through a market maker otherwise than on an exchange, but not including any private placement transaction.

2. <u>Registrations After the Window Period</u>.

(a) <u>Parent Initiated Registrations</u>. After the expiration of the Window Period, Parent shall notify the Supplemental Benefit Committee in writing if it desires to register any Parent Common under the Securities Act in connection with a public underwritten offering (a "<u>Parent Registration Notice</u>"), other than in connection with a Permitted Parent Registration, as to which no notice shall be required; provided, that Parent shall not give a Parent Registration Notice during the Supplemental Benefit Trust's Registration Period or the period referred to in Section 2(a)(ii) below. Each Parent Registration Notice shall set out (x) the number of shares which Parent proposes to sell in such offering, (y) the estimated per share price range and (z) the estimated number of shares of Parent Common which could be included in such offering without adversely affecting the marketability thereof, as determined by Parent's lead underwriter(s) (which shall be nationally recognized investment banking firm(s)).

(i) Parent shall have the exclusive right to attempt to close the offering described in any Parent Registration Notice within 90 days of the date thereof (the "<u>Parent's 90 Day Period</u>"), and Parent will not be obligated to effect any Demand Registration, and the Supplemental Benefit Trust will not offer or sell any Parent Common Equity in an underwritten

public offering (except as provided in Section 2(a)(iii)) or make any Trust Market Offerings, during Parent's 90 Day Period, and if Parent closes any such offering, during a further period of 180 days after such closing or such shorter period to which the lead underwriter(s) under such offering shall consent in writing (the "Parent's Standstill Period;" the Parent's 90 Day Period and the Parent's Standstill Period, collectively, the "Parent's Registration Period").

(ii)    If Parent or any of its subsidiaries closes an offering pursuant to Section 2(a)(i), Parent shall not be entitled to give any further notice pursuant to Section 2(a) for the period beginning on the expiration of the Parent's Registration Period and ending 90 days thereafter, during which 90-day period the Supplemental Benefit Committee shall have the exclusive right to make a Registration Request.

(iii)    The Supplemental Benefit Committee shall have the right, upon written notice to Parent (a "Piggyback Notice"), which notice shall be given within 15 business days after receipt of the Parent's Registration Notice, to include in the offering described in such Parent's Registration Notice such number of shares of Parent Common Equity as are specified in such Piggyback Notice, up to a number of shares equal to the greater of (x) the total available capacity of the offering as finally determined by Parent's lead underwriter(s), less the number of shares of Parent Common Equity which Parent finally determines to sell in the offering or (y) one-half of such total available capacity. For purposes of determining the number of shares it desires to include in such offering, the Supplemental Benefit Committee shall be entitled to have a representative be present at (but not to participate in) any pricing meeting. Any registration initiated by Parent pursuant to a Parent Registration Notice as to which the Supplemental Benefit Trust has elected to participate pursuant to this Section 2(a)(iii) is herein a "Parent Initiated Piggyback Registration."

(b)    Supplemental Benefit Trust Initiated Registrations. After the expiration of the Window Period, any Registration Request made by the Supplemental Benefit Committee in connection with a public underwritten offering shall set out (x) the number of shares which the Supplemental Benefit Trust proposes to sell in such offering, (y) the estimated per share price range, and (z) the number of shares of Parent Common which could be included in such offering without adversely affecting the marketability thereof, as determined by the Supplemental Benefit Trust's lead underwriter(s) (a "Post-Window Period Registration Request"); provided, that the Supplemental Benefit Committee shall not make any Post-Window Period Registration Request during (x) the Parent's Registration Period, (y) the period referred to in Section 2(b)(ii) below, or (iii) the period beginning on the expiration of the Window Period and ending 90 days after the later of (A) the expiration of the Window Period or (B) the expiration of 180 days after the closing of the last underwritten public offering made pursuant to a Demand Registration during the Window Period (or such shorter period to which the lead underwriters under such offering shall consent).

(i)    The Supplemental Benefit Committee shall have the exclusive right to attempt to close the offering described in any Post-Window Period Registration Request within 90 days of the date thereof (the "Supplemental Benefit Trust's 90 Day Period"), and Parent, except as otherwise provided in this Section 2(b), will not (x) register any public offering of Parent Common Equity under the Securities Act or (y) offer or sell in any public offering any Parent Common Equity previously registered by it pursuant to Rule 415 (in both such cases, other than pursuant to Permitted Parent Registrations) during the Supplemental Benefit Trust's 90 Day Period, and if the Supplemental Benefit Committee closes any such offering, during a further period of 180 days after such closing or such shorter period to which the lead underwriters under

such offering shall consent in writing (the "Supplemental Benefit Trust's Standstill Period;" the Supplemental Benefit Trust's 90 Day Period and the Supplemental Benefit Trust's Standstill Period, collectively, the "Supplemental Benefit Trust's Registration Period").

(ii)     If the Supplemental Benefit Committee closes an offering pursuant to Section 2(b), the Supplemental Benefit Committee shall not be entitled to give Parent a Post-Window Period Registration Request for the period beginning on the expiration of the Supplemental Benefit Trust's Registration Period and ending 90 days thereafter, during which 90 day period Parent shall have the exclusive right to give a Parent Registration Notice.

(iii)     Parent shall have the right, upon written notice to the Supplemental Benefit Committee, which notice shall be given within 15 business days after the receipt of a Post-Window Period Registration Request, to include in any public offering under a Post-Window Period Registration Request such number of shares of Parent Common Equity as are specified in such notice, up to a number of shares equal to the greater of (x) the total available capacity of the offering as finally determined by the Supplemental Benefit Trust's lead underwriter(s), less the number of shares of Parent Common Equity which the Supplemental Benefit Committee finally determines to sell in such offering, or (y) one-half of such total available capacity. For purposes of determining the number of shares it desires to include in such offering, Parent shall be entitled to have a representative present at (but not to participate in) any pricing meeting. Any registration initiated by the Supplemental Benefit Committee pursuant to a Post-Window Period Registration Request as to which the Parent has elected to participate in the offering pursuant to this Section 2(b)(iii) is herein a "Supplemental Benefit Trust Initiated Piggyback Registration." (Parent Initiated Piggyback Registrations and Supplemental Benefit Trust Initiated Piggyback Registrations are, collectively, "Piggyback Registrations.")

(c)     Piggyback Registration Expenses. Subject to Section 1(g), the party that initiates a Piggyback Registration shall pay all Registration Expenses of such Piggyback Registration; provided, that each party participating in such Piggyback Registration shall pay its pro rata share of SEC and State "blue sky" filing fees and its pro rata share of any and all underwriters' discounts and commissions.

(d)     Selection of Underwriters. In the case of a Parent Initiated Piggyback Registration, the selection of investment bankers and underwriters (including lead underwriters) for the offering will be made by Parent. In the case of a Supplemental Benefit Trust Initiated Piggyback Registration, the selection of the investment banker(s) and underwriters (including lead underwriters) shall be made in accordance with Section 1(h).

(e)     Revised Piggyback Rights. At such time (the "Piggyback Rights Revision Date") as both (i) at least three years have passed since the Supplemental Benefit Trust acquired (as such term is used in Rule 144 of the Securities Act) the Registrable Securities and (ii) either (A) the Supplemental Benefit Trust owns, directly and indirectly, less than 5 percent of the total issued and outstanding Parent Common Equity, or (B) Parent shall have furnished the Supplemental Benefit Committee with an opinion of counsel to Parent knowledgeable in securities law matters to the effect that the Supplemental Benefit Committee is not an "affiliate" of Parent (as such term is defined under Rule 144 of the Securities Act) and has not been such an affiliate for the preceding three months (it being understood that it is within the sole discretion of Parent as to whether or not to obtain such an opinion), then the provisions set forth in Sections 2(a)(ii) and 2(b) above and any other provisions in Section 2(a) which restrict Parent's ability to initiate and file registrations and sell securities at any time shall terminate and the number of Registrable

184

Securities that the Supplemental Benefit Committee shall be entitled to include in any Parent Initiated Piggyback Registration shall be limited to the amount described in clause (x) of the first sentence of Section 2(a)(iii).

3.    Holdback Agreements. In connection with each other's underwritten public offerings, the Supplemental Benefit Trust and Parent each agree to enter into such reasonable and customary restrictions on the sale or distribution (including sales pursuant to Rule 144) of Parent's equity securities as may be requested by the underwriters managing such registered public offering.

4.    Registration Procedures. Whenever the Supplemental Benefit Committee requests that any offering of Registrable Securities be registered pursuant to this Appendix B-4, Parent will use its best efforts to effect the registration of such offering in accordance with the intended method of disposition thereof, and pursuant thereto Parent will as expeditiously as possible:

(a)    prepare and file with the SEC a registration statement with respect to such Registrable Securities in cooperation with the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, and use its best efforts to cause such registration statement to become effective (provided that before filing such registration statement or prospectus or any amendments or supplements thereto (other than any amendment or supplement in connection with any filing incorporated by reference into such registration statement or prospectus), Parent will furnish to the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, copies of such registration statement and all such other documents proposed to be filed);

(b)    in cooperation with the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith (other than with respect to any amendment or supplement in connection with any filing incorporated by reference into such registration statement or prospectus) as may be necessary to keep such registration statement effective until the completion of the disposition of the Registrable Securities to be sold thereunder or so long thereafter as a dealer is required to deliver a prospectus in connection with the offer or sale of any such securities;

(c)    comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement during such period in accordance with the intended methods of disposition;

(d)    furnish to the Supplemental Benefit Committee and its counsel and investment bankers and underwriters, if any, such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus) and such other documents as the Supplemental Benefit Committee may reasonably request in order to facilitate the disposition of the Registrable Securities in accordance with the intended methods of disposition;

(e)    use its best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as the Supplemental Benefit Committee reasonably requests and do any and all other acts and things as the Supplemental Benefit Committee may reasonably request in order to facilitate the disposition in accordance with the intended method of disposition in such jurisdictions of the Registrable Securities (provided that Parent will not be required to (i) qualify generally to do business in any jurisdiction where it would

185

not otherwise be required to qualify but for this subparagraph, (ii) subject itself to taxation in any such jurisdiction, or (iii) consent to general service of process in any such jurisdiction);

(f)     cause all such Registrable Securities to be listed on each securities exchange and national market quotation system on which similar securities issued by Parent are then listed or quoted;

(g)     provide a transfer agent and registrar for all such Registrable Securities not later than the effective date of such registration statement and furnish, or cause to be furnished, to each purchaser of Registrable Securities registered pursuant to this Appendix B-4 a certificate or certificates for a number of shares of Parent Common equal to the number of shares of Registrable Securities so purchased in the name of such purchaser or in such other name as such purchaser may direct;

(h)     enter into such customary agreements (including, if applicable, underwriting agreements in customary form) and take all such other actions as the Supplemental Benefit Committee or its investment bankers and underwriters, if any, reasonably request in order to facilitate the disposition of such Registrable Securities (including, without limitation, effecting a stock split or a combination of shares);

(i)     make available for inspection by the Supplemental Benefit Committee and its counsel, any investment bankers and underwriters, if any, accountants and other agents retained by the Supplemental Benefit Committee, all financial and other records, pertinent corporate documents and properties of Parent and its subsidiaries, and cause the officers, directors, employees and independent accountants of Parent and its subsidiaries to supply all information reasonably requested by the Supplemental Benefit Committee and such counsel, investment bankers and underwriters, accountants or agents in connection with the preparation and filing of such registration statement and any amendment or supplement thereto;

(j)     otherwise use its best efforts to comply with all applicable rules and regulations of the SEC, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least 12 months beginning with the first day of Parent's first full fiscal quarter after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(k)     permit the Supplemental Benefit Committee and its counsel, investment bankers and underwriters, if any, accountants and agents, to participate in the preparation of such registration statement and to require the insertion therein of material concerning the Supplemental Benefit Trust and its plan of distribution furnished to Parent in writing, which in the reasonable judgment of the Supplemental Benefit Committee and its counsel should be included; Parent will consider insertion in the registration statement of additional material proposed by the Supplemental Benefit Committee, provided, however, that Parent will make all final decisions with respect to the content of the registration statement (other than with respect to information concerning the Supplemental Benefit Trust and the Plan of Distribution), and, provided, further, that in the event Parent declines to include any such additional material proposed by the Supplemental Benefit Committee and the Supplemental Benefit Committee shall have been advised by counsel knowledgeable in securities laws (which counsel shall be reasonably satisfactory to Parent) to the effect that the failure to insert such material may present a material risk that the registration statement would be materially misleading or would omit to state a material

fact, the Supplemental Benefit Committee shall have the right to require Parent to withdraw such registration statement, in which event Parent will pay or reimburse the Supplemental Benefit Trust for all Registration Expenses incurred in connection with such registration statement, and such registration statement shall not count as one of the five Demand Registration Statements for which Parent is required to pay Registration Expenses as provided in Section 1(g).

(l)     in the event of the issuance of any stop order suspending the effectiveness of a registration statement, or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any Registrable Securities included in such registration statement for sale in any jurisdiction, use its reasonable best efforts promptly to obtain the withdrawal of such order;

(m)     obtain a cold comfort letter from Parent's independent public accountants and an opinion from Parent's counsel, in each case addressed to the Supplemental Benefit Committee in customary form and covering such matters of the type customarily covered by cold comfort letters and such legal opinions, respectively, as the Supplemental Benefit Committee may reasonably request; and

(n)     promptly notify the Supplemental Benefit Committee: (i) of the filing of any registration statement, any amendment or supplement thereto, any related prospectus and prospectus supplement and the effectiveness of such registration statement; (ii) of any request by the SEC for amendments or supplements to such registration statement or the prospectus related thereto or for additional information; (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such registration statement or the initiation of any proceedings for that purpose; (iv) of the receipt by Parent of any notification with respect to the suspension of the qualification of any of the Registrable Securities for sale under the securities or blue sky laws of any jurisdiction or the initiation of any proceeding for such purpose; and (v) of the existence of any fact of which Parent becomes aware which results in such registration statement, the prospectus related thereto or any document incorporated therein by reference containing an untrue statement of a material fact or omitting to state a material fact required to be stated therein or necessary to make any statement therein in light of the circumstances under which they were made not misleading; and, in the case of the notification relating to an event described in clause (v) hereof, Parent, except in the case of a Blackout as to which notice has been given under Section 1(d)(ii), shall promptly prepare and furnish to the Supplemental Benefit Committee and each investment banker and underwriter participating in the disposition of Registrable Securities, a reasonable number of copies of a prospectus supplemented or amended (or, if the prospectus is supplemented or amended by means of a filing under the Exchange Act, Parent shall advise the Supplemental Benefit Committee of such filing and furnish it with copies thereof) so that, as thereafter delivered to the purchasers of any such securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein in the light of the circumstances under which they were made not misleading.

The Supplemental Benefit Committee shall cooperate with Parent in connection with, and shall take, or cause to be taken, all actions reasonably requested by Parent that are necessary or customary for Parent to effect the registration of any Registrable Securities of the Supplemental Benefit Trust pursuant to this Appendix B-4.

The Supplemental Benefit Committee hereby agrees that, upon receipt of any notice of Parent of the happening of (A) any event of the kind described in clause (iii) of Section 4(n), the

Supplemental Benefit Trust will discontinue its disposition of Registrable Securities pursuant to the registration statement relating to such Registrable Securities, until the stop order shall have been lifted or rescinded; (B) any event of the kind described in Section 4(n)(iv), the Supplemental Benefit Trust will discontinue its disposition of Registrable Securities pursuant to the registration statement relating to such Registrable Securities in the jurisdiction with respect to which the suspension of the qualification of any of the Registrable Securities for sale has occurred, until the suspension shall have been lifted or rescinded; and (C) any event of the kind described in Section 4(n)(v), the Supplemental Benefit Trust will discontinue its disposition of Registrable Securities pursuant to the registration statement relating to such Registrable Securities until the Supplemental Benefit Committee's receipt of the copies of the supplemented or amended prospectus contemplated by Section 4(n)(v) and, if so directed by Parent, will deliver to Parent (at Parent's expense) all copies, other than permanent file copies, then in the Supplemental Benefit Committee or Supplemental Benefit Trust's possession of the prospectus relating to such Registrable Securities current at the time of receipt of such notice. In the event Parent gives notice pursuant to Section 4(n)(iii) or 4(n)(v) and the stop order, in the case of Section 4(n)(iii), continues for more than 30 days after such notice, or Parent fails to supplement or amend the prospectus to cure any material untrue statement or material omission within 30 days after such notice, in the case of Section 4(n)(v), the Supplemental Benefit Committee may withdraw the Demand Registration and the related Registration Request in respect of the registration affected by such notice. In the event of such withdrawal, such Demand Registration shall not be counted for the purposes of determining the number of Demand Registrations for which Parent is required to pay the Registration Expenses pursuant to Section 1(g), and Parent will pay and reimburse the Supplemental Benefit Trust for all Registration Expenses incurred by the Supplemental Benefit Trust in connection with such Demand Registration.

       5.    <u>Registration Expenses</u>. For purposes of this Appendix B-4, "<u>Registration Expenses</u>" shall mean all expenses incurred by Parent or the Supplemental Benefit Committee in connection with a Demand Registration or a Piggyback Registration, including without limitation all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, messenger and delivery expenses, and fees and disbursements of counsel to Parent and the Supplemental Benefit Committee and all independent certified public accountants, investment bankers and other persons retained by or on behalf of Parent or the Supplemental Benefit Committee.

       6.    <u>Indemnification</u>.

       (a)    Parent agrees to indemnify, to the extent permitted by law, the Supplemental Benefit Trust, its trustee, the Supplemental Benefit Committee, and each Supplemental Benefit Committee Member, each Supplemental Benefit Committee Member Alternate, and each other person who controls any of such entities within the meaning of the Securities Act against all losses, claims, damages, liabilities and expenses, including the fees and expenses of legal and other advisors, as incurred, arising out of any untrue or alleged untrue statement of material fact contained in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as any such statement is included therein in reliance on and in conformity with any information furnished in writing to Parent by or on behalf of the Supplemental Benefit Trust or the Supplemental Benefit Committee expressly for use therein or by the Supplemental Benefit Trust or Supplemental Benefit Committee's failure to deliver a copy of any prospectus after Parent has furnished the

Supplemental Benefit Trust or Supplemental Benefit Committee with a sufficient number of copies of the same.

(b) In connection with any registration statement in which the Supplemental Benefit Trust is participating, the Supplemental Benefit Committee on behalf of the Supplemental Benefit Trust, will furnish such information and affidavits as Parent reasonably requests for use in connection with any such registration statement or prospectus and, to the extent permitted by law, will indemnify Parent, the Company, their respective directors and officers and each person who controls Parent (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses arising out of any untrue or alleged untrue statement of material fact contained in the registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent that such untrue statement or omission is contained in any information or affidavit so furnished in writing by the Supplemental Benefit Trust or Supplemental Benefit Committee; provided, that the obligation to indemnify will be individual to the Supplemental Benefit Trust and will be limited to the net amount of proceeds received by the Supplemental Benefit Trust from the sale of Registrable Securities under such registration statement.

(c) Any claim for indemnification hereunder will be made in accordance with the Indemnification Procedures.

(d) In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in this Section 6 is due in accordance with the terms hereof but is for any reason held by a court to be unavailable on grounds of policy or otherwise, the Supplemental Benefit Trust and Parent, as between themselves, shall contribute to the aggregate losses, claims, damages, liabilities and expenses (including reasonable fees and expenses of legal and other advisors) to which Parent and any Indemnified Party may be subject in such proportion so that portion thereof for which the Supplemental Benefit Trust shall be responsible shall be limited to the portion finally determined by a court or the parties to any settlement to be directly attributable to an untrue statement of a material fact or an omission to state a material fact in a registration statement, preliminary prospectus, prospectus or any amendment or supplement thereto in specific reliance upon and in conformity with written information furnished to the Parent through an instrument duly executed by the Supplemental Benefit Committee, on behalf of the Supplemental Benefit Trust, stating that it is for use therein, and Parent shall be responsible for the balance; provided, that no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. For purposes of this Section 6(d), each person who controls the Supplemental Benefit Committee or the trustee under the Supplemental Benefit Trust within the meaning of the Securities Act shall have the same rights to contribution as the Supplemental Benefit Committee, and each person who controls Parent within the meaning of the Securities Act and each officer and director of Parent or Company shall have the same rights to contribution as Parent, subject in each case to the proviso in the immediately preceding sentence. Any Party entitled to contribution will, promptly after receipt of notice of commencement of any action, suit or proceeding against such party in respect of which a claim for contribution may be made against another party or parties under this Section 6(d), notify such party or parties from whom contribution may be sought, but the omission to so notify any party shall not relieve such party from any other obligation it may have under this Section 6(d) or otherwise except to the extent that such failure shall have been prejudicial to such party. Parent and the Supplemental Benefit Committee agree that it would not be just and equitable if their respective contribution

189

obligations were to be determined by pro rata allocation, by reference to the proceeds realized by them or in any manner which does not take into account the equitable considerations set forth in this Section 6(d).

(e)     The indemnification and contribution provided for hereunder will remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party, and will survive the transfer of securities.

7.     Participation in Underwritten Registrations. The Supplemental Benefit Trust may not participate in any underwritten offering unless the Supplemental Benefit Trust (a) agrees to sell its securities on the basis provided in any underwriting arrangements approved by the person or persons entitled to approve such arrangements and (b) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements. In connection with underwritten offerings under Demand Registrations, Parent shall enter into reasonable and customary indemnification agreements with the Supplemental Benefit Trust's underwriters.

8.     Third Party Registration Rights. Parent represents and warrants, to the Supplemental Benefit Trust that no person or entity other than Parent and the Company have any right, pursuant to statute, contract or otherwise, to require or cause Parent or the Company to register equity securities of Parent or the Company under the Securities Act. Without the prior written consent of the Supplemental Benefit Committee, Parent shall not, and shall cause the Company not to grant any such right to any person or entity to the extent that such right is exercisable during the Window Period or would restrict, limit or adversely affect the Supplemental Benefit Trust's registration rights during any Supplemental Benefit Trust's Registration Period.

9.     Additional Requests for Registration. Notwithstanding Sections 1(d) and 2(a), the Supplemental Benefit Committee may request the permission of Parent to register Registrable Securities pursuant to the terms hereof or during any Parent's Registration Period by notice to Parent. Notwithstanding Section 1(f) and 2(b), Parent or the Company may request the permission of the Supplemental Benefit Committee to register its equity securities during the Window Period or during any Supplemental Benefit Trust's Registration Period by notice to the Supplemental Benefit Committee (except that no such notice will be required in the case of a Permitted Parent Registration). Each such notice shall specify the nature and number of shares requested to be registered and the anticipated per share price range, if applicable.

10.     Notices. All notices, requests or other communications required or permitted to be given or made hereunder shall be in writing and shall be deemed to have been given when actually delivered or when delivered to a nationally recognized commercial courier for next day delivery, or when deposited in the United States mail, certified mail, return receipt requested, postage prepaid to the address of the parties as set forth below or at such other address as any party may furnish in writing to the other when transmitted by facsimile to the telecopy number for each party set forth below. Rejection or other refusal to accept, or inability to deliver because of change of address of which no notice was given, shall be deemed to be receipt of good notice, request, or other communication.

(i)     If to Parent:
Navistar International Corporation
455 North Cityfront Plaza Drive
Chicago, IL 60611

190

Attention: General Counsel
Telecopy: 312/836-3982

With copies to:

Kirkland & Ellis
Suite 5700
200 E. Randolph Drive
Chicago, IL 60610
Attention: Michael H. Kerr, P.C.
Telecopy: 312/861-2200

(ii)    If to the Supplemental Benefit Trust or Supplemental Benefit
        Committee:

        at such addresses and with copies to
        such persons as the Supplemental Benefit
        Committee shall from time to time notify
        Parent in writing.

## APPENDIX B-6

### [*RESERVED*]

**EXHIBIT D**

DEFINITION SUPPLEMENT

When used in the Settlement Agreement or any Exhibits thereto, the following terms shall have the meanings set forth below:

"Actual Number of Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Actuary" means Coopers & Lybrand or such successor actuary as is selected by the Company from time to time.

"Additional Permissible Benefits" has the meaning assigned to it in Section 1.2 of Exhibit B to the Settlement Agreement.

"Adjusted Health APBO" has the meaning assigned to it in Section 7.2 of Exhibit B to the Settlement Agreement.

"Advance Funding" has the meaning assigned to it in Section 8.2 of Exhibit B to the Settlement Agreement.

"Annual Service Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Applicable Retirement Plan" means (i) The Navistar International Transportation Corp. Retirement Plan for Salaried Employees as in effect on the Effective Date, (ii) The Navistar Financial Corporation Retirement Plan for Salaried Employees as in effect on the Effective Date, (iii) The Navistar International Transportation Corp. Non-Contributory Retirement Plan as in effect on the Effective Date and (iv) those multiemployer pension funds as in effect on the Effective Date to which the Employers have contributed and that have Participants who have been provided with postretirement Health and Life Insurance Benefits by the Employers.

"Attributable Debt" means, as of any particular time, the present value discounted at the rate of 6 ½% per annum (compounded semi-annually) of the obligation of a lessee for rental payments during the remaining term of any lease (including any period for which such lease has been extended or may, at the option of the lessor, be extended) included in a Sale and Lease-Back Transaction, other than such a transaction permitted by Section 7.7 of Exhibit A to the Settlement Agreement.

"Average Contributing Participants" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Basic Life Insurance Program" means the part of the Life Insurance Program pursuant to which the Employers agree to provide group life insurance, entirely at their own expense, to the Retirees.

193

"Blackout Period" has the meaning assigned to it in Section 3.4 of Exhibit B to the Settlement Agreement.

"Board" means the Board of Directors of Parent.

"CBA" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Charter Amendments" has the meaning assigned to it in Section 8.1 of the Settlement Agreement.

"Class" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Class Counsel" means the law firms of Bobulsky, Grdina & Altier, 2036 East Prospect Road, Ashtabula, Ohio 44004; Bredhoff & Kaiser, 1000 Connecticut Avenue, N.W., Washington, D.C. 20036; Cloppert, Portman, Suater, Latanick & Foley, 225 East Board Street, Columbus, Ohio 43215; Gregory, Moore, Jaekle, Heinen, Ellison & Brooks, 3727 Cadillac Tower, Detroit, Michigan 48226; Kleiman, Whitney, Wolfe & Gore, One East Wacker Drive, Chicago, Illinois 60601; Lackey, Nusbaum, Harris, Reny & Torzewski, Two Maritime Plaza, Toledo, Ohio 46304; Macey, Macey & Swanson, 445 North Pennsylvania Street, Suite 401, Indianapolis, Indiana 48204; Miller, Carson & Boxberger, 1400 One Summit Square, Fort Wayne, Indiana 46802; and Daniel W. Sherrick, Associate General Counsel, International UAW, 8000 East Jefferson, Detroit, Michigan 48214.

"Class Member" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Class Representatives" means Art Shy, Fred Burris, Clarence Nuss, John Herring, Carl Potts, Harold Retherford, Henry G. Betley, Richard Spitler, Jack O'Neill, Donald McPhearson, the UAW and its Locals 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293, the UPGWA and its Locals 4, 122 and 134, the IAM and its Locals 1471, 2819 and 2821, the SEE and the USWA and its Local 4320.

"Collective Bargaining Representatives" means the UAW and its Locals 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293; the UPGWA and its Locals 4, 122 and 134; IAM and its Locals 1471, 2819 and 2821; the SEE; the USWA and its Locals 3740 and 4320; the International Brotherhood of Teamsters and its Locals 705 and 570; the International Union of Operating Engineers and its Local 399; and the International Federation Professional and Technical Employees and its Local 137.

"Committee's Standstill Period" has the meaning assigned to it in Section 1(f)(iv) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Company" means Navistar International Transportation Corp., and each successor thereto.

"Company Costs Per Capita" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Contributing Participants" means Retirees, Spouses and Surviving Spouses for such periods as they are making required contributions to the Health Benefit Program.

"Contributing Participant's Annual Contribution" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Court" means the United States District Court for the Southern District of Ohio Western Division.

"Cumulative Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Deferred Retiree Participants" means individuals affected by health care benefit litigation settlements in Ragan, et al. v. Navistar, No. 88-2623-S (D.Kan.); Local Union 369, International Brotherhood of Electrical Workers, AFL-CIO, et al. Navistar, No. C-88-6724-L-A (W.D.Ky.); and Bolding et al. v. Navistar, No. 88-9751-9 (Superior Court, GA).

"Demand Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Dependent" means (i) a person's Spouse, and (ii) unmarried children residing in a person's household and unmarried children not residing in a person's household for whom such person is legally required to provide medical care. For purposes of (ii) above, (A) the children of a person include (I) the natural children of such person, (II) legally adopted children of such person, (III) stepchildren of such person for whom legal adoption proceedings have been initiated and (IV) other children related by blood or marriage to such person or who are under such person's legal guardianship and who are dependent on such person for more than one-half of their support as defined in the IRC, who either qualify in the current year for dependency status, or who have been reported as dependents on such person's most recent federal income tax return ("dependency tax status") and (B) children shall continue to qualify as children until the end of the calendar year in which they attain age 19 years; provided, that (I) if a child is totally and permanently disabled at the time he or she would otherwise cease to be a child for purposes of this definition, he or she will continue to be covered as a child for as long as he or she remains totally and permanently disabled, and (II) if a child qualifies in the current year for dependency tax status or has been reported as a dependent on a person's most recent federal tax return, the child will continue to be covered as a child through the end of the calendar year in which the child attains age 25 years provided the child is unmarried and is legally residing in the person's household.

"DOL" means the U.S. Department of Labor.

"DOL Exemption for Parent Common Equity" means an exemption from the DOL permitting the Company to contribute to the Supplemental Benefit Trust and for the Supplemental Benefit Trust to hold Parent Class B Common, and to permit the Parent Class B Common to be voted in accordance with and satisfy the requirements of Article III of Exhibit B to the Settlement Agreement without violating the provisions of Section 406 or 407 of ERISA or Section 4975 of the IRC, such exemption to be in form and substance reasonably satisfactory to the Company and the Supplemental Benefit Committee.

195

"DOL Exemption for Parent Series A Preference" means an exemption from the DOL permitting the Supplemental Benefit Trust to hold Parent Series A Preference without violating the prohibited transaction rules of ERISA, such exemption to be in form and substance reasonably satisfactory to the Company and the Class Representatives.

"DOL Exemptions" means the DOL Exemption for Parent Common Equity and the DOL Exemption for Parent Series A Preference.

"Effective Date" has the meaning assigned to it in Section 13.1 of the Settlement Agreement.

"Eligible Dependent" means (i) each Dependent of a Retiree, during the life of such Retiree and the life of such Retiree's Surviving Spouse, if any, (ii) each Dependent of a deceased former Employee who died prior to the Effective Date, during the life of such Employee's Present Surviving Spouse, if any, and (iii) each Dependent of a Present Employee or of a Present Eligible Former Employee who dies prior to becoming a Future Retiree and who is survived by a Future Surviving Spouse, during the life of such Surviving Spouse; provided, that Eligible Dependents shall not include Dependents who are in military service or the Peace Corps (or similar service) of any country or Dependents covered under any health care plan sponsored by the Employers.

"Employee" means an active employee of an Employer, including all such persons who, although on layoff, sick leave, long-term disability or Employer-approved leave of absence, are treated as active employees by the relevant Employer under relevant CBAs or employment policies, but excluding active employees of an Employer who are nonresident aliens employed outside of the United States and Canada.

"Employers" means Parent, the Company, NFC, HARCO National Insurance Company, Indianapolis Casting Corporation, Navistar International Export Corporation and Navistar International Overseas Corporation, and each successor thereto.

"Enrolled Participant" means each Retiree and Surviving Spouse who has enrolled or re-enrolled in the Health Benefit Program and the Supplemental Benefit Program and their Eligible Dependents, other than a Retiree, Surviving Spouse or Eligible Dependent whose enrollment therein has been terminated in accordance with Section 2.3 of Exhibit A to the Settlement Agreement and who has not re-enrolled in accordance with Section 2.4 of Exhibit A to the Settlement Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Event Date" has the meaning assigned to it in Section 3.6 of Exhibit B to the Settlement Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated thereunder.

"Excluded Retirees" means Retirees and their Dependents who were formerly (i) hourly employees and technical and office employees of the Solar Division (Solar Plan 804 & 805); (ii) hourly Benham Coal employees, Progressive Mine Workers of America, Local Union No. 402,

District No. 2; (iii) salaried and management employees of the Chicago, West Pullman and Southern Railroad; and (iv) retirees affected by the litigation settlement in Lumpkin v. Navistar, No. 81C6674 (N.D. Ill. 1981).

"Exempted Indebtedness" means the sum of (i) all outstanding indebtedness of Parent (and any predecessor corporation) and Restricted Subsidiaries incurred after March 1, 1968 and secured by any mortgage, security interest, pledge or lien other than those permitted by paragraph (a) of Section 5.06 of the Indenture, (ii) all Attributable Debt and (iii) all outstanding indebtedness for borrowed money of Restricted Subsidiaries other than that permitted by paragraph (a) of Section 5.08 of the Indenture.

"Existing Plans" means all plans and other arrangements of the Employers, as in effect on the Effective Date, under which Present Retirees, Present Surviving Spouses, Present Eligible Dependents and Present Eligible Former Employees are receiving, are entitled to receive, or would become entitled to receive, postretirement health or life insurance benefits in the absence of the Settlement Agreement.

"Expected Average Contributing Participants" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Company Costs Per Capita" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Drug Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Medical Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Number of Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Participant Contributions" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Fairness Hearing" has the meaning assigned to it in Section 4.1 of the Settlement Agreement.

"FASB 106" means Financial Accounting Standards Board Statement No. 106 regarding accounting for postretirement benefits other than pensions.

"Final" means the earlier of (i) expiration of the time period for an appeal as a matter of right if no appeal has been filed; (ii) any final dismissal or withdrawal of appeal from the Judgment; or (iii) the date of final affirmance of the Judgment following any appeal, including the expiration of the time for petitions for writs of certiorari (or written confirmation by the appellants that no such petition will be filed) and, if certiorari be granted, the date of final affirmance of the Judgment following review pursuant to that grant.

"Foster Case" has the meaning assigned to it in Section 2.2 of the Settlement Agreement.

"Fully Diluted Basis" means, as of a particular date of determination, the total number of shares of Parent Common Equity and equivalents outstanding as calculated in accordance with Appendix B-7 to Exhibit B to the Settlement Agreement.

"Fully Funded" means, as of a particular date of determination, that the balance of the Employers' prefunding contributions held under the Health Benefit Trust equals the sum of the Employers' share of the Health APBO under the Health Benefit Program plus the actuarial present value of the postretirement benefits under the Basic Life Insurance Program (as determined by the Actuary consistent with the determination of Health APBO).

"Fully Funded Amount" means, as of a particular date of determination, the amount of money necessary so that the balance of the Employers' prefunding contributions held under the Health Benefit Trust equals the sum of the Employers' share of the Health APBO under the Health Benefit Program plus the actuarial present value of the postretirement benefits under the Basic Life Insurance Program (as determined by the Actuary consistent with the determination of Health APBO).

"Fully Funded Date" means the first date on which the Health Benefit Trust is Fully Funded.

"Funding Notice" means the notice described in Section 8.2 of Exhibit B to the Settlement Agreement.

"Future Retiree" means (i) each Present Employee who after the Effective Date becomes eligible to commence the receipt of Pension Benefits, (ii) each other Present Employee who is represented by a Collective Bargaining Representative and who after the Effective Date continues active employment with an Employer beyond attainment of age 65 years and then terminates employment and (iii) each Present Eligible Former Employee who after the Effective Date satisfies the applicable conditions for Health and Life Insurance Benefits.

"Future Surviving Spouse" means (i) the Spouse of a Retiree who dies after the Effective Date and (ii) the Spouse of a Present Employee or of a Present Eligible Former Employee who dies after the Effective Date after becoming eligible for normal or early retirement under the Navistar International Transportation Corp. Retirement Plan for Salaried Employees or the Navistar Financial Corporation Retirement Plan for Salaried Employees; (iii) the husband or wife of a Present Employee or of a Present Eligible Former Employee who dies after the Effective Date after becoming eligible for normal or regular early retirement under the Navistar International Transportation Corp. Noncontributory Retirement Plan.

"HBPC Chair" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Committee Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Company Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Other Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Other Member Alternate" has the meaning assigned to it in Section 6.6 of Exhibit A to the Settlement Agreement.

"HBPC UAW Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"Health Accumulated Postretirement Benefit Obligation" and "Health APBO" mean the actuarial present value of the postretirement benefits under the Health Benefit Program attributed to employee service rendered to the date of determination as determined by the Actuary (i) in accordance with FASB 106, (ii) in a manner consistent with the assumptions reflected in Appendix A-5 to Exhibit A to the Settlement Agreement, and (iii) using methods, factors and procedures determined by the Actuary.

"Health and Life Insurance Benefits" means postretirement health or life insurance benefits payable under any Existing Plan.

"Health Benefit Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Health Benefit Program Committee" means the committee described in Section 6.1 of Exhibit A to the Settlement Agreement.

"Health Benefit Program Letter" has the meaning assigned to it in Section 7.2.1 of the Settlement Agreement.

"Health Benefit Program Payment Default" has the meaning assigned to it in Section 10.1 of Exhibit A to the Settlement Agreement.

"Health Benefit Trust" means the trust established and maintained for the benefit of Participants as set forth in the trust agreement attached as Appendix A-3 to Exhibit A to the Settlement Agreement.

"HMO" means a health maintenance organization.

"IAM" means International Machinists District Lodge 28.

"Immediate Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Immediate Drop Outs During the First 45 Days" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Immediate Drop Outs During the Second 45 Days" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Imputed Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Indemnification Procedures" mean the following procedures to be followed by any party entitled to indemnification under the Settlement Agreement or the Plan (an "Indemnified Party"): promptly after receipt of notice of the commencement of any action in respect of which the Indemnified Party intends to seek indemnification hereunder, the Indemnified Party shall notify the party obliged to provide such indemnification (the "Indemnifying Party") thereof in writing; provided, that the failure of an Indemnified Party to give such notice shall not affect the right of the Indemnified Party to indemnification hereunder, except to the extent that the Indemnifying Party has been prejudiced by such failure. The Indemnifying Party shall be entitled to assume sole control of the defense of any such action; provided, that the Indemnifying Party shall not be entitled to assume control of such defense if in the opinion of counsel to the Indemnified Party there is a significant possibility of a conflict between the interests of the Indemnifying Party and those of the Indemnified Party or such counsel intends to assert a separate legal defense. If the Indemnifying Party does not assume the defense of two or more Indemnified Parties in any action where indemnity may be available, such indemnity shall include the reasonable defense costs of one counsel for such Indemnified Parties as a group; provided, that if in the opinion of counsel to any such Indemnified Party there is a significant possibility of a conflict between the interests of such Indemnified Party and those of any other such Indemnified Party or if such counsel intends to assert a separate legal defense, such Indemnified Party shall be entitled to separate counsel; and, provided, further, that such Indemnified Party shall obtain the prior written approval of the Indemnifying Party before entering into any settlement of any claim for which it is seeking indemnification hereunder or ceasing to defend against such claim.

"Indenture" means the Indenture, dated as of March 1, 1985, between a predecessor of Parent and Commerce Union Bank, as trustee.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Judgment" means the Judgment of the Court approving the Settlement Agreement in the form of Exhibit G to the Settlement Agreement.

"Lien/Sale and Leaseback Default" has the meaning assigned to it in Section 10.2 of Exhibit A to the Settlement Agreement.

"Life Insurance Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Litigation" means the *Shy* Case and the *Foster* Case.

"Long-Form Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Market Offering" has the meaning assigned to it in Section 1(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Maximum Corridor Medical Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Measurement Year (x)" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Monthly Base Contribution" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Named Fiduciary" means a fiduciary within the meaning of Section 402(a)(2) of ERISA.

"Navistar" means Parent, the Company, NFC, HARCO National Insurance Company and Indianapolis Casting Corporation, and each successor thereto.

"Navistar Interest Rate" means (i) the average interest rate paid by the Company from time to time on borrowings pursuant its revolving credit facility (or its primary revolving credit facility if it has more than one), or (ii) if the Company has no revolving borrowings at a particular time, the average interest rate paid by NFC from time to time on borrowings pursuant to its revolving credit facility (or its primary revolving credit facility if it has more than one) or (iii) if neither the Company nor NFC has revolving borrowings at a particular time, 1.0% over the prime rate announced from time to time by the Morgan Guaranty Trust Company.

"Navistar Parties" means Parent, the Company, NFC, HARCO National Insurance Company and Indianapolis Casting Corporation, and each successor thereto.

"Navistar Released Parties" means Navistar and the present and former officers, directors, committees (including the Pension and Employee Benefit Committee), employees, parents, subsidiaries, attorneys, insurers, partners, consultants, advisers, agents, and representatives of Navistar as well as their respective predecessors, successors, assigns and present and former direct and indirect affiliates.

"New CBA" has the meaning assigned to it in Section 12.1.6 of the Settlement Agreement.

"New Drop Ins" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"New Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"NFC" means Navistar Financial Corporation, and each successor thereto.

"Non-Represented Employees" means all Employees who are not represented by Collective Bargaining Representatives.

"Notice Order" has the meaning assigned to it in Section 4.1 of the Settlement Agreement.

"Optional Life Insurance Program" means the part of the Life Insurance Program pursuant to which additional group life insurance benefits are provided as described in Section 4.2 of Exhibit A to the Settlement Agreement.

"Optional Life Insurance Program Letter" has the meaning specified in Section 7.2.5 of the Settlement Agreement.

"Other Period" has the meaning assigned to it in Section 8.2 of Exhibit B to the Settlement Agreement.

"Other Voting Securities" has the meaning assigned to it in Section 3.1 of Exhibit B to the Settlement Agreement.

"Parent" means Navistar International Corporation, and each successor thereto.

"Parent Class B Common" means the Class B common stock of Parent, par value $0.01 per share.

"Parent Common" means the common stock of Parent, par value $0.01 per share.

"Parent Common Equity" means Parent Common and Parent Class B Common.

"Parent Initiated Piggyback Registration" has the meaning assigned to it in Section 2(a)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent Permitted Registrations" has the meaning assigned to it in Section 1(d)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent Postponement" has the meaning assigned to it in Section 1(d)(ii) of Appendix B-3 to Exhibit B to the Settlement Agreement.

"Parent Preference Stock" means Parent Series A Preference and Parent Series B Preference.

"Parent Registration" has the meaning assigned to it in Section 1(d)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent Registration Notice" has the meaning assigned to it in Section 2(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent Securities" means the Parent Common Equity and the Parent Preference Stock.

"Parent Series A Preference" has the meaning assigned to it in Section 5.1 of Exhibit B to the Settlement Agreement.

"Parent Series B Preference" means the Series B preference stock of Parent, par value $1.00 per share.

"Parent's 90 Day Period" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent's Registration Period" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Parent's Standstill Period" has the meaning assigned to it in Section 2(a)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Participant" means each Present Employee, Retiree, Surviving Spouse and Present Eligible Former Employee who is or may become eligible to receive health or life insurance benefits under the Plan, and their Eligible Dependents, regardless of whether any such person has enrolled in the Plan or whether his enrollment in the Plan has been terminated.

"Pension Benefits" means retirement benefits under an Applicable Retirement Plan, including but not limited to disability and pension benefits, whether paid monthly, in a lump sum or otherwise, including such benefits payable pursuant to the terms of any plant closing agreement, severance arrangement or otherwise, but not including a deferred vested pension or an "Accrued Benefit" as defined in the respective sales agreements regarding the sales of the Solar Turbines International Division and the Construction Equipment Division.

"Permitted Parent Registration" has the meaning assigned to it in Section 1(e) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Piggyback Notice" has the meaning assigned to it in Section 2(a)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Piggyback Registration" has the meaning set forth in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Piggyback Rights Revision Date" has the meaning set forth in Section 2(e) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Plan" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Plan 1" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Plan 2" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Plan Administrator" means the administrator of the Plan within the meaning of Section 3(16)(A) of ERISA.

"Plan Expenses" means all out-of-pocket administrative costs of the Health Benefit Program and Life Insurance Program, including but not limited to the costs of the trustee of the Health Benefit Trust, the costs of the Health Benefit Program Committee (other than expenses paid by the Company in accordance with Section 6.7 of Exhibit A to the Settlement Agreement) and

the costs of service providers and professionals (other than the Actuary) engaged by the Plan Administrator, the Named Fiduciary or the Health Benefit Program Committee.

"Plan Year" means the fiscal year of the Company, which fiscal year currently ends on October 31.

"Post-Window Period Registration Request" has the meaning assigned to it in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Present Eligible Dependent" means each Eligible Dependent on the Effective Date.

"Present Eligible Former Employer" means each former employee who as of the Effective Date is not a Present Retiree but who, without any further employment by the Employers and upon the satisfaction of any applicable conditions, would become eligible for Health and Life Insurance Benefits in the absence of the Settlement Agreement.

"Present Employee" means (i) each Non-Represented Employee on the Effective Date, (ii) each Employee represented by a Collective Bargaining Representative as of February 28, 1993, and (iii) during the terms of the New CBAs, each other Employee covered by a New CBA to the extent such Employee is eligible to benefits under the Plan pursuant to the terms of such New CBA.

"Present Non-Represented Employee" means each Present Employee who is not a member of a collective bargaining unit represented by a Collective Bargaining Representative on the Effective Date.

"Present Represented Employee" means each Present Employee who is a member of a collective bargaining unit represented by a Collective Bargaining Representative on the Effective Date.

"Present Retiree" means each former Employee, other than an Excluded Retiree, who is receiving Health and Life Insurance Benefits on the Effective Date.

"Present Surviving Spouse" means each Spouse of a deceased former Employee who is receiving Health and Life Insurance Benefits on the Effective Date.

"Principal Property" shall mean any plant used primarily for manufacturing purposes located within the United States of America, excluding its territories and possessions, of Parent or any Restricted Subsidiary except any such Plant which the Board by resolution declares is not of material importance to the total business conducted by Parent and its Restricted Subsidiaries as an entity.

"Program Administrator" means the administrator of the Supplemental Benefit Program within the meaning of Section 3(16)(A) of ERISA.

"Registrable Securities" means (a) the Parent Common issued upon the conversion of the Parent Class B Common issued to the Supplemental Benefit Trust by Parent on the Effective Date, (b) any Parent Common issued by Parent to the Supplemental Benefit Trust after the Effective

Date, (c) any Parent Common underlying any other Parent Securities issued by Parent to the Supplemental Benefit Trust after the Effective Date, (d) any other securities of Parent issued to the Supplemental Benefit Trust in connection with any distribution made in respect of the Parent Class B Common, and (e) any other securities of Parent issued to the Supplemental Benefit Trust in respect of, or upon conversion or exchange of, any of the securities described in the foregoing clauses (a) through (d); provided, that the securities described in the foregoing clauses (d) and (e) shall be deemed Registrable Securities only if the class of securities of which they are a part shall have been registered under the Exchange Act. As to any particular Registrable Securities, such securities will cease to be Registrable Securities when they have been sold, transferred or otherwise disposed of by the Supplemental Benefit Trust.

"Registration Expenses" has the meaning assigned to it in Section 5 of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Registration Request" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Restricted Stock" has the meaning assigned to it in Section 10.2(d) of Exhibit B to the Settlement Agreement.

"Restricted Subsidiary" shall mean any subsidiary of Parent (a) substantially all the property of which is located, or substantially all the business of which is carried on, within the United States of America, excluding its territories and possessions, and (b) which owns or leases a Principal Property.

"Retiree" means each Present Retiree and each Future Retiree.

"Retiree Adjustment Ratio" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Retiree Cost Sharing Ratio" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Rule 415" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Rule 415 Demand Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Sale and Lease-back Transaction" has the meaning assigned to it in Section 7.7(a) of Exhibit A to the Settlement Agreement.

"SBC Chair" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class One Other Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class One Other Member Alternate" has the meaning assigned to it in Section 6.1(b) of Exhibit B to the Settlement Agreement.

"SBC Class Two Other Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class Two Other Member Alternate" has the meaning assigned to it in Section 6.1(c) of Exhibit B to the Settlement Agreement.

"SBC Committee Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Committee Member Alternate" has the meaning assigned to it in Section 6.1(c) of Exhibit B to the Settlement Agreement.

"SBC UAW Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SEC" means the United States Securities and Exchange Commission.

"Scheduled Contributions" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Section 10.2 Cure Period" has the meaning assigned to it in Section 10.2 of Exhibit A to the Settlement Agreement.

"Securities Act" means the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

"Security" means any debenture, note or other evidence of indebtedness, as the case may be, authenticated and delivered under the Indenture.

"SEE" means Society of Engineering Employees, Inc.

"Settlement Agreement" means the settlement agreement entered in the *Shy* Case and approved by the U.S. District Court for the Southern District of Ohio, as amended from time to time in accordance with the provisions therein.

"Short-Form Registration" has the meaning assigned to it in Section 1(a) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"*Shy* Case" has the meaning assigned to it in the recitals to the Settlement Agreement.

"SPD" means summary plan description.

"Spouse" means the husband or wife of a person to whom such person is legally married and does not include a former spouse from whom such person is divorced.

"State or National Health Insurance Program" means any program pursuant to which the federal government of the United States, the government of any State or territory thereof or any governmental authority thereof or therein, mandates or provides directly or indirectly health care benefits.

"Stay Orders" has the meaning assigned to it in Section 13 of the Settlement Agreement.

"Subsidiary" means any corporation of which at least a majority of the outstanding stock having voting power under ordinary circumstances to elect a majority of the board of directors of said corporation shall at the time be owned by Parent or by Parent and one or more Subsidiaries or by one or more Subsidiaries.

"Super-Majority Transaction" means (i) a merger or consolidation to which Parent is a constituent corporation, if either (A) the stockholders of Parent immediately before such merger or consolidation, do not own, directly or indirectly, more than 50% of the combined voting power of the then outstanding voting securities of the corporation surviving or resulting from such merger or consolidation or (B) equity securities of Parent or the Company would be issued to stockholders of the other constituent corporation(s) to such merger or consolidation which have a fair market value at the time of the transaction in excess of $750 million, or (ii) the sale, transfer, pledge or other disposition of all or substantially all of the assets of Parent and its subsidiaries on a consolidated basis or the Company and its subsidiaries on a consolidated basis.

"Super-Majority Vote" means the vote of at least 85% of the shares of Parent Common Equity, voting as a single class, present in person or by proxy at a meeting at which a Super-Majority Transaction is submitted for a stockholder vote and a quorum is present.

"Supplemental Benefit Committee" has the meaning assigned to it in Section 6.1 of Exhibit B to the Settlement Agreement.

"Supplemental Benefit Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Supplemental Benefit Program Payment Default" has the meaning assigned to it in Section 11.1 of Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust" means the trust established and maintained for the benefit of Enrolled Participants and Retirees, whether or not they are Enrolled Participants, as set forth in the trust agreement attached as Appendix B-2 to Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust Initiated Piggyback Registration" has the meaning assigned to it in Section 2(b)(iii) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust's 90 Day Period" has the meaning assigned to it in Section 2(b)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust's Registration Period" has the meaning assigned to it in Section 2(b)(i) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust's Standstill Period" has the meaning assigned to it in Section 2(b)(1) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Supplement Trust Designee" has the meaning assigned to it in Section 5.2 of Exhibit B to the Settlement Agreement.

"Supplemental Trust Piggyback Registration" has the meaning assigned to it in Section 2(b) of Appendix B-4 to Exhibit B to the Settlement Agreement.

"Surviving Cumulative Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Surviving Spouse" means each Present Surviving Spouse and each Future Surviving Spouse.

"Total Actual Drug Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Actual Medical Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Estimated Annual Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Expected Drug Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Expected Medical Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Maximum Corridor Medical Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Trust Market Offerings" has the meaning assigned to it in Section 1(i) of Appendix B-3 to Exhibit B to the Settlement Agreement.

"UAW" means the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, an unincorporated association with its principal offices in the State of Michigan.

"UAW Designee" means the member of the Board which the UAW is entitled to elect in accordance with the terms of the Parent Series B Preference.

"UAW/Navistar Joint Committee" has the meaning assigned to it in the current Health Security Agreement between the Company and the UAW.

"UPGWA" means the International Union, United Plant Guard Workers of America.

"USWA" means the International Union, United Steelworkers of America.

"Window Period" means that period of time (extended by the length of time of any Blackout Period or Other Period that occurs during what would constitute the Window Period without such extension) which shall commence on the Window Period Commencement Day and shall be the shorter of the following:

(i)     the period from the Window Period Commencement Day until the date following completion of the sale which causes the net proceeds received by the Supplemental Benefit Trust in respect of the sale of Parent Common Equity to equal or exceed $500 million (including any such proceeds received upon sales approved by the Board or through tender offers, but excluding amounts received in connection with Advance Funding sales); and

(ii)    the period equal in duration to the period from the Effective Date to the Window Period Commencement Day. "Window Period Commencement Day" means the first day on or after the Event Date that is not during a Blackout Period or Other Period.

## Exhibit D

**Profit Sharing Settlement Agreement**

## PROFIT SHARING SETTLEMENT AGREEMENT

This Settlement Agreement (the "Profit Sharing Settlement Agreement") is made as of December 22, 2021, by and among Navistar, Inc. (*f/k/a* Navistar International Transportation Corp.) and Navistar International Corporation (together, "Navistar"), and The Supplemental Benefit Program Committee of the Navistar, Inc. Retiree Supplemental Benefit Program (the "SBC") (each a "Party," and collectively, the "Parties").

## RECITALS

A.      On June 8, 1993, the U.S. District Court for the Southern District of Ohio (the "Court") entered a Consent Decree (as amended by Order of the Court dated August 11, 2021, the "1993 Consent Decree") in the case captioned *Shy, et al. v. Navistar Inc., et al.,* Case No. C-3-92-33 (the "Shy Action").

B.      Pursuant to the 1993 Consent Decree, Navistar and a class (the "Shy Class") composed of most of Navistar's active employees and retirees at the time (and their dependents), the UAW and several other unions, entered into the Shy Settlement Agreement (the "Shy Agreement").

C.      The Shy Agreement created, among other things, the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (now known as the Navistar, Inc. Retiree Health Benefit and Life Insurance Plan) (the "Shy Plan"), which provides health and life insurance benefits for certain retirees, including coverage for prescription drugs.  Navistar, Inc. is the Administrator and Named Fiduciary of the Health Benefit Program and Life Insurance Program components of the Shy Plan (collectively, the "Base Plan"), subject to the review authority of the Health Benefit Program Committee (the "HBPC").  Base Plan benefits are provided from a trust (the "Health Benefit Trust"), which is funded in part by certain monthly premiums paid by retirees. Each year, Navistar, Inc., in conjunction with the Base Plan's actuary, calculates the Contributing Participants' Annual Contribution (as defined in Appendix A-6 of the Shy Plan) (the "Retiree Contribution") based, in part, on the cost of prescription drugs covered under Medicare Part D.

D.      The Shy Agreement established a Supplemental Benefit Trust (the "Supplemental Trust") administered by the SBC.  Among other things, the Supplemental Trust contributes money to "buy down," or reduce, the Retiree Contribution.

E.      The SBC is also the Program Administrator and Named Fiduciary of the Retiree Supplemental Benefit Program component of the Shy Plan (the "Supplemental Benefit Program") established under the terms of the Shy Agreement.

F.      The Supplemental Trust is funded in part through contributions from Navistar, Inc. Pursuant to Section 7.1 of the Supplemental Benefit Program, Navistar is obligated to make certain contributions under the Supplemental Benefit Trust Profit Sharing Plan, attached to the Supplemental Benefit Program as Appendix B-6 (the "Profit Sharing Plan"), consisting of a portion of its Qualifying Profits (as that term is defined in the Profit Sharing Plan).

1

G.      The Profit Sharing Plan terminates on the first day of the Supplemental Benefit Program's Plan Year following the "Profit Sharing Cessation Date" (the "PSCD") as defined in Section 7.2 of the Supplemental Benefit Program.

H.      In March 2012, the SBC filed a Motion to Intervene in the Shy Action and then filed a complaint in 2014 with the Court (as amended, the "Complaint"), raising disputes under the Profit Sharing Plan regarding the calculation of Navistar's profit sharing contributions for certain years.

I.      In 2015, the United States Court of Appeals for the Sixth Circuit ruled that the disputes raised in the Complaint must be arbitrated under Section 8.4 of the Profit Sharing Plan.

J.      CliftonLarsonAllen LLP (the "Arbitrator") was appointed in 2015, and since then the matters raised in the Complaint have been the subject of an arbitration proceeding (the "Profit Sharing Arbitration").

K.      In the course of the Profit Sharing Arbitration, the SBC agreed that out of the years at issue (2001 to 2014) it sought an award only with respect to the calculations under the Profit Sharing Plan for the years ending October 31, 2006, 2008, 2009, 2010 and 2011 (the "Challenged Years").

L.      The SBC also has raised disputes regarding the profit sharing calculations for the years ending October 31, 2015, 2016, 2017, 2018, 2019 and 2020.

M.      On February 5, 2021, the Arbitrator issued an Amended Final Award (the "Arbitration Award") in the Profit Sharing Arbitration, in which the Arbitrator concluded that Navistar Inc.'s calculation of Qualifying Profits for the Challenged Years should be adjusted in certain respects and that Navistar, Inc. owed past due profit sharing contributions and pre-award interest totaling $239 million.  That same day, the SBC filed with the Court a Motion to Confirm Arbitration Award and Assess Interest (the "Motion to Confirm").

N.      On February 16, 2021, Navistar filed with the Court a Motion to Vacate and/or Stay Arbitration Award (the "Motion to Vacate").  The Motion to Vacate and Motion to Confirm remain pending with the Court, although both are currently stayed.

O.      Additional disagreements have arisen between Navistar and the SBC regarding whether the PSCD has occurred, and if not, whether payment of some or all of the Arbitration Award would cause the PSCD to occur.

P.      On October 21, 2016, Mr. Krzysiak (a current member of the SBC and the Shy Class) and Mr. LaCour (a former member of the SBC and a current member of the Shy Class) filed a complaint in the Court against Navistar in a civil action captioned *Krzysiak, et al. v. Navistar International Corporation, et al.*, S.D. Ohio Case No. 3:16-CV-00443-WHR (the "Krzysiak Action").  Plaintiffs in the Krzysiak Action assert that Navistar is improperly failing to account for Medicare Part D subsidies as a reduction in the cost of prescription drugs for purposes of calculating the Retiree Contribution.  The SBC, which is not a party to the Krzysiak Action, agrees with Plaintiffs in the Krzysiak Action and has stated, in addition, that Navistar's conduct with regard to the Medicare Part D subsidies has the effect of increasing the Retiree Contribution, which

2

in turn increases the amount payable by the Supplemental Trust to buy down that cost on behalf of beneficiaries and thereby causes harm to the Supplemental Trust. The Krzysiak Action remains pending before the Court.

Q.      On October 22, 2021, Navistar, the SBC, Mr. LaCour, Mr. Krzysiak and the UAW signed a Letter of Intent (the "LOI") containing certain material terms of their agreement to effect the resolution of their disputes and disagreements and to provide for the amendment of the Supplemental Benefit Program to eliminate Navistar's obligation to make profit sharing and post-PSCD contributions to the Supplemental Trust in exchange for an immediate cash payment (collectively, the "Settlement").

R.      The Parties agreed to certain modifications to the 1993 Consent Decree to reflect the terms of the Settlement and to seek Court approval of an amendment of the Supplemental Benefit Program (the "Consent Decree Modifications," as detailed in the Class Settlement Agreement (defined below)).

S.      The Consent Decree Modifications include the following agreed addition to the definition of "Total Actual Drug Cost" in Appendix A-6 of the Shy Plan (the "Part D Credit Modification"):

> Commencing with the Measurement Year to be used for determining the Contributing Participants' Annual Contribution for the 2022 Plan Year, "Total Actual Drug Cost" shall equal (i) the sum of paid drug claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of paid drug claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for such Measurement Year, less (ii) the total amount of any subsidies, manufacturer rebates or similar payments for Medicare Part D Plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year, including, but not limited to, the manufacturer discount under 42 CFR 423 Subpart W: Medicare Coverage Gap Discount Program (42 CFR 423.2300 – 42 CFR 423.2345); the federal reinsurance subsidy, the direct subsidy and the low income cost-sharing subsidy under 42 CFR 423 Subpart G: Payments to Part D Plan Sponsors for Qualified Prescription Drug Coverage (42 CFR 423.301 – 42 CFR 423.360); and the low income premium subsidy under 42 CFR 423 Subpart P: Premiums and Cost-Sharing Subsidies for Low-Income Individuals (42 CFR 423.771 – 42 CFR 423.800), less (iii) manufacturer rebates for non-Medicare Part D prescription drug plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year.

T.      Consistent with the LOI, on October 23, 2021, Navistar paid $75 million to the Supplemental Trust as a partial prepayment of amounts to be paid under this Profit Sharing Settlement Agreement (the "$75 Million Prepayment").

U.      Consistent with the LOI, Navistar and the SBC (and others) agreed to the terms of a "Class Settlement Agreement," to which this Profit Sharing Settlement Agreement will be appended as

an exhibit, and which will be executed by Navistar, the SBC and the other parties thereto contemporaneously with the execution of this Profit Sharing Settlement Agreement.

V.     Consistent with the LOI, within one (1) business day of the execution of the Class Settlement Agreement, this Profit Sharing Settlement Agreement, and the Krzysiak Action Settlement Agreement (as defined in the Class Settlement Agreement), Navistar will pay $25 million to the Supplemental Trust as a further partial prepayment of amounts to be paid under the Profit Sharing Settlement Agreement (the "$25 Million Prepayment").

W.     The Parties wish to effectuate and finalize the agreement memorialized in the LOI on the terms set forth herein.

*Now therefore*, intending to be legally bound, Navistar and the SBC agree to the following:

**Settlement Payments**

1.     The "Payment Date" shall be three (3) business days after each of the following is true:

   a.  Final Effectiveness, as defined in the Class Settlement Agreement, has occurred; and

   b.  The Court has entered an Order dismissing the Krzysiak Action with prejudice, and such Order has become a Final Order (as defined in the Class Settlement Agreement).

2.     On or before the Payment Date, Navistar will pay or cause to be paid to the Supplemental Trust $556 million in cash, less certain credits, plus an additional interest amount, as follows:

   a.  The $75 Million Prepayment and the $25 Million Prepayment will be credited;

   b.  Any amount paid by Navistar under the Profit Sharing Plan for any plan year after the plan year ending October 31, 2020, will be credited;

   c.  Navistar will pay the difference between $556 million and the credits identified in subparagraphs (a) and (b); and

   d.  Navistar will pay an additional amount equal to the sum of daily simple interest accruals for the period beginning August 11, 2021, and ending on the day before the Payment Date, where each day's interest accrual is equal to 0.01369863% (i.e., 5% per annum) of the difference between $192 million and the amounts that have been paid by Navistar as of such day under the Profit Sharing Plan for any plan year after October 31, 2020.

3.     In addition, on or before the Payment Date, Navistar will perform its obligation under the Krzysiak Action Settlement Agreement to pay or cause to be paid $3 million to the Supplemental Trust, subject to the terms of the Krzysiak Action Settlement Agreement.

4.      Within three (3) business days after payment of the amounts set forth in paragraphs 2 and 3, the SBC shall execute the release attached hereto as <u>Exhibit A</u>, to be effective as of the date of such payment.

5.      The SBC agrees to amend the Supplemental Benefit Program and seek Court approval for all modifications of the Shy Agreement necessary to eliminate Navistar's obligations to make profit sharing or post-PSCD contributions to the Supplemental Trust.

**<u>Other Terms</u>**

6.      <u>Reset Date.</u>  This Profit Sharing Settlement Agreement shall be null and void upon the occurrence of the Reset Date, as defined in the Class Settlement Agreement, and in such case the relevant provisions of that agreement shall apply (notwithstanding any termination of that agreement).

7.      <u>Governing Law and Jurisdiction.</u>  This Profit Sharing Settlement Agreement shall be governed by the laws of the State of Illinois without regard to its conflict of laws provisions.  In the event of any dispute arising out of or in connection with this Profit Sharing Settlement Agreement, the Court shall have exclusive jurisdiction to resolve such dispute(s).

8.      <u>Integration / Entire Agreement.</u>  This Profit Sharing Settlement Agreement, together with the Settlement Approval and Consent Decree Modification Agreement, form the entire agreement of the Parties regarding the Settlement, and all prior communications, whether oral or written, by or among any of the Parties shall be of no further effect or evidentiary value.

9.      <u>Non-reliance.</u>  Each Party acknowledges that, in executing this Profit Sharing Settlement Agreement, it has not relied on any representation or statement made by any other Party, except as expressly set forth herein.

10.      <u>Modification of Agreement.</u>  This Profit Sharing Settlement Agreement may only be amended by written agreement of each of the Parties and in accordance with the Settlement Approval and Consent Decree Modification Agreement.

11.      <u>Failure to Enforce.</u>  The failure by any Party to enforce any provision of this Profit Sharing Settlement Agreement at any time, or for any period of time, shall not be construed as a waiver of any right of enforcement the Party may have.

12.      <u>No Third-party Beneficiaries.</u>  The provisions of this Profit Sharing Settlement Agreement are intended solely for the benefit of each Party hereto and their respective successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other person.

13.      <u>Interpretation.</u>  This Profit Sharing Settlement Agreement has been negotiated and reviewed by the Parties with the advice of counsel, and in the event of an ambiguity its provisions are not to be construed against or in favor of any Party.

14.     <u>No Admission.</u>  This Profit Sharing Settlement Agreement shall not be construed as an admission as to any Party's liability or the merits of any Party's claims or legal positions regarding the subject matter of this Profit Sharing Settlement Agreement.


[SIGNATURE BLOCKS TO FOLLOW]

Navistar, Inc.

_____

By: Curt A. Kramer

Its: Senior Vice President and General Counsel

Navistar International Corporation

_____

By: Curt A. Kramer

Its: Senior Vice President and General Counsel

The Supplemental Benefit Program Committee of the Navistar International Transportation Corp.
Retiree Supplemental Benefit Program

_____

By:

Its:

Navistar, Inc.

_____

By:

Its:

Navistar International Corporation

_____

By:

Its:

The Supplemental Benefit Program Committee of the Navistar International Transportation Corp. Retiree Supplemental Benefit Program

_____

By: Ted Scallet

Its:  Counsel

**<u>Exhibit A</u>**

**Release**

## **IRREVOCABLE RELEASE**

On December 22, 2021, Navistar, Inc. (f/k/a Navistar International Transportation Corp.) and Navistar International Corporation (together, "Navistar"), and The Supplemental Benefit Program Committee of the Navistar, Inc. Retiree Supplemental Benefit Program (the "SBC"), executed that certain Profit Sharing Settlement Agreement resolving their various disputes in and related to the civil action captioned *Shy, et al. v. Navistar Inc., et al.*, Case No. C-3-92-33.  Navistar agreed to make certain settlement payments under paragraphs 2 and 3 of the Profit Sharing Settlement Agreement (collectively, the "Settlement Consideration").

As of [date of payments] (the "Release Effective Date"), Navistar has provided the Settlement Consideration.

In exchange for the Settlement Consideration, and effective as of the Release Effective Date, the SBC hereby releases Navistar and its present and former affiliates, directors, officers, employees, service providers and agents (collectively, the "Navistar Released Parties") of any and all rights, claims and causes of action that the SBC or anyone claiming on behalf of, through or under the SBC by way of subrogation or otherwise, has, had, or may have, or may be entitled to assert, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to:

a.      the receipt or application, prior to and including October 31, 2021, of any of the following Medicare Part D subsidies by the Retiree Health Benefit and Life Insurance Plan and/or Navistar: the manufacturer discount under 42 CFR 423 Subpart W: Medicare Coverage Gap Discount Program (42 CFR 423.2300 – 42 CFR 423.2345); the federal reinsurance subsidy, the direct subsidy and the low income cost-sharing subsidy under 42 CFR 423 Subpart G: Payments to Part D Plan Sponsors for Qualified Prescription Drug Coverage (42 CFR 423.301 – 42 CFR 423.360); and the low income premium subsidy under 42 CFR 423 Subpart P: Premiums and Cost-Sharing Subsidies for Low-Income Individuals (42 CFR 423.771 – 42 CFR 423.800); and

b.      the Profit Sharing Plan, including, without limitation, any obligation of the Navistar Released Parties thereunder or under Section 7.1 of the Supplemental Benefit Program.

Execution date: [_____]


The Supplemental Benefit Committee


_____

By:

Its:

9

**Exhibit E**

**Krzysiak Action Settlement Agreement**

## KRZYSIAK ACTION SETTLEMENT AGREEMENT

This agreement (the "Krzysiak Action Settlement Agreement") is made as of December 22, 2021, by and among Navistar, Inc. (*f/k/a* Navistar International Transportation Corp.) and Navistar International Corporation (together, "Navistar"), Wayne Krzysiak and Michael LaCour (together with Mr. Krzysiak, the "Krzysiak Plaintiffs") (each a "Party" and together the "Parties").

## RECITALS

A.      On June 8, 1993, the U.S. District Court for the Southern District of Ohio (the "Court") entered a Consent Decree (as amended by Order of the Court dated August 11, 2021, the "1993 Consent Decree") in the case captioned *Shy, et al. v. Navistar Inc., et al.,* Case No. C-3-92-33 (the "Shy Case").

B.      Pursuant to the 1993 Consent Decree, Navistar and a class (the "Shy Class") composed of most of Navistar's active employees and retirees at the time (and their dependents), the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") and several other unions, entered into the Shy Settlement Agreement (the "Shy Agreement").

C.      The Shy Agreement created, among other things, the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (now known as the Navistar, Inc. Retiree Health Benefit and Life Insurance Plan) (the "Shy Plan"), which provides health and life insurance benefits for certain retirees, including coverage for prescription drugs.  Navistar, Inc. is the Administrator and Named Fiduciary of the Health Benefit Program and Life Insurance Program components of the Shy Plan (collectively, the "Base Plan"), subject to the review authority of the Health Benefit Program Committee (the "HBPC").  Base Plan benefits are provided from a trust (the "Health Benefit Trust"), which is funded in part by certain monthly premiums paid by retirees. Each year, Navistar, Inc., in conjunction with the Base Plan's actuary, calculates the Contributing Participants' Annual Contribution (as defined in Appendix A-6 of the Shy Plan) (the "Retiree Contribution") based, in part, on the cost of prescription drugs covered under Medicare Part D.

D.      On October 21, 2016, Mr. Krzysiak (a current member of the SBC and the Shy Class) and Mr. LaCour (a former member of the SBC and a current member of the Shy Class) filed a complaint in the Court against Navistar in a civil action captioned *Krzysiak, et al. v. Navistar International Corporation, et al.*, S.D. Ohio Case No. 3:16-CV-00443-WHR (the "Krzysiak Action").  The Krzysiak Plaintiffs assert that Navistar is improperly failing to account for Medicare Part D subsidies as a reduction in the cost of prescription drugs for purposes of calculating the Retiree Contribution.  The Krzysiak Action remains pending before the Court.

E.      On October 22, 2021, Navistar, Mr. LaCour and Mr. Krzysiak, along with the SBC and the UAW, signed a Letter of Intent (the "LOI") containing, among other provisions, certain material terms of their agreement to effect the resolution of their disputes and disagreements (collectively, the "Settlement").

F.      Consistent with the LOI, Navistar and the SBC (and others) agreed to the terms of a "Class Settlement Agreement," to which this Krzysiak Action Settlement Agreement will be appended as

1

an exhibit, and which will be executed by Navistar, the SBC and the other parties thereto contemporaneously with the execution of this Krzysiak Action Settlement Agreement.

G.      The parties to the LOI agreed to certain modifications to the 1993 Consent Decree to reflect the terms of the Settlement (as defined in the Class Settlement Agreement, the "Consent Decree Modifications").

H.      The Consent Decree Modifications include the following agreed addition to the definition of "Total Actual Drug Cost" in Appendix A-6 of the Shy Plan (the "Part D Credit Modification"):

> Commencing with the Measurement Year to be used for determining the Contributing Participants' Annual Contribution for the 2022 Plan Year, "Total Actual Drug Cost" shall equal (i) the sum of paid drug claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of paid drug claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for such Measurement Year, less (ii) the total amount of any subsidies, manufacturer rebates or similar payments for Medicare Part D Plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year, including, but not limited to, the manufacturer discount under 42 CFR 423 Subpart W: Medicare Coverage Gap Discount Program (42 CFR 423.2300 – 42 CFR 423.2345); the federal reinsurance subsidy, the direct subsidy and the low income cost-sharing subsidy under 42 CFR 423 Subpart G: Payments to Part D Plan Sponsors for Qualified Prescription Drug Coverage (42 CFR 423.301 – 42 CFR 423.360); and the low income premium subsidy under 42 CFR 423 Subpart P: Premiums and Cost-Sharing Subsidies for Low-Income Individuals (42 CFR 423.771 – 42 CFR 423.800), less (iii) manufacturer rebates for non-Medicare Part D prescription drug plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year.

**Now therefore**, intending to be legally bound, Navistar and the Krzysiak Plaintiffs agree to the following:

1.      Within seven (7) business days after this Krzysiak Action Settlement Agreement is fully executed, the Parties to this Krzysiak Settlement Agreement will request that the Court formally suspend its consideration of the Krzysiak Action, and all parties will cease and cause the cessation of all litigation activities related to the Krzysiak Action or Navistar's treatment of Medicare Part D subsidies in the calculation of the Retiree Contribution.

2.      Upon Final Effectiveness, as defined in the Class Settlement Agreement, the Parties to this Krzysiak Settlement Agreement shall jointly request that the Court enter an order dismissing the Krzysiak Action with prejudice and providing that each Party shall bear its own costs (the "Dismissal Order").

3.      The "Payment Date" shall be three (3) business days after each of the following is true:

2

a. Final Effectiveness, as defined in the Class Settlement Agreement, has occurred; and

b. The Dismissal Order has become a Final Order (as defined in the Class Settlement Agreement).

2. On or before the Payment Date, Navistar will pay or cause to be paid the following amounts in cash (together, the "Settlement Payments"):

a. $17 million to the VEBA Subaccount A of the Health Benefit Trust; and

b. $3 million to the Supplemental Trust (in addition to the amounts payable under the Profit Sharing Settlement Agreement (as defined in the Class Settlement Agreement)).

3. As additional consideration, Navistar has agreed to the inclusion of the Part D Credit Modification as part of the Consent Decree Modifications.

4. Within three (3) business days after payment of the amounts set forth in paragraph 2, the Krzysiak Plaintiffs shall execute the release attached hereto as Exhibit A, to be effective as of the date of such payment.

**Other Terms**

5. Reset Date. This Krzysiak Action Settlement Agreement shall be null and void upon the occurrence of the Reset Date, as defined in the Class Settlement Agreement, and in such case the parties shall be free to resume litigation of the Krzysiak Action.

6. Governing Law and Jurisdiction. This Krzysiak Action Settlement Agreement shall be governed by the laws of the State of Illinois without regard to its conflict of laws provisions. In the event of any dispute arising out of or in connection with this Krzysiak Action Settlement Agreement, the Court shall have exclusive jurisdiction to resolve such dispute(s).

7. Integration / Entire Agreement. This Krzysiak Action Settlement Agreement forms the entire agreement between Navistar and the Krzysiak Plaintiffs regarding the Settlement, and all prior communications, whether oral or written, by or among any of the parties to this Krzysiak Settlement Agreement shall be of no further effect or evidentiary value.

8. Non-reliance. Each Party to this Krzysiak Settlement Agreement acknowledges that, in executing this Krzysiak Action Settlement Agreement, it has not relied on any representation or statement made by any other party, except as expressly set forth herein.

9. Modification of Agreement. This Krzysiak Action Settlement Agreement may only be amended by written agreement of each of the Parties.

10. Failure to Enforce. The failure by any Party to enforce any provision of this Krzysiak Action Settlement Agreement at any time, or for any period of time, shall not be construed as a waiver of any right of enforcement the Party may have.

11.     <u>No Third-party Beneficiaries.</u>   The provisions of this Krzysiak Action Settlement Agreement are intended solely for the benefit of each Party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other person.

12.     <u>Interpretation.</u>  This Krzysiak Action Settlement Agreement has been negotiated and reviewed by the Parties with the advice of counsel, and in the event of an ambiguity its provisions are not to be construed against or in favor of any party.

13.     <u>No Admission.</u>  This Krzysiak Action Settlement Agreement shall not be construed as an admission as to any party's liability or the merits of any party's claims or legal positions regarding the subject matter of this Krzysiak Action Settlement Agreement.

[SIGNATURE BLOCKS TO FOLLOW]

Navistar, Inc.

_o/b/o Curt A. Kramer_

_____

By: Curt A. Kramer

Its: Senior Vice President and General Counsel

Navistar International Corporation

_o/b/o Curt A. Kramer_

_____

By: Curt A. Kramer

Its: Senior Vice President and General Counsel

Wayne Krzysiak

_____

Michael LaCour

_____

5

Navistar, Inc.

_____

By:

Its:

Navistar International Corporation

_____

By:

Its:

Wayne Krzysiak

_____

By: Ted Scallet
Counsel for Mr. Krzysiak

Michael LaCour

_____

By: Ted Scallet
Counsel for Mr. LaCour

5

**<u>Exhibit A</u>**

**Release**

## **IRREVOCABLE RELEASE**

On December 22, 2021, Wayne Krzysiak and Michael LaCour (together, the "Krzysiak Plaintiffs"), and Navistar, Inc. (*f/k/a* Navistar International Transportation Corp.) and Navistar International Corporation (together, "Navistar"), executed that certain Krzysiak Action Settlement Agreement resolving their various disputes in and related to the civil action captioned *Krzysiak, et al. v. Navistar International Corporation, et al.*, No. 3:16-CV-00443-WHR (S.D. Ohio) (the "Krzysiak Action").  Under the Krzysiak Action Settlement Agreement, Navistar agreed to make certain Settlement Payments and to implement the Part D Credit Modification, each as defined in the Krzysiak Action Settlement Agreement (together, the "Settlement Consideration").

As of [date of Settlement Payments] (the "Release Effective Date"), Navistar has provided the Settlement Consideration.

In exchange for the Settlement Consideration, and effective as of the Release Effective Date, the Krzysiak Plaintiffs hereby release all of Navistar, any current or former affiliate of Navistar, any of their respective successors or assigns, as well as any current or former director, officer, or employee of any of the foregoing, individually and collectively, from any claim the Krzysiak Plaintiffs have or may have relating to or arising from the Krzysiak Action, the subject matter of the Krzysiak Action, and Navistar's treatment of Medicare Part D subsidies in the calculation of the "Contributing Participants' Annual Contribution" under the Navistar, Inc. Retiree Health Benefit and Life Insurance Plan (*f/k/a* the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan) for any plan year.

Execution date: [_____]

Wayne Krzysiak

_____

Michael LaCour

_____

7

**<u>Exhibit F</u>**

**Class Releases**

(to be included in Final Approval Order)

The Final Approval Order shall provide that, upon payment of each of the amounts set forth in paragraphs 14 and 15 of the Class Settlement Agreement, the following "Class Releases" will be deemed effective and binding on the Modified Shy Class and its members:

"The Modified Shy Class fully and finally releases Navistar and its present and former affiliates, directors, officers, employees, service providers and agents (collectively, the "Navistar Released Parties") of any and all rights, claims and causes of action that the Modified Shy Class or anyone claiming on behalf of, through or under the Modified Shy Class by way of subrogation or otherwise, has, had, or may have, or may be entitled to assert, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to:

    a. the receipt or application, prior to and including October 31, 2021, of any of the following Medicare Part D subsidies by the Retiree Health Benefit and Life Insurance Plan and/or Navistar: the manufacturer discount under 42 CFR 423 Subpart W: Medicare Coverage Gap Discount Program (42 CFR 423.2300 – 42 CFR 423.2345); the federal reinsurance subsidy, the direct subsidy and the low income cost-sharing subsidy under 42 CFR 423 Subpart G: Payments to Part D Plan Sponsors for Qualified Prescription Drug Coverage (42 CFR 423.301 – 42 CFR 423.360); and the low income premium subsidy under 42 CFR 423 Subpart P: Premiums and Cost-Sharing Subsidies for Low-Income Individuals (42 CFR 423.771 – 42 CFR 423.800); and

    b. (ii) the Profit Sharing Plan, including, without limitation, any obligation of the Navistar Released Parties thereunder or under Section 7.1 of the Supplemental Benefit Program."

**<u>Exhibit G</u>**

**Long Form Notice**

## NOTICE OF *NAVISTAR* CLASS ACTION SETTLEMENT

**IF YOU ARE ENTITLED TO RECEIVE MEDICAL OR LIFE INSURANCE BENEFITS FROM NAVISTAR, THIS PROPOSED CLASS ACTION SETTLEMENT MAY AFFECT YOU**

---

**PLEASE READ THIS NOTICE CAREFULLY.**

**A FEDERAL COURT HAS AUTHORIZED THIS NOTICE.**

**THIS IS NOT A SOLICITATION FROM A LAWYER.**

**YOU HAVE NOT BEEN SUED.**

---

Please be advised that there is a proposed agreement to settle disputes among parties in *Shy v. Navistar International Corp.*, Case No. 3:92-cv-0333-WHR (S.D. Ohio) (the "*Shy* Lawsuit"). This is the case concerning your health and life insurance benefits that has been pending before Judge Walter H. Rice since 1992. This class action settlement notice (the "Notice") has been sent to you because you are a current or future recipient of retiree medical or life insurance benefits from the Navistar, Inc. Retiree Health Benefit and Life Insurance Plan (the "*Shy* Plan").

Defendants Navistar, Inc. and Navistar International Corp. ("Navistar"), plaintiff The Supplemental Benefit Program Committee of the Navistar, Inc. Retiree Supplemental Benefit Program (the "SBC"), and certain plaintiffs and representatives of your fellow Navistar retirees ("Class Representatives") have reached an agreement to resolve the current disputes. This agreement would eliminate your right to bring additional lawsuits concerning the current disputes in exchange for cash and other consideration that would be used for an increase in the healthcare benefits that you receive.

**PLEASE READ THIS NOTICE CAREFULLY**. If you are a participant or beneficiary in the *Shy* Plan, your rights may be affected whether or not you act.

### YOUR LEGAL RIGHTS ARE AFFECTED BY THIS SETTLEMENT:

| ACTIONS YOU MAY TAKE IN THE SETTLEMENT | |
|---|---|
| **NO ACTION IS NECESSARY.** | If the proposed Class Action Settlement is approved by the Court and you are a Class Member, you do not need to do anything. |

| **YOU CAN OBJECT NO LATER THAN APRIL 11, 2022. WRITTEN OBJECTIONS MUST BE FILED WITH THE COURT BY THIS DATE.** | If you are a Class Member and wish to object to any part of the proposed Class Action Settlement, you must submit to the Court a written explanation outlining the reasons for your objection, as discussed below. |
|---|---|
| **YOU CAN GO TO THE FAIRNESS HEARING ON JUNE 9, 2022 BY FILING A NOTICE OF INTENTION TO APPEAR WITH THE COURT NO LATER THAN APRIL 11, 2022.** | If you have submitted a written objection to the Court, you can ask to speak in Court about your objections. You may also appear in Court through an attorney if you so desire, but you do not have to have an attorney. |

If you have any questions about this Notice, the proposed Class Action Settlement, or your participation in the settlement, please **DO NOT contact the Court**. All questions should be directed to Navistar through the toll-free number or contact information provided below. If you are not satisfied with Navistar's response, you may also contact Class Counsel as provided below.

## INTRODUCTION AND SUMMARY

**(This section is a summary. Please read the entire document.)**

In 1993, the United States District Court in Dayton, Ohio (the "Court") approved a settlement of claims involving the health and life insurance plans for retirees of Navistar. The settlement was set out in an agreement (the "*Shy* Agreement") which, among other things, created the *Shy* Plan.

The *Shy* Plan consists of several benefit programs. The Retiree Health Benefit Program and the Retiree Life Insurance Program (together, the "Base Plan") provide major medical and basic life insurance benefits to the *Shy* Plan participants. The Navistar, Inc. Retiree Supplemental Benefit Program (the "Supplemental Plan") provides additional benefits to *Shy* Plan participants (dental, vision, hearing, and certain prescription drug and supplemental life insurance benefits) and covers some out-of-pocket healthcare costs such as deductibles and the participants' monthly premiums for the Base Plan benefits.

This Notice describes proposed new settlements and agreements that would affect the *Shy* Plan and amend certain provisions of the *Shy* Agreement (the "Proposed Class Action Settlement").

### The Settlement Class, Class Members, Class Representatives, and Class Counsel

As noted above, you are receiving this Notice because you are believed to be a current or possible future participant or beneficiary of the *Shy* Plan. This makes you a "Class Member" of a

2

"Settlement Class" of persons who have rights under the *Shy* Agreement that would be affected by the Proposed Class Action Settlement. The proposed Settlement Class is defined as follows:

Nothing in the new definition of a Settlement Class or in the Proposed Class Action Settlement affects the provisions of the *Shy* Agreement that determine who is eligible to be a participant or beneficiary of the *Shy* Plan.

The Court appointed *Shy* Plan participants Fred Cortright (Ret. UAW), Miller Rodgers (Ret. UAW), Carl Potts (Ret. SEE), Robert Bergmann (Ret. USW), and Richard Zounes (Ret. Salaried) to represent the interests of the Class Members with respect to the Proposed Class Action Settlement. These persons are the "Class Representatives." The Court has also appointed lawyers to represent the Class Representatives and the Class Members (the "Class Counsel").

### The Disputes Leading to the Proposed Settlements and Modifications

The Proposed Class Action Settlement would make effective separate agreements resolving two disputes involving the *Shy* Agreement, Navistar, and the SBC. The SBC was created by the *Shy* Agreement to oversee the Supplemental Plan and the Trust Fund that holds the assets of the Supplemental Plan (the "Supplemental Trust").

For the past ten years, Navistar and the SBC have been involved in disputes concerning Navistar's obligation to make profit-sharing payments to the Supplemental Trust under the *Shy* Agreement (the "Profit-Sharing Disputes"). The *Shy* Agreement provided for those payments to the Supplemental Trust to fund the Supplemental Benefit Program. The *Shy* Agreement used the term "profit-sharing" because Navistar's obligation to contribute to the Supplemental Trust depends on the profitability of Navistar in any given year.

Separately, for the past five years, Navistar and the SBC have been involved in disputes concerning subsidies paid to the Base Plan under the Medicare Part D prescription drug program (the "Medicare Part D Subsidies Dispute"). Navistar and the SBC disagree about how the subsidies affect the calculation of the monthly premiums that the *Shy* Plan participants are required to make under the *Shy* Agreement. The SBC financed a lawsuit to resolve the Medicare Part D Subsidies Dispute which was filed against Navistar by two *Shy* Plan participants (who were also SBC members) (the "*Krzysiak* Plaintiffs") under the case caption *Krzysiak v. Navistar International Corp.*, S.D. Ohio No. 3:16-CV- 00443-WHR (the "*Krzysiak* Lawsuit").

### The Reasons for the Proposed Class Action Settlement and the Parties Involved.

The Proposed Class Action Settlement was negotiated by Navistar, the SBC, and the Class Representatives. It incorporates two related settlements. The SBC and Navistar resolved their Profit-Sharing Disputes (the "Profit-Sharing Settlement"), and Navistar and the *Krzysiak* Plaintiffs resolved the *Krzysiak* Lawsuit (the "*Krzysiak* Settlement"). Both settlements, however, are contingent on Court approval of the Proposed Class Action Settlement.

The Class Representatives and Class Counsel reviewed the Profit-Sharing Settlement and the *Krzysiak* Settlement as they affect the Class Members and represented the interests of the Class

Members in the negotiation and drafting of the Proposed Class Action Settlement. The Class Representatives and Class Counsel believe that the Proposed Class Action Settlement, and the Profit-Sharing Settlement and the *Krzysiak* Settlement, all of which would be made effective upon the approval of the Proposed Class Action Settlement, are fair and in the best interest of the Class Members. The Class Representatives and Class Counsel asked the Court to approve the Proposed Class Action Settlement and make the Profit-Sharing Settlement and the *Krzysiak* Settlement effective.

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") reviewed the Proposed Class Action Settlement, as well as the Profit-Sharing Settlement and the *Krzysiak* Settlement, and supports approval of each of them by the Court.

### The Principal Terms of the Proposed Class Action Settlement, the Profit-Sharing Settlement and the *Krzysiak* Settlement

The Proposed Class Action Settlement would make effective the following commitments by Navistar:

- Navistar agreed to pay $556 million (plus interest) in the Profit-Sharing Settlement to resolve the Profit-Sharing Disputes in exchange for Navistar's obligation to make profit-sharing or other contributions to the Supplemental Trust in the future;

- Navistar committed to share the benefit of future Medicare Part D subsidies (currently estimated at a value of $118 million) so as to reduce *Shy* Plan participant premiums through an agreement in the *Krzysiak* Settlement;

- Navistar agreed to pay $17 million to the Base Plan Retiree Sub Account A pursuant to the *Krzysiak* Settlement; and

- Navistar agreed to reimburse the Supplemental Trust for $3 million of litigation expenses in the *Krzysiak* Lawsuit.

Additionally, as a result of the settlement negotiations, Navistar and the UAW agreed to recommend action by the Health Benefit Program Committee directing $48 million of Base Plan Retiree Sub Account A assets, plus the aforementioned $17 million, toward the reduction of future monthly participant premiums (the "HBPC Resolution").

If the Proposed Class Action Settlement is approved, the Class Members, the SBC, and the *Krzysiak* Plaintiffs agree that they will not pursue legal claims against Navistar (the "Releases") relating to:

- Navistar's liability for profit-sharing payments allegedly due to the Supplemental Trust for any year prior to 2021;

4

- Navistar's obligation to make profit-sharing payments or other contributions to the Supplemental Trust for 2021 and in the future; and

- The issues raised in the *Krzysiak* Lawsuit concerning Navistar's past treatment of Medicare Part D subsidies and the calculation of the *Shy* Plan participant premiums.

The Proposed Class Action Settlement would make changes to the various documents comprising the *Shy* Agreement in two respects:

- Navistar's commitment with respect to the Medicare Part D subsidies and the calculation of the *Shy* Plan participant premiums in the *Krzysiak* Settlement would be made a part of the *Shy* Agreement; and

- Navistar's obligation to make profit-sharing and other contributions to the Supplemental Trust in the future would be eliminated as provided in the Profit-Sharing Settlement.

Additionally, the Class Representatives propose to expand the Settlement Class, for this Class Action Settlement only, to include all present and future *Shy* Plan participants and beneficiaries.

### The Effect of the Proposed Class Action Settlement on the Base Plan and the Supplemental Benefit Program

The $742 million total estimated value (plus interest) derived from the Proposed Class Action Settlement, the Profit-Sharing Settlement, the *Krzysiak* Settlement, and the HBPC Resolution will be used solely for the benefit of the Class Members. The SBC believes that, if the settlements become effective, the SBC can provide the following annual supplemental benefits to the Class Members, effective January 1, 2022:

- The current drug, dental, vision, hearing and supplemental life insurance benefits;

- Zero-dollar deductibles for Medicare-age participants and $400 annual co-payments for pre-Medicare participants;

- A fixed participant premium rate of $5 per month; and

- Reimbursement of the base Medicare Part B premium.

The base Medicare Part B premium is approximately $1,800 in 2021 and increases each year. The SBC's initial modeling indicates that approval of the proposed Class Action Settlement would enable it to reimburse the Class Members for all or virtually all of their base Medicare Part B premiums each year for the rest of their lives. However, the SBC would need to monitor the costs

and the earnings on the Supplemental Trust's investments to determine the actual amount that can be reimbursed each year.

The proposed settlements would not change the benefits provided to the Class Members by the Base Plan, or any aspect of the operation and administration of the Base Plan. The only effect of the settlements on the Base Plan would be to reduce the participant premiums and increase Navistar's contributions to the Base Plan in the future.

The Proposed Class Action Settlement would make changes to the *Shy* Plan documents to make the Profit-Sharing Settlement and the *Krzysiak* Settlement effective.

### Evaluation of the Proposed Settlements and Modifications

It is possible that the SBC or the *Krzysiak* Plaintiffs could generate more value for the Class Members at some time in the future by continuing their existing litigation, or through future profit-sharing payments. It is also possible that Navistar could ultimately prevail in the existing disputes and the future profit-sharing payments would never materialize. Any continuing litigation would be time-consuming, continue to drain Supplemental Trust assets and resources, and the eventual outcome would be uncertain. On balance, the Class Representatives, Class Counsel and the SBC believe that the Proposed Class Action Settlement, the Profit-Sharing Settlement, and the *Krzysiak* Settlement are fair, reasonable, and adequate, and in the best interests of the Class Members.

### The Class Action Approval Process

This Notice provides information about the Proposed Class Action Settlement, and it explains your rights to be heard concerning the terms of the Proposed Class Action Settlement as well as the Profit-Sharing Settlement and the *Krzysiak* Settlement that would be made effective. Please read it carefully.

Additional information about the Proposed Class Action Settlement, the Profit-Sharing Settlement, and the *Krzysiak* Settlement, is available at the following:

- www.navistar.com/shysettlement

- Toll-free number: 1-877-353-5100

**Please do not contact the Court. The Court personnel will not be able to answer your questions.**

| WHAT THIS NOTICE CONTAINS |
|---|

Why Did I Get This Notice And Does It Apply To Me? ...................................................... Page 8
What Is This Case About? ................................................................................................... Page 9
Why Is There A Proposed Settlement? .............................................................................. Page 11
What Might Happen If There Were No Settlement? .......................................................... Page 11
What Benefits Might I Receive From The Proposed Settlement? ...................................... Page 12
How Does The Proposed Settlement Affect My Legal Rights? ......................................... Page 13
How Do I Participate In The Proposed Settlement? What Do I Need To Do? ................... Page 14
What If I Don't Like the Proposed Settlement? How Do I Object? ................................... Page 14
When And Where Is The Fairness Hearing? Am I Required To Attend The Fairness
Hearing? May I Speak At The Hearing? ............................................................................ Page 15
Who Represents The Interests Of The Class Members? .................................................... Page 16
What Payment Are The Attorneys For The Class Seeking? How Will The Lawyers Be
Paid? .................................................................................................................................. Page 17
How Do I Get More Information About This Case? ........................................................... Page 17

| WHY DID I GET THIS NOTICE AND DOES IT APPLY TO ME? |
|---|

You received this Notice because our records indicate that you are one of the individuals in the Settlement Class, as it is defined below. The Court preliminarily approved the Proposed Class Action Settlement, and as part of that preliminary approval directed that this Notice be sent to potential Class Members because they have a right to be informed of the Proposed Class Action Settlement and to object to it for any reason. This Notice also informs you of a hearing in the Court, called a "Fairness Hearing," where the Court will decide whether to finally approve the Proposed Class Action Settlement.

The reason that a change in the definition of the settlement class is being proposed is that the original class was composed of Navistar retirees who were receiving health benefits in 1993, then-active salaried employees, and their spouses and eligible dependents. The original class did not include employees in 1993 who were covered by collective bargaining agreements between Navistar and the UAW or other unions. Instead, these people became eligible for the *Shy* Plan through later collective bargaining agreements with Navistar.

The Class Representatives believe that it is appropriate, for purposes of this Class Action Settlement only, to expand the original settlement class to include everyone who is or may become a *Shy* Plan participant or beneficiary. This expansion of the class would not affect the provisions of the *Shy* Agreement that determine who is eligible to be a participant or beneficiary of the *Shy* Plan.

The new Settlement Class would consist of:

Present participants (including spouses and dependents) and those eligible to become participants, whether upon retirement or election (including eligible spouses and dependents), in the Navistar International Transportation Corp. Retiree Health

7

Benefit and Life Insurance Plan (n/k/a the Navistar, Inc. Retiree Health and Life Insurance Plan). This includes all eligible present retirees, individuals eligible upon retirement or election, and participating, eligible, or future-eligible spouses and dependents in the Navistar International Transportation Corp. Retiree Health Benefit Program (n/k/a the Navistar, Inc. Retiree Health Benefit Program), the Navistar International Transportation Corp. Retiree Life Insurance Program (n/k/a the Navistar, Inc. Retiree Life Insurance Program), and the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (n/k/a the Navistar, Inc. Retiree Supplemental Benefit Program).

| WHAT IS THIS CASE ABOUT? |
|---|

### Background

The 1993 *Shy* Agreement was the result of a lawsuit challenging Navistar's decision to cut its retiree health and life insurance benefits. Navistar claimed that it could not stay in business unless it reduced its estimated $2.6 billion of potential liability for these benefits. The lawsuit was resolved by an agreement to make a series of changes to the retiree health and life insurance benefits that were reflected in a new health and welfare benefit plan that included the Base Plan and the Supplemental Plan.

The new Base Plan guaranteed that the then-current and certain future retirees would receive major medical benefits to cover doctor and hospital bills, as well as basic life insurance. Navistar agreed to make contributions to the Base Plan that were sufficient to provide the promised major medical and life insurance benefits in the Base Plan. The participants in the Base Plan were also required to pay monthly premiums to be eligible to receive the Base Plan benefits. The value of the benefits guaranteed under the Base Plan was estimated at $1 billion in 1993.

The Supplemental Plan was created to provide as much of the remaining $1.6 billion of pre-*Shy* Agreement retiree medical and life benefits as possible. The SBC was created to make decisions about the benefits and operation of the Supplemental Plan. It has two members with no prior relationship to Navistar, a former non-represented employee retiree and two UAW-designated members. The *Shy* Agreement created the Supplemental Trust to hold assets dedicated to the provision of the supplemental benefits. Navistar agreed to contribute stock in Navistar to the Supplemental Trust on the condition that it be sold within five years. The SBC sold the stock for approximately $500 million in 1995, and it has used the proceeds and investment earnings from the sale to support the provision of supplemental benefits since then.

### The Profit-Sharing Dispute

In addition to the stock that was contributed to the Supplemental Trust in 1993, the *Shy* Agreement required Navistar to make profit-sharing payments to the Supplemental Trust. The Profit-Sharing Plan in the *Shy* Agreement determines whether Navistar must make a profit-sharing payment to the Supplemental Trust in any given year based on Navistar's profits and losses, and the total hours worked by Navistar's employees. There is no guarantee that there will be a profit-sharing contribution in any year.

8

### The Dispute over Past Profit-Sharing

Navistar made a total of $286 million in profit-sharing contributions from 1994 through 2000. Navistar, however, calculated that it owed no profit-sharing from 2001 through 2010. In 2012, the SBC initiated proceedings in the Court concerning the lack of profit-sharing payments. In 2015, the Sixth Circuit Court of Appeals ruled that the dispute had to be resolved by an arbitrator selected from among the five largest accounting firms in the United States. In 2016, the arbitration of the SBC's dispute with Navistar over past profit-sharing payments began with the accounting firm of CliftonLarsonAllen LLP serving as the arbitrator.

 The arbitrator issued an Amended Final Award in February 2021. Navistar was ordered to pay the Supplemental Trust past profit-sharing of $159 million plus $80 million in prejudgment interest. The SBC filed a motion in Court seeking to enforce the arbitration award, and Navistar filed a motion seeking to overturn it.

In 2020, Navistar and the SBC agreed to postpone the arbitration of their disputes concerning profit-sharing payments for more recent years pending the decision of the arbitrator concerning the earlier years. The SBC calculates that Navistar owes an additional $53 million in profit-sharing and interest for the more recent years under the reasoning of the arbitrator's decision.

### The Dispute over the Value of Future Profit-Sharing

The *Shy* Agreement provided for a "Profit-Sharing Cessation Date" when Navistar's obligation to make future profit-sharing payments ends. The SBC and Navistar have different views of how the Profit-Sharing Cessation Date is determined under the *Shy* Agreement. Navistar believes that paying the $292 million of past profit-sharing per the arbitrator's decision may be sufficient to terminate Navistar's obligation to make profit-sharing payments in the future. The SBC believes that Navistar would still be short of the amount necessary to end profit-sharing. Absent approval of the Proposed Class Action Settlement, the resolution of this dispute would likely involve future legal proceedings.

### <u>The Medicare Part D Subsidies Dispute</u>

The *Shy* Agreement provided that each year Navistar and the actuary for the *Shy* Plan must calculate the participants' premiums for the upcoming year. The calculation formula is based, in part, on the total claims and administrative expenses of the Base Plan in the prior year. Beginning in 2013, the Base Plan received payments from the federal government generated by the purchase of prescription drugs by the participants in the Base Plan. Navistar, as Plan Administrator, did not reduce the Base Plan's costs by the amount of Medicare Part D prescription drug subsidies the Base Plan received when it calculated the applicable participant premium rate.

The SBC believes that Navistar's past and future calculations of the participant premiums should reflect the net cost of the prescription drugs; that is, the cost of the drugs after the receipt of the Medicare Part D subsidies. Using this method, the Base Plan's costs that are used in the calculation would be lower, and that would cause the participant premiums to be lower. In addition,

9

because the *Shy* Agreement provides that Navistar must pay all Base Plan claims and expenses that are not covered by the monthly participant premiums, the SBC believes that the failure to offset the Medicare Part D subsidies in the calculation of the participant premiums causes the participants and the Supplemental Trust to pay more of the Base Plan's costs – and Navistar to pay less – than was intended in the *Shy* Agreement. Navistar disputes these allegations.

In 2016, two *Shy* Plan participants who were SBC members, Wayne Krzysiak and Michael LaCour, filed the *Krzysiak* Lawsuit in the same federal court as the *Shy* Lawsuit to resolve the Medicare Part D Subsidies Dispute. The lawsuit was brought under the federal law governing employee benefit plans – the Employee Retirement Income Security Act of 1974 ("ERISA") – and sought to require Navistar to pay back into the Base Plan a share of the Medicare Part D subsidies that had not been reflected in the calculation of the participant premiums since 2012. The lawsuit also asked the Court to require Navistar to reduce the Base Plan's costs by the amount of the Medicare Part D subsidies for purposes of calculating the participant premiums in future years.

Navistar filed a motion for summary judgment in opposition to the *Krzysiak* Lawsuit, asserting that it is time-barred by ERISA because it was filed more than three years after the *Krzysiak* Plaintiffs had actual knowledge of an alleged violation of ERISA. The Court decided that that motion must be decided before the *Krzysiak* Lawsuit can proceed further. The Court conducted trials on this motion in both 2019 and 2020. The Court has not decided whether the *Krzysiak* Lawsuit can proceed or must be dismissed.

## WHY IS THERE A PROPOSED SETTLEMENT?

The SBC agreed to resolve the Profit-Sharing Disputes with Navistar, and the *Krzysiak* Plaintiffs agreed to settle the Medicare Part D Subsidies Dispute with Navistar, because they believe that those settlements are fair, reasonable, and adequate, and in the best interests of the participants in the *Shy* Plan. The Class Representatives and Class Counsel reviewed the Profit-Sharing Settlement, the *Krzysiak* Settlement and the Proposed Class Action Settlement and believe that these settlements are fair, reasonable, and adequate, and in the best interests of the Settlement Class.

Navistar agreed to the Profit-Sharing Settlement, the *Krzysiak* Settlement and the Proposed Class Action Settlement to resolve the pending Profit-Sharing and Medicare Part D Subsidies Disputes once and for all, and to eliminate Navistar's obligation to make future profit-sharing contributions to the Supplemental Trust. Navistar believes that it has legal defenses to the current claims and any future claims, and it does not admit any fault, violation of law, or wrongdoing by entering into any of the settlements.

## WHAT MIGHT HAPPEN IF THERE IS NO SETTLEMENT?

The Profit-Sharing Settlement and the *Krzysiak* Settlement will not become effective if the Court does not approve the Proposed Class Action Settlement. If that happens, the disputes will go back to their prior status as if the parties never agreed to the settlements and Navistar will make whatever future profit-sharing payments are required by the *Shy* Agreement. The terms of the

Profit-Sharing Settlement, the *Krzysiak* Settlement and the Proposed Class Action Settlement will be void and will not take effect.

It is possible that the total of the relief obtained at some time in the future in the existing Profit-Sharing and Medicare Part D Subsidies Disputes and in future profit-sharing payments would exceed the $742 million (plus interest) of value that the approval of the Proposed Class Action Settlement and the HBPC Resolution would create for the benefit of the Class Members. However, there is a risk that no recovery might be achieved after further contested and protracted litigation, including appeals, which could last several years into the future. As the number of Class Members continues to decline because of the deaths of the *Shy* Plan participants and beneficiaries, the ability to lower the monthly premiums and increase the supplemental benefits *immediately* is an important factor to consider.

## WHAT BENEFITS MIGHT I RECEIVE FROM THE PROPOSED SETTLEMENT?

### The Value of the Settlements in Total

It is important to consider the Profit-Sharing Settlement, the *Krzysiak* Settlement, and the Proposed Class Action Settlement in their entireties to evaluate their effects on the Class Members, and whether they would further the purpose of the *Shy* Agreement.

The SBC believes that, based on reasonable assumptions and projections, the $742 million of value (plus interest) generated by the settlements and the related HBPC Resolution, when added to the existing assets in the Supplemental Trust would be sufficient to provide health care benefits to the Class Members that are comparable to the benefits that the Class Members had before the cutbacks that led to the 1992 *Shy* litigation in the first place. That would fulfill the purpose of the Supplemental Plan and achieve the goal of the negotiators of the *Shy* Agreement to create a way to restore the pre-1993 benefits in the future.

### The Value of the Individual Settlements

Because the Proposed Class Action Settlement would require the Class Members to enter into a Release giving up a right to file future lawsuits about the Profit-Sharing Disputes and the Medicare Part D Subsidies Dispute, it is also important to evaluate the three settlements individually.

The Profit-Sharing Settlement between Navistar and the SBC relating to past profit-sharing provides for Navistar to pay a total of $292 million (plus interest). That represents the full value of the arbitration award and the SBC's calculation of the profit-sharing owed by Navistar for the post-arbitration years.

The Proposed Class Action Settlement would also amend the Supplemental Plan to exchange the Supplemental Trust's right to receive future contributions from Navistar for an additional immediate payment of $264 million. It is possible that the value of future profit-sharing payments would exceed that amount, but the SBC agreed to amend the Supplemental Plan to make that exchange based on advice from an array of experts. The SBC's decision was based on many

factors, including (1) the dispute over when profit-sharing ends; (2) the ability of Navistar to meet its financial projections in the future, and (3) the impact of the acquisition of Navistar by Traton SE. The Class Representatives reviewed the negotiations between the SBC and Navistar, the advice received by the SBC, and the SBC's analysis and conclusion. The Class Representatives agreed in the Proposed Class Action Settlement to seek Court approval of this proposed amendment of the Supplemental Plan.

The *Krzysiak* Settlement would reduce future participant premiums through Navistar's agreement to account for the subsidies in the calculation of the premiums. This would satisfy the claim for future relief in the *Krzysiak* Lawsuit. The payment of $3 million to the Supplemental Trust would fully reimburse the fees and expenses the SBC spent in support of the *Krzysiak* Lawsuit.

The payment of $17 million to the Base Plan Retiree Sub Account A dedicated to the payment of future participant premiums would resolve the claim in *Krzysiak* for alleged losses of the Base Plan caused by Navistar's calculation of the premiums from 2012 through 2021. That represents less than one-third of the potential recovery on this claim in the *Krzysiak* Lawsuit. The *Krzysiak* Plaintiffs and the SBC believe that this is a reasonable settlement based on the risk that the case could be dismissed, the value of the future relief achieved in the settlement of the Medicare Part D Subsidies Dispute, and the total value of the settlements which would become effective if the Proposed Class Action Settlement is approved by the Court.

The Class Representatives and Class Counsel believe that the Release by the Class Members of their potential Medicare Part D subsidies claims relating to the 2012 through 2021 time period is fair and in the best interest of the Class Members because the value of such claims is uncertain. The claims could be time-barred. No Class Member suffered any out-of-pocket loss from Navistar's alleged actions because the Supplemental Trust covered 100% of the lost Medicare Part D subsidies when the SBC bought down the premiums in those years. The Class Representatives and Class Counsel also believe that the Release of these claims by the Class Members is justified by the value of the future relief achieved in the settlement of the Medicare Part D Subsidies Dispute, and the total value of the settlements.

The payments described above will be used to provide additional supplemental benefits to the Class Members in the amount and form described. No Class member would receive a direct cash payment as a result of the approval of the Proposed Class Action Settlement. The Proposed Class Action Settlement, a detailed agreement setting forth proposed terms, can be viewed and downloaded at www.navistar.com/shysettlement.

## HOW DOES THE PROPOSED SETTLEMENT AFFECT MY LEGAL RIGHTS?

The Proposed Class Action Settlement includes Releases which require the Class Members to give up their rights to bring claims in the future relating to past and future profit-sharing and the Medicare Part D subsidies. If the Proposed Class Action Settlement is approved, you would not be able to bring your own lawsuit involving those issues.

12

## HOW DO I PARTICIPATE IN THE PROPOSED SETTLEMENT? WHAT DO I NEED TO DO?

You do not need to do anything to participate in the Proposed Class Action Settlement. As a member of the Settlement Class, the settlement will include you and you will be bound by and benefit from the Proposed Class Action Settlement if it is approved by the Court. You would not be able to "opt out" of the Proposed Class Action Settlement and then bring your own lawsuit making claims about profit-sharing and the Medicare Part D subsidies.

## WHAT IF I DON'T LIKE THE PROPOSED SETTLEMENT? HOW DO I OBJECT?

Although you cannot exclude yourself from the Proposed Class Action Settlement, you can object to it and ask the Court not to approve it.

Any Class Member may object to the Proposed Class Action Settlement or Class Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses. Objections must be in writing. To object to the Proposed Class Action Settlement, you must give reasons why you think the Court should not approve it. The Court will consider your views before making a decision.

In order to have your objection considered, you or your attorney must mail the written objection to Class Counsel, Navistar Counsel, and the Court. Your objection must contain: (a) the full name, address, telephone number, and email address of the objector; (b) a written statement of all grounds for the objection accompanied by any legal or factual support for such objection; (c) copies of any papers, briefs, or other documents on which the objection is based; (d) a list of all cases in which the objector and/or objector's counsel had filed or in any way participated in—financially or otherwise—objecting to a class action settlement in the preceding five years; (e) the name, address, email address, and telephone number of all attorneys representing the objector; (f) a statement indicating whether the objector and/or the objector's counsel intends to appear at the Fairness Hearing, and, if so, a list of all persons, if any, who will be called to testify in support of the objection; and (g) the objector's signature. Class Members who fail to make objections in the manner specified in this section will be deemed to have waived any objections and will be foreclosed from making any objection to the Proposed Class Action Settlement. You must mail your written objection to the following addresses:

**Navistar Counsel**
John C. Goodchild, III
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103

**Court**
Office of the Clerk
Walter H. Rice Federal Building
200 W. 2nd Street, Suite 712
Dayton, Ohio 45402

13

**Class Counsel**
W. B. Markovits
Markovits, Stock & DeMarco, LLC
3825 Edwards Road, Suite 650
Cincinnati, OH 45209

An Objection to the Proposed Class Action Settlement must be filed on or before April 10, 2022.  If you do not object within this time period, you lose your right to object to the Proposed Class Action Settlement.

You may file a written objection without having to appear at the Settlement Fairness Hearing. You may not, however, appear at the Fairness Hearing to present your objection unless you first filed and served a written objection in accordance with the procedures described above, unless the Court orders otherwise.

---

**WHEN AND WHERE IS THE FAIRNESS HEARING? AM I REQUIRED TO ATTEND THE FAIRNESS HEARING? MAY I SPEAK AT THE HEARING?**

---

The Court will hold a hearing to decide whether to finally approve the Proposed Class Action Settlement.  You may attend and you may be able to speak at the hearing, but you do not have to do so. The Court will hold the Fairness hearing at _____ a.m./p.m. on June 9, 2022, at the Walter H. Rice Federal Building, 200 W. 2nd St., Dayton, Ohio 45402, in Courtroom _____. At the hearing, the Court will consider whether the settlement is fair, reasonable, and adequate. If there are objections that were received by the deadline, the Court will then consider them. If you submit a timely objection, the Court will also listen to you speak at the hearing, if you so request.

You are not required to attend the Fairness Hearing but are welcome to attend. If you send an objection you can come to Court to discuss it if you filed a Notice of Appearance and the Court permits; however, you are not obligated to attend. You may also pay your own lawyer to attend or discuss your objection, but that is not necessary.

You may ask the Court to permit you to speak at the Fairness Hearing. To do so, you must file a written request with the Court saying that it is your "Notice of Intent to Appear at the Fairness Hearing in *Shy v. Navistar International Corp.*, Case No. 3:92-cv -0333-WHR (S.D. Ohio)." This notice must be filed no later than April 10, 2022. If you plan to have your own attorney speak for you at the hearing, you must also include the name, address, and telephone number of the attorney who will appear. Your written request must be sent to the Clerk of Court, Class Counsel, and Navistar's Counsel at their addresses above. You may not be permitted to speak at the hearing if your Notice of Intent to Appear is late.

The date and time of the Fairness Hearing could change. If you plan to attend the hearing, please contact Class Counsel or call the toll-free number to confirm.

| WHO REPRESENTS THE INTERESTS OF THE CLASS MEMBERS? |
|---|

The Court has appointed Class Representatives and Class Counsel to represent the interests of the Class Members. The following individuals have been appointed as Class Representatives, each of whom is a Navistar retiree:

> Robert Bergmann (Ret. USW)
> Fred Cortright (Ret. UAW)
> Carl Potts (Ret. SEE)
> Miller Rodgers (Ret. UAW
> Richard Zounes (Ret. Salaried)

The lawyers that the Court has appointed to serve as Class Counsel are:

> W. B. Markovits
> Terence R. Coates
> Markovits, Stock and Demarco, LLC
> 3825 Edwards Road, Suite 650
> Cincinnati, Ohio 45209
> Phone: 513-651-3700
> bmarkovits@msdlegal.com
> tcoates@msdlegal,com

The SBC also has counsel that were instrumental in negotiating the settlements. These lawyers are:

> Ted Scallet
> EascoLaw, LLP
> 2756 Stephenson Lane, NW
> Washington, DC 20015
> Phone: 202-329-6399
> ted@eascolaw.com

> Sarah Adams
> Groom Law Group, Chartered
> 1701 Pennsylvania Ave, NW
> Washington, DC 20006
> Phone: 202-857-0620
> sadams@groom.com

If you would like to be represented by your own lawyer, you may hire one at your own expense. You do not need to hire your own attorney to file an Objection.

| WHAT PAYMENT ARE THE ATTORNEYS FOR THE CLASS SEEKING?  HOW WILL THE LAWYERS BE PAID? |
|:---:|

Navistar agreed to pay the fees and expenses of Class Counsel in this matter, subject to a $750,000 cap that Navistar and Class Counsel agreed to and believe is reasonable. If the Proposed Class Action Settlement is approved, Class Counsel's attorneys' fees will be subject to review by this Court as part of the settlement process. Navistar agreed to pay the fees and expenses of Class Counsel regardless of their recommendations with respect to the Profit-Sharing Settlement or the *Krzysiak* Settlement and whether or not the Proposed Class Action Settlement is ultimately approved. This agreement came after the material financial terms of the Proposed Class Action Settlement were determined and has no effect on any payment to Class Members. Payment to Class Counsel will be made following Court review of fees, if any, or at the time the settlement process is terminated. Any Class Member who objects to the request by Class Counsel for payment of their fees and expenses may state that objection in writing and may appear at the hearing. If you submit a written Objection, you are not required to appear at the hearing.

The fees and expenses of the SBC's lawyers are reviewed by the SBC and paid by the Supplemental Trust.

The out-of-pocket expenses of the Class Representatives, if any, will be reimbursed by Class Counsel. The Class Representatives are not being paid fees.

| HOW DO I GET MORE INFORMATION ABOUT THE CASE? |
|:---:|

The detailed Settlement Agreement, plan amendments, key litigation documents and a "Frequently Asked Questions" page may be found on Navistar's settlement website at the following address:

- www.navistar.com/shysettlement

If you have further questions, Navistar has a toll-free hotline at 1-877-353-5100.

If there is an issue that cannot be dealt with through the websites or hotline, you may contact Class Counsel at 1-513-651-3700.

**Please do not contact the Court. The Court personnel will not be able to answer your questions.**

**<u>Exhibit H</u>**

**Email Notice**

**To:** Navistar Medical or Life Insurance Benefits Recipient
**From:** Navistar

**Subject:** *Shy v. Navistar International Corp.*, Case 3:92-cv-0333-WHR (S.D. Ohio) – Notice of Class Action Settlement

**NOTICE OF *NAVISTAR* CLASS ACTION SETTLEMENT**

**IF YOU ARE ENTITLED TO RECEIVE MEDICAL OR LIFE INSURANCE BENEFITS FROM NAVISTAR, THIS PROPOSED CLASS ACTION SETTLEMENT MAY AFFECT YOU**

***A federal court authorized this notice. This is not a solicitation from a lawyer.***

Please be advised that there is a proposed agreement to settle disputes among parties in *Shy v. Navistar International Corp.*, Case No. 3:92-cv-0333-WHR (S.D. Ohio) (the "*Shy* Lawsuit"). This is the case concerning your health and life insurance benefits that has been pending before Judge Walter H. Rice since 1992. This class action settlement notice (the "Notice") has been sent to you because you are a current or future recipient of retiree medical or life insurance benefits from the Navistar, Inc. Retiree Health Benefit and Life Insurance Plan (the "*Shy* Plan"). The agreement would eliminate your right to bring additional lawsuits concerning the current disputes in exchange for cash and other consideration, estimated at a value of $742 million plus interest, that would be used for an increase in the healthcare benefits that you receive. For further details about the settlement and related matters please see www. navistar.com/shysettlement or call toll-free at 1-877-353-5100.

Defendants Navistar, Inc. and Navistar International Corp. ("Navistar"), plaintiff The Supplemental Benefit Program Committee of the Navistar, Inc. Retiree Supplemental Benefit Program (the "SBC"), and certain plaintiffs and representatives of your fellow Navistar retirees ("Class Representatives") have reached an agreement to resolve the current disputes. This agreement would eliminate your right to bring additional lawsuits concerning the current disputes in exchange for cash and other consideration that would be used for an increase in the healthcare benefits that you receive.

A hearing will be held before the Honorable Walter H. Rice on June 9, 2022, at _____ a.m. in the Walter H. Rice Federal Building and U.S. Courthouse, Courtroom ___, 200 West Second Street Dayton, Ohio 45402, or as otherwise ordered by the Court ("Fairness Hearing") to determine: (i) whether the proposed Settlement is fair, reasonable and adequate; (ii) whether the above class definition should be adopted for the Settlement; (iii) whether Class Counsel's motion for attorneys' fees and expenses should be approved; (iv) whether certain provisions of the agreement resulting from the *Shy* case should be modified to effect the Settlement; (v) to consider any Class Member's timely objection to the Settlement or to the motion for attorneys' fees and expenses; and (v) to consider any other matters that may properly be brought before the Court in connection with the Settlement. You do NOT need to attend the Fairness Hearing.

**PLEASE READ THIS NOTICE CAREFULLY**. If you are a participant or beneficiary in the *Shy* Plan, your rights may be affected whether or not you act.

**YOUR LEGAL RIGHTS ARE AFFECTED BY THIS SETTLEMENT:**

| ACTIONS YOU MAY TAKE IN THE SETTLEMENT | |
|---|---|
| **NO ACTION IS NECESSARY.** | If the proposed Class Action Settlement is approved by the Court and you are a Class Member, you do not need to do anything. |
| **YOU CAN OBJECT NO LATER THAN APRIL 11, 2022. WRITTEN OBJECTIONS MUST BE FILED WITH THE COURT BY THIS DATE.** | If you wish to object to any part of the proposed Class Action Settlement, you must submit to the Court a written explanation outlining the reasons for your objection, as discussed below. |

| | |
|---|---|
| **YOU CAN GO TO THE HEARING ON JUNE 9, 2022 BY FILING A NOTICE OF INTENTION TO APPEAR NO LATER THAN APRIL 11, 2022.** | If you have submitted a written objection to the Court, you can ask to speak in Court about your objections. You may also appear in Court through an attorney if you so desire, but you do not have to have an attorney. |

## Additional Case Information

**What is a class action?** A class action is a lawsuit whereby certain representatives of the potential class file a lawsuit on behalf of themselves and others similarly situated. Class actions permit individuals with potentially smaller individual damages to pursue their individual claims together in one proceeding against a common defendant or defendants.

**Why am I a receiving this Notice?** You are receiving this notice because you appear to be a member of the Settlement Class, which is defined as follows:

> Present participants (including spouses and dependents) and those eligible to become participants, whether upon retirement or election (including eligible spouses and dependents), in the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (n/k/a the Navistar, Inc. Retiree Health and Life Insurance Plan). This includes all eligible present retirees, individuals eligible upon retirement or election, and participating, eligible, or future-eligible spouses and dependents in the Navistar International Transportation Corp. Retiree Health Benefit Program (n/k/a the Navistar, Inc. Retiree Health Benefit Program), the Navistar International Transportation Corp. Retiree Life Insurance Program (n/k/a the Navistar, Inc. Retiree Life Insurance Program), and the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (n/k/a the Navistar, Inc. Retiree Supplemental Benefit Program).

**Who are the class representatives?** Miller Rodgers (Ret. UAW), Fred Cortright (Ret. UAW), Robert Bergmann (Ret. USW), Richard Zounes (Ret. Salaried), Carl Potts (Ret. SEE) are the named plaintiffs and class representatives in this lawsuit. They have diligently reviewed and approved of the terms of the proposed Settlement.

**Who are the attorneys for the plaintiff and the proposed class?** Class Counsel are W.B. Markovits and Terence R. Coates of Markovits, Stock & De Marco, LLC, 3825 Edwards Road, Suite 650, Cincinnati, OH 45209, telephone (513) 651-3700.

**Do I have any obligation to pay attorneys' fees or expenses?** No. Navistar agreed to pay the fees and expenses of Class Counsel in this matter, subject to a $750,000 cap that Navistar and Class Counsel agreed to and believe is reasonable. Class Counsel's attorneys' fees will be subject to review by this Court as part of the approval process.

**If I submit an objection to the settlement, what must it include?** Any Class Member may object to the proposed settlement. Your objection must contain: (a) the full name, address, telephone number, and email address of the objector; (b) a written statement of all grounds for the objection accompanied by any legal or factual support for such objection; (c) copies of any papers, briefs, or other documents on which the objection is based; (d) a list of all cases in which the objector and/or objector's counsel had filed or in any way participated in—financially or otherwise—objecting to a class action settlement in the preceding five years; (e) the name, address, email address, and telephone number of all attorneys representing the objector; (f) a statement indicating whether the objector and/or the objector's counsel intends to appear at the Fairness Hearing, and, if so, a list of all persons, if any, who will be called to testify in support of the objection; and (g) the objector's signature. Class Members who fail to make objections in the manner specified in this section will be deemed to have waived any objections and will be foreclosed from making any objection to the Settlement. Any objection shall be filed with the Court and a copy must be served upon Class Counsel and Navistar's counsel no later than **April 11, 2022**. Class Counsel may be served at the address above. Navistar's counsel may be served at:  John C. Goodchild, III, Morgan, Lewis & Bockius LLP, 1701 Market Street, Philadelphia, PA 19103. Objections may be filed with the Court at:  Office of the Clerk, Walter H. Rice Federal Building, 200 W. 2nd Street, Suite 712, Dayton, OH 45402.

**Who is the Judge overseeing this settlement?** Judge Walter H. Rice, United States District Judge, Southern District of Ohio, Walter H. Rice Federal Building, 200 W. 2nd St., Dayton, Ohio 45402.

**<u>Where may I locate the settlement agreement or obtain more information about the Settlement?</u>** More information may be found on the settlement website at <u>www.navistar.com/shysettlement</u>. Questions may be directed to a toll-free line at 1-877-353-5100.  You may also contact Class Counsel listed above.

**PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE REGARDING THIS NOTICE.**

## Exhibit I

**Publication Notice**

For immediate release

**DAYTON, OHIO [Insert Date] PRNewswire**

A class action settlement has been reached to settle disputes among parties in *Shy v. Navistar International Corp.*, Case 3:92-cv-0333-WHR (S.D. Ohio). The Court has granted preliminary approval of this settlement. The agreement would eliminate your right to bring additional lawsuits concerning the current disputes in exchange for cash and other consideration, estimated at a value of $742 million plus interest, that would be used for an increase in the healthcare benefits that you receive.  For further details about the settlement and related matters please see www. navistar.com/shysettlement or call toll-free at 1-877-353-5100.

The settlement class is defined as:

> Present participants (including spouses and dependents) and those eligible to become participants, whether upon retirement or election (including eligible spouses and dependents), in the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (n/k/a the Navistar, Inc. Retiree Health and Life Insurance Plan). This includes all eligible present retirees, individuals eligible upon retirement or election, and participating, eligible, or future-eligible spouses and dependents in the Navistar International Transportation Corp. Retiree Health Benefit Program (n/k/a the Navistar, Inc. Retiree Health Benefit Program), the Navistar International Transportation Corp. Retiree Life Insurance Program (n/k/a the Navistar, Inc. Retiree Life Insurance Program),  and the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (n/k/a the Navistar, Inc. Retiree Supplemental Benefit Program).

This agreement would eliminate your right to bring additional lawsuits concerning the current disputes in exchange for cash and other consideration that would be used for an increase in the healthcare benefits that you receive.

A hearing will be held before the Honorable Walter H. Rice on June 9, 2022, at _____ a.m. in the  Walter H. Rice Federal Building and U.S. Courthouse, Courtroom ____, 200 West Second Street Dayton, Ohio 45402, or as otherwise ordered by the Court ("Fairness Hearing") to determine: (i) whether the proposed Settlement is fair, reasonable and adequate; (ii) whether the above class definition should be adopted for the Settlement; (iii) whether Class Counsel's motion for attorneys' fees and expenses should be approved; (iv) whether certain provisions of the agreement resulting from the *Shy* case should be modified to effect the Settlement; (v)  to consider any Class Member's timely objection to the Settlement or to the motion for attorneys' fees and expenses; and (v) to consider any other matters that may properly be brought before the Court in connection with the Settlement.  You do NOT need to attend the Fairness Hearing.

If you are a member of the settlement class, your rights may be affected.