**NAVISTAR INTERNATIONAL CORPORATION**
**FINAL VERSIONS OF**
**SETTLEMENT AGREEMENT DOCUMENTS**

<u>Document</u>                                                                                          <u>Page Number</u>

Amended and Restated Settlement Agreement [modified]                            [3]

    Exhibit A – Base Plan [modified]                                                      [26]

        Appendix A-1 – Health Benefit Program SPD [omitted]              [54]

        Appendix A-2 – Life Insurance Program SPD [omitted]              [55]

        Appendix A-3 – Health Benefit Trust Agreement [original]          [56]

        Appendix A-4 – Present Represented Employees [original]          [67]

        Appendix A-5 – Initial Actuarial Valuation [original]                [68]

        Appendix A-6 – Actuarial Definitions Supplement [modified]      [90]

        Appendix A-7 – HBPC Committee Members [original]                [99]

    Exhibit B – Supplemental Plan [modified]                                          [102]

        Appendix B-1 – Supplemental Benefit Program SPD [modified]    [115]

        Appendix B-2 – Supplemental Benefit Trust Agreement [modified]  [156]

        Appendix B-3 – Third Amended and
            Restated Certificate of Incorporation [modified]        [169]

        Appendix B-4 – *Reserved* [deleted from original per settlement]    [178]

        Appendix B-5 – SBC Committee Members [original]                  [179]

        Appendix B-6 – *Reserved* [deleted from original per settlement]    [185]

        Appendix B-7 – Calculation of Common and
            Dilutative Common Equivalent Shares [original]          [186]

    Exhibit C – List of Class Members [original]                                  [189]

    Exhibit D – Definition Supplement [modified]                              [190]

    Exhibit E – Notice Order [original]                                            [203]

    Exhibit F – Cover Letter [original]                                            [206]

    Exhibit G – Judgment [original]                                                [225]

    Exhibit H – Health Benefit Program Letter [original]                      [280]

    Exhibit I – Premium Bill [original]                                            [283]

    Exhibit J – *Reserved* [deleted from original per settlement]            [285]

    Exhibit K – Legal Opinions [original]                                        [286]

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ART SHY, FRED BURRIS, CLARENCE
NUSS, JOHN HERRING, CARL POTTS,
HAROLD RETHERFORD, HENRY G. BETLEY,
RICHARD A. SPITLER, JACK O'NEAL, and
DONALD McPHEARSON on behalf of
themselves and other persons
similarly situated, and
INTERNATIONAL UNION, UNITED
AUTOMOBILE AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA AND ITS LOCAL UNIONS 6,
66, 98, 119, 226, 305, 402, 472, 658,
2274, and 2293, INTERNATIONAL UNION,
UNITED PLANT GUARD WORKERS OF AMERICA         Case No. C-3-92-333
("UPGWA") AND ITS LOCAL UNIONS 122,           Judge Walter H. Rice
4 AND 134 AND INTERNATIONAL
MACHINISTS DISTRICT LODGE 28 AND ITS
LOCAL LODGES 1471, 2819, AND 2821,
SOCIETY OF ENGINEERING EMPLOYEES, INC.
("SEE"), INTERNATIONAL UNION, UNITED
STEELWORKERS OF AMERICA ("USWA")
AND ITS LOCAL UNION 4320 on behalf of
themselves and other similarly
situated unions,

                              Plaintiffs,

        vs.

NAVISTAR INTERNATIONAL CORPORATION,
NAVISTAR INTERNATIONAL TRANSPORTATION
CORP., NAVISTAR FINANCIAL CORPORATION,
HARCO NATIONAL INSURANCE COMPANY, the
NAVISTAR INTERNATIONAL TRANSPORTATION
CORP. HEALTH PLAN and the INDIANAPOLIS
CASTING CORPORATION,

                              Defendants.

_____/

2

# TABLE OF CONTENTS

Page

Summary of Settlement Agreement ............................................................ 6
1. Discovery ................................................................... 7
2. Benefits Of Settlement ....................................................... 8
3. No Admissions ............................................................... 9
4. Class Action Notice Order .................................................... 9
5. Judgment to be Entered Approving the Settlement ................................ 10
6. Releases and Related Matters ................................................. 10
7. Initial Eligibility and Enrollment in the Plan .............................. 11
8. Corporate Approvals ......................................................... 14
9. Contribution of Parent Securities ............................................ 14
10. Board of Directors .......................................................... 15
11. Costs, Attorneys Fees and Indemnification .................................... 16
12. Conditions and Effective Date of Settlement .................................. 16
13. Effect of Disapproval or Modification ........................................ 17
14. Representations and Warranties ............................................... 18
15. Miscellaneous Provisions ..................................................... 20

3

Exhibits

| Exhibit A | - | The Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan |
|-----------|---|----|
| Exhibit B | - | The Navistar International Corp. Retiree Supplemental Benefit Program |
| Exhibit C | - | List of Class Members |
| Exhibit D | - | Definition Supplement |
| Exhibit E | - | Notice order |
| Exhibit F | - | Cover Letter |
| Exhibit G | - | Judgment |
| Exhibit H | - | Health Benefit Program Letter |
| Exhibit I | - | Premium Bill |
| Exhibit J | - | *Reserved* |
| Exhibit K | - | Legal Opinions |

4

Amended and Restated
Settlement Agreement

This Settlement Agreement, dated as of March 30, 1993, amended and restated as of June 30, 1993, and further amended and restated as of December 22, 2021 (which, together with the Exhibits hereto, is referred to as the "Settlement Agreement"), is between Navistar, by and through its attorneys, and the Class Representatives, on behalf of the Class, by and through Class Counsel, in the class action of *Shy et al. v. Navistar*, Civil Action No. C-3-92-333 (S.D. Ohio) (the "*Shy Case*"). This Settlement Agreement shall apply to:

(i)     Present Retirees, Present Surviving Spouses and Eligible Dependents of Class Members;

(ii)    Present Eligible Former Employees and Present Non-Represented Employees who will be eligible for Health and Life Insurance Benefits after the Effective Date; and

(iii)   all labor organizations which presently are or were in the past parties to collective bargaining agreements ("CBAs") pursuant to which Navistar maintains an Existing Plan.

Each such natural person constitutes a "Class Member" and all of such natural persons and entities constitute the "Class".

In the event of an inconsistency between this Settlement Agreement and any Exhibit hereto, this Settlement Agreement shall control; provided, that any reference to or description of the Health Benefit Program or the Life Insurance Program is qualified entirely by reference to Exhibit A, and any reference to or description of the Supplemental Benefit Program is qualified entirely by reference to Exhibit B (as amended effective December 31, 2021). In the event of any inconsistency between the Health Benefit Program SPD or the Life Insurance Program SPD and Exhibit A, Exhibit A shall control. In the event of any inconsistency between the Supplemental Benefit Program SPD (as amended) and Exhibit B (as amended), Exhibit B shall control.

Capitalized terms used and not otherwise defined in this Settlement Agreement have the meanings given them in the Definition Supplement attached as Exhibit D.

This Settlement Agreement affects only the duration and level of, and not eligibility for, Health and Life Insurance Benefits. All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan in the absence of this Settlement Agreement (other than Excluded Retirees) shall be eligible for benefits under the Plan. No person not otherwise eligible for Health and Life Insurance Benefits under an Existing Plan shall be eligible for any benefit by virtue of this Settlement Agreement.

## Summary of
## Settlement Agreement

This Settlement Agreement finally resolves and settles all claims of the Class Members in the *Shy* Case, subject to Court approval and the other terms and conditions set out below.

On the Effective Date, the Company will establish the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), ERISA Plan number 584, EIN 36-1264810, which will be comprised of:

(i)      the Navistar International Transportation Corp. Retiree Health Benefit Program (n/k/a the Navistar, Inc. Retiree Health Benefit Program) (the "Health Benefit Program"), described in Exhibit A;

(ii)     the Navistar International Transportation Corp. Retiree Life Insurance Program (n/k/a the Navistar, Inc. Retiree Life Insurance Program) (the "Life Insurance Program"), described in Exhibit A, which consists of the Basic Life Insurance Program and the Optional Life Insurance Program; and

(iii)    the Navistar International Transportation Corp. Retiree Supplemental Benefit Program (n/k/a the Navistar, Inc. Retiree Supplemental Benefit Program) (the "Supplemental Benefit Program"), described in Exhibit B (as amended).

Subject to the contribution requirements described in Exhibit A, the Company agrees that the benefits provided by the Health Benefit Program will be made available for the lifetime of:

(i)      Present Retirees and Class Members who are or will become Surviving Spouses;

(ii)     Present Eligible Former Employees at such time as they would have been entitled to receive Health and Life Insurance Benefits under the Existing Plans in the absence of this Settlement Agreement; and

(iii)    Present Non-Represented Employees at such time as they become eligible to commence the receipt of Pension Benefits or as described below.

The Company has further agreed that (i) the benefits provided by the Health Benefit Program will be made available to Eligible Dependents of Class Members for as long as they remain such, (ii) the benefits provided by the Basic Life Insurance Program will be made available to Present Retirees for the duration of their lives, and (iii) the benefits provided by the Optional Life Insurance Program will be made available to Class Member Retirees who satisfy the eligibility requirements set out in the Life Insurance SPD.

Pursuant to the New CBAs and not through this Settlement Agreement, the Company has also agreed that the benefits provided by the Health Benefit Program and the Basic Life Insurance Program will be made available to Present Represented Employees and their Surviving Spouses at such time as they would have been entitled to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the New CBAs for the duration of their lives and to their

Eligible Dependents for so long as they remain such, subject, in the case of the Health Benefit Program to the contribution requirements described in Exhibit A.

The Company's share of the initial estimated accumulated post-retirement benefit obligation in connection with the Plan is $1 billion ($946 million for the Health Benefit Program and $54 million for the Basic Life Insurance Program). The Company will fund the Health Benefit Program and the Basic Life Insurance Program by making contributions to the Health Benefit Trust, including contributions of the Annual Service Cost and pre-funding contributions up to $500 million on or before the Event Date from the proceeds of sales of securities or from other sources. The Health Benefit Program will be administered by the Company in its capacity as Plan Administrator, subject to the review authority of the Health Benefit Program Committee. The Health Benefit Program Committee shall consist of seven members, including three Company appointees, two UAW appointees and two other appointees, one of whom shall preside as chairperson.

The Supplemental Benefit Program will be established for the purposes of reducing or reimbursing premiums, co-payments and deductibles that would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program and of providing Additional Permissible Benefits.

The Supplemental Benefit Program will be administered by the Supplemental Benefit Committee, which shall consist of five members, including two UAW appointees and three other appointees, one of whom shall preside as chairperson. The initial members of such committee shall be approved by the Court. On the Effective Date, Parent will transfer one share of Parent Series B Preference to the UAW, which will entitle it to elect one member of the Board until such time as the Health Benefit Program and the Life Insurance Program are Fully Funded, subject to certain reinstatement rights.

The Plan can only be amended under certain limited conditions specified herein and in Exhibits A and B, including in the event of the adoption of a State or National Health Insurance Program.

In exchange, the coverage of Class Members for Health and Life Insurance Benefits under the Existing Plans will be terminated at the end of the day before the Effective Date, except that claims incurred prior to the Effective Date will be paid in accordance with the Existing Plans. At that time, all of the claims of the Class in the *Shy* Case will be released, and the *Shy* Case will be dismissed with prejudice.

1.      *Discovery*.

The Class Representatives conducted substantial discovery both prior to and after the commencement of the Litigation. This discovery included, among other things, the review of documents produced by Navistar and third parties, interviews of witnesses and the analysis of Navistar's relevant retiree health care documents. The Class Representatives have thoroughly investigated the law applicable to the Class Members' claims. The Class Representatives and their retained experts and consultants have also conducted an extensive review of Navistar's current and

projected future financial condition. Similarly, counsel for Navistar has thoroughly reviewed the various defenses available to Navistar.

2.      *Benefits Of Settlement*.

2.1      *To The Class*. The Class Representatives and Class Counsel have conducted a thorough and detailed analysis of Navistar's financial situation and have determined that unless the costs incurred by the Employers to provide Health and Life Insurance Benefits under the Existing Plans are immediately and permanently reduced, Navistar is likely to file for bankruptcy and may be liquidated. In the event of Navistar's bankruptcy and liquidation, there is a high likelihood that benefits for the Class Members would be dramatically reduced or eliminated. Even in the event of a successful reorganization of Navistar, it is likely that continued retiree benefits would be reduced by more than is required in this Settlement Agreement. Thus, the Class Representatives and Class Counsel have concluded that further proceedings to continue the *Shy* Case against Navistar would not be in the best interests of the Class. In reaching this conclusion, the Class Representatives and Class Counsel further recognize the length and cost of further proceedings necessary to continue the *Shy* Case against Navistar through trial and appeals. The Class Representatives and Class Counsel have also taken into account the uncertainty and delay that such proceedings would entail and the risk of an adverse outcome. The Class Representatives and Class Counsel are also mindful of problems of proof and the various defenses available to Navistar.

Given these considerations, but without admitting that their contentions in the *Shy* Case lack merit or any liability of any kind to Navistar, the Class Representatives and the Class Counsel have determined that it is desirable, beneficial and in the best interests of the Class that the claims of the Class be settled in the manner and on the terms set forth herein, and that these terms are fair and reasonable.

2.2      *To Navistar*. Navistar has concluded that the further conduct of the *Shy* Case would be protracted and expensive for all parties. This Settlement Agreement will allow Navistar to avoid the expense of litigating multiple lawsuits concerning its Health Benefit and Life Insurance obligations. Navistar previously sought to reduce its retiree health benefits pursuant to a declaratory judgment action filed in the Northern District of Illinois (the "*Foster Case*"), which was dismissed by the agreement of the parties as a condition of the commencement of settlement discussions in the *Shy* Case.

Substantial amounts of time, energy and resources have been spent on and, absent this Settlement Agreement, would continue to be spent on the defense of the claims asserted by or on behalf of the Class. Although Navistar's current financial position permits it to pay its debts as they become due, Navistar's net assets are dwarfed by its potential long-term liability for Health and Life Insurance Benefits. Unless definite and swift action is taken permanently to reduce the costs of such benefits, Navistar will be threatened with insolvency. Without admitting liability of any kind to the Class, or that its defense in the *Shy* Case lacks merit, Navistar has therefore determined that it is desirable, beneficial and in the best interest of Navistar that the claims of all Class Members be settled in the manner and on the terms set forth herein, and that these terms are fair and reasonable.

3.      *No Admissions*.

3.1     Navistar continues to deny any wrongdoing or legal liability arising out of any of the claims and contentions alleged against it in the *Shy* Case. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement is, may be construed as, or may be used as, an admission by or against Navistar of any fault, wrongdoing or liability whatsoever.

3.2     The Class Representatives have claimed and continue to claim that the contentions made by or on behalf of the Class in the *Shy* Case have merit. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement is, may be construed as, or may be used as, an admission by or against the Class or the Class Representatives, or any of them, that any of their contentions lacked merit.

3.3     There has been no determination by any court as to the factual or legal allegations made by or against Navistar in the *Shy* Case. Neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement is, may be construed as, or may be used as, an admission by any of the parties hereto or a waiver of any applicable statute of limitations, and neither this Settlement Agreement nor any document referred to herein nor any action taken to carry out this Settlement Agreement shall be offered or received in evidence in any action or proceeding by or against Navistar, the Class or the Class Representatives, or any of them, in any court, administrative agency or other tribunal for any purpose whatsoever other than to enforce the provisions of this Settlement Agreement or to obtain or seek approval of this Settlement Agreement in accordance with Rule 23 of the Federal Rules of Civil Procedure.

4.      *Class Action Notice Order*.

4.1     The parties shall submit this Settlement Agreement to the Court and shall seek from the Court an order (the "Notice Order"), substantially in the form of Exhibit E hereto, providing that the *Shy* Case will continue to be stayed and that notice of the hearing on the proposed settlement (the "Fairness Hearing") shall be given to the Class. Following entry of the Notice Order, the Company shall (i) mail a copy of the notice contemplated in the Notice Order to the Class, together with the documents referred to in Section 4.2, (ii) cause the notice contemplated by the Notice Order to be published in the daily newspaper of largest circulation in Springfield, Ohio, Chicago, Illinois, Indianapolis, Indiana, Fort Wayne, Indiana, Moline, Illinois, and Milwaukee, Wisconsin, and (iii) submit a proof of such mailing and publication to the Court. Until entry of the Judgment, copies of this Settlement Agreement shall also be made available for inspection by Class Members at the Court, at the UAW offices in Springfield, Ohio, Indianapolis, Indiana, Chicago, Illinois, Moline, Illinois, Dallas, Texas, Memphis, Tennessee, and Louisville, Kentucky, and at the offices of each of the other labor organization Class Representatives and Class Counsel. In addition, prior to entry of the Judgment, Class Counsel shall conduct such meetings or make such other communications as Class Counsel shall deem appropriate to inform the Class Members of the proposed terms of this Settlement Agreement, which meetings and communications will be ineffective to vary the terms hereof.

4.2     The notice sent to the Class Members shall include a cover letter substantially in the form of Exhibit F, and copies of this Settlement Agreement, definitions of certain terms used

in this Settlement Agreement, the Health Benefit Program SPD (Appendix A-1), the Life Insurance Program SPD (Appendix A-2) and the Supplemental Benefit Program SPD (Appendix B-1). The Company shall send additional copies of any of such materials and/or copies of any other Exhibit or Appendix to any Class Member upon request.

5.      *Judgment to be Entered Approving the Settlement*.

After notice to the Class Members and upon approval by the Court of this Settlement Agreement, the parties will request the Court to enter the Judgment substantially in the form of Exhibit G hereto.

6.      *Releases and Related Matters*.

6.1     In consideration of Navistar's entry into this Settlement Agreement, the establishment of the Plan and the other obligations of Navistar contained herein, the Class Representatives and the Class Counsel hereby consent to the entry of the Judgment, which will be binding upon the Class pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.

6.1.1     As of the Effective Date, the Class, the Class Representatives and anyone claiming on behalf of, through or under them by way of subrogation or otherwise shall be released and discharged, and shall be forever barred and enjoined from instituting or prosecuting, either directly or indirectly, against the Navistar Released Parties or the Employers, any and all rights, claims or causes of action, whether known or unknown, suspected or unsuspected, concealed or hidden, which they had, have or hereafter may have, arising out of or based upon or otherwise related to any of the claims that were or could have been asserted in the *Shy* Case with respect to Health and Life Insurance Benefits, including all rights to continuation of such benefits under expired collective bargaining agreements, as well as any claims that this Settlement Agreement, any document referred to herein or any action taken to carry out this Settlement Agreement is not in compliance with applicable laws and regulations; provided, that nothing contained in this Settlement Agreement shall preclude the Class or the Class Representatives, or any of them, from asserting any right or claim or bringing any action to enforce the terms of this Settlement Agreement or the Judgment.

6.1.2     Each of the Navistar Released Parties, the Employers, the Class Representatives and the Class Counsel shall refrain from taking any action to challenge the compliance of this Settlement Agreement, any document referred to herein or any action taken to carry out this Settlement Agreement with applicable laws and regulations or from encouraging any other person or entity to do so.

6.1.3     As of the Effective Date, the Navistar Released Parties and the Employers shall be forever released and discharged with respect to any and all rights, claims or causes of action that the Class or anyone claiming on behalf of, through or under the Class by way of subrogation or otherwise, has, had or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to any of the claims that were or could have been asserted in the *Shy* Case with respect to Health and Life Insurance Benefits, including all rights to continuation of such benefits under expired collective bargaining agreements, as well as any claims that this Settlement Agreement, any document

10

referred to herein or any action taken to carry out this Settlement Agreement is not in compliance with applicable laws and regulations.

6.2     Neither the entry into of this Settlement Agreement nor the consent to the Judgment is, may be construed as, or may be used as, an admission by or against the Navistar Released Parties, the Employers, the Class, the Class Representatives, or any of them, of any fault, wrongdoing or liability whatsoever.

6.3     Neither the entry into of this Settlement Agreement nor the consent to the Judgment waives or releases any right, claim or cause of action, whether known or unknown, suspected or unsuspected, concealed or hidden, which the Class or the Class Representatives, or any of them, has, had or hereafter may have with respect to (i) any matter not related to Health and Life Insurance Benefits, including, but not limited to, rights, claims or causes of action relating to workers' compensation, pension benefits, sickness or accident programs, salary continuation or disability or pension programs maintained by the Employers or any of them or (ii) the implementation and enforcement of this Settlement Agreement or the Judgment.

7.      *Initial Eligibility and Enrollment in the Plan*.

7.1     <u>Termination of Existing Plans</u>. The Company will, and will cause the other Employers to, terminate the coverage of the Class Members (other than Deferred Retiree Participants) for Health and Life Insurance Benefits under the Existing Plans as of the end of the day before the Effective Date, whereupon the Plan will be established as described below and in Exhibits A and B. The Company will, and will cause the other Employers to, terminate the coverage of Deferred Retiree Participants for Health and Life Insurance Benefits under the Existing Plans as of the end of the first day permitted by the applicable settlement agreements, whereupon they will be entitled to receive benefits under the Health Benefit Program and the Supplemental Benefit Program. Claims incurred prior to the Effective Date or such day will be paid under the Existing Plans as provided in Exhibit A.

7.2     <u>Initial Eligibility</u>. Present Retirees (other than the Deferred Retiree Participants), Present Surviving spouses and Present Eligible Dependents will be entitled to receive benefits under the Health Benefit Program on the Effective Date, subject to the applicable enrollment requirements set forth below. Present Retirees will receive benefits under the Basic Life Insurance Program without contribution or enrollment. Present Retirees will receive benefits under the Optional Life Insurance Program if they make required premium contributions and if they meet the eligibility requirements set forth in the Life Insurance Program SPD. Deferred Retiree Participants will be entitled to receive benefits under the Health Benefit Program at such time as may be permitted under the applicable Settlement Agreement. Present Eligible Former Employees and Present Non-Represented Employees shall be eligible for benefits under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of this Settlement Agreement. Class Members will receive benefits under the Health Benefit Program and the Supplemental Benefit Program subject to the payment of any required premium contributions, except that supplemental life insurance benefits may be provided to all Retirees, including those who are not Enrolled Participants.

7.2.1 <u>Enrollment</u>. Not less than two weeks before the Effective Date, Present Retirees (other than the Deferred Retiree Participants) and Present Surviving Spouses will be sent a letter, substantially in the form of Exhibit H (the "<u>Health Benefit Program Letter</u>"), a premium bill, substantially in the form of Exhibit I, and a stamped, preaddressed envelope.

7.2.2 <u>Health Benefit Program Letter and Bill</u>. The Health Benefit Program Letter sent to each Present Retiree (other than Deferred Retiree Participants) and Present Surviving Spouse will state that the Health Benefit Program will be effective on the beginning of the Effective Date and that payment of the enclosed bill will automatically enroll the Participants for whom coverage is elected in the Health Benefit Program and the Supplemental Benefit Program. The letter will also list the names of any Present Eligible Dependents of such Present Retiree or Present Surviving Spouse in the Company's records, whether or not such Present Retiree, Present Surviving Spouse and such Eligible Dependents are eligible for Medicare, and the premium due. The letter will provide instructions for declining coverage and correcting the information with respect to Eligible Dependents and Medicare eligibility contained in the letter.

The letter will further explain that failure to pay will lead to termination of health benefit coverage under the Health Benefit Program and the Supplemental Benefit Program. The letter will summarize the right to re-enroll for health benefits under the Health Benefit Program and the Supplemental Benefit Program and will refer to specific pages of the Health Benefit Program SPD for further detail. The bill will provide that Present Retirees or Present Surviving Spouses who do not wish to enroll in the Health Benefit Program and the Supplemental Benefit Program may decline coverage by checking a box on the back of the bill. The back of the bill will also provide spaces for electing or declining coverage for Spouses. The letter will include a toll-free number which the Present Retirees or Present Surviving Spouses may call for assistance.

7.2.3 <u>Payments</u>. The letter and bill will both specify that payment may be made by personal check, bank check or money order. Pension deduction will be made available at the first feasible opportunity and forms for such election will be sent at that time. Until such option is made available, Present Retirees and Present Surviving Spouses who enroll in the Health Benefit Program and the Supplemental Benefit Program will receive bills,, reminder notices and termination notices in accordance with Exhibit A, and the due dates and grace periods for payment of bills set out in Exhibit A shall apply.

7.2.4 <u>Due Dates</u>. Payment of the applicable initial premium contribution will be due on the Effective Date. Payments received within 31 days of the due date will be considered as received as of such date. A reminder notice will be sent 14 days after the due date. A termination notice will be sent 31 days after the due date, stating that coverage is terminated, but that coverage will be reinstated without penalty as of the Effective Date if payment is received within 90 days of the Effective Date.

7.2.5 <u>Enrollment in the Optional Life Insurance Program</u>. Each Present Retiree who meets the eligibility requirements for the Optional Life Insurance Program set forth in the Life Insurance Program SPD will receive an enrollment letter (the "<u>Optional Life Insurance Program Letter</u>") prior to the Effective Date. The Optional Life Insurance Program Letter sent to each such Present Retiree will state the amount of Company-paid life insurance benefits provided to such Present Retiree under the Existing Plans as of the day before the Effective Date and the

amount of Company-paid life insurance that will be discontinued as of the Effective Date. The Optional Life Insurance Program Letter will further state that such Present Retiree will have the right, as a one-time option, to purchase optional life insurance directly from Aetna Life Insurance company in $1,000 increments up to the discontinued amount, rounding upwards if necessary. To receive such optional life insurance, such Present Retiree must enroll within 31 days of the date of the Optional Life Insurance Program Letter. An enrollment form will be included with the Optional Life Insurance Program Letter, together with a rate schedule with examples of premium cost, and a space to designate beneficiaries. Subsequent bills will be sent quarterly. Upon payment of the applicable premium for the first month, individual certificates of coverage will be sent to Present Retirees electing optional life insurance.

7.2.6 <u>Enrollment for Class Members Not Yet Eligible for Retirement</u>. Present Eligible Former Employees and Present Non-Represented Employees may apply to enroll in the Health Benefit Program, the Supplemental Benefit Program and (if they meet the eligibility requirements set out in the Life Insurance Program SPD) the Optional Life Insurance Program as of the date on which they apply to receive Pension Benefits. If such Present Eligible Former Employees and Present Non-Represented Employees are eligible to enroll in the Health Benefit Program and the Supplemental Benefit Program at such time, they will receive a notice containing substantially the information set out in Section 7.2.2 and a bill for the applicable initial premium contribution, payable in accordance with Exhibit A, and they shall be enrolled in the Basic Life Insurance Program automatically at such time. Upon payment of such premium contribution, such Present Eligible Former Employees and Present Non-Represented Employees shall also be enrolled in the Health Benefit Program and the Supplemental Benefit Program. If any such person is eligible to enroll in the optional Life Insurance Program at such time, he will receive substantially the information set out in Section 7.2.5. In the event of a change in the eligibility requirements under any of the Applicable Retirement Plans, if a Present Eligible Former Employee or a Present Non-Represented Employee applies for Pension Benefits prior to the time such person is eligible to receive benefits under the Plan, the Company shall inform such person of the date on which such person shall be so eligible.

7.2.7 <u>Enrollment for Deferred Retiree Participants</u>. Not less than two weeks before the date on which Deferred Retiree Participants become eligible to receive benefits under the Health Benefit Program, they will be sent a letter containing substantially the information set out in Section 7.2.2 and a bill for the applicable initial premium contribution, payable in accordance with Exhibit A. Upon payment of such premium contribution, such Deferred Retiree Participants shall be enrolled in the Health Benefit Program and the Supplemental Benefit Program.

7.3 <u>List of Eligible Class Members</u>. Exhibit C sets out the names of Present Retirees, Present Surviving Spouses, Present Eligible Former Employees and Present Non-Represented Employees, all as reflected in the records of the Company. At any time prior to the Effective Date, if the Company, the Class Members or the Class Representatives, or any of them, believes that an individual has been erroneously included in or excluded from Exhibit C, the inclusion or exclusion will be brought to the attention of the other parties. If the Company, the Class Members or the Class Representatives, or any of them, does not agree to the inclusion or exclusion of any such individual in or from Exhibit C, the disagreement shall be resolved through the claims dispute procedure set forth in the Health Benefit Program SPD. After the Effective Date, an individual

13

who believes that he or she has been erroneously excluded from Exhibit C should contact the Plan Administrator, and any dispute shall be determined pursuant to the claims dispute procedures set forth in Exhibit A. No person erroneously included in Exhibit C shall be entitled to any benefits under this Settlement Agreement or the Exhibits. No person who would otherwise be entitled to Health and Life Insurance Benefits under any existing Plan shall lose his or her eligibility for benefits under this Settlement Agreement because he or she was erroneously excluded from Exhibit C.

7.4    <u>Erroneous Exclusion Remedy</u>.   In the event that an individual who has been erroneously excluded from Exhibit C is later determined to be a Class Member, such individual's participation shall be recognized as of the Effective Date or such later date as such individual first became eligible to enroll in the Health Benefit Program and the Supplemental Benefit Program or, at the option of such Class Member, the date on which he or she receives the Health Benefit Program Letter and other material described in Section 7.2.2. The Company shall send the Health Benefit Program Letter and such other material to each individual erroneously excluded from Exhibit C as promptly as practicable upon learning that such individual was so excluded, explaining such person's enrollment options and offering to permit such individual to pay premium arrearages in installments as may be agreed between the Company and such individual.

8.    *Corporate Approvals*.

Navistar shall take all actions required in connection with the execution and delivery of this Settlement Agreement and the performance of its obligations hereunder. Without limiting the generality of the foregoing, Parent shall use its best efforts to obtain any necessary stockholder approval to ensure that the Certificate of Incorporation of Parent as of the Effective Date shall be in the form of the amended and restated certificate of incorporation attached as Appendix B-3 (the "<u>Charter Amendments</u>").

9.    *Contribution of Parent Securities*.

9.1    [*Reserved*].

9.2    [*Reserved*].

9.3    On the Effective Date, the Company shall contribute one share of Parent Series B Preference to the UAW. This share may not be transferred, since the sole purpose of its issuance is to permit the UAW to elect the UAW Designee in accordance with Section 10.1. The following legend shall be placed on the certificate representing the Parent Series B Preference issued to the UAW:

"The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be sold or transferred except in compliance with such Act or an exemption from the registration requirements under such Act. In addition, the securities represented by this certificate are subject to voting agreements, transfer restrictions and other provisions contained in the Navistar International Corporation certificate of incorporation, and the Settlement Agreement, dated as of March 30, 1993 in the class action of *Shy et al. v. Navistar Civil* Action No. C-3-92-33 (S.D. Ohio), a copy of which is on file at the office of the Secretary of Navistar International Corporation."

14

Stop transfer orders will be entered with the transfer agent (or agents) and the registrar (or registrars) of such securities against the transfer of legended securities held by the UAW. Other than as provided herein, the UAW shall not give any proxies or powers of attorney or make any assignments with respect to the voting of, or enter into any voting trusts, voting agreements or similar arrangements with respect to the Parent Series B Preference.

10.    *Board of Directors*.

10.1    Until the Fully Funded Date, the UAW shall be entitled to elect the UAW Designee. After the Fully Funded Date, the UAW shall be entitled, pursuant to the terms of its share of the Parent Series B Preference, to elect the UAW Designee at any time when the funding level of the Health Benefit Trust falls below 85 percent of the Fully Funded Amount. The UAW Designee shall not be entitled to any compensation from Parent for the performance of his services as such; provided, that the Company shall, at the option of the UAW (i) pay such director the value of any compensation paid to a non-employee director of Parent, (ii) contribute such amount to the Contributing Participants' Sub-account or (iii) pay and contribute such amount to the UAW Designee and the  Contributing Participants' Sub-account in such proportions as the UAW shall direct in each case in a lump sum in cash within 30 days following the end of the year for which such payment or contribution is paid; and provided, further, that this Section 10.1 shall not affect the UAW Designee's right to any amount paid as or in lieu of reimbursement for expense. For the avoidance of doubt, any contribution of the Company to the Contributing Participants' Sub-account under this Section 10.1 shall not count toward any contribution or payment obligation of the Company or the Employers to the Health Benefit Trust under the Health Benefit Program or Life Insurance Program or the Health Benefit Trust Agreement.

10.2    [*Reserved*].

10.3    Parent shall indemnify each present or former UAW Designee for, and hold each such person harmless from and against, any and all losses, costs, liabilities, damages and expenses (including fees and disbursements of legal advisors), as incurred, which any such person may incur as a result of his or her actions or omissions as a director of Parent to the greatest extent that Parent then indemnifies or holds harmless any other director of Parent, whether pursuant to the Delaware General Corporation Law, Parent's Certificate of Incorporation, contract or otherwise. From and after the Effective Date and until the sixth anniversary of such time as no UAW Designee is entitled to serve on the Board, Parent shall cause to be maintained in effect its current policies of directors' and officers' liability insurance for the benefit of such Designees and, if such current policies cannot be maintained, Parent shall use its reasonable best efforts to obtain appropriate substitute policies of directors' and officers, liability insurance; provided, that the terms and conditions of any such policies with respect to such Designees, or any of them, shall not be less favorable to such Designees than the terms and conditions of any directors' and officers' liability insurance then maintained by Parent for any of its other directors.

10.4    The Board shall cause the number of directors constituting the Board to be increased or decreased from time to time in order to include the UAW Designee.

10.5    The UAW Designee will be assigned to the committees of the Board in the same manner as the current members of the Board.

15

11.    *Costs, Attorneys Fees and Indemnification*.

11.1    [*Reserved*].

11.2    Each party to this Settlement Agreement agrees not to seek any other future fees or expenses from any other party in connection with the *Shy* Case, except that the Class Representatives or any other party prevailing in any action to enforce the terms of this Settlement Agreement may seek any such fees and costs as may be allowed by law or as provided herein.

11.3    Parent and the Company shall indemnify the Class Representatives for, and hold them harmless from and against, any and all losses, costs, liabilities, damages and expenses (including, without limitation, fines, penalties, taxes and the fees and disbursements of actuarial, financial and legal advisors) as incurred, which they may incur (a) in connection with or arising out of the Litigation, including, without limitation, the execution, delivery, performance and enforcement of this Settlement Agreement, (b) as a result of the failure of Navistar to comply with its obligations hereunder or the failure of any representation or warranty made by Navistar to be true and complete on and as of the date on which it was made or (c) as a result of any limitation on the legality, validity, binding nature or enforceability of this Settlement Agreement as a result of the bankruptcy of Navistar or any Employer, except that Navistar's obligation to indemnify the non-Navistar parties to the *Foster Case* and the Class Representatives for the fees and expenses of actuarial, financial and legal advisors retained by them through the date on which the Judgment becomes Final shall be limited to the fees and expenses specified in Sections 11.1 and 11.2. Any claim for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

12.    *Conditions and Effective Date of Settlement*.

12.1    This Settlement Agreement became effective on June 30, 1993 (the "Effective Date").  The following conditions remain effective on Navistar.

12.1.1    [*Reserved*].

12.1.2    [*Reserved*].

12.1.3    [*Reserved*].

12.1.4    [*Reserved*].

12.1.5    [*Reserved*].

12.1.6    [*Reserved*].

12.1.7    [*Reserved*].

12.1.8    [*Reserved*].

12.1.9    [*Reserved*].

12.1.10     [*Reserved*].

12.1.11     [*Reserved*].

12.1.12     [*Reserved*].

12.1.13     [*Reserved*].

12.1.14     [*Reserved*].

12.1.15     [*Reserved*].

12.1.16     [*Reserved*].

12.1.17     [*Reserved*].

12.1.18     [*Reserved*].

12.1.19     [*Reserved*].

12.1.20     The delivery of a waiver executed by a duly authorized officer of each Employer of its rights to seek any amendment or modification of the Plan pursuant to Section 1114 of the Bankruptcy Code or of any New CBA pursuant to Section 1113 of the Bankruptcy Code substantially in the form of Sections 15.1.1 and 15.1.2 hereto.

12.1.21     The delivery of such further information and documents as Class Counsel or the Class Representatives, or any of them, may reasonably request (a) to evidence the compliance of Navistar with its obligations under this Settlement Agreement, (b) to substantiate the representations of Navistar contained in Section 14.2 and (C) to consummate the transactions contemplated by this Settlement Agreement.

12.1.22     [*Reserved*].

12.2     [*Reserved*].

12.3     [*Reserved*].

13.     *Effect of Disapproval or Modification*.

In the event that the Judgment is materially modified as the result of any ruling by the Court or by the Court of Appeals (which, for purposes of clarification, do not include those agreed pursuant to that certain Letter of Intent by and among the UAW, the Supplemental Benefit Committee, and the Company (among others), dated as of October 22, 2021, or pursuant to the Class Settlement Agreement modifying the terms of this Settlement, dated as of December 22, 2021), either of Navistar or the Class Representatives may terminate this Settlement Agreement by notice to the others within 90 days of such modification after negotiating in good faith to agree on such amendments to this Settlement Agreement as will effectuate the purposes hereof while complying with the terms of such modification; provided, that the obligations of Navistar in Sections 10.3 and 11 shall survive such termination. In the event of such termination, the positions

of Navistar, the Class, the Class Representatives, or any of them, shall be deemed to have reverted to the positions of such parties as of the date and time immediately prior to the execution of this Settlement Agreement as provided under the executed Stipulations and Orders for Stay of Litigation and Certain Other Matters ("Stay Orders"), including reinstatement of the Existing Plans. As promptly as practicable following such termination, the UAW Designee and the Supplemental Trust Designees shall resign from the Board. In the event of a termination under this Section, the Company shall apply assets held in the Health Benefit Trust to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the IRC). Monies disbursed (i) by Navistar pursuant to the Stay Orders or Section 11 or (ii) which have been used to provide benefits to Participants shall not be reimbursed and, except as otherwise expressly provided herein, the parties shall thereafter proceed in all respects as if this Settlement Agreement had not been executed, without prejudice to the right of any party to assert any claims or to be reimbursed for costs and expenses incurred by it pursuant to the Stay Orders, this Settlement Agreement or any other agreement. In the event of such termination, the parties specifically agree that in the event any subsequent proceedings in the *Shy* Case are necessary, each of the parties will bear its own costs and expenses (including the fees and expenses of actuarial, financial and legal advisors), without prejudice to its right to seek reimbursement of such costs and expenses as permitted by law or pursuant to any future stay order or agreement among the parties.

14.    *Representations and Warranties.*

14.1    Class Counsel represent and warrant to Navistar that they have full power and authority to execute and deliver this Settlement Agreement on behalf of the Class Representatives and to perform their obligations hereunder.

14.2    Navistar represents and warrants to Class Counsel and the Class Representatives as of the Effective Date as follows:

(a)    The Navistar Parties and the other Employers are all corporations duly incorporated, validly existing and in good standing in the jurisdictions of their incorporation;

(b)    Navistar and the other Employers have all necessary power and authority to execute and deliver this Settlement Agreement and each document referred to herein to be executed and delivered by them and to take any action required or appropriate to be taken by them in connection with the performance of their obligations hereunder;

(c)    The execution and delivery of this Settlement Agreement and any document referred to herein to be executed and delivered by Navistar or any other Employer and any action required or appropriate to be taken by any of them in connection with the performance of its obligations hereunder have been duly authorized by all necessary action on the part of such party;

(d)    This Settlement Agreement and each other document required to be executed and delivered by Navistar or any other Employer are the legal, valid and binding obligations of Navistar or such other Employer enforceable against them in accordance with their terms except to the extent such enforceability is limited by bankruptcy;

(e)     The Class Members include all of the individuals entitled to receive Health and Life Insurance Benefits under Existing Plans, except for the Excluded Retirees. All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan (except for the Excluded Retirees) in the absence of this Settlement Agreement shall be eligible for benefits under the Plan. No person not otherwise eligible for Health and Life Insurance Benefits under an Existing Plan shall be eligible for any benefit by virtue of this Settlement Agreement.

(f)     The execution and delivery of this Settlement Agreement and any document referred to herein and the performance of the obligations of Navistar and the other Employers hereunder will not (i) violate or conflict with the certificate of incorporation, by-laws or other constituent documents of Navistar or any other Employer, (ii) require the consent of any person, or violate or conflict with or accelerate the performance required, under any agreement to which Navistar or any other Employer is a party or by which it is bound, (iii) violate or conflict with any statute, rule or regulation applicable to Navistar or any other Employer or by which any of such parties is bound, (iv) require the authorization or approval of, any other action by, or any notice to or filing with, any governmental authority in connection with Navistar's execution and delivery of this Settlement Agreement or the performance of the obligations of Navistar or any other Employer hereunder, other than the authorizations, approvals, notices and filings referred to in Section 12.1, (v) violate or conflict with any order, ruling, decree, judgment or award of any court, arbitrator or government agency applicable to Navistar or any other Employer or (vi) result in the creation of any lien, claim, security interest, encumbrance, charge, restriction or right of any kind whatsoever of any third party upon any of the properties or assets of Navistar or any other Employer;

(g)     Upon their issuance in accordance with the terms of this Settlement Agreement, the shares of Parent Series B Preference to be issued by Parent will be duly and validly authorized, issued and outstanding, fully paid and non-assessable;

(h)     [*Reserved*];

(i)     Upon the issuance of the shares of Parent Series B Preference to be issued by the Parent in accordance with the terms of this Settlement Agreement, the UAW will acquire valid title to, and full rights of ownership of, the shares issued to them, free and clear of any and all liens, claims, security interests, encumbrances, charges, restrictions or rights of third parties of any kind (other than restrictions set out in Exhibit B or under the Securities Act); and

(j)     Except as specifically set forth herein, the execution, delivery and performance of this Settlement Agreement shall not result in the creation of any rights in, or in any payments to, any employee, officer or director of any of the Navistar Parties and shall not constitute a change in control or similar event under any plan, program, arrangement or agreement with, or benefitting, any such employee, officer or director.

14.3    Counsel to Navistar represent and warrant to the Class Representatives that they have full power and authority to execute and deliver this Settlement Agreement on behalf of Navistar.

15. *Miscellaneous Provisions*.

    15.1.    Waiver of Sections 1113 and 1114.

        15.1.1    In consideration of the agreements of the Class Representatives in this Settlement Agreement, Navistar hereby waives, and shall cause each of the other Employers to waive, its rights to seek any amendment or modification of the Plan pursuant to Section 1114 of the Bankruptcy Code. In the event that the waiver set forth in the preceding sentence is held to be unenforceable and any court of competent jurisdiction should approve any such amendment or modification, then Navistar will be obligated to take, and to cause such other Employers to take, such remedial actions as the Class Representatives may deem appropriate in order to place the Participants in substantially the same position as they would have been in had the waiver been held valid.

        15.1.2    In consideration of the agreements of the Class Representatives in this Settlement Agreement, Navistar hereby waives, and shall cause each of the other Employers to waive, its rights to seek amendment or modification of the New CBAs pursuant to Section 1113 of the Bankruptcy Code. In the event that the waiver set forth in the preceding sentence is found to be unenforceable and a court of competent jurisdiction should approve any such amendment or modification, then Navistar will be obligated to take such remedial actions as the Class Representatives may deem appropriate in order to place the Employees covered by the New CBAs in substantially the same position as they would have been in had the waiver been held valid.

    15.2    The Exhibits hereto are incorporated in this Settlement Agreement as though fully set forth herein. References in this Settlement Agreement to "Sections" and "Exhibits" refer to the Sections and Exhibits of this Settlement Agreement unless otherwise specified.

    15.3    The waiver by one party of (a) any breach by the other party of, or (b) any other right to enforce or claim or benefit under, this Settlement Agreement shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, this Settlement Agreement.

    15.4    This Court will retain exclusive jurisdiction to resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of this Settlement Agreement, except for disputes relating solely to eligibility or entitlement to benefits hereunder. Each of the parties hereto expressly and irrevocably submits to the jurisdiction of the Court in connection with any proceedings in connection with the enforcement, interpretation or implementation of this Settlement Agreement, except for disputes relating solely to eligibility or entitlement to benefits hereunder, and expressly waives any argument it may have with respect to venue or forum non conveniens.

    15.5    This Settlement Agreement constitutes the entire agreement between the parties, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than the representations, warranties and covenants contained and memorialized in this Settlement Agreement. This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, which are related to the subject matter hereof.

15.6    The captions used in this Settlement Agreement are for convenience of reference only and do not constitute a part of this Settlement Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Settlement Agreement, and all provisions of this Settlement Agreement will be enforced and construed as if no captions had been used in this Settlement Agreement.

15.7    The Class Representatives expressly authorize Class Counsel to take all appropriate action required or permitted to be taken by the Class Representatives pursuant to this Settlement Agreement to effectuate its terms and also expressly authorize Class Counsel to enter into any non-material modifications or amendments to this Settlement Agreement on behalf of them that Class Counsel deems appropriate from the date this Settlement Agreement is signed until the Effective Date; provided, that the effectiveness of any amendment which adversely impacts the level of Plan benefits to any Class Member as well as any material amendment shall be subject to the approval of the Court after appropriate notice to the Class Members.

15.8    This Settlement Agreement may be executed in two or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument, provided that counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

15.9    No party to this Settlement Agreement may assign any of its rights hereunder without the prior written consent of the other parties, and any purported assignment in violation of this sentence shall be void. Any party to this Settlement Agreement may delegate any of its obligations under this Settlement Agreement; provided, that no such delegation shall relieve such party of such obligation; and provided, further, that the delegation of any of the obligations of Navistar under this Settlement Agreement to the transferee of all or any part of the assets of any Employer shall be subject to the express written assumption of such obligations by such transferee.

15.10    By executing and supporting this Settlement Agreement, and by agreeing to its provisions regarding the role of the Class Representatives in corporate governance, administration of the Plan, claims dispute resolution, and other matters, the Class Representatives are not undertaking any legal duty or standard of care with respect to such future activities except as otherwise may be required by law. In all instances where individual Class Members have the right to initiate claims review or arbitration proceedings, no failure of the Class Representatives to participate in such proceedings shall bar or prejudice any such Class Members.

15.11    Each of Navistar, the Class Representatives and the Class Counsel shall do any and all acts and things, and shall execute and deliver any and all documents, as may be necessary or appropriate to effect the purposes of this Settlement Agreement.

15.12    This Settlement Agreement shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or preempted thereby, with the laws of the State of Illinois.

15.13    Any notice, request, information or other document to be given under this Settlement Agreement to any of the parties by any other party shall be in writing or delivered

personally, or sent by Federal Express or other carrier which guarantees next-day delivery, transmitted by facsimile, or sent by registered or certified mail, postage prepaid, as follows:

> If to the Class Representatives
> or Class Counsel, addressed to Class
> Counsel at the addresses indicated on the
> signature pages of this Settlement
> Agreement

> If to Navistar, addressed to:

> > Navistar, Inc.
> > Benefits Department
> > 2701 Navistar Drive
> > Lisle, Illinois  60532

> in each case with copies to:

> > General Counsel
> > Navistar, Inc.
> > 2701 Navistar Drive
> > Lisle, Illinois  60532

> > > and

> > John C. Goodchild, III
> > Morgan, Lewis & Bockius LLP
> > 1701 Market Street
> > Philadelphia, Pennsylvania 19103-2921

22

IN WITNESS WHEREOF, the parties hereto have caused this Settlement Agreement to be executed by themselves or their duly authorized attorneys.

/s/ David S. Cupps                              , Trial Attorney
David S. Cupps                    (0017002)
Anne C. Griffin                    (0017571)
VORYS, SATER, SEYMOUR & PEASE
52 East Gay Street
P.O. Box 1008
Columbus, Ohio  43216-1008
(614) 464-6319

/s/ Emily Nicklin
Emily Nicklin
Ruben Castillo
KIRKLAND & ELLIS
200 E. Randolph Drive
Chicago, Illinois  60601
(312) 861-2000

Attorneys for Defendants Navistar International
Corporation, Navistar International Transportation Corp.,
Navistar Financial Corporation, Harco National Insurance
Company, the Navistar International Transportation Corp.
Health Plan and the Indianapolis Casting Corporation

/s/ Daniel W. Sherrick
Daniel W. Sherrick
Associate General Counsel
International Union, United Automobile, Aerospace
and Agricultural Implement Workers of America, UAW
8000 East Jefferson
Detroit, Michigan  48214
(313) 926-5216

Counsel for Plaintiffs International Union,
United Automobile, Aerospace, and Agricultural
Implement Workers of America, and its Local
Unions 6, 66, 98, 119, 226, 305, 402, 472,
658, 2274 and 2293

/s/ Betty Grdina                              , Trial Attorney
Betty Grdina                    (0014602)
BOBULSKY, GRDINA & ALTIER
2036 East Prospect Road
Ashtabula, Ohio  44004
(216) 998-4214

Counsel for Plaintiffs Art Shy,
Fred Burris, Clarence Nuss, John Herring,
Henry G. Betley and Richard A. Spitler

/s/ Gerald B. Lackey                          , Trial Attorney
Gerald B. Lackey                    (0017244)
LACKEY, NUSBAUM, HARRIS, RENY & TORZEWSKI
Two Maritime Plaza, 3rd Floor
Toledo, Ohio  46304
(419) 243-1105

Counsel for Plaintiffs Carl Potts and
Harold Retherford

/s/ Barry Macey
Barry Macey
MACEY, MACEY & SWANSON
445 North Pennsylvania Street
Suite 401
Indianapolis, Indiana  46204
(317) 637-2345

Counsel for Plaintiffs Jack O'Neal &
    Donald McPhearson

/s/ Gordon A. Gregory
Gordon A. Gregory
GREGORY, MOORE, JAEKLE, HEINEN
    ELLISON & BROOKS
3727 Cadillac Tower
Detroit, Michigan  48226
(313) 964-5600

Counsel for Plaintiffs International Union,
United Plant Guard Workers of America, and its Local
Unions 122, 4 and 134

/s/ Mark Schneider
Mark Schneider
Associate General Counsel
International Association of Machinists
900 Machinists Place
Upper Marlboro, Maryland  20772
(301) 967-4500

24

Counsel for International Association
of Machinists, its District Lodge 28,
and its Local Lodges 1471, 2819, and 2821

/s/ Bruce O. Boxberger
Bruce O. Boxberger
Arthur E. Mandelbaum
MILLER, CARSON & BOXBERGER
1400 One Summit Square
Fort Wayne, Indiana 46802
(219) 423-9411

Counsel for Society of Engineering
Employees, Inc.

/s/ David Gore
David Gore
KLEIMAN, WHITNEY, WOLFE & GORE
One East Wacker Drive
Suite 1910
Chicago, Illinois 60601
(312) 467-4380

Counsel for International Union,
United Steelworkers of America, and its Local 4320
and USWA, Local 4320

/s/ Frederick G. Cloppert, Jr.          , Trial Attorney
Frederick G. Cloppert, Jr.          (0010371)
Michael J. Hunter          (0018756)
CLOPPERT, PORTMAN, SAUTER, LATANICK & FOLEY
225 East Broad Street
Columbus, Ohio 43215
(614) 461-4455

Local Counsel for all Unions and
Individual Plaintiffs listed above

/s/ Ian D. Lanoff
Ian D. Lanoff
Julia Penny Clark
BREDHOFF & KAISER
1000 Connecticut Ave., N.W.
Suite 1300
Washington, D.C. 20036
(202) 833-9340

Additional Counsel for all Unions and
Individuals listed above

25

**EXHIBIT A**

**THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**
**RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN (n/k/a THE NAVISTAR,**
**INC. RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN)**

## TABLE OF CONTENTS

ARTICLE I          Introduction  ..................................................................................29

    1.1    Definitions.............................................................................................29
    1.2    Purpose of the Plan ..............................................................................29
    1.3    Health Benefit Program, Life Insurance Program, Supplemental Benefit Program........................................................................................29
    1.4    Trust Funds ...........................................................................................30
    1.5    Administration, Plan Year  ...................................................................30
    1.6    Amendments ..........................................................................................30
    1.7    Termination of Existing Health and Life Insurance Benefits ...................30

ARTICLE II         Plan Participants ..................................................................31

    2.1    Eligibility .............................................................................................31
    2.2    Enrollment.............................................................................................31
    2.3    Termination of Coverage Under the Health Benefit Program. ...................32
    2.4    Re-Enrollment .......................................................................................33

ARTICLE III        Contributions to the Health Benefit Program  ............................33

    3.1    Determinations by the Actuary. ............................................................33
    3.2    Contributing Participants' Annual Contributions ...................................33
    3.3    Employers' Annual Contribution...........................................................36
    3.4    Transfers of Funds between Sub-accounts  ............................................36
    3.5    Transfers from the Supplemental Benefit Trust to the Health Benefit Trust ..... 37
    3.6    Employers' Prefunding Contributions. ................................................. 37
    3.7    Payment of Benefits. ............................................................................. 38
    3.8    State or National Health Insurance Programs ....................................... 39
    3.9    Guarantee of Health Benefit Program ...................................................40

ARTICLE IV         Contributions to Life Insurance Program  .................................41

    4.1    Employer Contributions.........................................................................41
    4.2    Optional Life Insurance ........................................................................41
    4.3    Guarantee of Life Insurance Program ...................................................41

ARTICLE V          Administration of the Health Benefit Program and the Life Insurance Program ...................................................................42

ARTICLE VI         Health Benefit Program Committee.........................................43

    6.1    Health Benefit Program Committee .......................................................43
    6.2    Committee Powers.................................................................................43

27

6.3     Program Design ....................................................................................44
6.4     Action by Health Benefit Program Committee.................................. 45
6.5     Health Benefit Program Committee Minutes......................................45
6.6     HBPC Other Member ..........................................................................46
6.7     Expenses ..............................................................................................46
6.8     Dispute Resolution...............................................................................46

ARTICLE VII General Provisions.................................................................47

7.1     Required Data .......................................................................................47
7.2     Non-Alienation .....................................................................................47
7.3     Action by Employers ...........................................................................47
7.4     Applicable Law.....................................................................................47
7.5     Limitation of Liability; Indemnification .............................................47
7.6     Limitation on Liens as Security for Employers' Contributions...........47
7.7     Limitations on Sale and Lease-Back Transactions ..............................49
7.8     Subrogation...........................................................................................50
7.9     Assignment and Delegations.................................................................50
7.10    Captions ................................................................................................50

ARTICLE VIII Amendment and Termination ...............................................50

8.1     Amendment............................................................................................50
8.2     Termination...........................................................................................51

ARTICLE IX Exclusive Benefit and Prohibited Inurement .........................51

9.1     Exclusive Benefit .................................................................................51
9.2     Prohibited Inurement ...........................................................................51

ARTICLE X Events of Default.......................................................................52

APPENDICES

Appendix A-1 Health Benefit Program SPD

Appendix A-2 Life Insurance Program SPD

Appendix A-3 Health Benefit Trust Agreement

Appendix A-4 Present Represented Employees

Appendix A-5 Initial Actuarial Report

Appendix A-6 Actuarial Definitions Supplement

Appendix A-7 HBPC Committee Members

**NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**
**RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN (n/k/a THE NAVISTAR,**
**INC. RETIREE HEALTH BENEFIT AND LIFE INSURANCE PLAN)**

ARTICLE I

Introduction

1.1 <u>Definitions</u>. Capitalized terms used and not defined herein have the meanings assigned to them in Exhibit D to the Settlement Agreement.

1.2 <u>Purpose of the Plan</u>. The Plan shall be established by the Employers effective as of the Effective Date. The purpose of the Plan is (i) to provide Enrolled Participants with the health insurance benefits described herein, (ii) to provide all Retirees, whether or not they are Enrolled Participants, with the life insurance benefits described here, and (iii) to provide Enrolled Participants and all Retirees with the additional benefits described in Exhibit B to the Settlement Agreement. Enrolled Participants who are (i) Retirees and Surviving Spouses will be eligible to receive such health insurance and additional benefits for the duration of their lives and (ii) Eligible Dependents will be eligible to receive such health insurance and additional benefits for so long as they remain Eligible Dependents. Basic life insurance benefits shall be provided to Retirees for the duration of their lives.

1.3 <u>Health Benefit Program. Life Insurance Program. Supplemental Benefit Program</u>. The Plan ("Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan" (n/k/a the Navistar, Inc. Retiree Health Benefit and Life Insurance Plan)) consists of the Health Benefit Program ("Navistar International Transportation Corp. Retiree Health Benefit Program" (n/k/a the Navistar, Inc. Retiree Health Benefit Program)), the Life Insurance Program ("Navistar International Transportation Corp. Retiree Life Insurance Program" (n/k/a the Navistar, Inc. Retiree Life Insurance Program)) and the Supplemental Benefit Program ("Navistar International Transportation Corp. Retiree Supplemental Benefit Program" (n/k/a the Navistar, Inc. Retiree Supplemental Benefit Program)).

(a) The Health Benefit Program provides for the health benefits described in the SPD attached as Appendix A-1 hereto. Such SPD also describes the preferred provider organization and coordinated care features of the Health Benefit Program and the HMO alternatives to the Health Benefit Program. The Plan Administrator will make arrangements for Contributing Participants to be afforded the option to subscribe to HMO alternatives as required by law or as determined by the UAW/Navistar Joint Committee, in lieu of receiving the benefits under the Health Benefit Program described in Appendix A-1. Contributing Participants who are Retirees or Surviving Spouses will be given the opportunity not less than once each year to elect to change their enrollment (and that of their Eligible Dependents) from the Health Benefit Program to such HMO alternatives or from such HMO alternatives to the Health Benefit Program. If such a Retiree or Surviving Spouse elects an HMO alternative, the Actuary shall determine the per capita cost of benefits under the Health Benefit Program for such Contributing Participant, and the excess of the premium contribution payable to the HMO for such Contributing Participant over such amount shall be added to the

required contributions of such Contributing Participant under the Health Benefit Program. Promptly after receiving notice from a Contributing Participant who has elected to enroll in an HMO alternative that he or she has moved out of an area where such HMO alternative is offered, the Plan Administrator shall notify such Contributing Participant of the premium contribution required to be made to the Health Benefit Trust to receive coverage under the Health Benefit Program. Such Contributing Participant will be transferred to coverage under the Health Benefit Program as of the first day of the calendar month following the month for which premium payments are last made to the HMO on behalf of the Contributing Participant.

(b)     The Life Insurance Program provides Retirees with the life insurance benefits described in the SPD attached as Appendix A-2 hereto.

(c)     The Supplemental Benefit Program provides for the reduction or reimbursement of premiums, co-payments, deductibles and other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program or to participate in Medicare or any part thereof, or any successor or comparable program thereto, and for the provision of Additional Permissible Benefits to Enrolled Participants and Retirees whether or not they are Enrolled Participants, as set forth in Exhibit B to the Settlement Agreement.

      1.4     <u>Trust Funds.</u>  The Health Benefit Program and the Life Insurance Program shall be implemented by the Health Benefit Trust. The Supplemental Benefit Program shall be implemented by the Supplemental Benefit Trust. The Health Benefit Trust and the Supplemental Benefit Trust are intended to meet the requirements of tax exempt organizations under Section 501(c)(9) of the IRC, or under any comparable section or sections of any future legislation that amends, supplements or supersedes said section.

      1.5     <u>Administration. Plan Year.</u>  The Plan is administered for plan reporting purposes on the basis of the Plan Year, although the determinations to be made by the Actuary hereunder are made on the basis of the calendar year or the Measurement Year. The Health Benefit Program and the Life Insurance Program are administered by the Company as the Plan Administrator and Named Fiduciary in accordance with Article V, subject to the review authority of the Health Benefit Program Committee provided in Article VI.

      1.6     <u>Amendments.</u>  The benefits provided under the Plan may be amended only to the limited extent provided in Section 8.1.

      1.7     <u>Termination of Existing Health and Life Insurance Benefits.</u> The Company will, and will cause the other Employers to, terminate coverage for Health and Life Insurance Benefits under Existing Plans (other than for Excluded Retirees and Deferred Retiree Participants) as of the end of the day immediately before the Effective Date. The Company will, and will cause the other Employers to, terminate the coverage of Deferred Retiree Participants for Health and Life Insurance Benefits under the Existing Plans as of the end of the first day permitted by the applicable settlement agreements, whereupon they will be eligible to receive benefits under the Health Benefit Program and the Supplemental Benefit Program.  Claims incurred prior to the Effective Date or such day will be paid under the Existing Plans in accordance with the terms thereof. Claims

for hospital stays which commenced and pregnancies which occurred prior to the Effective Date will be paid as described in the Health Benefit Program SPD.

ARTICLE II

Plan Participants

2.1 <u>Eligibility.</u> The following shall apply with respect to eligibility:

(a) Each Present Employee, Present Eligible Former Employee, Present Retiree, Present Eligible Dependent and Present Surviving Spouse shall be a Participant in the Plan as of the Effective Date;

(b) Present Retirees (other than Deferred Retiree Participants), Present Surviving Spouses and Present Eligible Dependents will be entitled to receive benefits under the Health Benefit Program on the Effective Date, subject to the applicable enrollment requirements set forth below. Present Retirees will receive benefits under the Basic Life Insurance Program without contribution or enrollment. Present Retirees will receive benefits under the Optional Life Insurance Program if they make required premium contributions and if they meet the eligibility requirements set forth in the Life Insurance Program SPD. Deferred Retiree Participants will be entitled to receive benefits under the Health Benefit Program at such time as may be permitted under the applicable settlement agreement. Present Eligible Employees and Present Non-Represented Employees shall be eligible for benefits under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement;

(c) Present Represented Employees shall be eligible for benefits under the Plan at such time as they would have been eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement;

(d) Exhibit C is intended to list all President Non-Represented Employees, Present Eligible Former Employees, Present Retirees and Present Surviving Spouses, as reflected in the records of the Company. Appendix A-4 is intended to list all Present Represented Employees, as reflected in the records of the Company. The Company shall correct each error in Exhibit C and Appendix A-4 (including each omission therefrom) as it becomes known. All persons who would otherwise be entitled to Health and Life Insurance Benefits under any Existing Plan in the absence of the Settlement Agreement (other than Excluded Retirees) shall be eligible for benefits under the Plan. No person erroneously listed on Exhibit C or Appendix A-4 shall be entitled to any benefits hereunder. Any disputes concerning eligibility to participate in the Plan shall be resolved through the claims dispute procedure set forth in Appendix A-1.

2.2 <u>Enrollment.</u> Participants may enroll in the Health Benefit Program and the Supplemental Benefit Program as follows:

(a) Each Present Retiree, Present Surviving Spouse, Present Eligible Former Employee and Present Non-Represented Employee may enroll in the Health Benefit Program and the Supplemental Benefit Program for themselves and for their Eligible Dependents as provided in the Settlement Agreement;

31

(b)    Each Present Represented Employee may apply to enroll in the Health Benefit Program, the Supplemental Benefit Program and (if they meet the eligibility requirements set out in the Life Insurance Program SPD) the Optional Life Insurance Program as of the date on which they apply to receive Pension Benefits. If such Present Represented Employees are eligible to enroll in the Health Benefit program and the Supplemental Program at such time, they will receive a notice and a bill for the applicable initial premium contribution, in accordance with the reasonable enrollment procedures adopted by the Plan Administrator from time to time, and they shall be enrolled in the Basic Life Insurance Program automatically at such time. Upon payment of such premium contribution, such Presented Represented Employee shall also be enrolled in the Health Benefit Program and the Supplemental Benefit Program. If any such person is eligible to enroll in the Optional Life Insurance Program at such time, he will receive information in accordance with the reasonable enrollment procedures adopted by the Plan Administrator from time to time. In the event of a change in the eligibility requirements under any of the Applicable Retirement Plans, if a Present Represented Employee applies for Pension Benefits prior to the time such person is eligible to receive benefits under the Plan, the Plan Administrator shall inform such person of the date on which such person shall be so eligible; and

(c)    Each Future Surviving Spouse not otherwise enrolled at the death of his or her wife or husband shall become eligible to enroll in the Health Benefit Program and the Supplemental Benefit Program for himself or herself and any other Eligible Dependents at that time.

The Plan Administrator shall notify each person described in subparagraphs (b) and (c) of their eligibility to enroll in the Plan without any pre-existing condition limitation or health screening requirement. Notices of the monthly contributions required to be made to the Health Benefit Program by or on behalf of Enrolled Participants shall be sent each month to all Contributing Participants and to all Participants who become eligible to become Contributing Participants as provided in Appendix A-1. Such contributions shall be due on the first day of that month. The Plan Administrator shall establish reasonable procedures for enrollment and payment of required contributions, including procedures for the payment of such contributions by voluntary deductions from pension payments under pension plans of the Employers. Present Employees shall be enrolled in the Basic Life Insurance Program for the duration of their lives automatically as of the dates they would have become eligible to receive Health and Life Insurance Benefits under the Existing Plans in the absence of the Settlement Agreement, irrespective of whether they become or continue as Enrolled Participants in the Health Benefit Program and the Supplemental Benefit Program

       2.3    Termination of Coverage Under the Health Benefit Program. An Enrolled Participant shall continue as an Enrolled Participant in the Health Benefit Program and the Supplemental Benefit Program only during the periods for which required contributions have been made to the Health Benefit Program by or on behalf of that Enrolled Participant in accordance with Article III. Following the enrollment of each Contributing Participant as described above, a bill will be sent to such Contributing Participant approximately three weeks prior to the first day of each month. A reminder notice shall be sent approximately two weeks after the first day of each month to each Contributing Participant for whom the required contribution for that month had not yet been received. If such contribution still has not been received, a termination notice will be sent at the end of the month to each Contributing Participant for whom the required contribution for that month has not yet been received, stating that coverage will be reinstated

without penalty if such contribution is received within 45 days of the original due date. If a contribution required to be made by or on behalf of an Enrolled Participant to enroll or to continue as an Enrolled Participant for any month is not received within 45 days of the first day of such month, such Enrolled Participant's participation in the Health Benefit Program and the Supplemental Benefit Program shall cease as of the first day of the calendar month for which the contribution was not made, except that Retirees who are not Enrolled Participants may continue to receive life insurance benefits under the Life Insurance Program. Except for required contributions so received during the 45 days following the due date therefor, premium contributions may not be paid retroactively. Notwithstanding any other provisions hereof, the participation of an Eligible Dependent in the Health Benefit Program and the Supplemental Benefit Program shall cease when such person ceases to be an Eligible Dependent. If the participation of an Enrolled Participant in the Health Benefit Program and the Supplemental Benefit Program ceases for any reason, benefits will be paid for claims incurred prior to the date on which his or her participation ceases.

2.4    Re-Enrollment.    Re-Enrollments (including enrollments for those who decline to participate when first eligible) in the Health Benefit Program and the Supplemental Benefit Program are permitted as provided in Appendix A-1, subject to certain pre-existing condition and other limitations. Except as provided in Appendix A-1, no Retiree, Eligible Dependent or Surviving Spouse who is not enrolled when eligible or who ceases enrollment shall be eligible to re-enroll in the Health Benefit Program.

## ARTICLE III

## Contributions to the Health Benefit Program

3.1    Determinations by the Actuary. The Actuary shall make the determinations required to be made by it pursuant to the Health Benefit Program on behalf of the Plan Administrator in the Plan Administrator's capacity as a fiduciary hereunder. Such determinations include determining annually the Retiree Cost Sharing Ratio, the Contributing Participants' Annual Contributions, the Total Estimated Annual Cost of the Health Benefit Program and such other liability and expense calculations as may be required under the Health Benefit Program or by the Health Benefit Program Committee in the exercise of its powers, rights and duties hereunder. The Actuary will furnish these determinations and such additional information as may be necessary or appropriate, including but not limited to workpapers and computer readable spreadsheets, to verify the accuracy thereof to the Company, the Health Benefit Program Committee and the Supplemental Benefit Committee as promptly as practicable, but not later than September 1 of each year for the following calendar year. The Actuary will be available to answer reasonable questions from the Health Benefit Program Committee and the Supplemental Benefit Committee and their designees at no cost to the Health Benefit Trust or the Supplement Benefit Trust. The Health Benefit Program Committee may choose to review or reproduce such determinations and information itself or hire another actuary to review or reproduce all or part of such determinations and information. The initial determinations of the Actuary are detailed in the initial actuarial report attached hereto as Appendix A-5. All determinations by the Actuary hereunder are subject to the dispute resolution provisions of Section 6.8.

3.2    Contributing Participants' Annual Contributions. The Employers and the Contributing Participants shall share the total cost of the Health Benefit Program. All definitions and mathematical formulas relating to the calculation of Contributing Participants' Annual Contributions

33

for a given calendar year are set out in Appendix A-6. The Actuary will determine the Contributing Participants' Annual Contribution for each year. The Contributing Participants' Annual Contribution for a given calendar year ("calendar year (x)") shall be the Scheduled Contributions for calendar year (x) adjusted for the following:

(a) <u>Adjustment 1</u> (T1) - The Contributing Participants' Annual Contribution for calendar year (x) shall be increased by (T1) if the Total Actual Medical Cost for Measurement Year (x-1) exceeds the Total Expected Medical Dollars for Measurement Year (x-1). T1 will equal the lesser of Total Maximum Corridor Medical Dollars for Measurement Year (x-1) or Total Actual Medical Cost for Measurement Year (x-1), reduced by Total Expected Medical Dollars for Measurement Year (x-1).

(b) <u>Adjustment 2</u> (T2). The Contributing Participants' Annual Contribution for calendar year (x) shall be adjusted by (T2) if the Total Actual Medical Cost for Measurement Year (x-1) is less than Total Expected Medical Dollars for Measurement Year (x-1) or if the Total Actual Medical Cost for Measurement Year (x-1) is greater than the Total Maximum Corridor Medical Dollars for Measurement Year (x-1). T2 equals (i) the Retiree Adjustment Ratio for Measurement Year (x-1), multiplied by (ii) the Total Actual Medical Cost for Measurement Year (x-1) reduced by the sum of the Total Expected Medical Dollars for Measurement Year (x-1) and T1. T2 can be positive or negative, resulting in an increase or decrease in the Contributing. Participants' Annual Contribution.

(c) <u>Adjustment 3</u> (T3) - The Contributing Participants' Annual Contribution for calendar year (x) shall be adjusted by (T3) if the Total Actual Drug Cost for Measurement Year (x-I) is greater or less than Total Expected Drug Dollars for Measurement Year (x-1). T3 equals (i) the Total Actual Drug Cost for Measurement Year (x-1) reduced by Total Expected Drug Dollars for Measurement Year (x-1), multiplied by (ii) the Retiree Adjustment Ratio for Measurement Year (x-1). T3 can be positive or negative resulting in an increase or decrease in contributions.

(d) <u>Adjustment 4</u> (DRP) - The Contributing Participants' Annual Contribution for calendar year (x) shall be decreased by (DRP) to account for savings due to the failure of Participants who are or became eligible to enroll in the Health Benefit Program to do so. For calendar year 1994, DRP will equal the Expected Company Costs Per Capita for Measurement Year 1994 times the number of Immediate Drop Outs During the First 45 Days.

For calendar year 1995, DRP will equal the sum of (i) Expected Company Costs Per Capita for Measurement Year 1994 multiplied by the number of Immediate Drop Outs During the Second 45 Days, (ii) the number of Cumulative Drop Outs at the beginning of Measurement Year 1995 reduced by the number of Immediate Drop Outs, multiplied by 50 percent of Expetted Company Costs Per Capita for Measurement Year 1994, and (iii) the number of Cumulative Drop Outs at the beginning of Measurement Year 1995 multiplied by the Expected Company Costs Per Capita for Measurement Year 1995.

34

For calendar years after 1995, DRP will equal the Expected Company Costs Per Capita for Measurement Year (x) multiplied by the number of Cumulative Drop Outs at the beginning of that Measurement Year.

In all years, DRP will be calculated for each of the eight age groupings shown in Tables I and II of Appendix A-6 and the eight calculations will be totaled.

(e)  <u>Adjustment 5</u> (DEF) - The Contributing Participants' Annual Contribution for calendar year (x) shall be decreased by (DEF) ̄to account for savings due to potential Retirees who elect to defer their retirements beyond the dates assumed in the initial retirement rate assumptions. DEF equals (i) the Expected Number of Retirees and Spouses at the beginning of Measurement Year (x) reduced by the Actual Number of Retirees and Spouses at the beginning of Measurement Year (x), multiplied by (ii) the Expected Company Costs Per Capita for Measurement Year (x). The DEF calculation will be performed for each of the eight age groupings shown in Table IV of Appendix A-6 and multiplied by the Retiree Adjustment Ratio for such calendar year for any age group in which the Actual Number of Retirees and Spouses for Measurement Year (x) is greater than the Expected Number of Retirees and Spouses for Measurement Year (x). DEF will equal the sum of the above calculation for each of the eight age groupings.

(f)  <u>Adjustment 6</u> (I) - The Contributing Participants' Annual Contributions for calendar year (x) shall be adjusted by (I) for any interest accrued on (i) late payments from the Supplemental Benefit Trust to reduce or reimburse premiums, co-payments, deductibles and costs or to provide Additional Permissible Benefits, (ii) advances from the Employers' Sub-account to the Contributing Participants' Sub-account during Measurement Year (x-1), (iii) general interest accrued in the Contributing Participants' Sub-account during Measurement Year (x-1), and (iv) interest accrued on adjustments to the Contributing Participants' Annual Contributions for T1, T2, T3, DRP and DEF.

Interest accrued due to late payments from the Supplemental Benefit Program will be calculated monthly and will be the average daily late payment during such month times the number of days late divided by 365 times the Navistar Adjustment Rate at the end of the prior Measurement Year.

The interest adjustment will include the net result of any interest accrued on the Employers' funding any Contributing Participants' contribution shortfalls as described in section 3.7. Interest accrued for advances from the Employer Sub-account to the Contributing Participants' Sub-account will be calculated monthly and be the average daily advance times the number of days advanced divided by 365 times the Navistar Rate at the end of the prior Measurement Year.

Interest will be credited on excess Contributing Participants' contributions as described in Section 3.7. Interest will be calculated monthly and be the greater of (i) the actual earnings on the Contributing Participants' Sub-account, and (ii) the average daily balance for such month of the Contributing Participants' Sub-account multiplied by the average for such month of the 90-day LIBOR rates during such month.

Interest will be adjusted for delays in the recognition of T1, T2, T3, DRP and DEF. The adjustment to the Contributing Participants' Annual Contributions for calendar year 1994 will be calculated as the negative of the DRP adjustment times the Navistar Rate at the beginning of Measurement Year 1994 times seven divided by 12. The calendar year 1995 adjustment to the Contributing Participants' Annual Contributions will be calculated as (i) the Navistar Rate at the beginning of Measurement Year 1995, multiplied by (ii) the sum of T1, T2 and T3, times 19, divided by 12, reduced by the sum of (A) DEF times eight, divided by 12, (B) DRP component (i) times 19 divided by 12, (C) DRP component (ii) times 16.5 divided by 12, and (D) DRP component (iii) times eight divided by 12. The adjustment to the Contributing Participants' Annual Contributions for all years after 1995 will be calculated as (i) the Navistar Rate at the beginning of the Measurement Year, multiplied by (ii) the result of (A) the sum of T1, T2 and T3, times 20, divided by 12, reduced by (B) the sum of DEF and DRP times eight, divided by 12.

The net amount of the aggregate increases or decreases required by Adjustments 1 through 6 above shall be determined and shall be used to determine the uniform percentage adjustment to the Monthly Base Contributions for the year. Each year the Monthly Base Contribution shall be multiplied by a fraction the numerator of which will be [Scheduled Contributions plus (T1) plus (T2) plus (T3) minus (DEF) minus (DRP) plus (I)] and the denominator of which will be Scheduled Contributions.

        3.3   <u>Employers' Annual Contribution</u>.   The Employers' annual contribution shall equal the Total Estimated Annual Cost less the Contributing Participants' share of the Total Estimated Annual Cost. The Contributing Participants' share of the Total Estimated Annual Cost shall equal the sum of the Plan 1 and Plan 2 Contributing Participants' Annual Contributions (detailed in section 3.2) times the respective number of Plan 1 and Plan 2 Contributing Participants.

        3.4   <u>Transfers of Funds between Sub-accounts</u>.  The Actuary will determine the amount of transfers from the Employers' Sub-account to the Contributing Participants' Sub-account and vice versa for each calendar year required by the Section 3.2 adjustments. Transfers will be made on the first of each month and will be equal to one twelfth of the annual transfer amount. The annual amount of transfers for calendar year x will equal:

(a)     T1 times (1-Retiree Adjustment Ratio for Measurement Year x-1), minus

(b)     DRP, minus

(c)     DEF, plus

(d)     I accrued on T1, multiplied by (1-Retiree Adjustment Ratio for Measurement Year (x-1)), minus

(e)     I accrued on DRP minus

(f)     I accrued on DEF

If the amount of transfers is greater than zero, the transfer will be made from the Contributing Participants' Sub-account to the Employers' Sub-account. If the amount of

transfers is less than zero, the transfer will be made to the Contributing Participants' Sub-account from the Employers' Sub-account.

3.5 <u>Transfers from the Supplemental Benefit Trust to the</u> <u>Health Benefit Trust</u>. At the discretion of the Supplemental Benefit Committee, contributions may be made from the Supplemental Benefit Trust to the Health Benefit Trust. If contributions are to be made by the Supplemental Benefit Trust in lieu of Participant Contributions in calendar year (x), Supplemental Benefit Trust contributions will be made on the first of each month and be credited to the Contributing Participants' Sub-account. If the Supplemental Benefit Trust makes contributions are to reduce or reimburse premiums, co-payments, deductibles and other amounts that would otherwise be required to be paid by or on behalf of Enrolled Participants or to provide Additional Permissible Benefits, the value of the enhanced benefits will be determined by the claims administrator and billed monthly by the Plan Administrator to the Supplemental Benefit Committee. Payment of such amounts is due within 15 days of notification and will be allocated to the Contributing Participants' and Employers' Sub-accounts. The amount allocated to the Contributing Participants' Sub-account will be the payment amount times the Retiree Cost Sharing Ratio. The balance of the payment will be allocated to the Employers' sub-account according to Section 3.7 (b).

3.6 <u>Employers' Prefunding Contributions.</u> The following shall apply with respect to prefunding contributions:

(a) The Employers will make a prefunding contribution of $2 million as of the Effective Date to pay all then accrued administrative costs of establishing the Plan and initial claims.

(b) As of the end of each calendar quarter, the Employers will make a prefunding contribution equal to one-quarter of the Employers' share of the estimated Annual Service Cost as determined by the Actuary.

(c) Prior to six months after the Effective Date, Parent shall make a pre-funding contribution or contributions to the Health Benefit Trust totalling $100 million. Prior to the Event Date and as quickly as is prudent, the Parent shall use its best efforts to sell $500 million of Parent Common. From the Effective Date until the Event Date, Parent shall make pre-funding contributions to the Health Benefit Trust of any and all net cash proceeds from the sale of Parent Common; provided, that Parent may use whatever portion of the proceeds from the sale of Parent Common as the Board reasonably determines is appropriate for working capital; and provided, further, that by the Event Date, the amount of pre-funding contributions made to the Health Benefit Trust shall equal the lesser of $500 million or the total amount of the cash proceeds of all sales of Parent Common between the Effective Date and the Event Date. Nothing herein shall prevent Parent from making pre-funding contributions to the Health Benefit Trust from sources other than the sale of the Parent Common. Parent may defer the initial $100 million contribution, or any portion thereof, required by the first sentence of this Section 3.6(c) only if, and only for so long as, the Board reasonably and in good faith determines that failure to defer such contribution, or such portion, will cause Parent or the Company to become unable to pay its obligations arising in the ordinary course of its business when due. Any deferral described in the preceding sentence shall be permitted only upon notice to the HBPC Committee, by an authorized officer of Parent, that the Board has made the determination described in the preceding sentence.

3.7    <u>Payment of Benefits</u>.  For purposes of accounting for contributions and the payment of benefits, the following shall apply.

(a)    The Contributing Participants' share of actual benefit payments and administrative costs will be charged to the accumulated Contributing Participants' accumulated contributions according to the Retiree Cost Sharing Ratio. Any excess contributions shall be accumulated and used to offset any actual benefit payments and administrative costs incurred in subsequent months in excess of contributions collected. Should the balance in the Contributing Participants' Sub-account be insufficient to pay the Contributing Participants' share of actual benefit payments and administrative costs, the Employers' Sub-account (prefunding contribution balance) will advance sufficient funds to the Contributing Participants' Sub-account to cover such shortfalls. Such amounts advanced to the Contributing Participants' Sub-account will be repaid to the Employers' Sub-account immediately upon the availability of funds in the Contributing Participants' Sub-account.

(b)    The Employers' share of actual benefit payments and administrative costs will be one minus the Retiree Cost Sharing Ratio and will be allocated to the Employers' monthly contribution or to Employers' prefunding contributions. The amount of the actual benefit payments and administrative costs to be paid from Employers' prefunding contributions shall be the amount equal to the aggregate of such amounts to be paid by the Employers multiplied by the ratio of the prior year end outstanding balance of Employers' prefunding contributions (plus the balance of any advances to the Contributing Participants' Sub-account) divided by the Employers' share of the Health APBO as of the prior year end. Should the Employers make prefunding contributions at times other than the beginning of the year (other than prefunding contributions for estimated Annual Service Cost), the ratio used to allocate amounts to be paid by the Employers after such additional contribution shall be adjusted as if such additional contribution were made at the beginning of the calendar year less an earnings adjustment equal to the amount of additional contribution times the discount rate used to calculate the Health APBO for the prior year and multiplied by the ratio of the number of months elapsed from the beginning of the year to the date of additional contribution divided by 12.

(c)    Should the amount of Employers' contributions not be sufficient to pay the portion of the Employers' share of actual benefit payments and administrative costs not allocated to Employers' prefunding contributions, the Employers shall make additional contributions to cover the deficiency.  Should the amount of Employers' contributions exceed such share, such excess contributions shall be used to offset subsequent months' actual benefit payments and administrative costs described above.

(d)    The balance of any Employers' and Contributing Participants' contributions not required to pay actual benefit payments and administrative costs shall be invested by the trustee of the Health Benefit Trust and the actual earnings on such invested balance will be credited to the respective account balances and used in determining contributions described in sections 3.2.

38

3.8 <u>State or National Health Insurance Programs</u>. Notwithstanding the foregoing, in the event of the adoption of, or any legislative change in, a State or National Health Insurance Program as a result of which, following such adoption or change, Participants receive post-retirement health care benefits greater or lesser than those provided under such programs on the Effective Date, the following shall apply:

(a)     The Actuary (i) shall determine the actuarial present value of any new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or change attributable to the provision of such post-retirement benefits to such Participants, and (ii) shall redetermine the Health APBO immediately following the implementation of such adoption or change by subtracting such actuarial present value determined in (i) above from the Health APBO immediately prior to the implementation of such adoption or change; provided that the resulting Health APBO immediately following the implementation of such adoption or change, plus the actuarial present value of the new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or change attributable to the provision of such post-retirement benefits to such Participants, shall not exceed the Health APBO immediately prior to the implementation of such adoption or change.

In addition, if any new taxes, premiums or other amounts are required to be paid by the Employers as a result of such adoption or change based on the number of Participants or on the value of benefits provided to Participants under the Health Benefit Program or contributions made by the Employers under the Health Benefit Program for the benefit of Participants, after the Actuary has made the calculations described in the preceding paragraph, the Actuary shall determine the actuarial present value of such new taxes, premiums or other amounts, and the excess thereof over the actuarial present value determined in (i) above will be allocated between the Employers and the Participants by the Health Benefit Program Committee in a fair and equitable manner to further reduce the Health APBO immediately following the implementation of such adoption or change; provided that the Health APBO immediately following the implementation of such adoption or change, plus the actuarial present value of the new taxes, premiums or other amounts required to be paid by the Employers in connection with such adoption or change attributable to the provision of such post-retirement benefits to such Participants, plus the actuarial present value of the allocated additional taxes, premiums or other amounts used to further reduce the Health APBO, shall not exceed the Health APBO immediately prior to the implementation of such adoption or change. If the Health Benefit Program Committee cannot reach a consensus in 30 days as to how such allocation shall be made, the Health Benefit Program Committee shall select a qualified individual or firm to make such determination, and the determination of such individual or firm shall be final and binding. If the Health Benefit Program Committee is unable to agree upon an individual or firm to resolve such dispute, the Health Benefit Program Committee shall petition the Court to select an individual or firm to assist the parties by resolving the dispute. In such event, the Health Benefit Program Committee shall suggest to the court at least five individuals or firms with appropriate background to be so appointed. One-half of the fees and expenses of the individual or firm appointed by the court shall be a Plan Expense, and the other half shall be paid by the Company.

    (b)    Following such determinations as are required in Section 3.8(a) above, the Health Benefit Program Committee may redesign the Health Benefit Program, including, in its sole discretion, by modifying the benefits thereunder and the amount of contributions required to be made by or on behalf of Enrolled Participants; provided that any changes in required contributions must be reasonably related to changes in the redesigned benefits provided under the Health Benefit Program. Further, the duration of the Employers' liability under the Health Benefit Program following such redesign shall be consistent with such duration immediately prior to such redesign. This redesign opportunity shall be a one-time opportunity available to the Health Benefit Program Committee with respect to each such adoption or change.

        If the Employers are required as a result of such adoption or change to provide benefits which are not available under the Health Benefit Program, the Health Benefit Program Committee will redesign the Health Benefit Program to provide such mandated benefits while maintaining the Health APBO in effect prior to such mandate.

    (c)    Following any such redetermination of the Health APBO, the Actuary shall continue to make the determinations required to be made by it hereunder in accordance with the other provisions of this Exhibit A on the basis of the Health APBO as so redetermined.

The Actuary's determinations under this Section 3.8 shall be made based upon actuarial data, methods, factors, procedures and assumptions consistent with those used in the determination of the Health APBO and Retiree Cost-Sharing Ratio as of the Effective Date.

    3.9 <u>Guarantee of Health Benefit Program.</u> The Parent and the Company hereby jointly and severally, unconditionally and irrevocably guarantee the provision of benefits under and in accordance with the terms of the Health Benefit Program as primary obligors and not merely as sureties. The Parent's and the Company's obligations under this guarantee shall not be impaired by (i) any breach or violation of any provision of the Health Benefit Program, whether by the Company, any other Employer or otherwise, (ii) any modification or amendment of or to, or any waiver of any obligation of any party under, the Health Benefit Program, provided that as of the effectiveness of any such modification, amendment or waiver this guarantee shall thereafter be deemed to apply to the Health Benefit Program as so modified, amended or waived, (iii) any merger, re-organization or bankruptcy of the Company or any other Employer or (iv) any other event which may cause the Company or any other Employer to lose its separate legal identity or to cease to exist. This guarantee shall not be affected in any way by the absence of any action to obtain payment of any amount under the Health Benefit Program. The Parent and the Company hereby waive all requirements as to promptness, diligence, presentment, demand for payment, protest and notice of any kind with respect to this guarantee. This guarantee shall remain in full force and effect until the termination of the Health Benefit Program and shall remain in full force and effect or be reinstated, as the case may be, if at any time any amount paid by the Parent, the Company or any other Employer under the Health Benefit Program or this guarantee, in whole or in part, is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Parent, the Company or such other Employer or otherwise, all as though such payment had not been made. This guarantee is a guarantee of payment and not of collection. Each of Parent and the Company irrevocably waives any and all rights or claims to

indemnity, subrogation, reassessment, exoneration or contribution which it had, has, or hereafter may have in respect of any payment under this guarantee to the extent that under applicable law such rights of Parent or the Company would render a payment by the Company or any other Employer (other than Parent) avoidable if made prior to 90 days before a bankruptcy or similar proceeding of the Company or such Employer. To the extent that Parent makes a payment of a type described in the immediately preceding sentence under this guarantee on behalf of any other Employer, and to the extent that the Company makes a payment of such a type on behalf of any other Employer (other than Parent), such payment shall be deemed to be a capital contribution to such Employer.

## ARTICLE IV

### Contributions to Life Insurance Program

4.1     Employer Contributions.  The Employers shall make monthly contributions to the Health Benefit Trust sufficient to permit such trust to pay all premiums necessary to obtain the life insurance benefits (other than the optional additional life insurance benefits referred to in Section 4.2) for Retirees under the Basic Life Insurance Program. Such contributions shall be segregated from the contributions to the Health Benefit Program and invested in a separate sub-account under the Health Benefit Trust prior to applying such amounts to pay such premiums.

4.2     Optional Life Insurance.  In addition to the coverage referred to in Section 4.1, Retirees who meet the eligibility requirements set out in the Life Insurance Program SPD shall have the right to purchase, at group rates but entirely at their own cost, optional additional life insurance coverage up to the maximum of the coverage that would have been available to such Retirees under the Existing Plans. As more fully described in Appendix A-2, this opportunity is a one-time election available to each such Retiree as of the later of the Effective Date or such Retiree's date of retirement which shall be exercised in accordance with the procedures set forth in Appendix A-2.  The Plan Administrator shall arrange for such coverage to be provided directly to Retirees electing to purchase such coverage by a designated insurance company, which as of the Effective Date shall be Aetna Life Insurance Company. Retirees shall be given reasonable notice of this optional coverage and of any changes in the insurance company designated to provide such coverage, or in the terms and conditions thereof, as provided in Appendix A-2. The Plan Administrator shall use its best efforts to ensure that the terms and conditions of the coverage made available to Retirees from time to time pursuant to this Section 4.2 are competitive. The Optional Life Insurance Program is provided directly to Retirees by the designated life insurance company under a group insurance arrangement, not under the Life Insurance Program. Although the eligibility and benefit amount provisions of this program are included in the Life Insurance Program SPD attached as Appendix A-2, it is intended that the Optional Life Insurance Program shall not be considered a plan as such term is defined in ERISA.

4.3     Guarantee of Life Insurance Program.  Parent and the Company hereby jointly and severally, unconditionally and irrevocably guarantee the provision of benefits under and in accordance with the terms of the Basic Life Insurance Program, as primary obligors and not merely as sureties. Parent's and the Company's obligations under this guarantee shall not be impaired by (i) any breach or violation of any provision of the Basic Life Insurance Program, whether by Parent, the Company, any other Employer or otherwise, (ii) any modification or amendment of or to, or any waiver of any obligation of any party under, the Basic Life Insurance Program, provided that as of the effectiveness of any such modification, amendment or waiver this

41

guarantee shall thereafter be deemed to apply to the Basic Life Insurance Program as so modified, amended or waived, (iii) any merger, reorganization or bankruptcy of Parent, the Company or any other Employer or (iv) any other event which may cause Parent, the Company or any other Employer to lose its separate legal identity or to cease to exist. This guarantee shall not be affected in any way by the absence of any action to obtain payment of any amount under the Basic Life Insurance Program. Parent and the Company hereby waive all requirements as to promptness, diligence, presentment, demand for payment, protest and notice of any kind with respect to this guarantee. This guarantee shall remain in full force and effect until the termination of the Basic Life Insurance Program and shall remain in full force and effect or be reinstated, as the case may be, if at any time any amount paid by Parent, the Company or any other Employer under the Basic Life Insurance Program or this guarantee, in whole or in part, is rescinded or must otherwise be returned upon the insolvency, bankruptcy or reorganization of Parent, the Company or such other Employer or otherwise, all as though such payment had not been made. This guarantee is a guarantee of payment and not of collection. Each of Parent and the Company irrevocably waives any and all rights or claims to indemnity, subrogation, reassessment, exoneration or contribution which it had, has, or hereafter may have in respect of any payment under this guarantee to the extent that under applicable law such rights of Parent or the Company would render a payment by the Company or any other Employer (other than Parent) avoidable if made prior to 90 days before a bankruptcy or similar proceeding of the Company or such Employer. To the extent that Parent makes a payment of a type described in the immediately preceding sentence under this guarantee on behalf of any other Employer, and to the extent that the Company makes a payment of such a type on behalf of any other Employer (other than Parent), such payment shall be deemed to be a capital contribution to such Employer.

ARTICLE V

Administration of the Health Benefit Program
and the Life Insurance Program

As the Plan Administrator and Named Fiduciary, the Company is responsible for the administration of the Health Benefit Program and the Life Insurance Program, subject to review by the Health Benefit Program Committee as provided in Article VI. Subject to such review, the Plan Administrator shall have the following powers, rights and duties, which it shall perform in its capacity as a fiduciary under ERISA:

(a)    to adopt such rules of procedure consistent with the Health Benefit Program and the Life Insurance Program as it may deem appropriate for the efficient administration of such programs or in connection with the exercise or discharge of its powers, rights and duties;

(b)    to construe and interpret the Health Benefit Program and the Life Insurance Program and to decide all questions of eligibility under such programs;

(c)    to appoint claims administrators, medical review agencies and other service providers;

42

(d)     to enroll Participants in the Health Benefit Program, and the Life Insurance Program, to distribute and receive plan administration forms  and to comply with all applicable governmental reporting and disclosure requirements; and

 (e)     to respond to requests for information by the Health Benefit Program Committee relating to the Plan.

The Plan Administrator shall perform its duties with respect to plan administration on a reasonable and non-discriminatory basis and shall apply uniform rules to all persons similarly situated.

<u>ARTICLE VI</u>

Health Benefit Program Committee

6.1     <u>Health Benefit Program Committee</u>.  The Health Benefit Program Committee shall consist of seven members, including two members appointed by the UAW (the "<u>HBPC UAW Members</u>"), who may be replaced at any time by the UAW, three members appointed by the Company (the "<u>HBPC Company Members</u>"); who may be replaced at any time by the Company, one member appointed as representative of the non-UAW Retirees in accordance with Section 6.6 (the "<u>HBPC Other Member</u>") and a seventh member appointed by a majority of the other six members, who shall be the chairperson of the Health Benefit Program Committee (the "<u>HBPC Chair</u>"; the HBPC Chair, the HBPC UAW Members, the HBPC Other Member and the HBPC Company Members, collectively, the "<u>HBPC Committee Members</u>"); provided that such seventh member may be recalled at any time by a vote of a majority of the HBPC UAW Members and the HBPC Other Member, on the one hand, or a majority of the HBPC Company Members, on the other hand, whereupon a new member shall be appointed by a majority of the other six members. The persons who shall initially serve in such capacities are identified in Appendix A-7 hereto. The Health Benefit Program Committee shall have a Secretary, who shall be elected by the HBPC Committee Members.

6.2     <u>Committee Powers</u>.  The Health Benefit Program Committee shall be a fiduciary under ERISA with respect to its responsibilities hereunder. The Health Benefit Program Committee shall have the powers, rights and duties set forth herein and the following additional powers, rights and duties consistent with its rights and obligations under this Exhibit A:

(a)     to adopt such rules of procedure consistent with the Health Benefit Program and the Life Insurance Program as it may deem appropriate in its sole discretion in connection with the exercise or discharge of its powers, rights and duties hereunder;

(b)     to resolve disputes with respect to determinations of the Plan Administrator regarding benefits and eligibility in its sole discretion in accordance with the dispute resolution procedure set forth in the relevant SPD; provided, that the Health Benefit Program Committee shall apply the terms of the Existing Plans in a manner consistent with the prior interpretations of such Existing Plans by the Company; and provided, further, that the Health Benefit Program Committee may not provide for the payment of any benefits not provided under the Health Benefit Program;

(c)     to review any and all determinations made by the Actuary under the Health Benefit Program, as well as the calculations and experience trends and other assumptions used by

the Actuary in making such determinations and to initiate the dispute resolution procedure referred to in Section 6.8, such decision to review or initiate being in its sole discretion;

(d)     to bring to the attention of the Plan Administrator and to discuss with the Plan Administrator such administrative problems under the Health Benefit Program of which it has knowledge as it may deem appropriate in its sole discretion;

(e)     to require the Plan Administrator to provide it with such information regarding the administration of the Plan as it may deem appropriate in its sole discretion;

(f)     to make such recommendations to the Plan Administrator and Named Fiduciary in connection with the administration of the Health Benefit Program and the Life Insurance Program as it may deem appropriate in its sole discretion;

(g)     to engage such consultants and other professionals to assist it in the exercise or discharge of its powers, rights and duties hereunder as it may deem appropriate in its sole discretion;

(h)     to review and enforce Parent's, the Company's and the other Employers' compliance with their obligations under the Health Benefit Program and the Life Insurance Program, such decision to review or enforce being in its sole discretion; and

(i)     to undertake such other actions as are necessary or appropriate in connection with the exercise or discharge of such powers, rights and duties.

provided, that the Health Benefit Program Committee shall have no authority to modify benefits except as expressly provided herein or to waive any contribution obligation of the Employers under the Health Benefit Program or the Life Insurance Program; and provided, further, that the Health Benefit Program Committee shall be bound by the instructions of the Supplemental Benefit Program Committee with respect to the use of any assets transferred to the Health Benefit Trust from the Supplemental Benefit Trust.

6.3     Program Design.  The Health Benefit Program Committee, as a matter of appropriate program design and not as a fiduciary, shall have the following powers, rights and duties:

(a)     reasonably to redesign benefits under the Health Benefit Program as provided in Section 3.8 as it may deem appropriate in its sole discretion;

(b)     reasonably to redesign benefits under the Health Benefit Program as necessary to implement such coordinated care systems as may be recommended by the UAW/Navistar Joint Committee or, if such committee ceases to exist, reasonably to redesign benefits under the Health Benefit Program as it deems necessary or appropriate to implement coordinated care systems in its sole discretion and otherwise to give effect to the powers granted to such committee in Appendix A-1; provided, that no such redesign shall increase the Employers' share of the Health APBO;

(c)     to make such adjustments in the Contributing Participants' Annual Contribution by a unanimous vote of the HBPC Committee Members as may be required to prevent the

44

Contributing Participant's Sub-account from maintaining an unnecessary and inappropriate surplus or deficit for an extended period of time.

6.4    <u>Action by Health Benefit Program Committee.</u> Any action by the Health Benefit Program Committee will be subject to the following provisions:

(a)    The HBPC Chair or any two members may call a meeting of the Health Benefit Program Committee on not less than two days' advance written notice to all members (including telephone conference, video conference and other technology-assisted meetings of persons at separate locations);

(b)    At all meetings of the Health Benefit Program Committee the HBPC Company Members shall have a total of three votes and the HBPC UAW Members and the HBPC Other Member together shall have a total of three votes, the vote of any absent HBPC Company Members being divided equally between the HBPC Company Members present and the vote of any absent HBPC UAW Member or the absent HBPC Other Member being divided equally between the HBPC UAW Members and HBPC Other Member present;

(c)    A meeting of the Health Benefit Committee shall be validly constituted if both HBPC UAW Members or one UAW Member and the HBPC Other Member, on the one hand, and two HBPC Company Members, on the other hand, participate in such meeting;

(d)    Except as otherwise specifically provided herein, the Health Benefit Program Committee shall act by the majority vote of all of its members at a duly called and validly constituted meeting, which action shall be as effective as if such action had been taken by all members of the Health Benefit Program Committee, or by written instrument signed by all of the HBPC Committee Members, which instrument may be executed in counterparts; provided, that one or more HBPC Committee Members or other persons may be so authorized to act with respect to particular matters on behalf of all HBPC Committee Members; and provided, further, that no HBPC Committee Member shall be liable or responsible for any act or omission of other HBPC Committee Members in which the former has not concurred; and

(e)    The HBPC Chair shall vote only in case of a failure of the other HBPC Committee Members to adopt a decision as to any matter which is properly before the Health Benefit Committee and within its authority to determine; and

(f)    The certificate of the Secretary of the Health Benefit Program Committee or of a majority of the HBPC Committee Members that the Health Benefit Program Committee has taken or authorized any action shall be conclusive in favor of any person relying on such certificate.

6.5    <u>Health Benefit Program Committee Minutes.</u> As soon as is reasonably practicable after each meeting of the Health Benefit Program Committee, its Secretary shall

prepare draft minutes of such meeting, which shall be delivered to each HBPC Committee Member and approved or modified at the following meeting.

6.6 <u>HBPC Other Member</u>. The initial HBPC Other Member is the person specified as such in Appendix A-7. In the event of the death, incapacity or resignation of the HBPC Other Member, his successor shall be appointed by a majority vote of such HBPC Other Member (if he is not deceased or incapacitated) and two alternates (the "<u>HBPC Other Member Alternates</u>") upon notice from the Health Benefit Program Committee or such HBPC Other Member of such death, incapacity or resignation; provided, that the HBPC Other Member shall not be a Non-Represented Employee, an employee of the UAW, an Employee represented by the UAW or a Retiree represented by the UAW at the time of his retirement. The initial HBPC Other Member Alternates are the persons specified as such in Appendix A-7. In the event of the death, incapacity or resignation of either of the HBPC Other Member Alternates, his successor shall be appointed by a majority vote of such HBPC Other Member Alternate (if he is not deceased or incapacitated), the other HBPC Other Member Alternate and the HBPC Other Member upon notice from the Health Benefit Program Committee or such HBPC Other Member Alternate of such death, incapacity or resignation. The HBPC Other Member or either of the HBPC Other Member Alternates may also be replaced by the Court upon petition signed by not less than 50 Participants who are Non-Represented Employees, Present Employees who are not represented by the UAW or Retirees who were not represented by the UAW at the time of their retirement, for failure adequately to represent the Participants.

6.7 <u>Expenses</u>. The Company agrees that, upon demand and the Company's receipt of such detailed supporting documentation as the Company may reasonably request, it will forthwith pay (i) to all HBPC Committee Members that are not employed by the Company, any Employer or the UAW, reasonable compensation for time spent on Health Benefit Program Committee matters, (ii) to each HBPC UAW Member, the HBPC Other Member and any HBPC Other Member Alternate, the amount of any and all out-of-pocket expenses, including reasonable travel expenses, incurred by him in exercising or discharging his powers, rights and duties hereunder and (iii) to the Health Benefit Program Committee, the amount of any and all out-of-pocket costs and expenses (other than expenses of consultants and other professionals) incurred by it in connection with reviewing the administration of the Health Benefit Program and the Life Insurance Program. Such compensation and expenses shall not be considered Plan Expenses.

6.8 <u>Dispute Resolution</u>. In the event of a dispute regarding any determination by the Actuary hereunder, the Company and the Health Benefit Program Committee will attempt to resolve such dispute. If any such dispute is not so resolved to the satisfaction of the Health Benefit Program Committe, the Health Benefit Program Committee may request that such determination be resolved by an independent actuary. Such independent actuary shall be selected in accordance with the following procedure. First, the Company and the Health Benefit Program Committee shall, for a period not to exceed 10 days, seek to agree on a firm to serve as such independent actuary. Second, in the event that the Company and the Health Benefit Program Committee fail to agree on such a firm, they shall request the Society of Actuaries to prepare a list of the seven largest actuarial firms with their principal offices in the United States (as measured by the number of enrolled actuaries in such firms) and communicate such list to the parties. Third, the Company and the Health Benefit Program Committee shall, beginning with the Company, alternately strike one name off such list until only one such name remains, and that firm shall act as such independent actuary. The Actuary, the Company and the Health Benefit Program

Committee shall cooperate with such independent actuary in reevaluating the disputed determination, and the determination of the independent actuary shall be final and binding on all parties. One-half of the fees and expenses of the independent actuary shall be a Plan Expense, and the other half shall be paid by the Company. For purposes of this Section 6.8, the Health Benefit Program Committee shall act by a vote of any two of the HBPC UAW Members and the HBPC Other Member.

ARTICLE VII

General Provisions

7.1 <u>Required Data</u>. Enrolled Participants shall furnish the Plan Administrator with such information as may be necessary to permit the Plan Administrator, claims administrators, medical review agencies or committees to perform their duties with respect to the administration of the Plan.

7.2 <u>Non-Alienation</u>. No Participant or other person shall have any right, title or interest in any assets of the Plan prior to the payment thereof on behalf of such person. No rights or interests of any Participant under the Plan shall be assignable either voluntarily or involuntarily.

7.3 <u>Action by Employers</u>. Any action required or permitted to be taken by any Employer under the Plan shall be taken by resolution of the board of directors of such Employer, or by resolution of a duly authorized committee of its board of directors, or by a person or persons authorized by resolution of its board of directors or such committee.

7.4 <u>Applicable Law</u>. The Plan shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or pre-empted thereby, with the laws of the State of Illinois.

7.5 <u>Limitation of Liability; Indemnification</u>. To the extent permitted by applicable law, no person shall be personally liable for any act done or omitted to be done in good faith in the administration of the Health Benefit Program or the Life Insurance Program or the investment of the assets of the Health Benefit Trust. The Employers shall jointly and severally indemnify and hold harmless, to the extent permitted by applicable law, each present or former employee of an Employer through whom the Plan Administrator is performing or has performed any of its responsibilities hereunder, each present or former director or officer of the Employers, the UAW, each present or former HBPC Committee Member and each HBPC Other Member Alternate from and against any and all losses, costs, liabilities, damages and expenses (including fines, penalties, taxes and the fees and disbursements of actuarial and legal advisors), as incurred, by reason of any act done or omitted to be done in good faith in connection with the administration of the Plan or the investment of the assets of the Health Benefit Trust or in connection with the enforcement of the obligations of Parent, Company or any other Employer under the Health Benefit Program and Life Insurance Program. Any claim for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

7.6 <u>Limitation on Liens as Security for Employers' Contributions</u>. Parent will not, and will not permit any Restricted Subsidiary to, create or assume any mortgage, security interest, pledge or lien (herein referred to as "mortgage"), or permit to exist any mortgage created or assumed since March 1, 1968, of or upon any Principal Property, or shares of capital stock or

47

indebtedness for borrowed money issued by any Restricted Subsidiary and owned by Parent or any Restricted Subsidiary, whether owned at the Effective Date or thereafter acquired, without making effective provision, and Parent in such case will make or cause to be made effective provision, whereby the obligations of Parent and the Company under the Health Benefit Program and the Basic Life Insurance Program shall be secured by such mortgage equally and ratably with any and all other indebtedness or obligations thereby secured, so long as such indebtedness or obligations shall be so secured; provided, that the foregoing shall not apply to any of the following:

(a)     mortgages on any Principal Property acquired, constructed or improved by Parent or any Restricted Subsidiary after March 1, 1968 which are created or assumed contemporaneously with, or within 90 days after, such acquisition, construction or improvement to secure or provide for the payment of any part of the purchase price of such Principal Property or the cost of such construction or improvement incurred after March 1, 1968, or, in addition to mortgages contemplated by clauses (b) and (c) below, mortgages on any such Principal Property existing at the time of acquisition thereof, provided, that in the case of any such construction or improvement the mortgage shall not apply to any property theretofore owned by Parent or any Restricted Subsidiary other than any theretofore substantially unimproved real property on which the property so constructed, or the improvement, is located and other than any machinery or equipment installed on the real property on which the property so constructed or the improvement is located;

(b)     mortgages on property of a corporation existing at the time such corporation is merged or consolidated with Parent or a Restricted Subsidiary or at the time of a sale, lease or other disposition of the properties of such corporation (or a division thereof) as an entirety or substantially as an entirety to Parent or a Restricted Subsidiary;

(c)     mortgages on property of a corporation existing at the time such corporation becomes a Restricted Subsidiary;

(d)     mortgages securing indebtedness of a Restricted Subsidiary to Parent or to another Restricted Subsidiary;

(e)     mortgages in favor of the United States of America or any State thereof, or any department, agency, instrumentality or political subdivision of any such jurisdiction, to secure partial, progress, advance or other payments pursuant to any contract or statute for the purpose of financing all or any part of the purchase price or the cost of constructing or improving the property subject to such mortgages;

(f)     mortgages in favor of any customer to secure partial, progress, advance or other payments for goods produced or services rendered to such customer in the ordinary course of business not exceeding the amount of such payments;

(g)     mortgages for the sole purpose of extending, renewing or replacing (or successively extending, renewing or replacing) in whole or in part the indebtedness secured by any mortgage referred to in the foregoing clauses (a) to (f), inclusive, or in this clause (g);

48

provided, that the principal amount of indebtedness secured thereby shall not exceed the principal amount of indebtedness so secured at the time of such extension, renewal or replacement, and that such extension, renewal or replacement shall be limited to all or a part of the property which secured the mortgage so extended, renewed or replaced (plus improvements on such property);

(h)     pledges or deposits under workmen's compensation, unemployment insurance or similar statutes and mechanics', workmen's, repairmen's, materialmen's, carriers' or other similar liens arising in the ordinary course of business or deposits or pledges to obtain the release of any such liens;

(i)     liens created by or resulting from any litigation or other proceedings, including liens arising out of judgments or awards against Parent or any Restricted Subsidiary with respect to which Parent or such Restricted Subsidiary is in good faith prosecuting an appeal or proceeding for review; or liens incurred by Parent or any Restricted Subsidiary for the purpose of obtaining a stay or discharge in the course of any legal proceeding to which Parent or such Restricted Subsidiary is a party; or

(j)     liens for taxes or assessments or governmental charges or levies not yet due or delinquent, or which can thereafter be paid without penalty, or which are being contested in good faith by appropriate proceedings; landlord's liens on property held under lease; and any other liens of a nature similar to those hereinabove described in this clause (j) which do not, in the opinion of Parent, materially impair the use of such property in the operation of the business of Parent or a Restricted Subsidiary or the value of such property for the purpose of such business.

Notwithstanding the foregoing provisions, Parent or any Restricted Subsidiary may, without equally and ratably securing its contribution obligations under the Plan, create, assume, or permit to exist mortgages which would otherwise be subject to the foregoing restrictions if at the time of such creation, assumption or permission, and after giving effect thereto, such indebtedness does not exceed 5% of the stockholders' equity in Parent and its consolidated Subsidiaries, as shown by the audited consolidated balance sheet of Parent and its consolidated Subsidiaries in the latest annual report to the stockholders of Parent.

   7.7 <u>Limitations on Sale and Lease-Back Transactions</u>.

(a)     Parent will not, nor will it permit any Restricted Subsidiary to,  enter into any arrangement, or permit to exist any arrangement entered into since March 1, 1968, with any person providing for the leasing by Parent or any Restricted Subsidiary of any principal property (except for temporary leases for a term, including any renewal thereof, of not more than three years and except for leases between Parent and a Restricted Subsidiary or between Restricted Subsidiaries) which property has been or is to be sold or transferred by Parent or a Restricted Subsidiary to such person (a "<u>Sale and Lease-Back Transaction</u>") unless the net proceeds of such sale are at least equal to the fair value (as determined by the Board) of such property and either (1) Parent or such Restricted Subsidiary would be entitled to incur a mortgage on such property without equally and ratably securing the obligations of Parent and the Company under the Health

Benefit Program and the Basic Life Insurance Program pursuant to Section 7.6(a), or (2) Parent shall contribute an amount equal to the net proceeds of such sale (as so determined) to the Health Benefit Trust, the retirement of Securities or other indebtedness ranking on a parity with the Securities (other than any mandatory retirement or payment at maturity and provided that any retirement of Securities is in accordance with the applicable optional redemption terms adopted pursuant to Section 2.02 of the Indenture), within 120 days of the effective date of any such arrangement.

(b)     Notwithstanding the provisions of paragraph (a) of this Section 7.7, Parent or any Restricted Subsidiary may enter into or permit to exist Sale and Lease-Back transactions, if at the time such Sale and Lease-Back Transactions are (or were) entered into, and after giving effect thereto, Exempted Indebtedness does (or did) not exceed 5% of the stockholders' equity in Parent and its consolidated Subsidiaries as shown by the audited consolidated balance sheet of Parent and its consolidated Subsidiaries contained in the latest annual report to the stockholders of parent.

7.8     <u>Subrogation</u>.  In the event of any payment under the Health Benefit Program on behalf of an Enrolled Participant, the Company or the excess loss insurer of benefits under the Health Benefit Program shall be subrogated to all rights of recovery of the Enrolled Participant against any person or organization in respect of such payment except against insurers on policies of insurance issued to and in the Participant's name, or against a policy of insurance to which the Participant has contributed 50 percent or more of the premium. The Participant shall, at the request of the Company or such insurer, execute and deliver such instruments and papers as may be required and do whatever else is necessary to secure such rights.

7.9     <u>Assignment and Delegations</u>.  The rights of any party under the Plan may not be assigned without the prior written agreement of the Company and the Supplemental Benefit Committee, and any purported assignment in violation of this sentence shall be void. Any party may delegate any of its obligations under the Health Benefit Program or the Life Insurance Program; provided, that no such delegation shall relieve such party of any of such obligations; and provided, further, that the delegation of any obligations in connection with the transfer of any of the assets of any Employer shall be subject to the express assumption of such obligation by the proposed transferee.

7.10     <u>Captions</u>. The captions used in this Exhibit A are for convenience of reference only and do not constitute a part of this Exhibit A and will not be deemed to limit, characterize or in any way affect any provision of this Exhibit A, and all provisions of this Exhibit A will be enforced and construed as if no captions had been used in this Exhibit A.

<u>ARTICLE VIII</u>

<u>Amendment and Termination</u>

8.1     <u>Amendment</u>.  The Plan Administrator and the Health Benefit Program Committee reserve the right to amend the Health Benefit Program and the Life Insurance Program as follows:

50

(a)    The Plan Administrator shall have the right to make nonmaterial technical and administrative amendments thereto and to the Health Benefit Trust which are necessary to comply with the requirements of the IRS and ERISA and other applicable legal requirements; provided, that no such amendment shall adversely affect the level of benefits to any Class Member;

(b)    The HBPC Committee Members may by unanimous written consent amend the benefits provided under the Health Benefit Program; provided, that any proposed amendment which adversely impacts the level of Plan benefits to any Class Member shall be subject to approval by the Court after appropriate notice to Class Members; and

(c)    The Health Benefit Program Committee may reasonably redesign the Health Benefit Program in accordance with the provisions of Section 6.3.

8.2    <u>Termination</u>.  The Health Benefit Program and the Basic Life Insurance Program will terminate on the earlier of (a) the termination of the Settlement Agreement as provided in Section 13 thereof and (b) the later of the death of the last Participant entitled to benefits and the payment of any and all claims previously incurred by Participants and any and all benefits payable in respect of the death of any Participant; provided, that the obligations of Parent and the Company under Sections 6.6 and 7.6 shall survive such termination.  In the event the Health Benefit Program and the Life Insurance Program terminate in accordance with clause (a) of this Section 8.2, any or all of the assets held in the Health Benefit Trust shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association: within the meaning of Section 501(c) (9) of the IRC, as determined by the Company.

ARTICLE IX

Exclusive Benefit and Prohibited Inurement

9.1    <u>Exclusive Benefit</u>.  No part of the corpus or income of the Health Benefit Trust shall be used for, or diverted to, any purposes other than for the exclusive benefit of persons who are or may become entitled to benefits under the Health Benefit Program or the Life Insurance Program and for defraying reasonable expenses of administering such programs.

9.2    <u>Prohibited Inurement</u>.  No part of the corpus or income of the Health Benefit Trust shall inure to the benefit of Parent, the Company or any other Employer.  All fiduciaries hereunder shall discharge their duties solely in the interests of Participants for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration. No benefit under the Health Benefit Program or the Life Insurance Program or interest, right or claim in or to any part of the Health Benefit Trust or any payment therefrom shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, hypothecation or commutation, nor shall any such benefit or interest, right or claim in or to any part of the Health Benefit Trust or any payment therefrom be in any manner liable for or subject to garnishment, attachment, execution or levy or be liable for or subject to the debts, contracts, liabilities, engagements or torts of the person entitled thereto, and the trustee under such trust shall not recognize any attempt to make it so, except as directed by the Company, in its capacity as Plan Administrator, for the payment of benefits directly to health care providers or provided by the Health Benefit Program and Life Insurance Program in a manner that is consistent with applicable law.

51

ARTICLE X

Events of Default

10.1    Upon the occurrence and during the continuation of a "Health Benefit Program Payment Default," the Health Benefit Program Committee shall have the right, by notice to the Company:

(a)    to require the Company to make prefunding contributions to the Health Benefit Trust in an amount equal to the excess, if any, of the Health APBO as most recently determined by the Actuary over the amount of any prefunding contribution (other than prefunding of the Annual Service Cost) made by the Company under the Health Benefit Program and the Life Insurance Program from the Effective Date until the date of such notice; and/or

(b)    to replace the Company as Plan Administrator and Named Fiduciary of the Health Benefit Program and the Life Insurance Program.

As used herein, the term "Health Benefit Program Payment Default" shall mean the failure at any time by Parent, the Company or any other Employer to make any payment or contribution required to be made by it pursuant to Sections 3.3, 3.6(b), 3.9, 4.1, 4.3 or 7.5 within five days after receipt of written notice of such failure from the Health Benefit Program Committee, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 10.1; provided, that with respect to any failure to make a payment or contribution required to be made by an Employer pursuant to Sections 3.3, 3.4 or 3.6, if such Employer shall have paid or contributed the amount determined by the Actuary in accordance with Article III and such Employer shall be required to make any additional payment or contribution as determined by the independent actuary referred to in Section 6.7, the Health Benefit Program Committee shall not give notice of such failure unless such Employer shall have failed to make such additional payment or contribution within five days of the date of such determination by such independent actuary; and provided, further, that the Health Benefit Program Committee shall not give notice of a failure to make a payment under Section 7.6 unless the Indemnified Party has executed the undertaking provided for in the Indemnification Procedures.

10.2    Upon the occurrence and during the continuation of a "Lien/Sale and Lease-back Default," the Health Benefit Program Committee shall have the right, by notice to the Company, to replace the Company as Plan Administrator and Named Fiduciary of the Health Benefit Program and the Life Insurance Program. As used herein, the term "Lien/Sale and Lease-back Default" shall mean the failure by Parent to cure any breach of Section 7.7 or 7.8 within 30 days after receipt of written notice of such failure, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 10.2 (said 30 days being hereinafter referred to as the "Section 10.2 Cure Period").

10.3    In the event any of the failures described in Section 10.2 which would otherwise constitute a Lien/Sale and Lease-back Default cannot be cured as a matter of right solely through the payment of money, the Section 10.2 Cure Period shall be extended for such additional period of time as

is reasonably necessary to permit Parent to effect such cure as long as Parent, the Company or any Employer is diligently and in good faith pursuing such cure.

        10.4    The rights of the Health Benefit Program Committee under this Article X are in addition to, and not in lieu of, any rights that such Committee, or any other person or entity, including, without limitation, any HBPC Committee Member, HBPC Other Member Alternate or Participant, may have under the Settlement Agreement, any Exhibit thereto or any Appendix to any such Exhibit, whether in equity or at law. The waiver by the Health Benefit Program Committee or any such person or entity of any Health Benefit Program Payment Default, Lien/Sale and Lease-back Default or other breach of any provision of, or any other right to enforce or claim or benefit under, any such document shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, any such document.

APPENDIX A-1

**Health Benefit Program SPD**

**The Health Benefit Program SPD is in the process of being updated. The parties will file a new version for class members' reference when complete. The updates are not subject to court approval.**

54

**Life Insurance Program SPD**

**The Life Insurance Program SPD is in the process of being updated. The parties will file a new version for class members' reference when complete. The updates are not subject to court approval.**

## NAVISTAR INTERNATIONAL TRANSPORTATION CORP.
## RETIREE HEALTH BENEFIT TRUST

THIS AGREEMENT OF TRUST (hereinafter referred to as the "Agreement") is made and entered into this 18th day of June, 1993, by and between Navistar International Transportation Corp., a corporation organized under the laws of the State of Delaware (hereinafter referred to as the "Company"), and The Northern Trust Company (hereinafter referred to as the "Trustee").

### W I T N E S S E T H:

**WHEREAS**, the Company was a defendant in <u>Shy</u> v. <u>Navistar International Corporation</u>, Case No. C-3-92-333 (S.D. Ohio) (the "Litigation"), and entered into a settlement agreement (the "Settlement Agreement") with the plaintiffs in the Litigation in order to limit its liability to the plaintiffs; and

**WHEREAS**, in order to provide post-retirement health and life insurance benefits to Participants and Beneficiaries (as hereinafter defined), the Company maintains the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan (the "Plan"), which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program (the "Health Benefit Program"), (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program (the "Life Insurance Program"), and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program; and

**WHEREAS**, under the Settlement Agreement, the Health Benefit Program, and the Life Insurance Program, the Company has agreed to provide certain benefits with an initial accumulated postretirement benefit obligation of $1,000 million ($946 million for the Health Benefit Program and $54 million for the Life Insurance Program) and to make certain contributions to the Health Benefit Program and the Life Insurance Program (collectively the "Programs") with respect to such obligation; and

**WHEREAS**, in order to implement and carry out the terms of the Settlement Agreement and the Programs, the Company wishes to establish the Navistar International Transportation Corp. Retiree Health Benefit Trust (hereinafter referred to as the "Trust"), which shall form a part of the Programs, and which is intended to satisfy the requirements of Section 501(c)(9) of the Code (as hereinafter defined) or any successor provision thereto; and

**WHEREAS**, the Company has authorized the execution of this Agreement and the creation of a trust fund to provide benefits under the Programs; and

**WHEREAS**, the Company intends, through this Agreement, to provide for management and control of the assets of the Programs through a trust fund; and

**WHEREAS**, The Northern Trust Company has consented to act as Trustee hereunder and to hold and administer such sums as are transferred or contributed upon the terms set forth herein,

**NOW, THEREFORE**, the Company and the Trustee hereby agree to establish the Navistar International Transportation Corp. Retiree Health Benefit Trust, subject to the following terms and conditions:

## ARTICLE I

## DEFINITIONS

1.1 **Definitions.** The following words and phrases when used herein shall have the following meanings, except as otherwise required by the context:

(a) **"Administrator"** means the Company.

(b) **"Beneficiary"** means a person designated as a beneficiary of a Participant by the Participant, or by the terms of a Program, and who is or may become entitled to a benefit under a Program.

(c) **"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

(d) **"Committee"** means the committee established pursuant to the Programs.

(e) **"Company"** means Navistar International Transportation Corp.

(f) **"Employers"** means Navistar International Corporation, Navistar International Transportation Corp., Navistar Financial Corporation, HARCO National Insurance Company, and Indianapolis Casting Corporation.

(g) **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended from time to time.

(h) **"Investment Manager"** means a person or entity who is either:

(1) an investment adviser registered as such under the Investment Advisers Act of 1940; or

(2) a bank, as defined in that Act; or

(3) an insurance company qualified to manage, acquire, or dispose of any asset of an employee benefit plan under the laws of more than one State.

(i) **"Participant"** means a Participant as defined by the Programs.

(j) **"Plan"** means the Navistar International Transportation Corp. Retiree Health Benefit and Life Insurance Plan, which is comprised of three benefit programs: (i) the Navistar International Transportation Corp. Retiree Health Benefit Program, (ii) the Navistar International Transportation Corp. Retiree Life Insurance Program, and (iii) the Navistar International Transportation Corp. Retiree Supplemental Benefit Program.

(k) **"Program Account"** means that part of the assets of the Trust attributable to a particular Program, including contributions, income, gains or losses, and expenses allocable to that Program and insurance contracts, if any, used as vehicles to pay benefits under the Program.

(l) **"Programs"** means the Navistar International Transportation Corp. Retiree Health Benefit Program and the Navistar International Transportation Corp. Retiree Life Insurance Program of the Plan.

(m) **"Trust Fund"** means the assets of the Trust.

(n) **"Trust Year"** means the fiscal year beginning on each November 1st and ending on the following October 31st; provided that the first Trust Year shall begin on the effective date specified by Section 12.9 hereof and shall end on the following October 31st.

1.2 **Gender and Number**. Masculine pronouns shall refer both to males and to females. Singular or plural words shall be construed to refer to the plural or the singular, respectively, where appropriate.

## ARTICLE II

## PAYMENTS TO AND FROM THE TRUST

2.1 **Payments to the Trust**. The Trustee shall receive any payments made to it in cash or in the form of such other property as it may from time to time deem acceptable and which shall have been delivered to it. Such payments may be made by the Company, by the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust, or by any other person or entity designated by the Company. All payments so received, together with the income therefrom and any other increment thereon, shall be held, invested, reinvested, and administered by the Trustee pursuant to the terms of this

57

Agreement, without distinction between principal and income. The Trustee shall not be responsible for the calculation or collection of any contribution under, or required by, the Programs, but shall be responsible only for cash or other property received by it pursuant to this Agreement.

      2.2    **Payments from the Trust**. The Trustee shall, from time to time and at the written direction of the Administrator, make, directly or indirectly, payments out of the Trust Fund in such amounts, to such persons, and for such purposes as may be specified in the written directions of the Administrator. To the extent permitted by law, the Trustee shall be under no liability for any payment made pursuant to the written direction of the Administrator or for any payment not made in the absence of a written direction of the Administrator. Any written direction of the Administrator shall constitute a certification that the payment so directed is one that the Administrator or its designated representative is authorized to direct. If a dispute arises with respect to a payment, the Trustee may withhold or cause to be withheld such payment until the dispute has been resolved.

## ARTICLE III

## ADMINISTRATION OF ACCOUNTS

      3.1    **Separate Accounts**. The assets allocable to each Program shall be allocated, for accounting purposes, to a separate Program Account for each Program. In addition, the Company may direct the Trustee in writing to account separately for such funds as the Company shall designate in writing, and if so directed, the Trustee shall establish separate accounts or sub-accounts for such funds. The funds allocated to such accounts and sub-accounts (including the Program Accounts) may be commingled for investment purposes. The Company shall designate to the Trustee in writing the account or sub-account to which each payment to and from the Trust is allocable.

## ARTICLE IV

## INVESTMENT AUTHORITY

      4.1    **Trustee's Authority**. Except as otherwise provided in this Agreement, the Trustee shall have exclusive authority and discretion to manage and control the Trust Fund; to invest and reinvest the principal and income of the Trust Fund and keep the Trust Fund invested, as a single fund without distinction between principal and income, in such securities or in such property, real or personal, tangible or intangible, as the Trustee shall deem advisable, including but not limited to capital or common stocks (whether voting or nonvoting and whether or not currently paying a dividend), preferred stocks (whether voting or nonvoting and whether or not currently paying a dividend), bonds, notes, debentures, interests in investment companies, trusts, partnerships, and other pooled funds, savings bank deposits (including but not limited to savings accounts and savings investment media that are maintained by the Trustee's own Banking Department), and commercial paper, and in such other property, investments and securities, whether domestic or foreign, of any kind, class, or character as the Trustee may deem suitable for the Trust Fund, and such investment and reinvestment shall not be restricted to properties and securities authorized for investment by trustees under any present or future law; provided that in no event shall the Trustee make any investment prohibited by ERISA. The Trustee in its discretion may keep such portion of the Trust Fund in cash or cash equivalents (including deposits in the Trustee's own Banking Department) as the Trustee may from time to time deem to be in the interest of Participants and Beneficiaries, even if such balances exceed the maximum amount insured from time to time by the Federal Deposit Insurance Corporation. Except as otherwise provided by Article VII hereof, all rights associated with assets of the Trust shall be exercised by the Trustee; all such rights shall in no event be exercisable by or rest with Participants and Beneficiaries.

# ARTICLE V

# POWERS AND DUTIES OF THE TRUSTEE

    5.1    **Powers**. The Trustee shall have the following powers with respect to the Trust Fund in addition to those conferred by laws:

        (a)    to sell, exchange, convey, transfer, or otherwise dispose of any property held by it, by private contract or at public auction; and no person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition;

        (b)    to make commitments either alone or in company with others to purchase at any future date any property, investments, or securities set forth in Section 4.1 hereof;

        (c)    to retain, manage, operate, repair, develop, preserve, improve, mortgage, or lease for any period any real property held by the Trustee upon such terms and conditions as the Trustee deems proper, either alone or by joining with others using other Trust assets for any such purposes if by it deemed advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease, including the waiver of rentals, if by it deemed advisable; and to make provisions for the amortization of the investment or in depreciation of the value of such property as it may deem advisable;

        (d)    to organize corporations under the laws of any State for the purpose of acquiring or holding title to any property for the Trust Fund or to request the Company to appoint another trustee for such purpose;

        (e)    to retain any stocks or other property received as a result of the exercise of any of the powers herein granted, whether or not investment in such stocks or other property is authorized by Section 4.1 hereof;

        (f)    to vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to exercise any conversion privileges, subscription rights, or other options, and to make any payments incidental thereto; to consent to or otherwise participate in corporate reorganizations or other changes affecting corporate securities and to delegate discretionary powers and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to stocks, bonds, securities, or other property held in the Trust Fund;

        (g)    to make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

        (h)    to register any investment held in the Trust Fund in its own name or in the name of a nominee and to hold any investment in bearer form, to utilize the services of a depository clearing corporation (such as the Depository Trust Company) to the extent permitted by law, and to combine certificates representing such investments with certificates of the same issue held by the Trustee in other fiduciary capacities under employee benefit plans, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust;

        (i)    to employ suitable agents and counsel and to pay reasonable expenses and compensation thereto;

        (j)    to borrow money on such terms and conditions as the Trustee in its discretion may deem advisable;

        (k)    to transfer monies of the Trust Fund to a common or collective trust fund or pooled investment fund; money and other assets of the Trust Fund invested in such a fund shall be held and administered by the trustee thereof strictly in accordance with the terms of, and under the powers governing, such fund to the extent consistent with this Agreement and the terms of the Programs funded hereunder; the combining of money and other assets of this Trust with money and other assets of such a fund is hereby specifically authorized;

(1)    to compromise or otherwise adjust all claims in favor of or against the Trust Fund;

(m)    to compromise, compound, and settle any debt or obligations upon such terms as the Trustee may deem advisable and to agree to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon, default, or otherwise enforce any such obligation; and

(n)    upon receipt of written direction from the Administrator, to use monies in the Trust Fund to purchase or maintain insurance or annuity contracts.

5.2    **Dealing with Trustee**. In no event shall any purchaser, vendor, or other person dealing with the Trustee be required to ascertain the authority and power of the Trustee to make any sale, transfer, assignment, or investment of the whole or any part of the Trust Fund at any time held hereunder, or to make any contract in relation thereto, nor shall any insurance company be required to ascertain the power or authority of the Trustee to apply for and purchase any insurance or annuity contract, and any such person or company may rely upon any factual information furnished by the Trustee in connection therewith. All parties dealing with the Trustee with respect to the Trust Fund shall have the right to assume that the Trustee has full power and authority in all respects to deal with the Trust Fund and shall not be affected by any notice to the contrary, and no purchaser shall be required to see to the application of the purchase money.

5.3    **Fees and Expenses**. The Trustee shall be paid such reasonable compensation as may be agreed upon in writing from time to time between the Trustee and the Company. Such compensation and all fees and expenses incurred by the Trustee in the proper performance of its duties, including fees for legal services rendered to the Trustee and compensation paid to any Investment Manager, shall be paid from the Trust Fund unless paid by the Company. All taxes of any kind that may be levied or assessed under existing or future laws upon, or with respect to, the Trust shall be paid from the Trust Fund.

5.4    **Administration**. The Trustee shall not be responsible in any way for the administration of the Programs.

5.5    **Consultation and Indemnification**. The Trustee may consult with counsel, and the Trustee shall not be deemed imprudent by reason of taking or refraining from taking any action in accordance with the opinion of counsel. The Company shall cause the Trust to indemnify and hold the Trustee harmless from and against any liability that the Trustee may incur in the administration of the Trust Fund, unless such liability arises from the Trustee's negligence or breach of the provisions of this Agreement or ERISA; provided that nothing in this Section 5.5 shall require any payment from any source other than the Trust or require any payment to be made to the Trust. The Trustee shall not be required to give any bond or any other security for the faithful performance of its duties under this Agreement, except such as may be required by law.

5.6    **Responsibilities**. Except as required by ERISA, the Trustee shall be under no duty (i) to take any action other than as herein specified with respect to the Trust unless the Administrator or an Investment Manager shall furnish the Trustee with instructions in proper form as described by Section 5.8 hereof or (ii) to engage in any suit with respect to the Trust unless the Trustee shall have first agreed in writing to do so and shall have been fully indemnified to the satisfaction of the Trustee. To the extent not prohibited by ERISA, the Trustee shall not be responsible or liable in any way for any action or omission of the Company, the Administrator, or the Committee with respect to the performance of their duties and obligations as set forth in the Programs and this Agreement; provided that the Trustee shall not be relieved of responsibility or liability for any responsibility, obligation, or duty imposed upon it under this Agreement or under ERISA. The Trustee is a party to this Agreement solely for the purpose set forth in this Agreement and to perform the acts set forth herein, and no obligation or duty shall be imposed upon it except as expressly stated herein or as required by ERISA.

5.7    **Direction**. The Trustee may request the advice or direction of the Administrator with respect to the administration of the Trust and the distribution of the Trust Fund, and, to the extent

60

permitted by ERISA, shall be protected from liability in relying upon any direction given to it by the Administrator, in writing, in response to such a request.

        5.8    **Reliance on Written Instructions**.  The Trustee shall be entitled to rely upon any written notice, instruction, direction, certificate, or other communication believed by it to be genuine and to be signed by the Company, the Administrator, an Investment Manager, or their authorized agent(s) or representative(s), unless it knows or should know that the direction or instruction constitutes a breach of the Company's, the Administrator's, or the Investment Manager's fiduciary responsibility with respect to the Trust. The Trustee shall be fully protected in making payments out of the Trust Fund, or in taking or omitting to take any other actions, in accordance with the written instructions of the Company, the Administrator, an Investment Manager, or their authorized agent(s) or representative(s), and shall have no responsibility to see to the application of any such payments by the Participants or their Beneficiaries or legal representatives, or by any other recipients thereof specified in such instructions, or to ascertain whether such instructions comply with the terms of the Programs, or to determine the rights or benefits of any person in the Trust or under the Programs, and shall not be liable to any person for or in respect of any payment made by it, or action taken or omitted to be taken by it, in good faith without notice or knowledge of a change in the condition or status of any person affecting that person's rights hereunder; provided that if the Trustee knows or should know that such an instruction constitutes a breach of fiduciary responsibility with respect to the Programs, the Trustee shall inform the Administrator of the breach. The Company, the Administrator, and any Investment Manager(s) shall furnish the Trustee with a list naming their authorized agent(s) or representative(s), and describing the scope of the authority granted, and shall notify the Trustee of any changes to the list. Absent such notification, the Trustee may assume no change has occurred with respect to each list.

**ARTICLE VI**

**FUNDING POLICY AND INVESTMENT OBJECTIVES**

        6.1    **Communication to Trustee**. The Administrator shall inform the Trustee in writing of the funding policy under the Programs and of the investment objectives of the Trust and of any changes or modifications therein. Until the Administrator informs the Trustee in writing of any change in the funding policy under the Programs or of any change in the investment objectives of the Trust, the Trustee may assume that there has been no change in the funding policy or the investment objectives, as the case may be.

**ARTICLE VII**

**DUTIES OF THE ADMINISTRATOR**

        7.1    **Information**. The Administrator shall furnish the Trustee with such information and data relating to the Programs as are necessary for the Trustee to carry out its duties under this Agreement.

        7.2    **Investment Responsibility**.  The Trustee, and not the Administrator, shall have the full responsibility for investment of the Trust Fund, except where the Administrator has appointed an Investment Manager pursuant to Section 7.3 hereof or has established a segregated fund managed by the Administrator pursuant to Section 7.5 hereof.

        7.3    **Appointment of Investment Manager**. The Administrator may appoint one or more Investment Managers for the purpose of directing the Trustee with respect to the investment or reinvestment of all or any portion of the Trust Fund. The Administrator shall certify to the Trustee the appointment and scope of authority of, and any resignation or removal or change in authority of, any Investment Manager appointed by it under this Section, the appointment of any successor thereto, and the identity of the individual or individuals entitled to act on behalf of the Investment Manager. In particular, the Administrator shall state and certify how

61

investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any change or revocation thereof. An Investment Manager shall present evidence to the Trustee of its qualifications as an Investment Manager under Section 3(38) of ERISA, and shall acknowledge in writing its appointment as a fiduciary of the Programs.

7.4    **Responsibility of Investment Manager**. An Investment Manager shall have sole investment responsibility for that portion of the assets of the Trust Fund that it has been appointed to manage. An Investment Manager that has been thus granted such responsibility shall have all the investment powers enumerated in Article IV hereof that shall be granted to it by the Administrator. Where such an Investment Manager has been appointed by the Administrator, the Trustee shall have no duty to review or recommend any investment or reinvestment of the Trust Fund, nor shall the Trustee be charged with the duties imposed by Section 8.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to any Investment Manager. The Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this Section. The Trustee shall be under no duty to question the direction or lack of direction of any Investment Manager, but shall act, and shall be fully protected in acting, in accordance with each such direction.

7.5    **Segregated Fund**. The Administrator may create a segregated fund by certifying to the Trustee in writing that it has established a segregated fund in accordance with procedures that are consistent with Section 403(a)(1) of ERISA, the investment and control of the assets of which are to be the sole and exclusive responsibility of the Administrator. The Administrator shall have complete discretionary authority to direct the Trustee with respect to the investment and reinvestment of the portion of the Trust Fund constituting the segregated fund, as specified by the Administrator, without any requirement that any other fiduciary be consulted prior to the giving of any such directions to the Trustee or the carrying out of such directions by the Trustee. If the Administrator has thus assumed such discretionary authority, the Administrator shall have all the investment powers enumerated in Article IV hereof. The Administrator shall certify to the Trustee the scope of its authority, any change in the authority of the Administrator, and the identity of the individual or individuals entitled to act on behalf of the Administrator. In particular, the Administrator shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification. To the extent permitted by ERISA, the Trustee shall be fully protected in relying on each such certification until it receives notice of any change or revocation thereof, and the Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this Section. The Trustee shall have no duty to review or to recommend any investment or reinvestment of the segregated fund, nor shall the Trustee be charged with the duties imposed by Section 8.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to the Administrator. The Trustee shall have no discretionary authority over a segregated fund, but shall be subject, with respect to the segregated fund, to all proper directions of the Administrator that are not contrary to the terms of ERISA.

## ARTICLE VIII

## FIDUCIARY OBLIGATIONS

8.1    **Standard of Fiduciary Conduct**. The Trustee shall discharge its duties solely in the interest of the Participants and Beneficiaries and

(a)    for the exclusive purpose of providing benefits to Participants and Beneficiaries and defraying reasonable expenses of administering the Programs (including any such expenses incurred by the Administrator or the Committee);

(b)      with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(c)      by diversifying the investments of the Programs so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so; and

(d)      in accordance with this Agreement, except to the extent that this Agreement may be inconsistent with ERISA.

8.2    **Prohibited Inurement**. Except as provided herein and in the Programs, none of the assets of the Trust shall inure to the benefit of the Company, any affiliate thereof, or any other person except through the payment of benefits provided under the Programs (including the payment of reasonable Program administration expenses). Notwithstanding the foregoing, if the Company makes a contribution to the Trust by a mistake of fact, the contribution (reduced by any investment losses, but not increased by any investment gains) may be returned to the Company within one year after the payment of the contribution.

8.3    **Scope of Responsibility**. A fiduciary not charged with a specific responsibility under the provisions of the Programs or this Agreement shall be under no duty to question any action or lack of action of another fiduciary with respect to such responsibility, and shall not be liable for a breach of fiduciary responsibility by another fiduciary, unless the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary knowing such act is a breach, or if, having knowledge of a breach by such other fiduciary, the fiduciary fails to make reasonable efforts under the circumstances to remedy the breach.

## ARTICLE IX

## ACCOUNTING

9.1    **Accounting for Trust Fund**. The Trustee shall keep timely, accurate, and detailed accounts of all investments, receipts, disbursements, and other transactions hereunder, and all accounts, books, and records relating hereto shall be open to inspection and audit at all reasonable times by the Administrator and any other person designated by the Administrator. Within sixty (60) days following the close of each Trust Year, within sixty (60) days after the removal or resignation of the Trustee, and at such other times as the Administrator reasonably may require, the Trustee shall file with the Administrator a written account setting forth all investments, receipts, disbursements, and other transactions effected by the Trustee during such Trust Year or since the date of its last account. The Trustee, within the same time periods, shall ascertain and certify to the Administrator, in accordance with applicable U.S. Department of Labor regulations, the cost and fair market values as of the close of such Trust Year (or such other period as the Administrator may require) of all securities and other properties held in the Trust Fund. Such fair market values shall be determined either by the Trustee itself or by such person or persons believed by the Trustee to be competent to make such determination as the Trustee may select, but in accordance with a method consistently followed and uniformly applied. The Trustee, within the same time periods, also shall furnish to the Administrator a balance sheet containing a description in reasonable detail of all assets and liabilities of the Trust. In the event any portion of the Trust Fund has been transferred to a common or collective trust fund pursuant to Section 5.1 hereof, such account shall include a copy of the latest annual written account of the common or collective trust fund. The Administrator shall have the right to require an audit by certified public accountants of the records and assets of the Trust. The expenses and any special fee charged by the Trustee for any such audit shall be paid pursuant to the provisions of Section 5.3 hereof.

## ARTICLE X

## RESIGNATION, REMOVAL, AND SUCCESSION OF TRUSTEE

10.1 **Resignation**. The Trustee may resign at any time by giving sixty (60) days' notice in writing to the Company.

10.2 **Removal**. The Company may remove the Trustee at any time by giving thirty (30) days' notice in writing to the Trustee.

10.3 **Successor Trustee**. In no event shall the resignation or removal of the Trustee terminate this Agreement, but upon such resignation or removal of the Trustee, the Company shall have the duty forthwith of appointing a successor trustee, who shall have the same powers and duties conferred upon the Trustee hereunder. In the event of such resignation or removal of such Trustee and upon the appointment of a successor trustee and acceptance of such Trustee, the Trustee shall turn over to the successor trustee the Trust Fund and all records of books of account and other documents pertaining to this Agreement that are in its possession, reserving such sums as the Trustee shall reasonably deem necessary to defray its expenses in settling its accounts, to pay any of its compensation due and unpaid, and to discharge any obligation of the Trust Fund for which the Trustee may be liable; and if the sums so reserved are not sufficient for these purposes, the Trustee shall be entitled to recover the amount of any deficiency from either the Company or the successor trustee, or both. To the extent permitted by ERISA, after the Trust Fund has been properly transferred and delivered to the successor trustee, the Trustee shall be released and discharged from all further accountability or liability for the Trust Fund and shall not be responsible in any way for the further disposition of the Trust Fund or any part thereof.

10.4 **Waiver of Notice**. In the event of any resignation or removal of the Trustee, the Trustee and the Company may in writing waive any notice of resignation or removal as may be provided hereunder.

## ARTICLE XI

## AMENDMENT AND TERMINATION OF AGREEMENT

11.1 **Amendment**. This Agreement may be amended in writing at any time or from time to time, in whole or in part, by action of the Company, and any such amendment may be retroactive. However, no amendment that affects the rights, duties, or responsibilities of the Trustee shall become effective without the Trustee's written consent. No amendment shall be inconsistent with the requirements of ERISA or with the provisions of the Programs. No amendment shall authorize or permit any assets of the Programs to be used for, or diverted to, purposes other than for the exclusive benefit of Participants and Beneficiaries of the Programs and the payment of reasonable Program administration expenses prior to the satisfaction of all liabilities under the Programs. No amendment shall cause or permit any portion of the Trust Fund to revert to or become the property of the Employers.

11.2 **Termination**. The Company may terminate the Trust in accordance with the terms of the Programs.

11.3 **Distribution Upon Termination**. In the event of the termination of the Trust, or of all or any part of a Program, the funds of which are held hereunder, the Trustee shall dispose of such funds in accordance with the written order of the Administrator. Such order shall require that the funds of each Program be disposed of in a manner that benefits the Participants and Beneficiaries covered by the Program (including the payment of reasonable Program administration expenses); provided that if all of the liabilities of a Program have been satisfied, any remaining assets of that Program shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code) as the Company shall determine in its

64

discretion. Notwithstanding the foregoing, in the event the Programs are terminated pursuant to a termination of the Settlement Agreement in Shy v. Navistar International Corporation, any assets of the Programs shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" (within the meaning of Section 501(c)(9) of the Code) as determined by the Company in its discretion. Except as provided by Section 8.2 hereof, under no condition shall the termination of the Trust result in a distribution of any portion of the Trust Fund to the Employers.

## ARTICLE XII

## MISCELLANEOUS

12.1 **Limited Effect of Programs and Trust**. Neither the establishment of the Programs nor the Trust nor any modification thereof, nor the creation of any fund or account, nor the payment of any amounts from the Trust, shall be construed as giving to any Participant or Beneficiary any legal or equitable right against the Trustee, the Company, the Administrator, the Committee, or any affiliate, director, officer, employee, agent, or representative thereof, except as may otherwise be expressly provided in the Programs and except as may otherwise be provided by ERISA. Under no circumstances shall the terms of employment of any employee be modified or in any way affected by the Trust or this Agreement.

12.2 **Nonalienation of Benefits**. Except as otherwise required by law, neither the benefits payable from any Program Account nor any Participant's or Beneficiary's interest in any of the assets of the Trust shall be subject to any manner of anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, garnish, execute, levy upon, or otherwise dispose of any right to benefits payable under, or any interest in, the Trust Fund shall be void. Neither the Trust Fund nor the Trustee shall in any manner be liable for, or be subject to, the debts, contracts, liabilities, engagements, or torts of any person entitled to benefits from a Program.

12.3 **Governing Law**. This Agreement shall be administered, construed, and enforced according to the laws of the State of Illinois, except to the extent superseded by ERISA or any other federal law.

12.4 **Severability**. If any provision of this Agreement shall be held illegal or invalid, such illegality or invalidity shall not affect the remaining provisions of this Agreement but shall be fully severable, and this Agreement shall be construed and administered as if said illegal or invalid provision had never been inserted herein.

12.5 **Binding Effect**. The provisions of this Agreement shall be binding upon and inure to the benefit of the Company and its successors, the Trustee and its successors in Trust, and the Participants and their Beneficiaries, and their respective heirs, personal representatives, successors and assigns, in accordance with and subject to the terms hereof.

12.6 **Number of Originals**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and the counterparts shall constitute one and the same instrument, which shall be sufficiently evidenced by any one thereof.

12.7 **Fiduciary Duties**. Nothing in this Agreement shall relieve or be deemed to relieve the Trustee or any other fiduciary from any responsibility or liability for any responsibility, obligation, or duty imposed by or under ERISA.

12.8 **Evidence of Authority**. The execution by the Trustee of any instrument, document, or paper in connection with the exercise of any of the powers enumerated herein shall, of itself,

65

be conclusive evidence to all persons of the authority of the Trustee to execute the same and to exercise all powers incident thereto.

        12.9    **Effective Date**.  This Agreement shall be effective as of the 1st day of July, 1993.

        **IN WITNESS WHEREOF**, this Agreement has been executed this 18th day of June, 1993.

<table>
<tr><td></td><td>NAVISTAR INTERNATIONAL TRANSPORTATION CORP.</td></tr>
<tr><td>Attest:</td><td>By: _____</td></tr>
<tr><td>_____</td><td>        Thomas M. Hough<br>        Vice President and Treasurer</td></tr>
<tr><td></td><td>THE NORTHERN TRUST COMPANY, as Trustee for the Navistar International Transportation Corp. Retiree Health Benefit Trust</td></tr>
<tr><td>Attest:</td><td>By: _____</td></tr>
<tr><td>_____<br>ASSISTANT SECRETARY</td><td>Title: _____</td></tr>
</table>

APPENDIX A-4

<u>PRESENT REPRESENTED EMPLOYEES</u>

INCLUDED IN EXHIBIT C

APPENDIX A-5

**Navistar International Transportation
Corporation
Postretirement Benefit Programs**

**Actuarial Valuation
as of January 1, 1993**

## ACTUARIAL STATEMENT OF OPINION

This report presents the results of the January 1, 1993 valuation of Navistar International Transportation Corporation's postretirement medical and life insurance benefit program. It has been prepared to support the actuarial mechanics of the proposed settlement. The report also presents an actuarial projection of valuations for January 1, 1994 and January 1, 1995. Results for different accounting periods or for other purposes may differ significantly from the results reported herein.

The calculations reported in this valuation report have been made on a basis consistent with our understanding of *SFAS No. 106, Employers' Accounting for Postretirement Benefits Other Than Pensions.* It was prepared in accordance with the provisions of the *Actuarial Compliance Guideline No. 3 For SFAS No. 106.* This report, however, should not be considered to provide accounting advice.

Our calculations were based on the employee/retiree demographic and financial data, furnished by Navistar and information gathered through discussions with Navistar personnel. We also relied upon detailed claims data furnished by Navistar and Medstat. The data have not been audited by Coopers & Lybrand and we cannot certify as to the accuracy of completeness of the data supplied. Our calculations are based on our understanding of Navistar's postretirement benefit programs as described by Navistar personnel and presented in this report.

This valuation was based upon generally accepted actuarial methods. We performed such tests as we considered necessary to ensure the accuracy of the results. We certify that the amounts presented in the accompanying report have been determined appropriately according to the actuarial assumptions and methods stated herein. It should be recognized, however, that because future events frequently do not occur exactly as expected, there are usually differences between projected and actual results. Accordingly, there can be no assurance that actual experience will match our projections.

Respectfully submitted,

COOPERS & LYBRAND

By: _____     By: _____
    Jeannie M. Wodarczyk                 G. Todd Swim
    F.S.A., M.A.A.A.                     F.S.A., M.A.A.A.

# CONTENTS

SECTION I          VALUATION RESULTS

SECTION II         POSTRETIREMENT BENEFIT PLAN PROVISIONS

SECTION III        PARTICIPANT DATA

SECTION IV        BASELINE COST DETERMINATION

SECTION V          ACTUARIAL ASSUMPTIONS AND METHODS

SECTION VI        DETAILED TABLES OF VALUATION RESULTS

# SECTION I
# VALUATION RESULTS

This valuation report summarizes our measurement of Navistar's obligations under the provisions of SFAS No. 106. The valuation incorporates all postretirement medical and life insurance benefits applicable to Navistar's active employees, retirees, and their dependents.

**Please note: All valuation results presented in this report are based on our understanding of the provisions of SFAS No. 106, Navistar's plan provisions, the census and claims data provided by Navistar and Medstat, and the assumptions chosen by management, as described in this report.**

*VALUATION RESULTS*

**January 1, 1993 Valuation Results**

The following table summarizes Navistar's accumulated postretirement benefit obligation (APBO) as of January 1, 1993 based on the covered participants and the postretirement medical and life insurance plans in effect at that time.

---

### I-1

### APBO as of January 1, 1993
### (Medical, Including Drugs and Life – Contributions)
### ($millions)

|  | Total |
|---|---|
| Medical | $ 998.1 |
| Drugs | 332.9 |
| Life | 54.4 |
| Contributions | (385.3) |
| Total | 1,000.1 |
| Percent of total | 100.0% |

---

# SECTION I
# VALUATION RESULTS
# (continued)

## Valuation Results for Future Years

The obligations were projected for fiscal years 1994 and 1995 based on the January 1, 1993 valuation assumptions. The projection assumed retirements, terminations, and deaths according to the valuation assumptions documented in Section V. The projection is a closed group projection.

Tables I-2 and I-3 summarize Navistar's projected APBO for 1993, 1994, and 1995.

---

### I-2

### Projected APBO
### ($ millions)
### Medical Programs

| | Medical + Drug - Contributions | |
| | Total | |
| | APBO | % Share |
|---|---:|---:|
| 1/1/93 employer's share | $ 945.7 | 71.1% |
| Covered participants' | 385.3 | 28.9% |
| | 1,331.0 | 100.0% |
| | | |
| 1/1/94 employer's | $ 990.9 | 71.7% |
| Covered participants' | 390.2 | 28.3% |
| | 1,381.1 | 100.0% |
| | | |
| 1/1/95 employer's | $ 1,035.3 | 72.6% |
| Covered participants' | 390.0 | 27.4% |
| | 1,425.3 | 100.0% |

---

**SECTION I**
**VALUATION RESULTS**
**(continued)**

---

**I-3**

**Projected APBO**
**($ millions)**
**Medical and Life Insurance Programs**

1/1/93 <u>Total</u>

| | | |
|---|---|---|
| Medical | $ | 998.1 |
| Drugs | | 332.9 |
| Life | | 54.4 |
| Retiree contributions | | 385.3 |

Net medical =
(Medical + Drugs + Life – Cont.)          $   1,000.1

1/1/94 <u>Total</u>

| | | |
|---|---|---|
| Medical | $ | 1,031.3 |
| Drugs | | 349.9 |
| Life | | 54.7 |
| Retiree contributions | | 390.2 |

Net medical =
(Medical + Drugs + Life – Cont.)          $   1,045.7

1/1/95                                         <u>Total</u>

| | | |
|---|---|---|
| Medical | $ | 1,060.5 |
| Drugs | | 364.8 |
| Life | | 54.7 |
| Retiree contributions | | 390.0 |

Net medical =
(Medical + Drugs + Life – Cont.)          $   1,090.0

---

# SECTION I
## VALUATION RESULTS
### (continued)

Obligations were projected through 2002 on the same closed group basis. The following two tables summarize Navistar's projected covered participants, cash flows, and service cost.

---

**I-4**

**Projected Cash Flows and Covered Participants**
**($ thousands)**

| Year | Covered Participants Retirees and Dependents | Cash Flows Less Contributions Medical + Drugs | Life | Total |
|------|------|------|------|------|
| 1993 | 58,149 | $53,524 | $4,663 | $ 58,187 |
| 1994 | 56,881 | 58,831 | 4,798 | 63,629 |
| 1995 | 55,368 | 64,434 | 4,920 | 69,354 |
| 1996 | 53,920 | 70,365 | 5,060 | 75,425 |
| 1997 | 52,540 | 76,654 | 5,157 | 81,811 |
| 1998 | 51,303 | 83,345 | 5,241 | 88,586 |
| 1999 | 50,092 | 90,583 | 5,312 | 95,895 |
| 2000 | 48,991 | 97,397 | 5,367 | 102,764 |
| 2001 | 47,773 | 103,961 | 5,405 | 109,366 |
| 2002 | 46,560 | 109,584 | 5,425 | 115,009 |

---

Navistar International
Transportation Corporation

Coopers & Lybrand

**SECTION I**
**VALUATION RESULTS**
**(continued)**

---

**I-5**

**Projected Annual Service Cost**
**($ thousands)**

| Year | Medical + Drugs | Life | Total |
|------|-----------------|------|-------|
| 1993 | $11,466 | $177 | $11,643 |
| 1994 | 11,566 | 172 | 11,737 |
| 1995 | 11,653 | 160 | 11,813 |
| 1996 | 8,926 | 115 | 9,041 |
| 1997 | 8,564 | 107 | 8,671 |
| 1998 | 8,364 | 101 | 8,465 |
| 1999 | 7,243 | 80 | 7,323 |
| 2000 | 7,275 | 77 | 7,351 |
| 2001 | 5,672 | 57 | 5,729 |
| 2002 | 5,303 | 51 | 5,354 |

---

## SECTION II
## POSTRETIREMENT BENEFIT PLAN PROVISIONS


Navistar's postretirement medical and life insurance plan provisions are summarized in the following pages.

**Exhibit II-1** summarizes our understanding of the major provisions of the postretirement medical plans.

**Exhibit II-2** summarizes our understanding of the major provisions of the postretirement life insurance plans.

**SECTION II**
**POSTRETIREMENT BENEFIT PLAN PROVISIONS**
(continued)

*Exhibit II-1*

**Postretirement Medical Plan Provisions**

| Plan Feature | Description |
|---|---|
| Retiree eligibility: | |
| Represented | Age 65 with 1+ years of service, or Age 60 with 10+ years of service, or 30+ years of service. |
| Nonrepresented | Age 55 with 10+ years of service, or 30+ years of service. |
| Period of coverage | Lifetime. |
| Spouse/dependent coverage | Spouses at date of retirement have lifetime coverage. Dependent children covered to age 1(?) (25 under certain conditions), or lifetime if permanently disabled. |
| Plan type | Comprehensive major medical. |
| Deductible | $200. |
| Coinsurance | Pre-65 — 80%. Post-65 — 100%. |
| Annual out-of-pocket maximum | Pre-65 — $500. Post-65 — $200. |
| Lifetime maximum | None. |

**SECTION II**
**POSTRETIREMENT BENEFIT PLAN PROVISIONS**
(continued)

_**Exhibit II-1**_

**Postretirement Medical Plan Provisions**
**(continued)**

| Plan Feature | Description |
|---|---|
| Retiree contributions | Pre-65 — $70/month in 1993.<br>Post-65 — $34/month in 1993.<br><br>Base contributions are scheduled to increase at 6% per year. Contributions may increase or decrease due to cost sharing of certain actuarial gains and losses as described in Section 3.4 of Article III. |
| Part B Medicare premium | Paid by retiree. |
| Drug copayments | Retail pharmacy: $18 for brand name; $8 for generics.<br><br>Mail order: $7; 30-day maximum in mail order. |

**SECTION II**
**POSTRETIREMENT BENEFIT PLAN PROVISIONS**
(continued)

---

*Exhibit II-2*

**Postretirement Life Insurance Plan Provisions**

| Plan Feature | Description |
|---|---|
| Retiree eligibility: | |
|     Represented | Age 65 with 1+ years of service, or Age 60 with 10+ years of service, or 30+ years of service. |
|     Nonrepresented | Age 55 with 10+ years of service, or 30+ years of service. |
| Period of coverage | Lifetime. |
| Spouse/dependent coverage | None. |
| Retiree contributions | None. |
| Death benefit amount | Based on salary and years of service with $5,000 maximum benefit.  Limited additional coverage can be purchased at group rates. |

---

# SECTION III
# PARTICIPANT DATA


The participant demographic data (active and retired) were provided by Navistar. The following tables summarize the demographic data provided.

**Exhibit III-1** summarizes the active employee census by age and years of service used for the 1/1/93 valuation.

**Exhibit III-2** summarizes the retired participant census, both retirees and their dependents, by age used for the 1/1/93 valuation.

# SECTION III
# PARTICIPANT DATA
(continued)

*Exhibit III-1*

**Active Employee Census as of January 1, 1993**

| Age | Years of Service | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | 0-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30+ | |
| < 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 20-24 | 64 | 3 | 0 | 0 | 0 | 0 | 0 | 67 |
| 25-29 | 313 | 102 | 0 | 0 | 0 | 0 | 0 | 415 |
| 30-34 | 240 | 227 | 52 | 3 | 0 | 0 | 0 | 522 |
| 35-39 | 227 | 192 | 146 | 119 | 77 | 0 | 0 | 761 |
| 40-44 | 172 | 175 | 240 | 273 | 1,140 | 140 | 0 | 2,140 |
| 45-49 | 137 | 141 | 251 | 229 | 1,257 | 1,586 | 263 | 3,864 |
| 50-54 | 49 | 112 | 86 | 373 | 911 | 1,472 | 1,231 | 4,234 |
| 55-59 | 46 | 46 | 78 | 137 | 379 | 611 | 918 | 2,215 |
| 60-64 | 7 | 27 | 14 | 31 | 80 | 137 | 244 | 540 |
| 65+ | 0 | 2 | 3 | 7 | 9 | 12 | 36 | 69 |
| Total | 1,255 | 1,027 | 870 | 1,172 | 3,853 | 3,958 | 2,692 | 14,827 |

*Average age: 48.1*

*Average years of service: 21.7*

*Total employees NFC*: 370*

*Total employees Navistar (excluding NFC)*: 14,457*

•**NFC = Navistar Financial Corp.**

## SECTION III

## PARTICIPANT DATA
(continued)

*Exhibit III-2*

### Retired Census as of January 1, 1993

| Age | Medical Program<br>Retirees and Dependents | Life Insurance<br>Retirees |
|-----|-----|-----|
| < 50 | 930 | 165 |
| 50-54 | 1,740 | 390 |
| 55-59 | 4,344 | 1,181 |
| 60-64 | 7,669 | 2,017 |
| 65-69 | 11,297 | 3,262 |
| 70-74 | 11,355 | 3,215 |
| 75-79 | 9,948 | 2,797 |
| 80-84 | 6,454 | 1,695 |
| 85-89 | 3,065 | 740 |
| 90-94 | 1,091 | 195 |
| 95+ | 257 | 13 |
| Total | 58,149 | 15,668 |
| | | |
| **Average age:** | 70.8 | 70.7 |
| **Total NFC*:** | 217 | 111 |
| **Total Navistar (excluding NFC)*:** | 57,932 | 15,557 |

*NFC = Navistar Financial Corp.

Navistar International
Transportation Corporation

## SECTION IV
## BASELINE COST DETERMINATION

The estimation of postretirement benefit obligations is based on average per capita costs for a one-year period. These are referred to as the "baseline costs." The components of baseline costs and the current plan population are projected into the future to estimate future benefit payments using assumptions to estimate the effect of future trends and population changes.

Navistar's baseline costs were based on actual claims data provided by Medstat. Although reviewed for reasonableness, the data used in developing the baseline costs were not audited by Coopers & Lybrand. A description of the data used and the methods employed to develop the baseline cost assumptions is presented in the remainder of this section.

To understand the discussion of baseline costs presented in this section, it is important to differentiate between "eligible charges" and "net incurred claims." Eligible charges generally represent the gross amount of the bills received for retirees. Net incurred claims are eligible charges less retiree copayments and deductibles, other insurance, and Medicare payments. In other words, net incurred claims represent the net claims amount paid by the employer prior to recognition of retiree contributions, if any. SFAS No. 106 calls for trend assumptions to be applied to eligible charges and explicit recognition of the impact of fixed plan design features. Consistent with the FASB intent, we applied the cost trend assumptions to the eligible charges and separately projected copayments, deductibles, other insurance, and Medicare payments.

### *1991 CLAIMS EXPERIENCE*

Eligible charges were developed for:

- ➢ Total medical
- ➢ Total admin.

Offsets to eligible charges were categorized into the following:

- ➢ Medical deductible and coinsurance
- ➢ Drug copayments
- ➢ COB (other insurance)
- ➢ Medicare

For each individual, eligible charges minus the offsets (deductible, coinsurance, COB Medicare) equals the incurred net claims.

The 1991 per capita claims for medical and drugs were adjusted for plan design changes and trended to 1993 as shown on the following page.

84

**SECTION IV**
**BASELINE COST DETERMINATION**
**(continued)**

_Exhibit IV-1_

**1993 Average Per Capita Costs**

|  | Medical | Drug | Admin. | Deductible | Drug Copays | Medicare | COB | Net Claims |
|---|---|---|---|---|---|---|---|---|
| Nonrepresented age: | | | | | | | | |
| < 50 | $2,063 | $276 | $156 | $220 | $105 | $ 0 | $417 | $1,753 |
| 50-54 | 1,653 | 302 | 142 | 220 | 116 | 0 | 280 | 1,481 |
| 55-59 | 2,234 | 335 | 174 | 220 | 126 | 0 | 369 | 2,028 |
| 60-64 | 3,907 | 381 | 266 | 220 | 144 | 0 | 593 | 3,597 |
| 65-69 | 3,290 | 318 | 84 | 110 | 123 | 2,563 | 0 | 896 |
| 70-74 | 3,997 | 366 | 83 | 110 | 140 | 3,316 | 0 | 880 |
| 75-79 | 4,979 | 399 | 82 | 110 | 151 | 4,339 | 0 | 860 |
| 80+ | 4,545 | 396 | 80 | 110 | 151 | 3,908 | 0 | 852 |
| Represented age: | | | | | | | | |
| < 50 | $2,269 | $276 | $169 | $242 | $105 | $ 0 | $458 | $1,909 |
| 50-54 | 1,819 | 302 | 153 | 242 | 116 | 0 | 308 | 1,608 |
| 55-59 | 2,457 | 335 | 188 | 242 | 126 | 0 | 406 | 2,206 |
| 60-64 | 4,298 | 381 | 289 | 242 | 144 | 0 | 652 | 3,930 |
| 65-69 | 3,619 | 318 | 92 | 121 | 123 | 2,820 | 0 | 965 |
| 70-74 | 4,397 | 366 | 91 | 121 | 140 | 3,648 | 0 | 945 |
| 75-79 | 5,477 | 399 | 90 | 121 | 151 | 4,773 | 0 | 921 |
| 80+ | 4,999 | 396 | 87 | 121 | 151 | 4,299 | 0 | 911 |

Navistar International
Transportation Corporation

Coopers & Lynbrand

# SECTION V
## ACTUARIAL ASSUMPTIONS AND METHODS

### *Actuarial Assumptions*

| | |
|---|---|
| Discount rate | 9%. |
| Health care trend rates | Trend rates for each year are illustrated in Exhibit V-II |
| Mortality | Same as used in pension valuation. Rates in Exhibit V-II. |
| Retirement | Same as pension valuation. The following table illustrates the retirement rates applicable to active employees eligible to retire. |

| Age | Represented | Nonrepresented |
|-----|-------------|----------------|
| < 50 | 0% | 0% |
| 50-54 | 5% | 0% |
| 55-59 | 12% | 15% |
| 60-61 | 16% | 25% |
| 62 | 40% | 40% |
| 63-64 | 35% | 35% |
| 65 | 50% | 70% |
| 66-69 | 50% | 40% |
| 70 | 100% | 100% |

| | |
|---|---|
| Turnover | Annual ultimate rates based on attained age are illustrated in Exhibit V-II. |
| Disability | Current retired disabled employees are included with normal retirees in the valuation. Any additional disabled employees are assumed to remain in the active medical plan, accruing years of service, until eligible to retire. Separate disability decrement rates are not considered. |
| Coverage | Where coverage is available, 100% of all retirees will participate in the postretirement benefit plans. |
| Dependents of future retirees | 90% prior to the year 2000; 50% after 2000 to reflect increasing spousal coverage under dual benefits. |
| Payment of claims | Assumed to occur mid-year. |

**SECTION V**
**ACTUARIAL ASSUMPTIONS AND METHODS**
**(continued)**

*Exhibit V-1*

**Health Care Trend Rates**

| Year | Medical | | Drug | Administrative Costs | Deductible | COB | Medicare |
|------|---------|---------|------|----------------------|------------|-----|----------|
|      | Pre-65 | Post-65 | | | | | |
| 1994 | 11.0 | 9.0 | 14.0 | 8.0 | 6.0 | 11.0 | 9.0 |
| 1995 | 10.7 | 8.8 | 12.5 | 7.5 | 6.0 | 10.7 | 8.8 |
| 1996 | 10.4 | 8.6 | 11.0 | 7.0 | 6.0 | 10.4 | 8.6 |
| 1997 | 10.1 | 8.4 | 9.5 | 6.5 | 6.0 | 10.1 | 8.4 |
| 1998 | 9.8 | 8.2 | 8.6 | 6.0 | 6.0 | 9.8 | 8.2 |
| 1999 | 9.5 | 8.0 | 8.2 | 5.5 | 6.0 | 9.5 | 8.0 |
| 2000 | 9.2 | 7.8 | 8.0 | 5.5 | 6.0 | 9.2 | 7.8 |
| 2001 | 8.9 | 7.6 | 7.8 | 5.5 | 6.0 | 8.9 | 7.6 |
| 2002 | 8.6 | 7.4 | 7.6 | 5.5 | 6.0 | 8.6 | 7.4 |
| 2003 | 8.2 | 7.3 | 7.4 | 5.5 | 6.0 | 8.2 | 7.3 |
| 2004 | 7.9 | 7.1 | 7.2 | 5.5 | 6.0 | 7.9 | 7.1 |
| 2005 | 7.6 | 6.9 | 7.0 | 5.5 | 6.0 | 7.6 | 6.9 |
| 2006 | 7.3 | 6.7 | 6.8 | 5.5 | 6.0 | 7.3 | 6.7 |
| 2007 | 7.0 | 6.5 | 6.6 | 5.5 | 6.0 | 7.0 | 6.5 |
| 2008 | 6.7 | 6.3 | 6.1 | 5.5 | 6.0 | 6.7 | 6.3 |
| 2009 | 6.4 | 6.1 | 6.2 | 5.5 | 6.0 | 6.4 | 6.1 |
| 2010 | 6.1 | 5.9 | 6.0 | 5.5 | 6.0 | 6.1 | 5.9 |
| 2011 | 5.8 | 5.7 | 5.8 | 5.5 | 6.0 | 5.8 | 5.7 |
| 2012+ | 5.5 | 5.5 | 5.5 | 5.5 | 6.0 | 5.5 | 5.5 |

Navistar International
Transportation Corporation

Coopers & Lybrand

## MORTALITY AND TURNOVER ASSUMPTIONS
## ANNUAL RATES PER 1,000 PARTICIPANTS

| Age | Rep & Non-Rep Mortality | Turnover Represented | Turnover Nonrepresented |
|---|---|---|---|
| 11 | 0.416 | 0.0 | 0.0 |
| 12 | 0.416 | 0.0 | 0.0 |
| 13 | 0.416 | 0.0 | 0.0 |
| 14 | 0.420 | 0.0 | 0.0 |
| 15 | 0.426 | 0.0 | 0.0 |
| 16 | 0.432 | 50.0 | 105.0 |
| 17 | 0.438 | 50.0 | 105.0 |
| 18 | 0.446 | 50.0 | 105.0 |
| 19 | 0.454 | 50.0 | 105.0 |
| 20 | 0.463 | 50.0 | 105.0 |
| 21 | 0.474 | 50.0 | 97.6 |
| 22 | 0.490 | 50.0 | 90.2 |
| 23 | 0.507 | 50.0 | 82.8 |
| 24 | 0.525 | 50.0 | 75.4 |
| 25 | 0.546 | 50.0 | 68.0 |
| 26 | 0.570 | 48.0 | 65.4 |
| 27 | 0.595 | 46.0 | 62.8 |
| 28 | 0.624 | 44.0 | 60.2 |
| 29 | 0.655 | 42.0 | 57.6 |
| 30 | 0.690 | 40.0 | 55.0 |
| 31 | 0.728 | 36.8 | 53.0 |
| 32 | 0.770 | 33.6 | 51.0 |
| 33 | 0.816 | 30.4 | 49.0 |
| 34 | 0.868 | 27.2 | 47.0 |
| 35 | 0.925 | 24.0 | 45.0 |
| 36 | 0.987 | 21.4 | 43.2 |
| 37 | 1.055 | 18.8 | 41.4 |
| 38 | 1.133 | 16.2 | 39.6 |
| 39 | 1.220 | 13.6 | 37.8 |
| 40 | 1.318 | 11.0 | 36.0 |
| 41 | 1.436 | 9.0 | 34.0 |
| 42 | 1.584 | 7.0 | 32.0 |
| 43 | 1.760 | 5.0 | 30.0 |
| 44 | 1.964 | 3.0 | 28.0 |
| 45 | 2.194 | 1.0 | 26.0 |
| 46 | 2.452 | 0.8 | 24.0 |
| 47 | 2.737 | 0.6 | 22.0 |
| 48 | 3.049 | 0.4 | 20.0 |
| 49 | 3.396 | 0.2 | 18.0 |
| 50 | 3.787 | 0.0 | 16.0 |
| 51 | 4.221 | 0.0 | 13.6 |
| 52 | 4.694 | 0.0 | 11.2 |
| 53 | 5.203 | 0.0 | 8.8 |
| 54 | 5.749 | 0.0 | 6.4 |
| 55 | 6.332 | 0.0 | 4.0 |
| 56 | 6.931 | 0.0 | 3.2 |
| 57 | 7.565 | 0.0 | 2.4 |
| 58 | 8.249 | 0.0 | 1.6 |
| 59 | 9.032 | 0.0 | 0.8 |
| 60 | 9.900 | 0.0 | 0.0 |
| 61 | 10.841 | 0.0 | 0.0 |

Navistar International
Transportation Corporation

Coopers & Lybrand

## MORTALITY AND TURNOVER ASSUMPTIONS
## ANNUAL RATES PER 1,000 PARTICIPANTS
### (continued)

| Age | Rep & Non-Rep Mortality | Turnover Represented | Turnover Nonrepresented |
|---|---|---|---|
| 62 | 11.848 | 0.0 | 0.0 |
| 63 | 12.928 | 0.0 | 0.0 |
| 64 | 14.101 | 0.0 | 0.0 |
| 65 | 15.416 | 0.0 | 0.0 |
| 66 | 16.857 | 0.0 | 0.0 |
| 67 | 18.492 | 0.0 | 0.0 |
| 68 | 20.310 | 0.0 | 0.0 |
| 69 | 22.315 | 0.0 | 0.0 |
| 70 | 24.510 | 0.0 | 0.0 |
| 71 | 27.260 | 0.0 | 0.0 |
| 72 | 30.145 | 0.0 | 0.0 |
| 73 | 33.172 | 0.0 | 0.0 |
| 74 | 36.429 | 0.0 | 0.0 |
| 75 | 40.042 | 0.0 | 0.0 |
| 76 | 44.115 | 0.0 | 0.0 |
| 77 | 48.892 | 0.0 | 0.0 |
| 78 | 54.204 | 0.0 | 0.0 |
| 79 | 60.299 | 0.0 | 0.0 |
| 80 | 66.827 | 0.0 | 0.0 |
| 81 | 73.057 | 0.0 | 0.0 |
| 82 | 79.540 | 0.0 | 0.0 |
| 83 | 86.446 | 0.0 | 0.0 |
| 84 | 93.801 | 0.0 | 0.0 |
| 85 | 101.830 | 0.0 | 0.0 |
| 86 | 110.384 | 0.0 | 0.0 |
| 87 | 119.332 | 0.0 | 0.0 |
| 88 | 128.861 | 0.0 | 0.0 |
| 89 | 138.292 | 0.0 | 0.0 |
| 90 | 148.084 | 0.0 | 0.0 |
| 91 | 158.307 | 0.0 | 0.0 |
| 92 | 168.759 | 0.0 | 0.0 |
| 93 | 179.383 | 0.0 | 0.0 |
| 94 | 191.232 | 0.0 | 0.0 |
| 95 | 203.763 | 0.0 | 0.0 |
| 96 | 216.736 | 0.0 | 0.0 |
| 97 | 230.584 | 0.0 | 0.0 |
| 98 | 245.425 | 0.0 | 0.0 |
| 99 | 261.215 | 0.0 | 0.0 |
| 100 | 278.149 | 0.0 | 0.0 |
| 101 | 296.369 | 0.0 | 0.0 |
| 102 | 317.101 | 0.0 | 0.0 |
| 103 | 340.883 | 0.0 | 0.0 |
| 104 | 368.473 | 0.0 | 0.0 |
| 105 | 401.339 | 0.0 | 0.0 |
| 106 | 440.639 | 0.0 | 0.0 |
| 107 | 491.171 | 0.0 | 0.0 |
| 108 | 539.706 | 0.0 | 0.0 |
| 109 | 597.169 | 0.0 | 0.0 |
| 110 | 1000.000 | 0.0 | 0.0 |

# SECTION V
## ACTUARIAL ASSUMPTIONS AND METHODS
### (continued)

*Actuarial Methods*

Obligations

The actuarial present value of the net medical dental, and life insurance benefits expected to be paid after retirement (net of retiree contributions) was calculated as of the measurement date The expected postretirement benefit obligation. (EPBO) represents this actuarial present value of all such postretirement benefits expected to be paid after the measurement date for those active and retired participants covered as of the measurement date. The accumulated postretirement benefit obligation (APBO) represents that portion of the EPBO attributable to service rendered prior to the measurement date.

Attribution method

Benefit/years-of-service approach; projected unit credit actuarial cost method.

Attribution period

Costs are spread ratably from the date of hire to the date the employee is fully eligible to retire and receive all the benefits he/she is expected to receive under the postretirement medical and life insurance plans.

Service cost

The increase in the APBO attributable to employee service in the year and based on the attribution method described above (includes interest to the end of the year).

## APPENDIX A-6

## ACTUARIAL DEFINITIONS

When used in Article III of Exhibit A or in this Appendix A-6 thereto, the following terms shall have the meanings set forth below:

"Actual Number of Retirees and Spouses" at the beginning of a given Measurement Year equals the total of the Actual Number of Retirees and Spouses at the beginning of the previous Measurement Year, aged 1 year, plus the total of the actual number of Participants who became new Retirees, Spouses and Surviving Spouses during that previous Measurement Year, plus the number of Imputed Retirees and spouses for the prior Measurement Year. Notwithstanding the foregoing, the Actual Number of Retirees and Spouses at the beginning of measurement Year 1994 is zero.

"Annual Service Cost" means the annual service cost of postretirement benefits with respect to the Health Benefit Program as computed by the Actuary in accordance with FASB 106 and the assumptions set forth in Appendix A-5 to Exhibit A to the Settlement Agreement.

"Average Contributing Participants" for a given Measurement Year equals the mathematical average of the number of Contributing Participants at the end of the prior Measurement Year and the number of Contributing Participants at the end of current Measurement Year. Notwithstanding the foregoing, during the initial year the number of Contributing Participants at the beginning of the 45th day after the Effective Date will be used as the number of Contributing Participants at the end of the prior Measurement Year.

"Contributing Participants" has the meaning assigned to it in Exhibit D to the Settlement Agreement.

"Contributing Participants' Annual Contribution" for a given calendar year is the total estimated annual contribution that Contributing Participants will make in twelve monthly installments in that calendar year.

"Cumulative Drop Outs" at the beginning of a given Measurement Year is determined at the beginning of each Measurement Year and is the sum of the Surviving Cumulative Drop Outs plus New Drop Outs, reduced by New Drop Ins.

"Expected Average Contributing Participants" for a given calendar year equals the sum of (i) the actual number of active Employees at the end of the prior Measurement Year who were expected to be eligible to be Contributing Participants at the end of the current Measurement Year, using the mortality and retirement

90

assumptions in Appendix A-5, and (ii) the actual number of Contributing Participants at the end of the prior Measurement Year who were expected to be eligible to be Contributing Participants at the end of the current Measurement Year, using the mortality assumptions in Appendix A-5. Notwithstanding the foregoing, the 1994 Expected Average Contributing Participants equals the actual number of active Employees and Contributing Participants on the Effective Date reduced by Immediate Drop Outs During the First 45 Days projected forward 10 months using the mortality and retirement assumptions in Appendix A-5.

"Expected Company Costs Per Capital" for a given Measurement Year equals the Expected Medical Per Capita Costs for that Measurement Year plus the Expected Drug Per Capita Costs for that Measurement Year, reduced by the Expected Participant Contributions for that Measurement Year.

"Expected Drug Per Capita Costs" for a given Measurement Year are developed from the numbers in Table I and the following formula : For Measurement Year (x) = [2/3 calendar year (x-1) ] plus [1/3 calendar year (x)]. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Expected Drug Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Drug Per Capita Costs for calendar year 1994.

"Expected Medical Per Capita Costs" for a given Measurement Year are developed from the numbers in Table II and the following formula : For Measurement Year (x) = [2/3 calendar year (x-1)] plus [1/3 calendar year (x)]. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Expected Medical Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Medical Per Capita Costs for calendar year 1994.

"Expected Number of Retirees and Spouses" for a given Measurement Year will be based upon the actual number of Employees on the Effective Date, with Retirees and Spouses projected in accordance with retirement rates from Appendix A-5 and with spouses imputed at the "dependents of future retirees rates" from Appendix A-5. Notwithstanding the foregoing, for Measurement Year 1994, five-sixths of the retirement rates will be applied.

"Expected Participant Contributions" for a given Measurement Year (x) equals 8 times the Monthly Base Contributions for calendar year (x-1) plus 4 times the Monthly Base Contribution for calendar year (x). Notwithstanding the foregoing, for Measurement Year 1994, it equals 6 times the Monthly Base Contributions for calendar year 1993 plus 4 times the Monthly Base Contribution for calendar year 1994.

"FASB 106" has the meaning assigned to it in Exhibit D to the Settlement Agreement.

"Health Accumulated Postretirement Benefit Obligation" and "Health APBO" have the meaning assigned to them in Exhibit D to the Settlement Agreement.

"Immediate Drop Outs" means the Immediate Drop Outs During the First 45 Days and the Immediate Drop Outs During the Second 45 Days.

"Immediate Drop Outs During the First 45 Days" means the Retirees, Spouses and Surviving Spouses who are eligible to enroll in the Health Benefit Program as of the Effective Date from whom a form is received by the end of the 44th day following the Effective Date indicating their elections not to enroll in the Health Benefit Program.

"Immediate Drop Outs During the Second 45 Days" means the Retirees, Spouses and Surviving Spouses who are eligible to enroll in the Health Benefit Program as of the Effective Date but do not do so by the end of the 89th day following the Effective Date, exclusive of all Immediate Drop Outs During the First 45 days.

"Imputed Retirees and Spouses" are calculated at the beginning of each Measurement Year based on active Employees that have died or terminated prior to retirement in the previous Measurement Year. These deaths and terminations are accumulated and aged each year with retirement rates applied when retirement eligibility is reached. No retirement rates are applied to terminated Employees in their year of termination. In their year of death, 50% of the retirement rates are applied.

"Maximum Corridor Medical Per Capita Costs" for a given Measurement Year are developed from the numbers in Table III and the following formula: For Measurement Year (x) [2/3 calendar year (x-1)] plus [1/3 calendar year (x)]. Notwithstanding the foregoing, for Measurement Year 1994 it equals 1/2 of the Maximum Corridor Medical Per Capita Costs for calendar year 1993 plus 1/3 of the Expected Medical Per Capita Costs for calendar year 1994.

"Measurement Year (x)" is the twelve month period beginning May 1 of year (x-1) and ending April 30 of year (x) . Notwithstanding the foregoing, Measurement Year 1994 is the period from the Effective Date through April 30, 1994.

"Monthly Base Contribution" The Monthly Base Contribution for the first calendar year (1993) shall be $70 per month for retirees under age 65 and $34 per month for retirees age 65 and over. In each subsequent year the Monthly Base Contribution will increase 6%, as follows:

MONTHLY BASE CONTRIBUTION

| Year | Under 65 | 65 and Over |
|------|----------|-------------|
| 1993 | $70.00 | $34.00 |
| 1994 | 74.20 | 36.04 |
| 1995 | 78.65 | 38.20 |
| 1996 | 83.37 | 40.49 |
| 1997 | 88.38 | 42.92 |
| y | $70.00 \times (1.06)^{(y-1993)}$ | $34.00 \times (1.06)^{(y-1993)}$ |

"New Drop Ins" at the beginning of a given Measurement Year equals the number of Retirees, Spouses, and surviving Spouses (other than new Retirees and their Spouses) who elect to become or again become Contributing Participants during the prior Measurement Year. For this purpose, there will be no mortality imputed during the prior Measurement Year. Notwithstanding the foregoing, there are no New Drop Ins at the beginning of Measurement Year 1994.

"New Drop Outs" at the beginning of a given Measurement Year equals the number of Retirees, Spouses and Surviving Spouses who elect not to be Contributing Participants during the prior Measurement Year. For this purpose, there will be no mortality imputed during the prior Measurement Year. Notwithstanding the foregoing, for Measurement Year 1995 all Immediate Drop outs will be included in New Drop Outs during the previous Measurement Year.

"Plan 1" is the Health Benefit Program as applicable to Contributing Participants who are not eligible for Medicare, as described in Appendix A-1 to Exhibit A to the Settlement Agreement.

"Plan 2" is the Health Benefit Program as applicable to Contributing Participants who are eligible for Medicare, as described in Appendix A-1 to Exhibit A to the Settlement Agreement.

"Retiree Adjustment Ratio" for a given Measurement Year (x) equals the following formula: 1/3 of the Retiree Cost Sharing Ratio for calendar year (x) plus 2/3 of the Retiree Cost Sharing Ratio for calendar year (x-1). Notwithstanding the foregoing, for Measurement Year 1994, Retiree Adjustment Ratio equals 3/5 of the Retiree Cost Sharing Ratio for calendar year 1993 plus 2/5 of the Retiree Cost Sharing Ratio for calendar year 1994.

"Retiree Cost Sharing Ratio" for a given calendar year equals the Scheduled Contributions for such year divided by the sum of the products of (i) the Expected Medical Per Capita Costs plus the Expected Drug Per Capita Costs for such year in each of the eight age groups, and (ii) the respective number of Expected Average Contributing Participants for such year in each of such age groups. Notwithstanding the foregoing, the 1993 Retiree Cost Sharing Ratio is 36.3%.

93

"Scheduled Contributions" for a calendar year equals the sum of (i) twelve times the applicable Monthly Base Contribution for such year multiplied by the number of Expected Average Contributing Participants under Plan 1, and (ii) twelve times the applicable Monthly Base Contribution for such year multiplied by the number of Expected Average Contributing Participants under Plan 2.

"Surviving Cumulative Drop Outs" at the beginning of a given Measurement Year equals the Cumulative Drop Outs from the beginning of the prior Measurement Year times the probability of survival to the end of that Measurement Year. For the purpose of this calculation, the probability of survival during the Measurement Year will be based upon the mortality rates specified in Appendix A-5. Notwithstanding the foregoing, the Surviving Cumulative Drop Outs at the beginning of Measurement Year 1994 is zero.

"Total Actual Drug Cost" for a given Measurement Year equals the sum of paid drug claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of paid drug claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for such Measurement Year. For Measurement Year 1994, Total Actual Drug Cost equals the sum of paid drug claims and administrative expenses and applicable HMO premiums for the period from October 1, 1993 through April 30, 1994 multiplied by a fraction, the numerator of which is 10 and the denominator of which is 7. Commencing with the Measurement Year to be used for determining the Contributing Participants' Annual Contribution for the 2022 Plan Year, "Total Actual Drug Cost" shall equal (i) the sum of paid drug claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of paid drug claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for such Measurement Year, less (ii) the total amount of any subsidies, manufacturer rebates or similar payments for Medicare Part D Plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year, including, but not limited to, the manufacturer discount under 42 CFR 423 Subpart W: Medicare Coverage Gap Discount Program (42 CFR 423.2300 – 42 CFR 423.2345); the federal reinsurance subsidy, the direct subsidy and the low income cost-sharing subsidy under 42 CFR 423 Subpart G: Payments to Part D Plan Sponsors for Qualified Prescription Drug Coverage (42 CFR 423.301 – 42 CFR 423.360); and the low income premium subsidy under 42 CFR 423 Subpart P: Premiums and Cost-Sharing Subsidies for Low-Income Individuals (42 CFR 423.771 – 42 CFR 423.800), less (iii) manufacturer rebates for non-Medicare Part D prescription drug plans that are payable to and received by the Retiree Health Benefit and Life Insurance Plan for Plan Participants and their Eligible Dependents during the Measurement Year.

"Total Actual Medical Cost" for a given Measurement Year equals the sum of paid medical claims and administrative expenses and applicable HMO premiums (including an allocated portion of Plan Expenses based upon the ratio of

paid medical claims to all paid drug and medical claims) for Contributing Participants and their Eligible Dependents for the Measurement Year. For Measurement Year 1994, Total Actual Medical Cost equals the sum of paid medical claims and administrative expenses and applicable HMO premiums for the period from October 1, 1993 through April 30, 1994 multiplied by a fraction the numerator of which is 10 and the denominator of which is 7.

"Total Estimated Annual Cost" for a given Measurement Year means the Actuary's estimate of the total cost of providing all covered benefits and administrative costs of the Health Benefit Program for such year. The Actuary's estimate of administrative costs shall include, but not be limited to, Plan Expenses.

"Total Expected Drug Dollars" for a given Measurement Year equals the Expected Drug Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table I and then totaled.

"Total Expected Medical Dollars" for a given Measurement Year equals the Expected Medical Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table II and then totaled.

"Total Maximum Corridor Medical Dollars" for a given Measurement Year equals the Maximum Corridor Medical Per Capita Costs times the number of Average Contributing Participants for such year. This calculation will be performed for each of the eight age groups shown in Table III and then totaled.

95

TABLE I
EXPECTED DRUG PER CAPITA COSTS
NET PER CAPITA COSTS *(DRUGS)*

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 – 79 | 80 + |
| 1993 | $196 | $215 | $239 | $273 | $206 | $235 | $257 | $254 |
| 1994 | 237 | 260 | 288 | 329 | 251 | 287 | 314 | 310 |
| 1995 | 278 | 305 | 338 | 386 | 298 | 340 | 371 | 367 |
| 1996 | $319 | $350 | $388 | $443 | $343 | $392 | $428 | $424 |
| 1997 | 358 | 393 | 436 | 498 | 387 | 442 | 483 | 478 |
| 1998 | 397 | 436 | 483 | 551 | 431 | 492 | 537 | 532 |
| 1999 | 438 | 480 | 532 | 607 | 476 | 544 | 593 | 588 |
| 2000 | 480 | 527 | 584 | 666 | 523 | 598 | 652 | 646 |
| 2001 | $525 | $576 | $638 | $728 | $573 | $655 | $715 | $708 |
| 2002 | 572 | 627 | 695 | 793 | 626 | 715 | 780 | 773 |
| 2003 | 621 | 681 | 755 | 861 | 681 | 778 | 849 | 841 |
| 2004 | 672 | 738 | 817 | 932 | 738 | 844 | 920 | 913 |
| 2005 | 726 | 797 | 882 | 1,006 | 798 | 913 | 995 | 987 |
| 2006 | $782 | $858 | $950 | $1,084 | $861 | $984 | $1,073 | $1,054 |
| 2007 | 840 | 922 | 1,020 | 1,164 | 925 | 1,058 | 1,154 | 1,144 |
| 2008 | 900 | 988 | 1,093 | 1,247 | 992 | 1,135 | 1,237 | 1,227 |
| 2009 | 962 | 1,056 | 1,168 | 1,332 | 1,061 | 1,214 | 1,323 | 1,312 |
| 2010 | 1,026 | 1,125 | 1,245 | 1,421 | 1,132 | 1,295 | 1,411 | 1,399 |
| 2011 | $1,091 | $1,197 | $1,325 | $1,511 | $1,205 | $1,378 | $1,502 | $1,489 |
| 2012 | 1,157 | 1,269 | 1,404 | 1,602 | 1,278 | 1,461 | 1,592 | 1,580 |
| 2013 | 1,226 | 1,346 | 1,489 | 1,698 | 1,355 | 1,550 | 1,588 | 1,675 |
| 2014 | 1,299 | 1,426 | 1,577 | 1,799 | 1,436 | 1,642 | 1,759 | 1,775 |
| 2015 | 1,377 | 1,511 | 1,671 | 1,906 | 1,522 | 1,740 | 1,896 | 1,881 |
| 2016 | $1,458 | $1,600 | $1,770 | $2,019 | $1,612 | $1,844 | $2,009 | $1,993 |
| 2017 | 1,544 | 1,895 | 1,874 | 2,138 | 1,708 | 1,963 | 2,128 | 2,111 |
| 2018 | 1,635 | 1,794 | 1,984 | 2,264 | 1,809 | 2,068 | 2,253 | 2,235 |
| 2019 | 1,730 | 1,899 | 2,100 | 2,396 | 1,915 | 2,190 | 2,385 | 2,366 |
| 2020 | 1,831 | 2,010 | 2,223 | 2,536 | 2,027 | 2,318 | 2,525 | 2,505 |
| 2021 | $1,938 | $2,127 | $2,352 | $2,683 | $2,145 | $2,453 | $2,672 | $2,651 |
| 2022 | 2,050 | 2,251 | 2,488 | 2,839 | 2,270 | 2,596 | 2,827 | 2,805 |
| 2023 | 2,169 | 2,381 | 2,632 | 3,003 | 2,401 | 2,746 | 2,991 | 2,968 |
| 2024 | 2,294 | 2,518 | 2,784 | 3,176 | 2,540 | 2,905 | 3,164 | 3,139 |
| 2025 | 2,426 | 2,663 | 2,944 | 3,358 | 2,687 | 3,072 | 3,346 | 3,320 |
| 2026 | $2,565 | $2,816 | $3,112 | $3,551 | $2,841 | $3,249 | $3,538 | $3,511 |
| 2027 | 2,712 | 2,977 | 3,291 | 3,754 | 3,004 | 3,435 | 3,741 | 3,712 |
| 2028 | 2,867 | 3,147 | 3,478 | 3,969 | 3,176 | 3,632 | 3,955 | 3,925 |
| 2029 | 3,030 | 3,327 | 3,677 | 4,195 | 3,358 | 3,839 | 4,181 | 4,149 |
| 2030 | 3,203 | 3,516 | 3,886 | 4,433 | 3,549 | 4,058 | 4,419 | 4,386 |
| 2031 | $3,384 | $3,716 | $4,107 | $4,685 | $3,751 | $4,289 | $4,671 | $4,635 |
| 2032 | 3,576 | 3,926 | 4,339 | 4,951 | 3,964 | 4,533 | 4,936 | 4,898 |
| 2033 | 3,779 | 4,149 | 4,585 | 5,231 | 4,189 | 4,790 | 5,216 | 5,178 |
| 2034 | 3,992 | 4,383 | 4,844 | 5,527 | 4,426 | 5,061 | 5,511 | 5,469 |
| 2035 | 4,218 | 4,631 | 5,117 | 5,838 | 4,677 | 5,347 | 5,822 | 5,778 |
| 2036 | $4,456 | $4,892 | $5,406 | $6,167 | $4,941 | $5,649 | $6,151 | $6,104 |
| 2037 | 4,706 | 5,167 | 5,710 | 6,515 | 5,219 | 5,967 | 6,497 | 6,448 |
| 2038 | 4,971 | 5,458 | 6,031 | 6,881 | 5,513 | 6,303 | 6,863 | 6,811 |
| 2039 | 5,250 | 5,764 | 6,370 | 7,267 | 5,823 | 6,657 | 7,249 | 7,194 |
| 2040 | 5,545 | 6,088 | 6,727 | 7,675 | 6,150 | 7,031 | 7,656 | 7,598 |
| 2041 | $5,855 | $6,429 | $7,104 | $8,105 | $6,495 | $7,425 | $8,085 | $8,024 |
| 2042 | 6,183 | 6,789 | 7,501 | 8,559 | 6,859 | 7,842 | 8,538 | 8,474 |
| 2043 | 8,523 | 7,169 | 7,921 | 9,037 | 7,243 | 8,281 | 9,018 | 8,948 |
| 2044 | 6,894 | 7,569 | 8,363 | 9,542 | 7,648 | 8,744 | 9,520 | 9,449 |
| 2045 | 7,279 | 7,992 | 8,830 | 10,075 | 8,075 | 9,232 | 10,052 | 9,977 |
| 2046 | $7,685 | $8,438 | $9,323 | $10,637 | $8,526 | $9,748 | $10,613 | $10,534 |
| 2047 | 8,113 | 8,908 | 9,843 | 11,230 | 9,002 | 10,292 | 11,205 | 11,121 |
| 2048 | 8,566 | 9,405 | 10,391 | 11,855 | 9,604 | 10,865 | 11,830 | 11,741 |
| 2049 | 9,042 | 9,928 | 10,969 | 12,515 | 10,033 | 11,471 | 12,489 | 12,395 |
| 2050 | 9,546 | 10,481 | 11,580 | 13,212 | 10,592 | 12,109 | 13,184 | 13,085 |
| 2051 | $10,076 | $11,064 | $12,223 | $13,946 | $11,181 | $12,783 | $13,918 | $13,813 |
| 2052 | 10,636 | 11,679 | 12,903 | 14,721 | 11,803 | 13,494 | 14,691 | 14,581 |
| 2053 | 11,227 | 12,327 | 13,619 | 15,539 | 12,459 | 14,243 | 15,506 | 15,392 |
| 2054 | 11,850 | 13,012 | 14,375 | 16,401 | 13,151 | 15,035 | 16,369 | 16,247 |

TABLE II
EXPECTED DRUG PER CAPITA COSTS
NET PER CAPITA COSTS *(DRUGS)*

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 – 79 | 80 + |
| 1993 | $1,689 | $1,371 | $1,917 | $3,540 | $734 | $685 | $641 | $637 |
| 1994 | 1,895 | 1,544 | 2,140 | 3,948 | 810 | 756 | 706 | 703 |
| 1995 | 2,091 | 1,703 | 2,355 | 4,365 | 876 | 818 | 765 | 760 |
| 1996 | $2,316 | $1,889 | $2,605 | $4,825 | $853 | $890 | $832 | $828 |
| 1997 | 2,552 | 2,088 | 2,874 | 5,311 | 1,036 | 967 | 904 | 898 |
| 1998 | 2,805 | 2,302 | 3,161 | 5,832 | 1,123 | 1,047 | 979 | 973 |
| 1999 | 3,074 | 2,521 | 3,469 | 6,385 | 1,215 | 1,133 | 1,058 | 1,052 |
| 2000 | 3,351 | 2,765 | 3,794 | 6,967 | 1,313 | 1,222 | 1,142 | 1,134 |
| 2001 | $3,650 | $3,016 | $4,136 | $7,590 | $1,415 | $1,315 | $1,230 | $1,221 |
| 2002 | 3,956 | 3280 | 4,503 | 8,243 | 1,521 | 1,415 | 1,321 | 1,312 |
| 2003 | 4,279 | 3,554 | 4,887 | 8,928 | 1,633 | 1,519 | 1,418 | 1,407 |
| 2004 | 4,626 | 3,840 | 5,278 | 9,649 | 1,748 | 1,627 | 1,519 | 1,506 |
| 2005 | 4,986 | 4,126 | 5,696 | 10,385 | 1,868 | 1,743 | 1,623 | 1,609 |
| 2006 | $5,350 | $4,429 | $6,115 | $11,150 | $1,994 | $1,861 | $1,731 | $1,717 |
| 2007 | 5,718 | 4,728 | 6,532 | 11,947 | 2,124 | 1,981 | 1,844 | 1,827 |
| 2008 | 6,101 | 5,022 | 6,955 | 12,751 | 2,259 | 2,106 | 1,961 | 1,941 |
| 2009 | 6,486 | 5,337 | 7,381 | 13,571 | 2,399 | 2,233 | 2,082 | 2,059 |
| 2010 | 6,875 | 5,672 | 7,803 | 14,414 | 2,539 | 2,364 | 2,208 | 2,179 |
| 2011 | $7,306 | $5,972 | $8,254 | $15,227 | $2,684 | $2,499 | $2,335 | $2,302 |
| 2012 | 7,718 | 6,287 | 8,640 | 16,029 | 2,834 | 2,638 | 2,462 | 2,428 |
| 2013 | 8,127 | 6,632 | 9,005 | 16,876 | 2,991 | 2,783 | 2,597 | 2,661 |
| 2014 | 8,581 | 6,967 | 9,417 | 17,746 | 3,153 | 2,939 | 2,738 | 2,701 |
| 2015 | 9,077 | 7,343 | 9,913 | 18,643 | 3,326 | 3,099 | 2,887 | 2,850 |
| 2016 | $9,617 | $7,781 | $10,454 | $19,620 | $3,500 | $3,269 | $3,046 | $3,006 |
| 2017 | 10,226 | 8,173 | 11,013 | 20,542 | 3,683 | 3,451 | 3,214 | 3,171 |
| 2018 | 10,783 | 8,611 | 11,584 | 21,451 | 3,877 | 3,642 | 3,392 | 3,345 |
| 2019 | 11,371 | 9,164 | 12,163 | 22,511 | 4,076 | 3,839 | 3,582 | 3,528 |
| 2020 | 11,991 | 9,727 | 12,883 | 23,725 | 4,279 | 4,048 | 3,776 | 3,723 |
| 2021 | $12,645 | $10,302 | $13,685 | $25,045 | $4,497 | $4,260 | $3,983 | $3,928 |
| 2022 | 13,334 | 10,931 | 14,426 | 26,410 | 4,711 | 4,483 | 4,205 | 4,144 |
| 2023 | 14,061 | 11,526 | 15,233 | 27,784 | 4,928 | 4,719 | 4,437 | 4,372 |
| 2024 | 14,827 | 12,152 | 16,061 | 29,264 | 5,180 | 4,960 | 4,676 | 4,613 |
| 2025 | 15,635 | 12,813 | 17,049 | 30,921 | 5,454 | 5,207 | 4,931 | 4,865 |
| 2026 | $16,488 | $13,510 | $18,277 | $32,617 | $5,750 | $5,471 | $5,188 | $5,133 |
| 2027 | 17,386 | 14,245 | 19,323 | 34,427 | 6,057 | 5,731 | 5,459 | 5,416 |
| 2028 | 18,334 | 15,020 | 20,317 | 36,384 | 6,387 | 5,998 | 5,747 | 5,713 |
| 2029 | 19,333 | 15,837 | 20,974 | 38,361 | 6,704 | 6,305 | 6,040 | 6,025 |
| 2030 | 20,386 | 16,698 | 21,674 | 40,600 | 7,074 | 6,637 | 6,339 | 6,353 |
| 2031 | $21,497 | $17,606 | $22,856 | $43,343 | $7,448 | $6,997 | $6,660 | $6,694 |
| 2032 | 22,668 | 18,563 | 24,103 | 45,729 | 7,861 | 7,368 | 6,976 | 7,057 |
| 2033 | 23,903 | 19,572 | 25,418 | 48,067 | 6,304 | 7,746 | 7,301 | 7,440 |
| 2034 | 25,205 | 20,636 | 26,804 | 49,739 | 8,755 | 8,157 | 7,676 | 7,640 |
| 2035 | 26,578 | 21,758 | 28,266 | 51,881 | 9,253 | 8,605 | 8,079 | 8,258 |
| 2036 | $28,026 | $22,941 | $29,808 | $54,721 | $9,849 | $9,057 | $8,515 | $8,697 |
| 2037 | 29,553 | 24,188 | 31,434 | 57,717 | 10,376 | 9,560 | 8,967 | 9,161 |
| 2038 | 31,162 | 25,502 | 33,148 | 60,877 | 10,904 | 10,098 | 9,426 | 9,650 |
| 2039 | 32,860 | 25,886 | 34,955 | 64,210 | 11,294 | 10,648 | 9,928 | 10,166 |
| 2040 | 34,649 | 28,350 | 36,862 | 67,725 | 11,792 | 11,250 | 10,471 | 10,701 |
| 2041 | $36,536 | $29,890 | $38,872 | $71,432 | $12,431 | $11,968 | $11,019 | $11,262 |
| 2042 | 38,526 | 31,514 | 40,691 | 75,343 | 13,106 | 12,608 | 11,631 | 11,854 |
| 2043 | 40,624 | 33,226 | 43,226 | 79,467 | 13,817 | 13,248 | 12,285 | 12,476 |
| 2044 | 42,836 | 35,032 | 45,583 | 83,817 | 14,567 | 13,724 | 12,956 | 13,133 |
| 2045 | 45,168 | 36,935 | 48,068 | 88,405 | 15,357 | 14,329 | 13,689 | 13,811 |
| 2046 | $47,626 | $38,941 | $50,688 | $93,244 | $16,190 | $15,106 | $14,553 | $14,519 |
| 2047 | 50,220 | 41,056 | 53,452 | 98,348 | 17,068 | 15,824 | 15,329 | 15,282 |
| 2048 | 52,964 | 43,286 | 56,365 | 103,731 | 17,994 | 16,787 | 16,105 | 16,086 |
| 2049 | 55,837 | 45,637 | 59,438 | 109,409 | 18,970 | 17,697 | 16,687 | 16,939 |
| 2050 | 58,877 | 48,116 | 62,677 | 115,397 | 19,998 | 18,655 | 17,423 | 17,826 |
| 2051 | $62,081 | $50,728 | $66,094 | $121,713 | $21,083 | $19,666 | $18,366 | $18,756 |
| 2052 | 65,460 | 53,483 | 69,699 | 128,374 | 22,226 | 20,731 | 19,359 | 19,747 |
| 2053 | 69,023 | 56,387 | 73,494 | 135,400 | 23,431 | 21,854 | 20,407 | 20,815 |
| 2054 | 72,779 | 59,448 | 77,499 | 142,810 | 24,701 | 23,037 | 21,511 | 21,940 |

Navistar International
Transportation Corporation

Coopers & Lybrand

### TABLE III
### MAXIMUM CORRIDOR MEDICAL PER CAPITA COSTS
### NET PER CAPITA COSTS *(MEDICAL EXCLUDING DRUGS)*

| Calendar Year | Under Age 65 | | | | Age 65 & Older | | | |
|---|---|---|---|---|---|---|---|---|
| | <50 | 50 – 54 | 55 – 59 | 60 – 64 | 65 – 69 | 70 – 74 | 75 – 79 | 80 + |
| 1993 | $1,689 | $1,371 | $1,917 | $3,540 | $734 | $685 | $641 | $637 |
| 1994 | 1,913 | 1,559 | 2,160 | 3,983 | 817 | 763 | 715 | 710 |
| 1995 | 2,129 | 1,735 | 2,398 | 4,442 | 892 | 833 | 779 | 775 |
| 1996 | $2,379 | $1,941 | $2,674 | $4,999 | $979 | $915 | $855 | $851 |
| 1997 | 2,641 | 2,163 | 2,974 | 5,488 | 1,073 | 1,001 | 937 | 931 |
| 1998 | 2,924 | 2,402 | 3,295 | 6,069 | 1,172 | 1,093 | 1,022 | 1,016 |
| 1999 | 3,227 | 2,649 | 3,640 | 6,688 | 1,276 | 1,190 | 1,112 | 1,105 |
| 2000 | 3,540 | 2,924 | 4,006 | 7,343 | 1,388 | 1,292 | 1,208 | 1,200 |
| 2001 | $3,878 | $3,208 | $4,392 | $8,044 | $1,505 | $1,399 | $1,308 | $1,299 |
| 2002 | 4,225 | 3,507 | 4,806 | 8,781 | 1,627 | 1,513 | 1,414 | 1,404 |
| 2003 | 4,592 | 3,819 | 5,241 | 9,554 | 1,754 | 1,632 | 1,524 | 1,513 |
| 2004 | 4,986 | 4,143 | 5,884 | 10,369 | 1,886 | 1,756 | 1,639 | 1,626 |
| 2005 | 5,394 | 4,471 | 6,157 | 11,200 | 2,023 | 1,888 | 1,758 | 1,744 |
| 2006 | $5,805 | $4,813 | $6,631 | $12,063 | $2,167 | $2,022 | $1,881 | $1,867 |
| 2007 | 6,222 | 5,151 | 7,102 | 12,959 | 2,315 | 2,159 | 2,010 | 1,992 |
| 2008 | 6,653 | 5,483 | 7,578 | 13,871 | 2,468 | 2,300 | 2,143 | 2,122 |
| 2009 | 7,083 | 5,837 | 8,055 | 14,775 | 2,624 | 2,443 | 2,278 | 2,254 |
| 2010 | 7,518 | 6,211 | 8,525 | 15,709 | 2,781 | 2,589 | 2,419 | 2,388 |
| 2011 | $7,992 | $6,543 | $9,023 | $16,605 | $2,941 | $2,739 | $2,550 | $2,524 |
| 2012 | 8,444 | 6,889 | 9,445 | 17,479 | 3,106 | 2,891 | 2,699 | 2,663 |
| 2013 | 8,891 | 7,267 | 9,845 | 18,403 | 3,278 | 3,050 | 2,847 | 2,808 |
| 2014 | 9,389 | 7,635 | 10,295 | 19,352 | 3,455 | 3,221 | 3,002 | 2,963 |
| 2015 | 9,932 | 8,046 | 10,837 | 20,330 | 3,645 | 3,397 | 3,166 | 3,126 |
| 2016 | $10,524 | $8,527 | $11,430 | $21,396 | $3,836 | $3,584 | $3,341 | $3,298 |
| 2017 | 11,190 | 8,957 | 12,041 | 22,402 | 4,037 | 3,784 | 3,525 | 3,479 |
| 2018 | 11,800 | 9,438 | 12,645 | 23,394 | 4,250 | 3,993 | 3,720 | 3,670 |
| 2019 | 12,444 | 10,044 | 13,289 | 24,550 | 4,468 | 4,209 | 3,928 | 3,871 |
| 2020 | 13,123 | 10,662 | 14,087 | 25,875 | 4,691 | 4,439 | 4,142 | 4,085 |
| 2021 | $13,839 | $11,292 | $14,965 | $27,315 | $4,931 | $4,671 | $4,370 | $4,310 |
| 2022 | 14,594 | 11,982 | 15,776 | 28,804 | 5,165 | 4,916 | 4,613 | 4,547 |
| 2023 | 16,390 | 12,635 | 16,659 | 30,303 | 5,404 | 5,176 | 4,8658 | 4,797 |
| 2024 | 16,230 | 13,323 | 17,565 | 31,918 | 5,680 | 5,440 | 5,131 | 5,063 |
| 2025 | 17,115 | 14,048 | 18,646 | 33,726 | 5,981 | 5,711 | 5,411 | 5,340 |
| 2026 | $18,048 | $14,813 | $19,900 | $35,576 | $6,306 | $6,001 | $5,683 | $5,634 |
| 2027 | 19,033 | 15,619 | 21,135 | 37,551 | 6,642 | 6,287 | 5,991 | 5,945 |
| 2028 | 20,071 | 16,470 | 22,223 | 39,687 | 6,983 | 6,580 | 6,307 | 6,271 |
| 2029 | 21,166 | 17,356 | 22,942 | 41,843 | 7,354 | 6,917 | 6,629 | 6,615 |
| 2030 | 22,320 | 18,312 | 23,709 | 44,297 | 7,759 | 7,282 | 6,958 | 6,975 |
| 2031 | $23,537 | $19,308 | $25,003 | $47,280 | $8,170 | $7,677 | $7,310 | $7,350 |
| 2032 | 24,820 | 20,359 | 26,368 | 49,884 | 8,623 | 8,086 | 7,655 | 7,730 |
| 2033 | 26,174 | 21,467 | 27,807 | 52,435 | 9,110 | 8,600 | 8,016 | 8,170 |
| 2034 | 27,501 | 22,635 | 29,325 | 54,260 | 9,606 | 8,952 | 8,428 | 8,610 |
| 2035 | 29,106 | 23,667 | 30,925 | 56,598 | 10,152 | 9,443 | 8,871 | 9,070 |
| 2036 | $50,693 | $25,166 | $32,614 | $59,697 | $10,807 | $9,941 | $9,350 | $9,553 |
| 2037 | 32,366 | 26,535 | 34,394 | 62,967 | 11,386 | 10,493 | 9,847 | 10,063 |
| 2038 | 34,130 | 27,979 | 38,271 | 66,416 | 11,966 | 11,065 | 10,351 | 10,601 |
| 2039 | 35,991 | 29,501 | 38,250 | 70,053 | 12,395 | 11,689 | 10,904 | 11,168 |
| 2040 | 37,953 | 31,106 | 40,337 | 73,890 | 12,942 | 12,351 | 11,501 | 11,757 |
| 2041 | $40,021 | $32,796 | $42,539 | $77,936 | $13,645 | $13,140 | $12,104 | $12,374 |
| 2042 | 42,203 | 34,582 | 44,860 | 82,204 | 14,386 | 13,843 | 12,777 | 13,026 |
| 2043 | 44,503 | 36,463 | 47,307 | 86,706 | 15,168 | 14,547 | 13,497 | 13,710 |
| 2044 | 46,928 | 38,446 | 49,889 | 91,454 | 15,992 | 15,071 | 14,235 | 14,434 |
| 2045 | 49,485 | 40,537 | 52,611 | 96,462 | 16,880 | 15,737 | 15,041 | 15,160 |
| 2046 | $52,182 | $42,742 | $55,481 | $101,745 | $17,776 | $16,591 | $16,992 | $15,958 |
| 2047 | 55,026 | 45,066 | 58,508 | 107,316 | 18,741 | 17,491 | 16,846 | 16,796 |
| 2048 | 58,024 | 47,517 | 61,700 | 113,192 | 19,759 | 18,440 | 17,700 | 17,684 |
| 2049 | 61,185 | 50,100 | 65,065 | 119,390 | 20,832 | 19,440 | 18,341 | 18,623 |
| 2050 | 64,519 | 52,824 | 88,615 | 125,927 | 21,963 | 23,495 | 19,162 | 19,600 |
| 2051 | $68,034 | $55,696 | $72,357 | $132,822 | $23,155 | $21,608 | $20,189 | $20,626 |
| 2052 | 71,740 | 58,724 | 76,304 | 140,095 | 24,412 | 22,778 | 21,283 | 21,715 |
| 2053 | 75,648 | 61,916 | 80,488 | 147,765 | 25,738 | 24,013 | 22,436 | 22,891 |
| 2054 | 79,769 | 65,281 | 84,854 | 155,855 | 27,135 | 25,316 | 23,652 | 24,131 |

Navistar International
Transportation Corporation

Coopers & Lybrand

## APPENDIX A-7
## HELATH BENEFIT PROGRAM COMMITTEE

HBPC UAW Member                    —    John Collings

HBPC UAW Member                    —    Craig Miller


HBPC Other Member                  —    John Mindiola

HBPC Other Member Alternate    —    Phillip Herzog

HBPC Other Member Alternate    —    Shirley Jacobs

- 2 -

## John Mindiola

Mr. Mindiola is the President of United Steelworkers Local 3740. He is a 34 year employee of the Navistar plant in Waukesha and has spent the last 32 years in the Pattern Repair Department. Mr. Mindiola is serving his second term as president of Local 3740 and has served as a member of the bargaining and grievance committee for 27 years. He has held a variety of offices in the local union.

**HBC Other Member Alternates**

**Shirley Jacobs**

Ms. Jacobs worked for Navistar as a secretary for thirty years. Her last position prior to retiring was secretary to the Branch Manager.

**Mr. Herzog**

Mr. Herzog worked for Navistar for thirty years. He retired in January of 1993 from the position of traffic manager.

**EXHIBIT B**

**THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**
**RETIREE SUPPLEMENTAL BENEFIT PROGRAM (n/k/a THE**
**NAVISTAR, INC. RETIREE SUPPLEMENTAL BENEFIT PROGRAM)**

# TABLE OF CONTENTS

**PAGE**

| | | |
|---|---|---|
| ARTICLE I | Introduction | 105 |
| 1.1 | Definitions | 105 |
| 1.2 | Purpose | 105 |
| ARTICLE II | Supplemental Benefit Trust | 105 |
| 2.1 | Establishment | 105 |
| ARTICLE III | *Reserved* | 106 |
| ARTICLE IV | *Reserved* | 106 |
| ARTICLE V | *Reserved* | 106 |
| ARTICLE VI | The Supplemental Benefit committee | 106 |
| 6.1 | A Supplemental Benefit Program Committee | 106 |
| 6.2 | Powers and Duties | 107 |
| 6.3 | Program Design | 108 |
| 6.4 | Action by Supplemental Benefit Committee | 108 |
| 6.5 | Provision of Benefits | 109 |
| 6.6 | Supplemental Benefit Committee Minutes | 110 |
| ARTICLE VII | Company Contributions | 110 |
| 7.1 | Contributions | 110 |
| ARTICLE VIII | *Reserved* | 110 |
| 8.1 | *Reserved* | 110 |
| ARTICLE IX | Amendments and Termination | 110 |
| 9.1 | Amendments | 110 |
| 9.2 | Termination | 111 |
| ARTICLE X | Miscellaneous | 111 |
| 10.1 | *Reserved* | 111 |
| 10.2 | *Reserved* | 111 |
| 10.3 | Limitation of Liability and Indemnification | 111 |
| 10.4 | Exclusive Benefit | 112 |
| 10.5 | Prohibited Inurement | 112 |
| 10.6 | Assignment, Delegation | 112 |
| 10.7 | Captions | 113 |
| 10.8 | Incorporation of Appendices; References | 113 |
| 10.9 | Governing Law | 113 |
| ARTICLE XI | Events of Default | 113 |
| 11.1 | Supplemental Benefit Program Payment Default | 113 |

11.2  No Limitation of Rights  ................................................................................. 113

**<u>Appendices</u>**

Appendix B-1          SPA Supplemental Benefit Program
Appendix B-2          Supplemental Benefit Trust Agreement
Appendix B-3          Restated Certificate of Incorporation
Appendix B-4          [*Reserved*]
Appendix B-5          SBC Committee Members
Appendix B-6          [*Reserved*]
Appendix B-7          Calculation of Common and Dilutative Common Equivalent Shares

**THE NAVISTAR INTERNATIONAL TRANSPORTATION CORP.**
**RETIREE SUPPLEMENTAL BENEFIT PROGRAM (n/k/a THE**
**NAVISTAR, INC. RETIREE SUPPLEMENTAL BENEFIT PROGRAM)**

ARTICLE I
Introduction

1.1    Definitions. Capitalized terms used and not defined herein have the meanings assigned to them in Exhibit D to the Settlement Agreement.

1.2    Purpose. As of the Effective Date, the Company shall establish the Health Benefit Program and the Life Insurance Program. Effective as of such date, the Company shall further establish the Supplemental Benefit Program (the "Navistar International Transportation Corp. Retiree Supplemental Benefit Program" (n/k/a the Navistar, Inc. Retiree Supplemental Benefit Program)) on the terms and subject to the conditions set forth below for the benefit of Enrolled Participants and Retirees, whether or not they are Enrolled Participants. From time to time, it is anticipated that cash generated from assets held in the Supplemental Benefit Trust established under the Supplemental Benefit Program may be used to (i) reduce or reimburse premiums, co-payments, deductibles and other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program, (ii) reduce or reimburse premiums which would otherwise be required to be paid by or on behalf of Enrolled Participants to participate in Medicare or any part thereof or any successor or comparable program thereto, (iii) provide Enrolled Participants with additional benefits or (iv) provide additional life insurance benefits to all Retirees, including both those who are Enrolled Participants and those who are not Enrolled Participants (the benefits described in clauses (iii) and (iv), "Additional Permissible Benefits"). All the benefits which may be provided under the Supplemental Benefit Program are limited to those benefits which are permissible under a trust intended to meet the requirements of an organization described in Section 501(c) (9) of the IRC or under any comparable section or sections of any future legislation that amends, supplements or supersedes said section.

ARTICLE II
Supplemental Benefit Trust

2.1    Establishment. The Company has established the Supplemental Benefit Trust for the benefit of the Enrolled Participants, in the case of both health benefits and life insurance benefits, and Retirees who are not Enrolled Participants, in the case of life insurance benefits. The Supplemental Benefit Trust shall be maintained in accordance with this Supplemental Benefit Program, the SPD attached as Appendix B-1 and the trust agreement attached as Appendix B-2.

105

ARTICLE III
[*Reserved*]

ARTICLE IV
[*Reserved*]

ARTICLE V
[*Reserved*]

ARTICLE VI
The Supplemental Benefit Program Committee

6.1 A Supplemental Benefit Program committee (the "<u>Supplemental Benefit Committee</u>") shall be formed on the Effective Date in accordance with the following procedures:

(a) The Supplemental Benefit Committee shall consist of two individuals designated by the UAW (the "<u>SBC UAW Members</u>"), who may be replaced at any time by the UAW, two other members (the "<u>SBC Class One Other Members</u>") and a fifth member (the "<u>SBC Class Two Other Member</u>") (each, an "<u>SBC Committee Member</u>" and, collectively, the "<u>SBC Committee Members</u>"). The persons who shall initially serve in such capacities are identified in Appendix B-5 hereto. The Supplemental Benefit Committee shall have a chairperson (the "<u>SBC Chair</u>"), who shall be elected from time to time from among the SBC Class One Other Members, and a Secretary, who shall be elected from time to time from among the SBC Committee Members; each such election shall be by a majority vote of all the SBC Committee Members. Parent shall provide copies of the Supplemental Benefit Program, the Health Benefit Program and the Life Insurance Program to each SBC Committee Member and each SBC Committee Member's successor, if applicable.

(b) In the event of the death, incapacity or resignation of an SBC Class One Other Member, his successor shall be appointed by a majority vote of such SBC Class One Other Member (if he is not deceased or incapacitated), the remaining SBC Class One Other Member and one alternate (the "<u>SBC Class One Other Member Alternate</u>") upon notice from the Supplemental Benefit Committee or such SBC Class One Other Member of such death, incapacity or resignation. The person who shall initially serve as the SBC Class One Other Member Alternate is identified in Appendix B-5. In the event of the death, incapacity or resignation of the SBC Class One Other Member Alternate, his successor shall be appointed by a majority vote of such SBC Class One Other Member Alternate (if he is not deceased or incapacitated) and the SBC Class One Other Members upon notice from the Supplemental Benefit Committee or such SBC Class One Other Member Alternate of such death, incapacity or resignation.

(c) In the event of the death, incapacity or resignation of the SBC Class Two Other Member, his successor shall be appointed by a majority vote

106

of such SBC Class Two Other Member (if he is not deceased or incapacitated) and two alternates (the "SBC Class Two Other Member Alternates"; the SBC Class One Other Member Alternate and the SBC Class Two Other Member Alternates, collectively, the "SBC Committee Member Alternates") upon notice from the Supplemental Benefit Committee or such SBC Class Two Other Member of such death, incapacity or resignation. The persons who shall initially serve as the SBC Class Two Other Member Alternates are identified in Appendix B-5. In the event of the death, incapacity or resignation of either of the SBC Class Two Other Member Alternates, his successor shall be appointed by a majority vote of such SBC Class Two Other Member Alternate (if he is not deceased or incapacitated), the other SBC Class Two Other Member Alternate and the SBC Class Two Other Member upon notice from the Supplemental Benefit Committee or such SBC Class Two Other Member Alternate of such death, incapacity or resignation.

None of the SBC Class One Other Members, the SBC Class Two Other Member or the SBC Committee Member Alternates shall be a current employee of the UAW or a Retiree who was represented by the UAW at the time of his retirement.

6.2    Powers and Duties. As the Program Administrator and Named Fiduciary under the Supplemental Benefit Program, the Supplemental Benefit Committee is responsible for the administration of the Supplemental Benefit Program. The Supplemental Benefit Committee, as the Named Fiduciary, shall have the powers, rights and duties provided for herein and the following additional powers, rights and duties, all of which such powers, rights and duties shall be exercised or discharged in the Supplemental Benefit Committee's sole discretion, consistent with its rights and obligations under this Exhibit B and the Settlement Agreement:

(a) to adopt such rules and procedures as it may deem appropriate for the efficient administration of the Supplemental Benefit Program or in connection with the exercise or discharge of its powers, rights and duties;

(b) to engage such consultants, actuaries and other professionals as it may deem appropriate to assist it in the exercise of its powers, rights and duties;

(c) to establish the investment policy under the Supplemental Benefit Trust and appoint and remove investment managers and trustees thereunder;

(d) to review and enforce Parent's and the Company's compliance with their obligations under the Supplemental Benefit Program;

107

(e) to invest assets consistent with the provisions of the Supplemental Benefit Program and to direct the trustee of the Supplemental Benefit Trust with respect thereto;

(f) to direct the transfer of funds from the Supplemental Benefit Trust to the appropriate person as determined by the Supplemental Benefit Committee pursuant to Section 6.3 at the beginning of each calendar year;

(g) to construe and interpret the Supplemental Benefit Program and to decide all questions of eligibility for benefits under such program;

(h) to appoint claims administrators, medical review agencies and other service providers; and

(i) to undertake such other actions as are necessary or appropriate in connection with the exercise of such powers, rights and duties.

6.3 <u>Program Design.</u> The Supplemental Benefit Committee, as a matter of appropriate program design, shall have the following powers, rights and duties, all of which such powers, rights and duties shall be exercised or discharged in the Supplemental Benefit Committee's sole discretion, consistent with the terms of this Exhibit B and the Settlement Agreement:

(a) at the beginning of each calendar year, to determine the amount of assets of the Supplemental Benefit Trust to be used for the purpose of (i) reducing premiums, co-payments, deductibles or other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program, (ii) reducing or reimbursing premiums which would otherwise be required to be paid by or on behalf of Enrolled Participants to participate in Medicare or any part thereof or any successor or comparable program thereto or (iii) providing Additional Permissible Benefits; and

(b) to determine the manner in which the assets of the Supplemental Benefit Trust shall be used each year in accordance with the provisions hereof in a fair and equitable manner.

6.4 <u>Action by Supplemental Benefit Committee.</u> Any action by the Supplemental Benefit Committee will be subject to the following provisions:

(a) The SBC Chair or any two SBC Committee Members may call a meeting of the Supplemental Benefit Committee on not less than two days' advance written notice to all SBC Committee Members (including telephone conference, video conference and other technology-assisted meetings of persons at separate locations);

108

(b) The Supplemental Benefit Committee shall act by the majority vote of all of its members, which action shall be as effective as if such action had been taken by all SBC Committee Members, or by a written instrument signed by all of the SBC Committee Members, which instrument may be executed in counterparts; provided, that one or more SBC Committee Members or other persons may be so authorized to act with respect to particular matters on behalf of all SBC Committee Members; and provided, further, that no SBC Committee Member shall be liable or responsible for an act or omission of other SEC Committee Members in which the former has not concurred; and

(c) The certificate of the secretary of the Supplemental Benefit Committee or of the majority of the SBC Committee Members that the Supplemental Benefit Committee has taken or authorized any action shall be conclusive in favor of any person relying on such certificate.

6.5 <u>Provision of Benefits.</u>

(a) The Company shall cooperate with the Supplemental Benefit Committee and the Supplemental Benefit Trust to provide for the reduction or reimbursement of premiums, co-payments, deductibles and other amounts which would otherwise be required to be paid by or on behalf of Enrolled Participants under the Health Benefit Program or to participate in Medicare or any part thereof or any successor or comparable program thereto through the Health Benefit Program, including, in the case of reimbursement of such amounts that would otherwise be required to be paid to participate in Medicare or any part thereof or any successor or comparable program thereto, by addition of such reimbursement to pension payments.

(b) In the event that Additional Permissible Benefits are to be provided by the Supplemental Benefit Program, then, at the request of the Supplemental Benefit Committee, in a writing signed by both the SBC Chair and the Secretary of the Supplemental Benefit Committee, the Company shall cooperate with the Supplemental Benefit Committee and aid it in determining how such benefits should be administered. Such aid shall include identifying and negotiating with claims administrators, medical review agencies and other service providers to provide such benefits on the terms specified by the Supplemental Benefit Committee and informing the Supplemental Benefit Committee of the available alternatives that most closely approximate those specified by the Supplemental Benefit Committee. Notwithstanding anything else contained in this Section 6.5, in providing such cooperation and aid the Company shall act in a ministerial capacity only, and shall neither possess, be granted or delegated, nor exercise any discretionary authority, control or responsibility in the development, administration or management of the Additional Permissible Benefits portion of the Supplemental Benefit Program and none of Parent, the Company or any other Employer shall

have any obligation to Participants to provide any Additional Permissible Benefits to Participants, or any liability to Participants for failing to provide any Additional Permissible Benefits.

6.6 <u>Supplemental Benefit Committee Minutes.</u> As soon as is reasonably practicable after each meeting of the Supplemental Benefit Committee, the Secretary of the Supplemental Benefit Committee shall prepare draft minutes of such meeting, which shall be delivered to each SBC Committee Member and approved or modified at the following meeting.

ARTICLE VII
<u>Company Contributions</u>

7.1 <u>Contributions</u>. The Company shall have no obligation to make any cash contributions to the Supplemental Benefit Trust, and the Supplemental Benefit Trust Profit Sharing Plan is terminated effective as of December 31, 2021.

ARTICLE VIII
<u>[*Reserved*]</u>

8.1     [*Reserved*].

ARTICLE IX
<u>Amendments and Termination</u>

9.1     <u>Amendments.</u>  The Supplemental Benefit Program may not be amended except by a written instrument executed by a majority of the members of the Supplemental Benefit Committee and the Company; provided, that:

(a)     the consent of the Company shall not be required with respect to any amendment of Sections 6.1 through 6.4, so long as no such amendment shall (i) adversely affect the obligations of any Employer or (ii) be inconsistent with any of the obligations of the Supplemental Benefit Committee under this Exhibit B;

(b)     [*Reserved*];

(c)     the effectiveness of any material amendment to the Supplemental Benefit Program shall be subject to the approval of the Court after appropriate notice to the Class Members; and

(d)     in the event the IRS asserts that any Employer is or will be subject to an excise tax on any of the benefits paid or payable by the Supplemental Benefit Trust under the IRC as in effect on the date of the Settlement Agreement, then the Company may amend the Supplemental Benefit Program and/or the Supplemental Benefit Trust to minimize the current and future liability for such tax so long as no such amendment adversely affects the level of Supplemental Benefit Program

110

benefits that are then being provided or could be provided in the future to any Participant.

        9.2    <u>Termination.</u> The Supplemental Benefit Program shall terminate upon the earlier of (a) the termination of the Settlement Agreement as provided in Section 13 thereof or (b) the termination of the Health Benefit Program and the Life Insurance Program; provided, that the obligations of Parent and the Company under Sections 10.3 shall survive such termination. In the event the Supplemental Benefit Program terminates, all of the assets held in the Supplemental Benefit Trust shall be applied to provide such benefits as may be provided by a "voluntary employees' beneficiary association" within the meaning of Section 501(c) (9) of the IRC, as set forth herein. If there are any living Participants at or after the time the Supplemental Benefit Program terminates, the Supplemental Benefit Committee shall determine the disposition of such Supplemental Benefit Trust assets solely to any such living Participants for the remainder of their lives, consistent with this Section 9.2. If there are no living Participants at or any time after the Supplemental Benefit Program terminates, then the Company and the Supplemental Benefit Committee shall attempt in good faith to reach consensus regarding the disposition of any residual assets in the Supplemental Benefit Trust consistent with this Section 9.2, provided that, if such consensus cannot be achieved promptly, either the Company or the Supplemental Benefit Committee may apply to the Court for a determination as to the disposition of such residual assets consistent with this Section 9.2, and the Court's determination shall be binding.

ARTICLE X<br><u>Miscellaneous</u>

        10.1    [*Reserved*].

        10.2    [*Reserved*].

        10.3    <u>Limitation of Liability and Indemnification.</u> To the extent permitted by applicable law, no person shall be personally liable for any act done or omitted to be done in good faith in the administration of the Supplemental Benefit Program or the investment of the assets of the Supplemental Benefit Trust. The Employers shall jointly and severally indemnify and hold harmless, to the extent permitted by law, the Supplemental Benefit Trust, the UAW, and each present or former SBC Committee Member and SBC Committee Member Alternate from and against any and all losses, costs, liabilities, damages and expenses (including fines, penalties and taxes and the fees and disbursements of actuarial and legal advisors), as incurred, which they may incur (a) in connection with the establishment and implementation of the Supplemental Benefit Program in accordance with the terms hereof, (b) in connection with the enforcement of the obligations of Parent, the Company or any other Employer under the Supplemental Benefit Program or (e) by reason of any act done or omitted to be done in good

faith in connection with the Supplemental Benefit Program, other than by reason of the sale of or transfer of any interest in securities of Parent in violation of Section 3.4 or 5.3 or the exercise of the powers, duties and rights of the Supplemental Benefit Committee under Sections 6.2 through 6.6 or any amendment thereof; provided, that the payment of any such amount by any of the Employers in advance of the final disposition of any proceeding for which indemnification is being sought shall be made only upon delivery to each Employer paying such amount of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such amount under this Section 10.3 or otherwise. Any claims for indemnification hereunder shall be made in accordance with the Indemnification Procedures.

10.4     Exclusive Benefit. No part of the corpus or income of the Supplemental Benefit Trust shall be used for, or diverted to, any purposes other than for the exclusive benefit of persons who are or may become entitled to benefits under the Supplemental Benefit Program and for defraying reasonable expenses of administering such program.

10.5     Prohibited Inurement. No part of the corpus or income of the Supplemental Benefit Trust shall inure to the benefit of Parent or the Company. All fiduciaries hereunder shall discharge their duties solely in the interests of Participants for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration. No benefit under the Supplemental Benefit Program or interest, right or claim in or to any part of the Supplemental Benefit Trust or any payment therefrom shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, hypothecation or commutation, nor shall any such benefit or interest, right or claim in or to any part of the Supplemental Benefit Trust or any payment therefrom be in any manner liable for or subject to garnishment, attachment, execution or levy or be liable for or subject to the debts, contracts, liabilities, engagements or torts of the person entitled thereto, and the trustee under such trust shall not recognize any attempt to make it so, except as directed by the Supplemental Benefit Committee, in its capacity as Program Administrator, to the .appropriate person for the payment of benefits in a manner that is consistent with applicable law.

10.6     Assignment. Delegation. The rights of any party under the Supplemental Benefit Program may not be assigned without the prior written consent of the Company and the Supplemental Benefit Committee, and any purported assignment in violation of this sentence shall be void. Any party may delegate any of its obligations under the Supplemental Benefit Program; provided, that no such delegation shall relieve such party of any of such obligations; and, provided, further, that the delegation of any obligation of Parent or the Company in

connection with the transfer of any assets of either of them shall be subject to the express assumption of such obligation by the transferee.

10.7 <u>Captions.</u> The captions used in this Exhibit B are for convenience of reference only and do not constitute a part of this Exhibit B and will not be deemed to limit, characterize or in any way affect any provision of this Exhibit B and all provisions of this Exhibit B will be enforced and construed as if no captions had been used in this Exhibit B.

10.8 <u>Incorporation of Appendices: References.</u> The Appendices hereto are incorporated in this Exhibit B as though fully set forth herein. References in this Exhibit B to "Articles," "Sections" and "Appendices" refer to the Articles, Sections and Appendices of this Exhibit B unless otherwise specified.

10.9 <u>Governing Law.</u> This Exhibit B shall be construed in accordance with applicable federal laws and, to the extent not inconsistent therewith or preempted thereby, with the laws of the State of Illinois.

<u>ARTICLE XI</u>
<u>Events of Default</u>

11.1 <u>Supplemental Benefit Program Payment Default.</u> An Event Date shall occur upon the occurrence of a "Supplemental Benefit Program Payment Default." As used herein, the term

"<u>Supplemental Benefit Program Payment Default</u>" shall mean the failure at any time by Parent or the Company to make any payment or contribution required to be made by it pursuant to Section 10.3 of this Exhibit B within five days after receipt of written notice of such failure from the Supplemental Benefit Committee, which notice shall specify with particularity the nature and circumstances of such failure and shall state that it constitutes notice under this Section 11.1; provided, that the Supplemental Benefit Committee shall not give notice of a failure to make a payment under Section 10.3 unless the Indemnified Party has executed the undertaking provided for in Section 10.3.

11.2 <u>No Limitation of Rights.</u> The rights of the Supplemental Benefit Committee under this Article XI are in addition to, and not in lieu of, any rights that the Supplemental Benefit Committee, or any other person or entity, including, without limitation, any SBC Committee Member, SBC Committee Member Alternate or Participant, may have under the Settlement Agreement, any Exhibit thereto or any Appendix to any such Exhibit, whether in equity or at law. The waiver by the Supplemental Benefit Committee or any such person or entity of any Supplemental Benefit Program Payment Default or other breach of any provision of, or any other right to enforce or claim or benefit under, any such

113

document shall not be deemed a waiver of any other breach of, or right to enforce or claim or benefit under, such document.

**APPENDIX B-1**

**YOUR RETIREE SUPPLEMENTAL BENEFIT PROGRAM**
**<u>SUMMARY PLAN DESCRIPTION</u>**

Introduction ................................................................................................................... 1

How the Program Works .............................................................................................. 2

Eligibility and Enrollment ........................................................................................... 3

    Eligible Retirees ..................................................................................................... 3

    Dependents ............................................................................................................ 3

    Surviving Spouse .................................................................................................. 4

    Married to Another Navistar Employee or Retiree ............................................ 4

    Enrollment ............................................................................................................ 4

Appealing an Enrollment or Eligibility Status Decision ............................................. 4

When Coverage Begins ................................................................................................ 5

When Coverage Ends ................................................................................................... 5

Program Termination ................................................................................................... 5

Notice of COBRA Continuation Coverage Rights ...................................................... 6

Claims Procedures for Benefits Related To the Retiree Health Benefit Program and Life
    Insurance ............................................................................................................... 9

Claims Procedures for Vision and Dental ................................................................... 15

Claims Procedures for Added Supplemental Benefits ................................................. 21

Qualified Medical Child Support Orders ..................................................................... 24

Nature of Benefits ....................................................................................................... 25

Sources of Contributions to the Trust ......................................................................... 26

The Supplemental Benefit Program Committee .......................................................... 26

Other Matters ............................................................................................................... 27

Administrative Information .......................................................................................... 28

    Discretionary Authority of the Plan Administrator for the Program ................... 28

    Clerical Error ......................................................................................................... 28

    Rescission in the Event of Fraud ......................................................................... 28

    Nonassignment of Benefits .................................................................................. 28

Your Rights Under ERISA ........................................................................................... 30

Appendix A ................................................................................................................... i

**NAVISTAR, INC.**
**RETIREE SUPPLEMENTAL BENEFIT PROGRAM**
**SUMMARY PLAN DESCRIPTION**

## Introduction

This Summary Plan Description ("SPD") summarizes the terms of the Navistar, Inc. Retiree Supplemental Benefit Program (f/k/a the Navistar International Transportation Corp. Retiree Supplemental Benefit Program) (the "Program") negotiated as part of the settlement reached in *Shy v. Navistar*, Case No. C-3-92-333 (S.D. Ohio, 1992) (the "*Shy* Settlement Agreement"), and reflects the terms of the Program effective as of January 1, 2022. The information in this SPD is only a summary, and this SPD does not contain all of the details of the written plan document for the Program. If there are any discrepancies between this SPD and the written plan document for the Program, the written plan document for the Program will govern.

This Program constitutes one part of a larger, three part retiree health and life benefits plan known as the Navistar, Inc. Retiree Health Benefit and Life Insurance Plan ("Retiree Benefit Plan"), EIN 36-1264810, ERISA Plan No. 584, all of which was negotiated as part of the *Shy* Settlement Agreement. The three parts of the Retiree Benefit Plan are:

- The Navistar, Inc. Retiree Health Benefit Program, referred to as the "Retiree Health Benefit Program";

- The Navistar, Inc. Retiree Life Insurance Program referred to as the "Retiree Life Insurance Program"; and

- The Navistar, Inc. Retiree Supplemental Benefit Program, which is described in this SPD and referred to in this SPD as the "Program."

Each of the three parts of the Retiree Benefit Plan has its own SPD. For persons who are eligible for benefits under this Program, this SPD is designed to be read in conjunction with the other two SPDs.

This SPD applies to you if you meet the eligibility requirements for the Program. The Program is provided for eligible retirees, surviving spouses, and dependents of Navistar, Inc. (f/k/a Navistar International Transportation Corp.), Navistar International Corporation, Navistar Financial Corporation and Indianapolis Casting Corporation (collectively referred to as "Navistar").

The *Shy* Settlement Agreement defines and identifies those retirees, surviving spouses, and dependents who are eligible to participate in this Program. Some benefits provided under this Program (such as premium reimbursements and co-payment reductions) are only available to persons eligible to participate in the Program who are making contributions to the Retiree Health Benefit Program (or for whom such contributions are being made). Certain other benefits (such as life insurance benefits and certain other permissible benefits) may be made available to retirees whether or not they enroll in the Retiree Health Benefit Program. This Program may not be altered,

1

modified or terminated except to the extent permitted under the terms of the _Shy_ Settlement Agreement.

This Program is designed to provide a mechanism to supplement the benefit levels provided for you under the Retiree Health Benefit Program or Retiree Life Insurance Program, and/or to enable you to offset some or all of the costs shifted to you as part of the changes that Navistar has made in the past to its' retiree health and life insurance benefits. This Program and its corresponding Retiree Supplemental Benefit Trust (the "Trust") were created to receive and hold certain payments of cash and stock from Navistar. From time to time, those assets held in the Trust may be used to provide benefits, such as those described below under the section entitled "Nature of Benefits."

This Program is effective as of the effective date of the _Shy_ Settlement Agreement or the date of your retirement, whichever comes later. The Program described in this booklet and all rights hereunder are governed by and construed, administered, and regulated in accordance with the Employee Retirement Income Security Act of 1974 ("ERISA") and the Internal Revenue Code (the "Code") to the extent applicable, and to the extent not preempted by ERISA, the laws of the State of Illinois.

Please take the time to review this SPD to completely understand your benefits. The Supplemental Benefit Program Committee (the "Committee"), described on page 23 of this booklet, or its delegate has complete discretion to interpret and construe the provisions of the Program (unless otherwise delegated to another party), including in connection with any claim for benefits and associated appeals. The Committee reserves the right to modify, amend, suspend, or terminate the Program at any time, consistent with the terms of the _Shy_ Settlement Agreement. The Committee is under no obligation to pay benefits in any year, and the benefits described in this Program are provided at the discretion of the Committee. In addition, a modification, amendment, suspension, or termination may occur without the consent of and without prior notice to any participant in the Program or dependent, as permitted by applicable law.

The terms and conditions of the Program are set forth in this SPD, the formal plan document, and the Trust. Together, these documents are incorporated by reference into the formal plan document and constitute the written instruments under with the Program is established and maintained. An amendment to one of these documents constitutes an amendment to the Program.

## How the Program Works

The Program may provide benefit payments, from time to time, at the discretion of the Committee. In order to qualify for certain discretionary benefit payments, including reductions in premium contributions and drug copayments under the Retiree Health Benefit Program and reimbursements for Medicare premiums, you must be enrolled in this Program as well as the Retiree Health Benefit Program. In order to qualify for other payments, such as life insurance payments or any other additional benefits ("Additional Permissible Benefits"), you do not need to be enrolled in the Retiree Health Benefit Program. Please note that enrollment in the Retiree Health Benefit Program is separate and apart from coverage under this Program, and does not constitute a part of this

Program. This SPD does not make any representations as to the nature and extent of benefits provided under the Retiree Health Benefit Program.

## Eligibility and Enrollment

### Eligible Retirees

In accordance with the *Shy* Settlement Agreement, you are eligible for benefits that may be provided under this Program if:

- You retired or will retire from Navistar with a benefit (except a deferred vested pension benefit) from one of the following retirement plans (or a successor to one of the following retirement plans):

  - The Navistar International Transportation Corp. Retirement Plan for Salaried Employees (now known as the Navistar, Inc. Salaried Employees Pension Plan No. 1 and the Navistar, Inc. Salaried Employees Pension Plan No. 2);

  - The Navistar Financial Corporation. Retirement Plan for Salaried Employees (now known as the Navistar, Inc. Salaried Employees Pension Plan No. 1 and the Navistar, Inc. Salaried Employees Pension Plan No. 2);

  - The Navistar International Transportation Corp. Noncontributory Retirement Plan (now known as the Navistar, Inc. Hourly Employees Pension Plan No. 1 and the Navistar, Inc. Hourly Employees Pension Plan No. 2; or

  - Certain multi-employer pension funds to which Navistar contributed.

- In addition, for certain benefits, including direct or indirect reductions in premium contributions, co-payments, deductibles, or other amounts required to be paid by or on behalf of participants in the Retiree Health Benefit Program, or reductions or reimbursements in your Medicare premiums, you must be paying monthly premiums under the Retiree Health Benefit Program.

- Even if you are not paying monthly premiums under the Retiree Health Benefit Program, you may still be eligible for life insurance benefits or certain other Additional Permissible Benefits.

### Dependents

Coverage is available under this Program for dependents (including spouse and children) to the same extent and under the same terms and conditions as such coverage is available under the Retiree Health Benefit Program.  If your dependents are covered under the Retiree Health Benefit Program, those dependents will be covered under this Program.  Please consult your SPD for the Retiree Health Benefit Program for further details.

**Surviving Spouse**

Coverage is available under this Program for a surviving spouse to the same extent and under the same terms and conditions as such coverage is available under the Retiree Health Benefit Program. Please consult your SPD for the Retiree Health Benefit Program for further details.

**Married to Another Navistar Employee or Retiree**

If you are married to another Navistar employee or retiree, the coverage election made by you under the Retiree Health Benefit Program will apply under this Program.  Please consult your SPD for the Retiree Health Benefit Program for further details.

**Enrollment**

If you are eligible for benefits under this Program, enrollment in the Program is automatic. However, you will only be eligible for certain benefits, such as direct or indirect reductions in premium contributions, co-payments, deductibles, or other amounts required to be paid by or on behalf of participants in the Retiree Health Benefit Program, or reductions or reimbursements in your Medicare premiums, if you are paying monthly premiums under the Retiree Health Benefit Program.

## Appealing an Enrollment or Eligibility Status Decision

This section describes the appeals process that applies to enrollment and eligibility for the Program only. The Retiree Benefit Plan Administrator, and not the Program Plan Administrator, makes determinations regarding enrollment and eligibility status in the Program. If you disagree with the Retiree Benefits Plan Administrator's determination regarding your enrollment or eligibility status, you have 365 days from your eligibility enrollment event to appeal in writing to the following address:

> Navistar, Inc.
> P.O. Box 4080
> Lisle, IL 60532
>  (877) 353-5100

Your appeal will be handled within 60 days from the date it is received by Navistar, Inc. unless an extension is required. The 60 day period may be extended if it is determined that an extension is necessary due to matters beyond Navistar, Inc.'s control. You will be notified prior to the end of the 60 day period if an extension or additional information is required.

If you disagree with Navistar, Inc.'s determination, your eligibility status dispute may be reviewed and resolved by the Retiree Health Benefit Program's Health Benefit Program Committee. The Health Benefit Program Committee may review and resolve eligibility disputes and will act in its sole discretion in resolving such disputes. The decision of the Health Benefit Program Committee is final and binding on all parties.

In order to appeal an eligibility dispute to the Health Benefit Program Committee, you must appeal in writing to the following address:

> Health Benefit Program Committee

4

c/o Navistar, Inc.
P.O. Box 4080
Lisle, IL 60532
(877) 353-5100

## When Coverage Begins

If the Program provides benefits that require enrollment in the Retiree Health Benefit Program, your participation begins upon the receipt of your first monthly premium under the Retiree Health Benefit Program. If the Program provides other benefits (such as Additional Permissible Benefits) that do not require enrollment in the Retiree Health Benefit Program, you will be eligible for benefits whether or not you are enrolled in the Retiree Health Benefit Program.  If you retire from Navistar in the future and are otherwise eligible for coverage under this Program at the time of your retirement, coverage begins as of your retirement date.

Remember, however, that the Committee may decide to only provide some benefits, or no benefits at all, in any particular year. Coverage in this Program therefore does not guarantee that money will be applied in that year for any particular purpose. Also remember that, in order to be eligible to receive certain discretionary benefits under this Program, you must be enrolled in this Program as well as the Retiree Health Benefits Program.

## When Coverage Ends

Your Program coverage will end on the earliest of these two dates:

- the date you are no longer eligible for coverage; or

- in the case of certain benefits that require enrollment in the Retiree Health Benefit Program, the last day of the period for which you have made the required contributions for coverage under the Retiree Health Benefit Program.  The Retiree Health Benefit Program allows a grace period of 45 days after the statement due date for receipt of required contributions.

## Program Termination

This Program will terminate upon the earlier of the termination of the *Shy* Settlement Agreement or the termination of the Retiree Health Benefit Program and the Life Insurance Program. In the event of termination of the Program, any or all assets remaining in the Trust will be used to provide benefits as may be provided by a "voluntary employees' beneficiary association" within the meaning of Code section 501(c)(9), as determined by Navistar.

However, if the preliminary settlement agreement entered into on December 22, 2021 by and between Navistar and class representatives (the "Preliminary Settlement Agreement") is approved, and the Program is terminated, the use of all of the assets held in the Trust will be used to provide benefits as may be provided by a "voluntary employees' beneficiary association" within the meaning of Code section 501(c)(9), as set forth below.  If there are any living participants at or

after the time the Program terminates, the Committee shall determine the disposition of the assets solely to any living participants for the remainder of their lives. If there are no living participants at or any time after the Program terminates, then Navistar and the Committee shall attempt in good faith to reach consensus regarding the disposition of any residual assets in the Trust, provided that, if such a consensus cannot be achieved promptly, either Navistar or the Committee may apply to the court that oversees the Shy Settlement Agreement for a determination regarding the disposition of assets, and that court's determination will be binding.

Further, the Committee reserves the right to modify, amend, suspend, or terminate the Program at any time, consistent with the _Shy_ Settlement Agreement. The Committee is under no obligation to pay benefits in any year, and the benefits described in this Program are provided at the discretion of the Committee. In addition, a modification, amendment, suspension, or termination may occur without the consent of and without prior notice to any participant in the Program or dependent, as permitted by applicable law and consistent with the _Shy_ Settlement Agreement.

## Notice of COBRA Continuation Coverage Rights

### Introduction

This notice has important information about your right to coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") to COBRA continuation coverage, which is a temporary extension of coverage under the Program. This notice explains COBRA continuation coverage, when it may become available to you and your family, and what you need to do to protect your right to get it. When you become eligible for COBRA, you may also become eligible for other coverage options that may cost less than COBRA continuation coverage.

The right to COBRA continuation coverage was created by a federal law, the Consolidated Omnibus Budget Reconciliation Act of 1985. COBRA continuation coverage can become available to you and other members of your family when group health coverage would otherwise end. For more information about your rights and obligations under the Program and under federal law, you should review this SPD or contact the Plan Administrator for the Retiree Benefit Plan.

You may have other options available to you when you lose group health coverage.

For example, you may be eligible to buy an individual plan through the Health Insurance Marketplace. By enrolling in coverage through the Marketplace, you may qualify for lower costs on your monthly premiums and lower out-of-pocket costs. Additionally, you may qualify for a 30-day special enrollment period for another group health plan for which you are eligible (such as a spouse's plan), even if that plan generally doesn't accept late enrollees.

### COBRA Continuation Coverage

COBRA continuation coverage is a continuation of Program coverage when it would otherwise end because of a life event. This is also called a "qualifying event." Specific qualifying events are listed later in this notice. After a qualifying event, COBRA continuation coverage must be offered to each person who is a "qualified beneficiary." You, your spouse, and your dependent children could become qualified beneficiaries if coverage under the Program is lost because of the qualifying event. Qualified beneficiaries who elect COBRA continuation coverage must pay

for COBRA continuation coverage. The premiums will be based on the amount necessary to cover 102% (150% during continuation for disability) of the cost of providing coverage under the Program.

If you're the spouse of a retiree, you may become a qualified beneficiary if you lose your coverage under the Program because of the following qualifying events:

- Your spouse dies;

- Your spouse becomes entitled to Medicare benefits (under Part A, Part B, or both); or

- You become divorced or legally separated from your spouse.

Your dependent children may become qualified beneficiaries if they lose coverage under the Program because of the following qualifying events:

- The parent-retiree dies;

- The parent-retiree becomes entitled to Medicare benefits (Part A, Part B, or both);

- The parents become divorced or legally separated; or

- The child stops being eligible for coverage under the Program as a "dependent child."

Sometimes, filing a proceeding in bankruptcy under title 11 of the United States Code can be a qualifying event. If a proceeding in bankruptcy is filed with respect to Navistar, and that bankruptcy results in the loss of coverage of any retiree covered under the Program, the retiree will become a qualified beneficiary. The retiree's spouse, surviving spouse, and dependent children will also become qualified beneficiaries if bankruptcy results in the loss of their coverage under the Program.

**COBRA Availability**

The Program will offer COBRA continuation coverage to qualified beneficiaries only after the Plan Administrator for the Retiree Benefit Plan has been notified that a qualifying event has occurred. Navistar must notify the Plan Administrator for the Retiree Benefit Plan if it becomes aware of the following qualifying events:

- Death of the participant;

- Commencement of a proceeding in bankruptcy with respect to Navistar, Inc.; or

- The participant's becoming entitled to Medicare benefits (under Part A, Part B, or both).

For all other qualifying events (divorce or legal separation of the participant and spouse, or a dependent child's losing eligibility for coverage as a dependent child), you must notify the Plan Administrator for the Retiree Benefit Plan within 60 days after the qualifying event occurs. You must provide this notice to Navistar, Inc. at P.O. Box 4080, Lisle, IL 60532.

**Providing COBRA Coverage**

Once the Plan Administrator for the Retiree Benefit Plan receives notice that a qualifying event has occurred, COBRA continuation coverage will be offered to each of the qualified beneficiaries. Each qualified beneficiary will have an independent right to elect COBRA continuation coverage. Covered retirees may elect COBRA continuation coverage on behalf of their spouses, and parents may elect COBRA continuation coverage on behalf of their children.

COBRA continuation coverage is a temporary continuation of coverage that generally lasts for 18 months due to employment termination or reduction of hours of work. Certain qualifying events, or a second qualifying event during the initial period of coverage, may permit a beneficiary to receive a maximum of 36 months of coverage.

There are also ways in which this 18-month period of COBRA continuation coverage can be extended:

**Disability Extension**

If you or anyone in your family covered under the Program is determined by Social Security to be disabled and you notify the Plan Administrator for the Retiree Benefit Plan in a timely fashion, you and your entire family may be entitled to get up to an additional 11 months of COBRA continuation coverage, for a maximum of 29 months. The disability would have to have started at some time before the 60th day of COBRA continuation coverage and must last at least until the end of the 18-month period of COBRA continuation coverage.

**Second Qualifying Event**

If your family experiences another qualifying event during the 18 months of COBRA continuation coverage, the spouse and dependent children in your family can get up to 18 additional months of COBRA continuation coverage, for a maximum of 36 months, if the Plan Administrator for the Retiree Benefit Plan is properly notified about the second qualifying event. This extension may be available to the spouse and any dependent children getting COBRA continuation coverage if the participant dies; becomes entitled to Medicare benefits (under Part A, Part B, or both); gets divorced or legally separated; or if the dependent child stops being eligible under the Program as a dependent child. This extension is only available if the second qualifying event would have caused the spouse or dependent child to lose coverage under the Program had the first qualifying event not occurred.

**Other Coverage Options**

Instead of enrolling in COBRA continuation coverage, there may be other coverage options for you and your family through the Health Insurance Marketplace, Medicare, Medicaid, Children's Health Insurance Program ("CHIP"), or other group health plan coverage options (such as a spouse's plan) through what is called a "special enrollment period." Some of these options may cost less than COBRA continuation coverage. You can learn more about many of these options at www.healthcare.gov.

**Contact for Questions**

Questions concerning the Program or your COBRA continuation coverage rights should be addressed to the contact or contacts identified below. For more information about your rights under ERISA, including COBRA, the Patient Protection and Affordable Care Act, and other laws affecting group health plans, contact the nearest Regional or District Office of the U.S.

8

Department of Labor's Employee Benefits Security Administration (EBSA) in your area or visit www.dol.gov/ebsa. (Addresses and phone numbers of Regional and District EBSA Offices are available through EBSA's website.) For more information about the Marketplace, visit www.HealthCare.gov.

**Address Changes**

To protect your family's rights, let the Plan Administrator for the Retiree Benefit Plan know about any changes in the addresses of family members. You should also keep a copy, for your records, of any notices you send to the Plan Administrator for the Retiree Benefit Plan.

**COBRA Administrator**
WageWorks
P.O. Box 223684
Dallas, TX 75222-3684
(888) 678-4881

To report a Qualifying Event, contact Navistar.

To report a second Qualifying Event, or to inquire about your COBRA election, payments, duration of coverage, or general questions, contact Navistar.

## Claims Procedures for Benefits Related To the Retiree Health Benefit Program and Life Insurance

If believe you are entitled to benefits under this Program that are only available if you are paying monthly premiums under the Retiree Health Benefit Program, including direct or indirect reductions in premium contributions, co-payments, deductibles, or other amounts required to be paid by or on behalf of participants in the Retiree Health Benefit Program, as well as any life insurance benefit, you may submit any such claims to Navistar, who will serve as the Claims Administrator for those benefits, in writing to the following address:

> Navistar, Inc.
> P.O. Box 4080
> Lisle, IL  60532
> (877) 353-5100

To file a claim for benefits provided under the Retiree Health Benefit Program and the Retiree Life Insurance Program, please see the applicable SPD for those specific plans. If you are provided either the Vision Service Plan Insurance Company ("VSP") vision plan or the Delta dental plan ("Delta") under this Program, separate claims procedures apply to those benefits, which are described in this SPD. In addition, if you are provided certain other benefits under this Program, including hearing benefits offered by EPIC Hearing Healthcare ("EPIC"), Medicare premium reimbursements, and other temporary benefits (collectively, the "Added Supplemental Benefits"), you are subject to separate claims procedures that apply to the Added Supplemental Benefits, which are described in this SPD.

**Claims for Benefits: Initial Claims**

Unless otherwise provided in the applicable insurance policy/evidence of coverage or benefits

summary, your claim for benefits will be processed under the procedures described below, depending upon the category of claim that you are making. The procedures listed below are default claims procedures and apply only when the applicable insurance policy/evidence of coverage or benefits summary doesn't provide for a specific claims procedure. Where a separate claims procedure is provided for, you must follow that specific claims procedure.

### Urgent Claims

An "Urgent Claim" is a claim for medical care or treatment where making a determination under the normal timeframes could seriously jeopardize your life or health or your ability to regain maximum function, or, in the opinion of a physician with knowledge of your medical condition, would subject you to severe pain that could not adequately be managed without the care or treatment that is the subject of the claim.

You will be notified of the Claims Administrator's determination on your claim for urgent care as soon as possible, but not later than 72 hours after receipt of your claim by the Claims Administrator, unless you fail to provide sufficient information to determine whether, or to what extent, benefits are covered or payable under the Program. In the case of such a failure, you will be notified as soon as possible, but not later than 24 hours after receipt of your claim by the Claims Administrator of the specific information needed to complete your claim. You will have at least 48 hours to provide the specific information. You will be notified of the Claims Administrator's benefit determination as soon as possible, but not later than 48 hours after the Claim's Administrator's receipt of the specified information or, if earlier, the end of the period afforded you to provide the specified information. You may also receive notice orally, in which case a notice in writing or in electronic media (such as email) will be provided within 3 days of the oral notice.

### Pre-Service Claims

A "Pre-Service Claim" is a claim for services that have not yet been rendered and for which the Program requires prior authorization.  If your pre-service claim is improperly filed, you will be sent notification within five days of receipt of the claim.

If your Pre-Service Claim is filed properly, you will be notified of the Claim's Administrator's decision on your Pre-Service Claim not more than 15 days after receipt of your claim by the Claims Administrator. This period may be extended by the Claims Administrator for up to 15 days, provided that the Claims Administrator determinates that such an extension is necessary due to matters beyond the control of the Claims Administrator and notifies you, prior to the expiration of the initial 15-day period, of the circumstances requiring the extension of time and the date by which the Claims Administrator expects to render a decision. If such an extension is necessary due to your failure to submit information necessary to decide the claim, the notice of extension shall specifically describe the required information and you shall be afforded at least 45 days from the receipt of the notice within which to provide the specified information. If your claim is denied, you will be notified in the manner set forth below. In the event that a period of time is extended due to a failure to submit information necessary to decide your claim, the period of making the benefit determination shall be tolled from the date on which the notification of the extension is sent to you until the date on which you respond to the request for additional

information.

### Post-Service Claims

A "Post-Service Claim" is a claim for services that already have been rendered, or where the Program does not require prior authorization.

You will be notified of the Claims Administrator's decision with respect to a Post-Service Claim within 30 days of the receipt of your claim. This period may be extended one time for up to 15 days, provided that the Claims Administrator determines that such an extension is necessary due to matters beyond the control of the Claims Administrator and notifies you, prior to the expiration of the initial 30-day period, of the circumstances requiring the extension of time and the date by which the Claims Administrator expects to render a decision. If such an extension is necessary due to your failure to submit the information necessary to decide the claim, the notice of extension shall specifically describe the required information and you shall be given at least 45 days from the receipt of the notice to provide the specified information. In the event that a period of time is extended due to a failure to submit information necessary to decide your claim, the period of making the benefit determination shall be tolled from the date on which the notification of the extension is sent to you until the date on which you respond to the request for additional information.

### Concurrent Care Claims

A "Concurrent Care Claim" is a claim that arises when there is a reduction or termination of ongoing care.

You will be notified if there is to be any reduction or termination in coverage for ongoing care sufficiently in advance of such reduction so that you will be able to appeal the decision before the coverage is reduced or terminated, unless such a reduction or termination is due to a Program amendment or termination of the Program.

### Other Benefit Claims

Other benefit claims include claims for benefits that pay for premium contributions, co-payments, deductibles, or other amounts required to be paid by or on behalf of participants in the Retiree Health Benefit Program.

Notice of the Program's determination will be sent within a reasonable time period, but not longer than 90 days from receipt of the claim.

If the Claims Administrator determines that an extension is necessary due to special circumstances, this time may be extended for an additional 90 days. You will receive notice prior to the extension that indicates the special circumstances requiring the extension and the date by which the Plan Administrator expects to render a determination.

**Notice of Determination**

The decision on any appeal of your claim will be given to you in writing. If your claim is denied,

in whole or in part, the Claims Administrator will send you a notice in writing or in electronic media (such as email) of its decision including:

- The specific reason(s) for the adverse determination;

- A reference to specific Program provision(s) on which the benefit determination is based;

- A description of additional material or information, if any, needed to perfect the claim and the reasons such material or information is necessary;

- A description of the Program's claims review procedures and the time limits applicable to such procedures;

- A statement of your right to bring a civil action under section 502(a) of ERISA following appeal;

- A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits;

- If an internal rule, guideline, protocol or other similar criterion was relied upon in making the adverse determination, that specific rule, guideline, protocol, or other similar criterion, or a statement such information will be provided free of charge upon request;

- If the denial is based on a medical necessity or experimental treatment or similar limit, explain the scientific or clinical judgment for the determination (or state that such information will be provided free of charge upon request); and

- In the case of an adverse determination concerning a claim involving urgent care, a description of the expedited review process applicable to the claims.

**Appealing Your Claim**

If your claim is denied, you will have the opportunity to appeal and have a full and fair review of your claim denial.  In connection with your appeal, you will have the opportunity to submit written comments, documents, or other information in support of your appeal, and you will have reasonable access to all documents that are relevant to your claim.  Your appeal will be conducted by a person who is neither the individual who made the determination that is the subject of the appeal, nor the subordinate of such an individual.  No deference will be afforded to the initial determination.

If your claim involves a medical judgment question, the Claims Administrator will consult with an appropriately qualified health care practitioner with training and experience in the field of

12

medicine involved.  If a health care professional was consulted for the initial determination, a different health care professional will be consulted on appeal.  Upon request, the Claims Administrator will provide you with the identification of any medical expert whose advice was obtained on behalf of the Program in connection with your appeal.

Your appeal should be submitted, in writing, to the following address:

> Navistar, Inc.
> P.O. Box 4080
> Lisle, IL  60532
> (877) 353-5100

Claims must be submitted in accordance with the time periods specified below. In addition, a final decision on appeal will be made within the time periods specified below.

### *Urgent Claims*

You must submit your appeal within 1 year of the date of your initial denial notice.

You will be notified of the determination as soon as possible, taking into account the medical exigencies, but not later than 72 hours after receipt of the claim.

### *Pre-Service Claims*

You must submit your appeal within 1 year of the date of your initial denial notice.

You will be notified of the determination within a reasonable period of time taking into account the medical circumstances, but no later than 15 days from the date your request is received.

### *Post-Service Claims*

 You must submit your appeal within 1 year of the date of your initial denial notice.

You will be notified of the determination within a reasonable period of time, but no later than 30 days from the date your request is received.

### *Other Benefit Claims*

You must submit your appeal within 1 year of the date of your initial denial notice.

You will be notified of the determination within a reasonable time, but not later than 60 days from receipt of the request for review.

If the Plan Administrator determines that an extension is necessary due to special circumstances, this time may be extended for an additional 60 days.  You will receive notice prior to the extension that indicates the special circumstances requiring the extension and the date by which the Plan Administrator expects to render a determination.

**If Your Appeal is Denied**

If your appeal is denied, you will receive notice in writing or in electronic media (such as email) of the decision, including the following information:

- The specific reason(s) for the denial of the claim;

- Reference to the specific Program provision on which the denial is based;

- A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your benefits claim.

- A statement of your right to bring a civil action for your benefits under ERISA Section 502(a) following a denial, in whole or in part, of your appeal;

- If an internal rule, guideline, protocol or other similar criterion was relied upon in making the adverse determination, that specific rule, guideline, protocol, or other similar criterion, or a statement such information will be provided free of charge upon request; and

- If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Program to the claimant's medical circumstances, or access to this information free of charge upon request.

**Additional Voluntary Appeal Right**

After you have exhausted your required appeal (described above), you may also file a voluntary appeal to the Retiree Health Benefit Program's Health Benefit Program Committee. This seven (7) member joint Health Benefit Program Committee has been established to resolve disputes following the regular claims procedure. Two members of the committee have been selected by the UAW; three by Navistar; one non-UAW retiree shall be appointed as described in the *Shy* Settlement Agreement; and one neutral member shall be elected by the other six. The Health Benefit Program Committee may review and resolve benefit and eligibility disputes after the claim review procedure and will act in its sole discretion in resolving such disputes.

You do not, however, have to file a voluntary appeal before you can bring an action under ERISA Section 502(a), and if you bring such an action the Program waives any right to assert that you have failed to exhaust administrative remedies because you did not elect to submit the benefit dispute to this voluntary appeal procedure. Further, if you do make a voluntary appeal, the statute of limitations or other defense based on timeliness is tolled during the time that the voluntary appeal(s) is pending. A voluntary appeal will have no effect on your right to any other benefits under the Program and no fees or costs are imposed on you as part of a voluntary appeal.

Decisions on voluntary appeal will be made pursuant to the same time schedule as appeals heard by the Program. However, if special circumstances require an extension of time for processing, you will be notified in writing. In that case, a decision will be made as soon as possible, but not later than 120 days after receiving your request for review. The manner and content of notification of benefit determination on voluntary appeal will be similar to the notification on other appeals under the Program.

Your voluntary appeal should be submitted, in writing, to the following address:

> Health Benefit Program Committee,
> c/o Navistar, Inc.
> P.O. Box 4080
> Lisle, IL 60532
> (877) 353-5100

Your voluntary appeal to the Health Benefit Program Committee must be in writing. For additional information regarding the Health Benefit Program Committee and the voluntary appeal procedure, please refer to the Retiree Health Benefit Program's SPD.

You will have the right to bring a civil action under ERISA Section 502(a). You must appeal your claim, and that appeal must be denied by an appeal reviewer, before you may bring a civil action under ERISA. You and your Program may also have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your state insurance regulatory agency.

## Claims Procedures for Vision and Dental

If you receive benefits through the VSP plan or the Delta dental plan, the following claims procedures apply.

A "claim" is a request from you or your authorized representative for payment of your plan benefits made in accordance with the plan's reasonable procedures.

Casual inquiries about benefits or the circumstances under which benefits might be paid are not considered claims. Nor is a request for a determination of whether an individual is eligible for benefits under the plan considered to be a claim. However, if you file a claim for specific benefits and your claim is denied because you are not eligible for benefits under the plan, the coverage determination is considered a denial of a claim.

Interactions between you and a doctor who participates in the VSP network ("VSP Doctor") or a Dentist who participates in the Delta Dental program ("Participating Dentist") do not constitute a claim. However, if the provider declines to render service unless you pay the entire cost, you should pay the cost and then submit a post-service claim for reimbursement for the service, as described under the "Submitting a Claim for Benefits" section, below.

**Submitting a Claim for Benefits**

Your claim for dental and vision benefits will be considered for payment upon the receipt of a claim by the "Claims Administrator." For purposes of this section, the Claims Administrator for your dental benefits is Delta Dental and the Claims Administrator for your vision benefit is VSP.

### Dental Benefits

In general, if dental benefits are provided through a Participating Dentist, your Participating Dentist will submit a proof of claim directly to Delta Dental. However, you will be responsible for the payment to the provider of any applicable co-payments. If dental benefits are provided through an out-of-network provider, you must submit a claim directly to Delta Dental at the following address:

> Delta Dental
> P.O. Box 9085
> Farmington Hills, MI 48333-9085
> (800) 524-0149
> www.deltadental.com

### Vision Benefits

In general, if vision benefits are provided through a VSP Doctor, no claim needs to be submitted to VSP to receive your vision benefits. You simply make an appointment with your VSP Doctor. Tell your Doctor that you are a VSP Member when making your appointment. If vision benefits are provided through an out-of-network provider, you must submit a claim to VSP at the following address:

> VSP
> 3333 Quality Drive
> Rancho Cordova, California 95690
> (800) 877-7195 www.vsp.com

### Time Limit for Filing a Claim

In general, all dental claims must be submitted to Delta Dental within one year of the date of services and vision claims must be submitted to VSP within 365 days of the date of services, or your claim will be denied.

### Right to an Authorized Representative

If you wish, you can appoint an authorized representative to act on your behalf for the purposes of filing a claim and seeking a review of a denied claim. You also can simply choose to represent yourself. In order to use an authorized representative (this person may be an attorney, but need not be), however, you must notify the Claims Administrator in advance, by completing and submitting a designated form. To request the form for designating an authorized representative, contact the Claims Administrator.

### Determination of a Benefit Claim

The determination of a benefit claim will vary depending on whether the claim is a Concurrent Care Claim or a Post-Service Claim.

16

The period of time for the plan to make a benefit determination begins at the time the claim is filed in accordance with the plan's procedures, without regard to whether all the necessary information accompanies the filing. Please read each section carefully to determine which procedure is applicable to your request for benefits.

### Concurrent Care Claims

A Concurrent Care Claim is a claim that is reconsidered after an initial approval was made and results in a reduction, termination or extension of a benefit. In this situation a decision to reduce, terminate or extend treatment is made concurrently with the provision of treatment. Please note that Concurrent Care Claims apply only to Dental claims and not to Vision claims.

A reconsideration of a benefit with respect to a Concurrent Care Claim that involves the reduction or termination of a previously-approved benefit (other than by plan amendment or termination) will be made as soon as possible, but in any event early enough to allow you to have an appeal decided before the benefit is reduced or terminated.

A request to extend approved treatment will need to be submitted and decided according to the Post-Service Claim timeframes discussed below.

### Post-Service Claim

A Post-Service Claim is a claim that is not a Concurrent Care Claim (for example, a claim submitted for payment after dental or vision services and treatments have been obtained).

Ordinarily, you will be notified of decisions on Post-Service Claims within 30 days from the receipt of the claim. The plan may unilaterally extend this period one time for up to 15 days if the extension is necessary due to matters beyond the control of the plan. If an extension is necessary, you will be notified, before the end of the initial 30-day period, of the circumstances requiring the extension and the date by which the plan expects to render a decision.

If an extension is required because the plan needs additional information from you, the extension notice will specify the information needed. You will have 45-days from receipt of the notification to supply the additional information. If the information is not provided within that time, your claim will be denied. During the 45-day period in which you are allowed to supply additional information, the normal deadline for making a decision on the claim will be suspended. The deadline is suspended from the date of the extension notice until either 45 days have passed, or until the date you respond to the request, whichever is earlier. The plan then has 15 days to make a decision on the claim and notify you of the determination.

### Notice of a Claim Decision

If your claim is denied, in whole or in part, you will be provided with a notice in writing or in electronic media (such as email) of the decision to deny the claim. This notice will state:

- The specific reason(s) for the adverse determination;

- A reference to specific Program provision(s) on which the benefit determination is based;

- A description of additional material or information, if any, needed to perfect the claim and the reasons such material or information is necessary;

- A description of the Program's claims review procedures and the time limits applicable to such procedures;

- A statement of your right to bring a civil action under section 502(a) of ERISA following appeal;

- A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits;

- If an internal rule, guideline, protocol or other similar criterion was relied upon in making the adverse determination, that specific rule, guideline, protocol, or other similar criterion, or a statement such information will be provided free of charge upon request; and

- If the denial is based on a medical necessity or experimental treatment or similar limit, explain the scientific or clinical judgment for the determination (or state that such information will be provided free of charge upon request).

**Request for Review of Denied Claim**

If your claim is denied in whole or in part, or if you disagree with the decision made on a claim, you or your authorized representative should first contact the applicable Claims Administrator and discuss your claim problems with a customer service representative and check to make sure the claim was processed correctly. You may do this by calling the following toll-free numbers:

- **Delta Dental Customer Service Representative: (800) 524-0149**

- **VSP Customer Service Representative: (800) 877-7195**

This inquiry is not required and should not be considered a formal request for review of a denied claim.

If you are still not satisfied, you or your authorized representative may appeal to have a full and fair review of your claim denial by the Claims Administrator, see below. Your written appeal should include your name, address, social security number, member ID number, the reason why you believe your claim was wrongly denied, and any other information you believe supports your claim. You have 180 days from the day you received notice of the initial decision to deny benefits to submit your appeal. However, for a Concurrent Care Claim that involves a termination or reduction or previously approved care, the plan's decision on appeal must be rendered before the care is terminated or reduced.

If your initial appeal is denied by the Claims Administrator, you may request a second level of appeal with the Claims Administrator.

18

Both the first level and second levels of appeal must be in writing and delivered or mailed to your Claims Administrator at the following address:

**Appeals involving Dental Claims:**

> Dental Director Delta Dental
> P.O. Box 30416 Lansing, MI
> 48909-7916

**Appeals involving Vision Claims:**

> VSP
> Member Appeals 3333 Quality
> Drive Rancho Cordova, CA
> 95670

**Review Process**

You have the right to receive reasonable access to and copies of all documents "relevant" to your claim upon request and free of charge. A document, record or other information is relevant if:

- it was relied upon in making the decision;

- it was submitted, considered or generated in the court of making the benefit determination (regardless of whether it was relied upon);

- it demonstrates compliance with the administrative processes for ensuring consistent decision making; or

- it constitutes a statement of plan policy regarding the denied treatment or service.

Review of your claim will take into account all comments, documents, records and other information you submit relating to the claim (regardless of whether this information was submitted or considered in the initial benefit determination).

A different person will review your appeal than the person (or that person's subordinate) who originally denied the claim. The reviewer will not give deference to the initial decision to deny benefits. The appeals decision will be made on the basis of the entire record, including such additional documents and comments that you may submit.

Upon request, the plan will identify medical or vocational experts, if any, that gave advice to the plan regarding your claim, without regard to whether their advice was relied upon in deciding your claim.

If your claim involves a medical judgment question, the Claims Administrator will consult with an appropriately qualified health care practitioner with training and experience in the field of medicine involved. If a health care professional was consulted for the initial determination, a different health care professional will be consulted on appeal. Upon request, the Claims Administrator will provide you with the identification of any medical expert whose advice was obtained on behalf of the plan in connection with your appeal.

**Timing of Notification of Decision on Appeal**

*Concurrent Care Claims*

You will be sent a notice of a decision on appeal for a Concurrent Care Claim that involves a termination or reduction of previously approved care before the care is terminated or reduced. Notice of a decision on appeal for a Concurrent Claim that involves an extension of care will be sent by the plan based on the time frames for Post-Service Claim.

*Post-Service Claims*

You will be sent a notice of a decision on appeal for a Post-Service claim within 30 days of receipt of the appeal by the Claims Administrator. If the Claims Administrator determines that an extension is necessary due to matters beyond its control, this time may be extended 15 days. If your appeal is denied, and you choose to pursue a second level of appeal, you will be sent a notice of decision concerning your second appeal within 30 days of receipt of the second appeal by the Claims Administrator.

**Notice of a Decision on Appeal**

The decision on any appeal of your claim will be given to you in writing. The notice of a denial of a claim on appeal will state:

- The specific reason(s) for the adverse determination;

- A reference to specific plan provision(s) on which the benefit determination is based;

- A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your benefits claim.

- A statement of your right to bring a civil action for your benefits under ERISA Section 502(a) following a denial, in whole or in part, of your appeal;

- If an internal rule, guideline, protocol or other similar criterion was relied upon in making the adverse determination, that specific rule, guideline, protocol, or other similar criterion, or a statement such information will be provided free of charge upon request; and

- If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or access to this information free of charge upon request.

You will have the right to bring a civil action under ERISA Section 502(a). You must appeal your claim, and that appeal must be denied by an appeal reviewer, before you may bring a civil action under ERISA. You and your Program may also have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your state insurance regulatory agency.

**Decision of the Claims Administrator**

The denial of a claim for which the right of an appeal has been waived, or the decision of the Claims Administrator or its designees with respect to an appeal, shall be final and binding upon all parties, including the claimant and any person asserting a right to benefits pursuant to the claim, subject only to judicial review. The provisions of this section shall apply to and include any and every claim for benefits under the plan, and any claim or right asserted under the plan, regardless of the basis asserted for the claim, regardless of when the act or omission upon which the claim is based occurred, and regardless of whether or not the claimant is a "participant" or "beneficiary" of the plan within the meaning of those terms as defined in ERISA.

**Limitation on When a Lawsuit May Be Started**

If your claim is denied in whole or in part after both levels of appeal have been completed, you have the right to seek to have your claim paid by filing a civil action in court, but you will not be able to do so unless you have exhausted each level of appeal described above, or until the appropriate time frame described above has elapsed since you filed a request for appeal and you have not received a final decision. You may also pursue your claim for benefits under section 502(a) of the Employee Retirement Income Security Act without exhausting these appeal procedures if the plan has failed to follow them.

## Claims Procedures for Added Supplemental Benefits

If believe you are entitled to Added Supplemental Benefits under this Program, such as hearing benefits offered by EPIC, Medicare premium reimbursements, and certain other temporary benefits, the following claims procedures apply, and you may submit any such claim to the Committee, who will service as the Claims Administrator for those benefits, in writing to the following address:

> Supplemental Benefit Program Committee
> Attn: Jan Bair
> 226301 Curtiss-Wright Parkway, Suite 105
> Richmond Hts. OH 44143
> (216) 261-8414

**Claims for Benefits: Initial Claims**

Unless otherwise provided in the applicable insurance policy/evidence of coverage or benefits summary, your claim for Added Supplemental Benefits will be processed under the procedures described below. The procedures listed below are default claims procedures and apply only when the applicable insurance policy/evidence of coverage or benefits summary doesn't provide for a specific claims procedure. Where a separate claims procedure is provided for, you must follow that specific claims procedure.

Notice of the Program's determination will be sent within a reasonable time period, but not longer than 90 days from receipt of the claim.

If the Claims Administrator determines that an extension is necessary due to special circumstances, this time may be extended for an additional 90 days.  You will receive notice prior to the extension that indicates the special circumstances requiring the extension and the date by which the Plan Administrator expects to render a determination.

21

**Notice of Determination**

The decision on any appeal of your claim will be given to you in writing. If your claim is denied, in whole or in part, the Claims Administrator will send you a notice in writing or in electronic media (such as email) of its decision including:

- The specific reason(s) for the adverse determination;

- A reference to specific Program provision(s) on which the benefit determination is based;

- A description of additional material or information, if any, needed to perfect the claim and the reasons such material or information is necessary;

- A description of the Program's claims review procedures and the time limits applicable to such procedures;

- A statement of your right to bring a civil action under section 502(a) of ERISA following appeal;

- A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits;

- If an internal rule, guideline, protocol or other similar criterion was relied upon in making the adverse determination, that specific rule, guideline, protocol, or other similar criterion, or a statement such information will be provided free of charge upon request;

- If the denial is based on a medical necessity or experimental treatment or similar limit, explain the scientific or clinical judgment for the determination (or state that such information will be provided free of charge upon request); and

- In the case of an adverse determination concerning a claim involving urgent care, a description of the expedited review process applicable to the claims.

**Appeling Your Claim**

If your claim is denied, you will have the opportunity to appeal and have a full and fair review of your claim denial. In connection with your appeal, you will have the opportunity to submit written comments, documents, or other information in support of your appeal, and you will have access to all documents that are relevant to your claim. Your appeal will be conducted by a person who is neither the individual who made the determination that is the subject of the appeal, nor the subordinate of such an individual.  No deference will be afforded to the initial determination.

22

If your claim involves a medical judgment question, the Claims Administrator will consult with an appropriately qualified health care practitioner with training and experience in the field of medicine involved.  If a health care professional was consulted for the initial determination, a different health care professional will be consulted on appeal.  Upon request, the Claims Administrator will provide you with the identification of any medical expert whose advice was obtained on behalf of the Program in connection with your appeal.

Your appeal should be submitted, in writing, to the following address:

> Supplemental Benefit Program Committee
> Attn: Jan Bair
> 226301 Curtiss-Wright Parkway, Suite 105
> Richmond Hts. OH 44143
> (216) 261-8414

You must submit your appeal within 60 days of the date of your initial denial notice.

You will be notified of the determination within a reasonable time, but not later than 60 days from receipt of the request for review.

If the Claims Administrator determines that an extension is necessary due to special circumstances, this time may be extended for an additional 60 days.  You will receive notice prior to the extension that indicates the special circumstances requiring the extension and the date by which the Plan Administrator expects to render a determination.

**If Your Appeal is Denied**

If your appeal is denied, you will receive notice in writing or in electronic media (such as email) of the decision, including the following information:

- The specific reason(s) for the denial of the claim;

- Reference to the specific Program provision on which the denial is based;

- A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your benefits claim.

- A statement of your right to bring a civil action for your benefits under ERISA Section 502(a) following a denial, in whole or in part, of your appeal;

- If an internal rule, guideline, protocol or other similar criterion was relied upon in making the adverse determination, that specific rule, guideline, protocol, or other similar criterion, or a statement such information will be provided free of charge upon request; and

- If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or access to this information free of charge upon request.

You will have the right to bring a civil action under ERISA Section 502(a). You must appeal your claim, and that appeal must be denied by an appeal reviewer, before you may bring a civil action under ERISA. You and your Program may also have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your state insurance regulatory agency.

## Qualified Medical Child Support Orders

Federal law requires the Program to provide medical and dental benefits to any dependent of a retiree pursuant to a court order that satisfies the conditions required to be a QMCSO.

A QMCSO is a final court or administrative agency order that generally results from a divorce or legal separation that: (a) designates one parent to pay for a child's health plan coverage; (b) specifies the name and last known address of the parent required to pay for coverage and the name and mailing address of each child covered by the QMCSO; (c) contains a reasonable description of the type of coverage to be provided under the designated parent's health care plan or the manner in which the coverage is to be determined; (d) states the period for which the order applies; and (e) identifies each health plan to which the order applies.

When the Program receives a medical child support order, the Plan Administrator will determine whether the order is a QMCSO. Such determination is binding on the participant, the child, the other parent, and any other party acting on behalf of the child.

**Program Response to a QMCSO**

- If an order is determined to be a QMCSO, and if the participant is covered by the Program, the Plan Administrator will so notify the parents and each child and advise them of the procedures that must be followed to provide coverage for the dependent children.

- The Program will accept enrollment of the dependent children specified by the QMCSO from either the retiree or the custodial parent and, if required by the QMCSO, the Program will accept contributions for that coverage from a parent who is not covered by the Program. The child's enrollment will be effective immediately and subject to the same limitations as any other enrollment under the Program, to the extent permitted by applicable law.

- If the retiree is not covered by the Program at the time the QMCSO is received (but is eligible for coverage), and the QMCSO orders the retiree to provide coverage for his or her dependent children, the Program will accept the enrollment of the retiree and the dependent children specified by the order. Enrollment will be effective immediately and subject to the same limitations as any other enrollment under the Program, to the extent permitted by applicable law.

24

- In addition to the child support order of a court or state administrative agency, the Program will treat as a QMCSO an appropriately completed National Medical Child Support Notice that it receives with respect to a child of a non-custodial parent-participant, provided that the notice meets the requirements set forth above.

- An order will not be accepted by the Program as a QMCSO if it requires the Program to provide any type or form of benefit or any option that the Program does not otherwise provide, or if it requires a retiree who is not eligible for coverage under the Program to provide coverage under the Program for a dependent child, except as required by a state's Medicaid-related child support laws. For a state administrative agency order to be a QMCSO, state law must provide that such order will have the force and effect of law, and the order must be issued through an administrative process established by state law.

- Coverage of dependent children under a QMCSO will terminate when coverage of the participant-parent terminates for any reason, including failure to pay required contributions, subject to the dependent children's right to elect COBRA coverage if that right applies.

- If you have any questions about QMCSOs, or you would like a copy of the Program's QMCSO Procedures, please contact the Supplemental Benefit Committee at 226301 Curtiss-Wright Parkway, Suite 105 Richmond Hts. OH 44143, phone: (216) 261-8414.

## Nature of Benefits

The Committee shall at the beginning of each calendar year determine, in a fair and equitable manner, the amount of assets of the Trust to use to provide benefits. Because of the unique nature of the Program, it is not certain whether any benefits will be provided each year.  If sufficient funds are available under the Program, and the Committee determines to pay benefits for the year, you may be provided some or all of the following benefits outlined below.

### Premium Contributions, Co-Payment Reductions, and Deductible Reductions under the Retiree Health Benefit Program

The Program may be used to reduce the total premium contributions through direct or indirect contributions, co-payments, deductible, or other amounts required to be paid by or on behalf of participants in the Retiree Health Benefit Program. These co-payment reductions may include, among others, prescription drug co-payment reductions. However, in order to qualify for these benefits, you must be enrolled in the Retiree Health Benefit Program.

### Medicare Premium Reimbursements

The Program may be used to reduce or reimburse your Medicare premiums. However, in order to qualify for these benefits, you must be enrolled in the Retiree Health Benefit Program.

### Additional Permissible Benefits

The Program may also provide certain Additional Permissible Benefits, including but not limited to any of the following:

- Life insurance benefits as provided for in the *Shy* Settlement Agreement in amounts up to $5,000.

- The provision of a vision plan.

- The provision of a hearing plan.

- The provision of a dental plan.

- Certain other temporary benefits.

The type and amount of benefits provided under the Program may vary from year to year. If the Committee determines to provide such benefits for the upcoming year, a detailed Schedule of Benefits describing those benefits will be made available to you, without cost, at your request.

In order to request a Schedule of Benefits, please contact the Supplemental Benefit Committee at 226301 Curtiss-Wright Parkway, Suite 105 Richmond Hts. OH 44143, phone: (216) 261-8414. In addition, a Schedule of Benefits for 2022 has been attached to this SPD as Appendix A.

## Sources of Contributions to the Trust

The Trust has historically been funded by contributions from Navistar, Inc. As a part of the *Shy* Settlement Agreement, the Trust was initially funded by the contribution of Navistar International Corporation's Class B Common Stock. The Trust subsequently sold all of that stock and used some of the proceeds to provide additional benefits to plan members and has reinvested the remainder in other investments. In addition, prior to the sale of these shares, the Trust had previously received certain cash payments from Navistar. Navistar had also previously made certain profit-sharing contributions to the Trust each year based on a profit-sharing formula.

In the future, contributions to the Trust will be governed by the terms of any finalized settlement agreement entered into between Navistar and class representatives in connection with the class action *Shy et al. v. Navistar*, No. C-3-92-333 (S.D. Ohio). On December 22, 2021, Navistar and class representatives entered into the Preliminary Settlement Agreement. Pending court approval of the Preliminary Settlement Agreement, Navistar would no longer be required to make employer contributions to the Program.

## The Supplemental Benefit Program Committee

A five (5) member Supplemental Benefit Program Committee (the "Committee") has been established to manage the Program. Two members have been selected by the United Auto Workers Union ("UAW"), one member has been chosen from among the non-UAW retirees, and two public members, all of whom have been either initially approved by the Court as part of the *Shy* Settlement

26

Agreement, or have become members of the Committee pursuant to the terms and conditions of the Program. The Committee is responsible for the general administration of the Program, management of the assets in the Trust, determination of the type of benefits to provide, and interpretation of the Program.

## Other Matters

All health and life benefits provided under the Retiree Benefit Plan, of which this Program is a part, will be provided under the terms and conditions set forth in applicable Retiree Benefit Plan documents. Please consult the SPDs for the Retiree Health Benefit Program and the Retiree Life Insurance Program to learn about eligibility for those benefits, as well as requirements relating to the following in connection with the Retiree Benefit Plan:

- Any cost-sharing provisions, including premiums, deductibles, coinsurance, and copayment amounts that you or your beneficiary is responsible for;

- Any annual or lifetime caps or other limits on benefits under the Retiree Benefit Plan;

- The extent to which preventive services are covered under the Retiree Benefit Plan;

- Whether, and under what circumstances, existing and new drugs are covered under the Retiree Benefit Plan;

- Whether, and under what circumstances, coverage is provided for medical tests, devices and procedures;

- Provisions governing the use of network providers, the composition of the provider network, and whether and under what circumstances, coverage is provided out of network;

- Any conditions or limits on the selection of primary care providers or providers of specialty medical care;

- Any conditions or limits on obtaining emergency medical care; and

- Any provisions requiring preauthorizations or utilization review as a condition to obtaining a benefit or service under the Retiree Benefit Plan.

This summary should be read in connection with the Retiree Benefit Program and the Retiree Life Insurance Program. Unless otherwise noted, if there is a conflict between a specific provision under this summary and the _Shy_ Settlement Agreement, the _Shy_ Settlement Agreement controls. If the _Shy_ Settlement Agreement is silent, then this summary controls, except where this summary refers to the Retiree Health Benefit Program and the Retiree Life Insurance Program, in which case the Retiree Health Benefit Program and the Retiree Life Insurance Program control.

## Administrative Information

### Discretionary Authority of the Plan Administrator for the Program

The Plan Administrator for the Program has responsibility for the interpretation and construction of the Program and final authority for the operation and administration of the Program, including its day-to-day operation and administration.

### Clerical Error

A clerical error or other administrative error does not create benefits under the Program. You are responsible for the accuracy of information pertaining to participation in the Program.

### Rescission in the Event of Fraud

Any act, practice, or omission by an eligible participant in the Program that constitutes fraud or an intentional misrepresentation of material fact is prohibited by the Program, and the Program may rescind benefit payments retroactively as a result. Any such fraudulent statements, including on Program forms and in electronic submissions, may invalidate any payment or claims for services and may be grounds for rescinding coverage.

### Uncashed Checks

If a check to an eligible participants for benefits under the Program remains uncashed for two years after issue, amounts attributable to such check shall be forfeited to the Program. In such event, the participant shall have no further claim to such amount for any reason.

### Nonassignment of Benefits

Assignment or alienation of any benefits provided by the Program will not be permitted or recognized except as otherwise required by applicable law. This means that, except as required by applicable law, reimbursements and other benefits including Additional Permissible Benefits are not subject to sale, assignment, anticipation, alienation, attachment, garnishment, levy, execution, or any other form of transfer. Generally, state and local laws will not be recognized unless permitted or required by an applicable federal law, such as ERISA.

This Program is part of the Retiree Benefit Plan. Pertinent administrative information is as follows:

| | |
|---|---|
| Plan Name | Navistar, Inc. Retiree Health Benefit and Life Insurance Plan |
| Employer Identification Number | 36-1264810 |
| Plan Number | 584 |

28

| | |
|---|---|
| Plan Year | Calendar year, January 1 through December 31 |
| Type of Plan | Welfare plan providing health and life insurance benefits |
| Type of Administration | The Program is administered by the Committee while the Retiree Benefit Plan is administered by Navistar, Inc. Both the Committee and Navistar, Inc. utilize certain contract administrators for processing claims. |
| Sponsoring Employer | Navistar, Inc.<br>P.O. Box 4080<br>Lisle, IL  60532<br>(877) 353-5100 |
| Plan Administrator for the Program | Supplemental Benefit Program Committee.<br><br>Attn: Jan Bair<br>226301 Curtiss-Wright Parkway, Suite 105<br>Richmond Hts. OH 44143<br>(216) 261-8414 |
| Plan Administrator for the Retiree Benefit Plan | Navistar, Inc.<br>P.O. Box 4080<br>Lisle, IL  60532<br>(877) 353-5100 |
| Agent for Service of Legal Process | Supplemental Benefit Program Committee<br><br>Attn: Jan Bair<br>226301 Curtiss-Wright Parkway, Suite 105<br>Richmond Hts. OH 44143<br>(216) 261-8414 |
| Contributions to the Plan | Retiree contributions to the Retiree Health Benefit Program are set by the Plan Administrator for the Retiree Health Benefit Program. Employer contributions cover all remaining costs of the Retiree Health Program. |
| Funding Medium | The Program is funded through employer contributions that are held in trust.  However, as noted above, if the Preliminary Settlement Agreement entered into on December 22, 2021 receives court approval, Navistar would no longer be required to make employer contributions to the Program. |

## Your Rights Under ERISA

As a participant in this Program, you are entitled to certain rights and protections under ERISA. ERISA provides that all Plan participants shall be entitled to:

### Receive Information About Your Plan and Benefits

- Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all documents governing the Program, including insurance contracts, and a copy of the latest annual report (Form 5500 Series) filed by the Program with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

- Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Program, including insurance contracts, and copies of the latest annual report (Form 5500 Series) and updated SPD. The Plan Administrator may make reasonable charge for the copies.

- Receive a summary of the Program's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

### Prudent Actions by Plan Fiduciaries

In addition to creating rights for plan participants ERISA imposes duties upon the people who are responsible for the operation of this Program. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

### Enforce Your Rights

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in Federal court.

If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court.  The court will decide who should pay court costs and legal fees.  If you are successful, the court may order the person you have sued to pay these costs and fees.  If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**Assistance with Your Questions**

If you have any questions about your plan, you should contact the Program's Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Program's Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory.

You may also contact the:

Division of Technical Assistance and Inquiries
Employee Benefits Security Administration
U.S. Department of Labor
200 Constitution Avenue N.W., Washington, D.C. 20210

Or by telephone at (866) 444-3272.

You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration. Additional information may be obtained from the Department of Labor's website at www.dol.gov/ebsa.

# Appendix A

## 2022 Schedule of Benefits

For 2022, the Committee has determined to offer the following benefits, each described in detail in this Appendix:

- Vision Care Benefits;
- Hearing Benefits;
- Delta Dental Benefits;
- Premiums, Deductibles and Out-of-Pocket Maximum Reduction Benefits; and
- Life Insurance Benefits.

## VISION CARE BENEFITS

If you choose to be provided benefits through Vision Service Plan Insurance Company ("VSP"), you will be eligible to receive the following benefits set forth in the following table:

| Benefits | Description | Copay | Frequency |
|---|---|---|---|
| **Wellvision Exam** | • Focuses on yours eyes and overall wellness | $0 | Every calendar year |
| **Prescription Glasses** | | | |
| **Frame** | • $125 featured frame brands allowance<br>• $105 frame allowance<br>• 20% savings on the amount over your allowance<br>• $60 Costco frame allowance | $0 | Every other calendar year |
| **Lenses** | • Single vision, lined bifocal, and lined trifocal lenses<br>• Impact-resistant lenses for dependent children | $0 | Every calendar year |
| **Lense Enhancements** | • Standard progressive lenses<br>• Premium progressive lenses<br>• Custom progressive lenses<br>• Average savings of 40% on other lens enhancements | $50<br>$80-$90<br>$120-$160 | Every calendar year |
| **Contacts (Instead of Glasses)** | • $105 allowance for contacts; copay does not apply<br>• Contact lens exam (fitting and evaluation) | Up to $60 | Every calendar year |
| **Diabetic Eyecare Plus Program** | • Retinal screening for members with diabetes<br>• Additional exams and services for members with diabetic eye | $0<br><br>$20 per exam | As needed |

|  | disease, glaucoma, or age-related macular degeneration. Limitations and coordination with your medical coverage may apply. |  |  |
|---|---|---|---|
| **Extra Savings** | | | |
| **Glasses and Sunglasses** | • Extra $20 to spend on featured frame brands.<br>• 30% savings on additional glasses and sunglasses, including lens enhancements, from the same VSP provider on the same day as your WellVision Exam. Or get 20% from any VSP provider within 12 months of your last WellVision Exam. | | |
| **Routine Retinal Screening** | • No more than a $39 copay on routine retinal screening as an enhancement to a WellVision Exam | | |
| **Laser Vision Correction** | • Average 15% off the regular price or 5% off the promotional price; discounts only available from contracted facilities<br>• After surgery, use your frame allowance (if eligible) for sunglasses from any VSP doctor | | |

However, if you choose to go to a non VSP provider your benefits will be paid at the rates on the following table:

| Benefits | 2022 |
|---|---|
| **Eye Exam (one per year)** | Reimbursed up to $50.00 |
|  |  |
| **Lenses (one per year)** |  |
| Single vision | Reimbursed up to $50.00 |
| Lined bifocal | Reimbursed up to $75.00 |
| Lined trifocal | Reimbursed up to $100.00 |
| Progressive | Reimbursed up to $75.00 |
|  |  |
| **Frame (once every other year)** | Reimbursed up to $70.00 |
|  |  |
| **Contact Lenses**<br>**Services and Materials**<br>**(once per year in place of any other lenses or frames)** |  |
| Elective (instead of glasses) | Reimbursed up to $105.00 |
| Necessary - - - Medical | Reimbursed up to $210.00 |

Some out-of-network providers will ask you to pay up front. You will then need to submit a claim to VSP for reimbursement. You will need to call VSP at 1-800-877-7195 to get a form to fill out and submit to VSP for reimbursement.

We have been advised by VSP that Costco and WalMart (although not VSP providers) will submit your claim for you.

If you are over 65, medically necessary eye examinations should be billed to United Healthcare (or regular Medicare if you are not on United Healthcare Medicare). If you are not yet 65, medically necessary eye exams should be billed to Aetna.

By doing this, the medically necessary exam costs are not billed to our Trust and saves money that can be used for other benefits.

## HEARING BENEFITS

### Hearing Benefits Effective January 1, 2022

### Our Provider is EPIC Hearing Healthcare

For in network providers the plan will pay $600 per year/$100 per paid toward hearing aids. Out of network providers will be paid at the old rate of $450 per year.

You will need to speak with an EPIC professional with questions on eligibility and to assist you through the process.

Call 1-866-956-5400

Your call should be answered promptly. Please identify yourself as a Navistar Shy retiree and say your coverage is through EPIC.

## DENTAL BENEFITS

Delta Dental PPO (Point-of-Service) – Summary of 2022 Dental Plan Benefits
Navistar, Inc. Retiree Supplemental Benefit Trust
Group # 9100

**Please remember to get a pre-authorization for expensive procedures**

Summary of Dental Plan Benefits – The percentages below are applied to Delta Dental's allowance for each service and it may vary due to the dentist's network participation.

Benefit Year – January 1 through December 31

**Covered Services**

|  | **PPO Dentist** | **Premier Dentist** | **Non-Participating Dentist** |
|---|---|---|---|
|  | **Plan Pays** | **Plan Pays** | **Plan Pays\*** |
| **Diagnostic & Preventative** | | | |
| Diagnostic and Preventative Services – exams, cleanings, fluoride, and space maintainers | 100% | 100% | 100% |
| Emergency Palliative Treatment – to temporarily relieve pain | 100% | 100% | 100% |
| Sealants – see notes | 100% | 100% | 100% |
| Radiographs – X-rays | 100% | 100% | 100% |
| **Basic Services** | | | |
| Minor Restorative Services – fillings and crown repair | 100% | 100% | 100% |
| Endodontic Services – root canals | 100% | 100% | 100% |
| Periodontic Services – to treat gum disease | 100% | 100% | 100% |
| Oral surgery Services – extractions and dental surgery | 100% | 100% | 100% |
| Relines and Repairs – relines and repairs to bridges and dentures | 100% | 100% | 100% |
| Major Restorative Services - crowns | 100% | 100% | 100% |
| Other Basic Services – misc. services | 100% | 100% | 100% |
| **Major Services** | | | |
| Prosthodontic Services - braces | 50% | 50% | 50% |
| **Orthodontic Services** | | | |
| Orthodontic Services - braces | 50% | 50% | 50% |
| Orthodontic Age Limit | No Age Limit | No Age Limit | No Age Limit |

\*When you receive services from a Nonparticipating Dentist, the percentages in this column indicate the portion of Delta Dental's Nonparticipating Dentist Fee that will be paid for those services. The Nonparticipating Dentist Fee may be less than what your dentist charges and you are responsible for that difference.

For retirees under the age of 65 and their dependents, no payment will be made for oral surgical procedures that are already covered under the Navistar, Inc. group medical plan.

➢ Oral exams (including evaluations by a specialist) are payable twice per calendar year.

➢ Prohpylaxes (cleanings) are payable twice per calendar year. Two additional prohpylaxes are payable per calendar year for individuals with a documented history of periodontal disease.

➢ Fluoride treatments are payable twice per calendar year with no age limit.

➢ Bitewing X-rays are payable once per calendar year and full mouth X-rays (which include bitewing X-rays) are payable once in any five-year period.

➢ Sealants are payable once per tooth per lifetime for first permanent molars up to age nine and second permanent molars up to age 14. The surface must be free from decay and restorations.

➢ Composite resin (white) restorations are covered services on posterior teeth.

➢ Porcelain and resin facings on crowns are optional treatment on posterior teeth.

➢ Surgical extractions for people under age 65 are not covered services under the dental plan. Submit to the medical plan.

➢ Implants and related services are not covered services.

➢ Crowns over implants are payable once per five-year period. Services related to crown over implants are covered services.

➢ For Retirees under age 65 and their dependents, no payment will be made for oral surgical procedures that are already covered under the International Truck and Engine Corporation Group medical program.

**Maximum Payment** - $2,000 per person total per benefit year. All services, except diagnostic and preventative services, emergency palliative treatment, sealants, certain surgical procedures, and orthodontics. $1,300 per person total per lifetime on orthodontic services.

**Deductible** – None.

**Waiting Period** – None.

### PREMIUM, DEDUCTIBLE, AND OUT-OF-POCKET MAXIMUM REDUCTIONS

### Plan 1 Non-Medicare

The Non-Medicare monthly participant total contribution (Premium) amount for 2022 will be $5.00 due to a reduced total contribution as well as increased funding due to the settlement reached by the Supplemental Benefit Committee with Navistar regarding certain outstanding issues.

|  | Total Contribution | Reduction | Each Participant Pays |
|---|---|---|---|
| **2022** | $73.62/month | $68.62/month | $5.00/month |

The *Shy* Settlement Agreement stipulates a 6% increase in deductibles and out-of-pocket maximums each year. In 2022, the 6% increase raised the deductible from $1,022 to $1,087 and the out-of-pocket maximum from $2,556 to $2,711. A settlement of our outstanding issues with Navistar and the return the Trust received from investments in 2021 allowed the Trust to buydown those amounts for 2022. Please note, investment returns fluctuate from year to year and all buydowns, if any, could increase or decrease next year.

|  | Deductible | Supplemental Trust Pays | Each Participant Pays |
|---|---|---|---|
| 2022 | $1,084 | $1,084 | $0 |
|  | Out-Of-Pocket Max | Supplemental Trust Pays | Each Participant Pays |
| 2022 | $2,709 | $2,309 | $400 |

## Plan 2 Medicare Eligible

The Medicare-Eligible monthly participant total contribution (Premium) amount for 2022 will be $5.00 due to a reduced total contribution as well as increased funding due to the settlement reached by the Supplemental Benefit Committee with Navistar regarding certain outstanding issues

|  | Total Contribution | Reduction | Each Participant Pays |
|---|---|---|---|
| 2022 | $35.76/month | $30.76/month | $5.00/month |

The *Shy* Settlement Agreement stipulates a 6% increase in deductibles and out-of-pocket maximums each year. Only the out-of-pocket maximums affect us as Participants in Plan 2. The 2022 6% increase raised our scheduled out-of-pocket maximum from $1,022 in 2021 to $1,084 for 2022. A settlement of our outstanding issues with Navistar and the return the Trust received from investments in 2021 allowed the Trust to buydown those amounts for 2022. Please note, investment returns fluctuate from year to year and all buydowns, if any, could increase or decrease next year.

|  | Out-Of-Pocket Max | Supplemental Trust Pays | Each Participant Pays |
|---|---|---|---|
| 2022 | $1,084 | $1,084 | $0 |

## Prescription Drug Cost per the Shy Settlement Agreement

Unlike the deductible and out-of-pocket maximum, prescription drug copayments do not automatically increase over time under the *Shy* Settlement Agreement. Those copayments per the *Shy* Settlement Agreement are:

| Retail | | Mail Order (30 Day Prescription) | |
|--------|---------|-------|---------|
| **Brand** | **Generic** | **Brand** | **Generic** |
| $18 | $8 | $7 | $7 |

In 2022 the Trust will buydown these copayments, thus saving participants money on their prescription drugs. The copayments for 2022 will be as follows:

| Retail | | Mail Order (**30 Day Prescription**) | |
|--------|---------|-------|---------|
| **Brand** | **Generic** | **Brand** | **Generic** |
| $12 | $5 | $7 | $4 |

## LIFE INSURANCE

Life Insurance coverage of up to $5,000 will be provided in 2022. Per the _Shy_ Settlement Agreement, Participants are eligible for a maximum of $5,000 from Navistar and, if eligible, a maximum of $5,000 from the Supplemental Trust as an additional amount.

155

**APPENDIX B-2**

**TRUST AGREEMENT**
**UNDER THE**
**NAVISTAR, INC. RETIREE SUPPLEMENTAL BENEFIT PROGRAM**

This **Trust Agreement**, dated _____ (the "Succession Date"), and amended effective _____, is by and between the **Supplemental Benefit Committee of the Navistar, Inc. Retiree Supplemental Benefit Trust (the "Committee")** and **Comerica Bank**, a Texas banking association (the "Trustee").

### RECITALS:

Navistar Inc. (the "Company") maintains the Navistar, Inc. Retiree Health Benefit and Life Insurance Plan (formerly known as the Navistar International Corp. Retiree Health Benefit and Life Insurance Plan) (the "Plan"), which is comprised of three benefit programs, including the Navistar, Inc. Retiree Supplemental Benefit Program (formerly known as the Navistar International Corp. Retiree Supplemental Benefit Program) (the "Supplemental Benefit Program"); and

The Company and Wells Fargo, N.A. entered into the Navistar International Transportation Corp. Retiree Supplemental Benefit Trust (now known as the Navistar, Inc. Retiree Supplemental Benefit Trust) (the "Trust"), dated July 1, 1993, to provide for the management and control of the assets of the Supplemental Benefit Program through a trust fund; and

The Supplemental Benefit Program is administered by the Program Fiduciary, which shall be the Committee, as determined by the terms of the Supplemental Benefit Program.

Effective June 13, 2011, the Program Fiduciary removed Wells Fargo, N.A. as trustee of the Trust and appointed Comerica Bank (the "Trustee") as successor trustee; and

Comerica Bank has agreed to act as successor trustee of the Trust, in accordance with the terms and conditions of this Trust Agreement.

**NOW, THEREFORE,** the Program Fiduciary and the Trustee agree:

### Article 1
### Trustee Succession and Establishment of Trust

Comerica Bank shall succeed Wells Fargo, N.A. as Trustee of the Trust as of the Succession Date. Also as of the Succession Date, Wells Fargo, N.A. shall transfer and deliver, or arrange for the transfer and delivery to the successor Trustee of all assets then held by it or subject to its control under the Trust. The Trustee shall become responsible for the Trust estate, and any future contributions thereto, only when, as and if it receives the same. The Trustee shall have no liability or responsibility for the acts or omissions of the former trustee.

The assets of the Trust and all income thereon (the "Fund") shall be held and managed by the Trustee under this Trust Agreement. The parties intend that the Supplemental Benefit Program and the Trust shall form a voluntary employees' beneficiary association under §501(c)(9) of the Internal

Revenue Code of 1986, as amended ("Code"). It shall be the duty of the Company or the Supplemental Benefit Committee (the "Committee") to take any and all actions that they may deem necessary or advisable to ensure that the Supplemental Benefit Program and Trust meet the requirements of Code §501(c)(9). The Supplemental Benefit Program is administered by the Program Fiduciary. The Program Fiduciary shall be the Committee, as determined by the terms of the Supplemental Benefit Program.

Subject to applicable law, neither the establishment of the Supplemental Benefit Program or this Trust, nor any modification thereof, nor the creation of any fund or account(s), nor the payment of any benefits, shall be construed as giving any person any legal or equitable right against the Trustee, the Committee, or any officer or employee thereof, except as specifically provided in the Supplemental Benefit Program or in the Trust. Under no circumstances shall terms of employment be affected by the Supplemental Benefit Program or this Trust Agreement. The Trustee is not a party to the Supplemental Benefit Program and the parties intend that the duties of the Trustee shall be defined solely by the terms of this Trust Agreement and applicable law, including the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA").

## Article 2
## Contributions

The Trustee shall receive and place in the Fund all amounts transferred to it from the prior trustee, and any contributions it receives from the Employers. The Trustee shall be accountable to the Employers for all such transfers and contributions it receives, but shall have no duty to see that the amounts transferred or contributed comply with the provisions of the Supplemental Benefit Program and the Code, nor shall the Trustee be obliged to collect any contributions from the Employers, or otherwise see that contributions are deposited according to the provisions of the Supplemental Benefit Program and the Code. The term "Employers" shall mean the Company, Navistar International Corporation, Navistar Financial Corporation, Navistar Global Operations Corporation (f/k/a Navistar International Export Corporation) and International Truck and Engine Overseas Corporation (f/k/a Navistar International Overseas Corporation).

## Article 3
## Payments

The Trustee shall, from time to time on written direction of the Committee, make payments out of the Fund to such persons (including any member of the Committee who qualifies under the terms of the Supplemental Benefit Program), in such manner and amounts, and for such purposes as may be specified in such direction.

## Article 4
## Diversion Prohibited

*Section 4.1*     It shall be unlawful, at any time prior to the satisfaction of all liabilities with respect to the Supplemental Benefit Program participants and their beneficiaries, for any part of the Fund (other than such part as is required to pay taxes and expenses) to be used for, or diverted to, purposes other than for the exclusive benefit of such Supplemental Benefit Program participants or their beneficiaries.

*Section 4.2* In making payment upon a direction authorized herein, the Trustee may accept such direction as a certification that such payment complies with this Article and the Supplemental Benefit Program and need make no further investigation.

## Article 5
## Trustee's Powers

*Section 5.1* Except and to the extent that a duly appointed independent investment manager or the Program Fiduciary is exercising investment discretion pursuant to this Agreement, the Trustee shall have the following powers and authority in the management and administration of the Fund, to be exercised in its sole judgment and discretion:

(a)　To purchase, subscribe or otherwise acquire for the Fund any securities or other property. In making investments the Trustee shall diversify the investments so as to minimize the risk of large losses, unless under the circumstances it is the Trustee's opinion it is not prudent to do so.

(b)　To sell, exchange, convey, convert, redeem, transfer, grant options upon, lend or otherwise dispose of any securities or property held by the Fund, by private contract or at public auction, for cash or on credit, and no person dealing with the Trustee shall be required to see to the application of the purchase money or to inquire into the validity, expediency or propriety of any such sale, action or other disposition.

(c)　To settle, compromise or arbitrate, any claims, debts or damages, due or owing to or from the Trust; to commence or defend suits or legal proceedings; and to represent the Trust in all suits or legal proceedings.

(d)　To exercise any conversion privilege or subscription right in connection with any securities or other property of the Fund; to consent or object to the reorganization, consolidation, merger or readjustment of the finances of, or to the sale, mortgage, pledge or lease of the property of any corporation or association, any of the securities of which are in the Fund; to do any act with reference to the above, including the exercise of options, making of agreements and payment of expenses or assessments which may be deemed necessary or advisable in connection therewith; and to hold and retain any securities or other property which it may so acquire.

(e)　To vote, personally or by general or limited proxy, any stock in the Fund and similarly to exercise, personally or by general or by limited power of attorney, any right appurtenant to any securities or other property in the Fund.

(f)　To borrow money in such amounts and upon such terms and conditions as shall be deemed advisable or proper to carry out the purposes of the Trust and to pledge any securities or other property in the Fund for the repayment of any such loan.

(g)　To renew or extend or participate in the renewal or extension of any mortgage, upon such terms as may be deemed advisable and to agree to reduction in the rate

of interest on, or to any other modification or change in the terms of, any mortgage or any guarantee pertaining thereto, in any manner and to any extent that may be deemed advisable for preserving the value of the investment; to waive any default in the performance of any covenant or condition of any mortgage or in the performance of any guarantee, or to enforce any such default in such manner and to such extent as may be deemed advisable; to exercise and enforce any and all rights of foreclosure, to bid on property in foreclosure, to take a deed in lieu of foreclosure with or without paying a consideration therefor and in connection therewith to release the obligation on the bond secured by such mortgage and to exercise and enforce in any proceeding at law or in equity any rights or remedies in respect to any such mortgage or guarantee.

(h)     To hold uninvested part, or all, of the Fund, without liability for payment of interest thereon for a reasonable period of time.

(i)     To employ suitable agents, including but not limited to an investment adviser which may or may not be a subsidiary or an affiliate of the Trustee, and counsel and pay their reasonable expenses and compensation.

(j)     To register any securities in the Fund in its own name or in the name of a nominee, with or without the addition of words indicating that such securities are held in a fiduciary capacity; and to hold any securities in bearer form or by electronic book entry.

(k)     To execute and deliver deeds, leases, mortgages, conveyances, contracts, waivers, releases or other instruments necessary or proper for accomplishing the foregoing powers.

(l)     Notwithstanding any other provision of this Agreement, the Trustee may cause any part, or all, of the Fund to be invested in one or more of the common trust funds maintained by the Trustee or its affiliates. The portion of the Fund so invested may be commingled with the funds of other trusts, to the extent allowed by law. Certain of the Comerica common trust funds may engage in securities lending transactions. When a fund engages in securities lending transactions, a monthly fee of forty percent $(40\%)$ of the income (as modified from time to time) received from the loan after all broker rebates and finder fees are deducted, will be deducted from the fund's loan income. The Program Fiduciary hereby authorizes this fee for any future series of securities lending transactions involving a Comerica common trust fund in which the Fund is invested. Any change to this fee arrangement will be noted in the financial statements of the Comerica common trust fund(s) for tax exempt organizations and/or in direct communication. If the Program Fiduciary objects in writing to this fee arrangement or any material change thereto, it shall have the opportunity to withdraw from the affected Comerica common trust fund(s) for tax exempt organizations, without penalty, at the then current market value and as soon as is practicable.

*Section 5.2* "Securities or other property" as used above means stock (common or preferred) or any other interest in any corporation, bonds, notes, or other evidences of indebtedness or ownership (unsecured or secured by real or personal property wherever situated), without regard to any provision of Michigan law concerning investments by fiduciaries.

*Section 5.3* The Program Fiduciary may select an investment manager (or managers) meeting the definition of an "investment manager" under §3(38) of the Employee Retirement Income Security Act of 1974, as amended, who may direct the Trustee to invest any part of the Fund in any securities or other property (except Company property or securities), and direct that it make sales of any securities or property constituting part of the Trust, and the Trustee shall act on such directions and shall have no liability for acting in accordance with such directions or for the retention of any securities or property so purchased. The Trustee will be protected in relying upon any telegram or letter purporting to have been sent by the investment manager which it believes in good faith to be genuine. In directing investments, the investment manager shall diversify the investments so as to minimize the risk of large losses, unless under the circumstances it is the investment manager's opinion that it is clearly prudent not to do so. The Trustee shall be fully protected in relying upon the certification of the Program Fiduciary with respect to the selection of such investment manager and it shall not be the responsibility of the Trustee to determine or review investment instructions given to it by such investment manager. Each investment manager shall be a fiduciary under the Trust and shall acknowledge that it is a fiduciary under the Trust in writing delivered to the Trustee and the Program Fiduciary.

*Section 5.4 (a)* Notwithstanding the foregoing provisions of this Article 5, the Trustee may, in good faith, accept investment directions from the Program Fiduciary or its authorized representative pursuant to a proper written designation consistent with the terms of the Supplemental Benefit Program. The Trustee shall hold, administer and dispose of such investments in accordance with directions to the Trustee contained in a written notice from the Program Fiduciary (or its authorized representative). Any such notice shall advise the Trustee regarding the retention of investment powers by the Program Fiduciary and shall be of a continuing nature or otherwise, and may be revoked in writing by the Fiduciary.

(b) The Trustee shall not be liable but shall be fully protected by reason of its taking or refraining from taking any action at the direction of the Program Fiduciary, nor shall the Trustee be liable but shall be fully protected by reason of its refraining from taking any action because of the failure of the Program Fiduciary to give direction or order. The Trustee shall be under no duty to question or make inquiry as to any direction, notification or order or failure to give a direction, notification or order by the Program Fiduciary. The Trustee shall be under no duty to review any investments acquired for the Trust Fund at the direction of the Program Fiduciary, and the Trustee shall be under no duty at any time to make any recommendation with respect to disposing of or retaining any such investment. While the Program Fiduciary may direct the Trustee with respect to investments, the Program Fiduciary may not (1) borrow from the Fund or pledge any assets of the Fund as security for a loan; (2) buy property or assets from or sell property or assets to the Fund; (3) charge any fee for services rendered to the Fund; or (4) receive any services from the Fund on a preferential basis.

*(c)* The Committee hereby indemnifies and holds the Trustee or its nominee harmless from any and all actions, claims, demands, liabilities, losses, damages or reasonable expenses of

whatsoever kind and nature in connection with or arising out of (1) any action taken or omitted in good faith or any investment or disbursement of any part of the Trust Fund made by the Trustee in accordance with the directions of the Program Fiduciary or with respect to any investment previously made at the direction of the Program Fiduciary in the absence of further directions from the Program Fiduciary therefor, or (2) any failure by the Trustee to pay for any property purchased by the Program Fiduciary for the Trust Fund by reason of the insufficiency of funds in the Trust Fund.

*(d)* Anything herein to the contrary notwithstanding, the Committee shall have no responsibility to the Trustee under the foregoing indemnification if the Trustee participated in or concealed any act or omission that constituted a breach of its fiduciary responsibility, or if the Trustee fails to perform any of the duties undertaken by it under the provisions of this Trust, or if the Trustee fails to act in conformity with the directions of an authorized representative of the Program Fiduciary.

*Section 5.5* Without in any way limiting the Trustee's powers described in this Agreement, the Trustee shall have the power to do any of the following, as directed by the Program Fiduciary from time to time:

(a) Place all or any part of the marketable securities of the Fund in a sub-custody account maintained with Morgan Stanley;

(b) Engage Morgan Stanley to act as a sub-custodian of such account; and

(c) Pay out of the custody account all reasonable custody charges, brokerage commissions, and other fees and expenses incurred pursuant to Section 5.6(a) and (b) and as set forth in Section 6.3.

## Article 6
## Taxes, Trustee's Compensation, and Other Expenses

*Section 6.1* The Trustee shall pay out of the Fund all real and personal property taxes, income taxes and other taxes of any kind levied or assessed under existing or future laws upon or in respect to the Trust or any money, property or securities in the Fund.

*Section 6.2* If any taxes are assessed on or in respect to the Trust or the Fund, the Trustee may assume that the assessment is lawful unless the Program Fiduciary, after notice, advises the Trustee in writing to the contrary; in such event, the Trustee at the request and expense of the Program Fiduciary may contest the validity of such taxes under the direction of the Program Fiduciary, or its counsel, or the Program Fiduciary may itself contest such validity.

*Section 6.3* The Trustee shall be entitled to receive such reasonable compensation as may be agreed upon in writing from time to time between the Program Fiduciary and the Trustee, as currently set forth in Exhibit A attached hereto. Expenses arising from the operation of the Fund and administrative expenses of the Supplemental Benefit Program, including, but not limited to, the compensation of the Trustee, shall be payable from the Fund, unless and except to the extent that the Program Fiduciary shall pay the same.

*Section 6.4* All payments under this Article may be made without seeking the approval or directions of the Committee.

## Article 7
## Accounts of Trustee

*Section 7.1*    The Trustee shall render from time to time accounts of its transactions to the Program Fiduciary; the Program Fiduciary may approve such accounts by written instruments delivered to the Trustee. If the Program Fiduciary fails to file with the Trustee written objection to any such account within sixty (60) days of receipt, the Program Fiduciary shall be deemed to have approved the account; and in such case, or upon the written approval of the Program Fiduciary, the Trustee shall be released, relieved and discharged with respect to all matters set forth in such account as though the same had been judicially settled.

*Section 7*.2 No person except the Committee may require an accounting or bring any action against the Trustee with respect to the Trust or its actions as Trustee.

*Section 73* The Trustee shall not be responsible for accounting for or maintaining records concerning the benefits or accounts of Supplemental Benefit Program participants or their beneficiaries.

*Section 7.4* The Trustee utilizes various standard industry pricing services and brokerage contacts to provide current pricing information for active publicly traded securities. The Trustee shall attempt to provide a reasonably accurate current market value for assets not publicly traded. Many fixed income securities are priced on a matrix system, resulting in a mathematical approximation of price derived by computer. Although the Trustee will make reasonable and good faith efforts to provide accurate pricing, in some instances prices may not reflect the most accurate pricing readily available or the true value of the asset. The Trustee shall not be liable for such an occurrence.

## Article 8
## Trustee's Responsibilities and Immunities

*Section 8.1* The Trustee shall not be responsible for:

    *(a)*    Administration or interpretation of the terms of the Supplemental Benefit Program; or

    *(b)*    Any actuarial matters; or

    *(c)*    The adequacy of the Fund to meet the requirements of the Supplemental Benefit Program; or

    *(d)*    Making or enforcing any collection from the Employers.

*Section 8.2* The Trustee shall be fully protected in relying and acting upon:

(a)     A certification of the Committee (or such other person as the Committee may designate) with respect to any instruction, direction or approval of the Committee;

(b)     A certification of any member of the Committee as to the membership of the Committee as it now exists and the continuance of such membership until a new certification is filed;

(c)     Any instrument, certificate or paper it believes to be genuine and signed or presented by the proper person or persons;

and, as to all of the foregoing, the Trustee is hereby relieved of any duty to make investigation or inquiry as to any statement contained in any such writing and is authorized to accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 8.3 The Trustee shall be under no liability for any payment made pursuant to written directions of the Committee for the proper application of any payment so directed, and it shall be under no duty to inquire whether the payment so directed conforms to the Supplemental Benefit Program.

Section 8.4 If responsibility for investment management resides directly with the Program Fiduciary and/or an outside investment manager, the following will apply:

(a)     The Trustee subscribes to various standard industry notification services pertaining to capital actions including puts, calls, tenders, mergers, conversions, stock distributions and other activities. The Trustee agrees to process assets in accordance with Program Fiduciary's and/or investment manager's instructions, provided the Trustee receives the Program Fiduciary's and/or investment manager's timely written authorization. In no event shall the Trustee be liable for failure to respond to a capital action if proper notification and authorization has not been provided to the Trustee by the Program Fiduciary and/or investment manager within the required time frames as specified in the capital action notice. The Trustee shall attempt to notify the Program Fiduciary and/or investment manager if it becomes aware of a voluntary action or provision which may affect an asset, but shall not be obligated to do so, and under no circumstances shall the Trustee be liable for failure to provide such notice. Further, the Trustee shall have no responsibility and no obligation with respect to any asset to take any action which shall pertain to stock dividends, warrants, rights to subscribe, offers to purchase, exercising of options, plans of reorganization, plans of exchange of securities, claims or settlements pertaining thereto, other than that which is directly authorized by the Program Fiduciary and/or investment manager by written instruction received by the Trustee within required time frames.

(b)     The Trustee shall have no obligation or liability with respect to the receipt, distribution, or reporting of an event of a bond default or a filing of a bankruptcy, and shall have no obligation or liability for the filing of any related report or claim

other than that which is directly authorized by the Program Fiduciary and/or investment manager by written instruction received by the Trustee within required time frames.

(c)     The Trustee shall not be liable for any loss resulting from the physical presence of any property in a foreign country including, but not limited to, losses resulting from nationalization, expropriation, exchange controls or acts of war or terrorism.

Section 8.5 Subject to applicable law, including ERISA, the Trustee shall not be liable hereunder, except for its own gross negligence or willful misconduct.

## Article 9
## Change of Trustee

The Trustee may resign at any time by written notice to the Program Fiduciary which shall be effective sixty (60) days after delivery. The Trustee may be removed at any time by the Program Fiduciary by written notice to the Trustee which shall be effective thirty (30) days after delivery. Prior to the effective date of such resignation or removal, the Program Fiduciary shall appoint a successor trustee which shall have the same powers and duties as are conferred upon the Trustee under this Agreement, and in default thereof, such successor trustee may be appointed by a court of competent jurisdiction. Trustee shall deliver all property of the Fund, less such reasonable amount as it shall deem necessary to provide for its expenses, compensation and any taxes or advances chargeable or payable out of the Fund, on the effective date of the resignation or removal, or as soon thereafter as practicable. The successor trustee shall thereupon have the same powers and duties as are conferred upon the Trustee. The receipt and acceptance by the successor trustee of the assets of the Fund and such records and accounts shall be a full and complete acquittance and discharge of the Trustee. No successor trustee shall have any obligation or liability with respect to the acts or omissions of its predecessors.

## Article 10
## Amendments and Termination

Section 10.1 This Agreement may be amended or modified at any time by written agreement of the Program Fiduciary and the Trustee, provided, however, that no amendment shall be inconsistent with ERISA or with the provisions of the Supplemental Benefit Program

Section 10.2 This Trust and Agreement may be terminated by the Program Fiduciary in accordance with the terms of the Supplemental Benefit Program. Upon termination of this Trust, the Trustee shall first reserve such reasonable amounts as the Trustee may deem necessary to provide for the payment of any expenses then or thereafter chargeable to the Fund. The balance of the Fund, together with any excess amounts reserved by the Trustee in accordance with the preceding sentence, shall be liquidated and distributed by the Trustee upon direction of the Program Fiduciary to or for the benefit of the Supplemental Benefit Program participants and their beneficiaries as provided in the Supplemental Benefit Program. The Program Fiduciary shall have full responsibility to see that such distribution is proper and within the terms of the Supplemental Benefit Program, this Trust and applicable law and regulations of governmental agencies.

*Section 10.3* Upon termination of this Trust, the Trustee shall have all of the powers provided herein as are necessary or desirable for the orderly liquidation and distribution of the Fund.

**Article 11**
**Miscellaneous**

*Section 11.1* The records of the Trust shall be kept on the basis of the calendar year.

*Section 11.2* No right or claim of any Supplemental Benefit Program participant or beneficiary to any of the monies or other assets of the Fund may be assigned or pledged, nor shall such right or claim be subject to garnishment, attachment, execution or levy of any kind, and any attempt to transfer, assign, or pledge the same will not be recognized by the Trustee.

*Section 11.3* This Agreement and the Trust created hereby shall be construed, regulated and administered under the laws of Michigan (to the extent not preempted by federal law), and the Trustee shall be liable to account only in the courts of that State. All contributions are effective when received by the Trustee in Michigan.

*Section 11.4* The Trustee may at any time initiate legal action for the settlement of its accounts or for the determination of any question of construction which may arise or for instructions, the only necessary party defendant to such action shall be the Committee, except that the Trustee may elect to bring in others as defendants.

*Section 11.5* The Trustee shall not be required to engage in administrative proceedings or litigation without being indemnified against any expenses thereof. Subject to applicable law, including ERISA, in any case in which the Trustee engages in administrative proceedings or litigation in discharge of its fiduciary obligations, its expenses thereof shall constitute a charge against the assets of the Trust unless paid by the Program Fiduciary.

*Section 11.6* The Program Fiduciary represents and warrants that it is duly authorized under the terms of the Supplemental Benefit Program to enter into this Agreement, that it has taken all necessary actions to adopt, execute, deliver and perform this Agreement, that the person executing this Agreement on its behalf has full power and authority to do so, and that this Agreement constitutes a valid and binding agreement of the Program Fiduciary enforceable against it according to its terms.

*Section 11.7* **The parties acknowledge that the right to trial by jury is a constitutional one, but that it may be waived. Each party, after consulting (or having had the opportunity to consult) with counsel of their choosing, each knowingly and voluntarily, and for their mutual benefit, waives any right to trial by jury in any action, proceeding or counterclaims brought by either of the parties against the other on any matters whatsoever arising out of or in connection with, this Agreement.**

**IN WITNESS WHEREOF,** the Program Fiduciary and the Trustee have caused this amended Agreement to be executed by their duly authorized officers on the dates noted, effective as of the date stated on the first page of this Agreement.

**Supplemental Benefit Committee of the Navistar, Inc. Retiree Supplemental Benefit Program**

**Comerica Bank**

**Program Fiduciary**

**Trustee**

By:_____

By:_____

Its:_____

Its:_____

Date:_____

Date:_____

**Exhibit A**
**Domestic Custody Fee Schedule**

The following fee schedule will be guaranteed for three years from the inception date of the relationship.

**Responsibility Fees**
Includes all account charges, transaction activity and holdings.  Also includes monthly and annual Statement of Account.

- **Market Value Fee**
  First $100 million in assets                    2.0 basis point (.00020)
  Balance of assets                                1.5 basis point (.00015)

- **Special Assets**                                $1,000 per fund or portfolio
  Mutual funds, commingled funds, and other assets
  Held elsewhere but reported by Comerica will be
  Excluded from the market value calculation and
  Assessed a separate annual holding charge.

Minimum Annual Responsibility fee of $10,000

**Wire Transfer Fee:**                             $17.00 per outgoing wire

**Cash Management Fee**                            18 basis points
For daily management of uninvested cash. The charge is
deducted from the earnings  of the cash management
vehicle

Invoices will be produced on a quarterly calendar basis. Per Section 6.3 of the Trust Agreement Under the Navistar, Inc. Retiree Supplemental Benefit Program, the invoices shall be payable from the Fund, unless and except to the extent that the Program Fiduciary shall pay the same.

**APPENDIX B-3**

169

# THIRD AMENDED AND RESTATED

# CERTIFICATE OF INCORPORATION

# OF

# NAVISTAR INTERNATIONAL CORPORATION

FIRST:  The name of the corporation is Navistar International Corporation (the "**Corporation**").

SECOND:  The address of its registered office in the State of Delaware is Corporation Service Company, 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808.  The name of its registered agent at such address is Corporation Service Company.

THIRD:  The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("**Delaware Law**").

FOURTH:  The total number of shares of stock which the Corporation shall have authority to issue is 10, consisting of:

(1) 1 share of a class designated preference stock, with a par value of $1.00 (the "**Preference Stock**"), and

(2) 9 shares of common stock, with a par value of $0.10 per share (the "**Common Stock**"),

amounting in the aggregate to $1.90.

FIFTH:  The Board of Directors shall have the power to adopt, amend or repeal the bylaws of the Corporation.

SIXTH:  Election of directors need not be by written ballot unless the bylaws of the Corporation so provide.

SEVENTH:  The Corporation expressly elects not to be governed by Section 203 of Delaware Law.

EIGHTH:  (1) Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative ("proceeding"), by reason of the fact that he or she is or was a director or officer of the Corporation (which term shall include any predecessor corporation of this Corporation) or is or was

serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans ("indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment), against all expenses, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith and such indemnification shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the indemnitee's heirs, executors and administrators; provided however, that, except as provided in paragraph 2 of this ARTICLE EIGHTH with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors. The right to indemnification conferred in this ARTICLE EIGHTH shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition; provided however, that, if the Delaware Law requires, the payment of such expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a proceeding, shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this ARTICLE EIGHTH or otherwise.

(2) If a claim under paragraph 1 of this ARTICLE EIGHTH is not paid in full by the Corporation within sixty (60) days after a written claim has been received by the Corporation, except in the case of a claim for expenses incurred in defending a proceeding in advance of its final disposition, in which case the applicable period shall be twenty (20) days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or in part in any such suit or in a suit brought by the Corporation to recover payments by the Corporation of expenses incurred by an indemnitee in defending in his or her capacity as a director or officer, a proceeding in advance of its final disposition, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such claim. In any action brought by the indemnitee to enforce a right to indemnification hereunder (other than an action brought to enforce a claim for expenses incurred in defending any

2

proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the Corporation) or by the Corporation to recover payments by the Corporation of expenses incurred by an indemnitee in defending, in his or her capacity as a director or officer, a proceeding in advance of its final disposition, the burden of proving that the indemnitee is not entitled to be indemnified under this ARTICLE EIGHTH or otherwise shall be on the Corporation. Neither the failure of the Corporation (including the Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware Law, nor an actual determination by the Corporation (including the Board of Directors, independent legal counsel or its stockholders) that the indemnitee has not met such applicable standard of conduct, shall be a presumption that the indemnitee has not met the applicable standard of conduct, or in the case of such an action brought by the indemnitee, be a defense to the action.

(3) The rights conferred on any person by paragraphs 1 and 2 of this ARTICLE EIGHTH shall not be exclusive of any other right which such person may have or hereafter acquire under any statute, this certificate of incorporation by-law, agreement, vote of stockholders or disinterested directors or otherwise.

(4) The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware Law.

(5) Persons who are not included as indemnitees under paragraph 1 of this ARTICLE EIGHTH but are employees of the Corporation or any subsidiary may be indemnified to the extent authorized at any time or from time to time by the Board of Directors.

NINTH: The Corporation reserves the right to amend this Certificate of Incorporation in any manner permitted by Delaware Law and all rights and powers conferred herein on stockholders, directors and officers, if any, are subject to this reserved power.

TENTH: The Preference Stock may be issued from time to time in one or more series of any number of shares, provided that the aggregate number of shares issued and not canceled of any and all such series shall not exceed the total number of shares of Preference Stock hereinabove authorized, and with distinctive serial designations, all as shall hereafter be stated and expressed in the resolution or resolutions providing for the issue of such Preference Stock from time to time adopted by the Board of Directors pursuant to authority so to do which is hereby vested in the Board of Directors. Each series of Preference Stock

3

(i) may have such voting powers, full or limited, or may be without voting powers; (ii) may be subject to redemption at such time or times and at such prices; (iii) may be entitled to receive dividends (which may be cumulative or noncumulative) at such rate or rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or series of stock; (iv) may have such rights upon the dissolution of, or upon any distribution of the assets of, the Corporation; (v) may be made convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of stock of the Corporation, at such price or prices or at such rates of exchange, and with such adjustments; (vi) may be entitled to the benefit of a sinking fund to be applied to the purchase or redemption of shares of such series in such amount or amounts; (vii) may be entitled to the benefit of conditions and restrictions upon the creation of indebtedness of the Corporation or any subsidiary, upon the issue of any additional stock (including additional shares of such series or of any other series) and upon the payment of dividends or the making of other distributions on, and the purchase, redemption or other acquisition by the Corporation or any subsidiary of any outstanding stock of the Corporation; and (viii) may have such other relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof; all as shall be stated in said resolution or resolutions providing for the issue of such Preference Stock. Shares of any series of Preference Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or which, if convertible or exchangeable, have been converted into or exchanged for shares of stock of any other class or classes shall have the status of authorized and unissued shares of Preference Stock of the same series and may be reissued as a part of the series of which they were originally a part or may be reclassified and reissued as part of a new series of Preference Stock to be created by resolution or resolutions by the Board of Directors or as part of any other series of Preference Stock, all subject to the conditions or restrictions on issuance set forth in the resolution or resolutions adopted by the Board of Directors providing for the issue of any series of Preference Stock.

(1)     Series B Stock.  The designated powers, preferences and relative participating, optional or other special rights and the qualifications, limitations or restrictions thereof, of one (1) share of a series of Preference Stock are as follows:

(a)     Designation.  The designation of this series of Preference Stock shall be "Nonconvertible Junior Preference Stock, Series B (With Par Value of $1.00)" (referred to herein as the "**Series B Stock**").

(b)     Dividends.  The holder of the share of the Series B Stock shall not be entitled to receive dividends with respect to the Series B Stock.

(c)     Rights of Redemption.  The Series B Stock shall be subject to redemption as follows:

4

(i)　　Optional Redemption.  At any time after the holder of Series B Stock has not been entitled to vote separately as a class to elect a director at any time for five consecutive years, the Series B Stock may be redeemed at the option of the Corporation, in whole or in part, at any time or from time to time upon not less than five days' prior notice to the holder of record of the Series B Stock sent by first class mail, postage prepaid, to such holder at its address appearing on the Series B Stock register maintained by the Corporation, at a redemption price of $1.00 (hereinafter called the "**Series B Redemption Date**").

(ii)　　Effect of Redemption.  All rights of the holder of Series B Stock as a stockholder of the Corporation by reason of the ownership of Series B Stock shall cease on the Series B Redemption Date, except the right to receive the amount payable upon redemption of such share on presentation and surrender of the certificate representing such share.  After the Series B Redemption Date, such share shall not be deemed to be outstanding.

(d)　　Rights on Liquidation, Dissolution, Winding Up.

(i)　　Liquidation Payment.  In the event of any involuntary liquidation, dissolution or winding up of the Corporation, the holder of the Series B Stock (if then outstanding) shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders, before any payment shall be made to the holders of any class of capital stock of the Corporation ranking junior upon liquidation to the Series B Stock, an amount equal to $1.00 per share.  The merger or consolidation of the Corporation into or with any other corporation or the merger or consolidation of any other corporation into or with the Corporation shall not in any event be considered a dissolution, liquidation or winding up of the Corporation under this paragraph (d).

(ii)　　Proportionate Distribution.  In the event the assets of the Corporation available for distribution to the holder of the Series B Stock upon any involuntary or voluntary liquidation, dissolution or winding up of the Corporation shall be insufficient to pay in full all amounts to which such holder is entitled pursuant to subparagraph (1) of this paragraph (d), no such distribution shall be made on account of any shares of any other class or series of preference stock ranking on a parity with the Series B Stock upon liquidation unless proportionate distributive amounts shall be paid on account of the Series B Stock, ratably, in proportion to the full distributive amounts to which the holders of all such parity shares are respectively entitled upon such liquidation, dissolution or winding up.

(e)　　Voting.  The Series B Stock shall not have any voting powers, either general or special, except as required by applicable law and as follows:

5

(i)     Change of Priority or Rights.  Without the affirmative vote or consent of the holder of the Series B Stock, voting or consenting (as the case may be) separately as a class, given in person or by proxy, either in writing or by resolution adopted at a special meeting called for the purpose, the Corporation shall not (i) change the number of authorized shares of the Series B Stock or (ii) amend this Certificate of Incorporation or take any other action (including, without limitation, a merger or consolidation to which the Corporation is a constituent party) which would have the effect of eliminating the Series B Stock or of amending, altering or repealing any of the preferences, special rights or powers of the holder of the Series B Stock so as adversely to affect such preferences, special rights or powers.

(ii)     Election of Director.  Until the Fully Funded Date, the number of directors constituting the Board of Directors of the Corporation shall be increased by one, and the holder of the Series B Stock shall have, in addition to any other voting rights, the exclusive and special right, voting separately as a class, to elect one person to fill such newly created directorship.  Except for the involuntary resignation of any such director under this subparagraph (b) or the removal of any such director by the holder of the Series B Stock, the director elected by the holder of the Series B Stock shall have a one year term of office.  The right of the holder of Series B Stock to elect a director may be exercised by written consent of such holder.  On the Fully Funded Date, the special right of the holder of the Series B Stock so to vote separately as a class for the election of a director shall terminate (subject to subsequent revesting as provided below) and the director elected by the holder of the Series B Stock shall be deemed to have resigned effective immediately without any further action upon such person's part.  Subsequent to the Fully Funded Date, the special right of the holder of Series B Stock to vote separately as a class for the election of a director shall revest at any time when the balance of the Employers' funding contribution held under the Health Benefit Trust falls below 85% of the Fully Funded Amount; provided, however, that such revested special right of the holder of Series B Stock to vote separately as a class for the election of a director shall terminate (subject to revesting as provided by this subparagraph (b)) if the balance of the Employers' funding contribution held under the Health Benefit Trust rises above 85% of the Fully Funded Amount. At any time when the holder of the Series B stock has the right to elect a director as provided in this subparagraph (b), (i) such holder shall have the exclusive right to remove such director, with or without cause, from time to time and elect his or her successor and (ii) any vacancies in the seat held by the director elected by the holder of the Series B Stock shall be filled only by vote of the holder of the Series B Stock.

(f) Conversion Rights. The holder of the share of the Series B Stock shall have no conversion rights with respect to such share.

6

(g) Nontransferability. The Series B Stock shall be issued to the UAW and the Series B Stock and any rights thereunder shall be nontransferable.  Any attempted transfer shall be void and of no effect.  The Corporation shall place on the certificate representing any issued share of the Series B Stock a legend consistent with the provisions hereof.

(h)     Definitions.

(i)     Employers. The term "Employers" shall have the meaning assigned to such term in the Settlement Agreement.

(ii)     Fully Funded Amount. The term "Fully Funded Amount" shall have the meaning assigned to such term in the Settlement Agreement.

(iii)     Fully Funded Date. The term "Fully Funded Date" shall have the meaning assigned to such term in the Settlement Agreement.

(iv)     Health Benefit Trust. The term "Health Benefit Trust" shall have the meaning assigned to such term in the Settlement Agreement.

(v)     Settlement Agreement. The term "Settlement Agreement" shall mean that certain settlement agreement entered into in 1993 between the Corporation, its employees, retirees and collective bargaining organizations.

(vi)     UAW. The term "UAW" shall have the meaning assigned to such term in the Settlement Agreement.

(i)     Rank of Series B Stock. The share of the Series B Stock shall rank junior upon liquidation to any other series of Preferred or Preference Stock authorized or designated after the initial date of issuance of the Series B Stock. The share of the Series B Stock shall rank senior upon liquidation to the shares of the Common Stock.

(j)     Retirement of Redeemed Shares, Etc.  When redeemed, the share of the Series B Stock shall have the status of authorized and unissued Preference Stock.

(k)     Fractional Shares.  No fractional shares of Series B Stock shall be issued.

(l)     Stock Calculations.  In making any calculations with respect to holdings or ownership of the Corporation's stock, the Corporation's stock records shall be conclusive evidence of such holdings and ownership.

IN WITNESS WHEREOF, this Third Amended and Restated Certificate of Incorporation has been executed by duly authorized officers of the Corporation on this <u>1st</u> day of July, 2021.

NAVISTAR INTERNATIONAL CORPORATION

By: _____

Name:    Curt A. Kramer

Title:    Senior Vice President and General Counsel

By: _____

Name:    Eleanor P. Cabreré

Title:    Corporate Secretary

*[Signature Page to Third Amended and Restated Certificate of Incorporation]*

**APPENDIX B-4**

## [RESERVED]

## APPENDIX B-5
## SUPPLEMENTAL BENEFIT COMMITTEE

| | | |
|---|---|---|
| **SBC UAW Member** | – | **David Hirschland** |
| **SBC UAW Member** | – | **Art Shy** |
| **SBC Class One Other Member** | – | **Ron Bloom** |
| **SBC Class One Other Member** | – | **John Grigsby** |
| **SBC Class One Other Member Alternate** | – | **Larry Owen** |
| **SBC Class Two Other Member** | – | **Joseph "Bud" Thompson** |
| **SBC Class Two Other Member Alternate** | – | **Neil Springer** |
| **SBC Class Two Other Member Alternate** | – | **Jack L. McCaskey** |

179

## DAVID HIRSCHLAND

David Hirschland is Assistant Director of the UAW Social Security Department. He has major responsibility for the Union's position on pensions both in the public policy and collective bargaining arenas. He has over fifteen years of negotiating and program administration experience within the automobile, aerospace and agricultural implement industries and with numerous other companies across the U.S. and in Canada.

He has had principal responsibility for benefit plans in the reorganizations of White Motor Corporation and Allis Chalmers Corporation and more recently in the negotiation of the settlement of Shy v. Navistar.

Mr. Hirschland serves on the Oversight Committee of the White Motor Retiree Trust and of the Allis Chalmers UAW Retiree Trust. These plans provide lifetime health and life benefits to the retirees and the dependents of retirees of these two companies. They are funded from proceeds received in the bankruptcy proceeding and from retiree contributions.

Mr. Hirschland is a member of the Board of Directors of the Health Alliance Plan, the largest HMO in Michigan, and is a former member of the Michigan State Health Planning Commission.

Mr. Hirschland has a Bachelor of Arts Degree from Cornell University and a Master of Business Administration Degree from The Wharton School at the University of Pennsylvania.

## ART SHY

Art Shy has been an active member of the UAW for over 44 years. He began his career as an assembler and welder at International Harvester in Springfield, Ohio in 1946 after serving four years as a machinist in the United States Navy during World War II.

He was elected shop steward of local 402 in 1947, and went on to serve as committee person, bargaining chair, and as local union financial and recording secretary.

In 1951, Mr. Shy was elected chair of the International Harvester Intra-Corporation Council, a position he held until his appointment as UAW, International Representative in 1955.

He went on to become the Assistant Director of the International Harvester Department, Assistant Director of the Agricultural Implement Department, and Administrative Assistant to UAW Vice-President, Pat Greathouse in 1966. He coordinated UAW activities, including collective bargaining with American Motors, International Harvester, J.I. Case, Caterpillar, John Deere, Mack Truck, White Motors, Allis Chalmers, and other UAW-represented companies.

Art Shy was appointed Director of Education Programs in 1978 by UAW President, Douglas Fraser. His responsibilities included the over-all administration and coordination in the development and implementation of all International education programs, including the union's Education Department and the Walter and May Reuther Family Education Center at Black Lake. He created the UAW Winter Institute Program that provides specialized leadership training for local union officers and committee members, and was instrumental in revitalizing the High School Labor Education Program and Staff Training Institutes.

Art Shy represented the UAW on the National Advisory Committee to the United States Secretary of Labor for the Job Training Partnership Act (JTPA). He also served on various university labor studies centers and a number of national organizations dealing with education, civil rights and world affairs.

## RON BLOOM

Ron A. Bloom is one of the founding partners of the investment banking firm of Keilin and Bloom. The firm focuses on financial transactions where employees play a role as stakeholders. Mr. Bloom represented the Steelworkers in the restructuring of Algoma Steel; a transaction which created the largest employee-owned company in Canada and is currently representing the Air Line Pilots in the restructuring of Northwest Airlines.

Prior to founding Keilin and Bloom, Mr. Bloom was a Vice President at the investment banking firm of Lazard Freres & Company where he worked on a wide variety of corporate transactions including mergers, acquisitions, restructurings and divestitures. He specialized in analyzing, structuring and raising financing for union-led employee-ownership transactions including Oregon Metallurgical Corporation, Northwestern Steel and Wire, and Republic Engineered Steels.

Mr. Bloom served as a research and negotiating specialist for the Service Employees International Union (SEIU), and has also served as the New England Regional Director of the Jewish Labor Committee, a multi-issue organization that is a liaison between the Labor movement and the Jewish community. Before working for the Jewish Labor Committee, he was the Executive Director for the Massachusetts Coalition for Full Employment.

He attended Weslyan University and graduated with distinction from Harvard Graduate School of Business Administration.

## JOHN T. GRIGSBY, JR.

John T. Grigsby, Jr. is a specialist in providing consulting services and assistance to companies in financial distress. He is the President and Founder of John T. Grigsby and Associates, President and Chief Executive Director of Pro Set, Inc., President of Thomson McKinnon Securities, Inc., and Vice Chairman and Executive Vice-President of Allis Chalmers Corporation. From October 1989 to September 1992, he was Managing Director of Lomas Financial Corporation, Lomas Chapter 11 Project.

Mr. Grigsby served as Chief Financial Officer of White Motor Corporation from August 1981 to November 1983 while it was in Chapter 11 bankruptcy and then became Disposition Assets Trustee, a position in which he served until the Trust (what trust) was dissolved in 1992. As part of the plan of reorganization, Mr. Grigsby developed, along with employee representatives, the White Motor Retiree Benefit Plan and Trust. This first of its kind program which went into effect in 1983 and is funded by proceeds from the White Motor bankruptcy and retiree contributions, is designed to provide health and life insurance benefits to the retirees of White Motor. Mr. Grigsby serves as Chairman of the Committee which oversees the operation of the plan.

Mr. Grigsby currently serves as a member of the Board of Directors of Allis Chalmers Corporation, First Southern Bank, and First Florida Industries. He also served on the Board of Directors of White Motor Corporation from August 1981 to November 1983 and on the Board of Directors of Food Fair from April 1979 to July 1981.

Mr. Grigsby received his Bachelor of Arts from Duke University and has taken graduate studies in finance at The Wharton School of the University of Pennsylvania.

## JOSEPH V. "BUD" THOMPSON

Joseph V. "Bud" Thompson is currently Chief Human Resources Officer for Continental Bank.  He has been employed by the Bank since 1986.

Before joining the bank Mr. Thompson was employed by Navistar for twenty two years in a variety of positions including: Corporate Labor Relations Manager; Manager, Employee Relations, Agricultural Implement Division; Vice President, Human Resources, Agricultural Implement Group; Managing Director, International Harvester - Great Britain; Vice President, Labor Relations; and Vice President, Human Resources.

Mr. Thompson has been active in a number of civic organizations in the Chicago area, including acting as Regional Chairman for the Girl Scouts of America Fund Raising Committee; chairing the U.S. Savings Bond Campaign; chairing the Industry Campaign for the United Way; serving on the Compensation Committee for the United Way.

Mr. Thompson received his Bachelor of Arts degree from Bellarmine College and his Juris Doctor from John Marshall Law School.  He also completed the Stanford Executive Program at the Business School of Stanford University.

184

**APPENDIX B-6**

[*RESERVED*]

Appendix B-7

CALCULATION OF COMMON AND DILUTIVE COMMON EQUIVALENT SHARES

| | Assume market price of $2.00 | Assume market price of $3.00 | Assume market price of $5.00 |
|---|---|---|---|
| Actual shares outstanding 10/31/92 | 255,991,500 | | |
| Add - Issuable to UAW | 1,362,622 | | |
| Deduct - Treasury shares | 1,895,467 | | |
| Shares outstanding 10/31/92 | 255,458,655 | 255,458,655 | 255,458,655 |
| Assume conversion Series D (179,129 shares) conversion rate of 3 1/8 | 559,778 | 559,778 | 559,778 |
| Assume conversion of options and and warrants net of repurchase | 0 | 723,655 | 1,979,847 |
| Common and dilutive common equivalent shares | 256,018,433 | 256,742,088 | 257,998,280 |

Note:  Above calculations assume no pyramiding.

CALCULATION OF INCREMENTAL INCREASE IN SHARES OUTSTANDING FROM EXERCISE OF OPTIONS

MARKET PRICE OF $3.00

| Exercise Price (a) | Options Exercised (b) | Proceeds (a * b) | | | |
|---|---|---|---|---|---|
| 2.5625 | 22,500 | $57,656 | | | |
| 2.1875 | 2,632,920 | 5,759,513 | | | |
| 2.125 | 25,000 | 53,125 | | | |
| **Total** | **2,680,420** | **$5,870,294** | / | $3.00 = | 1,956,765 shares repurchased |

| | | |
|---|---|---|
| Common shares issued upon exercise | 2,680,420 | |
| Common shares repurchased (Proceeds % market price) | 1,956,765 | |
| Incremental increase in shares outstanding | 723,655 | |

MARKET PRICE OF $5.00

| Exercise Price (a) | Options Exercised (b) | Proceeds (a * b) | | | |
|---|---|---|---|---|---|
| 2.5625 | 22,500 | $57,656 | | | |
| 2.125 | 25,000 | 53,125 | | | |
| 2.1875 | 2,632,920 | 5,759,513 | | | |
| 3.5625 | 40,000 | 142,500 | | | |
| 3.75 | 1,454,420 | 5,454,075 | | | |
| 3.9375 | 43,850 | 172,659 | | | |
| 4.375 | 690,000 | 3,018,750 | | | |
| 4.4375 | 25,000 | 110,938 | | | |
| **Total** | **4,933,690** | **$14,769,216** | / | $5.00 = | 2,953,843 shares repurchased |

| | | |
|---|---|---|
| Common shares issued upon exercise | 4,933,690 | |
| Common shares repurchased (Proceeds % market price) | 2,953,843 | |
| Incremental increase in shares outstanding | 1,979,847 | |

Options Outstanding at 10/31/92

|  | Exercise Price | Outstanding |
|---|---|---|
| 1975 Plan | 3.9375 | 43,850 |
|  | 6.25 | 3,000 |
|  | 9.125 | 65,000 |
| 1985 Plan | 2.125 | 25,000 |
|  | 2.5625 | 22,500 |
|  | 2.1875 | 2,632,920 |
| PIP | 3.5625 | 40,000 |
| PIP | 3.75 | 1,454,420 |
|  | 4.375 | 690,000 |
| PIP | 4.4375 | 25,000 |
| PIP | 5 | 22,500 |
| PIP | 5 | 20,000 |
| PIP | 5.0625 | 1,147,200 |
|  | 6 | 92,000 |
|  | 6 | 154,500 |
| PIP | 6.0625 | 5,000 |
| PIP | 6.1875 | 10,800 |
|  | 6.6875 | 5,000 |
|  | 6.8125 | 20,000 |
|  | 7.3125 | 174,500 |
|  | 7.3125 | 145,000 |
|  | 8.4375 | 5,000 |
|  | 9.125 | 38,500 |
|  | 9.125 | 33,500 |
|  |  | ---------- |
| TOTAL OPTIONS 10/31/92 |  | 6,875,190 |
|  |  | ========== |

188

**EXHIBIT C**

## <u>LIST OF CLASS MEMBERS</u>

**FILED WITH THE COURT BUT NOT INCLUDED HEREIN**

**EXHIBIT D**

DEFINITION SUPPLEMENT

When used in the Settlement Agreement or any Exhibits thereto, the following terms shall have the meanings set forth below:

"<u>Actual Number of Retirees and Spouses</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Actuary</u>" means Coopers & Lybrand or such successor actuary as is selected by the Company from time to time.

"<u>Additional Permissible Benefits</u>" has the meaning assigned to it in Section 1.2 of Exhibit B to the Settlement Agreement.

"<u>Adjusted Health APBO</u>" has the meaning assigned to it in Section 7.2 of Exhibit B to the Settlement Agreement.

"<u>Annual Service Cost</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Applicable Retirement Plan</u>" means (i) The Navistar International Transportation Corp. Retirement Plan for Salaried Employees as in effect on the Effective Date, (ii) The Navistar Financial Corporation Retirement Plan for Salaried Employees as in effect on the Effective Date, (iii) The Navistar International Transportation Corp. Non-Contributory Retirement Plan as in effect on the Effective Date and (iv) those multiemployer pension funds as in effect on the Effective Date to which the Employers have contributed and that have Participants who have been provided with postretirement Health and Life Insurance Benefits by the Employers.

"<u>Attributable Debt</u>" means, as of any particular time, the present value discounted at the rate of 6 ½% per annum (compounded semi-annually) of the obligation of a lessee for rental payments during the remaining term of any lease (including any period for which such lease has been extended or may, at the option of the lessor, be extended) included in a Sale and Lease-Back Transaction, other than such a transaction permitted by Section 7.7 of Exhibit A to the Settlement Agreement.

"<u>Average Contributing Participants</u>" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Basic Life Insurance Program</u>" means the part of the Life Insurance Program pursuant to which the Employers agree to provide group life insurance, entirely at their own expense, to the Retirees.

"<u>Board</u>" means the Board of Directors of Parent.

"<u>CBA</u>" has the meaning assigned to it in the recitals to the Settlement Agreement.

190

"Charter Amendments" has the meaning assigned to it in Section 8.1 of the Settlement Agreement.

"Class" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Class Counsel" means the law firms of Bobulsky, Grdina & Altier, 2036 East Prospect Road, Ashtabula, Ohio 44004; Bredhoff & Kaiser, 1000 Connecticut Avenue, N.W., Washington, D.C. 20036; Cloppert, Portman, Suater, Latanick & Foley, 225 East Board Street, Columbus, Ohio 43215; Gregory, Moore, Jaekle, Heinen, Ellison & Brooks, 3727 Cadillac Tower, Detroit, Michigan 48226; Kleiman, Whitney, Wolfe & Gore, One East Wacker Drive, Chicago, Illinois 60601; Lackey, Nusbaum, Harris, Reny & Torzewski, Two Maritime Plaza, Toledo, Ohio 46304; Macey, Macey & Swanson, 445 North Pennsylvania Street, Suite 401, Indianapolis, Indiana 48204; Miller, Carson & Boxberger, 1400 One Summit Square, Fort Wayne, Indiana 46802; and Daniel W. Sherrick, Associate General Counsel, International UAW, 8000 East Jefferson, Detroit, Michigan 48214.

"Class Member" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Class Representatives" means Art Shy, Fred Burris, Clarence Nuss, John Herring, Carl Potts, Harold Retherford, Henry G. Betley, Richard Spitler, Jack O'Neill, Donald McPhearson, the UAW and its Locals 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293, the UPGWA and its Locals 4, 122 and 134, the IAM and its Locals 1471, 2819 and 2821, the SEE and the USWA and its Local 4320.

"Collective Bargaining Representatives" means the UAW and its Locals 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293; the UPGWA and its Locals 4, 122 and 134; IAM and its Locals 1471, 2819 and 2821; the SEE; the USWA and its Locals 3740 and 4320; the International Brotherhood of Teamsters and its Locals 705 and 570; the International Union of Operating Engineers and its Local 399; and the International Federation Professional and Technical Employees and its Local 137.

"Company" means Navistar International Transportation Corp. (n/k/a Navistar, Inc.), and each successor thereto.

"Company Costs Per Capita" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Contributing Participants" means Retirees, Spouses and Surviving Spouses for such periods as they are making required contributions to the Health Benefit Program.

"Contributing Participant's Annual Contribution" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Court" means the United States District Court for the Southern District of Ohio Western Division.

"Cumulative Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"<u>Deferred Retiree Participants</u>" means individuals affected by health care benefit litigation settlements in <u>Ragan, et al. v. Navistar</u>, No. 88-2623-S (D.Kan.); <u>Local Union 369, International Brotherhood of Electrical Workers</u>, <u>AFL-CIO, et al. Navistar</u>, No. C-88-6724-L-A (W.D.Ky.); and <u>Bolding et al. v. Navistar</u>, No. 88-9751-9 (Superior Court, GA).

"<u>Dependent</u>" means (i) a person's Spouse, and (ii) unmarried children residing in a person's household and unmarried children not residing in a person's household for whom such person is legally required to provide medical care. For purposes of (ii) above, (A) the children of a person include (I) the natural children of such person, (II) legally adopted children of such person, (III) stepchildren of such person for whom legal adoption proceedings have been initiated and (IV) other children related by blood or marriage to such person or who are under such person's legal guardianship and who are dependent on such person for more than one-half of their support as defined in the IRC, who either qualify in the current year for dependency status, or who have been reported as dependents on such person's most recent federal income tax return ("dependency tax status") and (B) children shall continue to qualify as children until the end of the calendar year in which they attain age 19 years; provided, that (I) if a child is totally and permanently disabled at the time he or she would otherwise cease to be a child for purposes of this definition, he or she will continue to be covered as a child for as long as he or she remains totally and permanently disabled, and (II) if a child qualifies in the current year for dependency tax status or has been reported as a dependent on a person's most recent federal tax return, the child will continue to be covered as a child through the end of the calendar year in which the child attains age 25 years provided the child is unmarried and is legally residing in the person's household.

"<u>DOL</u>" means the U.S. Department of Labor.

"<u>Effective Date</u>" has the meaning assigned to it in Section 13.1 of the Settlement Agreement.

"<u>Eligible Dependent</u>" means (i) each Dependent of a Retiree, during the life of such Retiree and the life of such Retiree's Surviving Spouse, if any, (ii) each Dependent of a deceased former Employee who died prior to the Effective Date, during the life of such Employee's Present Surviving Spouse, if any, and (iii) each Dependent of a Present Employee or of a Present Eligible Former Employee who dies prior to becoming a Future Retiree and who is survived by a Future Surviving Spouse, during the life of such Surviving Spouse; provided, that Eligible Dependents shall not include Dependents who are in military service or the Peace Corps (or similar service) of any country or Dependents covered under any health care plan sponsored by the Employers.

"<u>Employee</u>" means an active employee of an Employer, including all such persons who, although on layoff, sick leave, long-term disability or Employer-approved leave of absence, are treated as active employees by the relevant Employer under relevant CBAs or employment policies, but excluding active employees of an Employer who are nonresident aliens employed outside of the United States and Canada.

"<u>Employers</u>" means Parent, the Company, NFC, HARCO National Insurance Company, Indianapolis Casting Corporation, Navistar International Export Corporation and Navistar International Overseas Corporation, and each successor thereto.

192

"Enrolled Participant" means each Retiree and Surviving Spouse who has enrolled or re-enrolled in the Health Benefit Program and the Supplemental Benefit Program and their Eligible Dependents, other than a Retiree, Surviving Spouse or Eligible Dependent whose enrollment therein has been terminated in accordance with Section 2.3 of Exhibit A to the Settlement Agreement and who has not re-enrolled in accordance with Section 2.4 of Exhibit A to the Settlement Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Retirees" means Retirees and their Dependents who were formerly (i) hourly employees and technical and office employees of the Solar Division (Solar Plan 804 & 805); (ii) hourly Benham Coal employees, Progressive Mine Workers of America, Local Union No. 402, District No. 2; (iii) salaried and management employees of the Chicago, West Pullman and Southern Railroad; and (iv) retirees affected by the litigation settlement in Lumpkin v. Navistar, No. 81C6674 (N.D. Ill. 1981).

"Exempted Indebtedness" means the sum of (i) all outstanding indebtedness of Parent (and any predecessor corporation) and Restricted Subsidiaries incurred after March 1, 1968 and secured by any mortgage, security interest, pledge or lien other than those permitted by paragraph (a) of Section 5.06 of the Indenture, (ii) all Attributable Debt and (iii) all outstanding indebtedness for borrowed money of Restricted Subsidiaries other than that permitted by paragraph (a) of Section 5.08 of the Indenture.

"Existing Plans" means all plans and other arrangements of the Employers, as in effect on the Effective Date, under which Present Retirees, Present Surviving Spouses, Present Eligible Dependents and Present Eligible Former Employees are receiving, are entitled to receive, or would become entitled to receive, postretirement health or life insurance benefits in the absence of the Settlement Agreement.

"Expected Average Contributing Participants" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Company Costs Per Capita" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Drug Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Medical Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Number of Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Expected Participant Contributions" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Fairness Hearing" has the meaning assigned to it in Section 4.1 of the Settlement Agreement.

"FASB 106" means Financial Accounting Standards Board Statement No. 106 regarding accounting for postretirement benefits other than pensions.

"Final" means the earlier of (i) expiration of the time period for an appeal as a matter of right if no appeal has been filed; (ii) any final dismissal or withdrawal of appeal from the Judgment; or (iii) the date of final affirmance of the Judgment following any appeal, including the expiration of the time for petitions for writs of certiorari (or written confirmation by the appellants that no such petition will be filed) and, if certiorari be granted, the date of final affirmance of the Judgment following review pursuant to that grant.

"Foster Case" has the meaning assigned to it in Section 2.2 of the Settlement Agreement.

"Fully Funded" means, as of a particular date of determination, that the balance of the Employers' prefunding contributions held under the Health Benefit Trust equals the sum of the Employers' share of the Health APBO under the Health Benefit Program plus the actuarial present value of the postretirement benefits under the Basic Life Insurance Program (as determined by the Actuary consistent with the determination of Health APBO).

"Fully Funded Amount" means, as of a particular date of determination, the amount of money necessary so that the balance of the Employers' prefunding contributions held under the Health Benefit Trust equals the sum of the Employers' share of the Health APBO under the Health Benefit Program plus the actuarial present value of the postretirement benefits under the Basic Life Insurance Program (as determined by the Actuary consistent with the determination of Health APBO).

"Fully Funded Date" means the first date on which the Health Benefit Trust is Fully Funded.

"Future Retiree" means (i) each Present Employee who after the Effective Date becomes eligible to commence the receipt of Pension Benefits, (ii) each other Present Employee who is represented by a Collective Bargaining Representative and who after the Effective Date continues active employment with an Employer beyond attainment of age 65 years and then terminates employment and (iii) each Present Eligible Former Employee who after the Effective Date satisfies the applicable conditions for Health and Life Insurance Benefits.

"Future Surviving Spouse" means (i) the Spouse of a Retiree who dies after the Effective Date and (ii) the Spouse of a Present Employee or of a Present Eligible Former Employee who dies after the Effective Date after becoming eligible for normal or early retirement under the Navistar International Transportation Corp. Retirement Plan for Salaried Employees or the Navistar Financial Corporation Retirement Plan for Salaried Employees; (iii) the husband or wife of a Present Employee or of a Present Eligible Former Employee who dies after the Effective Date after becoming eligible for normal or regular early retirement under the Navistar International Transportation Corp. Noncontributory Retirement Plan.

194

"HBPC Chair" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Committee Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Company Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Other Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"HBPC Other Member Alternate" has the meaning assigned to it in Section 6.6 of Exhibit A to the Settlement Agreement.

"HBPC UAW Member" has the meaning assigned to it in Section 6.1 of Exhibit A to the Settlement Agreement.

"Health Accumulated Postretirement Benefit Obligation" and "Health APBO" mean the actuarial present value of the postretirement benefits under the Health Benefit Program attributed to employee service rendered to the date of determination as determined by the Actuary (i) in accordance with FASB 106, (ii) in a manner consistent with the assumptions reflected in Appendix A-5 to Exhibit A to the Settlement Agreement, and (iii) using methods, factors and procedures determined by the Actuary.

"Health and Life Insurance Benefits" means postretirement health or life insurance benefits payable under any Existing Plan.

"Health Benefit Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Health Benefit Program Committee" means the committee described in Section 6.1 of Exhibit A to the Settlement Agreement.

"Health Benefit Program Letter" has the meaning assigned to it in Section 7.2.1 of the Settlement Agreement.

"Health Benefit Program Payment Default" has the meaning assigned to it in Section 10.1 of Exhibit A to the Settlement Agreement.

"Health Benefit Trust" means the trust established and maintained for the benefit of Participants as set forth in the trust agreement attached as Appendix A-3 to Exhibit A to the Settlement Agreement.

"HMO" means a health maintenance organization.

"IAM" means International Machinists District Lodge 28.

195

"Immediate Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Immediate Drop Outs During the First 45 Days" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Immediate Drop Outs During the Second 45 Days" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Imputed Retirees and Spouses" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Indemnification Procedures" mean the following procedures to be followed by any party entitled to indemnification under the Settlement Agreement or the Plan (an "Indemnified Party"): promptly after receipt of notice of the commencement of any action in respect of which the Indemnified Party intends to seek indemnification hereunder, the Indemnified Party shall notify the party obliged to provide such indemnification (the "Indemnifying Party") thereof in writing; provided, that the failure of an Indemnified Party to give such notice shall not affect the right of the Indemnified Party to indemnification hereunder, except to the extent that the Indemnifying Party has been prejudiced by such failure. The Indemnifying Party shall be entitled to assume sole control of the defense of any such action; provided, that the Indemnifying Party shall not be entitled to assume control of such defense if in the opinion of counsel to the Indemnified Party there is a significant possibility of a conflict between the interests of the Indemnifying Party and those of the Indemnified Party or such counsel intends to assert a separate legal defense. If the Indemnifying Party does not assume the defense of two or more Indemnified Parties in any action where indemnity may be available, such indemnity shall include the reasonable defense costs of one counsel for such Indemnified Parties as a group; provided, that if in the opinion of counsel to any such Indemnified Party there is a significant possibility of a conflict between the interests of such Indemnified Party and those of any other such Indemnified Party or if such counsel intends to assert a separate legal defense, such Indemnified Party shall be entitled to separate counsel; and, provided, further, that such Indemnified Party shall obtain the prior written approval of the Indemnifying Party before entering into any settlement of any claim for which it is seeking indemnification hereunder or ceasing to defend against such claim.

"Indenture" means the Indenture, dated as of March 1, 1985, between a predecessor of Parent and Commerce Union Bank, as trustee.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Judgment" means the Judgment of the Court approving the Settlement Agreement in the form of Exhibit G to the Settlement Agreement.

"Lien/Sale and Leaseback Default" has the meaning assigned to it in Section 10.2 of Exhibit A to the Settlement Agreement.

"Life Insurance Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Litigation" means the *Shy* Case and the *Foster* Case.

"Maximum Corridor Medical Per Capita Costs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Measurement Year (x)" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Monthly Base Contribution" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Named Fiduciary" means a fiduciary within the meaning of Section 402(a)(2) of ERISA.

"Navistar" means Parent, the Company, NFC, HARCO National Insurance Company and Indianapolis Casting Corporation, and each successor thereto.

"Navistar Interest Rate" means (i) the average interest rate paid by the Company from time to time on borrowings pursuant its revolving credit facility (or its primary revolving credit facility if it has more than one), or (ii) if the Company has no revolving borrowings at a particular time, the average interest rate paid by NFC from time to time on borrowings pursuant to its revolving credit facility (or its primary revolving credit facility if it has more than one) or (iii) if neither the Company nor NFC has revolving borrowings at a particular time, 1.0% over the prime rate announced from time to time by the Morgan Guaranty Trust Company.

"Navistar Parties" means Parent, the Company, NFC, HARCO National Insurance Company and Indianapolis Casting Corporation, and each successor thereto.

"Navistar Released Parties" means Navistar and the present and former officers, directors, committees (including the Pension and Employee Benefit Committee), employees, parents, subsidiaries, attorneys, insurers, partners, consultants, advisers, agents, and representatives of Navistar as well as their respective predecessors, successors, assigns and present and former direct and indirect affiliates.

"New CBAs" means ratification of CBAs between Navistar and the Collective Bargaining Representatives such that all Present Employees who are represented by Collective Bargaining Representatives shall, upon such Present Employees becoming Retirees, be eligible to receive benefits under the Plan.

"New Drop Ins" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"New Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"NFC" means Navistar Financial Corporation, and each successor thereto.

197

"Non-Represented Employees" means all Employees who are not represented by Collective Bargaining Representatives.

"Notice Order" has the meaning assigned to it in Section 4.1 of the Settlement Agreement.

"Optional Life Insurance Program" means the part of the Life Insurance Program pursuant to which additional group life insurance benefits are provided as described in Section 4.2 of Exhibit A to the Settlement Agreement.

"Optional Life Insurance Program Letter" has the meaning specified in Section 7.2.5 of the Settlement Agreement.

"Parent" means Navistar International Corporation, and each successor thereto.

"Parent Common" means the common stock of Parent, par value $0.01 per share.

"Parent Common Equity" means Parent Common.

"Parent Preference Stock" means Parent Series A Preference and Parent Series B Preference.

"Parent Securities" means the Parent Common Equity and the Parent Preference Stock.

"Parent Series B Preference" means the Series B preference stock of Parent, par value $1.00 per share.

"Participant" means each Present Employee, Retiree, Surviving Spouse and Present Eligible Former Employee who is or may become eligible to receive health or life insurance benefits under the Plan, and their Eligible Dependents, regardless of whether any such person has enrolled in the Plan or whether his enrollment in the Plan has been terminated.

"Pension Benefits" means retirement benefits under an Applicable Retirement Plan, including but not limited to disability and pension benefits, whether paid monthly, in a lump sum or otherwise, including such benefits payable pursuant to the terms of any plant closing agreement, severance arrangement or otherwise, but not including a deferred vested pension or an "Accrued Benefit" as defined in the respective sales agreements regarding the sales of the Solar Turbines International Division and the Construction Equipment Division.

"Plan" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Plan 1" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Plan 2" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Plan Administrator" means the administrator of the Plan within the meaning of Section 3(16)(A) of ERISA.

"<u>Plan Expenses</u>" means all out-of-pocket administrative costs of the Health Benefit Program and Life Insurance Program, including but not limited to the costs of the trustee of the Health Benefit Trust, the costs of the Health Benefit Program Committee (other than expenses paid by the Company in accordance with Section 6.7 of Exhibit A to the Settlement Agreement) and the costs of service providers and professionals (other than the Actuary) engaged by the Plan Administrator, the Named Fiduciary or the Health Benefit Program Committee.

"<u>Plan Year</u>" means the fiscal year of the Company, which fiscal year currently ends on October 31.

"<u>Present Eligible Dependent</u>" means each Eligible Dependent on the Effective Date.

"<u>Present Eligible Former Employer</u>" means each former employee who as of the Effective Date is not a Present Retiree but who, without any further employment by the Employers and upon the satisfaction of any applicable conditions, would become eligible for Health and Life Insurance Benefits in the absence of the Settlement Agreement.

"<u>Present Employee</u>" means (i) each Non-Represented Employee on the Effective Date, (ii) each Employee represented by a Collective Bargaining Representative as of February 28, 1993, and (iii) during the terms of the New CBAs, each other Employee covered by a New CBA to the extent such Employee is eligible to benefits under the Plan pursuant to the terms of such New CBA.

"<u>Present Non-Represented Employee</u>" means each Present Employee who is not a member of a collective bargaining unit represented by a Collective Bargaining Representative on the Effective Date.

"<u>Present Represented Employee</u>" means each Present Employee who is a member of a collective bargaining unit represented by a Collective Bargaining Representative on the Effective Date.

"<u>Present Retiree</u>" means each former Employee, other than an Excluded Retiree, who is receiving Health and Life Insurance Benefits on the Effective Date.

"<u>Present Surviving Spouse</u>" means each Spouse of a deceased former Employee who is receiving Health and Life Insurance Benefits on the Effective Date.

"<u>Principal Property</u>" shall mean any plant used primarily for manufacturing purposes located within the United States of America, excluding its territories and possessions, of Parent or any Restricted Subsidiary except any such Plant which the Board by resolution declares is not of material importance to the total business conducted by Parent and its Restricted Subsidiaries as an entity.

"<u>Program Administrator</u>" means the administrator of the Supplemental Benefit Program within the meaning of Section 3(16)(A) of ERISA.

"<u>Restricted Subsidiary</u>" shall mean any subsidiary of Parent (a) substantially all the property of which is located, or substantially all the business of which is carried on, within the

United States of America, excluding its territories and possessions, and (b) which owns or leases a Principal Property.

"Retiree" means each Present Retiree and each Future Retiree.

"Retiree Adjustment Ratio" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Retiree Cost Sharing Ratio" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Sale and Lease-back Transaction" has the meaning assigned to it in Section 7.7(a) of Exhibit A to the Settlement Agreement.

"SBC Chair" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class One Other Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class One Other Member Alternate" has the meaning assigned to it in Section 6.1(b) of Exhibit B to the Settlement Agreement.

"SBC Class Two Other Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Class Two Other Member Alternate" has the meaning assigned to it in Section 6.1(c) of Exhibit B to the Settlement Agreement.

"SBC Committee Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SBC Committee Member Alternate" has the meaning assigned to it in Section 6.1(c) of Exhibit B to the Settlement Agreement.

"SBC UAW Member" has the meaning assigned to it in Section 6.1(a) of Exhibit B to the Settlement Agreement.

"SEC" means the United States Securities and Exchange Commission.

"Scheduled Contributions" has the meaning assigned to it in Appendix A-6 of Exhibit A to the Settlement Agreement.

"Section 10.2 Cure Period" has the meaning assigned to it in Section 10.2 of Exhibit A to the Settlement Agreement.

"Securities Act" means the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

"Security" means any debenture, note or other evidence of indebtedness, as the case may be, authenticated and delivered under the Indenture.

"SEE" means Society of Engineering Employees, Inc.

"Settlement Agreement" means the settlement agreement entered in the *Shy* Case and approved by the U.S. District Court for the Southern District of Ohio, as amended from time to time in accordance with the provisions therein.

"*Shy* Case" has the meaning assigned to it in the recitals to the Settlement Agreement.

"SPD" means summary plan description.

"Spouse" means the husband or wife of a person to whom such person is legally married and does not include a former spouse from whom such person is divorced.

"State or National Health Insurance Program" means any program pursuant to which the federal government of the United States, the government of any State or territory thereof or any governmental authority thereof or therein, mandates or provides directly or indirectly health care benefits.

"Stay Orders" has the meaning assigned to it in Section 13 of the Settlement Agreement.

"Subsidiary" means any corporation of which at least a majority of the outstanding stock having voting power under ordinary circumstances to elect a majority of the board of directors of said corporation shall at the time be owned by Parent or by Parent and one or more Subsidiaries or by one or more Subsidiaries.

"Supplemental Benefit Committee" has the meaning assigned to it in Section 6.1 of Exhibit B to the Settlement Agreement.

"Supplemental Benefit Program" has the meaning assigned to it in the recitals to the Settlement Agreement.

"Supplemental Benefit Program Payment Default" has the meaning assigned to it in Section 11.1 of Exhibit B to the Settlement Agreement.

"Supplemental Benefit Trust" means the trust established and maintained for the benefit of Enrolled Participants and Retirees, whether or not they are Enrolled Participants, as set forth in the trust agreement attached as Appendix B-2 to Exhibit B to the Settlement Agreement.

"Surviving Cumulative Drop Outs" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Surviving Spouse" means each Present Surviving Spouse and each Future Surviving Spouse.

"Total Actual Drug Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Actual Medical Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Estimated Annual Cost" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Expected Drug Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Expected Medical Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Total Maximum Corridor Medical Dollars" has the meaning assigned to it in Appendix A-6 to Exhibit A to the Settlement Agreement.

"Trust Market Offerings" has the meaning assigned to it in Section 1(i) of Appendix B-3 to Exhibit B to the Settlement Agreement.

"UAW" means the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, an unincorporated association with its principal offices in the State of Michigan.

"UAW Designee" means the member of the Board which the UAW is entitled to elect in accordance with the terms of the Parent Series B Preference.

"UAW/Navistar Joint Committee" has the meaning assigned to it in the current Health Security Agreement between the Company and the UAW.

"UPGWA" means the International Union, United Plant Guard Workers of America.

"USWA" means the International Union, United Steelworkers of America.

EXHIBIT E
FORM OF PUBLISHED NOTICE

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ART SHY, et al.,                    )
                                    )
                Plaintiffs,         )
                                    )
        v.                          )          NO. C-3-92-333
                                    )          CLASS ACTION
NAVISTAR INTERNATIONAL              )
CORPORATION, et al.,                )
                                    )
                Defendants.         )

NOTIFICATION TO ALL NAVISTAR RETIREES AND SURVIVING
SPOUSES AND DEPENDENTS OF NAVISTAR RETIREES, AND TO
FORMER NAVISTAR EMPLOYEES AND PRESENT NAVISTAR NON-
REPRESENTED EMPLOYEES WHO WILL BE ELIGIBLE FOR RETIREE
HEALTH AND LIFE INSURANCE BENEFITS UPON RETIREMENT.

On July 28, 1992, the Navistar Companies, which include

the Navistar International Transportation Corporation, Navistar

International Corporation, Navistar Financial Corporation,

Indianapolis Casting Corporation, HARCO National Insurance

Company, or International Harvester Corporation, announced a plan

to terminate their existing health insurance coverage for

retirees and substitute a lower level of coverage.  On August 23,

1992 a lawsuit was filed by several retired Navistar employees as

well as several unions that represent Navistar employees to force

Navistar to continue providing health coverage for life, at the

existing levels, to all current retirees and their surviving

spouses.  The parties to this litigation have entered into a

Settlement Agreement, dated March 31, 1993, and the Court has scheduled a hearing on May 7, 1993 to determine, among other things, whether the proposed settlement should be approved as fair, reasonable and adequate.  A form of Notice of Hearing on Proposed Settlement (the "Notice") has been mailed to all persons who appear on Navistar's records as being affected by the terms of the proposed Settlement Agreement.

If you are a current or former employee of one of the above-listed Navistar companies and you believe that you are affected by the terms of the proposed Settlement Agreement, but have not received a Notice in the mail by April 10, 1993, you should first obtain copies of the Notice and proposed Settlement Agreement by writing or calling Navistar General Counsel, Navistar International Transportation Corp., 455 North Cityfront Plaza Drive, Chicago, Illinois 60611, 1-800-972-1124.  You will be sent a Notice that explains the terms of the Settlement Agreement.  That Notice also explains what you must do if you want to object to the Settlement and ask the Judge not to approve it.  No objections to the proposed Settlement will be considered unless they are submitted by April 30, 1993.  If you do not comply with the instructions contained in the Notice you will not be allowed to object to the proposed Settlement.

The Settlement, if approved by the Court, will determine and resolve the claims of all current non-represented Navistar employees and Navistar retirees to all retiree health

- 2 -

and life insurance benefits.  It will not have any direct effect on the rights of current Navistar employees who are represented by a union.

**EXHIBIT F**

**Cover Letter**

**DATE:** April 5, 1993

**TO:** All Class Members in **Shy v. Navistar**

**FROM:** Counsel for the Class Representatives

**RE:** **Notice of Proposed Settlement**

---

We sent a letter to you approximately two weeks ago in which we described the process which led to the proposed settlement in this case involving your retiree health and life insurance benefits. As we predicted in that letter, the Court has now directed that the attached detailed documentation of the proposed settlement be sent to you.

All of the representatives of retired and active employees and labor unions who are currently parties to this lawsuit fully support the proposed settlement.

> **The proposed settlement has two key elements. First, Navistar has agreed to provide certain basic health and life insurance benefits to retirees, surviving spouses and their families on a lifetime basis. These basic levels of benefits will be provided through a "Base Program". Second, Navistar will place 50% of its common stock, and a potentially significant share of its future profits, into a separate trust which will be used to <u>improve</u> the basic levels of health and life insurance benefits that Navistar is obligated to provide under the Base Program. Through these stock and profit sharing mechanisms, we hope that the benefits provided by the Base Program can be significantly improved in the future.**

April 5, 1993
Page 2

The details of the new proposed health and life insurance benefits are summarized in this letter and are set forth fully in the attached documents. Certain additional lengthy documents governing other elements of the proposed settlement are on file with the Court but are not being mailed at this time. If you wish to receive copies of any of those documents, call Navistar at (800) 972-1124.

The Court will hold a hearing on May 7, 1993 to decide whether to give the proposed settlement its final approval. You may register your objection to the proposed settlement in writing if you choose and you may attend the hearing if you desire.

**If you do not object to the proposed settlement, you need do nothing at this point. If the proposed settlement is given final approval, you will receive the necessary enrollment materials sometime after the court hearing.**

Under the terms of the proposed settlement, your benefits will not change until at least one month after the May 7 hearing.

The purpose of this letter is to explain the proposed settlement in general terms and inform you of the opinion of the retiree and union parties to the lawsuit. **However, the official legal documents filed in connection with the proposed settlement will govern the terms of the settlement if it is approved by the court. For a detailed understanding of the settlement, you should refer to the actual documents.**

In addition, meetings will be held in a number of locations in order to help explain the proposed settlement and answer your questions. Those meetings are currently scheduled for:

April 5, 1993
Page 3

| Saturday, April 17th<br>9:00 AM<br>Hara Arena<br>Conference and Exhibition<br>  Center<br>10001 Shiloh Spring Road<br>Dayton, Ohio | Saturday, April 17th<br>2:00 PM<br>Indianapolis State Fairgrounds<br>  Coliseum<br>1202 East 38th Street<br>Indianapolis, Indiana |
|---|---|
| Sunday, April 18th<br>2:00 PM<br>UIC Pavilion<br>University of Illinois at Chicago<br>1150 West Harrison Street<br>Chicago, Illinois | |

We will be videotaping at least one of these meetings. That videotape will be made available to local union retiree chapters, retiree clubs, and other groups. If your group is interested in showing this tape, have them call Navistar at (800) 972-1124.

You should keep all of the attached documents, especially the Summary Plan Descriptions. If the Court approves the proposed settlement, the Summary Plan Descriptions will be your explanation of the new retiree benefit programs.

## THE PROCESS WHICH LED TO THE PROPOSED SETTLEMENT AND THE ALTERNATIVES TO THE SETTLEMENT

Navistar has been perilously close to bankruptcy for some time. Based on extremely detailed financial analyses conducted by both the Company and the UAW over the past year, and the opinions of several financial experts retained on your behalf, it was concluded that Navistar

April 5, 1993
Page  4

would very likely be forced to file for bankruptcy if it were unable to significantly reduce its retiree health and life insurance costs.

In a bankruptcy proceeding, your benefits would either have been terminated completely or reduced in ways much more drastic than required by the proposed settlement.  The ultimate outcome of a potential bankruptcy filing is difficult to predict because it depends on a number of unresolved legal issues.  Two things, however, are certain. First, Navistar and all of its creditors would argue strongly that Navistar is contractually permitted to terminate your benefits completely.  If they prevailed in that argument, you would recover **nothing** in a bankruptcy proceeding.  Second, even if we were able to prevail in that argument, and even if we were able to avoid a complete liquidation of the Company, Navistar's business would be gravely damaged by a bankruptcy filing and Navistar would therefore be able to support only a smaller package of health and life benefits than we were able to achieve in the proposed settlement.

Keeping Navistar alive and preventing a bankruptcy filing provides the greatest protection possible for you and your family.

We were also faced with a difficult legal situation.  Navistar took the position that it was under **no obligation to provide you with any health care or life insurance benefits**.  Although we argued that Navistar was obligated to continue your benefits unchanged for the rest of your life, there was no guarantee that we would have won that argument in the courts.  More importantly, resolution of that dispute would have taken years of litigation.  In the meantime, Navistar could have moved to impose reductions in your benefits far more severe than those in the proposed settlement, or simply could have attempted to terminate your benefits completely.

We understand that uncertainty about health and life insurance benefits can by itself devastate families.  We understand too the importance of the principle of lifetime benefits.  That is why the proposed settlement calls for **lifetime benefits without any gap in coverage.**

April 5, 1993
Page 5

For the reasons described above, all of the plaintiffs in this suit --
including a number of unions and representatives of both union and non-
union retirees -- have been working together over the past several
months in order to obtain the greatest possible protection of your
benefits. We think we have accomplished that goal at the lowest
possible cost to retirees.

## THE ADDITION OF NON-UNION ACTIVE EMPLOYEES TO THE CLASS

Already, most of the unions that represent Navistar active
employees have agreed that their active members, upon their retirement,
will be covered by the health and life insurance programs described in
the proposed settlement. Since the non-union active employees of
Navistar have no way to bargain for the same benefits, all of the plaintiffs
in *Shy v. Navistar* have filed an Amended Complaint with the Court
adding non-union active employees to the Class. If the Court approves
the proposed settlement, non-union actives, upon their retirement, will
therefore be covered by the same health and life insurance programs
described in the proposed settlement.

This amendment ensures that all Navistar retirees -- both union and
non-union - - and virtually all active employees (upon their retirement) will
receive the same package of health and life insurance benefits. From the
highest paid executive to the lowest paid worker, everyone who retires
from Navistar will receive the identical package of health and life
insurance benefits.

April 5, 1993
Page 6

# WHAT THE SETTLEMENT AGREEMENT DOES AND WHAT IT DOESN'T DO

The dispute in this case involved the duration of retiree health and life insurance benefits. Navistar took the position that it can terminate your benefits at any time. We argued that it cannot. **Under the proposed settlement, Navistar is obligated to provide basic health and life insurance benefits to retirees and their families for life.**

The proposed settlement does not change any rules governing who is eligible for benefits. If you are a covered retiree or surviving spouse today, you will continue to be eligible. If you are on lay-off or under some other circumstance, and would become eligible for retirement health care benefits under Navistar's existing arrangements, you will become eligible at the same time as you otherwise would have. If you are currently an active employee, you will become eligible upon your retirement, just as under your existing plan.

Dependents, including spouses, also continue to be covered as more fully described in the attached documents.

**This proposed settlement has no impact on the pension benefits provided by Navistar's pension plans.** As required by Federal law, Navistar has established trust funds from which your pension benefits are being paid. Those benefits are not, and will not be, modified as a result of this settlement.

Most of Navistar's existing health care plans require that Navistar reimburse retirees over age 65 for the cost of Medicare Part B premiums. Today, these premiums cost you $38 per month. Navistar is currently adding reimbursements for these amounts to your pension check. Under the terms of the proposed settlement, Navistar will no longer reimburse the cost of these Medicare Part B premiums and, therefore, those amounts will no longer be added to your pension check.

April 5, 1993
Page 7

**The proposed settlement has absolutely no impact on the health and life insurance benefits received by Navistar active employees.** If you are a non-union active employee, the proposed settlement does not modify or amend your existing coverages in any way; it applies only to your health and life insurance coverages once you retire. The proposed settlement does not alter whatever rights Navistar previously had to modify existing coverages for non-union active employees during their active employment. As for union-represented active employees, some of the affected bargaining units have already agreed to establish a structure for implementing coordinated care programs. All of those activities, however, are outside the scope of the proposed settlement. The proposed settlement applies only to post-retirement health and life insurance.

**Finally, if you have purchased "paid up" life insurance by pension or salary withholdings, that coverage will not be affected. You have purchased that coverage and it will continue without change**.

# THE BASIC STRUCTURE OF THE SETTLEMENT

The settlement creates four different programs:

* The Base Program, which includes:

    1) The Base Health Program

    2) The Basic Life Insurance Program

    3) The Optional Life Insurance Program

* The Supplemental Program

Each of these programs is discussed in detail below.

April 5, 1993
Page 8

\*    **The Base Program**

The benefits provided by the Base Program are described below:

| Categories | Before Age 65 | 65 and Above |
|---|---|---|
| Contributions per adult | $70/mo. | $34/mo. |
| Deductibles/person | $200/year | $200/year |
| Out-of-Pocket max./person (includes deductibles) | $500/year | $200/year |
| Co-payments* | 80%/20% | None |
| Office Visits | No | Yes |
| Part B Medicare Premium | Not applicable | Paid by Retiree |
| Outpatient Psychiatric | 52 visits/year at 50% | Medicare Levels |
| Inpatient Psychiatric | 60 days per year | Medicare Levels |
| Substance Abuse | 35 days per year | Medicare Levels |
| Prescription Drug Co-payments | • $8/generic drug<br>• $18/brand name<br>• $7/mail order for each 30-day supply up to a maximum of 90 days at one time | • $8/generic drug<br>• $18/brand name<br>• $7/mail order for each 30-day supply up to a maximum of 90 days at one time |
| Life Insurance | • $5,000 max.<br>• limited additional coverage can be purchased at group rates | • $5,000 max.<br>• limited additional coverage can be purchased at group rates |

\*  This co-payment feature means that, after you pay the deductible and until you reach the out-of-pocket maximum for each year, you will be responsible for paying 20% of covered charges and the plan will pay 80%.  After you meet the out-of-pocket maximum, the plan will pay 100% of covered charges.

214

April 5, 1993
Page  9

The Company has agreed, with only very limited exceptions, to pre-fund the Base Program with at least $100 million within six months of the effective date of the proposed settlement.  The Company has also agreed to use its best efforts to raise an additional $400 million through future stock offerings and contribute that money to the trust fund, for a total of $500 million, within five years of the effective date.  This pre-funding will provide an important set of protections.  The funds will be contributed to a trust fund separate from the Company's assets, and will be available to provide for retirement health care and life insurance benefits even if the Company experiences financial difficulty or bankruptcy in the future.  Of course, to the extent that funds are not set aside in this manner, a future insolvency or bankruptcy of the Company may adversely affect its ability to continue these benefits.

In order to understand how these benefits are different from the benefits you currently have, please consult the Summary Plan Description covering your current program.

The three parts of the Base Program are described in more detail below.

## (1)    Base Health Program

Participants in the Base Health Program will be required to pay monthly contributions, as well as co-payments and deductibles for covered services as described in more detail above.  The amount of the monthly contributions, the deductibles and out-of-pocket maximums are expected to increase with inflation each year.  The program, however, was designed to "cushion" the impact of future cost increases on retirees.  Thus, even if medical inflation continues to rise as rapidly as current projections indicate, the increases in contributions, deductibles and out-of-pocket maximums would still increase by only 6% each year, much less than the expected rate of medical inflation.  We have also built in

April 5, 1993
Page  10

mechanisms to hold down these future increases based on participation rates and retirement ages.

The erosion of living standards caused by medical inflation is a frightening prospect for all of us.  We have, therefore, made every possible effort to ensure that this plan remains affordable over the long term.  While the mechanisms we developed to accomplish these results are admittedly complex, we believe they will allow us to achieve our goal of minimizing the cost increases you will experience in the future.

**(2)    Basic Life Insurance Program**

Under the proposed settlement, the Basic Life Insurance Program will provide continuing life insurance coverage of $5,000 for each retiree who had $5,000 or more in Company-paid life insurance prior to the effective date of the settlement. If you had less than $5,000 in coverage prior to the proposed settlement, you will continue to have the level of coverage that you had before the settlement.

This coverage will be provided on a lifetime basis to retirees. As under Navistar's existing plans, it covers only the retiree, not the surviving spouse or any dependents.

This coverage will automatically be provided to all retirees, even those who choose not to participate in the Base Health Program.  No enrollment is necessary.  If you are currently a retiree covered by Navistar's existing life insurance arrangements, you will automatically be covered by the new life insurance program.

**(3)    Optional Life Insurance Program**

If you are a retiree who, prior to the effective date of the proposed settlement, had Company-paid life insurance in an

April 5, 1993
Page 11

amount greater than $5,000, you will be offered a one-time option to purchase coverage **up to the level that you had prior to the settlement** at favorable rates. You must enroll in this program at your first available opportunity. For current retirees this will be at the time of the effective date of the new plan. Future retirees will be provided an opportunity to purchase this optional coverage at the time of retirement.

**If you decline this optional coverage, it will <u>not</u> be made available at a later date.**

This Optional Life Insurance Program is being offered directly by Aetna. The Company will use its best efforts to provide this coverage at competitive rates. If you are eligible for this Optional Life Insurance Program, based on the amount of your Company-paid life insurance before the settlement, you will receive a separate enrollment form for this program.

**The above descriptions summarize the coverages of the Base Program. We strongly encourage you to read the Summary Plan Descriptions of the Health Program and the Life Insurance Program in order to obtain a detailed understanding of the benefit provisions.**

\*      **The Supplemental Program**

All parties to the proposed settlement have understood from the beginning the importance of developing a base health and life insurance program that the Company can afford and that also gives the Company the best possible chance of surviving over the long term. But equally important was our belief that, if the Company succeeded as a result of the sacrifices made by retirees, those retirees should share in that success.

**The Supplemental Program includes two key elements to do just that. First, the Supplemental Program will be issued common stock sufficient to make it a 50% owner of Navistar on the effective date of**

April 5, 1993
Page  12

**the proposed settlement.  Second, the Supplemental Program will also receive a potentially significant share of future Company profits.**

A committee made up of two UAW appointees, one non-UAW retiree representative and two public members will be the Trustees of the Supplemental Program.  All assets of the Supplemental Program will be placed in a separate trust fund.  The Trustees will use the assets of this fund to supplement or improve the benefits provided by the Base Program.  For example, the Supplemental Program Trustees may decide in a particular year to use these assets to reduce monthly contributions otherwise payable by participants in the Base Program.  The Supplemental Program Trustees may also decide to use such assets to reduce the Base Health Program co-pays and deductibles, to add other medical coverages, or to increase the amount of the basic life insurance benefit.

The Supplemental Program Trustees are restricted in their right to sell the Navistar stock held by that program for a period of approximately five years.  This will enable the Company to sell shares to the public in order to fulfill its $500 million prefunding obligation to the Base Program. The Trustees are also restricted from selling these Navistar stock holdings in certain narrowly defined circumstances in order to preserve certain tax benefits that are currently very valuable.  Within those restrictions, the Supplemental Program Trustees are obligated to determine when it is in the best interests of participants to sell the Navistar stock holdings and otherwise invest the proceeds, or use them to provide additional benefits to participants.

**Remember, the Supplemental Program will initially hold 50% of Navistar's common stock which will be used to provide benefits in addition to those provided by the Base Program.**

Keep in mind also that the assets of the Supplemental Program consist only of the Company's stock and the profit-sharing obligation. **There is no guarantee that the assets of the Supplemental Program will have significant long-term value.**  While we hope to be able to significantly improve the overall package of benefits you will receive by

April 5, 1993
Page 13

utilizing the assets of the Supplemental Program, there can be no guarantee that the Supplemental Program will be able to provide any significant additional benefits.

In addition, even if those assets have value, they must be used over a long period of time to assist a large number of people. In any given year, therefore, the Supplemental Program Trustees may decide not to use any of the plan's assets. Instead, those Trustees may decide to conserve those assets so that they will be available to provide benefits in the future.

To the extent that the benefits provided by the Supplemental Program are intended to supplement the medical benefits provided by the Base Program, they will be available only to retirees, surviving spouses and dependents who enroll in the Base Program's medical coverage by paying the required monthly contribution. Any improvement of the life insurance benefits by the Supplemental Program will be available to anyone who is eligible for the Basic Life Insurance Program.

# OTHER ELEMENTS OF THE SETTLEMENT

Through the stock ownership and profit sharing elements of the Supplemental Program, Navistar retirees have a major stake in the future success of the Company. For that reason, the Supplemental Program has the right to appoint two members to Navistar's Board of Directors immediately. When the amount of Navistar stock held in the Supplemental Program falls below 20%, the Supplemental Program will have the right to appoint only one director. When those holdings fall below 10%, it will no longer have the right to appoint directors.

In addition, the UAW will have the right to appoint one director to the Navistar Board of Directors. That right will continue until the Company has fully funded its obligation to the Base Program, a total of approximately $1 billion.

April 5, 1993
Page 14

# THE NECESSARY APPROVALS AND ENROLLMENT PROCESSES

**The Court has scheduled a hearing for May 7th to decide whether to approve this proposed settlement.**

**IF YOU CHOOSE TO OBJECT TO THE PROPOSED SETTLEMENT, YOU MUST SUBMIT YOUR OBJECTION IN WRITING. THE DETAILS OF THESE REQUIREMENTS ARE SET FORTH IN THE ATTACHED NOTICE OF PROPOSED SETTLEMENT FROM THE COURT.**

**IF YOU SUPPORT THE PROPOSED SETTLEMENT, YOU NEED NOT FILE ANYTHING OR APPEAR IN COURT. AS NOTED ABOVE, ALL OF THE RETIREE AND UNION REPRESENTATIVES FULLY SUPPORT THE PROPOSED SETTLEMENT.**

If the proposed settlement is approved by the Court on May 7th, you will receive an enrollment package soon after that. That package will include a bill for your first month's contributions. It will also include the information currently available to the Company about your age, Medicare status, and dependents. You should check that information carefully when it arrives.

Certain other conditions, such as approval by various government agencies, are also required before the proposed settlement can become effective.

220

April 5, 1993
Page  15

---

If you choose to enroll in the Base Health Program, you need only pay the monthly contribution.  Do not send any money at this time.  **In order to assure continuous coverage, you must make certain to pay the first bill on or before the due date that will be set out in the bill that you will receive.** If you enroll by paying your first bill on or before the due date, your coverage will **not** be limited by any pre-existing condition limitations.

**If you fail to enroll in the Base Health Program during the initial period and seek to join the program later, your right to join may be limited by the pre-existing condition provisions of the program.  See the attached Summary Plan Description for further details.**

---

The Company will also make arrangements as quickly as possible to allow you to pay your monthly contribution by pension check-off.  We believe that the pension check-off method of payment will be to your advantage because it will ensure that you do not lose coverage because you fail to pay a monthly contribution.  If you choose to pay by check each month, however, you may do so and the Company will continue to send you monthly bills.

---

**Even if you elect the pension check-off method of payment, it will take some time for the Company to establish the necessary mechanisms.  In the meantime, you must pay the first monthly bill by check and you will continue to be billed on a monthly basis until the pension check-off procedure is in place.  If you do not pay these monthly bills your health coverage will terminate.**

---

As noted above, you will be covered by the Basic Life Insurance Program automatically even if you do not sign up for the health coverage.  You will not need to fill out any enrollment forms for the basic life insurance coverage.

If you are eligible for the optional insurance program, you will receive a separate enrollment package.

April 5, 1993
Page 16

# CONCLUSION

The proposed settlement is the result of long, difficult and complex negotiations on your behalf.  While the settlement increases your costs, the Company has agreed to provide health care and life insurance coverage for you and your families on a lifetime basis.  We believe that the only alternative to the benefit reductions you are now being asked to accept would be certain bankruptcy for Navistar, and the likely termination of your benefits.

The proposed settlement should allow Navistar to survive not only over the short term but for many years to come.  It also gives current and future retirees the assurance of knowing they now have Navistar's genuine commitment to provide lifetime health and life insurance benefits. Finally, it allows Navistar retirees to participate -- by owning 50% of the Company and receiving a potentially significant share of Navistar's future profits -- in any financial success that Navistar may enjoy in the future.

We have carefully considered all of the alternatives and have concluded that this settlement is the best resolution of these difficult circumstances.  **We therefore recommend that you do not object to the settlement.**

222

April 5, 1993
Page 17

     If the Court approves the settlement on May 7th, you will receive an enrollment package and further information.

     This cover letter has been prepared by your class representatives as listed below:

| | |
|---|---|
| Daniel W. Sherrick<br>Associate General Counsel<br>International Union, UAW<br>Detroit, MI<br><br>Counsel for UAW and its<br>Locals 6, 66, 98, 119,<br>226, 305, 402, 472, 658,<br>2274 and 2293 | Gerald B. Lackey<br>Lackey, Nusbaum, Herring,<br>Reny & Torzewski<br>Toledo, OH<br><br>Counsel to Salaried<br>Retirees Carl Potts<br>and Harold Retherford |
| Gordon A. Gregory<br>Gregory, Moore, Joakie,<br>Heinen, Ellison & Brooks<br>Detroit, MI<br><br>Counsel to International<br>Union, United Plant Guard<br>Workers and its<br>Locals 122, 4 and 134 | Betty Grdina<br>Bobulsky, Gervalis & Grdina<br>Ashtabula, OH<br><br>Counsel to Hourly Retirees<br>Art Shy, Fred Burris,<br>Clarence Nuss, John Herring,<br>Henry G. Betley and<br>Richard A. Spitler |
| Mark D. Schneider<br>Associate General Counsel<br>Int'l. Assoc. of Machinists<br>Upper Marlboro, MD<br><br>Counsel to IAM and its<br>District Lodge 28 and its<br>Locals 1471, 2819 and 2821 | Bruce Boxberger<br>Arthur E. Mandelbaum<br>Miller, Carson, Boxberger<br>& Murphy<br>Fort Wayne, IN<br><br>Counsel to Society of<br>Engineering Employees |

April 5, 1993
Page  18

| Frederick G. Cloppert<br>Cloppert, Portman, Sauter<br>& Latanick<br>Columbus, OH<br><br>Local Counsel for all<br>Unions and Retirees<br>named above | Barry A. Macey<br>Macey, Macey & Swanson<br>Indianapolis, IN<br><br>Counsel to Non-Union<br>Active Employees<br>Jack O'Neal and<br>Donald McPhearson |
| --- | --- |
| David Gore<br>Kleiman, Whitney, Wilfe & Gore<br>Chicago, IL<br><br>Counsel to United Steelworkers<br>Union and its Local 4320 | |

**EXHIBIT G**

**Judgment**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

FILED
KENNETH J. MURPHY
CLERK
93 MAY 27 AM 9:51
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

ART SHY, et al.,          :

      Plaintiffs,     :

vs.                       :          Case No. C-3-92-333

NAVISTAR INTERNATIONAL    :          Judge Walter Herbert Rice
CORPORATION, et al.,      :

      Defendants.      :

-----------------------------------------------------------------

OPINION SETTING FORTH THE FACTUAL FINDINGS WHICH
SUPPORT THE COURT'S ULTIMATE FINDING, FOLLOWING A
HEARING CONDUCTED PURSUANT TO FED. R. CIV. P. 23(e),
THAT THE SETTLEMENT AGREEMENT ENTERED INTO HEREIN IS A
FAIR, ADEQUATE AND REASONABLE RESOLUTION OF THE CLAIMS
OF THE CLASS AS WHOLE; BRIEFING SCHEDULE SET FORTH ON
OBJECTIONS OF DAVID BROADUS; SEPARATE JUDGMENT ENTRY TO
BE FILED

-----------------------------------------------------------------

This case, arising out of the de-industrialization of the
United States, presents this Court with a tragic situation, which
unfortunately and inevitably will be replicated with other
manufacturing companies and other workers.  A manufacturing
concern, Navistar International Corporation and a number of its
subsidiaries (collectively "Navistar"), "downsized" significantly
during the 1980s.  As a result, Navistar, which employed nearly
100,000 workers in the late 1970s, now has but 13,500 employees.
Navistar's annual sales went from $8.25 billion in the late 1970s
to $3.8 billion in its most recent fiscal year, 1992.  However,
when Navistar sold or closed its manufacturing facilities, it
retained its obligation to pay for health and life insurance
benefits for retirees of those manufacturing facilities so sold

226

- 2 -

or closed.  Consequently, Navistar now has 3.3 retirees for every current/active employee.[1]  A consequence of Navistar's downsizing is that it is no longer large enough to generate sufficient income to be able to afford to pay post-retirement health and life insurance benefits to its workers at the level it is currently paying, a level which the class members contend was promised them by the company for their lifetime and the lifetime of their surviving spouses.

The Court is now faced with one of the most difficult decisions presented it in nearly a quarter century on the Bench, nothing less than a classic lose/lose proposition.  Does the Court approve a settlement agreement negotiated between the parties in this class action which will result in the payment of post-retirement health and life insurance benefits at a lower level than which they are currently being paid, or does the Court reject that settlement agreement with the inevitable result being, even were the retires to succeed in convincing a court

_____

[1]That ratio is striking when contrasted with other industrial companies, such as General Motors which has less than one retiree for each employee or Caterpillar which has barely more than one-half retiree for each employee.  Indeed, Navistar's most comparable competitor, Paccar, has 25 active employees for each retiree.  See Defendants' Exhibit A.  In various memoranda filed in this case, counsel have represented that Navistar has more than 63,000 retirees, a figure which would create a ratio of retirees to active employees of almost 4.7 to 1.  Presumably, the figure of 63,000 plus refers to retired employees and surviving spouses and dependents of those retired employees, i.e., to all persons receiving retiree health and life insurance benefits.  In an exercise of caution, this Court will adopt, as a Finding of Fact, the ratio of 3.3 retired employees to those on the active roles.

- 3 -

that the company had made to each of them a valid, lifetime promise of health and life insurance benefits, that such a decision to reject will force Navistar to file a petition under Chapter 11 of the Bankruptcy Code, a proceeding from which it is not likely to emerge, an option which will result in even greater hardship imposed upon Navistar's retirees?  The Court is aware that the settlement agreement will impose hardship on many retirees.  At the very least, the settlement will provide every retiree with less than that to which he or she deems himself or herself entitled.  Nevertheless, for reasons which follow, the Court concludes that the only reasonable option is to approve the settlement agreement and to enter same as a consent decree, for the reason that the hardship which Navistar's retirees will be forced to endure if the settlement agreement is approved is substantially and significantly less than that which will be imposed upon them if the agreement is rejected.  Moreover, the settlement agreement contains provisions (in addition to a formula for profit sharing, Navistar will be required to issue sufficient shares of common stock to a retirement trust fund to give the retirees a 50% ownership in the company) which permit the retirees to share a significant portion of the value or increase which the settlement agreement and their sacrifices will create in Navistar.  Thus, if Navistar returns to a condition of profitability in the future, a significant portion of the loss of benefits imposed by the settlement agreement will be eliminated.

As a means of analysis, the Court will briefly outline the events which led the parties to enter into the settlement

- 4 -

agreement which it must now approve or disapprove, following which, the Court will turn to the central question: is the settlement agreement a fair, adequate and reasonable resolution of the claims of the class as a whole. In this latter inquiry, the Court will focus on the seriousness of Navistar's financial distress, the alternatives to the settlement agreement and the question of whether the settlement agreement could be made more fair. Finally, the Court will address some of the common themes in the objections which were filed with the Court and which were orally presented during the hearing which was held on May 7, 1993. However, before turning to those subjects, the Court will set forth the standards which govern its determination of whether to adopt or to reject the settlement agreement and the limits of its jurisdiction or power in these proceedings.

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action, such as this case, cannot be settled by the parties until the court approves their settlement agreement, after giving members of the class notice and the opportunity to express their views on the agreement of settlement.[2] A court

_____

[2]The class so certified is defined as follows:

    Present Retirees, Present Surviving Spouses, Eligible
    Dependents of Class Members; Present Eligible Former
    Employees, and Present Non-Represented Employees who
    will be eligible for Health and Life Insurance Benefits
    after the Effective Date, and all labor organizations
    which presently are or were in the past parties to
    collective bargaining agreements ("CBAs") pursuant to
    which Navistar maintains an Existing Plan.

Doc. #23 at 2.

- 5 -

cannot approve a settlement agreement in a class action unless it finds that the settlement is a fair, adequate and reasonable resolution of the claims of the class as a whole. Clark Equipment Co. v. International Union, Allied Industrial Workers of America, 803 F.2d 878 (6th Cir. 1986), cert. denied, 480 U.S. 934 (1987). It is neither required, nor is it possible for a court to determine that the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, taken as a whole, must be fair, adequate and reasonable. Id. This Court's power in the present proceeding is limited. It can only decide to accept or to reject the settlement agreement. Bronson v. Board of Education, 604 F.Supp. 68, 73 (S.D.Ohio 1984). This Court does not have the power to order modifications or adjustments to that agreement; nor does the Court have the power to rewrite the agreement to suit its preferences. Id.[3]

I. The events leading to the settlement agreement.

In February, 1992, Navistar informed the unions, particularly the UAW, which represented a number of its employees, that it would become insolvent as a result of the burden placed upon it by retiree health benefits.[4] The UAW

_____

[3]Of course, the Court can always reject the settlement agreement with suggested modifications made to the parties.

[4]Initially, Navistar was only concerned with the impact of retiree health insurance benefits. During the negotiations between Navistar and the UAW, which were held during October, November and December, 1992, the parties decided to add retiree life insurance benefits to the plan. The parties decided to do

- 6 -

approached Navistar's cries of poverty with healthy skepticism.
After initial meetings between labor and management, Navistar
agreed to open all of its books and records to the UAW and to any
consultants it might obtain, in order that they might corroborate
the company's dire predictions.  The UAW then retained Keilin and
Bloom, an investment banking firm, and the Segal Company, an
actuarial firm, as consultants to help it to determine the
veracity of Navistar's statements regarding the impact of retiree
health benefits on the future of the company.  Keilin and Bloom
is an investment banker which was formed to provide advice to
labor unions.  Ron Bloom ("Bloom"), a founding partner of Keilin
and Bloom, was the lead partner in this endeavor.  The
investigation into Navistar's financial condition commenced in
April, 1992, and continued through July, 1992.  In this
investigation, Bloom and others, who were with the UAW and Keilin
and Bloom, examined hundreds of documents and expended thousands
of hours.  No documents requested of the company, or categories
of documents, were denied the investigators.  The focus of the
inquiry was twofold: 1) to determine if Navistar was accurately
representing its financial condition; and 2) if the
representation concerning the financial condition was accurate,
to consider the various means of addressing the problem.  In
order to determine the truth of Navistar's representations, the

---

this because to reduce retiree life insurance benefits would
ultimately lessen any reduction ultimately deemed necessary in
retiree health insurance benefits, i.e., by reducing life
insurance benefits, less of a reduction of benefits would be
necessary in the area of health benefits.

- 7 -

investigators focused on the truck manufacturing industry generally, Navistar's historical financial results and the company's projections of its future financial health. Bloom and his associates subjected Navistar's projections to sensitivities analysis, a process by which they substituted different figures for those which Navistar had used as the basic assumptions of its projections, thereby assessing the accuracy of those projections. Bloom was granted complete access to Navistar's financial data. Indeed, Bloom said that he had never been granted greater access to company records, on similar tasks, during the course of his career.

Bloom's conclusions matched those of management and its advisors. All agreed that the present value of retiree health and life insurance benefits was $2.6 billion dollars. Bloom also concluded that Navistar's obligation, which is not funded,[5] created both a short-term liquidity crisis, with the probability that Navistar would become insolvent during the summer of 1993, and a long-term financial problem for the company which affected its future ability to survive. Moreover, Thomas Levy, an actuary with the Segal Company, confirmed Navistar's actuarial assumptions as to the costs of its retiree benefits. The focus then turned to the potential alternatives to Navistar's proposed solution, to wit: the drastic reduction of the retirees' health

--------

[5]Currently, Navistar spends nearly $200 million a year on retiree health and life insurance benefits; because Navistar has not set aside money to pay for these benefits, it must pay for same out of operating income.

232

- 8 -

insurance benefits.[6] All parties were in agreement that the
magnitude of Navistar's obligation to furnish health insurance
benefits to its retirees would prevent it from borrowing
sufficient funds in the debt market or from raising sufficient
capital in the equity market to finance the short-term crisis.
Moreover, all agreed that the magnitude of the short-term crisis
prevented Navistar from resolving it through reductions in
operating costs, such as seeking a reduction in the wages paid to
current employees, and that the nature of the truck manufacturing
market would prevent Navistar from growing its way out of the
long-term problem imposed by retiree health insurance benefits.
The UAW and its consultants began to focus upon the bankruptcy
alternative to Navistar's proposed solution. While bankruptcy
had the potential benefit of requiring additional parties to
contribute to a resolution to Navistar's short-term and long-term
problems, this option was rejected because the UAW and its
consultants concluded that Navistar, for reasons set forth below,
would not emerge from a bankruptcy proceeding and that the
retirees would receive less through such a proceeding than they
would through a negotiated settlement. Therefore, the parties
began to negotiate.

In July, 1992, negotiations between the parties were
terminated when Navistar wrote to all of its retirees, telling

---

[6]Indeed, the company has always taken the position that it
possessed the legal right to terminate completely and
unilaterally all retiree health and life insurance benefits other
than those called for in the current collective bargaining
agreement.

- 9 -

them that it was unilaterally altering the health insurance benefits which it was providing its retirees.[7]  At the same time, Navistar filed an action in the United States District Court for the Northern District of Illinois, seeking an order from that court declaring that it had the right, unilaterally, to alter or even to terminate the health insurance benefits which it provided to its retirees.  In August, 1992, Plaintiffs initiated this litigation, in which they sought to prevent Navistar from altering the health insurance benefits of its retirees.  In October, 1992, the parties were able to agree upon a framework which would allow settlement negotiations to continue.  Under that framework, Navistar agreed to dismiss the action pending in the Northern District of Illinois and not to reduce retirees' health insurance benefits during negotiations.  The parties also agreed that any reduction in retiree health insurance benefits would be shared by all retirees.  Consequently, negotiations resumed with literally hundreds of meetings occurring.  It was during those negotiations that the parties agreed to include reductions in retiree life insurance benefits, in order that a smaller reduction in retiree health insurance benefits would be required.

---

[7]The present value of the revised plan which Navistar sought to impose unilaterally is $550 million.  The present value of the amount Navistar is obligated to pay for retiree health and life insurance benefits under the settlement agreement is $1 billion. In addition, under the settlement agreement, the retirees will own 50% of the shares of Navistar common stock and be entitled to profit sharing, and other benefits of the enhanced value of Navistar.

- 10 -

In December, 1992, the negotiators reached a tentative agreement under which the present value of Navistar's obligation for retiree health and life insurance benefits would be reduced from $2.6 billion to $1 billion.  This tentative agreement ripened into the settlement agreement between the parties, the approval or disapproval of which is now before the Court.  The settlement agreement contains two plans, the Base Plan and the Supplemental Plan.  The Base Plan provides basic life and health insurance benefits to retirees.  Navistar is obligated to provide $1 billion to the Base Plan.  Under the Base Plan, retirees' health and life insurance benefits would be reduced.  For instance, company-provided life insurance would be reduced to a maximum of $5,000.  In addition, retirees would be required to pay monthly premiums for their health insurance, as well as deductibles and, for those under the age of 65, co-payments. However, the Supplemental Plan, which is a truly innovative concept, turns over much of the ownership of Navistar to the very retirees who must sacrifice benefits under the settlement agreement, a Plan which could well alleviate some (perhaps as much as one-half or more) of the hardship which the settlement will require retirees to endure.  The Supplemental Plan is a trust which will be administered by retirees and their representatives.  Navistar must contribute 50% of the shares of its common stock and a portion of its future profits to the trust established under the Supplemental Plan.  The income generated by the Supplemental Plan can be used, for instance, to reduce the premiums which retirees must pay for their health insurance.

- 11 -

Thus, if the retirees' sacrifices allow Navistar to return to prosperity, the retirees will own a significant share of the consequent gain in the value of the company. The $1 billion which Navistar must contribute to the Base Plan will reduce retiree health and life insurance benefits to 38% of the former value of those benefits, $2.6 billion; however, conservative projections set the value of the stock and Navistar's profits which will be contributed to the Supplemental Plan at $750 million; thus, the value of the settlement agreement could rise to 68% of the former amount of $2.6 billion, or even more.[8] Indeed, 67% of the value of the restructured Navistar will be in the Base and Supplemental Plans, and thus be owned by the retirees.

On April 5, 1993, this Court gave preliminary approval to the settlement agreement, certified this litigation as a class action for settlement purposes and directed that notice be given to the class so certified.[9] See Doc. #23. On May 7, 1993, the

---

[8]Theoretically, depending upon the extent to which Navistar returns to profitability, all of the health and life insurance benefits, reduced pursuant to the settlement agreement, could be restored to their former levels.

[9]The class so certified is defined as follows:

> Present Retirees, Present Surviving Spouses, Eligible Dependents of Class Members; Present Eligible Former Employees, and Present Non-Represented Employees who will be eligible for Health and Life Insurance Benefits after the Effective Date, and all labor organizations which presently are or were in the past parties to collective bargaining agreements ("CBAs") pursuant to which Navistar maintains an Existing Plan.

Doc. #23 at 2.

- 12 -

Court conducted a "fairness" hearing, during which proponents and opponents of the settlement agreement were given an opportunity to address the Court. After that hearing, the Court spoke twice with counsel for the parties. During the second conversation, occurring on May 12, 1993, the Court told counsel that it wanted sworn testimony addressing two questions: 1) the basic premise underlying the settlement agreement, to wit: Navistar's precarious financial condition; and 2) the allocation of burdens imposed by the settlement agreement among the class members, i.e., are those burdens fairly allocated. Accordingly, a second hearing was held on May 17, 1993, during which the Court heard testimony from six witnesses on those subjects.[10] Based upon the evidence and objections presented at the two hearings and the written objections which were filed pursuant to the notice, the Court now must consider the question of whether the settlement agreement is a fair, adequate and reasonable resolution of the claims of the class as a whole.

## II. Is the settlement agreement a fair, adequate and reasonable resolution of the claims of the class as a whole?

To understand the Court's resolution of this inquiry, one must start with an awareness of Navistar's business, its competitive position within the industries in which it operates

---

[10]The witnesses were Ron Bloom; Daniel Sherrick, Associate General Counsel for the UAW; Robert Lannert, Navistar's CFO; Thomas D. Levy, an actuary retained by the UAW; David Hirschland of the UAW and Iris Goldfein, an employee benefits specialist who was retained by Navistar.

- 13 -

and the nature of those industries generally. Navistar is a leading manufacturer of medium and heavy duty trucks and of diesel engines for use in its trucks and those of other manufacturers. Navistar's core industry, the manufacture of medium and heavy trucks, accounts for approximately 70% of its business, while the production of diesel engines is approximately 15% of that business. The remainder of Navistar's business comes from the sale of spare parts. One of Navistar's competitive strengths is its network of approximately 1000 dealers. Another important component of Navistar's competitive position is its ability to provide financing to its customers and dealers through its wholly owned subsidiary, Navistar Financial Corporation ("NFC").

The truck manufacturing industry itself is highly competitive and unlikely to experience significant growth. Navistar's competitors in the heavy truck industry include Freightliner, Paccar, GMC-Volvo-White, Mack Trucks and Ford Trucks. With the exception of Paccar, every one of Navistar's competitors is part of a large corporate enterprise and, consequently, has access to significant financial resources. Freightliner is owned by the German industrial giant, Daimler-Benz, the maker of Mercedes-Benz automobiles, among other products. Mack Trucks is owned by Renault, the French corporation which itself is owned by the French government. Of the "big three" US automakers, Ford is on the soundest financial footing. GMC-Volvo-White is backed by General Motors and the Swedish industrial giant, Volvo. Although Paccar, like Navistar, is a stand-alone company,

- 14 -

Paccar's labor force is largely non-unionized and younger than Navistar's. Given a competitive industry, and competitors positioned to take advantage of any slippage in performance, Navistar must perform at a high level of efficiency simply to maintain its position. Navistar's primary competitors in the medium truck industry are GMC and Ford, each of which is considerably larger than Navistar.

This industry is not likely to experience significant growth; rather, it is "mature," i.e., its prospects for growth track the growth rate in GNP in the United States. Its prospects for growth are further limited by the re-emergence of railroads, especially Conrail and Union Pacific, as competitors to the trucking industry, and by the success of the truck manufacturing industry itself, which has built its product to last longer and, hence, has created a market that needs heavy trucks less frequently than in previous years. As is stated above, the truck manufacturing industry is cyclical; it suffers sales and income losses when the economy is weak, and its sales and income improves when the economy strengthens. Within the industry itself, Navistar has worse results than the industry generally, particularly Paccar, when the economy is weak, and it has better results when the economy is stronger.[11]

---

[11] Navistar's ability to rebound when the economy improves was demonstrated on May 20, 1993, when Navistar announced an $8 million profit for the second quarter of its current fiscal year. The fact that Navistar had an $8 million profit for its most recent quarter does not mean that Navistar's short-term and long-term financial problems are not real, nor does the $8 million profit resolve those problems. As is discussed in greater detail below, Navistar's short-term financial problem is one of

- 15 -

The first question for the Court to resolve is whether Navistar's statements of financial distress are of the accuracy which it claims. The evidence presented to the Court establishes that Navistar faces both a short-term and a long-term problem. The short-term problem is one of liquidity; at some point during the summer of 1993, Navistar could become insolvent because it could run out of money. Bloom testified that, because of monthly swings in its cash needs, Navistar must maintain $100 million in cash on hand. This need for cash on hand is exacerbated during

---

liquidity; it faces the genuine prospect of insolvency because it will run out of cash during the summer of 1993. The testimony before the Court was that Navistar must have $100 million in cash on hand to cover its cash flow swings within a particular month. Indeed, its weekly cash requirements are $70 million. Thus, even if one were to assume the $8 million profit translates into an increase of $8 million in Navistar's cash reserves, that amount simply does not resolve its liquidity crisis, given its cash requirements. Indeed, in his declaration of May 24, 1993 (attached), Bloom stated that even though Navistar had a $3 million profit for the first half of this fiscal year (a $5 million loss for the first quarter coupled with the second quarter's $8 million profit), the company still suffered a net negative cash flow of $110 million for that period; moreover, considering the amount Navistar must pay the owners of its preferred stock, the company suffered a $11 million loss to its common shareholders over that period. In addition, the net negative cash flow, which is predicted to remain at $110 million for the year, is occurring at a time that Navistar is at a relatively high point of the business cycle and should be building cash reserves to cushion it against the inevitable downturn of the business cycle. Bloom also stated that, although Navistar's results for the second quarter might delay its short-term liquidity crisis ("might delay for a few months Navistar 'actually running out of money'"), it did not alter his opinion that a failure to approve the settlement agreement would inevitably force the company into bankruptcy. Moreover, an $8 million profit in one quarter neither addresses nor resolves Navistar's long-term financial problem, to wit: the impact of retiree health and life insurance benefits and the consequent inability to access the equity and debt markets on the company's ability to survive in the future.

240

- 16 -

July when Navistar's factories are closed for vacation, a time when none of its products are shipped and it does not receive cash.[12] Looming over the this short-term liquidity crisis is the requirement that, in December, 1993, Navistar's auditors must give their opinion as to whether Navistar is a "going concern." In other words, the auditors must state whether Navistar will remain solvent for the next twelve months. Bloom testified that, if the settlement agreement is not approved, the auditors will most probably state that Navistar will not remain solvent and is not a going concern. The consequences of such an opinion would be catastrophic. For instance, in an effort to stave off financial catastrophe in the 1980s, Navistar was able to convince its suppliers to accept payment as much as 55 to 60 days after delivery, the net result of which was to create a $500 million line of credit for Navistar.[13] If Navistar could not obtain a "going concern letter" from its auditors, its suppliers would sell only on a cash on delivery basis, effectively destroying the $500 million line of credit. Moreover, as Bloom testified, it is difficult to go through a financial crisis in private. Navistar's short-term financial crisis provides its competitors with the

---

[12]Robert Lannert, Navistar's chief financial officer testified that current projections indicated that Navistar would have only $70 million in cash during the month of July. That amount is barely enough to meet one week's obligations.

[13]This 55-60 day delay in payments must be contrasted to industry norms of 20-30 days. Because of the lengthy delay which Navistar's suppliers must endure, even the shortest additional delay in payment could cause suppliers to require cash payments on delivery.

- 17 -

opportunity to attack its network of dealers and to persuade its customers to purchase, at least in the short-term, from them rather than from Navistar.  A dealer who sells only Navistar equipment might not be willing to risk its future on Navistar's ability to withstand its short-term liquidity crisis. Indeed, Robert Lannert, Navistar's Chief Financial Officer, testified that some of its dealers who previously sold only Navistar's trucks now also sell trucks of its competitors. Additionally, customers depend on the manufacturer of trucks to stay in business so that it can supply spare parts and stand behind warranty claims.  Additionally, the continued existence of a manufacturer supports the resale value of its trucks.  Therefore, customers might not be willing to risk purchasing Navistar trucks if the company's continued existence were in question.  Thus, unless Navistar is able to convince its dealers and customers that it has solved its short-term problems, it is likely to suffer competitively both in the short-term and in the long-term.

Even if Navistar could survive its short-term liquidity crisis, its obligation to provide health and life insurance benefits to its retirees has a potentially devastating impact on its long-term prospects.  Simply stated, Navistar's long-term financial problem is the requirement that it provide such benefits to its retirees.  This fact is most graphically demonstrated by an examination of Navistar's liabilities. Retiree health and life insurance benefits, $2.6 billion, constitute approximately 60% of Navistar's current and long-term

- 18 -

liabilities.[14]  In comparison, Navistar's long-term debt is only
$189 million.  The net effect of the magnitude of Navistar's
long-term obligation to provide retiree health and life insurance
benefits is to deny it access to the equity and debt markets. For
instance, as a result of this long-term obligation, Navistar's
debt instruments are now rated as "junk bonds." Additionally,
Navistar contacted approximately 200 lenders, in an effort to
raise funds by selling some of its unencumbered assets to a
lender who would then lease them back to it.  No such company was
willing to enter into such a financing arrangement with Navistar.
Although Navistar has suffered losses in recent years, its
performance, before considering the amount it must annually pay
for retiree health and life insurance benefits, is in line with
its most comparable competitor, Paccar.[15]  The amount which
Navistar must pay for retiree health and life insurance benefits,
however, destroys its ability to compete, long-term, by denying
it access to the equity and debt markets.

Having concluded that Navistar's perceived short-term and
long-term financial problems are reality and that the problems

_____

[14]The magnitude of Navistar's obligation to provide retiree
health and life insurance benefits is also demonstrated by the
fact that such obligation is nearly 800% of its net worth.  In
comparison, GM's similar obligation is less than 200%, while that
of Cummins and Caterpillar is less than 100%.  The liability of
Paccar, Navistar's most comparable competitor, is much less than
that.  See Defendants' Exhibit B.

[15]The evidence demonstrated that Navistar's operating margins are
higher than those of Paccar; however, Navistar must contribute
6.6% of sales to retiree health and life insurance benefits.
Paccar contributes only .3% of its sales to those benefits.  See
Plaintiffs' Exhibit 1 at p. 11.

- 19 -

are significant, the Court now turns to the possible solutions to those problems. The long-term problem excludes Navistar from the debt and equity markets; therefore, the short-term liquidity crisis cannot be addressed by borrowing funds or by raising capital in the equity markets. Additionally, because of the magnitude of the short-term problem (for instance Navistar forecasts negative cash flow through 1995), operating cost reductions, such as reducing the compensation to current Navistar employees, alone, would not be sufficient to rectify the liquidity crisis. Moreover, due to the mature nature of the truck manufacturing market, Navistar will not be able to grow its way out of the long-term problem. Indeed, the only alternative to the settlement agreement now under consideration is a proceeding under Chapter 11 of the Bankruptcy Code.

If Navistar were to file for protection under Chapter 11 of the Bankruptcy Code, it would not be able to emerge as an operating company from those proceedings. Liquidation of the company would be the inevitable result. That was the conclusion of all who testified on that subject, and it is a factual finding which this Court so makes herein.[16] Bloom explained the problems which Navistar would face if it attempted to reorganize under

_____

[16]Even if Navistar were able to emerge from a Chapter 11 proceeding, it would be as a much smaller company. For instance, Bloom testified that the mere filing of a petition under Chapter 11 would reduce Navistar's value by $600 million. Thus, a reorganized Navistar would not be able to afford to pay the retirees' health and life insurance benefits, even at the reduced level offered by the Base Plan agreed to in the settlement agreement.

- 20 -

Chapter 11. **First**, Navistar's sales are dependent upon financing provided by NFC. This financing allows dealers, and in some instances customers, to finance their purchase of Navistar trucks. As a result of Navistar's relationships with its lenders, NFC would also be required to file under Chapter 11. This would impose upon Navistar the requirement that it obtain about $1 billion in debtor-in-possession financing, merely to remain as an operating concern. Bloom testified that it would not be possible to obtain that amount of financing. **Second**, the filing of a petition under Chapter 11 would have a catastrophic effect on Navistar's sales. It is simply not reasonable to believe that Navistar's dealers and customers would continue to support the company if it filed for protection under Chapter 11.

However, merely because Navistar would not emerge from a Chapter 11 proceeding does not necessarily mean that the retirees will benefit more by the settlement agreement than they would by Navistar's liquidation. However, all evidence demonstrated the retirees would suffer more under a Chapter 11 proceeding, from which Navistar did not emerge, than they will under the settlement agreement. Under such a situation, a liquidating Chapter 11 or a conversion to a Chapter 7, the retirees would be treated as unsecured creditors. Indeed, they would have the largest claim. This would make them the focal point of other creditors of Navistar and would encourage attempts to reduce the benefits paid to them. Accordingly, the initial hurdle which the retirees would have to overcome would be the resolution of the question of whether they are entitled to lifetime benefits.

- 21 -

Navistar has taken the position in this litigation and in the litigation in the Northern District of Illinois that it retained the right, unilaterally, to terminate or to alter the health and life insurance benefits which it provides to its retirees. Of course, if the retirees lost that battle, they would suffer much more under bankruptcy than they would under the settlement agreement. Bloom testified that, under those circumstances, the present value of the retirees claim would be reduced from $2.6 billion to $50 million. In contrast, the settlement agreement provides the retirees with the present value of $1 billion in health and life insurance benefits. The settlement agreement also makes the retirees owners of 50% of the shares of Navistar common stock and requires Navistar to pay a portion of its future profits to a trust for profit sharing purposes. At present, the stock and future profits are conservatively valued at $750 million. If the settlement agreement is not approved, this value will be lost to the retirees, because such a decision will force Navistar to file for bankruptcy and result in the company's ultimate liquidation.

Assuming that the retirees prevailed on the question of lifetime benefits, in other words that a court would rule that Navistar did not have the right to terminate or to alter those benefits, the value of the retirees claim against Navistar's assets would not be diminished; however, the retirees would receive less than the $1 billion they will receive under the settlement agreement. Under a liquidating Chapter 11 or a Chapter 7, the inevitable result of such a ruling or, for that

- 22 -

matter, the inevitable result of this Court's refusal to accept this settlement, Navistar's assets would be sold and the estate created by that sale distributed to Navistar's creditors. According to Bloom, the amount received from the sale of Navistar's assets would not be sufficient enough to provide the retirees the $1 billion which the settlement agreement requires Navistar to contribute to the Base Plan.[17]  Bloom testified that, although some of Navistar's assets, such as its facilities to manufacture diesel engines, would be attractive to potential buyers, on the whole, Navistar's assets would not attract generous buyers.[18]  Moreover, the sale of Navistar's assets would occur as part of a forced liquidation, akin to a "fire sale," thus further limiting the amount which would be realized.  Based upon the limited amount which would be recovered from the sale of Navistar's assets, Bloom testified that he could not foresee a set of circumstances under which the retirees would receive more in a bankruptcy proceeding than the $1 billion which Navistar would contribute to the Base Plan under the settlement agreement. As indicated, the settlement agreement (although not the

---

[17]Of course, Navistar's liquidation would destroy the value of the stock which Navistar must contribute to the Supplemental Plan.  A liquidation would also prevent the generation of future profits to be contributed to that plan.

[18]This prediction is supported by Navistar's inability to convince any lender to enter into a sale and leaseback financing arrangement with any of Navistar's assets.  Simply stated, the fact that no company would engage in such a transaction demonstrates that the lenders did not have great confidence in the value of those assets (or in the ability of the company to meet any payments required under such a transaction).

- 23 -

bankruptcy option) also creates a Supplemental Plan into which 50% of the shares of Navistar common stock will be contributed and into which Navistar must contribute a portion of its future profits. Thus, the settlement agreement provides the possibility of an even greater return to the retirees. If the sacrifices by the retirees allow Navistar to return to profitability, the retirees will share in the value so created. Through their stock ownership and the profit sharing, the retirees will own 55% of that additional value. Indeed, during the May 17, 1993, hearing, there was testimony that, based upon the current value of Navistar's shares of common stock, the Supplemental Plan will be worth $750 million. That amount could significantly reduce the hardship imposed upon the retirees by the settlement agreement, by, for instance, reducing the monthly premium which retirees will be required to pay for their health insurance. Additionally, unlike a proceeding under Chapter 11, the settlement agreement also provides the assurance that the retiree benefits, although reduced, are in fact lifetime benefits. Navistar will never again be able to take the position, which it has taken in this litigation and in the lawsuit it filed in the Northern District of Illinois, that it retained the right, unilaterally, to terminate or to alter retirees' health and life insurance benefits. Finally, Navistar's agreement to partially pre-fund its obligation to pay benefits to retirees reduces the class members' dependence on Navistar's continued financial viability for the future provision of those benefits.

- 24 -

Based upon the foregoing, this Court finds that the settlement agreement, as onerous as it may be to many retirees, is infinitely preferable to the only alternative which Navistar possesses, the filing of a petition under Chapter 11 of the Bankruptcy Code.

### III. Does the settlement agreement fairly distribute the burdens which it imposes upon and among the members of the class?

Apart from the question of whether the amount of the settlement is fair, adequate and reasonable to the class as a whole, the Court must also consider whether the manner in which the burdens of the settlement agreement are distributed among class members is also fair, adequate and reasonable. Based upon the statements made by many retirees during the hearing of May 7, 1993, and in their objections which they filed, the Court questioned whether the settlement plan provided for the fairest method of distributing the burdens imposed among class members. In particular, the Court questioned whether the parties could not design a plan which shifted the burden more to those retirees who were better able to afford the hardship and away from those retirees who were less able. For instance, many long-time retirees stated that they received monthly pension benefits which were much less than those received by more recent retirees. Thus, the Court asked the parties to address, at the hearing which was held on May 17, 1993, the question of whether it would be possible to allocate the burdens in a different manner by taking more from those with higher monthly pension amounts. Based upon

249

- 25 -

the evidence presented at that hearing, the Court finds that the manner of distributing the burdens imposed by the settlement agreement is fair, adequate and reasonable.

**First**, the evidence demonstrated that the settlement agreement contains features which are designed to alleviate some of the burden imposed upon those least able to afford it.  The most obvious of these is the cap of $5000 which is placed on life insurance benefits.  By so capping life insurance benefits, more resources could be allocated to health insurance benefits, thus reducing the contribution which retirees must pay for their health insurance.  The evidence demonstrated that the retirees with the highest life insurance benefits also received the largest monthly pension benefits from Navistar.  Indeed, those retirees, to whom Navistar currently provides life insurance policies for more than $100,000, receive annual pensions between $60,000 and $120,000.  If they so desire, those retirees can afford to purchase the additional life insurance which will be necessary to supplement the reduced $5,000 life insurance benefit which the settlement agreement will provide.  Additionally, Daniel Sherrick, Associate General Counsel for the UAW, testified that the plan was designed with other features which have the effect of distributing the burdens from those who can least afford them to those who are more able to afford these burdens. For instance, a decision was made to keep the deductible and co-insurance payments relatively low, by increasing the amount of the monthly premium, so that a health crisis would not force any

- 26 -

retiree to sell his or her car or home to pay the deductible or co-insurance.[19]

Second, the evidence demonstrated that there was no practical manner to design a program which distributed the burdens away from those who could least afford them to those who could more easily afford them. The most logical method of doing so, by basing health insurance premiums on each retiree's monthly Navistar pension, is not a practical solution because monthly pension payments are a notoriously bad predictor of a retiree's ability to afford the burdens imposed by the settlement agreement. Those retirees with the lowest monthly pension benefits are most likely to be the retirees with the shortest service with Navistar. Retirees who did not spend their entire careers working for Navistar quite possibly receive pensions from other employers. Thus, their relatively low monthly Navistar pensions do not necessarily reflect their ability to bear the burden. Moreover, the Navistar pension plans are designed to allow any worker, regardless of his or her age, to retire after thirty years of service with the company. The worker who chooses this option and retires before the age of 62 is paid a supplemental pension benefit until the age of 62, when he or she

---

[19]The retirees will pay for their health insurance through a number of mechanisms, a monthly premium, a deductible and, for retirees not eligible for medicare, a co-payment requirement. The plan could reduce the amount which retirees must pay under one of these mechanisms by increasing one or both of the others. For example, the monthly premium which the retirees will be required to pay could be reduced by increasing the deductible and/or the co-payment requirement, a choice which in this Court's opinion would increase the burden on those least able to shoulder it.

- 27 -

will be eligible to receive social security. When the retiree
reaches the age of 62, his or her pension benefit is reduced;
however, the retiree's income will remain relatively stable
because he or she will then be receiving social security. Thus,
the mere fact that a younger retiree receives a higher monthly
pension benefit than that of an older retiree does not
necessarily mean that the younger retiree is better able to
afford the burdens of this settlement agreement. Indeed, the
evidence demonstrated that, for Navistar's retirees who served
more than 30 years with the company, those younger than 62
received, on average, monthly pension benefits which are less
than the combined pension and social security benefits received
by retirees over the age of 62.

The alternative method of determining how to allocate the
burdens imposed upon the retirees by the settlement agreement is
to require each retiree to furnish all relevant information
regarding his or her ability to bear the burdens imposed by the
settlement agreement, including all of his or her income and
assets and the like. For instance, a retiree or his or her
spouse may have other sources of income, such as another pension
or income generated from savings. The administrative costs
required to pay for this solution would quickly consume any
additional amounts which those who could most afford it would be
required to pay, without, in any material fashion, reducing the
burden on the other class members. Thus, this solution is not
practical. Moreover, this approach would be subject to abuse or

- 28 -

perceived abuse, thus undercutting the perception that the plan was fair.

Third, even if a system based upon Navistar monthly pension benefits was adopted so that those who received monthly pension benefits over a given amount were required to pay twice the amount than that which is now proposed by the plan, the savings to the remainder of the class would be minimal. The evidence demonstrated that there are simply not enough Navistar retirees who receive large monthly pensions, so that, by shifting an increased burden to them, the burden on the remainder of the class would be materially reduced. If the unrealistic amount of $1,000 per month in pension benefits were chosen as the cut-off figure, the savings to those retirees above the age of 65, receiving less than that monthly benefit, would be $1.78. If the more realistic figure of $1,600 were chosen, the savings for retirees above the age of 65, receiving less than that monthly benefit, would be $.36 per month.

Therefore, based upon the foregoing, the Court concludes that the manner chosen by the settlement agreement to allocate the burdens imposed by the agreement on the members of the class, among the class members, is fair, adequate and reasonable.

IV. Other categories of objections.

Numerous other objections were presented both at the May 7th hearing and in written submissions. Although the Court has read and considered each of these objections, time does not permit it

- 29 -

to comment on each objection, individually.[20] Nevertheless, certain common themes were emphasized by the objectors, and the Court will address those common themes.

First, many objectors asserted that the problems which now confront Navistar grow out of its mismanagement over the years. This may well be true; however, whether or not Navistar's management operated poorly in the past is simply not relevant to the issues presently before the Court. Whatever the causes of Navistar's current short-term and long-term financial crises, those crises are real, and if they are not addressed by the adoption of the settlement agreement, Navistar will inevitably be forced into bankruptcy which would impose much more onerous financial burdens upon the retirees.

Second, many retirees objected to the settlement agreement, on the basis that Navistar had promised that they would have health and life insurance benefits for the remainder of their

_____

[20]The one exception to this is the objection of David W. Broadus. See Doc. #92. Mr. Broadus asserts that he is not a member of the class because his claim to continued benefits is not typical of the remainder of the class, since Navistar expressly promised him that it would not reduce his retirement benefits in order to resolve potential litigation with him. Within 20 days of the entry of this Opinion, the parties must show cause why the Court should not exclude this particular claim of Mr. Broadus from the class on the basis that his particular settlement agreement with Navistar is different from those of the class generally. Mr. Broadus may file a memorandum in opposition within 20 days thereafter. Of course, any assertion of Mr. Broadus that retirees were generally promised lifetime benefits would be typical of the claims of the class generally.

Until such time as this Court has ruled upon the merits of Broadus' objection and, therefore, the question of his inclusion within the certified class, the health and life insurance benefits of said retiree are not to be reduced by Navistar.

- 30 -

lives and those of their surviving spouses. That promise is at the crux of this litigation and the litigation which Navistar filed in the Northern District of Illinois. Navistar has taken the position that it retained the unilateral right to terminate or to alter those benefits. If this Court does not approve the settlement agreement, that issue will be decided by this Court or by a Bankruptcy Court, in connection with proceedings under Chapter 11. Even if the retirees prevail on that issue, such a victory would be indeed hollow, because it would inevitably lead to Navistar's liquidation which would cause greater hardship to the retirees than will be caused by approval of the settlement agreement. The evidence demonstrated that the retirees would receive far less for their health and life insurance benefits under a liquidation than the minimum amount guaranteed by the agreement, $1 billion.[21] Moreover, the shares of stock and profits which Navistar must contribute to the Supplemental Plan could, by current conservative estimates, increase the $1 billion by $750 million. Thus, maintaining the status quo by rejecting the settlement agreement would be disastrous to the members of the class as a whole.

Third, many objectors voiced the opinion that current employees are not contributing enough to resolve Navistar's financial crisis. This contention is simply not supported by the

---

[21]As a practical matter, "one cannot wring water from a stone." Regardless of the validity or binding nature of a promise, if there is no money to fund or to "back-up" the promise, there is no money and the promise cannot be met or fulfilled.

- 31 -

record. For instance, this contention ignores the fact that Navistar's financial problems have existed since the late 1970s. Throughout that period, active workers, both those who are represented by unions and those who are not so represented, have been called upon to sacrifice in order to insure the survival of the company. It is only with this settlement agreement that retirees have been required to contribute to Navistar's survival through a reduction in their health and life insurance benefits. However, retirees alone, through the Supplemental Plan, have the potential for restoration of all or a significant portion of their lost benefits.[22] In addition, every current Navistar employee, upon his or her retirement, will be covered by the retiree health and life insurance plan which is contained in the settlement agreement. Additionally, the health insurance plan for current Navistar employees has been altered to a managed care system which limits an employees' choice of who can provide medical care. While managed care may not require the same economic sacrifice of current employees as the settlement agreement will require of retirees, the limitations it places on freedom of choice require sacrifice, nonetheless. Navistar and the UAW have also adopted a new collective bargaining agreement which freezes employees' wages at current levels and makes

---

[22] The $1 billion which Navistar is required to contribute to the Base Plan is equal to 38% of the current value of the retiree health and life insurance benefits, $2.6 billion. With the additional value contained in the Supplemental Plan, now conservatively valued at $750 million, the 38% figure increases to 68%.

- 32 -

changes in work rules which will result in fewer workers being recalled from lay-off.[23] Thus, while retirees will be required to pay premiums for their health insurance and many will have their life insurance benefits reduced, many current employees may lose their jobs and some on lay-off will not be recalled to employment or will have their recall delayed. Finally, the cruel reality is that Navistar's long-term financial problem is the present value, $2.6 billion, of its obligation to provide health and life insurance benefits to its retirees. Thus, Navistar's long-term financial prospects can be resolved only if retiree health and life insurance benefits are adjusted.

Fourth, many retirees objected to the plan because of the financial hardship which it will impose upon them. The awful truth is that the settlement agreement will impose hardship on a group of men and women who, through their thoughtful comments, have clearly demonstrated that they do not deserve to suffer such hardship. The Court wishes that these honorable people did not have to suffer any hardship; however, the alternative to the settlement agreement, the bankruptcy and liquidation of Navistar, would be far worse for the retirees. Moreover, while the plan

---

[23]The value of the changes in the work rules alone is estimated at $50 million per year. This is a significant amount when contrasted with the amount which the retirees will contribute on an annual basis. The evidence established that the annual cost to Navistar for the retirees' health and life insurance benefits is $200 million. Under the settlement agreement, Navistar's cost for this coverage will be reduced by approximately $120 million per year. However, through the Supplemental plan, the retirees (alone) have the ability to recover much of which they lose through the settlement agreement.

- 33 -

does require that the retirees pay costs, such as premiums,
deductibles and co-payments, which they were not previously
required so to pay, the plan was designed to provide meaningful
coverage to all members of the class at a price which most, if
not all, will be able to afford.  Additionally, there is the
probability that the value contained in the Supplemental Plan
will in the future somewhat (if not completely) alleviate the
hardship imposed by the settlement agreement.[24]  Finally, as has
been indicated, Navistar's agreement to partially pre-fund its
obligation to pay benefits to its retirees reduces the class
members' dependence on Navistar's continued financial viability
for the future provision of those benefits.

Based upon all of the foregoing, the Court finds that the
settlement agreement is a fair, adequate and reasonable
resolution of the claims of the class as a whole.  This finding,
required by the Federal Rules of Civil Procedure to terminate a
class action, remains disturbing: approval of the settlement
agreement places this Court's imprimatur on a decision by the
parties to decrease significantly the health and life insurance

---

[24]There is no guarantee that the restructuring of Navistar's
obligation to provide retiree health and life insurance benefits
will cause Navistar to prosper or even to survive.  Nonetheless,
there is a reasonable probability that the restructuring will be
successful because it will reduce Navistar's fixed liabilities,
thus giving it access to the debt and equity markets which, in
turn, will give Navistar the ability to finance cash flow
problems, should that problem arise in the future.

- 34 -

benefits that current and future retirees of Navistar will enjoy during their retirement.

Difficult as it may be for the individual class members to accept, the evidence showed that retirees of companies which have gone into bankruptcy have fared significantly worse than will Navistar's retirees under this settlement.[25]  The evidence also showed that few companies now offer their retirees health insurance coverage as generous as that which will be provided under the settlement agreement;[26] likewise, the evidence showed comparable, privately available insurance is more costly and less comprehensive than that which will be provided by the settlement agreement.[27]  Moreover, the evidence showed that the present

---

[25]For instance, as a result of its liquidating bankruptcy, Eastern Airline's retirees received 10% of the value of their health and life insurance benefits.  Under similar circumstances, Pam Am's retirees received 3%.  In contrast, Navistar's retirees will receive 38% of the value of their health and life insurance benefits in the Base Plan alone, with the potential for an even greater recovery as a result of the value in the Supplemental Plan.  See Plaintiffs' Exhibit 5.  Under current, conservative valuations of the Supplemental Plan, the 38% figure could increase to 68%.

[26]The evidence demonstrated that only 20% to 30% of employers provide any health insurance to their retirees. Navistar's most comparable competitor, Paccar, is among those employers which do not provide such coverage.

[27]The most comparable medicare supplement offered by the American Association of Retired People ("AARP") would cost between $93.50 and $103.75 per month.  The settlement agreement at issue herein will require retirees who are on medicare to pay a monthly premium of $34.  For retirees who are not eligible for medicare, the difference in cost between insurance which could be purchased and the monthly premium which is required by the plan proposed under the settlement agreement would be even greater, and for those with medical conditions such as diabetes, heart disease or cancer, coverage would not be available at any price.

- 35 -

value of Navistar's obligations under the Base Plan set forth in the settlement agreement--$1 billion--is a vast improvement over the plan which Navistar initially sought to impose on its retirees.[28]  Finally, the evidence showed that Navistar itself will emerge from this settlement in a strengthened form, and that the retirees will benefit from Navistar's improved fiscal health.

The Court will not insult the class members by suggesting that they should be grateful for what the settlement agreement does provide.  That suggestion--never made by the parties--would dishonor and belittle the hard work and loyalty rendered to the company over the years of their employment by the class members and the sacrifices they will have to bear.  Rather, despite the hardship which it does impose, the Court concludes that this well negotiated settlement agreement is less burdensome to Navistar's retirees than any other realistic alternative.  The Court notes with regret, anger and frustration (feelings demonstrated by all concerned with this litigation) that the decline of this country's manufacturing base has made such negotiations and the resulting sacrifices an inevitable necessity.

By separate entry, the Court will enter judgment adopting the settlement agreement as a consent decree.

May 26, 1993

_Walter Herbert Rice_
WALTER HERBERT RICE
UNITED STATES DISTRICT JUDGE

---

[28]Initially, Navistar offered a program which was worth $550 million, without the potential for enhancement in value set forth by the settlement agreement's Supplemental Plan.

260

CABLE: "UAW DETROIT"
FAX (313) 822-4844
LEGAL DEPARTMENT PHONE (313) 926-5216

*Solidarity House*

8000 EAST JEFFERSON AVENUE
DETROIT, MICHIGAN 48214
PHONE (313) 926-5000



**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA—UAW**

OWEN F. BIEBER, *PRESIDENT*          BILL CASSTEVENS, *SECRETARY-TREASURER*

VICE-PRESIDENTS:     CAROLYN FORREST     •     ERNEST LOFTON     •     STAN MARSHALL     •     STEPHEN P. YOKICH

JORDAN ROSSEN
*General Counsel*
M. ELIZABETH BUNN
LAURA J. CAMPBELL
BETSEY A. ENGEL
CONNYE Y. HARPER
RALPH O. JONES
*Associate General Counsel*

RICHARD M. McHUGH
MICHAEL B. NICHOLSON
LEONARD R. PAGE
NANCY SCHIFFER
DANIEL W. SHERRICK
M. JAY WHITMAN
*Associate General Couns*

May 24, 1993

The Honorable Walter H. Rice
United States District Judge
United States District Court
200 West Second Street
P.O. Box 818
Dayton, OH 45402

　　　　　Re:　　Shy, et al. v. Navistar, et al.
　　　　　　　　Case No. C-3-92-333

Dear Judge Rice:

　　　　As you requested, attached please find an additional declaration from financial analyst, Ron Bloom.

　　　　This copy has not been executed by Mr. Bloom. He will be faxing an executed copy within the next few minutes. Since that copy will, however, be a "second generation" fax, I thought this might be easier to read.

　　　　Thank you very much for your consideration.

　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　Daniel W. Sherrick
　　　　　　　　　　　　Associate General Counsel

DWS/ss
opeiu494

Enclosure

cc:　　Bob Boardman
　　　　Julia Penny Clark
　　　　Fred Cloppert
　　　　David Cupps
　　　　Emily Nicklin

261

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ART SHY, et al.,

        Plaintiffs,

v.

                                Case No.: C-3-92-333
                                Judge: Walter H. Rice

NAVISTAR, et al.

        Defendants.

_____/

### DECLARATION OF RON BLOOM

Ron Bloom, pursuant to Section 1746 of the Judicial Code, 28 U.S.C. Section 1746, declares as follows:

1. My name is Ron Bloom.  I am a founding partner of the investment banking firm of Keilin and Bloom located in New York City.  I graduated from Wesiyan University in 1977 and received a Masters in Business Administration from the Harvard Business School in 1985.  I make the following statements based on personal knowledge and would be competent to so testify if called as a witness.

2. I have served as the financial advisor to the plaintiff class in the above-captioned lawsuit for over 12 months.  In that capacity, I have examined and analyzed a great deal of information regarding the financial condition of Navistar International Transportation Corp. (together with its corporate affiliates, "Navistar" or the "Company").

3. I have recently been provided with information regarding the Company's financial performance for the second fiscal quarter, which ended on April 30, and with revised forecasts for the remainder of the fiscal year.  I have had the opportunity to question financial professionals employed by the Company regarding this information and have found no reason to doubt its veracity or reasonableness.

4. Navistar achieved Net Income, before accounting for dividends of just over $7 million on its preferred stock, of approximately $8 million for the second quarter which, when added to a loss of $5 million for the first fiscal quarter, produced net income, before preferred dividends, of $3 million for the first half of this fiscal year. After taking into account the preferred dividends the Company suffered a net loss to common shareholders of $11 million for the six month period ending on April 30. While this performance may allow the Company to show a modest profit, for accounting purposes, for the current fiscal year, the Company continues to expect to show a negative net cash flow of approximately $110 million for that period.

5. These results were achieved on sales of $1.2 billion for the second quarter and sales of $2.2 billion for the first six months of the current fiscal year.

6. The results in the second quarter compare favorably with the results achieved in the same period last year and were somewhat better than those projected in the Company's Business Plan, which was prepared prior to the commencement of the current fiscal year.

7. The improvements over last year's results for both the second quarter and the first six months appear to have resulted largely from significantly higher volume of sales and profits in the Company's heavy truck segment. There has been some modest improvement in the medium truck segment as well. The improvement in medium trucks, while not as large as that seen in the heavy truck segment, was greater than anticipated in the Company's Business Plan and accounts for a large portion of the amount by which the Company's performance exceeded the projections set out in the Business Plan.

8. These results do not, unfortunately, change my view regarding the crisis facing Navistar and do not, in any material way, change my view regarding the immediacy of that crisis.

263

9. Navistar's improved performance in the recent quarters was largely expected and predicted in the Business Plan. That improvement resulted largely from normal and foreseeable oscillations in the business cycle. While the Company is performing somewhat better than projected in their Business Plan, the degree of those unanticipated improvements is not sufficient to cause me to change my conclusions or judgments regarding the Company's overall financial situation.

10. Navistar continues to face a liability that, over the long term, cannot be supported by the ability of Navistar's assets to generate cash flow. Short-term improvements, based on the high levels of demand associated with the current phase of the business cycle, do not alter this conclusion.

11. In the short term, the modest unanticipated improvements described above will permit the Company to achieve a cash balance approximately $45 million above the levels anticipated by the Business Plan. Given Navistar's size, and the severity of its current liquidity crisis, this modestly improved performance will not, in my judgment, permit the Company to avoid an imminent liquidity crisis. Navistar still faces, over the next few months, a dangerously low level of liquidity. Without the changes which would occur as a result of the proposed settlement, Navistar's cash balance is forecast to drop to as low as $70 million over the next few months, even taking into account the second quarter improvements described above. This level of cash provides insufficient liquidity for a company of Navistar's size because it leaves no meaningful margin for error. In addition, as described more fully below, projected continuing losses which will occur absent implementation of the proposed settlement will soon use up that projected cash balance.

12. The Company's most recent projections predict cash reserves rising to approximately $140 million by the end of the fiscal year. These results still represent a net cash decline of $110 million for the year. In addition, Navistar is now at a relatively high point in the business cycle for its major product segments. Because of

264

the highly cyclical nature of its business, Navistar must now be building up its cash reserves if it is to survive the inevitable troughs which will occur later in the business cycle.

13. Without the changes associated with the proposed settlement, Navistar faces continued negative cash flow for the foreseeable future. The magnitude of these anticipated losses is much greater than the modest improvement (over last year) in second quarter results described above. While the Company's better than expected performance may, as a theoretical matter, delay for a few months Navistar actually "running out of money," the magnitude of the anticipated future shortfalls makes a bankruptcy filing inevitable. Given the inevitability of this crisis, Navistar would still be very likely to take immediate action to seek bankruptcy protection despite the performance described above. While the recently-announced results may help Navistar "dodge the bullet" for a few more months, Navistar still faces a likely filing for protection from creditors under the Bankruptcy Code if it does not obtain the cost relief contemplated in the proposed settlement.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 24, 1993.

_____
Ron Bloom

opeiu494
rondec.doc

265

06/08/93   18:13   ☎1 614 464 6350          V.S.S.P. COLS.B   _____   _____   ☑002

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ART SHY, et al.,                    :

        Plaintiffs,                 :

    vs.                             :        Case No. C-3-92-333

NAVISTAR INTERNATIONAL              :        Judge Walter Herbert Rice
CORPORATION, et al.,                :

        Defendants.                 :

-------------------------------------------------------------

SUPPLEMENTAL OPINION ON ALL ISSUES SAVING AND
EXCEPTING THE OBJECTIONS OF PUTATIVE CLASS MEMBER,
DAVID BROADUS; FED. R. CIV. P. 54(b)
CERTIFICATION; DIRECTIONS TO CLERK; TERMINATION
ENTRY

-------------------------------------------------------------

This case arises out of a decision by the Defendants,
Navistar International Corporation, Navistar International
Transportation Corp., Navistar Financial Corporation, Harco
National Insurance Company, Indianapolis Casting Corporation, and
the Navistar International Transportation Corp. Health Plan
(collectively referred to as "Navistar"), to reduce the health
benefits that were being provided to their retired employees and
the retired employees' families.  Navistar announced on July 28,
1992, that it would make major changes in its existing health
benefits program for retirees and their families.  This lawsuit
was subsequently filed by the Plaintiffs, Art Shy, Fred Burris,
Clarence Nuss, John Herring, Carl Potts, Harold Retherford,
Henry G. Betley, Richard A. Spitler, Jack O'Neal and Donald
McPhearson, and on behalf of themselves and all other persons
similarly situated, and International Union, United Automobile

266

06/08/93  18:13  ☎1 614 464 6350     V.S.S.P. COLS.B _____     ☒00:

- 2 -

Aerospace, and Agricultural Implement Workers of America ("UAW") and its Local Unions 6, 66, 98, 119, 226, 305, 402, 472, 658, 2274 and 2293, International Union, United Plant Guard Workers of America ("UPGWA") and its Local Unions 4, 122 and 134, and International Association of Machinists District Lodge 28 and its Local Lodges 1471, 2819 and 2821, Society of Engineering Employees, Inc. ("SEE"), United Steelworkers ("USWA") and its Local Union 4320 on behalf of themselves and other similarly situated unions.

This matter comes before the Court on the joint submission by all named parties of a Settlement Agreement dated March 30, 1993. The parties seek approval of that Agreement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. The Court entered an Order on April 5, 1993, which (1) granted conditional certification of a class for settlement purposes, (2) gave preliminary approval to the Settlement Agreement, (3) ordered that notice be given to members of the class, (4) set a deadline of April 30, 1993, for class members to submit any objections to the Settlement Agreement, and (5) set a hearing on May 7, 1993, for the purpose of determining whether the terms of the Settlement Agreement are fair, reasonable and in the best interests of the class.

Notice in a form approved by the Court was mailed to all identified class members on April 5, 1993, and notices were also published in the newspapers of the largest circulation in the following cities, where significant concentrations of Navistar retirees live: Springfield, Ohio; Chicago, Illinois;

267

- 3 -

Indianapolis, Indiana; Fort Wayne, Indiana; and Moline, Indiana. The Clerk of the Court received objections or other comments from approximately 130 class members. The Court held a hearing May 7, 1993, at 2 p.m. At that hearing, all class members in attendance who had filed objections or who otherwise wished to make comments were allowed to address the Court.

The Court having now considered the submissions of the named parties, the Settlement Agreement and its exhibits, the objections and comments of class members, the evidence and argument presented at the hearing of May 7, 1993, the testimony adduced in open Court on May 17, 1993, and the Declarations of Ron Bloom and Robert Lennert, submitted to this Court on May 24, 1993, and otherwise being fully advised in the premises, the Court makes the following Findings of Fact and Conclusions of Law:

1. This Court has jurisdiction over the subject matter of this litigation and over all parties to this litigation, including all members of the Class as defined in paragraph 2.

2. The Class consists of the following:

    (i) Present Retirees of Navistar, Present Surviving Spouses and Eligible Dependents of Class Members;

    (ii) Present Eligible Former Employees and Present Non-represented Employees of Navistar who will be eligible for Health and Life Insurance Benefits after the Effective Date of the Settlement Agreement; and

268

- 4 -

  (iii) All labor organizations which presently are or were in the past parties to collective bargaining agreements pursuant to which Navistar maintains an Existing Plan of Health and Life Insurance Benefits for Retirees.

  3. The conditional certification of the Class that was entered on April 5, 1993, for purposes of considering the Settlement Agreement, is hereby confirmed for purposes of the Final Judgment.  All of the requirements of Rule 23(a) are satisfied, and the Class is properly maintainable under Rule 23(b)(2) or, in the alternative, under Rule 23(b)(1)(B).  All members of the Class shall be bound by this Court's Judgment, save and excepting putative class member David Broadus, the merits of whose objection to the settlement and, therefore, to his inclusion within the class certified herein shall be briefed according to prior Order of the Court, subject only to the condition that the Class certification shall be withdrawn in the event that the Final Judgment approving the Settlement Agreement is materially modified as a result of any subsequent ruling by this Court or by the Court of Appeals.

  4. The Court finds that the Notice provided to the Class of the proposed settlement was the best notice practicable under the circumstances, including both the notice by publication and the individual notice mailed directly to all class members who could be identified through reasonable effort.  That Notice provided due and adequate notice to members of the class of the proposed settlement and of these proceedings, including the opportunity to

- 5 -

register objections and to be heard by the Court on the question
of whether the Settlement Agreement should be approved.  That
Notice fully satisfied the requirements of Rule 23 of the Federal
Rules of Civil Procedure and the requirements of due process.

     5.  The Court finds that the terms of the Settlement
Agreement are fair, reasonable, and adequate in all respects, and
are in the best interests of the Class, with the possible
exception of putative class member Broadus.  In particular, the
Court finds:

          a.  The Settlement is the product of arm's-length
bargaining.  The instant suit was commenced on August 23, 1992.
Shortly thereafter, the Plaintiffs and Navistar began to discuss
a possible settlement.  Those discussions resulted in the filing
of a Stipulation and Order for Stay of Litigation and Certain
Other Matters on October 18, 1992. The parties negotiated this
settlement in frequent, intensive meetings from October, 1992,
until March 30, 1993, just before it was filed with the Court.
At all stages of the negotiations and on every issue of
consequence to the settlement, Plaintiffs' negotiators have had
access to all relevant information and have been assisted by a
full complement of expert professional advisors, including
financial analysts, investment bankers, actuaries, health
benefits specialists, and attorneys.

          b.  Sufficient investigation has been completed to
enable Plaintiffs' counsel and the Court to act intelligently.
Plaintiffs had full access to Navistar's relevant financial data,
analyses, and projections.  Further, Plaintiffs' independent

- 6 -

financial, actuarial and legal advisors had a full opportunity to challenge and test the information they received from Navistar. Thus, Plaintiffs were never forced to rely on Navistar's position or assertions in any area without having the opportunity to perform a thorough and independent evaluation.

      c.  The proponents of the settlement are counsel experienced in similar litigation.  Plaintiffs' counsel have been involved in many class action cases involving retiree health and life insurance benefits.  All of these cases involved legal issues that are similar to those presented by this case and involved thousands of retirees.  In addition, Plaintiffs' counsel has advised unions in collective bargaining with Navistar and other large industrial companies on the subjects of retiree health and life insurance benefits.

      d.  The settlement process fully protected the rights and interests of the Class members, with the possible exception of putative Class member Broadus.  With the consent of all named Plaintiffs, the UAW served as lead negotiator for the Plaintiffs and communicated regularly with the individual counsel for the other union and retiree groups.  There was no conflict of interest between the UAW and other segments of the Class.  All of the retirees, both union and non-union, receive the same treatment under the settlement.  The attorneys' fee amount had no impact on the substantive terms of the settlement agreement as it was negotiated only after those terms had been agreed.  The Class members received notice of the proposed settlement that fully

- 7 -

explained the terms. In addition, the Class members were given adequate time to prepare and present objections.

e. Plaintiffs' counsel appropriately exercised their judgment in determining that Navistar could not survive under the financial burden which would result if plaintiffs were successful in their suit. The settlement is in the best interest of the Class members (with the possible exception of putative class member Broadus) because it provides each Class member with lifetime health and life insurance benefits which, although less than the benefits the Class members were previously provided, are ultimately more valuable for several reasons. First, Navistar has compromised by giving up its legal position that it has a unilateral right to terminate or modify its retirees health and life insurance benefit programs. Second, Navistar's agreement to partially pre-fund its retiree benefit obligations reduces the Class members' dependence on Navistar's continued financial viability for the future provision of benefits. Third, the transfer of 50 percent of Navistar's common stock at the time of the settlement to the Supplemental Benefit Trust, which benefits Class members, gives the Class members a substantial equity position in Navistar in return for their benefit reductions. The assets in that Trust, plus future profit-sharing contributions from Navistar, will provide the opportunity for retirees' health benefits to be restored to their former levels, if the restructuring of retiree benefits has the expected result of allowing Navistar to return to profitable operations.

- 8 -

Absent this settlement, successful prosecution of this litigation probably would lead to the bankruptcy of Navistar and may result in the liquidation of Navistar. That result almost certainly would produce a much more substantial reduction in the level of retiree benefits and a far greater likelihood that those benefits would not continue for life.

6.   Plaintiffs request an award from Navistar of $2,836,655 in attorneys' fees and expenses, including the fees of actuaries, investment bankers, and other professionals who have advised and assisted Plaintiffs' counsel in negotiating the Settlement Agreement. Plaintiffs have submitted a detailed fee application, which demonstrates that these fees and expenses were reasonably and necessarily incurred in connection with this action. The Court finds that both the hours of work that were expended and the hourly rates are reasonable, considering the complexity of the subject of this litigation.

7.   Pursuant to the terms of the Settlement Agreement, the parties tendered to the Court the names of the five individuals to serve as the initial members and three individuals to serve as alternate members of the Supplemental Benefit Committee. The Court finds that the selection process, as outlined in the Settlement Agreement, and by which the initial members and the alternate members were selected is fair to the Class.

It is therefore ORDERED, ADJUDGED, and DECREED as follows:

1.   The Settlement Agreement dated March 30, 1993, is approved. That Settlement Agreement will bind all parties as of

- 9 -

the effective date provided therein.  All parties shall comply
with the terms of the Settlement Agreement.

    2.   In accordance with the Settlement Agreement:

      a.  As of the effective date of the Settlement
Agreement, the Class (with the possible exception of putative
class member Broadus), the Class representatives and anyone
claiming on behalf of, through or under them by way of
subrogation or otherwise shall be released, discharged, and shall
be forever barred and enjoined from instituting or prosecuting,
either directly or indirectly, against the Navistar Released
Parties or the Employers any and all rights, claims or causes of
action, whether known or unknown, suspected or unsuspected,
concealed or hidden, which they had, have or hereafter may have,
arising out of or based upon or otherwise related to any of the
claims that were or could have been asserted in this case with
respect to Health and Life Insurance Benefits, including all
rights to continuation of such benefits under expired collective
bargaining agreements, as well as any claims that the Settlement
Agreement, any document referred to in it or any action taken to
carry out the Settlement Agreement is not in compliance with
applicable laws and regulations; provided, that nothing contained
in this Judgment shall preclude the Class or the Class
representatives, or any of them, from asserting any right or
claim or bringing any action to enforce the terms of the
Settlement Agreement or the Judgment.

      b.  As of the Effective Date of the Settlement
Agreement, the Navistar Released Parties and the Employers shall

274

- 10 -

be forever released and discharged with respect to any and all rights, claims or causes of action that the Class (with the possible exception of putative class member Broadus) or anyone claiming on behalf of, through or under the Class by way of subrogation or otherwise, has, had or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to any of the claims that were or could have been asserted in this case with respect to Health and Life Insurance Benefits, including all rights to continuation of such benefits under expired collective bargaining agreements, as well as any claims that the Settlement Agreement, any document referred to in it or any action taken to carry out the Settlement Agreement is not in compliance with applicable laws and regulations.

c.  Neither the entry into of the Settlement Agreement nor the consent of this Judgment is, may be construed as, or may be used as, an admission by or against the Navistar Released Parties, the Employers, the Class, the Class Representatives, or any of them, of any fault, wrongdoing or liability whatsoever.

d.  Neither the entry into of the Settlement Agreement nor the consent to this Judgment waives or releases any right, claim or cause of action, whether known or unknown, suspected or unsuspected, concealed or hidden, which the Class or the Class Representatives, or any of them, has, had or hereafter may have with respect to (i) any matter not related to Health and Life Insurance Benefits, including, but not limited to, rights, claims or causes of action relating to workers' compensation, pension

- 11 -

benefits, sickness or accident programs, salary continuation or
disability or pension programs maintained by the Employers or any
of them or (ii) the implementation and enforcement of the
Settlement Agreement or this Judgment.

3.    Not less than two weeks before the Effective Date of
the Settlement Agreement, Navistar shall send by first-class
mail, postage prepaid, notification to the Present Retirees
(other than the Deferred Retiree Participants) and Present
Surviving Spouses, informing them of their immediate eligibility
to become participants.

4.    This Court hereby dismisses on the merits and with
prejudice to the Class and to the parties each and every claim in
the above-captioned cases, without costs to any of the settling
parties as against the other.  Except as set forth in paragraph 6
below, Defendants shall have no responsibility or liability
whatsoever for payment of fees or expenses of any kind to Class
Counsel or to any Plaintiff or Class member (with the possible
exception of putative class member Broadus).

5.    The Court hereby approves the appointment of David
Hirschland, Art Shy, Ron Bloom, John Grigsby, and Joseph "Bud"
Thompson as the initial members, and Larry Owen, Neil Springer,
and Jack L. McCaskey as alternate members of the Supplemental
Benefit Committee.

6.    Without affecting the finality of the opinion, this
supplemental opinion and the resultant Judgment in any way, this
Court hereby retains continuing jurisdiction over all parties

~ 12 ~

hereto for the purposes of implementing, enforcing and
administering the Settlement Agreement and exhibits thereto.

7.    Class counsel is awarded $2,836,655 for attorneys' fees
and expenses.

8.    In the event that the Settlement Agreement does not
become effective in accordance with its terms, then the Judgment
shall be rendered null and void and be vacated and the Settlement
Agreement shall be rendered null and void.

9.    The Opinion filed May 27, 1993, and this Supplemental
Opinion filed this date, are intended to dispose of all claims
set forth in the Plaintiffs' Complaint and all objections,
written or oral, to the Settlement Agreement between the parties,
save and excepting that of the putative class member Broadus, the
merits of whose objection to the settlement and, therefore, to
his inclusion within the class certified herein shall be briefed
according to the prior ruling of this Court.

10.    With regard to all claims and the Settlement Agreement,
as to all class members, saving and excepting that of putative
class member David Broadus, this Court concludes that there is no
just reason for delay, Fed. R. Civ. P. 54(b). This Court directs
the Office of the Clerk of Courts to enter final judgment to all
claims and objections of class members, saving and excepting that
of putative class member Broadus.

06/08/93   18:19   ☎1 614 464 6350      V.S.S.P. COLS.B                        ☒014

– 13 –

11.    The captioned cause is hereby ordered terminated upon
the docket records of the United States District Court for the
Southern District of Ohio, Western Division, at Dayton.

June 8, 1993

_____
WALTER HERBERT RICE
UNITED STATES DISTRICT JUDGE

Copies mailed to:

All counsel of record

K. Gregory Haynes, Esq.

278

06/08/93   18:19   ☎1 614 464 6350      V.S.S.P. COLS.B                    ☒015

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ART SHY, et al., | : | |
| Plaintiffs, | : | |
| vs. | : | Case No. C-3-92-... |
| NAVISTAR INTERNATIONAL CORPORATION, et al., | : | Judge Walter Herbert Rice |
| Defendants. | : | |

## JUDGMENT ENTRY

Pursuant to this Court's Opinion, filed May 27, 1993, and its Supplemental Opinion, filed June 8, 1993, this Court enters final judgment, as a Consent Decree, on all claims and as to all class members, save and excepting the objection of putative class member David Broadus, the merits of whose objection to the settlement agreement, by and between the parties, and, therefore, to his inclusion within the certified class remains to be determined, having found that, with that single exception, there is no just cause for delay and that the settlement agreed upon, by and between the parties, is a fair, adequate and reasonable resolution of the claims of the class as a whole.

Attorneys fees are awarded in the amount of $2,836,665.00.

June 8, 1993

WALTER HERBERT RICE
UNITED STATES DISTRICT JUDGE

Copies to:

All Counsel of Record

K. Gregory Haynes, Esq.

279

EXHIBIT H

June 10, 1993
REVISED 3/22/93

(Name)
(Social Security Number)
(Address)
(City, State)
(Zip)


Re: Navistar Enrollment Package

Dear (Name):

Here is your new Navistar retiree medical benefits enrollment package, which contains your first month's bill, and a pre-addressed return envelope.

**Be Sure to Read the Summary Plan Description Booklet**
**Mailed to You in April, 1993**

You'll find full details of the new program in the summary plan description negotiated as part of the settlement reached in Shy vs. Navistar ("Shy" Case Number XX; S.D. Ohio, 1992). Please take some time to look through it and refresh your memory of all plan coverage and expenses.

**About the New Program and Your Enclosed bill**

The new medical benefits program will take over immediately from the old one, and is effective on July 1, 1993 with no break in coverage - provided you return your payment on time. **Paying your first bill enrolls you in the plan.** Just detach the bottom portion of the bill and return it with your personal check, bank check or money order. **Do not send cash.** You'll receive monthly billing statements two to three weeks before each due date. To keep your coverage in force, be sure to send payment within 31 days after the due date.

In the future, you'll be able to have your premium payment deducted from your pension check if you are receiving pension payments. You'll receive the necessary forms to complete as soon as this option is available.

Enrolling in the new health benefit program also automatically provides you with the potential benefit opportunities of the supplemental plan. The details and potential benefit opportunities of the supplemental plan are described in the supplemental plan booklet that was sent to you in April.

**How Your Payment Was Determined**

The enclosed materials include your first month's bill for medical benefits. It's important to remember that your bill applies only to you and your dependent spouse (if you're married). Eligible dependent children are covered at no cost to you.

The amount of your bill is based on whether or not:

- o     you are eligible for Medicare
- o     you are covering your dependent spouse, and
- o     your dependent spouse is eligible for Medicare.

Our records show the following information for you and your family:

Eligible for Medicare                         (yes/no)

Dependent spouse                           (name)

Eligible for Medicare                         (yes/no)

Dependent child                             (name)

(repeat last line for additional dependent children)

The premium for each adult not eligible for Medicare is $70 per month. The premium for each adult eligible for Medicare is $34 per month. For example, if you are not eligible for Medicare, but your dependent spouse is eligible for Medicare, your bill would be $104 - that is $70 for you plus $34 for your spouse.

If you have any questions about your bill, call the Navistar Information Center at 1-800-972-1124

**Your Share of Medical Costs May Change in Future Years**

As you know, the cost of medical care climbs higher every year. And as the cost of medical care goes up, so does the cost of providing medical benefits to Navistar retirees. To keep pace with rising costs, your monthly payment as well as the plan deductible and out-of-pocket maximum may go up in future years.

281

**How to Decline Coverage**

If you want to decline coverage for a dependent spouse, fill out the reverse side of the bill and return it with the premium payment for yourself only. You can call the Information Center at 1-800-972-1124 for help in determining your contribution for this billing period.

If, after reviewing this program, you want to decline coverage for yourself, check the box on the reverse side of the bill and return it in the envelope provided. If you and/or spouse declines coverage at this time, your opportunity to enroll in the future will be limited by the specific conditions explained on page X of the summary plan description. You may also be subject to pre-existing condition rules.

Declining coverage under the Navistar Retiree Health Benefit Program does not affect the amount of Company-paid Retiree Basic Term Life Insurance for which you are eligible. Nor does it affect your opportunity to purchase Retiree-paid Optional Term Life Insurance.

We believe the new program provides an affordable, fair package of benefits. While it requires some change and sacrifice on your part, the new program is an important step toward keeping Navistar strong and competitive in future years - and continuing to provide the benefits you and your family need and deserve.

Sincerely,


(Name)

282

EXHIBIT I

**NAVISTAR.**

**Special Plans
Statement of Amount Due**
Administered by Aetna Life & Casualty

| | | |
|---|---|---|
| Statement Date | 12/07/92 | ❶ |
| Payments received after above date will appear on next statement. | | |
| Account Number | 000003-16-001 | ❷ |
| Identification Number | 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 | ❸ |
| Affiliation Number | 3000 | ❹ |
| Payment Due Date | 01/01/93 | ❺ |
| Billing Questions Call: ❻ | Claim Questions, Refer To Your Claim Office | |

## Account Activity

| Period Covered | Description | Amount |
|---|---|---|
| ❼ | ❽ | ❾ |
| 01/01/93  to  01/31/93 | BALANCE FORWARD | 0.00 |
| | PERIOD BILLING | 107.00 |

❿ 

**Amount Due**  |  107.00

This is the only Notice you will receive for the above Amount Due. Your cancelled check or money order stub is your receipt.

- - - - - - - - - - - Do not mail this portion / Retain for your records. - - - - - - - - - - -

**NAVISTAR.**   **Statement of Amount Due**

**⓮
"Changes"**
Please use space on reverse
side to report changes.

NAVISTAR INTERNATIONAL TRANSPORTATION CORP.

To assure proper credit, please make
your check or money order payable to:

⓫
**NAVISTAR**

⓭
000003160013000000151151515101930010700

Mail payment with this stub
in the enclosed envelope to:

⓬
**Aetna Life & Casualty**
Premium Collection, MB1L
66 Sigourney St.
Hartford, CT  06160

| | |
|---|---|
| Name: | SAMPLE, JJ |
| Identification Number: | 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 |
| Account Number: | 000003-16-001 |
| Affiliation Number: | 3000 |
| Payment Due Date: | 01/01/93 |
| Amount Due: | 107.00 |

283



## Information That Will Help Us Help You ... ⑮

- You can expect to receive your Statement Of Amount Due 2 to 3 weeks prior to each Payment Due Date.
- Report Address Changes promptly in the space provided below or call our Customer Service Telephone Number located on the front of this statement.
- To assure your payment is applied promptly to your account:
  - Mail payment in the form of a check or money order. Also include your payment stub (bottom portion of this Statement) using the enclosed pre-addressed return envelope.
  - Indicate your Affiliation Number and Identification Number on your check or money order.
  - Mail your payment and stub at least 5 business days prior to the Payment Due Date.
  - Questions regarding your Statement may be brought to our attention by calling our Customer Service telephone number located on the front of this statement or write to us at the following address:

      Aetna Life Insurance Company
      Aetna Health Plans
      Special Plans Unit, MB1K
      151 Farmington Avenue
      Hartford, CT 06156

      (Please include your Address, Telephone Number, Affiliation Number and Identification Number)

- If your Navistar Medical Plan identification card is lost or damaged, a replacement card can be obtained by calling or writing the above Aetna office. Please allow at least 3 weeks for delivery of replacement card.
- Contact the Rockford Claim Office regarding questions about claims or when seeking additional claim forms. The Claim Office telephone number appears on your insurance identification card.
- Questions regarding your Medical Plan may be obtained by referencing your Benefit Booklet or contacting the Rockford Claim Office.
- You will have 31 days from payment DUE DATE to pay the amount due or coverage will terminate as of the date through which you are paid.

### Use this space to report Changes or Cancel Coverage ⑯

## Complete Only The Sections You Wish To Change (Signature Is Required)

| Name (First, Last) | | | | |
|---|---|---|---|---|
| Street Address | | | | |
| City | | State | | Zip Code |
| Birthdate | | | | |

Cancel My Dependents Listed Below:

| Name | Relationship | Birthdate |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Have you recently become eligible for Medicare because of Disability? _____

If yes, Date Eligible: _____
(A copy of your Medicare card must be submitted to the office.)

Reminder: If your dependent children, covered by your Policy, are no longer eligible for this coverage, please cancel their coverage by completing the Change Section of this form.

☐ I decline coverage for me and all of my covered dependents. (Check box to cancel coverage)

I certify that the above information is accurate and complete. Signature _____ Date _____

**EXHIBIT J**

**[RESERVED]**

**EXHIBIT K**

**Legal Opinions**

Navistar International
Corporation

Robert A. Boardman
Senior Vice President
and General Counsel

455 North Cityfront Plaza Drive
Chicago Illinois 60611
Telephone 312 836-2252

# NAVISTAR®

July 1, 1993

Class Representatives, as named in
Schedule I attached hereto

Gentlemen:

I am the General Counsel of Navistar International Corporation, a Delaware corporation (the "Company"), and of Navistar International Transportation Corp., a Delaware corporation ("NITC"), and have represented the Company, NITC, Navistar Financial Corporation, Harco National Insurance Company and Indianapolis Casting Corporation (collectively, the "Navistar Parties") in connection with the transactions contemplated by the Settlement Agreement, dated as of March 30, 1993, and the exhibits thereto, as Amended and Restated as of June 30, 1993(the "Settlement Agreement"), in the class action of <u>Shy, et. al. v. Navistar</u>, (Civil Action No. C-3-92-333) (S.D.O.). Capitalized terms used but not defined herein shall, unless the context otherwise requires, have the meanings assigned to them in the Settlement Agreement.

I have examined the articles and certificates of incorporation, by-laws, resolutions of the Boards of Directors and shareholders of each of the Navistar Parties, the Settlement Agreement and all exhibits and documents related thereto, the side letters entered into by NITC or by Indianapolis Casting Corporation with each of its Collective Bargaining Representatives regarding participation by Present Employees represented by such Collective Bargaining Representatives in the Plan (the "Side Letters"), and such other matters of fact and law which I deemed necessary in order to render this opinion.

For the purposes of this opinion, I have assumed the authenticity of all documents submitted to the Company as originals, the conformity to the originals of all documents submitted to the Company as copies, and the authenticity of the originals of all documents submitted to the Company as copies. I have also assumed the genuineness of the signatures of persons signing all documents in connection with which this opinion is rendered on behalf of the parties thereto other than the Navistar Parties, the authority of such persons signing on behalf of the parties thereto other than the Navistar Parties, and the due authorization,

INTERNATIONAL

287

July 1, 1993
Page 2

execution and delivery of all documents by parties thereto other than the Navistar Parties. I have also assumed that the Judgment becomes Final without being modified.

Based upon the foregoing and subject to the assumptions and qualifications expressed herein, it is my opinion that:

1. Neither the execution and delivery of the Settlement Agreement by the Navistar Parties, nor the consummation of the transactions contemplated therein, will (i) violate or conflict with the articles or certificate of incorporation or by-laws of any Navistar Party or any Employer, (ii) require the consent of any person, or violate or conflict with, or accelerate the performance required under, any agreement to which any Navistar Party or any Employer is a party or by which it is bound, except where the failure to obtain such consent, or such violation, conflict or acceleration would not have a material adverse effect on the business or financial condition of the Company and its subsidiaries taken as a whole, (iii) violate or conflict with any statute, rule or regulation applicable to any Navistar Party or any Employer or by which any of them is bound, which, in the experience of the undersigned, is normally applicable to general business corporations which are not engaged in regulated business activities and to transactions of the type contemplated by the Settlement Agreement, except no opinion is expressed as to any statute, rule or regulation the violation of which would not have a material adverse effect on the business or financial condition of the Company and its subsidiaries taken as a whole, and except no opinion is expressed with respect to Part 4 of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or with respect to insurance laws and regulations applicable to HARCO National Insurance Company, (iv) violate or conflict with any order, ruling, decree, judgment or award of any court, arbitrator or government agency applicable to any Navistar Party or any Employer, except no opinion is expressed with respect to Part 4 of Title I of ERISA or (v) result in the creation of any lien, claim, security interest, encumbrance, charge, restriction or right of any kind whatsoever of any third party upon any of the properties or assets of any Navistar Party or any Employer, except where the creation of any such lien, claim, security interest, encumbrance, charge, restriction or right would not have a material adverse effect on the business or financial condition of the Company and its subsidiaries taken as a whole, and except for such liens, claims, security interests, encumbrances, charges, restrictions and rights created in connection with, or as a result of, satisfaction of the conditions set forth in Sections 12.1.6 and 12.1.12 of the Settlement Agreement;

2. No authorization or approval of any action by or any notice to or filing with, any governmental authority is presently required to be obtained or made by any Navistar Party or any

July 1, 1993
Page 3

Employer to authorize, or to make valid or legally binding, the Settlement Agreement, or is otherwise presently required in connection with the consummation of the transactions contemplated by the Settlement Agreement which have occurred under the Settlement Agreement at or prior to the time this opinion letter is delivered, except for (i) authorizations, approvals, notices and filings referred to in Section 12.1, (ii) authorizations, approvals, notices and filings required in connection with the conduct by any Navistar Party or any Employer of its business in the ordinary course, (iii) authorizations, approvals, notices and filings required under federal and state securities laws and regulations, (iv) authorizations, approvals, notices and filings under the Hart-Scott-Rodino Antitrust Improvements Act, (v) authorizations, approvals, exemptions, notices and filings under the IRC and under ERISA required in connection with the Plan, (vi) authorizations, approvals, notices and filings under any insurance laws and regulations applicable to HARCO National Insurance Company, and (vii) authorizations, approvals, notices and filings required in connection with, or as a result of, satisfaction of the conditions set forth in Sections 12.1.6 and 12.1.12 of the Settlement Agreement, and except no opinion is expressed with respect to Part 4 of Title I of ERISA.

3. Each of the Side Letters is a valid, binding and enforceable obligation of the employer executing it.

4. No provision of ERISA will result in the Settlement Agreement not being a valid, binding and enforceable obligation of each of the Navistar Parties.

Certain requests for rulings have been, or will be, submitted to the Internal Revenue Service relating to the Settlement Agreement and to the effects, if any, of the transactions contemplated therein on any Navistar Party's net operating loss carryovers and capital loss carryovers to which any such party is entitled under the Federal income tax laws, and no opinion is expressed as to such matters.

My opinion is subject to the following further qualifications:

(a) my opinion as set forth in paragraphs 3 and 4 above as to the obligations of each of the Navistar Parties is subject to the effect of bankruptcy, insolvency, reorganization, arrangement, moratorium, receivership or other similar laws affecting the enforcement of rights generally of creditors of such Navistar Party (including, without limitation, laws with respect to fraudulent transfers and conveyances);

July 1, 1993
Page 4

    (b)  the binding effect and enforceability of the Settlement Agreement and the Side Letters and the availability of injunctive relief or other equitable remedies thereunder are subject to the effect of general principles of equity (regardless of whether enforcement is considered in proceedings at law or in equity) and to the effect of laws and judicial decisions which have imposed duties and standards of conduct;

    (c)  requirements in the Settlement Agreement and the Side Letters specifying that provisions thereof may only be waived in writing may not be valid, binding or enforceable to the extent that an oral agreement or an implied agreement by trade, practice or course or conduct has been created modifying any provision of such documents;

    (d)  I have assumed the correctness of the facts forming the basis of the representations and warranties of all parties contained in the Settlement Agreement;

    (e)  I express no opinion with respect to the binding effect and enforceability of the Settlement Agreement to the extent of any limitations under applicable insurance laws and regulations; and

    (f)  with regard to paragraph 4 above, I express no opinion with respect to Part 4 of Title I of ERISA or with respect to any rules and regulations under such Part.

I render no opinion as to the laws of any jurisdiction other than the internal law of the State of Illinois and the United States of America and the internal corporate law of the State of Delaware.

This letter is limited to the specific issues addressed herein and the opinion rendered above is limited in all respects to laws and facts existing on the date hereof. By rendering this opinion, I do not undertake to advise you with respect to any other matter or of any change in such laws or facts or in the interpretations of such laws which may occur after the date hereof.

This opinion is furnished to you for your benefit in connection with the Settlement Agreement, and is not to be used, circulated, quoted or otherwise relied upon for any other purpose.

Very truly yours,

Robert H. Bostoom

# KIRKLAND & ELLIS
### A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

200 East Randolph Drive
Chicago, Illinois 60601

To Call Writer Direct
312 861-2000

312 861-2000

Facsimile:
312 861-2200

July 1, 1993

Class Representatives, as named in
Schedule I attached hereto

Ladies and Gentlemen:

We have acted as special counsel to Navistar Interna-
tional Corporation, Navistar International Transportation Corp.,
Navistar Financial Corporation, Harco National Insurance Company
and Indianapolis Casting Corporation in connection with the
transactions contemplated by the Settlement Agreement, dated as of
March 30, 1993, and the exhibits thereto, as Amended and Restated
as of June 30, 1993 (the "Settlement Agreement"), in the class
action of Shy, et. al. v. Navistar, (Civil Action No. C-3-92-333)
(S.D.O.).

We have also acted as special counsel for Navistar Finan-
cial Corporation in connection with the preparation of (i) the
Amended and Restated Credit Agreement dated as of April 26, 1993,
among Navistar Financial, the banks referred to therein and
Chemical Bank, Continental Bank N.A. and Morgan Guaranty Trust
Company of New York, as co-agents (the "Credit Agreement"), (ii)
the NFC Security Agreement, the Harco Leasing Security Agreement,
the Harco Insurance Security Agreement, the NFSC Security Agree-
ment, the NFRRC Security Agreement and the TRIP Security Agreement
and (iii) the Master Intercompany Agreement, the Amended Parents'
Side Agreement, the Tax Allocation Amendment and the Amended Tax
Allocation Agreement.  Pursuant to Section 2.01(u) of the Credit
Agreement, we delivered the opinion dated April 30, 1993, attached
hereto as Exhibit A (the "April 30th Opinion Letter").

Subject to each of the assumptions, qualifications and
limitations contained herein and in the April 30th Opinion Letter,
we hereby authorize you to rely on our opinions expressed in
paragraphs 1 and 2 of the April 30th Opinion Letter.

Denver              Los Angeles              New York              Washington D.C.

# KIRKLAND & ELLIS

July 1, 1993
Page 2


    This letter is furnished to you for your benefit in connection with the Settlement Agreement and is not to be used, circulated, quoted for any other purpose.

        Very truly yours,

        KIRKLAND & ELLIS

# KIRKLAND & ELLIS

### SCHEDULE I

Art Shy
Fred Burris
Clarence Nuss
John Herring
Henry G. Betley
Richard A. Spitler
Carl Potts
Harold Retherford
Jack O'Neal
Donald McPhearson

International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America and its Local Unions 6, 66, 98, 119, 226, 300, 407, 472, 658, 2274 and 2293

International Union, United Plant Guard Workers of America, Local Unions 122, 4 and 134, International Association of Machinists, and its District Lodge 28, and its local Lodges 1471, 2819, and 2821

Society of Engineering Employees, Inc. International Union

United Steelworkers of America, and its Local 4320 and USWA, Local 4320.

EXHIBIT A

April 30, 1993

To the Banks, Co-agents and
  Collateral Trustee Referred to Below
c/o Morgan Guaranty Trust Company
  of New York
60 Wall Street
New York, New York  10260

        We have acted as special counsel for Navistar Financial
Corporation ("Navistar Financial") in connection with the
preparation of (i) the Amended and Restated Credit Agreement dated
as of April 26, 1993, among Navistar Financial, the banks referred
to therein and Chemical Bank, Continental Bank N.A. and Morgan
Guaranty Trust Company of New York, as co-agents (the "Credit
Agreement", and together with the Notes outstanding thereunder (the
"Notes") the "Credit Documents"), (ii) the NFC Security Agreement,
the Harco Leasing Security Agreement, the Harco Insurance Security
Agreement, the NFSC Security Agreement, the NFRRC Security
Agreement and the TRIP Security Agreement (collectively referred
to herein as the "Security Documents") and (iii) the Master
Intercompany Agreement, the Amended Parents' Side Agreement, the
Tax Allocation Amendment and the Amended Tax Allocation Agreement
(collectively referred to, along with the Credit Documents and the
Security Documents, as the "Transaction Documents"). Terms defined
in the Credit Agreement or the NFC Security Agreement and not
otherwise defined herein, are used herein as defined in the Credit
Agreement or the NFC Security Agreement. This opinion is being
rendered to you at the request of our client pursuant to Section
2.01(u) of the Credit Agreement.

        In connection with the opinions hereinafter expressed,
we have examined and relied on originals or copies, certified or
otherwise identified to our satisfaction, of executed copies of
the Transaction Documents.  In addition, we have examined and
relied on originals or copies, certified or otherwise identified
to our satisfaction, of such instruments and certificates of
officers and representatives of Navistar Financial, TRIP, NFSC,
NFRRC, Harco Insurance and Harco Leasing (collectively referred to
herein as the "Credit Parties" and singularly referred to herein
as a "Credit Party"), .Navistar. Transportation and Navistar

To the Banks, Co-agents and
  Collateral Trustee Referred to
  on Page 1
April 30, 1993
Page 2

International and such other persons, and such corporate records
of Navistar Financial and Navistar Transportation, and we have made
such investigations of law, as we have deemed appropriate as a
basis for the opinions expressed below. In rendering the opinions
herein set forth, we have assumed with your permission and without
independent verification (i) the authenticity of all documents and
instruments submitted to us as originals and the conformity to
authentic original documents and instruments of all documents and
instruments submitted to us as copies, (ii) the existence of the
parties to the Transaction Documents, (iii) the power and authority
of the parties to the Transaction Documents to execute, deliver and
perform the Transaction Documents, (iv) except to the extent
expressly opined herein, that the Transaction Documents have been
duly authorized, executed and delivered by the parties thereto,
that the execution, delivery and performance of the Transaction
Documents does not violate any applicable law, that no consent,
approval, authorization, permit, license, filing or registration
is a prerequisite to the legality, validity, binding effect or
enforceability of the Transaction Documents and that the
Transaction Documents are legal, valid, binding, and enforceable
against all parties thereto and (v) that all parties to the
transactions contemplated by the Transaction Documents have acted
and will continue to act in good faith.

Based on the foregoing and subject to the further
assumptions, qualifications and limitations hereinafter set forth,
we are of the opinion that:

1. The execution, delivery and performance by Navistar
Financial of each of the Transaction Documents to which
Navistar Financial is a party have been duly authorized by all
necessary corporate action and do not violate any provision
of the certificate of incorporation or by-laws of Navistar
Transportation. The execution, delivery and performance by
(a) each Credit Party of each Transaction Document to which
it is a party, (b) Navistar Financial of the Master
Intercompany Agreement, (c) Navistar Transportation of the
Master Intercompany Agreement, the Amended Parents' Side
Agreement, the Tax Allocation Amendment and the Amended Tax
Allocation Agreement, (d) Navistar International of the
Amended Parents' Side Agreement, and (e) TRIP of the Tax
Allocation Amendment and the Amended Tax Allocation Agreement
do not (i) violate any provision of applicable law, (ii)
conflict with or result in a breach or violation of any of the

To the Banks, Co-agents and
  Collateral Trustee Referred to
  on Page 1
April 30, 1993
Page 3

terms or provisions of, or constitute a default under, or
require any waiver or consent under, any agreement listed on
Annex A attached hereto (collectively referred to herein as
the "Identified Documents"), or (iii) result under the terms
of any of the Identified Documents in the creation or
imposition of any Lien on, or any other claim or interest of
any other Person in, any asset of any Credit Party, Navistar
Transportation or Navistar International other than the Liens
created under the Security Documents.

2. Each of the Credit Documents, the NFC Security
Agreement and the Master Intercompany Agreement constitutes
a legal, valid, binding and enforceable agreement of Navistar
Financial; each of the other Transaction Documents constitutes
a legal, valid, binding and enforceable agreement of each
Credit Party which is a party thereto; each of the Master
Intercompany Agreement, the Amended Parents' Side Agreement,
the Tax Allocation Amendment and the Amended Tax Allocation
Agreement constitutes a legal, valid, binding and enforceable
agreement of Navistar Transportation; the Amended Parents'
Side Agreement constitutes a legal, valid, binding and
enforceable agreement of Navistar International; and each of
the Tax Allocation Amendment and the Amended Tax Allocation
Agreement constitutes a legal, valid, binding and enforceable
agreement of TRIP.

3. No consent, approval, authorization, permit or
license from, and no filing or registration with, any Federal,
State of Illinois or State of New York regulatory authority
is required in connection with the execution, delivery and
performance by any Credit Party of any Transaction Document
to which it is a party, by Navistar Financial of the Master
Intercompany Agreement, by Navistar Transportation of the
Master Intercompany Agreement, the Amended Parents' Side
Agreement, the Tax Allocation Amendment or the Amended Tax
Allocation Agreement, by Navistar International of the Amended
Parents' Side Agreement or by TRIP of the Tax Allocation
Amendment or the Amended Tax Allocation Agreement except (i)
the filing of financing statements and any other action
required from time to time to perfect the security interest
of the Collateral Trustee under the NFC Security Agreement and
the security interests of Navistar Financial under the
Intercompany Security Agreements which are Security Documents,
(ii) licenses and permits required in the ordinary course of

296

To the Banks, Co-agents and
  Collateral Trustee Referred to
  on Page 1
April 30, 1993
Page 4

business and (iii) such filings as may be required under federal and state securities laws.

4. Navistar Financial is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

5. Upon execution and delivery of letters in the form attached hereto as Annex B by Navistar Financial and by Continental Bank N.A. and Harris Trust and Savings Bank, respectively, a valid, perfected security interest will have been created under the Uniform Commercial Code as in effect in the State of Illinois (the "Illinois UCC") in favor of the Collateral Trustee, for the benefit of the Secured Parties, in all right, title and interest of Navistar Financial in the accounts of Navistar Financial at such banks described in such letters, all funds deposited therein from time to time, all interest earned thereon and all "proceeds" (as defined in the Illinois UCC) thereof (collectively, the "NFC UCC Deposit Account Collateral").

6. Upon delivery of the Pledged Securities evidenced by stock certificates or notes to the Collateral Trustee in the State of New York in accordance with the provisions of the NFC Security Agreement, and assuming the continued possession thereof in the State of New York or Illinois by the Collateral Trustee or an agent of the Collateral Trustee, and further assuming that neither the Collateral Trustee nor any Bank has knowledge of any lien on or adverse claim to such Pledged Securities other than Prior Permitted Liens, the Collateral Trustee will have, for the benefit of the Secured Parties, a valid, perfected security interest under the Uniform Commercial Code as in effect in the State of New York (the "New York UCC") and the Illinois UCC (together, the "Covered UCC") in all of Navistar Financial's right, title and interest in such Pledged Securities and all "proceeds" (as defined in the Covered UCC) thereof (the "NFC Pledged Collateral"), prior to all other Liens arising under the Covered UCC, except Prior Permitted Liens. Upon delivery of the Pledged Securities (as defined in the Harco Leasing Security Agreement) evidenced by stock certificates, notes or other "instruments" (as defined in the Covered UCC) (the "Harco Leasing Pledged Securities") and of the Instruments (as defined in each of the NFRRC Security Agreement, the NFSC Security Agreement and the TRIP

297

To the Banks, Co-agents and
  Collateral Trustee Referred to
  on Page 1
April 30, 1993
Page 5

Security Agreement) to Navistar Financial in the State of
Illinois or New York in accordance with the provisions of the
relevant Intercompany Security Agreement, and assuming
continued possession thereof in the State of Illinois or New
York by Navistar Financial or an agent of Navistar Financial
and, in the case of the Harco Leasing Pledged Securities,
compliance with the procedures set forth in subsections (K)
and (L) of Section 4 of the Harco Leasing Security Agreement
to the extent applicable, and further assuming that Navistar
Financial has no knowledge of any lien on or adverse claim to
such Pledged Securities or Instruments other than Prior
Permitted Liens, Navistar Financial will have a valid,
perfected security interest under the Covered UCC in all
right, title and interest of the relevant Credit Party other
than Navistar Financial (each a "Subsidiary Pledgor") in such
Pledged Securities or Instruments, as the case may be, and all
"proceeds" (as defined in the Covered UCC) thereof (with
respect to each such Subsidiary Pledgor, its "Subsidiary
Pledged Collateral"), prior to all other Liens arising under
the Covered UCC, except Prior Permitted Liens.

    7.   The NFC Security Agreement creates a valid security
interest (the "Principal NFC Security Interest" and, together
with the security interest referred to in paragraph 5, the
security interest in NFC Pledged Collateral referred to in
paragraph 6 and the security interest in other Marketable
Securities owned by Navistar Financial granted by the NFC
Security Agreement, the "NFC Security Interests") in favor of
the Collateral Trustee, for the benefit of the Secured
Parties, in all Navistar Financial's right, title and interest
in all Collateral owned by it other than the NFC UCC Deposit
Account Collateral, the NFC Pledged Collateral and the
Marketable Securities owned by Navistar Financial (the
"Principal NFC Collateral" and, together with the NFC UCC
Deposit Account Collateral, the NFC Pledged Collateral and the
Marketable Securities owned by Navistar Financial in which a
security is granted by the NFC Security Agreement, the "NFC
Collateral") to the extent the Covered UCC is applicable to
the creation of a security interest in such Collateral. Each
of the Intercompany Security Agreements which is a Security
Document creates a valid security interest (with respect to
each Subsidiary Pledgor, an "Other Subsidiary Security
Interest" and, together with the security interest referred
to in paragraph 6 with respect to such Subsidiary Pledgor,

298

To the Banks, Co-agents and
  Collateral Trustee Referred to
  on Page 1
April 30, 1993
Page 6

such Subsidiary Pledgor's "Subsidiary Security Interests") in
favor of Navistar Financial in all right, title and interest
of the Subsidiary Pledgor that is a party thereto in all
Pledgor Collateral (as defined in each such Intercompany
Security Agreement other than the Harco Insurance Security
Agreement and the Harco Leasing Assignment) or Harco
Collateral (as defined in the Harco Insurance Security
Agreement), as the case may be (with respect to each such
Subsidiary Pledgor, its "Subsidiary Collateral"), other than
such Subsidiary Pledgor's Subsidiary Collateral which
constitutes a UCC Deposit Account, funds deposited therein
from time to time, interest earned thereon or "proceeds" (as
defined in the Covered UCC) thereof, if any, Marketable
Securities, if any, or Subsidiary Pledged Collateral, if any
(such Subsidiary's "Other Subsidiary Collateral"), to the
extent the Covered UCC is applicable to the creation of a
security interest in such Collateral.

8. UCC-1 financing statements (collectively, the
"Financing Statements") have been filed with the Secretary of
State of Illinois by Navistar Financial and by each of the
Subsidiary Pledgors, and by Harco Insurance in the other
filing offices specified in Section 2(D) of the Harco
Insurance Security Agreement. The Secretary of State of
Illinois and such other filing offices include all offices in
which filings are required under the Covered UCC to perfect
the security interest of the Collateral Trustee in the
Principal NFC Collateral and the security interest of Navistar
Financial in each Subsidiary Pledgor's Other Subsidiary
Collateral, in each case to the extent such Collateral
consists of "accounts," "general intangibles" or "chattel
paper" or "proceeds" thereof (each as defined in the Covered
UCC), and such security interests are perfected under the
Covered UCC.

9. The NFC Security Interests validly secure the
payment of all future Loans made by the Banks to Navistar
Financial and all Secured Obligations of Navistar Financial
in respect of future purchases of Receivables under the MBD
Receivables Purchase Agreement and the TRIP Receivables
Purchase Agreement (such Loans and Secured Obligations being
hereinafter referred to as "Future Advances"), whether or not
at the time such Loans or purchases are made an Event of
Default or "Termination Event" (as defined in the MBD

To the Banks, Co-agents and
  Collateral Trustee Referred to
  on Page 1
April 30, 1993
Page 7

Receivables Purchase Agreement) or other event not within the control of the Banks, TRIP or the purchasers under the MBD Receivables Purchase Agreement (the "Purchasers") has relieved or may relieve them from their obligations to make such Loans or purchases, as the case may be, and are perfected to the extent set forth in paragraphs 5, 6 and 8 above with respect to such Future Advances. Insofar as the priority thereof is governed by the Covered UCC and provided that neither the Collateral Trustee nor any Bank nor any Purchaser has knowledge of any lien on or adverse claim to the NFC Collateral, the NFC Security Interests that have been perfected by filing, by taking possession or under Section 8-321 of the UCC have the same priority with respect to each Future Advances as they do with respect to Loans made, or Secured Obligations of Navistar Financial in respect of purchases of Receivables under the MBD Receivables Purchase Agreement or the TRIP Receivables Purchase Agreement made, on the date hereof.

10. Each Subsidiary Security Interest arising under a Security Document validly secures the payment of all future loans made by Navistar Financial to the Subsidiary Pledgor that is a party thereto whether or not at the time such loans are made a default or other event not within the control of Navistar Financial has relieved or may relieve Navistar Financial from any obligation to make such loans, and is perfected to the extent set forth in paragraphs 6 and 8 above with respect to such future loans. Insofar as the priority thereof is governed by the Covered UCC, and provided that, with respect to each Subsidiary Pledgor, Navistar Financial has no knowledge of any lien on or adverse claim to such Subsidiary Pledgor's Subsidiary Collateral, such Subsidiary Security Interests with respect to each Subsidiary Pledgor have the same priority with respect to future loans made by Navistar Financial to such Subsidiary Pledgor pursuant to a commitment existing on the date hereof as they do with respect to loans made on the date hereof.

The opinions expressed above are subject to the following qualifications and limitations:

(a) The validity, binding effect and enforceability of any document, agreement or other instrument and of any security interest may be limited by applicable bankruptcy,

To the Banks, Co-agents and
  Collateral Trustee Referred to
  on Page 1
April 30, 1993
Page 8

insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally (including, without limitation, preference and fraudulent conveyance or transfer laws).

(b) Rights of acceleration and the availability of equitable remedies may be limited by equitable principles of general applicability (regardless of whether enforcement is considered in a proceeding in equity or at law).

(c) The validity, binding effect and enforceability of any document, agreement or other instrument may also be limited by the general qualifications set forth on Annex C attached hereto. In addition, certain of the remedial provisions of the Transaction Documents may be further limited or rendered invalid, non-binding or unenforceable by applicable law, but such law does not, in our opinion, make the remedies afforded by the Transaction Documents inadequate for the practical realization of the benefits provided thereby, subject to the economic consequences of any delay which may arise from such limitations.

(d) With reference to the opinions expressed in paragraphs 5 through 10 above, we have assumed that the chief executive office and principal place of business of each Credit Party are and will continue to be located in Rolling Meadows, Illinois and we note that (i) the existence, continuation and scope of any secured party's interest in proceeds is limited to the extent set forth in Section 9-306 of the Covered UCC and (ii) the existence, continuation and scope of any security interest in any collateral acquired by a debtor subsequent to the commencement of a case against or by such party under the Bankruptcy Code is subject to the limitation set forth in Section 552 of the Bankruptcy Code.

(e) We have not been called upon to, and accordingly do not, express any opinion as to the various state and federal laws regulating lenders or the conduct of their business that may relate to the Transaction Documents or the transactions contemplated thereby. Without limiting the generality of the foregoing, we express no opinion as to the effect (if any) of any law of any jurisdiction other than the States of Illinois and New York in which any Bank is located which limits the rate of interest that such Bank may charge or collect.

To the Banks, Co-agents and
  Collateral Trustee Referred to
  on Page 1
April 30, 1993
Page 9

(f)  We express no opinion as to the effect, if any, of non-compliance with the Federal Assignment of Claims Act of 1940, as amended, 31 U.S.C. § 3727 and 41 U.S.C. § 15, with respect to such of the Collateral as may be subject thereto.

(g)  We express no opinion as to any law identified on Annex D attached hereto (provided, however, that this clause (g) shall not limit the scope of any opinion set forth in another paragraph of this opinion specifically as to any law identified on Annex D).

(h)  We have made no examination of, and express no opinion as to, the condition of title to any real or personal property affected by any of the Security Documents.

(i)  We have assumed that each item of NFC Collateral and Subsidiary Collateral exists, that Navistar Financial has rights in each item of NFC Collateral and that each Subsidiary Pledgor has rights in each item of Subsidiary Collateral.

(j)  The opinions expressed in paragraph 6 above are subject to the effect of: (i) Sections 9-301(4), 9-307(3) and 9-312(7) of the Covered UCC, insofar as they relate, on account of the absence of a commitment, to the security interest in the Subsidiary Pledgors' Subsidiary Pledged Collateral; (ii) the priority of federal tax liens, liens created under Title IV of ERISA and other liens and interests accorded priority under federal law; (iii) the priority of any claim (including for taxes) in favor of any state or any of its respective agencies, authorities, municipalities or political subdivisions which claim is given lien status and/or priority under any law of such state; (iv) the loss of perfection of security interests described in paragraph 6 in, and the possible priority of security interests in favor of third parties in, any property distributed with respect to or in respect of the Pledged Securities included in the NFC Pledged Collateral or the Pledged Securities or Instruments included in any Subsidiary Pledgor's Subsidiary Pledged Collateral (including, without limitation, dividends thereon) under circumstances such as those described in Section 8-321(2) of the Covered UCC; (v) Section 9-104 of the Covered UCC; (vi) the priority of security interests which may be perfected by any means other than by possession or by filing

302

To the Banks, Co-agents and
  Collateral Trustee Referred to
  on Page 1
April 30, 1993
Page 10

a financing statement under the Covered UCC and (vii) Section 364(d) of the Bankruptcy Code.

(k)  Any purported assignment of, or any transfer of any interest in, any agreement, lease or governmental approval, license or permit may be subject to restrictions upon assignment or transfer which, although not necessarily applicable to assignments intended as security, will be required to be satisfied before a secured party will be treated as an assignee thereof, except to the extent that consents to or approvals of such assignment have been obtained from the appropriate governmental body or third party.

(l) We have assumed the accuracy of the representation of Navistar Financial set forth in the second sentence of Section 5.09 of the Credit Agreement and that Navistar Financial does not intend to violate Federal Reserve Board margin regulations.

Our opinions expressed herein are limited to the laws of the States of Illinois and New York, and the Federal laws of the United States of America, which, in our experience, are normally applicable to general business corporations which are not engaged in regulated business activities and to transactions of the type contemplated by the Transaction Documents (but without our having made any special investigation as to any other laws).

Our opinions are limited to the specific issues addressed herein and are limited in all respects to documents, laws and facts existing on the date hereof. By rendering our opinions, we do not undertake to advise you of any changes in such documents, laws or facts which may occur after the date hereof or as to any future action that may be or become necessary to maintain the perfection or priority of security interests, such as the filing of new financing statements under the circumstances contemplated by Section 9-402(7) of the Covered UCC or the filing of continuation statements.

Our opinions herein have been furnished at your request and are solely for your benefit in connection with the transactions contemplated by the Transaction Documents and may not be otherwise distributed or relied upon by any other person or entity or quoted or reproduced, in whole or in part, in any other document or filed with any government agency without our prior written consent.

303

To the Banks, Co-agents and
  Collateral Trustee Referred to
  on Page 1
April 30, 1993
Page 11

except that a copy of this opinion may be delivered to any Bank or
any Purchaser and any Bank or Purchaser may file and reproduce the
opinion in connection with any proceeding involving the Transaction
Documents and the transactions contemplated thereby and except
that, to the extent required by law, each such Bank and Purchaser
may permit any regulatory agency or authority having jurisdiction
over it to examine a copy of this opinion or produce a copy of this
opinion as required in response to subpoenas or other legal
process.

                                    Very truly yours,


                              KIRKLAND & ELLIS